**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| In re: | Chapter 11 |
|---|---|
| LEISURE INVESTMENTS HOLDINGS LLC, *et al*., | Case No. 25-10606 (LSS) (Jointly Administered) |
| Debtors. | **RE: D.I. 73** |

**EDUARDO ALBOR'S VERIFIED RESPONSE TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) ENFORCING (A) THE AUTOMATIC STAY AND (B) THE COURT'S ORDER COMPELLING DEBTORS' FORMER OFFICERS AND OTHER REQUIRED PERSONNEL TO TURN OVER RECORDS AND (II) GRANTING RELATED RELIEF [ECF NO. 73]**[1]

Party in interest, Eduardo Albor (***"Mr. Albor"***), by and through undersigned counsel, files this Verified Response ("***Response***") to *Debtor's Motion for Entry of an Order (I) Enforcing (A) the Automatic Stay and (B) the Court's Order Compelling Debtors' Former Officers and Other Required Persons to Turn Over Records, and (II) Granting Related Relief* ("***Enforcement Motion***") [ECF No. 73]. In support hereof, Mr. Albor states:[2]

---

[1] Capitalize terms not otherwise defined herein shall have the meaning ascribed to them in the Verified Response.

[2] Contemporaneously with the filing of this Response, Mr. Albor has filed his *Verified Response to Debtor's Motion for Entry of an Order (I) Compelling Debtors' Former Officers and Other Required Persons to Turn Over Records and (II) Granting Related Relief*, ("***Verified Response***") pursuant to which Mr. Albor describes in detail the relevant factual background and procedural posture that lead to the Noteholders' illegitimate attempt to wrest control of the Dolphin Group Mexican Entities from their current and legitimate management while Controladora Dolphin, S.A. de. C.V. ("***Controladora Dolphin***") was subject to injunctive precautionary measures entered by the Second Bankruptcy Court in Mexio in the *Concurso Mercantil* proceeding on January 28, 2025. In the interest of brevity, the factual background and procedural posture set forth in the Verified Response is fully incorporated herein.

**PRELIMINARY STATEMENT**

Immediately upon appearing in these jointly administered bankruptcy cases, Mr. Albor directed the undersigned to cooperate with Debtors' counsel to develop a procedure by which any records of the U.S.-Based Dolphin Group Entities that may be in Mr. Albor's possession, custody or control, and that are required to be turned over pursuant to 11 U.S.C. § 542(e) and this Court's Interim Order [ECF No 38], could be delivered to Debtors and their representative, Mr. Wagstaff.

Additionally, Mr. Albor is willing to allow Mr. Wagstaff and his staff access to Mr. Albor's building (*in which the Debtors hold no possessory interest whatsoever*)[3] provided that counsel for Mr. Albor and/or Controladora Dolphin is present to supervise the access and monitor when and how records are reviewed. This safeguard is necessary because the building also contains Mr. Albor's personal and confidential records, business records of non-debtor entities, and records belonging to the Dolphin Group's Mexican Entities. Accordingly, the undersigned requested that Debtors provide a list identifying the operational and financial records they believe are needed — and that are not already within Debtors' possession, custody, or control — particularly given that Debtors already possess the U.S.-based Dolphin Group properties, which themselves contain operational and financial records related to those properties. To date, Debtors have failed to respond to this request.

To be clear, Mr. Albor remains willing to cooperate with Debtors to turn over relevant records and/or provide access to Mr. Albor's building as described herein in compliance with this

[3] Debtors repeatedly claim they have a possessory interest in the so-called "Dolphin Group Headquarters" in Cancún. However, they proceed from a false assumption that there is a lease between Controladora Dolphin and Mr. Albor, giving the Debtors a possessory interest in such "headquarters." Debtors are mistaken. There is no such lease, and the building in which certain (but not all) Dolphin Group records are held belongs to Mr. Albor personally, and that building also has Mr. Albor's personal records, the records of non-debtor companies and the Dolphin Group Mexican Entities where are subject to precautionary measures of the Tenth Civil Court in Mexico City.

Court's Interim Order and 11 U.S.C. § 542(e), provided that doing so does not compromise Mr. Albor's rights, jeopardize his personal or confidential non-debtor information, or conflict with applicable orders of the Mexican courts, Mexican law, or his fiduciary obligations to the Dolphin Group's Mexican entities.[4]

That said, in addition to his Verified Response (filed contemporaneously herewith), Mr. Albor is compelled to specifically respond to the Enforcement Motion and point out the incorrect and/or misleading statements of fact or arguments of law set forth therein.

**RESPONSE**

1. Notwithstanding the fact that this Court has set a final hearing on *Debtor's Motion for Entry of an Order (I) Compelling Debtors' Former Officers and Other Required Persons to Turn Over Records and (II) Granting Related Relief* ("***Turnover Motion***") [ECF No. 7] for May 5, 2025 – a mere 3 business days from the date set for the hearing on the Enforcement Motion – Debtors have forced an unnecessarily expedited hearing on the Enforcement Motion and Turnover Motion for April 29, 2025 at 9:00 a.m.[5] It appears that the only reason Debtors forced this expedited hearing is to harass and intimidate Mr. Albor, because the Enforcement Motion is devoid of *any* factual bases for an expedited hearing so close to the May 5, 2025 hearing on the Turnover Motion.

[4] Controlodora Dolphin S.A. de C.V., Aqua Tours, S.A. de C.V., Dolphin Austral Holdings S.A. de C.V., Promotora Garrafón, S.A. de C.V., Viajero Cibernético S.A. de C.V., Ejecutivos de Turismo Sustentable S.A. de C.V. and Dolphin Capital Company, S. de R.L. de C.V. ("***Dolphin Group Mexican Entities***") (all currently included as Debtors in the above-captioned jointly administer cases under corporate authority that is not only challenged but suspended and voided pursuant to the April 10 Suspension Order) (defined in the Verified Response).

[5] Debtors initially sought to have the hearing on the Enforcement Motion on Friday, April 25, 2025, but never bothered to meet and confer with undersigned to determine if the undersigned counsel was even available – which the undersigned was not. Notwithstanding, in an effort to be cooperative with the Debtors alleged need for expedited relief, Mr. Albor agreed to the expedited hearing date on April 29, 2025.

2. Indeed, it appears the only substantive basis for the expedited relief requested is the fact that Mr. Wagstaff and his staff illegally trespassed and seized control of Mr. Albor's building under the mistaken belief that (1)Mr. Wagstaff was an authorized representative of the Dolphin Group Mexican Entities, and (2) one such entity, Controladora Dolphin, had a possessory interest in Mr. Albor's building. As further described below, Mr. Wagstaff was wrong on both counts, and that is precisely why the District Attorney in Cancún, after an investigation, authorized the state police to trespass and remove Mr. Wagstaff and his staff from Mr. Albor's building, and return possession of the building to Mr. Albor.

3. Clearly, Debtors are frustrated that Mr. Albor and the Dolphin Group Mexican Entities are exercising their due process rights under Mexican law. But all of the actions taken by the Noteholders on March 28, 2025, to depose Mr. Albor and the legitimate management of the Dolphin Group Mexican Entities, occurred *well after the precautionary measures were put in place by the Concurso Mercantil court on January 28, 2025*.

4. The Noteholders knew about those precautionary measures but chose to ignore them by deposing Mr. Albor and his board and installing Mr. Strom on March 28, 2025, who promptly filed these jointly administered bankruptcy cases on March 31, 2025.

5. Worse, as noted in Mr. Albor's Verified Response, in their rush to seize control of the Dolphin Group, Mr. Albor contends that the Noteholders failed to comply with the terms of the operating and security agreements which give them the right to exercise a "board flip" in the first place. Debtors have argued they did comply with the terms of such agreements. But where there is a dispute regarding corporate authority of a company, no court can simply take the word of one side or the other. Rather, the parties to such a dispute must litigate the matter before a court of competent jurisdiction, and in this case, the appropriate courts are those of Mexico.

6. The ability of the Noteholders to exercise their "board flip" rights, when and how they did, is very much in dispute. Mr. Albor and Controladora Dolphin contend that (i) the Noteholders failed to follow the strict requirements of the operating and security agreements to exercise their default rights, (ii) obtained shareholder resolutions that were not unanimous because Mr. Albor was not present and did not vote, and (iii) acted without authority because the precautionary measures of the *Concurso Mercantil* were in place.

7. Specifically, the precautionary measures of the *Concurso Mercantil* court suspended, among other things, "all judicial and extrajudicial enforcement proceedings" against Controladora Dolphin's assets and provided other related injunctive relief. This is precisely why there is so much "contentious and ongoing litigation"[6] in Mexico related to these issues which have caused Debtors to seek this Court's approval to pay $300,000 in advance retainers to Mexican counsel.

**A. Debtors Attempt to Minimize the Validity and Effect of the April 10 Suspension Order, While Inflating the Validity and Effect of the April 4 Order, is Misplaced**

8. The Enforcement Motion appears predicated not only on a misunderstanding of the facts, but also the "validity and effect" of orders entered by Mexican courts.

9. For example, Debtors attempt to minimize and challenge the validity and effect of the April 10 Suspension Order[7] by arguing in their Enforcement Motion that the April 10 Suspension Order (Docket No. 256/2025) was obtained *ex-parte* without the prior knowledge of Debtors.[8] But Debtors neglect to advise the Court that the April 4, 2025 Order (Docket No.

[6] *See* Debtors' Motion for Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code Authorizing the Debtors to Pay Advance Retainers to Mexican Counsel ("***Retainer Motion***") [ECF No. 74] at p. 1.
[7] Dismissively referred to as the "*Provisional Order,*" as if the April 4 Order is not likewise "provisional" by Debtors' definition.
[8] Enforcement Motion at ¶15, fn. 6.

222/2025), upon which Debtors rely, **was also obtained *ex-parte*, without the prior knowledge of Controladora Dolphin or Mr. Albor and from precisely the same Mexican Court and Judge (Hon. Rodrigo Cortés Rodríguez Toledano) that entered the subsequent April 10 Suspension Order**.

10. Moreover, the April 4 Order is already subject to challenge in an Amparo proceeding initiated by Mr. Albor and Controladora Dolphin (Docket No. 354/2025) along with the related order of the First Commercial Court of Cancún (Docket. No. 39/2025) which sought to enforce the April 4 Order.

11. Importantly, neither the April 4 Order nor the enforcement order from the First Commercial Court of Cancún were provided to Controladora Dolphin or Mr. Albor prior to Mr. Wagstaff's illegal and illegitimate hostile seizure of Mr. Albor's office building.

12. Thus, it is unfortunate to observe Debtors' attempt to minimize the "validity and effect" of the April 10 Suspension Order while simultaneously inflating the validity and effect of the April 4 Order. The simple truth is that both the April 4 Order and the April 10 Suspension Order are of equal validity but unfortunately conflict with each other. Accordingly, the issue of their validity and effect can only be, and will be, resolved by resort to the appellate process of the Mexican courts.

**B. Mr. Wagstaff Illegally Trespassed and Occupied Mr. Albor's Building and was Legally Removed as a Result**

13. In support of their Enforcement Motion, Debtors antiseptically assert that Mr. Wagstaff, with the assistance of Mexican counsel, a security detail, and other local authorities "gained access to and control of the Headquarters in accordance with the Injunction."[9] Further, Debtors argue that that "the Former CEO returned to the Headquarters accompanied by twenty

[9] Enforcement Motion at ¶ 19.

armed individuals purporting to be state police officers." And "the Former CEO and his entourage forcibly entered the Headquarters and retook possession." [10]

14. The reality of what occurred at Mr. Albor's building on April 11, 2025, is in stark contrast to Mr. Wagstaff's declaration for a few reasons. First, it was Mr. Wagstaff and his entourage that were threatening and forcibly and illegally took possession of Mr. Albor's building. Mr. Wagstaff apparently relied upon the authority granted to him in the April 4 Order and the subsequent Order of the First Commercial Court of Cancún that had neither been served on or seen by Mr. Albor or management of the Dolphin Group Mexican Entities. However, the April 10 Suspension Order and its precautionary measures precluded Mr. Wagstaff from taking any action with respect to seizing the assets or property of the Dolphin Group Mexican Entities.

15. Second, Mr. Wagstaff acted on the mistaken belief that Debtors had a possessory right to enter Mr. Albor's building based on a further mistaken belief that Controladora Dolphin had a lease with the building owner. The fact is, there is no such lease or possessory interest held by *any* Dolphin Group entity in Mr. Albor's building.

16. Third, Mr. Albor did not, as suggested by Debtors and Mr. Wagstaff, resort to self-help and forcibly remove Mr. Wagstaff and his staff from the building with the assistance of questionable armed individuals. Instead, Mr. Albor resorted to legal process when confronted with the illegal trespass and occupation of his building. Mr. Albor filed a complaint with the District Attorney of Cancún, who thereupon conduced their own investigation, reviewed the documents provided by Mr. Albor proving that he owned the building, and then instructed *real* state police officers (not "twenty armed individuals *purporting* to be state police officers" as argued by Debtors)[11] to accompany Mr. Albor to his building whereupon the state police officers returned

[10] Id.
[11] Enforcement Motion at ¶19, Declaration of Mr. Wagstaff at ¶ 28 (emphasis added).

possession of Mr. Albor's building to him. Accordingly, it is ironic that Debtors seek to cast Mr. Albor's actions in a negative light, *when Mr. Albor is the only party that acted under actual legal authority on April 11, 2025*.

17. Debtors argue that, for safety concerns, the Riveron team did not attempt to re-enter the building, without ever advising this Court that the real reason they could not re-enter the building is because they were illegally trespassed and removed pursuant to the authority of the District Attorney of Cancún and the *real* state police (not the municipal police that accompanied Mr. Wagstaff and his private security force when he illegally trespassed into Mr. Albor's building).

**C. Mr. Albor and the Dolphin Group Mexican Entities are Complying with Mexican Court Orders by Preventing Mr. Wagstaff from Asserting Dominion or Control Over the Assets, Books and Records of the Dolphin Group Mexican Entities**

18. The Debtors further argue in their Enforcement Motion that certain of the Debtors' employees have been instructed not to provide the CRO and the Riveron team with access to information, and security protocols have been implemented to block emails from the Riveron team to certain of the Debtors' existing personnel.

19. However, Mr. Albor and the Dolphin Group Mexican Entities are simply complying with the April 10 Suspension Order and before that, they were complying with the terms of the precautionary measures of the *Concurso Mercantil* court before it was dismissed.

20. Thus, it would be improper for this Court to enforce the automatic stay against Mr. Albor in a way that would extinguish his due process rights in the Mexican courts, or conflict with the valid orders of a Mexican Court.

**D. Debtors Advised This Court They Only Seek Basic Financial and Operational Records Pursuant to 11 U.S.C. § 542(e), but Their Actions Show Otherwise**

21. At a hearing on April 2, 2025, counsel for the Debtors advised this Court that Debtors were not on a "fishing expedition to garner documents in support of claims and causes of

action or other matters which might impact third party economic rights or claims or defenses" and that Debtors only seek records related to the Debtors' property or financial affairs to "operate the business."

22. However, their actions to illegally seize the property of Mr. Albor (not Controladora Dolphin or any other Dolphin Group Entity) belies this assertion.

23. In fact, Debtors, through Mr. Strom and Mr. Wagstaff, are clearly engaged in a strategy to use the *imprimatur* of this Court to nullify the authority and jurisdiction of the Mexican courts and make their disputed authority to replace the management and control of Dolphin Group Mexican Entities a *fait accompli*, by seizing control of the books and records of not only the U.S.-based Dolphin Group Entities, but the Dolphin Group Mexican Entities which are subject to, and under the protection of, precautionary measures entered by a Mexican court.

24. Debtors argue they must have "access to and control of the Headquarters in Mexico" to "schedule claims, assess liabilities, obtain contracts and vendor lists, prepare and file tax returns, administer self-insured health benefit and other insurance policies, process accounts payables and receivables, manage financial transactions, administer payroll, and otherwise operate their businesses."[12]

25. Aside from the fact that none of this information is required 3 business days prior to the May 5, 2025, hearing, Debtors' enumerated reasons for needing immediate access to such records do not reveal exactly what "records" Debtors need with any specificity.

26. For example, Mr. Strom and/or Mr. Wagstaff are already in possession of U.S.-Based Dolphin Group properties and presumably have access to operational and financial records of those properties as a result.

[12] Enforcement Motion at ¶16.

27. Moreover, there is no argument in the Enforcement Motion that employees are not being paid, or that marine animals are not being cared for or fed at the U.S.-based Dolphin Group Entities as a result of not having access to Mr. Albor's building, and tax return filings can be extended. Conversely, Mr. Albor and the legitimate management of the Dolphin Group Mexican Entities remain in control of those entities, ensuring that employees are paid, and marine animals are being fed and cared for.

28. Ironically, it is Debtors' actions that are causing real harm to the Dolphin Group. For example, Debtors have been contacting vendors, alleging they have control of the Dolphin Group Mexican Entities. But since the corporate control issue is contested and currently being litigated in Mexican courts, Mr. Albor and the legitimate management of the Dolphin Group Mexican Entities have been forced to correct the misinformation being provided to vendors by Debtors' representatives. This in turn is causing confusion on the part of the vendors, imperiling the revenue-generating business relationships between Dolphin Group Mexican Entities and their vendors, with some vendors threatening to move their business elsewhere while the dispute between the competing management teams is litigated.

29. Accordingly, to prevent further damage to the business of the Dolphin Group entities, Debtors should be ordered to work with Mr. Albor and his counsel to develop a procedure for access to basic operational and financial records that will not jeopardize Mr. Albor's personal and confidential information or the records of non-debtor entities. With respect to the records of the Dolphin Group Mexican Entities, those are subject to the precautionary measures of the Tenth Civil Court pursuant to the April 10 Suspension Order. Once the appellate procedure plays out with respect to that order and the April 4, 2025 Order, Mr. Albor, the Dolphin Group Mexican Entities and Debtors will have sufficient guidance for further compliance with this Court's Orders.

**E. Debtors Recitation of Generic Law on the Effect of the Automatic Stay is Misplaced**

30. Debtors' Enforcement Motion goes to great lengths to provide a summary of general law of the scope and effect of the automatic stay – something that both this Court and counsel in this case are well familiar. But the issue in this case is not the effect of the automatic stay in a vacuum; rather, it is whether The Dolphin Group Mexican Entities are even properly debtors in these jointly administer cases.

31. The entire presentation to this Court from the Debtors, from first day motions to now, presumes Mr. Strom had authority to act on behalf of the Dolphin Group Mexican Entities because the Noteholders properly exercised their right to "flip the board" and remove Mr. Albor and his management team from the Dolphin Group Mexican Entities.

32. This is the subject of fierce disagreement and multiple actions before Mexican courts. Indeed, the Tenth Civil Court has issued what can only be described as conflicting authority, because its April 4 Order and the April 10 Suspension Order are clearly at odds with each other. Only the appropriate Mexican appellate court can resolve these contradictions.

33. Debtors simply fail to address how this Court can possibly force Mexican citizens and Mexican companies under the injunctive protection of Mexican courts to (1) give up their due process rights under Mexican law and (2) violate the orders of Mexican courts or Mexican law.

34. And while Mr. Albor and The Dolphin Group Mexican Entities will comply with the orders of Mexican courts hearing the appeals and Amparo proceedings, they cannot simply ignore the Mexican courts and Mexican law.

35. Accordingly, this Court should abstain from hearing any disputes regarding the rights and obligations of Mexican citizens and Mexican companies. The Mexican courts are fully capable and competent to resolve these issues. And much like the Court would do for a state court

litigation based on non-bankruptcy law, the Court can simply await the ruling of the Mexican courts regarding the corporate control issues and act accordingly.

36. For example, if Mr. Albor and the Dolphin Group Mexican Entities prevail on their argument that the Noteholders improperly deposed Mr. Albor and the Dolphin Group board, then a motion to dismiss the bankruptcy case of the Dolphin Group Mexican Entities pursuant to 11 U.S.C. §1112(b) will almost immediately be filed with this Court. Moreover, this Court will presumably give deference to the Mexican court rulings, otherwise there would be a risk of inconsistent rulings between this Court and the Mexican courts, and the principles of international comity would be abused.

37. Conversely, if the Mexican courts find that the Noteholders acted properly, then Mr. Albor and the Dolphin Group Mexican Entities will have no choice but to comply with orders of the Mexican Courts (while preserving their rights to appeal, or initiate Amparo proceedings regarding orders they believe were improvidently granted – just as they are doing now).

38. Accordingly, it would be premature, inappropriate and contrary to international comity principals for this Court to enter orders against parties under the protection of injunctive precautionary measures entered by sovereign Mexican courts.

**F. The Court Should Order the Parties to Cooperate on Development of an Access Protocol**

39. This Court is not without the ability to fashion relief that accommodates both parties' positions. Simply put, the Court can, and respectfully should, order the Debtors to provide Mr. Albor with a list of the records it needs for compliance with 11 U.S.C. §542(e) that Debtors do not already have by virtue of their possession of the U.S.-based Dolphin Group properties.

40. The parties can then fashion an "access protocol" for Mr. Wagstaff and/or his staff to obtain such records, and if necessary, provide access to Mr. Albor's building to review and

collect or copy such records. If such access to Mr. Albor's building proves necessary, then Mr. Albor simply requires his personal and confidential records and the records of non-debtor companies to be protected, his counsel and/or that of Controladora Dolphin be present during such access which will be provided during regular business hours and in a way that does not disrupt regular business operations, and any access to the records of the Dolphin Group Mexican Entities would be given only if, and to the extent granted, by the Mexican courts.

41. To the extent the parties cannot agree upon specific records or access, the parties can always come back to the Court to clarify the scope of its Order in this regard.

42. Debtors have not argued that employees are not being paid, or marine animals not being cared for or fed since they obtained their DIP Financing. Accordingly, there is no reason to allow Debtors to seize total control of the Dolphin Group Mexican Entities' records – primarily because doing so would violate the precautionary measures entered by a Mexican court, but also because doing so would be inconsistent with Debtors' argument that it is only seeking information pursuant to the narrow confines of 11 U.S.C. § 542(e), and not for the purpose of going on a fishing expedition to build its cases against Mr. Albor and/or the management of the Dolphin Group Mexican Entities.

## CONCLUSION

In summary, without waiving any legal or equitable rights regarding Mr. Strom and Mr. Wagstaff's control of the Dolphin Group Mexican Entities, Mr. Albor is willing to work with the Debtors to develop a protocol for access to the requested Records of the U.S.-based Dolphin Group companies pursuant to the narrowly limited scope of 11 U.S.C. § 542(e) and provided any such procedure does not require Mr. Albor to act contrary to Mexican law or validly issued orders of the Mexican courts.

WHEREFORE, Mr. Albor respectfully requests an Order of the Court (i) narrowly tailoring any Final Order on the Turnover Motion and Order on the Enforcement Motion to require the parties to work in good faith on a protocol for access to records held in Mr. Albor's building in Cancún, Quintana Roo, Mexico where Dolphin Group records are kept, for the purpose of facilitating the turnover or copying of such records required for the operations of the U.S.-based Dolphin Group Entities (ii) requiring the parties to resolve conflicts between Mexican Court orders pursuant to Mexican law in Mexico and (iii) for such other and further relief as the Court deems just and proper.

Dated: April 28, 2025
Wilmington, Delaware

GELLERT SEITZ BUSENKELL & BROWN, LLC

*/s/ Michael Busenkell*
Michael Busenkell (DE 3933)
1201 North Orange Street, Suite 300
Wilmington, Delaware 19801
Tel.: (302) 425-5800
Fax: (302) 425-5814
E-mail: mbusenkell@gsbblaw.com

-and-

James C. Moon (admitted *pro hac vice*)
Daniel N. Gonzalez (admitted *pro hac vice)*
MELAND BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221
Email: jmoon@melandbudwick.com
dgonzalez@melandbudwick.com

*Counsel to Eduardo Albor*