**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>LEISURE INVESTMENTS HOLDINGS LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-10606 (LSS)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 205** |

**CHIEF RESTRUCTURING OFFICER'S PRELIMINARY REPORT IN CONNECTION WITH ORDER (I) ENFORCING (A) THE AUTOMATIC STAY AND (B) THE COURT'S ORDER COMPELLING DEBTORS' FORMER OFFICERS AND OTHER REQUIRED PERSONS TO TURN OVER RECORDS, AND (II) GRANTING RELATED RELIEF**

I, Robert Wagstaff, state as follows:

1. I am a Managing Director at Riveron Management Services, LLC ("**Riveron**"), and am duly authorized to submit this report on behalf of the Debtors. I have been employed and retained to serve as the Chief Restructuring Officer ("**CRO**") of the Debtors. By an order of the Court, dated April 3, 2025, I have also been authorized to serve as the Debtors' foreign representative in any court where recognition of the Chapter 11 Cases is deemed appropriate. I submit this report in connection with the Court's *Order (I) Enforcing (A) the Automatic Stay and (B) the Court's Order Compelling Debtors' Former Officers and Other Required Persons to Turn Over Records and (II) Granting Related Relief* [Docket No. 205] (the "**Order**").[2]

---

[1] Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the Debtors is not provided herein. A complete list of the Debtors along with the last four digits of their tax identification numbers, where applicable, may be obtained on the website of the Debtors' noticing and claims agent at https://veritaglobal.net/dolphinco, or by contacting counsel for the Debtors. For the purposes of these chapter 11 cases, the address for the Debtors is Leisure Investments Holdings LLC, c/o Riveron Management Services, LLC, 600 Brickell Avenue, Suite 2550, Miami, FL 33131.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Order.

33277130.4

2.      Since the Court entered the Order on June 5, 2025, my team and I have been working to obtain access to the Debtors' Records (both physical and electronic) and control over the Debtors' cash and bank accounts. This process has been challenging due to the concentration of relevant Records and personnel at the Headquarters.

3.      We have adhered to the Order's direction that our access to the Records at the Headquarters is to be supervised by Mr. Albor's authorized representatives. However, I have personally observed Mr. Albor's representatives instructing the Debtors' employees to withhold certain information, causing unnecessary delays and, in many cases, resulting in employees being hesitant, unable or unwilling to provide Records. I have had to repeatedly contact the Debtors' counsel to report these instances of interference by Mr. Albor's representatives, and I understand that Debtors' counsel has communicated with Mr. Albor's counsel numerous times to prevent such interference.

4.      On June 12, 2025, my team discovered that Mr. Albor had been diverting all revenues from the Debtors' Mexican parks to an entity called "Proyectos Ejecutivos Sostentables, S.A. de C.V." ("**PES**"). This scheme appears to have begun in April 2025, and was initiated as a result of the Debtors' efforts to obtain control over the Debtors' Mexican bank accounts. The scheme intensified after the May 21, 2025 hearing before this Court, where I testified that the Debtors had obtained control over the Mexican bank accounts and had removed Mr. Albor's access to and control over such accounts. Mr. Albor or his associates purchased temporary portable point-of-service payment terminals at a Costco near the Debtors' headquarters in Cancun and deployed them at the Debtors' park locations in Mexico. This allowed park revenues to circumvent the Debtors' ordinary bank accounts (at that point controlled by the Debtors and not by Mr. Albor). Instead, by use of the Costco-purchased POS terminals instead of the Debtors' ordinary point-of-

service systems, funds were deposited postpetition into a non-Debtor account held or maintained by PES.

5.      I received a copy of an email, attached as <u>Exhibit A</u>, which was sent by Concepcion Esteban Manchado, who I first met at my deposition in Miami on May 15, 2025.  At my deposition, Ms. Esteban represented herself to be both legal counsel to Controladora Dolphin and, consistent with Mr. Albor's testimony at his deposition, Mr. Albor's personal attorney.

6.      In the email, dated May 27, 2025, Ms. Esteban sent Mr. Albor a draft agreement between Controladora Dolphin and PES, which draft document was back-dated to March 28, 2025, the effective date of the resolutions removing Mr. Albor from control over Controladora Dolphin and appointing Mr. Strom as independent director.[3]  The draft agreement purports to convey operation of the Debtors' Mexican parks to PES for an indeterminate period, during which PES would, among other things, manage the parks in PES's name (but on behalf of Controladora Dolphin), acquire all accounts receivable generated at the parks, and receive some additional consideration on account of services purportedly rendered to Controladora Dolphin.

7.      Upon discovering the scheme, I contacted Debtors' counsel, who then contacted Mr. Albor's counsel to obtain full information regarding PES and the amount of funds illegally diverted.  I demanded from Mr. Albor's authorized representatives the immediate return of all diverted funds so that the Debtors could able to pay an upcoming payroll to Debtor employees and other operating expenses.  I also demanded that all efforts to divert funds through PES be discontinued immediately so that the Debtors' revenues would continue to properly flow into Debtor bank accounts.

---

[3] The agreement attached to Ms. Esteban's email was in Spanish; Exhibit A includes the original Spanish version along with a machine-translated English version.  I am fluent in Spanish and English and believe that the translation is accurate.

33277130.4

3

8. I have requested all details regarding the PES scheme (see my email attached as Exhibit B). While my team has rerouted revenues from the Mexican parks so that they are deposited into the Debtors' bank accounts, we continue to investigate to ensure no further misdirected payments, and to determine the extent to which estate funds have been dissipated as a result of this scheme. As of the date of this report I have not received any documentation related to PES from either Mr. Albor or Ms. Esteban.

9. I received a copy of an email from Mr. Albor dated June 13, 2025, a copy of which is attached as Exhibit C. In this email, Mr. Albor admits that he embarked on the PES scheme so that he could continue to maintain control over the Debtors' cash flow, since the Debtors' existing banks had been directed to provide account access to Mr. Strom and me as the authorized representatives of the Debtors. Rather than pledging full cooperation with my team in turning over all access and control related to PES after entry of the Order, Mr. Albor states that the Debtors' employees should only provide such control if they are released from any and all liability. Further, Mr. Albor's June 13 email states that "PES has not taken or used any funds from the business of Controladora in Mexico" – but a preliminary review of PES payment records indicates that PES paid at least 812,000 pesos (approximately $40,000) to Cervantes Diaz Gutierrez, Mr. Albor's personal attorneys in Mexico (see Exhibit D).

10. I understand and believe that Mr. Albor or his associates undertook a similar scheme to circumvent ordinary banking activities with respect to entities that are non-Mexican subsidiaries of the Debtors. I received a copy of an email from Mr. Albor dated June 17, 2025, a copy of which is attached as Exhibit E, in which Mr. Albor directs Debtor employees responsible for the Debtors' accounting and treasury functions to transfer money from an "Elysium" bank account in one hour. I understand, based on Mr. Albor's deposition testimony, that "Elysium" is

the name of an entity through which Mr. Albor personally owns property in the United States. Mr. Albor's email to the accounting and treasury employees states that "this email is not a joke"[4] and that he is "not asking a favor, but rather giving [them] a clear and precise instruction."[5] However, similar to Mr. Albor's attempts to siphon money out of Debtor accounts, bank records indicate that Elysium received disbursements from certain subsidiaries of Controladora Dolphin, rather than those funds being deposited into Controladora Dolphin's bank accounts. See <u>Exhibit F</u>. To date, I have not received information regarding the nature of the "Elysium" account, nor has Mr. Albor returned the misdirected payments made to the "Elysium" account.

11. My team and I generally continue to face obstruction in obtaining full access to the Records. Mr. Albor's personal representatives, Ms. Esteban and Valeria Albor, appear to have taken the view that the Order provides me and my team with access only to a subset of Records limited to what they determine to be directly related to the business operations of the Debtor entities themselves, and as such have refused to provide Records reflecting all of the Debtors' assets, including the Debtors' interests in various subsidiaries, despite multiple demands.

12. Attached as <u>Exhibit G</u> is an email message from my colleague to Ms. Esteban, requesting access to the Debtors' contract file repository. The contract files are maintained in a locked room at the Headquarters, and that the files in that locked room are accessible only by fingerprint access limited to Ms. Esteban. My colleague requested a meeting with Ms. Esteban to ensure that Riveron can access this room, but Ms. Esteban refused to comply unless she received a severance payment of approximately $600,000. I further understand counsel spoke with Mr. Albor's counsel, requesting that he direct Ms. Esteban, in her capacity as Mr. Albor's personal

---

[4] See Exhibit E: "*Este correo no es broma.*"
[5] See Exhibit E: "*Ya no les estoy pidiendo un favor sino les estoy dando una instrucción clara y precisa.*"

representative, to provide access to the contract room since she is apparently the only person who can obtain access.

13. To presumably comply with our request, Ms. Esteban sent a notary public to the Headquarters this morning to meet with the Debtors' staff and two notaries requested to attend on the Debtors' behalf and tasked with documenting the contracts being collected from the locked contract room. Ms. Esteban did not appear personally. Shortly after the process of reviewing and documenting the collection of contracts, Mr. Albor personally appeared at the Headquarters. Mr. Albor stated that the Debtors' conduct was illegal and threatened to contact the district attorney unless the Debtors stopped the process of reviewing and cataloging the contracts and returned the documents to the locked office.

14. Prior to this, on Saturday, June 21, 2025, Mr. Albor dispatched a representative (his driver) to the Headquarters to change the locks on the door to the legal department, located on the first floor of the Headquarters. A Debtor representative who was at the Headquarters stopped this attempt. Mr. Albor's counsel apparently advised the Debtors' counsel that Mr. Albor had only sought to change the locks on his personal office; however, Mr. Albor's personal office is not located on the first floor of the Headquarters.

15. In addition, Mr. Albor has not complied with paragraph 4a of the Order, which requires him to cease prosecution of the MX Control Litigation on behalf of any Debtor and on behalf of himself personally unless and until this Court lifts the automatic stay upon motion and order. On June 18, 2025, Mr. Albor filed another amparo in the Concurso Mercantil proceeding, challenging the dismissal of the Concurso Mercantil. A copy of the latest amparo filing is attached as <u>Exhibit H</u>. In the amparo filing, Mr. Albor presents himself as the attorney-in-fact for Controladora, which is not the case.

16. Paragraph 7 of the Order requires the filing of a Corrective Certification with the Court once Mr. Albor believes that he has completed the Corrective Measures. Based on my observations, Mr. Albor has not completed the Corrective Measures and continues to engage in certain of the Identified Stay Violations, as well as other actions inconsistent with his obligations under the Order.

Dated: June 23, 2025                                                         */s/ Robert Wagstaff*

                                                                                            Robert Wagstaff
                                                                                            Chief Restructuring Officer