**Exhibit A**

**Documentation of Diversion of Funds to PES**



→ **Concepcion Esteban**   27 may

para Eduardo, mí ⌃

| | | |
|---|---|---|
| De | **Concepcion Esteban** | cesteban@thedolphinco.com |
| Para | **Eduardo Albor** | eduardoalbor@thedolphinco.com |
| | **Sergio Jácome** | sjacome@thedolphinco.com |
| Fecha | 27 may 2025, 6:55 p.m. | |
| 🔒 | Encriptación estándar (TLS) | |
| | Más información | |

Buenas tardes Adjunto el borrador del ==contrato== para sus comentarios, lo voy a revisar también yo por lo que está sujeto a comentarios

Concepción



CONTRATO DE OPERACIÃ_N CON...

W  Documento

**CONTRATO DE OPERACIÓN QUE CELEBRAN POR UNA PARTE CONTROLADORA DOLPHIN, S.A. DE C.V. REPRESENTADA EN ESTE ACTO POR LA LIC. CONCEPCIÓN ESTEBAN MANCHADO, EN LO SUCESIVO "DOLPHIN", Y POR LA OTRA PARTE PROYECTOS EJECUTIVOS SUSTENTABLES REPRESENTADA EN ESTE ACTO POR EL C. MARCEL RENE MOUCHERON HEMMER, EN LO SUCESIVO "PES", MISMO QUE OTORGAN AL TENOR DE LOS SIGUIENTES DEFINICIONES, ANTECEDENTES, DECLARACIONES Y CLAUSULAS:**

## DECLARACIONES

**PRIMERA.- DECLARA "DOLPHIN", POR CONDUCTO DE SU REPRESENTANTE COMPARECIENTE:**

A. Que es una Sociedad Mercantil legalmente constituida y existente conforme a la legislación mexicana, según consta en la Escritura Pública No. 42,974, de fecha 10 de abril de 2007, ante la fe del Licenciado Marco Antonio Sánchez Vales, Notario Público Número 3, de Quintana Roo, inscrita en el Registro Público de la Propiedad y del Comercio de Quintana Roo, en su delegación Cancún bajo el folio mercantil electrónico número 18314 2, de fecha 03 de agosto de 2007.

B. Que cuenta con la capacidad jurídica necesaria para celebrar el presente contrato, y que dentro de su objeto social se encuentra prevista la posibilidad de celebrar contratos como el presente.

C. Que su representante compareciente cuenta con las facultades suficientes para celebrar el presente contrato, y obligar a su representada en los términos del mismo y que a la presente fecha no le ha sido revocado ni en forma alguna, limitado, modificado o suspendido.

D. Que actualmente es la operadora de las siguientes instalaciones: MARINA AQUATOURS, DOLPHIN DISCOVERY ISLA MUJERES, PARQUE GARRAFON, DOLPHIN DISCOVERY PLAYA DEL CARMEN, DOLPHIN DISCOVERY PUERTO AVENTURAS, DOLPHIN DISCOVERY AKUMAL, DOLPHIN DISCOVERY COZUMEL, DOLPHIN DISCOVERY MAHAHUAL Y DOLPHIN DISCOVERY VALLARTA, las "**INSTALACIONES**".

E. Que señala para todos los efectos de este contrato como su domicilio convencional, el ubicado en Banco Chinchorro esq. Acanceh, Manzana 1, Lote 7-02, Supermanzana 13, Cancún, Quintana Roo, CP. 77504.

F. Que se encuentra inscrita en el Registro Federal de Contribuyentes con la clave **CDO070410V77**.

G. Que cuenta con todos los derechos sobre las construcciones que conforman LOS PARQUES, y que cuenta con las facultades para entregar dichas instalaciones a PES quien deberá de destinarlas al objeto de este contrato, sin mayor restricción que las que expresamente las partes convienen a través de este contrato.

H. Que es su deseo y voluntad celebrar el presente contrato para entregar a PES la operación de las Instalaciones, a fin de que PES opere dichas Instalaciones, y otorgue en general los

1

servicios de nado con mamíferos marinos, de parque acuático, de Marina turística y cualquiera otro que las partes de común acuerdo convengan, en los términos y bajo las condiciones que se establecen en el presente contrato.

**SEGUNDA.- DECLARA PES, POR CONDUCTO DE SU REPRESENTANTE COMPARECIENTE:**

A. Que es una Sociedad Mercantil legalmente constituida y existente conforme a la legislación mexicana, según consta en la Escritura Pública No. 62,587 de fecha 05 de Diciembre de 2018, pasada ante la fe del Licenciado Marco Antonio Sánchez Vales, Notario Público Número 3, de Quintana Roo, inscrita en el Registro Público de la Propiedad y del Comercio de Quintana Roo, en su delegación Cancún bajo el folio mercantil electrónico número 2019002871, de fecha 16 de enero de 2019.

B. Que cuenta con la capacidad jurídica necesaria para celebrar el presente contrato, y que dentro de su objeto social se encuentra prevista la posibilidad de celebrar contratos como el presente, asimismo se encuentra la prestación de toda clase de servicios turísticos, incluyendo, sin limitar, la operación de delfinarios.

C. Que su representante compareciente cuenta con las facultades suficientes para celebrar el presente contrato, y obligar a su representada en los términos del mismo, y que a la presente fecha no le ha sido revocado ni en forma alguna limitado, modificado o suspendido.

D. Que cuenta con la experiencia técnica y el personal capacitado para prestar servicios turísticos, para la operación de las Instalaciones.

E. Que señala para todos los efectos de este contrato como su domicilio convencional, el ubicado en Lote 5-02, Mza. 70, Sección D Tercera Etapa, Zona Hotelera de Cancún, Q. Roo.

F. Que se encuentra inscrita en el Registro Federal de Contribuyentes con la clave **PES181205470**.

G. Que es su deseo y voluntad celebrar el presente contrato para llevar a cabo la operación de las Instalaciones, en los términos y bajo las condiciones que se establecen en el presente contrato.

**TERCERA.- DECLARAN AMBAS PARTES:**
**UNICO.-** Que ambas han convenido en conjuntar esfuerzos para la operación de las Instalaciones, de conformidad con lo establecido en las cláusulas de este contrato.

Expuesto lo anterior, las partes otorgan y se sujetan a las siguientes:

**CLAUSULAS**

2

**PRIMERA.- OBJETO**

DOLPHIN y PES, en este acto convienen en celebrar el presente contrato, mediante el cual DOLPHIN hace entrega en posesión durante la vigencia del presente contrato de las **INSTALACIONES** y los bienes que se describen en el **Anexo A** de este contrato y que forma parte integral del mismo, para que PES opere dichas **INSTALACIONES** en nombre propio pero por cuenta de DOLPHIN.

**SEGUNDA.- DE LA DISPOSICION DE LOS BIENES**

Para la correcta consecución del objeto de este contrato, DOLPHIN hace entrega en posesión a DOLPHIN de las **INSTALACIONES**, de sus accesorios y en su caso de los mamíferos marinos que ahí habitan, por todo el tiempo que dure este contrato y sus extensiones. Será responsabilidad de PES supervisar el mantenimiento de las Instalaciones, así como el cuidado de los ejemplares de mamíferos marinos en caso de ser aplicable.

Las partes convienen en que DOLPHIN será responsable, por todo el tiempo de vigencia de este contrato, de las reparaciones mayores que deban hacerse a las instalaciones construidas, por vicios ocultos de la construcción.

**TERCERA.- DE LOS DELFINES**

DOLPHIN deberá mantener en todo momento y bajo su responsabilidad, cualesquiera permisos, licencias, autorizaciones y aprobaciones análogas relativas a la operación de EL DELFINARIO. En virtud de que los delfines que serán utilizados en EL DELFINARIO son propiedad de DOLPHIN, incluyendo las crías que nacieran en el mismo, cualquier acción o actividad relacionada con los delfines será exclusiva decisión y responsabilidad de DOLPHIN.

**CUARTA.- DE LOS PERMISOS LICENCIAS Y AUTORIZACIONES**

PES será responsable de gestionar y obtener ante las dependencias federales, estatales o municipales respectivas, durante toda la vigencia de este contrato, los registros, permisos, renovaciones y demás que se requieran en su caso, para el desarrollo de las actividades en las **INSTALACIONES**, con excepción de los trámites relativos al registro de los **PIMVS** (Predio o instalación que maneja vida silvestre de forma confinada fuera de su hábitat natural).

Será exclusiva responsabilidad de DOLPHIN presentar los avisos y los informes del plan de manejo que se requieran, así como los permisos para el traslado de sus delfines para la operación de las actividades interactivas que se desarrollarán en las **INSTALACIONES** que cuenten con mamíferos marinos.

DOLPHIN tendrá la responsabilidad de proveer a PES cualquier documento que se requiera, para dar cumplimiento a los compromisos asumidos por ésta, en términos de ese contrato, incluyendo sin limitar, a comprobantes de pagos de derechos, impuestos, anuencias de protección civil, pagos de predial, etc…, y cualquiera otro que sea necesario para los fines de gestión y trámite.

Será responsabilidad exclusiva de cada parte de las cuales es titular, el mantener vigentes los permisos, concesiones y licencias que le correspondan, dentro de las responsabilidades de cada parte se considera el pago de derechos que corresponda y el cumplimiento de condicionantes que en su caso proceda. Ambas partes deberán acreditar, a solicitud de la otra parte, encontrarse al corriente y en el cumplimiento de todas y cada una de las obligaciones y condiciones a su cargo.

3

**QUINTA.- CONTRAPRESTACION POR EL USO DE LAS INSTALACIONES DE EL DELFINARIO**

Las partes convienen que la contraprestación por la operación de las **INSTALACIONES**, se realizará conforme a lo establecido en el **Anexo B** de este contrato y que forma parte integral del mismo

**SEXTA.- CUENTAS PENDIENTES**

Las partes acuerdan que PES adquirirá las cuentas por cobrar de DOLPHIN, por lo que PES cobrará dichas cuentas por orden de DOLPHIN, y realizaran compensaciones de tiempo en tiempo, entre la contraprestación y las cuentas que logre cobrar PES.

**SÉPTIMA.- DE LA COMERCIALIZACION**

La comercialización de las actividades en las **INSTALACIONES**, será directamente responsabilidad de PES, a través de intermediarios (agencias locales) y por medio de ventas directas (walk in) y electrónicas (internet).

**OCTAVA.- VIGENCIA**

El presente contrato entrará en vigor a partir del día 28 de Mayo del 2025 y se mantendrá vigente por un plazo de _____ años, siendo renovable por el mismo plazo a su vencimiento excepto el caso de que una de las partes exprese a la otra su deseo de no renovarlo, con cuando menos 90 días de anticipación.

**NOVENA.- SEGUROS**

DOLPHIN deberá contratar por todo el tiempo de vigencia de este contrato, los seguros necesarios que amparen las **INSTALACIONES**, incluyendo enunciativa más no limitativamente por incendio, robo, vandalismo, siniestros naturales, huracanes, marejada, vientos tempestuosos, granizo, inundaciones, desprendimientos, etc., siempre que dicha cobertura se encuentre disponible en el mercado de seguros.

Asimismo, PES deberá contratar a partir del inicio de la operación objeto de este contrato y mantener vigente durante todo el período de vigencia de este Contrato, una póliza de seguro contra reclamaciones hechas por terceros y de responsabilidad civil a terceros correspondientes a las actividades que dentro de las Instalaciones se desarrollen.

Las partes recíprocamente deberán entregarse, a solicitud de la otra parte, copia de las pólizas de los seguros antes referidos, para asegurarse de su existencia, cobertura y alcances, y en su caso poder hacer las recomendaciones pertinentes para su correcta cobertura.

**DÉCIMA.- PROPIEDAD INTELECTUAL**

DOLPHIN declara que es el legítimo y único titular de los derechos de propiedad industrial y/o intelectual derivados de los registros marcarios y de software listados en el **Anexo C** el cual forma parte integral del presente contrato.

En virtud de lo anterior, DOLPHIN otorga, de manera gratuita y temporal, en favor de PES el derecho de uso de las Marcas y Software, de acuerdo a lo establecido en la presente Cláusula.

El uso de las Marcas y Software por parte del PES se llevará a cabo exclusivamente en relación con la operación de las Instalaciones y se podrá realizar únicamente mientras se encuentre vigente el presente Contrato.

La licencia de uso de las Marcas y Software otorgada en el presente contrato no podrá ser transferida por PES total o parcialmente en favor de terceros sin autorización expresa y por escrito de DOLPHIN.

**DÉCIMA PRIMERA.- DEL PERSONAL**

En razón de que las partes ejercen sus actividades de manera independiente no se originará (i) una relación societaria o de asociación entre las partes; ni (ii) una relación de contenido laboral por corresponsabilidad o solidaridad patronal, ni material ni jurídicamente entre las partes, ni sus colaboradores o empleados; ya que las actividades de cada una de las partes y sus empleados, factores o dependientes no serán de subordinación a la otra parte. Por tal razón, PES contratará por su cuenta y bajo su responsabilidad y tutela al personal de trabajo que requiera para llevar a cabo su operación, liberando desde ahora a DOLPHIN, empresas afiliadas, subsidiarias, controladores, accionistas, ejecutivos y colaboradores de toda responsabilidad laboral que se le pudiere fincar respecto de los trabajadores de PES**,** quien se obliga a sacar libre y a salvo a DOLPHIN empresas afiliadas, subsidiaras, controladora, accionistas, ejecutivos y colaboradores de cualesquier demandas o reclamaciones que se presenten en contra de esta última, por el personal contratado por PES.

**DÉCIMA SEGUNDA.- TERMINACIÓN ANTICIPADA**

Las Partes tendrán la facultad de dar por terminado anticipadamente el presente Contrato, sin necesidad de declaración judicial previa, cuando se susciten cualquiera de las siguientes circunstancias:

a) Las Partes podrán dar por terminado el presente Contrato de forma anticipada, sin penalidad o responsabilidad para cualquiera de las Partes, siempre que medie acuerdo expreso por escrito entre ambas Partes.

b) En caso de que cualquiera de las Partes incumpla con las obligaciones a su cargo derivadas del presente Contrato.

En caso de que cualquier Parte desee dar por terminado el presente contrato, deberá de notificarlo con un aviso previo de 90 días a las otra parte.

**DÉCIMA TERCERA.- CESION DEL CONTRATO**

Cualquier cesión o transmisión parcial o total que DOLPHIN hiciera sobre alguna de las Instalaciones, a favor de un tercero, se entenderá hecha con todos los derechos y obligaciones implícitos en este contrato, por lo que no se verá afectado ni alterado en ninguna de sus condiciones ni requerirá autorización de PES, y seguirá surtiendo plenamente sus efectos legales.

De la misma manera cualquier cesión o transmisión de la propiedad o control accionario parcial o total de PES a favor de cualquier tercero, se entenderá hecha con todos los derechos y obligaciones implícitos en este contrato, por lo que no se verá afectado ni alterado en ninguna de sus condiciones ni requerirá autorización de DOLPHIN, y seguirá surtiendo plenamente sus efectos legales. En cualquier caso donde una de las partes cediera o transmitiera el control accionario o el control operativo de la empresa a un tercero, deberá informarle a la otra parte dentro de los 30 días siguientes al que dicho control surtiera efectos.

Excepto por lo dispuesto en esta cláusula, las partes no podrán ceder los derechos y obligaciones derivados del presente acto jurídico, salvo a empresas filiales o aquellas con las que las partes mantengan una participación accionaria mayoritaria de control, y previa notificación a la otra parte, quien solo podrá oponerse a dicha cesión con causa justificada.

**DÉCIMA CUARTA.- INCUMPLIMIENTO Y RESCISION**

En caso de que cualquiera de las partes incumpliese alguna o algunas de las obligaciones establecidas a su cargo en el presente Instrumento, la parte perjudicada podrá exigir el cumplimiento forzoso de las obligaciones del presente Contrato, en cuyo caso se notificará por escrito a la parte que incumple, manifestando las circunstancias del incumplimiento, para que esta, dentro de un plazo de 30 días siguientes a la fecha de la notificación de incumplimiento, subsane el incumplimiento aludido. El plazo de 30 días podrá ser prorrogado por un periodo igual cuando la parte que incumpla se vea impedida para subsanar su incumplimiento debido a un caso fortuito o de fuerza mayor.

En caso de que el incumplimiento no sea subsanando en el término previsto en el párrafo anterior, entonces la parte perjudicada podrá optar por la rescisión de este contrato con el resarcimiento de daños y perjuicios correspondiente, bastando para ello un simple aviso por escrito, sin necesidad de declaración judicial alguna.

**DÉCIMA QUINTA. MODIFICACIONES AL CONTRATO.**

Cualquier modificación que las Partes deseen llevar a cabo en relación con el contenido del presente Contrato deberá efectuarse mediante convenio que se hará constar por escrito firmado por ambas Partes. Cualquier modificación al presente Contrato solamente afectará la materia sobre la que expresamente verse. Por lo tanto, se mantendrán, todos los términos y condiciones que no sean materia del convenio modificatorio correspondiente

**DÉCIMA SEXTA.- CONFIDENCIALIDAD**

Los términos y condiciones del presente Contrato, así como toda información y documentos que cada parte reciba de la otra, como consecuencia de este contrato, incluyendo sin limitarse la información que PES reporte a DOLPHIN conforme a este contrato o como consecuencia del mismo, tendrán el carácter de información confidencial, por lo que PES y DOLPHIN no podrán, bajo ninguna circunstancia, divulgar su contenido sin previa autorización por escrito de la otra parte.

**DÉCIMA SÉPTIMA.- DOMICILIOS Y NOTIFICACIONES**

Las partes establecen como sus domicilios convencionales para recibir alguna notificación los señalados en las declaraciones de este contrato.

Todos los avisos que las partes deban o deseen darse en relación con el presente convenio, deberán efectuarse por escrito por medio de cualquier medio que garantice que la parte interesada recibió el aviso de que se trate en su domicilio respectivo, siendo del emisor la carga de la prueba de que el destinatario ha sido notificado.

Cualquiera de las PARTES podrá notificar a la otra de un nuevo domicilio al cual deban dirigirse todos los avisos y comunicaciones relacionados con el presente Contrato, dirigiendo para tal efecto aviso por escrito con diez días de anticipación a la fecha en que deba producirse el cambio

de domicilio. En caso contrario, todos los comunicados dirigidos al último domicilio registrado entre las PARTES, surtirán plenos efectos.

**DÉCIMA OCTAVA.- TITULOS DE LAS CLAUSULAS.**
Ambas partes aceptan que los encabezados utilizados al principio de cada cláusula han sido utilizados para agilizar la referencia de las mismas, sin que el contenido de la cláusula deba ser considerado como definiciones de los mismos.

**DÉCIMA NOVENA.- VICIOS DE LA VOLUNTAD.**
Las partes aceptan que el presente convenio se encuentra libre de dolo, mala fe o cualquier otro vicio de la voluntad que pudiera afectar su validez.

Los términos y condiciones del presente Contrato sólo podrán ser modificados mediante acuerdo expreso y por escrito de las PARTES.

**VIGÉSIMA.- MISCELANEOS.**
En el supuesto de que una o más de las disposiciones que conforman el presente Contrato resulte inejecutable, nulificada o invalidada por la voluntad de las Partes, mandamiento de autoridad competente o ministerio de ley, dicha disposición deberá ser separada o de ser posible interpretada de manera que permita su ejecución, y la validez, legalidad y cumplimiento de las disposiciones restantes contenidas en este Contrato continuarán con plenos efectos. Los anexos del presente contrato forman parte integral del mismo.

El que PES o DOLPHIN no insistan en el estricto cumplimiento de cualquier de los acuerdos, términos, estipulaciones contractuales y condiciones del presente contrato, no se considerará como una renuncia a ningún derecho o recurso que pudiera tener dicha parte y no se considerará una renuncia a cualquier violación o incumplimiento posterior en relación con dichos acuerdos, términos, estipulaciones contractuales y condiciones.

**VIGÉSIMA PRIMERA.- JURISDICCION Y COMPETENCIA.**
Para efectos de la interpretación, cumplimiento y ejecución del presente instrumento, las partes convienen expresamente en someterse a las disposiciones aplicables del Código Civil para el Estado de Quintana Roo, así como a las demás disposiciones aplicables de los Estados Unidos Mexicanos, y a la jurisdicción de los tribunales competentes de la ciudad de Cancún, Estado de Quintana Roo, renunciando expresamente a cualesquier otros fueros que pudieren corresponderles por razón de sus domicilios presentes o futuros o por la ubicación de sus bienes.

**ENTERADOS DEL VALOR, CONTENIDO Y ALCANCES LEGALES DEL PRESENTE CONVENIO, LAS PARTES LO FIRMAN POR DUPLICADO PARA DEBIDA CONSTANCIA, EN LA CIUDAD DE CANCÚN, QUINTANA ROO, EL DÍA 28 DE MARZO AÑO DOS MIL VEINTICINCO.**

**CONTROLADORA DOLPHIN, S.A. DE C.V.**          **PROYECTOS EJECUTIVOS SUSTENTABLES, S.A. DE C.V.**


**LIC. CONCEPCIÓN ESTEBAN MANCHADO**          **MARCEL RENE MOUCHERON HEMMER**

7

**OPERATION AGREEMENT ENTERED INTO BY A CONTROLLING PARTY DOLPHIN, S.A. DE C.V. REPRESENTED IN THIS ACT BY MRS. CONCEPCIÓN ESTEBAN MANCHADO, HEREINAFTER "DOLPHIN", AND ON THE OTHER PARTY PROYECTOS EJECUTIVOS SUSTENTABLES REPRESENTED IN THIS ACT BY MR. MARCEL RENE MOUCHERON HEMMER, HEREINAFTER "PES", WHICH THEY GIVE TO THE FOLLOWING DEFINITIONS,  BACKGROUND, DECLARATIONS AND CLAUSES:**

## DECLARATIONS

**FIRST.- "DOLPHIN" DECLARES, THROUGH HIS REPRESENTATIVE APPEARING:**

A.  That it is a Mercantile Company legally constituted and existing in accordance with Mexican legislation, as stated in Public Deed No. 42,974, dated April 10, 2007, before the faith of Mr. Marco Antonio Sánchez Vales, Notary Public Number 3, of Quintana Roo, registered in the Public Registry of Property and Commerce of Quintana Roo,  in its Cancun delegation under the electronic mercantile folio number 18314 2, dated August 3, 2007.

B.  That it has the necessary legal capacity to enter into this contract, and that within its corporate purpose the possibility of entering into contracts such as this one is foreseen.

C.  That your representative appearing has sufficient powers to enter into this contract, and bind your client under the terms thereof and that as of this date it has not been revoked or in any way revoked, limited, modified or suspended.

D.  It is currently the operator of the following facilities: MARINA AQUATOURS, DOLPHIN DISCOVERY ISLA MUJERES, GARRAFON PARK, DOLPHIN DISCOVERY PLAYA DEL CARMEN, DOLPHIN DISCOVERY PUERTO AVENTURAS, DOLPHIN DISCOVERY AKUMAL, DOLPHIN DISCOVERY COZUMEL, DOLPHIN DISCOVERY MAHAHUAL AND DOLPHIN DISCOVERY VALLARTA, the "**FACILITIES.**"

E.  That it indicates for all purposes of this contract as its conventional domicile, the one located at Banco Chinchorro esq. Acanceh, Manzana 1, Lote 7-02, Supermanzana 13, Cancún, Quintana Roo, CP. 77504.

F.  That it is registered in the Federal Taxpayers Registry with the code **CDO070410V77**.

G.  That it has all the rights over the constructions that make up THE PARKS, and that it has the powers to deliver said facilities to PES, which must allocate them to the object of this contract, without greater restriction than those expressly agreed upon by the parties through this contract.

H.  That it is their desire and willingness to enter into this contract to deliver to PES the operation of the Facilities, so that PES operates said Facilities, and generally provides the services of swimming with marine mammals, water park, tourist marina and any other that the parties by mutual agreement agree, under the terms and under the conditions established in this contract.

**SECOND.- PES DECLARES, THROUGH ITS REPRESENTATIVE APPEARING:**

1

A.  That it is a legally constituted and existing Commercial Company in accordance with Mexican law, as stated in Public Deed No. 62,587 dated December 5, 2018, passed before the faith of Mr. Marco Antonio Sánchez Vales, Notary Public Number 3, of Quintana Roo, registered in the Public Registry of Property and Commerce of Quintana Roo, in its Cancun delegation under the electronic mercantile folio number 2019002871, dated January 16, 2019.

B.  That it has the necessary legal capacity to enter into this contract, and that within its corporate purpose is provided for the possibility of entering into contracts such as this one, as well as the provision of all kinds of tourist services, including, but not limited to, the operation of dolphinariums.

C.  That your representative appearing has sufficient powers to enter into this contract, and bind your client under the terms thereof, and that as of this date it has not been revoked or in any way limited, modified or suspended.

D.  That it has the technical experience and trained personnel to provide tourist services, for the operation of the Facilities.

E.  That indicates for all purposes of this contract as its conventional domicile, the one located at Lot 5-02, Mza. 70, Section D Third Stage, Cancun Hotel Zone, Q. Roo.

F.  That it is registered in the Federal Taxpayers Registry with the code **PES181205470**.

G.  That it is your desire and will to enter into this contract to carry out the operation of the Facilities, under the terms and conditions established in this contract.

**THIRD.- BOTH PARTIES DECLARE:**
**ONLY.-** That both have agreed to join forces for the operation of the Facilities, in accordance with the provisions of the clauses of this contract.

Having stated the above, the parties grant and are subject to the following:

**CLAUSES**

**FIRST.- PURPOSE**
DOLPHIN and PES hereby agree to enter into this contract, by which DOLPHIN delivers in possession during the term of this contract the **FACILITIES** and goods described in **Appendix A** of this contract and which form an integral part thereof, so that PES operates said **FACILITIES** in its own name but on behalf of DOLPHIN.

**SECOND.- OF THE DISPOSITION OF THE ASSETS**

2

For the correct achievement of the object of this contract, DOLPHIN delivers in possession to DOLPHIN the **FACILITIES**, its accessories and, where appropriate, the marine mammals that live there, for the entire duration of this contract and its extensions. It will be the responsibility of PES to supervise the maintenance of the Facilities, as well as the care of the specimens of marine mammals if applicable.

The parties agree that DOLPHIN will be responsible, for the entire duration of this contract, for the major repairs that must be made to the facilities built, due to hidden defects in the construction.

**THIRD.- DOLPHINS**

DOLPHIN shall maintain at all times and under its responsibility, any permits, licenses, authorizations and similar approvals relating to the operation of THE DOLPHINARIUM. By virtue of the fact that the dolphins that will be used in THE DOLPHINARIUM are the property of DOLPHIN, including the calves that are born in it, any action or activity related to the dolphins will be the sole decision and responsibility of DOLPHIN.

**FOURTH.- PERMITS, LICENSES AND AUTHORIZATIONS**

PES will be responsible for managing and obtaining from the respective federal, state or municipal agencies, throughout the term of this contract, the registrations, permits, renewals and others that are required, where appropriate, for the development of activities in the **FACILITIES,** with the exception of the procedures related to the registration of the **PIMVS** (Property or facility that manages wildlife in a confined manner outside its natural habitat).

It will be the sole responsibility of DOLPHIN to present the notices and reports of the management plan that are required, as well as the permits for the transfer of its dolphins for the operation of the interactive activities that will take place in the **FACILITIES** that have marine mammals.

DOLPHIN will be responsible for providing PES with any document that is required to comply with the commitments assumed by it, in terms of this contract, including without limitation, proof of payment of rights, taxes, civil protection consents, property payments, etc., and any other that may be necessary for the purposes of management and processing.

It will be the exclusive responsibility of each party of which it is the owner, to maintain in force the permits, concessions and licenses that correspond to it, within the responsibilities of each party is considered the payment of the corresponding rights and the fulfillment of conditions that may apply. Both parties must prove, at the request of the other party, that they are up to date and in compliance with each and every one of the obligations and conditions for which they are responsible.

**FIFTH.- CONSIDERATION FOR THE USE OF THE FACILITIES OF EL DELFINARIUM**

The parties agree that the consideration for the operation of the **FACILITIES** will be made in accordance with the provisions  of **Annex B** of this contract and that it is an integral part of it

**SIXTH.- PENDING ACCOUNTS**

The parties agree that PES will acquire the accounts receivable from DOLPHIN, so PES will collect such accounts on behalf of DOLPHIN, and will make compensations from time to time, between the consideration and the accounts that PES manages to collect.

3

**SEVENTH.- MARKETING**

The commercialization of the activities in the **FACILITIES** will be directly the responsibility of PES, through intermediaries (local agencies) and through direct sales (walk in) and electronic sales (internet).

**EIGHTH.- VALIDITY**

This contract will enter into force as of May 28, 2025 and will remain in force for a period of _____ years, being renewable for the same period upon expiration except in the event that one of the parties expresses to the other its desire not to renew it, at least 90 days in advance.

**NINTH.- INSURANCE**

DOLPHIN must contract for the entire period of validity of this contract, the necessary insurance that covers the **FACILITIES,** including but not limited to fire, theft, vandalism, natural accidents, hurricanes, tidal waves, stormy winds, hail, floods, landslides, etc., provided that such coverage is available in the insurance market.

Likewise, PES must contract, from the beginning of the operation subject to this contract and maintain in force throughout the period of validity of this Contract, an insurance policy against claims made by third parties and civil liability to third parties corresponding to the activities that are carried out within the Facilities.

The parties must reciprocally deliver, at the request of the other party, a copy of the aforementioned insurance policies, to ensure their existence, coverage and scope, and where appropriate to be able to make the pertinent recommendations for their correct coverage.

**TENTH.- INTELLECTUAL PROPERTY**

DOLPHIN declares that it is the legitimate and sole owner of the industrial and/or intellectual property rights derived from the trademark and software registrations listed in **Annex C** , which is an integral part of this contract.

By virtue of the foregoing, DOLPHIN grants, free of charge and temporarily, in favor of PES the right to use the Trademarks and Software, in accordance with the provisions of this Clause.

PES's use of the Marks and Software is solely in connection with the operation of the Facilities and may be made only while this Agreement is in effect.

The license to use the Trademarks and Software granted in this agreement may not be transferred by PES in whole or in part in favor of third parties without the express written authorization of DOLPHIN.

**ELEVENTH.- PERSONNEL**

Due to the fact that the parties exercise their activities independently, (i) a corporate or association relationship between the parties will not arise; nor (ii) a relationship of labor content by co-responsibility or employer solidarity, neither materially nor legally between the parties, nor their collaborators or employees; since the activities of each of the parties and their employees,  factors or dependents will not be subordinate to the other party. For this reason, PES will hire on its own account and under its responsibility and tutelage the work personnel it requires to carry out its operation, releasing from now on DOLPHIN, affiliated companies, subsidiaries, controllers,

shareholders, executives and collaborators from all labor liability that may be imposed on it with respect to PES workers. who undertakes to remove DOLPHIN affiliates, subsidiaries, controllers, shareholders, executives and collaborators from any lawsuits or claims that may be filed against the latter, by the personnel hired by PES.

**TWELFTH.- EARLY TERMINATION**

The Parties shall have the right to terminate this Agreement early, without the need for a prior judicial declaration, when any of the following circumstances arise:

a) The Parties may terminate this Agreement early, without penalty or liability for either Party, provided that there is express written agreement between both Parties.

b) In the event that any of the Parties fails to comply with their obligations arising from this Agreement.

In the event that either Party wishes to terminate this Agreement, it shall give 90 days' notice to the other Party.

**THIRTEENTH.- ASSIGNMENT OF THE CONTRACT**

Any partial or total assignment or transfer that DOLPHIN may make over any of the Facilities, in favour of a third party, will be understood to have been made with all the rights and obligations implicit in this contract, so it will not be affected or altered in any of its conditions nor will it require authorization from PES, and will continue to have full legal effects.

In the same way, any assignment or transfer of the ownership or partial or total shareholding control of PES in favor of any third party, will be understood to have been made with all the rights and obligations implicit in this contract, so it will not be affected or altered in any of its conditions nor will it require authorization from DOLPHIN.  and will continue to have full legal effects. In any case where one of the parties assigns or transfers the shareholder control or the operational control of the company to a third party, it must inform the other party within 30 days after such control takes effect.

Except as provided in this clause, the parties may not assign the rights and obligations arising from this legal act, except to subsidiary companies or those with which the parties hold a majority controlling interest, and prior notice to the other party, who may only oppose such assignment with justified cause.

**FOURTEEN.- NON-COMPLIANCE AND TERMINATION**

In the event that any of the parties fails to comply with any of the obligations established in this Instrument, the injured party may demand the forced performance of the obligations of this Agreement, in which case the breaching party shall be notified in writing, stating the circumstances of the breach, so that the latter,  within a period of 30 days following the date of the notification of non-compliance, correct the aforementioned non-compliance. The 30-day period may be extended for an equal period when the non-compliant party is prevented from remedying its breach due to an unforeseeable event or force majeure.

In the event that the breach is not remedied within the term provided for in the previous paragraph, then the injured party may opt for the termination of this contract with the corresponding compensation for damages, a simple written notice being sufficient for this, without the need for any judicial declaration.

**FIFTEENTH. MODIFICATIONS TO THE CONTRACT.**

Any modification that the Parties wish to make in relation to the content of this Agreement must be made by means of an agreement that will be recorded in writing signed by both Parties. Any modification to this Agreement will only affect the subject matter expressly addressed. Therefore, all the terms and conditions that are not the subject of the corresponding amending agreement will be maintained

**SIXTEENTH.- CONFIDENTIALITY**

The terms and conditions of this Agreement, as well as any information and documents that each party receives from the other, as a result of this Agreement, including without limitation the information that PES reports to DOLPHIN under or as a consequence of this Agreement, shall be confidential information, and therefore PES and DOLPHIN shall not,  Under no circumstances may you disclose its content without the prior written authorization of the other party.

**SEVENTEENTH.- ADDRESSES AND NOTIFICATIONS**

The parties establish as their conventional addresses to receive any notification those indicated in the declarations of this contract.

All notices that the parties are required to give or wish to give in connection with this agreement must be made in writing by any means that guarantees that the interested party received the notice in question at its respective domicile, the issuer being on the burden of proof that the addressee has been notified.

Either of the PARTIES may notify the other of a new address to which all notices and communications related to this Agreement must be addressed, sending for this purpose written notice ten days prior to the date on which the change of address must take place. Otherwise, all communications addressed to the last registered address between the PARTIES will have full effect.

**EIGHTEENTH.- TITLES OF THE CLAUSES.**

Both parties accept that the headings used at the beginning of each clause have been used to expedite the reference thereof, without the content of the clause being considered as definitions thereof.

**NINETEENTH.- DEFECTS OF THE WILL.**

The parties accept that this agreement is free of fraud, bad faith or any other defect of the will that could affect its validity.

The terms and conditions of this Agreement may only be modified by express written agreement of the PARTIES.

**TWENTIETH.- MISCELLANEOUS.**

In the event that one or more of the provisions of this Agreement is found to be unenforceable, void or invalidated by the will of the Parties, order of competent authority or operation of law, such

provision shall be severed or, if possible, interpreted in such a way as to permit its execution, and the validity, legality and enforceability of the remaining provisions contained in this Agreement shall continue in full effect. The annexes to this Agreement form an integral part of this Agreement.

The failure of PES or DOLPHIN to insist upon strict performance of any of the agreements, terms, contractual provisions and conditions of this agreement shall not be deemed a waiver of any right or remedy that such party may have and shall not be deemed a waiver of any subsequent breach or default in connection with such agreements,  terms, contractual stipulations and conditions.

**TWENTY-FIRST.- JURISDICTION AND COMPETENCE.**
For the purposes of the interpretation, compliance and execution of this instrument, the parties expressly agree to submit to the applicable provisions of the Civil Code for the State of Quintana Roo, as well as to the other applicable provisions of the United Mexican States, and to the jurisdiction of the competent courts of the city of Cancun, State of Quintana Roo,  expressly waiving any other jurisdictions that may correspond to them by reason of their present or future domiciles or by the location of their assets.

**AWARE OF THE VALUE, CONTENT AND LEGAL SCOPE OF THIS AGREEMENT, THE PARTIES SIGN IT IN DUPLICATE FOR DUE RECORD, IN THE CITY OF CANCUN, QUINTANA ROO, ON MARCH 28, YEAR TWO THOUSAND AND TWENTY-FIVE.**

**CONTROLADORA DOLPHIN, S.A. DE C.V.**   **SUSTAINABLE EXECUTIVE PROJECTS,**
                   **S.A. DE C.V.**

**LIC. CONCEPCIÓN ESTEBAN MANCHADO**  **MARCEL RENE MOUCHERON HEMMER**

**Exhibit B**

**Correspondence to Mr. Albor's Authorized Representatives**

**Greecher, Sean**

---

| | |
|---|---|
| **From:** | Greecher, Sean |
| **Sent:** | Friday, June 13, 2025 2:54 PM |
| **To:** | James C. Moon |
| **Subject:** | FW: Proyectos Ejecutivos Sostentables |
| **Attachments:** | Image.jpeg |
| | |
| **Importance:** | High |

---

**From:** Robert Wagstaff <Robert.Wagstaff@riveron.com>
**Sent:** Thursday, June 12, 2025 7:07 PM
**To:** Greecher, Sean <sgreecher@ycst.com>
**Subject:** FW: Proyectos Ejecutivos Sostentables
**Importance:** High

FYI

Robert Wagstaff
Managing Director
M: +1 (305) 586-5558

**Riveron**
Complexity and Urgency. Simplified.™

---

**From:** Robert Wagstaff
**Sent:** Thursday, June 12, 2025 7:07 PM
**To:** Concepcion Esteban <cesteban@thedolphinco.com>; Valeria Albor <valbor@thedolphinco.com>; Dagoberto Hernandez <dhernandez@thedolphinco.com>
**Subject:** Proyectos Ejecutivos Sostentables
**Importance:** High

Dear Sir/Madams,

I understand, through a conversation between our attorneys and Mr. Albor's attorney, Jim Moon, that Mr. Moon was told that the income stream from the Mexico parks that was previously sent to bank accounts in the name of Controladora Dolphin was temporarily transferred to Proyectos Ejecutivos Sostentables (PES) because Controladora's bank accounts were frozen and there was no way to make disbursements for Controladora's expenses.

Since me and my representatives are now in control Controladora's bank accounts, and considering that the transactions corresponded to funds belonging to Controladora, I request from all of you the following:

- All funds currently held by PES are to be returned to the Controladora bank account with BBVA
- Please provide:
    - All monthly bank statements for the last two years
    - Any contracts, including the operating agreement with Controladora, labor agreements, and any other vendor agreement executed on behalf of Controladora.

Dagoberto:

- In relation to the point of sale system (SBX) and related processes, I ask you that you reinstate the settings in Oracle so that the invoices for individual transactions processed by SBX are once again issued under the name of Controladora and not PES.
- Please restore the contract for the Google suite of services to the name of Controladora. Members of my team will be at the corporate offices tomorrow to get passwords to the suite (again, see the attached order from the bankruptcy judge).

Valeria:

- In relation to revenue from e-commerce transactions, I request that you reestablish the flow of funds as it was before PES was inserted into the process.

Please contact me if these instructions are not clear.

Best regards,

Robert

Robert Wagstaff
Managing Director
M: +1 (305) 586-5558
O: +1 (305) 860-3773



  

NOTICE: This e-mail message, including any attachments, is  or the sole use o  the intended recipient(s) and may contain con idential and/or privileged in ormation. Any unauthorized review, use, disclosure or distribution o  this e-mail is prohibited. I  you have received this message in error, please contact the sender and destroy all copies (and attachments) o  the original message.

**Exhibit C**

**Correspondence from Mr. Albor regarding PES**

**Greecher, Sean**

---

| | |
|---|---|
| **From:** | James C. Moon <jmoon@melandbudwick.com> |
| **Sent:** | Friday, June 13, 2025 2:26 PM |
| **To:** | Greecher, Sean |
| **Subject:** | FW: PES |

See below...just received.

---

**From:** EDUARDO ALBOR <dolphincancun@gmail.com>
**Sent:** Friday, June 13, 2025 2:25 PM
**To:** lorenzo camara p solis <locapesol@gmail.com>
**Cc:** Sergio Jacome <sjacome@thedolphinco.com>; Martin Flores <mflores@thedolphinco.com>; Concepcion Esteban <cesteban@thedolphinco.com>; Rosy Ortiz <rortiz@thedolphinco.com>; Alfonso Delgado <adelgado@thedolphinco.com>; James C. Moon <jmoon@melandbudwick.com>; Alejandro Díaz Steta <adiaz@cdabogados.com.mx>; Harris Caston <hcaston@gmail.com>; Vale Albor <valbor@thedolphinco.com>; Dagoberto Hernandez <dhernandez@thedolphinco.com>
**Subject:** Re: PES

==EXTERNAL EMAIL:==

Lorenzo,

I am responding this email in English, as all the people I copy here read and understand English, including my lawyer James Moon and Alejandro Diaz Steta, and also with the understanding this can be forwarded to anybody who is now responsible for Controladora.

First and foremost, I acknowledge that, as far as I know, you do not have access neither control to any bank account of PES and this is also of the knowledge of people in charge of the money and financing of Controladora, like Sergio Jacome and Martin Flores and Rosy Ortiz, which they can confirm.

Once we knew, a couple of weeks ago, that the access of the bank accounts in Controladora were restricted, we look first how to keep the Company operating as our main duty and responsibility and the only way to do it was having access to the cash flow of the operation. That is why we (Sergio, martin and me) decided that the only immediate way was to use the bank accounts of PES and the POS of PES to keep the operation.

I am sorry you are placed now in a situation you only allowed to do through an entity you have no control at all on the cash flow or bank accounts, even though you have responsibility with the fulfillment of obligations with local and federal authorities such as SAT, IMSS, INFONAVIT, etc, which you should be released and discharged as you have no control on the books and administration of PES, but it has always been under the control Martin as Comptroller and Sergio as CFO and used to be under my supervision when I was responsible for the Company and Martin and Sergio report me.

They all are now reporting to a Chief restructure officer, called R. Waggstaff and they are responsible of the cash and administration of Controladora and understand what I said in this email about PES, which is

not one of the debtors but has been used by the debtors to avoid the operation being disrupted. I am not responsible for the business of Controladora and have to let the people in charge continue the business, even if their actions and decisions disrupt the business.

My involvement now is just to not get involve but want to leave all this clear and avoid any misunderstanding which create you any problem and contingency at all, while you have only be of full cooperation for the Company for more than 27 years.

Therefore, I leave clear that:

1.  Neither you, nor PES, have not taken or used any funds from the business of Controladora in Mexico.

2.  Neither you, nor I have any control on PES bank accounts, neither registered signature in those bank accounts but all them are under the control of Sergio, Martin and Rosy and all the cash have been used for payments of obligations of the Company, under my instructions to make sure they are applied to the most relevant and urgent payments and to avoid disruption of the business.

3. You have not responsibility of the administration of PES and you should make sure that, before you formalize the delivery of the legal control of PES to the people now in charge of Controladora, YOU ARE FIRST RELEASED OF ANY AND ALL RESPONSABILITY THE COMPANY CURRENTLY HAS. Martin and Sergio perfectly understand what I say and they can explain to the new administration.

 Lorenzo, I am willing to meet anybody and cooperate,  to clarify any misunderstands annd leave anll this clear,  as you are not to be held responsible of any action of PES. You have only been cooperative to avoid any disruption of the business and should be released of any responsibility under PES and assumed by Controladora, before you deliver full legal control of the entity. As I said, there is no bank or administration control you have on PES, since it has actually been under control of the administration of Controladora.

Lorenzo, For further clarification of any of the above.

Sergio, Martin, Rosy, you can explain the Riveron People why this was implemented and the consequences on the operation should this be suddenly disrupted.

Rosy, Argelia, you should use the procedes in the bank accounts strictly to the use of the business operation of TDC, which you know and are aware are more urgent and relevant, including unpaid taxes of PES. Full legal control will be transferred once Lorenzo is fully released of any and all responsaility.

I should not interfere in any way but I feel morally responsable to keep Lorenzo out of any risk or contingency.

I am now in MxCT taking care of personal health issues need to deal with and may be on and off for some times and apologize if this creates inconviniences or miss understandings.

James, feel free to share or forward this email to Riveron lawyers. As I mentioned to you, I am here with no intention other than cooperare and avoid ant disruption of the business yet, need to make sure nothing of this creates any contingency to Lorenzo.

Best regards,

Eduardo Albor


El El vie, 13 de jun de 2025 a la(s) 11:10 a.m., lorenzo camara p solis <locapesol@gmail.com> escribió:

Eduardo ,

Necesito entender el tema del PES en el involucramiento con Controladora y con todo el tema jurídico que está sucediendo !!

Yo no tengo acceso a cuentas ni dinero de PES .

Quedó en espera de tus comentarios

Lorenzo

**Exhibit D**

**PES payment to Mr. Albor's personal attorneys**

0026010025050800000431109
SERVICIOS COMPARTIDOS PARA EL ENTRETENIM

| Fecha | Concepto | Cargo | Abono |
|---|---|---|---|
| 08/MAY | W01 TRASPASO A TERCEROS<br>PAGO PREST 3740A2083CDO BMRCASH Ref. REFBNTC00606405 | 717,500.00 | |
| 08/MAY | W01 TRASPASO A TERCEROS<br>PAGO PREST 3740A2083CDO BMRCASH Ref. REFBNTC00606405 | 466,000.00 | |
| 08/MAY | T20 SPEI RECIBIDOAZTECA<br>0737403compra de material Ref. 0105986160 127<br>00127691021020278015<br>25050801001254224624H<br>JOSE LUIS FERNANDEZ MORA | | 10,000. |
| 08/MAY | W01 TRASPASO A TERCEROS<br>PAGO PREST3740A2823VCI BMRCASH Ref. REFBNTC00606405 | 20,000.00 | |
| 08/MAY | W01 TRASPASO A TERCEROS<br>PAGO PREST 3740A6350ATO BMRCASH Ref. REFBNTC00606405 | 42,000.00 | |
| 08/MAY | W01 TRASPASO A TERCEROS<br>USUFRUCTO INMUEBLE CONTRATO BMRCASH Ref.<br>REFBNTC00606405 | 200,000.00 | |
| 08/MAY | M50 CAMBIOS/DERIVADOS/VOSTRO<br>257288002 PROYECTOS EJECUTIVOS SUS Ref. 1559110800 | | 694,070. |
| 08/MAY | T17 SPEI ENVIADO MIFEL<br>0000001FACT A 1802 Ref. 0000491719 042<br>00042180016004925820<br>0026010025050800000491719<br>CERVANTES DIAZ GUTIERREZ SC | 812,000.00 | |
| 08/MAY | W01 TRASPASO A TERCEROS<br>EF7845A0E9BC BMRCASH Ref. REFBNTC00606405 | 87,000.00 | |
| 08/MAY | W01 TRASPASO A TERCEROS<br>ABONO F 826 BMRCASH Ref. REFBNTC00606405 | 10,273.00 | |
| 08/MAY | W01 TRASPASO A TERCEROS<br>757432 BMRCASH Ref. REFBNTC00606405 | 38,280.00 | |
| 08/MAY | T17 SPEI ENVIADO HSBC<br>0000001SALDO OC581 ABONO OC Ref. 0000533138 021<br>00021320003000626797 | 38,027.50 | |

**Exhibit E**

**Correspondence from Mr. Albor demanding
transfer of company funds to personal account**

**Greecher, Sean**

---

**Subject:** RE: [EXTERNAL] Fwd: Mi cuenta Elysium

---------- Mensaje reenviado ---------
De: **Eduardo Albor** <eduardoalbor@thedolphinco.com>
Fecha: El mar, 17 de jun de 2025 a la(s) 11:37 a.m.
Asunto: Mi cuenta Elysium
Para: Rosy Ortiz <rortiz@thedolphinco.com>, Argelia Cordero <tesoreria3@thedolphinco.com>

Rosy , Argelia,

Este correo no es broma.

Necesito respuesta de ustedes antes de las 12 respecto a si ya hicieron la transferencia de mi cuenta de Elysium a la de PNC.

Sino tengo respuesta antes de las 12, en 29 minutos o la ejecución como instruí antes. De una hora. Haré contacto directo con el banco.

Y les aseguro que cuando tome de nuevo el control (y no es pregunta, informo), tú te quedas de asistente personal de Sergio Rosy y tú de Conchita Argelia (y no es amenaza, es promesa), secula secular.

Ya no les estoy pidiendo un favor sino les estoy dando una instrucción clara y precisa. Tienen una hora, para las 12:30 para ejecutara. Será la última vez que les pido algo.



NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and/or privileged information. Any unauthorized review, use, disclosure or distribution of this e-mail is prohibited. If you have received this message in error, please contact the sender and destroy all copies (and attachments) of the original message.

**Exhibit F**

**Bank statements indicating disbursement of Debtor subsidiary funds into Elysium account**

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|------|-------------|-------------|-------------|---------------|-----------------|
| 2025-06-03 | | WORLD OF DOLPHINS INC. | -35030.00 | 0 | 60329.98 |
| 2025-06-03 | | ROYAL CARIBBEAN CRUISES LTD/RO | 0 | 45237.25 | 95359.98 |
| 2025-05-30 | | MONTHLY SERVICE FEE | -100.00 | 0 | 50122.73 |
| 2025-05-30 | | WORLD OF DOLPHINS INC. | -58030.00 | 0 | 50222.73 |
| 2025-05-30 | | ROYAL CARIBBEAN CRUISES LTD/RO | 0 | 32386.75 | 108252.73 |
| 2025-05-29 | | 1/MSC CRUISES SA/ROC/534480/// | 0 | 23059.25 | 75865.98 |
| 2025-05-28 | | WORLD OF DOLPHINS INC. | -36030.00 | 0 | 52806.73 |
| 2025-05-28 | | ELYSIUM DEVELOPMENTS GC, LTD. | -50030.00 | 0 | 88836.73 |
| 2025-05-28 | | 1/MSC CRUISES SA/ROC/532242/// | 0 | 10084.50 | 138866.73 |
| 2025-05-28 | | ROYAL CARIBBEAN CRUISES LTD/RO | 0 | 72435.20 | 128782.23 |
| 2025-05-27 | | DISNEY WORLDWIDE SERVICES INC. | 0 | 5882.50 | 56347.03 |
| 2025-05-23 | | WORLD OF DOLPHINS INC. | -43530.00 | 0 | 50464.53 |
| 2025-05-23 | | ROYAL CARIBBEAN CRUISES LTD/RO | 0 | 43495.57 | 93994.53 |
| 2025-05-20 | | WORLD OF DOLPHINS INC. | -45030.00 | 0 | 50498.96 |
| 2025-05-20 | | ROYAL CARIBBEAN CRUISES LTD/RO | 0 | 44459.95 | 95528.96 |
| 2025-05-16 | | WORLD OF DOLPHINS INC. | -28530.00 | 0 | 51069.01 |
| 2025-05-16 | | ROYAL CARIBBEAN CRUISES LTD/RO | 0 | 29473.50 | 79599.01 |
| 2025-05-15 | | WORLD OF DOLPHINS INC. | -6830.00 | 0 | 50125.51 |
| 2025-05-14 | | DISNEY WORLDWIDE SERVICES INC. | 0 | 6813.50 | 56955.51 |
| 2025-05-13 | | Elysium  Properties Investment | -78594.00 | 0 | 50142.01 |
| 2025-05-13 | | ROYAL CARIBBEAN CRUISES LTD/RO | 0 | 50394.80 | 128736.01 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|------|-------------|-------------|--------------|---------------|-----------------|
| 2025-05-09 | | Concepcion Esteban Manchado | -5079.01 | 0 | 78341.21 |
| 2025-05-09 | | ANDRES MAURETTE JIMENEZ | -4579.00 | 0 | 83420.22 |
| 2025-05-09 | | Elysium  Properties Investment | -6079.00 | 0 | 87999.22 |
| 2025-05-09 | | WORLD OF DOLPHINS INC. | -36030.00 | 0 | 94078.22 |
| 2025-05-09 | | Harris C Caston | -7579.00 | 0 | 130108.22 |
| 2025-05-09 | | ROYAL CARIBBEAN CRUISES LTD/RO | 0 | 76385.60 | 137687.22 |
| 2025-05-08 | | DISNEY WORLDWIDE SERVICES INC. | 0 | 11126.00 | 61301.62 |
| 2025-05-07 | | WORLD OF DOLPHINS INC. | -11030.00 | 0 | 50175.62 |
| 2025-05-07 | | Elysium  Properties Investment | -55094.00 | 0 | 61205.62 |
| 2025-05-06 | | ROYAL CARIBBEAN CRUISES LTD/RO | 0 | 65523.90 | 116299.62 |
| 2025-05-02 | | WORLD OF DOLPHINS INC. | -67030.00 | 0 | 50775.72 |
| 2025-05-02 | | ROYAL CARIBBEAN CRUISES LTD/RO | 0 | 71555.50 | 117805.72 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|------|--------------|-------------|--------------|---------------|-----------------|
| 2025-06-06 | | PRINCESS CRUISE LINES, LTD./RO | 0 | 5129.58 | 62041.34 |
| 2025-06-06 | | CARNIVAL CORPORATION/ROC/74738 | 0 | 17131.08 | 56911.76 |
| 2025-06-05 | | FLORIDA CRUISE ASSOCIATION INC | -10070.00 | 0 | 39780.68 |
| 2025-05-30 | | MONTHLY SERVICE FEE | -100.00 | 0 | 49850.68 |
| 2025-05-30 | | ANDRES MAURETTE JIMENEZ | -4055.00 | 0 | 49950.68 |
| 2025-05-30 | | Transfer To Acct 10466402 | -40000.00 | 0 | 54005.68 |
| 2025-05-30 | | CARNIVAL CORPORATION/ROC/91345 | 0 | 16416.83 | 94005.68 |
| 2025-05-29 | | 1/NCL CORPORATION LTD/ROC/OTR6 | 0 | 8034.08 | 77588.85 |
| 2025-05-28 | | CARNIVAL CORPORATION/ROC/72215 | 0 | 8103.08 | 69554.77 |
| 2025-05-23 | | PRINCESS CRUISE LINES, LTD./RO | 0 | 2794.58 | 61451.69 |
| 2025-05-23 | | CARNIVAL CORPORATION/ROC/79663 | 0 | 13396.08 | 58657.11 |
| 2025-05-23 | | Transfer From Acct 10466402 | 0 | 20000.00 | 45261.03 |
| 2025-05-23 | | Transfer To Acct 10466402 | -20000.00 | 0 | 25261.03 |
| 2025-05-23 | | Transfer To Acct 10466402 | -7500.00 | 0 | 45261.03 |
| 2025-05-22 | | 1/NCL CORPORATION LTD/ROC/OTR6 | 0 | 8814.08 | 52761.03 |
| 2025-05-21 | | Transfer To Acct 10466402 | -10000.00 | 0 | 43946.95 |
| 2025-05-21 | | CARNIVAL CORPORATION/ROC/63358 | 0 | 12964.08 | 53946.95 |
| 2025-05-20 | | Transfer To Acct 10466402 | -10000.00 | 0 | 40982.87 |
| 2025-05-16 | | Transfer To Acct 10466402 | -24500.00 | 0 | 50982.87 |
| 2025-05-16 | | CARNIVAL CORPORATION/ROC/81509 | 0 | 31627.08 | 75482.87 |
| 2025-05-15 | | Transfer To Acct 10466402 | -10000.00 | 0 | 43855.79 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|------|--------------|-------------|--------------|---------------|-----------------|
| 2025-05-14 | | 1/NCL CORPORATION LTD/ROC/OTR6 | 0 | 3746.08 | 53855.79 |
| 2025-05-14 | | Transfer To Acct 10466402 | -9000.00 | 0 | 50109.71 |
| 2025-05-14 | | CARNIVAL CORPORATION/ROC/64838 | 0 | 5170.08 | 59109.71 |
| 2025-05-09 | | PRINCESS CRUISE LINES, LTD./RO | 0 | 2322.08 | 53939.63 |
| 2025-05-09 | | Transfer To Acct 10466402 | -2000.00 | 0 | 51617.55 |
| 2025-05-09 | | Transfer To Acct 10466402 | -24000.00 | 0 | 53617.55 |
| 2025-05-09 | | PRINCESS CRUISE LINES, LTD./RO | 0 | 3993.08 | 77617.55 |
| 2025-05-09 | | Transfer To Acct 10457826 | -500.00 | 0 | 73624.47 |
| 2025-05-09 | | CARNIVAL CORPORATION/ROC/74342 | 0 | 27211.08 | 74124.47 |
| 2025-05-07 | | Harris C Caston | -7555.00 | 0 | 46913.39 |
| 2025-05-07 | | 1/NCL CORPORATION LTD/ROC/OTR6 | 0 | 6196.08 | 54468.39 |
| 2025-05-07 | | CARNIVAL CORPORATION/ROC/61026 | 0 | 7316.08 | 48272.31 |
| 2025-05-06 | | Concepcion Esteban Manchado | -5055.00 | 0 | 40956.23 |
| 2025-05-06 | | Elysium  Properties Investment | -12070.00 | 0 | 46011.23 |
| 2025-05-06 | | Guillermo Sanchez Contreras | -3055.00 | 0 | 58081.23 |
| 2025-05-06 | | Sergio S Jacome Palma | -3055.00 | 0 | 61136.23 |
| 2025-05-02 | | Transfer To Acct 10466402 | -16000.00 | 0 | 64191.23 |
| 2025-05-02 | | Transfer To Acct 10466402 | -23000.00 | 0 | 80191.23 |
| 2025-05-02 | | CARNIVAL CORPORATION/ROC/75038 | 0 | 28241.08 | 103191.23 |
| 2025-05-01 | | NCL CORPORATION LTDGEM-CMA-24M | 0 | 23268.08 | 74950.15 |
| 2025-05-01 | | CARNIVAL CORPORATION/ROC/78704 | 0 | 16695.08 | 51682.07 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|------|--------------|-------------|--------------|---------------|-----------------|
| 2025-06-17 | | CBK2552929430DD_09/06/25 | -548.20 | 0 | 53760.29 |
| 2025-06-17 | | POS FEES DSC 13615140444 | -8.78 | 0 | 54308.49 |
| 2025-06-17 | | POS FEES VSA 13615140444 | -547.12 | 0 | 54317.27 |
| 2025-06-17 | | POS FEES MCD 13615140444 | -295.43 | 0 | 54864.39 |
| 2025-06-17 | | POS PYMT DSC 13615140444 | 0 | 270.00 | 55159.82 |
| 2025-06-17 | | POS PYMT VSA 13615140444 | 0 | 16832.86 | 54889.82 |
| 2025-06-17 | | POS PYMT MCD 13615140444 | 0 | 9089.18 | 38056.96 |
| 2025-06-16 | | CBK9303187542DD_02/06/25 | -113.06 | 0 | 28967.78 |
| 2025-06-16 | | POS FEES VSA 13615140444 | -218.63 | 0 | 29080.84 |
| 2025-06-16 | | POS FEES MCD 13615140444 | -103.71 | 0 | 29299.47 |
| 2025-06-16 | | POS RFND VSA 13615140444 | -552.33 | 0 | 29403.18 |
| 2025-06-16 | | POS FEES VSA 13615140444 | 0 | 17.95 | 29955.51 |
| 2025-06-16 | | POS PYMT VSA 13615140444 | 0 | 6727.19 | 29937.56 |
| 2025-06-16 | | POS PYMT MCD 13615140444 | 0 | 3191.23 | 23210.37 |
| 2025-06-16 | | POS FEES VSA 13615140444 | -455.96 | 0 | 20019.14 |
| 2025-06-16 | | POS FEES DSC 13615140444 | -20.33 | 0 | 20475.10 |
| 2025-06-16 | | POS FEES MCD 13615140444 | -166.53 | 0 | 20495.43 |
| 2025-06-16 | | POS PYMT VSA 13615140444 | 0 | 14026.26 | 20661.96 |
| 2025-06-16 | | POS PYMT DSC 13615140444 | 0 | 625.06 | 6635.70 |
| 2025-06-16 | | POS PYMT MCD 13615140444 | 0 | 5122.89 | 6010.64 |
| 2025-06-13 | | Transfer To Acct 10466402 | -48000.00 | 0 | 887.75 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|---|---|---|---|---|---|
| 2025-06-13 | | 1/ARE YOU EXPERIENCED SL.RESER | 0 | 6022.97 | 48887.75 |
| 2025-06-13 | | CBK2552159640DD_08/05/25 | -89.25 | 0 | 42864.78 |
| 2025-06-13 | | DEBIT REVERSAL | 0 | 1212.60 | 42954.03 |
| 2025-06-13 | | DEBIT REVERSAL | 0 | 290.40 | 41741.43 |
| 2025-06-13 | | 9286625214_PRE-ARB_DD9/3/2025 | -1212.60 | 0 | 41451.03 |
| 2025-06-13 | | 9286583252_PRE-ARB_DD16/12/202 | -290.40 | 0 | 42663.63 |
| 2025-06-13 | | 9286625214_PRE-ARB_DD9/3/2025 | -1212.60 | 0 | 42954.03 |
| 2025-06-13 | | 9286583252_PRE-ARB_DD16/12/202 | -290.40 | 0 | 44166.63 |
| 2025-06-13 | | POS FEES MCD 13615140444 | -151.25 | 0 | 44457.03 |
| 2025-06-13 | | POS FEES VSA 13615140444 | -252.50 | 0 | 44608.28 |
| 2025-06-13 | | POS FEES DSC 13615140444 | -10.93 | 0 | 44860.78 |
| 2025-06-13 | | POS PYMT MCD 13615140444 | 0 | 4654.22 | 44871.71 |
| 2025-06-13 | | POS PYMT VSA 13615140444 | 0 | 7768.63 | 40217.49 |
| 2025-06-13 | | POS PYMT DSC 13615140444 | 0 | 336.18 | 32448.86 |
| 2025-06-12 | | 25418/69804_PRE-ARB_DD24/3/202 | -747.63 | 0 | 32112.68 |
| 2025-06-12 | | 5425199795_PRE-ARB_DD2/27/2025 | -743.75 | 0 | 32860.31 |
| 2025-06-12 | | POS FEES VSA 13615140444 | -368.44 | 0 | 33604.06 |
| 2025-06-12 | | POS FEES DSC 13615140444 | -4.88 | 0 | 33972.50 |
| 2025-06-12 | | POS FEES MCD 13615140444 | -122.09 | 0 | 33977.38 |
| 2025-06-12 | | POS PYMT VSA 13615140444 | 0 | 11336.72 | 34099.47 |
| 2025-06-12 | | POS PYMT DSC 13615140444 | 0 | 150.02 | 22762.75 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|---|---|---|---|---|---|
| 2025-06-12 | | POS PYMT MCD 13615140444 | 0 | 3756.27 | 22612.73 |
| 2025-06-11 | | CBK5450829876DD_19/05/25 | -357.00 | 0 | 18856.46 |
| 2025-06-11 | | POS FEES VSA 13615140444 | -237.53 | 0 | 19213.46 |
| 2025-06-11 | | POS FEES DSC 13615140444 | -6.50 | 0 | 19450.99 |
| 2025-06-11 | | POS FEES MCD 13615140444 | -91.19 | 0 | 19457.49 |
| 2025-06-11 | | POS PYMT VSA 13615140444 | 0 | 7307.93 | 19548.68 |
| 2025-06-11 | | POS PYMT DSC 13615140444 | 0 | 200.00 | 12240.75 |
| 2025-06-11 | | POS PYMT MCD 13615140444 | 0 | 2805.20 | 12040.75 |
| 2025-06-10 | | Transfer To Acct 10466402 | -23000.00 | 0 | 9235.55 |
| 2025-06-10 | | CBK9296565159DD_22/04/25 | -152.60 | 0 | 32235.55 |
| 2025-06-10 | | CBK2545462577DD_09/02/25 | -40.00 | 0 | 32388.15 |
| 2025-06-10 | | CBK2544923455DD_05/05/25 | -458.20 | 0 | 32428.15 |
| 2025-06-10 | | CBK2545919812DD_15/04/25 | -180.00 | 0 | 32886.35 |
| 2025-06-10 | | CBK2546024192DD_05/05/25 | -188.00 | 0 | 33066.35 |
| 2025-06-10 | | POS FEES VSA 13615140444 | -757.66 | 0 | 33254.35 |
| 2025-06-10 | | POS FEES MCD 13615140444 | -309.90 | 0 | 34012.01 |
| 2025-06-10 | | POS FEES DSC 13615140444 | -28.56 | 0 | 34321.91 |
| 2025-06-10 | | POS PYMT VSA 13615140444 | 0 | 23312.47 | 34350.47 |
| 2025-06-10 | | POS PYMT MCD 13615140444 | 0 | 9535.39 | 11038.00 |
| 2025-06-10 | | POS PYMT DSC 13615140444 | 0 | 878.52 | 1502.61 |
| 2025-06-09 | | Transfer To Acct 10479319 | -14000.00 | 0 | 624.09 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|------|--------------|-------------|--------------|---------------|-----------------|
| 2025-06-09 | | CBK5448770520DD_19/05/25 | -222.60 | 0 | 14624.09 |
| 2025-06-09 | | CBK9301722344DD_26/05/25 | -316.80 | 0 | 14846.69 |
| 2025-06-09 | | POS FEES DSC 13615140444 | -11.38 | 0 | 15163.49 |
| 2025-06-09 | | POS FEES VSA 13615140444 | -314.93 | 0 | 15174.87 |
| 2025-06-09 | | POS FEES MCD 13615140444 | -165.38 | 0 | 15489.80 |
| 2025-06-09 | | POS RFND VSA 13615140444 | -120.00 | 0 | 15655.18 |
| 2025-06-09 | | POS FEES VSA 13615140444 | 0 | 3.90 | 15775.18 |
| 2025-06-09 | | POS PYMT DSC 13615140444 | 0 | 350.02 | 15771.28 |
| 2025-06-09 | | POS PYMT VSA 13615140444 | 0 | 9687.54 | 15421.26 |
| 2025-06-09 | | POS PYMT MCD 13615140444 | 0 | 5088.18 | 5733.72 |
| 2025-06-06 | | Transfer To Acct 10479319 | -36000.00 | 0 | 645.54 |
| 2025-06-06 | | POS FEES DSC 13615140444 | -9.26 | 0 | 36645.54 |
| 2025-06-06 | | POS FEES MCD 13615140444 | -177.18 | 0 | 36654.80 |
| 2025-06-06 | | POS FEES VSA 13615140444 | -296.13 | 0 | 36831.98 |
| 2025-06-06 | | POS PYMT DSC 13615140444 | 0 | 284.85 | 37128.11 |
| 2025-06-06 | | POS PYMT MCD 13615140444 | 0 | 5450.80 | 36843.26 |
| 2025-06-06 | | POS PYMT VSA 13615140444 | 0 | 9109.51 | 31392.46 |
| 2025-06-05 | | Transfer To Acct 10466402 | -10000.00 | 0 | 22282.95 |
| 2025-06-05 | | POS FEES VSA 13615140444 | -81.34 | 0 | 32282.95 |
| 2025-06-05 | | POS FEES MCD 13615140444 | -74.36 | 0 | 32364.29 |
| 2025-06-05 | | POS PYMT VSA 13615140444 | 0 | 2503.23 | 32438.65 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|------|-------------|-------------|--------------|---------------|-----------------|
| 2025-06-05 | | POS PYMT MCD 13615140444 | 0 | 2288.03 | 29935.42 |
| 2025-06-04 | | Kenneth Fawssett | -218.50 | 0 | 27647.39 |
| 2025-06-04 | | POS FEES MCD 13615140444 | -157.64 | 0 | 27865.89 |
| 2025-06-04 | | POS FEES DSC 13615140444 | -4.23 | 0 | 28023.53 |
| 2025-06-04 | | POS FEES VSA 13615140444 | -312.63 | 0 | 28027.76 |
| 2025-06-04 | | POS PYMT MCD 13615140444 | 0 | 4850.34 | 28340.39 |
| 2025-06-04 | | POS PYMT DSC 13615140444 | 0 | 130.02 | 23490.05 |
| 2025-06-04 | | POS PYMT VSA 13615140444 | 0 | 9619.92 | 23360.03 |
| 2025-06-03 | | CBK9301386458DD_22/05/25 | -76.02 | 0 | 13740.11 |
| 2025-06-03 | | CBK5446836521DD_13/05/25 | -222.53 | 0 | 13816.13 |
| 2025-06-03 | | CBK5446896058DD_21/05/25 | -190.20 | 0 | 14038.66 |
| 2025-06-03 | | Transfer To Acct 10466402 | -50200.00 | 0 | 14228.86 |
| 2025-06-03 | | POS FEES VSA 13615140444 | -707.98 | 0 | 64428.86 |
| 2025-06-03 | | POS FEES DSC 13615140444 | -24.22 | 0 | 65136.84 |
| 2025-06-03 | | POS FEES MCD 13615140444 | -453.51 | 0 | 65161.06 |
| 2025-06-03 | | POS PYMT VSA 13615140444 | 0 | 21783.55 | 65614.57 |
| 2025-06-03 | | POS PYMT DSC 13615140444 | 0 | 745.02 | 43831.02 |
| 2025-06-03 | | POS PYMT MCD 13615140444 | 0 | 13953.94 | 43086.00 |
| 2025-06-02 | | POS RFND VSA 13615140444 | -294.30 | 0 | 29132.06 |
| 2025-06-02 | | POS RFND MCD 13615140444 | -277.60 | 0 | 29426.36 |
| 2025-06-02 | | POS FEES VSA 13615140444 | 0 | 9.56 | 29703.96 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|------|-------------|-------------|--------------|---------------|-----------------|
| 2025-06-02 | | POS FEES MCD 13615140444 | 0 | 9.02 | 29694.40 |
| 2025-06-02 | | POS FEES VSA 13615140444 | -545.52 | 0 | 29685.38 |
| 2025-06-02 | | POS FEES DSC 13615140444 | -30.18 | 0 | 30230.90 |
| 2025-06-02 | | POS FEES MCD 13615140444 | -280.12 | 0 | 30261.08 |
| 2025-06-02 | | POS PYMT VSA 13615140444 | 0 | 16784.89 | 30541.20 |
| 2025-06-02 | | POS PYMT DSC 13615140444 | 0 | 928.26 | 13756.31 |
| 2025-06-02 | | POS PYMT MCD 13615140444 | 0 | 8619.12 | 12828.05 |
| 2025-05-30 | | INTEREST PAID | 0 | 0.23 | 4208.93 |
| 2025-05-30 | | MONTHLY SERVICE FEE | -100.00 | 0 | 4208.70 |
| 2025-05-30 | | Elysium  Properties Investment | -10070.00 | 0 | 4308.70 |
| 2025-05-30 | | Transfer To Acct 10466402 | -30000.00 | 0 | 14378.70 |
| 2025-05-30 | | POS FEES DSC 13615140444 | -35.58 | 0 | 44378.70 |
| 2025-05-30 | | POS FEES MCD 13615140444 | -143.77 | 0 | 44414.28 |
| 2025-05-30 | | POS FEES VSA 13615140444 | -464.39 | 0 | 44558.05 |
| 2025-05-30 | | POS RFND MCD 13615140444 | -345.15 | 0 | 45022.44 |
| 2025-05-30 | | POS RFND VSA 13615140444 | -347.19 | 0 | 45367.59 |
| 2025-05-30 | | POS FEES MCD 13615140444 | 0 | 11.22 | 45714.78 |
| 2025-05-30 | | POS FEES VSA 13615140444 | 0 | 11.28 | 45703.56 |
| 2025-05-30 | | POS PYMT DSC 13615140444 | 0 | 1094.46 | 45692.28 |
| 2025-05-30 | | POS PYMT MCD 13615140444 | 0 | 4422.15 | 44597.82 |
| 2025-05-30 | | POS PYMT VSA 13615140444 | 0 | 14286.11 | 40175.67 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|------|--------------|-------------|--------------|---------------|-----------------|
| 2025-05-29 | | REV_CBK5441317003DD_09/05/25 | 0 | 285.01 | 25889.56 |
| 2025-05-29 | | POS FEES VSA 13615140444 | -177.97 | 0 | 25604.55 |
| 2025-05-29 | | POS FEES MCD 13615140444 | -102.55 | 0 | 25782.52 |
| 2025-05-29 | | POS PYMT VSA 13615140444 | 0 | 5475.41 | 25885.07 |
| 2025-05-29 | | POS PYMT MCD 13615140444 | 0 | 3155.17 | 20409.66 |
| 2025-05-28 | | POS FEES DSC 13615140444 | -11.56 | 0 | 17254.49 |
| 2025-05-28 | | POS FEES VSA 13615140444 | -260.63 | 0 | 17266.05 |
| 2025-05-28 | | POS FEES MCD 13615140444 | -261.94 | 0 | 17526.68 |
| 2025-05-28 | | POS RFND VSA 13615140444 | -237.20 | 0 | 17788.62 |
| 2025-05-28 | | POS FEES VSA 13615140444 | 0 | 7.71 | 18025.82 |
| 2025-05-28 | | POS PYMT DSC 13615140444 | 0 | 355.60 | 18018.11 |
| 2025-05-28 | | POS PYMT VSA 13615140444 | 0 | 8017.71 | 17662.51 |
| 2025-05-28 | | POS PYMT MCD 13615140444 | 0 | 8058.96 | 9644.80 |
| 2025-05-27 | | Transfer To Acct 10466402 | -25000.00 | 0 | 1585.84 |
| 2025-05-27 | | Transfer To Acct 10466402 | -10000.00 | 0 | 26585.84 |
| 2025-05-27 | | POS FEES MCD 13615140444 | -219.75 | 0 | 36585.84 |
| 2025-05-27 | | POS FEES VSA 13615140444 | -577.87 | 0 | 36805.59 |
| 2025-05-27 | | POS PYMT MCD 13615140444 | 0 | 6760.90 | 37383.46 |
| 2025-05-27 | | POS PYMT VSA 13615140444 | 0 | 17780.28 | 30622.56 |
| 2025-05-26 | | POS FEES VSA 13615140444 | -94.31 | 0 | 12842.28 |
| 2025-05-26 | | POS FEES MCD 13615140444 | -90.83 | 0 | 12936.59 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|------|--------------|-------------|--------------|---------------|-----------------|
| 2025-05-26 | | POS FEES DSC 13615140444 | -8.89 | 0 | 13027.42 |
| 2025-05-26 | | POS RFND MCD 13615140444 | -33.50 | 0 | 13036.31 |
| 2025-05-26 | | POS FEES MCD 13615140444 | 0 | 1.09 | 13069.81 |
| 2025-05-26 | | POS PYMT VSA 13615140444 | 0 | 2901.62 | 13068.72 |
| 2025-05-26 | | POS PYMT MCD 13615140444 | 0 | 2794.30 | 10167.10 |
| 2025-05-26 | | POS PYMT DSC 13615140444 | 0 | 273.50 | 7372.80 |
| 2025-05-23 | | CBK5440339766DD_28/04/25 | -120.00 | 0 | 7099.30 |
| 2025-05-23 | | CBK5441317003DD_05/05/25 | -285.01 | 0 | 7219.30 |
| 2025-05-23 | | ANDRES MAURETTE JIMENEZ | -5055.00 | 0 | 7504.31 |
| 2025-05-23 | | Elena Margarita Dominguez Rica | -5055.00 | 0 | 12559.31 |
| 2025-05-23 | | Elysium  Properties Investment | -20070.00 | 0 | 17614.31 |
| 2025-05-23 | | Transfer From Acct 10466402 | 0 | 20000.00 | 37684.31 |
| 2025-05-23 | | POS FEES MCD 13615140444 | -126.38 | 0 | 17684.31 |
| 2025-05-23 | | POS FEES DSC 13615140444 | -19.73 | 0 | 17810.69 |
| 2025-05-23 | | POS FEES VSA 13615140444 | -233.86 | 0 | 17830.42 |
| 2025-05-23 | | POS RFND MCD 13615140444 | -270.90 | 0 | 18064.28 |
| 2025-05-23 | | POS FEES MCD 13615140444 | 0 | 8.80 | 18335.18 |
| 2025-05-23 | | POS PYMT MCD 13615140444 | 0 | 3887.93 | 18326.38 |
| 2025-05-23 | | POS PYMT DSC 13615140444 | 0 | 607.31 | 14438.45 |
| 2025-05-23 | | POS PYMT VSA 13615140444 | 0 | 7194.09 | 13831.14 |
| 2025-05-22 | | POS FEES MCD 13615140444 | -51.29 | 0 | 6637.05 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|------|--------------|-------------|--------------|---------------|-----------------|
| 2025-05-22 | | POS FEES VSA 13615140444 | -150.08 | 0 | 6688.34 |
| 2025-05-22 | | POS RFND VSA 13615140444 | -145.57 | 0 | 6838.42 |
| 2025-05-22 | | POS FEES VSA 13615140444 | 0 | 4.73 | 6983.99 |
| 2025-05-22 | | POS PYMT MCD 13615140444 | 0 | 1577.58 | 6979.26 |
| 2025-05-22 | | POS PYMT VSA 13615140444 | 0 | 4617.10 | 5401.68 |
| 2025-05-21 | | VENTURE ASHORE, LLC/POP PURCHA | 0 | 199.88 | 784.58 |
| 2025-05-21 | | CBK5439717152DD_28/04/25 | -188.00 | 0 | 584.70 |
| 2025-05-21 | | Transfer To Acct 10466402 | -14200.00 | 0 | 772.70 |
| 2025-05-21 | | POS FEES MCD 13615140444 | -133.40 | 0 | 14972.70 |
| 2025-05-21 | | POS FEES VSA 13615140444 | -363.58 | 0 | 15106.10 |
| 2025-05-21 | | POS RFND VSA 13615140444 | -325.20 | 0 | 15469.68 |
| 2025-05-21 | | POS FEES VSA 13615140444 | 0 | 10.57 | 15794.88 |
| 2025-05-21 | | POS PYMT MCD 13615140444 | 0 | 4103.94 | 15784.31 |
| 2025-05-21 | | POS PYMT VSA 13615140444 | 0 | 11186.89 | 11680.37 |
| 2025-05-20 | | Christopher Barnes | -323.50 | 0 | 493.48 |
| 2025-05-20 | | Michael Walton | -405.25 | 0 | 816.98 |
| 2025-05-20 | | Revinate LLC | -160.00 | 0 | 1222.23 |
| 2025-05-20 | | Transfer To Acct 10466402 | -27500.00 | 0 | 1382.23 |
| 2025-05-20 | | REV_CBK2536257359DD_10/03/25 | 0 | 190.40 | 28882.23 |
| 2025-05-20 | | POS FEES VSA 13615140444 | -481.58 | 0 | 28691.83 |
| 2025-05-20 | | POS FEES MCD 13615140444 | -186.68 | 0 | 29173.41 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|------|-------------|-------------|--------------|---------------|-----------------|
| 2025-05-20 | | POS PYMT VSA 13615140444 | 0 | 14818.09 | 29360.09 |
| 2025-05-20 | | POS PYMT MCD 13615140444 | 0 | 5743.30 | 14542.00 |
| 2025-05-20 | | POS RFND VSA 13615140444 | -876.75 | 0 | 8798.70 |
| 2025-05-20 | | POS FEES VSA 13615140444 | 0 | 28.49 | 9675.45 |
| 2025-05-20 | | POS FEES DSC 13615140444 | -3.51 | 0 | 9646.96 |
| 2025-05-20 | | POS FEES VSA 13615140444 | -240.42 | 0 | 9650.47 |
| 2025-05-20 | | POS FEES MCD 13615140444 | -91.93 | 0 | 9890.89 |
| 2025-05-20 | | POS RFND VSA 13615140444 | -670.50 | 0 | 9982.82 |
| 2025-05-20 | | POS FEES VSA 13615140444 | 0 | 21.80 | 10653.32 |
| 2025-05-20 | | POS PYMT DSC 13615140444 | 0 | 108.01 | 10631.52 |
| 2025-05-20 | | POS PYMT VSA 13615140444 | 0 | 7396.15 | 10523.51 |
| 2025-05-20 | | POS PYMT MCD 13615140444 | 0 | 2828.38 | 3127.36 |
| 2025-05-16 | | CBK2548384847DD_10/3/25 | -186.85 | 0 | 298.98 |
| 2025-05-16 | | CBK2548616627DD_20/4/25 | -404.96 | 0 | 485.83 |
| 2025-05-16 | | Transfer To Acct 10466402 | -8000.00 | 0 | 890.79 |
| 2025-05-16 | | POS FEES VSA 13615140444 | -254.29 | 0 | 8890.79 |
| 2025-05-16 | | POS FEES MCD 13615140444 | -92.97 | 0 | 9145.08 |
| 2025-05-16 | | POS RFND MCD 13615140444 | -341.60 | 0 | 9238.05 |
| 2025-05-16 | | POS FEES MCD 13615140444 | 0 | 11.10 | 9579.65 |
| 2025-05-16 | | POS PYMT VSA 13615140444 | 0 | 7822.47 | 9568.55 |
| 2025-05-16 | | POS PYMT MCD 13615140444 | 0 | 2859.43 | 1746.08 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|---|---|---|---|---|---|
| 2025-05-15 | | CBK2546628169DD_10.03.25 | -472.15 | 0 | -1113.35 |
| 2025-05-15 | | CBK2546883982DD_14.04.25 | -468.00 | 0 | -641.20 |
| 2025-05-15 | | CBK2544873162DD_05.05.25 | -149.25 | 0 | -173.20 |
| 2025-05-15 | | CBK9297212258DD_16.04.25 | -70.02 | 0 | -23.95 |
| 2025-05-15 | | Transfer To Acct 10466402 | -6700.00 | 0 | 46.07 |
| 2025-05-15 | | POS FEES VSA 13615140444 | -165.51 | 0 | 6746.07 |
| 2025-05-15 | | POS FEES MCD 13615140444 | -61.20 | 0 | 6911.58 |
| 2025-05-15 | | POS FEES DSC 13615140444 | -4.16 | 0 | 6972.78 |
| 2025-05-15 | | POS RFND MCD 13615140444 | -455.25 | 0 | 6976.94 |
| 2025-05-15 | | POS FEES MCD 13615140444 | 0 | 14.80 | 7432.19 |
| 2025-05-15 | | POS PYMT VSA 13615140444 | 0 | 5091.09 | 7417.39 |
| 2025-05-15 | | POS PYMT MCD 13615140444 | 0 | 1882.35 | 2326.30 |
| 2025-05-15 | | POS PYMT DSC 13615140444 | 0 | 128.00 | 443.95 |
| 2025-05-14 | | Transfer To Acct 10466402 | -15000.00 | 0 | 315.95 |
| 2025-05-14 | | POS FEES DSC 13615140444 | -27.91 | 0 | 15315.95 |
| 2025-05-14 | | POS FEES MCD 13615140444 | -198.28 | 0 | 15343.86 |
| 2025-05-14 | | POS FEES VSA 13615140444 | -265.53 | 0 | 15542.14 |
| 2025-05-14 | | POS PYMT DSC 13615140444 | 0 | 858.25 | 15807.67 |
| 2025-05-14 | | POS PYMT MCD 13615140444 | 0 | 6100.70 | 14949.42 |
| 2025-05-14 | | POS PYMT VSA 13615140444 | 0 | 8169.16 | 8848.72 |
| 2025-05-13 | | REV CBK5431108452DD_16.04.25 | 0 | 200.00 | 679.56 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|---|---|---|---|---|---|
| 2025-05-13 | | Transfer To Acct 10466402 | -24500.00 | 0 | 479.56 |
| 2025-05-13 | | POS FEES DSC 13615140444 | -2.27 | 0 | 24979.56 |
| 2025-05-13 | | POS FEES MCD 13615140444 | -227.83 | 0 | 24981.83 |
| 2025-05-13 | | POS FEES VSA 13615140444 | -450.45 | 0 | 25209.66 |
| 2025-05-13 | | POS PYMT DSC 13615140444 | 0 | 69.98 | 25660.11 |
| 2025-05-13 | | POS PYMT MCD 13615140444 | 0 | 7009.72 | 25590.13 |
| 2025-05-13 | | POS PYMT VSA 13615140444 | 0 | 13857.57 | 18580.41 |
| 2025-05-12 | | CBK2544038094DD_05/05/25 | -606.30 | 0 | 4722.84 |
| 2025-05-12 | | CBK2544042861DD_05/05/25 | -458.20 | 0 | 5329.14 |
| 2025-05-12 | | POS RFND MCD 13615140444 | -1081.79 | 0 | 5787.34 |
| 2025-05-12 | | POS RFND VSA 13615140444 | -2337.96 | 0 | 6869.13 |
| 2025-05-12 | | POS FEES MCD 13615140444 | 0 | 35.15 | 9207.09 |
| 2025-05-12 | | POS FEES VSA 13615140444 | 0 | 75.98 | 9171.94 |
| 2025-05-12 | | POS FEES MCD 13615140444 | -93.28 | 0 | 9095.96 |
| 2025-05-12 | | POS FEES DSC 13615140444 | -20.89 | 0 | 9189.24 |
| 2025-05-12 | | POS FEES VSA 13615140444 | -176.50 | 0 | 9210.13 |
| 2025-05-12 | | POS PYMT MCD 13615140444 | 0 | 2869.72 | 9386.63 |
| 2025-05-12 | | POS PYMT DSC 13615140444 | 0 | 642.44 | 6516.91 |
| 2025-05-12 | | POS PYMT VSA 13615140444 | 0 | 5429.30 | 5874.47 |
| 2025-05-09 | | DAIMARYS LEON | -5055.00 | 0 | 445.17 |
| 2025-05-09 | | Transfer From Acct 10455041 | 0 | 500.00 | 5500.17 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|------|-------------|-------------|--------------|---------------|-----------------|
| 2025-05-09 | | Elysium  Properties Investment | -17070.00 | 0 | 5000.17 |
| 2025-05-09 | | POS FEES MCD 13615140444 | -139.09 | 0 | 22070.17 |
| 2025-05-09 | | POS FEES VSA 13615140444 | -246.50 | 0 | 22209.26 |
| 2025-05-09 | | POS PYMT MCD 13615140444 | 0 | 4278.50 | 22455.76 |
| 2025-05-09 | | POS PYMT VSA 13615140444 | 0 | 7583.49 | 18177.26 |
| 2025-05-08 | | POS FEES VSA 13615140444 | -148.05 | 0 | 10593.77 |
| 2025-05-08 | | POS FEES MCD 13615140444 | -124.40 | 0 | 10741.82 |
| 2025-05-08 | | POS PYMT VSA 13615140444 | 0 | 4554.71 | 10866.22 |
| 2025-05-08 | | POS PYMT MCD 13615140444 | 0 | 3827.70 | 6311.51 |
| 2025-05-07 | | Transfer To Acct 10466402 | -20000.00 | 0 | 2483.81 |
| 2025-05-07 | | REV_CBK2541869804DD_24/03/25 | 0 | 747.63 | 22483.81 |
| 2025-05-07 | | CBK5438793313DD_24/04/25 | -274.99 | 0 | 21736.18 |
| 2025-05-07 | | CBK9295327407DD_24/04/25 | -296.40 | 0 | 22011.17 |
| 2025-05-07 | | CBK2542209728DD_02/04/25 | -767.00 | 0 | 22307.57 |
| 2025-05-07 | | POS FEES MCD 13615140444 | -119.33 | 0 | 23074.57 |
| 2025-05-07 | | POS FEES VSA 13615140444 | -289.06 | 0 | 23193.90 |
| 2025-05-07 | | POS FEES DSC 13615140444 | -29.04 | 0 | 23482.96 |
| 2025-05-07 | | POS PYMT MCD 13615140444 | 0 | 3671.36 | 23512.00 |
| 2025-05-07 | | POS PYMT VSA 13615140444 | 0 | 8892.59 | 19840.64 |
| 2025-05-07 | | POS PYMT DSC 13615140444 | 0 | 893.44 | 10948.05 |
| 2025-05-06 | | Transfer To Acct 10466402 | -60000.00 | 0 | 10054.61 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|---|---|---|---|---|---|
| 2025-05-06 | | CBK9295056113DD_31/03/253. | -334.40 | 0 | 70054.61 |
| 2025-05-06 | | POS FEES MCD 13615140444 | -229.00 | 0 | 70389.01 |
| 2025-05-06 | | POS FEES VSA 13615140444 | -605.32 | 0 | 70618.01 |
| 2025-05-06 | | POS PYMT MCD 13615140444 | 0 | 7046.57 | 71223.33 |
| 2025-05-06 | | POS PYMT VSA 13615140444 | 0 | 18624.48 | 64176.76 |
| 2025-05-06 | | POS FEES DSC 13615140444 | -8.46 | 0 | 45552.28 |
| 2025-05-06 | | POS FEES VSA 13615140444 | -355.44 | 0 | 45560.74 |
| 2025-05-06 | | POS FEES MCD 13615140444 | -298.94 | 0 | 45916.18 |
| 2025-05-06 | | POS PYMT DSC 13615140444 | 0 | 260.04 | 46215.12 |
| 2025-05-06 | | POS PYMT VSA 13615140444 | 0 | 10934.24 | 45955.08 |
| 2025-05-06 | | POS PYMT MCD 13615140444 | 0 | 9197.00 | 35020.84 |
| 2025-05-01 | | CBK543589768DD_24/04/25 | -379.95 | 0 | 25823.84 |
| 2025-05-01 | | Elysium  Properties Investment | -15070.02 | 0 | 26203.79 |
| 2025-05-01 | | CBK9294618338DD_10/02/25 | -358.00 | 0 | 41273.81 |
| 2025-05-01 | | POS FEES VSA 13615140444 | -297.94 | 0 | 41631.81 |
| 2025-05-01 | | POS FEES MCD 13615140444 | -100.30 | 0 | 41929.75 |
| 2025-05-01 | | POS FEES DSC 13615140444 | -14.53 | 0 | 42030.05 |
| 2025-05-01 | | POS PYMT VSA 13615140444 | 0 | 9165.24 | 42044.58 |
| 2025-05-01 | | POS PYMT MCD 13615140444 | 0 | 3085.89 | 32879.34 |
| 2025-05-01 | | POS PYMT DSC 13615140444 | 0 | 447.00 | 29793.45 |
| 2025-05-01 | | POS FEES DSC 13615140444 | -12.51 | 0 | 29346.45 |

| Date | Instrument # | Description | Debit Amount | Credit Amount | Running Balance |
|------|--------------|-------------|--------------|---------------|-----------------|
| 2025-05-01 | | POS FEES VSA 13615140444 | -181.30 | 0 | 29358.96 |
| 2025-05-01 | | POS FEES MCD 13615140444 | -95.34 | 0 | 29540.26 |
| 2025-05-01 | | POS RFND DSC 13615140444 | -336.15 | 0 | 29635.60 |
| 2025-05-01 | | POS RFND VSA 13615140444 | -171.36 | 0 | 29971.75 |
| 2025-05-01 | | POS RFND MCD 13615140444 | -168.30 | 0 | 30143.11 |
| 2025-05-01 | | POS FEES DSC 13615140444 | 0 | 10.92 | 30311.41 |
| 2025-05-01 | | POS FEES VSA 13615140444 | 0 | 5.57 | 30300.49 |
| 2025-05-01 | | POS FEES MCD 13615140444 | 0 | 5.47 | 30294.92 |
| 2025-05-01 | | POS PYMT DSC 13615140444 | 0 | 385.01 | 30289.45 |
| 2025-05-01 | | POS PYMT VSA 13615140444 | 0 | 5577.85 | 29904.44 |
| 2025-05-01 | | POS PYMT MCD 13615140444 | 0 | 2933.16 | 24326.59 |

**Exhibit G**

**Email to Concepcion Esteban for access to Records (contract repository)**

**Greecher, Sean**

---

| | |
|---|---|
| **From:** | Matias Marambio Calvo <Matias.MarambioCalvo@riveron.com> |
| **Sent:** | Wednesday, June 18, 2025 3:17 PM |
| **To:** | cesteban@thedolphinco.com |
| **Cc:** | Robert Wagstaff; Martin Flores; Sergio Jácome; Javier Lozano; Alfonso Peniche; Carlo Reyes Escandón |
| **Subject:** | Dolphin - Acceso Archivo Contratos Legal |

**Importance:**    High

Concepción,

Te solicito una reunión cuánto antes para poder coordinar el acceso al Repositorio de Archivo de Contratos. Necesitamos acceder a las copias físicas, que sólo tu tienes posibilidad de acceder, cuánto antes.

Copio a los abogados de la Compañía, Guerra y Nassar Nassar para que nos acompañen en la reunión,

Quedamos atentos, y muchas gracias por tu ayuda.

Saludos,
Matías.-

Matias Marambio Calvo
Director
Restructuring & Turnaround Services
M: +1 (475) 280 8607



**Greecher, Sean**

| | |
|---|---|
| **From:** | Matias Marambio Calvo <Matias.MarambioCalvo@riveron.com> |
| **Sent:** | Wednesday, June 18, 2025 3:17 PM |
| **To:** | cesteban@thedolphinco.com |
| **Cc:** | Robert Wagstaff; Martin Flores; Sergio Jácome; Javier Lozano; Alfonso Peniche; Carlo Reyes Escandón |
| **Subject:** | Dolphin - Acceso Archivo Contratos Legal |

**Importance:**     High

Concepción,

Te solicito una reunión cuánto antes para poder coordinar el acceso al Repositorio de Archivo de Contratos. Necesitamos acceder a las copias físicas, que sólo tu tienes posibilidad de acceder, cuánto antes.

Copio a los abogados de la Compañía, Guerra y Nassar Nassar para que nos acompañen en la reunión,

Quedamos atentos, y muchas gracias por tu ayuda.

Saludos,
Matías.-

Matias Marambio Calvo
Director
Restructuring & Turnaround Services
M: +1 (475) 280 8607



**Exhibit H**

**June 18, 2025 amparo filed by Mr. Albor, purportedly on behalf of Controladora Dolphin**

FORMA B-2



PODER JUDICIAL DE LA FEDERACIÓN

**Concurso Mercantil 1/2025**
**Promociones: 22756**
**Mesa: III**

En Ciudad de México, **diecinueve de junio de dos mil veinticinco**, la Secretaria del Juzgado Segundo de Distrito en Materia de Concursos Mercantiles, con residencia en la Ciudad de México y jurisdicción en toda la República Mexicana, hace constar y **CERTIFICA:**

- Que el escrito registrado con número de folio interno **22756**, se encuentra firmado electrónicamente por Eduardo de Martín Albor Villanueva.
- Que se verifica que el certificado de la firma electrónica se encuentra vigente y válido, y por tanto no han sido revocado. **Doy fe.**

**La Secretaria.**
**Marlene Sandra Chávez Reyes.**

En la misma fecha, la Secretaria da cuenta a la Jueza con la certificación que antecede y con el escrito registrado con número de folio interno **22756. Conste.**

**Ciudad de México, diecinueve de junio de dos mil veinticinco.**

Con fundamento en lo dispuesto por el artículo 1077, del Código de Comercio de aplicación supletoria a la Ley de Concursos Mercantiles, por disposición expresa de su numeral 8, téngase por recibido y agréguese a los autos el escrito registrado con número de folio interno **22756**, firmado electrónicamente por Eduardo de Martín Albor Villanueva, quien se ostenta como apoderado de Controladora Dolphin, Sociedad Anónima de Capital Variable, en términos del instrumento notarial seis mil doscientos sesenta y uno, pasado ante la fe de la licenciada Ivonne Lemus Arellano, titular de la Notaría número sesenta y cuatro del estado de Quintana Roo; mediante el cual promueve **JUICIO DE AMPARO DIRECTO** contra la resolución de **veintiuno de mayo de dos mil veinticinco**, a través del cual este Juzgado resolvió el recurso de revocación interpuesto por Controladora Dolphin Sociedad Anónima de Capital Variable, en contra del auto de **catorce de abril de dos mil veinticinco**.

**SE RINDE INFORME**

Con fundamento en el artículo 178, fracción III, de la Ley de Amparo, **RÍNDASE EL INFORME JUSTIFICADO**, manifestando que **ES CIERTO** el acto reclamado, toda vez que ante este Juzgado de





1

Distrito se tramita el concurso mercantil 1/2025-III, y el **veintiuno de mayo de dos mil veinticinco**, se dictó sentencia en la que se resolvió el recurso de revocación interpuesto por Controladora Dolphin Sociedad Anónima de Capital Variable, en contra del auto de **catorce de abril de dos mil veinticinco**, y confirmó el desistimiento de la solicitud de concurso mercantil.

Por cuanto hace a los actos de ejecución que el promovente atribuye al Actuario judicial adscrito a este juzgado de Distrito, se rinde informe en el sentido de que **NO SON CIERTOS,** en razón de que la actuación del mencionado servidor público se circunscribió a notificar lo resuelto por este órgano jurisdiccional.

Por otra parte, del contenido del escrito de demanda de amparo se advierte que el promovente también reclama de este juzgado de Distrito:

1.- El auto de veintiuno de mayo de dos mil veinticinco, dictado en el concurso mercantil 1/2025, a través del cual se resolvió infundado el recurso de revocación interpuesto contra el diverso auto de catorce de abril de dos mil veinticinco y confirmó el levantamiento de medidas cautelares.

2.- El auto de cuatro de junio de dos mil veinticinco dictado en el concurso mercantil 1/2025, a través del cual se resolvió infundado el recurso de revocación interpuesto contra el diverso auto de veintidós de mayo de dos mil veinticinco y confirmó la decisión de revocar las autorizaciones judiciales formuladas por la quejosa en el concurso mercantil.

3.- La omisión de dar trámite y resolver  el incidente de falta de personalidad presentado el uno de abril de dos mil veinticinco.

4.- La omisión de hacer cumplir el requerimiento formulado el tres de abril de dos mil veinticinco.

5.- La omisión de dictar la sentencia de concurso mercantil en el plazo que establece la ley concursal.

6.- La omisión de dar vista o tramitar vía incidental la solicitud de desistimiento presentada en el concurso mercantil al existir controversia sobre la personalidad del solicitante y ser producto de la violación de medidas cautelares.

2



**PODER JUDICIAL DE LA FEDERACIÓN**

Al respecto, se rinde informe justificado en el sentido de que **ES CIERTO** el acto reclamado en el numeral 1, toda vez que el **veintiuno de mayo de dos mil veinticinco**, se dictó sentencia en la que se resolvió el recurso de revocación interpuesto por Controladora Dolphin Sociedad Anónima de Capital Variable, en contra del auto de **catorce de abril de dos mil veinticinco**, y confirmó el levantamiento de las medidas cautelares.

De igual forma, **ES CIERTO** el acto reclamado en el numeral 2, toda vez que el **cuatro de junio de dos mil veinticinco,** se dictó resolución en la que se resolvió el recurso de revocación interpuesto por Controladora Dolphin Sociedad Anónima de Capital Variable, en contra del auto de **veintidós de mayo del año en curso**, y confirmó la decisión de revocar a las personas autorizadas por la quejosa.

Por otra parte, **NO SON CIERTOS LOS ACTOS RECLAMADOS** en los numerales 3 al 6, en razón de que a la fecha de la presentación de la demanda de amparo no existen las omisiones que se atribuyen a este órgano jurisdiccional.

Lo anterior es así, pues en auto de **catorce de abril de dos mil veinticinco**, se levantó la reserva ordenada en proveído de tres de abril del año en curso y, en consecuencia, se admitió y resolvió de plano el incidente de falta de personalidad promovido por Controladora Dolphin, Sociedad Anónima de Capital Variable mediante escrito con número de folio interno 8311, al no estimarse necesaria su substanciación en razón del desistimiento de la comerciante.

De igual forma, **NO ES CIERTO** el acto reclamado consistente en la omisión de hacer cumplir el requerimiento formulado el **tres de abril de dos mil veinticinco**, en razón de que en el auto **de catorce de abril del año en curso**, se estableció que no existe controversia sobre la titularidad de CI Banco, Sociedad Anónima, Institución de Banca Múltiple de más del noventa y nueve por ciento de las acciones de la comerciante, por lo que se estimó suficiente el desahogo por parte de la citada institución fiduciaria para resolver sobre la procedencia de la solicitud de la comerciante de tenerla por desistida del procedimiento concursal en que se actúa.





Asimismo, respecto a la omisión de dictar la sentencia de concurso mercantil en el plazo que establece la ley concursal que el peticionario de amparo señala como violación procesal que trasciende al resultado del fallo, se rinde informe en el sentido de que **NO ES CIERTO**, pues de las constancias de autos se advierte que en proveído de **veinticuatro de marzo de dos mil veinticinco** se dio vista a las partes con el dictamen del visitador para los efectos previstos en el artículo 41 de la Ley de Concursos Mercantiles, el cual transcurrió del **veintisiete de marzo al dos de abril del año en curso,** por lo que el plazo para dictar la sentencia que declarara o no en concurso mercantil a la comerciante, **iniciaría** una vez transcurrido el plazo para formular alegatos.

No obstante, el **treinta y uno de marzo de dos mil veinticinco** se recibió el escrito con número de folio interno **7862**, mediante el cual, la comerciante manifestó su voluntad de desistirse del procedimiento concursal, y el **catorce de abril siguiente**, se levantó la reserva para proveer sobre el mismo y se resolvió tener a la comerciante **desistiéndose** del procedimiento concursal.

Asimismo, no es cierta la omisión de dar vista o **tramitar vía incidental** la solicitud de desistimiento presentada en el concurso mercantil, al no existir solicitud de las partes en ese sentido.

Por otra parte, infórmese al Tribunal de amparo que en relación con los actos reclamados en los numerales 3 al 6, se actualiza la causa de improcedencia prevista en la fracción X del artículo 61 de la Ley de Amparo, en razón de que el veinticinco de abril de do mil veinticinco, se recibió la demanda de amparo directo promovida por Controladora Dolphin SA de CV, en la que reclamó entre otros actos:

1.- La omisión de dar trámite y resolver el incidente de falta de personalidad presentado el uno de abril de dos mil veinticinco.

2.- La omisión de hacer cumplir el requerimiento formulado el tres de abril de dos mil veinticinco.

3.- La omisión de dictar la sentencia de concurso mercantil en el plazo que establece la ley concursal.

4.- La omisión de dar vista o tramitar vía incidental la solicitud de desistimiento presentada en el concurso mercantil al existir controversia sobre la personalidad del solicitante y ser producto de la

4

FORMA B-2



PODER JUDICIAL DE LA FEDERACIÓN

violación de medidas cautelares.

El conocimiento de dicha demanda de amparo, correspondió al **Octavo Tribunal Colegiado en Materia Civil del Primer Circuito**, el cual, la radicó con el número de expediente **DC 320/2025-IV**.

## EMPLAZAMIENTO A TERCEROS INTERESADOS

Dado el estado procesal que guarda el presente asunto, se estima que no actualiza la existencia de terceros interesados.

## CERTIFICACIÓN

Así también, en términos de la fracción I, del mismo dispositivo legal, hágase constar en el escrito de demanda, la fecha en que la parte quejosa fue notificada del acto reclamado y la de su presentación de demanda ante este juzgado, así como los días inhábiles que mediaron entre ambas fechas.

## REMISIÓN DE DEMANDA Y CONSTANCIAS.

En consecuencia, como lo estipula el artículo 178, de la Ley de Amparo, remítase al Tribunal Colegiado en Materia Civil del Primer Circuito, en turno, por conducto de la Oficina de Correspondencia Común de los Tribunales Colegiados, la demanda de amparo con la certificación a que hace alusión el artículo antes citado.

Asimismo, como justificación del acto reclamado, comuníquese al **Tribunal Colegiado en Materia Civil del Primer Circuito, en turno**, que el expediente electrónico completo queda disponible para su vinculación y consulta en la plataforma del Sistema Integral de Seguimiento de Expedientes [SISE], en donde podrá consultar todas las constancias del presente concurso.

En ese sentido, se instruye al Oficial Judicial "A" adscrito a este órgano jurisdiccional, para que proceda hacer disponible el expediente electrónico y el Tribunal Colegiado se encuentre en aptitud de realizar la vinculación y consultar las constancias que integran el mismo.





**SUSPENSIÓN**

Con fundamento en lo dispuesto por el artículo 190, de la Ley de Amparo, **SE NIEGA LA SUSPENSIÓN** del acto reclamado, en razón de que éste consiste en la sentencia de **veintiuno de mayo de dos mil veinticinco**, a través de la cual, este Juzgado resolvió el recurso de revocación interpuesto por Controladora Dolphin SA de CV en contra del auto de **catorce de abril de dos mil veinticinco**.

En ese sentido, el peticionario de amparo solicita la suspensión de la ejecución del acto que reclama, para que se paralicen todos sus efectos; y en consecuencia, sigan surtiendo efectos las medidas cautelares, se continúe reconociendo personalidad a Martín Flores Merino y demás personas autorizadas, no se revoque el domicilio y la consulta del expediente y no se haga efectivo el billete de depósito que se exhibió para garantizar los honorarios del visitador; sin embargo, los efectos de la resolución de **veintiuno de mayo de dos mil veinticinco**, consisten en mantener el estado generado, en el que se tuvo por desistida a la comerciante y, por ende, <u>**que no se continúe con el trámite del procedimiento concursal.**</u>

En ese orden, la concesión de la suspensión solicitada implicaría conceder efectos restitutorios al peticionario de amparo; sin embargo, esta juzgadora considera que el acto reclamado no es un acto susceptible de suspenderse con un efecto de tutela anticipada, puesto que ello iría en contra del orden público y el interés social, previstos en el artículo 1 de la Ley de Concursos Mercantiles que establecen:

> *"**Artículo 1o.-** La presente Ley es de interés público y tiene por objeto regular el concurso mercantil. Es de interés público conservar las empresas y evitar que el incumplimiento generalizado de las obligaciones de pago ponga en riesgo la viabilidad de las mismas y de las demás con las que mantenga una relación de negocios. Con el fin de garantizar una adecuada protección a los acreedores frente al detrimento del patrimonio de las empresas en concurso, el juez y los demás sujetos del proceso regulado en esta Ley deberán regir sus actuaciones, en todo momento, bajo los principios de trascendencia, economía procesal, celeridad, publicidad y buena fe."*

Del dispositivo transcrito se advierte que la finalidad del procedimiento concursal, es la conservación de las empresas, así

6

FORMA B-2



**PODER JUDICIAL DE LA FEDERACIÓN**

como evitar que el incumplimiento generalizado de las obligaciones de pago, ponga en riesgo la viabilidad de las mismas y de las demás con las que mantenga una relación de negocios, lo que constituye un aspecto que interesa a la sociedad, dado el impacto que su conservación o desaparición, producen en la economía nacional y como generadoras de fuentes de empleo, por lo que sujetar a una empresa, y a sus posibles acreedores, a la tramitación de un procedimiento concursal, en el que eventualmente pueda confirmarse que no se reúnen los requisitos legales para ello, indudablemente afectaría el orden público del que están revestidas las disposiciones de la ley concursal.

Apoya a lo anterior, por analogía la jurisprudencia 2a./J.22/2023 (11ª), (registro 2026730), publicada por la Segunda Sala de la Suprema Corte de Justicia de la Nación, visible en la Gaceta del Semanario Judicial de la Federación, Undécima Época, Tomo V, Junio de 2023, página 4497, de rubro y texto siguientes:

> *"**SUSPENSIÓN DEL ACTO RECLAMADO CON EFECTOS RESTITUTORIOS. PARÁMETROS QUE DEBE TOMAR EN CUENTA EL JUZGADOR AL ANALIZAR LA POSIBILIDAD DE CONCEDERLA ANTE LA EVENTUALIDAD DE QUE, CON ELLO, SE DEJE SIN MATERIA EL JUICIO DE AMPARO EN LO PRINCIPAL.** Hechos: Los Tribunales Colegiados de Circuito llegaron a conclusiones discrepantes en relación con los casos donde se dejaría sin materia el juicio de amparo si se solicita la suspensión del acto reclamado con efectos restitutorios, y esos efectos coinciden con los de una eventual sentencia favorable a la parte quejosa. Las posturas contrarias versaron sobre el requisito referente a la posibilidad jurídica de conceder la suspensión, pues uno de los órganos jurisdiccionales consideró que sí era posible restituir provisionalmente a la quejosa del derecho vulnerado, mientras que el otro Tribunal sostuvo que no era posible conceder la suspensión dado que con ello se agotaría la materia del juicio en lo principal. Criterio jurídico: La Segunda Sala de la Suprema Corte de Justicia de la Nación determina que en caso de conceder la suspensión con efectos restitutorios, el órgano jurisdiccional deberá considerar que la materia del juicio de amparo subsiste cuando, en la eventualidad de que resuelva de forma adversa a la quejosa, puedan retrotraerse los efectos de la suspensión y, en contraposición a ello, se tratará de un beneficio no transitorio o definitivo que dejaría sin materia el juicio, cuando éste no pueda ser revocado aun cuando se niegue el amparo. Lo anterior implica que, por regla general, el hecho de que los efectos de la suspensión y una sentencia favorable a la quejosa coincidan, no es una razón suficiente para negar la concesión de la medida cautelar, aun cuando se argumente que la finalidad de esa negativa es preservar la materia del asunto, pues el entendimiento de la expresión*

7



*"conservar la materia del amparo" es que el órgano jurisdiccional velará por proporcionar las condiciones idóneas para proteger el derecho que la parte quejosa considera afectado, no así la prevalencia del fondo sobre la suspensión. Justificación: El enunciado "conservar la materia del amparo hasta la terminación del juicio", previsto en el primer párrafo del artículo 147 de la Ley de Amparo, debe contextualizarse en armonía con la finalidad última del juicio de amparo, que es la de proteger de forma eficaz los derechos que la parte quejosa considera afectados. En ese orden de ideas, la importancia de la suspensión del acto reclamado debe equipararse con la relevancia de conservar la materia del juicio en lo principal, pues ambas buscan crear las condiciones para que el juicio de amparo cumpla con su función protectora por lo que, por regla general, será incorrecto sostener que debe negarse la suspensión con la finalidad de conservar la materia del asunto en lo principal. La suspensión del acto reclamado es, por definición, un beneficio transitorio, porque aun cuando se conceda con un carácter restitutorio y exista identidad entre los efectos de una eventual sentencia favorable a la quejosa, ese beneficio durará únicamente hasta que la sentencia que se dicte en el cuaderno principal cause ejecutoria. La excepción a la regla general, esto es, en qué casos una medida cautelar con efectos restitutorios verdaderamente dejaría sin materia un juicio de amparo, se configurará cuando la restitución provisional de los derechos no pueda ser revocada aun cuando se niegue el amparo."*

**Notifíquese.**

Así lo proveyó y firma electrónicamente la licenciada **Ruth Haggi Huerta García**, Jueza Segundo de Distrito en Materia de Concursos Mercantiles con Residencia en la Ciudad de México y jurisdicción en toda la República Mexicana, ante **Marlene Sandra Chávez Reyes**, Secretaria de Juzgado con quien actúa y da fe. **Doy fe**.

*MSCR/KIBR*

***Marlene Sandra Chávez Reyes***, *Secretaria del Juzgado Segundo de Distrito en Materia de Concursos Mercantiles con Residencia en la Ciudad de México y Jurisdicción en toda la República Mexicana, certifica: que la promoción de cuenta y el presente acuerdo han sido integrados al expediente electrónico que existe en el Sistema Integral de Seguimiento de Expedientes; asimismo, que los archivos electrónicos correspondientes coinciden en su totalidad con las presentes constancias.* **Doy fe.**

Razón. En esta fecha se gira el oficio 3138 a la autoridad correspondiente, notificándole el auto que antecede. Doy fe.

FORMA B-2

**PODER JUDICIAL DE LA FEDERACIÓN**

MARLENE SANDRA CHAVEZ REYES
7950AD29C366455700000000000000000601
08/08/25 11:12:02

# PODER JUDICIAL DE LA FEDERACIÓN

MARLENE S SANDRA CHAVEZ REYES
7990sQNN66aG5T00000000000000000000000694
08/08/25 11:12:02

FORMA B-2



**PODER JUDICIAL DE LA FEDERACIÓN**

**Concurso Mercantil 1/2025-III**
**INFORME JUSTIFICADO**

CIUDAD DE MÉXICO, DIECINUEVE DE JUNIO DE DOS MIL VEINTICINCO.

OF. 3138/2025. TRIBUNAL COLEGIADO EN MATERA CIVIL DEL PRIMER CIRCUITO, EN TURNO.

En cumplimiento al acuerdo emitido hoy en los autos del concurso mercantil de **1/2025-III**, con fundamento en el artículo 178 de la Ley de Amparo, se rinde informe justificado en los siguientes términos:

*"Con fundamento en el artículo 178, fracción III, de la Ley de Amparo, RÍNDASE EL INFORME JUSTIFICADO, manifestando que ES CIERTO el acto reclamado, toda vez que ante este Juzgado de Distrito se tramita el concurso mercantil 1/2025-III, y el veintiuno de mayo de dos mil veinticinco, se dictó sentencia en la que se resolvió el recurso de revocación interpuesto por Controladora Dolphin Sociedad Anónima de Capital Variable, en contra del auto de catorce de abril de dos mil veinticinco, y confirmó el desistimiento de la solicitud de concurso mercantil.*

*Por cuanto hace a los actos de ejecución que el promovente atribuye al Actuario judicial adscrito a este juzgado de Distrito, se rinde informe en el sentido de que NO SON CIERTOS, en razón de que la actuación del mencionado servidor público se circunscribió a notificar lo resuelto por este órgano jurisdiccional.*

*Por otra parte, del contenido del escrito de demanda de amparo se advierte que el promovente también reclama de este juzgado de Distrito:*

*1.- El auto de veintiuno de mayo de dos mil veinticinco, dictado en el concurso mercantil 1/2025, a través del cual se resolvió infundado el recurso de revocación interpuesto contra el diverso auto de catorce de abril de dos mil veinticinco y confirmó el levantamiento de medidas cautelares.*
*2.- El auto de cuatro de junio de dos mil veinticinco dictado en el concurso mercantil 1/2025, a través del cual se resolvió infundado el recurso de revocación interpuesto contra el diverso auto de veintidós de mayo de dos mil veinticinco y confirmó la decisión de revocar las autorizaciones judiciales formuladas por la quejosa en el concurso mercantil.*
*3.- La omisión de dar trámite y resolver el incidente de falta de personalidad presentado el uno de abril de dos mil veinticinco.*
*4.- La omisión de hacer cumplir el requerimiento formulado el tres de abril de dos mil veinticinco.*
*5.- La omisión de dictar la sentencia de concurso mercantil en el plazo que establece la ley concursal.*
*6.- La omisión de dar vista o tramitar vía incidental la solicitud de desistimiento presentada en el concurso mercantil al existir controversia sobre la personalidad del solicitante y ser producto de la violación de medidas cautelares.*

*Al respecto, se rinde informe justificado en el sentido de que ES CIERTO el acto reclamado en el numeral 1, toda vez que el veintiuno de mayo de dos mil veinticinco, se dictó sentencia en la que se resolvió el recurso de revocación interpuesto por Controladora Dolphin Sociedad Anónima de Capital Variable, en contra del auto de catorce de abril de dos mil veinticinco, y confirmó el levantamiento de las medidas cautelares.*



11



De igual forma, **ES CIERTO** el acto reclamado en el numeral 2, toda vez que el **cuatro de junio de dos mil veinticinco**, se dictó resolución en la que se resolvió el recurso de revocación interpuesto por <span style="color:red">Controladora Dolphin Sociedad Anónima de Capital Variable,</span> en contra del auto de **veintidós de mayo del año en curso**, y confirmó la decisión de revocar a las personas autorizadas por la quejosa.

Por otra parte, **NO SON CIERTOS LOS ACTOS RECLAMADOS** en los numerales 3 al 6, en razón de que a la fecha de la presentación de la demanda de amparo no existen las omisiones que se atribuyen a este órgano jurisdiccional.

Lo anterior es así, pues en auto de **catorce de abril de dos mil veinticinco**, se levantó la reserva ordenada en proveído de tres de abril del año en curso y, en consecuencia, se admitió y resolvió de plano el incidente de falta de personalidad promovido por <span style="color:red">Controladora Dolphin, Sociedad Anónima de Capital Variable</span> mediante escrito con número de folio interno 8311, al no estimarse necesaria su substanciación en razón del desistimiento de la comerciante.

De igual forma, **NO ES CIERTO** el acto reclamado consistente en la omisión de hacer cumplir el requerimiento formulado el **tres de abril de dos mil veinticinco**, en razón de que en el auto de **catorce de abril del año en curso**, se estableció que no existe controversia sobre la titularidad de <span style="color:red">CI Banco, Sociedad Anónima, Institución de Banca Múltiple</span> de más del noventa y nueve por ciento de las acciones de la comerciante, por lo que se estimó suficiente el desahogo por parte de la citada institución fiduciaria para resolver sobre la procedencia de la solicitud de la comerciante de tenerla por desistida del procedimiento concursal en que se actúa.

Asimismo, respecto a la omisión de dictar la sentencia de concurso mercantil en el plazo que establece la ley concursal que el peticionario de amparo señala como violación procesal que trasciende al resultado del fallo, se rinde informe en el sentido de que **NO ES CIERTO**, pues de las constancias de autos se advierte que en proveído de **veinticuatro de marzo de dos mil veinticinco** se dio vista a las partes con el dictamen del visitador para los efectos previstos en el artículo 41 de la Ley de Concursos Mercantiles, el cual transcurrió del **veintisiete de marzo al dos de abril del año en curso**, por lo que el plazo para dictar la sentencia que declarara o no en concurso mercantil a la comerciante, **iniciaría** una vez transcurrido el plazo para formular alegatos.

No obstante, el **treinta y uno de marzo de dos mil veinticinco** se recibió el escrito con número de folio interno **7862**, mediante el cual, la comerciante manifestó su voluntad de desistirse del procedimiento concursal, y el **catorce de abril siguiente**, se levantó la reserva para proveer sobre el mismo y se resolvió tener a la comerciante **desistiéndose** del procedimiento concursal.

Asimismo, no es cierta la omisión de dar vista o **tramitar vía incidental** la solicitud de desistimiento presentada en el concurso mercantil, al no existir solicitud de las partes en ese sentido.

Por otra parte, infórmese al Tribunal de amparo que en relación con los actos reclamados en los numerales 3 al 6, se actualiza la causa de improcedencia prevista en la fracción X del artículo 61 de la Ley de Amparo, en razón de que el veinticinco de abril de do mil veinticinco, se recibió la demanda de amparo directo promovida por <span style="color:red">Controladora Dolphin SA de CV</span>, en la que reclamó entre otros actos:
1.- La omisión de dar trámite y resolver el incidente de falta de personalidad presentado el uno de abril de dos mil veinticinco.
2.- La omisión de hacer cumplir el requerimiento formulado el tres de abril de dos mil veinticinco.

FORMA B-2

PODER JUDICIAL DE LA FEDERACIÓN

*3.- La omisión de dictar la sentencia de concurso mercantil en el plazo que establece la ley concursal.*

*4.- La omisión de dar vista o tramitar vía incidental la solicitud de desistimiento presentada en el concurso mercantil al existir controversia sobre la personalidad del solicitante y ser producto de la violación de medidas cautelares.*

*El conocimiento de dicha demanda de amparo, correspondió al **Octavo Tribunal Colegiado en Materia Civil del Primer Circuito**, el cual, la radicó con el número de expediente **DC 320/2025-IV**".*

Asimismo, se remite la demanda de amparo presentada de manera electrónica con la certificación correspondiente.

Por otro lado, le informo que el expediente electrónico completo queda disponible para su vinculación y consulta en la plataforma del Sistema Integral de Seguimiento de Expedientes [SISE], en donde podrá consultar todas las constancias del presente concurso.

**LE REITERO A USTED MI MAS DISTINGUIDA CONSIDERACIÓN Y APROVECHO LA OCASIÓN PARA ENVIARLE UN CORDIAL SALUDO. A T E N T A M E N T E.**

**(Firma electrónica)**
**Licenciada Ruth Haggi Huerta García**
**Jueza Segundo de Distrito en Materia de Concursos Mercantiles con residencia en la Ciudad de México y jurisdicción en toda la República Mexicana.**

PODER JUDICIAL DE LA FEDERACIÓN





## PODER JUDICIAL DE LA FEDERACIÓN

**EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN**

**Archivo Firmado:**
**115790674_4158000037210904051.p7m**
**Autoridad Certificadora:**
**Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal**
**Firmante(s): 2**

| FIRMANTE | | | | | |
|---|---|---|---|---|---|
| **Nombre:** | MARLENE SANDRA CHAVEZ REYES | | **Validez:** | BIEN | Vigente |
| **FIRMA** | | | | | |
| **No Serie:** | 70.6a.66.20.63.6a.66.32.00.00.00.00.00.00.00.00.00.01.60.9d | | **Revocación:** | Bien | No revocado |
| **Fecha (UTC/ CDMX)** | 19/06/25 23:19:26 - 19/06/25 17:19:26 | | **Status:** | Bien | Valida |
| **Algoritmo:** | RSA-SHA256 | | | | |
| **Cadena de firma:** | 47 02 3e b0 1e 8c a7 94 5c 6f 1c f9 83 d1 99 db 4a 9f c4 fa 97 49 8a d3 97 c0 f0 a5 3c 24 c0 49 87 f7 7a b8 84 92 18 67 e2 1a 8a eb 92 b0 6d 46 82 6d 2a 84 67 73 4a 9a 47 db a7 cd cf 1a 80 d3 2d 25 59 05 df 48 15 b0 63 94 b9 90 43 0e bf 80 e7 25 80 18 8d 94 1b d0 ca 48 08 95 7d 4e 2b ab b5 20 70 3f fc f5 8a 81 67 ce a2 7b 0d 0f 08 3f a7 62 01 a7 65 00 62 3a 6e d7 e4 4a 1a 4c 92 f3 87 0c 68 99 0b ab 19 e2 fa 3a f6 1b 6e 9a 5d 26 3f 57 9a d7 e0 24 dc ba 7a db 6d 55 82 9c 4b 8f 57 08 fa 24 00 b0 b6 12 52 c6 70 08 6a ff 0a 46 12 9f d8 2c f3 fa 6f db 5d c3 78 34 bd a5 4c 93 2d c6 eb d7 cf 4d 3c 2d 42 a5 e7 4f 5a 29 32 b2 b3 52 4c 0c 77 49 2e b2 d1 6c cb 94 57 fb 9b ab 65 38 9f 71 bf 1b 4e 24 cb 6c d3 55 63 5d bc 7d 93 98 31 0a 63 a1 71 d9 c7 e5 1a c5 d3 35 b3 50 | | | | |
| **OCSP** | | | | | |
| **Fecha: (UTC/ CDMX)** | 19/06/25 23:19:27 - 19/06/25 17:19:27 | | | | |
| **Nombre del respondedor:** | Servicio OCSP ACI del Consejo de la Judicatura Federal | | | | |
| **Emisor del respondedor:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal | | | | |
| **Número de serie:** | 70.6a.66.20.63.6a.66.32.00.00.00.00.00.00.00.00.00.01.60.9d | | | | |
| **TSP** | | | | | |
| **Fecha : (UTC/ CDMX)** | 19/06/25 23:19:27 - 19/06/25 17:19:27 | | | | |
| **Nombre del emisor de la respuesta TSP:** | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal | | | | |
| **Emisor del certificado TSP:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal | | | | |
| **Identificador de la respuesta TSP:** | 14540055 | | | | |
| **Datos estampillados:** | 0nv68YoRD0NDh8GvYSw4rGvHn+4= | | | | |



## PODER JUDICIAL DE LA FEDERACIÓN

| FIRMANTE | | | | |
|---|---|---|---|---|
| **Nombre:** | RUTH HAGGI HUERTA GARCIA | **Validez:** | BIEN | Vigente |

| FIRMA | | | | |
|---|---|---|---|---|
| **No Serie:** | 70.6a.66.20.63.6a.66.32.00.00.00.00.00.00.00.00.00.00.02.31.4d | **Revocación:** | Bien | No revocado |
| **Fecha (UTC/ CDMX)** | 19/06/25 23:37:25 - 19/06/25 17:37:25 | **Status:** | Bien | Valida |
| **Algoritmo:** | RSA-SHA256 | | | |
| **Cadena de firma:** | 5a e4 9a e7 d2 ca 39 13 04 c5 c7 57 dd 71 86 b3 84 c1 08 c5 f6 2a ca 99 fb a0 ed 74 01 6b 87 c5 79 34 e3 3f 82 0e 5b f1 98 6d 7b 40 15 dd cb 43 cf 44 ab a0 cd 1f 29 0c 62 a7 ac 2f 5c 16 e3 54 7e 36 dd 48 9a 9c d2 c6 a7 6d 3f 22 e5 da c1 c1 eb 15 15 ee 7e 2a 20 4c 72 1b f6 27 fb c2 2e 3f 18 dc 9d 66 ce a1 e1 30 fe e1 5b f6 13 e5 75 b1 23 d7 d0 04 5f cc 9e 3f ca 0d 54 6e bf c4 ec 3d cf 30 43 6f cf 17 71 d7 a8 d5 ae 46 64 79 f8 73 67 b4 83 0a 4b 53 cb 3d 0f b6 4d e4 4a f1 08 37 b0 2d e1 ad 0f 71 8b fe 97 37 d0 49 14 21 19 23 39 eb ec b3 18 92 ff 1b bc d1 9d 92 67 cd 10 de ee 32 32 75 72 50 f3 9c 9f 89 8f 00 a0 a9 e8 08 e0 28 68 77 65 d0 cc 89 a8 88 52 5e f6 67 6b 34 44 34 07 e7 b1 93 59 a9 39 7b 15 71 a8 ff 21 14 97 40 ac 3b 90 03 b5 66 bb 85 b4 65 0e 70 04 08 | | | |

| OCSP | |
|---|---|
| **Fecha: (UTC/ CDMX)** | 19/06/25 23:37:25 - 19/06/25 17:37:25 |
| **Nombre del respondedor:** | Servicio OCSP ACI del Consejo de la Judicatura Federal |
| **Emisor del respondedor:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal |
| **Número de serie:** | 70.6a.66.20.63.6a.66.32.00.00.00.00.00.00.00.00.00.00.02.31.4d |

| TSP | |
|---|---|
| **Fecha : (UTC/ CDMX)** | 19/06/25 23:37:26 - 19/06/25 17:37:26 |
| **Nombre del emisor de la respuesta TSP:** | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal |
| **Emisor del certificado TSP:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal |
| **Identificador de la respuesta TSP:** | 14552200 |
| **Datos estampillados:** | NsNXWAqDoqZra6RkRwo7+O/y1zI= |



# COPIA CERTIFICADA

EXECUTION VERSION
3000000000160000000000000000000000001R8
20150-2E-PP9939

----- **P.A. 6261.- ESCRITURA PÚBLICA NÚMERO SEIS MIL DOSCIENTOS SESENTA Y UNO.** --------

----- **VOLUMEN VIGÉSIMO OCTAVO, TOMO "A".** ----------------------------------------- **OAC/YPF** -----------

----- En la Ciudad de Cancún, Municipio de Benito Juárez, Estado de Quintana Roo, Estados Unidos Mexicanos, a los cinco días del mes de diciembre del año dos mil veinticuatro, Yo, Licenciada **IVONNE LEMUS ARELLANO**, Titular de la Notaría Pública número Sesenta y Cuatro del Estado, y del Patrimonio Inmobiliario Federal en ejercicio, HAGO CONSTAR: -----------------------------------------------------------------

---- **LA PROTOCOLIZACIÓN** del Acta de la Asamblea General Ordinaria de Accionistas de la Sociedad denominada **"CONTROLADORA DOLPHIN", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE,** de fecha siete de noviembre del dos mil veinticuatro, que realizo a solicitud de **MARTIN FLORES MERINO**, como delegado especial de dicha asamblea, al tenor del siguiente antecedente y cláusulas: ----------------------------

----------------------------------------------------- **PROTESTA DE LEY** -----------------------------------------------

---- Para los efectos de lo dispuesto en la fracción **ocho** (romano) del artículo **ochenta y nueve** de la Ley del Notariado para el Estado de Quintana Roo, la suscrita notario hace del conocimiento del compareciente, las penas en que incurren quienes declaran con falsedad en instrumento público, indicándoles que sus declaraciones se considerarán hechas bajo protesta de decir verdad. -------------------------------------------------

--------------------------------------------- **A N T E C E D E N T E S** --------------------------------------------

---- **PRIMERO.- ACTA CONSTITUTIVA.-** Por escritura número cuarenta y dos mil novecientos setenta y cuatro, de fecha diez de abril de dos mil siete, otorgada ante la fe del Marco Antonio Sánchez Vales, Notario Público número Tres del Estado de Quintana Roo, cuyo primer testimonio quedó inscrito en el Registro Público de la Propiedad y del Comercio, en su Delegación Cancún, bajo el folio número **18314** (dieciocho mil trescientos catorce), se constituyó la sociedad **"GO ON DREAMS", SOCIEDAD ANONIMA DE CAPITAL VARIABLE**, con domicilio en la ciudad de Cancún, Quintana Roo, pudiendo tener agencias y sucursales; Duración de cincuenta años; Cláusula de admisión de extranjeros; Capital social variable, teniendo un mínimo fijo sin derecho a retiro de Cien mil Pesos, Moneda Nacional, y teniendo por objeto social el que quedó redactado en dicha escritura. De dicho instrumento copio en su parte conducente lo siguiente: ----------------

---- ""...**CLAUSULAS**.... VIGESIMA QUINTA. – LA ADMINISTRACION. – La administración de la sociedad será encomendada a un Administrador Único o el Consejo de Administración según así lo acuerde la Asamblea Ordinaria. Las personas serán nombradas por la propia Asamblea quien fijará sus atribuciones, facultades y poderes, así como sus emolumentos.- VIGESIMA SEXTA. – Cuando los administradores sean dos o más constituirán Consejo de Administración, siendo el presidente quien legalmente representará al Consejo y gozará del uso y ejercicio de la firma social con la suma de facultades que se contienen en estos Estatutos o que de manera especial se señalen en su nombramiento. El Consejo estará formado por el número de miembros que designe la Asamblea.- VIGESIMA SEPTIMA. – Para que el Consejo de Administración funcione legalmente deberán de asistir, cuando menos, la mitad de sus miembros y sus resoluciones serán válidas cuando sean tomadas por mayoría de votos de los presentes. En caso de empate, el Presidente gozará del voto de calidad.- Las resoluciones tomadas fuera de sesión de consejo, por unanimidad de sus miembros, tendrán para todos los efectos legales la misma validez que si hubieran sido adoptadas en sesión de consejo, siempre y cuando las resoluciones se confirmen por escrito.- VIGESIMA OCTAVA. – El Administrador Único o el Consejo de Administración tendrá las más amplias facultades

reconocidas por la Ley para un mandatario general, pudiendo celebrar todo tipo de contratos y realizar y dirigir los negocios de la sociedad en los términos del artículo Diez de la Ley General de Sociedades Mercantiles, gozando para ello de un Poder General Amplísimo para Pleitos y Cobranzas, Actos de Administración y de Riguroso Dominio con todas las facultades generales y las especiales que conforme a la ley requieran cláusula especial, en los términos del artículos dos mil ochocientos diez y dos mil ochocientos cuarenta y tres del Código Civil del Estado de Quintana Roo y sus correlativos en los diversos Códigos de la República Mexicana.- Transcripción del artículo Dos Mil Ochocientos Diez del Código Civil del Estado de Quintana Roo: "En todos los poderes generales para pleitos y cobranzas bastará que se diga que se otorga con todas las facultades generales y las especiales que requieran cláusula especial conforme a la ley, para que se entiendan conferidos sin limitación alguna. En los poderes generales para administrar bienes, bastará que se digan que se otorgan con ese carácter, para que el apoderado tenga toda clase de facultades administrativas. En los poderes generales para ejercer actos de dominio, con la sola excepción de la donación, que en este Código es un negocio personalísimo para el donante y por tanto no admite la representación en cuanto a éste, bastará que se diga que dichos poderes generales se dan con ese carácter para que el apoderado tenga toda clase de facultades de dueño, tanto en lo relativo a los bienes, como para hacer toda clase de gestiones a fin de defenderlos. Cuando se quieran limitar, en los tres casos antes mencionados, las facultades de los apoderados, se consignarán las limitaciones o se otorgarán al respecto poderes especiales. Los notarios insertarán este artículo en los testimonios de los poderes que ante ellos se otorguen. Lo mismo hará al calce del poder y antes de las firmas de la ratificación si es que en el texto del documento no lo hubieran insertado los interesados, los funcionarios ante quienes los otorgantes y los testigos ratifiquen sus firmas de conformidad con la fracción II del artículo 2807 en relación con el 218 y al 2811. Sin esta inserción, los aludidos testimonios y las mencionadas ratificaciones carecerán de todo efecto legal."- De manera enunciativa pero no limitativa, el Administrador Único o el Consejo de Administración, según el caso, gozara de la firma social quedando expresamente facultado para suscribir títulos de crédito, solicitar su protesto, endosar, avalar y en general realizar toda clase de actos y operaciones de crédito en los términos del artículo Noveno de la General de Títulos y Operaciones de Crédito; igualmente queda facultado para presentar denuncias y querellas y desistirse de ellas en los casos en que proceda; para constituirse como coadyuvante del Ministro Público para el efecto de la reparación del daño; para articular y absolver posiciones; presentar testigos y tachar a los que presentare la contraparte; para transigir y comprometer en árbitros; para tener la representación laboral conforme los artículos once, cuarenta y seis, cuarenta y siete, ciento treinta y cuatro, fracción tercera, quinientos seis, ochocientos setenta y ocho, ochocientos ochenta, ochocientos ochenta y tres, y ochocientos ochenta y cuatro de la Ley Federal del Trabajo; de igual manera se le confiere la representación patronal de la sociedad para actuar ante o frente a los sindicatos con los cuales tenga celebrados contratos colectivos de trabajo, así como para celebrar y rescindir contratos individuales de trabajo; para comparecer ante las Juntas de Conciliación y Arbitraje, ya sean Locales o Federales, llevando la representación patronal para acreditar personalidad y capacidad en juicio o fuera de él, en Los términos del artículo seiscientos noventa y dos Fracción II Y III; podrá comparecer al desahogo de las pruebas testimoniales y confesionales en los términos del artículo setecientos ochenta y siete y setecientos ochenta y ocho de la Ley Federal del Trabajo, con facultades para señalar domicilios

convencionales para oír y recibir notificaciones en los términos del artículo ochocientos setenta y comparecer, con la representación patronal bastante y suficiente, a la audiencia a qué se refiere el artículo ochocientos setenta y tres, ochocientos setenta y cinco, ochocientos setenta y seis, ochocientos setenta y siete y ochocientos setenta y ocho de la Ley Federal del Trabajo, en sus tres fases de conciliación, demanda y excepciones y de ofrecimiento y admisión de pruebas, gozando de las facultades de celebrar todo tipo de convenio, transacciones, finiquitos. De la misma forma, el Administrador Único o el Consejo de Administración queda facultado para solicitar y desistirse del Juicio Constitucional de Amparo, designar a apoderados para la tramitación el juicio Constitucional; para otorgar y revocar poderes generales o especiales, sin menoscabo de sus facultades; para abrir y cerrar, depositar, retirar y girar en cuentas de cheques e inversiones en toda clases de instituciones bancarias y de seguros, designando a las personas que podrán firmar en dichas cuentas; para concurrir ante toda clase de autoridades fiscales sean federales, estatales o municipales; para tramitar y registrar el Registro federal de Contribuyentes, aumento o disminución de obligaciones fiscales, así como la firma electrónica de la Sociedad ante la Secretaria de Hacienda y Crédito Público; para presentar y recibir toda clase de documentos ante la Secretaria de Hacienda y Crédito Público, la Secretaria de Hacienda del Estado de Quintana Roo y la Tesorería en cualesquiera de los Municipios del Estado de Quintana Roo; para presentar toda clase de escritos, recursos, inconformidades, demandas y juicios de nulidad ante el Tribunal Federal de Justicia Fiscal y Administrativo, llevando en todas sus instancias los procesos en los cuales sean parte o tercera la Sociedad y de la manera más amplia, representar a la sociedad ante toda clase de autoridades y personas físicas o morales nacionales o extranjeras…". ---------------------------------------------------------------------------------------------------------------------

----- **SEGUNDO.- CAMBIO DE DENOMINACIÓN Y MODIFICACIÓN DEL OBJETO SOCIAL.-** Por escritura número cuarenta y cinco mil ciento noventa y siete, de fecha veinticinco de febrero de dos mil ocho, otorgada ante la fe del Licenciado Marco Antonio Sánchez Vales, Titular de la Notaría Pública número Tres del Estado de Quintana Roo, cuyo primer testimonio quedó inscrito en el Registro Público de la Propiedad y del Comercio del Estado de Quintana Roo, en su Delegación Cancún, bajo el folio número 118314 (ciento dieciocho mil trescientos catorce), se hizo constar la protocolización de un acta de asamblea general extraordinaria de accionistas de la sociedad denominada "**GO ON DREAMS**", **SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, en la cual, entre sus puntos más importantes se acordó el cambio de denominación social de la sociedad para quedar con el nombre de <u>**CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**</u>, y por consecuencia la reforma a la cláusula primera de los Estatutos Sociales. La ampliación del objeto social de la sociedad y por consecuencia la modificación de la cláusula cuarta de los Estatutos Sociales referente a dicho objeto, el cual quedó redactado de la manera siguiente: "**CUARTA.- OBJETO SOCIAL.-** La sociedad tendrá por objeto social, de manera enunciativa pero no limitativa, el siguiente: a) El establecimiento, administración, operación y explotación de centros de atracción turística, incluyendo sin limitar la presentación de espectáculos con animales marinos; b) El establecimiento, administración, explotación y operación de toda clase de negociaciones de carácter comercial o industrial; c) La realización de toda clase de actividades turísticas y muy especialmente la compra, venta, arrendamiento, explotación, operación y construcción de toda clase de hoteles, restaurantes, bares, clubes, condominios, marinas y centros deportivos, así como la compra y venta de bienes muebles e inmuebles necesarios para el

4

funcionamiento normal de dichos negocios  y la prestación de los servicios relacionados con los mismos; d)
La promoción, administración y participación de toda clase de negocios inmobiliarios, así como la adquisición,
enajenación por cualquier título, arrendamiento, subarrendamiento, y en general la realización de toda clase
de actos de comercio respecto de bienes muebles e inmuebles; e) La organización, promoción de todo tipo
de excursiones turísticas, así como la prestación de toda clase de servicios para el establecimiento,
administración, operación y explotación de centros de atracción turística.; f) La importación, exportación, y
manejo de todo tipo de mercancías en los diferentes regímenes de aduaneros, así como la compra y venta
de fletes marítimos, aéreos y terrestres; g) Adquirir y exportar embarcaciones, de Bandera Mexicana y
extranjera; h) La prestación de servicios de transporte marítimo; i) La obtención, administración y explotación
de toda clase de concesiones, permisos federales en la Zona Federal Marítimo Terrestre, así como la
construcción de muelles previa autorización de la Secretaria de Desarrollo Social y la Secretaria de
Comunicaciones y Transportes; j) La adquisición, construcción, instalación y explotación de toda clase de
almacenes, depósitos, bodegas, oficinas, plantas, muelles, dársenas, atracaderos, cargaderos de petróleo,
gasolineras, astilleros, varaderos, y demás establecimientos e inmuebles necesarios o convenientes  para la
realización de los fines de la sociedad; k) En general, la realización de toda clase de actividades de
construcción, operación, explotación de marinas turísticas para tener en depósito de y dar servicios a toda
clase de embarcaciones mexicanas y extranjeras; l) La prestación y explotación del servicio público de
autotransporte federal del Turismo en las rutas o tramo de jurisdicción federal y local, mediante las
concesiones o permisos que para tal efecto le otorgue a la sociedad correspondiente o mediante las
concesiones o permisos que en goce le aporten sus propios socios; m) La explotación y operación de los
servicios auxiliares y conexos; n) La coordinación , enlace, combinación e intercambio de equipo con otras
personas físicas o morales dedicadas al mismo objeto, así como el enrolamiento interno de los vehículos con
que la empresa realiza las prestación de servicios tanto federales como locales; o) Obtener toda clase de
préstamos y créditos con o sin garantía específica y otorgar préstamos a sociedades mercantiles y civiles
con los que la sociedad tenga relaciones de negocios o títulos de crédito a cargo de sociedades en las que
tenga interés o participación, así como de obligaciones o títulos de crédito a cargo de otras sociedades a
personas con los que la sociedad tenga relación de negocios; p) Emitir y girar toda clase de títulos de crédito,
aceptarlos y endosarlos, incluyendo obligaciones con o sin garantía hipotecaria o real; q) Adquirir en
propiedad o en arrendamiento toda clase de bienes muebles e inmuebles, así como derechos reales sobre
ellos que sean necesarios convenientes para su objeto social o para las operaciones de las sociedades
mercantiles o civiles en las que la sociedad tenga interés o participación o con las que mantenga relaciones
de negocios; r) Adquirir acciones, intereses o participaciones en otras sociedades mercantiles o civiles, ya
sea formando parte en su constitución o adquiriendo acciones o participaciones en las ya constituidas, así
como enajenar o traspasar tales acciones o participaciones; s) Fungir como representante, intermediario,
mediador, comisionista, agente, factor, asesor y prestador de servicios  de cualquier naturaleza ante toda
clase de personas e instituciones de naturaleza civil, mercantil, públicas o privadas nacionales o extranjeras
en la realización de toda clase de operaciones, actos y contratos civiles, mercantiles, de crédito, laborales y
de cualquier otra naturaleza; t) La promoción, administración y participación en toda clase de negocios
inmobiliarios, así como la adquisición, enajenación por  cualquier título, arrendamiento y subarrendamiento

y en general la realización de toda clase de actos de comercio respecto de bienes inmuebles; u)

otorgamiento y obtención de créditos para sí o para terceros, recibiendo y constituyendo las garantías reales

o personales necesarias o relacionadas con ello; v) Responsabilizarse por obligaciones de terceros en forma

onerosa o gratuita, constituyendo toda clase de garantías reales o personales; w) La celebración de toda

clase de contratos que tengan por objeto la concesión del uso o autorización de explotación de marcas,

patentes, inversiones, modelos, y dibujos industriales, la cesión o autorización de nombres comerciales, la

concesión de derechos de autor, la transmisión de conocimientos técnicos y la provisión de asistencia

técnica, así como la celebración de toda clase de contratos de licencia y franquicia; x) Obligarse

solidariamente; y) Registrar, adquirir, enajenar, poseer, licenciar, concesionar y ceder el derecho al uso de

patentes, marcas, concesiones, franquicias, nombres comerciales, logotipos distintivos, permisos, licencias,

privilegios, inventos, mejoras y derechos de autor que estén relacionados o que sean útiles respecto a

cualquier negocio de la sociedad, sean nacionales o extranjeros; z) La emisión de bonos y obligaciones con

o sin garantía hipotecaria o prendaria; aa) La inversión de capitales en valores de toda índole; bb) La

preparación, conceptualización, ejecución, implementación, interpretación, complementación, investigación

y, en general, la elaboración de toda clase de estudios y proyectos relacionados con la ciencia, la industria y

el comercio, así como la promoción, administración y participación en toda clase de negocios; cc) En general,

la celebración de todos los convenios y contratos y la realización de todos los actos de naturaleza que sean

y que directa o indirectamente favorezcan a la buena marcha y mejor desarrollo de su objeto social, previa

la obtención y sujeto, en su caso, a las autorizaciones y/o permisos que se requieran conforme a la ley." ---

----- **TERCERO.- AUMENTO DE CAPITAL.-** Por escritura número cuarenta y nueve mil ciento setenta y

nueve, de fecha tres de diciembre del año dos mil nueve, otorgada ante la fe del Doctor Marco Antonio

Sánchez Vales, Titular de la Notaría Pública Número Tres del Estado de Quintana Roo, se hizo constar la

Protocolización de un Acta de Asamblea General Ordinaria de Accionistas de la sociedad denominada

**CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, en el cual entre otros

puntos del orden del día se acordó aumentar el capital social. ----------------------------------------------------------

----- **CUARTO.-** Por escritura número cincuenta y un mil diecisiete, de fecha trece de diciembre del año dos

mil diez, otorgada ante la fe del Doctor Marco Antonio Sánchez Vales, Titular de la Notaría Pública Número

Tres del Estado de Quintana Roo, cuyo primer testimonio quedó inscrito en el Registro Público de la

Propiedad y el Comercio del Estado de Quintana Roo, Delegación Cancún, bajo el folio electrónico número

18314 (dieciocho mil trescientos catorce), se hizo constar la Protocolización de un Acta de Asamblea

Ordinaria de Accionistas de la sociedad denominada **CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA

DE CAPITAL VARIABLE**, en la cual entre otros puntos del orden del día se acordó ratificar al Consejo de

Administración, renuncia y designación de nuevo Comisario de la Sociedad. ----------------------------------------

----- **QUINTO.- AUMENTO DE CAPITAL.-** Por escritura número cincuenta y cuatro mil veinticuatro, de fecha

veintinueve de septiembre del año dos mil doce, otorgada ante la fe del Doctor Marco Antonio Sánchez Vales,

Titular de la Notaría Pública Número Tres del Estado de Quintana Roo, se hizo constar la Protocolización de

un Acta de Asamblea Ordinaria de Accionistas de la Sociedad denominada **CONTROLADORA DOLPHIN,

SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, en la cual entre otros puntos del orden del día se acordó

aumentar el capital social de la sociedad. ----------------------------------------------------------------------------------------

----- **SEXTO.-** Por escritura cincuenta y cinco mil doscientos uno, de fecha cinco de julio del año dos mil trece, otorgada ante la fe del Doctor Marco Antonio Sánchez Vales, Titular de la Notaría Pública Número Tres del Estado de Quintana Roo, cuyo primer testimonio quedó inscrito en el Registro Público de la Propiedad y del Comercio del Estado de Quintana Roo, Delegación Cancún, bajo el folio número 18314 (dieciocho mil trescientos catorce), se hizo constar la Protocolización de Acta de Asamblea Ordinaria de Accionistas de la Sociedad denominada **CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, la cual entre sus puntos más importantes del orden del día se ratificó al Presidente, Secretario y Tesorero del Consejo de Administración de la sociedad respectivamente a los señores Licenciados Eduardo Albor Villanueva, Concepción Esteban Manchado y al Contador Público Martin Flores Merino, quienes en el ejercicio de sus funciones seguirán gozando de todas y cada una de las facultades que les fueron otorgadas con anterioridad. ------------------------------------------------------------------------------------------------

----- **SEPTIMO.-** Por escritura número cincuenta y cinco mil doscientos dos, de fecha cinco de julio del año dos mil trece, otorgada ante la fe del Doctor Marco Antonio Sánchez Vales, Titular de la Notaría Pública Número Tres del Estado de Quintana Roo, se hizo constar la Protocolización de un Acta de Asamblea Ordinaria de Accionistas de la Sociedad denominada **CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, la cual entre otros puntos del Orden del día se acordó ratificar los acuerdos tomados en la asamblea de fecha quince de febrero de dos mil ocho la cual fue protocolizada mediante escritura número cuarenta y cinco mil ciento noventa y siete, de fecha veinticinco de febrero de dos mil ocho, otorgada ante la fe del Licenciado Marco Antonio Sánchez Vales, Titular de la Notaría Pública número Tres del Estado de Quintana Roo, cuyo primer testimonio quedó inscrito en el Registro Público de la Propiedad y del Comercio del Estado de Quintana Roo, en su Delegación Cancún, bajo el folio número 118314 (ciento dieciocho mil trescientos catorce), en lo referente a la reforma de la Cláusula Primera de los estatutos sociales, respecto a la modificación de la denominación de la sociedad y en consecuencia se instruyó al Secretario del Consejo de Administración para que haga las anotaciones respectivas en el Libro de Registro de Acciones que al efecto lleva la sociedad, así como para que lleve a cabo el canje de los títulos que amparan las acciones de la sociedad mediante la cancelación de los títulos actualmente en circulación y la emisión de los nuevos; y respecto a la reforma la cláusula cuarta de los estatutos sociales en esta Asamblea, respecto al objeto de la Sociedad para quedar en los términos del acta de la asamblea que se ratificó se especifican; asimismo acordó que la sociedad  se constituye en obligada solidaria y/o aval de Olimpia Investments Group, Lid., hasta por la cantidad de $1´530,000.00 (un millón quinientos treinta mil dólares moneda curso legal de los Estados Unidos de América), frente al Caterpillar Financial Services Corporation suscribiendo al efecto el contrato respectivo; La designación del Licenciado Eduardo Albor Villanueva, para que en nombre de la sociedad suscriba los documentos necesarios para la correcta constitución de la garantía aprobada en el punto anterior.--------------------------------------------------------------------------------

----- **OCTAVO.-** Por escritura número cincuenta y seis mil setecientos cincuenta y siete, de fecha catorce de julio del año dos mil catorce, otorgada ante la fe del Doctor Marco Antonio Sánchez Vales, Titular de la Notaría Pública Número Tres del Estado de Quintana Roo, se hizo constar la Protocolización de un Acta de Asamblea Ordinaria de Accionistas de la Sociedad denominada **CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, la cual entre otros puntos del Orden del día se acordó el monto que ha

de percibir el Presidente del Consejo de Administración de la sociedad, en concepto de honorarios por las funciones que desempeña en la sociedad. -------------------------------------------------------------------------------

----- NOVENO.- Por escritura número cincuenta y seis mil setecientos cincuenta y ocho, de fecha catorce de julio del año dos mil catorce, otorgada ante la fe del Doctor Marco Antonio Sánchez Vales, Titular de la Notaría Pública Número Tres del Estado de Quintana Roo, se hizo constar la Protocolización de un Acta de Asamblea Ordinaria de Accionistas de la Sociedad denominada **CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, la cual entre otros puntos del Orden del día se acordó los honorarios mensuales que percibiría el Presidente del Consejo de Administración de la sociedad. ----------------------------

----- **DÉCIMO.- ACUERDOS PARA FUSIÓN DE LA SOCIEDAD**.- Mediante Escritura Pública número cincuenta y seis mil novecientos veintisiete, de fecha dos de septiembre del año dos mil catorce, otorgada ante la fe del Doctor Marco Antonio Sánchez Vales, Titular de la Notaría Pública Número Tres del Estado de Quintana Roo, cuyo primer testimonio quedó inscrito en el Registro Público de Comercio del Estado de Quintana Roo, Delegación Cancún, bajo el folio mercantil electrónico Número 18314 (dieciocho mil trescientos catorce), de fecha diecisiete de diciembre de dos mil catorce, se hizo constar la protocolización del Acta de Asamblea General Extraordinaria de accionistas de la sociedad denominada **CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, en la cual entre sus puntos más importantes se acordó fusionar ésta sociedad con la sociedad denominada **DELFINES DE QUINTANA ROO, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE,** desapareciendo ésta última como sociedad Fusionada, y subsistiendo **CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE,** como sociedad Fusionante y se acordaron las bases conforme a las cuales debía llevarse a cabo dicha fusión y firmarse el convenio de fusión respectivo y se designó a la licenciada Concepción Esteban Manchado, como Delegada especial de la Asamblea a efecto de firmar el convenio de fusión propuesto y llevar a cabo, en definitiva la fusión convenida. ---------------------------------------------------------------------------------------------------------------

----- **DÉCIMO PRIMERO.- FUSIÓN DE SOCIEDADES.-** Por escritura número cincuenta y siete mil novecientos sesenta, de fecha primero de junio de dos mil quince, otorgada ante la fe del Doctor Marco Antonio Sánchez Vales, titular de la notaría pública número tres del Estado de Quintana Roo, cuyo primer testimonio está pendiente de ser inscrito en el Registro Público de la Propiedad y del Comercio del Estado de Quintana Roo, Delegación Cancún, por lo reciente de su otorgamiento, se hizo constar la Protocolización de un Acta de Asamblea General Extraordinaria de Accionistas de la Sociedad denominada **CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, en la cual entre sus puntos más importantes se formalizó **LA FUSIÓN DEFINITIVA** que celebraron las personas morales denominadas **DELFINES DE QUINTANA ROO, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, como sociedad Fusionada, y **CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, en su carácter de sociedad Fusionante subsistiendo esta última y como consecuencia de dicho fusión se aumentó el capital social en su parte fija y se reformo al efecto la cláusula sexta de los estatutos sociales. --------------

----- **DÉCIMO SEGUNDO.- MODIFICACION DE ESTATUTOS.-** Por escritura número cincuenta y ocho mil cien, de fecha nueve de julio de dos mil quince, otorgada ante la fe del Doctor Marco Antonio Sánchez Vales, titular de la notaría pública número tres del Estado de Quintana Roo, cuyo primer testimonio quedó inscrito en el Registro Público de la Propiedad y del Comercio del Estado de Quintana Roo, Delegación Cancún, en

8

el folio mercantil electrónico 18314*2 (dieciocho mil trescientos catorce asterisco dos), se hizo constar la protocolización de un Acta de Asamblea General Extraordinaria de accionistas de la sociedad denominada **CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, en la que entre sus puntos más importantes del orden del día se acordó la reforma de las cláusulas Sexta, Octava, y Décima primera, referente al capital social y sus acciones; de los estatutos sociales. -----------------------------------------------------------

----- **DÉCIMO TERCERO.-** Mediante escritura pública número mil setecientos once del protocolo abierto, de fecha veintidós de julio del dos mil quince, otorgada ante la fe de la suscrita notario, se hizo constar la protocolización de un Acta de Asamblea General Ordinaria de accionistas de la sociedad denominada **CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, en la que entre sus puntos del orden del día se acordó la aprobación para celebrar los documentos de la operación documento que quedo descrito en el instrumento citado, y la aprobación de otorgar en favor de CT CORPORATION SYSTEM, un poder especial irrevocable tan amplio como en derecho proceda, para ser ejercido en el Estado de Nueva York, Estados Unidos de América. ------------------------------------------------------------------------

---- **DÉCIMO CUARTO.- OTORGAMIENTO DE UN PODER ESPECIAL IRREVOCABLE.-** Por escritura número mil ochocientos veinte, de fecha dos de octubre de dos mil quince, otorgada ante la fe del licenciado José Miguel Ortiz Martínez, actuando como notario auxiliar de esta notaría, de la cual su titular es la licenciada Ivonne Lemus Arellano, se hizo constar la protocolización de un Acta de Asamblea General Ordinaria de accionistas de la sociedad denominada **CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, celebrada con fecha dos de octubre de dos mil quince, en la que entre sus puntos más importantes del orden del día se otorgó en favor de CT Corporation System, con domicilio en 818 (ochocientos dieciocho) W. 7th (séptima) Street, Suite 930 (novecientas treinta), Los Ángeles, California 90017 (noventa mil diecisiete), Estados Unidos de América, un poder especial irrevocable, tan amplio como en derecho proceda para que dicho Agente de Proceso reciba, acepte y reconozca en representación de la Sociedad cualquier clase de notificaciones y emplazamientos de cualquier naturaleza relacionadas con cualquier demanda, reclamación, acción, procedimiento o juicio, incluyendo sin limitación cualquier procedimiento judicial, arbitral o administrativo, derivado de o relacionado con el Contrato de Emisión y Compra de Valores, los Documentos de Garantía (*Collateral Documents* según dicho término se define en el Contrato de Emisión y Compra de Valores), los Documentos de la Adquisición (*Acquistion Documents* según dicho término se define en el Contrato de Emisión y Compra de Valores) y los Documentos de la Inversión (*Investment Documents* según dicho término se define en el Contrato de Emisión y Compra de Valores) pero exceptuando en todo caso los Documentos de Garantía Mexicanos (*Mexico Security Document* según dicho término se define en el Contrato de Emisión y Compra de Valores), incluyendo sin limitar, el Fideicomiso de Garantía, el Contrato de Prenda Sobre Acciones, y el Contrato de Prenda Sin Transmisión de Posesión. Para estos efectos, el Agente de Proceso gozará de un poder especial irrevocable para pleitos y cobranzas en los términos del primer párrafo del artículo 2554 (dos mil quinientos cincuenta y cuatro) del Código Civil para el Distrito Federal y de sus correlativos en el Código Civil Federal y en los Estados de la República Mexicana. La Sociedad señala como domicilio convencional para recibir cualquiera de las notificaciones o emplazamientos antes citados el ubicado en 818 (ochocientos dieciocho) W. 7th (séptima) Street, Suite 930 (novecientas treinta), Los Ángeles, California 90017 (noventa mil diecisiete), Estados Unidos de América, o

cualquier otro domicilio que en el futuro le notifique el Agente de Proceso a la Sociedad dicho poder otorgado como cumplimiento de una condición prevista en el Contrato de Emisión y Compra de Valores y, por lo tanto, es irrevocable en términos de lo dispuesto por el Artículo 2596 (dos mil quinientos noventa y seis) del Código Civil Federal y sus correlativos en los Códigos Civiles de los Estados y del Distrito Federal de México. --------------------------------------------------------------------------------------------------------------------

----- **DÉCIMO QUINTO**.- **PROTOCOLIZACIÓN.-** Mediante escritura número tres mil quinientos noventa y uno del protocolo abierto, de fecha cuatro de septiembre del dos mil dieciocho, otorgada ante la fe de la suscrita notario, se hizo constar la protocolización de un Acta de Asamblea General Ordinaria de accionistas de la sociedad denominada **CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, celebrada con fecha cuatro de septiembre del dos mil dieciocho, en la que entre sus puntos más importantes del orden del día se aprobó la celebración de los documentos de la operación de la sociedad en su carácter de sociedad emisora (*Issuer*), el Convenio Modificatorio número 5 (cinco) al Contrato de Emisión y Compra de Valores (*Amendment No. 5 cinco to Note Purchase Agreement*); b) La suscripción de cualesquier título de crédito en forma de *Senior Secured Notes* o *Notes* (según dicho término se define el Convenio Modificatorio Número 5 al Contrato de Emisión y Compra de Valores) que requieran ser suscritos por la Sociedad, como suscriptor, como obligado solidario o avalista, según sea el caso, conforme con lo establecido en, o en relación con el Convenio Modificatorio Número 5 cinco al Contrato de Emisión y Compra de Valores (los *Senior Secured Notes*, conjuntamente con el Convenio Modificatorio número 5 cinco al Contrato de Emisión y Compra de Valores y los *Investment Documents*, y c) Cualesquier otros convenios, contratos, instrumentos, documentos, garantías, certificados, instrucciones, notificaciones, avisos, requerimientos, poderes y/o solicitudes requeridas conforme a, derivadas de o relacionadas con cualquiera de los Documentos de la Operación, e incluyendo, en cada caso, cualquier modificación, ya sea total o parcial, suplemento, sustitución o cualquier otra reforma de los mismos, los cuales todos serán considerados Documentos de la Operación.

---- **DÉCIMO SEXTO.-** Mediante escritura número tres mil novecientos treinta del protocolo abierto, de fecha tres de abril de dos mil diecinueve, otorgada ante la fe de la suscrita notario, se hizo constar la protocolización de un Acta de Asamblea General Ordinaria de accionistas de la sociedad denominada **CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, celebrada con fecha tres de abril de dos mil diecinueve, en la cual, entre sus puntos más importantes se sometió a la consideración de los accionistas la conveniencia de que la Sociedad celebrara y tomara cualquier acción necesaria y o conveniente para otorgar los "Documentos de la Operación", según término que quedó descrito en la asamblea que se viene relacionando como: "*El contrato de emisión, compra y garantía de valores (Note Purchase and Guarantee Agreement) que será celebrado entre, (i) la Sociedad (Issuer), en su carácter de sociedad emisora y bajo cualquier otro carácter ahí establecido, (ii) Dolphin Capital Company, S. de R.L. de C.V. (Parent Guarantor) (en adelante "Dolphin") conjuntamente con ciertas subsidiarias y afiliadas de Dolphin, incluyendo la Sociedad, como garantes (Guarantors), (iii) aquellos compradores (Purchasers), que de tiempo en tiempo adquieran los valores (Senior Secured Notes) emitidos por Controladora, en su carácter de compradores (los "Compradores"), y (iv) Wilmington Trust, National Association. (Collateral Agent), en su carácter de agente de garantías en nombre y para beneficio de los Compradores (el "Agente de Garantías") (el "Contrato de Emisión y Compra de Valores"); b) El convenio de aportación y primer convenio modificatorio y de re-*

*expresión total al contrato de fideicomiso irrevocable de garantía número CIB/2380 de fecha 8 de octubre de 2015, que será celebrado entre, (i) la Sociedad, Promotora Garrafón, S.A. de C.V. ("Promotora"), y Dolphin, en su carácter de fideicomitentes y fideicomisarios en segundo lugar, (ii) el Agente de Garantías, en su carácter de fideicomisario en primer lugar, y (iii) CIBanco, S.A., Institución de Banca Múltiple, (el "Fiduciario"), como fiduciario, con la comparecencia de Dolphin Austral Holdings, S.A. de C.V. ("Austral"), Aqua Tours, S.A. de C.V. ("Aqua Tours"), Viajero Cibernético, S.A. de C.V. ("Viajero"), y Desarrollo Corporativo del Pacífico, S.A. de C.V.(el "Fideicomiso de Garantía"); c) El convenio de ampliación, modificación ratificación y subsistencia de contrato de hipoteca marítima, de fecha 10 de diciembre de 2015, celebrado entre la Sociedad, como garante hipotecario, y el Agente de Garantías, como acreedor hipotecario (la "Hipoteca Marítima"); d) Cualesquiera pagarés que requieran ser suscritos por la Sociedad, como promitente o "por aval", según sea el caso, conforme a lo establecido en o en relación con el Contrato de Emisión y Compra de Valores (los "Pagarés"); e) El primer convenio de adhesión, modificatorio y re-expresión total al contrato de prenda sin transmisión de posesión de fecha 8 de octubre de 2015, que será celebrado entre la Sociedad, Austral, Viajero, Aqua Tours, Promotora y Dolphin, como deudores prendarios, y el Agente de Garantías, como acreedor prendario (el "Contrato de Prenda sin Transmisión de Posesión" y, conjuntamente con el Contrato de Emisión y Compra de Valores, el Fideicomiso de Garantía, la Hipoteca Marítima y los Pagarés, los "Documentos de la Operación"); y f) Cualesquier otros convenios, contratos, instrumentos, documentos, garantías, certificados, instrucciones, notificaciones, avisos, requerimientos, poderes y/o solicitudes requeridas conforme a, derivadas de o relacionadas con cualquiera de los Documentos de la Operación, e incluyendo, en cada caso, cualquier modificación, ya sea total o parcial, suplemento, sustitución o cualquier otra reforma de los mismos"* Por lo que se resolvió  aprobar la celebración por parte de la Sociedad de los Documentos de la Operación y cualesquier otros convenios, contratos, instrumentos, documentos, garantías, certificados, instrucciones, notificaciones, avisos, requerimientos, poderes y/o solicitudes requeridas conforme a, derivadas de o relacionadas con cualquiera de los Documentos de la Operación, e incluyendo, en cada caso, cualquier modificación, ya sea total o parcial, suplemento, sustitución o cualquier otra reforma de los mismos. En tal virtud, la Sociedad podrá realizar, suscribir, celebrar y llevar a cabo todos aquellos actos que sean necesarios o convenientes a fin de consumar todas las operaciones objeto de dichos Documentos de la Operación, incluyendo sin limitar, el Contrato de Emisión y Compra de Valores, el Fideicomiso de Garantía y el Contrato de Prenda sin Transmisión de Posesión; asimismo se aprobó; el otorgamiento de un poder irrevocable en favor de CT Corporation System, con domicilio en 818 W. (ochocientos dieciocho W)  7th (siete, t, h), Street, Suite 930 (novecientos treinta), Los Ángeles, California 90017 (nueve, cero, cero, uno, siete), Estados Unidos de América. ---------------------------------------------------------------

**DÉCIMO SÉPTIMO.- PROTOCOLIZACIÓN DE ACTA.-** Mediante escritura número cuatro mil trescientos noventa y tres, de fecha dos de julio de dos mil veinte, otorgada ante la suscrita notaria, se hizo constar la protocolización del acta de la Asamblea General Ordinaria de la sociedad denominada **"CONTROLADORA DOLPHIN", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, en el cual de la página diecisiete frente a la página  diecinueve frente, obra el acta de asamblea general ordinaria de accionistas, de fecha primero de julio de dos mil veinte, en la que entre otras resoluciones se acordó confirmar y ratificar la validez, vigencia y el contenido de las Resoluciones Corporativas 2019 en su integridad y el otorgamiento de un poder especial

para la celebración de los Documentos de Garantía Mexicanos en favor de los señores Arturo Pérez Estrada y Carlos Manuel Escandón Alcocer. -----------------------------------------------------------------------------------

**DÉCIMO OCTAVO.- PROTOCOLIZACIÓN DE ACTA DE SESIÓN DEL CONSEJO.-** Mediante escritura número cinco mil cincuenta,  de fecha veintiuno de diciembre de dos mil veintiuno, otorgada ante la fe de la suscrita notario se hizo constar la protocolización del acta de la sesión del Consejo de administración de la sociedad denominada **"CONTROLADORA DOLPHIN", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, celebrada el día treinta de septiembre de dos mil veinte, en la cual se tomaron acuerdos relativos a la ratificación de los miembros del Consejo de Administración, así como agregar dos Vocales a la estructura del Consejo de Administración de la Sociedad y otorgamiento de facultades; Propuesta para que los miembros del Consejo de Administración, para efectos de la operación y desempeño de sus cargos, figuren como Consejero Presidente, Consejero Legal, Consejero Contralor, Consejero Corporativo y Consejero de Finanzas; y aprobación de compensación extraordinaria que han de percibir los miembros del Consejo de Administración, por el desempeño de sus respectivas funciones, realizadas durante los últimos meses. -----

**DÉCIMO NOVENO.- PROTOCOLIZACIÓN DE ACTA DE SESIÓN DEL CONSEJO.-** Mediante escritura número cinco mil cincuenta y uno,  de fecha veintiuno de diciembre de dos mil veintiuno, otorgada ante la fe de la suscrita notario se hizo constar la protocolización del acta de la sesión del Consejo de administración de la sociedad denominada **"CONTROLADORA DOLPHIN", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, celebrada el día treinta de septiembre de dos mil veinte, en la cual se tomaron acuerdos relativos a la Propuesta para que los miembros del Consejo de Administración, para efectos de la operación y desempeño de sus cargos, figuren como Consejero Presidente, Consejero Legal, Consejero Contralor, Consejero Corporativo y Consejero de Finanzas; y aprobación de compensación extraordinaria en concepto de honorarios que han de percibir los miembros del Consejo de Administración, por el desempeño de sus respectivas funciones, realizadas durante los últimos meses. -----------------------------------------------------------------

**VIGÉSIMO.-** Mediante escritura número cinco mil ciento cincuenta del protocolo abierto, de fecha siete de abril de dos mil veintidós, otorgada ante la fe de la suscrita notario se hizo constar la protocolización de un acta general ordinaria de accionistas de la sociedad denominada **"CONTROLADORA DOLPHIN", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, celebrada el día catorce de marzo de dos mil veintidós, en la cual se tomaron los acuerdos siguientes: se aprobó el informe presentado por el Consejo de Administración, respecto a la marcha de la sociedad, así como las operaciones realizadas por está durante el ejercicio social concluido el treinta y uno de diciembre del año dos mil diecinueve; se aprobaron los Estados Financieros de Controladora Dolphin, Sociedad Anónima de Capital Variable., al treinta y uno de diciembre del dos mil diecinueve, los cuales estuvieron junto con el informe del Consejo a disposición de los accionistas en las oficinas de la Sociedad;  Se aprobaron todas y cada una de las operaciones llevadas a cabo por la sociedad, durante el ejercicio social concluido al treinta y uno de diciembre de dos mil diecinueve, aprobándose y ratificándose también todos y cada uno de los actos realizados por el Consejo Administración de Controladora Dolphin, Sociedad Anónima. de Capital Variable, durante el ejercicio social. Se aprobó el informe presentado por el Comisario de la Sociedad, por el ejercicio que va del primero de enero al treinta y uno de diciembre del año dos mil diecinueve. Se ratificaron los nombramientos y poderes al Presidente, Secretario y Tesorero del Consejo de Administración de la Sociedad, respectivamente, a los señores Eduardo

de Martin Albor Villanueva (también conocido como Eduardo Albor Villanueva), Concepción Esteban Manchado y Martín Flores Merino. --------------------------------------------------------------------------------

**VIGÉSIMO PRIMERO.- PROTOCOLIZACIÓN DE ASAMBLEA.-** Mediante escritura pública número cinco mil ciento ochenta y ocho del protocolo abierto, de fecha diecinueve de mayo del dos mil veintidós, otorgada ante la suscrita notario, se hizo constar la protocolización de un acta de asamblea general ordinaria de accionistas de la sociedad denominada **"CONTROLADORA DOLPHIN", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, celebrada el día diecinueve de mayo del dos mil veintidós, en la cual se tomaron los acuerdos siguientes: la aprobación de la sociedad para que celebre los *documentos del Financiamiento, así como los Documentos de Garantía, los Contratos del Deudor y los Contratos Tagepa, cualquier documento necesario o conveniente para la apropiada suscripción e implementación de los Documentos de la Operación.*

**VIGÉSIMO SEGUNDO.-** Mediante escritura pública número seis mil doscientos sesenta del protocolo abierto de fecha cinco de diciembre del dos mil veinticuatro, otorgada ante la fe de la suscrita notario, se hizo constar la protocolización de un acta de asamblea general ordinaria de accionistas de la sociedad denominada **"CONTROLADORA DOLPHIN", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, celebrada el día siete de noviembre del dos mil veinticuatro, en la cual se tomaron los acuerdos siguientes: la aprobación *presentado por el Consejo de Administración de la Sociedad, respecto del ejercicio fiscal que va del primero de enero al treinta y uno de diciembre del año dos mil veintiuno; Ratificación del Contador Público Javier Otero Ibarra, en su cargo de Comisario de la Sociedad; Ratificación del Consejo de Administracion de la Sociedad;* --------------------------------------------------------------------------------

**VIGÉSIMO TERCERO.- DEL ACTA QUE SE PROTOCOLIZA.-** El compareciente me exhibe de la sociedad denominada **"CONTROLADORA DOLPHIN", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, el Acta de Asamblea General Ordinaria de Accionistas, de fecha siete de noviembre del dos mil veinticuatro, así como la lista de asistencia, copias de las mismas se agregan al apéndice del presente instrumento bajo la letra **"A"**, y la cual transcribo a continuación:--------------------------------------------------------------------------------

*"----------------------------------- CONTROLADORA DOLPHIN, S. A. DE C.V. -----------------------------------*

*----------------------------- ASAMBLEA GENERAL ORDINARIA DE ACCIONISTAS-----------------------------*

*------------------------------------------------- Ejercicio 2022 -------------------------------------------------*

*------------------------------------------- 7 DE NOVIEMBRE DE 2024 -------------------------------------------*

*En la Ciudad de Cancún, Quintana Roo, siendo las 12:30 horas del día 7 de noviembre de 2024, se reunieron en el domicilio social de CONTROLADORA DOLPHIN, S. A. DE C.V. (la "Sociedad" o "Controladora"), el Sr. Sergio Said Jácome Palma en nombre y representación de CIBanco S. A., Institución de Banca Múltiple, y el Licenciado Eduardo Albor Villanueva, (quien también acostumbra usar indistintamente el nombre de Eduardo de Martín Albor Villanueva), accionistas de la Sociedad, con el objeto de celebrar una Asamblea General Ordinaria de Accionistas (la "Asamblea"). --------------------------------------------------------------------*

*La Asamblea fue presidida por el Licenciado Eduardo Albor Villanueva, Presidente del Consejo de Administración de la Sociedad, y fungió como Secretaria de la misma la Licenciada Concepción Esteban Manchado quien es Secretaria del Consejo de Administración de la Sociedad, quienes protestaron el leal y fiel desempeño de su cargo manifestando tener pleno conocimiento de los estatutos vigentes de la sociedad sobre los cuales se deberá regir la presente asamblea. --------------------------------------------------------------------*

*El Presidente y Secretaria de esta Asamblea hacen constar la presencia del 100% (CIEN POR CIENTO) de las acciones con derecho a voto así como de la presencia del Contador Público Javier Otero Ibarra, Comisario de la Sociedad. -------------------------------------------------------------------------------------------------------------*

*Asimismo se encuentran en la asamblea los demás miembros del Consejo de Administración de la Sociedad señores Valeria Margarita Albor Domínguez y Martín Flores Merino y como invitado el señor Juan Alfonso Delgado del Olmo. ------------------------------------------------------------------------------------------------------------*

*Por unanimidad de todos los miembros del Consejo de Administración se acordo designar al Sr. Sergio Said Jácome Palma como Escrutador de la Asamblea, quien aceptó desempeñar este encargo procediendo a confirmar la representación de las acciones del capital social así como la identidad de todos los miembros del Consejo de Administración y demás asistentes a esta asamblea. -------------------------------------------------*

*El escrutador certifica la presencia de la totalidad del capital social de la Sociedad conforme a la siguiente lista: -------------------------------------------------------------------------------------------------------------------------*

| Accionista y firma | Capital Fijo Serie "A" | Capital Variable Serie "B" | Valor |
|---|---|---|---|
| CIBanco, S.A., Institución de Banca Múltiple, en su carácter de fiduciario del fideicomiso irrevocable de garantía número CIB/2380<br>RFC: BNY080206UR9<br>Representada por el Sr. Sergio Said Jácome Palma | 999 | 2,102,242 | $210,324,100.00 |
| Eduardo Albor Villanueva<br>RFC: AOVE661126732 | 6<br>(las cuales se encuentran pignoradas en favor de Wilmington Trust, National Association) | - | $600.00 |
| TOTAL | 1,005 | 2,102,242 | $210,324,700.00 |

*La lista de asistencia se agrega al expediente de la presente acta como **Anexo "B"** debidamente firmada por todos los asistentes a la presente Asamblea. --------------------------------------------------------------------------*

*Con base en la certificación emitida por el Escrutador, el Presidente declaró la Asamblea legalmente instalada en virtud de que se encontraba presente en la Asamblea el 100% (CIEN POR CIENTO) de las acciones con*

*derecho a voto lo cual satisface los requisitos establecidos en los estatutos sociales y en la Ley General de Sociedades Mercantiles para tales efectos. --------------------------------------------------------------------------*

*Acto seguido, el Presidente solicitó a la Secretaria procediera a dar lectura al Orden del Día propuesto para esta Asamblea, el cual se transcribe a continuación: -----------------------------------------------------------*

*--------------------------------------------------- ORDEN DEL DÍA ---------------------------------------------------*

**I. Presentación del informe del Consejo de Administración de la Sociedad por los ejercicios sociales que van del 01 de enero 31 de diciembre de 2022 y acuerdos en torno al mismo. --------------------------**

**II. Presentación del informe del Comisario de la Sociedad respecto de las actividades realizadas por el Consejo de Administración por los ejercicios sociales que van del 01 de enero 31 de diciembre de 2022 y acuerdos en torno a dicho informe. ---------------------------------------------------------------------**

**III. Nombramiento o en su caso ratificación de los miembros del Consejo de Administración de la Sociedad y otorgamiento de facultades. --------------------------------------------------------------------**

**IV. Discusión sobre la ratificación del Comisario de la Sociedad. ----------------------------------------**

**V. Designación del Delegado o Delegados que acudirán ante el Notario Público de su elección a protocolizar la presente acta, en caso de ser necesario y al efecto, a expedir las copias certificadas de la misma. ----------------------------------------------------------------------------------------------------------**

**VI. Redacción, lectura y aprobación del acta resultante de la Asamblea. ---------------------------------**

**VII. Clausura.--------------------------------------------------------------------------------------------------------**

*La Asamblea, por unanimidad de votos, aprobó la declaratoria del Presidente respecto de la legal instalación de la Asamblea, así como el Orden del Día antes mencionado, cuyos puntos fueron desahogados en los siguientes términos:--------------------------------------------------------------------------------------------------------*

*-------------------------------------- PRIMER PUNTO DEL ORDEN DEL DÍA --------------------------------------*

**I. Presentación del informe del Consejo de Administración de la Sociedad por los ejercicios sociales que van del 01 de enero 31 de diciembre de 2022 y acuerdos en torno al mismo. --------------------------**

*El Presidente del Consejo de Administración de la Sociedad, en uso de la voz, cuestionó a los contadores presentes Sergio Jácome Palma y Martin Flores Merino, responsables de la preparación y revisión de la información financiera que aquí se presenta, respecto al retraso en la disponibilidad de esta información financiera así como la de los ejercicios anteriores. En uso de la voz el Contador Público Martín Flores recordó a los presentes que el retraso principalmente se ocasionó por los cambios de despacho de auditoría, así como el retraso que se tuvo para cubrir los honorarios de la auditoría externa de los ejercicios anteriores. -- Por otro lado el Contador Publico Sergio Jácome Palma recordó a los presentes que independientemente de los retrasos a que se refiere el Contador Martín Flores, se ha elaborado reportes financieros cada mes durante el presente año para ser enviados a los acreedores financieros de la empresa y tenedores de las notas emitidas, principalmente a los tenedores de la deuda Senior PRUDENTIAL INSURANCE COMPANY OF AMERICA, PRUDENTIAL LEGACY INSURANCE COMPANY OF NEW JERSEY, CIGNA HEALTH AND LIFE INSURANCE COMPANY, LIFE INSURANCE COMPANY OF NORTH AMERICA, de conformidad con el NPA modificado y vigente a la fecha de la entrega de los aludidos reportes. ---------------------------------------*

*Por otro lado, el señor Jacome recordó a los presentes que con fecha 27 de junio de 2022, la Sociedad suscribió en su calidad de deudor colateral, la deuda contraída por Tritón Investments Holdings LLC hasta*

por USD$ 75,000,000.00 (Setenta y cinco millones de Dólares, Moneda de los Estados Unidos de América)

en favor de SCULPTOR REAL ESTATE AND LEISURE INVESTMENT FUNDING LLC. como tenedores de

deuda Junior, razón por la cual a partir de dicha fecha se comparte a SCULPTOR REAL ESTATE AND

LEISURE INVESTMENT FUNDING LLC. la misma información financiera. En consecuencia, la situación

financiera de la empresa no nada mas la que aquí se presenta, sino la de los meses corrientes, ha sido

debidamente reportada a los interesados mencionados (acreedores financieros) y a los Ultimos Beneficiarios

en el capital de las sociedades controladoras de la Sociedad. -----------------------------------------------

Habiendose aclarado la razón en el retraso de la información, se dio uso de la voz a los contadores Sergio

Jacome y Martin Flores quienes expusieron de una manera resumida a los presentes el contenido de los

informes financieros que corresponden al periodo que va del 01 de enero al 31 de diciembre de 2022. Se

hizo constar que dichos informes, se encontraban en las oficinas de la Sociedad a disposición de los

interesados y con toda la información a que se refiere el artículo 172 de la Ley General de Sociedades

Mercantiles, por lo cual el informe referido incluye: ----------------------------------------------------------

A. Estado de Situación Financiera al 31 de diciembre de 2022 ------------------------------------------------

B. Estado de Resultados del 1 de enero al 31 de diciembre de 2022 -----------------------------------------

C. Estado de cambios en la situación financiera al 31 de diembre de 2022 ------------------------------------

D. Estado de cambios en las partidas que integran el patrimonio social, al 31 de diciembre de 2022 ----------

E. Principales políticas y criterios contables y de información seguidos en la preparación de la información

financiera ----------------------------------------------------------------------------------------------------

F. Informe sobre la marcha de la sociedad en el ejercicio, así como sobre las políticas seguidas por los

administradores y, en su caso, sobre los principales proyectos existentes. -----------------------------------

F.1 Entorno de mercado ----------------------------------------------------------------------------------------

F.2 Aspectos macroeconómicos relevantes ------------------------------------------------------------------------

G. Notas a los Estados Financieros -----------------------------------------------------------------------------

G.1 Notas al Estado de Resultados ------------------------------------------------------------------------------

G.2 Notas al Estado de Situación Financiera ----------------------------------------------------------------------

G.3 Notas de la Deuda Senior a favor de Prudential Insurance Company of America, Prudential Legacy

Insurance Company of New Jersey, Cigna Health and Life Insurance Company, Life Insurance Company of

North America, así como de la deuda Junior de la cual la Sociedad es responsable colateral a favor de

Sculptor Real Estate and Leisure Investment Funding LLC (necesidad de recursos para reforzar el capital de

trabajo)--------------------------------------------------------------------------------------------------------

H. Otros asuntos relevantes ------------------------------------------------------------------------------------

Una vez concluida la exposición y desglose de todos los puntos contenidos en el informe, los socios por

unanimidad de votos, tomaron el siguiente: ---------------------------------------------------------------------

**ACUERDO I.1.-** Aprobar por unanimidad el informe aquí presentado por el Consejo de Administración de la

Sociedad, respecto del ejercicio fiscal que va del 01 de enero al 31 de diciembre del año 2022. -----------------

**ACUERDO I.2.-** Se conservará en las oficinas de la Sociedad un ejemplar del informe del Consejo de

Administración en los términos de lo establecivo en el artículo 172 y siguientes de la Ley General de

Sociedades Mercantiles.-----------------------------------------------------------------------------------------

16

-------------------------------------------- *SEGUNDO PUNTO DEL ORDEN DEL DIA* --------------------------------------------

*I. **Presentación del informe del Comisario de la Sociedad respecto de las actividades realizadas por el Consejo de Administración por los ejercicios sociales que van del 01 de enero 31 de diciembre de 2022 y acuerdos en torno a dicho informe.*** --------------------------------------------

*El Comisario de la Sociedad, Contador Público Javier Otero Ibarra, dando cumplimiento con el segundo punto del Orden del Día, presentó a la Asamblea su informe, el cual incluye los siguientes puntos:* --------------------

*a. Su opinión respecto de si las políticas y criterios contables y de información seguidos por la Sociedad son los adecuados y suficientes.* --------------------------------------------

*b. Su opinión respecto de sí las políticas y criterios contables han sido aplicados consistentemente en el informe presentado por el Consejo de Administración.* --------------------------------------------

*c. Su opinión respecto de si la información presentada por el Consejo de Administración refleja en forma veraz y suficiente la información financiera y los resultados de la sociedad.* --------------------------------------------

*Los Accionistas, tomando en cuenta el informe presentado por el Comisario y las opiniones vertidas en él, discutieron y analizaron el mismo, tomando el siguiente:*--------------------------------------------

***ACUERDO II.1.-*** *Se aprueba el informe presentado por el Comisario de la Sociedad, y en consecuencia por unanimidad de votos y en su totalidad, el informe presentado por el Consejo de Administración de la Sociedad, respecto del ejercicio social que va del 01 de enero al 31 de diciembre de 2022.*--------------------

***ACUERDO II.2.-*** *Se conservará en las oficinas de la sociedad un ejemplar del informe del Comisario de la Sociedad.* --------------------------------------------

-------------------------------------------- *TERCER PUNTO DEL ORDEN DEL DIA* --------------------------------------------

*I. **Nombramiento o en su caso ratificación de los miembros del Consejo de Administración de la Sociedad y otorgamiento de facultades.*** --------------------------------------------

*En cumplimiento del siguiente punto del orden del día, el Presidente de la Asamblea, propone que se ratifique a cada uno de los miembros que integran el Consejo de Administración de la Sociedad, a lo cual Concepcion Esteban Manchado solicitó el uso de la voz, quien manifestó a los presentes que quisiera poner sobre la mesa su propuesta de renunciar al cargo de Secretaria del Consejo de Administración de la Sociedad, efectivo al 31 de Diciembre de 2024, exponiendo que la razón principal de ello es que considera que el cargo de miembro del consejo amerita gran disponibilidad de tiempo para desempeñarlo de la mejor manera posible, y que en virtud de otras responsabilidades que implica estar al frente del departamento legal de la compañia, es que tomó esa decisión, mas sin embargo de ser aceptada su renuncia, manifestó que siempre estará disponible para apoyar al Consejo de Administración, y de suplir, si  hubiera necesidad de ello,  la ausencia de alguno de los miembros. Tras haber mencionado lo anterior, exhibió y entregó al Presidente de la Asamblea en su Calidad de Presidente del Consejo de Administración de la Sociedad, su renuncia por escrito y solicitó que la misma sea aceptada. A lo cual el presidente solicita que la renuncia entregada se agregue al legajo de esta Acta en el anexo que corresponde.* --------------------------------------------

*Con base en lo anterior, el presidente de la Asamblea en uso de la voz y tras la presentación de la renuncia de la licenciada Concepción Esteban Manchado, preguntó a los presentes si alguno tiene alguna objeción en aceptar la renuncia, a lo que nadie manifestó estar en contra de ello. El Presidente agradeció a la Secretaria del Consejo la participación activa que ha desempeñado durante todo el tiempo que ha estado al frente de*

tal cargo, asi como la debida antelación con que presenta su renuncia, a fin de que el tiempo que resta para que sea efectiva, pide que empape de sus funciones a quien la sustituya en el cargo. --------------------

Seguidamente y tras la renuncia referida, el señor Sergio Jácome solicita al presidente el uso de la voz, lo cual una vez otorgado, menciona que quisiera proponer en este acto ciertas modificaciones a la forma en que opera el Consejo de Administración para hacerlo más efectivo y mas dinámico, en base a la experiencia que el ha adquirido a su paso por Deloitte KPMG e EY. --------------------------------------------------------

El Presidente le pide al señor Jácome que comparta sus ideas haciendo énfasis que estas serán consideradas siempre que no modifique el número de miembros del Consejo de Administración y la forma en que se ejercen las facultades. ---------------------------------------------------------------------

El señor Jácome propone que los nombres en los puestos de cada uno de los miembros del Consejo de Administración, reflejen su función actual dentro de la Sociedad, por lo que propone que la presidencia recaiga en el señor Eduardo Albor Villanueva; que haya tres vicepresidencias una corporativa, una financiera y una operativa, las cuales recaerían en la persona que ocupa cada una de dichas direcciones, es decir, la vicepresidencia corporativa la ocuparía la licenciada Valeria Albor, la vicepresidencia financiera el propio Sergio Jácome, la vicepresidencia operativa el doctor Alfonso Delgado, y propone que el contador Martin Flores, quien ha venido desempeñando dentro del Consejo ocupe la Secretaría del Consejo de Administración de la Sociedad. ---------------------------------------------------------------

Con base en la propuesta anterior, el presidente haciendo una reflexión mencionó que en efecto, las circunstancias requieren miembros del Consejo de Administracion que esten totalmente involucrados, no solo en la administracion, sino tambien en la operacion de la empresa y tengan experiencia de campo, que ayude a tomar decisiones mas informadas y con el involucramiento de las diferentes áreas del negocio, por lo que, en virtud de que se encuentra en la antesala de la Asamblea el Doctor Juan Alfonso Delgado del Olmo, se solicitó a la Asamblea permita se le invite a pasar al recinto donde esta se desarrolla, a lo que habiendo sido consentido por los presentes, se le hizo pasar; se le dio la bienvenida pro los presentes y acto seguido el señor Jácome lo puso al tanto de lo mencionado anteriormente, y se le informó de la propuesta para que se integre como parte del Consejo de Administración de la Sociedad. -----------------------------------------

Continuando con la explicación, el señor Jácome sugirió que el Consejo de Administración se sesione cada bimestre; asimismo, que cada uno de los miembros del Consejo de Administración tenga un suplente, el cual no podrán coexistir simultáneamente con el titular en funciones, el cual puede ser o no parte de la compañía, sería designado por el propio consejero titular, debiendo ser ratificado el suplente por 3 de los 5 consejeros, y el titular deberá salvar su voto al respecto; dicho suplente cubrirá las ausencias temporales del consejero suplido, por hasta 6 meses, y si fuera una ausencia definitiva, por hasta un año. ------------------------------

Para el caso de ausencia definitiva de alguno de los consejeros titulares, o ausencia temporal que llegue al plazo de un año, la Asamblea General de Accionistas deberá ratificar como titular al suplente que ocupa el puesto de manera temporal, o en su caso, nombrar a otra persona para que ocupe dicho cargo. Para el caso de que la Asamblea General de Accionistas no se reúna en el plazo señalado, será responsabilidad del Consejo de Administración ratificar al suplente como titular, o en su caso nombrar consejero titular, con el voto favorable de 3 de los 4 consejeros, debiendo el suplido salvar su voto.----------------------------------------

*Sin contravenir a lo anterior, para el caso de ausencia del Presidente del Consejo de Administración, ocupará su posición como suplente la vicepresidenta corporativa, quien a su vez será suplida por su suplente; por hasta 6 meses, con posibilidad de una prórroga de una sola vez por seis meses adicionales, a solicitud del titular, y en caso de ausencia definitiva, la Asamblea General de Accionistas deberá nombrar de entre los tres vicepresidentes a quien deberá ocupar la titularidad de la Presidencia, y en el caso que no acepte, o por decisión unánime de la Asamblea General de Accionistas, un tercero ocupará dicho cargo, el cual deberá ser ratificado por el Consejo de Administración. En el caso de que la Asamblea General de Accionistas no se reúna para ratificar al presidente suplente, como titular de la presidencia del Consejo, o nombrar a un tercero por unanimidad de votos, el suplente permanecerá en funciones una vez ratificado por 3 de 4 miembros del Consejo de Administración. --------------------------------------------------------------------------------*

*Continuando con la propuesta de conformación del Consejo de Administración, el presidente solicitó a los presentes que sugirieran, para el caso de ser aprobada la propuesta, quien podría ser su suplente, a lo que:*

- *El Consejero Presidente propone como su suplente a Valeria Margarita Albor Dominguez;---------*
- *La Consejera Vice Presidente Corporativa como su suplente a Concepcion Esteban Manchado;*
- *El Consejero Vicepresidente Financiero propone como su suplente a Rosalba Ortiz Merlo; ---------*
- *El Consejero Vicepresidente Operativo propone como su suplente a Franco Martínez Sánchez; ------------------------------------------------------------------------------------------------*
- *El Secretario de momento se abstiene de nombrar suplente y solicita a la Asamblea que se le autorice a designarlo a mas tardar el 31 de diciembre del presente año. --------------------------------*

*Tras un amplio intercambio de opiniones, los accionistas, por unanimidad de votos acordaron: -----------------*

**ACUERDO III.1.-** *Se acepta la renuncia de Concepcion Esteban Manchado al cargo de Secretaria del Consejo de Administración con efectos al 31 de Diciembre de 2024.------------------------------------------------*

**ACUERDO III.2.-** *Se nombra como nuevo Consejo de Administración de la Sociedad a las siguientes personas y con los cargos que se mencionan que entrará en funciones a partir del 1º de Enero de 2025: ----*

*CONSEJERO PRESIDENTE: ---------------------------------- Eduardo Albor Villanueva --------------------------*

*CONSEJERO VICEPRESIDENTE CORPORATIVA: -------- Valeria Margarita Albor Dominguez --------------------*

*CONSEJERO VICEPRESIDENTE FINANCIERO: ---------------------- Sergio Said Jacome Palma --------------------*

*CONSEJERO VICEPRESIDENTE OPERATIVO: -------------- Juan Alfonso Delgado Del Olmo --------------------*

*CONSEJERO SECRETARIO: -------------------------------- Martin Flores Merino --------------------------------*

*quienes estando presentes en esta Asamblea aceptan el cargo para el que fueron elegidos, los que no causionarán su manejo por asi determinarlo esta asamblea.--------------------------------------------------------*

**ACUERDO III.3.-** *Se aprueba por unanimidad que el Consejo de Administración sesione bimestralmente. --*

**ACUERDO III.4.-** *Se ratifica que el Consejo de Administración de la Sociedad, continúe ejerciendo sus facultades tal y como estan consignadas en la Cláusula Vigésima Octava de los Estatutos Sociales, de la siguiente forma: ---------------------------------------------------------------------------------------------------------*

*a) Las facultades para Pleitos y Cobranzas, las ejercerán todos y cada uno de los 5 miembros que conforman el Consejo de Administración de la Sociedad, indistintamente. ---------------------------------------------------------*

*b) Las facultades para Actos de Administración, las ejercerán:-----------------------------------------------------*

*i) El Presidente del Consejo de Administración, sin restricción alguna. ----------------------------------------------*

*ii) Cualquiera de los miembros del Consejo de Administración, indistintamente, en actos de hasta $2´500,000.00 (Dos millones quinientos mil pesos 00/100 M.N.) o el equivalente a USD$100,000.00 (Cien mil dólares de Estados Unidos de Norteamérica).* --------------------------------------------------------

*iii) Se requerirá la firma de 2 de los miembros del Consejo de Administración, conjuntamente, para actos que excedan $2´500,000.00 (Dos millones quinientos mil pesos 00/100 M.N.) o el equivalente a USD$100,000.00 (Cien mil dólares de Estados Unidos de Norteamérica).* --------------------------------------------------

*c) Las facultades para Actos de Dominio y Títulos de Crédito, las ejercerán:* --------------------------------------

*i) El presidente del Consejo de Administración en forma individual o 2 de los integrantes del Consejo de Administración, conjuntamente, en actos que no excedan el umbral de $12´000,000.00 (Doce Millones de Pesos 00/100 M.N.) o USD$500,000.00 (Quinientos mil dólares de Estados Unidos de Norteamérica.* --------

*ii) El presidente del Consejo de Administración en forma individual o 3 de los integrantes del Consejo de Administración, conjuntamente, en actos mayores de $12´000,000.00 (Doce Millones de Pesos 00/100 M.N.) o USD$500,000.00 (Quinientos mil dólares de Estados Unidos de Norteamérica, pero que no excedan $50´000,000.00 (Cincuenta millones de pesos 00/100 M.N.) o USD$2´000,000.00 (Dos millones de dólares de Estados Unidos de Norteamérica).* -------------------------------------------------------------

*iii) Los Actos de Dominio y Títulos de Crédito que excedan los umbrales de $50´000,000.00 (Cincuenta millones de pesos 00/100 M.N.) o USD$2´000,000.00 (Dos millones de dólares de Estados Unidos de Norteamérica), deberán ser aprobados mediante una Sesión del Consejo de Administración, requiriéndose el voto favorable de cuando menos 4 de los miembros del Consejo de Administración.* ----------------------------

**ACUERDO III.5.-** *Se aprueba la designación de los suplentes de cada uno de los consejeros a las siguientes personas:* ------------------------------------------------------------------------------------------------------------------

- *Suplente del Consejero Presidente: Valeria Margarita Albor Dominguez;* -----------------------------
- *Suplente de la Consejera Vicepresidente Corporativa:  Concepcion Esteban Manchado;* --------------
- *Suplente del Consejero Vicepresidente Financiero: Rosalba Ortiz Merlo;* -----------------------------
- *Suplente del Consejero Vicepresidente Operativo: Franco Martínez Sánchez;* ----------------------------
- *El Secretario de momento se abstiene de nombrar suplente y esta asamblea aprueba a que sea designado a mas tardar el 31 de diciembre del presente año.* -------------------------------------------

**ACUERDO III.6.-** *Se aprueba por unanimidad de votos el mecanismo propuesto para el manejo de las suplencias temporales y definitivas de los miembros del Consejo de Administración, así como las específicas para el caso de ausencia temporal o definitiva del presidente, ya que estas agilizarán la operatividad del Consejo de Administración, en el entendido de que deben mantenerse siendo 5 miembros y las facultades y funciones deben quedar como lo establecen los estatutos de la Sociedad, y como se aprobó en la presente asamblea de Accionistas, por lo cual cualquier cambio aquí no previsto deberá ser aprobado por la Asamblea de Accionistas.* -------------------------------------------------------------------------------------------------

**ACUERDO III.7.-** *El Consejo de Administración continuará buscando e implementando medidas dentro de su operación, que agilicen la toma de decisiones, lo que realizará en la sesiones que sostenga el propio Consejo de Administración, siempre que no implique una modificación a lo aprobado en esta Asamblea General de Accionistas.* ------------------------------------------------------------------------------------------

------------------------------- *CUARTO PUNTO DEL ORDEN DEL DIA* ----------------------------------------------

*IV. Discusión sobre la ratificación del Comisario de la Sociedad.* ----------------------------------------------

*En cumplimiento del siguiente punto del Orden del día, el Presidente de la Asamblea, puso a consideración de los presentes la posibilidad de ratificar o remover al Comisario de la Sociedad. En virtud de lo anterior y toda vez que el Comisario se condujo bien y fielmente durante el ejercicio 2022, y que cumplió los objetivos y expectativas esperadas por la Sociedad, por unanimidad de votos de las partes sociales representadas, la Asamblea adoptó el siguiente:* ----------------------------------------------------------------------------------

*ACUERDO IV.1.-* *Se ratifica al Contador Público Javier Otero Ibarra, en su cargo de Comisario de la Sociedad.* --------------------------------------------------------------------------------------------------------

---------------------------------------- *QUINTO PUNTO DEL ORDEN DEL DIA* -----------------------------------------

*V. Designación del Delegado o Delegados que acudirán ante el Notario Público de su elección a protocolizar la presente acta, en caso de ser necesario y al efecto, a expedir las copias certificadas de la misma.* ---------------------------------------------------------------------------------------------------------

*Los presentes en la Asamblea, acordaron por unanimidad de votos, nombrar a los Licenciados Eduardo Albor Villanueva y/o Martin Flores Merino y/o Concepcion Esteban Manchado como delegados especiales de la misma, para que conjunta o separadamente expidan la copia o copias que de esta acta sean necesarias, así como para asentar la presente en el libro de actas de la Sociedad y acudir ante el Notario Público de su elección a realizar la protocolización de la misma, en caso de que esto fuera necesario, y para presentar cualesquier avisos que sean necesarios y/o convenientes en relación con las resoluciones adoptadas por la presente Asamblea, así como para inscribir , por sí o a través de terceros, los testimonios que correspondan, en los Registros Públicos correspondientes.* --------------------------------------------------------------------

---------------------------------------- *SEXTO PUNTO DEL ORDEN DEL DIA* -----------------------------------------

*VI. Redacción, lectura y aprobación del acta resultante de la Asamblea.* -----------------------------------------

*En el presente punto del Orden del Día, la Secretaria de la Asamblea, a petición del Presidente, redactó el acta resultante de la misma, para ser asentada en el libro de Actas, la cual es firmada por todos los presentes para constancia.* -----------------------------------------------------------------------------------------------------

---------------------------------------- *SEPTIMO PUNTO DEL ORDEN DEL DIA* ----------------------------------------

*VII. Clausura.* -------------------------------------------------------------------------------------------------------------

*Asimismo y toda vez que no hay más asuntos que tratar, por haberse agotado el Orden del Día propuesto para la presente Asamblea, el Presidente la declaró formalmente clausurada, siendo las 14:10 horas del día en que dio inicio, haciendo constar que al término de la Asamblea se contó con el quórum indicado al inicio de la misma, siendo firmada por el Presidente y la Secretaria de la Asamblea, así como los demás asistentes que quisieron firmar.* ---------------------------------------------------------------------------------------------

*Espacio en blanco intencionalmente, sigue hoja de firmas*------------------------------------------------------------

*Firma ---- **Lic. Eduardo Albor Villanueva --- Presidente** ------------------------------------------------------------*

*Firma ---- **Lic. Concepción Esteban Manchado --- Secretario**-----------------------------------------------------*

*Firma ---- **Sergio Said Jácome Palma ---- Escrutador** ------------------------------------------------------------*

*Firma ---- **C. P. Javier Otero Ibarra --- Comisario** ------------------------------------------------------------------*

*Firma ---- **Valeria Margarita Albor Domínguez** --------------------------------------------------------------------*

*Firma ---- **Martín Flores Merino** --------------------------------------------------------------------------------------*

Firma --- **Juan Alfonso Delgado del Olmo** -------------------------------------------------

*Hoja de firmas del Acta de Asamblea general Ordinaria de Accionistas de CONTROLADORA DOLPHIN, S.*

*A. DE C.V. de fecha 7 de Noviembre de 2024.* ------------------------------------------------

--------------------------------------- **Anexo "A"** ---------------------------------------------

-------------------------------- **Lista de Asistencia** -------------------------------------------

----------------------- **CONTROLADORA DOLPHIN, S. A. DE C.V.** ---------------------------------

*Lista de Asistencia de los accionistas de **CONTROLADORA DOLPHIN, S. A. DE C.V.** (la "**Sociedad**")*

*correspondiente a la Asamblea General Ordinaria de Accionistas celebrada el día 7 de noviembre del 2024,*

*a las 13:00 horas (la "**Asamblea**").* ----------------------------------------------------------

| Accionista | Número de Acciones | Valor en MXN | Firmas |
|---|---|---|---|
| LIC. Eduardo Albor Villanueva AOVE661126732 | 6 | $600.00 | Sr. Eduardo Albor Villanueva |
| CIBanco S. A., Institución de Banca Múltiple, como fiduciario del Fideicomiso CIB/2380 BNY080206UR9 Representada por el Sr. Sergio Said Jácome Palma | 2,103,241 | $210,324,100.00 | Sr. Sergio Said Jácome Palma |
| **Total** | **2,103,247** | **$210,324,700.00** | |

**Firma ---- C. P. Javier Otero Ibarra --- Comisario** -------------------------------------------

**Firma ---- Concepcion Esteban Manchado ---- Secretario**-------------------------------------

Firma --- *Valeria Margarita Albor Domínguez* -----------------------------------------------

Firma ---- *Martín Flores Merino* ------------------------------------------------------------

Firma ---- *Juan Alfonso Delgado del Olmo* ----------------------------------------------------

*El suscrito designado Escrutador certifica que previa verificación de la personalidad de los representantes de*

*los Accionistas, de la cedula de identificación fiscal de los Accionistas y del Libro de Registro de Acciones de*

*la Sociedad, se encuentran representadas en esta Asamblea **2,103,247** (DOS MILLONES CIENTO TRES*

*MIL DOSCIENTAS CUARENTA Y SIETE) acciones que constituyen el 100% (CIEN POR CIENTO) del capital*

*social de la Sociedad por lo que existe el quórum legal requerido para la celebración de la Asamblea, de*

*acuerdo con lo señalado en los estatutos sociales de la Sociedad.* ---------------------------------

--------------------------------------- *Cancún, Quintana Roo, a 7 de noviembre de 2024* ---------------------------

Firma --- *Sergio Said Jacome Palma* ---- **Escrutador"**---------------------------------------

---- **VIGÉSIMO CUARTO.-** Declara el compareciente que el texto y las firmas que obran en el acta transcrita

son auténticos y de las personas a quienes se atribuyen y solicita se protocolice en términos de Ley. -------

22

----- Expuesto lo anterior la compareciente otorga las siguientes: ----------------------------------------------------------

------------------------------------------------ C L Á U S U L A S ------------------------------------------------------

----- **PRIMERA**.- Queda protocolizada el acta de la Asamblea General Ordinaria de accionistas de la sociedad denominada **"CONTROLADORA DOLPHIN", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, celebrada el día siete de noviembre del dos mil veinticuatro, para todos los efectos legales a que haya lugar. ------------

------ **SEGUNDA**.- En consecuencia, de la cláusula anterior quedan formalizados todos y cada uno de los acuerdos tomados en el acta que por este instrumento se protocoliza los cuales se tienen por reproducidos en la presente clausula como si a la letra se insertasen para todos los efectos legales a que haya lugar. ----

----- **TERCERA**.- Los derechos, gastos y honorarios que devengue el presente instrumento serán a cargo de la sociedad denominada **"CONTROLADORA DOLPHIN", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE.**

-------------------------------------------- **P E R S O N A L I D A D** ------------------------------------------

----- Manifiesta **MARTIN FLORES MERINO**, bajo protesta de decir verdad, que su representada se encuentra legalmente constituida y que cuenta con plena capacidad legal para el otorgamiento de este acto, así como que sus facultades de representación no le han sido revocadas, suspendidas, modificadas o limitadas de forma alguna y que conservan íntegro su vigor, acreditando su personalidad con el acta de la asamblea general ordinaria de accionistas que se protocoliza en términos del presente instrumento, y manifiesta que el Registro Federal de Contribuyentes de su representada es "**CDO070410V77**" (C, D, O, cero, siete, cero, cuatro, uno, cero, V, siete, siete). -------------------------------------------------------------------------------------

-------------------------------------------------- **I N S E R C I O N** -----------------------------------------------------

----- **TRANSCRIPCIÓN DEL ARTÍCULO DOS MIL OCHOCIENTOS DIEZ DEL CÓDIGO CIVIL PARA EL ESTADO DE QUINTANA ROO**. --------------------------------------------------------------------------

----- *"Artículo dos mil ochocientos diez. – En todos los poderes generales para pleitos y cobranzas bastará que se diga que se otorga con todas las facultades generales y las especiales que requieran cláusula especial conforme a la ley, para que entiendan conferidos sin limitación alguna.- En los poderes generales para administrar bienes bastará expresar que se dan con ese carácter, para que el apoderado tenga toda clase de facultades administrativas.- En los poderes generales para ejercer actos de dominio, con la sola excepción de la donación, que en este código es un negocio jurídico personalísimo para el donante y por tanto no admite la representación en cuanto a éste, bastará que se diga que dichos poderes generales se dan con ese carácter para que el apoderado tenga todas las facultades de dueño, tanto en lo relativo a los bienes, como para hacer toda clase de gestiones a fin de defenderlos. Cuando se quieran limitar, en los tres casos antes mencionados, las facultades del apoderado, se consignarán las limitaciones o se otorgarán al respecto poderes especiales. Los Notarios insertarán este artículo en los testimonios de los poderes que ante ellos se otorguen. Lo mismo hará al calce del poder y antes de la firma de la ratificación sí es que el texto del documento no lo hubieran insertado los interesados, los funcionarios ante quienes los otorgantes y los testigos ratifiquen sus firmas de conformidad con la fracción II del artículo 2807 en relación con el 218 y 2811. Sin esta inserción los aludidos testimonios y las mencionadas ratificaciones carecerán de todo efecto legal".*

----- **TRANSCRIPCIÓN DEL ARTÍCULO DOS MIL QUINIENTOS CINCUENTA Y CUATRO DEL CÓDIGO CIVIL FEDERAL** -------------------------------------------------------------------------

ESCRITURAS NÚMERO 3,616 VOLUMEN CXXXVI / LIC. JORGE CARLOS VILLANUEVA / ABOGADOS NOTARIOS PÚBLICOS ASOCIADOS 2018-05 28 09:04:09

----- *"ARTÍCULO 2554.- En todos los poderes generales para pleitos y cobranzas bastará que se diga que se otorga con todas las facultades generales y las especiales que requieran cláusula especial conforme a la Ley, para que se entiendan conferidos sin limitación alguna.- En los poderes generales para administrar bienes, bastará expresar que se dan con ese carácter para que el apoderado tenga toda clase de facultades administrativas.- En los poderes generales para ejercer actos de dominio, bastará que se den con ese carácter, para que el apoderado tenga todas las facultades de dueño, tanto en lo relativo a los bienes, como para hacer toda clase de gestiones, a fin de defenderlos.- Cuando se quisieren limitar en los tres casos antes mencionados las facultades de los apoderados, se consignarán las limitaciones o los poderes serán especiales.- Los notarios insertarán este artículo en los testimonios de los poderes que otorguen y sus correlativos en las demás entidades de la República Mexicana".* -----------------------------------------

------------------------------------------------------- **G E N E R A L E S** -------------------------------------------------------

----- Por sus generales, previamente advertida de las penas en que incurren quienes declaran con falsedad, el compareciente manifestó ser: ----------------------------------------------------------

----- **MARTIN FLORES MERINO,** mexicano, originario de Orizaba, Estado de Veracruz, lugar en donde nació el día veintinueve de julio de mil novecientos setenta, casado, contador púbico, con domicilio en supermanzana trescientos veinte, manzana noventa, lote diez, Cerrada Chinak Meru, Fraccionamiento Quintana Kavanayen, de esta ciudad de Cancún, Municipio Benito Juárez, Quintana Roo, con Clave Única del Registro de Población **"FOMM700729HVZLRR00"** (F, O, M, M, siete, cero, cero, siete, dos, nueve, H, V, Z, L, R, R, cero, cero), y con Registro Federal de Contribuyentes **"FOMM7007291N9"** (F, O, M, M, siete, cero, cero, siete, dos, nueve, uno, N, nueve). -----------------------------------------

----- **YO, EL NOTARIO, CERTIFICO:** ----------------------------------------------------------

----- **I.-** Que conceptúo al compareciente con la capacidad jurídica necesaria para el otorgamiento de este acto, quien se identificó Ante Mí con el documento que en copia se agrega al apéndice de la presente escritura bajo la **letra "B".** ----------------------------------------------------------

----- **II.-** Que lo relacionado e inserto en la presente escritura concuerda con sus originales, a que me remito y tuve a la vista. ----------------------------------------------------------

----- **III.-** Que advertí y expliqué al solicitante en cumplimiento de lo dispuesto por la "Ley Federal de Protección de Datos Personales en Posesión de los Particulares", que sus "Datos Personales" se utilizarán de la forma que estipula el "Aviso de Privacidad" que fue puesto a su disposición con anterioridad a la firma del presente instrumento y el cual declara conocer en su totalidad. ----------------------------------------

----- **IV.-** Que para cumplir con lo dispuesto por el apartado B fracción IX y apartado D fracción V del artículo veintisiete del Código Fiscal de la Federación y la Resolución Miscelánea Fiscal vigente, hago constar lo siguiente: ----------------------------------------------------------

A) Que le solicité a la compareciente que me proporcionara la clave del Registro Federal de Contribuyentes y la Cédula de Identificación Fiscal o la Constancia de Situación Fiscal correspondiente, de cada uno de los asociados y de los representantes legales nombrados en el acta de asamblea que por este instrumento se protocoliza y que solicitarán la e.firma de la persona moral, o bien, ejercerán facultades de representación de dicha persona moral ante las autoridades fiscales. ----------------------------------------

B.- Que la compareciente me declara, de manera expresa, lo siguiente:----------------------------------

24

--- i) Que el Registro Federal de Contribuyentes de **"CIBanco", Sociedad Anónima, Institución de Banca Múltiple**, como Fiduciario del fideicomiso irrevocable con garantías número **C, I, B, diagonal, dos mil trescientos ochenta** es **BNY080206UR9** (B, N, Y, cero, ocho, cero, dos, cero, seis, U, R, nueve), presentándome al efecto la Constancia de Situación Fiscal, y que el Registro Federal de Contribuyentes del señor **EDUARDO DE MARTIN ALBOR VILLANUEVA**, es **AOVE661126732** (A, O, V, E, seis, seis, uno, uno, dos, seis, siete, tres dos), presentándome al efecto la Cédula de Identificación Fiscal, documentos que en copia agrego al apéndice de este instrumento bajo la **letra "C"**.-------------------------------------------------

--- **V.-** Que advertí y expliqué a la solicitante en cumplimiento de lo dispuesto por la "Ley Federal de Protección de Datos Personales en Posesión de los Particulares", que sus "Datos Personales" se utilizarán de la forma que estipula el "Aviso de Privacidad" que fue puesto a su disposición con anterioridad a la firma del presente instrumento y el cual declara conocer en su totalidad. --------------------------------------------------------

---- **VI.-** Que el compareciente no me presentó el Registro de la sociedad en el Registro Nacional de Inversiones Extranjeras, por lo que procederé a dar el aviso respectivo. ------------------------------------------

---- **VII.-** Que hice saber al compareciente el derecho que tiene de leer por sí misma el presente instrumento, y que por no haberlo ejercido, le fue leído íntegramente; que ilustré a la compareciente acerca del valor y consecuencias legales del contenido de este instrumento, quien conforme con su tenor, lo firma de conformidad ante la suscrita Notario en la misma fecha de su encabezamiento. **DOY FE.** -----------------------

---- Firma de: **MARTIN FLORES MERINO.** ------------------------------------------------------------------

----- Ante Mí. - Licenciada **IVONNE LEMUS ARELLANO.** - Rúbrica. El sello de autorizar. --------------------

----- **ES COPIA CERTIFICADA SACADA DE SU ORIGINAL QUE OBRA EN EL PROTOCOLO ABIERTO A MI CARGO.- DOY FE.** --------------------------------------------------------------------------------





# PODER JUDICIAL DE LA FEDERACIÓN

**EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN**

**Archivo Firmado:**
**415800200000000000048316489.p7m**
**Autoridad Certificadora:**
**AC DEL SERVICIO DE ADMINISTRACION TRIBUTARIA**
**Firmante(s): 1**
**Este documento digital es una copia fiel de su versión física o electrónica, la cual corresponde a su original.**

EDER FLORES CORONA<br>706a0d628c66a6520000000000000000000000001c<br>15/05/26 17:00:00

| FIRMANTE | | | | |
|---|---|---|---|---|
| Nombre: | EDUARDO DE MARTIN ALBOR VILLANUEVA | Validez: | BIEN | Vigente |
| **FIRMA** | | | | |
| No Serie: | 30.30.30.30.31.30.30.30.30.30.37.31.34.32.31.31.32.31.38 | Revocación: | Bien | No revocado |
| Fecha (UTC/ CDMX) | 18/06/25 02:15:42 - 17/06/25 20:15:42 | Status: | Bien | Valida |
| Algoritmo: | RSA-SHA256 | | | |
| Cadena de firma: | 52 10 cc 38 47 91 ba 84 52 14 97 76 fa 1f 77 09<br>17 7e 01 de 16 50 7f f4 94 06 13 d7 f8 87 61 4f<br>62 9d d7 db 01 8b 82 78 ca 82 b4 7c 2a f8 4e 44<br>5e e7 e4 5f 2e fe cb ce 0f a2 90 0e 8a eb 53 e5<br>7b 5e 3a d3 15 74 da f1 9b 0c a0 8c f7 5a ba 78<br>3e 37 03 f5 87 04 4f 86 0e aa f7 fb bb 54 9f 0c<br>47 65 04 18 85 87 99 0b 3f 1a f0 06 32 73 38 63<br>31 a6 74 c6 3e 26 cb 32 a6 7a 51 d6 09 20 b0 60<br>01 62 41 65 52 31 30 8b c2 1b a5 46 a5 4c 78 9b<br>bd f8 95 5e 5d 0b fd 94 99 49 5b 76 88 ac e3 a6<br>70 ad 18 2d 9f 94 eb 37 13 cd cb 39 19 b2 cb 0e<br>77 1f 42 39 27 59 df aa 66 d0 22 2c fe fb 8a 7d<br>ba 70 63 ed d1 80 93 29 66 e0 18 e1 ed 57 52 9c<br>d9 bc d7 00 64 83 41 ee 83 c2 d4 56 6c d8 c1 c6<br>b7 8a 7d 7e 4b d3 ef 69 98 f8 62 45 ef e4 5f 78<br>08 2e 0c 3d ec db ac d1 fe 5f d7 a9 60 05 e5 85 | | | |
| **OCSP** | | | | |
| Fecha: (UTC/ CDMX) | 18/06/25 02:15:12 - 17/06/25 20:15:12 | | | |
| Nombre del respondedor: | OCSP SAT | | | |
| Emisor del respondedor: | AC DEL SERVICIO DE ADMINISTRACION TRIBUTARIA | | | |
| Número de serie: | 30.30.30.30.31.30.30.30.30.30.37.31.34.32.31.31.32.31.38 | | | |
| **TSP** | | | | |
| Fecha : (UTC/ CDMX) | 18/06/25 02:15:44 - 17/06/25 20:15:44 | | | |
| Nombre del emisor de la respuesta TSP: | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal | | | |
| Emisor del certificado TSP: | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal | | | |
| Identificador de la respuesta TSP: | 13220718 | | | |
| Datos estampillados: | 5zv6rG+vW1x6oCvKiVvUCIqH9f0= | | | |



# Portal de Servicios en Línea del Poder Judicial de la Federación

**Poder Judicial de la Federación**

# Acuse de Recepción de Notificación

## Juzgado Segundo de Distrito en Materia de Concursos Mercantiles, con residencia en la Ciudad de México y jurisdicción en toda la República Mexicana

| | |
|---|---|
| **Tipo de asunto:** | Concursos Mercantiles |
| **Número de expediente:** | 1/2025 |
| **Cuaderno:** | Principal |
| **Parte notificada:** | CONTROLADORA DOLPHIN, S.A. DE C.V. (promovente) |
| **Notificación realizada por:** | Carlos Eduardo Milla Ortega |

**Síntesis del acuerdo:**

Ciudad de México, veintiuno de mayo de dos mil veinticinco. VISTOS los autos del concurso mercantil 1/2025, para resolver el recurso de revocación interpuesto por C.D.Sociedad Anónima de Capital Variable, por conducto de su apoderado legal V.B.R., contra el proveído de catorce de abril de dos mil veinticinco; y, R E S U L T A N D O: PRIMERO. Presentación del recurso de revocación. Por escrito presentado el veinticuatro de abril de dos mil veinticinco (folio 11350), a través del Portal de Servicios en Línea del Poder Judicial de la Federación, recibido el veinticinco de abril siguiente en la Oficialía de Partes de este Juzgado de Distrito, **** interpuso recurso de revocación contra el auto de catorce de abril de dos mil veinticinco, específicamente, en la parte conducente que tuvo a la comerciante por desistida del presente concurso mercantil. Por lo expuesto y con fundamento en el artículo 268, de la Ley de Concursos Mercantiles y 1334 y 1335, del Código de Comercio, se: R E S U E L V E: ÚNICO. Se declara Infundado el recurso de revocación interpuesto por C.D.Sociedad Anónima de Capital Variable, por conducto de su apoderado legal V.B.R., contra el proveído de catorce de abril de dos mil veinticinco; por los motivos y fundamentos precisados en el considerando cuarto de la presente resolución. SEGUNDO. Se confirma el auto impugnado. Notifíquese, y personalmente al recurrente.

| | |
|---|---|
| **Fecha del acuerdo:** | 21/05/2025 |
| **Fecha de publicación del acuerdo:** | 22/05/2025 |
| **Fecha de notificación:** | 26/05/2025 |
| **Hora de notificación:** | 09:33 |



# PODER JUDICIAL DE LA FEDERACIÓN

## EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN

**Archivo Firmado:**
**41580020000000000048316490.p7m**
**Autoridad Certificadora:**
**AC DEL SERVICIO DE ADMINISTRACION TRIBUTARIA**
**Firmante(s): 1**
**Este documento digital es una copia fiel de su versión física o electrónica, la cual corresponde a su original.**

<div style="writing-mode:vertical">EDER FLORES CORONA<br/>700a0629e656a8320000000000000000000000041c<br/>15:05:26 17/06/00</div>

| FIRMANTE | | | | |
|---|---|---|---|---|
| Nombre: | EDUARDO DE MARTIN ALBOR VILLANUEVA | Validez: | BIEN | Vigente |
| **FIRMA** | | | | |
| No Serie: | 30.30.30.30.31.30.30.30.30.30.37.31.34.32.31.31.32.31.38 | Revocación: | Bien | No revocado |
| Fecha (UTC/ CDMX) | 18/06/25 02:15:38 - 17/06/25 20:15:38 | Status: | Bien | Valida |
| Algoritmo: | RSA-SHA256 | | | |
| Cadena de firma: | 80 3c 3f af 59 9a 2f e9 f0 69 ba bb 68 c1 0c 33<br/>d7 07 29 68 ec 01 fa 2d cc 0e 7c 60 32 31 da bf<br/>97 ac 2f 2e 1c 8f 99 c2 64 6f 6e 61 4a dd f9 21<br/>f7 d3 b6 1f 14 13 4c 54 df 7e 1c 87 97 b0 c1 33<br/>86 98 bb e9 e4 12 6e 18 ae b9 be c7 32 99 84 3e<br/>6e 90 2a e2 d6 a9 f0 5e 2c e9 85 5e 74 11 16 b5<br/>0c d6 92 e4 ec 4d 5b fb 98 a7 03 3b f5 c7 ef e1<br/>8c bc b7 62 d8 52 61 48 04 6f e5 fd bf 9a ad 42<br/>a4 89 98 a2 1d cb c0 b8 bd 1a b4 4f 4d 8b 80 b2<br/>bb a5 16 cd 17 d5 8c 46 18 e4 f5 6e 8c fa 25 00<br/>ed 50 9d 54 77 44 5c eb 76 ee 3b e2 6e 7e 14 a2<br/>1a 8d c9 4d a6 59 8a 4b 8f 85 41 54 26 02 69 67<br/>0b 3a 4b 52 46 20 12 4f 8c ba 9e 55 29 3c b7 7c<br/>9e 2b 2e 01 c9 de 03 75 de ae 99 10 89 be a9 9a<br/>6a 60 5d d4 c2 71 ba b1 0e 00 78 b2 8e d7 fb a8<br/>b9 3a df be b5 0d 2d e2 56 6e 77 4a eb e1 57 53 | | | |
| **OCSP** | | | | |
| Fecha: (UTC/ CDMX) | 18/06/25 02:15:07 - 17/06/25 20:15:07 | | | |
| Nombre del respondedor: | OCSP SAT | | | |
| Emisor del respondedor: | AC DEL SERVICIO DE ADMINISTRACION TRIBUTARIA | | | |
| Número de serie: | 30.30.30.30.31.30.30.30.30.30.37.31.34.32.31.31.32.31.38 | | | |
| **TSP** | | | | |
| Fecha : (UTC/ CDMX) | 18/06/25 02:15:39 - 17/06/25 20:15:39 | | | |
| Nombre del emisor de la respuesta TSP: | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal | | | |
| Emisor del certificado TSP: | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal | | | |
| Identificador de la respuesta TSP: | 13220700 | | | |
| Datos estampillados: | oL7pR3gYzDy3ljP0FNkbfVsu/9c= | | | |

**Quejosa**:

Controladora Dolphin, S.A. de C.V. ("**Controladora**" o "**Quejosa**")

Concurso mercantil: 1/2025

**Asunto**: <u>Se promueve demanda de amparo directo y se solicita la suspensión de los actos reclamados</u>.

**JUZGADO SEGUNDO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA.**

**EDUARDO ALBOR VILLANUEVA**, apoderado general de **CONTROLADORA DOLPHIN, S.A. DE C.V.**, ("**Controladora**" o "**Quejosa**"), personalidad que se acredita en términos de la escritura pública que se acompaña como Anexos "1", comparece y expone:

Se manifiesta **BAJO PROTESTA DE DECIR VERDAD** que la digitalización del documento público que se acompaña como Anexo "1" es copia íntegra e inalterada del documento impreso obtenida de su original, de conformidad con la fracción VI del artículo 3º del Acuerdo General 12/2020 del Pleno del Consejo de la Judicatura Federal.

Se acompaña al presente escrito demanda de amparo directo en la que se reclama el auto de 21 de mayo de 2025 a través del cual este Juzgado resolvió el recurso de revocación interpuesto por Controladora en contra del auto de 14 de enero de 2025.

Se solicita a este Juzgado que remita la demanda de amparo que se promueve, junto con la totalidad de los autos originales del juicio en que se actúa, al Tribunal Colegiado en Materia Civil del Primer Circuito que por turno corresponda.

Por lo expuesto y fundado, Usted **JUEZA DE DISTRITO**, atentamente se solicita:

**PRIMERO**.  Tener por presentada la presente demanda de amparo directo que se promueve, y remitirla, junto con la totalidad de los autos originales del juicio en que se actúa y los anexos de la presente demanda, al Tribunal Colegiado en Materia Civil del Primer Circuito que por turno corresponda.

**SEGUNDO.**  Conceder la suspensión solicitada en el cuerpo de dicha demanda.

<div align="center">

**PROTESTO LO NECESARIO**
**Ciudad de México, a la fecha de su presentación.**

[firmado electrónicamente]
_____
**EDUARDO ALBOR VILLANUEVA**
apoderado general de
**CONTROLADORA DOLPHIN, S.A. DE C.V.**

</div>

**Quejosa:**

Controladora Dolphin, S.A. de C.V. ("**Controladora**" o "**Quejosa**")

**Asunto:**

<u>**Se promueve demanda de amparo directo y se solicita la suspensión de los actos reclamados.**</u>

**TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO, EN TURNO.**

**EDUARDO ALBOR VILLANUEVA**, apoderado general de **CONTROLADORA DOLPHIN, S.A. DE C.V.**, ("**Controladora**" o "**Quejosa**"), personalidad que se acredita en términos de la escritura pública que se acompaña como Anexos "1", así como **VICENTE BAÑUELOS RIZO**, por propio derecho y como autorizado en términos amplios de la Quejosa, comparecen y exponen:

Se manifiesta **BAJO PROTESTA DE DECIR VERDAD** que la digitalización de los documentos públicos que se acompañan como Anexos "1", "1-A" y "1-B" es copia íntegra e inalterada de los documentos impresos obtenida de sus originales, de conformidad con la fracción VI del artículo 3º del Acuerdo General 12/2020 del Pleno del Consejo de la Judicatura Federal.

Con fundamento en los artículos 103 fracción I y 107 de la Constitución Política de los Estados Unidos Mexicanos, así como los artículos 1°, 5, 17 y 170 de la Ley de Amparo, se promueve **DEMANDA DE AMPARO DIRECTO,** en los términos que se precisan más adelante.

Ahora bien, para dar cumplimiento a lo dispuesto por el artículo 175 de la Ley de Amparo, se expresa lo siguiente:

<div align="center">ÍNDICE</div>

I.      CONSIDERACIÓN PREVIA. ...........................................................................4

II.     AUTORIZACIÓN DE PERSONAS. .................................................................6

III.    NOMBRE Y DOMICILIO DE LA QUEJOSA...................................................7

IV.     NOMBRE Y DOMICILIO DE LA TERCERO INTERESADA.......................7

V.      AUTORIDADES RESPONSABLES...................................................................8

VI.     ACTOS RECLAMADOS. ...................................................................................8

VII.    OPORTUNIDAD DE LA DEMANDA DE AMPARO. ...................................9

VIII.   PROCEDENCIA. ............................................................................................. 10

   A.   El Auto Reclamado puso fin al Concurso Mercantil. ......................................10

   B.   Ya se agotaron recursos ordinarios. ...............................................................13

IX.     BREVES ANTECEDENTES RELEVANTES. ................................................. 14

   A.   Sobre Controladora y su actual situación financiera. ....................................14

   B.   Antecedentes del concurso mercantil. .......................................................... 20

X.      CONCEPTOS DE VIOLACIÓN........................................................................ 27

EDUARDO ALBOR VILLANUEVA<br>0ODc6400194600ODOO000000000000000018<br>2025T1:36:39 P66420

1



**PRIMERO. CONTRARIO A LO QUE ADUCE EL JUZGADO RESPONSABLE, ES FALSO QUE EL INCIDENTE DE FALTA DE PERSONALIDAD PRESENTADO POR CONTROLADORA ESTUVIERA "SIN MATERIA" AL MOMENTO DE SU PRESENTACIÓN, SIENDO EVIDENTE QUE DICHO JUZGADO SÍ RECONOCIÓ PERSONALIDAD A LOS SEDICENTES APODERADOS, POR LO QUE DEBIÓ HABERLO ADMITIDO Y SUSTANCIADO PREVIO A RESOLVER SOBRE LA SOLICITUD DE DESISTIMIENTO Y, AL NO HACERLO, VIOLÓ LOS DERECHOS A LA SEGURIDAD JURÍDICA Y ACCESO A LA JUSTICIA DE LA QUEJOSA.** .................. **27**

    a.   Principio de seguridad jurídica ...................................................................................... 27
    b.   Derecho de acceso a la justicia ...................................................................................... 29
    c.   Ilegalidad del Auto Reclamado y violación a los derechos de seguridad jurídica y acceso a la justicia. 32

**SEGUNDO. EL JUZGADO RESPONSABLE VIOLÓ EL PRINCIPIO DE CONTRADICCIÓN AL RESOLVER LA VALIDEZ DE LA REPRESENTACIÓN Y FACULTADES DE LOS SEDICENTES APODERADOS SIN QUE ANTES SE AGOTARA UN PROCEDIMIENTO PARA ELLO.** ................................................................................. **46**

    a.   Debido Proceso, garantía de audiencia y el principio de contradicción. ......................................... 46
    b.   El Juzgado Responsable violó el derecho al debido proceso, la garantía de audiencia y el principio de
    contradicción en perjuicio de Dolphin ....................................................................................... 53

**TERCERO. A MAYOR ABUNDAMIENTO, EL SOLO HECHO DE QUE EN LA SUPUESTA RUA PARTICIPARÁ CI BANCO Y WILMINGTON TRUST NO IMPORTA LA VALIDEZ DE DICHA RESOLUCIÓN, ADEMÁS DE QUE NO SUBSANA LA OBLIGACIÓN QUE TENÍA EL JUZGADO RESPONSABLE DE RESOLVER CON PRIORIDAD EL INCIDENTE DE FALTA DE PERSONALIDAD Y EL RESTO DE LAS IMPUGNACIONES INTERPUESTAS POR CONTROLADORA PARA CUESTIONAR LA PERSONALIDAD DE LOS SEDICENTES APODERADOS .**.................................... **57**

**CUARTO. CONTRARIO A LO SOSTENIDO POR EL JUZGADO RESPONSABLE, EL HECHO DE QUE CI BANCO SEA EL "ACCIONISTA MAYORITARIO" Y HAYA MANIFESTADO NO ESTAR CONFORME CON LA PRESENTACIÓN DEL CONCURSO MERCANTIL, NO IMPORTA LA VALIDEZ DE LA SUPUESTA RUA NI LA DOTA DE UNA PRESUNCIÓN DE LAGELIDAD, NI JUSTIFICA LAS VIOLACIONES COMETIDAS POR EL JUZGADO RESPONSABLE .** .............................. **63**

**QUINTO. CONTRARIO A LO SOSTENIDO POR EL JUZGADO RESPONSABLE, ÉSTE SÍ ACTUÓ EN CONTRA DE SUS PROPIAS DETERMINACIONES AL DAR TRÁMITE A LA SOLICITUD DE DESISTIMIENTO A PESAR DE QUE NO SE HABÍA CUMPLIDO CON EL REQUERIMIENTO QUE ÉSTE HABÍA FORMULADO .** ................................. **66**

    a.   Principio de seguridad jurídica ...................................................................................... 67
    b.   Principio de congruencia y exhaustividad ...................................................................... 67
    c.   Ilegalidad del Auto Reclamado. .................................................................................... 68

**SEXTO.   EL JUZGADO RESPONSABLE PARTE DE PREMISAS ERRÓNEAS Y NO ADVIERTE LA RATIO DE LOS AGRAVIOS FORMULADOS POR LA QUEJOSA, YA QUE ÉSTA NO SE DUELE DE UN MERO OTORGAMIENTO DE EFECTOS A LA SUPUESTA RUA, SINO DEL HECHO DE QUE FUE OMISO EN VALORAR EL RESTO DEL CAUDAL PROBATORIO Y RAZONES QUE DEMOSTRABAN LA INVALIDEZ DE DICHA RESOLUCIÓN, VIOLANDO EL PRINCIPIO DE CONTRADICCIÓN PUES, CONTRARIO A LO SOSTENIDO EN EL JUZGADO RESPONSABLE, ÉSTE SÍ DESESTIMÓ IMPLÍCITAMENTE LAS PROMOCIONES FORMULADAS POR CONTROLADORA.** .......................................................................................................... **75**

    a.   Debido Proceso, garantía de audiencia y el principio de contradicción. ......................................... 75
    b.   El Juzgado Responsable violó el derecho al debido proceso, la garantía de audiencia y el principio de
    contradicción en perjuicio de Dolphin. ..................................................................................... 75

**SÉPTIMO.   CONTRARIO A LO QUE SOSTIENE EL JUZGADO RESPONSABLE, EL DESISTIMIENTO FORMULADO POR LOS SEDICENTES APODERADOS SÍ FUE PROMOVIDO POR LOS ACREEDORES DE LA QUEJOSA, POR LO QUE ESTABA COMPLEIDO A EJERCER LAS FACULTADES QUE LE OTORGA EL ARTÍCULO 87 DE LA LEY DE CONCURSOS MERCANTILES, LAS CUALES NO DEPENDEN DEL DICTADO DE UNA SENTENCIA DE CONCURSO MERCANTIL.** .............................. **80**

    a.   El principio par conditio creditorum en el procedimiento concursal. ............................................. 81
    b.   La aplicación del artículo 87 de la Ley de Concursos Mercantiles. .............................................. 87
    c.   Caso en concreto. ...................................................................................................... 91

**OCTAVO.  CONTRARIO A LO QUE SOSTIENE EL JUZGADO RESPONSABLE, EL HECHO DE QUE EL JUZGADO RESPONSABLE PASÓ POR ALTO QUE EL DESISTIMIENTO FORMULADO POR EL SEDICENTE APODERADO DE CONTROLADORA ES PRODUCTO DE LA VIOLACIÓN FLAGRANTE A LAS MEDIDAS CAUTELARES, NO SON CUESTIONES AJENAS A LA CONTROVERSIA Y, POR EL CONTRARIO, DEBIERON HABER SIDO ANALIZADAS POR EL JUZGADO RESPONSABLE ANTES DE DECIDIR SOBRE EL DESISTIMIENTO PRESENTADO POR LOS SEDICENTES APODERADOS.** .......................................................... **96**



**NOVENO.    CONTRARIO A LO QUE SOSTIENE EL JUZGADO RESPONSABLE, ESTABA OBLIGADO A DICTAR LA SENTENCIA DE CONCURSO MERCANTIL AL TRANSCURRIR EL PLAZO IMPRORROGABLE PARA ELLO, MÁXIME QUE SÍ ESTABAN PROBADOS LOS EXTREMOS PARA LA DECLARACIÓN DE CONCURSO MERCANTIL .** ...............................................................................................................**102**

**DÉCIMO. EL JUZGADO RESPONSABLE FUE OMISO EN ADVERTIR LA ILEGALIDAD DE LA SUPUESTA RUA, PARTIENDO DEL HECHO EVIDENTE DE QUE ÉSTA FUE CELEBRADA POR WILMINGTON TRUST A PESAR DE QUE HABÍA RENUNCIADO COMO "AGENTE DE GARANTÍAS", POR LO QUE NO GOZABA DE FACULTADES PARA SU CELEBRACIÓN Y ESTABA VICIADA DE NULIDAD ABSOLUTA, ADEMÁS DE QUE NO SE SIGUIÓ EL PROCEDIMIENTO PARA LA EJECUCIÓN DE GARANTÍAS PRENDARIAS QUE SUSTENTÓ DICHA RESOLUCIÓN.** ....................................................................................................................**108**

**DÉCIMO PRIMERO. CONTRARIO A LO QUE SOSTIENE EL JUZGADO RESPONSABLE, ÉSTE SÍ VIOLÓ EL PRINCIPIO DE BUENA FE PROCESAL AL SUSTENTAR EL AUTO RECLAMADO EN EL HECHO DE QUE CI BANCO, COMO ACCIONISTA MAYORITARIO DE CONTROLADORA, ADUJO QUE SUPUESTAMENTE NO CONSINTIÓ LA PRESENTACIÓN DEL CONCURSO MERCANTIL, PUES ELLO NO IMPORTA LA VALIDEZ DE LA SUPUESTA RUA, NI MUCHO MENOS PRIVA DE EFECTOS A LA ASAMBLEA GENERAL DE ACCIONISTAS Y LA SESIÓN DE CONSEJO DE ADMINISTRACIÓN QUE SUSTENTARON LA PRESENTACIÓN DE LA SOLICITUD, MISMAS QUE DEBIERON SER VALORADAS PREVIO A DECIDIR SOBRE EL DESISTIMIENTO Y DEBIERON CONSIDERARSE BAJO EL MISMO PESO QUE LOS ACTOS DE LOS ACREEDORES.** **114**

    a.   El principio de buena fe procesal..........................................................................115
    b.   La ilegalidad del Auto Reclamado. ..................................................................117

**DÉCIMO SEGUNDO. EL JUZGADO RESPONSABLE ACTUÓ DE FORMA ILEGAL AL CONFIRMAR EL LEVANTAMIENTO DE LAS MEDIDAS CAUTELARES A PESAR DE QUE NO HABÍA CAUSADO ESTADO EL AUTO DE DESISTIMIENTO.** .....................**119**

**DÉCIMO TERCERO. AL CONFIRMAR EL AUTO DE DESISTIMIENTO Y EL CONSECUENTE LEVANTAMIENTO DE MEDIDAS CAUTELARES, EL JUZGADO RESPONSABLE INCUMPLIÓ CON LO DISPUESTO EN EL ARTÍCULO 25 DE LA LEY DE CONCURSOS MERCANTILES, PUES NO ESTABA FACULTADO PARA ORDENAR EL LEVANTAMIENTO DE LAS MEDIDAS CAUTELARES SIN PREVIAMENTE AGOTARSE ALGUNO DE LOS MEDIOS Y RECURSOS QUE REGULA EL ARTÍCULO 1183 DEL CÓDIGO DE COMERCIO.** ....................................**122**

**DÉCIMO CUARTO. INCONSTITUCIONALIDAD DE LOS ARTÍCULOS 1, 7, 25, 26 Y 28 DE LA LEY DE CONCURSOS MERCANTILES, ASÍ COMO EL ARTÍCULO 1183 DEL CÓDIGO DE COMERCIO AL INTERPRETAR IMPLÍCITAMENTE LA POSIBILIDAD DE DECRETAR EL LEVANTAMIENTO DE MEDIDAS CAUTELARES SIN QUE SE HAYA INTERPUESTO RECURSO ORDINARIO Y SIN QUE MEDIE SOLICITUD EXPRESA PARA ELLO.** ..........................................................................................**124**
    a.   Debido proceso y principio de contradicción. ..................................................124
    b.   Tutela cautelar efectiva.....................................................................................124
    c.   La interpretación inconstitucional e implícita emprendida por el Juzgado Responsable. ..................126
    d.   Necesidad de ejercer control de constitucionalidad para salvaguardar la constitucionalidad de los preceptos reclamados y consecuente inconstitucionalidad de las Resoluciones Reclamadas al amparo del ejercicio de dicho control. ........................................130

**DÉCIMO QUINTO. INCONSTITUCIONALIDAD DE LOS ARTÍCULOS 1, 7, 25, 26 Y 29 DE LA LEY DE CONCURSOS MERCANTILES, ASÍ COMO EL ARTÍCULO 1343 DEL CÓDIGO DE COMERCIO, AL INTERPRETAR IMPLÍCITAMENTE LA POSIBILIDAD ORDENAR EL LEVANTAMIENTO DE LAS MEDIDAS CAUTELARES A PESAR DE QUE EL AUTO RECLAMADO NO HABÍA CAUSADO ESTADO.** ...................................**134**
    a.   Acceso a la justicia. ..........................................................................................135
    b.   Tutela judicial efectiva. .....................................................................................140
    c.   Recurso efectivo................................................................................................145
    d.   La interpretación inconstitucional e implícita sostenida por el Juzgado Responsable. ........................147
    e.   Necesidad de ejercer control de constitucionalidad para salvaguardar la constitucionalidad de los preceptos reclamados y consecuente inconstitucionalidad de las Resoluciones Reclamadas al amparo del ejercicio de dicho control. ........................................149

**DÉCIMO SEXTO. INCONSTITUCIONALIDAD DEL ARTÍCULO 28 DE LA LEY DE CONCURSOS MERCANTILES, AL INTERPRETARSE IMPLÍCITAMENTE LA POSIBILIDAD DE QUE EL DESISTIMIENTO DEL CONCURSO MERCANTIL SEA PLANTEADO POR LOS ACREEDORES DE LA COMERCIANTE.** ..............................**150**
    a.   Principio de seguridad jurídica ..........................................................................150
    b.   Debido proceso, tutela judicial efectiva y acceso a la justicia.................................150
    c.   La interpretación implícita e inconstitucional sostenida por el Juzgado Responsable. ........................151
    d.   El ejercicio de control de constitucionalidad que debe ejercerse sobre los Preceptos Reclamados... 152

TRADUCCIONES CERTIFICADAS LUNA DE VILLANUEVA
293597459845684957683945876934857693487562834576
28345728497594287



**DÉCIMO SÉPTIMO. INCONSTITUCIONALIDAD DE LOS ARTÍCULOS 18 Y 19 DE LA LEY DE CONCURSOS MERCANTILES, AL INTERPRETAR QUE EL INCIDENTE DE FALTA DE PERSONALIDAD NO ES DE PREVIO Y ESPECIAL PRONUNCIAMIENTO Y PUEDE DARSE TRÁMITE A PETICIONES FORMULADAS POR PERSONAS CUYA PERSONALIDAD FUE IMPUGNADA. ................................................................153**

a. Principio de seguridad jurídica .................................................................. 153
b. Debido proceso, tutela judicial efectiva y acceso a la justicia.................... 153
c. Recurso efectivo. ........................................................................................ 153
d. La interpretación inconstitucional e implícita emprendida por el Juzgado Responsable. .................. 155
e. El ejercicio de control de constitucionalidad que debe ejercerse sobre los Preceptos Reclamados... 159

**XI.   SOLICITUD DE SUSPENSIÓN. ..................................................................160**

**A.   Efectos para los cuales se solicita la supensión .....................................160**

**B.   Cumplimiento de requisitos para procedencia de la suspensión. ..................164**

a. La petición de parte. ................................................................................... 167
b. Existencia de los actos reclamados. ............................................................ 167
c. Naturaleza de los actos reclamados, es decir, que sean susceptibles de ser suspendidos. .................. 167
d. El quejoso debe resentir una afectación en su interés jurídico o legítimo. ................ 173
e. Ponderación entre la apariencia del buen derecho y el interés social o el orden público. .................. 174
f. Sobre la garantía. ....................................................................................... 176

I.   **CONSIDERACIÓN PREVIA**.

De las constancias de autos del presente expediente, así como de los breves antecedentes que se narran más adelante, este Tribunal advertirá que la presente controversia tiene en su núcleo cuestiones irresueltas de personalidad.

La controversia surge después de que ciertos acreedores de la Quejosa, de manera ilegal, ejecutaran ciertas garantías prendarias sobre acciones en su contra e intentaran tomar "control corporativo" sobre ella, designando un nuevo Consejo de Administración y nombrando nuevos apoderados.

Lo anterior lo hicieron mediante una supuesta "resolución unánime de accionistas" celebrada el 28 de marzo de 2025, en la que se designaron a los siguientes apoderados: *(i)* Steven Robert Strom, *(ii)* Robert L. Wagstaff, *(iii)* Michael Nicosia Flynn, *(iv)* Eduardo Moyano Luco, *(v)* Matías Marambio Calvo, *(vi)* María Lucia Wagstaff, *(vii)* Carlos Alfredo Moyano Luco, *(viii)* Francisco José Glennie Calvo, *(ix)* Jaime René Guerra González, *(x)* Jesús Armando Treviño Moyeda, *(xi)* Alfonso Peniche García, *(xii)* Román Salazar Castillo, *(xiii)* Rogelio Héctor Palacios Beltrán, *(xiv)* Carlos Braulio Reyes Escandón, *(xv)* Miguel Ángel Hernández Morales, *(xvi)* Sebastián Ruanova Carbajal y, *(xvii)* Rodrigo Josué Gazcón Quintana ("**Sedicentes Apoderados**").

La validez de esta ilegal resolución ya está siendo impugnada por Controladora en las vías idóneas para ello; de hecho, actualmente Controladora promovió un juicio ordinario mercantil en contra de los Sedicentes Apoderados, radicado ante el Juzgado Décimo de lo Civil del Tribunal Superior de Justicia de la Ciudad de México ("**Juzgado Décimo**") bajo el expediente 256/2025, el cual incluso dictó medidas cautelares que ya constan en el presente expediente, que suspendieron la validez de la resolución unánime bajo la cual pretenden actuar.

Lo anterior aunado a que, como obra en autos, la validez de dicha resolución **también fue impugnada en el presente concurso mercantil** a través de un "incidente de falta de personalidad", cuya desestimación por parte del Juzgado Responsable **es precisamente una de las violaciones que se reclaman en la presente demanda de amparo**.



Máxime que, se reitera a este Tribunal, la presente controversia tiene en su núcleo precisamente la invalidez de la representación de los Sedicentes Apoderados y demás actos realizados con la finalidad **de desconocer la personalidad de los legítimos representantes de la Quejosa**, quienes suscriben la presente ampliación de demanda.

Por lo tanto, si la presente controversia precisamente versa sobre cuestiones de personalidad, es evidente que este Tribunal **no debe acordar favorable cualquier solicitud, formulada por distintos apoderados, que busque desestimar la presente demanda ni, mucho menos, debe impedir la procedencia de esta demanda alegando cuestiones de personalidad**. Al respecto, es aplicable el siguiente criterio jurisprudencial vinculante:

> **"PERSONALIDAD. EL RECURSO INTERPUESTO CONTRA SU DESCONOCIMIENTO EN EL JUICIO DE AMPARO NO DEBE DESECHARSE CON BASE EN EL ARGUMENTO DE LA FALTA DE PERSONALIDAD.**
>
> Hechos: Los Tribunales Colegiados de Circuito contendientes se pronunciaron en forma contradictoria en torno a si procede desechar un recurso por falta de legitimación ad procesum o personalidad del promovente, cuando esto es el punto jurídico debatido, en virtud de haber sido el sustento de la resolución recurrida; o si debe reservarse su estudio para la sentencia que decida el recurso, como tema de fondo.
>
> Criterio jurídico: El Pleno en Materia Civil del Tercer Circuito establece que el tribunal que conoce del recurso interpuesto contra la resolución que tuvo por no acreditada la personalidad de quien compareció en representación del quejoso, debe resolver el fondo de la cuestión planteada y no desecharlo con base en ese desconocimiento.
>
> Justificación: Ello, con el fin de dar respuesta a los argumentos tendentes a demostrar la ilegalidad de la resolución recurrida, en observancia de los derechos fundamentales de acceso a la tutela jurisdiccional y de audiencia y defensa. En virtud de que la materia de fondo a dilucidar en el medio de impugnación respectivo es, propiamente, analizar si efectivamente tiene o no dicha representación. En tanto **que desconocer, de entrada, la personalidad cuestionada, desechando el recurso por esa misma razón, conllevaría a la falacia de "petición de principio", que consiste en emplear el argumento cuestionado contra el recurrente, cuando éste no es susceptible de ser utilizado, porque ello implicaría que el tribunal ya aceptó la legalidad del punto jurídico debatido**. Lo anterior, sin haber mediado la respuesta a cada uno de los agravios hechos valer con la intención de probar lo contrario."[1]

[Énfasis añadido]

Criterio que, cabe mencionar, es congruente con el distinto emitido por la Primera Sala de la Suprema Corte de Justicia de la Nación, mismo que se reproduce a continuación:

> **"PERSONALIDAD, MOTIVO DEL AMPARO**. Si se lleva al conocimiento del Juez de Distrito que conoce del amparo, la legalidad o ilegalidad de una providencia que en un juicio, en trámite, desconoce una personalidad, resulta antijurídico que ese funcionario exija previamente a la admisión de la demanda, que se le acredite esa personalidad, puesto que es precisamente el problema que se va a discutir y resolver en el fondo del juicio de garantías."[2]

---

[1] Registro digital: 2023081 Plenos de Circuito;11a. Época;Gaceta del Semanario Judicial de la Federación;PC.III.C. J/55 C (10a.) ;J; Publicación: viernes 07 de mayo de 2021 10:12 h
[2] Registro digital: 345916 SCJN;5a. Época;Semanario Judicial de la Federación ;TA

CLYDE&CO

En consecuencia, desde ahora se hace de oportuno conocimiento de este Tribunal que Controladora **desconoce cualquier actuación de los Sedicentes Apoderados, por lo que ninguna actuación que éstos formulen ante este Tribunal debe ser considerada**, al ser evidente que la personalidad que ostentan es ilegal.

Lo anterior, sin que deba pasar desapercibido para este Tribunal que al presente juicio de amparo también comparece **Vicente Bañuelos Rizo**, por su propio derecho y, en consecuencia, bajo una personalidad distinta a la de Controladora.

## II.   AUTORIZACIÓN DE PERSONAS.

Se autoriza en términos amplios del artículo 12 de la Ley de Amparo vigente, a los Licenciados en Derecho Vicente Bañuelos Rizo,[3] Alejandro Acevedo Juárez,[4] Luis Roberto Luna Reyes,[5] Carlos Eduardo Milla Ortega,[6] Francisco Alberto Ladino Chávez,[7] Gian Carlo Alexis Cardiel Ávila[8], Gonzalo López de Lerena de Giau[9] e Ilse Angulo Leyva,[10] quienes, en consecuencia, quedan autorizados para oír y recibir todo tipo de notificaciones a nombre de la Quejosa, recoger documentos y valores, consultar el expediente y tomar apuntes y fotografías del mismo, imponerse de los autos, interponer los recursos que procedan, ofrecer y rendir pruebas, alegar en las audiencias, solicitar su suspensión o diferimiento y realizar cualquier acto que resulte necesario para la defensa de los derechos del autorizante.

Se autoriza únicamente para oír y recibir notificaciones, imponerse de los autos, recoger documentos y tomar apuntes y fotografías de los escritos y acuerdos que conformen el expediente a Yolanda Aimée Díaz Chacón, Lucía Paulina Aguilar Fernández, Emilio Jesús Flores Domínguez, Karla Pamela Ramos Guerrero, Nilda Noelia Báez Padilla y Luis Emilio Sánchez Solano.

Con fundamento en los artículos 35, 36 y 40 del Acuerdo General 12/2020 del Pleno del Consejo de la Judicatura Federal, se solicita autorizar a las siguientes personas cuyos nombres de usuario del Sistema del Portal de Servicios en Línea del Poder Judicial de la Federación se identifican, la consulta vía internet del expediente electrónico citado al rubro, con la finalidad de consultar y actuar vía electrónica en dicho portal, para lo cual se proporcionan los datos de registro siguientes:

| Nombre | Usuario | Correo electrónico |
|---|---|---|
| Vicente Bañuelos Rizo | Vicentebanuelos | Vicente.Banuelos@clydeco.com |
| Alejandro Acevedo Juárez | AlejandroAC1404 | Alejandro.Acevedo@clydeco.com |
| Francisco Alberto Ladino Chávez | fcoladinoc | francisco.ladino@clydeco.com |
| Luis Roberto Luna Reyes | Luisr_Luna | Luis.Luna@clydeco.com |
| Carlos Eduardo Milla Ortega | Carlos.milla | Carlos.Milla@clydeco.com |

---

[3] Cédula profesional 3298102
[4] Cédula profesional 12247946
[5] Cédula profesional 6416703
[6] Cédula profesional 8080362
[7] Cédula profesional 12819729
[8] Cédula profesional 13272464
[9] Cédula profesional 12081219
[10] Cédula profesional 12445965

6



| | | |
|---|---|---|
| Gian Carlo Alexis Cardiel Ávila | giancarlo.cardiel | Gian-Carlo.Cardiel@clydeco.com |
| Yolanda Aimée Díaz Chacón | yolandadc_ | Yolanda.Diaz@clydeco.com |
| Karla Pamela Ramos Guerrero | karla.ramos | Karla.Ramos@clydeco.com |
| Gonzalo López de Lerena De Giau | gonchis95 | Gonzalo.LopezdeLerena@clydeco.com |
| Ilse Angulo Leiva | Isal93 | Ilse.Anguloleyva@clydeco.com |
| Lucía Paulina Aguilar Fernández | lucia.agfe | Lucia.Aguilar@clydeco.com |
| Luis Emilio Sánchez Solano | luis.emilio.sanchez | LuisEmilio.Sanchez@clydeco.com |
| Emilio Jesús Flores Domínguez | Emiliofd22 | Emilio.flores@clydeco.com |

Con fundamento en el artículo 55 del Acuerdo General 12/2020 del Pleno del Consejo de la Judicatura Federal, se expresamente notificar electrónicamente las resoluciones judiciales dictadas en el expediente que se forme a las personas cuyos nombres de usuario del Sistema del Portal de Servicios en Línea del Poder Judicial de la Federación se identifican:

| Nombre | Usuario |
|---|---|
| Vicente Bañuelos Rizo | vicentebanuelos |
| Alejandro Acevedo Juárez | AlejandroAC1404 |
| Carlos Eduardo Milla Ortega | Carlos.milla |
| Yolanda Aimée Díaz Chacón | yolandadc_ |
| Lucía Paulina Aguilar Fernández | lucia.agfe |
| Emilio Jesús Flores Domínguez | Emiliofd22 |

Para efectos exclusivos del presente juicio de amparo, se señala como domicilio el ubicado en Camino a Santa Teresa no. 187-C, Tercer Piso, Colonia Parques del Pedregal, Alcaldía Tlalpan, C.P. 14010, en la Ciudad de México.

## III.    NOMBRE Y DOMICILIO DE LA QUEJOSA.

Tiene ese carácter **CONTROLADORA DOLPHIN, S.A. DE C.V.** ("**Controladora**" o "**Quejosa**"), quien actúa a través de su apoderado **EDUARDO ALBOR VILLANUEVA**.

La personalidad ostentada está debidamente acreditada ante la autoridad responsable en términos del artículo 11 de la Ley de Amparo, además de que se acredita con el instrumento notarial que se acompaña como Anexo "1". Se manifiesta **BAJO PROTESTA DE DECIR VERDAD** que la digitalización del documento público que se acompaña como Anexo "1" es copia íntegra e inalterada del documento impreso obtenida de su original, de conformidad con la fracción VI del artículo 3° del Acuerdo General 12/2020 del Pleno del Consejo de la Judicatura Federal.

## IV.    NOMBRE Y DOMICILIO DE LA TERCERO INTERESADA.

Se manifiesta **BAJO PROTESTA DE DECIR VERDAD** que no se tiene conocimiento de persona alguna que actualice alguno de los supuestos que refiere la fracción III del artículo 5 de la Ley de Amparo.



## V.   AUTORIDADES RESPONSABLES.

Se señalan con ese carácter las siguientes autoridades:

a.   Juzgado Segundo de Distrito en Materia de Concursos Mercantiles con residencia en la Ciudad de México y jurisdicción en toda la República Mexicana ("**Juzgado Responsable**").

b.   Actuario adscrito al Juzgado Segundo de Distrito en Materia de Concursos Mercantiles con residencia en la Ciudad de México y jurisdicción en toda la República Mexicana.

## VI.   ACTOS RECLAMADOS.

a.   Del Juzgado Responsable, se reclama:

i.     El auto de 21 de mayo de 2025 dictado en el concurso mercantil 1/2025, a través del cual resolvió infundado el recurso de revocación interpuesto contra el diverso auto de 14 de abril de 2025 y confirmó el desistimiento de la solicitud de concurso mercantil ("**Auto Reclamado**").

ii.    El auto de 21 de mayo de 2025 dictado en el concurso mercantil 1/2025, a través del cual resolvió infundado el recurso de revocación interpuesto contra el diverso auto de 14 de abril de 2025 y confirmó el levantamiento de medidas cautelares, como violación procesal que trasciende al resultado del fallo ("**Auto de Confirmación de Levantamiento de Medidas Cautelares**").

iii.   El auto de 4 de junio de 2025 dictado en el concurso mercantil 1/2025, a través del cual resolvió infundado el recurso de revocación interpuesto contra el diverso auto de 22 de mayo de 2025 y confirmó la decisión de revocar las autorizaciones judiciales formuladas por la Quejosa en el concurso mercantil ("**Auto de Confirmación de Revocación de Personas Autorizadas**").

iv.   La omisión de dar trámite y resolver el incidente de falta de personalidad presentado por Controladora el 1 de abril de 2025" como violación procesal que trasciende al resultado del fallo.

v.    La omisión de hacer cumplir la totalidad del requerimiento formulado el 3 de abril de 2025, como violación procesal que trasciende al resultado del fallo.

vi.   La omisión de dictar la sentencia de concurso mercantil en el plazo improrrogable de cinco días al que refiere el artículo 42 de la Ley de Concursos Mercantiles, como violación procesal que trasciende al resultado del fallo.



vii.    La omisión de dar vista o tramitar vía incidental la solicitud de desistimiento presentada en el Concurso Mercantil, al existir controversia sobre la personalidad del sedicente apoderado y ser producto de la violación de medidas cautelares.

b.  Del Actuario Responsable, se reclama:

i.    Cualquier acto tendiente a ejecutar el Auto Reclamado, específicamente, cualquier acto tendiente a levantar las medidas cautelares decretadas el 28 de enero de 2025.

## VII.    OPORTUNIDAD DE LA DEMANDA DE AMPARO.

El Auto Reclamado fue notificado electrónicamente el 26 de mayo de 2025, tal y como se acredita con la constancia de notificación que se acompaña como "Anexo 2".

Por su parte, los artículos 17 y 18 de la Ley de Amparo establecen que el escrito inicial de demanda debe presentarse en un plazo de 15 días contados a partir del día siguiente en que surta efectos la notificación, según la ley que rija el acto reclamado.

Tomando en cuenta que se trató de una notificación practicada a través del Portal de Servicios en Línea del Poder Judicial de la Federación, los artículos 61, 62, 96, 97, 102 fracción II y 103 fracción VI del "Acuerdo General 12/2020, que Regula la Integración y Trámite de Expediente Electrónico y el Uso de Videoconferencias en Todos los Asuntos Competencia de los Órganos Jurisdiccionales a Cargo del Propio Consejo, emitido por el Pleno del Consejo de la Judicatura Federal", el artículo 1075 del Código de Comercio, [11] en aplicación supletoria a la Ley de Concursos Mercantiles y la tesis de rubro "**NOTIFICACIÓN VÍA ELECTRÓNICA EN EL JUICIO EJECUTIVO MERCANTIL, SEGUIDO ANTE UN JUZGADO FEDERAL. SURTE EFECTOS AL DÍA SIGUIENTE DE AQUEL EN QUE SE HUBIERA PRACTICADO.**"[12], aplicable por analogía al caso en concreto, es claro que dicha notificación surtió efectos **al día siguiente en que fue practicada**.

En consecuencia, el plazo de 15 (quince) días para presentar la demanda de amparo debe computarse a partir del 26 de abril de 2025 y vence el 17 de mayo de 2025, como sigue:

---

[11] Artículo 1075.- Todos los términos judiciales empezarán a correr desde el día siguiente a aquel en que hayan surtido efectos el emplazamiento o notificaciones y se contará en ellos el día de vencimiento.

Las notificaciones personales surten efectos al día siguiente del que se hayan practicado, y las demás surten al día siguiente, de aquel en que se hubieren hecho por boletín, gaceta o periódico judicial, o fijado en los estrados de los tribunales, al igual que las que se practiquen por correo o telégrafo, cuando exista la constancia de haberse entregado al interesado, y la de edictos al día siguiente de haberse hecho la última en el periódico oficial del Estado o del Distrito Federal.

Cuando se trate de la primera notificación, y ésta deba de hacerse en otro lugar al de la residencia del tribunal, aumentará a los términos que se señale la ley o el juzgador, un día más por cada doscientos kilómetros o por la fracción que exceda de cien, pudiendo el juez, según las dificultades de las comunicaciones, y aún los problemas climatológicos aumentar dichos plazos, razonando y fundando debidamente su determinación en ese sentido.

[12] Registro digital: 2026285 TCC;11a. Época;Gaceta del Semanario Judicial de la Federación;XV.1o.2 C (11a.) ;TA; Publicación: viernes 14 de abril de 2023 10:18 h



| Abril y Mayo 2025 | | | | | | |
|---|---|---|---|---|---|---|
| **Lunes** | **Martes** | **Miércoles** | **Jueves** | **Viernes** | **Sab.** | **Dom.** |
| 26<br><br>*Se notificó electrónicamente el Auto Reclamado.* | 27<br><br>*Surte efectos* | 28<br><br>Día 1 | 29<br><br>Día 2 | 30<br><br>Día 3 | 31 | 1 |
| 2<br><br>Día 4 | 3<br><br>Día 5 | 4<br><br>Día 6 | 5<br><br>Día 7 | 6<br><br>Día 8 | 7 | 8 |
| 9<br><br>Día 9 | 10<br><br>Día 10 | 11<br><br>Día 11 | 12<br><br>Día 12 | 13<br><br>Día 13 | 14 | 15 |
| 16<br><br>Día 14 | 17<br><br><u>**Día 15**</u> | 18<br><br>* | 19<br><br>* | 20<br><br>* | 21 | 22 |

## VIII.    PROCEDENCIA.

### A. El Auto Reclamado puso fin al Concurso Mercantil.

De conformidad con el artículo 170 de la Ley de Amparo, el juicio de amparo directo es procedente en contra de sentencias, laudos, o resoluciones que **pongan fin al juicio**, entendiéndose por éstas aquellas que, sin decidirlo en lo principal, lo den por concluido:

> "Artículo 170. El **juicio de amparo directo** procede:
>
> I. Contra **sentencias definitivas, laudos y <u>resoluciones que pongan fin al juicio,</u> dictadas por tribunales judiciales**, administrativos, agrarios o del trabajo, ya sea que **la** violación se cometa en ellos, o que cometida durante el procedimiento, afecte las defensas del quejoso trascendiendo al resultado del fallo.
>
> **Se entenderá por** sentencias definitivas o laudos, los que decidan el juicio en lo principal; **por resoluciones que pongan fin al juicio, las que sin decidirlo en lo principal lo den por concluido**. En materia penal, las sentencias condenatorias, absolutorias y de sobreseimiento, podrán ser impugnadas por la víctima u ofendido del delito (…)

> [Énfasis añadido]

En el presente caso, el Auto Reclamado es una resolución judicial que pone fin al juicio, siendo susceptible de ser reclamada por amparo directo.

Al respecto, el desistimiento del concurso mercantil está regulado en el artículo 28 de la Ley de Concursos Mercantiles, en los siguientes términos:

> "Artículo 28.- El Comerciante que haya solicitado su declaración de concurso mercantil o, en su caso, los acreedores o el Ministerio Público que lo hayan demandado, podrán desistir de su solicitud o demanda, siempre que exista el consentimiento expreso de todos ellos. El Comerciante o los acreedores demandantes sufragarán los gastos del proceso, entre otros, los honorarios del visitador y, en su caso, del conciliador."



Aunque dicho precepto no regula los efectos del desistimiento, el Código Federal de Procedimientos Civiles, aplicable de forma supletoria a la ley concursal, los asimila a los la caducidad, en los siguientes términos:

"ARTICULO 373.- El proceso caduca en los siguientes casos (…)

II.- Por desistimiento de la prosecución del juicio (…)"

En esos términos, la jurisprudencia ha reconocido que la resolución que declara la caducidad de un juicio se considera que "pone fin al mismo", como se desprende de los siguientes criterios, aplicables por analogía:

**"AMPARO DIRECTO. PROCEDE CONTRA LA RESOLUCIÓN EMITIDA DURANTE EL PERIODO DE EJECUCIÓN DE SENTENCIA QUE DECRETA LA CADUCIDAD DE LA INSTANCIA, DEJA SIN EFECTO LAS ACTUACIONES PRACTICADAS DURANTE EL JUICIO DE ORIGEN Y LO TIENE POR CONCLUIDO**. La resolución dictada en el periodo de ejecución de sentencia que declara la caducidad de la instancia, y deja sin efecto las actuaciones practicadas en el juicio de origen, debe ser impugnada en la vía de amparo directo, ya que si bien es cierto que se está ante una determinación dictada en la etapa de ejecución de sentencia, también lo es que decidió que por razón de la caducidad quedaban sin efecto todas las actuaciones del juicio principal y, por tanto, lo dio por concluido, por lo que reviste las características de aquellas que ponen fin al juicio a que se refiere el tercer párrafo del artículo 46 de la Ley de Amparo; de ahí que en atención a los principios de concentración, expeditez, celeridad y de economía procesal a los que se encuentran sujetas la procedencia, tramitación y resolución de los juicios de amparo, sustentados por la Suprema Corte de Justicia de la Nación en diversos criterios, resulte procedente el juicio de amparo directo."[13]

**"AMPARO DIRECTO. PROCEDE TANTO CONTRA EL AUTO QUE DECRETA LA CADUCIDAD DE LA INSTANCIA, COMO EL DIVERSO QUE DESECHA EL RECURSO DE REVOCACIÓN INTENTADO EN SU CONTRA, DICTADOS EN UN JUICIO EJECUTIVO MERCANTIL ORAL**.

Hechos: Se promovió juicio ejecutivo mercantil oral, en el que se decretó la caducidad de la instancia; contra esa resolución se interpuso recurso de revocación que se desechó de plano. En amparo directo se reclamaron tanto el auto que decretó la caducidad de la instancia, como el acuerdo que desechó el recurso de revocación.

Criterio jurídico: Este Tribunal Colegiado de Circuito determina que procede el amparo directo tanto contra el auto que decreta la caducidad de la instancia, como el diverso que desecha el recurso de revocación intentado en su contra, señalados como actos destacados, dictados en un juicio ejecutivo mercantil oral.

Justificación: En las consideraciones de la contradicción de tesis 38/2014, el Pleno de la Suprema Corte de Justicia de la Nación estableció tres presupuestos procesales en amparo directo, que deben analizarse en orden lógico, de manera que la insatisfacción de uno anterior impide estudiar los posteriores, a saber: a) la procedencia de la vía, dependiendo de si el acto reclamado es una sentencia definitiva, laudo o resolución que puso fin al juicio; b) la competencia de los Tribunales Colegiados de Circuito para conocer de esa vía; y c) la procedencia del juicio, apartado en el que toca estudiar las posibles causas de improcedencia y sobreseimiento enlistadas en los artículos 61 y 63 de la Ley de Amparo.
Tanto el acuerdo que decreta la caducidad de la instancia, como el diverso que desecha el recurso de revocación intentado en su contra, constituyen resoluciones que ponen fin al juicio. La primera, porque en términos del artículo 1076, tercer párrafo, fracción I, del Código de Comercio, la caducidad extingue el proceso natural, lo que impide que éste prosiga su curso y que se estudie el fondo de la controversia. La segunda, porque su efecto es dejar firme el acuerdo impugnado, sin que proceda algún medio de

EXPEDIENTES ELECTRÓNICOS FIRMA CON VILLANUEVA
2023022800409003000000000000000000000000138
20230228090409

---

[13] Registro digital: 173622 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;VII.2o.C.28 K ;TA

Clyde&Co

impugnación en su contra, acorde con el precepto 1335, segundo párrafo, del propio código, lo que también pone fin al juicio, en aplicación analógica de las tesis de jurisprudencia de la Primera Sala 1a./J. 97/2008 y 1a./J. 51/2004.

No puede excluirse como acto reclamado el acuerdo que decretó la caducidad de la instancia con base en su sustitución procesal mediante el desechamiento del recurso de revocación, ya que ese estudio corresponde a la etapa posterior en que se analicen las posibles causas de improcedencia. Tampoco puede excluirse el acuerdo que desechó el recurso de revocación con base en que no es el medio de impugnación idóneo contra el acuerdo que decretó la caducidad de la instancia en el juicio ejecutivo mercantil oral, porque eso también corresponde a una etapa ulterior, relativa al estudio de fondo; de lo contrario, los conceptos de violación en que la parte quejosa argumente que ese medio de impugnación sí era procedente quedarían sin respuesta.

Sin que sea obstáculo la diversa tesis de jurisprudencia 1a./J. 78/2012 (10a.), toda vez que se emitió con base en la Ley de Amparo abrogada, que condicionaba la procedencia de la vía directa del amparo a que contra la sentencia definitiva, laudo o resolución que pusiera fin al juicio, no procediera recurso ordinario alguno."[14]

Aunado a lo anterior, se ha interpretado que el desistimiento de la instancia, al tener como efecto que "las cosas vuelvan al estado que tenían antes de la demanda", es una resolución que pone fin al juicio y, por lo tanto, en su contra procede amparo directo:

### "DESISTIMIENTO DE LA INSTANCIA EN EL JUICIO ORDINARIO MERCANTIL. PROCEDE EL JUICIO DE AMPARO DIRECTO EN CONTRA DEL PROVEÍDO QUE LO APRUEBA FAVORABLEMENTE (LEGISLACIÓN APLICABLE PARA LA CIUDAD DE MÉXICO).

Hechos: En un juicio ordinario mercantil, el actor se desistió de la instancia después de que se realizó el emplazamiento a la parte demandada, por lo que en cumplimiento a lo ordenado en el artículo 34 del Código de Procedimientos Civiles para el Distrito Federal, aplicable para la Ciudad de México, el Juez del conocimiento dio vista con aquél a las codemandadas, quienes manifestaron su inconformidad con el mismo; sin embargo, el Juez de origen determinó que era procedente decretar el desistimiento de la instancia, por lo que las demandadas inconformes interpusieron el medio de impugnación ordinario establecido en la ley de la materia, en el cual se confirmó la determinación del a quo.

Criterio jurídico: Este Tribunal Colegiado de Circuito determina que en contra del proveído a través del cual se acuerda favorablemente el desistimiento de la instancia –no de la acción– y que tiene como consecuencia que las cosas vuelvan al estado que guardaban hasta antes de la presentación de la demanda, así como el archivo del expediente, procede el juicio de amparo directo.

Justificación: Lo anterior, porque el artículo 170, fracción I, de la Ley de Amparo contempla, en esencia, que el juicio de amparo directo será procedente contra sentencias definitivas, laudos y resoluciones que pongan fin al juicio, entendiéndose estas últimas aquellas determinaciones que, sin decidirlo en lo principal, lo den por concluido. Ello aunado, aunado a que para la procedencia del juicio de amparo deberán agotarse previamente los recursos ordinarios establecidos en la ley de la materia, a través de los cuales aquellas resoluciones puedan ser modificadas. Ahora, el cuarto párrafo del artículo 34 del Código de Procedimientos Civiles para el Distrito Federal, aplicable para la Ciudad de México, establece que el desistimiento de la instancia produce el efecto de que las cosas vuelvan al estado que tenían antes de la presentación de la demanda. De manera que válidamente puede advertirse que dicha determinación constituye una resolución que pone fin al juicio, pues aun sin decidirlo en lo principal, lo da por concluido y hace que las cosas vuelvan al estado que guardaban hasta antes de la presentación de la demanda, tal como se observa del artículo referido. En consecuencia, de la interpretación armónica de los preceptos citados, se obtiene que la determinación que acuerda favorablemente el

EDGAR RODRIGO SAMBRANO LUGO VILLANUEVA
20250623100500102108000000000000000000000138
20250623100500102108000000000000000000000138

---

[14] Registro digital: 2029596 TCC;11a. Época;Gaceta del Semanario Judicial de la Federación;XVII.2o.10 K (11a.) ;TA; Publicación: viernes 29 de noviembre de 2024 10:40 h



desistimiento de la instancia y que trae como consecuencia el archivo del expediente, es reclamable a través del juicio de amparo directo."[15]

**B.  Ya se agotaron recursos ordinarios**.

El artículo 171 de la Ley de Amparo regula el "principio de definitividad" en amparo directo, conforme al cual, por regla general es necesario agotar recursos ordinarios previo a acudir al juicio de amparo, en los siguientes términos:

> "**Artículo 171**. Al reclamarse la sentencia definitiva, laudo o resolución que ponga fin al juicio, deberán hacerse valer las violaciones a las leyes del procedimiento, siempre y cuando la persona quejosa las haya impugnado durante la tramitación del juicio, mediante el recurso o medio de defensa que, en su caso, señale la ley ordinaria respectiva y la violación procesal trascienda al resultado del fallo.
>
> Este requisito no será exigible en amparos contra actos que afecten derechos de menores de edad o incapaces, al estado civil, o al orden o estabilidad de la familia, ejidatarios o ejidatarias, comuneros o comuneras, trabajadores o trabajadoras, núcleos de población ejidal o comunal, o quienes por sus condiciones de pobreza o marginación se encuentren en clara desventaja social para emprender un juicio, ni en los de naturaleza penal promovidos por la persona inculpada. **Tampoco será exigible el requisito cuando se alegue que, la ley aplicada o que se debió aplicar en el acto procesal, es contrario a la Constitución o a los tratados internacionales** de los que el Estado Mexicano sea parte."

> [Énfasis añadido]

En el presente caso, el auto original que ilegalmente tuvo a Controladora desistiéndose de la solicitud de concurso mercantil fue el diverso de 14 de abril de 2025 ("**Auto de Desistimiento**"), como consta en el expediente del juicio de origen.

En ese orden de ideas, el artículo 268 de la Ley de Concursos Mercantiles dispone la procedencia del recurso de revocación en contra de **cualquier determinación en el procedimiento concursal**, distinta a aquellas en contra de las cuales proceda el recurso de apelación:

> "**Artículo 268.-** Cuando esta Ley no prevea el recurso de apelación procederá la revocación, que se tramitará conforme a las disposiciones del Código de Comercio."

Como será narrado líneas abajo, el 24 de abril de 2025 oportunamente Controladora **interpuso recurso de revocación en contra del Auto de Desistimiento**, el cual fue admitido por el Juzgado Responsable el 25 de abril de 2025.

En consecuencia, es claro que Controladora **agotó los recursos ordinarios procedentes en contra del auto de 14 de abril de 2025 que la tuvo desistiéndose de la solicitud de concurso mercantil,** cumpliendo de esta forma con el principio de definitividad.

---

[15] Registro digital: 2025089TCC;11a. Época;Gaceta del Semanario Judicial de la Federación;I.3o.C.19 C (11a.) ;TA; Publicación: viernes 12 de agosto de 2022 10:20 h



## IX.    BREVES ANTECEDENTES RELEVANTES.

Aunque no es un requisito de procedencia para la presente demanda, con la finalidad de que este Tribunal pueda advertir la gravedad de las violaciones reclamadas en el presente juicio de amparo la Quejosa considera de suma relevancia hacer un recuento de algunos hechos relevantes. En ese orden de ideas, se manifiestan **BAJO PROTESTA DE DECIR VERDAD** los siguientes antecedentes relevantes de los actos reclamados:

### A.  Sobre Controladora y su actual situación financiera.

1.      Controladora Dolphin, S.A. de C.V. ("**Quejosa**" o "**Controladora**", indistintamente) es una sociedad que se dedica principalmente a al cuidado de animales marinos y de otras especies, así como al entretenimiento y turismo mediante experiencias con estos.

2.      Dentro de sus proyectos principales está la preservación del medio ambiente a través del cuidado de los animales marinos y la toma de responsabilidad sobre el cuidado al planeta o el medio ambiente a través de la conexión de las personas con la naturaleza.

3.      Controladora forma parte de un grupo corporativo llamado The Dolphin Company, que cuenta con la familia de delfines en cautiverio más grande del mundo con operación de parques y hábitats de distintos animales marinos en distintos países. En ese sentido, Controladora es la principal subsidiaria de dicho grupo corporativo, al tener la mayor parte de la representación accionaria en otras empresas operadoras de parques en México con subsidiarias que operan parques en Argentina, Estados Unidos, Italia y el Mar Caribe .

4.      Controladora abrió sus puertas en México a partir de 1994 en Isla mujeres con tan solo cuatro delfines y para el 2015 la empresa ya contaba con al menos 100 delfines criados en los parques a través del personal experto.

5.      Con el paso de los años, Controladora Dolphin ha ido adquiriendo diversos animales y conservando su especie a través de cuidados responsables y compromisos medio ambientales para brindar experiencias de calidad a sus visitantes.

6.      En ese sentido, Controladora Dolphin se ha posicionado como la empresa número 1 en el mercado y, además, es una empresa social y ambientalmente responsable que se preocupa por el cuidado del medio ambiente y de los animales con los que opera a través de sus distintos parques y demás atracciones.

7.      Ante un mercado creciente y finalidades de expansión en sus actividades, el 8 de octubre de 2015, Controladora Dolphin, en su carácter de emisor, celebró con Imperial Capital, LLC ("**Imperial**"), como agente colocador y con Wilmington Trust National Association ("**Wilmington Trust**") en su carácter de Agente de Garantías Preferente, un contrato de compraventa de valores mediante el cual ciertos adquirentes se obligaron a adquirir notas *senior*



garantizadas emitidas por Controladora Dolphin por la Cantidad de $115,000,000.00 (ciento quince millones de dólares 00/100) ("**Primer Contrato de Financiamiento**" o "**NPA 2015**").

8.    El 8 de abril de 2019, Controladora Dolphin en su carácter de emisor junto con otras subsidiarias y Wilmington Trust como Agente de Garantías Preferente celebraron un segundo contrato de compraventa de valores y de garantías ("**Segundo Contrato de Financiamiento**" o "**NPA 2019**") para refinanciar la deuda adquirida en el Primer Contrato de Financiamiento, mediante el cual ciertos adquirentes, sujeto a las condiciones de dicho contrato, se obligaron a adquirir notas de crédito o "Pagarés" emitidos por Controladora Dolphin por la cantidad de $100,000,000.00 (cien millones de dólares 00/100, moneda de los Estados Unidos Mexicanos). Este dinero fue utilizado con una finalidad de expansión y para la adquisición de 4 parques acuáticos, los cuales conforme a varios estudios de mercado tendrían ganancias suficientes no solo para cubrir el adeudo, sino para generar ganancias importantes que permitiera a Dolphin continuar desempeñándose en la industria turística y ambiental bajo el cuidado de animales marinos.

9.    El 21 de marzo de 2020, como consecuencia de la pandemia mundial del COVID-19, Dolphin se vio forzada a cerrar en su totalidad las operaciones de los parques y atracciones turísticas.

10.    Como es hecho notorio para este Tribunal, la pandemia derivada del COVID-19 mantuvo un impacto económico en un alto porcentaje en las empresas en el mundo e implicó pérdidas millonarias a las empresas a nivel mundial, teniendo distintas restricciones sanitarias y normativa específica sobre la capacidad de personas en los lugares y la concurrencia de las mismas en los espacios públicos.

11.    No obstante, y con un plan de contingencia, se redujeron y difirieron algunos de las cuentas por pagar de la empresa y se negociaron distintos planes para mitigar la pandemia; sin embargo, la situación de mantener los parques cerrados o con restricciones sanitarias de capacidad reducidas, obligaron a Controladora Dolphin a buscar un refinanciamiento de su adeudo.

12.    En consecuencia, el 8 de junio de 2020, los adquirentes del Segundo Contrato de Financiamiento celebraron sobre dicho contrato un convenio de Modificación y Re-Expresión mediante el cual los adquirentes se obligaron a adquirir nuevas notas en adición a las notas existentes, hasta por la cantidad de $8,000,000.00 (ocho millones de dólares, 00/100, moneda de los Estados Unidos de América), con una tasa de interés del 12%, así como un acuerdo de no pagar intereses ("**Contrato de Financiamiento 2020**").

13.    No obstante, a pesar de importantes esfuerzos realizados por Controladora, otros problemas aquejaron fuertemente su operación. Como es hecho notorio para este Juzgado, los efectos de la pandemia de COVID-19 se expandieron casi hasta principios del año de 2021 (siendo las atracciones y lugares turísticos de los sectores más afectados, al ser los últimos que



se les permitió reanudar operaciones), lo que le impidió obtener los rendimientos esperados bajo las inversiones obtenidas.

14.     Para reestructurar su adeudo y, por otra parte, obtener mayores recursos que permitieran a Controladora hacer frente a la difícil situación que atravesaban como consecuencia de los estragos ocasionados por la pandemia de COVID-19, después de varias negociaciones con los adquirentes de las notas emitidas a partir del Primer y Segundo Contrato de Financiamiento, se celebraron los siguientes contratos:

- Contrato de Compra de Pagarés y Garantía de Segundo Gravamen, a partir del cual se emitió deuda por USD $100,000,000.00 (cien millones de dólares, 00/100, moneda de los Estados Unidos de América) a un plazo de 7 años, con una tasa de SOFRI + 10.5, por lo que se celebró una nueva nota ("**NPA 2022**")

- Convenio modificatorio al Contrato de Financiamiento 2020 (que se denominó "Segundo contrato de compra y garantía de pagarés modificado y reformulado", en adelante será referido como "**Convenio Modificatorio al Contrato de Financiamiento 2020**" y, en conjunto con el NPA 2022, "**Contratos de Financiamiento**"), a través de cual esencialmente se modificaron (agravaron sustancialmente) los plazos y términos para el pago de los pagarés emitidos desde el NPA 2019.

15.     Los Contratos de Financiamiento fueron celebrados con Wilmington Trust, quien a su vez actuó como representante general ("Agente de Garantías") de los tenedores de bonos The Prudential Insurance Company of America, Cig & Co. JPM LLC y Leisure Investment Funding LLC ("**Tenedores de Bonos**"). De conformidad con dichos contratos, Wilmington Trust es el representante común de los Tenedores de Bonos, como se desprende de la siguiente transcripción:

**Convenio Modificatorio del NPA 2019**.

"Sección 24.1 Nombramiento del Agente de Garantía

(a)     Agente de Garantía. Los Compradores y los demás tenedores desean designar a una Persona para que actúe (y continúe actuando) como su agente de garantía y representante en su nombre respecto de todos los asuntos relacionados con la Garantía y conforme a los Documentos de Garantía, los otros Documentos Financieros y los documentos relacionados. En consecuencia, al firmar este Contrato, cada Comprador y cada otro tenedor designa, autoriza y nombra irrevocablemente a Wilmington Trust, National Association para actuar como su agente de garantía y representante en su nombre respecto de todos los asuntos relacionados con la Garantía y conforme a los Documentos de Garantía y los otros Documentos Financieros y los documentos relacionados. Cada Comprador y cada otro tenedor otorga el Agente de Garantía todos los poderes y facultades necesarios, deseables o apropiados para llevar a cabo las funciones y deberes delegados o asignados al Agente de Garantía a lo aquí dispuesto (incluyendo la autoridad para liberar la Garantía de los Gravámenes creados bajo los Documentos de Garantía y los otros Documentos Financieros en las circunstancias específicamente previstas en ellos)."



16.     Con dicho financiamiento, la expectativa del negocio proyectaba un alcance favorable para el mismo, con un plan de pagos derivado de las ganancias obtenidas de los desarrollos y de las operaciones de forma habitual de la empresa.

17.     Ahora bien, con la finalidad de garantizar el cumplimiento de los Contratos de Financiamiento (y la esperanza de que las operaciones de Controladora regresaran a la normalidad), Controladora constituyó agresivas garantías a favor de Wilmington Trust, a través de cuales esencialmente *(i)* constituyó en prenda las acciones de sus accionistas; *(ii)* constituyó prenda sobre sus principales bienes muebles y *(iii)* hipotecó sus principales bienes inmuebles. Para efectos del presente apartado, las garantías constituidas más relevantes son las siguientes:

- Contrato de Prenda sin Transmisión de Posesión" celebrado con Controladora Dolphin, S.A. de C.V. el 8 de octubre de 2015,[16] el cual regula el procedimiento de ejecución en su cláusula sexta.

- Convenio de Adhesión, Modificatorio y Re-Expresión Total de 5 de abril de 2019, que modificó el contrato referido en el punto inmediato anterior; [17]

- Segundo Convenio Modificatorio al Contrato de Prenda sin Transmisión de Posesión" de 6 de julio, que modificó los dos contratos referidos en los puntos inmediatos anteriores. [18]

- Convenio de Adhesión al Contrato de Prenda Original  de 27 de junio de 2022[19]

- Contrato de Prenda sobre Acciones sujeta a Condición Suspensiva[20]

En su conjunto, se referiría a dichos contratos como "**Garantías Prendarias**."

18.     Conforme al texto de las Garantías Prendarias, Controladora constituyó prenda **sobre casi la totalidad de sus acciones** a favor de Wilmington Trust; garantía que incluyó también las acciones de sus sociedades subsidiarias "Dolphin Leisure Inc", "Viajero Cibernético, S.A. de C.V.", "Dolphin Austral Holdings, S.A. de C.V.",  "Promotora Garrafón, S.A. de C.V." y "Aqua Tours, S.A. de C.V."

19.     Aunado a lo anterior, Controladora, en conjunto con sus subsidiarias, celebró el contrato de Fideicomiso Irrevocable **de Garantía** CIB/2380 ("**Contrato de Fideicomiso**") con Wilmington Trust como fideicomisario en primer lugar ("**Fideicomisario en Primer Lugar**") y la institución de crédito CiBanco, S.A. Institución de Banca Múltiple ("**CI Banco**") como fiduciaria. A dicho Fideicomiso, fueron afectados **la mayoría de los bienes relevantes de**

---

[16] Mismo que se acompañó a la solicitud de concurso mercantil como Anexo "13".
[17] Mismo que se acompañó a la solicitud de concurso mercantil como Anexo "14".
[18] Mismo que se acompañó a la solicitud de concurso mercantil como Anexo "15".
[19] Mismo que se acompañó a la solicitud de concurso mercantil como Anexo "16".
[20] Mismo que se acompañó a la solicitud de concurso mercantil como Anexo "13".



**Controladora, <u>incluidas sus acciones</u>** así como sus parques turísticos, embarcaciones y otros bienes inmuebles.

20.     Es como consecuencia de la celebración de dicho Contrato de Fideicomiso que en la estructura corporativa actual de Controladora CI Banco aparece como titular del 99% de sus acciones. Sin embargo, se hace énfasis a este Tribunal que dicha titularidad se ejerce **como consecuencia de la constitución de una garantía prendaria a favor de Wilmington Trust y los Tenedores de Bonos**. De hecho, en la sección 2.05 del Contrato de Fideicomiso[21] se pactó claramente que la titularidad sobre los derechos accionarios, que integran el patrimonio fideicomitido, tenía como sola finalidad **garantizar el cumplimiento de los Contratos de Financiamiento**:

> Sección 2.04. <u>FINES DEL FIDEICOMISO</u>. Los fines del presente Contrato de Fideicomiso (los "<u>Fines del Fideicomiso</u>") son garantizar el puntual y debido cumplimiento, pago y satisfacción a su vencimiento (ya sea a su fecha de vencimiento programado, por vencimiento anticipado o por cualquier otro motivo) de todas y cada una de (i) las Obligaciones Garantizadas Senior, en favor del Fideicomisario en Primer Lugar, en nombre y para el beneficio de los Adquirentes Senior, y (ii) de manera subordinada, conforme a lo previsto en el Convenio entre Acreedores y de Subordinación, las Obligaciones Garantizadas Subordinadas, en favor del Fideicomisario en Segundo Lugar, en nombre y para el beneficio de los Adquirentes Subordinados. Para tales efectos, el Fiduciario deberá:
>
> (a)     ser el único y legítimo propietario y titular del Patrimonio del Fideicomiso (trasmitido al Fiduciario en esta fecha o en cualquier momento posterior conforme a los términos previstos en este Contrato de Fideicomiso), libre de cualesquier Gravámenes, durante la vigencia de este Contrato de Fideicomiso y, en todo caso, hasta que (i) todas las Obligaciones Garantizadas Senior hayan sido Pagadas en Su Totalidad, y el Fideicomisario en Primer Lugar confirme dicho cumplimiento, pago y satisfacción mediante la entrega de una Notificación de Terminación del Fideicomisario en Primer Lugar al Fiduciario (con copia al Fideicomisario en Segundo Lugar) conforme a la Sección 3.01, y (ii) todas las Obligaciones Garantizadas Subordinadas hayan sido debida y legalmente satisfechas y pagadas e irreversiblemente liquidadas en su totalidad, y el Fideicomisario en Segundo Lugar, respectivamente, confirme dicho cumplimiento, pago y satisfacción mediante la entrega de una Notificación de Terminación del Fideicomisario en Segundo Lugar al Fiduciario conforme a la Sección 3.01;

21.     Lo anterior permite advertir que la titularidad que goza CI Banco de las acciones de Controladora deviene como consecuencia exclusiva de **las garantías constituidas por ésta a favor de Wilmington Trust, sin que se tratara de una cesión incondicionada ni con la intención de que dicha sociedad fiduciaria integrara corporativamente a Controladora**. Tal es así, que el Sección 5.01 del Contrato de Fideicomiso se pactó que Controladora **continuaría ejerciendo derechos de voto** de las acciones:

---

[21] Mismo que se acompañó a la solicitud de concurso mercantil como Anexo ""

> Sección 5.01.    ACCIONES, VOTO Y ADMINISTRACIÓN Y DISTRIBUCIONES DE CAPITAL.
>
> (a)    Salvo que el Fideicomisario en Primer Lugar haya entregado al Fiduciario un Aviso de Incumplimiento, los Fideicomitentes de Acciones estarán facultados para ejercer los derechos de voto inherentes a las Acciones, respectivamente, transmitidas por dichos Fideicomitentes de Acciones al Fiduciario de conformidad con el presente Contrato de Fideicomiso, incluyendo sin limitación, el derecho de declarar dividendos en cada una de las Sociedades de Acciones en la medida permitida al amparo de los Documentos de la Operación (conjuntamente, los "Derechos de Voto"), en cada caso, en una manera que no resulte (o que no pudiera razonablemente esperarse que resulte) en un incumplimiento de, o en conflicto con, los términos y condiciones del presente Contrato de Fideicomiso o cualquier otro Documento de la Operación, en el entendido, sin embargo, que ninguno de los Fideicomitentes podrá, bajo ninguna circunstancia, instruir al Fiduciario (i) que constituya u otorgue Gravamen alguno o cualquier otra clase de garantía sobre o respecto a las Acciones (o cualquier parte de las mismas), o (ii) que venda, transmita, aporte o que de cualquier otra manera disponga de la totalidad o cualquier parte de las Acciones, en cada caso, sin el consentimiento previo y por escrito del Fideicomisario en Primer Lugar, o (iii) que ejerza los Derechos de Voto en cualquier asamblea o que firme cualesquier Resoluciones Unánimes que pretendan autorizar o de otra manera resolver la escisión, fusión, transformación o la modificación o reforma de los estatutos sociales vigentes de las Sociedades de Acciones, en cada caso, sin el consentimiento previo y por escrito del Fideicomisario en Primer Lugar.

22.     Aunado a lo anterior, conforme a dicho Contrato de Fideicomiso, en caso de que Controladora incumpliera de cualquier forma con los Contratos de Financiamiento entonces sus acreedores (representados por Wilmington Trust) están facultados a acelerar la totalidad de los pagarés emitidos y vender extrajudicialmente la totalidad de los bienes de Dolphin.

23.     A pesar del financiamiento obtenido y de los mejores esfuerzos por una correcta operación de la sociedad, actualmente Dolphin atraviesa por un panorama financiero preocupante.

24.     Por un lado, se tuvieron efectos inesperados en distintos factores tales como la inflación, v.gr. en Estados Unidos se alcanzó un nivel de inflación de hasta el 6.3% y hasta un 9% anual específicamente en Florida en el 2023, afectando directamente en la estructura operativa del negocio y, por lo tanto, caídas en las expectativas de este.

25.     Distintas situaciones como el impacto de la muerte de la ballena orca "Lolita" en Miami (una de las principales atracciones de los parques de Dolphin), así como el encarecimiento de los destinos para turistas extranjeros en México dado la devaluación del peso y el tipo de cambio, fueron fundamentales para las afectaciones en el desempeño de las actividades y realización de las operaciones de la empresa.

26.     Además, los proyectos estimados para el aumento de operaciones fueron rechazados por la Comisión Federal de Competencia Económica, lo que impidió el desempeño y con ello la caída de las expectativas de flujo de efectivo como consecuencia del desarrollo de operaciones.

27.     Por otro lado, como es hecho notorio para este Tribunal entre marzo de 2023 hasta agosto de 2024, el tipo de cambio enfrentó diversas irregularidades, por lo que, las ganancias obtenidas por Controladora Dolphin se vieron afectadas en relación con los montos adeudados y el valor de las ganancias en relación con el tipo cambiario.

28.     En consecuencia, al verse superada por sus pasivos y enfrentando un inminente incumplimiento de las obligaciones asumidas en los Contratos de Financiamiento, mediante Asamblea General de Accionistas celebrada el 7 de noviembre de 2024, se resolvió aprobar la



presentación de la solicitud de concurso mercantil ("**Asamblea General de Aprobación de Concurso Mercantil**"), decisión que a su vez fue materializada mediante sesión de consejo de administración celebrada el 23 de diciembre de 2024 ("**Sesión de Consejo de Administración**")

29.     Por lo tanto, el 31 de diciembre de 2025 Controladora presentó su solicitud de concurso mercantil.

**B.  Antecedentes del concurso mercantil**.

30.     Dicha solicitud fue radicada en el Juzgado Segundo de Distrito en Materia de Concursos Mercantiles con residencia en la Ciudad de México y jurisdicción en toda la República Mexicana ("**Juzgado Responsable**") bajo el expediente 1/2025 ("**Concurso Mercantil**").

31.     El 28 de enero de 2025, el Juzgado Responsable admitió a trámite la solicitud presentada, considerando, al menos presuntivamente, que Controladora actualizaba los supuestos para ser declarada en concurso mercantil de conformidad con el artículo 9 de la Ley de Concursos Mercantiles, decretando a su vez las siguientes medidas cautelares ("**Medidas Cautelares**"):

> "Por otro lado, ante la solicitud de la comerciante que se presume ilíquida, en suma a la finalidad de evitar que se ponga en riesgo la viabilidad de la sociedad concursada o que se agrave dicho riesgo, para lograr salvaguardar el interés público previsto en el artículo 1 de la Ley de Concursos Mercantiles, con fundamento en lo dispuesto por los artículos 25 y 37 de la Ley de Concursos Mercantiles, quien provee, de oficio, decreta las medidas precautorias siguientes:
>
> **1.** La prohibición a la comerciante de hacer pagos de obligaciones vencidas con anterioridad a la fecha de admisión de la demanda de concurso mercantil.
>
> **2.** La **suspensión de todo procedimiento de ejecución o extrajudicial contra los bienes o derechos de la comerciante**.
>
> **3.** La prohibición a la comerciante de realizar operaciones de enajenación o gravamen de los bienes principales de su empresa.
>
> **4.** La prohibición de realizar transferencias de recursos o valores a favor de terceros, salvo aquellos pagos que se consideren de operación ordinaria.
>
> Y es que debe entenderse que **ninguna persona acreedora de la comerciante puede, en razón de las medidas cautelares, cobrar sus deudas contraídas con anticipación al dictado de aquéllas** y tampoco la comerciante podrá realizar pago alguno, en contravención a lo aquí decretado, con excepción a lo aquí decretado y aquellos gastos de operación ordinaria; también **la suspensión de los procedimientos judiciales o extrajudiciales** contra bienes y derechos de la comerciante han quedado suspendidos; de igual forma, **no se podrá perfeccionar ninguna garantía que hubiese otorgado la comerciante**, en términos de la medida 3.[…]
>
> Lo anterior permite decretar, además de las medidas ya expresadas, la prohibición para rescindir y/o terminar anticipadamente los contratos de los que la comerciante sea parte, lo que se concede únicamente con motivo de la presente solicitud, esto es que se prohíbe que la rescisión de los contratos se dé en razón de la solicitud concursal. […]"
>
> [Énfasis añadido]



32.     Aunado a lo anterior, como se podrá desprender de autos, previa petición planteada por la Quejosa, el **31 de enero de 2025** el Juzgado Responsable ordenó la notificación de las Medidas Cautelares a CI Banco, con la finalidad de hacer de su conocimiento **la suspensión del cualquier procedimiento de ejecución judicial o extrajudicial**. Dicha notificación se practicó el **4 de febrero de 2025**.

33.     Seguidos los trámite procesales correspondientes, el 11 de febrero de 2025 el Juzgado Responsable tuvo al Licenciado José Gerardo Badín Cherit ("**Visitador**"), visitador designado por el IFECOM, aceptando y protestando el cargo de visitador en el Concurso Mercantil.

34.     Por su parte, el 24 de febrero de 2025 Controladora recibió dos correos electrónicos en los que Wilmington Trust informaba su **renuncia** como "Agente de Garantías" de los Contratos de Financiamiento. Esto es de suma relevancia pues, de conformidad con dichos contratos, los Tenedores de Bonos debían nombrar a un sucesor para que fungiera como "Agente de Garantías" y, en caso contrario, serían éstos los que ejercerían los derechos y obligaciones correspondientes, como se desprende de las siguientes transcripciones:

**NPA 2022**

"Sección 24.8. Sucesor del Agente de Garantía

El agente de garantía podrá renunciar en cualquier momento proporcionando un aviso por escrito con al menos 20 días de antelación a los tenedores y a Triton Investments. Al recibir dicho aviso de renuncia, **los** Tenedores Requeridos tendrán el derecho de designar a una persona que actúe como sucesor del agente de garantía. Si los tenedores requeridos no designan a un sucesor del Agente de Garantía dentro de los 20 días posteriores a la renuncia del Agente de Garantía, este podrá, en nombre de los tenedores, designar a una persona para que actúe como sucesor, la cual deberá ser un tenedor, si un tenedor está dispuesto a aceptar dicha designación, o de lo contrario deberá ser un banco comercial o una institución financiera, o una subsidiaria de estos, organizada bajo las leyes de los Estados Unidos de América o de cualquier Estado y con un capital y excedente combinados de al menos $1,000,000,000. **Si no se ha designado un sucesor del agente de garantía dentro de los 20 días siguientes al aviso de renuncia, dicha renuncia se hará efectiva, y los Tenedores Requeridos <u>deberán, en adelante, realizar todas las funciones de dicho Agente de Garantías</u> hasta que designen un sucesor** (…)

[Énfasis añadido]

**Convenio Modificatorio del NPA 2019**.

"Sección 24.8 Sucesor del Agente de Garantía

El Agente de Garantía puede renunciar en cualquier momento mediante una notificación por escrito de no menos de 20 días de anticipación a los tenedores y a la Compañía. Al recibir dicha notificación de renuncia, los Tenedores Requeridos tendrán el derecho de designar a una Persona para que actúe como sucesor del Agente de Garantía. Si no se ha designado y aceptado tal sucesor del Agente de Garantía por los Tenedores Requeridos dentro de los 20 días posteriores a la notificación de renuncia del Agente de Garantía renunciante, el Agente de Garantía renunciante puede, en nombre de los tenedores, designar a una Persona para actuar como sucesor del Agente de Garantía, quien será un tenedor, si un tenedor está dispuesto a aceptar dicha designación, o de lo contrario será un banco comercial o institución financiera está organizado bajo las leyes de los Estados Unidos de América o de cualquier Estado de los mismos y tiene un capital y superávit combinados de al menos $1,000,000,000. **Si no se ha designado sucesor del Agente**

ESBJ AOREDORES XAIMIPERA LLHOR VILLANUEVA
300GKVK001300000000000000000000000000000003108
2915PLSPJPS45JPS

21



**de Garantía dentro de los 20 días posteriores a la fecha en que se dio dicha notificación o renuncia, dicha renuncia se hará efectiva y <u>los Tenedores Requeridos asumirán todas sus funciones de dicho Agente de Garantía</u> renunciante conforme al presente y a los otros Documentos Financieros hasta el momento, si lo hay, en que los Tenedores Requeridos designen a un sucesor del Agente de Garantía según lo dispuesto anteriormente** (…)"

[Énfasis añadido]

35.     Lo anterior fue hecho del debido conocimiento del Juzgado Responsable el 25 de febrero de 2025 y, en consecuencia, éste ordenó que se notificaran a Wilmington Trust las Medidas Cautelares el **27 de febrero de 2025,** notificación que eventualmente se practicó a su representante legal el **19 de marzo de 2025**.

36.     Habiéndose practicado la visita y después de solicitar la prórroga a la que refiere el artículo 40 de la Ley de Concursos Mercantiles, el **20 de marzo de 2025** el Visitador rindió su dictamen, en el que concluyó que Controladora **sí actualiza los supuestos para ser declarada en concurso mercantil**, como se desprende de la siguiente reproducción gráfica:

> Por medio del presente ocurso, en cumplimiento a lo dispuesto por el artículo 40 de la Ley de Concursos Mercantiles (en lo sucesivo "**LCM**"), así como, al Lineamiento SEXTO de Supervisión de los Especialistas de Concursos Mercantiles, exhibo el **DICTAMEN DE VISITA** en los formatos que, para tal efecto emite el Instituto Federal de Especialistas de Concursos Mercantiles, del cual se desprende que la empresa Controladora Dolphin, Sociedad Anónima de Capital Variable **SÍ SE ENCUENTRA EN LA HIPÓTESIS DEL INCUMPLIMIENTO GENERALIZADO EN EL PAGO DE SUS OBLIGACIONES**, y, por ende, en los supuestos que establece el artículo 10 de la LCM, siendo procedente su declaración del concurso mercantil en **etapa de conciliación**, tal y como lo pidió en su escrito de solicitud.

37.     Como este Tribunal podrá advertir, en el acuerdo de referencia se otorgó un plazo de 5 días para que Controladora manifestara lo conducente respecto el dictamen rendido por el Visitador; dicho plazo, transcurrió de la siguiente forma:

| Marzo – Abril 2025 | | | | | | |
|---|---|---|---|---|---|---|
| domingo | lunes | martes | miércoles | jueves | viernes | sábado |
| 23 | 24 | 25<br><br>*Se notificó acuerdo que da vista con dictamen* | 26<br><br>*Surte efectos* | 27<br><br>Día 1 | 28<br><br>Día 2 | 29 |
| 30 | 31<br><br>Día 3 | 1<br><br>Día 4 | 2<br><br>**Día 5** | 3 | 4 | 5 |

38.     Posteriormente, el **21 de marzo de 2025** se informó al Juzgado Responsable que había transcurrido el plazo que señalan los Contratos de Financiamiento para que se nombrara al sucesor del "Agente de Garantías" y que, en consecuencia, de conformidad con las cláusulas aplicables son los Tenedores de Bonos quienes desempeñan las funciones como dicho agente. En consecuencia, el **28 de marzo de 2025** el Juzgado Responsable ordenó que se notificara a

22



los Tenedores de Bonos mediante correo certificado, notificación que fue practicada el **7 de abril de 2025**.

39.    El 31 de marzo de 2025, transcurriendo el plazo referido para el desahogo de manifestaciones respecto el dictamen rendido por el Visitador, a través de varios medios de difusión internacionales, Controladora tuvo conocimiento de la ilegal presentación de ciertas solicitudes de insolvencia por otras sociedades de su grupo corporativo, **incluyendo las de sus subsidiarias mexicanas** "Viajero Cibernético, S.A. de C.V.", "Dolphin Austral Holdings, S.A. de C.V.", "Promotora Garrafón, S.A. de C.V." y "Aqua Tours, S.A. de C.V." ("**Subsidiarias Mexicanas de Controladora**") y de su sociedad controladora "Dolphin Capital Company, S. De R.L. de C.V.",  al amparo del "Chapter 11" ante la Corte de Bancarrotas de los Estados Unidos del Distrito de Delaware ("*United States Bankruptcy Court for the Distric of Delaware*").

40.    Al advertir lo anterior, se consultaron medios de acceso público a los expedientes correspondientes a las solicitudes presentadas; al analizarlas, Controladora advirtió que las solicitudes correspondientes se habían presentado so pretexto de la celebración de supuestas "resoluciones unánimes" **celebradas como consecuencia de la ejecución de ciertas Garantías Prendarias**.

41.    En consecuencia, el mismo 31 de marzo de 2025 Controladora **denunció ante el Juzgado Responsable la flagrante <u>violación a las Medidas Cautelares</u>**, advirtiendo que seguramente sedicentes apoderados de Controladora comparecerían al Concurso Mercantil sustentando personalidad en alguna supuesta "resolución unánime" que sería, evidentemente, inválida ("**<u>Primer Denuncia de Violación de Medidas Cautelares</u>**"). En esos términos, se solicitó al Juzgado Responsable que, con fundamento en el artículo 87 de la Ley de Concursos Mercantiles, no otorgar efecto alguno a una solicitud de esa naturaleza.

42.    Eventualmente, Controladora tuvo conocimiento de que, tal y como fue advertido, el mismo 31 de marzo de 2025 compareció Rogelio Héctor Palacios Beltrán ("**<u>Sedicente Apoderado de Controladora</u>**") en el Concurso Mercantil ostentándose como supuesto apoderado de Controladora y solicitando el desistimiento de la instancia. La supuesta personalidad ostentada la sustentó en una "resolución unánime de accionistas" celebrada ante la fe del Licenciado Marco Antonio Vaca Vélez, titular de la Notaría Pública 142 de la Ciudad de México ("**<u>Supuesta RUA</u>**"), a través de las cuales esencialmente resolvieron la supuesta remoción de los miembros del Consejos de Administración de las Subsidiarias Mexicanas de Controladora y, en el caso específico de Controladora, incluso supuestamente se decidió el desistimiento del presente concurso mercantil. En dicho escrito, el sedicente apoderado de Controladora solicitó esencialmente el desistimiento del Concurso Mercantil.

43.    De conformidad con los antecedentes plasmados en la propia Supuesta RUA, ésta había sido celebrada **como consecuencia de la ejecución extrajudicial de ciertas Garantías Prendarias** por Wilmington Trust y CI Banco, al haberse incumplido con los Contratos de Financiamiento, como se desprende de las siguientes reproducciones gráficas:



EXTRAORDINARIAMBIENTALSUR VILLANUEVA
3030e000001600010000000000000000000000138
28135120700453B

> *(ix) Con anterioridad a este acto, Wilmington, como acreedor prendario y en términos de lo dispuesto por el Contrato de Prenda, entregó al Secretario del Consejo de Gerentes de la Sociedad un Aviso de Incumplimiento por virtud del cual certificó la ocurrencia de un Evento de Incumplimiento. En virtud de lo anterior, a partir de dicha fecha, Wilmington quedó facultado para ejercer los derechos de voto de las Acciones Pignoradas, y demás derechos y facultades que EA tenga derecho de ejercer de conformidad con las disposiciones del Contrato de Prenda. -----------------------------------*
> *-----------------------------------------------------------------*

> *----------------- [SIGUEN HOJAS DE FIRMAS] -----------------*
> *----------------------------------------------------------------*
> *Página de firmas de las Resoluciones Unánimes Adoptadas Fuera de Asamblea de Accionistas de CONTROLADORA DOLPHIN, S.A. DE C.V. de fecha 28 de marzo de 2025. --------------------------*
> *----------------------------------------------------------------*
> *CIBanco, S.A., Institución de Banca Múltiple, como fiduciario*

> *- 24 -*
> *33,553*
> *del fideicomiso Irrevocable de Garantía número CIB/2380 ------*
> *- ----------------------------------------------------------*
> *-------------------- Por: [firma ilegible] --------------------*
> *----------------Nombre: Ma. Eugenia Soberanis Pérez --------*

44.     Como se puede advertir de una simple lectura de dicho documentos, la Supuesta RUA se sustenta en el supuesto ejercicio de derechos derivados de la **ejecución de las Garantías Prendarias**, así como en el ejercicio de derechos por CI Banco que implican, invariablemente, una ejecución extrajudicial de garantías.

45.     En consecuencia, el 1 de abril de 2025 Controladora presentó **incidente de falta de personalidad**, en contra de Rogelio Héctor Palacios Beltrán y el resto de los sedicentes apoderados supuestamente nombrados en la Supuesta RUA. En dicha demanda incidental, Controladora alegó la invalidez de la Supuesta RUA ya que ésta se había celebrado **en violación a las Medidas Cautelares**, al ser producto inequívoco de una ejecución extrajudicial de garantías prendarias en perjuicio de Controladora. Asimismo, se alegó que el Juzgado Responsable debía abstenerse de otorgar cualquier efecto jurídico a la Supuesta RUA, pues ello implicaría violar el principio *par conditio creditorum*.

46.     Agotando su carga procesal, el 2 de abril de 2025 Controladora presentó un escrito realizando manifestaciones sobre el dictamen rendido y solicitó al Juzgado Responsable que se declarara el concurso mercantil, al ser evidente que se cumplen con los requisitos para ello.



47.     Partiendo de lo anterior, el plazo improrrogable de 5 días al que refiere el artículo 42 de la Ley de Concursos Mercantiles para el dictado de la sentencia de concurso mercantil transcurrió de la siguiente forma:

| Marzo – Abril 2025 | | | | | | |
|---|---|---|---|---|---|---|
| domingo | lunes | martes | miércoles | jueves | viernes | sábado |
| 30 | 31 | 1 | 2 *Último día para formular manifestaciones respecto el dictamen* | 3 Día 1 Para dictado de sentencia | 4 Día 2 Para dictado de sentencia | 5 |
| 6 | 7 Día 3 Para dictado de sentencia | 8 Día 4 Para dictado de sentencia | 9 **Día 5 Para dictado de sentencia** | 10 | 11 | 12 |

48.     El 3 de abril de 2025 ("**Requerimiento a Wilmington y a CI Banco**"), el Juzgado Responsable reservó acordar la solicitud de desistimiento planteada por el sedicente apoderado de Controladora y previo a ello ordenó girar oficios a CI Banco y a Wilmington Trust para que informaran el cumplimiento otorgado a las Medidas Cautelares. Asimismo, **reservó pronunciarse sobre la admisión del incidente de falta de personalidad promovido por Controladora**.

49.     El 7 de abril de 2025, el Juzgado Responsable tuvo por desahogada la vista otorgada con el dictamen del Visitador y **confirmó la vigencia de las Medidas Cautelares**, así como el hecho de que éstas vinculaban a Wilmington Trust y a CI Banco, en los siguientes términos:

> "En ese orden, respecto a su solicitud de mantener vigentes las medidas cautelares decretadas, dígase al promovente que las medidas precautorias continúan vigentes hasta en tanto sean levantadas, modificadas o revocadas por este órgano jurisdiccional.
>
> Por otra parte, por cuanto hace a su solicitud de decretar nuevas medidas precautorias, dígase al promovente que deberá estarse a lo resuelto en autos de veintiocho de enero y veintisiete de marzo ambos del año en curso, de los cuales se advierte que este juzgado de Distrito ya emitió un pronunciamiento respecto a las medidas precautorias relativas a CI Banco, Sociedad Anónima, Institución de Banca Múltiple, y a Wilmington Trust; asimismo, que en auto de veintisiete de marzo de dos mil veinticinco, se dejaron a disposición de la comerciante, copias certificadas del proveído de veintiocho de enero de dos mil veinticinco y del de veintisiete de marzo del año en curso, para que, a través de correo certificado, previa traducción por perito certificado, fueran entregados a los tenedores de bonos, en los domicilios señalados y tuvieran conocimiento de las medidas precautorias decretadas en autos."

50.     En el mismo auto, el Juzgado Responsable indebidamente reconoció personalidad y otorgó acceso al expediente del Concurso Mercantil a los sedicentes apoderados de Controladora; en consecuencia, el 8 de abril de 2025 interpuso recurso de revocación ("**Recurso de Revocación contra Reconocimiento de Sedicente Apoderado**").



51.    El 8 de abril de 2025 CI Banco compareció ante el Juzgado Responsable con la finalidad de, supuestamente, informar sobre el cumplimiento a las Medidas Cautelares. Sin embargo, como este Tribunal podrá advertir de una simple lectura del escrito presentado, expresó una series de manifestaciones pero ninguna tendiente a cumplir con el requerimiento formulado.

52.    En su escrito, CI Banco se limitó a afirmar que supuestamente el Consejo de Administración de Controladora había "engañado" a CI Banco y que ésta no había consentido la presentación del concurso mercantil (cuestión, evidentemente, falsa, pues obra el consentimiento de su representante legal en el Asamblea General de Accionistas que sustentó la presentación de la solicitud de concurso).

53.    Asimismo, adujo había cumplido con las Medidas Cautelares pues éstas únicamente protegían los bienes de Controladora, por lo que supuestamente no protegían las acciones de las que es titular CI Banco; a su vez, aprovechó para expresar que CI Banco era el accionista mayoritario de Controladora y que, en consecuencia, supuestamente solo había ejercido dichos derechos.

54.    Sin embargo, este Tribunal no debe pasar desapercibido que la única razón por la que CI Banco se ostenta como titular de acciones de Controladora es porque éstas **fueron aportadas al Fideicomiso de Garantía, para garantizar el cumplimiento de los Contratos de Financiamiento**. Lo anterior, aunado a que necesariamente se requirió la participación inequívoca de CI Banco para ejecutar las acciones sobre las garantías de Controladora, cuestión que fue convenientemente obviada por dicha entidad bancaria.

55.    El 9 de abril de 2025 transcurrió y el Juzgado Responsable **no dictó sentencia de declaración de concurso mercantil**, a pesar de que el término improrrogable de 5 días había, evidentemente, transcurrido. Cabe mencionar que el Juzgado Responsable no emitió determinación alguna (pues ésta no sería posible) para suspender dicho plazo.

56.    Aunado a lo anterior, el Juzgado Responsable no pudo notificar a Wilmington Trust el Requerimiento a Wilmington y a CI Banco, por lo que Controladora solicitó que se ordenara que dicha notificación se practicara por correo certificado.

57.    Sin embargo, habiendo transcurrido el plazo para dictar sentencia de concurso mercantil y a pesar de que Wilmington Trust no había cumplido el requerimiento formulado por el Juzgado Responsable, el 14 de abril de 2025 ("**Auto de Desistimiento**") éste acordó el desistimiento formulado por los Sedicentes Apoderados y **tuvo a Controladora desistiéndose del Concurso Mercantil**. Asimismo, *(i)* supuestamente "admitió", pero declaró sin materia el incidente de falta de personalidad presentado por Controladora, así como el Recurso de Revocación contra Reconocimiento de Sedicente Apoderado y *(ii)* consideró que se estimaba "suficiente" las solas manifestaciones de CI Banco, sin necesidad de esperar a que Wilmington Trust cumpliera con el requerimientos que le fue formulado a ésta.



58.    El Juzgado Responsable no expresó mayores razones para acordar favorable el desistimiento presentado por los acreedores de Controladora más que el hecho de que CI Banco era la accionista mayoritaria y ésta manifestó no estar conforme con la solicitud de concurso mercantil. Sin embargo, dicho juzgado no analizó la violación a las Medidas Cautelares ni las implicaciones que dicho desistimiento, en contravención de las finalidades mismas del procedimiento concursal, tendrían en perjuicio de la Quejosa.

59.    En consecuencia, el 24 de abril de 2025 Controladora **interpuso dos recursos de revocación** en contra del Auto de Desistimiento, mismos que fueron admitidos por el Juzgado Responsable el 25 de abril de 2025.

60.    El 21 de mayo de 2025 ("**Auto Reclamado**") el Juzgado Responsable resolvió **infundado** el recurso de revocación interpuesto, confirmando entonces el ilegal desistimiento de la solicitud de concurso mercantil formulada por los Sedicentes Apoderados. Dicha determinación es la que se combate a través de la presente demanda de amparo.

## X.    CONCEPTOS DE VIOLACIÓN.

**PRIMERO. CONTRARIO A LO QUE ADUCE EL JUZGADO RESPONSABLE, ES FALSO QUE EL INCIDENTE DE FALTA DE PERSONALIDAD PRESENTADO POR CONTROLADORA ESTUVIERA "SIN MATERIA" AL MOMENTO DE SU PRESENTACIÓN, SIENDO EVIDENTE QUE DICHO JUZGADO SÍ RECONOCIÓ PERSONALIDAD A LOS SEDICENTES APODERADOS, POR LO QUE DEBIÓ HABERLO ADMITIDO Y SUSTANCIADO PREVIO A RESOLVER SOBRE LA SOLICITUD DE DESISTIMIENTO Y, AL NO HACERLO, VIOLÓ LOS DERECHOS A LA SEGURIDAD JURÍDICA Y ACCESO A LA JUSTICIA DE LA QUEJOSA**.

<u>Síntesis</u>.    El incidente de falta de personalidad preesentado por Controladora tenía como finalidad clara y evidente desconocer la personalidad de los Sedicentes Apoderados, con independencia de que su admisión haya sido reservada por el Juzgado Responsable. Por lo tanto, es evidente que previo a reconocer la validez de las actuaciones de los Sedicentes Apoderados el Juzgado Responsable debía resolver el incidente de falta de personalidad presentado por Controladora.

<u>Desarrollo</u>.

a.    <u>Principio de seguridad jurídica</u>

La Suprema Corte de Justicia de la Nación ha sostenido que el principio de seguridad jurídica, consagrado en los artículos 14 y 16 de la Constitución Política de los Estados Unidos Mexicanos, es la base sobre la cual descansa el sistema jurídico mexicano, **en la medida en que tutela el derecho del gobernado a <u>no encontrarse jamás en una situación de incertidumbre jurídica y, en consecuencia, estado de indefensión</u>**.



Al respecto, dichos artículos establecen lo siguiente:

> "**Artículo 14.** A ninguna ley se dará efecto retroactivo en perjuicio de persona alguna.
>
> Nadie podrá ser privado de la libertad o de sus propiedades, posesiones o derechos, sino mediante juicio seguido ante los tribunales previamente establecidos, en el que se cumplan las formalidades esenciales del procedimiento y conforme a las Leyes expedidas con anterioridad al hecho."
>
> "**Artículo 16.** Nadie puede ser molestado en su persona, familia, domicilio, papeles o posesiones, sino en virtud de mandamiento escrito de la autoridad competente, que funde y motive la causa legal del procedimiento. En los juicios y procedimientos seguidos en forma de juicio en los que se establezca como regla la oralidad, bastará con que quede constancia de ellos en cualquier medio que dé certeza de su contenido y del cumplimiento de lo previsto en este párrafo."

La esencia del derecho a la seguridad jurídica **versa sobre la premisa relativa a "*saber a qué atenerse*" respecto del contenido de las leyes y de la propia actuación de la autoridad**, y, respecto de los actos legislativos, exige el establecimiento de normas que otorguen certeza a los gobernados.

No obstante, a pesar de que el artículo 16 de la Constitución Federal contenga la tutela de la seguridad jurídica de la situación del gobernado frente a la regulación existente y la conducta del Estado, no debe entenderse en la dimensión de que el ordenamiento jurídico y en específico las porciones normativas—, deben señalar de manera especial el procedimiento que regula las relaciones entre los particulares y las autoridades, sino únicamente constriñe a que **la ley de que se trate contenga los elementos mínimos y necesarios para hacer valer el derecho del interesado y evitar así, que se generen actitudes arbitrarias por parte del poder público**. Sirve de sustento a lo anterior las tesis siguientes:

> "**GARANTÍA DE SEGURIDAD JURÍDICA, QUÉ SE ENTIENDE POR**. La garantía de seguridad jurídica prevista en el artículo 16 de la Constitución Política de los Estados Unidos Mexicanos, no debe entenderse en el sentido de que la ley ha de señalar de manera especial y precisa un procedimiento para regular cada una de las relaciones que se entablen entre las autoridades y los particulares, sino que debe contener los elementos mínimos para hacer valer el derecho del gobernado y para que, sobre este aspecto, la autoridad no incurra en arbitrariedades, lo que fácilmente explica que existen trámites o relaciones que por su simplicidad, sencillez o irrelevancia, no requieren de que la ley pormenorice un procedimiento detallado para ejercitar el derecho correlativo. Lo anterior corrobora la ociosidad de que en todos los supuestos la ley deba detallar en extremo un procedimiento, cuando éste se encuentra definido de manera sencilla y suficiente para evidenciar la forma en que debe hacerse valer el derecho por el particular y las facultades y obligaciones que le corresponden a la autoridad."[22]
>
> "**GARANTÍA DE SEGURIDAD JURÍDICA. SUS ALCANCES.** La garantía de seguridad jurídica prevista en el artículo 16 de la Constitución Política de los Estados Unidos Mexicanos, no debe entenderse en el sentido de que la ley ha de señalar de manera especial y precisa un procedimiento para regular cada una de las relaciones que se entablen entre las autoridades y los particulares, sino que debe contener los elementos mínimos para hacer valer el derecho del gobernado y para que, sobre este aspecto, la autoridad no incurra en arbitrariedades, lo que explica que existen trámites o relaciones que por su simplicidad o sencillez, no requieren de que la ley pormenorice un procedimiento detallado para ejercer el derecho correlativo. Lo anterior corrobora que es innecesario que

---

[22] Tesis Aislada; Instancia: Segunda Sala; Fuente: Apéndice (actualización 2002), tomo I, Jur. Acciones de Inconstitucionalidad y C.C, página 321.



en todos los supuestos de la ley se deba detallar minuciosamente el procedimiento, cuando éste se encuentra definido de manera sencilla para evidenciar la forma en que debe hacerse valer el derecho por el particular, así como las facultades y obligaciones que le corresponden a la autoridad."[23]

En esa perspectiva, **el principio constitucional de seguridad jurídica tiene por objeto**, a nivel normativo, desde un aspecto positivo, **que los particulares tengan plena certeza del contenido del ordenamiento jurídico existente, a grado tal que puedan conocer los alcances y consecuencias de las hipótesis normativas que el legislador ha contemplado, así como también el ámbito de competencia y de actuación de las instituciones y autoridades del poder público**, para que con ello, <u>desde un ámbito negativo</u>, **estén en aptitud de evitar actuaciones arbitrarias por parte de las autoridades y, en caso de que ello suceda, poder acceder a los remedios jurídicos o medios de defensa conducentes**.

Conforme a ello, la seguridad jurídica se erige como uno de los ejes rectores que regulan la interacción entre el Estado y los gobernados, debido a que, en tanto los dispositivos legales se revistan de certeza, posibilitaran a los particulares conocer las facultades y aptitudes que se le permitieron a la autoridad, **ello con la finalidad de evitar la actualización de conductas arbitrarias o desproporcionadas y excesivas** y, en el supuesto de suscitarse, los ciudadanos tengan la certeza de hacer valer sus derechos.

b.   <u>Derecho de acceso a la justicia</u>

El artículo 17 de la Constitución Federal reconoce el derecho humano de acceso a la justicia, el cual implica que todas las personas tienen derecho a que se les administre justicia por órganos jurisdiccionales que estarán expeditos para impartirla en los plazos y términos que fijen las leyes.

"Artículo 17. Ninguna persona podrá hacerse justicia por sí misma, ni ejercer violencia para reclamar su derecho. Toda persona tiene derecho a que se le administre justicia por tribunales que estarán expeditos para impartirla en los plazos y términos que fijen las leyes, emitiendo sus resoluciones de manera pronta, completa e imparcial. Su servicio será gratuito, quedando, en consecuencia, prohibidas las costas judiciales."

Además, este derecho está reconocido en la Convención Americana sobre Derechos Humanos, en el artículo 8 y 25, cuyo contenido se transcribe a continuación:

"Artículo 8. Garantías Judiciales

1. Toda persona tiene derecho a ser oída, con las debidas garantías y dentro de un plazo razonable, por un juez o tribunal competente, independiente e imparcial, establecido con anterioridad por la ley, en la sustanciación de cualquier acusación penal formulada contra ella, o para la determinación de sus derechos y obligaciones de orden civil, laboral, fiscal o de cualquier otro carácter."

"Artículo 25. Protección Judicial

1. Toda persona tiene derecho a un recurso sencillo y rápido o a cualquier otro recurso efectivo ante los jueces o tribunales competentes, que la ampare contra actos que violen sus derechos fundamentales reconocidos por la Constitución, la ley o la presente Convención,

---

[23] Jurisprudencia; Instancia: Segunda Sala; Fuente. Semanario Judicial de la Federación y su Gaceta, tomo XXIV, octubre de 2016, página 351.



aun cuando tal violación sea cometida por personas que actúen en ejercicio de sus funciones oficiales.

2. Los Estados Partes se comprometen:

a) A garantizar que la autoridad competente prevista por el sistema legal del Estado decidirá sobre los derechos de toda persona que interponga tal recurso;

b) A desarrollar las posibilidades de recurso judicial, y

c) A garantizar el cumplimiento, por las autoridades competentes, de toda decisión en que se haya estimado procedente el recurso."

Este derecho implica que toda persona tiene garantizado el acceso a los órganos jurisdiccionales con el fin de que se le imparta justicia, para la determinación de sus derechos y obligaciones de cualquier carácter, con las debidas garantías.

Al respecto, la Primera Sala de la Suprema Corte de Justicia de la Nación definió este derecho como "el derecho público subjetivo que toda persona tiene, dentro de los plazos y términos que fijen las leyes, para acceder de manera expedita a tribunales independientes e imparciales, a plantear una pretensión o a defenderse de ella, con el fin de que a través de un proceso en el que se respeten ciertas formalidades, se decida sobre la pretensión planteada y, en su caso, se ejecute esa decisión". Lo anterior con sustento en la siguiente tesis de jurisprudencia:

> **"GARANTÍA A LA TUTELA JURISDICCIONAL PREVISTA EN EL ARTÍCULO 17 DE LA CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS. SUS ALCANCES.** La garantía a la tutela jurisdiccional puede definirse como el derecho público subjetivo que toda persona tiene, dentro de los plazos y términos que fijen las leyes, para acceder de manera expedita a tribunales independientes e imparciales, a plantear una pretensión o a defenderse de ella, con el fin de que a través de un proceso en el que se respeten ciertas formalidades, se decida sobre la pretensión o la defensa y, en su caso, se ejecute esa decisión. Ahora bien, si se atiende a que la prevención de que los órganos jurisdiccionales estén expeditos -desembarazados, libres de todo estorbo- para impartir justicia en los plazos y términos que fijen las leyes, significa que el poder público -en cualquiera de sus manifestaciones: Ejecutivo, Legislativo o Judicial- no puede supeditar el acceso a los tribunales a condición alguna, pues de establecer cualquiera, ésta constituiría un obstáculo entre los gobernados y los tribunales, por lo que es indudable que el derecho a la tutela judicial puede conculcarse por normas que impongan requisitos impeditivos u obstaculizadores del acceso a la jurisdicción, si tales trabas resultan innecesarias, excesivas y carentes de razonabilidad o proporcionalidad respecto de los fines que lícitamente puede perseguir el legislador. Sin embargo, no todos los requisitos para el acceso al proceso pueden considerarse inconstitucionales, como ocurre con aquellos que, respetando el contenido de ese derecho fundamental, están enderezados a preservar otros derechos, bienes o intereses constitucionalmente protegidos y guardan la adecuada proporcionalidad con la finalidad perseguida, como es el caso del cumplimiento de los plazos legales, el de agotar los recursos ordinarios previos antes de ejercer cierto tipo de acciones o el de la previa consignación de fianzas o depósitos."[24]

[Énfasis añadido]

En el mismo sentido, la Segunda Sala de la Suprema Corte de Justicia de la Nación ha considerado que el derecho de acceso a la justicia implica que ésta deba ser (i) pronta, (ii) completa, (iii) imparcial y (iv) gratuita, de acuerdo con la siguiente jurisprudencia:

---

[24] Registro digital: 172759 SCJN; 9a. Época; Semanario Judicial de la Federación y su Gaceta; 1a./J. 42/2007; J

CLYDE&CO

**"ACCESO A LA IMPARTICIÓN DE JUSTICIA. EL ARTÍCULO 17 DE LA CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS ESTABLECE DIVERSOS PRINCIPIOS QUE INTEGRAN LA GARANTÍA INDIVIDUAL RELATIVA, A CUYA OBSERVANCIA ESTÁN OBLIGADAS LAS AUTORIDADES QUE REALIZAN ACTOS MATERIALMENTE JURISDICCIONALES.** La garantía individual de acceso a la impartición de justicia consagra a favor de los gobernados los siguientes principios: 1. De justicia pronta, que se traduce en la obligación de las autoridades encargadas de su impartición de resolver las controversias ante ellas planteadas, dentro de los términos y plazos que para tal efecto establezcan las leyes; 2. De justicia completa, consistente en que la autoridad que conoce del asunto emita pronunciamiento respecto de todos y cada uno de los aspectos debatidos cuyo estudio sea necesario, y garantice al gobernado la obtención de una resolución en la que, mediante la aplicación de la ley al caso concreto, se resuelva si le asiste o no la razón sobre los derechos que le garanticen la tutela jurisdiccional que ha solicitado; 3. De justicia imparcial, que significa que el juzgador emita una resolución apegada a derecho, y sin favoritismo respecto de alguna de las partes o arbitrariedad en su sentido; y, 4. De justicia gratuita, que estriba en que los órganos del Estado encargados de su impartición, así como los servidores públicos a quienes se les encomienda dicha función, no cobrarán a las partes en conflicto emolumento alguno por la prestación de ese servicio público. Ahora bien, si la citada garantía constitucional está encaminada a asegurar que las autoridades encargadas de aplicarla lo hagan de manera pronta, completa, gratuita e imparcial, es claro que las autoridades que se encuentran obligadas a la observancia de la totalidad de los derechos que la integran son todas aquellas que realizan actos materialmente jurisdiccionales, es decir, las que en su ámbito de competencia tienen la atribución necesaria para dirimir un conflicto suscitado entre diversos sujetos de derecho, independientemente de que se trate de órganos judiciales, o bien, sólo materialmente jurisdiccionales."**[25]**

Ahora bien, la Primera Sala de la Suprema Corte de Justicia de la Nación, al definir el derecho de acceso efectivo a la justicia, también estableció las etapas y los derechos que se desprenden de aquel, las cuales son tres, consistentes en una etapa previa a juicio, una judicial, y una posterior a juicio. Lo anterior con fundamento en la siguiente jurisprudencia:

**"DERECHO DE ACCESO EFECTIVO A LA JUSTICIA. ETAPAS Y DERECHOS QUE LE CORRESPONDEN.** De los artículos 14, 17 y 20, apartados B y C, de la Constitución Política de los Estados Unidos Mexicanos y 8 de la Convención Americana sobre Derechos Humanos, deriva el derecho de acceso efectivo a la justicia, el cual comprende, en adición a determinados factores socioeconómicos y políticos, el derecho a una tutela jurisdiccional efectiva y los mecanismos de tutela no jurisdiccional que también deben ser efectivos y estar fundamentados constitucional y legalmente. Ahora bien, en la jurisprudencia 1a./J. 42/2007, de rubro: "GARANTÍA A LA TUTELA JURISDICCIONAL PREVISTA EN EL ARTÍCULO 17 DE LA CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS. SUS ALCANCES.", la Primera Sala de la Suprema Corte de Justicia de la Nación definió el acceso a la tutela jurisdiccional como el derecho público subjetivo que toda persona tiene, dentro de los plazos y términos que fijen las leyes, para acceder de manera expedita a tribunales independientes e imparciales, a plantear una pretensión o a defenderse de ella, con el fin de que, a través de un proceso en el que se respeten ciertas formalidades, se decida sobre la pretensión o la defensa y, en su caso, se ejecute tal decisión; de ahí que este derecho comprenda tres etapas, a las que corresponden tres derechos: (i) una previa al juicio, a la que le corresponde el derecho de acceso a la jurisdicción, que parte del derecho de acción como una especie del de petición dirigido a las autoridades jurisdiccionales y que motiva un pronunciamiento por su parte; (ii) una judicial, que va desde el inicio del procedimiento hasta la última actuación y a la que concierne el derecho al debido proceso; y, (iii) una posterior al juicio, identificada con la eficacia de las resoluciones emitidas. Ahora, los derechos mencionados alcanzan no solamente a los procedimientos ventilados ante Jueces y tribunales del Poder Judicial, sino también a todos aquellos seguidos ante autoridades que, al pronunciarse sobre la determinación de derechos y obligaciones, realicen funciones materialmente jurisdiccionales."**[26]**

---

[25] Registro digital: 171257 SCJN; 9a. Época;Semanario Judicial de la Federación y su Gaceta; 2a./J. 192/2007 ;J

[26] Registro digital: 2015591 SCJN; 10a. Época; Gaceta del Semanario Judicial de la Federación; 1a./J. 103/2017 (10a.); J; Publicación: viernes 24 de noviembre de 2017 10:35 h

31



De la jurisprudencia anterior se desprende que este derecho comprende tres etapas a las que les corresponden sus respectivos tres derechos. La segunda, relevante para el presente asunto, es la judicial, a la cual le corresponde el derecho al debido proceso.

El derecho de acceso a la justicia en la etapa judicial se refiere al conjunto de derechos que tienen las partes que son partes de un proceso, entendidas como el conjunto de formalidades esenciales del procedimiento que garantizan que las partes puedan hacer valer sus pretensiones dentro de juicio, en un plano de igualdad y de seguridad jurídica.

En ese sentido, el derecho de acceso a la justicia en la etapa judicial, comprende la totalidad de las actuaciones dentro del procedimiento, y permite que las partes participen en él, manifestando lo que a su derecho convengan y realicen todas las actuaciones necesarias para la prosecución o defensa de sus pretensiones e intereses.

Dicho derecho también implica que, las actuaciones judiciales deben estar sujetas al debido proceso y respetar los derechos de las partes en aras de garantizar efectivamente el citado derecho. Las actuaciones judiciales deben realizarse siempre con la finalidad de alcanzar una justicia verdadera y efectiva, atendiendo a las pretensiones de las partes y asegurando que el proceso sirva para los fines para los cuales fue creado.

Es decir, los órganos jurisdiccionales deben asegurar no solamente que el proceso se lleve cumpliendo con las normas procesales o formales que lo regulan, sino que también deben vigilar el cumplimiento de las normas necesarias que aseguren los derechos de las partes, con el fin de dar seguridad jurídica a las mismas y de garantizar el debido proceso. De lo contrario, se haría nugatorio el derecho de acceso a una justicia efectiva, toda vez que se consideraría garantizado con el simple hecho de seguir un procedimiento formal, sin consideración alguna sobre el fondo del mismo.

En ese sentido, una tutela judicial efectiva o un derecho de acceso efectivo a la justicia implica que las normas procesales deben interpretarse de tal manera que se maximice el acceso a la justicia, es decir, que las resoluciones que decidan sobre un asunto resuelvan el fondo de la cuestión planteada y no así que obstaculice el ejercicio de estos derechos.

c.    Ilegalidad del Auto Reclamado y violación a los derechos de seguridad jurídica y acceso a la justicia.

Uno de los principales agravios que Controladora hizo valer en contra de la decisión del Juzgado Responsable de acordar favorable el desistimiento presentado por los Sedicentes Apoderados es que, en su contra, se había promovido previa y oportunamente un incidente de falta de personalidad que no fue resuelto por dicha autoridad judicial.

Para responder dicho agravio, en el Auto Reclamado el Juzgado Responsable sostiene que no estaba obligado a resolver el incidente de falta de personalidad porque al momento en que se



presentó "*no había materia sobre el cual resolverlo*". En ese orden de ideas, el Juzgado Responsable sostiene que toda vez que al momento de la presentación del incidente de falta de personalidad no se había reconocido la personalidad de los Sedicentes Apoderados, entonces la incidencia no debía resolverse. Dichas consideraciones son ilegales, como se demostrará a continuación.

En primer lugar, es necesario enfatizar a este Tribunal el contexto bajo el cual se presentó el ilegal desistimiento de la solicitud de concurso mercantil y, en consecuencia, cómo se presentó el incidente de falta de personalidad. Como fue narrado en el capítulo de "Hechos", al momento de la presentación de la solicitud de desistimiento los legítimos apoderados de Controladora **no tenían conocimiento de que se estaba llevando a cabo dicho acto**.

Por el contrario, como ha sido debidamente narrado, Controladora supo de la existencia de la Supuesta RUA como consecuencia de otros procedimientos iniciados en Delaware, Estados Unidos de América y, de inmediato, denunció la ilegalidad de dicha resolución como consecuencia de la violación frontal a las Medidas Cautelares decretadas por el propio Juzgado Responsable.

En ese orden de ideas, el **mismo día en que Controladora <u>denunció la violación a las Medidas Cautelares</u>, los Sedicentes Apoderados presentaron su solicitud de desistimiento concurso mercantil**, de la cual únicamente se tuvo conocimiento como consecuencia de una visita al Juzgado en que se advirtió la constancia en el expediente de mérito. En consecuencia, **al día hábil inmediato siguiente en que los Sedicentes Apoderados presentaron su solicitud de concurso mercantil, es que <u>Controladora presentó incidente de falta de personalidad en su contra</u>**.

Como consta en el expediente, el Juzgado Responsable decidió **reservar** tanto la solicitud de desistimiento de concurso mercantil como el incidente de falta de personalidad presentado por Controladora; se hace notar a este Tribunal que dicho órgano **no desechó ni desestimó el incidente presentado, sino que simplemente "reservó" su pronunciamiento**, condicionando dicha reserva a que Wilmington Trust y CI Banco cumplieran con el requerimiento que les fue formulado.

Asimismo, se hace notar a este Tribunal que el Juzgado Responsable **acordó al mismo tiempo la solicitud de desistimiento y el incidente de falta de personalidad, reservando el pronunciamiento de ambos**, sin que distinguiera o privilegiara el trámite de alguno.

Conforme a lo anterior, y de un simple análisis de constancias, este Tribunal advertirá la falsedad de las manifestaciones del Juzgado Responsable. Lo anterior pues es **falso que el incidente de falta de personalidad no tuviera "materia"; contrario a lo aducido, su materia era clara: <u>denunciar la carencia de representación de los Sedicentes Apoderados</u> para actuar en el concurso mercantil y la clara nulidad de la Supuesta RUA bajo la cual pretendía actuar en representación de Controladora**.

EDGAR RODRIGUES SAAVEDRA LUIS E. VILLANUEVA
20190AC0A7C06A0A7C8A6A7C8A6A7C8A6A7C8A6A7C8A6A
2017C39 5F19 EF45F



El hecho de que el Juzgado Responsable haya "reservado" la admisión del incidente **no lo desproviste de su objeto claro y evidente, más aun si, como supuestamente aduce el Juzgado Responsable, tampoco había reconocido personalidad a los Sedicentes Apoderados**.

El Juzgado Responsable parece sostener que, como al momento de presentación del incidente de falta de personalidad supuestamente no se había reconocido la personalidad de los Sedicentes Apoderados, entonces es válido que primero haya reconocido dicha personalidad para aceptar el desistimiento formulado y solo después pronunciarse sobre la admisión del incidente para dejarlo sin materia. Sin embargo, el Juzgado Responsable ignora la naturaleza y finalidad del incidente de falta de personalidad.

Al respecto, la jurisprudencia ha reconocido la personalidad es una cuestión de crasa relevancia en los procedimientos judiciales que debe analizarse, incluso, con preferencia al "fondo" del asunto ya que sus efectos hacen dependen la subsistencia misma del procimiento judicial. Al respecto,  al resolver la contradicción de tesis 50/98-PL el Pleno de la Suprema Corte de Justicia de la Nación sostuvo lo siguiente:

> "Que siendo la personalidad un presupuesto procesal, dadas las condiciones anteriores, su cuestionamiento motiva la integración de una litis, **tan preponderante como la de fondo, sólo que debe quedar definida antes que la principal**. Debe observarse también que **la resolución sobre personalidad no solamente es declarativa, o de simple reconocimiento o desconocimiento de la legitimación de una de las partes, sino que también es constitutiva, puesto que <u>de ella depende, bien la prosecución o bien la insubsistencia del proceso</u>**; en su caso, afecta notablemente la actuación de los comparecientes, las cargas de las partes, la consecuencia sobre éstas, etc., de lo cual se infiere que la resolución sobre la personalidad causa, a una de las partes, un perjuicio inmediato de imposible reparación que exige ser enmendado, desde luego, a través del amparo indirecto (…) Las observaciones anteriores conducen a estimar que la resolución sobre personalidad, cuando recae dentro de un incidente previo a la definitiva, debe ser reclamada en amparo indirecto (con la excepción que más adelante se indicará), porque **además de dirimir un presupuesto procesal, deja a una de las partes sin defensa, o afecta ésta en alto grado**; ello es así, porque si la resolución desecha o desestima el incidente de falta de personalidad propuesto en contra del que comparece por la parte demandada, vincula al actor a seguir todo el procedimiento viciado que plantea quien carece de la representación que ostenta, con todos los inconvenientes y perjuicios que la sentencia y su ejecución acarrea, exponiéndose, además, a que nunca se le oiga al respecto en el supuesto de que le sea favorable la sentencia de fondo y que en contra de ésta, su contraparte obtenga el amparo; lo mismo ocurrirá, pero en perjuicio de la demandada, si la resolución desestima la excepción de falta de personalidad que oponga en contra de quien se apersona en nombre del actor. Y, en el supuesto de que la resolución desconozca la personalidad de quien comparece por la demandada, impide a esta parte todo tipo de defensa.-Cabe agregar que, además de las graves consecuencias ya apuntadas, cuando el juzgador ordinario desestima la objeción de personalidad del representante del actor, la concesión del amparo solicitado por el demandado no será para que se reponga el procedimiento, a partir del punto en que se cometió la violación, como sucede tratándose de otras violaciones procesales, sino para que se emita nueva resolución en la que se desconozca la personalidad de quien ostentó la representación del indicado actor, con lo cual se le pone fin al juicio (…) "

[Énfasis añadido]

34



De dicho precedente se publicó la tesis jurisprudencial de rubro "**PERSONALIDAD. EN CONTRA DE LA RESOLUCIÓN QUE DIRIME ESTA CUESTIÓN, PREVIAMENTE AL FONDO, PROCEDE EL AMPARO INDIRECTO.**"[27]

En ese mismo orden de ideas, al resolver la contradicción de tesis 19/2001-SS, la Segunda Sala de la Suprema Corte de Justicia de la Nación sostuvo las siguientes consideraciones:

"En el caso esta Segunda Sala estima necesario precisar el significado de algunos conceptos procesales vinculados con la presente contradicción de tesis, tales como 'incidente', 'previo y especial pronunciamiento' y 'resolver de plano'.

"El Diccionario de la Lengua Española, al referirse a la palabra incidente, lo define en los siguientes términos: Incidente. (Del lat. Incidens, -entis.) adj. Que sobreviene en el curso de un asunto o negocio y tiene con él alguna conexión. 2. Número de casos, a veces en tanto por ciento, o, más en general, repercusión de ellos en algo. 3. Der. Incidente, cuestión distinta de la principal en un juicio.

"Por su parte el Diccionario Jurídico Mexicano, editado por el Instituto de Investigaciones Jurídicas de la Universidad Nacional Autónoma de México, Novena Edición, en la página 1665, del tomo relativo a las letras de la I a la O, define la palabra 'incidente' en los siguientes términos: 'Incidente. I. (Del latín incidere, que significa sobrevivir, interrumpir, producirse). Procesalmente, los incidentes son procedimientos que tienden a resolver controversias de carácter adjetivo relacionadas inmediata y directamente con el asunto principal ...'

"En cambio, Eduardo Pallares, en su diccionario de derecho procesal civil, al referirse al incidente establece lo siguiente: '... deriva del latín, incido incidens (acontecer, interrumpir, suspender) significa en su acepción más amplia, lo que sobreviene accesoriamente en algún asunto o negocio fuera de lo principal, y jurídicamente, la cuestión que sobreviene entre los litigantes durante el curso de la acción principal. La palabra incidente puede aplicarse a todas las excepciones, a todas las contestaciones, a todos los acontecimientos accesorios que se originan en un negocio e interrumpen o alteran o suspenden su curso ordinario. Son incidentes de un juicio el nombramiento de un nuevo procurador, la recusación de un Juez u otro funcionario de la administración de justicia, la acumulación de autos, la oposición a la prueba pedida, la reclamación de nulidad de una o varias actuaciones, la reposición de una providencia o auto, la petición de término extraordinario de prueba, la declinatoria de jurisdicción, la alegación y prueba de tachas, etc., porque todas éstas se derivan y traen su origen del negocio principal; pero no todas las que hemos citado y otras que caben dentro de la definición, están comprendidas en las prescripciones de este título, encaminado a trazar el procedimiento que ha de seguirse en todas las cuestiones que la ley tiene como incidentales dentro de la principal. Tanto la ley como la jurisprudencia, reconocen también estos incidentes o cuestiones incidentales con el nombre de artículos, pero la verdadera palabra jurídica es la de incidentes, y bajo este nombre principalmente los trata la ley ...'

"De lo anterior, podemos concluir que los incidentes son las cuestiones que se promueven durante la tramitación de un juicio y tienen relación inmediata con el negocio principal.

"Por **lo que respecta a los incidentes de previo y especial pronunciamiento, tanto la doctrina como la jurisprudencia han coincidido en manifestar que éstos, son aquellos que <u>suspenden el procedimiento en lo sustancial</u>, hasta en tanto no se resuelva la cuestión ventilada en él.** En otros términos, **los incidentes de previo y especial pronunciamiento, son aquellos que impiden que el juicio siga su curso mientras no se resuelvan, por referirse a presupuestos procesales sin los cuales el proceso no puede continuar**. Se les llama de **especial pronunciamiento porque han de resolverse mediante una resolución que únicamente concierne a la cuestión incidental y no a la definitiva que es en la que se deciden las cuestiones litigiosas principales**.

---

[27] Registro digital: 190368 SCJN;9a. Época;Semanario Judicial de la Federación y su Gaceta;P./J. 4/2001 ;J

Clyde&Co

"**Dentro de los incidentes de previo y especial pronunciamiento la doctrina procesal ha incluido entre otros, a la incompetencia, la litis pendencia, la conexidad y <u>la falta de personalidad</u>**.

"En relación con el término 'resolver de plano', en el argot jurídico significa que se debe de resolver en la misma pieza de autos sin mayor sustanciación, de inmediato e integralmente. También significa resolver sin formulismos y tramitación especial alguna."

[Énfasis añadido]

Consideraciones que se suman a los criterios jurisprudenciales de rubro "**INCIDENTE DE FALTA DE PERSONALIDAD EN EL JUICIO DE AMPARO. AL SER DE PREVIO Y ESPECIAL PRONUNCIAMIENTO, DEBE ADMITIRSE Y RESOLVERSE CONFORME A LA SEGUNDA REGLA PREVISTA EN EL ARTÍCULO 35 DE LA LEY DE AMPARO**"[28] y "**CADUCIDAD DE LA INSTANCIA EN MATERIA MERCANTIL. LA EXCEPCIÓN DE FALTA DE PERSONALIDAD AL CONSTITUIR UNA RESOLUCIÓN DE CUESTIÓN PREVIA O CONEXA, INTERRUMPE EL PLAZO PARA QUE OPERE AQUÉLLA**"[29] que el Juzgado Responsable, sin explicar razón alguna, indebidamente consideró inaplicables.

Conforme a dichos criterios es evidente la amplitud en que la jurisprudencia ha reconocido la relevancia de cuestiones de personalidad y la necesidad de que éstas **sean analizadas de manera prioritaria sobre cualquier otra cuestión**.

Partiendo entonces de la naturaleza y relevancia de la personalidad en los procedimientos judiciales, debiera ser evidente para este Tribunal la ilegalidad de las consideraciones del Juzgado Responsable al sostener que su actuar fue correcto al primero acordar favorable la solicitud de desistimiento formulada por los Sedicentes Apoderados, **quienes eran los sujetos en contra de quienes se promovió el incidente de falta de personalidad,** y solo después desestimar el incidente pues éste "no tenía materia" al momento de su presentación.

Lo cierto es que, contrario a lo que sostiene el Juzgado Responsable, el incidente de falta de personalidad **debió ser tramitado de forma privilegiada y previa a que se otorgara cualquier efecto a la solicitud de desistimiento formulada por los Sedicentes Apoderados**. Lo anterior pues, si dicho incidente precisamente **tenía por objeto que se desconocieran sus facultades de representación, por orden lógico y conforme a los criterios citados, su resolución debió privilegiarse**.

Sin que obstara el hecho que aduce el Juzgado Responsable de que "no se había reconocido personalidad" de los Sedicentes Apoderados pues, además de que ello es una consideración falsa, con independencia de que hubiera ya un reconocimiento o no de personalidad **ya existía una denuncia clara de una ausencia de representación de dichas personas <u>que debió ser atendida de manera privilegiada</u>**. Al respecto, son relevantes los siguientes criterios:

---

[28] Registro digital: 169288 SCJN;9a. Época;Semanario Judicial de la Federación y su Gaceta;1a./J. 42/2008 ;J

[29] Registro digital: 2017789 SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;1a./J. 33/2018 (10a.) ;J; Publicación: viernes 07 de septiembre de 2018 10:16 h



"**QUEJA PREVISTA EN LA FRACCIÓN VI DEL ARTÍCULO 95 DE LA LEY DE AMPARO. PROCEDE CONTRA EL AUTO QUE DESECHA EL INCIDENTE DE FALTA DE PERSONALIDAD O LA RESOLUCIÓN DE FONDO DICTADA EN ÉL.** El indicado medio de defensa procede contra la resolución del Juez de Distrito que desecha el incidente de falta de personalidad de quien se ostenta representante del quejoso, del tercero perjudicado o de la autoridad responsable, así como contra la que lo resuelve en el fondo, durante el trámite del juicio de amparo indirecto, porque: a) La dicta un Juez de Distrito o el superior de la autoridad responsable; b) Se emite una vez iniciado el juicio de amparo; c) No procede el recurso de revisión establecido en el artículo 83 de la Ley de Amparo contra este tipo de decisiones; y, d) Por su naturaleza trascendental y grave puede ocasionar daño o perjuicio a las partes no reparable en sentencia definitiva -aun cuando al final la parte que cuestiona la personalidad de la otra obtuviera un fallo favorable-. Lo anterior es así, **porque el aspecto de personalidad debe estudiarse en forma preferente, sin esperar a que se dicte la sentencia definitiva, para averiguar si afecta o no a alguna de las partes, la deficiente o la falta de comprobación de la personalidad, ya que aparte del empleo estéril de recursos, sean materiales o humanos, o la pérdida de tiempo, el representado en el juicio de amparo <u>debe tener la seguridad de que la actuación de su representante tendrá un efecto válido en él y en su contraparte, y la certeza de que los trámites y diligencias que lleve a cabo son efectivas y legales.</u>**"[30]

[Énfasis añadido]

"**PERSONALIDAD, EXAMEN DE LA**. Si en términos del artículo 222, fracción I, inciso b) del Código de Procedimientos Civiles del Estado de Puebla, se opuso la excepción de falta de personalidad del actor; el juzgador tenía la obligación de examinar tal aspecto al pronunciar la sentencia, atento a lo dispuesto por el artículo 221 del mismo ordenamiento legal, puesto que la personalidad de las partes es un presupuesto procesal, es decir, un requisito indispensable sin el cual no puede iniciarse, ni substanciarse válidamente un juicio, por lo cual, debe ser analizada por la potestad común aun de oficio, esto es, a pesar de que se haya o no impugnado oportunamente, **ya sea a través de la excepción o del incidente respectivo, pues sería antijurídico que se resolviera sobre la cuestión de fondo cuando el actor carece de personalidad para ejercitar la acción.**"[31]

[Énfasis añadido]

En ese orden de ideas, es claro que el orden en que debió resolver las peticiones formuladas por las partes fue el incorrecto, toda vez que primero debió resolver el incidente de falta de personalidad y después la solicitud de desistimiento.

Lo anterior toda vez que sigue un orden lógico. Si la personalidad del Sedicente Apoderado de Controladora se impugnó a través de un incidente (por lo que fue evidentemente cuestionada, así como la validez de sus actuaciones), es **congruente que dicha incidencia deba ser resuelta antes de otorgar plenos efectos a sus actos, con mayoría de razón si éste <u>se trata del desistimiento de la instancia</u>**.

Actuar de forma contraria, como lo hizo el Juzgado Responsable, implica la vulneración frontal del derecho de seguridad jurídica y de acceso efectivo a la justicia puesto que permitiría que la sola intervención de cualquier persona que aparente tener personalidad, a pesar de que ésta sea impugnada por la vía idónea, pudiera tener consecuencias trascendentales, tal como provocar el desistimiento de una persona de un concurso mercantil, con las consecuencias que ello conlleva.

---

[30] Registro digital: 162748 SCJN;9a. Época;Semanario Judicial de la Federación y su Gaceta;2a./J. 203/2010 ;J

[31] Registro digital: 203267 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;VI.2o.29 C ;TA



Es decir, cuando una persona se ostenta dentro de un juicio y su personalidad se impugna, el Juzgado, previo a resolver cualquier otra cuestión, debe avocarse al conocimiento de dicho asunto toda vez que este resulta fundamental para el resultado de dicho procedimiento.

Sobre este punto, la jurisprudencia ha reconocido la necesidad de que se resuelvan cuestiones de personalidad incluso de manera preferente a otros presupuestos procesales, dado que se cuestiona la legitimación misma de las partes:

> **"INCOMPETENCIA Y FALTA DE PERSONALIDAD. SI AMBAS EXCEPCIONES SE OPONEN SIMULTÁNEAMENTE, DEBE RESOLVERSE PREVIAMENTE LA ÚLTIMA (LEGISLACIÓN DEL ESTADO DE MÉXICO).** Los artículos 217 y 218 de la Ley del Trabajo de los Servidores Públicos del Estado y Municipios, permiten tramitar como incidentes de previo y especial pronunciamiento, las cuestiones de: I. Nulidad; II. Competencia; III. Personalidad; IV. Acumulación; y V. Excusa, e incluso, cuando se promuevan los mismos dentro de una "audiencia o diligencia", el Tribunal Estatal de Conciliación y Arbitraje, los sustanciará y resolverá de plano, oyendo a las partes y continuará el procedimiento de inmediato; empero, salvo lo vinculado con la tercera de las hipótesis indicadas, en relación con las demás, señalará dentro de las veinticuatro horas siguientes, día y hora para la audiencia incidental, en la que resolverá la cuestión planteada. **En consecuencia, los aspectos vinculados con la personalidad, deben dilucidarse de plano, con el objeto de continuar el juicio en forma inmediata.** Por ende, en el evento de oponerse simultáneamente las excepciones de incompetencia y de falta de personalidad, es ilegal ordenar la solución de la primera, cuando previamente se debe examinar la incidencia de plano, porque los numerales invocados lo prevén así."[32]

[Énfasis añadido]

Lo sostenido en el criterio anterior tiene una razón simple: como ha sido reconocido por la Primera Sala de la Suprema Corte de Justicia de la Nación, lo actuado en un juicio por alguien que no tiene representación **no produce efecto legal alguno**, es decir, **es nulo todo acto realizado por otro sin un poder válido que sustente su actuar,** y tampoco puede ratificarse por la parte correspondiente.

Sobre este último punto, la Primera Sala ha establecido que si bien la ineficacia de los actos efectuados por otro sin poder consistentes en la celebración de contratos, la gestión de negocios, los actos celebrados por mandatario en exceso de los límites del mandato, o para extinguir la acción de nulidad de los actos jurídicos viciados de nulidad relativa, puede convalidarse mediante la ratificación de la parte en cuya representación se celebraron dichos actos, esto no aplica tratándose de actos llevados a cabo dentro de un procedimiento judicial.

La ratificación de los actos nulos por falta de personalidad dentro de juicio no puede ser convalidada por la parte en cuya supuesta representación se realizaron porque en el juicio existe una relación jurídica de carácter público, porque implica el ejercicio de la función estatal de la jurisdicción.

En ese orden de ideas, el incumplimiento de cualquiera de los presupuestos procesales **impide la constitución válida de la relación jurídica,** siendo uno de ellos que las partes estén debidamente representadas. Por lo tanto, ante la falta del presupuesto de personalidad, los actos

---

[32] Registro digital: 192242 TCC; 9a. Época;Semanario Judicial de la Federación y su Gaceta; II.T.132 L; TA

Clyde&Co

realizados por uno de ellos **son nulos.** Lo anterior con fundamento en las siguientes tesis de la Primera Sala de la Suprema Corte de Justicia de la Nación:

**"FALTA DE PERSONALIDAD. NO ES VÁLIDO SUBSANARLA MEDIANTE LA RATIFICACIÓN DE LO ACTUADO POR QUIEN CARECE DE ELLA.** La ratificación de las partes sobre lo actuado en juicio por quien no tiene su representación, no es un medio válido para subsanar la falta de personalidad a que se refiere el artículo 41 del Código de Procedimientos Civiles para el Distrito Federal. Lo anterior, ya que la ratificación se encuentra prevista en los artículos 1802, 1896, 1906, 2234 y 2583 del Código Civil para dicha entidad, con el fin de salvar la ineficacia originaria de los actos efectuados por otro sin poder, consistentes en la celebración de contratos, la gestión de negocios, los actos celebrados por el mandatario traspasando los límites expresos del mandato, o para extinguir la acción de nulidad de los actos jurídicos cuya invalidez es relativa, mediante el cumplimiento voluntario por medio del pago, novación o de cualquier otro modo; dichos supuestos no tienen lugar tratándose de los actos llevados a cabo dentro de un procedimiento judicial, porque en éste existe una relación jurídica de carácter público, pues implica el ejercicio de la función estatal de la jurisdicción, donde el incumplimiento de cualquiera de sus presupuestos impide la constitución válida de la relación jurídica, y uno de ellos consiste en que la parte esté debidamente representada. Ante esa situación, la falta del presupuesto no puede convalidarse con la mera voluntad de una de las partes con la pretensión de conferir el mandato con efectos retroactivos, dentro del juicio."[33]

**"FALTA DE PERSONALIDAD. EL DEFECTO SUBSANABLE SÓLO RECAE EN SU PRUEBA Y NO EN LA EXISTENCIA DEL PRESUPUESTO PROCESAL.** Del artículo 41, en relación con los artículos 35, fracción IV, 36, 47, 95, fracción I, 272-A y 272-C, todos del Código de Procedimientos Civiles para el Distrito Federal, se advierte que los defectos a subsanar cuando se declara fundada la excepción de falta de personalidad en el actor, o de la impugnación respecto a la del demandado, son los defectos formales de la prueba material de dicho presupuesto procesal, que ordinariamente consiste en un documento, sea aquel donde se otorga el poder, mandato o representación para comparecer a juicio a nombre de otro, o aquel donde consta el nombramiento del cargo para el cual se confiere la representación legal, o el acta de la sociedad donde se asientan las facultades conferidas al mandatario, o algún otro; esto, bajo la premisa de que la representación sí fue conferida pero se encuentra deficientemente probada por una cuestión de forma en el medio probatorio que impide su comprobación; es decir, en el contexto del citado artículo 41, subsanar significa reparar o remediar el defecto de la prueba de la personalidad y no la oportunidad para exhibir otro mandato o algún otro medio donde se otorgue la representación que antes no se tenía, con pretensión de que surta efectos retroactivos. Esto es así, porque como la personalidad es un presupuesto procesal, sólo ante su existencia se logra integrar válidamente la relación procesal, de lo contrario, son inválidas las actuaciones llevadas a cabo por el falso representante; de ahí que la presentación del nuevo poder en donde, a diferencia del anterior, sí se confiera la representación, a lo sumo podría conducir, en el caso del demandado, a reconocer su personalidad a partir de ese momento, pero no respecto de los actos previos en que se carecía de ella."[34]

De las tesis anteriores se evidencia que, debido a que la falta de personalidad de una de las partes **no es subsanable dentro de juicio,** aunado al hecho de que el incidente de falta de personalidad constituye una resolución previa y de especial pronunciamiento porque se trata de un elemento **esencial para el dictado de la sentencia,** el Juzgado Responsable resolvió ilegal e indebidamente el desistimiento del concurso mercantil sin antes analizar la personalidad de los Sedicentes Apoderados.

---

[33] Registro digital: 2005131SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;1a. CCCLVII/2013 (10a.) ;TA; Publicación: viernes 13 de diciembre de 2013 13:20 h
[34] Registro digital: 2005129 SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;1a. CCCLIII/2013 (10a.) ;TA; Publicación: viernes 13 de diciembre de 2013 13:20 h



Precisamente por esta razón es por la cual el incidente de falta de personalidad debe ser resuelto de forma previa, de plano, con especial pronunciamiento. Toda actuación realizada por alguien que **no tenga facultades o atribuciones dentro de un juicio determinado será** <u>inválida siempre y nunca se convalidara.</u>

En esos términos, es claro que el Juzgado Responsable debió haber resuelto en primer lugar, el incidente de falta de personalidad de las personas promovido en contra del Sedicente Apoderado de Controladora, sin dar previamente trámite a su solicitud de desistimiento; lo anterior, más aun si se toma en consideración que se **desconocía la personalidad de la persona que** <u>solicitaba el desistimiento de un concurso mercantil,</u> por lo que la trascendencia de dicha resolución ameritaba estudiar primero la personalidad del solicitante y después, con base en lo resuelto en el incidente, estudiar la solicitud de desistimiento.

Sobre este punto, el Segundo Tribunal Colegiado en Materia Administrativa del Cuarto Circuito en un criterio aplicable analógicamente al caso en concreto, reconoció que si la personalidad de un representante está siendo impugnada, entonces **no puede reconocérsele efecto alguno a un intento de desistimiento** <u>hasta en tanto se resuelva dicha cuestión de personalidad</u>:

> "**SOBRESEIMIENTO POR DESISTIMIENTO DEL JUICIO DE AMPARO FUERA DE LA AUDIENCIA CONSTITUCIONAL POR UNO DE LOS REPRESENTANTES DEL QUEJOSO. ES IMPROCEDENTE CUANDO ESA REPRESENTACIÓN ESTÁ EN DISPUTA**. De la interpretación de los artículos 4o., 8o. y 14 de la Ley de Amparo, a la luz del principio de certeza jurídica que exige que la situación de las partes en el juicio no sea modificada más que por procedimientos regulares, establecidos previamente, debe considerarse que la personalidad de quien se desiste expresamente del juicio de garantías debe estar debidamente acreditada y, por tanto, es condición sine qua non que exista plena seguridad de que quien lo hace, real y efectivamente represente al quejoso para que proceda el sobreseimiento conforme al artículo 74, fracción I, de la ley de la materia. En tal virtud, **si a la instancia constitucional comparecen diversos profesionistas quienes se disputan mutuamente el reconocimiento como representantes del quejoso,** <u>es improcedente sobreseer fuera de la audiencia constitucional por el desistimiento expresado por uno de ellos, dada la falta de certeza de esa representación pues, en todo caso, este punto será materia de la sentencia en donde habrán de tomarse en cuenta las constancias que durante la tramitación se aporten o incidan en el ánimo decisorio para resolver lo atinente al desistimiento.</u> Estimar lo contrario implicaría concluir el juicio sin tener certidumbre sobre la representación del quejoso y sin valorar la totalidad de las constancias que pudieran presentarse, incluso en la audiencia constitucional,** en contravención a la garantía de justicia completa y efectiva contenida en el artículo 17 de la Constitución Política de los Estados Unidos Mexicanos."[35]

[Énfasis añadido]

Siendo evidente que, contrario a lo que sostiene el Juzgado Responsable, el criterio de mérito **es plenamente aplicable al caso en concreto aun y cuando haya sido pronunciado en un juicio de amparo,** pues las cuestiones de personalidad son **connaturales a cualquier procedimiento judicial,** además de que es posible aplicar precedentes **de manera analógica.**

---

[35] Registro digital: 2000903 TCC;10a. Época;Semanario Judicial de la Federación y su Gaceta;IV.2o.A.3 K (10a.) ;TA



En ese orden de ideas, el incumplimiento de cualquiera de los presupuestos procesales **impide la constitución válida de la relación jurídica,** siendo uno de ellos que las partes estén debidamente representadas. Por lo tanto, ante la falta del presupuesto de personalidad, los actos realizados por uno de ellos **son nulos.** Lo anterior con fundamento en las siguientes tesis de la Primera Sala de la Suprema Corte de Justicia de la Nación:

> **"FALTA DE PERSONALIDAD. NO ES VÁLIDO SUBSANARLA MEDIANTE LA RATIFICACIÓN DE LO ACTUADO POR QUIEN CARECE DE ELLA.** La ratificación de las partes sobre lo actuado en juicio por quien no tiene su representación, no es un medio válido para subsanar la falta de personalidad a que se refiere el artículo 41 del Código de Procedimientos Civiles para el Distrito Federal. Lo anterior, ya que la ratificación se encuentra prevista en los artículos 1802, 1896, 1906, 2234 y 2583 del Código Civil para dicha entidad, con el fin de salvar la ineficacia originaria de los actos efectuados por otro sin poder, consistentes en la celebración de contratos, la gestión de negocios, los actos celebrados por el mandatario traspasando los límites expresos del mandato, o para extinguir la acción de nulidad de los actos jurídicos cuya invalidez es relativa, mediante el cumplimiento voluntario por medio del pago, novación o de cualquier otro modo; dichos supuestos no tienen lugar tratándose de los actos llevados a cabo dentro de un procedimiento judicial, porque en éste existe una relación jurídica de carácter público, pues implica el ejercicio de la función estatal de la jurisdicción, donde el incumplimiento de cualquiera de sus presupuestos impide la constitución válida de la relación jurídica, y uno de ellos consiste en que la parte esté debidamente representada. Ante esa situación, la falta del presupuesto no puede convalidarse con la mera voluntad de una de las partes con la pretensión de conferir el mandato con efectos retroactivos, dentro del juicio."[36]

> **"FALTA DE PERSONALIDAD. EL DEFECTO SUBSANABLE SÓLO RECAE EN SU PRUEBA Y NO EN LA EXISTENCIA DEL PRESUPUESTO PROCESAL.** Del artículo 41, en relación con los artículos 35, fracción IV, 36, 47, 95, fracción I, 272-A y 272-C, todos del Código de Procedimientos Civiles para el Distrito Federal, se advierte que los defectos a subsanar cuando se declara fundada la excepción de falta de personalidad en el actor, o de la impugnación respecto a la del demandado, son los defectos formales de la prueba material de dicho presupuesto procesal, que ordinariamente consiste en un documento, sea aquel donde se otorga el poder, mandato o representación para comparecer a juicio a nombre de otro, o aquel donde consta el nombramiento del cargo para el cual se confiere la representación legal, o el acta de la sociedad donde se asientan las facultades conferidas al mandatario, o algún otro; esto, bajo la premisa de que la representación sí fue conferida pero se encuentra deficientemente probada por una cuestión de forma en el medio probatorio que impide su comprobación; es decir, en el contexto del citado artículo 41, subsanar significa reparar o remediar el defecto de la prueba de la personalidad y no la oportunidad para exhibir otro mandato o algún otro medio donde se otorgue la representación que antes no se tenía, con pretensión de que surta efectos retroactivos. Esto es así, porque como la personalidad es un presupuesto procesal, sólo ante su existencia se logra integrar válidamente la relación procesal, de lo contrario, son inválidas las actuaciones llevadas a cabo por el falso representante; de ahí que la presentación del nuevo poder en donde, a diferencia del anterior, sí se confiera la representación, a lo sumo podría conducir, en el caso del demandado, a reconocer su personalidad a partir de ese momento, pero no respecto de los actos previos en que se carecía de ella."[37]

De las tesis anteriores se evidencia que, debido a que la falta de personalidad de una de las partes **no es subsanable dentro de juicio,** aunado al hecho de que el incidente de falta de personalidad constituye una resolución previa y de especial pronunciamiento porque se trata de un elemento **esencial para el dictado de la sentencia,** el Juzgado Responsable resolvió ilegal e

---

[36] Registro digital: 2005131 SCJN; 10a. Época; Gaceta del Semanario Judicial de la Federación; 1a. CCCLVII/2013 (10a.) ; TA; Publicación: viernes 13 de diciembre de 2013 13:20 h

[37] Registro digital: 2005129 SCJN; 10a. Época; Gaceta del Semanario Judicial de la Federación; 1a. CCCLIII/2013 (10a.) ; TA; Publicación: viernes 13 de diciembre de 2013 13:20 h



indebidamente el desistimiento del concurso mercantil sin antes analizar la personalidad de los Sedicentes Apoderados.

Precisamente por esta razón es por la cual el incidente de falta de personalidad debe ser resuelto de forma previa, de plano, con especial pronunciamiento. Toda actuación realizada por alguien que **no tenga facultades o atribuciones dentro de un juicio determinado será <u>inválida siempre y nunca se convalidara.</u>**

En esos términos, es claro que el Juzgado Responsable debió haber resuelto en primer lugar, el incidente de falta de personalidad de las personas promovido en contra del Sedicente Apoderado de Controladora, sin dar previamente trámite a su solicitud de desistimiento; lo anterior, más aun si se toma en consideración que se **desconocía la personalidad de la persona que <u>solicitaba el desistimiento de un concurso mercantil,</u>** por lo que la trascendencia de dicha resolución ameritaba estudiar primero la personalidad del solicitante y después, con base en lo resuelto en el incidente, estudiar la solicitud de desistimiento.

Sobre este punto, el Segundo Tribunal Colegiado en Materia Administrativa del Cuarto Circuito en un criterio aplicable analógicamente al caso en concreto, reconoció que si la personalidad de un representante está siendo impugnada, entonces **no puede reconocérsele efecto alguno a un intento de desistimiento <u>hasta en tanto se resuelva dicha cuestión de personalidad</u>**:

> "**SOBRESEIMIENTO POR DESISTIMIENTO DEL JUICIO DE AMPARO FUERA DE LA AUDIENCIA CONSTITUCIONAL POR UNO DE LOS REPRESENTANTES DEL QUEJOSO. ES IMPROCEDENTE CUANDO ESA REPRESENTACIÓN ESTÁ EN DISPUTA.** De la interpretación de los artículos 4o., 8o. y 14 de la Ley de Amparo, a la luz del principio de certeza jurídica que exige que la situación de las partes en el juicio no sea modificada más que por procedimientos regulares, establecidos previamente, debe considerarse que la personalidad del que se desiste expresamente del juicio de garantías debe estar debidamente acreditada y, por tanto, es condición sine qua non que exista plena seguridad de que quien lo hace, real y efectivamente represente al quejoso para que proceda el sobreseimiento conforme al artículo 74, fracción I, de la ley de la materia. En tal virtud, **si a la instancia constitucional comparecen diversos profesionistas quienes se disputan mutuamente el reconocimiento como representantes del quejoso, <u>es improcedente sobreseer fuera de la audiencia constitucional por el desistimiento expresado por uno de ellos, dada la falta de certeza de esa representación pues, en todo caso, este punto será materia de la sentencia en donde habrán de tomarse en cuenta las constancias que durante la tramitación se aporten o incidan en el ánimo decisorio para resolver lo atinente al desistimiento.</u>** Estimar lo contrario implicaría concluir el juicio sin tener certidumbre sobre la representación del quejoso y sin valorar la totalidad de las constancias que pudieran presentarse, incluso en la audiencia constitucional,** en contravención a la garantía de justicia completa y efectiva contenida en el artículo 17 de la Constitución Política de los Estados Unidos Mexicanos."[38]

[Énfasis añadido]

Como se puede advertir de dicho criterio, el Tribunal Colegiado consideró lógicamente que si comparecen a un procedimiento judicial dos personas distintas, existiendo controversia sobre la legitimación de una de ellas, y ésta se desiste del procedimiento, es evidente que **dicho**

---

[38] Registro digital: 2000903 TCC;10a. Época;Semanario Judicial de la Federación y su Gaceta;IV.2o.A.3 K (10a.) ;TA



**desistimiento no puede surtir efectos sin antes resolverse lo atinente al problema de personalidad presentado**, de lo contraría se resolvería el juicio sin tener certidumbre de la representación, **en contravención al artículo 17 de la Constitución Federal**.

Siendo evidente que, contrario a lo que sostiene el Juzgado Responsable, el criterio de mérito **es plenamente aplicable al caso en concreto aun y cuando haya sido pronunciado en un juicio de amparo**, pues las cuestiones de personalidad son **connaturales a cualquier procedimiento judicial**, además de que es posible aplicar precedentes **de manera analógica**.

En ese mismo orden de ideas, también es aplicable el siguiente criterio judicial:

> **"INCIDENTE DE FALTA DE PERSONALIDAD EN EL JUICIO DE AMPARO. TAMBIÉN ES ADMISIBLE CUANDO LA DISPUTA DE LA REPRESENTACIÓN LEGAL SEA ENTRE INDIVIDUOS QUE DICEN TENERLA SOBRE LA MISMA PARTE QUEJOSA.** Del análisis conjunto de las ejecutorias emitidas por la Primera y la Segunda Salas de la Suprema Corte de Justicia de la Nación, que dieron lugar a las tesis de jurisprudencia 1a./J. 42/2008 y 2a./J. 203/2010, publicadas en el Semanario Judicial de la Federación y su Gaceta, Novena Época, Tomo XXVIII, julio de 2008, página 258 y Tomo XXXIII, febrero de 2011, página 917, de rubros: "INCIDENTE DE FALTA DE PERSONALIDAD EN EL JUICIO DE AMPARO. AL SER DE PREVIO Y ESPECIAL PRONUNCIAMIENTO, DEBE ADMITIRSE Y RESOLVERSE CONFORME A LA SEGUNDA REGLA PREVISTA EN EL ARTÍCULO 35 DE LA LEY DE AMPARO." y "QUEJA PREVISTA EN LA FRACCIÓN VI DEL ARTÍCULO 95 DE LA LEY DE AMPARO. PROCEDE CONTRA EL AUTO QUE DESECHA EL INCIDENTE DE FALTA DE PERSONALIDAD O LA RESOLUCIÓN DE FONDO DICTADA EN ÉL.", respectivamente, se establecen diversas premisas relacionadas con el objeto y la procedencia del incidente de falta de personalidad en el juicio de amparo, obtenidas de la interpretación que del Máximo Tribunal del País ha brindado al artículo 35 de la Ley de Amparo abrogada, a saber, que: 1) La personalidad debe estudiarse en forma preferente, sin esperar a que se dicte la sentencia definitiva, para averiguar si la deficiente o la falta de comprobación de este aspecto, afecta o no a alguna de las partes; 2) El representado en el juicio de amparo debe tener la seguridad de que la actuación de su representante tendrá un efecto válido en él y en su contraparte, y la convicción de que los trámites y diligencias que lleve a cabo son efectivos y legales; 3) El propósito de la incidencia de mérito es dar certeza en el procedimiento de amparo; 4) Corresponde al Juez de amparo analizar la personalidad de las partes considerando que la materia del debate no son intereses puramente privados sino salvaguardar el orden constitucional, por lo que, en esa virtud, dicho juzgador y, en su caso, el tribunal de alzada, tienen la facultad de analizar la personalidad del promovente de la demanda, sin necesidad de que medie queja o instancia del tercero perjudicado, de las autoridades responsables o del Ministerio Público; y, 5) El referido precepto permite la impugnación de la personalidad de los sujetos que comparecen en representación de alguna de las partes en el juicio de amparo, a través de un incidente que se resuelve de plano y sin mayor trámite o forma de sustanciación, dentro del mismo expediente principal, por lo cual, requiere de un pronunciamiento previo y especial, que amerita que se decida antes de llegar al fondo del asunto, pues su resolución anticipada condiciona la emisión de la sentencia principal. Por tanto, en atención a ello, el incidente de mérito es admisible también cuando la disputa de la representación legal sea entre individuos que dicen tenerla sobre la misma parte quejosa pues, finalmente, lo que se encuentra en controversia es una cuestión de personalidad; lo que viene a justificar la promoción de dicho incidente."[39]

En ese orden de ideas, contrario a lo sostenido por el Juzgado Responsable, lo cierto es que el incidente de falta de personalidad en ningún momento "careció de materia", sino que tenía por objeto claro impugnar la ilegal representación ostentada por los Sedicentes Apoderados y, en

---

[39] Registro digital: 2006629 TCC;10a. Época;Gaceta del Semanario Judicial de la Federación;VIII.A.C.12 K (10a.) ;TA; Publicación: viernes 06 de junio de 2014 12:30 h



consecuencia, **debía resolverse de manera anterior y preferente a cualquier otra cuestión, incluyendo evidentemente la solicitud de desistimiento de concurso mercantil formulada**.

Por lo tanto, contrario a lo que sostiene el Juzgado Responsable en el Auto Reclamado, es evidente que su actuar fue ilegal a preferir la resolución sobre la solicitud del desistimiento presentada por los Sedicentes Apoderados sobre la resolución del incidente de falta de personalidad presentado.

Ahora bien, no pasa desapercibido el diverso argumento sostenido por el Juzgado Responsable en el sentido de que no había reconocido la personalidad de los Sedicentes Apoderados y que en el auto de 7 de abril de 2025 se limitó simplemente a "*dar acceso al expediente*" a éstos, por lo que el incidente de falta de personalidad carecía de materia.

Sobre este punto, es necesario partir de la premisa de que el hecho de que al momento de la presentación del incidente no se hubiera reconocido expresamente la personalidad de los Sedicentes Apoderados **no implica de manera automática que éste careciera de materia**. Como ha sido demostrado, dicho incidente tiene por objeto impugnar la representación general de los Sedicentes Apoderados y, en consecuencia, demostrar que éstos **carecían de cualquier facultad para actuar en representación de Controladora**.

En ese orden de ideas, la materia del incidente subsiste **con independencia de un reconocimiento expreso de la personalidad de los Sedicentes Apoderados** siendo que, como ha sido debidamente demostrado, **dicho incidente debía ser resuelto con anterioridad y preferencia a cualquier reconocimiento de validez a las actuaciones de dichas personas**.

No obstante lo anterior, lo cierto es que en el auto de 7 de abril de 2025 el Juzgado Responsable **sí reconoció, aunque sea implícitamente, la personalidad ostentada por los Sedicentes Apoderados**. Ello se afirma pues, contrario a lo que sostiene el Juzgado Responsable, no es posible únicamente "*dar acceso al expediente*" a una persona sin antes reconocerle el carácter de parte en el juicio.

Lo anterior pues ni la Ley de Concursos Mercantiles, ni el Código Federal de Procedimientos Civiles, ni el Código de Comercio prevén alguna figura o facultad una persona que no es parte en un procedimiento judicial pueda tener acceso a un expediente sin que previamente se haya reconocido su carácter como parte en dicho procedimiento; por el contrario, dicho reconocimiento **es necesario para estar facultado para consultar cualquier expediente judicial**.

Por lo tanto, es claro que el Juzgado Responsable sí había formulado un reconocimiento implícito de la personalidad ostentada por los Sedicentes Apoderados, lo que refuerza el hecho de que el incidente de falta de personalidad **no carecía de materia y debió haber sido resuelto previo a acordar favorable la solicitud de desistimiento**.



Aunado a lo anterior, no debe pasar desapercibido que también estaba pendiente de resolución la Recurso de Revocación con Reconocimiento de Sedicente Apoderado (interpuesto precisamente en contra del auto de 7 de abril de 2025), en la cual también se impugnaba el reconocimiento de personalidad del Sedicente Apoderado.

Lo anterior, refuerza el hecho de que el reconocimiento de la personalidad de dicho supuesto apoderado estaba, por decir lo menos, *sub judice*, al haber sido impugnada la decisión del Juzgado Responsable de reconocer personalidad al Sedicente Apoderado.

En consecuencia, el Juzgado Responsable **no estaba facultado para reconocer las actuaciones del Sedicente Apoderado de Controladora sino hasta la resolución de dicho recurso de revocación**, ya que es evidente que un auto no puede ser ejecutado ni surtir efcetos sino hasta que causare cosa juzgada:

> "**SENTENCIAS DE SEGUNDA INSTANCIA EN MATERIA MERCANTIL. NO CAUSAN ESTADO MIENTRAS EXISTA PENDIENTE EL JUICIO DE AMPARO CORRESPONDIENTE.** Aunque es verdad que el juicio de amparo no es una tercera instancia sino un juicio de constitucionalidad o de legalidad cuya materia está constituida por cuestiones jurídicas distintas de las que lo son en el juicio del que emana el acto reclamado, puesto que en éste la autoridad judicial decide sobre los derechos y obligaciones controvertidos por las partes, y en aquél lo que se juzga es si los actos de dicha autoridad son o no violatorios de las garantías constitucionales invocadas por la quejosa; y aunque es verdad también que la autoridad responsable juega en el amparo el papel de parte demandada, mientras que en el juicio ordinario funge como órgano de justicia, y aunque es también cierto, por último, que de conformidad con el texto expresa del artículo 1343 del Código de Comercio "la sentencia de segunda instancia causará ejecutoria, confirme o revoque la de primera, y cualquiera que sea el interés que en el litigio se verse"; sin embargo, debe decirse que atento el principio de la jerarquía de las leyes propio de nuestro régimen federal, por virtud del cual la Constitución y su ley orgánica del amparo están supraordenadas a las otras leyes, de tal manera que, aun cuando conforme al texto expreso del invocado precepto del Código de Comercio, las sentencias de segunda instancia causan ejecutoria, constituyendo cosa juzgada, lo cierto es que estableciendo el juicio de amparo nuestra Constitución Federal, y siendo esa la Ley Suprema de toda la Unión (artículo 133), de ello resulta que no es dable, bajo ningún concepto, que se pueda considerar que las repetidas sentencias tengan la certeza y autoridad de la cosa juzgada, puesto que contra ellas existe el medio de impugnación constitucional de amparo, y de ahí que la disposición contenida en el referido artículo 1343 del Código de Comercio debe entenderse únicamente en cuanto a que no admite ya ningún recurso ordinario establecido por dicho código. Por tanto, cuando procede el amparo directo contra sentencias de segunda instancia, tiene que admitirse que el fallo que está impugnado en la vía extraordinaria no causa estado sino hasta que su tramitación concluye por la resolución que recae en el juicio de amparo correspondiente, y mientras esto no ocurre, el pleito continúa sub judice."[40]

> "**SENTENCIAS DE SEGUNDA INSTANCIA. NO CAUSAN ESTADO MIENTRAS EXISTA PENDIENTE EL JUICIO DE AMPARO CORRESPONDIENTE**. Es cierto que de acuerdo con el artículo 426 del Código de Procedimientos Civiles para el Distrito y Territorios Federales, la sentencia de segunda instancia pone término al juicio y, por lo tanto, causa ejecutoria por ministerio de la ley. Esto es verdad, sin embargo, únicamente en cuanto que no admite ya ningún recurso ordinario establecido por la ley común, puesto que el citado precepto nada dice, ni existe disposición alguna en el Código Procesal Civil, en relación a los fallos de segunda grado. Empero, la fracción III del artículo 107 constitucional, dispone que el amparo directo es procedente contra sentencias definitivas, dictadas en el juicio del orden civil, respecto de las cuales se han agotado los recursos ordinarios establecidos por la ley. Por tanto,

---

[40] Registro digital: 241851 SCJN;7a. Época;Semanario Judicial de la Federación ;TA

Clyde&Co

cuando procede el amparo directo contra sentencias de segunda instancia, tiene que admitirse que el fallo que está impugnado en la vía extraordinaria, no causa estado sino hasta que su tramitación concluye por la resolución que recae en el juicio de amparo correspondiente, y mientras esto no ocurre, el pleito continua subjudice."[41]

Por las razones antes expuestas, el Juzgado Responsable violó el principio de seguridad jurídica, el derecho de acceso a la justicia y el principio de economía procesal, toda vez que declaró el desistimiento del concurso mercantil a pesar de que estaba pendiente la resolución de un incidente de falta de personalidad promovido en contra del propio solicitante de dicho desistimiento, en flagrante contravención a lo dispuesto por el ordenamiento jurídico mexicano.

## SEGUNDO. EL JUZGADO RESPONSABLE VIOLÓ EL PRINCIPIO DE CONTRADICCIÓN AL RESOLVER LA VALIDEZ DE LA REPRESENTACIÓN Y FACULTADES DE LOS SEDICENTES APODERADOS SIN QUE ANTES SE AGOTARA UN PROCEDIMIENTO PARA ELLO.

<u>Síntesis.</u> En el Auto Reclamado, el Juzgado Responsable sostiene que fue legal el reconocimiento de efectos al desistimiento formulado por los Sedicentes Apoderados pues éstos basaron su legitimación en la Supuesta RUA, la cual fue adoptada por CI Banco como accionista mayoritario y, por lo tanto, gozaba de presunción de legalidad y autenticidad. En ese orden de ideas, el Juzgado Responsable violó el principio de contradicción y de debido proceso en perjuicio de Controladora pues sostiene la validez de la Supuesta RUA a pesar de que ésta fue impugnada en el incidente de falta de personalidad que no fue debidamente tramitado y, por lo tanto, no se escuchó ni venció a Controladora respecto a los motivos por los cuales dicha resolución carecía de cualquier efecto jurídico.

<u>Desarrollo.</u>

a. <u>Debido Proceso, garantía de audiencia y el principio de contradicción.</u>

Se puede definir el derecho al debido proceso como la facultad de toda persona "a ser oída públicamente y con justicia por un tribunal independiente e imparcial, para la determinación de sus derechos y obligaciones o para el examen de cualquier acusación contra ella en materia penal."[42]

La doctrina internacional[43], reconoce el derecho de toda persona para recurrir a los tribunales y hacer valer sus derechos mediante un procedimiento sencillo y breve por el cual la justifica lo ampare contra actos de la autoridad que violen en su perjuicio derechos fundamentales.

---

[41] Registro digital: 269673 SCJN;6a. Época;Semanario Judicial de la Federación ;TA
[42] Artículo 10 del a Declaración Universal de Derechos Humanos.
[43] Por ejemplo, la Declaración Americana de Derechos y Deberes del Hombre en su artículo XVIII



Por ejemplo, la Declaración Universal de los Derechos Humanos define el derecho al debido proceso como "el conjunto de condiciones y requisitos de carácter jurídico y procesal que son necesarios para poder afectar legalmente los derechos de los gobernados." [44]

Asimismo, la doctrina ha reconocido que el derecho al debido proceso protege diversos aspectos e implica una serie de prerrogativas a favor del gobernado, como lo son:

i. La exigencia de un proceso previo en el que se cumplan las formalidades esenciales del procedimiento.

ii. Prohibición de tribunales especiales y leyes privativas.

iii. Restricción de la jurisdicción militar.

iv. Derecho o garantía de audiencia.

v. Fundamentación y motivación de las resoluciones dictadas por autoridad competentes. [45]

Como se podrá desprender de la amplia definición establecida anteriormente, el debido proceso tiene diversas facetas construidas a favor del gobernado, que buscan que cualquier controversia sea resuelta por un auténtico tribunal imparcial, que permita la exposición de las pretensiones aducidas por las partes y el ejercicio de sus acciones, protegiéndolas de la comisión de cualquier arbitrariedad en su perjuicio.

En el ordenamiento jurídico mexicano, el derecho al debido proceso está consagrado en los artículos 14 y 16 de la Constitución General, al respecto:

> "Artículo 14. A ninguna ley se dará efecto retroactivo en perjuicio de persona alguna.
>
> Nadie podrá ser privado de la libertad o de sus propiedades, posesiones o derechos, sino mediante juicio seguido ante los tribunales previamente establecidos, en el que se cumplan las formalidades esenciales del procedimiento y conforme a las Leyes expedidas con anterioridad al hecho.
>
> En los juicios del orden criminal queda prohibido imponer, por simple analogía, y aún por mayoría de razón, pena alguna que no esté decretada por una ley exactamente aplicable al delito de que se trata.
>
> En los juicios del orden civil, la sentencia definitiva deberá ser conforme a la letra o a la interpretación jurídica de la ley, y a falta de ésta se fundará en los principios generales del derecho."
>
> *
>
> "Artículo 16. Nadie puede ser molestado en su persona, familia, domicilio, papeles o posesiones, sino en virtud de mandamiento escrito de la autoridad competente, que funde y motive la causa legal del procedimiento. En los juicios y procedimientos seguidos en forma de juicio en los que se establezca como regla la oralidad, bastará con que quede constancia de ellos en cualquier medio que dé certeza de su contenido y del cumplimiento de lo previsto en este párrafo."

---

[44] Artículo 10 Toda persona tiene derecho, en condiciones de plena igualdad, a ser oída públicamente y con justicia por un tribunal independiente e imparcial, para la determinación de sus derechos y obligaciones o para el examen de cualquier acusación contra ella en materia penal.

[45] Cipriano Gómez Lara. (2006). El debido proceso como derecho humano. México: UNAM.



La doctrina jurisprudencial mexicana, por su parte, ha definido el derecho al debido proceso de la siguiente forma:

"**GARANTIA DE DEBIDO PROCESO LEGAL CONTENIDA EN EL ARTICULO 14 CONSTITUCIONAL. DEFINICION**. La garantía de debido proceso legal consagrada en el artículo 14 constitucional, en la parte relativa a que los juicios deben llevarse a cabo ante autoridad competente, cumpliendo con "... las formalidades esenciales del procedimiento..." implica necesariamente que los procedimientos jurisdiccionales seguidos ante las autoridades respectivas, se tramiten conforme a las disposiciones procesales exactamente aplicables al caso concreto, pues de lo contrario se transgrede el derecho positivo y, por ende, se actualiza la infracción a la garantía de que se trata."[46]

Como se puede desprender de la tesis transcrita, la doctrina jurisprudencial mexicana ha buscado sintetizar la protección buscada por el derecho al debido proceso en lo que denomina como "formalidades esenciales del procedimiento", resulta relevante el siguiente criterio jurisprudencial:

"**DERECHO AL DEBIDO PROCESO. SU CONTENIDO**. Dentro de las garantías del debido proceso existe un "núcleo duro", que debe observarse inexcusablemente en todo procedimiento jurisdiccional, y otro de garantías que son aplicables en los procesos que impliquen un ejercicio de la potestad punitiva del Estado. Así, en cuanto al "núcleo duro", las garantías del debido proceso que aplican a cualquier procedimiento de naturaleza jurisdiccional son las que esta Suprema Corte de Justicia de la Nación ha identificado como formalidades esenciales del procedimiento, cuyo conjunto integra la "garantía de audiencia", las cuales permiten que los gobernados ejerzan sus defensas antes de que las autoridades modifiquen su esfera jurídica definitivamente. Al respecto, el Tribunal en Pleno de esta Suprema Corte de Justicia de la Nación, en la jurisprudencia P./J. 47/95, publicada en el Semanario Judicial de la Federación y su Gaceta, Novena Época, Tomo II, diciembre de 1995, página 133, de rubro: "FORMALIDADES ESENCIALES DEL PROCEDIMIENTO. SON LAS QUE GARANTIZAN UNA ADECUADA Y OPORTUNA DEFENSA PREVIA AL ACTO PRIVATIVO.", sostuvo que las formalidades esenciales del procedimiento son: (i) la notificación del inicio del procedimiento; (ii) la oportunidad de ofrecer y desahogar las pruebas en que se finque la defensa; (iii) la oportunidad de alegar; y, (iv) una resolución que dirima las cuestiones debatidas y cuya impugnación ha sido considerada por esta Primera Sala como parte de esta formalidad. Ahora bien, el otro núcleo es identificado comúnmente con el elenco de garantías mínimo que debe tener toda persona cuya esfera jurídica pretenda modificarse mediante la actividad punitiva del Estado, como ocurre, por ejemplo, con el derecho penal, migratorio, fiscal o administrativo, en donde se exigirá que se hagan compatibles las garantías con la materia específica del asunto. Por tanto, dentro de esta categoría de garantías del debido proceso, se identifican dos especies: la primera, que corresponde a todas las personas independientemente de su condición, nacionalidad, género, edad, etcétera, dentro de las que están, por ejemplo, el derecho a contar con un abogado, a no declarar contra sí mismo o a conocer la causa del procedimiento sancionatorio; y la segunda, que es la combinación del elenco mínimo de garantías con el derecho de igualdad ante la ley, y que protege a aquellas personas que pueden encontrarse en una situación de desventaja frente al ordenamiento jurídico, por pertenecer a algún grupo vulnerable, por ejemplo, el derecho a la notificación y asistencia consular, el derecho a contar con un traductor o intérprete, el derecho de las niñas y los niños a que su detención sea notificada a quienes ejerzan su patria potestad y tutela, entre otras de igual naturaleza."[47]

Como se puede desprender de la tesis citada, se han reconocido como formalidades esenciales del procedimiento las siguientes: *(i)* la notificación o emplazamiento al procedimiento; *(ii)* la

---

[46] [TA]; 9a. Época; T.C.C.; S.J.F. y su Gaceta; Tomo III, Junio de 1996; Pág. 845. I.8o.C.13 K .

[47] SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;1a./J. 11/2014 (10a.) ;J; Publicación: viernes 28 de febrero de 2014 11:02 h



oportunidad de ofrecer y desahogar pruebas; *(iii)* la oportunidad de alegar; *(iv)* la sentencia o resolución.

Por su parte, cuando se trata de actos de molestia o privativos, el derecho al debido proceso adquiere especial relevancia pues se establece como una carga en contra de las autoridades, de tal suerte que, <u>sin observar las formalidades esenciales del procedimiento, no pueden emitir acto de molestia alguno</u>. Al respecto, resulta relevante la siguiente tesis:

> **"DERECHO AL DEBIDO PROCESO. EL ARTÍCULO 14 CONSTITUCIONAL PREVÉ DOS ÁMBITOS DE APLICACIÓN DIFERENCIADOS**. La Primera Sala de la Suprema Corte de Justicia de la Nación, en la tesis aislada 1a. LXXV/2013 (10a.), publicada en el Semanario Judicial de la Federación y su Gaceta, Décima Época, Libro XVIII, Tomo 1, marzo de 2013, página 881, de rubro: "DERECHO AL DEBIDO PROCESO. SU CONTENIDO.", estableció que el citado precepto constitucional contiene el derecho humano al debido proceso, integrado por un núcleo duro de formalidades esenciales del procedimiento, las cuales permiten que los gobernados ejerzan sus defensas antes de que las autoridades modifiquen su esfera jurídica en forma definitiva. Sin embargo, entendido como derecho esencialmente destinado a otorgar un derecho de defensa, es posible identificar en los precedentes de esta Suprema Corte de Justicia de la Nación, dos ámbitos de aplicación diferenciados. Desde una primera perspectiva, dicho derecho se ocupa del ciudadano, que es sometido a un proceso jurisdiccional al ser destinatario del ejercicio de una acción que, de resultar procedente y fundada, llevaría a la autoridad judicial a emitir un acto privativo en su contra, en cuyo caso la autoridad debe verificar que se cumpla con las formalidades esenciales del procedimiento, a fin de otorgar al sujeto pasivo de la relación procesal la posibilidad de una defensa efectiva, por lo cual se debe garantizar que se le notifique del inicio del procedimiento y de sus consecuencias; se le dé el derecho de alegar y ofrecer pruebas, y se le asegure la emisión de una resolución que dirima las cuestiones debatidas. Sin embargo, el debido proceso también puede entenderse desde la perspectiva de quien insta la función jurisdiccional del Estado para lograr reivindicar un derecho y no tanto defenderse del mismo, en cuyo caso se ubica en una posición, al interior de un juicio, de cuya suerte depende el ejercicio de un derecho, el cual en caso de no dirimirse adecuadamente podría tornar nugatorio su derecho. Así, bajo esta segunda perspectiva, se entiende que dicho derecho humano permite a los justiciables acceder a los órganos jurisdiccionales para hacer valer sus derechos y defender sus intereses de forma efectiva y en condiciones de igualdad procesal, esto es, exige un procedimiento que otorgue a las partes igual oportunidad de defender sus puntos de vista y ofrecer pruebas en apoyo de sus pretensiones."[48]

En el marco de las formalides esenciales del procedimientos y, en general, del derecho al debido proceso, existen ciertos principios fundamentales que deben respetarse.

Uno de ellos es el llamado "principio de contradicción."

La Suprema Corte de Justicia de la Nación[49] ha definido este principio como aquel que "garantiza que el proceso sea una verdadera contienda argumentativa en que sea refutable cualquier elemento discursivo o probatorio y que no se favorezca la pretensión de una de las partes sin demostrarse por qué la contraria no lo supeera, asegurando la calidad de la información que es dada al Juez o Tribunal."

---

[48] SCJN;10a. Época;Semanario Judicial de la Federación y su Gaceta;1a. CCLXXVI/2013 (10a.) ;TA
[49] Amparo Directo en Revisión 225/2019

CLYDE&CO

A su vez, sostiene que el principio de contradicción "hace posible el enfrentamiento entre las partes, permitiendo el conocimiento de los argumentos de la contraria y la manifestación ante el Juez o Tribunal de los propios, por lo que constituye una exigencia ineludible vinculada al derecho a un proceso público con todas las garantías, <u>para cuya observancia se requiere el deber de los órganos judiciales de posibilitarlo</u>."

En el Amparo Directo en Revisión 243/2017, la Primera Sala de la Suprema Corte de Justicia de la Nación sostuvo que el principio de contradicción se manifiesta desde dos diferentes vertientes complementarias: como derecho de defensa y como una garantía en la formación de la prueba, al respecto:

> "Conceptualmente el principio de contradicción se manifiesta desde dos diferentes vertientes complementarias: como un derecho de defensa  y como una garantía en la formación de la prueba.
>
> **Cuando se habla del derecho de defensa o de audiencia se hace referencia a la <u>consideración del principio de contradicción desde la perspectiva de un derecho de todas las partes en el proceso, cuyo contenido esencial radica en la exigencia de ser oído, en el sentido de que puedan alegar y probar para conformar la sentencia, que conozcan y puedan rebatir todos los materiales de hecho y de derecho que puedan influir en la emisión del fallo judicial</u>.**
>
> **En este sentido, <u>como consecuencia del clásico principio audiatur et altera pars (óigase a la otra parte), resulta como primera derivación de este principio la imposibilidad de proceder a la condena de cualquier persona sin que previamente sea oída en la causa</u>.**
>
> (…)
> En ese sentido, la observancia del referido principio exige que toda afirmación, petición o pretensión formulada por una de las partes en el proceso, debe ponerse en conocimiento de la contraria para que ésta pueda expresar su conformidad u oposición manifestando sus propias razones. Desde este enfoque, el principio en estudio niega la posibilidad de que exista prueba oculta. El conocimiento de los elementos probatorios y de la evidencia física, que serán objeto de prueba en el juicio es la condición que permite el ejercicio del contradictorio en la audiencia de juicio. De manera que las pruebas practicadas a espaldas de las partes, que se conserven en secreto o que sean conocidas solamente por el juez antes de la sentencia, carecerán de valor probatorio, por vulnerar el derecho de defensa de la parte a quien perjudique.
>
> De ahí que en esta vertiente, el principio de contradicción consiste en el indispensable interés de someter a refutación y contra argumentación la información, actos y pruebas de la contraparte, en un proceso jurisdiccional.
>
> Desde otro enfoque, en el aspecto probatorio, el principio de contradicción constituye una garantía en la formación de la prueba, aplicado concretamente a la producción de la prueba testimonial, el principio exige que la contraparte del oferente de la prueba –en una audiencia pública– tenga la oportunidad de contrainterrogar al sujeto de prueba sobre el contenido de sus afirmaciones, con el propósito de controvertir la credibilidad de su testimonio.
>
> En efecto, tal como lo sostuvo esta Primera Sala al resolver el amparo directo en revisión 3457/2013 , la credibilidad del testimonio puede controvertirse a través de las siguientes estrategias: (i) al cuestionar la forma en la que el testigo adquirió el conocimiento sobre los hechos que depone, de tal manera que se aclare si se trata de un conocimiento personal, de referencia o inferencial; o (ii) al debatir  la credibilidad de los atributos de la declaración, lo que puede llegar a poner en duda la veracidad del testimonio (argumentar que el testigo declara en contra de sus creencias), la objetividad de aquello que el testigo dice creer (argumentar que el testigo no formó sus creencias sobre los hechos que declara de acuerdo con un entendimiento objetivo de la evidencia que percibió con sus sentidos) o la calidad de la observación en la que se apoyó la declaración (argumentar que las



capacidades sensoriales del testigo no son óptimas, que el estado físico de éste al momento de percibir los hechos no era el más adecuado para esos efectos o que las condiciones en las que percibió esos hechos lo hacen poco fiable)."

[Énfasis añadido]

Conforme a lo transcrito, el principio de contradicción en su vertiente de derecho de defensa implica la posibilidad de que ambas partes sean oídas durante el procedimiento, de tal suerte que **puedan alegar y probar para conformar la sentencia**.

El principio de contradicción busca brindar a las partes igualdad de oportunidades a efecto que ambas sean debidamente escuchadas en juicio, que se escuche su "versión" y se les otorgue la oportunidad de refutar lo alegado por su contraparte.

Sobre la importancia del principio de contradicción, conviene tomar en consideración la opinión de Pietro Calamandrei:

> "Las partes son personas, es decir, sujetos de deberes y de derechos que no están situados frente al juez como súnditos, sometidos a su potestad y obligados a obedecerlo pasivamente, sino como ciudadamos libres y activos que tienen ante el juzgador no solo deberes que cumplir sino también derechos que resptar, por lo que el juez no debe estimarse únicamente como autoridad dotada de poderes, sino como un funcionario sujeto a deberes y responsabilidades frente a las partes, las que tienen derecho de hacer libremente sus razones y de ser escuchadass con atención.
>
> (…)
>
> El principio del contradictorio se parece como dos gotas de agua al principio de la oposición parlamentaria. Ambos están fundados sobre ciertas ideas tan simples que pueden parecer hasta ingenuas; o sea, que los hombres saben ser razonables, capaces de persuadir con buenas razones y dejarse convencer por las ajenas; que la verdad sólo puede conocerse en su integridad si se observa en sus diversos aspectos, dándole vueltas para descubrir sus tres dimensionaes y que el contradictor no es un enemigo, sino un colaborador, porque con sus objeciones ayuda a descubrir y corregir los errores alimentando la contienda de emulación, que constituye el estímulo y el fermento de todo progreso humano.
>
> (…)
>
> Por tanto, el contradictorio es indispensable en el procesos para no exarcebar la litigiosidad de las partes o para dar oportunidad a los aborgados para hacer ostentación de su elocuencia, sino en interés de la justicia y del juez, ya que precisamente en la contraposición dialéctica de las defensas contrarias encuentra fácilmente el medio más adecuado para descubrir toda la verdad, iluminada bajo sus más diversos aspectos."[50]

Como se puede desprender de la cita transcrita, el principio de contradicción como consecuencia del derecho al debido proceso, busca una participación equitativa de las partes en el procedimiento judicial.

Mediante la participación activa de las partes, se busca que el juzgador se allegue del mayor número de elementos que le permitan dilucidar los hechos de la controversia y acercarse, en esa medida, a un concepto de "verdad".

---

[50] Pietro Calamandrei. (1960). Proceso y Democracia. Buenos Aires, Argentina: Ediciones jurídicas Europa-América

CLYDE&CO

En suma, el principio de contradicción permite al juzgado cumplir con la finalidad de todo procedimiento judicial, es decir, la resolución de la controversia planteada **partiendo de una verdad probada por las partes en juicio**.

Para comprender la importancia y trascendencia del principio de contradicción en el procedimiento, es necesario partir de la premisa que a través del procedimiento judicial se busca resolver una controversia, a partir de los hechos que se dan a conocer por las partes.

En otras palabras, se puede decir que el fin de todo procesos judicial es conocer la "verdad" y resolver conforme a la misma.

Se puede definir la verdad como la existencia de coincidencia entre lo que se dice y los hechos que se describen. Por ejemplo, Heidegger[51] establece que "verdad es coincidencia. Tal coincidencia se da porque el enunciado se rige conforme aquello sobre lo cual dice."

En el caso del procedimiento judicial, el juez, escuchando a ambas partes, debe buscar llegar a un conocimiento de "verdad", es decir, de los hechos que realmente dieron origen a la controversia que se le plantea y, en consecuencia, resolver de conformidad con dicha "verdad."

El juez, como aplicador del derecho, tiene como tarea dilucidar los hechos que dieron origen a la controversia y aplicar las normas que coincidan con la controversia planteada. Solo existiendo esta coincidencia podemos afirmar que se cumplió con la finalidad del procedimiento judicial.

Para poder acercarse a un concepto de verdad dentro de cualquier procedimiento judicial, Michele Taruffo establece:

> "la condición más importante es que los hechos han de ser establecidos correctamente tomando como base los elementos de prueba relevantes y pertinentes, como condicicón necesaria para la correcta aplicación de las normas sustantivas"[52]

Para dicho autor, el conocimiento de la verdad es a través de la participación activa de las partes en el procedimiento judicial, como lo es a través del ofrecimiento de pruebas "relevantes y pertinentes."

Esta participación activa de las partes únicamente se logra mediante un pleno respecto al principio de contradicción.

En esencia, el juez debe velar en todo momento en escuchar a las partes, para cumplir con la finalidad del procedimiento judicial que dirige, esto es, **conocer la verdad a efecto de aplicar las normas que coincidan con la misma**.

---

[51] Heidegger, M. (2007). De la esencia de la verdad. (A. Ciria, Trad.) Madrid: Editorial Herder.
[52] Taruffo, M. (2008). La prueba. (J. Ferrer, Trad.) Barcelona: Editorial Marcial Pons.



Esta obligación debe privilegiarse incluso por encima de cualquier formalidad procesal que puedan establecer las leyes; circunstancia que es reconocida por nuestra Consititución Federal en su artículo 17, al respecto:

> "Artículo 17 (…) Siempre que no se afecte la igualdad entre las partes, el debido proceso u otros derechos en los juicios o procedimientos seguidos en forma de juicio, **las autoridades deberán privilegiar la solución del conflicto sobre los formalismos procedimentales**."

> [Énfasis añadido]

De todo lo expuesto hasta el momento es posible concluir que permitir la participación de las partes en el procedimiento judicial es esencial, limitar dicha participación, es decir, actuar de manera contraria al principio de contradicción, sería actuar de manera contraria a la finalidad misma del procedimiento judicial.

b.   El Juzgado Responsable violó el derecho al debido proceso, la garantía de audiencia y el principio de contradicción en perjuicio de Dolphin.

Otra de las principales razones esgrimidas por el Juzgado Responsable para sustentar la decisión asumida en el Auto Reclamado es que los Sedicentes Apoderados sí estaban facultados para actuar en representación de Controladora pues su legitimación estaban sustentada en la Supuesta RUA, la cual supuestamente fue "*otorgada por la voluntad de la totalidad de accionistas de la comerciante, particularmente de CI Banco…*", por lo que sostiene que gozaba de una presunción de legalidad.

Sin embargo, el Juzgado Responsable pasó completamente por alto – en evidente violación al principio de contradicción – que precisamente el hecho de que la Supuesta RUA hubiera sido otorgada por "la voluntad" de los accionistas era una cuestión que estaba en pugna, en adición a que la legitimación de CI Banco para actuar como accionista también había sido cuestionada por Controladora en el incidente de falta de personalidad.

A lo largo de su demanda incidental, Controladora esencialmente alegó la ilegalidad de la Supuesta RUA pues ésta *(i)* había sido celebrada en contravención a las Medidas Cautelares, al ser producto inexorable de la ejecución extrajudicial de garantías prendarias, y *(ii)* que Wilmington Trust **carecía de facultades para ejercer derechos de voto**, al haber perdido el carácter de "Agente de Garantías" en los Contratos de Financiamiento.

Aunque cada uno de estos argumentos será ahondado más adelante, por ahora se debe hacer énfasis a este Tribunal que la legalidad de la Supuesta RUA no era una cuestión indiscutida y, por el contrario, era materia precisamente de la demanda incidental presentada por Controladora. Más aun, como fue narrado en el capítulo de "Antecedentes", previo al dictado del Auto de Desistimiento fueron planteadas diversas cuestiones al Juzgado Responsable:

> (i)   por una parte, los legítimos representantes de Controladora denunciaron la violación a Medidas Cautelares como consecuencia de la celebración de la Supuesta RUA



y la presentación del desistimiento, solicitando entonces que no se le reconociera efectos jurídicos a la misma;

(ii)    al mismo tiempo, de manera contradictoria a lo realizado por los legítimos representantes de Controladora, el Sedicente Apoderado de Controladora compareció sustentando su legitimación en la Supuesta RUA y adujo el desistimiento del Concurso Mercantil, solicitando además que se desconocieran los actos realizados por los legítimos representantes de Controladora

(iii)    consecuentemente, los legítimos representantes de Controladora presentaron un **incidente de falta de personalidad** en contra del Sedicente Apoderado de Controladora, en el que solicitaron una vez más al Juzgado Responsable que no otorgara efecto jurídico alguno a la Supuesta RUA;

(iv)    el Juzgado Responsable requirió a Wilmington Trust y a CI Banco que informaran el cumplimiento de las Medidas Cautelares,

(v)    CI Banco desahogó dicho requerimiento, sin referir ni justificar la ejecución extrajudicial de las garantías prendarias sobre las acciones de Controladora, y

(vi)    los legítimos representantes de Controladora manifestaron su voluntad clara de que se continuara con el Concurso Mercantil

De lo anterior, es posible desprender que el Juzgado Responsable se enfrentaba a una controversia clara: por un lado, los legítimos representantes de Controladora denunciaron la ejecución ilegal de garantías y la consecuente necesidad de que no se reconociera efecto jurídico al desistimiento del Concurso Mercantil y, por el otro, sedicentes apoderados solicitaron el desistimiento y aducían tener la representación de la Quejosa.

Partiendo de dichas premisas, es claro que el Juzgado Responsable debía respetar el principio de contradicción y, atendiendo a la existencia de peticiones encontradas y a una denuncia clara de que se habían incumplido con las Medidas Cautelares, previo a resolver sobre el desistimiento del concurso mercantil el Juzgado Responsable **debió otorgar audiencia a las partes con la finalidad de conocer la "verdad legal" y, en consecuencia, decidir sobre los efectos de la Supuesta RUA**.

Sin embargo, desde el Auto de Desistimiento y ahora en el Auto Reclamado, de manera completamente ilegal el Juzgado Responsable parte de la premisa (que indebidamente asume indiscutida) de que la Supuesta RUA es válida por el solo hecho de que fue supuestamente adoptada por todos los accionistas.

No obstante, el solo hecho de que aparentemente los accionistas de una sociedad hayan participado en la adopción de un acto corporativo **no torna automáticamente como válido**



dicho acto, mucho menos **cuando obraba evidencia en el expediente sobre la ilegalidad de la Supuesta RUA y las diversas irregularidades bajo la cual ésta fue celebrada**.

Contrario a la manera en que el Juzgado Responsable actúa en el Auto Reclamado, lo cierto es que no existía una obligación inexcusable de reconocer plenos efectos a la Supuesta RUA por el solo hecho de la participación de los accionistas de Controladora; **por el contrario, ante la existencia de una clara impugnación de dicha resolución y evidencia contundente sobre su invalidez, el Juzgado Responsable** <u>debía respetar el principio de contradicción y resolver previamente la validez de la Supuesta RUA y si ésta debía o no surtir efectos</u>.

En respeto al principio de contradicción y debido proceso, cualquier decisión (incluso implícita) sobre la personalidad de los legítimos representantes de la Quejosa debió adoptarse **solo como consecuencia de haberse seguido un procedimiento incidental para ello**; al respecto, son relevantes por analogía los siguientes criterios:

> **"PERSONALIDAD DEL ACTOR. ES IMPROCEDENTE SU EXAMEN OFICIOSO SI PREVIAMENTE SE RECONOCIÓ EN FORMA EXPRESA Y FUE CONSENTIDA LA RESOLUCIÓN EN QUE ELLO SUCEDIÓ (LEGISLACIÓN DEL ESTADO DE PUEBLA).** Los artículos 238 y 222 del Código de Procedimientos Civiles, dicen como sigue: "Artículo 238. El Juez, en el auto en que provea la demanda, estudiará previamente su competencia y la personalidad del demandante. Si decide que es competente y que el promovente tiene la personalidad que ostenta, admitirá la demanda y ordenará emplazar al demandado, si aquélla cumple con los requisitos legales.". "Artículo 222. A la personalidad de los litigantes se aplicarán las siguientes disposiciones: I. Puede impugnarse: a) En queja contra el auto que reconoce la personalidad; o b) Como excepción al contestar la demanda. II. Impugnada la personalidad por uno de los medios establecidos en la fracción anterior, no podrá impugnarse por el otro. III. Cuando contestada ya la demanda, la falta de personalidad tenga una causa superveniente, puede aquélla impugnarse en incidente. IV. El incidente a que se refiere la fracción anterior, se tramitará como disponen los artículos 632 y 633, pero si antes de resolverse la cuestión incidental, se cita para sentencia en el negocio principal, se suspenderá el procedimiento en éste, para que ambas cuestiones se resuelvan en una sola sentencia, y si se declara procedente la falta de personalidad, se declarará también no estar el principal en estado de dictar sentencia.". De lo anterior resulta que si el Juez reconoce expresamente la personalidad del demandante y el demandado no agota ninguna de las dos alternativas que la ley concede para impugnar esa determinación, ésta debe tenerse consentida y por lo tanto el examen oficioso que posteriormente se pretendiera es indebido de acuerdo con el principio jurídico de la preclusión. Este criterio encuentra apoyo en la parte final de la jurisprudencia de la Suprema Corte de Justicia de la Nación, publicada en el Apéndice al Semanario Judicial de la Federación 1917-1985, Cuarta Parte, página 614, que dice: "PERSONALIDAD, EXAMEN DE LA.-La personalidad de las partes es un presupuesto procesal que debe examinarse de oficio por el juzgador, como expresamente lo dispone el artículo 47 del Código de Procedimientos Civiles para el Distrito Federal, en relación con los artículos 35, fracción IV, y 36 del mismo ordenamiento, por lo que, también debe resolver la objeción que al respecto presenten las partes, cualquiera que sea el momento en que lo hagan, porque la falta de impugnación oportuna no puede generar la existencia de una representación que no existe, y solamente debe omitir la reiteración del examen de la personalidad, en caso de haber sido resuelto antes de manera expresa y esté consentido el fallo, porque entonces opera el principio de la preclusión.".".[53]

> **"PERSONALIDAD, NO PROCEDE SU ESTUDIO OFICIOSO POR EL TRIBUNAL DE ALZADA CUANDO SE HAYA RESUELTO EN PRIMERA INSTANCIA Y ESTE CONSENTIDO EL FALLO RESPECTIVO. (LEGISLACION DEL ESTADO DE MICHOACAN).** Cuando el Juez de primera

---

[53] Registro digital: 192974 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;VI.1o.C. J/12 ;J

Clyde&Co

instancia resuelve de manera expresa la cuestión relativa a la falta de personalidad, en el incidente respectivo, y dicha resolución no es combatida por quien resulta perjudicado, el estudio indicado deja de ser oficioso; por tanto, el Magistrado responsable estuvo en lo correcto al estimar inatendibles los agravios que al respecto formuló el apelante, porque ello ya había sido resuelto a través de la interlocutoria pronunciada en el incidente que sobre falta de personalidad y personería promovió éste, la cual quedó firme al no haber sido recurrida por las partes, y dicho pronunciamiento debe considerarse consentido por el ahora peticionario de garantías, pues de estimar lo contrario se atentaría contra la firmeza del procedimiento, la cual es garantía de las partes, en términos del artículo 96 del código adjetivo de la entidad."[54]

Por lo tanto, el hecho de que ahora el Juzgado Responsable sostenga la plena legalidad de la Supuesta RUA sin que previamente se hayan agotado las impugnaciones formuladas por Controladora ni analizado las pruebas aportadas sobre la invalidez de dicha resolución, constituye una evidente y clara violación al principio de contradicción y al derecho al debido proceso.

Ahora bien, no pasa desapercibido el argumento del Juzgado Responsable en el sentido de que la validez de la Supuesta RUA y la validez de la representación de los accionistas de Controladora son *"cuestiones [que] escapan a los fines del procedimiento concursal, y en todo caso los interesados los deben hacer valer ante la autoridad competente para ello"*. Sin embargo, dicho motivo es falso y no subsana la clara violación al principio de contradicción.

Se afirma lo anterior pues la representación de los Sedicentes Apoderados descansa precisamente en la validez de la Supuesta RUA y en el hecho de que, quienes la celebraron, gozaran de facultades para ello al momento de hacerlo. En ese orden de ideas, al estar íntimamente relacionada con cuestiones de personalidad, es evidente que el Juzgado Responsable **estaba obligado a analizar la validez de la Supuesta RUA bajo los argumentos esgrimidos por Controladora**.

El solo hecho de que la Supuesta RUA constara en un instrumento notarial o que la resolución ostentada por los Sedicentes Apoderados fuera una resolución "unánime", no importan inmediatamente que éstas ya fueran plenamente válidas y que debieran ser reconocidas necesariamente por el Juzgado Responsable. Por el contrario, si se formularon argumentos y se ofrecieron pruebas para demostrar la ilegalidad de la resolución, es evidente que el Juzgado Responsable **estaba compelido y facultado para analizar dichas cuestiones al estar íntimamente relacionadas con la personalidad ostentada por los Sedicentes Apoderados**. Lo anterior, más aun si se toma en cuenta que de conformidad con el artículo 364 del Código Federal de Procedimientos Civiles[55] la resolución que se dicte en un incidente únicamente surtirá efectos en el juicio en que fueron dictadas, por lo que cualquier decisión sobre la carencia de personalidad como consecuencia de la invalidez de la Supuesta RUA **no afectaría la facultad de las partes de hacer valer la invalidez de dicho acto corporativo en otro foro, en el que se pueda tener una resolución con efectos generales**.

---

[54] Registro digital: 202173 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;XI.2o.48 C ;TA
[55] ARTICULO 364.- Las resoluciones incidentales no surten efecto alguno más que en el juicio en que hayan sido dictadas, a no ser que la resolución se refiera a varios juicios, caso en el cual surtirá efectos en todos ellos.



Sin embargo, la posibilidad de instar una acción que tuviera efectos generales **no limita la facultad y obligación que tenía el Juzgado Responsable de analizar los múltiples argumentos y pruebas que demostraban la invalidez de la Supuesta RUA, en el contexto de que de ella dependía la representación ostentada por los Sedicentes Apoderados.**

En consecuencia, es evidente que al sostener unilateralmente la validez de la Supuesta RUA sin resolver las múltiples impugnaciones que hizo valer Controladora, el Juzgado Responsable violó el principio de contradicción y, en consecuencia, el Auto Reclamado es ilegal.

**TERCERO. A MAYOR ABUNDAMIENTO, EL SOLO HECHO DE QUE EN LA SUPUESTA RUA PARTICIPARÁ CI BANCO Y WILMINGTON TRUST NO IMPORTA LA VALIDEZ DE DICHA RESOLUCIÓN, ADEMÁS DE QUE NO SUBSANA LA OBLIGACIÓN QUE TENÍA EL JUZGADO RESPONSABLE DE RESOLVER CON PRIORIDAD EL INCIDENTE DE FALTA DE PERSONALIDAD Y EL RESTO DE LAS IMPUGNACIONES INTERPUESTAS POR CONTROLADORA PARA CUESTIONAR LA PERSONALIDAD DE LOS SEDICENTES APODERADOS .**

<u>Síntesis</u>.        Contrario a lo que sostiene el Juzgado Responsable, es falso que la Supuesta RUA haya sido celebrada por todos los accionistas de Controladora pues *(i)* en ésta no participó el Señor Albor, quien es el legítimo accionista de Controladora; *(ii)* participó Wilmington Trust al haber ejecutado ilegalmente la garantía prendaria en contra de la acción del Señor Albor, en violación a las Medidas Cautelares, por lo que es claro que su participación fue ilegal; *(iii)* Wilmington Trust ya no era Agente de Garantías al momento de celebración de la Supuesta RUA, por lo que carecía de facultades para actuar como accionistas, y *(iv)* CI Banco tampoco podía actuar como accionista, pues solo detenta dicho derechos en garantía en perjuicio de Controladora, siendo que su actuar violó las Medidas Cautelares. Todo lo anterior, no obstante el hecho de que el Juzgado Responsable debía previamente admitir y resolver las incidencias y recursos presentados por Controladora.

<u>Desarrollo</u>.

En adición a la violación al principio de contradicción y el resto de las violaciones apuntadas en el concepto de violación inmediato anterior, es necesario hacer notar a este Tribunal que el Juzgado Responsable sustenta gran parte del Auto Reclamado en el hecho de que estaba compelido a reconocer efectos a la Supuesta RUA por el solo hecho de que ésta había sido supuestamente celebrada por la totalidad de los accionistas de Controladora, además de que el desistimiento del concurso mercantil "*fue instruido por la totalidad de sus accionistas*." Sin embargo, como se demostrará en el presente concepto de violación, dichas consideraciones son falsas.

En primer lugar, el Juzgado Responsable pasa por alto que es falso que hayan participado la "totalidad de los accionistas" de Controladora, como fue debidamente demostrado por Controladora en el concurso mercantil. Se afirma lo anterior, pues los accionistas legítimos



actuales de Controladora son **Eduardo de Martín Albor Villanueva** ("**Señor Albor**") y CI Banco, como consta en los documentos presentados en el concurso mercantil.

Ahora bien, la ilegítima razón por la cual fue posible la ilegal celebración de la Supuesta RUA, como se confiesa en los antecedentes de la propia resolución, es porque CI Banco y Wilmington Trust **ilegalmente ejecutaron extrajudicialmente la garantía prendaria que pesaba sobre las acciones que ostentaba el Señor Albor**.

Como fue desarrollado en el capítulo de "Antecedentes", desde la admisión del Concurso Mercantil el Juzgado Responsable decretó las Medidas Cautelares, entre las cuales, ordenó a la *(i)* la **suspensión de cualquier procedimiento judicial o extrajudicial de ejecución de garantías**; *(ii)* impidió el perfeccionamiento de cualquier garantía otorgada por Controladora, y *(iii)* la prohibición de rescindir o terminar anticipadamente cualquier contrato del que Controladora sea parte.

Por acuerdos de 31 de enero de 2025 y 28 de marzo de 2025, el Juzgado Responsable ordenó que las Medidas Cautelares fueran notificadas a CI Banco, como fiduciaria del Fideicomiso de Garantía, y a Wilmington Trust, como Agente de Garantías de los Contratos de Financiamiento; reconociendo, en consecuencia, la obligación de ambas personas morales de cumplir con las Medidas Cautelares.

En ese orden de ideas, desde la admisión del Concurso Mercantil las Medidas Cautelares estaban plenamente vigente y, desde mucho antes de la supuesta celebración de la Supuesta RUA, es evidente que tanto CI Banco como Wilmington Trust estaban correctamente notificadas de las medidas y, por lo tanto, vinculadas a su cumplimiento.

No obstante lo anterior, CI Banco y Wilmington Trust celebraron la Supuesta RUA **conscientes de la vigencia y vinculadas al cumplimiento de las Medidas Cautelares**; fue tal su descaro, que en los antecedentes de dicha resolución incluso hicieron constar que éste fue posible **como consecuencia de la ejecución extrajudicial de garantías prendarias en perjuicio de las acciones de Controladora**, tal y como fue narrado en el capítulo de "Antecedentes."

Partiendo de dicha premisa, es que al comparecer el Sedicente Apoderado de Controladora al Concurso Mercantil para solicitar su desistimiento, Controladora fue clara en solicitar que éste fuera desestimado, al ser evidente que era producto de una flagrante violación a las Medidas Cautelares (al haberse ejecutado ilegalmente garantías en perjuicio de Controladora). Asimismo, al presentar el incidente de falta de personalidad también se hizo valer este motivo de ilegalidad de la Supuesta RUA.

Dicho motivo **debió ser suficiente para demostrar la ilegalidad de la Supuesta RUA y el hecho de que, contrario a lo que ahí se hizo constar, no estaban representadas todas las accionistas en dicha resolución pues <u>la ejecución extrajudicial de las garantías prendarias a través de la cual pretendieron desconocer al Señor Albor es ilegal</u>**.

58



No obstante lo anterior, también estaba plenamente demostrado que Wilmington Trust carecía de facultades para actuar como accionista en la Supuesta RUA. En primer lugar, como fue narrado en el capítulo de "Antecedentes", el 24 de febrero de 2025 Controladora hizo de conocimiento del Juzgado Responsable que había recibido dos correos electrónicos de Wilmington Trust en los que, esencialmente, hacía de su conocimiento su renuncia como "Agente de Garantías" de los Contratos de Financiamientos (mismos que, a su vez, fueron exhibidos desde la solicitud de declaración de concurso mercantil).

La función de Wilmington Trust como "Agente de Garantías" era, esencialmente la de representar y ejercer los derechos de los Tenedores de Bonos derivados de los Contratos de Financiamiento, como se desprende de las siguientes cláusulas:

### NPA 2022

"Sección 24, sobre el Agente de Garantía.

(a)      Los compradores y los demás tenedores desean designar a una Persona para que actúe (y continúe actuando) como su agente de garantía y representante en su nombre con respecto a todos los asuntos relacionados con la Garantía y conforme a los Documentos de Garantía, los demás documentos financieros y los documentos relacionados. En consecuencia, mediante la ejecución de este Contrato, cada Comprador y cada otro tenedor designa, autoriza y nombra irrevocablemente a Wilmington Trust, Asociación Nacional, para actuar como su agente de garantía y representante en su nombre con respecto a todos los asuntos de Garantía y conforme a los Documentos de Garantía, los demás Documentos Financieros y los documentos relacionados. Cada Comprador y cada otro tenedor otorgar al Agente de Garantía todos los poderes y autoridad necesarios, deseables o apropiados para llevar a cabo las funciones y deberes delegados o asignados al Agente de Garantía conforme a este Contrato y los demás Documentos Financieros (incluyendo la autoridad para liberar la Garantía de los Gravámenes creados en virtud de los Documentos de Garantía y otros Documentos Financieros en las circunstancias específicamente previstas en este Contrato y en aquellos)."

### Convenio Modificatorio del NPA 2019.

"Sección 24.1 Nombramiento del Agente de Garantía

(a)      Agente de Garantía. Los Compradores y los demás tenedores desean designar a una Persona para que actúe (y continúe actuando) como su agente de garantía y representante en su nombre respecto de todos los asuntos relacionados con la Garantía y conforme a los Documentos de Garantía, los otros Documentos Financieros y los documentos relacionados. En consecuencia, al firmar este Contrato, cada Comprador y cada otro tenedor designa, autoriza y nombra irrevocablemente a Wilmington Trust, National Association para actuar como su agente de garantía y representante en su nombre respecto de todos los asuntos relacionados con la Garantía y conforme a los Documentos de Garantía y los otros Documentos Financieros y los documentos relacionados. Cada Comprador y cada otro tenedor otorga el Agente de Garantía todos los poderes y facultades necesarios, deseables o apropiados para llevar a cabo las funciones y deberes delegados o asignados al Agente de Garantía confirme a lo aquí dispuesto (incluyendo la autoridad para liberar la Garantía de los Gravámenes creados bajo los Documentos de Garantía y los otros Documentos Financieros en las circunstancias específicamente previstas en ellos."

En esos términos, es evidente que su renuncia es de suma importancia. Lo anterior pues, al cesar su función como "Agente de Garantías", es evidente que también cesa cualquier facultad de representación a favor de los Tenedores de Bonos y, por lo tanto, cualquier facultad para ejercer derechos al amparo de los Contratos de Financiamiento o cualquier otro derivado o relacionado



con éstos (como las Garantías Prendarias, que se incluyen en la definición de "Documentos Financieros" de los Contratos de Financiamiento).

En esos términos, los Contratos de Financiamiento disponen que al renunciar el "Agente de Garantías", los Tenedores de Bonos tienen el derecho a designar una persona que actúe como sucesor del agente de garantía en un plazo de 20 y 30 días posteriores a la renuncia, conforme a lo dispuesto en el NPA 2022 y el Convenio Modificatorio del NPA 2019, respectivamente. Como ejemplo de lo anterior y al ser los NPAS sustancialmente similares, se cita el apartado correspondiente a la cláusula de la sucesión del Agente de Garantías del Convenio Modificatorio del NPA 2019:

**Convenio Modificatorio del NPA 2019**.

"Sección 24.8 Sucesor del Agente de Garantía

El Agente de Garantía puede renunciar en cualquier momento mediante una notificación por escrito de no menos de 20 días de anticipación a los tenedores y a la Compañía. Al recibir dicha notificación de renuncia, **los Tenedores Requeridos tendrán el derecho de designar a una Persona para que actúe como sucesor del Agente de Garantía. Si no se ha designado y aceptado tal sucesor del Agente de Garantía por los Tenedores Requeridos dentro de los 20 días posteriores a la notificación de renuncia del Agente de Garantía renunciante, el Agente de Garantía renunciante puede, en nombre de los tenedores, designar a una Persona para actuar como sucesor del Agente de Garantía,** quien será un tenedor, si un tenedor está dispuesto a aceptar dicha designación, o de lo contrario será un banco comercial o institución financiera está organizado bajo las leyes de los Estados Unidos de América o de cualquier Estado de los mismos y tiene un capital y superávit combinados de al menos $1,000,000,000. Si no se ha designado sucesor del Agente de Garantía dentro de los 20 días posteriores a la fecha en que se dio dicha notificación o renuncia, dicha renuncia se hará efectiva y los Tenedores Requeridos asumirán todas sus funciones de dicho Agente de Garantía renunciante conforme al presente y a los otros Documentos Financieros hasta el momento, si lo hay, en que los Tenedores Requeridos designen a un sucesor del Agente de Garantía según lo dispuesto anteriormente. (…)[56]"

[Énfasis añadido]

No obstante, como se desprende de lo anterior, en caso de que los tenedores de bonos no designan a un sucesor del "Agente de Garantías" dentro de dichos plazos, **entonces recaen en ellos las funciones de dicho agente hasta en tanto no se realice el nombramiento correspondiente**.

Partiendo de lo anterior, tal y como consta en autos, el 21 de marzo de 2025 se informó al Juzgado Responsable que habían transcurrido los plazos que señalan los Contratos de Financiamiento para que se nombrara al sucesor del "Agente de Garantías" y que, en consecuencia, de conformidad con las cláusulas aplicables citadas, son los Tenedores de Bonos quienes desempeñan las funciones como dicho agente. Se reitera que todo esto obra en el expediente del concurso mercantil y fue hecho del debido conocimiento del Juzgado Responsable.

---

[56] La presente transcripción se encuentra contenida en la página 621 del documento adjunto a la solicitud de concurso como Anexo "37".



No obstante el evidente hecho de que para la fecha indicada era claro que Wilmington Trust **ya no actuaba como "Agente de Garantías" de los Contratos de Financiamiento**, en la Supuesta RUA se hizo constar que fue un supuesto apoderado de éste quien la celebró en supuesto ejercicio de derechos accionarios derivados de los Contratos de Financiamiento:



En esos términos, bastando un mero análisis de las constancias del juicio, debió haber sido evidente para el Juzgado Responsable que la Supuesta RUA era completamente inválida.

Partiendo de dichas consideraciones, es evidente la ilegalidad del Auto Reclamado pues el Juzgado Responsable pretende sostener la legalidad de la Supuesta RUA en el hecho de que ésta fue celebrada por todos los accionistas de Controladora, cuestión que ya se ha demostrado falsa.

Ahora bien, tampoco es relevante el hecho de que CI Banco haya celebrado la Supuesta RUA. Lo anterior pues, si bien es el accionista mayoritario de Controladora, no se debe pasar desapercibido que los Sedicentes Apoderados basaron su representación en una supuesta "resolución unánime de accionistas". En ese orden de ideas, de conformidad con la Ley General de Sociedades Mercantiles, para que una resolución adoptaba fuera de asamblea sea válida, es necesario que concurra la **aprobación de la totalidad de los socios**, como se desprende del siguiente precepto:

> "Artículo 80.- Las asambleas se reunirán en el domicilio social, por lo menos una vez al año, en la época fijada en el contrato (…)
>
> Adicionalmente, los socios podrán celebrar asambleas fuera del domicilio social, **siempre y cuando** la totalidad de los socios lo aprueben **y adicionalmente exista la posibilidad de utilizar medios electrónicos, ópticos o de cualquier otra tecnología**. Para dichas asambleas, en este caso, se deberá señalar en el acta de asamblea, el domicilio en el cual se llevó a cabo la asamblea respectiva."

[Énfasis añadido]

Por lo tanto, aunque fuera el socio mayoritario, su sola manifestación de voluntad no era suficiente para sostener la validez de la Supuesta RUA, contrario a lo que sostiene el Juzgado Responsable.

61



Aunado a todo lo anterior, el Juzgado Responsable pasó por alto que la única razón por la que CI Banco es accionista mayoritario de Controladora es porque las acciones de dichas sociedades fueron **aportadas en garantía al Fideicomiso**. En ese orden de ideas, la titularidad de las acciones que ejerce es como consecuencia de **de la constitución de una garantía prendaria a favor de Wilmington Trust y los Tenedores de Bonos**. De hecho, en la sección 2.05 del Contrato de Fideicomiso[57] se pactó claramente que la titularidad sobre los derechos accionarios, que integran el patrimonio fideicomitido, tenía como sola finalidad **garantizar el cumplimiento de los Contratos de Financiamiento**:

> **Sección 2.04.** <u>FINES DEL FIDEICOMISO.</u>  Los fines del presente Contrato de Fideicomiso (los "<u>Fines del Fideicomiso</u>") son garantizar el puntual y debido cumplimiento, pago y satisfacción a su vencimiento (ya sea a su fecha de vencimiento programado, por vencimiento anticipado o por cualquier otro motivo) de todas y cada una de (i) las Obligaciones Garantizadas Senior, en favor del Fideicomisario en Primer Lugar, en nombre y para el beneficio de los Adquirentes Senior, y (ii) de manera subordinada, conforme a lo previsto en el Convenio entre Acreedores y de Subordinación, las Obligaciones Garantizadas Subordinadas, en favor del Fideicomisario en Segundo Lugar, en nombre y para el beneficio de los Adquirentes Subordinados.  Para tales efectos, el Fiduciario deberá:
>
> (a)    ser el único y legítimo propietario y titular del Patrimonio del Fideicomiso (trasmitido al Fiduciario en esta fecha o en cualquier momento posterior conforme a los términos previstos en este Contrato de Fideicomiso), libre de cualesquier Gravámenes, durante la vigencia de este Contrato de Fideicomiso y, en todo caso, hasta que (i) todas las Obligaciones Garantizadas Senior hayan sido Pagadas en Su Totalidad, y el Fideicomisario en Primer Lugar confirme dicho cumplimiento, pago y satisfacción mediante la entrega de una Notificación de Terminación del Fideicomisario en Primer Lugar al Fiduciario (con copia al Fideicomisario en Segundo Lugar) conforme a la Sección 3.01, y (ii) todas las Obligaciones Garantizadas Subordinadas hayan sido debida y legalmente satisfechas y pagadas e irreversiblemente liquidadas en su totalidad, y el Fideicomisario en Segundo Lugar, respectivamente, confirme dicho cumplimiento, pago y satisfacción mediante la entrega de una Notificación de Terminación del Fideicomisario en Segundo Lugar al Fiduciario conforme a la Sección 3.01;

Lo anterior permite advertir que la titularidad que goza CI Banco de las acciones de Controladora deviene como consecuencia exclusiva de **las garantías constituidas por ésta a favor de Wilmington Trust, sin que se tratara de una cesión incondicionada ni con la intención de que dicha sociedad fiduciaria integrara corporativamente a Controladora**. Tal es así, que el Sección 5.01 del Contrato de Fideicomiso se pactó que Controladora **continuaría ejerciendo derechos de voto** de las acciones:

> **Sección 5.01.**    <u>ACCIONES, VOTO Y ADMINISTRACIÓN Y DISTRIBUCIONES DE CAPITAL.</u>
>
> (a)    Salvo que el Fideicomisario en Primer Lugar haya entregado al Fiduciario un Aviso de Incumplimiento, los Fideicomitentes de Acciones estarán facultados para ejercer los derechos de voto inherentes a las Acciones, respectivamente, transmitidas por dichos Fideicomitentes de Acciones al Fiduciario de conformidad con el presente Contrato de Fideicomiso, incluyendo sin limitación, el derecho de declarar dividendos en cada una de las Sociedades de Acciones en la medida permitida al amparo de los Documentos de la Operación (conjuntamente, los "<u>Derechos de Voto</u>"), en cada caso, en una manera que no resulte (o que no pudiera razonablemente esperarse que resulte) en un incumplimiento de, o en conflicto con, los términos y condiciones del presente Contrato de Fideicomiso o cualquier otro Documento de la Operación, <u>en el entendido</u>, <u>sin embargo</u>, que ninguno de los Fideicomitentes podrá, bajo ninguna circunstancia, instruir al Fiduciario (i) que constituya u otorgue Gravamen alguno o cualquier otra clase de garantía sobre o respecto a las Acciones (o cualquier parte de las mismas), o (ii) que venda, transmita, aporte o que de cualquier otra manera disponga de la totalidad o cualquier parte de las Acciones, en cada caso, sin el consentimiento previo y por escrito del Fideicomisario en Primer Lugar, o (iii) que ejerza los Derechos de Voto en cualquier asamblea o que firme cualesquier Resoluciones Unánimes que pretendan autorizar o de otra manera resolver la escisión, fusión, transformación o la modificación o reforma de los estatutos sociales vigentes de las Sociedades de Acciones, en cada caso, sin el consentimiento previo y por escrito del Fideicomisario en Primer Lugar.

Por lo tanto, es claro que el ejercicio de derechos corporativos por parte de CI Banco a través de la Supuesta RUA se realizó **como un acto de ejecución de garantías en contra de**

---

[57] Mismo que se acompañó a la solicitud de concurso mercantil como Anexo ""

ESTOS DOCUMENTOS SOMBRA ... DE VILLANUEVA
700060000130000 ...
25.025.02 PP08.03

Clyde&Co

Controladora, cuestión que <u>estaba vedada por las Medidas Cautelares decretadas por el Juzgado Responsable y, por lo tanto, torna dicho acto ilegal</u>.

No obstante todo lo anterior, es necesario hacer énfasis en que el Juzgado Responsable estaba compelido a resolver con prioridad y antelación el incidente de falta de personalidad que fue promovido por Controladora y, en consecuencia, **carecía de facultades para simplemente afirmar de manera unilateral la validez de la Supuesta RUA sin antes haber resuelto las incidencias presentadas por la comerciante**.

En otras palabras, aun suponiendo sin conceder que la Supuesta RUA sí hubiera sido celebrada por todos los accionistas de Controladora, **ello no relevaba al Juzgado Responsable de obviar el incidente de falta de personalidad y el resto de los medios de impugnación presentados por Controladora, en respeto al principio de contradicción y los derechos de acceso a la justicia y debido proceso**.

En consecuencia, es evidente que al sostener unilateralmente la validez de la Supuesta RUA sin advertir que ésta no había sido celebrada por accionistas legitimadas y al obviar las múltiples impugnaciones que hizo valer Controladora, el Juzgado Responsable violó el principio de contradicción y, en consecuencia, el Auto Reclamado es ilegal.

**CUARTO. CONTRARIO A LO SOSTENIDO POR EL JUZGADO RESPONSABLE, EL HECHO DE QUE CI BANCO SEA EL "ACCIONISTA MAYORITARIO" Y HAYA MANIFESTADO NO ESTAR CONFORME CON LA PRESENTACIÓN DEL CONCURSO MERCANTIL, NO IMPORTA LA VALIDEZ DE LA SUPUESTA RUA NI LA DOTA DE UNA PRESUNCIÓN DE LAGELIDAD, NI JUSTIFICA LAS VIOLACIONES COMETIDAS POR EL JUZGADO RESPONSABLE .**

<u>Síntesis</u>.        Para sustentar la validez de su decisión de acordar favorable el desistimiento formulado por los Sedicentes Apoderados, el Juzgado Responsable expresa en reiteradas ocasiones que CI Banco, como accionista mayoritario, expresó no haber estado conforme con la presentación de la solicitud de concurso mercantil. Sin embargo, la voluntad de CI Banco no convalida las múltiples ilegalidades denunciadas en contra de la Supuesta RUA ni releva al Juzgado Responsable de analizar los motivos de nulidad denunciados por Controladora

<u>Desarrollo.</u>

En seguimiento a lo expuesto en el concepto de violación inmediato anterior, no debe pasar desapercibido para este Tribunal que una de los principales argumentos esgrimidos por el Juzgado Responsable para desestimar el recurso de revocación interpuesto por Controladora es que CI Banco, quien es accionista mayoritario de Controladora, manifestó que no era su voluntad continuar con el concurso mercantil, lo que dota de una "presunción" de legalidad de la Supuesta RUA y además constituía una prueba suficiente para resolver sobre la solicitud de desistimiento. Como se demostrará, dicho argumento es ilegal.



En primer lugar, se reitera a este Tribunal la necesidad de tener en claro la razón fundamental por la que CI Banco es accionista de Controladora: porque es la institución fiduciaria de un **fideicomiso de garantía**, que tiene como finalidad esencial **garantizar las obligaciones asumidas por Controladora a favor de sus acreedores**.

En ese orden de ideas, si bien no se niega que CI Banco sea accionista mayoritario, tampoco se debe perder de vista (como lo hizo el Juzgado Responsable) que estaba **vinculada al cumplimiento de las Medidas Cautelares y, por lo tanto, <u>estaba vedada en participar en cualquier procedimiento de ejecución judicial o extrajudicial de garantías en perjuicio de Controladora</u>**, como fue desarrollado en los dos conceptos de violación anteriores.

Ahora bien, más allá de dichas consideraciones e incluso dejando de lado la violación a las Medidas Cautelares, lo cierto es que falso que la sola participación de CI Banco convalidara o de cualquier forma otorgara efectos a la Supuesta RUA, mucho menos que generara a su favor una "presunción" de legalidad.

Como ha sido desarrollado, la Ley General de Sociedades Mercantiles es clara en establecer que para que una resolución adoptada fuera de asamblea sea válida, es necesario que concurra la **aprobación de la totalidad de los socios**, como se desprende del siguiente precepto:

> "Artículo 80.- Las asambleas se reunirán en el domicilio social, por lo menos una vez al año, en la época fijada en el contrato (…)
>
> Adicionalmente, los socios podrán celebrar asambleas fuera del domicilio social, **siempre y cuando <u>la totalidad de los socios lo aprueben</u> y adicionalmente exista la posibilidad de utilizar medios electrónicos, ópticos o de cualquier otra tecnología**. Para dichas asambleas, en este caso, se deberá señalar en el acta de asamblea, el domicilio en el cual se llevó a cabo la asamblea respectiva."

[Énfasis añadido]

En el caso, como también ha sido demostrado, CI Banco **no era la única accionista de Controladora**, siendo que si bien era la accionista mayoritaria, el Señor Albor era el segundo accionista necesario para la adopción de cualquier resolución en términos del citado artículo 80 de la Ley General de Sociedades Mercantiles.

En ese orden de ideas, contrario a lo sostenido por el Juzgado Responsable, **es completamente intrascendente e irrelevante la voluntad y manifestaciones de CI Banco para decidir sobre la validez de la Supuesta RUA y reconocerle efectos jurídicos**.

Con independencia de lo sostenido por CI Banco, lo cierto es que el Juzgado Responsable **estaba obligado a analizar la validez de la Supuesta RUA a la luz de la legitimación de todos los supuestos "accionistas" que la adoptaron**, cuestión que fue completamente omiso en hacer.

Como fue desarrollado en el concepto de violación inmediato anterior, la Supuesta RUA fue adoptada de manera **ilegítima** con la ilegal participación de Wilmington Trust, quien sustentó



su legitimación en **la ilegal ejecución extrajudicial de garantías en perjuicio de Controladora, lo cual en sí mismo estaba vedado por las Medidas Cautelares**. Cuestión que, aunque obviada por el Juzgado Responsable, era suficiente para advertir la ilegalidad de la Supuesta RUA y, en consecuencia, la carencia de cualquier facultad de representación de los Sedicentes Apoderados.

Partiendo de dichas premisas, es completamente faso que la Supuesta RUA gozara de una "presunción" de legalidad como afirma el Juzgado Responsable. En primer lugar, ni la Ley General de Sociedades Mercantiles, ni el Código de Comercio, ni la Ley de Concursos Mercantiles **reconocen la existencia de la presunción que aduce el Juzgado Responsable**, por lo que no sería posible afirmar que se trata de una presunción legal.

En su caso, la "presunción" a la que aduce el Juzgado Responsable sería desprendida de los elementos de convicción que constan en el presente juicio, como se desprende del siguiente criterio:

> **"PRESUNCIÓN RELATIVA EN MATERIA CIVIL. SI LA LEY LE OTORGA EFICACIA PROBATORIA PLENA, PARA DESTRUIR SU EFECTO ES INSUFICIENTE OPONER INDICIOS (LEGISLACIÓN DEL ESTADO DE CHIHUAHUA).** En la doctrina jurídica procesal de nuestros días es casi unánime la convicción de que las dos clases de presunciones: legales y humanas no son propiamente pruebas, sino el principio o argumento lógico que permite al juzgador otorgar mérito convictivo al indicio o a las pruebas en general, es decir, es la función racional que efectúa el Juez para inferir a partir de un hecho probado la existencia de otro desconocido. Cuando la presunción está prevista en la ley se llama legal, mientras que la judicial es aquella que realiza el órgano decisor según las reglas de la lógica y la experiencia, también llamada humana. Entre las legales, las presunciones son relativas iuris tantum o absolutas iuris et de iure, según admitan o no prueba en contrario. Así, esa verdad provisional o absoluta proviene de lo dispuesto por el legislador, de manera que una vez comprobado el hecho al Juez le corresponde atribuir certeza a sus consecuencias. Ahora bien, de acuerdo con la interpretación sistemática de los artículos 258, 373 y 391 del Código de Procedimientos Civiles para el Estado de Chihuahua, la falta de contestación de la demanda genera la presunción de tener por confesados los hechos que en ella se imputen y a su vez esa confesión tácita, resultado de una presunción legal relativa, debe ser valorada como una prueba cuya certeza sólo es destruible mediante otra probanza que se aporte en sentido contrario; pero, además, es necesario tener presente que el último dispositivo citado precisa con claridad que las presunciones legales hacen prueba plena. De lo anterior se concluye que la idoneidad de la contraprueba ha de ser tal que resulte contundente para vencer la plenitud convictiva que la ley le atribuye a la confesión tácita, de manera que si el demandado no ofrece prueba alguna o sólo aporta un indicio o varios no articulados entre sí, o una o varias pruebas disociadas que la ley no les reserve la calidad de plenas, entonces, no es posible vencer la solidez atribuida por el ordenamiento adjetivo de mérito a la presunción relativa de que se trate."[58]

Como se desprende del criterio anterior, salvo que la ley prevea expresamente la existencia de una presunción ("presunción legal") entonces éstas solo pueden existir como consecuencia de la valoración que al respecto haya realizado el órgano jurisdiccional y, de cualquier forma, la presunción solo implica una verdad "provisional" que puede ser destruida con otros medios de prueba.

---

[58] Registro digital: 182792 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;XVII.1o.P.A.31 C ;TA

CLYDE&CO

En el caso, al momento en que le fue exhibida la Supuesta RUA al Juzgado Responsable e incluso de manera posterior a que le reconociera efectos, Controladora **ofreció diversas pruebas y argumentos para desvirtuar su validez, demostrando que ésta había sido celebrada <u>en violación frontal a las Medidas Cautelares y por personas (Wilmington Trust) que carecían de facultades para su celebración</u>**.

En otras palabras, el Juzgado Responsable contaba con pruebas que **destruían cualquier posible "presunción" de validez de la Supuesta RUA, que <u>necesariamente debieron ser analizadas y valoradas previo a reconocer efectos a dicha resolución</u>**. En el caso, dicha autoridad simplemente decidió ignorar las pruebas ofrecidas por Controladora, considerando la supuesta "presunción de validez" de la que gozaba la Supuesta RUA como consecuencia de la participación de CI Banco.

En ese orden de ideas, es evidente la ilegalidad del actuar del Juzgado Responsable quien otorgó un indebido valor a la participación y manifestaciones de CI Banco por el solo hecho de que era el "accionista mayoritario" de Controladora cuando es evidente que *(i)* para la validez de la Supuesta RUA no es suficiente que participe el accionista mayoritario, sino la totalidad de los accionistas, por lo que el Juzgado Responsable debió analizar la participación de todos los accionistas con especial énfasis en la ilegal representación ostentada por Wilmington Trust, quien actuó en ejecución de garantías en perjuicio de Controladora y el Señor Albor, y *(ii)* la sola participación de CI Banco no otorga presunción alguno pues ninguna se regula en ley, máxime que, aun de existir una presunción, existían elementos de prueba aportados por Controladora que la destruían al demostrar plenamente la nulidad de la Supuesta RUA, los cuales fueron indebidamente obviados por el Juzgado Responsable.

En consecuencia, es evidente la ilegalidad del Auto Reclamado, por lo que este Tribunal debe conceder el amparo y protección de la justicia de la Unión a favor de Controladora para ordenar su revocación y la inmediata continuación del concurso mercantil.

## QUINTO. CONTRARIO A LO SOSTENIDO POR EL JUZGADO RESPONSABLE, ÉSTE SÍ ACTUÓ EN CONTRA DE SUS PROPIAS DETERMINACIONES AL DAR TRÁMITE A LA SOLICITUD DE DESISTIMIENTO A PESAR DE QUE NO SE HABÍA CUMPLIDO CON EL REQUERIMIENTO QUE ÉSTE HABÍA FORMULADO .

<u>Síntesis</u>.        Al formular el Requerimiento a Wilmington Trust y CI Banco, el Juzgado Responsable buscaba informarse sobre el cumplimiento de las Medidas Cautelares por dichas personas y determinar, en su caso, la validez de la Supuesta RUA; sin embargo, el Juzgado Responsable obvio la respuesta de Wilmington Trust a dicho requerimiento y acordó el desistimiento formulado por los Sedicentes Apoderados. En ese orden de ideas, contrario a lo que sostiene el Juzgado Responsable en el Auto Reclamado, éste sí actuó en contra de sus propias determinaciones, sin que dicha violación se subsane por el solo hecho de que CI Banco sí dio cumplimiento al requerimiento formulado.



Desarrollo.

a. <u>Principio de seguridad jurídica</u>

El contenido y alcance de este principio ha sido desarrollado en el presente escrito por lo que se tiene por reproducido como si a la letra se insertase.

b. <u>Principio de congruencia y exhaustividad</u>

Los artículos 14, 16 y 17 de la Constitución Federal son fundamento del principio de congruencia y exhaustividad de las resoluciones judiciales. A continuación, se transcribe su contenido:

> "Artículo 14. A ninguna ley se dará efecto retroactivo en perjuicio de persona alguna.
>
> Nadie podrá ser privado de la libertad o de sus propiedades, posesiones o derechos, sino mediante juicio seguido ante los tribunales previamente establecidos, en el que se cumplan las formalidades esenciales del procedimiento y conforme a las Leyes expedidas con anterioridad al hecho."
>
> "Artículo 16. Nadie puede ser molestado en su persona, familia, domicilio, papeles o posesiones, sino en virtud de mandamiento escrito de la autoridad competente, que funde y motive la causa legal del procedimiento. En los juicios y procedimientos seguidos en forma de juicio en los que se establezca como regla la oralidad, bastará con que quede constancia de ellos en cualquier medio que dé certeza de su contenido y del cumplimiento de lo previsto en este párrafo."
>
> "Artículo 17. Ninguna persona podrá hacerse justicia por sí misma, ni ejercer violencia para reclamar su derecho.
>
> Toda persona tiene derecho a que se le administre justicia por tribunales que estarán expeditos para impartirla en los plazos y términos que fijen las leyes, emitiendo sus resoluciones de manera pronta, completa e imparcial. Su servicio será gratuito, quedando, en consecuencia, prohibidas las costas judiciales."

De los mandatos constitucionales transcritos, se desprende que toda persona tiene derecho a acudir ante los tribunales previamente establecidos que estarán expeditos para impartir justicia, respetando las formalidades esenciales del procedimiento.

**"CONGRUENCIA Y EXHAUSTIVIDAD, PRINCIPIOS DE. SUS DIFERENCIAS Y CASO EN QUE EL LAUDO INCUMPLE EL SEGUNDO DE ELLOS.** Del artículo 842 de la Ley Federal del Trabajo se advierte la existencia de dos principios fundamentales o requisitos de fondo que deben observarse en el dictado del laudo: el de congruencia y el de exhaustividad. El primero es explícito, en tanto que el segundo queda imbíbito en la disposición legal. Así, el principio de congruencia está referido a que el laudo debe ser congruente no sólo consigo mismo, sino también con la litis, tal como haya quedado establecida en la etapa oportuna; de ahí que se hable, por un lado, de congruencia interna, entendida como aquella característica de que el laudo no contenga resoluciones o afirmaciones que se contradigan entre sí y, por otro, de congruencia externa, que en sí atañe a la concordancia que debe haber con la demanda y contestación formuladas por las partes, esto es, que el laudo no distorsione o altere lo pedido o lo alegado en la defensa sino que sólo se ocupe de las pretensiones de las partes y de éstas, sin introducir cuestión alguna que no se hubiere reclamado, ni de condenar o de absolver a alguien que no fue parte en el juicio laboral. Mientras que el de exhaustividad está relacionado con el examen que debe efectuar la autoridad respecto de todas las cuestiones o puntos litigiosos, sin omitir ninguno de ellos, es decir, dicho principio implica la obligación del juzgador de decidir las controversias que se sometan a su conocimiento tomando en cuenta los argumentos aducidos tanto en la demanda

DIGITALMENTE NOMBRADA DOC. VILLANUEVA
XXXXXXX00X164465XDDSXXXXXXXXXXXXXXXXXX0136
26.07.24 07:06:42



como en aquellos en los que se sustenta la contestación y demás pretensiones hechas valer oportunamente en el juicio, de tal forma que se condene o absuelva al demandado, resolviendo sobre todos y cada uno de los puntos litigiosos que hubieran sido materia del debate. Por tanto, cuando la autoridad laboral dicta un laudo sin resolver sobre algún punto litigioso, en realidad no resulta contrario al principio de congruencia, sino al de exhaustividad, pues lejos de distorsionar o alterar la litis, su proceder se reduce a omitir el examen y pronunciamiento de una cuestión controvertida que oportunamente se le planteó, lo que permite, entonces, hablar de un laudo propiamente incompleto, falto de exhaustividad, precisamente porque la congruencia -externa- significa que sólo debe ocuparse de las personas que contendieron como partes y de sus pretensiones; mientras que la exhaustividad implica que el laudo ha de ocuparse de todos los puntos discutibles. Consecuentemente, si el laudo no satisface esto último, es inconcuso que resulta contrario al principio de exhaustividad que emerge del artículo 842 de la Ley Federal del Trabajo, traduciéndose en un laudo incompleto, con la consiguiente violación a la garantía consagrada en el artículo 17 de la Constitución Federal."[59]

Los principios de congruencia y exhaustividad deben cumplirse en todas las resoluciones judiciales que se emitan, con el fin de dar seguridad jurídica a las partes en cuya esfera jurídica recaerán sus efectos.

El primero de ellos, de congruencia, refiere a que la resolución debe ser congruente en su aspecto interno y externo. La congruencia interna refiere a que la resolución no debe contener resoluciones o afirmaciones que se contradigan entre sí o con resoluciones previamente dictadas por el mismo órgano jurisdiccional. Por otro lado, la congruencia externa se refiere a que la resolución debe coincidir con la litis y con todo aquello que fue solicitado por las partes.

El segundo, el principio de exhaustividad se refiere al examen que debe realizar el órgano jurisdiccional respecto de todos los puntos planteados por las partes y aquellos dispuestos por la ley, sin omitir alguno de ellos. Es decir, implica la obligación de decidir sobre las cuestiones sometidas a su conocimiento tomando en cuenta los argumentos vertidos por las partes.

Dicho principio tiene como fin garantizar el principio de seguridad jurídica, para que las partes tengan certidumbre sobre todas las cuestiones resueltas por el órgano jurisdiccional, sin que existan contradicciones u omisiones en sus resoluciones, y las partes puedan conocer su situación jurídica, así como los efectos que se producirán en su esfera jurídica.

c.    Ilegalidad del Auto Reclamado

El Auto Reclamado es ilegal toda vez que vulnera el principio de seguridad jurídica, así como el principio de congruencia y exhaustividad de las resoluciones judiciales pues, como será demostrado en el presente concepto de violación y contrario a lo que sostiene el Juzgado Responsable, éste sí actuó en contra de sus propias determinaciones.

Como fue desarrollado en el capítulo de "Antecedentes", previo a acordar el desistimiento formulado por los Sedicentes Apoderados el Juzgado Responsable emitió el Requerimiento a Wilmington y a CI Banco, a través del cual buscaba informarse sobre el cumplimiento a las Medidas Cautelares que dichas sociedades habían realizado. En su acuerdo, el Juzgado

---

[59] Registro digital: 179074 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;IV.2o.T. J/44 ;J

Clyde&Co

Responsable fue claro en establecer que **previo a pronunciarse sobre el desistimiento, se debían desahogar dichos requerimientos**:

> En ese orden, del instrumento notarial que se exhibe con el escrito identificado con el número de folio interno 7862, se advierte la participación de i] CI Banco, Sociedad Anónima, Institución de Banca Múltiple, y de ii] Wilmington Trust, en su otorgamiento, con motivo del ejercicio de derechos de conformidad con el contrato de prenda al que hace alusión en el instrumento notarial de referencia.
>
> En consecuencia, previo a proveer sobre el escrito de cuenta, requiérase a i] CI Banco, Sociedad Anónima, Institución de Banca Múltiple, y a ii] Wilmington Trust, para que en el término de tres días computados legalmente, informen sobre el cumplimiento dado a las medidas precautorias decretadas en el presente procedimiento concursal que les fueron notificadas.

No obstante lo anterior, como consta en autos, la única persona notificada del requerimiento citado fue CI Banco y, en consecuencia, fue ésta la única que "desahogó" (con comillas pues, como este Tribunal advertirá, formuló una serie de manifestaciones que nada se relacionan con el cumplimiento a las Medidas Cautelares) lo ordenado por el Juzgado Responsable.

A pesar de ello, después de que CI Banco presentara su desahogo el Juzgado Responsable acordó favorable el desistimiento formulado por los Sedicentes Apoderados, considerando "suficiente" las manifestaciones de CI Banco y, evidentemente, obviando lo formulado en el Requerimiento a Wilmington y a CI Banco.

Ahora, en el Auto Reclamado, el Juzgado Responsable excusa su actuar en que si bien había requerido también a Wilmington Trust, "consideró suficiente" las manifestaciones de CI Banco al ser la accionista mayoritaria de Controladora, además de que el cumplimiento de dicho requerimiento no era una "condición suspensiva" para acordar la solicitud de desistimiento, sino simplemente una manera de allegarse de medios de convicción que consideró satisfecha con las meras manifestaciones de CI Banco. Será evidente para este Tribunal que dichas consideraciones, son ilegales.

En primer lugar, es necesario partir de la premisa que el Requerimiento a Wilmington y a CI Banco fue formulado por el Juzgado Responsable con la finalidad de conocer **el cumplimiento que se había otorgado a las Medidas Cautelares**; lo anterior, como consecuencia de las diversas denuncias presentadas por Controladora en el sentido de que CI Banco y Wilmington Trust, **de manera conjunta, habían violado las Medidas Cautelares que eran de su pleno conocimiento al ejecutar extrajudicialmente garantías en perjuicio de Controladora**.

Partiendo de dicha finalidad, será evidente para este Juzgado que para tener un conocimiento pleno y veraz del cumplimiento a dichas medidas **era esencial conocer no solo la**

69



**manifestación de CI Banco, sino también la de Wilmington Trust pues ambas entidades fueron las que celebraron la Supuesta RUA y violaron las Medidas Cautelares, cuestión que de hecho fue implícitamente reconocida por el Juzgado Responsable en el requerimiento formulado.**

Por lo tanto, contrario a lo sostenido por el Juzgado Responsable, lo cierto es que no era "suficiente" con que únicamente CI Banco se manifestara, sino que era necesario que también Wilmington Trust explicara el cumplimiento a las medidas cautelares.

Sin que pase desapercibido la manifestación del Juzgado Responsable en el sentido de que CI Banco era el "accionista mayoritario" de Controladora; sin embargo, la representación ostentada por los Sedicentes Apoderados se sustentó en la Supuesta RUA, en la cual **no únicamente participó CI Banco, sino también Wilmington Trust, por lo que es completamente irrelevante la mayoría accionaria de aquella para conocer la validez de la resolución supuestamente adoptada.**

Aunado a lo anterior, este Tribunal no pasará desapercibido que al formula el Requerimiento a Wilmington y a CI Banco, el Juzgado Responsable fue claro en establecer que solamente resolvería respecto al desistimiento una vez que ambas personas desahogaran el requerimiento formulado.

De tal suerte que, si una de ellas no desahogaba el requerimiento, el Juzgado Responsable tenía que verse en la necesidad de utilizar otros medios con el fin de notificar nuevamente a la faltante, Wilmington Trust o realizar cualquier otra actuación tendiente a obtener el desahogo del requerimiento.

Sin embargo, contrario a lo expresado en el Auto Reclamado, lo cierto es al obviar la necesidad de que Wilmington Trust desahogara el requerimiento que le fue formulado el Juzgado Responsable se apartó de su propia decisión y consideró, sin fundamento alguno, que bastaba con las manifestaciones efectuadas por CI Banco.

En ese orden de ideas, es evidente que el Juzgado Responsable, de forma arbitraria y discrecional, decidió no cumplir con su propia resolución, consistente en no levantar la reserva y no resolver sobre el desistimiento hasta que ambas personas desahogaran el requerimiento.

Contrario a lo que ahora aduce el Juzgado Responsable, lo cierto es que **sí condicionó cualquier pronunciamiento sobre el desistimiento formulado al cumplimiento del Requerimiento a Wilmington y a CI Banco, sin hacer reserva alguna sobre la posibilidad de que fuera cumplido únicamente de manera "parcial".**

En ese orden de ideas, el Juzgado Responsable, con el fin de dar seguridad jurídica a las partes para que éstas tengan la certidumbre de los alcances y efectos de los actos de aquél, debió evitar una actuación arbitraria y discrecional, y sujetarse a lo dispuesto por el ordenamiento jurídico.



En ese sentido, los órganos jurisdiccionales una vez que dictan sus resoluciones, no pueden revocar sus propias determinaciones, salvo las excepciones previstas por la ley. Dicho de otra forma, una vez dictado un auto o una resolución, el órgano jurisdiccional debe sujetarse a lo dispuesto por él, ya que no tiene la facultad de revocar sus propias decisiones.

De sostener lo contrario, se llegaría a la conclusión de permitir que las autoridades judiciales puedan revocar sus actuaciones en el momento en que lo deseen sin necesidad de expresar motivo alguno, dejando sin certidumbre a los particulares respecto a qué atenerse dentro de un procedimiento judicial.

Esto es, si la autoridad judicial puede modificar e incluso contrariar sus propias determinaciones, entonces toda actuación judicial carecería de una efectividad o de certeza, porque en cualquier momento esa misma autoridad podría sustituirla o modificarla, sin mayores razones que su discrecionalidad.

Ello haría inútil todo procedimiento judicial puesto que provocaría que los gobernados estén a la merced de la discreción del órgano jurisdiccional, atentando abiertamente contra el principio de seguridad jurídica.

Permitir esto a las autoridades judiciales implicaría eliminar por completo la certeza que tienen los particulares en saber a qué atenerse respecto a la actuación de la autoridad y al alcance de un procedimiento judicial.

De ser así, el ordenamiento jurídico y el principio de legalidad tendría poca razón de ser, puesto a que el órgano jurisdiccional podría decidir libremente los alcances, duración y efectos de sus resoluciones, sin que los particulares puedan tener un conocimiento previo de estos. O peor aún, aunque tuvieran conocimiento del acto, no tendrían certeza alguna porque en el futuro ese acto podría ser revocado o sustituido por otro.

En el presente caso, si el Juzgado Responsable estableció expresamente que **no resolvería lo relativo al desistimiento sin antes tener los informes de CIBanco y Wilmington Trust y, posteriormente, obvió el cumplimiento de dicho requerimeinto, es evidente que <u>sí actuó en contravención a una congruencia elemental y en contra de sus propias determinaciones</u>**.

El principio de seguridad jurídica es uno de los más importantes del ordenamiento jurídico mexicano toda vez que permite el ejercicio de otros derechos y el conocimiento de los alcances y efectos de los procedimientos, así como de los actos intraprocesales. En el caso, el Juzgado Responsable atentó contra dicho principio al "echar atrás" su propia resolución.

Se trata de una violación de gran importancia toda vez que impide que la Quejosa sepa a qué consecuencias atenerse y a continuar actuando en el procedimiento, toda vez que en cualquier momento la autoridad podría revocar sus determinaciones.



Ninguna persona juzgadora puede revocar sus propias determinaciones. Al hacerlo transgrede el orden público del cual deriva la seguridad jurídica, el principio de legalidad e incluso el derecho al debido proceso.

Dicho principio está reconocido en el ordenamiento jurídico mexicano, así como en el nicho jurisprudencial del Poder Judicial de la Federación.

Tan es así, que el Código de Comercio, de aplicación supletoria a la Ley de Concursos Mercantiles regula como medio de defensa la revocación, mediante el cual el juez que los dictó puede revocar sus resoluciones. Sin embargo, existe un fundamento **expreso y requisitos que deben cumplirse para que el órgano jurisdiccional pueda hacerlo.**

Es decir, el órgano jurisdiccional no puede revocar su determinación sin más, sino que debe sujetarse a los requisitos y procedimiento previsto para ello, precisamente en cumplimiento del principio de seguridad jurídica y legalidad. Al respecto, el Código de Procedimientos Civiles para la Ciudad de México, aplicable de forma supletoria a la Ley de Concursos Mercantiles, dispone:

> "ARTICULO 272-G Los jueces y magistrados podrán ordenar, aun fuera de la audiencia a que se refiere el artículo 272A, que se subsane toda omisión que notaren en la substanciación, para el solo efecto de regularizar el procedimiento, **con la limitante que no podrán revocar sus propias determinaciones.**"

> [Énfasis añadido]

Aunado a lo anterior, sirve de sustento los siguientes criterios jurisprudenciales:

> **"REGULARIZACION DEL PROCEDIMIENTO, LOS TRIBUNALES NO DEBEN REVOCAR SUS PROPIAS RESOLUCIONES AL DECRETAR LA.** De lo dispuesto en el artículo 272-G del Código de Procedimientos Civiles del Distrito Federal, se desprende que tal dispositivo no establece una obligación, sino una facultad para que los jueces y magistrados puedan subsanar toda omisión que notaren en la sustanciación del procedimiento, para el solo efecto de regularizarlo, siempre que con ello no modifiquen sus propias determinaciones; por lo que si además el artículo 84 del Código aludido es contundente al ordenar que esos órganos jurisdiccionales no podrán variar ni modificar sus sentencias o autos después de firmados, estableciendo sólo la posibilidad de aclarar algún concepto o suplir cualquier omisión que las primeras contengan sobre un punto discutido en el litigio, o bien cuando los segundos sean obscuros o imprecisos, pero haciendo sobre todo hincapié en que **no se puede alterar la esencia de dichas sentencias y proveídos**; por lo que resulta incuestionable que no podía proceder la pretensión de la parte quejosa de que se regularizara el procedimiento, puesto que ello no sólo tendría como finalidad la de subsanar la omisión de que no se acordó una promoción de la parte demandada, por la que señaló un nuevo domicilio para oír notificaciones, ya que eso necesariamente también traería como consecuencia que se anulara todo lo actuado en el juicio natural, con posterioridad a un auto por el cual se ordenó una notificación personal a las partes, en virtud de que la misma se llevó a efecto en el domicilio originalmente señalado por la amparista y no en el que precisó con posterioridad; por lo tanto, al quedar claro que no se está en el supuesto de que se pretenda subsanar una simple omisión, es indudable que tal pretensión se debió intentar a través del recurso ordinario que resultara procedente para lograr la nulidad de las actuaciones relativas."[60]

> [Énfasis añadido]

---

[60] Registro digital: 203474 TCC; 9a. Época;Semanario Judicial de la Federación y su Gaceta;I.3o.C.77 C ;TA



Además, mediante **jurisprudencia,** se ha establecido que los órganos jurisdiccionales no pueden revocar de oficio sus propias determinaciones cuando se trata de acuerdos importantes y trascendentes en el procedimiento:

> **"TRIBUNALES DEL NUEVO SISTEMA DE JUSTICIA LABORAL. NO PUEDEN REVOCAR DE OFICIO SUS PROPIAS DETERMINACIONES TRATÁNDOSE DE ACUERDOS IMPORTANTES Y TRASCENDENTES EN EL PROCEDIMIENTO QUE PRODUCEN UN DERECHO PROCESAL A LA PARTE QUE FAVORECEN.**
>
> Hechos: Un Tribunal Colegiado de Circuito, al resolver un juicio de amparo directo, consideró que en un conflicto individual de seguridad social, cuando un Juez de Distrito Especializado en Materia de Trabajo, motu proprio regulariza el expediente tramitado por el secretario de instrucción, para dejar insubsistente el procedimiento hasta el acuerdo de admisión de la demanda, ello no implicaba la revocación de sus propias determinaciones, ya que el artículo 873-K de la Ley Federal del Trabajo, le faculta para subsanar las omisiones o errores en que éste haya incurrido. En cambio, el otro órgano colegiado contendiente, en la propia sede de control constitucional, arribó a la determinación de que cuando un secretario instructor admite la demanda laboral, esa decisión, de ser alterada oficiosamente por el Juez Laboral, sí conlleva dejar insubsistentes sus propias determinaciones, no obstante existir prohibición para ello en los términos postulados por los artículos 686 y 848 de la Ley Federal del Trabajo.
>
> Criterio jurídico: El Pleno Regional en Materia de Trabajo de la Región Centro-Norte, con residencia en Monterrey, Nuevo León, determina que el acuerdo del secretario instructor dictado en la fase escrita del procedimiento a través del cual admite a trámite la demanda laboral, aunque resulta una actuación de mero trámite, lo cierto es que guarda importancia y trascendencia, pues se trata de una decisión que produce un derecho procesal para la parte que le favorece, que desde luego no puede revocarse de oficio.
>
> Justificación: El principio de inmediación junto con los de firmeza de los autos, el preclusivo, de celeridad y de seguridad jurídica en materia procesal, permean en los actuales artículos 686, 848, 873 y 873-K de la Ley Federal del Trabajo, los que tienen como denominador común que el Juez en materia laboral debe asumir un papel proactivo; es decir, de protagonista para corregir o subsanar cualquier irregularidad u omisión formal que aprecie en la sustanciación del proceso, para lo cual podrá regularizarlo; naturalmente, sin que tal proceder implique llegar al extremo de revocar las propias resoluciones del órgano jurisdiccional. Por ende, no le está permitido al Juez laboral establecer, de oficio, la insubsistencia de un auto admisorio de demanda dictado por el secretario instructor del propio órgano jurisdiccional cuando entra en conocimiento posterior del asunto ya que, de hacerlo, tal proceder implica revocar su propia determinación (la del órgano jurisdiccional al margen de las personas que lo encarnan), incluso tratándose de acuerdos de mero trámite, como lo es el de admisión, pues goza de importancia y trascendencia en el procedimiento laboral; hecha excepción de que tal decisión se combata a través del recurso de reconsideración previsto en la ley laboral."[61]

En el presente caso, la resolución por la cual se formulaba el requerimiento a las personas mencionadas para informar sobre el cumplimiento a las medidas precautorias era fundamental para el concurso mercantil toda vez que su desahogo **completo** determinaría si se resolvía sobre el desistimiento o no.

En consecuencia, al obviar la necesidad de que Wilmington Trust desahogara el requerimiento que fue formulado, el Juzgado Responsable actúo en contra de sus propias determinaciones, sin fundamento alguno, violando el principio de seguridad jurídica, legalidad y derecho al debido proceso.

---

[61] Registro digital: 2028140 Plenos Regionales; 11a. Época;Gaceta del Semanario Judicial de la Federación;PR.L.CN. J/23 L (11a.) ;J; Publicación: viernes 02 de febrero de 2024 10:04 h



Si bien el Juzgado Responsable tiene discrecionalidad para emitir sus resoluciones, **no la tiene para actuar en contra de sus propias determinaciones ni para dejarlas sin efectos sin fundamento alguno.**

Al emitir una resolución, debe estarse a lo dispuesto por la misma, con la finalidad de generar seguridad jurídica. En su caso, de ser ilegal o estar equivocada, la misma será susceptible de modificación o revocación, pero únicamente a través de los mecanismos y procedimientos previstos por el ordenamiento jurídico.

En ese orden de ideas, es ilegal lo considerado por el Juzgado Responsable en el sentido de que que el hecho de que resolviera únicamente con lo manifestado por CI Banco se trató simplemente de "*la facultad de la persona juzgadora de resolver conforme a los elementos disponibles en autos*". Se afirma lo anterior pues, la facultad no alegada **no releva al juzgado de cumplir con lo ordenado previamente y permitir el desahogo correcto del requerimiento a Wilmington Trust, más si éste** <u>buscaba informarse sobre el cumplimiento a las Medidas Cautelares, lo cual era esencial para conocer la validez de la Supuesta RUA</u>.

Lo anterior, aunado a que las manifestaciones expresadas por CI Banco **ninguna referencia hicieron al cumplimiento de las Medidas Cautelares, sino que se limitaron a sostener que supuestamente no habían aprobado la presentación de la solicitud de concurso mercantil.** Por lo tanto, **es completamente falso que el Juzgado Responsable contara con los elementos necesarios para resolver sobre el cumplimiento de las Medidas Cautelares**.

En es orden de ideas, es claro que el Auto Reclamado genera una inestabilidad y una incertidumbre jurídica para la Quejosa porque el Juzgado fue en contra de sus propias determinaciones, al tener por desahogado el requerimiento sin haberse cumplido en su totalidad.

El Juzgado Responsable debió allegarse de todos los elementos posibles con el fin de emitir una resolución completa y congruente. Sin embargo, como consecuencia del Auto de Desistimiento ahora confirmado por el Auto Reclamado, eso no fue posible toda vez que no se tenía el informe de Wilmington Trust.

Por las razones antes expuestas, el Auto Reclamado viola el principio de seguridad jurídica y el principio de congruencia y exhaustividad de las resoluciones judiciales.



**SEXTO.    EL JUZGADO RESPONSABLE PARTE DE PREMISAS ERRÓNEAS Y NO ADVIERTE LA *RATIO* DE LOS AGRAVIOS FORMULADOS POR LA QUEJOSA, YA QUE ÉSTA NO SE DUELE DE UN MERO OTORGAMIENTO DE EFECTOS A LA SUPUESTA RUA, SINO DEL HECHO DE QUE FUE OMISO EN VALORAR EL RESTO DEL CAUDAL PROBATORIO Y RAZONES QUE DEMOSTRABAN LA INVALIDEZ DE DICHA RESOLUCIÓN, VIOLANDO EL PRINCIPIO DE CONTRADICCIÓN PUES, CONTRARIO A LO SOSTENIDO EN EL JUZGADO RESPONSABLE, ÉSTE SÍ DESESTIMÓ IMPLÍCITAMENTE LAS PROMOCIONES FORMULADAS POR CONTROLADORA**.

<u>Síntesis</u>.    Al momento de decidir sobre la solicitud de desistimiento, el Juzgado Responsable se enfrentaba a una clara controversia: le fueron presentadas solicitudes, por personas distintas, que eran distalmente contrarias entre sí (por un lado, se solicitaba el desistimiento del concurso mercantil y, por el otro, se solicitaba su continuación y el desconocimiento de la personalidad del otro promovente). Por lo tanto, para poder decidir sobre éstas, el Juzgado Responsable debió respetar el principio de contradicción y llevar a cabo un procedimiento que permitiera a ambas partes ser oídas y vencidas; más aun, si la decisión conllevaría el desconocimiento de la personalidad de los legítimos representantes de la Quejosa, la cual evidentemente no puede realizarse de manera unilateral. Sin embargo, en el Auto Reclamado el Juzgado Responsable se limitó a sostener que no debió seguir procedimiento alguno pues lo único que hizo fue reconocer valor legal a un nuevo poder, siendo que el mero reconocimiento no constituye la violación que aduce la Quejosa, sino el hecho de que ignoró por completo las múltiples denuncias, argumentos y pruebas que demostraban la invalidez del poder bajo el cual pretendían actuar los Sedicentes Apoderados.

<u>Desarrollo</u>.

a.   <u>Debido Proceso, garantía de audiencia y el principio de contradicción.</u>

El contenido y alcance de estos derechos ya fueron desarrollados en el tercer concepto de violación, por lo que en obvio de repeticiones innecesarias se solicita que dichas consideraciones se tenagn por reproducidos como si a la letra se insertasen.

b.    <u>El Juzgado Responsable violó el derecho al debido proceso, la garantía de audiencia y el principio de contradicción en perjuicio de Dolphin.</u>

Como fue narrado en el capítulo de "Antecedentes", previo al dictado del Auto de Desistimiento fueron planteadas diversas cuestiones al Juzgado Responsable:

(i)    por una parte, los legítimos representantes de Controladora denunciaron la violación a Medidas Cautelares como consecuencia de la celebración de la Supuesta RUA y la presentación del desistimiento, solicitando entonces que no se le reconociera efectos jurídicos a la misma;



(ii)    al mismo tiempo, de manera contradictoria a lo realizado por los legítimos representantes de Controladora, el Sedicente Apoderado de Controladora compareció sustentando su legitimación en la Supuesta RUA y adujo el desistimiento del Concurso Mercantil, solicitando además que se desconocieran los actos realizados por los legítimos representantes de Controladora

(iii)    consecuentemente, los legítimos representantes de Controladora presentaron un **incidente de falta de personalidad** en contra del Sedicente Apoderado de Controladora, en el que solicitaron una vez más al Juzgado Responsable que no otorgara efecto jurídico alguno a la Supuesta RUA;

(iv)    el Juzgado Responsable requirió a Wilmington Trust y a CI Banco que informaran el cumplimiento de las Medidas Cautelares, previo a pronunciarse sobre la solicitud de desistimiento

(v)    CI Banco desahogó dicho requerimiento, sin referir ni justificar la ejecución extrajudicial de las garantías prendarias sobre las acciones de Controladora, y

(vi)    los legítimos representantes de Controladora manifestaron su voluntad clara de que se continuara con el Concurso Mercantil

De lo anterior, es posible desprender que el Juzgado Responsable se enfrentaba a una controversia clara: por un lado, los legítimos representantes de Controladora denunciaron la ejecución ilegal de garantías y la consecuente necesidad de que no se reconociera efecto jurídico al desistimiento del Concurso Mercantil y, por el otro, sedicentes apoderados solicitaron el desistimiento y aducían tener la representación de la Quejosa.

Ahora bien, en lugar de resolver sobre dichas solicitudes encontradas, el Juzgado Responsable se limitó a aceptar el desistimiento formulado por los Sedicentes Apoderados. En el Auto Reclamado, dicho Juzgado justificó su decisión en el hecho de que únicamente se limitó a reconocer la validez de un acto corporativo (la Supuesta RUA), aduciendo que mediante su actuar no violó el derecho de debido proceso ni el principio de contradicción pues éste no "revocó oficiosamente" la personalidad de los apoderados de Controladora, siendo que "*el hecho de que un representante haya sido sustituido mediante los cauces corporativos no requiere pronunciamiento específico de la persona juzgadora.*" Evidentemente, dicha determinación es ilegal.

En primer lugar, este Tribunal debe advertir que el Juzgado Responsable partió de una apreciación inexacta del agravio que aqueja a la Quejosa y la verdadera naturaleza de la violación en la que incurrió.

La Quejosa no pretende sostener la imposibilidad jurídica o material de que una personal moral otorgue nuevos poderes a favor de terceras personas, como convenientemente pretende reducir el argumento el Juzgado Responsable. Controladora tampoco niega la posibilidad de

76



"sustitución" de un representante, ni la necesidad de que exista un procedimiento judicial especial siempre que se busque el reconocimiento de un nuevo representante.

La violación que cometió el Juzgado Responsable no se limita simplemente al hecho de que éste reconoció efectos a la Supuesta RUA y a las actuaciones de los Sedicentes Apoderados; la violación que adujo la Quejosa, y que se reclama ahora en el presente juicio de amparo, es que dicha valoración se hizo **sin tomar en consideración las múltiples pruebas y argumentos ofrecidos por la Quejosa para demostrar la ilegalidad de dicha resolución, omisión que constituye una violación frontal al derecho al debido proceso y al principio de contradicción**.

Más allá del hecho de que el Juzgado Responsable estuviera o no facultado a reconocer efectos de un acto corporativo, lo cierto es que dicho reconocimiento se realizó en el contexto de un **procedimiento legal**, por lo que ante la existencia de denuncias claras y contundentes sobre la invalidez de dicho acto (principalmente, ante la denuncia clara de que se habían incumplido con las Medidas Cautelares), lo cierto es que previo a resolver sobre el desistimiento del concurso mercantil el Juzgado Responsable **debió otorgar audiencia a las partes con la finalidad de conocer la "verdad legal" y, en consecuencia, decidir sobre los efectos de la Supuesta RUA**.

Para realizar lo anterior, el Juzgado Responsable debió tramitar el incidente de falta de personalidad promovido por la Quejosa **previo a resolver el desistimiento**, y/o **resolver el Recurso de Revocación contra Reconocimiento de Sedicente Apoderado, tal y como ha sido demostrado en conceptos de violación anteriores**.

Ahora bien, en caso de que el Juzgado Responsable considerara que se requería algún trámite especial, la propia Ley de Concursos Mercantiles, que en su artículo 267 permite el trámite en la vía incidental de "diversas cuestiones que se suscitaren durante el concurso mercantil." En ese orden de ideas, para decidir sobre si la Supuesta RUA había violado o no las Medidas Cautelares y, por lo tanto, si le debía reconocer efectos, entonces **debió aperturar un incidente que permitiera a las partes formular sus argumentos**.

Más aun, incluso de considerar que no era necesaria la vía incidental, el Juzgado Responsable **debió al menos dar vista con las manifestaciones del Sedicente Apoderado y de CI Banco, previo a decidir dar trámite al desistimiento presentado**; más aun, si los legítimos representantes de la Quejosa fueron claros en su voluntad de la continuación del procedimiento concursal.

Contrario a lo que sostiene el Juzgado Responsable, si bien el reconocimiento de personalidad no implicaba que "*deba agotarse un procedimiento dentro del concurso mercantil*", la valoración de las pruebas y argumentos que demostraban la ilegalidad de la Supuesta RUA y, por lo tanto, la carencia de personalidad de los Sedicentes Apoderados **sí era una cuestión que necesariamente debía resolverse de manera anticipada y en respeto a formalidades esenciales de procedimiento en favor de los legítimos representantes de Controladora**.



Sin embargo, el Juzgado Responsable resolvió favorable el desistimiento **sin respetar el principio de contradicción, <u>cediendo completamente a la solicitud planteada por el Sedicente Apoderado sin tomar en consideración ni otorgar garantía de audiencia a sus legítimos representantes</u>**, que son quienes solicitaron la declaración de concurso mercantil desde un inicio

En ese sentido, contrario a lo que sostiene el Juzgado Responsable en el Auto Reclamado, el hecho de que no haya escuchado los argumentos de los legítimos representantes de la Comerciante, únicamente dando trámite a los argumentos de su contraparte, es una evidente violación al **principio de contradicción y el derecho al debido proceso de la Quejosa**.

A mayor abundamiento, el hecho de que el Juzgado Responsable haya simplemente ignorado las múltiples denuncias y promociones de los legítimos representantes de Controladora para impugnar la Supuesta RUA y demostrar su ilegalidad, **sí implicó un ilegal desconocimiento de personalidad en su perjuicio**.

El Juzgado Responsable sustentó la omisión de escuchar a los legítimos representantes de la Quejosa en que ésta "*no constituye una revocación oficiosa [de la personalidad], sino el resultado natural de un cambio societario debidamente formalizado y comunicado al tribunal*"; sin embargo, como este Tribunal advertirá de lo expuesto hasta el momento, lo cierto es que el Juzgado Responsable únicamente advirtió la comunicación de los Sedicentes Apoderados y no así aquellas formuladas por los legítimos representantes de Controladora que debidamente le informaban **la carencia de facultades de dichos apoderados**.

Esto es, contrario a lo que sostiene el Juzgado Responsable, la decisión de únicamente "escuchar" los argumentos de ciertos representantes, **a pesar de que existían ptros argumentos formulados por los representantes reconocidos en el concurso mercantil, <u>sí implica un desconocimiento implícito y unilateral de los legítimos representantes de Controladora que viola el principio de contradicción y el derecho al debido proceso</u>**.

Más aun, el solo hecho de que haya dado trámite a la solicitud del Sedicente Apoderado de la Quejosa de desistirse del Concurso Mercantil implica, material y consecuentemente, que **desconoció la personalidad de los legítimos representantes de Controladora pues, a pesar de que éstos <u>expresamente manifestaron su voluntad de que iniciar y continuar con el procedimiento concursal, ésta fue ignorada y se prefirió lo expresado por el Sedicente Apoderado de Controladora</u>**.

Lo anterior, aunado al hecho de que la Asamblea General de Accionistas y la Sesión del Consejo de Administración bajo las cuales los representantes de la Quejosa sustentó su legitimación, **se mantienen vigentes sin que se demostrara lo contrario y, no obstante ello, el Juzgado Responsable únicamente otorgó validez a la Supuesta RUA**.

78



En ese orden de ideas, es evidente la contradicción en la que incurre el Juzgado Responsable al sostener que éste se limitó simplemente a reconocer la validez de un acto corporativo pues lo cierto es que en autos **no se había demostrado la invalidez de aquellos actos, adoptados válidamente por los órganos corporativos de Controladora, en los que se decidió iniciar con el concurso mercantil**.

Por lo tanto, no existe justificación alguna válida por la cual el Juzgado Responsable estuviera facultado para reconocer arbitrariamente la validez de los actos de los Sedicentes Apoderados y no así aquella de los actos corporativos realizados para sustentar la solicitud de desistimiento de concurso mercantil.

Más aun, el Juzgado Responsable **reconoció expresa y previamente la legitimación de representantes de la Quejosa**, solo para después ignorar sus peticiones y tramitar únicamente las del Sedicente Apoderado de Controladora.

Este desconocimiento material de la personalidad de los legítimos apoderados de la Quejosa no podía ser realizado de manera unilateral ni mucho menos oficiosa, como lo hizo el Juzgado Responsable.

En respeto al principio de contradicción y debido proceso, cualquier decisión (incluso implícita) sobre la personalidad de los legítimos representantes de la Quejosa debió adoptarse **solo como consecuencia de haberse seguido un procedimiento incidental para ello**; al respecto, son relevantes por analogía los siguientes criterios:

> **"PERSONALIDAD DEL ACTOR. ES IMPROCEDENTE SU EXAMEN OFICIOSO SI PREVIAMENTE SE RECONOCIÓ EN FORMA EXPRESA Y FUE CONSENTIDA LA RESOLUCIÓN EN QUE ELLO SUCEDIÓ (LEGISLACIÓN DEL ESTADO DE PUEBLA).** Los artículos 238 y 222 del Código de Procedimientos Civiles, dicen como sigue: "Artículo 238. El Juez, en el auto en que provea la demanda, estudiará previamente su competencia y la personalidad del demandante. Si decide que es competente y que el promovente tiene la personalidad que ostenta, admitirá la demanda y ordenará emplazar al demandado, si aquélla cumple con los requisitos legales.". "Artículo 222. A la personalidad de los litigantes se aplicarán las siguientes disposiciones: I. Puede impugnarse: a) En queja contra el auto que reconoce la personalidad; o b) Como excepción al contestar la demanda. II. Impugnada la personalidad por uno de los medios establecidos en la fracción anterior, no podrá impugnarse por el otro. III. Cuando contestada ya la demanda, la falta de personalidad tenga una causa superveniente, puede aquélla impugnarse en incidente. IV. El incidente a que se refiere la fracción anterior, se tramitará como disponen los artículos 632 y 633, pero si antes de resolverse la cuestión incidental, se cita para sentencia en el negocio principal, se suspenderá el procedimiento en éste, para que ambas cuestiones se resuelvan en una sola sentencia, y si se declara procedente la falta de personalidad, se declarará también no estar el principal en estado de dictar sentencia.". De lo anterior resulta que si el Juez reconoce expresamente la personalidad del demandante y el demandado no agota ninguna de las dos alternativas que la ley concede para impugnar esa determinación, ésta debe tenerse consentida y por lo tanto el examen oficioso que posteriormente se pretendiera es indebido de acuerdo con el principio jurídico de la preclusión. Este criterio encuentra apoyo en la parte final de la jurisprudencia de la Suprema Corte de Justicia de la Nación, publicada en el Apéndice al Semanario Judicial de la Federación 1917-1985, Cuarta Parte, página 614, que dice: "PERSONALIDAD, EXAMEN DE LA.-La personalidad de las partes es un presupuesto procesal que debe examinarse de oficio por el juzgador, como expresamente lo dispone el artículo 47 del Código de Procedimientos Civiles para el Distrito Federal, en relación con los artículos 35, fracción IV, y 36 del



DOCUMENTO SOMETIDO POR VILLANUEVA
5000000300153600 000000000000000000000000130
281705 28 FFFM 039

mismo ordenamiento, por lo que, también debe resolver la objeción que al respecto presenten las partes, cualquiera que sea el momento en que lo hagan, porque la falta de impugnación oportuna no puede generar la existencia de una representación que no existe, y solamente debe omitir la reiteración del examen de la personalidad, en caso de haber sido resuelto antes de manera expresa y esté consentido el fallo, porque entonces opera el principio de la preclusión.".["][62]

"**PERSONALIDAD, NO PROCEDE SU ESTUDIO OFICIOSO POR EL TRIBUNAL DE ALZADA CUANDO SE HAYA RESUELTO EN PRIMERA INSTANCIA Y ESTE CONSENTIDO EL FALLO RESPECTIVO. (LEGISLACION DEL ESTADO DE MICHOACAN).** Cuando el Juez de primera instancia resuelve de manera expresa la cuestión relativa a la falta de personalidad, en el incidente respectivo, y dicha resolución no es combatida por quien resulta perjudicado, el estudio indicado deja de ser oficioso; por tanto, el Magistrado responsable estuvo en lo correcto al estimar inatendibles los agravios que al respecto formuló el apelante, porque ello ya había sido resuelto a través de la interlocutoria pronunciada en el incidente que sobre falta de personalidad y personería promovió éste, la cual quedó firme al no haber sido recurrida por las partes, y dicho pronunciamiento debe considerarse consentido por el ahora peticionario de garantías, pues de estimar lo contrario se atentaría contra la firmeza del procedimiento, la cual es garantía de las partes, en términos del artículo 96 del código adjetivo de la entidad."[63]

Por lo tanto, contrario a lo sostenido en el Auto Reclamado, el hecho de que el Juzgado Responsable haya materialmente desconocido la personalidad de los legítimos representantes de la Quejosa sin previamente seguir un procedimiento incidental **viola en su perjuicio el derecho al debido proceso y el principio de contradicción**.

Ante tal violación, este Tribunal debe otorgar el amparo y protección de la justicia de la Unión para el efecto de revocar el Auto Reclamado.

**SÉPTIMO.   CONTRARIO A LO QUE SOSTIENE EL JUZGADO RESPONSABLE, EL DESISTIMIENTO FORMULADO POR LOS SEDICENTES APODERADOS SÍ FUE PROMOVIDO POR LOS ACREEDORES DE LA QUEJOSA, POR LO QUE ESTABA COMPLEIDO A EJERCER LAS FACULTADES QUE LE OTORGA EL ARTÍCULO 87 DE LA LEY DE CONCURSOS MERCANTILES, LAS CUALES NO DEPENDEN DEL DICTADO DE UNA SENTENCIA DE CONCURSO MERCANTIL.**

<u>Síntesis</u>.        Desde la Primer Denuncia de Violación a Medidas Cautelares (y, posteriormente, en el Incidente de Falta de Personalidad) se solicitó al Juzgado Responsable advertir que la Supuesta RUA, bajo la cual el Sedicente Apoderado sustentaba su legitimación y el desistimiento del concurso mercantil, constituía un acto evidentemente realizado por los acreedores de la Quejosa para el cobro indebido, indiscriminado y preferente de sus créditos, lo cual no permitido en virtud del principio *par conditio creditorum*, por lo que dicho Juzgado debía ejercer la facultad que le otorga el artículo 87 de la Ley de Concursos Mercantiles y obviar ("tener por no puesta") dichos actos. Sin embargo, el Juzgado Responsable fue completamente omiso en emprender el análisis apuntado y advertir, en consecuencia, la notoria improcedencia del desistimiento propuesto. En el Auto Reclamado, el Juzgado Responsable pretende sustentar dicha omisión en

---

[62] Registro digital: 192974 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;VI.1o.C. J/12 ;J
[63] Registro digital: 202173 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;XI.2o.48 C ;TA



el hecho de que no estaba "probado" que el desistimiento haya sido formulado por los acreedores de la Quejosa, además de que las facultades que regula el artículo 87 dependen del dictado de una sentencia de concurso mercantil; sin embargo, Controladora ofreció múltiples pruebas para demostrar que CI Banco, aunque su accionista mayoritaria, era una de las principales acreedoras de Controladora y quien controlaba la ejecución de agresivas garantías en su contra, además de que la Supuesta RUA fue celebrada con la participación de Wilmington Trust, representante de los Tenedores de Bonos y principales acreedores de Controladora, por lo que es evidente que la presentación del desistimiento fue un acto tendiente a ejecutar garantías y cobrar indebidamente y preferentemente créditos en perjuicio de Controladora.

<u>Desarrollo</u>

a.   <u>El principio *par conditio creditorum* en el procedimiento concursal.</u>

En la exposición de motivos de la Ley de Concursos Mercantiles, el legislador dejó en claro la intención del concurso mercantil y la protección que dicho procedimiento a favor de las comerciantes:

> "(…) Las cadenas productivas se integran vertical y horizontalmente, nacional e internacionalmente, tecnológica y sectorialmente. La mayor competitividad obliga a unas empresas a responder ágilmente a los nuevos nichos de mercado y a abandonar aquéllos donde se dejan de tener ventajas competitivas. A medida que la sociedad se moderniza, aumenta el número de empresas, y de la misma manera los factores que hacer variar su competitividad, rentabilidad y permanencia en el mercado.
>
> Existe, sin embargo, un serio problema cuando se dan condiciones que llevan a un empresario, de manera rápida e irremediable, a enfrentar problemas económicos y financieros: incluso cuando ello sea motivado por un error de cálculo o previsión cometido por un empresario honesto, competente y próspero. La empresa, considerada como la organización de trabajo, bienes materiales e intangibles destinados a producir u ofrecer profesionalmente bienes y servicios al mercado, con fines lucrativos, puede tener éxito o bien encontrarse en serias dificultades que amenacen su supervivencia. La quiebra de una empresa no trata de un incumplimiento singular y concreto de una obligación, sino de un incumplimiento general, que afecta a todos las que tienen relación con la empresa: e igualmente afecta la supervivencia económica de los trabajadores que laboran, en ella, de manera que su quiebra repercute en todo su entorno social.
>
> Además, **cuando una empresa se ve imposibilitada a cumplir de manera generalizada en sus obligaciones liquidas frente a una pluralidad de acreedores, se corre el riesgo de que se dé una situación en que el cobro a través de la acción individual por parte de sus acreedores resulte en un detrimento del valor total de la empresa. En este caso la acción individual también puede afectar la prelación que existía entre los acreedores, resultando en inequidades. Este es el momento en que el derecho concursal debe dirigir su normatividad para tratar de evitar que la empresa fracase, que se desperdicie el esfuerzo creativo ya realizado por el empresario, y que no se lastime al conglomerado social que, en alguna medida, se beneficia con el propio funcionamiento de la empresa. La posible quiebra es entonces, un fenómeno económico, y el propósito de la legislación concursal es precisamente atender los males sociales derivados de ese singular fenómeno**.
>
> En lo que hace al marco jurídico que regula las relaciones comerciales entre particulares, debe tenerse en cuenta que en el pasado los tribunales mexicanos y sus leyes procesales se crearon para resolver problemas de sociedades establecidas en ciudades más pequeñas, en las cuales lodos los actores se conocían y encontraban lodos los días en los lugares públicos y de trabajo. En tales condiciones sociales era factible suponer en el juez conocimientos básicos y la inmediatez con la empresa, necesarios para resolver muchos

81



de los problemas que produce la falta de liquidez. Además de que los casos de cesación de pagos eran menos en una sociedad que mostraba menor grado de desarrollo. Hoy en día, la vida en las ciudades no permite a los jueces conocer personalmente a las partes involucradas, el número de negocios que se les someten es aplastante, el tamaño y la complejidad de las empresas comerciales requiere que sean manejadas por equipos de especialistas en administración, contabilidad y en los diversos campos de la actividad comercial, industrial o de servicios de que se trate.

Por todo lo anterior, el marco jurídico no puede permanecer al margen del avance de la sociedad. Para impulsar un crecimiento económico sano y sostenido, que ofrezca oportunidades de desarrollo a toda la población, una condición necesaria es la de contar con un marco jurídico apropiado que ofrezca certidumbre y confianza en la solución, de conflictos entre particulares, facilite la reasignación eficiente de los recursos productivos en la economía y contribuya a que la salida de empresas de los mercados afecte lo menos posible su entorno social y económico. El marco jurídico que regula la actividad económica en este sentido ha venido modernizándose durante los últimos años. No sólo se han establecido acuerdos comerciales con los principales países del mundo, también se expidió la Ley Federal de Competencia, y se han realizado avances importantes en la forma de resolver conflictos entre los particulares, destacando entre ellos la Ley de Arbitrajes.

La legislación concursal también desempeña un papel estratégico. **Su propósito es el de ordenar los procesos de reestructuración de empresas, buscando en primer término aprovechar la experiencia y conocimientos del empresario alimentario y, por otra parte, procurar que los acreedores, ya sea comerciales o financieros, también puedan continuar operando. Cuando una instancia no puede concluir exitosamente, el Estado <u>puede desempeñar una función central coordinando los esfuerzos, proveyendo un foro donde la información fluya y que las empresas viables puedan aprovechar para reestructurarse, seguir operando y mantener el empleo</u>**. Por otra parte, cuando es el caso que las empresas han dejado de ser viables, el Estado desempeña un papel fundamental en la reasignación de factores productivos, de modo que los trabajadores puedan encontrar nuevas fuentes de empleo productivo y bien remunerado en tanto que los bienes sean aprovechados por otras empresas más productivas. En este proceso, los acreedores y los comerciantes obtienen el mayor valor de la empresa o de los bienes que la integran y con oportunidad pueden retomar otros negocios y actividades que contribuyan al bienestar general de la sociedad.

Así, la situación de una empresa que enfrenta problemas económicos o financieros que amenacen su supervivencia se constituye en un objeto de interés público, el cual requiere una participación congruente con la realidad económica, apoyándose en las instituciones para la impartición de justicia y, por otra parte, en la experiencia y conocimientos que agentes independientes puedan aportar a este tipo de procesos. En buena medida a ello responde la preocupación, no sólo de México sino de países con más alto grado de desarrollo económico, como Alemania, España, Francia, Inglaterra y Holanda, y de países con similar estructura económica, como Argentina, Brasil, Chile, Indonesia, Perú y Colombia, para revisar, actualizar y modernizar el marco jurídico de la quiebra de una empresa (…)"

[Énfasis añadido]

Como se puede desprender de lo anterior, la Ley de Concursos Mercantiles fue creada con la finalidad de otorgar una protección dual al sistema económico mexicano: por una parte, se protege **a la comerciante** del cobro agresivo, indiscriminado e individual de sus acreedores que pueda **impedir la continuación de su negocio** y, por otra parte, se protege también a los **acreedores** para que puedan cobrar de manera justa su crédito.

Por lo que hace a la protección de la comerciante, la Ley de Concursos Mercantiles prevé una serie de mecanismos que permiten otorgarla. En primer lugar, está **el otorgamiento de medidas cautelares**, que precisamente buscan evitar que los acreedores inicien con agresivos procedimientos de cobro que acaben con la posibilidad de continuar con el negocio.



Por lo que hace a la segunda de las finalidades apuntadas, se ha reconocido el principio concursal *"par conditio creditorum"*, por virtud de cual todos los acreedores **deben tener igual condición frente al patrimonio del deudor** que ha sido reconocido por la jurisprudencia en los siguientes criterios:

> "**COMPENSACIÓN DE CRÉDITOS EN EL JUICIO DE QUIEBRA. CONDICIONES EN QUE OPERA**. Uno de los principios básicos del concurso mercantil en etapa de quiebra es el de par condicio creditorum, por virtud del cual todos los acreedores, salvo aquellos de carácter privilegiado, tienen igual condición frente al patrimonio del deudor común; principio de igualdad de condición que significa que todos los acreedores son iguales ante la ley del concurso, lo que a su vez conduce a la llamada "ley del dividendo", que implica que si el patrimonio del deudor común es insuficiente para atender a todos los créditos, dicho patrimonio se divide entre los acreedores a prorrata o en proporción de todos los créditos, de suerte que el sacrificio de los acreedores sea para todos proporcionalmente igual. Conforme a esa regla, y salvo los casos de excepción que señala la ley, los acreedores deben ser pagados a prorrata en la medida del activo del deudor común. En esas condiciones, si bien el artículo 105 de la Ley de Concursos Mercantiles permite la compensación y, conforme a los artículos 2185 y 2186 del Código Civil Federal la compensación opera cuando dos personas reúnen la calidad de deudores y acreedores recíprocamente y su efecto es extinguir, por ministerio de la ley, las dos deudas hasta la cantidad que importe la menor, es preciso tener en cuenta que esas normas, en tratándose de la quiebra, deben necesariamente interpretarse en consonancia con el principio básico de igualdad a que previamente se hizo alusión, porque lo contrario, estimar que la compensación procede crédito contra crédito, implicaría atribuir a los acreedores con derecho a compensación un privilegio que la ley no les concede, de hacer efectivo su crédito en condiciones de ventaja frente a los restantes, dado que no se haría a prorrata, siendo que una vez declarada la quiebra todo el activo del quebrado se hace indisponible por estar destinado exclusivamente a la satisfacción de la masa de acreedores, bajo el principio de igualdad; en consecuencia, no es dable disponer de uno de los elementos de ese activo para pagar con él a un acreedor en situación de ventaja frente a los demás, y precisamente la compensación en el fondo equivale a un pago, en tanto que si bien el deudor no entrega la cosa debida, da en pago su propio derecho a la prestación que su acreedor le debía."[64]

> "**CONCURSO MERCANTIL. CUANDO SE PERMITE A UN ACREEDOR EJECUTAR GARANTÍAS Y OBTENER EL MONTO TOTAL O PARCIAL DE SU CRÉDITO SIN SOMETERSE AL PROCEDIMIENTO PREVISTO EN LA LEY DE LA MATERIA PARA DETERMINAR EL ORDEN Y PRELACIÓN DE LOS CRÉDITOS, SE CONTRAVIENE EL PRINCIPIO PAR CONDICIO CREDITORUM.**

> Hechos: Una acreedora de las comerciantes ejecutó las garantías otorgadas en un contrato celebrado con anterioridad al procedimiento concursal y durante su tramitación, obteniendo así parte de su crédito en perjuicio de los demás acreedores, habiéndose violado por ello disposiciones de orden público (Ley de Concursos Mercantiles) **que buscan proteger tanto a las comerciantes como a los acreedores con base en el principio par condicio creditorum, por virtud del cual todos los acreedores, salvo aquellos de carácter privilegiado, tienen igual condición frente al patrimonio del deudor común**; principio de igualdad de condición que significa que todos los acreedores son iguales ante la ley del concurso, siendo su objeto la satisfacción a prorrata (proporcional) de los derechos de los acreedores, respetando la respectiva posición preferencial que tengan los mismos en virtud de la ley.

> Criterio jurídico: Este Tribunal Colegiado de Circuito determina que permitir a una acreedora que en un procedimiento concursal ejecute garantías, obteniendo así el pago total o parcial de su crédito sin seguir el orden y prelación regulados en la Ley de Concursos Mercantiles, contraviene el principio par condicio creditorum y, en

---

[64] Registro digital: 2017608 TCC;10a. Época;Gaceta del Semanario Judicial de la Federación;I.8o.C.61 C (10a.) ;TA; Publicación: viernes 17 de agosto de 2018 10:25 h



consecuencia, se violan disposiciones de orden público en perjuicio de los demás acreedores.

Justificación: Lo anterior, porque la ruptura del principio par condicio creditorum se da cuando se permite que un acreedor reciba un pago anticipado de su crédito, o bien, cuando un acreedor es favorecido con mejores garantías luego de iniciado el concurso. Entonces, de acuerdo con la exposición de motivos de la Ley de Concursos Mercantiles, la regla general del citado principio es que todos los acreedores tienen derecho a serlo en condiciones de igualdad con respecto a los demás acreedores del mismo tipo; sin embargo, dicha regla general permite excepciones, las cuales se encuentran estrictamente limitadas en la ley de la materia, como sucede con acreedores que tienen algún privilegio especial sobre los restantes, por la naturaleza de su crédito, por ejemplo, con los créditos fiscales, de seguridad social o laborales, sólo por citar algunos ejemplos; de ahí que el referido principio signifique la posibilidad de que los acreedores del mismo tipo entren al concurso mercantil en igualdad de condiciones para el pago de sus créditos; por tanto, **ese principio se viola cuando en un procedimiento concursal se permite a uno o varios acreedores ejecutar garantías obteniendo así parte o el total de sus créditos, sin observar las disposiciones que para establecer el orden y prelación de los créditos prevé la Ley de Concursos Mercantiles**, lo cual se traduce en una violación a las disposiciones de orden público que la componen."[65]

[Énfasis añadido]

Como se puede desprender de los criterios citados, el principio *"par conditio creditorum"* implica en principio **la imposibilidad de los acreedores de ejecutar sus garantías para el cobro de sus créditos** sin observar las disposiciones de la Ley de Concursos Mercantiles; lo anterior, al ser injusto para el resto de los acreedores el permitir el cobro de sus créditos de manera preferente y en clara afectación indebida al patrimonio del deudor.

En el último de los precedentes citados, el Octavo Tribunal Colegiado en Materia Civil en la Ciudad de México interpretó un caso en el que el comerciante solicitó que se decretaran medidas a su favor que impidiera que se declarar el incumplimiento de un acuerdo de bonos y que se impidiera a uno de los acreedores ejecutar garantías que le permitieran el nombramiento de nuevos directores y administradores de la sociedad. La *ratio decidendi* de dicho precedente era decidir si era válida una suspensión otorgada en amparo que impedía al juzgado concursal aplicar el artículo 87 de la Ley de Concursos Mercantiles para impedir la ejecución de garantías y tener por no puestas ciertas cláusulas que impedían a la Quejosa acudir al concurso mercantil; al respecto:

"El artículo 1º de la Ley de Concursos Mercantiles dispone que es de interés público conservar las empresas y evitar que el incumplimiento generalizado de las obligaciones de pago ponga en riesgo la viabilidad de las mismas y de las demás con las que mantenga una relación de negocios.

Por su parte, el artículo 3º de la Ley de Concursos Mercantiles establece que la finalidad de la conciliación es lograr la conservación de la empresa del comerciante mediante el convenio que suscriba con sus acreedores reconocidos, en tanto que la finalidad de la quiebra es la venta de la empresa del comerciante, de sus unidades productivas o de los bienes que la integran para el pago a los acreedores reconocidos.

Lo que originó el juicio de amparo, fue la solicitud de las comerciantes de una medida para que se dejaran sin efectos cláusulas contractuales que permitirían a la tenedora de los bonos declarar un incumplimiento de las comerciantes, esto es, pretendieron que no se ejecutaran las garantías como se convino en el acuerdo de emisión de bonos celebrado

---

[65] Registro digital: 2025038 TCC;11a. Época;Gaceta del Semanario Judicial de la Federación;I.8o.C.11 C (11a.) ;TA; Publicación: viernes 05 de agosto de 2022 10:13 h



entre Oro Negro Drilling Pte. Ltd., y Nordic Trustee Asa, el veinticuatro de enero de dos mil catorce; asimismo, que no se transmitieran las acciones a Ond Pte. Ltd., y que no se nombraran nuevos directores y apoderados.

Al respecto, **se planteó que permitir que la acreedora Nordic Trustee Asa ejecutara las garantías implicaría dejar sin efectos el concurso mercantil, señalando que no tiene como objetivo principal llevar a las comerciantes directamente a la quiebra y que con la situación descrita se afectarían los objetivos económicos del Estado en relación con sus gobernados;** ya que el objetivo principal de la Ley de Concursos Mercantiles es conservar a las empresas y evitar que el incumplimiento generalizado de sus obligaciones de pago ponga en riesgo su viabilidad, así como la de sus correlativas con las que tengan negocios, haciendo valer las quejosas que se busca proteger a la empresa para preservar su operación y los empleos que genera, a fin de conservar el equilibrio entre el comerciante y sus acreedores.

Ahora bien, cabe precisar en primer término que las disposiciones contenidas en la Ley de Concursos Mercantiles son de orden público, puesto que tienden a proteger los intereses de toda una colectividad y a la economía nacional, lo que se confirma de la exposición de motivos de esa legislación promulgada mediante decreto publicado en el Diario Oficial de la Federación el doce de mayo de dos mil, de la cual se desprende que el objetivo principal de dicha ley es maximizar el valor de una empresa en crisis mediante su conservación, con lo cual se protege el empleo de sus elementos humanos y se evita la repercusión económica negativa a la sociedad, producida por la pérdida de una empresa que le proporciona bienes o servicios. Asimismo, se persigue mantener el principio de igualdad entre los acreedores.

En efecto, de la exposición de motivos de la Ley de Concursos Mercantiles se advierte que el legislador dispuso que la insolvencia de una empresa involucra empleados, proveedores y la población en su vertiente de consumidores o clientes, lo cual es negativo para la sociedad del Estado Mexicano.

Bajo esa óptica, en principio, resultaría improcedente otorgar la suspensión en el juicio de amparo que se promueve en contra de la determinación del juez rector del concurso en la cual, aplicando el artículo 87 de la Ley de Concursos Mercantiles deja sin efecto cláusulas contractuales, al considerar que su contenido agrava la situación de las comerciantes, debido a que, por un lado, el artículo 128 de la Ley de Amparo expresamente estatuye que no procederá esa medida cautelar cuando se siga perjuicio al interés social o se contravengan disposiciones de orden público (…)

Por tanto, de concederse la suspensión de los efectos de la resolución reclamada en los términos que estableció el juez de Distrito en la interlocutoria recurrida, provocaría que no se dejara sin efecto la aplicación de la cláusula 15.1 (g) (i) del acuerdo de emisión de bonos, pues al tener la suspensión la consecuencia de que quede provisionalmente sin efectos la resolución en la que se determinó como inaplicable dicha cláusula, esto es, que ésta se siga aplicando; **tal circunstancia pugnaría con la determinación de la responsable de tener por no puesta la cláusula en cuestión, además de <u>permitir que la ejecución de las garantías de forma previa, por parte de una acreedora, perjudicaría a la colectividad de acreedores pues ello podría ocasionar que las comerciantes quedaran sin activos y, por tanto, dejar sin materia el concurso mercantil</u>**.

De este modo, queda evidenciado, en principio, que de concederse la suspensión definitiva de los actos reclamados en los términos establecidos por el juzgador de amparo, se afectaría al interés social porque se privaría a la colectividad de un beneficio que le otorga la Ley de Concursos Mercantiles, y **le podría inferir un daño al continuarse aplicando una cláusula que se consideró debía tenerse por no puesta, al agravar la situación de la empresa y violar el principio "par condicio creditorum"** y transgredir, en consecuencia, las disposiciones previstas en la Ley de Concursos Mercantiles, así como la economía y el interés social.

Ciertamente, **el citado principio "par condicio creditorum" significa que la ley concursal debe proteger la integridad del patrimonio y la igualdad de los acreedores dentro del concurso, por lo que ambos ejes rectores del concurso (la integridad del patrimonio e igualdad entre acreedores) deben ser protegidos por la ley, <u>desde que el deudor manifiesta formalmente su voluntad de someterse al</u>**

ESTA ES UNA IMPRESIÓN DE UN DOCUMENTO ORIGINAL 35357120180600000000000000000000000000000128 LIC JOSE VILLANUEVA



**régimen del concurso mercantil**. Su objeto es la satisfacción a prorrata (proporcionalidad) de los derechos de los acreedores, respetando la respectiva posición preferencial que tengan los mismos en virtud de la ley.

La ruptura del principio "par condicio creditorum" **se da cuando se permite que un acreedor reciba un pago anticipado de su crédito, o bien, cuando un acreedor es favorecido con mejores garantías luego de iniciado el concurso**.

Entonces, de acuerdo a la exposición de motivos de la Ley de Concursos Mercantiles, la regla general del principio "par condicio creditorum" es que **todos los acreedores tienen derecho a ser pagados en condición de igualdad con respecto a los demás acreedores del mismo tipo**. Sin embargo, dicha regla general permite excepciones, las cuales se encuentran estrictamente limitadas en la propia Ley de Concursos Mercantiles, como sucede con acreedores que tienen algún privilegio especial sobre los restantes, por la naturaleza de su crédito, tal y como sucede, por ejemplo, con los créditos fiscales, de seguridad social o laborales, sólo por citar algunos ejemplos.

De ahí que, **el principio "par condicio creditorum" signifique la posibilidad de que los acreedores entren al concurso mercantil en igualdad de condiciones para el pago de sus créditos**, sin embargo, eso no significa tratar de forma igual a desiguales, pues la regla es tratar igual a los iguales, esto es, que estén en las mismas condiciones.

En ese orden de ideas, podría concluirse que no procede conceder la suspensión definitiva de los actos reclamados en los términos en que la decretó el juez de Distrito en la interlocutoria recurrida, dado que **con ello se estaría permitiendo a la acreedora Nordic Trustee As cobrar su crédito con anticipación, apropiándose de los activos de las comerciantes en perjuicio de sus demás acreedores; lo que sería contrario al propósito perseguido por la Ley de Concursos Mercantiles** (…)

Lo así considerado no admite otra interpretación, sino que **el juez concursal al resolver sobre la inaplicación de ciertas cláusulas contractuales necesariamente se refiere también al principio "par condicio creditorum", conforme al cual los acreedores tienen derecho a cobrar sus créditos en los términos, condiciones y prelación previstos en la Ley de Concursos Mercantiles, sin que alguno de ellos pueda cobrar su crédito en forma anticipada durante el procedimiento concursal**.

El principio "par condicio creditorum" **busca resolver el problema que se presenta, cuando en una situación jurídica determinada más de un acreedor concurre al pago de su crédito sobre el patrimonio del deudor que se encuentra en situación de insolvencia**. La condición de igualdad o trato igualitario que propugna el principio en comento, se refiere a acreedores de igual rango; de modo que los acreedores comunes no entrarán en igualdad de condiciones en relación con los acreedores con privilegio.

En el caso concreto, en la resolución señalada como acto reclamado el juez concursal dejó sin efectos la notificación de incumplimiento del contrato de bonos celebrado el veintinueve de enero de dos mil catorce, por Oro Negro Drilling Pte. Ltd., como deudor prendario y Nordic Trustee, As., como acreedor prendario, sobre las acciones de Oro Negro Primus, Oro Negro Decus, Oro Negro Laurus y Oro Negro Fortius, todas Pte. Ltd., y como consecuencia, también retrotrajo los efectos de esa notificación, en los siguientes aspectos (…)

La ejecución de las garantías por parte de la acreedora Nordic Trustee As., traería como consecuencia que el concurso mercantil y quiebra de las comerciantes no tuviera objeto, puesto que no habría masa que liquidar; ergo, tampoco podrían pagarse los créditos de los demás acreedores, todo ello en contravención del principio que rige al concurso mercantil de "par condicio creditorum" (…)"

[Énfasis añadido]

Como se puede desprender del texto citado, dicho Tribunal Colegiado interpretó que un eje del procedimiento concursal es la protección de los acreedores con la finalidad de que entren al concurso mercantil en igualdad de condiciones para el pago de sus créditos y que, en consecuencia, el juez concursal debe **velar por la integridad del patrimonio concursal desde**



que se presenta la solicitud de concurso mercantil, con la finalidad de <u>evitar el cobro o</u> <u>ejecución indiscriminada de garantías de forma previa y si seguir el procedimiento</u> <u>concursal</u>.

b.    <u>La aplicación del artículo 87 de la Ley de Concursos Mercantiles.</u>

Ahora bien, con la finalidad de velar por la protección del principio de *par conditio creditorum*, tal y como fue adelantado en el citado precedente del Octavo Tribunal Colegiado, el juzgado concursal puede valerse de varias herramientas.

Entre ellas, está el decreto de medidas cautelares (como aquellas decretadas por el Juzgado Responsable), que impidan la ejecución indiscriminada de garantías o el cobro agresivo de créditos. Aunado a dicha herramienta, existen disposiciones que precisamente buscan evitar la posibilidad de que cualquier acto jurídico que la comerciante haya celebrado con anterioridad a la presentación del concurso mercantil le impidan acceder a dicho procedimiento. Sobre este punto, el artículo 87 de la Ley de Concursos Mercantiles dispone:

> "Artículo 87.- Se tendrá por no puesta, salvo las excepciones expresamente establecidas en esta Ley, **cualquier estipulación contractual que con motivo de la presentación de una solicitud o demanda de concurso mercantil**, o de su declaración, establezca modificaciones que agraven para el Comerciante los términos de los contratos."

> [Énfasis añadido]

En el precedente citado en el apartado inmediato anterior, el Octavo Tribunal Colegiado mencionó que citado precepto podría servir de sustento para "tener por no puesto" actos corporativos como, por ejemplo, la declaración de terminación de un acuerdo de bonos, con la finalidad de **proteger a la comerciante y privilegiar el principio *par conditio creditorum*.**

En esos términos, el alcance del precepto citado ha sido interpretado jurisprudencialmente en el sentido de que el juzgado concursal está facultado para **suspender los efectos de cualquier estipulación contractual** que con motivo de la presentación de la solicitud de concurso mercantil agrave la situación de la comerciante, en los siguientes términos:

> "**CONCURSO MERCANTIL. EL JUEZ PUEDE SUSPENDER LOS EFECTOS DE CUALQUIER ESTIPULACIÓN CONTRACTUAL QUE CON MOTIVO DE LA PRESENTACIÓN DE LA SOLICITUD RELATIVA O DE SU DECLARACIÓN, ESTABLEZCA MODIFICACIONES QUE AGRAVEN LA SITUACIÓN DE LAS COMERCIANTES O IMPIDAN INICIAR EL TRÁMITE DEL JUICIO CONCURSAL.**

> Hechos: Las comerciantes, para efectos de la admisión de su concurso mercantil, solicitaron al Juez del conocimiento dejar sin efectos cláusulas de un contrato celebrado con su principal acreedora que estipulaban la necesidad de su aprobación a través de la opinión de un consejero independiente para que se pudiera iniciar el procedimiento concursal.

> Criterio jurídico: Este Tribunal Colegiado de Circuito determina que el Juez puede suspender los efectos de cualquier estipulación contractual que con motivo de la presentación de la solicitud del concurso o de su declaración, establezca modificaciones



que agraven la situación de las comerciantes o impidan iniciar el trámite del juicio concursal.

Justificación: Lo anterior, porque la aplicación del artículo 87 de la Ley de Concursos Mercantiles, que establece: "Se tendrá por no puesta, salvo las excepciones expresamente establecidas en esta ley, cualquier estipulación contractual que con motivo de la presentación de una solicitud o demanda de concurso mercantil, o de su declaración, establezca modificaciones que agraven para el comerciante los términos de los contratos.", no implica nulificar, modificar o extinguir los contratos o sus cláusulas estatutarias al amparo de las leyes a que se hayan sujetado las comerciantes y sus acreedores, sino únicamente inaplicarlas para no agravar la situación de los solicitantes del concurso, partiendo de la base de que su objeto fundamental es preservarlas sin dejar de mantener un principio de igualdad entre los acreedores. Por tanto, el tener por no puesta una cláusula contractual, es para suspender sus efectos con el único fin de que los comerciantes puedan iniciar su concurso mercantil, sin que para ello se requiera del consentimiento de sus acreedores."[66]

Dicho precedente surgió de un caso en que la comerciante **otorgó sus acciones en garantía** a favor de uno de sus acreedores, lo que implicó la modificación de sus estatutos sociales y la imposibilidad de presentar una solicitud de concurso mercantil, como se desprende de los siguientes extractos del precedente citado:

"Previo al estudio de los motivos de inconformidad, se hace necesario establecer que las quejosas aceptan **que sus acciones fueron entregadas en garantía**, así como que sus estatutos sociales fueron modificados y que, por tanto, de acuerdo con sus estatutos sociales, están en los supuestos contemplados en los artículos 2, 88A y 111A o 115A (dependiendo de la sociedad), que prevén (…)

Esto es, las impetrantes aceptan que pactaron en sus estatutos sociales que para iniciar un procedimiento de concurso mercantil fue su voluntad que se debía designar un consejero independiente, cuyo nombramiento debía ser aprobado por la institución de crédito. Asimismo, que el negocio y los asuntos de las sociedades deberían ser administrados bajo la dirección de los consejeros (no así a través de un socio único). Sin embargo, **afirman, que las cláusulas estatutarias 2, 88A y 111A o 115A (dependiendo de la sociedad) debieron tenerse por no puestas porque dependen de la voluntad de su acreedora** (…)"

[Énfasis añadido]

Consecuentemente, en dicho precedente, el Octavo Tribunal Colegiado en Materia Civil del Primer Circuito interpretó los alcances del artículo 87 de la Ley de Concursos Mercantiles en los siguientes términos:

"Como ya se apuntó, las quejosas confiesan que sus estatutos sociales se modificaron para adoptar la forma de administración y toma de decisiones que en ellos se estipula; asimismo, que sus acciones se encuentran gravadas por virtud de los que denominaron "contratos de acciones" y que dichas acciones garantizan el adeudo o deuda corporativa que contrajeron con ****** ******* ***.

Esto quiere decir que antes de iniciar un procedimiento de insolvencia, se requería de la aprobación de los consejeros (directores administradores de las sociedades) y, en su caso, del consejero independiente que nombraran (no acreditaron haberlo hecho) porque así expresamente lo prevén sus estatutos sociales.

El hecho de que ****** ******* ****, como acreedora principal podría o no haberse inconformado o aceptado al consejero independiente que en su caso nombraran las quejosas, se trata de una mera suposición no acreditada, puesto que las impetrantes no

---

[66] Registro digital: 2023843 TCC;11a. Época;Gaceta del Semanario Judicial de la Federación;I.8o.C.101 C (10a.) ;TA; Publicación: viernes 26 de noviembre de 2021 10:37 h

88



nombraron a ese consejero como se obligaron, no obstante solicitaron la declaración de su concurso mercantil a través de su socio único (…)

Ahora bien, nuestra realidad cotidiana se ve marcada por múltiples situaciones en las que causas ajenas a la voluntad de los sujetos provocan que los compromisos contraídos por estos no lleguen a buen fin. Esto es lo que viene a denominarse una imposibilidad sobrevenida del cumplimiento de la obligación.

Estas causas externas que impiden a los sujetos cumplir son de lo más variadas, desastres naturales que destruyen físicamente el objeto de la relación, disposiciones legales que prohíben desarrollar la prestación, fallecimiento o enfermedad del deudor de obligación personalísima, falta de cooperación del acreedor, entre otras.

El artículo 1943 del Código Civil Federal dispone que las condiciones imposibles de dar o hacer, las prohibidas por la ley o que sean contra las buenas costumbres, anulan la obligación que de ellas dependa.

Esta imposibilidad sobrevenida y no culpable ha de ser además objetiva y no subjetiva, lo que se ha entendido en dos sentidos. Unos consideran que la diferencia se encuentra en la extensión del impedimento, es decir, la imposibilidad es objetiva cuando la prestación no es susceptible de ser cumplida por nadie. El cumplir debe ser algo imposible para el obligado y para toda otra persona.

La extraordinaria dificultad de realización de la prestación se da en supuestos de alteración sobrevenida de las circunstancias del contrato que rompen el equilibrio contractual tal y como se había acordado por las partes y suponen la excesiva onerosidad de una de las prestaciones.

En cuanto a la cooperación del acreedor puede resultar necesaria para que el deudor pueda ejecutarla de forma exacta conforme a lo convenido. Esta cooperación del acreedor está basada en la buena fe negocial, que se proyecta a lo largo de la relación contractual.

La cooperación del acreedor **no debe entenderse como un deber de prestación o un deber accesorio, sino una carga que pesa sobre él. Así el acreedor que no cumpla su carga, puede motivar que su deudor no pueda ejecutar la prestación debida, apareciendo una imposibilidad transitoria, o incluso, producirse una imposibilidad** definitiva de la prestación. Dando lugar a una imposibilidad sobrevenida de la prestación por causa no imputable al deudor.

De lo expuesto se colige que el juez que conozca de un concurso mercantil (en el presente caso una solicitud de), debe ajustar sus actos a los mandatos de la ley y no puede atribuirse mayores facultades de las que la ley le permita.

El artículo 87 de la Ley de Concursos Mercantiles dispone que se tendrá por no puesta, cualquier estipulación contractual que con motivo de la presentación de una solicitud o demanda de concurso mercantil, o de su declaración, establezca modificaciones que agraven para el comerciante los términos de los contratos; esta disposición se refiere a los contratos que la comerciante tenga celebrados con otros entres jurídicos individuales o colectivos.

Así es, los artículos estatutarios tantas veces citados, pueden contravenir las disposiciones de la Ley de Concursos Mercantiles que establece que es de interés público conservar las empresas y evitar que el incumplimiento generalizado de las obligaciones de pago ponga en riesgo la viabilidad de las mismas y de las demás con las que mantenga una relación de negocios.

Los principios rectores de la Ley de Concursos Mercantiles son: el interés público, la igualdad de trato entre los acreedores, la universalidad, el principio de conservación de la empresa y el principio de liquidación ordenada de la empresa quebrada.

**El interés público se justifica básicamente por dos motivos: a).- Debido a que al Estado mexicano le interesa que se conserve la planta productiva del país y las fuentes de trabajo (principio de conservación de la empresa) y b).- porque el incumplimiento generalizado de las obligaciones de un comerciante, puede**

TRADUCCIÓN AUTORIZADA POR LILIBE VILLANUEVA PERITO TRADUCTOR AUTORIZADO



generar daño al tráfico comercial del país ya que es factible que derive en un problema de insolvencia generalizada por el contagio (si un comerciante no le paga a otro, es posible que este segundo no pueda pagar a un tercero). En sí, la materia concursal es parte de la política económica del Estado mexicano, así es lógico que en el artículo 1º de la Ley de Concursos Mercantiles, se establezca claramente que la ley está investida de interés público.

El primer efecto del interés público, se deriva de lo establecido en el artículo 6º del Código Civil Federal, que establece que la voluntad de los particulares no puede eximir de la observancia de la ley, ni alterarla ni modificarla. Sólo pueden renunciarse los derechos privados que no afecten directamente al interés público, cuando la renuncia no perjudique derechos de tercero.

De acuerdo con el artículo 1º de la Ley de Concursos Mercantiles su segundo párrafo se señala que: "Es de interés público conservar las empresas y evitar que el incumplimiento generalizado de las obligaciones de pago ponga en riesgo la viabilidad de las mismas y de las demás con las que mantenga una relación de negocios.…" PJF- Versión Pública A partir de la reforma del 2014, se incluye dentro del interés público de la ley concursal, el conservar las empresas que tengan contacto con una empresa que incumpla generalizadamente en el pago de sus obligaciones, es decir, trata de evitar las quiebras por contagio.

**La empresa se considera como un bien que genera beneficios a la colectividad (da empleos y genera riqueza interna), por lo que debe ser protegida por el Estado. Este principio de conservación de la empresa le da sentido al principio de interés público, inclusive la ley es de interés público en virtud de que su fin primordial es la conservación de la empresa.**

Debe quedar claro, que lo que busca este principio es proteger la conservación de la empresa, no a los dueños o accionistas de la misma.

La universalidad es una de las características propias del concurso y de los procedimientos sucesorios. Es universal en dos sentidos, ya que afecta a la totalidad de los bienes del comerciante y a la totalidad de los créditos del mismo, de ahí se derivan los conceptos de masa activa (conjunto de bienes del comerciante) y masa pasiva (conjunto de deudas del comerciante).

Derivándose de este principio de universalidad, se generan dos principios secundarios que son los de: unicidad procesal y unicidad de patrimonio. **El primero se refiere a que debe haber un sólo procedimiento por lo que éste tiene la cualidad de atraer cualquier otro procedimiento en contra o seguido por el comerciante; y el segundo señala que el patrimonio del comerciante debe ser único y deben someterse en su integridad al procedimiento concursal.**

Por último, **el principio de igualdad de trato entre los acreedores se deriva de la universalidad de los concursos. Si se afectan todos los créditos del comerciante, es lógico que <u>todos los acreedores sean tratados por igual</u>.**

**La propia Ley de Concursos Mercantiles establece que el acreedor <u>tiene un derecho subjetivo público a que se acuerde la apertura del concurso</u>. Si efectivamente concurren los presupuestos procesales y materiales que condicionan la apertura del concurso, <u>el acreedor tiene un indudable derecho subjetivo y público, porque se dirige frente al Estado a pedir y que el Juez acuerde, la apertura del concurso</u>.**

Los artículos estatutarios de las quejosas se contraponen a lo previsto en la fracción VII del artículo 20 de la Ley de Concursos Mercantiles, pues contienen una traba legal que les impide iniciar el procedimiento, lo que es contrario a los principios que rigen al procedimiento, esto es, el interés público, la igualdad de trato entre los acreedores, la universalidad y el principio de conservación de la empresa y sobre todo viola el derecho de acceso a la justicia de las impetrantes (…)"

[Énfasis añadido]



Como se puede desprender de lo anterior, dicho Tribunal Colegiado interpretó que la Ley de Concursos Mercantiles prevé un **derecho de las empresas de que se aperture el concurso mercantil cuando se cumplen con los requisitos para ello**, relevándolas del cumplimiento de compromisos contractuales que puedan impedir el ejercicio de dicho derecho.

En esos términos, conforme al precedente citado, es claro que el Juzgado concursal tiene la obligación de liberar cualquier obstáculo para acceder a una protección concursal y, en cumplimiento a un mandato de orden público, puede obviar ("tener por no puestas") disposiciones contractuales o actos jurídicos que de cualquier forma impidan el acceso al concurso mercantil.

c.    <u>Caso en concreto.</u>

De una simple lectura de la Supuesta RUA, es posible desprender que la supuesta legitimación aducida por el Sedicente Apoderado de Controladora se basa en la pretendida ejecución extrajudicial de garantías en perjuicio de la Quejosa y que, en consecuencia y contrario a lo que sostiene el Juzgado Responsable, **el desistimiento de la solicitud de concurso mercantil <u>sí fue promovido por sus acreedores</u>**.

Como fue referido líneas arriba, es necesario partir de la premisa demostrada de que CI Banco **es acreedora de Controladora**. Como se desprende del Contrato de Fideicomiso, CI Banco es la institución fiduciaria del Fideicomiso Irrevocable **de Garantía** CIB/2380, el cual fue **constituido con la finalidad de <u>garantizar las obligaciones asumidas en los Contratos de Financiamiento y con la finalidad de afectar la mayoría de los bienes de Controladora</u>**, incluyendo sus acciones.

Es como consecuencia de la celebración de dicho Contrato de Fideicomiso que en la estructura corporativa actual de Controladora CI Banco aparece como titular del 99% de sus acciones. Sin embargo, se hace énfasis a este Tribunal que dicha titularidad se ejerce **como consecuencia de la constitución de una garantía prendaria a favor de Wilmington Trust y los Tenedores de Bonos**. De hecho, en la sección 2.05 del Contrato de Fideicomiso[67] se pactó claramente que la titularidad sobre los derechos accionarios, que integran el patrimonio fideicomitido, tenía como sola finalidad **garantizar el cumplimiento de los Contratos de Financiamiento**:

EDGARDO RICARDO SARMIENTO VILLANUEVA
2025/06/05/09:00:00:000000000000000000000138

---

[67] Mismo que se acompañó a la solicitud de concurso mercantil como Anexo ""

91



> **Sección 2.04.** <u>FINES DEL FIDEICOMISO</u>. Los fines del presente Contrato de Fideicomiso (los "**Fines del Fideicomiso**") son garantizar el puntual y debido cumplimiento, pago y satisfacción a su vencimiento (ya sea a su fecha de vencimiento programado, por vencimiento anticipado o por cualquier otro motivo) de todas y cada una de (i) las Obligaciones Garantizadas Senior, en favor del Fideicomisario en Primer Lugar, en nombre y para el beneficio de los Adquirentes Senior, y (ii) de manera subordinada, conforme a lo previsto en el Convenio entre Acreedores y de Subordinación, las Obligaciones Garantizadas Subordinadas, en favor del Fideicomisario en Segundo Lugar, en nombre y para el beneficio de los Adquirentes Subordinados. Para tales efectos, el Fiduciario deberá:
>
> (a)     ser el único y legítimo propietario y titular del Patrimonio del Fideicomiso (trasmitido al Fiduciario en esta fecha o en cualquier momento posterior conforme a los términos previstos en este Contrato de Fideicomiso), libre de cualesquier Gravámenes, durante la vigencia de este Contrato de Fideicomiso y, en todo caso, hasta que (i) todas las Obligaciones Garantizadas Senior hayan sido Pagadas en Su Totalidad, y el Fideicomisario en Primer Lugar confirme dicho cumplimiento, pago y satisfacción mediante la entrega de una Notificación de Terminación del Fideicomisario en Primer Lugar al Fiduciario (con copia al Fideicomisario en Segundo Lugar) conforme a la Sección 3.01, y (ii) todas las Obligaciones Garantizadas Subordinadas hayan sido debida y legalmente satisfechas y pagadas e irreversiblemente liquidadas en su totalidad, y el Fideicomisario en Segundo Lugar, respectivamente, confirme dicho cumplimiento, pago y satisfacción mediante la entrega de una Notificación de Terminación del Fideicomisario en Segundo Lugar al Fiduciario conforme a la Sección 3.01;

Lo anterior permite advertir que la titularidad que goza CI Banco de las acciones de Controladora deviene como consecuencia exclusiva de **las garantías constituidas por ésta a favor de Wilmington Trust, sin que se tratara de una cesión incondicionada ni con la intención de que dicha sociedad fiduciaria integrara corporativamente a Controladora**.

En ese orden de ideas, aunque CI Banco es accionista de Controladora, es evidente que **también es su acreedora, pues a su favor están constituidas varias garantías (todas las cuales constan en el concurso mercantil), además de que es la institución fiduciaria de un <u>fideicomiso de garantía</u>, constituido a favor de los Tenedores de Bonos, principales acreedores de Controladora**.

Aunado a lo anterior, conforme a los Contratos de Financiamiento **exhibidos al Juzgado Responsable desde la presentación de la solicitud de concurso mercantil**, es claro que Wilmington Trust actuaba como "Agente de Garantías" de los Tenedores de Bonos, los principales acreedores de Controladora. Por lo tanto, es claro que Wilmington Trust **también es acreedora de Controladora o, por lo menos, <u>era el representante común de sus principales acreedores</u>**.

En ese orden de ideas, contrario a lo sostenido por el Juzgado Responsable, lo cierto es que en autos está debidamente demostrado que **CI Banco y Wilmington Trust <u>son acreedoras de Controladora</u>** (y, de hecho, son las principales acreedoras).

De hecho, **el propio Juzgado Responsable reconoció implícitamente que CI Banco y Wilmington Trust eran acreedoras de Controladora**. Tal es así que, como fue narrado en el capítulo de "Antecedentes", mediante autos de 31 de enero de 2025 y 27 de febrero de 2025 **ordenó que se les notificaran las Medidas Cautelares y las vinculó a su cumplimiento**.

Es completamente incongruente que ahora el Juzgado Responsable sostenga que "no estaba probado" que CI Banco y Wilmington Trust son las principales acreedoras de Controladora, cuando dicho juzgado incluso así ya lo había reconocido.



Ahora bien, la Supuesta RUA fue celebrada, precisamente por CI Banco y Wilmington Trust, como se puede advertir de una simple lectura del instrumento público en que consta. Por lo tanto, contrario a lo que sostiene el Juzgado Responsable **es evidente y está debidamente demostrado que la Supuesta RUA fue celebrada por las principales acreedoras de Controladora y que, de hecho, es producto de una ejecución extrajudicial de garantías**.

Al respecto, en los propios "Antecedentes" de la Supuesta RUA, Wilmington Trust y CI Banco hicieron constar que su celebración fue posible solo como consecuencia de la ejecución de *(i)* la declaración de un "Evento de Incumplimiento", al amparo de los Contratos de Financiamiento, y *(ii)* la ejecución extrajudicial (mediante el indebido ejercicio de derechos) de las prendas constituidas sobre las acciones de Controladora.

En consecuencia, desde la Primer Denuncia de Violación a Medidas Cautelares, Controladora advirtió que cualquier posible actuación por el Sedicente Apoderado de Controladora era no solo una flagrante violación a las Medidas Cautelares decretadas por el Juzgado Responsable, sino también un agresivo acto de ejecución que buscaría privar a Controladora de acceder a protección concursal e impedir la reestructura de sus créditos.

Como premonición, el primer acto en realizar el Sedicente Apoderado de Controladora (nombrado, cabe mencionar, por los acreedores de la Quejosa, Wilmington Trust y CI Banco) fue **solicitar el desistimiento del Concurso Mercantil**, apenas unos cuantos días antes de que Controladora fuera declarada en concurso mercantil.

Partiendo de dichas premisas, si estaba debidamente demostrado el carácter de Wilmington Trust y CI Banco eran acreedoras de Controladora y que se estaban aprovechando de las garantías constituidas a su favor para celebrar la Supuesta RUA y presentar la solicitud de desistimiento lo cierto es que, contrario a lo que se aduce en el Auto Reclamado, el Juzgado Responsable, como rector de procedimiento, estaba conminado a evaluar la validez de dicho acto a la luz de los principios esenciales que rigen el concurso mercantil, entre ellos el principio *par conditio creditorum*; más aun, si **así fue expresamente solicitado por Controladora en la Primer Denuncia de Violación a Medidas Cautelares**.

En ese orden de ideas, es evidente que el Juzgado Responsable **sí ocurrió en la grave omisión de emitir pronunciamiento alguno sobre el hecho evidente de que la Supuesta RUA y, en consecuencia, la legitimación ostentada por el Sedicente Apoderado de Controladora era producto inexorable de la ejecución extrajudicial de garantías por acreedores de Controladora**. Ello, contrario a lo que se sostiene el Auto Reclamado, es ilegal.

Contrario a lo que aduce el Juzgado Responsable, existían pruebas y argumentos que demostraban plenamente que la Supuesta RUA estaba invariablemente sustentada en la ejecución extrajudicial de garantías sobre acciones de Controladora, pues incluso **así fue sostenido en el propio texto de dicha resolución**.



Esta ejecución extrajudicial, que además constituye una **flagrante violación a las Medidas Cautelares, es independiente al hecho de que CI Banco sea la accionista "mayoritaria" de Controladora, o al hecho de que la Supuesta RUA conste en un instrumento notarial**. Como fue desarrollado en el segundo, tercer y cuarto conceptos de violación, lo cierto es que los motivos de invalidez de la Supuesta RUA en nada se relacionan con la participación accionaria de CI Banco.

Más aun, el hecho de que CI Banco sea la accionista mayoritaria **no importa que ésta no sea, a su vez, una de las principales acreedoras de Controladora (como de hecho así había sido reconocido por el Juzgado Responsable) y que por lo tanto sus actos deban ser analizados bajo el escrutinio de un acreedor**.

En ese orden de ideas, tampoco es relevante el hecho de que la Supuesta RUA constara en un instrumento notarial pues, como ha sido demostrado en conceptos de violación anteriores, ello no releva al Juzgado Responsable de analizar los múltiples motivos de invalidez de dicha resolución.

Lo cierto es que, por el solo hecho de que en la Supuesta RUA participaron las principales acreedoras de Controladora, el Juzgado Responsable debía analizar si dicho acto está permitido a la luz del principio de *par conditio creditorum* y si, en consecuencia, a pesar de sus efectos se permitiría una futura reestructura válida de Controladora y el futuro cobro de los créditos de los deudores afectados.

Ante dicho análisis, el Juzgado Responsable debió concluir inexorablemente que la ejecución extrajudicial de garantías sobre las acciones de Controladora que conllevaron a la remoción de su Consejo de Administración y la resolución de desistirse del concurso mercantil plasmadas en la Supuesta RUA, son cuestiones que **evidentemente no respetan el principio *par conditio creditorum***.

Lo anterior pues, en congruencia con los precedentes citados en los apartados inmediatos anteriores, es evidente que la ejecución indiscriminada de garantías fuera de los procedimientos concursales es una cuestión que **resulta contraria a la finalidad misma del concurso mercantil, al impedir que todos los acreedores puedan ejercer su derecho de cobro de créditos en igualdad plena de condiciones**.

El otorgar efectos a la ejecución extrajudicial de garantías implicaría entonces que ciertos acreedores privilegiados, **aprovechen las garantías constituidas a su favor para impedir a otros acreedores cobrar su crédito y tomar control de la masa concursal, impidiendo incluso (como en este caso) que se continúe con el concurso mercantil**, lo cual es evidentemente contrario al principio *par conditio creditorum*.

Lo anterior, aunado al hecho de que en el caso en concreto incluso se está impidiendo a Controladora continuar con el concurso mercantil y, por lo tanto, alcanzar una futura reestructura.



Ahora bien, habiendo determinado que el otorgar efectos a la Supuesta RUA y las actuaciones del Sedicente Apoderado de Controladora violan el principio *par conditio creditorum*, el Juzgado Responsable **estaba plenamente facultado para usar las herramientas a su alcance para impedir que dicho acto surtiera efectos** (tal y como le fue solicitado desde la Primera Denuncia de Violación de Medidas Cautelares), como la aplicación del artículo 87 de la Ley de Concursos Mercantiles.

En primer lugar, es necesario partir de la premisa de que el artículo 87 de la Ley de Concursos Mercantiles no es un efecto exclusivo de la sentencia de concurso mercantil. Como ha sido reconocido en los criterios de rubro "**CONCURSO MERCANTIL. EL JUEZ PUEDE SUSPENDER LOS EFECTOS DE CUALQUIER ESTIPULACIÓN CONTRACTUAL QUE CON MOTIVO DE LA PRESENTACIÓN DE LA SOLICITUD RELATIVA O DE SU DECLARACIÓN, ESTABLEZCA MODIFICACIONES QUE AGRAVEN LA SITUACIÓN DE LAS COMERCIANTES O IMPIDAN INICIAR EL TRÁMITE DEL JUICIO CONCURSAL**"[68] y "**CONCURSO MERCANTIL. CUANDO SE PERMITE A UN ACREEDOR EJECUTAR GARANTÍAS Y OBTENER EL MONTO TOTAL O PARCIAL DE SU CRÉDITO SIN SOMETERSE AL PROCEDIMIENTO PREVISTO EN LA LEY DE LA MATERIA PARA DETERMINAR EL ORDEN Y PRELACIÓN DE LOS CRÉDITOS, SE CONTRAVIENE EL PRINCIPIO PAR CONDICIO CREDITORUM**"[69], lo cierto es que la posibilidad de "tener por no puestas" disposiciones contractuales es una facultad que puede y debe ejercerse en cualquier etapa, con la finalidad **permitir el acceso a una protección concursal**.

En ese orden de ideas, desde la presentación de la solicitud de concurso mercantil, el artículo 87 de la Ley de Concursos Mercantiles permiten al juzgado concursal "tener por no puestas" disposiciones contractuales o actos que agraven la situación de la comerciante y le impidan acceder a una protección concursal; en esos términos, el Octavo Tribunal Colegiado ha reconocido que dicho preceptos **es idóneo** para hacer respetar el principio *par conditio creditorum* y respetar el "derecho subjetivo de la comerciante" de acceder al concurso mercantil.

A partir del ejercicio de dicha facultad, como le fue expresamente solicitado al Juzgado Responsable, éste debió simplemente obviar ("tener por no puesta") la Supuesta RUA y, en consecuencia, **privarla de efectos, negando la solicitud de desistimiento presentada por el Sedicente Apoderado de Controladora**, al estar plenamente demostrado que dicho acto fue realizados por sus acreedores con la finalidad de lograr un ilegal cobro de créditos.

---

[68] Registro digital: 2023843 TCC;11a. Época;Gaceta del Semanario Judicial de la Federación;I.8o.C.101 C (10a.) ;TA; Publicación: viernes 26 de noviembre de 2021 10:37 h

[69] Registro digital: 2025038 TCC;11a. Época;Gaceta del Semanario Judicial de la Federación;I.8o.C.11 C (11a.) ;TA; Publicación: viernes 05 de agosto de 2022 10:13 h





## PODER JUDICIAL DE LA FEDERACIÓN

**EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN**

**Archivo Firmado:**
**41580020000000000048316491.p7m**
**Autoridad Certificadora:**
**AC DEL SERVICIO DE ADMINISTRACION TRIBUTARIA**
**Firmante(s): 1**
**Este documento digital es una copia fiel de su versión física o electrónica, la cual corresponde a su original.**

EDER FLORES CORONA
70656062605d665350000000000000000002441c
15/05/26 17:00:00

| FIRMANTE | | | | |
|---|---|---|---|---|
| **Nombre:** | EDUARDO DE MARTIN ALBOR VILLANUEVA | **Validez:** | BIEN | Vigente |
| **FIRMA** | | | | |
| **No Serie:** | 30.30.30.30.31.30.30.30.30.30.37.31.34.32.31.31.32.31.38 | **Revocación:** | Bien | No revocado |
| **Fecha (UTC/ CDMX)** | 18/06/25 02:15:39 - 17/06/25 20:15:39 | **Status:** | Bien | Valida |
| **Algoritmo:** | RSA-SHA256 | | | |
| **Cadena de firma:** | 4e 80 52 70 25 51 c8 db 5b dd ec 00 a6 8c 92 eb 0f 60 4a fa e9 e0 b6 3c 4a 23 90 97 32 e5 b9 d3 76 50 ed 2d 0e f2 67 cd b2 78 a2 14 d9 ea d7 04 43 0f cf 5e 06 11 c2 d9 a3 02 81 f7 2d b1 85 f0 a8 79 f7 cb 0a f4 21 88 a9 7b 21 7b 40 2c 6e 3b d5 52 3b 6e ce 2e 18 8f 48 9e 45 03 79 25 8a 06 ec 15 be 06 37 c2 ac 02 2d 0a 81 5b ce 8b 47 e4 fd 6c 44 8c e0 2e fa 48 2b 2e 5d d0 2a 8b 1c 12 ec fd 45 2c 13 10 e5 e9 e9 43 0d 6e 26 8e ac 3e 55 01 05 c8 b8 d4 8c 59 b7 e5 61 0e cd ed c6 76 5d 38 49 f1 d4 31 3e 54 59 b7 63 cd 5b 01 79 33 8b e2 66 b0 42 c7 8e b6 8d b4 35 cd cb c3 1a 28 d9 d1 83 02 a8 8f 46 b7 ac 27 95 f2 70 8a 63 2a f5 a6 42 7e 0a 21 ea 5b d1 6f e4 00 ab a5 7b 34 c9 7b e6 58 da b7 6e 6a 28 57 e8 cd f2 67 a4 19 73 55 f9 30 06 f8 9b 66 9e fb 55 8c c8 aa 8f 60 | | | |
| **OCSP** | | | | |
| **Fecha: (UTC/ CDMX)** | 18/06/25 02:15:08 - 17/06/25 20:15:08 | | | |
| **Nombre del respondedor:** | OCSP SAT | | | |
| **Emisor del respondedor:** | AC DEL SERVICIO DE ADMINISTRACION TRIBUTARIA | | | |
| **Número de serie:** | 30.30.30.30.31.30.30.30.30.30.37.31.34.32.31.31.32.31.38 | | | |
| **TSP** | | | | |
| **Fecha : (UTC/ CDMX)** | 18/06/25 02:15:41 - 17/06/25 20:15:41 | | | |
| **Nombre del emisor de la respuesta TSP:** | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal | | | |
| **Emisor del certificado TSP:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal | | | |
| **Identificador de la respuesta TSP:** | 13220710 | | | |
| **Datos estampillados:** | iDkjJfJg5UF23LiG6LCm5PkejVY= | | | |

Como ha sido reconocido en los precedentes citados, el ejercicio de ésta facultad hubiera permitido al Juzgado Responsable privar de efectos a un acto que evidentemente pretende privar a Controladora de acceder al concurso mercantil (a pesar de cumplir los requisitos para ello) y que, además, **privilegia la actuación de ciertos acreedores que ilegalmente pretenden la ejecución extrajudicial de garantías prendarias para el cobro preferente de sus créditos**.

Contrario a sostenido en el Auto Reclamado, más allá de permitir al Sedicente Apoderado de Controladora desistirse del procedimiento concursal y reconocer efectos a la Supuesta RUA, al ser evidente que ésta viola el principio *par condictio creditorum* al ser producto de la ilegal ejecución de garantías prendarias y pretender privar al resto de los acreedores y a la comerciante misma acceder a una futura reestructura, con la finalidad de proteger la masa concursal y permitir que el concurso mercantil cumpliera con sus finalidades, debió aplicar el artículo 87 de la Ley de Concursos Mercantiles y **desconocer la Supuesta RUA ("tenerla por no puesta") y negar el desistimiento del procedimiento solicitado**.

Al ser omiso en actuar de dicha forma, y ser omiso en siquiera emprender un análisis del ejercicio de las facultades apuntadas tal y como expresamente le fue solicitado por Controladora, es evidente que el Auto Reclamado es ilegal y, por lo tanto, este Tribunal debe conceder el amparo y protección de la justicia de la Unión solicitados.

**OCTAVO.   CONTRARIO A LO QUE SOSTIENE EL JUZGADO RESPONSABLE, EL HECHO DE QUE EL JUZGADO RESPONSABLE PASÓ POR ALTO QUE EL DESISTIMIENTO FORMULADO POR EL SEDICENTE APODERADO DE CONTROLADORA ES PRODUCTO DE LA VIOLACIÓN FLAGRANTE A LAS MEDIDAS CAUTELARES, NO SON CUESTIONES AJENAS A LA CONTROVERSIA Y, POR EL CONTRARIO, DEBIERON HABER SIDO ANALIZADAS POR EL JUZGADO RESPONSABLE ANTES DE DECIDIR SOBRE EL DESISTIMIENTO PRESENTADO POR LOS SEDICENTES APODERADOS**.

<u>Síntesis</u>.        A pesar de así haber sido denunciado por Controladora oportunamente, al decidir sobre el desistimiento presentado por el Sedicente Apoderado de Controladora el Juzgado Responsable fue omiso en analizar que ésta era producto inexorable de la ejecución extrajudicial de garantías en contravención a las Medidas Cautelares, por lo que no debió reconocer efecto jurídico alguno a dicho acto. Cuestión que está inexorablemente relacionada con la presente controversia y no escapaba de las facultades de análisis del Juzgado Responsable.

<u>Desarrollo</u>

Como fue desarrollado en el capítulo de "Antecedentes", desde la admisión del Concurso Mercantil el Juzgado Responsable decretó las Medidas Cautelares, entre las cuales, ordenó a la *(i)* la **suspensión de cualquier procedimiento judicial <u>o extrajudicial</u> de ejecución de garantías**; *(ii)* impidió el perfeccionamiento de cualquier garantía otorgada por Controladora, y *(iii)* la prohibición de rescindir o terminar anticipadamente cualquier contrato del que Controladora sea parte.



Por acuerdos de 31 de enero de 2025 y 28 de marzo de 2025, el Juzgado Responsable ordenó que las Medidas Cautelares fueran notificadas a CI Banco, como fiduciaria del Fideicomiso de Garantía, y a Wilmington Trust, como Agente de Garantías de los Contratos de Financiamiento; reconociendo, en consecuencia, la obligación de ambas personas morales de cumplir con las Medidas Cautelares.

Esta obligación fue refrendada el 7 de abril de 2025, cuando el Juzgado Responsable justificó la negativa de nuevas medidas cautelares solicitadas por Controladora en contra de CI Banco y Wilmington Trust en el hecho de que de las ya decretadas ya habían sido notificadas a éstas, considerando ello suficiente para proteger los derechos de la Quejosa.

En ese orden de ideas, desde la admisión del Concurso Mercantil las Medidas Cautelares estaban plenamente vigente y, desde mucho antes de la supuesta celebración de la Supuesta RUA, es evidente que tanto CI Banco como Wilmington Trust estaban correctamente notificadas de las medidas y, por lo tanto, vinculadas a su cumplimiento.

No obstante lo anterior, CI Banco y Wilmington Trust celebraron la Supuesta RUA **conscientes de la vigencia y vinculadas al cumplimiento de las Medidas Cautelares**; fue tal su descaro, que en los antecedentes de dicha resolución incluso hicieron constar que éste fue posible **como consecuencia de la ejecución extrajudicial de garantías prendarias en perjuicio de las acciones de Controladora**, tal y como fue narrado en el capítulo de "Antecedentes."

Partiendo de dicha premisa, es que al comparecer el Sedicente Apoderado de Controladora al Concurso Mercantil para solicitar su desistimiento, Controladora fue clara en solicitar que éste fuera desestimado, al ser evidente que era producto de una flagrante violación a las Medidas Cautelares (al haberse ejecutado ilegalmente garantías en perjuicio de Controladora).

En esos términos, en la Primer Denuncia de Violación de Medidas Cautelares, Controladora solicitó no solo que impusiera medios de apremio en contra de CI Banco como Wilmington Trust, sino que además advirtiera la ilegalidad de sus actos, particularmente de la Supuesta RUA y, en consecuencia, no le otorgara efecto jurídico alguno.

Sin embargo, al decidir el desistimiento del Concurso Mercantil el Juzgado Responsable fue omiso en advertir, o siquiera analizar, el hecho de que éste era consecuencia de una flagrante violación a las Medidas Cautelares y los efectos que ellos debió conllevar para desestimar las peticiones planteadas por el Sedicentes Apoderado de Controladora. Ello evidentemente es ilegal.

En primer lugar, el Juzgado Responsable pasó por alto que las Medidas Cautelares decretadas constituyen un **mandato legítimo de autoridad**, por lo que son de **cumplimiento estricto** por las partes afectada.



Más allá de la responsabilidad penal o civil que puede derivar del incumplimiento de una medida cautelar, una cuestión relevante a advertir son los efectos que se le pueden reconocer al acto infractor (de existir).

Para resolver dicha cuestión, basta con acudir a la teoría general de la validez de los actos jurídicos para advertir que un acto acaecido en contravención a un mandato judicial **carece de cualquier efecto jurídico**.

Al respecto, el el Código Civil Federal prevé los siguientes requisitos de validez, sin los cuales el acto puede ser invalidado:

> "Artículo 1795.- El contrato puede ser invalidado:
>
> I. Por incapacidad legal de las partes o de una de ellas;
>
> II. Por vicios del consentimiento;
>
> III. **Porque su objeto, o su motivo o fin sea <u>ilícito</u>**;
>
> IV. Porque el consentimiento no se haya manifestado en la forma que la ley establece."
>
> [Énfasis añadido]

En ese sentido, se entiende que un hecho o acto es ilícito cuando es contrario a las leyes de orden público o a las buenas costumbres. Lo anterior con fundamento en el Código Civil Federal:

> "Artículo 1830.- Es ilícito el hecho que es contrario a las leyes de orden público o a las buenas costumbres."

Ahora bien, si un acto es ilícito en su objeto, motivo o fin, por ser contrario a las leyes de orden público o a las buenas costumbres, ello produce la nulidad del mismo, ya sea absoluta o relativa, según lo disponga la ley.

Ello con fundamento en el artículo 2225 del Código Civil Federal:

> Artículo 2225.- La ilicitud en el objeto, en el fin o en la condición del acto produce su nulidad, ya absoluta, ya relativa, según lo disponga la ley.

De acuerdo con este artículo, la nulidad por ilicitud puede ser absoluta o relativa. Sin embargo, la ley no vuelve a utilizar dichos vocablos con relación a la nulidad por ilicitud.

Para poder distinguir el tipo de nulidad por ilicitud, nos debemos apoyar en el principio de rigidez de la nulidad absoluta, en el sentido de que la nulidad absoluta debe reunir tres caracteres: *(i)* No debe desaparecer por confirmación, *(ii)* No debe desaparecer por prescripción y *(iii)* Debe ser invocada por todo interesado. Lo anterior con fundamento en el siguiente artículo del citado ordenamiento:

> "Artículo 2226.- La nulidad absoluta por regla general no impide que el acto produzca provisionalmente sus efectos, los cuales serán destruidos retroactivamente cuando se



pronuncie por el juez la nulidad. De ella puede prevalerse todo interesado y no desaparece por la confirmación o la prescripción."

Por su parte, la nulidad relativa debe diferir cuando menos en uno de ellos:

> "Artículo 2227.- La nulidad es relativa cuando no reúne todos los caracteres enumerados en el artículo anterior. Siempre permite que el acto produzca provisionalmente sus efectos."

En ese sentido, para saber qué tipo de nulidad es, tendremos que atender a los caracteres que se le atribuyan en cada caso en concreto.

Sin embargo, en los casos en los que no se establezcan sus caracteres, la doctrina ha sostenido que se debe distinguir si la norma tutela un interés general o uno particular. En el primer caso, la contravención a dicha norma da lugar a nulidad absoluta y, en el segundo, da lugar a una nulidad relativa.

En el presente caso, al tratarse de medidas cautelares dictados en un procedimiento de concurso mercantil, resulta claro que es se trata de una norma de **orden e interés público,** toda vez que existe un interés público en que, a través del concurso mercantil se conserven las empresas y se evite que el incumplimiento generalizado de las obligaciones de pago ponga en riesgo su viabilidad y a las demás con las que mantiene relaciones de negocios.

Ello tiene su fundamento en el artículo 1º de la Ley de Concursos Mercantiles:

> "Artículo 1o.- La presente Ley es de interés público y tiene por objeto regular el concurso mercantil.
>
> Es de interés público conservar las empresas y evitar que el incumplimiento generalizado de las obligaciones de pago ponga en riesgo la viabilidad de las mismas y de las demás con las que mantenga una relación de negocios. Con el fin de garantizar una adecuada protección a los acreedores frente al detrimento del patrimonio de las empresas en concurso, el juez y los demás sujetos del proceso regulado en esta Ley deberán regir sus actuaciones, en todo momento, bajo los principios de trascendencia, economía procesal, celeridad, publicidad y buena fe."

Además, dicha ley, al regular las providencias precautorias o medidas cautelares, faculta al Juez para dictar las providencias que estime necesarias con el **fin de salvaguardar el interés público previsto en el artículo primero de la ley.** A continuación, se transcribe el contenido de dicho artículo:

> "Artículo 26.-
>
> (…)
>
> El juez, a solicitud del Comerciante, o de oficio, dictará las providencias precautorias que considere necesarias a fin de evitar que se ponga en riesgo la viabilidad de la empresa con motivo de la demanda o de otras que se presenten durante la visita, o que se agrave dicho riesgo, para lograr salvaguardar el interés público previsto en el artículo primero de la presente Ley"

99



Partiendo de dicha premisa, es evidente que si un acto acaece en contravención a medidas cautelares decretadas en un procedimiento concursal, entonces dicho acto **es nulo y carece de cualquier efecto jurídico**.

Por lo tanto, si en el caso en concreto *(i)* las Medidas Cautelares ordenaron expresamente que no se ejecutaran judicial o extrajudicialmente garantía alguna en perjuicio de Controladora; *(ii)* las Medidas Cautelares fueron notificadas a Wilmington Trust y a CI Banco y, por lo tanto, éstas estaban vinculadas a su cumplimiento y *(iii)* no obstante lo anterior, Wilmington Trust y a CI Banco ejecutaron extrajudicial garantías prendarias y, en ilegal ejercicio de supuestas facultades obtenidas de dicha ejecución, celebraron la Supuesta RUA, es evidente que ésta **carecía de cualquier efecto jurídico, al ser producto inexorable de la violación flagrante a las Medidas Cautelares**.

En ese orden de ideas, al presentarse la Primer Denuncia de Violación a Medidas Cautelares (y, en su caso, al resolver el incidente de falta de personalidad presentado por Controladora) y antes de resolver sobre el desistimiento presentado, el Juzgado Responsable **debió analizar si la Supuesta RUA, bajo la cual el Sedicente Apoderado de Controladora pretendía sustentar su legitimación, <u>violaba o no las Medidas Cautelares y, en su caso, si debía reconocerle algún efecto jurídico o advertir su nulidad</u>**.

Evidentemente, partiendo de las premisas desarrolladas, dicho análisis debió conducir al Juzgado Responsable a concluir que la celebración de la Supuesta RUA, al ser producto de la ejecución extrajudicial de garantías en perjuicio de Controladora, invariablemente **violaba las Medidas Cautelares y, por lo tanto, <u>era un acto ilícito al que no se le podía reconocer efecto jurídico alguno</u>**.

En consecuencia, el Juzgado Responsable **debió declarar la existencia de una violación a las Medidas Cautelares, dictar medidas de apremio y, evidentemente, desconocer cualquier validez o efecto a la Supuesta RUA** (incluyendo, por mayoría de razón, el desistimiento presentado por el Sedicente Apoderado de Controladora).

Aunque pareciera que el Juzgado Responsable al dictar el Requerimiento a Wilmington y CI Banco pretendía emprender el análisis apuntado (pareciendo que buscaba hacerse llegar de evidencia sobre la existencia de una violación), es claro que éste no se llevó a cabo en el Auto Reclamado.

Actuando de manera ilegal y obviando la evidente violación a las Medidas Cautelares, al acordar favorable el desistimiento del Concurso Mercantil el Juzgado Responsable se limitó a considerar que "no podía ignorar" la existencia de la Supuesta RUA, **pero no se pronunció sobre la flagrante violación a las Medidas Cautelares y los efectos que ésta tenía sobre la Supuesta RUA.**

Más aun, como será ahondado en conceptos de violación posteriores, el Juzgado Responsable incluso actuó en contra de sus propias determinaciones y obvió el requerimiento que se había



formulado a Wilmington Trust, considerando que ya no era necesario su cumplimiento para decidir los efectos del desistimiento que le fue planteado.

Incluso, pasó por alto que CI Banco al supuestamente informar sobre el cumplimiento de las Medidas Cautelares, únicamente adujo que había sido supuestamente "engañado" (lo cual, evidentemente, es falso) y que no había actuado sobre bienes de Controladora; **sin embargo, no justificó ni se pronunció sobre su participación en la ejecución de garantías prendarias sobre Controladora.**

En ese orden de ideas, es evidente que el Juzgado Responsable simplemente decidió ignorar la violación a las Medidas Cautelares y a su propio mandato, obviando a su vez el evidente hecho de que, como consecuencia de dicha violación, la Supuesta RUA carecía de efectos y, por lo tanto, el Sedicente Apoderado de Controladora **no tenía facultades para solicitar el desistimiento del Concurso Mercantil**.

Aunado a lo anterior, no pasa desapercibido el argumento del Juzgado Responsable en el sentido de que las medidas cautelares no podía interpretarse como que vedaban el derecho de los accionistas para decidir el desistimiento del concurso mercantil. Sin embargo, dicho argumento no responde la omisión en que incurrió de analizar la violación a las Medidas Cautelares que debió culminar en el desconocimiento de la Supuesta RUA.

Esto es, no se pretende desconocer la facultad de una parte en un procedimiento judicial para decidir el desistimiento; lo cierto es que el Juzgado Responsable está tergiversando los agravios formulados por la Quejosa. La violación en que incurrió dicho juzgado es que ésta **fue omisa en analizar la invalidez de la Supuesta RUA** <u>como consecuencia de la violación de las Medidas Cautelares</u>.

Si bien es cierto las Medidas Cautelares no impedían en sí mismo la presentación de una solicitud de desistimiento, **sí impedían la posibilidad de ejecutar garantías en perjuicio de Controladora y, no obstante, la Supuesta RUA fue celebrada** <u>precisamente como consecuencia de una ilegal ejecución extrajudicial de garantías en su perjuicio</u>.

En ese orden de ideas, es evidente el Juzgado Responsable debió advertir que la Supuesta RUA **fue consecuencia de la violación inexcusable de las Medidas Cautelares y que, por lo tanto, <u>no se le debía reconocer efecto jurídico alguno</u>**, desestimando en consecuencia el desistimiento presentado por el Sedicente Apoderado de Controladora.

Al omitir dicho análisis y, en consecuencia, **no advertir la flagrante violación a las Medidas Cautelares en la que se sustentó el desistimiento planteado**, el Juzgado Responsable actuó de manera ilegal al emitir el Auto Reclamado. Por lo tanto, este Tribunal debe conceder el amparo y protección de la justicia de la Unión para revocarlo y ordenar que se continúe con el trámite del Concurso Mercantil.



**NOVENO. CONTRARIO A LO QUE SOSTIENE EL JUZGADO RESPONSABLE, ESTABA OBLIGADO A DICTAR LA SENTENCIA DE CONCURSO MERCANTIL AL TRANSCURRIR EL PLAZO IMPRORROGABLE PARA ELLO, MÁXIME QUE SÍ ESTABAN PROBADOS LOS EXTREMOS PARA LA DECLARACIÓN DE CONCURSO MERCANTIL .**

<u>Síntesis</u>.        La Ley de Concursos Mercantiles es clara en establecer que basta con que se acredite la actualización de los supuestos que refiere su artículo 10 y que transcurra el plazo que refiere el diverso artículo 42 para que se deba declarar a la comerciante en concurso mercantil. En el caso, ambos requisitos fueron cumplidos, por lo que el Juzgado Responsable debió emitir sentencia de declaración en concurso mercantil y no privilegiar el desistimiento presentado por el Sedicente Apoderado de Controladora, el cual además no fue acordado sino hasta con posterioridad a que transcurriera el término fatal para el dictado de la sentencia de concurso mercantil.

<u>Desarrollo</u>

Como ha sido desarrollado en conceptos de violación anteriores, el concurso mercantil es un procedimiento judicial de orden público que busca privilegiar la protección de los comerciantes y la posibilidad de que sus acreedores reciban un pago justo de sus créditos mediante un procedimiento de reestructura, cuestión que fue reconocida desde la exposición de motivos de la ley concursal.

Partiendo de dichas premisas, la posibilidad de solicitar la declaración de un concurso mercantil se ha reconocido jurisprudencialmente como un auténtico **derecho subjetivo**. Sobre este punto, conviene citar algunas consideraciones sostenidas por el Octavo Tribunal Colegiado en Materia Civil del Primer Circuito al resolver el amaro directo 836/2019:

> "De acuerdo con el artículo 1º de la Ley de Concursos Mercantiles su segundo párrafo se señala que: "Es de interés público conservar las empresas y evitar que el incumplimiento generalizado de las obligaciones de pago ponga en riesgo la viabilidad de las mismas y de las demás con las que mantenga una relación de negocios.…" PJF-Versión Pública A partir de la reforma del 2014, se incluye dentro del interés público de la ley concursal, el conservar las empresas que tengan contacto con una empresa que incumpla generalizadamente en el pago de sus obligaciones, es decir, trata de evitar las quiebras por contagio.
>
> **La empresa se considera como un bien que genera beneficios a la colectividad (da empleos y genera riqueza interna), por lo que debe ser protegida por el Estado. Este principio de conservación de la empresa le da sentido al principio de interés público, inclusive la ley es de interés público en virtud de que su fin primordial es la conservación de la empresa**.
>
> Debe quedar claro, que lo que busca este principio es proteger la conservación de la empresa, no a los dueños o accionistas de la misma.
>
> La universalidad es una de las características propias del concurso y de los procedimientos sucesorios. Es universal en dos sentidos, ya que afecta a la totalidad de los bienes del comerciante y a la totalidad de los créditos del mismo, de ahí se derivan los conceptos de masa activa (conjunto de bienes del comerciante) y masa pasiva (conjunto de deudas del comerciante).



Derivándose de este principio de universalidad, se generan dos principios secundarios que son los de: unicidad procesal y unicidad de patrimonio. **El primero se refiere a que debe haber un sólo procedimiento por lo que éste proceso tiene la cualidad de atraer cualquier otro procedimiento en contra o seguido por el comerciante; y el segundo señala que el patrimonio del comerciante debe ser único y deben someterse en su integridad al procedimiento concursal.**

Por último, **el principio de igualdad de trato entre los acreedores se deriva de la universalidad de los concursos. Si se afectan todos los créditos del comerciante, es lógico que** <u>todos los acreedores sean tratados por igual</u>.

**La propia Ley de Concursos Mercantiles establece que el acreedor** <u>tiene un derecho subjetivo público a que se acuerde la apertura del concurso</u>. **Si efectivamente concurren los presupuestos procesales y materiales que condicionan la apertura del concurso,** <u>el acreedor tiene un indudable derecho subjetivo y público, porque se dirige frente al Estado a pedir y que el Juez acuerde, la apertura del concurso</u>.

Los artículos estatutarios de las quejosas se contraponen a lo previsto en la fracción VII del artículo 20 de la Ley de Concursos Mercantiles, pues contienen una traba legal que les impide iniciar el procedimiento, lo que es contrario a los principios que rigen al procedimiento, esto es, el interés público, la igualdad de trato entre los acreedores, la universalidad y el principio de conservación de la empresa y sobre todo viola el derecho de acceso a la justicia de las impetrantes (…)"

[Énfasis añadido]

Lo anterior, sin pasar por alto el hecho de que por ser un procedimiento judicial, su acceso y la posibilidad de actuar en el mismo son **garantías mismas de los derechos de acceso a la justicia y la tutela judicial efectiva**, mismos que también importan la impartición de una **justicia pronta**, <u>dentro de los términos legales establecidos para tal efecto</u>, como fue reconocido por la Primera Sala de la Suprema Corte de Justicia de la Nación en la tesis de rubro **"GARANTÍA A LA TUTELA JURISDICCIONAL PREVISTA EN EL ARTÍCULO 17 DE LA CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS. SUS ALCANCES."**

Partiendo de dichos premisas, y atendiendo a la celeridad del procedimiento concursal, la Ley de Concursos Mercantiles impone como límite a las facultades del juzgado concursal la **imposibilidad de modificar plazos dentro del procedimiento**, al respecto:

"Artículo 7o.- El juez es el rector del procedimiento de concurso mercantil y tendrá las facultades necesarias para dar cumplimiento a lo que esta Ley establece**, sin que pueda modificar cualquier plazo o término que fije la misma salvo que ésta lo faculte expresamente para hacerlo.** Será causa de responsabilidad imputable al juez o al Instituto la falta de cumplimiento de sus respectivas obligaciones en los plazos previstos en esta Ley, salvo por causas de fuerza mayor o caso fortuito."

[Énfasis añadido]

Evidentemente, dicho límite se constituye como una garantía al derecho de acceso a la justicia y permite asegurar a la comerciante que acceda, oportunamente, a la protección judicial que otorga el concurso mercantil a su favor, de cumplirse con los requisitos legales para tal efecto.



Partiendo de lo anterior, la jurisprudencia ha sido clara en reconocer que los plazos que regula la Ley de Concursos Mercantiles **no pueden dejar de cumplirse**, sino que se debe evitar a toda costa cualquier dilación que atente contra los principios que persigue el concurso mercantil:

> **"SUSPENSIÓN DE LA ETAPA DE CONCILIACIÓN EN EL PROCEDIMIENTO DE CONCURSO MERCANTIL. EL JUEZ NO ESTÁ FACULTADO PARA OTORGARLA, SALVO POR CAUSA DE FUERZA MAYOR O CASO FORTUITO.** Conforme al sentido literal del artículo 7o. de la Ley de Concursos Mercantiles, los supuestos técnicos en que el juzgador o el Instituto Federal de Especialistas de Concursos Mercantiles pueden dejar de cumplir con sus obligaciones en los plazos que la ley establece sin incurrir en responsabilidad, son por causas de fuerza mayor o caso fortuito. Esto es, que el Juez que conoce del procedimiento de concurso mercantil, no podrá suspenderlo salvo por un hecho imprevisible ocasionado por una fuerza de la naturaleza (vis maior), o por una ocasionada por el hombre (vis absoluta). Esto tiene su razón de ser, porque el legislador de ningún modo quiso otorgar al Juez del concurso mercantil una facultad discrecional para suspender el procedimiento por un lapso determinado ni por tiempo indefinido, excluyendo cualquier tipo de subjetividad, garantizando seguridad jurídica a las partes involucradas y obligando al juzgador a actuar en estricto apego a lo dispuesto en la ley; de ahí que suspender la etapa de conciliación en el procedimiento de concurso mercantil no puede depender de la voluntad o ejercicio discrecional del Juez, para evitar a toda costa cualquier dilación que atente contra los intereses de alguna de las partes involucradas en el concurso."[70]

Incluso, se ha reconocido que la paralización del procedimiento concursal o el hecho de impedir, de cualquier forma, su trámite, está vedado por el ordenamiento jurídico mexicano al ser contrario a normas de orden público, como se desprende de los siguientes criterios:

> **"CONCURSO MERCANTIL. CONTRA LA RESOLUCIÓN QUE DECLARA LA QUIEBRA, ES IMPROCEDENTE CONCEDER LA SUSPENSIÓN DEFINITIVA.** La figura de la suspensión en el amparo tiene por objeto primordial preservar la materia del juicio constitucional, evitando que se causen daños y perjuicios de difícil reparación a la parte quejosa, para lo cual se hace necesario que se satisfagan todos y cada uno de los requisitos a que alude el artículo 124 de la Ley de Amparo, como son: que no se siga perjuicio al interés social, ni se contravengan disposiciones de orden público. Por otro lado, tomando en cuenta que el procedimiento que regula la Ley de Concursos Mercantiles no está previsto exclusivamente para dar satisfacción o certidumbre de los intereses de los particulares, sino que también desempeña un papel estratégico para la sociedad, de tal manera que dicha legislación en su numeral 1o. establece que es de interés público y que tiene por objeto regular el concurso mercantil, así como que es de interés público evitar el incumplimiento generalizado de las obligaciones de pago, lo que se traduce en un elemento objetivo que pone de manifiesto la preocupación de la sociedad frente a un interés particular; resulta inconcuso que cuando se solicita la suspensión definitiva de la resolución que declara la quiebra, de concederse se causarían mayores daños a la colectividad que los que se quieren eludir con esa medida cautelar, pues por encima del interés particular, se encuentra el de la colectividad e, incluso, proteger los derechos de los acreedores o la masa del comerciante y, al mismo tiempo, que con esa medida se proteja el conjunto de bienes y derechos que pertenecen a la negociación en concurso."[71]

> **"SENTENCIA DE CONCURSO MERCANTIL. NO PROCEDE OTORGAR LA SUSPENSIÓN, RESPECTO DE SU PUBLICACIÓN, YA QUE SE AFECTARÍA AL INTERÉS SOCIAL QUE PREVALECE FRENTE AL DEL COMERCIANTE CONCURSADO.** El artículo 128 de la Ley de Amparo,(1) establece los requisitos que habrán de cumplirse para el otorgamiento de la suspensión

---

[70] Registro digital: 2004598 TCC;10a. Época;Semanario Judicial de la Federación y su Gaceta;I.3o.C.115 C (10a.) ;TA

[71] Registro digital: 166210 Instancia: Tribunales Colegiados de Circuito Novena Época Materias(s): Civil Tesis: IV.3o.C.33 C Fuente: Semanario Judicial de la Federación y su Gaceta. Tomo XXX, Octubre de 2009, página 1411 Tipo: Aislada

Clyde&Co

del acto reclamado, entre los que se encuentran que no se perjudique al interés social, ni se contravengan disposiciones de orden público. En ese contexto, no puede otorgarse esta medida respecto de la publicación de la sentencia de concurso mercantil, ya que la ponderación entre el interés social de dar a conocer su existencia a todas las personas que pudiesen estar interesadas en acudir a ese proceso especial y universal para hacer valer sus derechos, indica que, frente al interés del comerciante concursado de no ver afectado su patrimonio por la erogación de los gastos de publicación, debe prevalecer aquél, porque el otorgamiento de la suspensión tendría como efecto la paralización del concurso mercantil, que es de interés público, en términos de los artículos 1o. y 2o. de la Ley de Concursos Mercantiles."[72]

"**SUSPENSIÓN. CUANDO SE RECLAMA LA EJECUCIÓN DE LA APROBACIÓN DE UN CONVENIO CONCURSAL, NO ES FACTIBLE CONCEDERLA PORQUE ELLO IMPLICARÍA UN PERJUICIO AL INTERÉS SOCIAL Y SE CONTRAVENDRÍAN DISPOSICIONES DE ORDEN PÚBLICO.** Para conceder la suspensión de los actos reclamados en el juicio de garantías, deben cumplirse los requisitos exigidos en el artículo 124 de la Ley de Amparo, a saber: que el agraviado la pida; que no se siga perjuicio al interés social ni se contravengan disposiciones de orden público y que, además, sean de difícil reparación los daños y perjuicios que se causen al agraviado con la ejecución del acto. Respecto a las disposiciones de orden público, se entienden aquellas que se encuentran plasmadas en los ordenamientos legales que tengan como fin inmediato y directo tutelar derechos de la colectividad, para evitar algún trastorno o desventaja, o para procurar satisfacción de necesidades o algún provecho o beneficio. En el anterior contexto, si en el amparo se reclama la ejecución de la sentencia que aprobó un convenio concursal, y de lo preceptuado por la Ley de Concursos Mercantiles, se pone de manifiesto que es un ordenamiento legal de interés público que tiene por objeto regular el concurso mercantil, que tiene como fin conservar las empresas y evitar que el incumplimiento generalizado de las obligaciones de pago, ponga en riesgo la viabilidad de las mismas y de las demás con las que mantenga una relación de negocios, resulta inconducente conceder la suspensión definitiva de los actos de ejecución, cuenta habida que de hacerlo, se paralizaría el procedimiento concursal, lo que implicaría suspender la ejecución y cumplimiento del mismo, con la consecuente retención de pagos a la totalidad de acreedores reconocidos, poniendo en riesgo la viabilidad de la empresa mercantil; inclusive provocaría que no se ordenara el levantamiento de las medidas provisionales decretadas dentro del concurso, en perjuicio de acreedores y proveedores de la empresa sujeta a concurso, la subsistencia de las inscripciones que con motivo de éste se hicieron en los Registros Públicos, y la consecuente afectación de manera directa a los derechos de la comerciante sujeta a concurso, como de los acreedores firmantes del convenio y los no firmantes; en contravención al contenido del artículo 124, fracción II, de la Ley de Amparo, ya que tales consecuencias provocarían que se siguiera perjuicio al interés social y se contravinieran disposiciones de orden público, pues la sociedad está interesada en la prosecución y conclusión de los concursos mercantiles."[73]

Bajo las premisas anteriores es que resultará evidente para la ilegalidad del Auto Reclamado.

Contrario a lo que adujo el Juzgado Responsable, el solo hecho de que transcurriera el plazo que regula el artículo 42 de la Ley de Concursos Mercantiles lo conminaba a dictar la sentencia de concurso mercantil **sin que existiera impedimento alguno para ello**.

Es falso, como aduce el Juzgado Responsable, que el hecho de que se haya presentado una solicitud de desistimiento de cualquier forma lo "impidiera" para dictar la sentencia de concurso

---

[72] Registro digital: 2009906 Instancia: Tribunales Colegiados de Circuito Décima Época Materias(s): Común, Civil Tesis: III.1o.C.25 C (10a.) Fuente: Gaceta del Semanario Judicial de la Federación. Libro 22, Septiembre de 2015, Tomo III, página 2209 Tipo: Aislada

[73] Registro digital: 163724 Instancia: Tribunales Colegiados de Circuito Novena Época Materias(s): Común Tesis: III.2o.C.54 K Fuente: Semanario Judicial de la Federación y su Gaceta. Tomo XXXII, Septiembre de 2010, página 1456 Tipo: Aislada



mercantil. Se afirma lo anterior, pues el plazo referido es **improrrogable e inmodificable, <u>sin que existan excepciones para ello</u>**.

El hecho de que haya se presentado una solicitud de desistimiento de ninguna manera obviaba el transcurso del plazo para el dictado de la sentencia de concurso mercantil, que necesariamente debió ser cumplido por el Juzgado Responsable.

Más aun si, contrario a lo que sostiene el Juzgado Responsable, **estaba plenamente demostrado los extremos para la declaración de concurso mercantil, <u>sin que ello sea una simple "valoración subjetiva", sino basado en elementos objetivos demostrados en el expediente</u>**.

Por una parte, conforme a los documentos contables que fueron presentados al Juzgado Responsable (y con fundamento en los cuales consideró, al menos presuntivamente, que se actualizaban los supuestos para ser declarada en concurso mercantil), Controladora demostró no solo el incumplimiento generalizado de sus obligaciones, sino también el hecho de que sus activos corresponden **a apenas el 1.28% para hacer frente a sus obligaciones**.[74]

Dicha situación financiera fue posteriormente constatada por el Visitador, quien al rendir su dictamen consideró de manera contundente que Controladora **actualizaba los supuestos que establece el artículo 10 de la Ley de Concursos Mercantiles para ser declarada en concurso mercantil**, como se desprende de la siguiente reproducción gráfica:

> Por medio del presente ocurso, en cumplimiento a lo dispuesto por el artículo 40 de la Ley de Concursos Mercantiles (en lo sucesivo "**LCM**"), así como, al Lineamiento SEXTO de Supervisión de los Especialistas de Concursos Mercantiles, exhibo el **DICTAMEN DE VISITA** en los formatos que, para tal efecto emite el Instituto Federal de Especialistas de Concursos Mercantiles, del cual se desprende que la empresa Controladora Dolphin, Sociedad Anónima de Capital Variable <u>**SÍ SE ENCUENTRA EN LA HIPÓTESIS DEL INCUMPLIMIENTO GENERALIZADO EN EL PAGO DE SUS OBLIGACIONES**</u>, y, por ende, en los supuestos que establece el artículo 10 de la LCM, siendo procedente su declaración del concurso mercantil en **etapa de conciliación**, tal y como lo pidió en su escrito de solicitud.

Partiendo de lo anterior, era evidente que Controladora **debía ser declarada en concurso mercantil**, pues toda la evidencia ofrecida al Juzgado Responsable arrojaba el cumplimiento inexorable de los supuestos necesarios para ello.

Incluso, al desahogar la vista otorgada con el dictamen del Visitador, Controladora **ratificó su intención plena de ser declarada en concurso mercantil**, solicitando al Juzgado Responsable que dictara la sentencia correspondiente en el término legal para tal efecto.

En esos términos, al comparecer el Sedicente Apoderado de la Comerciante para solicitar el desistimiento del concurso mercantil, el plazo con el que contaba el Juzgado Concursal para dictar la sentencia de concurso mercantil, de conformidad con el artículo 42 de la Ley de

---

[74] *Véase* Anexo 1 Sección 2 "Manifestación de incumplimiento o inminencia de incumplimiento generalizado en el pago de obligaciones" acompañado a la solicitud de declaración de concurso mercantil.

CLYDE&CO

Concursos Mercantiles estaba corriendo. Como fue narrado en el capítulo de "Antecedentes", éste plazo fatal vencía **de manera inexcusable e improrrogable**, el **9 de abril de 2025**.

Como consta en autos, al cumplirse dicho plazo el Juzgado Responsable **no había admitido aun la solicitud de desistimiento planteada por el Sedicente Apoderado de Controladora**, al haberla reservado pues supuestamente analizaría el cumplimiento de las Medidas Cautelares. Por lo tanto, **no existía impedimento o justificación legal alguna por la cual dicho juzgado <u>no debiera de haber emitido sentencia en la que declarara el concurso mercantil de Controladora</u>**.

Si toda la evidencia arrojaba que Controladora **debía ser declarada en concurso mercantil**, incluso con independencia de las manifestaciones contrarias de distintos apoderados, el Juzgado Responsable **estaba conminado a actuar bajo los plazos legales que establece la Ley de Concursos Mercantiles y, por lo tanto, <u>debió dictar sentencia de concurso mercantil a más tardar el 9 de abril de 2025</u>**.

Lo anterior pues dicha determinación otorgaría certeza no solo a Controladora, sino también a todos sus acreedores cuyas obligaciones se había demostrado incumplidas o que inminentemente se incumplirían, permitiéndoles acceder a un procedimiento de reestructura que implicara un pago justo de sus créditos.

En otras palabras, más allá de cualquier conflicto corporativo en el que distintas personas presentaran solicitudes contradictorias ante el Juzgado Responsable, lo cierto es que dicha autoridad estaba atada a un plazo fatal para decidir, con base en la evidencia presentada (incluyendo el dictamen del Visitador), si Controladora debía o no ser declarada en concurso mercantil; llegado dicho plazo, como lo fue, el Juzgado Responsable **debía dictar la sentencia correspondiente en estricto cumplimiento a la ley concursal para velar sus principios de orden público, principalmente, la protección y certeza tanto de la Quejosa como de sus acreedores**.

Sin embargo, en contravención a los principios esenciales del concurso mercantil, el Juzgado Responsable **omitió emitir la sentencia de concurso mercantil** y, en su lugar, prefirió reservar ilegalmente su pronunciamiento

La omisión de emitir dicha sentencia constituye una evidente violación por el Juzgado Responsable que debiera ser suficiente para que este Tribunal conceda el amparo y protección de la justicia de la Unión a favor de Controladora, ordenando la revocación del Auto Reclamado y la reanudación del Concurso Mercantil bajo los términos aplicables previstos en la Ley de Concursos Mercantiles.



**DÉCIMO. EL JUZGADO RESPONSABLE FUE OMISO EN ADVERTIR LA ILEGALIDAD DE LA SUPUESTA RUA, PARTIENDO DEL HECHO EVIDENTE DE QUE ÉSTA FUE CELEBRADA POR WILMINGTON TRUST A PESAR DE QUE HABÍA RENUNCIADO COMO "AGENTE DE GARANTÍAS", POR LO QUE NO GOZABA DE FACULTADES PARA SU CELEBRACIÓN Y ESTABA VICIADA DE NULIDAD ABSOLUTA, ADEMÁS DE QUE NO SE SIGUIÓ EL PROCEDIMIENTO PARA LA EJECUCIÓN DE GARANTÍAS PRENDARIAS QUE SUSTENTÓ DICHA RESOLUCIÓN**.

<u>Síntesis</u>.          Desde la Primer Denuncia de Violación a Medidas Cautelares, y habiéndose reiterado en el incidente de falta de personalidad, Controladora advirtió que la Supuesta RUA carecía de cualquier efecto jurídico pues, además de haber sido celebrado en contravención a las Medidas Cautelares, era evidente que las personas que la celebraron carecían de facultades para ello. Específicamente, Wilmington Trust carecía de facultades para ejercer cualquier derecho accionario pues había renunciado como "Agente de Garantías" a los Contratos de Financiamiento, además de que no se siguió el procedimiento necesario para la ejecución de las garantías prendarias, por lo que era evidente que carecía de cualquier facultad para celebrar la Supuesta RUA, lo que implica su evidente invalidez al carecer del consentimiento de los accionistas. Sin embargo, nada de esto fue siquiera analizado por el Juzgado Responsable a pesar de que, de haberlo hecho, era evidente que no debió otorgar efecto alguno a las actuaciones del Sedicente Apoderado de Controladora.

<u>Desarrollo</u>

Como ha sido desarrollado líneas arriba, la personalidad de las partes en un procedimiento judicial es considerada como un **presupuesto esencial del procedimiento**, sin el cual evidentemente no se puede permitir actuación alguna.

Como consecuencia de lo anterior, el artículo 1057 del Código de Comercio, de aplicación supletoria a la Ley de Concursos Mercantiles, permite que su análisis sea oficioso por el juzgador; al respecto:

> "Artículo 1057.- El juez **examinará de oficio la personalidad de las partes**, pero los litigantes podrán impugnar la de su contraria cuando tengan razones para ello, en vía incidental que no suspenderá el procedimiento y la resolución que se dicte será apelable en el efecto devolutivo, de tramitación inmediata, sin perjuicio de lo dispuesto por el artículo 1126 de este Código."

> [Énfasis añadido]

Asimismo, son relevantes los siguientes criterios:

> "**PERSONALIDAD, EXAMEN DE LA.** La personalidad de los litigantes es un presupuesto procesal, esto es, un requisito sin el cual no puede iniciarse ni sustanciarse válidamente el juicio, toda vez que no sería jurídico resolver una controversia en la que las partes o alguna de ellas, no estuviera legalmente representada; de ahí que la falta de impugnación oportuna de la personalidad de un litigante de ninguna manera puede motivar una representación que no existe; de lo que se sigue que la personalidad de las

108



partes debe ser analizada, aun de oficio, por el juzgador en cualquier estado del juicio, y sólo debe omitir la reiteración del examen de la personalidad, en caso de haber sido resuelto antes de manera expresa, a través de los medios de impugnación legalmente procedentes, o cuando en primera instancia el demandado no haya comparecido y en los agravios de la alzada combata la personalidad."[75]

"**PERSONALIDAD, EXAMEN DE LA**. Si en términos del artículo 222, fracción I, inciso b) del Código de Procedimientos Civiles del Estado de Puebla, se opuso la excepción de falta de personalidad del actor; el juzgador tenía la obligación de examinar tal aspecto al pronunciar la sentencia, atento a lo dispuesto por el artículo 221 del mismo ordenamiento legal, puesto que la personalidad de las partes es un presupuesto procesal, es decir, un requisito indispensable sin el cual no puede iniciarse, ni substanciarse válidamente un juicio, por lo cual, debe ser analizada por la potestad común aun de oficio, esto es, a pesar de que se haya o no impugnado oportunamente, ya sea a través de la excepción o del incidente respectivo, pues sería antijurídico que se resolviera sobre la cuestión de fondo cuando el actor carece de personalidad para ejercitar la acción."[76]

"**PERSONALIDAD, COMPROBACION DE LA. DEBE SER PLENA Y DIRECTA**. La personalidad constituye un presupuesto procesal indispensable para integrar válidamente la relación procesal, cuyo examen puede incluso hacerse de oficio con el propósito de mantener el proceso ordenado a su propio fin, evitando seguir una tramitación con persona que no sea el representante legítimo y condenar a la parte sin haberla realmente oído y vencido en el litigio. De ahí que deba justificarse plenamente y constar de modo directo en el documento relativo, y de ninguna manera deducirse a base de presunciones, dado que se trata de una cuestión esencial en el procedimiento."[77]

Partiendo de dichas consideraciones, es evidente que más allá de las violaciones cometidas por el Juzgado Responsable al omitir el trámite del incidente de falta de personalidad promovido por Controladora y el análisis de la Primer Denuncia de Violación a Medidas Cautelares (que son desarrolladas en otros conceptos de violación), lo cierto es que dicho juzgado tenía una obligación legal de analizar, oficiosamente, la personalidad ostentada por el Sedicente Apoderado de Controladora.

En esos términos, el Juzgado Responsable estaba conminado a analizar la validez de la Supuesta RUA para determinar si el Sedicente Apoderado de Controladora tenía facultades para actuar en el Concurso Mercantil. Evidentemente, el Juzgado fue omiso en emprender dicho análisis.

Bastaba con las constancias existentes en autos para que el Juzgado Responsable advirtiera las irregularidades de la Supuesta RUA y el evidente hecho de que ésta carecía de efectos jurídicos (aunque, se reitera, estas razones fueron expuestas de manera reiterada por Controladora, solo que sus argumentos fueron ilegalmente obviados).

En primer lugar, como fue narrado en el capítulo de "Antecedentes", el 24 de febrero de 2025 Controladora hizo de conocimiento del Juzgado Responsable que había recibido dos correos electrónicos de Wilmington Trust en los que, esencialmente, hacía de su conocimiento su renuncia como "Agente de Garantías" de los Contratos de Financiamientos (mismos que, a su vez, fueron exhibidos desde la solicitud de declaración de concurso mercantil).

---

[75] Registro digital: 189416 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;VI.2o.C. J/200 ;J

[76] Registro digital: 203267 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;VI.2o.29 C ;TA

[77] Registro digital: 199697 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;XII.2o.9 K ;TA



La función de Wilmington Trust como "Agente de Garantías" era, esencialmente la de representar y ejercer los derechos de los Tenedores de Bonos derivados de los Contratos de Financiamiento, como se desprende de las siguientes cláusulas:

**NPA 2022**

"Sección 24, sobre el Agente de Garantía.

(a)    Los compradores y los demás tenedores desean designar a una Persona para que actúe (y continúe actuando) como su agente de garantía y representante en su nombre con respecto a todos los asuntos relacionados con la Garantía y conforme a los Documentos de Garantía, los demás documentos financieros y los documentos relacionados. En consecuencia, mediante la ejecución de este Contrato, cada Comprador y cada otro tenedor designa, autoriza y nombra irrevocablemente a Wilmington Trust, Asociación Nacional, para actuar como su agente de garantía y representante en su nombre con respecto a todos los asuntos de Garantía y conforme a los Documentos de Garantía, los demás Documentos Financieros y los documentos relacionados. Cada Comprador y cada otro tenedor otorgar al Agente de Garantía todos los poderes y autoridad necesarios, deseables o apropiados para llevar a cabo las funciones y deberes delegados o asignados al Agente de Garantía conforme a este Contrato y los demás Documentos Financieros (incluyendo la autoridad para liberar la Garantía de los Gravámenes creados en virtud de los Documentos de Garantía y otros Documentos Financieros en las circunstancias específicamente previstas en este Contrato y en aquellos)."

**Convenio Modificatorio del NPA 2019**.

"Sección 24.1 Nombramiento del Agente de Garantía

(a)    Agente de Garantía. Los Compradores y los demás tenedores desean designar a una Persona para que actúe (y continúe actuando) como su agente de garantía y representante en su nombre respecto de todos los asuntos relacionados con la Garantía y conforme a los Documentos de Garantía, los otros Documentos Financieros y los documentos relacionados. En consecuencia, al firmar este Contrato, cada Comprador y cada otro tenedor designa, autoriza y nombra irrevocablemente a Wilmington Trust, National Association para actuar como su agente de garantía y representante en su nombre respecto de todos los asuntos relacionados con la Garantía y conforme a los Documentos de Garantía y los otros Documentos Financieros y los documentos relacionados. Cada Comprador y cada otro tenedor otorga el Agente de Garantía todos los poderes y facultades necesarios, deseables o apropiados para llevar a cabo las funciones y deberes delegados o asignados al Agente de Garantía confirme a lo aquí dispuesto (incluyendo la autoridad para liberar la Garantía de los Gravámenes creados bajo los Documentos de Garantía y los otros Documentos Financieros en las circunstancias específicamente previstas en ellos."

En esos términos, es evidente que su renuncia es de suma importancia. Lo anterior pues, al cesar su función como "Agente de Garantías", es evidente que también cesa cualquier facultad de representación a favor de los Tenedores de Bonos y, por lo tanto, cualquier facultad para ejercer derechos al amparo de los Contratos de Financiamiento o cualquier otro derivado o relacionado con éstos (como las Garantías Prendarias, que se incluyen en la definición de "Documentos Financieros" de los Contratos de Financiamiento).

En esos términos, los Contratos de Financiamiento disponen que al renuncia el "Agente de Garantías", los Tenedores de Bonos tienen el derecho a designar una persona que actúe como sucesor del agente de garantía en un plazo de 20 y 30 días posteriores a la renuncia, conforme a lo dispuesto en el NPA 2022 y el Convenio Modificatorio del NPA 2019, respectivamente. Como ejemplo de lo anterior y al ser los NPAS sustancialmente similares, se cita el apartado



correspondiente a la cláusula de la sucesión del Agente de Garantías del Convenio Modificatorio del NPA 2019:

**Convenio Modificatorio del NPA 2019**.

"Sección 24.8 Sucesor del Agente de Garantía

El Agente de Garantía puede renunciar en cualquier momento mediante una notificación por escrito de no menos de 20 días de anticipación a los tenedores y a la Compañía. Al recibir dicha notificación de renuncia, **los Tenedores Requeridos tendrán el derecho de designar a una Persona para que actúe como sucesor del Agente de Garantía. Si no se ha designado y aceptado tal sucesor del Agente de Garantía por los Tenedores Requeridos dentro de los 20 días posteriores a la notificación de renuncia del Agente de Garantía renunciante, el Agente de Garantía renunciante puede, en nombre de los tenedores, designar a una Persona para actuar como sucesor del Agente de Garantía,** quien será un tenedor, si un tenedor está dispuesto a aceptar dicha designación, o de lo contrario será un banco comercial o institución financiera está organizado bajo las leyes de los Estados Unidos de América o de cualquier Estado de los mismos y tiene un capital y superávit combinados de al menos $1,000,000,000. Si no se ha designado sucesor del Agente de Garantía dentro de los 20 días posteriores a la fecha en que se dio dicha notificación o renuncia, dicha renuncia se hará efectiva y los Tenedores Requeridos asumirán todas sus funciones de dicho Agente de Garantía renunciante conforme al presente y a los otros Documentos Financieros hasta el momento, si lo hay, en que los Tenedores Requeridos designen a un sucesor del Agente de Garantía según lo dispuesto anteriormente. (…)[78]"

[Énfasis añadido]

No obstante, como se desprende de lo anterior, en caso de que los tenedores de bonos no designan a un sucesor del "Agente de Garantías" dentro de dichos plazos, **entonces recaen en ellos las funciones de dicho agente hasta en tanto no se realice el nombramiento correspondiente**.

Partiendo de lo anterior, tal y como consta en autos, el 21 de marzo de 2025 se informó al Juzgado Responsable que habían transcurrido los plazos que señalan los Contratos de Financiamiento para que se nombrara al sucesor del "Agente de Garantías" y que, en consecuencia, de conformidad con las cláusulas aplicables citadas, son los Tenedores de Bonos quienes desempeñan las funciones como dicho agente. Se reitera que todo esto obra en el expediente del concurso mercantil y fue hecho del debido conocimiento del Juzgado Responsable.

No obstante el evidente hecho de que para la fecha indicada era evidente que Wilmington Trust **ya no actuaba como "Agente de Garantías" de los Contratos de Financiamiento**, en la Supuesta RUA se hizo constar que fue un supuesto apoderado de éste quien la celebró en supuesto ejercicio de derechos accionarios derivados de los Contratos de Financiamiento:

---

[78] La presente transcripción se encuentra contenida en la página 621 del documento adjunto a la solicitud de concurso como Anexo "37".





En esos términos, bastando un mero análisis de las constancias del juicio, debió haber sido evidente para el Juzgado Responsable que la Supuesta RUA era completamente inválida.

Lo anterior pues, para que las resoluciones unánimes adoptadas fuera de asamblea sean válidas, se deben cumplir varios requisitos: *(i)* que se encuentren **presentes la totalidad de las acciones** con derecho a voto o de la categoría especial de acciones de que se trate y *(ii)* que se adopten por unanimidad.

Es decir, el primer requisito exige que se encuentren presentes la totalidad de los accionistas de la sociedad respectiva. Ello tiene la finalidad de que, para no cumplir con las formalidades de una asamblea, se requiere que estén todos los accionistas con el fin de garantizar su derecho a la información y que puedan adoptar las decisiones necesarias, sin excluidos de las mismas.

De tal suerte que si no comparece uno de los accionistas o comparece una persona que no tenga tal carácter, **dicha resolución será nula**, al incumplir los requisitos exigidos por la ley.

En ese sentido, en el momento en el que Wilmington Trust renunció a su carácter de "Agente de Garantías", renunció a todos los derechos y obligaciones que tenía como tal, los cuales incluían el ejercicio de los derechos corporativos que se derivan de dichas acciones, incluyendo el derecho de voto.

Al renunciar, Wilmington Trust quedó sin la capacidad de poder ejercer voto alguno con las acciones que le fueron otorgadas en prenda puesto que renunció a su carácter de Agente de Garantías.

Por lo tanto, al celebrar la Supuesta RUA, Wilmington Trust carecía por completo de facultades para considerarse como accionista y celebrarla. Por lo tanto, es evidente que la Supuesta RUA **es inválida** pues para su celebración **no se contaba con el consentimiento de todos los accionistas de Controladora**, el cual es un <u>elemento de existencia del acto jurídico</u>, conforme al artículo 1794 del Código Civil Federal:

112



"Artículo 1794.- Para la existencia del contrato se requiere:

I. Consentimiento (…)"

En ese orden de ideas, es evidente que del estudio oficioso que debió emprender el Juzgado Responsable basándose en las constancias de autos, debió advertir la evidente invalidez de la Supuesta RUA y, por lo tanto, el claro hecho de que el Sedicente Apoderado de Controladora **carecía de facultades para actuar en el Concurso Mercantil**.

A mayor abundamiento, de constancias de autos el Juzgado Responsable habría advertido otros motivos de ilegalidad de la Supuesta RUA. Como ha sido establecido, conforme al texto mismo de la Supuesta RUA, ésta solo fue posible como consecuencia de la **ilegal ejecución extrajudicial de garantías prendarias en perjuicio de Dolphin**.

Con independencia de la ilegalidad en dicho acto (que debió haber sido advertida por el Juzgado Responsable, como ha sido desarrollado en otros conceptos de violación), lo cierto es que era evidente que **ni siquiera se siguió el procedimiento de ejecución que prevén las garantías constituidas**.

Al respecto, las garantías prendarias constituidas por Controladora constan, esencialmente, en el "Contrato de Prenda sobre Acciones Sujeta a Acción Suspensiva" celebrado entre Controladora y Wilmington Trust, que se acompañó como Anexo "19" a la solicitud de concurso mercantil, mismo que en su cláusula cuarta sección 4.02, dispone:

> Sección 4.02. Derechos de Voto y Evento de Incumplimiento. A partir del cumplimiento de la Condición Suspensiva, en caso de que ocurra un Evento de Incumplimiento, y siempre y cuando hayan transcurrido los plazos para subsanar dicho Evento de Incumplimiento que, en su caso, se establezcan en el Documento de la Operación correspondiente, todos los derechos del Deudor Prendario para ejercer los Derechos de Voto de conformidad con lo dispuesto en la Sección 4.01 de la presente Cláusula Cuarta terminarán, y a partir de dicho momento la totalidad de los derechos serán ejercidos por el Acreedor Prendario, quien tendrá el único y exclusivo derecho y facultad de ejercer los Derechos de Voto y cualesquiera otros derechos corporativos y económicos inherentes a las Acciones Pignoradas; en el entendido, que (i) antes de ejercer dichos derechos, el Acreedor Prendario entregará al respectivo Secretario miembro o no miembro del

> Consejo de Administración de la Sociedad, una notificación por escrito manifestando que un Evento de Incumplimiento ha ocurrido y (ii) el Acreedor Prendario tendrá el derecho, mas no la obligación, en cualquier momento posterior a la existencia de un Evento de Incumplimiento, de autorizar por escrito al Deudor Prendario que corresponda, para ejercer los Derechos de Voto y cualesquier derechos corporativos y económicos inherentes a las Acciones Pignoradas que sean de su propiedad. Como medio para cumplir con las obligaciones establecidas en la presente Cláusula Cuarta, el Deudor Prendario, una vez cumplida la Condición Suspensiva y conforme a los términos establecidos en el presente Contrato, el Deudor Prendario otorgará, dentro de los 15 (quince) Días Hábiles siguientes al cumplimiento de la Condición Suspensiva, un poder especial irrevocable, (sustancialmente en términos del formato que se adjunta al presente Contrato como **Anexo "G"**), en términos de los artículos 2554 y 2596 del Código Civil Federal y sus correlativos en los Códigos Civiles de los Estados de México, con el fin de facultar al Acreedor Prendario para que ejerza los Derechos de Voto y demás derechos corporativos y económicos inherentes a las Acciones Pignoradas conforme a lo establecido en el presente Contrato. El Deudor Prendario en este acto reconoce y acuerda que dicho poder especial se otorga como un medio para cumplir con una obligación de un contrato bilateral y, por lo tanto, es irrevocable. Las disposiciones de la presente sección, incluyendo la información relativa al otorgamiento del poder irrevocable a que se refiere el mismo, deberán ser incluidas en el asiento correspondiente del libro de registro de acciones de la Sociedad que documente la Prenda otorgada conforme al presente Contrato.

Como se puede desprender de lo anterior, dicho contrato dispone que previo poder ejecutar las prendas y ejercer cualquier derecho de voto que deriva de las acciones sobre las que están constituidas, es necesario que se haya notificado previamente **por escrito** un "evento de incumplimiento"al Secretario del Consejo de Administración de Controladora. En el caso, **dicha notificación no fue practicada**, a pesar de que era un requisito esencialmente para poder ejercer



cualqueir derecho derivado de las prendas constituidas (tal es así, que ni en el acta de la Supuesta RUA ni en el concurso mercantil se exhibió evidencia de dicha supuesta notificación).

Por lo tanto, al no cumplirse con dicha formalidad esencial, es evidente que Wilmington **carecía de cualquier derecho o facultad para celebrar la resolución unánime bajo lo cual los Sedicentes Apoderados ahora pretenden sustentar su representación**.

Todas las irregularidades apuntadas necesariamente debieron ser advertidas por el Juzgado Responsable de un análisis oficioso de la personalidad de Controladora (que estaba evidentemente llamado a emprender) y, en consecuencia, concluir que la Supuesta RUA era inválida y que la personalidad del Sedicente Apoderado de Controladora no fue debidamente demostrada, por lo que se debió negar cualquier solicitud presentada por éste.

En consecuencia, la omisión de emprender el análisis apuntada y, en consecuencia, **desestimar las peticiones del Sedicente Apoderado de Controladora desestimando la supuesta personalidad ostentada**, es una clara violación que torna ilegal el Auto Reclamado. Por lo tanto, este Tribunal debe conceder el amparo y protección de la justicia de la Unión para el efecto de revocarlo, ordenando que se desconozca la personalidad del Sedicente Apoderado de Controladora y, por lo tanto, se desestime su solicitud de desistimiento.

**DÉCIMO PRIMERO.    CONTRARIO A LO QUE SOSTIENE EL JUZGADO RESPONSABLE, ÉSTE SÍ VIOLÓ EL PRINCIPIO DE BUENA FE PROCESAL AL SUSTENTAR EL AUTO RECLAMADO EN EL HECHO DE QUE CI BANCO, COMO ACCIONISTA MAYORITARIO DE CONTROLADORA, ADUJO QUE SUPUESTAMENTE NO CONSINTIÓ LA PRESENTACIÓN DEL CONCURSO MERCANTIL, PUES ELLO NO IMPORTA LA VALIDEZ DE LA SUPUESTA RUA, NI MUCHO MENOS PRIVA DE EFECTOS A LA ASAMBLEA GENERAL DE ACCIONISTAS Y LA SESIÓN DE CONSEJO DE ADMINISTRACIÓN QUE SUSTENTARON LA PRESENTACIÓN DE LA SOLICITUD, MISMAS QUE DEBIERON SER VALORADAS PREVIO A DECIDIR SOBRE EL DESISTIMIENTO Y DEBIERON CONSIDERARSE BAJO EL MISMO PESO QUE LOS ACTOS DE LOS ACREEDORES**.

<u>Síntesis</u>.    El único motivo esgrimido por el Juzgado Responsable para decidir aceptar el desistimiento planteado por el Sedicente Apoderado de Controladora, reiterado ampliamente en el Auto Reclamado, es que constaba la manifestación de CI Banco "como accionista mayoritario" de la Quejosa de no querer continuar con el concurso mercantil. Sin embargo, contrario a lo considerado por el Juzgado Responsable, dicha manifestación no implica la validez de la Supuesta RUA ni, mucho menos, resta validez a la sesión de Consejo de Administración y la Asamblea General de Accionistas que sustentaron la presentación de la solicitud de concurso mercantil de la Quejosa, mismas que debieron tener el mismo peso para decidir la continuación del procedimiento concursal.

<u>Desarrollo</u>

114



a. <u>El principio de buena fe procesal.</u>

El principio de buena fe procesal, derivado del derecho a la tutela judicial efectiva, implica la exigencia de conductas de cumplir con ciertas cargas mínimas en cualquier procedimiento como la exposición de los hechos con veracidad o no alterar pruebas o hechos y, en general, cualquier conducta procesal que sea socialmente admitida como correcta:

> **"PRINCIPIO DE BUENA FE PROCESAL. EMANA DE LA GARANTÍA DE TUTELA JUDICIAL EFECTIVA**. El principio de buena fe procesal puede definirse, de manera general, como la conducta exigible a toda persona en un proceso, por ser socialmente admitida como correcta. Generalmente dicho principio no se incluye expresamente en los ordenamientos procesales, sino que resulta por inferencia de las normas que sancionan actos concretos contrarios a la buena fe. No obstante ello, el principio en comento tiene su origen en el derecho de tutela judicial efectiva y está relacionada con los derechos de defensa, igualdad y expeditez en la administración de justicia, porque la posibilidad de acudir a un órgano jurisdiccional para que declare el derecho que le asista a la parte que lo solicite es el medio por el cual el Estado dirime las controversias y, con ello, hacer efectivo el mandato de que ninguna persona pueda hacerse justicia por sí misma."[79]

> **"LEALTAD PROCESAL. ELEMENTOS QUE LA CONFORMAN**. Los principios de buena fe y de lealtad y probidad procesales deben basarse en la búsqueda de la verdad, tanto en relación con el derecho que se pretende, como en la forma en que se aplica o se sigue para conseguirlo. Así, dentro de la buena fe están los deberes específicos de exponer los hechos con veracidad, no ofrecer pruebas inútiles o innecesarias, no omitir o alterar maliciosamente los hechos esenciales a la causa y no obstaculizar ostensible y reiteradamente el desenvolvimiento normal del proceso. Por su parte, el principio de lealtad y probidad se conforma por el conjunto de reglas de conducta, presididas por el imperativo ético a que deben ajustar su comportamiento todos los sujetos procesales (partes, procuradores, abogados, entre otros), consistente en el deber de ser veraces y proceder con ética profesional, para hacer posible el descubrimiento de la verdad. Esto es, la lealtad procesal es consecuencia de la buena fe y excluye las trampas judiciales, los recursos torcidos, la prueba deformada e, inclusive, las inmoralidades de todo orden; de ahí que no puede darse crédito a la conducta de las partes que no refleja una lealtad al proceso."[80]

Como consecuencia de dicho principio, la jurisprudencia ha reconocido la existencia de una serie de presunciones en virtud de las cuales debe actuar el juzgador a lo largo del procedimiento, resultando de suma relevancia su impacto en la valoración probatoria.

En ese orden de ideas, el principio de buena fe procesal implica una serie de presupuestos, como la existencia de un intención de obrar honestamente, que en materia probatoria se traduce a una obligación del juez de partir de que se debe otorgar el valor probatorio aducido salvo la existencia de indicios contrarios al mismo que se reflejen el alcance o contenido de dicho prueba:

> **"PRINCIPIO DE BUENA FE PROCESAL. OBLIGA A NO PREJUICIAR DE FALSA LA PRUEBA DOCUMENTAL OFRECIDA EN COPIA SIMPLE FOTOSTÁTICA**. El artículo 373 del Código de Procedimientos Civiles para el Distrito Federal dispone que para acreditar hechos o circunstancias que tengan relación con el negocio que se ventile en juicio, las partes podrán presentar fotografías o copias fotostáticas, medios de prueba que serán valorados en su conjunto por el juzgador, atendiendo a las reglas de la lógica y de la experiencia, según lo previsto en el artículo 402

---

[79] Registro digital: 168826 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;I.7o.C.49 K ;TA
[80] Registro digital: 2018319 TCC;10a. Época;Gaceta del Semanario Judicial de la Federación;XI.1o.A.T. J/16 (10a.) ;J; Publicación: viernes 09 de noviembre de 2018 10:20 h



del mismo ordenamiento. **Dichos preceptos parten de una premisa fundamental para lograr su vigencia, que es la de observar el principio de buena fe procesal, porque reconoce que "para acreditar hechos o circunstancias" las partes pueden presentar fotografías, lo cual constituye el reconocimiento de que actúan en el proceso con probidad, con el sincero convencimiento de hallarse asistido de razón, y que por esa circunstancia pueden aportar ese tipo de medios de prueba. El principio de buena fe implica una serie de presupuestos, como la existencia de un estadio psicológico, que comprende la intención de obrar honestamente; la creencia de que la contraparte obra del mismo modo y la creencia o ignorancia de atributos o calidades en las personas o cosas. También supone la existencia de una influencia de ese estadio psicológico de la contraparte que le impulsa a la determinación de ofrecer un medio de prueba con la firme convicción de que es plausible que con aquél pueda demostrar lícitamente un hecho sujeto a controversia; así como la actuación conforme a ese estadio psicológico e influencia, que se verifica en el ofrecimiento efectivo de la prueba.** Estos presupuestos son analizados por el Juez no sólo por la especial posición y actitud del oferente de ese medio de prueba, sino por la aceptación, falta de reticencia o prueba en contrario que aporte la contraparte para desvirtuar su alcance o para demostrar el significado contrario de los hechos que se pretenden acreditar y que justamente exigen la aplicación de las reglas de la lógica y la experiencia. Entonces, el juzgador debe partir de un principio de buena fe procesal, que se apoya en la dignidad de las personas y los actos que realizan y que deben ser tratadas como tales pues es la base con la que actúan las partes y sólo ante la existencia de indicios contrarios a la misma reflejado en el contenido o alcance de dicho medio de prueba, puede el Juez dejar de otorgar valor probatorio a un documento en copia fotostática que la ley considera, prima facie, una fuente de prueba de los hechos o circunstancias del debate. Sería desapegado a la verdad y al citado principio que el juzgador partiera de la base de que cualquier copia fotostática tiene latente la posibilidad, dada la naturaleza de la reproducción y los avances de la ciencia, de que no corresponda a un documento realmente existente, sino a uno prefabricado que, para efecto de su fotocopiado, permita reflejar la existencia, irreal, del documento que se pretende hacer aparecer. Esto es así, porque en lugar de apegarse a la buena fe procesal, partiría de su desestimación por la autoridad, constituyendo un verdadero e injustificado prejuicio, y sólo recurriría a su abrigo cuando aquélla haya sido adminiculada con otros medios de prueba, lo que materialmente implicaría desconocerle, prima facie, valor probatorio por sí misma, lo que se aleja del contenido de la norma y de los principios rectores de la función judicial que tutela el artículo 17 de la Constitución Federal. Lo anterior, no significa que el juzgador deje de observar que las partes que litigan en defensa de sus intereses puedan incurrir en la alteración del documento o su confección, pero el acceso a la justicia como derecho humano exige de la autoridad judicial una disposición y actitud abierta al conocimiento de los hechos con las herramientas e instrumentos que el texto procesal le dota así como el resto del ordenamiento jurídico."[81]

Asimismo, se ha reconocido que como consecuencia del principio de buena fe procesal se debe partir de la base de que las partes actúan con probidad y el sincero convencimiento de que les asiste la razón, lo que implica un obrar honesto de que **la prueba no es ilícita**:

> **"PRINCIPIO DE BUENA FE PROCESAL. VALORACIÓN DE UNA COPIA SIMPLE OFRECIDA POR UN SERVIDOR PÚBLICO DE LA PROCURADURÍA DE LA DEFENSA DEL TRABAJO CON LA QUE PRETENDE ACREDITAR SU PERSONALIDAD EN EL JUICIO EN EL QUE COMPARECE COMO APODERADO DEL TRABAJADOR.** Si bien la copia simple de un documento no tiene valor probatorio pleno, sino que éste queda a la libre apreciación del juzgador, lo cierto es que para ello puede atenderse al principio de buena fe procesal, **que consiste en presuponer que las partes en el juicio actúan con probidad y el sincero convencimiento de que les asiste la razón; es decir, un obrar honesto sobre la convicción de que la prueba no es ilícita, que debe compaginarse con el derecho humano de tutela judicial efectiva, que está relacionado con los derechos de defensa, igualdad y expeditez en la administración de justicia**. Bajo ese principio, puede tenerse por acreditada la personalidad en un juicio en el que interviene como apoderado un servidor público de la

---

[81] Registro digital: 2002178 TCC;10a. Época;Semanario Judicial de la Federación y su Gaceta;I.3o.C.54 C (10a.) ;TA

Clyde&Co

Procuraduría de la Defensa del Trabajo, con la copia simple de su credencial vigente, porque la posibilidad de acudir a un órgano jurisdiccional para que defienda el derecho que asiste a la parte que lo solicite, es el medio por el cual el Estado dirime las controversias y, con ello, hacer efectivo el mandato de que ninguna persona pueda hacerse justicia por sí misma; por ello, se llega a la convicción de que con la referida copia el interesado efectivamente es un servidor público que presta sus servicios para la procuraduría mencionada, dependiente de la Secretaría del Trabajo y Previsión Social y, con ese carácter, representa dentro del juicio de amparo al trabajador quejoso."[82]

[Énfasis añadido]

En otras palabras, en virtud del principio de buena fe procesal se parte de la base de que las partes actúan con probidad, que los documentos y pruebas que ofrecen son reales y no fueron modificados o alterados y que lo único que buscan es, con honestidad, acreditar los alcances sus acciones o excepciones

b. La ilegalidad del Auto Reclamado.

Para sustentar el Auto Reclamado y la decisión de acordar favorable el desistimiento formulado por los Sedicentes Apoderados, el Juzgado Responsable reitera que la Supuesta RUA es una "*decisión soberana*" de Controladora y que, en consecuencia, no estaba obligado a priorizar actos corporativos previos respecto a posteriores, siendo que estaba plenamente facultado para reconocer la supuesta validez de la Supuesta RUA.

Sin embargo, una vez más, el Juzgado Responsable pasa por alto el hecho de que **ignoró por completo los múltiples motivos de invalidez que fueron esgrimidos por Controladora en contra de la Supuesta RUA y, en consecuencia, el hecho evidente que los Sedicentes Apoderados carecían de facultades de representación**.

En ese orden de ideas, más allá de un simple reconocimiento de la existencia de un acto corporativo, lo cierto es que el hecho de que el Juzgado Responsable no haya valorado todos los medios de defensa y manifestaciones esgrimidas por Controladora para desestimar la validez de la Supuesta RUA y la legitimación de CI Banco para celebrarla (que son desarrolladas en diversos conceptos de violación), lo cierto es que incluso la razón expresada por el Juzgado Responsable es falsa e ilegal, como se demuestra a continuación.

En primer lugar, el hecho de que CI Banco sea el "accionista mayoritario" de Controladora no importa, por ese solo hecho, que la Supuesta RUA sea válida y deba reconocérsele efecto alguno.

Como ha sido desarrollado líneas arriba, la Ley General de Sociedades Mercantiles es clara en establecer que para que una resolución adoptada fuera de asamblea sea válida, es necesario que concurra la **aprobación de la totalidad de los socios**, como se desprende del siguiente precepto:

"Artículo 80.- Las asambleas se reunirán en el domicilio social, por lo menos una vez al año, en la época fijada en el contrato (…)

---

[82] Registro digital: 2013578 TCC;10a. Época;Gaceta del Semanario Judicial de la Federación;III.3o.T.41 L (10a.) ;TA; Publicación: viernes 27 de enero de 2017 10:28 h



Adicionalmente, los socios podrán celebrar asambleas fuera del domicilio social, **siempre y cuando** <u>la totalidad de los socios lo aprueben</u> **y adicionalmente exista la posibilidad de utilizar medios electrónicos, ópticos o de cualquier otra tecnología**. Para dichas asambleas, en este caso, se deberá señalar en el acta de asamblea, el domicilio en el cual se llevó a cabo la asamblea respectiva."

[Énfasis añadido]

Partiendo de lo anterior, aun suponiendo sin conceder que CI Banco estaba facultada para celebrar la Supuesta RUA (que, se reitera, no lo estaba pues ello implicaría la violación a las Medidas Cautelares), ello no implica que no se requiriera el consentimiento **del resto de los accionistas de Controladora**, el cual no fue otorgado.

Al contrario, como ha sido ampliamente desarrollado, quien compareció en supuesta representación del resto de los accionistas fue Wilmington Trust quien **ya no contaba con facultad alguna al haber renunciado como "Agente de Garantías", además de que actuaba en violación a las Medidas Cautelares**.

Por lo tanto, aun obviando la ilegalidad del actuar de CI Banco (como lo hizo el Juzgado Responsable), lo cierto es que de cualquier forma **la Supuesta RUA es inválida pues es evidente que ésta** <u>no fue celebrada por todos los accionistas, al ser claro que quien se ostentó en representación del resto (Wilmington Trust), carecía de facultades para ello</u>.

Por otra parte, en nada impacta el hecho de que CI Banco haya alegado que en realidad "nunca" consintió la presentación del concurso mercantil y que fue supuestamente "engañado" por el Consejo de Administración de Controladora.

Además de que dichas cuestiones son **notoriamente falsas**, lo cierto es que consta en autos que CI Banco compareció a través de apoderado a la Asamblea de Aprobación de Concurso Mercantil y que, en su carácter de accionista, **aprobó la presentación del concurso mercantil**, decisión que fue posteriormente materializada en la Sesión del Consejo de Administración.

Bajo esa premisa, es evidente que CI Banco, **también como accionista mayoritario** <u>consintió la presentación de la solicitud de concurso mercantil</u>, con la diferencia de que dicha decisión también fue aprobada por los legítimos accionistas de Controladora.

Por lo tanto, el hecho de que ahora pretenda aducir que en realidad "no consintió" dicho acto, **no resta validez a la Asamblea de Aprobación de Concurso Mercantil,** siendo claro que en caso de que CI Banco considere que el apoderado que acudió a ésta actuó más allá de las facultades que le fueron concedidas para ello entonces deberá repetir en su contra, **más ello no importa en el consentimiento expresado y la validez de dicha asamblea**.

Más aun, el propio Juzgado Responsable consideró válidas y suficientes la Asamblea de Aprobación de Concurso Mercantil y la Sesión del Consejo de Administración, tal es así que con base en éstas decidió admitir a trámite la solicitud presentada por Controladora.



En esos términos, no existe razón válida por la cual el Juzgado Responsable pueda ahora desconocer la validez y efectos de dichos actos corporativos en preferencia a la Supuesta RUA, ni mucho menos existe alguna razón válida por la cual **deba preferir lo resuelto en dicha supuesta resolución**.

Por el contrario, lo cierto es que bajo el principio de buena fe procesal, el Juzgado Responsable debió valorar el hecho de que los legítimos representantes de Controladora estaban facultados para presentar el concurso mercantil (como de hecho fue reconocido implícitamente por dicho Juzgado al decidir su admisión), **y no preferir, sin fundamento alguno, lo expresado por CI Banco en el sentido de que existía un "engaño" en su presentación.**

No existe razón válida alguna por el Juzgado Responsable debió dar peso a los motivos esgrimidos por CI Banco en contraposición a lo demostrado por los legítimos representantes de Controladora, así como a su clara intención de continuar con el procedimiento concursal.

Mucho menos, como fue desarrollado en conceptos de violación previos, el Juzgado Responsable podía simplemente desconocer la validez de la Asamblea de Aprobación de Concurso Mercantil, la Sesión del Consejo de Administración y la consecuente personalidad ostentada por quienes solicitaron la declaración del concurso mercantil **sin previamente agotar un procedimiento que respetara el principio de contradicción**.

En cumplimiento al principio de buena fe procesal, el Juzgado Responsable estaba obligado a reconocer el valor de las actuaciones realizadas por los legítimos representantes de la Comerciante, sin preferir las manifestaciones realizadas por CI Banco y, en consecuencia, advertir no solo la ilegalidad del desistimiento presentado sino también el hecho evidente que **no era voluntad de Controladora desistirse del procedimiento concursal, sino que dicho acto estaba siendo efectuado por sus acreedores, de manera ilegal**.

Por lo tanto, es evidente que el Auto Reclamado es ilegal y, en consecuencia, este Tribunal deberá conceder el amparo y protección de la justicia de la Unión para el efecto de revocarlo.

## DÉCIMO SEGUNDO.    EL JUZGADO RESPONSABLE ACTUÓ DE FORMA ILEGAL AL CONFIRMAR EL LEVANTAMIENTO DE LAS MEDIDAS CAUTELARES A PESAR DE QUE NO HABÍA CAUSADO ESTADO EL AUTO DE DESISTIMIENTO.

<u>Síntesis</u>.        El Auto Reclamado confirmó el Auto de Desistimiento, a través del cual al el Juzgado Responsable inmediatamente ordenó el levantamiento de las Medidas Cautelares a pesar de que peste aún no había causado estado, lo que implica una violación flagrante al derecho a la seguridad jurídica y contraría frontalmente el artículo 1343 del Código de Comercio.

<u>Desarrollo</u>



El artículo 1343 del Código de Comercio, de aplicación supletoria a la Ley de Concursos Mercantiles, dispone que una sentencia causará ejecutoria cuando ésta no pueda ser impugnada por medio ordinario o extraordinario alguno de defensa:

> "Artículo 1343.- La sentencia de segunda instancia causará ejecutoria cuando la misma no pueda ser recurrida por ningún otro medio ordinario o extraordinario de impugnación, cualquiera que sea el interés que en el litigio se verse."

En términos similares, los artículos 354 y 356 del Código Federal de Procedimientos Civiles disponen:

> "ARTICULO 355.- Hay cosa juzgada cuando la sentencia ha causado ejecutoria."

> ARTICULO 356.- Causan ejecutoria las siguientes sentencias:
> "
> I.- Las que no admitan ningún recurso;

> II.- Las que, admitiendo algún recurso, no fueren recurridas, o, habiéndolo sido, se haya declarado desierto el interpuesto, o haya desistido el recurrente de él (…)"

Como se puede desprender de dichos preceptos, **solo hasta en tanto no proceda recurso ordinario ni extraordinario alguno en contra de una sentencia o resolución entonces se considera que ésta ha causado ejecutoria**.

Dichas disposiciones han sido interpretadas por la jurisprudencia en el sentido de que hasta en tanto una sentencia no causa ejecutoria, entonces ésta **no puede ser ejecutada ni se le puede otorgar efecto alguno**; son aplicables los siguientes criterios:

> "**SENTENCIAS DE SEGUNDA INSTANCIA EN MATERIA MERCANTIL. NO CAUSAN ESTADO MIENTRAS EXISTA PENDIENTE EL JUICIO DE AMPARO CORRESPONDIENTE**. Aunque es verdad que el juicio de amparo no es una tercera instancia sino un juicio de constitucionalidad o de legalidad cuya materia está constituida por cuestiones jurídicas distintas de las que lo son en el juicio del que emana el acto reclamado, puesto que en éste la autoridad judicial decide sobre los derechos y obligaciones controvertidos por las partes, y en aquél lo que se juzga es si los actos de dicha autoridad son o no violatorios de las garantías constitucionales invocadas por la quejosa; y aunque es verdad también que la autoridad responsable juega en el amparo el papel de parte demandada, mientras que en el juicio ordinario funge como órgano de justicia, y aunque es también cierto, por último, que de conformidad con el texto expresa del artículo 1343 del Código de Comercio "la sentencia de segunda instancia causará ejecutoria, confirme o revoque la de primera, y cualquiera que sea el interés que en el litigio se verse"; sin embargo, debe decirse que atento el principio de la jerarquía de las leyes propio de nuestro régimen federal, por virtud del cual la Constitución y su ley orgánica del amparo están supraordenadas a las otras leyes, de tal manera que, aun cuando conforme al texto expreso del invocado precepto del Código de Comercio, las sentencias de segunda instancia causan ejecutoria, constituyendo cosa juzgada, lo cierto es que estableciendo el juicio de amparo nuestra Constitución Federal, que es la Ley Suprema de toda la Unión (artículo 133), de ello resulta que no es dable, bajo ningún concepto, que se pueda considerar que las repetidas sentencias tengan la certeza y autoridad de la cosa juzgada, puesto que contra ellas existe el medio de impugnación constitucional de amparo, y de ahí que la disposición contenida en el referido artículo 1343 del Código de Comercio debe entenderse únicamente en cuanto a que no admite ya ningún recurso ordinario establecido por dicho código. Por tanto, cuando procede el amparo directo contra sentencias de segunda instancia, tiene que admitirse que el fallo que está impugnado en la vía extraordinaria no causa estado sino hasta que su tramitación

DOC ID 109546161.1 / DOC ID 109546161.1 / VILLANUEVA 261875 8075 9448



concluye por la resolución que recae en el juicio de amparo correspondiente, y mientras esto no ocurre, el pleito continúa sub judice."[83]

"**SENTENCIAS DE SEGUNDA INSTANCIA. NO CAUSAN ESTADO MIENTRAS EXISTA PENDIENTE EL JUICIO DE AMPARO CORRESPONDIENTE**. Es cierto que de acuerdo con el artículo 426 del Código de Procedimientos Civiles para el Distrito y Territorios Federales, la sentencia de segunda instancia pone término al juicio y, por lo tanto, causa ejecutoria por ministerio de la ley. Esto es verdad, sin embargo, únicamente en cuanto que no admite ya ningún recurso ordinario establecido por la ley común, puesto que el citado precepto nada dice, ni existe disposición alguna en el Código Procesal Civil, en relación a los fallos de segunda grado. Empero, la fracción III del artículo 107 constitucional, dispone que el amparo directo es procedente contra sentencias definitivas, dictadas en el juicio del orden civil, respecto de las cuales se han agotado los recursos ordinarios establecidos por la ley. Por tanto, cuando procede el amparo directo contra sentencias de segunda instancia, tiene que admitirse que el fallo que está impugnado en la vía extraordinaria, no causa estado sino hasta que su tramitación concluye por la resolución que recae en el juicio de amparo correspondiente, y mientras esto no ocurre, el pleito continua subjudice."[84]

Ahora bien, en el caso en concreto, y con reserva de lo expuesto en el capítulo de "Procedencia" de la presente demanda, el Auto Reclamado es impugnable (**de manera optativa, tomando en consideración la actualización de varias excepciones al principio de definitividad que ya fueron desarrolladas**) a través del recurso de revocación que prevé la Ley de Concursos Mercantiles, al respecto:

"Artículo 268.- Cuando esta Ley no prevea el recurso de apelación procederá la revocación, que se tramitará conforme a las disposiciones del Código de Comercio."

Aunado a lo anterior, como fue debidamente demostrado en el capítulo de "Procedencia" de la presente demanda, en contra del Auto Reclamado procede el juicio de amparo indirecto.

Partiendo de dichas premisas, es claro que al momento del dictado del Auto Reclamado, éste aun no había causado ejecutoria pues era **aun era susceptible de ser impugnada a través de medios tanto ordinarios como extraordinarios de defensa**.

No obstante lo anterior, de manera inmediata y a pesar de la posibilidad de que dicha determinación fuera impugnada, el Juzgado Responsable **ordenó el levantamiento de las Medidas Cautelares decretadas a favor de la Quejosa**, ejecutando así completamente el ilegal desistimiento del concurso mercantil.

Evidentemente, dicha resolución es contraria al texto expreso del Código de Comercio y del Código Federal de Procedimientos Civiles, según éste ha sido interpretado por la jurisprudencia, pues a pesar de que la sentencia aun se encuentra *sub judice* el Juzgado Responsable ya la dotó de plenos efectos y ordenó su material ejecución.

Cuestión que, como ha sido desarrollado líneas arriba, también es violatorio del derecho a un a la tutela cautelar efectiva.

---

[83] Registro digital: 241851 SCJN;7a. Época;Semanario Judicial de la Federación ;TA
[84] Registro digital: 269673 SCJN;6a. Época;Semanario Judicial de la Federación ;TA



Partiendo de lo anterior, debiera ser evidente para este Juzgado que el Auto Reclamado son ilegales al contrariar el texto expreso del Código de Comercio y del Código Federal de Procedimientos Civiles y, en consecuencia, debe otorgar el amparo y protección de la Justicia de la Unión para el efecto de revocar dicha resolución.

**DÉCIMO TERCERO.    AL CONFIRMAR EL AUTO DE DESISTIMIENTO Y EL CONSECUENTE LEVANTAMIENTO DE MEDIDAS CAUTELARES, EL JUZGADO RESPONSABLE INCUMPLIÓ CON LO DISPUESTO EN EL ARTÍCULO 25 DE LA LEY DE CONCURSOS MERCANTILES, PUES NO ESTABA FACULTADO PARA ORDENAR EL LEVANTAMIENTO DE LAS MEDIDAS CAUTELARES SIN PREVIAMENTE AGOTARSE ALGUNO DE LOS MEDIOS Y RECURSOS QUE REGULA EL ARTÍCULO 1183 DEL CÓDIGO DE COMERCIO**.

<u>Síntesis</u>.        Partiendo de la premisa de que el Auto Reclamado aun no causaba estado (por lo que el Concurso Mercantil no ha terminado), es evidente que en congruencia con lo dispuesto por el artículo 25 de la Ley de Concursos Mercantiles, el Juzgado Responsable carecía de facultades para ordenar el levantamiento de las Medidas Cautelares sino a través de alguno de los medios que regula el artículo 1183 del Código de Comercio.

<u>Desarrollo</u>

El artículo 25 de la Ley de Concursos Mercantiles es claro en establecer que el decreto y levantamiento de medidas cautelares se rige de conformidad con lo que disponga el Código de Comercio, al respecto:

> "Artículo 25.- El acreedor que demande la declaración de concurso mercantil de un Comerciante, podrá solicitar al juez la adopción de providencias precautorias o, en su caso, la modificación de las que se hubieren adoptado. La constitución, modificación o levantamiento de dichas providencias se regirán por lo dispuesto al efecto en el Código de Comercio."

En esos términos, el artículo 1183 del Código de Comercio establece que las providencias precautorias pueden levantarse, ya sea mediante la interposición de un recurso de apelación o demostrando la existencia de un hecho superveniente:

> "Artículo 1183.- En contra de la resolución que decrete una providencia precautoria procede el recurso de apelación de tramitación inmediata en efecto devolutivo, en términos de los artículos 1339,1345, fracción IV, y 1345 bis 1 de este Código.
>
> Sin perjuicio de lo anterior, la persona contra quien se haya dictado una providencia precautoria, puede en cualquier tiempo, pero antes de la sentencia ejecutoria, solicitar al juez su modificación o revocación, cuando ocurra un hecho superveniente."

Dicha disposición debe interpretarse, en atención al principio de contradicción, de manera armónica con los artículo 1349, 1350 y 1351 de dicho ordenamiento, que disponen:



Artículo 1349.- Son incidentes las cuestiones que se promueven en un juicio y tienen relación inmediata con el negocio principal, por lo que aquéllos que no guarden esa relación serán desechados de plano.

Artículo 1350.- Los incidentes se substanciarán en la misma pieza de autos, sin que suspendan el trámite del juicio en lo principal.

Artículo 1351.- Los incidentes, cualquiera que sea su naturaleza, se tramitarán verbalmente en las audiencias o por escrito, según se dispone en los siguientes artículos.

Así las cosas, una medida cautelar solo puede modificada o levantada previa demostración de la exitencia de un hecho superveniente que así lo amerite, siempre que se agote el procedimiento incidental correspondiente.

El único supuesto que se regula en que una medida cautelar puede ser revocada "de oficio" es que no se cumplan con los requisitos establecidos en el artículo 1181 del Código de Comercio:

"Artículo 1181.- Ejecutada la providencia precautoria antes de ser promovida la demanda, el que la pidió deberá presentarla dentro de tres días, si el juicio hubiere de seguirse en el lugar en que aquélla se dictó. Si debiere seguirse en otro lugar, el juez aumentará a los tres días señalados, los que resulten de acuerdo al último párrafo del artículo 1075.

El que pidió la medida precautoria deberá acreditar ante el juzgador que concedió la providencia la presentación de la demanda ante el juez competente, dentro de los tres días siguientes a que se venza cualquiera de los plazos del párrafo anterior."

"Artículo 1182.- Si el que solicita la providencia precautoria no cumple con lo dispuesto en el artículo que precede, **ésta se revocará de oficio**, aunque no lo pida la persona contra la que se decretó."

[Énfasis añadido]

Partiendo de dichas premisas, resutará evidente para este Tribunal la ilegalidad del Auto Reclamado pues en éste, el Juzgado Responsable ordenó el levantamiento de Medidas Cautelares **sin que se agotara alguno de los medios que se acaban de describir**.

Es necesario enfatizar que el Auto Reclamado aun no causa estado, por lo que el Concurso Mercantil sigue en trámite y no es posible aun considerar su terminación; partiendo de dicha consideración, es claro que **no existe motivo alguno por el cual se deban levantar las Medidas Cautelares**.

Partiendo de dicha premisa, el levantamiento de las Medidas Cautelares solo podría ser ordenado por el Juzgado Responsable previo a que se desahogara o interpusiera alguno de los medios de defensa que regula el Código de Comercio.

Sin embargo, como consta en autos, **ninguno de estos medios de defensa fue agotado en contra de las Medidas Cautelares**, por lo que, en consecuencia, el Juzgado Responsable <u>carecía de facultades para ordenar su levantamiento</u>.

123



En consecuencia, es evidente que la orden de levantar las Medidas Cautelares, confirmada por el Auto Reclamado **es ilegal**, pues no se realizó como consecuencia de alguno de los medios que prevé el Código de Comercio para tal efecto.

Por lo tanto, este Tribunal deberá conceder el amparo y protección de la Justicia de la Unión para el efecto de revocar el Auto Reclamado.

## DÉCIMO CUARTO. INCONSTITUCIONALIDAD DE LOS ARTÍCULOS 1, 7, 25, 26 Y 28 DE LA LEY DE CONCURSOS MERCANTILES, ASÍ COMO EL ARTÍCULO 1183 DEL CÓDIGO DE COMERCIO AL INTERPRETAR IMPLÍCITAMENTE LA POSIBILIDAD DE DECRETAR EL LEVANTAMIENTO DE MEDIDAS CAUTELARES SIN QUE SE HAYA INTERPUESTO RECURSO ORDINARIO Y SIN QUE MEDIE SOLICITUD EXPRESA PARA ELLO.

<u>Síntesis</u>.        Al confirmar la orden de levantamiento de las Medidas Cautelares en el Auto Reclamado, el Juzgado Responsable interpretó implícitamente que la Ley de Concursos Mercantiles y el Código de Comercio lo facultaban la revocar providencias precautorias sin necesidad de que previamente se siguiera un procedimiento para ello o se agotar recursos ordinarios en su contra; dicha interpretación torna inconstitucionales los artículos apuntados, por lo que este Tribunal debe ejercer control constitucional sobre éstos y, al hacerlo, advertir la inconstitucionalidad del Auto Reclamado.

<u>Desarrollo</u>.

a. <u>Debido proceso y principio de contradicción</u>.

El contenido y alcance de estos derechos ya fue desarrollado en el apartado "a" del tercer concepto de violación, por lo que para evitar repeticiones innecesarias, se solicita que dichas consideraciones se tengan por reproducidas como si la letra se insertasen.

b.        <u>Tutela cautelar efectiva</u>.

El derecho a la tutela cautelar efectiva fue reconocido en la observación general N° 31 (emitida el 26 de mayo del 2004) del Comité de Derechos Humanos:

> "(…) La obligación consignada en el párrafo 2 del artículo 2 de que se adopten medidas para hacer efectivos los derechos reconocidos en el Pacto no admite reservas y es inmediata. No se puede justificar el i n cumplimiento de esta obligación haciendo referencia a consideraciones de carácter político, social, cultural o económico dentro del Estado.
>
> En el párrafo 3 del artículo 2 se dispone que, además de proteger eficazmente los derechos reconocidos en el Pacto, los Estados Parte habrán de garantizar que todas las personas dispongan de recursos accesibles y efectivos para reivindicar esos derechos. Esos recursos se deben adaptar adecuadamente para tener en cuenta la vulnerabilidad especial de ciertas clases de personas, en particular los niños. El Comité atribuye importancia a que los Estados Parte establezcan en el derecho interno mecanismos judiciales y administrativos adecuados para conocer de las quejas sobre violaciones de los derechos. El Comité toma



nota de que el poder judicial puede garantizar el disfrute de los derechos reconocidos en el Pacto de distintas maneras, en especial mediante la aplicación directa del Pacto, la aplicación de disposiciones constitucionales u otras disposiciones legislativas similares o el efecto de la interpretación del Pacto en la aplicación de la legislación nacional. Se requieren en especial mecanismos administrativos que den cumplimiento a la obligación general de investigar las denuncias de violación de modo rápido, detallado y efectivo por organismos independientes e imparciales. Las instituciones nacionales de derechos humanos que cuenten con las facultades pertinentes pueden coadyuvar a tal fin. El hecho de que un Estado Parte no investigue las denuncias de violación puede ser de por sí una vulneración del Pacto. La cesación de la violación constituye un elemento indispensable del derecho a obtener un recurso efectivo. (…)

El Comité observa, además, que en determinadas circunstancias el derecho a hacer valer un recurso efectivo puede exigir que los <u>Estados Parte adopten y apliquen medidas provisionales para evitar la repetición de las violaciones y reparar cuanto antes cualquier daño que esas violaciones puedan haber causado.</u>

Aunque los regímenes jurídicos de los Estados Parte estén formalmente dotados del recurso adecuado, siguen ocurriendo violaciones de los derechos reconocidos en el Pacto. Cabe <u>suponer que ello es atribuible al hecho de que los recursos no funcionan con efectividad en la práctica.</u> Por consiguiente, se solicita a los Estados Parte que en sus informes periódicos señalen los obstáculos que se opongan a la efectividad de los recursos existentes."

La Comisión Interamericana de Derechos Humanos ha reconocido la existencia de este derecho como se puede apreciar de su publicación intitulada "El acceso a la justicia como garantía de los Derechos Económicos, Sociales y Culturales. estudio de los estándares fijados por el Sistema Interamericano de Derechos Humanos" en la que sostuvo lo siguiente:

"261.       El SIDH ha reconocido que la noción de "efectividad" que surge del artículo 25 de la CADH, <u>requiere que las herramientas judiciales disponibles, incluyan medidas procesales como las medidas precautorias, provisionales o cautelares</u> y, en general, recursos judiciales sencillos y rápidos para la tutela de derechos, con miras a impedir que las violaciones se prolonguen en el tiempo. Lo anterior, aún cuando la determinación acerca del fondo de la cuestión requiera de un período temporal más extenso. […]
De esta manera, en virtud de la especial naturaleza de estos recursos y de la necesidad y urgencia con la que deben actuar, la CIDH puntualiza ciertas características básicas que éstos deben presentar a fin de ser considerados "idóneos": a) que se trate de recursos sencillos, urgentes, informales, accesibles y tramitados por órganos independientes; b) que se cuente con la posibilidad de acceder a instancias judiciales federales o nacionales ante la sospecha de parcialidad en la actuación de los órganos locales; c) que se garantice una legitimación activa amplia; d) que puedan tramitarse como recursos individuales e igualmente como acciones cautelares colectivas (para proteger a un grupo determinado o determinable conforme a ciertos parámetros, afectado o bajo situación de riesgo inminente); y e) que se prevea la aplicación de medidas de protección en consulta con los afectados"[85]

En el ámbito nacional también se ha reconocido el derecho a la tutela judicial efectiva, como se puede desprender de la siguiente tesis:

"**SUSPENSIÓN EN EL AMPARO. PROCEDE CONCEDERLA, A PESAR DE QUE PUEDA ADELANTAR LOS EFECTOS DE LA DECISIÓN FINAL, SI ES NECESARIO PARA ASEGURAR UNA TUTELA CAUTELAR EFECTIVA QUE PRESERVE LA MATERIA DEL JUICIO Y LA CABAL RESTITUCIÓN DEL AFECTADO EN SUS DERECHOS**. El criterio de que la suspensión no debe otorgar efectos restitutorios o que anticipen la decisión final, por ser propios de la sentencia de fondo, debe superarse en aras de ser congruentes con la finalidad constitucional de preservar la materia del juicio y evitar la ejecución de actos

---

[85]       Ello       es       accesible       en       el       siguiente       hipervínculo:
https://www.cidh.oas.org/countryrep/AccesoDESC07sp/Accesodescv.sp.htm



de imposible o difícil reparación, siempre y cuando exista interés suspensional del solicitante y materia para la suspensión, para lo que es menester considerar la naturaleza del acto reclamado. Consecuentemente, procede conceder la suspensión a pesar de que pueda adelantar los efectos de la decisión final, pues ello sería en forma provisional, si es necesario para asegurar una tutela cautelar efectiva que preserve la materia del juicio y la cabal restitución del afectado en sus derechos; es decir, cuando de no otorgarse, la restitución que, en su caso, se ordene en la resolución definitiva, pueda ser ilusoria."[86]

En esos términos, la jurisprudencia ha reconocido que el otorgamiento de medidas cautelares **como un auténtico derecho humano**, como se desprende del siguiente criterio jurisprudencial:

"**MEDIDAS CAUTELARES O PROVIDENCIAS PRECAUTORIAS EN LOS JUICIOS MERCANTILES. SON INHERENTES AL DERECHO A LA JURISDICCIÓN, POR LO QUE LA LIMITACIÓN DE SU OTORGAMIENTO DEBE ATENDER A UNA INTERPRETACIÓN FUNCIONAL Y CONFORME DEL ARTÍCULO 1168 DEL CÓDIGO DE COMERCIO CON LOS ARTÍCULOS 1o. Y 17 CONSTITUCIONALES.** En los juicios mercantiles se pueden decretar medidas cautelares o providencias precautorias para mantener una situación preexistente, en virtud de que este tipo de instrumentos son inherentes al derecho a la jurisdicción, al tener la finalidad de hacer eficaces las sentencias de los Jueces tal como está previsto en el artículo 17, párrafo séptimo, de la Constitución Política de los Estados Unidos Mexicanos, el cual dispone que: "Las leyes federales y locales establecerán los medios necesarios para que se garantice la independencia de los tribunales y la plena ejecución de sus resoluciones.". Así la reforma publicada en el Diario Oficial de la Federación el 10 de enero de 2014 a los artículos 1168 y 1171 del Código de Comercio, no tuvo la intención de impedir que en los juicios mercantiles se decreten las medidas o providencias cautelares necesarias para hacer efectivo el cumplimiento de las sentencias, ya que su propósito se concretó a la interpretación de reglas claras y precisas que permitan a los acreedores obtener el cobro efectivo de sus créditos insolutos, mediante la radicación de personas o la retención de bienes. De esta manera, el texto reformado del artículo 1168, primer párrafo, invocado, que establece: "En los juicios mercantiles únicamente podrán dictarse las medidas cautelares o providencias precautorias previstas en este Código y que son las siguientes: (...)", no debe interpretarse con un criterio de simple literalidad, pues resultaría ser prohibitivo frente al deber del Juez ordinario de conservar subsistente la materia del juicio, lo que, desde luego, vulneraría los derechos fundamentales reconocidos por los instrumentos internacionales firmados por el Estado Mexicano y por la Constitución Política de los Estados Unidos Mexicanos, de acuerdo con su artículo 1o.; no obstante, una interpretación funcional y conforme de aquel numeral da la pauta para advertir que se trata de una norma taxativa al prever dos supuestos aplicables a determinada situación de hecho, lo cual, sin embargo, no restringe la posibilidad del juzgador de que en cumplimiento de su función en relación con el otorgamiento y procedencia de las diferentes medidas cautelares, deben adaptarse a las circunstancias y necesidades de cada caso, pues estas medidas deben ser flexibles incluso con posibilidad de modificación según se necesite en el procedimiento en que se emitan; además, al otorgarlas, debe fundarlas y motivarlas debidamente, así como en cuanto a las garantías que se exijan, a fin de evitar abusos de las partes que las soliciten. En tal virtud, tal interpretación es acorde con los derechos fundamentales a la tutela judicial efectiva y de acceso a la impartición de justicia reconocidos tanto por el artículo constitucional en comento, como por el precepto 25 de la Convención Americana sobre Derechos Humanos."[87]

c.      La interpretación inconstitucional e implícita emprendida por el Juzgado Responsable.

Como se puede desprender del Auto Reclamado, al acordar el desistimiento planteado por el Sedicente Apoderado de Controladora, el Juzgado Responsable consideró procedente ordenar el levantamiento inmediato de las Medidas Cautelares, a pesar de que no se había seguido

---

[86] [J]; 9a. Época; T.C.C.; S.J.F. y su Gaceta; Tomo XXXIV, Julio de 2011; Pág. 1919. I.4o.A. J/90.

[87] Registro digital: 2020903 Plenos de Circuito;10a. Época;Gaceta del Semanario Judicial de la Federación;PC.I.C. J/94 C (10a.) ;J; Publicación: viernes 25 de octubre de 2019 10:35 h



procedimiento alguno previo ni agotado alguno de los medios de defensa que para tal efecto prevé el Código de Comercio. Dicha determinación la hizo fundar en los artículos 1, 7 y 28 de la Ley de Concursos Mercantiles.

Aunque no lo plasma de forma expresa, es evidente que el Juzgado Responsable interpretó que dichos preceptos lo facultaban para ordenar el levantamiento de las Medidas Cautelares de manera unilateral y sin que se hubiera oído previamente a Controladora o sin que se hubiera agotado previamente un medio de defensa en su contra.

Evidentemente, este Tribunal advertirá dicha determinación torna inconstitucionales los artículos apuntados, al contrariarse los artículos 14 y 17 de la Constitución Federal y 25 de la Convención Americana de Derechos Humanos por violarse los derechos al debido proceso y de tutela cautelar efectiva.

Sobre este punto, este Tribunal debe considerar que la demostrada inconstitucionalidad de dichos preceptos al violar los derechos de acceso a la justicia y tula judicial efectiva es un verdadero planteamiento constitucional en términos de las tesis de rubro "**REVISIÓN EN AMPARO DIRECTO. DENTRO DE LAS CUESTIONES PROPIAMENTE CONSTITUCIONALES MATERIA DE ESTE RECURSO SE ENCUENTRA LA INTERPRETACIÓN REALIZADA POR LA AUTORIDAD RESPONSABLE O EL TRIBUNAL COLEGIADO DE CIRCUITO DE LA NORMA GENERAL CUYA CONSTITUCIONALIDAD SE IMPUGNA, AL RESOLVER CUESTIONES DE LEGALIDAD**"[88] y "**REVISIÓN EN AMPARO DIRECTO. ES PROCEDENTE CUANDO UN TRIBUNAL COLEGIADO DE CIRCUITO, AL VALORAR LAS PRUEBAS EN UN JUICIO DE GUARDA Y CUSTODIA, REALIZA UNA INTERPRETACIÓN IMPLÍCITA DE LOS ARTÍCULOS 4o. Y 16, PÁRRAFOS NOVENO Y DÉCIMO DE LA CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS**"[89] citadas y desarrolladas en el capítulo de "Procedencia" de la presente demanda.

Como este Tribunal podrá desprender de las tesis citadas, para que exista una cuestión de constitucionalidad ni siquiera es necesario que la autoridad responsable cite de manera expresa los artículos que interpreta, sino que basta la existencia de una interpretación implícita que fije su sentido y alcance.

Por lo tanto, es claro que aun y cuando el Juzgado Responsable no haya esgrimida expresamente la interpretación sostenida, , como consecuencia de la interpretación implícita de los mismos en los términos desarrollado en el presente apartado, deben ser declarados inconstitucionales.

Lo anterior pues la interpretación del Juzgado responsable importa la posibilidad de ordenar el levantamiento de medidas cautelares **sin procedimiento previo y sin que se haya agotado**

---

[88] Registro digital: 2006486 SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;2a./J. 55/2014 (10a.) ;J; Publicación: viernes 23 de mayo de 2014 10:06 h

[89] Registro digital: 162729 SCJN;9a. Época;Semanario Judicial de la Federación y su Gaceta;1a. XXXIV/2011 ;TA

127



**previamente un medio ordinario de defensa**, esto es, violando el principio de contradicción y presupuestos esenciales del derecho al debido proceso y a la tutela cautelar efectiva.

Como fue desarrollado anteriormente, el derecho al debido proceso consagra el principio de "contradicción" conforme al cual se debe respetar la posibilidad de que las partes sean oídas durante el procedimiento, de tal suerte que **puedan alegar y probar**, a efecto de poder allegar a un conocimiento de "verdad" durante el juicio".

Así, conforme a dicho principio es necesario que el juez permita la participación equitativa de las partes en el juicio, debiendo escuchar a ambas partes antes de adoptar una decisión.

Ahora bien, el principio de contradicción adquiere una especial relevancia cuando se trata de medidas cautelares pues las mismas buscan garantizar un derecho de tutela cautelar efectiva a favor de las partes, a efecto de lograr una sentencia útil y justa.

No obstante, dichas medidas son "flexibles" en el sentido de que pueden ser modificadas o incluso revocadas durante el desarrollo del procedimiento; sin embargo, ello que su modificación o revocación pueda realizarse de manera unilateral por el juez.

Precisamente, a efecto de respetar el derecho de contradicción es necesaria la participación de ambas partes previo a la decisión del juzgado de levantar o modificar una medida cautelar; dicha participación, se debe realizar vía incidental.

Al respecto, los artículos 1349, 1350, 1351 y demás aplicables del Código de Comercio establecen la posibilidad a las partes de hacer valer cuestiones relacionadas con el negocio principal a efecto de que sean resueltas vía incidental, respetando las formalidades esenciales del procedimiento.

Ante la posible existencia de un hecho superveniente que amerite la revocación o levantamiento de una medida cautelar, es necesario que se otorgue oportunidad al solicitante de desvirtuar dicho hecho o de ofrecer pruebas en virtud de las cuales se demuestre que prevalece la necesidad de mantener la vigencia de las medidas cautelares.

De lo contrario, se estaría violentando el principio de contradicción al impedir la participación activa de una de las partes durante el procedimiento.

Lo anterior es evidente si se toma en consideración que el artículo 1177 del Código de Comercio establece que las medidas cautelares únicamente serán otorgadas sin audiencia de la contraparte cuando son solicitadas previo a que inicie el juicio, siendo que cuando éste ha iniciado **deben tramitarse vía incidental**:

> "Artículo 1177.- Las providencias precautorias establecidas por este Código podrán decretarse, tanto como actos prejudiciales, como después de iniciado cualquiera de los juicios previstos en el mismo. En el primero de los casos, la providencia se decretará de plano, sin citar a la persona contra quien ésta se pida, una vez cubiertos los requisitos previstos en este ordenamiento. En el segundo caso, la providencia se sustanciará en

128



incidente, por cuerda separada, y conocerá de ella el juez o tribunal que al ser presentada la solicitud esté conociendo del negocio."

En consecuencia, si durante el trámite del juicio al decidirse sobre el otorgamiento de medidas cautelares debe respetarse el principio de contradicción; por mayoría de razón debe velarse el cumplimiento de dicho principio cuando se trata del levantamiento o modificación de dichas medidas.

No pasa desapercibido para la Quejosa el siguiente criterio emitido por la Primera Sala de la Suprema Corte de Justicia de la Nación:

> "**EMBARGO EN MATERIA MERCANTIL. EN SU DICTADO, LEVANTAMIENTO O SUSTITUCIÓN NO RIGE EL DERECHO DE AUDIENCIA PREVIA.** Las afectaciones a expectativas de derecho, entendidas como prerrogativas cuyo alcance o disfrute se encuentra condicionado al cumplimiento de condiciones determinadas, no pueden considerarse como actos privativos, sino de molestia. En este sentido, la obtención de una providencia precautoria debe entenderse como una expectativa de derecho cuya admisión o desechamiento constituye un acto de molestia, lo que es consistente con la doctrina jurisprudencial del Pleno de la Suprema Corte de Justicia de la Nación, en torno a los orígenes y efectos de la distinción entre actos privativos y de molestia, conforme a la cual las medidas cautelares, tanto en lo general como en el caso específico del embargo, constituyen actos de molestia respecto de los cuales no rige el derecho de audiencia previa. Así, el Pleno encuadró al levantamiento del embargo –en términos del artículo 1180 del Código de Comercio– como parte de esa doctrina, enfatizando que la sustitución de la garantía –fianza en lugar de embargo– no extingue la vigencia de la medida precautoria y que, en todo caso, la garantía que busca asegurar la efectividad del crédito carece de impacto respecto de la cuestión de fondo, pues no presume la existencia del derecho que se aduce como sustento de la acción intentada, lo cual será determinado por la sentencia y no por dicha providencia precautoria."[90]

Sin embargo, de un análisis del amparo en revisión 710/2017 (del cual deriva dicho criterio) este Tribunal podrá advertir que la Suprema Corte analizó el supuesto en que se levanten las medidas cautelares **con motivo del otorgamiento de contragarantía**:

> "Mediante escrito presentado el 21 de septiembre de 2012, Hes Logistics & Consulting, S.A. de C.V. (en adelante "Hes Logistics & Consulting") presentó en la vía mercantil ordinaria una demanda en contra de Fresenius Medical Care de México, S.A. de C.V. (en adelante "Fresenius Medical Care de México"), de quien reclamó el pago de $54'294,203.70 M.N., por adeudos derivados de los Contratos de Prestación de Servicios de Logística y Administración en materia de Transporte y Distribución, celebrados el 31 de octubre de 2008 y el 4 de noviembre de 2009, así como el convenio de prórroga de 18 de noviembre de 2011. La actora solicitó como providencia precautoria el secuestro provisional de bienes de la demandada para garantizar el pago de lo reclamado.
>
> Respecto a la providencia precautoria, en el auto admisorio de 26 de septiembre de 2012, el Juzgado Quinto de lo Mercantil del Primer Partido Judicial del Estado de Jalisco previno a la actora para que presentara a dos testigos que acreditaran el temor fundado de que se ocultaran o dilapidaran los bienes, en cumplimiento a lo previsto en el artículo 1173 del Código de Comercio (según el texto anterior a las reformas de enero de 2014). El 1° de octubre de 2013 se celebró una audiencia dentro de la cual se rindieron los testimonios solicitados.
>
> Por sentencia interlocutoria de 9 de octubre de 2012 el Juez decretó el embargo de bienes de la demandada por la cantidad reclamada, así como por USD $7,091.8 (cantidad en

---

[90] Registro digital: 2018656 SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;1a. CCXLII/2018 (10a.) ;TA; Publicación: viernes 07 de diciembre de 2018 10:19 h



dólares de los Estados Unidos de América), condicionado a que la actora exhibiera una fianza, lo cual aconteció el 17 del mismo mes y año. La diligencia de embargo se llevó a cabo al día siguiente, 18 de octubre de 2012.

Es importante mencionar que, durante la tramitación del juicio y con fundamento en el artículo 1180 del Código de Comercio, el 1° de noviembre de 2012 **se decretó el levantamiento de la medida cautelar, pues la parte demandada exhibió dos pólizas de fianza para garantizar el valor de lo reclamado** (…)"

Esto es, la Suprema Corte no analizó el supuesto en que la demandada solicite el levantamiento de medida cautelar como consecuencia de la existencia de hechos supervenientes que así lo ameriten, sino en virtud del ejercicio de un derecho que es el otorgamiento de contragarantía.

Al respecto, en dicho precedente la Suprema Corte reconoció la contragarantía como **un derecho de las partes en el procedimiento**, siendo que a través de la misma **no se levanta la medida cautelar concedida, sino que ésta se mantiene vigente a través de la garantía que constituye el afectado**:

> "(…) De hecho, existe una clara doctrina jurisprudencial del Tribunal Pleno en torno a los orígenes y efectos de la distinción entre actos privativos y de molestia , conforme a la cual las medidas cautelares –tanto en lo general como en el caso específico del embargo – constituyen actos de molestia respecto de los cuales no rige la garantía de audiencia . Al respecto, el Pleno encuadró al levantamiento del embargo –en términos del artículo 1180 del Código de Comercio– como parte de esa doctrina , **enfatizando que la sustitución de la garantía –fianza en lugar de embargo– no extingue la vigencia de la medida precautoria** y que, en todo caso, <u>la garantía que busca asegurar la efectividad del crédito carece de impacto respecto de la cuestión de fondo</u>, pues no presume la existencia del derecho que se aduce como sustento de la acción intentada, lo cual será determinado por la sentencia y no por dicha providencia precautoria (…)"

En esos términos, la excepción a la garantía de audiencia y al principio de contradicción detectada por la Primera Sala de la Suprema Corte de Justicia de la Nación encuentra sustento únicamente **en la medida en que se otorgue contragarantía, pues ésta asegura la efectividad de la acción ejercida y no tiene impacto en el fondo**.

Fuera de ese supuesto (esto es, cuando se busca el levantamiento de una medida sin el otorgamiento de contragarantía) es evidente que se debe respetar el principio de contradicción.

No obstante, el Juzgado Responsable interpretó la posibilidad de ordenar el levantamiento de medidas cautelares de manera unilateral, sin respetar el principio de contradiucción, sin agotarse previamente recursos y sin que sea necesario el otorgamiento de contragarantía alguna; ello deviene evidentemente inconstitucional por violar el derecho al debido proceso y el derecho a la tutela cautelar efectiva.

d.   <u>Necesidad de ejercer control de constitucionalidad para salvaguardar la constitucionalidad de los preceptos reclamados y consecuente inconstitucionalidad de las Resoluciones Reclamadas al amparo del ejercicio de dicho control.</u>



Previo a declarar la inconstitucionalidad de los artículos 1, 7 y 28 de la Ley de Concursos Mercantiles, la redacción de las normas requiere un ejercicio de control de constitucionalidad y convencionalidad *ex oficio*.

Al respecto, cabe destacar las siguientes jurisprudencias de la Suprema Corte de Justicia de la Nación:

**"CONTROL DE CONSTITUCIONALIDAD Y CONVENCIONALIDAD EX OFFICIO. NO ES UNA CUESTIÓN DE SUBSIDIARIEDAD, POR LO QUE DEBE LLEVARSE A CABO AUN CUANDO EL DERECHO HUMANO DE QUE SE TRATE ESTÉ CONTENIDO EN LA CONSTITUCIÓN FEDERAL.** La obligación de ejercer el control ex officio de constitucionalidad y convencionalidad de una norma se actualiza aun en aquellos casos en los que el derecho humano de que se trate esté regulado en la propia Constitución Federal. Lo anterior, porque el Tribunal Pleno, al resolver el expediente Varios 912/2010, no hizo esa acotación, ni determinó que el control ex officio fuera una cuestión de subsidiariedad, sino que más bien recalcó que los jueces y todas las autoridades del país estaban obligadas a velar por los derechos humanos y que esa vigilancia se traducía, en el caso de los juzgadores, en un problema interpretativo; para ello, se requiere que lleven a cabo efectivamente ese control en aquellos casos en los que la norma que se va a aplicar despierte sospechas para la autoridad aplicadora o sea señalada por el interesado como violatoria de derechos en el juicio de amparo; en esos supuestos, deberá además llevar a cabo el ejercicio en los tres pasos que indica el expediente Varios 912/2010: interpretación conforme en sentido amplio, interpretación conforme en sentido estricto y, en su caso, inaplicación."[91]

**"CONTROL DE CONSTITUCIONALIDAD Y CONVENCIONALIDAD EX OFFICIO. CONDICIONES GENERALES PARA SU EJERCICIO.** La autoridad judicial, para ejercer el control ex officio en los términos establecidos en el expediente Varios 912/2010 de la Suprema Corte de Justicia de la Nación, debe asegurarse que se ha actualizado la necesidad de hacer ese tipo de control, es decir, en cada caso debe determinar si resulta indispensable hacer una interpretación conforme en sentido amplio, una en sentido estricto o una inaplicación, lo cual ocurre cuando se está en presencia de una norma que resulta sospechosa o dudosa de cara a los parámetros de control de los derechos humanos. De este modo, cuando una norma no genera sospechas de invalidez para el juzgador, por no parecer potencialmente violatoria de derechos humanos, entonces no se hace necesario un análisis de constitucionalidad y convencionalidad exhaustivo, porque la presunción de constitucionalidad de que gozan todas las normas jurídicas no se ha puesto siquiera en entredicho. Lo anterior es así, porque como se señaló en el citado expediente Varios, las normas no pierden su presunción de constitucionalidad sino hasta que el resultado del control así lo refleje, lo que implica que las normas que son controladas puedan incluso salvar su presunción de constitucionalidad mediante la interpretación conforme en sentido amplio, o en sentido estricto."[92]

**"CONTROL DE CONSTITUCIONALIDAD Y CONVENCIONALIDAD EX OFFICIO. SU EJERCICIO NO NECESARIAMENTE LLEVA A LA INAPLICACIÓN DE UNA NORMA.** Si bien es cierto que todos los juzgadores deben preferir la observancia de los derechos humanos contenidos en la Constitución Política de los Estados Unidos Mexicanos y en los tratados internacionales de los que el Estado Mexicano sea parte, aun en los casos donde existan disposiciones en contrario en cualquier norma inferior, también lo es que no todo ejercicio de control de constitucionalidad ex officio de los derechos contenidos en la Constitución y en los referidos tratados lleva necesariamente a inaplicar la norma de que se trate, porque como lo señaló el Tribunal en Pleno de la Suprema Corte de Justicia de la Nación en el expediente varios 912/2010 (cumplimiento de la sentencia de la Corte Interamericana de Derechos Humanos en el caso Rosendo Radilla Pacheco), las normas no pierden su presunción de constitucionalidad, sino hasta que el resultado del control así lo refleje. Esta situación implica que las normas que son controladas puedan incluso salvar su presunción de constitucionalidad mediante su interpretación, ya sea: 1) conforme en sentido amplio; o, 2) en sentido estricto. Así, la inaplicación vendrá solamente en los

ESTA CONTIENE FIRMA ELECTRÓNICA DE VILLANUEVA<br>DESGLOSE DESGLOSE DESGLOSE DESGLOSE DESGLOSE

---

[91] [J]; 10a. Época; 1a. Sala; Gaceta S.J.F.; Libro 18, Mayo de 2015; Tomo I; Pág. 186. 1a./J. 38/2015 (10a.).
[92] [J]; 10a. Época; 1a. Sala; Gaceta S.J.F.; Libro 27, Febrero de 2016; Tomo I; Pág. 430. 1a./J. 4/2016 (10a.).



casos en los que la norma no salve esas dos posibilidades interpretativas. Por ello, los conceptos "control de constitucionalidad y convencionalidad ex officio" e "inaplicación" no son intercambiables; en otras palabras, un control de ese tipo no lleva necesariamente a la inaplicación de la norma. Por lo demás, lo relevante para el orden constitucional no es que ese control se omita hacer a profundidad en los casos en los que claramente no es derrotable la presunción de constitucionalidad de que gozan todas las normas, sino, en el caso contrario, cuando sea necesario justificar esa inderrotabilidad."[93]

Ahora bien, en lo que interesa, de lo anterior se desprende que (i) debe emprenderse el control de constitucionalidad ex officio, en los casos en los que la norma que se va a aplicar despierte sospechas o es dudosa de cara a los parámetros de control de los derechos humanos en el juicio de amparo; y, (ii) que las normas no pierden su presunción de constitucionalidad, sino hasta que el resultado del control así lo refleje, lo que implica que las normas que son controladas puedan incluso salvar su presunción de constitucionalidad mediante su interpretación, ya sea: 1) conforme en sentido amplio; o, 2) en sentido estricto.

En el caso en concreto, la interpretación implícita emprendida por el Juzgado Responsable es dudosa de cara a los parámetros de control de los derechos humanos de seguridad jurídica y tutela judicial efectiva.

En este sentido, procede solicitar a este Juzgado de Distrito que emprenda un ejercicio de control de constitucionalidad ex officio. Es importante que su Señoría tenga en consideración que no se pretende la inaplicación de la norma; en cambio, la Quejosa considera que la validez de dicha norma puede salvaguardarse mediante su interpretación conforme con la Constitución de la República y los tratados internacionales en materia de derechos humanos de los que México es parte.

Respecto a la interpretación conforme, es conveniente recordar la línea jurisprudencial diseñada por el Poder Judicial Federal.

En la doctrina clásica constitucional, incluso anterior a la que se adoptó con motivo de la reforma de derechos humanos de junio del 2011, el Pleno de la Suprema Corte de Justicia de la Nación puntualizó que debe optarse, antes de declarar la invalidez de una norma, y en su caso, expulsarla del ordenamiento jurídico, por la interpretación que salvaguarde su constitucionalidad.[94]

Por su parte, el segundo párrafo del artículo 1° constitucional, reformado mediante decreto publicado en el Diario Oficial de la Federación el 10 de junio de 2011, establece que las normas relativas a los derechos humanos se interpretarán de conformidad con la propia Constitución y con los tratados internacionales de la materia, favoreciendo en todo tiempo a las personas la protección más amplia (principio pro persona), específicamente respecto los pronunciamientos de la Suprema Corte de Justicia de la Nación y los criterios -obligatorios cuando el Estado

---

[93] [TA]; 10a. Época; 1a. Sala; Gaceta S.J.F.; Libro 1, Diciembre de 2013; Tomo I; Pág. 511. 1a. CCCLIX/2013 (10a.).
[94] Por analogía conviene invocar el criterio del Pleno de la Suprema Corte de Justicia de la Nación contenido en la tesis de rubro y texto siguientes: "INTERPRETACIÓN CONFORME EN ACCIONES DE INCONSTITUCIONALIDAD, CUANDO UNA NORMA ADMITA VARIAS INTERPRETACIONES DEBE PREFERIRSE LA COMPATIBLE CON LA CONSTITUCIÓN."

CLYDE&CO

Mexicano fue parte y orientadores en el caso opuesto- de la Corte Interamericana de Derechos Humanos.[95]

El principio de interpretación conforme de todas las normas del ordenamiento a la Constitución, reiteradamente utilizado por la Suprema Corte de Justicia de la Nación, es una consecuencia elemental de la concepción del ordenamiento como una estructura coherente.

Esta regla interpretativa opera con carácter previo al juicio de invalidez; antes de considerar a una norma jurídica como constitucionalmente inválida (sea por contrariar el texto fundamental, su interpretación judicial o internacional, o por atentar contra derechos fundamentales), es necesario agotar todas las posibilidades de encontrar en ella un significado que la haga compatible con la Constitución y que le permita, por tanto, subsistir dentro del ordenamiento.

Sólo en el caso de que exista una clara e inevitable incompatibilidad o una contradicción insalvable entre la norma ordinaria y la Constitución, procedería declararla inconstitucional.

El juez ha de procurar, siempre que sea posible, huir del vacío que se produce cuando se niega validez a una norma y, de ser posibles varias interpretaciones, debe preferir aquella que salve la aparente contradicción. La interpretación de las normas conforme a la Constitución se ha fundamentado tradicionalmente en el principio de conservación de ley, que se asienta a su vez en el principio de seguridad jurídica y en la legitimidad democrática del legislador.

Los tribunales, en el marco de sus competencias, sólo pueden declarar la inconstitucionalidad de una ley cuando no resulte posible una interpretación conforme con la Constitución. En cualquier caso, las normas son válidas mientras un tribunal no resuelva lo contrario.

Hoy en día, el principio de interpretación conforme de todas las normas del ordenamiento a la Constitución, se ve reforzado por el principio *pro persona*, contenido en el artículo 1o. de la Constitución Política de los Estados Unidos Mexicanos, el cual obliga a maximizar la interpretación conforme en aquellos escenarios en los cuales, dicha interpretación permita la efectividad de los derechos fundamentales de las personas frente al vacío legislativo que puede provocar una declaración de inconstitucionalidad de la norma.[96]

Incluso, la interpretación conforme se tratará como una cuestión constitucional cuando se cuestione que la modalidad interpretativa adoptada, aunque en el ámbito de legalidad, tiene el potencial de vulnerar la Constitución, siendo posible encontrar una intelección que la torne compatible con ésta, por lo que la opción de una modalidad sobre otra implica pronunciarse sobre la constitucionalidad de la norma.[97]

---

[95] Véase la tesis 1a. CCXIV/2013 de rubro "DERECHOS HUMANOS. INTERPRETACIÓN CONFORME, PREVISTA EN EL ARTÍCULO 1o. DE LA CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS."

[96] Véase la jurisprudencia 1a./J. 37/2017 emitida por la Primera Sala de la Suprema Corte de Justicia de la Nación de rubro "INTERPRETACIÓN CONFORME. NATURALEZA Y ALCANCES A LA LUZ DEL PRINCIPIO PRO PERSONA."

[97] Véase la tesis 1a. CCCLXVIII/2013 (10a.) emitida por la Primera Sala de la Suprema Corte de Justicia de la Nación de rubro "REVISIÓN EN AMPARO DIRECTO. DIFERENCIAS ENTRE CUESTIONES

133



Partiendo de dichas premisas, este Tribunal está llamado a emprender un ejercicio de interpretación conforme sobre los preceptos que se reclaman, de la forma que a continuación s expone:

Para ordenar el levantamiento de medidas cautelares, el juez debe respetar el debido proceso y el principio de contradicción, siendo que dicha solicitud debe resolverse vía incidental conforme al Código de Comercio; el único supuesto de excepción a dicha regla es que la parte afectada otorgue contragarantía suficiente.

Dicha interpretación salvaguarda la constitucionalidad de dicho precepto, pues a través de la misma se respeta plenamente el derecho al debido proceso y a la tutela cautelar efectiva.

En el presente caso, el Auto Reclamado deviene inconstitucional pues el Juez Responsable ordenó el levantamiento de la retención decretada **sin respetar el principio de contradicción, al haberse ordenado de manera inmediata al desistimiento del concurso mercantil y a pesar de que dicha determinación aun no causa estado**.

Por lo tanto, este Tribunal deberá conceder el amparo y protección solicitados y, en consecuencia, revocar el Auto Reclamado.

**DÉCIMO QUINTO. INCONSTITUCIONALIDAD DE LOS ARTÍCULOS 1, 7, 25, 26 Y 29 DE LA LEY DE CONCURSOS MERCANTILES, ASÍ COMO EL ARTÍCULO 1343 DEL CÓDIGO DE COMERCIO, AL INTERPRETAR IMPLÍCITAMENTE LA POSIBILIDAD ORDENAR EL LEVANTAMIENTO DE LAS MEDIDAS CAUTELARES A PESAR DE QUE EL AUTO RECLAMADO NO HABÍA CAUSADO ESTADO.**

<u>Síntesis.</u> Al confirmar el levantamiento de medidas cautelares a través del Auto Reclamado, el Juzgado Responsable interpretó implícitamente los artículos 1, 7, 25, 26 y 29 de la Ley de Concursos Mercantiles, así como el artículo 1343 del Código de Comercio al ordenar el levantamiento de las Medidas Cautelares a pesar de que el Auto Reclamado no había causado ejecutoria, dotando de plenos efectos el desistimiento presentado por el Sedicente Apoderado de Contraloria a pesar de que dicha decisión aun podía ser impugnada. Dicha interpretación torna inconstitucionales los artículos apuntados, al vulnerar los derechos de tutela judicial efectiva, acceso a la justicia y recurso judicial efectivo.

<u>Desarrollo.</u>

---

PROPIAMENTE CONSTITUCIONALES Y SUPUESTOS DE INTERPRETACIÓN CONFORME, PARA EFECTOS DE LA PROCEDENCIA DE AQUEL RECURSO."



a. <u>Acceso a la justicia.</u>

El derecho de acceso a la justicia consagrado en el artículo 17 de la Constitución Política de los Estados Unidos Mexicanos y 8, numeral 1, del Pacto de San José, implica que toda persona tiene derecho a que se le administre justicia por tribunales que estarán expeditos para impartirla **en los plazos y términos que fijen las leyes, emitiendo sus resoluciones de manera pronta, completa e imparcial**.

Al respecto, la Primera Sala de la Suprema Corte de Justicia de la Nación definió dicho derecho como "*el derecho público subjetivo que toda persona tiene, dentro de los plazos y términos que fijen las leyes, para acceder de manera expedita a tribunales independientes e imparciales, a plantear una pretensión o a defenderse de ella, con el fin de que, a través de un proceso en el que se respeten ciertas formalidades, se decida sobre la pretensión o la defensa y, en su caso, se ejecute tal decisión*". Lo anterior, según se desprende del siguiente criterio jurisprudencial:

"**DERECHO DE ACCESO EFECTIVO A LA JUSTICIA. ETAPAS Y DERECHOS QUE LE CORRESPONDEN**. De los artículos 14, 17 y 20, apartados B y C, de la Constitución Política de los Estados Unidos Mexicanos y 8 de la Convención Americana sobre Derechos Humanos, deriva el derecho de acceso efectivo a la justicia, el cual comprende, en adición a determinados factores socioeconómicos y políticos, el derecho a una tutela jurisdiccional efectiva y los mecanismos de tutela no jurisdiccional que también deben ser efectivos y estar fundamentados constitucional y legalmente. Ahora bien, en la jurisprudencia 1a./J. 42/2007, de rubro: "GARANTÍA A LA TUTELA JURISDICCIONAL PREVISTA EN EL ARTÍCULO 17 DE LA CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS. SUS ALCANCES.", la Primera Sala de la Suprema Corte de Justicia de la Nación definió el acceso a la tutela jurisdiccional como el derecho público subjetivo que toda persona tiene, dentro de los plazos y términos que fijen las leyes, para acceder de manera expedita a tribunales independientes e imparciales, a plantear una pretensión o a defenderse de ella, con el fin de que, a través de un proceso en el que se respeten ciertas formalidades, se decida sobre la pretensión o la defensa y, en su caso, se ejecute tal decisión; de ahí que este derecho comprenda tres etapas, a las que corresponden tres derechos: (i) una previa al juicio, a la que le corresponde el derecho de acceso a la jurisdicción, que parte del derecho de acción como una especie del de petición dirigido a las autoridades jurisdiccionales y que motiva un pronunciamiento por su parte; (ii) una judicial, que va desde el inicio del procedimiento hasta la última actuación y a la que concierne el derecho al debido proceso; y, (iii) una posterior al juicio, identificada con la eficacia de las resoluciones emitidas. Ahora, los derechos mencionados alcanzan no solamente a los procedimientos ventilados ante Jueces y tribunales del Poder Judicial, sino también a todos aquellos seguidos ante autoridades que, al pronunciarse sobre la determinación de derechos y obligaciones, realicen funciones materialmente jurisdiccionales"[98]

En el mismo sentido, la Segunda Sala de la Suprema Corte de Justicia de la Nación ha considerado que el derecho de acceso a la justicia implica que ésta debe ser "pronta", "completa", "imparcial" y "gratuita", según se desprende del siguiente criterio:

"**ACCESO A LA IMPARTICIÓN DE JUSTICIA. EL ARTÍCULO 17 DE LA CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS ESTABLECE DIVERSOS PRINCIPIOS QUE INTEGRAN LA GARANTÍA INDIVIDUAL RELATIVA, A CUYA OBSERVANCIA ESTÁN OBLIGADAS LA AUTORIDADES QUE REALIZAN ACTOS MATERIALMENTE JURISDICCIONALES**. La garantía individual de acceso a la impartición de justicia

---

[98] Registro digital: 2015591, Fuente: Gaceta del Semanario Judicial de la Federación, Libro 48, Noviembre de 2017, Tomo I, Materia(s): Constitucional y Página: 151



consagra a favor de los gobernados los siguientes principios: 1. De justicia pronta, que se traduce en la obligación de las autoridades encargadas de su impartición de resolver las controversias ante ellas planteadas, dentro de los términos y plazos que para tal efecto establezcan las leyes; 2. De justicia completa, consistente en que la autoridad que conoce del asunto emita pronunciamiento respecto de todos y cada uno de los aspectos debatidos cuyo estudio sea necesario, y garantice al gobernado la obtención de una resolución en la que, mediante la aplicación de la ley al caso concreto, se resuelva si le asiste o no la razón sobre los derechos que le garanticen la tutela jurisdiccional que ha solicitado; 3. De justicia imparcial, que significa que el juzgador emita una resolución apegada a derecho, y sin favoritismo respecto de alguna de las partes o arbitrariedad en su sentido; y, 4. De justicia gratuita, que estriba en que los órganos del Estado encargados de su impartición, así como los servidores públicos a quienes se les encomienda dicha función, no cobrarán a las partes en conflicto emolumento alguno por la prestación de ese servicio público. Ahora bien, si la citada garantía constitucional está encaminada a asegurar que las autoridades encargadas de aplicarla lo hagan de manera pronta, completa, gratuita e imparcial, es claro que las autoridades que se encuentran obligada a la observancia de la totalidad de los derechos que la integran son todas aquellas que realizan actos materialmente jurisdiccionales, es decir, las que en su ámbito de competencia tienen la atribución necesaria para dirimir un conflicto suscitado entre diversos sujetos de derecho, independientemente de que se trate de órganos judiciales, o bien, sólo materialmente jurisdiccionales."[99]

Asimismo, resultan relevantes los siguientes criterios:

**"GARANTÍA A LA TUTELA JURISDICCIONAL PREVISTA EN EL ARTÍCULO 17 DE LA CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS. SUS ALCANCES**. La garantía a la tutela jurisdiccional puede definirse como el derecho público subjetivo que toda persona tiene, dentro de los plazos y términos que fijen las leyes, para acceder de manera expedita a tribunales independientes e imparciales, a plantear una pretensión o a defenderse de ella, con el fin de que a través de un proceso en el que se respeten ciertas formalidades, se decida sobre la pretensión o la defensa y, en su caso, se ejecute esa decisión. Ahora bien, si se atiende a que la prevención de que los órganos jurisdiccionales estén expeditos -desembarazados, libres de todo estorbo- para impartir justicia en los plazos y términos que fijen las leyes, significa que el poder público -en cualquiera de sus manifestaciones: Ejecutivo, Legislativo o Judicial- no puede supeditar el acceso a los tribunales a condición alguna, pues de establecer cualquiera, ésta constituiría un obstáculo entre los gobernados y los tribunales, por lo que es indudable que el derecho a la tutela judicial puede conculcarse por normas que impongan requisitos impeditivos u obstaculizadores del acceso a la jurisdicción, si tales trabas resultan innecesarias, excesivas y carentes de razonabilidad o proporcionalidad respecto de los fines que lícitamente puede perseguir el legislador. Sin embargo, no todos los requisitos para el acceso al proceso pueden considerarse inconstitucionales, como ocurre con aquellos que, respetando el contenido de ese derecho fundamental, están enderezados a preservar otros derechos, bienes o intereses constitucionalmente protegidos y guardan la adecuada proporcionalidad con la finalidad perseguida, como es el caso del cumplimiento de los plazos legales, el de agotar los recursos ordinarios previos antes de ejercer cierto tipo de acciones o el de la previa consignación de fianzas o depósitos."[100]

**"ACCESO A LA JUSTICIA. CONSTITUYE UN DERECHO FUNDAMENTAL PREVISTO EN LOS ARTÍCULOS 17, SEGUNDO PÁRRAFO, DE LA CONSTITUCIÓN FEDERAL Y 8, NUMERAL 1, DE LA CONVENCIÓN AMERICANA SOBRE DERECHOS HUMANOS**. El artículo 17, segundo párrafo, de la Constitución Política de los Estados Unidos Mexicanos establece que toda persona tiene derecho a que se le administre justicia por tribunales que estarán expeditos para impartirla en los plazos y términos que fijen las leyes, emitiendo sus resoluciones de manera pronta, completa e imparcial, además de que su servicio será gratuito, y las costas judiciales prohibidas. Por su parte, el artículo 8, numeral

---

[99] Registro digital: 171257, Fuente: Semanario Judicial de la Federación y su Gaceta, Tomo XXVI, Octubre de 2007, Materia(s): Constitucional y Página: 209.

[100] Registro digital: 172759, Instancia: Primera Sala, Novena Época, Materias(s): Constitucional, Tesis: 1a./J. 42/2007, Fuente: Semanario Judicial de la Federación y su Gaceta. Tomo XXV, Abril de 2007, página 124, Tipo: Jurisprudencia.

CLYDE&CO

1, de la Convención Americana sobre Derechos Humanos dispone que toda persona tiene derecho a ser oída, con las debidas garantías y dentro de un plazo razonable, por un Juez o tribunal competente, independiente e imparcial, establecido con anterioridad por la ley, en la sustanciación de cualquier acusación penal formulada en su contra, o para la determinación de sus derechos y obligaciones de orden civil, laboral, fiscal o de cualquier otro carácter. Así, aunque la expresión "acceso a la justicia" no se advierte en la redacción de esas normas, se concluye que es el modo simple para identificar el método o medio adecuado para materializar el contenido de éstas en favor de los gobernados, pues al estar previsto en la parte dogmática de la Constitución Federal, dicho término constituye un derecho fundamental que, además, ha sido reconocido y ratificado en el instrumento internacional mencionado como una potestad inherente a la persona. En ese sentido, el acceso a la justicia es un derecho humano que garantiza, con determinados requisitos, que toda persona pueda acceder a tribunales independientes e imparciales, a fin de que se respeten y hagan valer sus derechos y para que los propios órganos encargados de impartir justicia resuelvan sin obstáculos las controversias sometidas a su consideración, de manera pronta, eficaz y en los plazos establecidos por la ley."[101]

Aunado a lo anterior, es relevante precisar que los 2 (dos) primeros párrafos del artículo 17 constitucionales no han sufrido alteraciones desde su expedición en 1917. Como se adelantó, esa razón podría explicar que la jurisprudencia se había centrado en explorar los alcances de esas figuras procesales y de competencias jurisdiccionales como aspectos autónomos establece lo siguiente:

> "Art. 17.- Ninguna persona podrá hacerse justicia por sí misma, ni ejercer violencia para reclamar su derecho.
>
> Toda persona tiene derecho a que se le administre justicia por tribunales que estarán expeditos para **impartirla en los plazos y términos que fijen las leyes**, emitiendo sus resoluciones de manera pronta, completa e imparcial. Su servicio será gratuito, quedando, en consecuencia, prohibidas las costas judiciales.
>
> Siempre que no se afecte la igualdad entre las partes, el debido proceso u otros derechos en los juicios o procedimientos seguidos en forma de juicio, **las autoridades deberán privilegiar la solución del conflicto sobre los formalismos procedimentales**."

Dicho precepto reconoce el principio de "privilegio de solución de conflicto sobre formalismos procesales", el cual ha sido ampliamente interpretado por la jurisprudencia en el sentido de que la actividad legislativa **debe ser sujeta a escrutinio**, debiéndose obviar aquellos formalismos que impidan el ejercicio de una acción o, al menos, se debe interpretar la ley de tal forma de que se permita la solución del conflicto sometido a la actividad jurisdiccional:

> "**ACCESO A LA JUSTICIA. LOS ÓRGANOS JURISDICCIONALES ESTÁN FACULTADOS PARA REALIZAR UN ESCRUTINIO DE RAZONABILIDAD A LA ACTIVIDAD LEGISLATIVA CUANDO EN ELLA SE IMPONGAN REQUISITOS DISTINTOS PARA EL EJERCICIO DE ACCIONES QUE PROTEJAN BIENES JURÍDICOS SIMILARES.** Si bien es cierto que la Constitución Política de los Estados Unidos Mexicanos no establece expresamente parámetros para realizar un análisis ordinario o estricto de la actividad legislativa, también lo es que reconoce que el ejercicio de los derechos humanos sólo podrá restringirse o suspenderse en los casos y bajo las condiciones que la propia Constitución establezca; asimismo, señala que los derechos deben interpretarse de forma que favorezca la protección más amplia de la persona e impone a todas las autoridades, en el ámbito de sus competencias, la obligación de respetar, promover, proteger y garantizar los derechos humanos; de ahí que las normas constitucionales busquen que las autoridades, por regla general, permitan el goce y disfrute de los derechos y, de forma excepcional, impongan alguna restricción. De la misma forma, el artículo 30 de la Convención Americana sobre

---

[101] Registro digital: 2020111, Instancia: Tribunales Colegiados de Circuito, Décima Época, Materias(s): Constitucional, Tesis: IV.3o.A.2 CS (10a.), Fuente: Gaceta del Semanario Judicial de la Federación. Libro 67, Junio de 2019, Tomo VI, página 5069, Tipo: Aislada. 344

CLYDE&CO

Derechos Humanos establece que la restricción a éstos debe aplicarse conforme a las leyes que se dicten por razones de interés general y con el propósito para el cual han sido establecidas. Consecuentemente, el hecho de que el artículo 17 constitucional permita al legislador regular los plazos y términos en los que debe garantizarse el acceso a la justicia, no implica que pueda establecer libremente requisitos que inhiban el ejercicio del derecho o alteren su núcleo esencial, por lo que los órganos jurisdiccionales están facultados para realizar un escrutinio de razonabilidad cuando el legislador imponga requisitos distintos para el ejercicio de acciones que protejan bienes jurídicos similares."[102]

**"MEDIDAS CAUTELARES EN MATERIA MERCANTIL. ES IMPROCEDENTE DECRETARLAS SI TIENEN POR OBJETO INHIBIR O IMPEDIR QUE UNA PERSONA EJERZA ANTE LOS TRIBUNALES LAS ACCIONES CORRESPONDIENTES, PUES ELLO IMPLICA VULNERAR EL DERECHO DE ACCESO A LA JURISDICCIÓN.**

Hechos: En un procedimiento de adopción de medidas cautelares previas al procedimiento arbitral mercantil, el Juez responsable las dictó y estableció que la contraparte de la solicitante debía abstenerse de realizar acciones tendentes a rescindir, terminar o anular el contrato celebrado entre ellas o a revocar unas cartas de crédito irrevocables otorgadas en garantía del cumplimiento de su obligación.

Criterio jurídico: Este Tribunal Colegiado de Circuito determina que es improcedente decretar medidas cautelares que tengan por objeto inhibir o impedir que una persona ejerza ante los tribunales las acciones correspondientes, pues ello implica vulnerar el derecho de acceso a la jurisdicción.

Justificación: Lo anterior, porque la Primera Sala de la Suprema Corte de Justicia de la Nación sostuvo en la tesis de jurisprudencia 1a./J. 42/2007, que el derecho a la tutela jurisdiccional puede definirse como el derecho público subjetivo que toda persona tiene, dentro de los plazos y términos que fijan las leyes, para acceder de manera expedita a tribunales independientes e imparciales, a plantear una pretensión o a defenderse de ella, con el fin de que a través de un proceso en el que se respeten ciertas formalidades, se decida sobre la pretensión o la defensa y, en su caso, se ejecute esa decisión; que la prevención de que los órganos jurisdiccionales estén expeditos –libres de todo estorbo– para impartir justicia en los plazos y términos que fijen las leyes, significa que el poder público –en cualquiera de sus manifestaciones: Ejecutivo, Legislativo o Judicial– no puede supeditar el acceso a los tribunales a condición alguna, pues de establecer cualquiera, ésta constituiría un obstáculo entre los particulares y los tribunales; en esa medida, también indicó nuestro Máximo Tribunal, que la reserva de ley establecida en el artículo 17 de la Constitución General por la que se previene que la impartición de justicia debe darse en los "plazos y términos que fijen las leyes", responde a una exigencia razonable y que, por tanto, esa prevención constitucional ha de interpretarse en el sentido de que se otorga al legislador la facultad para establecer límites racionales para el ejercicio de los derechos de acción y defensa, sin que puedan imponerse condiciones tales que impliquen, en verdad, la negación del derecho a la tutela jurisdiccional, por constituir estorbos entre los justiciables y la acción de los tribunales. Ahora bien, en el Código Federal de Procedimientos Civiles, aplicable supletoriamente al Código de Comercio, las medidas cautelares tienen por lo general carácter conservativo, esto es, se dictan para que las cosas se mantengan en el estado que guarden y con la finalidad de evitar actos de violencia entre las partes; sin embargo, ello de ninguna manera implica la posibilidad de que a través de una medida de esa naturaleza se impida a una persona ejercer el derecho de acceso a la justicia; de ahí que si una autoridad judicial, a pretexto de conservar las cosas en el estado que guardan, dicta una medida cautelar mediante la cual impide a la persona ejercer una acción o acudir a los tribunales a ejercerla, dicha medida no será propiamente de carácter conservativo, sino que en realidad constituirá un nuevo estado de cosas, atento al cual, en los hechos impedirá el ejercicio del derecho constitucional de acceso a la justicia, motivo por el cual, al ser contraria a ese derecho constitucional, esto es, por inhibir el acceso a la jurisdicción, deberá ser declarada improcedente."[103]

EXPEDIENTE SOLICITADA POR: LIC. VILLANUEVA
20187/2019 SFF/D/7

---

[102] Registro digital: 2009011 Instancia: Primera Sala Décima Época Materia(s): Constitucional Tesis: 1a. CXLV/2015 (10a.) Fuente: Gaceta del Semanario Judicial de la Federación. Libro 18, Mayo de 2015, Tomo I, página 391 Tipo: Aislada

[103] Registro digital: 2024663 Instancia: Tribunales Colegiados de Circuito Materias(s): Constitucional, Civil Tesis: I.15o.C.3 C (11a.) Fuente: Gaceta del Semanario Judicial de la Federación. Libro 13, Mayo de 2022, Tomo V, página 4679 Tipo: Aislada



"**PRINCIPIO DE MAYOR BENEFICIO FRENTE A FORMALISMOS PROCEDIMENTALES Y SOLUCIONES DE FONDO DE LOS CONFLICTOS. ÉSTAS DEBEN PRIVILEGIARSE FRENTE A AQUÉLLOS, SIEMPRE QUE NO SE AFECTE LA IGUALDAD DE LAS PARTES, EL DEBIDO PROCESO U OTROS DERECHOS**. Durante mucho tiempo fue motivo de crítica para los tribunales de amparo que las sentencias protectoras se concedieran por aspectos formales o procedimentales y no por temas de fondo; lo cual motivó que mediante la expedición de la nueva Ley de Amparo (publicada en el Diario Oficial de la Federación el dos de abril de dos mil trece), se estableciera en su artículo 189 que los órganos jurisdiccionales de amparo procederían al estudio de los conceptos de violación atendiendo a su prelación lógica, pero privilegiando en todo momento el principio de mayor beneficio; y fue en ese contexto que por reforma al precepto 17 de la Constitución General de la República publicada en el Diario Oficial de la Federación el 15 de septiembre de 2017, se adicionó a dicho dispositivo un tercer párrafo, en el que se puntualizó "Siempre que no se afecte la igualdad entre las partes, el debido proceso u otros derechos en los juicios o procedimientos seguidos en forma de juicio, las autoridades deberán privilegiar la solución del conflicto sobre los formalismos procedimentales.". Por tanto, acorde con esa aspiración social y en estricto acatamiento a los artículos citados, en los juicios o en los procedimientos relativos, todas las autoridades deben privilegiar la solución del conflicto sobre los formalismos procedimentales, con la única limitante de que no se afecte la igualdad de las partes, el debido proceso u otros derechos."[104]

"**DERECHO DE ACCESO A LA JUSTICIA (PRINCIPIO DE MAYOR BENEFICIO). A PARTIR DE LA ENTRADA EN VIGOR DE LA ADICIÓN AL ARTÍCULO 17, TERCER PÁRRAFO, CONSTITUCIONAL, TODAS LAS AUTORIDADES JUDICIALES Y AQUELLAS CON FUNCIONES MATERIALMENTE JURISDICCIONALES DEBEN PRIVILEGIAR LA SOLUCIÓN DEL CONFLICTO SOBRE LOS FORMALISMOS PROCEDIMENTALES, SIEMPRE Y CUANDO NO SE AFECTE LA IGUALDAD ENTRE LAS PARTES (DOF DE 15 DE SEPTIEMBRE DE 2017).**

Hechos: Una persona promovió juicio de amparo indirecto en el cual alegó que los artículos 91 y 92 de la Ley Federal de Procedimiento Administrativo que prevén la resolución del recurso de revisión en sede administrativa, son contrarios al mandato previsto en el tercer párrafo del artículo 17 de la Constitución Política de los Estados Unidos Mexicanos, puesto que no contemplan que se privilegie la resolución de fondo del asunto sobre los formalismos procedimentales. La Jueza de Distrito que conoció del asunto consideró que la disposición constitucional de referencia contiene una regla que confiere poder a la autoridad legislativa, mas no un derecho subjetivo público a favor de la persona, lo cual implica que hasta en tanto no se ejerza esa atribución por parte del Congreso de la Unión, a fin de adecuar las normas legales al texto del artículo 17 de la propia Constitución, las situaciones jurídicas imperantes en materia de resolución de recurso de revisión en sede administrativa no debían cambiar.

Criterio jurídico: La Segunda Sala de la Suprema Corte de Justicia de la Nación considera que a la entrada en vigor de la adición al artículo 17, tercer párrafo, contenida en el Decreto por el que se reforman y adicionan los artículos 16, 17 y 73 de la Constitución Política de los Estados Unidos Mexicanos, en materia de Justicia Cotidiana (Solución de Fondo del Conflicto y Competencia Legislativa sobre Procedimientos Civiles y Familiares), publicado en el Diario Oficial de la Federación el 15 de septiembre de 2017, todas las autoridades judiciales y aquellas con atribuciones materialmente jurisdiccionales del país deben privilegiar la resolución de fondo de los conflictos sometidos a su potestad sobre los formalismos procedimentales, siempre y cuando no se afecte la igualdad entre las partes. Lo anterior, con independencia de que las normas que rigen sus procedimientos no establezcan expresamente dicha cuestión.

Justificación: Del análisis de la reforma constitucional mencionada, se advierte que el Constituyente Permanente consideró que, para hacer frente a la problemática consistente en la "cultura procesalista", la cual genera que en el desahogo de una parte importante de asuntos se atiendan cuestiones formales y se deje de lado el fondo y, por tanto, sin resolver la controversia efectivamente planteada, debía adicionarse al artículo 17

---

[104] Registro digital: 2016171 Décima Época Materias(s): Constitucional, Común Tesis: (IV Región)2o.13 K (10a.) Fuente: Gaceta del Semanario Judicial de la Federación. Libro 51, Febrero de 2018, Tomo III, página 1524 Tipo: Aislada

CLYDE&CO

constitucional, el deber de las autoridades de privilegiar, por encima de aspectos formales, la resolución de fondo del asunto. Se dijo, que este deber exige también un cambio en la mentalidad de las autoridades para que en el despacho de los asuntos no se opte por la resolución más sencilla o rápida, sino por el estudio que clausure efectivamente la controversia y la aplicación del derecho sustancial. Además, se precisó que la incorporación explícita de tal principio en la Constitución General pretende que éste permee el sistema de justicia a nivel nacional, es decir, que todas las autoridades judiciales y con atribuciones materialmente jurisdiccionales del país se vean sometidas a su imperio, pero más allá de su obligatoriedad, reconozcan la razón y principio moral que subyacen a la adición al artículo 17 constitucional. Por lo anterior, esta Sala concluye que a la entrada en vigor de la referida adición, todas las autoridades jurisdiccionales deben privilegiar la resolución de los conflictos sometidos a su potestad, con independencia de que las normas que rigen sus procedimientos no establezcan expresamente dicha cuestión, puesto que del análisis teleológico de la reforma constitucional, se desprende la intención relativa a que este principio adicionado apoyara todo el sistema de justicia nacional para que las autoridades privilegiaran una resolución de fondo sobre la forma, evitando así reenvíos de jurisdicción innecesarios y dilatorios de la impartición de justicia."[105]

b.    <u>Tutela judicial efectiva.</u>

El derecho fundamental a la tutela judicial efectiva se desprende de la naturaleza de los derechos fundamentales de acceso a la justicia y a la jurisdicción, por lo que conviene explicar el contenido, desarrollo, extremos y límites de tales derechos fundamentales (principios rectores del también conocido -en algún sector doctrinario- como tutela judicial efectiva y de acceso a la justicia), contenidos en los artículos 25 de la Convención Americana sobre Derechos Humanos ("**CADH**") y 2 del Pacto Internacional de Derechos Civiles y Políticos.[106]

EXPEDIENTE NÚMERO... LIC. VILLANUEVA

---

[105] Registro digital: 2023741 Instancia: Segunda Sala Undécima Época Materias(s): Constitucional Tesis: 2a./J. 16/2021 (11a.) Fuente: Gaceta del Semanario Judicial de la Federación. Libro 7, Noviembre de 2021, Tomo II, página 1754 Tipo: Jurisprudencia.
[106] "Convención Americana sobre Derechos Humanos (Pacto de San José)
Artículo 25. Protección Judicial
1. Toda persona tiene derecho a un recurso sencillo y rápido o a cualquier otro recurso efectivo ante los Jueces o tribunales competentes, que la ampare contra actos que violen sus derechos fundamentales reconocidos por la Constitución, la ley o la presente convención, aun cuando tal violación sea cometida por personas que actúen en ejercicio de sus funciones oficiales.
2. Los Estados Partes se comprometen:
a) A garantizar que la autoridad competente prevista por el sistema legal del Estado decidirá sobre los derechos de toda persona que interponga tal recurso;
b) A desarrollar las posibilidades de recurso judicial, y
c) A garantizar el cumplimiento, por las autoridades competentes, de toda decisión en que se haya estimado procedente el recurso."
Pacto Internacional de Derechos Civiles y Políticos
Artículo 2
1.    Cada uno de los Estados Partes en el presente pacto se compromete a respetar y a garantizar a todos los individuos que se encuentren en su territorio y estén sujetos a su jurisdicción los derechos reconocidos en el presente pacto, sin distinción alguna de raza, color, sexo, idioma, religión, opinión política o de otra índole origen nacional o social, posición económica, nacimiento o cualquier otra condición social.
2. Cada Estado Parte se compromete a adoptar con arreglo a sus procedimientos constitucionales y a las disposiciones del presente pacto, las medidas oportunas para dictar las disposiciones legislativas o de otro carácter que fueren necesarias para hacer efectivos los derechos reconocidos en el presente pacto y que no estuviesen ya garantizados por disposiciones legislativas o de otro carácter.
3. Cada uno de los Estados Partes en el presente pacto se compromete a garantizar que:
a) Toda persona cuyos derechos o libertades reconocidos en el presente pacto hayan sido violados podrán interponer un recurso efectivo, aun cuando tal violación hubiera sido cometida por personas que actuaban en ejercicio de sus funciones oficiales;
b) La autoridad competente, judicial, administrativa o legislativa, o cualquiera otra autoridad competente prevista por el sistema legal del Estado, decidirá sobre los derechos de toda persona que interponga tal recurso y a desarrollar las posibilidades de recurso judicial;
c) Las autoridades competentes cumplirán toda decisión en que se hayan estimado procedente el recurso."



En el ámbito interamericano, si bien es cierto que los Estados Parte de la CADH gozan de un margen de apreciación para articular el derecho fundamental de tutela judicial efectiva,[107] no menos lo es que los requisitos y formalidades establecidos en sede legislativa deben ser proporcionales al fin u objetivo perseguido, esto es, no deben lesionar la sustancia misma de ese derecho.[108]

El 6 de agosto de 2008, la Corte Interamericana de Derechos Humanos, al resolver el caso Castañeda Gutman Vs. Estados Unidos Mexicanos estimó que un recurso judicial efectivo es aquel capaz de producir el resultado para el que ha sido concebido, es decir, debe ser un recurso capaz de conducir a un análisis por parte de un tribunal competente a efectos **de establecer si ha habido o no una violación a los derechos humanos y, en su caso, <u>proporcionar una reparación</u>**.[109]

Íntimamente relacionado con lo anterior, el Comité de Derechos Humanos razonó en la Observación General N° 31 (emitida el 26 de mayo del 2004) en lo que interesa, que **el derecho a hacer valer un recurso efectivo puede exigir que los <u>Estados Parte adopten y apliquen medidas provisionales para evitar la repetición de las violaciones y reparar cuanto antes cualquier daño que esas violaciones puedan haber causado</u>.**[110]

México, como firmante del Pacto, y Parte del sistema regional americano de protección de derechos humanos, tiene la obligación de implementar la efectividad de los recursos previstos

---

[107] Ese margen de apreciación de los Estados ha sido reconocido por esta Sala en las tesis siguientes: "REVISIÓN EN AMPARO DIRECTO. EL ARTÍCULO 25 DE LA CONVENCIÓN AMERICANA SOBRE DERECHOS HUMANOS NO HACE PROCEDENTE AQUEL RECURSO." [Décima Época. Registro digital: 2002906. Instancia: Primera Sala. Tipo de tesis: aislada. Fuente: Semanario Judicial de la Federación y su Gaceta, Libro XVII, Tomo 1, febrero de 2013, materia común, tesis 1a. XLVIII/2013 (10a.), página 843]. "REVISIÓN EN AMPARO DIRECTO. EL ARTÍCULO 83, FRACCIÓN V, DE LA LEY DE AMPARO, NO VULNERA EL DERECHO A UN RECURSO JUDICIAL EFECTIVO PREVISTO EN EL ARTÍCULO 25 DE LA CONVENCIÓN AMERICANA SOBRE DERECHOS HUMANOS." [Décima Época. Registro digital: 2002907. Instancia: Primera Sala. Tipo de tesis: aislada. Fuente: Semanario Judicial de la Federación y su Gaceta, Libro XVII, Tomo 1, febrero de 2013, materia constitucional, tesis 1a. XLVII/2013 (10a.), página 843]
[108] En términos similares se ha pronunciado el Tribunal Europeo de Derechos Humanos, al resolver el Caso Ashingdane c/Royaume-Uni, el 28 de mayo de 1985, A. 93, párrafo 57.
[109] Caso Castañeda Gutman Vs. Estados Unidos Mexicanos. Excepciones preliminares, Fondo, Reparaciones y Costas. Sentencia de 6 de agosto de 2008. Serie C Núm. 184.
[110] "(…) La obligación consignada en el párrafo 2 del artículo 2 de que se adopten medidas para hacer efectivos los derechos reconocidos en el Pacto no admite reservas y es inmediata. No se puede justificar el i n cumplimiento de esta obligación haciendo referencia a consideraciones de carácter político, social, cultural o económico dentro del Estado.
En el párrafo 3 del artículo 2 se dispone que, además de proteger eficazmente los derechos reconocidos en el Pacto, los Estados Parte habrán de garantizar que todas las personas dispongan de recursos accesibles y efectivos para reivindicar esos derechos. Esos recursos se deben adaptar adecuadamente para tener en cuenta la vulnerabilidad especial de ciertas clases de personas, en particular los niños. El Comité atribuye importancia a que los Estados Parte establezcan en el derecho interno mecanismos judiciales y administrativos adecuados para conocer de las quejas sobre violaciones de los derechos. El Comité toma nota de que el poder judicial puede garantizar el disfrute de los derechos reconocidos en el Pacto de distintas maneras, en especial mediante la aplicación directa del Pacto, la aplicación de disposiciones constitucionales u otras disposiciones legislativas similares o el efecto de la interpretación del Pacto en la aplicación de la legisla ción nacional. Se requieren en especial mecanismos administrativos que den cumplimiento a la obligación general de investigar las denuncias de violación de modo rápido, detallado y efectivo por organismos independientes e imparciales. Las instituciones nacionales de derechos humanos que cuentan con las facultades pertinentes pueden coadyuvar a tal fin. El hecho de que un Estado Parte no investigue las denuncias de violación puede ser de por sí una vulneración del Pacto. La cesación de la violación constituye un elemento indispensable del derecho a obtener un recurso efectivo. (…)
El Comité observa, además, que en determinadas circunstancias el derecho a hacer valer un recurso efectivo puede exigir que los <u>Estados Parte adopten y apliquen medidas provisionales para evitar la repetición de las violaciones y reparar cuanto antes cualquier daño que esas violaciones puedan haber causado</u>.
Aunque los regímenes jurídicos de los Estados Parte estén formalmente dotados del recurso adecuado, siguen ocurriendo violaciones de los derechos reconocidos en el Pacto. Cabe <u>suponer que ello es atribuible al hecho de que los recursos no funcionan con efectividad en la práctica</u>. Por consiguiente, se solicita a los Estados Parte que en sus informes periódicos señalen los obstáculos que se opongan a la efectividad de los recursos existentes."



en dicho instrumento internacional, específicamente, **respecto de aquéllos casos donde deban de adoptarse y aplicarse medidas provisionales para evitar la repetición de las conductas dañinas reclamadas, su persistencia o consumación y reparar cuanto antes cualquier daño que esas violaciones puedan haber causado**; ello, mediante la implementación legislativa correspondiente, invocando directamente el Pacto, o bien, ante la interpretación judicial de las normas que prevean los recursos y juicios, es decir, México, y por tanto, este órgano jurisdiccional, tiene la obligación internacional de aplicar e implementar el derecho fundamental convencional de tutela cautelar efectiva.

La noción de "efectividad" que surge del artículo 25 de la CADH requiere que las herramientas judiciales disponibles incluyan medidas procesales como las medidas precautorias, provisionales o cautelares- y, en general, **recursos judiciales sencillos y rápidos para la tutela de derechos, con miras a impedir que las violaciones se prolonguen en el tiempo**.[111] Lo anterior, aún cuando la determinación acerca del fondo de la cuestión requiera de un período temporal más extenso.

El derecho a la tutela judicial genera la obligación estatal de establecer y garantizar recursos judiciales idóneos y efectivos para la protección de los derechos".[112] Para que un recurso pueda considerarse "idóneo" debe cumplir con las características siguientes:

**a)**      que se trate de recursos **sencillos**, urgentes, **informales**, accesibles y tramitados por órganos independientes;

**b)**      que se cuente con la posibilidad de acceder a instancias judiciales federales o nacionales ante la sospecha de parcialidad en la actuación de los órganos locales;

**c)**      que se garantice una **legitimación activa amplia**;

**d)**      que puedan tramitarse como recursos individuales e igualmente como acciones cautelares colectivas (para proteger a un grupo determinado o determinable conforme a ciertos parámetros, afectado o bajo situación de riesgo inminente); y,

**e)**      que se prevea la **aplicación de medidas de protección** en consulta con los afectados.[113]

En relación con el trámite de estos recursos, la CIDH estableció en su informe que "… por tratarse de acciones de protección de derechos fundamentales en casos urgentes, la ritualidad de las pruebas no debería ser la misma que se exige en los procesos ordinarios, pues se trata de que

---

[111] En este mismo sentido, el Comité de Derechos Humanos, en su Observación General Nº 31, ha establecido: "…El Comité opina, además, que el derecho a un recurso efectivo puede, en ciertas circunstancias, requerir que los Estados Parte establezcan e implementen medidas provisionales o cautelares para evitar la continuación de las violaciones y para asegurar la reparación de todo daño causado por dichas violaciones lo más temprano posible…" (el destacado es propio) Cfr. Comité de Derechos Humanos, Observación General Nº 31, "La naturaleza de las obligaciones legales generales impuestas por el Pacto a los Estados parte", 26 de mayo de 2004, CCPR/C/21/Rev.1/Add.13, párrafo 19.

[112] Acceso a la justicia para las mujeres víctimas de violencia en las Américas, cit.

[113] Ibíd., páginas 35, 36.

CLYDE&CO

en un breve lapso de tiempo se adopten las medidas conducentes para la protección inmediata de los derechos amenazados".

En el ámbito comparado, el tribunal constitucional español determinó que "el derecho a la tutela judicial exige de los órganos jurisdiccionales que interpreten las normas procesales que condicionan ese acceso en el sentido más favorable a la eficacia del mencionado derecho fundamental (STC 159/1990), siendo de obligada observancia el principio hermenéutico pro actione."[114]

La jurisprudencia nacional ha sido encabezada por la Suprema Corte de Justicia de la Nación, misma que ha emitido diversos precedentes interpretando los artículos 25 y 2 convencionales en relación con el artículo 17 de la Constitución Política de los Estados Unidos Mexicanos,[115] arribando a la conclusión, en lo que interesa, de que los órganos jurisdiccionales deben deben resolver los conflictos sometidos a su consideración **sin más condición que las formalidades necesarias, razonables y proporcionales al caso para lograr su trámite y resolución**.

Por consiguiente, los órganos encargados de administrar justicia **deben asumir una actitud facilitadora del acceso a la jurisdicción**. Las reglas para la tramitación y los requisitos mismos para la admisión de los juicios, incidentes en ellos permitidos, o recursos intentados establecidos por el legislador son de interpretación estricta, lo que pretende no limitar el derecho fundamental de tutela judicial efectiva.

Es precisamente conforme al principio pro persona, en su vertiente pro actione, [116] que el Juez debe encontrar la interpretación más favorable a la acción, éste se encamina a **no entorpecer ni obstruir el derecho a la tutela judicial efectiva, por lo que, ante la duda, los requisitos y presupuestos procesales siempre <u>deberán ser interpretados en el sentido más favorable a la plena efectividad de ese derecho humano</u>**, lo que implica resolver los conflictos que se les plantean sin obstáculos o dilaciones innecesarias y evitando formalismos o interpretaciones no razonables que impidan o dificulten el enjuiciamiento de fondo y la auténtica tutela judicial, **evitando que los meros formalismos impidan un enjuiciamiento de fondo del asunto.**

---

[114] STC 136/1995, de veinticinco de septiembre de mil novecientos noventa y cinco, párrafo 2 -fundamentos jurídicos.

[115] La Suprema Corte ha determinado que la tutela judicial efectiva se encuentra consagrada como derecho humano en el artículo 17 constitucional en las jurisprudencias siguientes: "JUSTICIA, ACCESO A LA. LA POTESTAD QUE SE OTORGA AL LEGISLADOR EN EL ARTÍCULO 17 DE LA CONSTITUCIÓN GENERAL DE LA REPÚBLICA, PARA FIJAR LOS PLAZOS Y TÉRMINOS CONFORME A LOS CUALES AQUÉLLA SE ADMINISTRARÁ NO ES ILIMITADA, POR LO QUE LOS PRESUPUESTOS O REQUISITOS LEGALES QUE SE ESTABLEZCAN PARA OBTENER ANTE UN TRIBUNAL UNA RESOLUCIÓN SOBRE EL FONDO DE LO PEDIDO DEBEN ENCONTRAR JUSTIFICACIÓN CONSTITUCIONAL." (Novena Época. Registro digital: 188804. Instancia: Pleno. Tipo de tesis: Jurisprudencia. Fuente: Semanario Judicial de la Federación y su Gaceta, Tomo XIV, septiembre de 2001, materia constitucional, tesis P./J. 113/2001, página 5). "GARANTÍA A LA TUTELA JURISDICCIONAL PREVISTA EN EL ARTÍCULO 17 DE LA CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS. SUS ALCANCES." (Novena Época. Registro digital: 172759. Instancia: Primera Sala. Tipo de tesis: jurisprudencia. Fuente: Semanario Judicial de la Federación y su Gaceta, Tomo XXV, abril de 2007, materia constitucional, tesis 1a./J. 42/2007, página 124)

[116] Conforme se ha sustentado en la tesis 1a. CCXIV/2013 (10a.) el segundo párrafo del artículo 1o. constitucional, las normas relativas a los derechos humanos se interpretarán de conformidad con la propia Constitución y con los tratados internacionales de la materia, favoreciendo en todo tiempo a las personas la protección más amplia (principio pro persona). La tesis en comento tiene el rubro y datos de identificación siguientes: "DERECHOS HUMANOS. INTERPRETACIÓN CONFORME, PREVISTA EN EL ARTÍCULO 1o. DE LA CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS." [Décima Época. Registro digital: 2003974. Instancia: Primera Sala. Tipo de tesis: aislada. Fuente: Semanario Judicial de la Federación y su Gaceta, Libro XXII, Tomo 1, julio de 2013, materia constitucional, tesis 1a. CCXIV/2013 (10a.), página 556]

Clyde&Co

Así, **en el desarrollo del derecho de acceso a la jurisdicción se prohíbe al legislador no sólo la arbitrariedad e irrazonabilidad**, sino también el establecimiento de normas que por su rigorismo, por su formalismo excesivo o por cualquier otra razón, revelen una clara desproporción entre los fines que aquellas formalidades y requisitos establecidos en ley preservan para la correcta y funcional administración de justicia y para la efectiva protección de los derechos de las personas, frente a los intereses que sacrifican.[117]

Todas las anteriores fueron consideraciones vertidas por el Pleno de la Suprema Corte de Justicia de la Nación al resolver la **acción de inconstitucionalidad 62/2016 lo que <u>jurisprudencia de obligatoria observancia</u> para este Juzgado.**

Cabe recordar que el Cuarto Tribunal Colegiado en Materia Administrativa del Primer Circuito en jurisprudencia firme **reconoció la existencia del derecho fundamental a la <u>tutela cautelar efectiva</u>**, tal como aparece en el criterio de rubro y texto siguiente:

> **"SUSPENSIÓN EN EL AMPARO. PROCEDE CONCEDERLA, A PESAR DE QUE PUEDA ADELANTAR LOS EFECTOS DE LA DECISIÓN FINAL, SI ES NECESARIO PARA ASEGURAR UNA TUTELA CAUTELAR EFECTIVA QUE PRESERVE LA MATERIA DEL JUICIO Y LA CABAL RESTITUCIÓN DEL AFECTADO EN SUS DERECHOS.** El criterio de que la suspensión no debe otorgar efectos restitutorios o que anticipen la decisión final, por ser propios de la sentencia de fondo, debe superarse en aras de ser congruentes con la finalidad constitucional de preservar la materia del juicio y evitar la ejecución de actos de imposible o difícil reparación, siempre y cuando exista interés suspensional del solicitante y materia para la suspensión, para lo que es menester considerar la naturaleza del acto reclamado. Consecuentemente, procede conceder la suspensión a pesar de que pueda adelantar los efectos de la decisión final, pues ello sería en forma provisional, **si es necesario para asegurar** <u>una tutela cautelar efectiva</u> **que preserve la materia del juicio y la cabal restitución del afectado en sus derechos**; es decir, cuando de no otorgarse, la restitución que, en su caso, se ordene en la resolución definitiva, pueda ser ilusoria."[118]

En esos términos, el Pleno en Materia Civil del Primer Circuito emitió el siguiente criterio jurisprudencial:

> **"MEDIDA CAUTELAR O PROVIDENCIAS PRECAUTORIAS EN LOS JUICIOS MERCANTILES. SON INHERENTES AL DERECHO A LA JURISDICCIÓN, POR LO QUE LA LIMITACIÓN DE SU OTORGAMIENTO DEBE ATENDER A UNA INTERPRETACIÓN FUNCIONAL Y CONFORME DEL ARTÍCULO 1168 DEL CÓDIGO DE COMERCIO CON LOS ARTÍCULOS 1o. Y 17 CONSTITUCIONALES.** En los juicios mercantiles se pueden decretar medida cautelar o providencias precautorias para mantener una situación preexistente, en virtud de que este tipo de instrumentos son inherentes al derecho a la jurisdicción, al tener la finalidad de hacer eficaces las sentencias de los Jueces tal como está previsto en el artículo 17, párrafo séptimo, de la Constitución Política de los Estados Unidos Mexicanos, el cual dispone que: "Las leyes federales y locales establecerán los medios necesarios para que se garantice la independencia de los tribunales y la plena ejecución de sus resoluciones.". Así la reforma publicada en el Diario Oficial de la Federación el 10 de enero de 2014 a los artículos 1168 y 1171 del Código de Comercio, no tuvo la intención de impedir que en los juicios mercantiles se

---

[117] De manera similar se ha pronunciado el Tribunal Constitucional Español en la sentencia 90/2013, de 22 de abril de 2013, párrafo 3 -fundamentos jurídicos-.

[118] Época: Novena Época Registro: 161447 Instancia: Tribunales Colegiados de Circuito Tipo de Tesis: Jurisprudencia Fuente: Semanario Judicial de la Federación y su Gaceta Tomo XXXIV, Julio de 2011 Materia(s): Común, Administrativa Tesis: I.4o.A. J/90 Página: 1919

Clyde&Co

decreten las medidas o providencias cautelares necesarias para hacer efectivo el cumplimiento de las sentencias, ya que su propósito se concretó a la interpretación de reglas claras y precisas que permitan a sus acreedores obtener el cobro efectivo de sus créditos insolutos, mediante la radicación de personas o la retención de bienes. De esta manera, el texto reformado del artículo 1168, primer párrafo, invocado, que establece: "En los juicios mercantiles únicamente podrán dictarse las medida cautelar o providencias precautorias previstas en este Código y que son las siguientes: (...)", no debe interpretarse con un criterio de simple literalidad, pues resultaría ser prohibitivo frente al deber del Juez ordinario de conservar subsistente la materia del juicio, lo que, desde luego, vulneraría los derechos fundamentales reconocidos por los instrumentos internacionales firmados por el Estado Mexicano y por la Constitución Política de los Estados Unidos Mexicanos, de acuerdo con su artículo 1o.; no obstante, una interpretación funcional y conforme de aquel numeral da la pauta para advertir que se trata de una norma taxativa al prever dos supuestos aplicables a determinada situación de hecho, lo cual, sin embargo, no restringe la posibilidad del juzgador de que en cumplimiento de su función en relación con el otorgamiento y procedencia de las diferentes medida cautelar, deben adaptarse a las circunstancias y necesidades de cada caso, pues estas medidas deben ser flexibles incluso con posibilidad de modificación según se necesite en el procedimiento en que se emitan; además, al otorgarlas, debe fundarlas y motivarlas debidamente, así como en cuanto a las garantías que se exijan, a fin de evitar abusos de las partes que las soliciten. En tal virtud, tal interpretación es acorde con los derechos fundamentales a la tutela judicial efectiva y de acceso a la impartición de justicia reconocidos tanto por el artículo constitucional en comento, como por el precepto 25 de la Convención Americana sobre Derechos Humanos."[119]

c.    Recurso efectivo.

Dentro de los derechos de acceso a la justicia y tutela judicial efectiva, se ha reconocido la importancia de la garantía de acceso a un "recurso efectivo", tutelado en los artículos 14 y 17 constitucionales.

Al respecto, la jurisprudencia ha reconocido dicha garantía como la posibilidad de que los particulares impugnen una decisión y esta sea decidida por un órgano que, a su vez, establezca si se ha incurrido o no en la violación a derechos fundamentales y provea lo necesario para remediarla:

> "**DERECHO HUMANO A UN RECURSO JUDICIAL EFECTIVO. NO PUEDEN CONSIDERARSE EFECTIVOS LOS RECURSOS QUE, POR LAS CONDICIONES GENERALES DEL PAÍS O POR LAS CIRCUNSTANCIAS PARTICULARES DE UN CASO CONCRETO, RESULTEN ILUSORIOS**. El citado derecho humano está estrechamente vinculado con el principio general relativo a la efectividad de los instrumentos o medios procesales destinados a garantizar los derechos humanos reconocidos por la Constitución Política de los Estados Unidos Mexicanos o los instrumentos internacionales en la materia. Ahora bien, la inexistencia de un recurso efectivo contra las violaciones a tales derechos constituye una transgresión al derecho humano a un recurso judicial efectivo. En este sentido, para que exista dicho recurso, no basta con que lo prevea la Constitución o la ley, o que sea formalmente admisible, sino que se requiere que realmente sea idóneo para establecer si se ha incurrido en una violación a los derechos humanos y, en su caso, proveer lo necesario para remediarla. De manera que no pueden considerarse efectivos aquellos recursos que, por las condiciones generales del país o incluso por las circunstancias particulares de un caso concreto, resulten ilusorios, esto es, cuando su inutilidad se ha demostrado en la práctica, ya sea porque el Poder Judicial carece de la independencia necesaria para decidir con imparcialidad, faltan los medios para ejecutar las decisiones que se dictan, se deniega la justicia, se retarda injustificadamente la decisión o se impida al presunto lesionado acceder al recurso judicial."[120]

---

[119] Registro digital: 2020903 Plenos de Circuito;10a. Época;Gaceta del Semanario Judicial de la Federación;PC.I.C. J/94 C (10a.) ;J; Publicación: viernes 25 de octubre de 2019 10:35 h

[120] Registro digital: 2002287 SCJN;10a. Época;Semanario Judicial de la Federación y su Gaceta;1a. CCLXXVII/2012 (10a.) ;TA

Clyde&Co

"**TUTELA JUDICIAL EFECTIVA. EL ACCESO A UN RECURSO EFECTIVO, SENCILLO Y RÁPIDO, ES CONSECUENCIA DE ESE DERECHO FUNDAMENTAL.** El artículo 1o. de la Constitución Política de los Estados Unidos Mexicanos establece que todas las personas gozan de los derechos humanos reconocidos en la Constitución y en los tratados internacionales de los que el Estado Mexicano sea parte, así como de las garantías para su protección. Por su parte, el artículo 17 constitucional prevé el derecho fundamental a la tutela judicial efectiva, que supone, en primer término, el acceso a la jurisdicción, es decir, que el gobernado pueda ser parte en un proceso judicial y, en segundo, el derecho que tiene a obtener una sentencia sobre el fondo de la cuestión planteada y su cabal ejecución, que deberá ser pronta, completa e imparcial, lo cual se encuentra íntimamente relacionado con el principio del debido proceso, contenido en el artículo 14 del señalado ordenamiento, por lo que para dar cabal cumplimiento al derecho inicialmente mencionado, debe otorgarse la oportunidad de defensa previamente a todo acto privativo de la libertad, propiedad, posesiones o derechos, lo que impone, además, que se cumplan las formalidades esenciales del procedimiento. Por tanto, el acceso a un recurso efectivo, sencillo y rápido, mediante el cual los Jueces y tribunales tutelen de manera eficaz el ejercicio de los derechos humanos de toda persona que lo solicite, sustanciados de conformidad con las reglas del debido proceso legal, es consecuencia del derecho fundamental a la tutela judicial efectiva, en tanto que asegura la obtención de justicia pronta, completa e imparcial, apegada a las exigencias formales que la propia Constitución consagra en beneficio de toda persona que se encuentre bajo su jurisdicción."[121]

En ese sentido, el artículo 25.1 de la Convención Americana sobre Derechos Humanos que establece, como derecho humano para todas las personas sujetas a la jurisdicción del Estado sin discriminación, el derecho a la protección judicial efectiva, al determinar que toda persona tiene derecho a un recurso sencillo y rápido o a cualquier otro recurso efectivo ante los jueces o tribunales competentes, que la ampare contra actos que violen sus derechos fundamentales reconocidos por la Constitución, la Ley o la Convención, aun cuando tal violación sea cometida por personas que actúen en ejercicio de sus funciones oficiales:

> "Artículo 25. Protección Judicial
>
> 1. Toda persona tiene derecho a un recurso sencillo y rápido o a cualquier otro recurso efectivo ante los jueces o tribunales competentes, que la ampare contra actos que violen sus derechos fundamentales reconocidos por la Constitución, la ley o la presente Convención, aun cuando tal violación sea cometida por personas que actúen en ejercicio de sus funciones oficiales (…)"

En esos términos, la Corte Interamericana ha reiterado que no basta con que se prevea la existencia de recursos, **si estos no resultan efectivos para combatir la violación de los derechos protegidos por la Convención**. La garantía de un recurso efectivo "constituye uno de los pilares básicos, no sólo de la Convención Americana, sino del propio Estado de derecho en una sociedad democrática en el sentido de la Convención"[122].

Esta garantía de protección de los derechos de los individuos no supone sólo el resguardo directo a la persona vulnerada sino, además, a los familiares, quienes por los acontecimientos y circunstancias particulares de algunos casos, son los que ejercen la reclamación en el orden

---

[121] Registro digital: 2002096 TCC;10a. Época;Semanario Judicial de la Federación y su Gaceta;II.8o.(I Región) 1 K (10a.) ;TA
[122] Corte IDH, Caso Cantos Vs. Argentina. Fondo, Reparaciones y Costas. Sentencia de 28 de noviembre de 2002. Serie C No. 97.



interno[123]. De esa manera, la Corte Interamericana de Derechos Humanos ha señalado que, **estos recursos tienen que ser idóneos y efectivos, capaces de lograr entre otros resultados, una reparación por las violaciones sufridas**[124].

d.      La interpretación inconstitucional e implícita sostenida por el Juzgado Responsable.

Como se desarrolló en el capítulo de "Antecedentes", a través del Auto Reclamado, además de acordar el desistimiento del Concurso Mercantil, el Juzgado Responsable ordenó inmediatamente el levantamiento de las Medidas Cautelares.

Con reserva de lo expuesto en el capítulo de "Procedencia" de la presente demanda, de conformidad con el artículo 1343 de la Ley de Concursos Mercantiles dicha determinación es impugnable (**de manera optativa, tomando en consideración la actualización de varias excepciones al principio de definitividad que ya fueron desarrolladas**) a través del recurso revocación:

> "Artículo 1343.- La sentencia de segunda instancia causará ejecutoria cuando la misma no pueda ser recurrida por ningún otro medio ordinario o extraordinario de impugnación, cualquiera que sea el interés que en el litigio se verse."

Aunado a lo anterior, como fue debidamente demostrado en el capítulo de "Procedencia" de la presente demanda, en contra de dichas resoluciones también procede el juicio de amparo indirecto.

Ahora bien, el artículo 1343 del Código de Comercio dispone que una sentencia causará ejecutoria cuando ésta no pueda ser impugnada por medio ordinario o extraordinario alguno de defensa:

> "Artículo 1343.- La sentencia de segunda instancia causará ejecutoria cuando la misma no pueda ser recurrida por ningún otro medio ordinario o extraordinario de impugnación, cualquiera que sea el interés que en el litigio se verse."

En términos similares, los artículos 354 y 356 del Código Federal de Procedimientos Civiles disponen:

> "ARTICULO 355.- Hay cosa juzgada cuando la sentencia ha causado ejecutoria."
>
> ARTICULO 356.- Causan ejecutoria las siguientes sentencias:
> "
> I.- Las que no admitan ningún recurso;
>
> II.- Las que, admitiendo algún recurso, no fueren recurridas, o, habiéndolo sido, se haya declarado desierto el interpuesto, o haya desistido el recurrente de él (…)"

ESDOC465095063X66B0705A1.DOC VILLANUEVA 257015-8700445F

---

[123] Ver: Corte IDH, Caso 19 Comerciantes Vs. Colombia. Fondo, Reparaciones y Costas. Sentencia de 5 de julio de 2004. Serie C No. 109, párrafo 193.

[124] Ver: Corte IDH. Caso Castañeda Gutman Vs. Estados Unidos Mexicanos. Excepciones Preliminares, Fondo, Reparaciones y Costas. Sentencia de 6 de agosto de 2008. Serie C No. 184, Párrafo 78.



Evidentemente, al momento de dictarse el Auto Reclamado no se había promovido en su contra recurso (ordinario ni extraordinario) alguno pero, más aun, **estaba corriendo el plazo para que cualquiera de las partes pudiera impugnar dicha determinación**.

No obstante lo anterior, el Juzgado Responsable, apoyado implícitamente en los artículos citados y el resto de los preceptos que regulan la impugnación de las determinaciones reclamadas, consideró la posibilidad de dar plenos efectos a dicho desistimiento, ordenando el levantamiento de las Medidas Cautelares, **a pesar de que ni siquiera habían transcurrido los plazos necesarios para su impugnación y/o declaración de que dichas determinaciones han causado ejecutoria**.

En esos términos, el Juzgado Responsable consideró que aun y cuando una decisión judicial sea susceptible de impugnarse, está plenamente facultado para ejecutar la decisión y otorgarle plenos efectos de manera inmediata.

Evidentemente, este Tribunal advertirá que dicha interpretación torna inconstitucionales los artículos 1, 7, 25, 26 y 29 de la Ley de Concursos Mercantiles, así como el artículo 1343 del Código de Comercio que regulan el desistimiento del concurso mercantil, las facultades del juzgado concursal y la procedencia de recursos, al contrariar los artículos 14 y 17 de la Constitución Federal y 25 de la Convención Americana de Derechos Humanos.

Sobre este punto, este Tribunal debe considerar que la demostrada inconstitucionalidad de dichos preceptos al violar los derechos de acceso a la justicia y tula judicial efectiva es un verdadero planteamiento constitucional en términos de las tesis de rubro "**REVISIÓN EN AMPARO DIRECTO. DENTRO DE LAS CUESTIONES PROPIAMENTE CONSTITUCIONALES MATERIA DE ESTE RECURSO SE ENCUENTRA LA INTERPRETACIÓN REALIZADA POR LA AUTORIDAD RESPONSABLE O EL TRIBUNAL COLEGIADO DE CIRCUITO DE LA NORMA GENERAL CUYA CONSTITUCIONALIDAD SE IMPUGNA, AL RESOLVER CUESTIONES DE LEGALIDAD**"[125] y "**REVISIÓN EN AMPARO DIRECTO. ES PROCEDENTE CUANDO UN TRIBUNAL COLEGIADO DE CIRCUITO, AL VALORAR LAS PRUEBAS EN UN JUICIO DE GUARDA Y CUSTODIA, REALIZA UNA INTERPRETACIÓN IMPLÍCITA DE LOS ARTÍCULOS 4o. Y 16, PÁRRAFOS NOVENO Y DÉCIMO DE LA CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS**"[126] citadas y desarrolladas en el capítulo de "Procedencia" de la presente demanda.

Como este Tribunal podrá desprender de las tesis citadas, para que exista una cuestión de constitucionalidad ni siquiera es necesario que la autoridad responsable cite de manera expresa los artículos que interpreta, sino que basta la existencia de una interpretación implícita que fije su sentido y alcance.

---

[125] Registro digital: 2006486 SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;2a./J. 55/2014 (10a.) ;J; Publicación: viernes 23 de mayo de 2014 10:06 h

[126] Registro digital: 162729 SCJN;9a. Época;Semanario Judicial de la Federación y su Gaceta;1a. XXXIV/2011 ;TA

CLYDE&CO

Por lo tanto, es claro que aun y cuando el Juzgado Responsable no haya citado expresamente los preceptos reclamados, como consecuencia de la interpretación implícita de los mismos en los términos desarrollado en el presente apartado, deben ser declarados inconstitucionales.

Lo anterior pues la interpretación del Juzgado Responsable importa que la posibilidad de interponer recursos en contra de una decisión judicial sea ineficaz e inútil, ya que bajo su interpretación a pesar de que una exista la posibilidad de promover un recurso, ello no impide que la decisión adoptada surta plenos efectos y pueda ejecutarse en contra de la parte perjudicada.

Esto es, bajo la interpretación del Juzgado Responsable, aun cuando exista la posibilidad de que una decisión judicial sea revocada como consecuencia de la interposición de un recurso, en tanto no lo sea ésta puede ser plenamente ejecutada **a pesar de que dicha ejecución pueda conllevar efectos irreparables que tornen ilusorios los efectos del recurso promovido**.

Más aun, bajo la interpretación del Juzgado Responsable, ningún efecto material tiene la interposición de un recurso en el procedimiento pues se permite a la autoridad jurisdiccional otorgar plenos efectos a una decisión que aun se encuentra *sub judice*, con independencia de las consecuencias adversas que ello pueda tener.

Por lo tanto, dicha interpretación implícita desconoce el contenido de los derechos de acceso a la justicia, tutela judicial efectiva y recurso judicial efectivo pues, entonces, **los recursos no serían idóneos para la protección de derechos fundamentales ni para modificar o revocar una decisión judicial que se considere ilegal**, al permitir su plena ejecución y la realización de consecuencias adversas en contra del recurrente.

e.    Necesidad de ejercer control de constitucionalidad para salvaguardar la constitucionalidad de los preceptos reclamados y consecuente inconstitucionalidad de las Resoluciones Reclamadas al amparo del ejercicio de dicho control.

Previo a declarar la inconstitucionalidad de los artículos 1, 7, 25, 26 y 29 de la Ley de Concursos Mercantiles, así como el artículo 1343 del Código de Comercio, la redacción de las normas requiere un ejercicio de control de constitucionalidad y convencionalidad *ex oficio*.

Los alcances, límites y consecuencias del ejercicio de dicho control ya fuero ampliamente desarrollados en el apartado "d" del concepto de violación inmediato anterior, por lo que para evitar repeticiones innecesarias se solicita a este Tribunal que tenga por reproducidas dichas consideraciones como si a la letra se insertasen.

Partiendo de dichas premisas, este Tribunal está llamado a emprender un ejercicio de interpretación conforme sobre los preceptos que se reclaman, de la forma que a continuación s expone:

Con la finalidad de respetar los derechos de acceso a la justicia, tutela judicial efectiva y recurso judicial efectivo, cuando se impugna mediante medios ordinarios o extraordinarios de defensa una resolución judicial, la autoridad jurisdiccional debe abstenerse de ejecutar u otorgar efectos a la resolución impugnada hasta en tanto ésta no cause ejecutoria; lo anterior, para permitir que



el recurso interpuesto tenga efectos positivos a favor del recurrente, permitiendo la revocación, anulación o modificación de la decisión impugnada y salvaguardando cualquier derecho vulnerado.

En el caso, si el Auto Reclamado aun no ha causado estado, es claro que conforme a la interpretación propuesta el Juzgado Responsable **debió abstenerse de ejecutar y otorgarle efectos**, debiendo abstenerse de ordenar el levantamiento de las Medidas Cautelares sino hasta que se declarara que dicho auto había causado estado.

En consecuencia, será evidente para este Juzgado que el Auto Reclamado es inconstitucional, al otorgar plenos efectos a una sentencia interlocutoria que aun no ha causado ejecutoria, en contravención a los artículos 14 y 17 constitucionales, por lo que este Tribunal deberá otorgar el amparo y protección solicitados para el efecto de revocar las resoluciones apuntadas.

## DÉCIMO SEXTO. INCONSTITUCIONALIDAD DEL ARTÍCULO 28 DE LA LEY DE CONCURSOS MERCANTILES, AL INTERPRETARSE IMPLÍCITAMENTE LA POSIBILIDAD DE QUE EL DESISTIMIENTO DEL CONCURSO MERCANTIL SEA PLANTEADO POR LOS ACREEDORES DE LA COMERCIANTE.

<u>Síntesis</u>.        Al confirmar la posibilidad de que la solicitud de desistimiento presentada por el Sedicente Apoderado de Controladora surtiera plenos efectos a pesar de haber sido formulada por sus acreedores, el Juzgado Responsable permitió materialmente que los acreedores de la Quejosa se desistieran del concurso mercantil, apoyado en el artículo 28 de la Ley de Concursos Mercantiles. En consecuencia, la interpretación implícita sostenida por el Juzgado Responsable torna inconstitucional dicho precepto.

<u>Desarrollo.</u>

a.  <u>Principio de seguridad jurídica</u>

El contenido y alcance del principio de seguridad jurídica fue desarrollado anteriormente en el presente escrito, por lo que se tiene por reproducido como si a la letra se insertase.

b.        <u>Debido proceso, tutela judicial efectiva y acceso a la justicia.</u>

El contenido y alcance de estos derechos ya fue desarrollado en el apartado "a" del tercer concepto de violación, por lo que para evitar repeticiones innecesarias, se solicita que dichas consideraciones se tengan por reproducidas como si la letra se insertasen.

EDO. FIRMADO ELECTRONICAMENTE POR VILLANUEVA ... (watermark)

150



c.   <u>La interpretación implícita e inconstitucional sostenida por el Juzgado Responsable.</u>

Como ha sido ampliamente desarrollado en la presente demanda, el desistimiento formulado por el Sedicente Apoderado de Controladora es, invariablemente, un acto efectuado por los acreedores de la Quejosa.

Como ha quedado establecido, el Sedicente Apoderado de Controladora sustentó su personalidad en la Supuesta RUA, misma en la que, conforme a sus propios antecedentes, se celebró como consecuencia de la ejecución extrajudicial de garantías prendarias llevada a cabo por CI Banco y Wilmington Trust.

CI Banco actuó, como también ha sido establecido, como **fiduciaria en el Fideicomiso de Garantía** constituido por Controladora (entre otras sociedades subsidiarias) para garantizar el cumplimiento de los Contratos de Financiamiento. Por su parte, Wilmington Trust actuó como supuesto "Agente de Garantías" de estos mismos Contratos de Financiamiento.

Como este Tribunal podrá desprender, ambas sociedades actuaron **en representación y beneficio de los Tenedores de Bonos, quienes <u>son los principales acreedores de la Quejosa</u>**, según fue demostrado ante el Juzgado Responsable.

El hecho de que ambas sociedades representaban a los acreedores de Controladora era una cuestión que estaba evidentemente probada ante el Juzgado Responsable, por lo que éste era plenamente consciente de sus representación y los intereses que pretendían ventilar ante el Concurso Mercantil.

No obstante lo anterior, el Juzgado Responsable dio trámite a la solicitud de desistimiento presentada por el Sedicente Apoderado de Controladora, **a sabiendas de que ésta era un acto realizado en representación y por los intereses de los acreedores de Controladora**.

Ahora bien, la jurisprudencia ha reconocido ampliamente que dada la trascendencia del desistimiento, éste **es un acto personalísimo**, por lo que únicamente puede ser realizado por aquella persona que instó la acción en un inicio:

> "**DESISTIMIENTO**. Es improcedente sobreseer en el juicio de amparo, por desistimiento hecho por persona que no lo promovió, y cuando dicho juicio debe resolver precisamente sobre la personalidad del que hace el desistimiento."[127]

> "**DESISTIMIENTO**. El desistimiento carece de validez, si no es ratificado por quien lo hace, o si no consta que personalmente presentó el escrito relativo."[128]

No obstante lo anterior, al acordar favorablemente la solicitud planteada por el Sedicente Apoderado de Controladora, el Juzgado Responsable pasó por alto que ésta estaba siendo

---

[127] Registro digital: 288340 SCJN;5a. Época;Semanario Judicial de la Federación ;TA
[128] Registro digital: 280561 SCJN;5a. Época;Semanario Judicial de la Federación ;TA



formulada por personas distintas a aquellas que instaron la acción concursal e interpretó, en consecuencia, que dicha solicitud podía plantearse incluso por los acreedores de la comerciante.

Aunque no lo formuló expresamente, es evidente que el Juzgado Responsable interpretó los alcances del artículo 28 de la Ley de Concursos Mercantiles para considerar que el desistimiento de la solicitud de concurso mercantil no debe ser planteada necesariamente por quien instó la acción concursal y es titular de dicho derecho, sino que puede ser planteada por cualquier otro representante, incluso si éste actúa en beneficio de los acreedores de la comerciante.

Evidentemente, dicha interpretación torna inconstitucional el artículo referido al violentar los derechos a la seguridad jurídica, acceso a la justicia, debido proceso y tutela judicial efectiva, pues permite entonces que cualquier persona decida la continuación de un procedimiento concursal o pueda desistirse de la misma, a pesar de que no ser aquella que instó dicha acción y que incluso represente intereses contrarios a los de la comerciante.

d. <u>El ejercicio de control de constitucionalidad que debe ejercerse sobre los Preceptos Reclamados</u>.

Previo a declarar la inconstitucionalidad del artículo 28 de la Ley de Concursos Mercantiles, la redacción de las normas requiere un ejercicio de control de constitucionalidad y convencionalidad *ex oficio*.

Los alcances, límites y consecuencias del ejercicio de dicho control ya fuero ampliamente desarrollados en el apartado "d" del concepto de violación inmediato anterior, por lo que para evitar repeticiones innecesarias se solicita a este Tribunal que tenga por reproducidas dichas consideraciones como si a la letra se insertasen.

Partiendo de dichas premisas, este Tribunal está llamado a emprender un ejercicio de interpretación conforme sobre los preceptos que se reclaman, de la forma que a continuación s expone:

Con la finalidad de respetar los derechos derechos a la seguridad jurídica, acceso a la justicia, debido proceso y tutela judicial efectiva, el desistimiento a que refiere el artículo 28 de la Ley de Concursos Mercantiles es u acto personalísimo, que únicamente puede ser efectuado por la misma persona que instó la acción concursal y no así por personas distintas que representen incluso intereses contrarios a los de la comerciante, con independencia de que aleguen legitimación para ello.

En consecuencia, será evidente para este Tribunal que el Auto Reclamado es inconstitucional, al permitir al Sedicente Apoderado de Controladora desistirse del Concurso Mercantil, por lo que este Tribunal deberá otorgar el amparo y protección solicitados para el efecto de revocar las resoluciones apuntadas.

CLYDE&CO

**DÉCIMO SÉPTIMO. INCONSTITUCIONALIDAD DE LOS ARTÍCULOS 18 Y 19 DE LA LEY DE CONCURSOS MERCANTILES, AL INTERPRETAR QUE EL INCIDENTE DE FALTA DE PERSONALIDAD NO ES DE PREVIO Y ESPECIAL PRONUNCIAMIENTO Y PUEDE DARSE TRÁMITE A PETICIONES FORMULADAS POR PERSONAS CUYA PERSONALIDAD FUE IMPUGNADA.**

<u>Síntesis.</u> Los artículos 18 y 19 de la Ley de Concursos Mercantiles son inconstitucionales toda vez que el Juzgado Responsable interpretó implícitamente que el incidente de falta de personalidad no es de previo y especial pronunciamiento, dando trámite a peticiones formuladas por el Sedicente Apoderado de Controladora, a pesar de que su personalidad fue impugnada.

<u>Desarrollo.</u>

a. <u>Principio de seguridad jurídica</u>

El contenido y alcance del principio de seguridad jurídica fue desarrollado anteriormente en el presente escrito, por lo que se tiene por reproducido como si a la letra se insertase.

b. <u>Debido proceso, tutela judicial efectiva y acceso a la justicia</u>

El contenido y alcance de estos derechos ya fue desarrollado en el apartado "a" del tercer concepto de violación, por lo que para evitar repeticiones innecesarias, se solicita que dichas consideraciones se tengan por reproducidas como si la letra se insertasen.

c. <u>Recurso efectivo</u>

Dentro de los derechos de acceso a la justicia y tutela judicial efectiva, se ha reconocido la importancia de la garantía de acceso a un "recurso efectivo", tutelado en los artículos 14 y 17 constitucionales.

Al respecto, la jurisprudencia ha reconocido dicha garantía como la posibilidad de que los particulares impugnen una decisión y esta sea decidida por un órgano que, a su vez, establezca si se ha incurrido o no en la violación a derechos fundamentales y provea lo necesario para remediarla:

> **"DERECHO HUMANO A UN RECURSO JUDICIAL EFECTIVO. NO PUEDEN CONSIDERARSE EFECTIVOS LOS RECURSOS QUE, POR LAS CONDICIONES GENERALES DEL PAÍS O POR LAS CIRCUNSTANCIAS PARTICULARES DE UN CASO CONCRETO, RESULTEN ILUSORIOS**. El citado derecho humano está estrechamente vinculado con el principio general relativo a la efectividad de los instrumentos o medios procesales destinados a garantizar los derechos humanos reconocidos por la Constitución Política de los Estados Unidos Mexicanos o los instrumentos internacionales en la materia. Ahora bien, la inexistencia de un recurso efectivo contra las violaciones a tales derechos constituye una transgresión al derecho humano a un recurso judicial efectivo. En este sentido, para que exista dicho recurso, no basta con que lo prevea la Constitución o la ley, o que sea formalmente

153



admisible, sino que se requiere que realmente sea idóneo para establecer si se ha incurrido en una violación a los derechos humanos y, en su caso, proveer lo necesario para remediarla. De manera que no pueden considerarse efectivos aquellos recursos que, por las condiciones generales del país o incluso por las circunstancias particulares de un caso concreto, resulten ilusorios, esto es, cuando su inutilidad se ha demostrado en la práctica, ya sea porque el Poder Judicial carece de la independencia necesaria para decidir con imparcialidad, faltan los medios para ejecutar las decisiones que se dictan, se deniega la justicia, se retarda injustificadamente la decisión o se impida al presunto lesionado acceder al recurso judicial."[129]

**"TUTELA JUDICIAL EFECTIVA. EL ACCESO A UN RECURSO EFECTIVO, SENCILLO Y RÁPIDO, ES CONSECUENCIA DE ESE DERECHO FUNDAMENTAL.** El artículo 1o. de la Constitución Política de los Estados Unidos Mexicanos establece que todas las personas gozan de los derechos humanos reconocidos en la Constitución y en los tratados internacionales de los que el Estado Mexicano sea parte, así como de las garantías para su protección. Por su parte, el artículo 17 constitucional prevé el derecho fundamental a la tutela judicial efectiva, que supone, en primer término, el acceso a la jurisdicción, es decir, que el gobernado pueda ser parte en un proceso judicial y, en segundo, el derecho que tiene a obtener una sentencia sobre el fondo de la cuestión planteada y su cabal ejecución, que deberá ser pronta, completa e imparcial, lo cual se encuentra íntimamente relacionado con el principio del debido proceso, contenido en el artículo 14 del señalado ordenamiento, por lo que para dar cabal cumplimiento al derecho inicialmente mencionado, debe otorgarse la oportunidad de defensa previamente a todo acto privativo de la libertad, propiedad, posesiones o derechos, lo que impone, además, que se cumplan las formalidades esenciales del procedimiento. Por tanto, el acceso a un recurso efectivo, sencillo y rápido, mediante el cual los Jueces y tribunales tutelen de manera eficaz el ejercicio de los derechos humanos de toda persona que lo solicite, sustanciados de conformidad con las reglas del debido proceso legal, es consecuencia del derecho fundamental a la tutela judicial efectiva, en tanto que asegura la obtención de justicia pronta, completa e imparcial, apegada a las exigencias formales que la propia Constitución consagra en beneficio de toda persona que se encuentre bajo su jurisdicción."[130]

En ese sentido, el artículo 25.1 de la Convención Americana sobre Derechos Humanos que establece, como derecho humano para todas las personas sujetas a la jurisdicción del Estado sin discriminación, el derecho a la protección judicial efectiva, al determinar que toda persona tiene derecho a un recurso sencillo y rápido o a cualquier otro recurso efectivo ante los jueces o tribunales competentes, que la ampare contra actos que violen sus derechos fundamentales reconocidos por la Constitución, la Ley o la Convención, aun cuando tal violación sea cometida por personas que actúen en ejercicio de sus funciones oficiales:

"Artículo 25. Protección Judicial

1. Toda persona tiene derecho a un recurso sencillo y rápido o a cualquier otro recurso efectivo ante los jueces o tribunales competentes, que la ampare contra actos que violen sus derechos fundamentales reconocidos por la Constitución, la ley o la presente Convención, aun cuando tal violación sea cometida por personas que actúen en ejercicio de sus funciones oficiales (…)"

En esos términos, la Corte Interamericana ha reiterado que no basta con que se prevea la existencia de recursos, **si estos no resultan efectivos para combatir la violación de los derechos protegidos por la Convención**. La garantía de un recurso efectivo "constituye uno

---

[129] Registro digital: 2002287 SCJN;10a. Época;Semanario Judicial de la Federación y su Gaceta;1a. CCLXXVII/2012 (10a.) ;TA

[130] Registro digital: 2002096 TCC;10a. Época;Semanario Judicial de la Federación y su Gaceta;II.8o.(I Región) 1 K (10a.) ;TA



de los pilares básicos, no sólo de la Convención Americana, sino del propio Estado de derecho en una sociedad democrática en el sentido de la Convención"[131].

Esta garantía de protección de los derechos de los individuos no supone sólo el resguardo directo a la persona vulnerada sino, además, a los familiares, quienes por los acontecimientos y circunstancias particulares de algunos casos, son los que ejercen la reclamación en el orden interno[132]. De esa manera, la Corte Interamericana de Derechos Humanos ha señalado que, **estos recursos tienen que ser idóneos y efectivos, capaces de lograr entre otros resultados, una reparación por las violaciones sufridas**[133].

d.    <u>La interpretación inconstitucional e implícita emprendida por el Juzgado Responsable.</u>

A través del Auto Reclamado, el Juzgado Responsable interpretó que el incidente de falta de personalidad no es de previo y especial pronunciamiento, por lo tanto, les dio trámite a peticiones formuladas por el Sedicente Apoderado de Controladora, a pesar de que su personalidad fue impugnada.

Al emitir el Auto Reclamado, el Juzgado Responsable ilegalmente resolvió acordar el desistimiento del concurso mercantil y dejó sin efectos el incidente de falta de personalidad, a pesar de que debía resolver este con anterioridad a aquél, en virtud de que este incidente es una resolución de cuestión previa o conexa a lo principal, el cual condiciona la emisión de una resolución definitiva o laudo.

Al resolver en este sentido, la interpretación realizada por el Juzgado Responsable torna inconstitucionales los artículos 18 y 19 de la Ley de Concursos Mercantiles, toda vez que considera que el incidente de falta de personalidad no es de previo y especial pronunciamiento.

Al respecto, los artículos anteriores establecen lo siguiente:

> "Artículo 18.- Las excepciones de naturaleza procesal, incluyendo las de incompetencia del juez y de falta de personalidad, se tramitarán en vía incidental y no suspenderán el procedimiento. Tampoco se suspenderá el procedimiento de declaración de concurso mercantil por la interposición y trámite de recursos en contra de las resoluciones que al efecto dicte el juez.
>
> El juez deberá desechar de plano las excepciones notoriamente improcedentes y podrá resolver las excepciones procesales en una o varias sentencias interlocutorias."

> "Artículo 19.- Si se declara procedente la excepción de falta de personalidad del actor o la objeción que se haya hecho a la personalidad de quien se haya ostentado como representante del Comerciante, el juez concederá un plazo no mayor de diez días para que se subsane, si los defectos del documento presentado por el representante fueren subsanables. De no subsanarse, cuando se trate de la legitimación al proceso del Comerciante, se continuará el juicio en rebeldía de éste. Si no se subsanara la del actor, el juez de inmediato sobreseerá el juicio."

---

[131] Corte IDH, Caso Cantos Vs. Argentina. Fondo, Reparaciones y Costas. Sentencia de 28 de noviembre de 2002. Serie C No. 97.

[132] Ver: Corte IDH, Caso 19 Comerciantes Vs. Colombia. Fondo, Reparaciones y Costas. Sentencia de 5 de julio de 2004. Serie C No. 109, párrafo 193.

[133] Ver: Corte IDH. Caso Castañeda Gutman Vs. Estados Unidos Mexicanos. Excepciones Preliminares, Fondo, Reparaciones y Costas. Sentencia de 6 de agosto de 2008. Serie C No. 184, Párrafo 78.



Ahora bien, el Juzgado Responsable omitió considerar lo relativo a la tramitación de los incidentes en materia de concursos mercantiles. En ese sentido, el artículo 267 de la Ley de Concursos Mercantiles prevé que los las cuestiones que se susciten durante la tramitación del concurso mercantil se tramitarán vía incidental.

Sin embargo, existe una excepción: **salvo que tengan prevista una substanciación especial.**

Es decir, si una cuestión tiene una substanciación especial ya sea en la propia ley o en su regulación supletoria, que es el Código de Comercio, entonces dicha cuestión se regirá conforme a la misma y no conforme a lo dispuesto en el citado artículo:

> "Artículo 267.- Para el conocimiento y decisión de las diversas cuestiones que se suscitaren durante la tramitación del concurso mercantil, que no tengan prevista una substanciación especial se plantearán, por el interesado, a través de la vía incidental ante el juez, observándose los siguientes trámites:"

No obstante lo anterior, a través del Auto Reclamado el Juzgado Responsable, apoyado implícitamente en los artículos 18 y 19 de la Ley de Concursos Mercantiles, resolvió que el incidente de falta de personalidad no era de previo y especial pronunciamiento.

En otras palabras, el Juzgado Responsable sostuvo que el incidente de falta de personalidad se tramita como cualquier otro incidente, de forma posterior y que no es objeto de previo y especial pronunciamiento, a pesar de la trascendencia que éste puede tener en el procedimiento.

Evidentemente, este Juzgado advertirá que dicha interpretación torna inconstitucionales los artículos 18 y 19 de la Ley de Concursos Mercantiles, que regulan la tramitación del incidente de falta de personalidad dentro de un procedimiento concursal, toda vez que vulnera los artículos 14, 16 y 17 de la Constitución Política de los Estados Unidos Mexicanos, así como los artículos 8 y 25 de la Convención Americana sobre Derechos Humanos.

Sobre este punto, este Juzgado debe considerar que la demostrada inconstitucionalidad de dichos preceptos al violar los derechos de acceso a la justicia y tutela judicial efectiva es un verdadero planteamiento constitucional en términos de las tesis de rubro "**REVISIÓN EN AMPARO DIRECTO. DENTRO DE LAS CUESTIONES PROPIAMENTE CONSTITUCIONALES MATERIA DE ESTE RECURSO SE ENCUENTRA LA INTERPRETACIÓN REALIZADA POR LA AUTORIDAD RESPONSABLE O EL TRIBUNAL COLEGIADO DE CIRCUITO DE LA NORMA GENERAL CUYA CONSTITUCIONALIDAD SE IMPUGNA, AL RESOLVER CUESTIONES DE LEGALIDAD**"[134] y "**REVISIÓN EN AMPARO DIRECTO. ES PROCEDENTE CUANDO UN TRIBUNAL COLEGIADO DE CIRCUITO, AL VALORAR LAS PRUEBAS EN UN JUICIO DE GUARDA Y CUSTODIA, REALIZA UNA**

---

[134] Registro digital: 2006486 SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;2a./J. 55/2014 (10a.) ;J; Publicación: viernes 23 de mayo de 2014 10:06 h

156



**INTERPRETACIÓN IMPLÍCITA DE LOS ARTÍCULOS 4o. Y 16, PÁRRAFOS NOVENO Y DÉCIMO DE LA CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS"**[135].

Como este Juzgado podrá desprender de las tesis citadas, para que exista una cuestión de constitucionalidad ni siquiera es necesario que la autoridad responsable cite de manera expresa los artículos que interpreta, sino que basta la existencia de una interpretación implícita que fije su sentido y alcance.

Por lo tanto, es claro que aun y cuando el Juzgado Responsable no haya citado expresamente los preceptos reclamados, como consecuencia de la interpretación implícita de los mismos en los términos desarrollado en el presente apartado, deben ser declarados inconstitucionales.

Lo anterior pues la interpretación del Juzgado Responsable importa que el incidente de falta de personalidad no sea de previo y especial pronunciamiento, sino que pueda resolverse posteriormente, o incluso con la sentencia definitiva.

Esto es, bajo la interpretación del Juzgado Responsable, aun cuando se cuestione la personalidad de los Sedicentes Apoderados, estos podrían seguir actuando y sus actuaciones podrían seguir surtiendo efectos en el procedimiento concursal, sin analizar dicho incidente, sino hasta en un momento posterior.

Ello implica que el incidente de falta de personalidad no tenga ningún efecto material pues permite que el órgano jurisdiccional resuelva y admita solicitudes planteadas por la persona cuya personalidad se desconoce, a pesar de que estas **nunca se convaliden ni puedan ser ratificadas dentro de juicio,** por lo que viola flagrantemente el derecho al debido proceso, a una tutela judicial efectiva y a un recurso efectivo e idóneo.

Como fue mencionado en el primer concepto de violación, el Juzgado Responsable debió haber analizado primero el incidente de falta de personalidad y posterior a ello, y con base en la sentencia interlocutoria respectiva, decidir sobre el desistimiento. Sin embargo, al interpretar conforme a los artículos impugnados, que el incidente se puede resolver en un momento posterior, torna inconstitucionales dichos preceptos, toda vez que no permite a la Quejosa hacer valer sus pretensiones dentro del procedimiento concursal.

Además, la interpretación de dichos artículos implica que se deja sin efectos materiales, es decir, se deja vacío o inútil el incidente de falta de personalidad toda vez que la persona cuya personalidad sea cuestionada pueda actuar y hacer que sus actuaciones produzcan efectos de gran importancia y trascendencia, sin que estos puedan declararse inválidos sino hasta un momento posterior.

---

[135] Registro digital: 162729 SCJN;9a. Época;Semanario Judicial de la Federación y su Gaceta;1a. XXXIV/2011 ;TA

CLYDE&CO

En el presente caso, ni siquiera fue posible declararlos inválidos en un momento posterior puesto que la actuación **nula** de los Sedicentes Apoderados tuvo como efecto **el desistimiento del concurso mercantil.**

En ese sentido, la regulación mercantil y la jurisprudencia en la materia ha establecido que el incidente o excepción de falta de personalidad es una cuestión previa o conexa que debe resolverse con anterioridad a cualquier otra cuestión puesto que condiciona la emisión de la sentencia definitiva.

Si bien dicho tema no ha sido desarrollado como cuestión principal en el nicho jurisprudencial los órganos jurisdiccionales, la Primera Sala de la Suprema Corte de Justicia de la Nación ha establecido mediante **jurisprudencia** de forma indirecta y expresa que, el incidente de falta de personalidad **constituye una "resolución de cuestión previa y conexa"**, porque incide directa e inmediatamente en la continuación del procedimiento.

Además, constituye un elemento esencial para el dictado de la sentencia, porque es uno de los presupuestos procesales que demuestran las atribuciones o facultades que tiene una persona para intervenir en juicio a hacer valer sus pretensiones.

Este criterio ha sido desarrollado por la jurisprudencia al estudiar la caducidad de la instancia mercantil, al establecer que dicho incidente, por su importancia y trascendencia, interrumpe el plazo para que opere aquélla, toda vez que es una **resolución de cuestión previa o conexa.**

Lo anterior con fundamento en la siguiente jurisprudencia de la Primera Sala de la Suprema Corte de Justicia de la Nación:

> **"CADUCIDAD DE LA INSTANCIA EN MATERIA MERCANTIL. LA EXCEPCIÓN DE FALTA DE PERSONALIDAD AL CONSTITUIR UNA RESOLUCIÓN DE CUESTIÓN PREVIA O CONEXA, INTERRUMPE EL PLAZO PARA QUE OPERE AQUÉLLA.** De conformidad con lo dispuesto por el artículo 1076, fracción VI, del Código de Comercio, la caducidad de la instancia en los asuntos mercantiles no opera, entre otros casos, cuando es necesario esperar una resolución de cuestión previa o conexa emitida por el juez del conocimiento o por otras autoridades. Ahora bien, **la excepción de falta de personalidad constituye una "resolución de cuestión previa o conexa",** en tanto que es un tópico de naturaleza significativa que incide directa e inmediatamente en la debida continuación del procedimiento y que constituye un elemento esencial para el dictado de la sentencia, pues se erige como un presupuesto procesal tendiente a la demostración de las atribuciones o facultades necesarias que tiene la persona o individuo interviniente, para acudir ante el órgano jurisdiccional a hacer valer sus pretensiones.** Por tanto, la excepción de falta de personalidad interrumpe el plazo para que opere la caducidad de la instancia en materia mercantil, pues se trata de una condicionante para el dictado de una sentencia válida."[136]

[Énfasis añadido]

Por ello, el incidente de falta de personalidad debe resolverse de forma previa a cualquier otra cuestión que surja de manera concomitante o similar a aquél. En ese sentido, los órganos

---

[136] Registro digital: 2017789 SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;1a./J. 33/2018 (10a.) ;J; Publicación: viernes 07 de septiembre de 2018 10:16 h



jurisdiccionales han desarrollado este criterio, sobre todo en materia laboral puesto que en ella se regula expresamente que el incidente de falta de personalidad sea de previo y especial pronunciamiento. Sin embargo, aunque se trate de materia laboral, el razonamiento es aplicable porque en cualquier procedimiento, este incidente debe resolverse de forma previa a cualquier otro, por las consecuencias que su resultado puede tener en el procedimiento.

Lo anterior con fundamento en la siguiente tesis aislada citada anteriormente en el presente escrito: **"INCOMPETENCIA Y FALTA DE PERSONALIDAD. SI AMBAS EXCEPCIONES SE OPONEN SIMULTÁNEAMENTE, DEBE RESOLVERSE PREVIAMENTE LA ÚLTIMA (LEGISLACIÓN DEL ESTADO DE MÉXICO).**

Por ello, el Juzgado Responsable debió haber resuelto en primer lugar, el incidente de falta de personalidad de las personas que promovían el desistimiento del procedimiento. Esto es debido a que, si la persona que se **desconocía la personalidad de la persona que <u>solicitaba el desistimiento de un concurso mercantil</u>**, la trascendencia de dicha resolución ameritaba estudiar primero la personalidad del solicitante y después, con base en lo resuelto en el incidente, estudiar la solicitud de desistimiento.

La razón de ello es que, si el Juzgado estudiaba primero el incidente de falta de personalidad de los Sedicentes Apoderados y resolvía la falta de personalidad de estos, entonces no permitiría la solicitud de desistimiento por tal razón y continuaría la tramitación del concurso mercantil. Por otro lado, si determinaba que se tenía por acreditada la personalidad, entonces podía estudiar la solicitud de desistimiento.

En cualquier caso, lo que no debió hacer el Juzgado Responsable, fue acordar el desistimiento y dejar sin materia el incidente de falta de personalidad puesto que ello deja vacío este medio de defensa y permite que la actuación de cualquier persona en un procedimiento, que aparente tener personalidad, tenga resultados trascendentales, al punto de tener por desistido al solicitante de un concurso mercantil, con las graves consecuencias que ello implica.

Entonces, resulta claro que, conforme al contenido de los derechos al debido proceso, acceso a la justicia, tutela judicial efectiva y recurso efectivo, así como a lo dispuesto en la Constitución Federal y la Convención Americana sobre Derechos Humanos, la interpretación de los artículos impugnados los torna inconstitucionales, toda vez que no permiten estudiar el incidente de falta de personalidad como uno de tramitación especial y previa a cualquier otra cuestión, debido al impacto y trascendencia que tiene para el desarrollo del procedimiento y su resultado.

e.     <u>El ejercicio de control de constitucionalidad que debe ejercerse sobre los Preceptos Reclamados</u>.

De lo expuesto hasta el momento, este Juzgado podrá desprender que la interpretación implícita del Juez Responsable deviene inconstitucional al contrariar el derecho a la seguridad jurídica, debido proceso y avveso a la justicia;



Lo anterior, pues el Juzgado Responsable **realizó una interpretación de los Preceptos Reclamados en el sentido de que es posible obviar el trámite de un incidente de falta de personalidad a pesar de éste es de previo y especial pronunciamiento, y reconocer plenos efectos a actos efectuados por aquellas personas cuya personalidad se cuestiona**.

Sin embargo, la interpretación implícita del Juez Responsable, demostrada inconstitucional, tornaría inválido los Preceptos Reclamados y, previo a declarar la inconstitucionalidad de dichos preceptos, la redacción de las normas requiere un ejercicio de control de constitucionalidad y convencionalidad *ex oficio*.

Los alcances, límites y consecuencias del ejercicio de dicho control ya fuero ampliamente desarrollados en el apartado "d" del décimo segundo concepto de violación inmediato anterior, por lo que para evitar repeticiones innecesarias se solicita a este Tribunal que tenga por reproducidas dichas consideraciones como si a la letra se insertasen.

Partiendo de dichas premisas, se solicita a este Juzgado de Distrito que interprete los Preceptos Reclamados conforme con la Constitución de la forma que a continuación se expone.

Al implicar la resolución sobre un presupuesto esencial del procedimiento, el incidente de falta de personalidad debe resolverse **de manera previa y de especial pronunciamiento**, sin que se pueda decidir sobre la terminación del procedimiento antes de su resolución.

Lo anterior, con mayor relevancia, cuando la resolución de dicho incidente impacta en la validez de un acto **que puede resonar trascendentalmente en el procedimiento**, como la solicitud de sobreseimiento.

Más aun, no es posible otorgar validez alguna a actos de una persona cuya personalidad está siendo cuestionada en juicio, **sin antes resolver el incidente de falta de personalidad**.

Por ende, este Juzgado debe conceder la protección constitucional solicitada para el efecto de que se interprete conforme los Preceptos Reclamados y, con base en dicha interpretación, valore que el Auto Reclamado violentan los derechos de seguridad jurídica y debido proceso.

## XI.    SOLICITUD DE SUSPENSIÓN.

Con fundamento en el artículo 107 fracción X y demás relativos de la Constitución Política de los Estados Unidos Mexicanos, así como los artículos 190 , 191 y demás relativos y aplicables de la Ley de Amparo, el otorgamiento de la suspensión del acto reclamado, para los efectos que se precisan a continuación:

### A.  Efectos para los cuales se solicita la supensión

La suspensión de los actos reclamados se solicita para los siguientes efectos:

160



1.      Que se paralicen todos los efectos y consecuencias del Auto Reclamado y del Auto de Confirmación de Levantamiento de Medidas Cautelares;

2.      Como consecuencia de lo solicitado en el punto "1", para que sigan surtiendo efectos las medidas cautelares decretadas por el Juzgado Responsable el 28 de enero de 2025;

3.      Como consecuencia de lo solicitado en el punto "1", se continúe reconociendo la personalidad ostentada por Martín Flores Merino en el Concurso Mercantil, así como se continúe reconociendo a las personas autorizadas para tal efecto actuar en dicho procedimiento;

4.      Como consecuencia de lo solicitado en el punto "1", se deje sin efectos la revocación de autorizados, domicilio procesal y consulta de expediente electrónico solicitada por el sedicente apoderado Rogelio Héctor Palacios Beltrán

5.      Como consecuencia de lo solicitado en el punto "1", no se haga efectivo el billete de depósito presentado por Controladora para el pago de los honorarios del Visitador

Cabe mencionar que este Juzgado está plenamente facultado para conceder la suspensión solicitada para efectos y consecuencias distintas que, a su consideración, tengan como consecuencia la protección de los derechos fundamentales de Dolphin.

Sirve de apoyo a lo anterior el siguiente criterio jurisprudencial:

> "**SUSPENSIÓN. EL JUZGADOR PUEDE CONCEDERLA PARA EFECTOS Y CONSECUENCIAS DISTINTAS DE LAS PROPUESTAS POR EL QUEJOSO, PERO NO POR ACTOS NO RECLAMADOS EN LA DEMANDA**. De los artículos 124, último párrafo, de la Ley de Amparo abrogada y 147, primer párrafo, de la vigente, se advierte que en los casos en que la suspensión sea procedente, el órgano jurisdiccional deberá fijar la situación en que habrán de quedar las cosas y tomará las medidas pertinentes para conservar la materia del amparo hasta la terminación del juicio, lo cual significa que el juzgador está legalmente facultado para precisar, conforme a su prudente arbitrio, las consecuencias y/o estatus legal en que deban quedar las cosas a partir de que conceda la medida cautelar, sin importar que para ello se aparte de los efectos propuestos por el quejoso en su escrito inicial, ya sea para maximizarlos o ajustarlos a las necesidades del caso concreto, pues se trata de conservar la materia del juicio de amparo y no de limitarse mecánicamente a proveer la suspensión en los términos estrictos planteados por el quejoso, sobre todo en los casos en que sea evidente que si se atendiera en forma puntual a su solicitud, no se lograría el objetivo integral de la suspensión. Ahora bien, la atribución depositada en el órgano de amparo para modular fundada y motivadamente las implicaciones futuras del otorgamiento de la suspensión no llega al extremo de poder ordenar la paralización de actos no reclamados en la demanda, porque si no se cuestionó su constitucionalidad, es obvio que no constituyen la materia del juicio, la cual debe mantenerse intacta, a fin de preservar los bienes o derechos cuya tutela se demande en el juicio de amparo. [137]

En este supuesto, este Juzgado deberá conceder la suspensión para evitar y/o paralizar los efectos y consecuencias del Auto Reclamado a efecto de que no se materialice el desistimiento formulado por el Sedicente Apoderado de Controladora y no se levanten las Medidas Cautelares.

---

[137] Localización: [J]; 10a. Época; Pleno; Gaceta S.J.F.; Libro 63, Febrero de 2019; Tomo I; Pág. 14. P./J. 4/2019 (10a.).

CLYDE&CO

Adicionalmente, todo lo expuesto en este apartado debe interpretarse de conformidad con lo dispuesto en el tercer párrafo del artículo 17 de la Constitución General de la República, específicamente, respecto del principio de mayor beneficio frente a formalismos procedimentales y la preferencia de la solución de fondo de los conflictos.

Resulta aplicable por analogía el criterio del Segundo Tribunal Colegiado de Circuito del Centro Auxiliar de la Cuarta Región contenido en la tesis de rubro y texto siguientes:

> **"PRINCIPIO DE MAYOR BENEFICIO FRENTE A FORMALISMOS PROCEDIMENTALES Y SOLUCIONES DE FONDO DE LOS CONFLICTOS. ÉSTAS DEBEN PRIVILEGIARSE FRENTE A AQUÉLLOS, SIEMPRE QUE NO SE AFECTE LA IGUALDAD DE LAS PARTES, EL DEBIDO PROCESO U OTROS DERECHOS.** Durante mucho tiempo fue motivo de crítica para los tribunales de amparo que las sentencias protectoras se concedieran por aspectos formales o procedimentales y no por temas de fondo; lo cual motivó que mediante la expedición de la nueva Ley de Amparo (publicada en el Diario Oficial de la Federación el dos de abril de dos mil trece), se estableciera en su artículo 189 que los órganos jurisdiccionales de amparo procederían al estudio de los conceptos de violación atendiendo a su prelación lógica, pero privilegiando en todo momento el principio de mayor beneficio; y fue en ese contexto que por reforma al precepto 17 de la Constitución General de la República publicada en el Diario Oficial de la Federación el 15 de septiembre de 2017, se adicionó a dicho dispositivo un tercer párrafo, en el que se puntualizó "Siempre que no se afecte la igualdad entre las partes, el debido proceso u otros derechos en los juicios o procedimientos seguidos en forma de juicio, las autoridades deberán privilegiar la solución del conflicto sobre los formalismos procedimentales.". Por tanto, acorde con esa aspiración social y en estricto acatamiento a los artículos citados, en los juicios o en los procedimientos relativos, todas las autoridades deben <u>privilegiar la solución del conflicto sobre los formalismos procedimentales</u>, con la única limitante de que no se afecte la igualdad de las partes, el debido proceso u otros derechos."[138]

Asimismo, es necesario dejar en claro que la suspensión en el juicio de amparo no solo busca que una determinada situación permanezca incólume, ni únicamente conservar la materia del amparo, sino que a través de esta medida este Juzgado deberá buscar reestablecer a la Quejosa en el goce del derecho violado; al respecto, el artículo 147 de la Ley de Amparo señala:

> Artículo 147. En los casos en que la suspensión sea procedente, el órgano jurisdiccional deberá fijar la situación en que habrán de quedar las cosas y tomará las medidas pertinentes para conservar la materia del amparo hasta la terminación del juicio, pudiendo establecer condiciones de cuyo cumplimiento dependa el que la medida suspensional siga surtiendo efectos.
>
> Atendiendo a la naturaleza del acto reclamado, ordenará que las cosas se mantengan en el estado que guarden y, <u>de ser jurídica y materialmente posible, restablecerá provisionalmente al quejoso en el goce del derecho violado mientras se dicta sentencia ejecutoria en el juicio de amparo.</u>
>
> El órgano jurisdiccional tomará las medidas que estime necesarias para evitar que se defrauden los derechos de los menores o incapaces, en tanto se dicte sentencia definitiva en el juicio de amparo.

---

[138] Época: Décima Época Registro: 2016171 Instancia: Tribunales Colegiados de Circuito Tipo de Tesis: Aislada Fuente: Gaceta del Semanario Judicial de la Federación Libro 51, Febrero de 2018, Tomo III Materia(s): Constitucional, Común Tesis: (IV Región)2o.13 K (10a.) Página: 1524

CLYDE&CO

Lo anterior se traduce en que el Juez de Amparo debe buscar velar por la protección de los derechos fundamentales de la Quejosa; en el caso específico, entra en juego un derecho humano de especial relevancia: el derecho a la tutela cautelar efectiva.

El derecho a la tutela cautelar efectiva fue reconocido en la Observación General N° 31 (emitida el 26 de mayo del 2004), del Comité de Derechos Humanos, como se puede desprender a continuación:

> "(…) La obligación consignada en el párrafo 2 del artículo 2 de que se adopten medidas para hacer efectivos los derechos reconocidos en el Pacto no admite reservas y es inmediata. No se puede justificar el i n cumplimiento de esta obligación haciendo referencia a consideraciones de carácter político, social, cultural o económico dentro del Estado.
>
> En el párrafo 3 del artículo 2 se dispone que, además de proteger eficazmente los derechos reconocidos en el Pacto, los Estados Parte habrán de garantizar que todas las personas dispongan de recursos accesibles y efectivos para reivindicar esos derechos.
>
> Esos recursos se deben adaptar adecuadamente para tener en cuenta la vulnerabilidad especial de ciertas clases de personas, en particular los niños. El Comité atribuye importancia a que los Estados Parte establezcan en el derecho interno mecanismos judiciales y administrativos adecuados para conocer de las quejas sobre violaciones de los derechos. El Comité toma nota de que el poder judicial puede garantizar el disfrute de los derechos reconocidos en el Pacto de distintas maneras, en especial mediante la aplicación directa del Pacto, la aplicación de disposiciones constitucionales u otras disposiciones legislativas similares o el efecto de la interpretación del Pacto en la aplicación de la legislación nacional. Se requieren en especial mecanismos administrativos que den cumplimiento a la obligación general de investigar las denuncias de violación de modo rápido, detallado y efectivo por organismos independientes e imparciales. Las instituciones nacionales de derechos humanos que cuenten con las facultades pertinentes pueden coadyuvar a tal fin. El hecho de que un Estado Parte no investigue las denuncias de violación puede ser de por sí una vulneración del Pacto. La cesación de la violación constituye un elemento indispensable del derecho a obtener un recurso efectivo. (…)
>
> **El Comité observa, además, que en determinadas circunstancias el derecho a hacer valer un recurso efectivo puede exigir que los <u>Estados Parte adopten y apliquen medidas provisionales para evitar la repetición de las violaciones y reparar cuanto antes cualquier daño que esas violaciones puedan haber causado.</u> Aunque los regímenes jurídicos de los Estados Parte estén formalmente dotados del recurso adecuado, siguen ocurriendo violaciones de los derechos reconocidos en el Pacto. Cabe <u>suponer que ello es atribuible al hecho de que los recursos no funcionan con efectividad en la práctica</u>. Por consiguiente, se solicita a los Estados Parte que en** sus informes periódicos señalen los obstáculos que se opongan a la efectividad de los recursos existentes.

Por otra parte, la Comisión Interamericana de Derechos Humanos ha reconocido la existencia de este derecho, como se puede apreciar de su publicación intitulada "El acceso a la justicia como garantía de los Derechos Económicos, Sociales y Culturales.  estudio de los estándares fijados por el Sistema Interamericano de Derechos Humanos", en la cual se establece lo siguiente:

> 261.    El SIDH ha reconocido que la noción de "efectividad" que surge del artículo 25 de la CADH, requiere que las herramientas judiciales disponibles, incluyan medidas procesales como las medidas precautorias, provisionales o cautelares y, en general, recursos judiciales sencillos y rápidos para la tutela de derechos, con miras a impedir que las violaciones se prolonguen en el tiempo. Lo anterior, aún cuando la determinación acerca del fondo de la cuestión, requiera de un período temporal más extenso. […]
>
>  De esta manera, en virtud de la especial naturaleza de estos recursos y de la necesidad y urgencia con la que deben actuar, la CIDH puntualiza ciertas características básicas que éstos deben presentar a fin de ser considerados "idóneos": a) que se trate de



recursos sencillos, urgentes, informales, accesibles y tramitados por órganos independientes; b) que se cuente con la posibilidad de acceder a instancias judiciales federales o nacionales ante la sospecha de parcialidad en la actuación de los órganos locales; c) que se garantice una legitimación activa amplia; d) que puedan tramitarse como recursos individuales e igualmente como acciones cautelares colectivas (para proteger a un grupo determinado o determinable conforme a ciertos parámetros, afectado o bajo situación de riesgo inminente); y e) que se prevea la aplicación de medidas de protección en consulta con los afectados. [139]

Por otra parte, en el ámbito nacional, también se ha reconocido el derecho a la tutela judicial efectiva, como se puede desprender de la siguiente tesis:

> **"SUSPENSIÓN EN EL AMPARO. PROCEDE CONCEDERLA, A PESAR DE QUE PUEDA ADELANTAR LOS EFECTOS DE LA DECISIÓN FINAL, SI ES NECESARIO PARA ASEGURAR UNA TUTELA CAUTELAR EFECTIVA QUE PRESERVE LA MATERIA DEL JUICIO Y LA CABAL RESTITUCIÓN DEL AFECTADO EN SUS DERECHOS.** El criterio de que la suspensión no debe otorgar efectos restitutorios o que anticipen la decisión final, por ser propios de la sentencia de fondo, debe superarse en aras de ser congruentes con la finalidad constitucional de preservar la materia del juicio y evitar la ejecución de actos de imposible o difícil reparación, siempre y cuando exista interés suspensional del solicitante y materia para la suspensión, para lo que es menester considerar la naturaleza del acto reclamado. Consecuentemente, procede conceder la suspensión a pesar de que pueda adelantar los efectos de la decisión final, pues ello sería en forma provisional, si es necesario para asegurar una tutela cautelar efectiva que preserve la materia del juicio y la cabal restitución del afectado en sus derechos; es decir, cuando de no otorgarse, la restitución que, en su caso, se ordene en la resolución definitiva, pueda ser ilusoria.[140]

La tesis anterior es de suma relevancia en el presente caso, pues deja entrever la obligación que tiene el Juez debe velar por la tutela cautelar efectiva y, por lo tanto, se le permite adelantarse ciertos efectos de la decisión final del amparo con la finalidad de restituir a la parte quejosa en los derechos violentados.

Establecido lo anterior, resulta evidente para este Juzgado que cualquier interpretación realizada a efecto de resolver el otorgamiento de la medida suspensional solicitada debe ser en aras de proteger el derecho de tutelar cautelar efectiva de la Quejosa.

## B. Cumplimiento de requisitos para procedencia de la suspensión.

Ahora bien, aunque el Título Segundo, Capítulo II, Sección Cuarta de la Ley de Amparo no regula mayores requisitos para la concesión de la medida suspensional en amparo directo, se ha reconocido jurisprudencialmente que deben analizarse los mismos requisitos que en el caso de la suspensión en el juicio de amparo indirecto, al respecto:

> **"SUSPENSIÓN EN AMPARO DIRECTO. SU ANÁLISIS, AL MOMENTO DE PROVEER SOBRE ELLA, SE INTEGRA DE DIVERSAS FASES ORDENADAS Y CONCATENADAS QUE, DADA SU PRELACIÓN Y ESTRECHA RELACIÓN, NO PUEDEN OMITIRSE NI ALTERARSE EN EL ORDEN DE ESTUDIO POR LA AUTORIDAD QUE DEBE PRONUNCIARSE.** De la interpretación sistemática de la fracción X del artículo 107 de la Constitución General y de los preceptos 5o., fracción I, 128, 134, 140, 146, fracción I, 150 y 190, último párrafo, de la Ley de Amparo, se colige que al análisis ponderado

---

[139] Ello es accesible en el siguiente hipervínculo: https://www.cidh.oas.org/countryrep/AccesoDESC07sp/Accesodescv.sp.htm

[140] Localización: [J]; 9a. Época; T.C.C.; S.J.F. y su Gaceta; Tomo XXXIV, Julio de 2011; Pág. 1919. I.4o.A. J/90.

CLYDE&CO

que debe realizarse al momento de proveer sobre la suspensión le subyace un proceso lógico compuesto de diversas fases ordenadas y concatenadas que, dada su prelación y estrecha relación, no pueden ser omitidas ni alteradas en el orden de estudio por la autoridad que debe pronunciarse respecto de la medida cautelar, independientemente de la vía –directa o indirecta– en que se propongan. Ahora, si bien, dichas fases se encuentran plenamente desarrolladas en el marco jurídico que rige al incidente de suspensión en el juicio de amparo indirecto, el examen sistemático de la norma refleja su aplicabilidad, aunque con los debidos matices, al amparo uniinstancial. Así, como primera fase, corresponde fijar el acto reclamado y corroborar su certeza, pues los requisitos naturales como legales inherentes a la concesión giran en torno a su precisión y existencia; seguidamente en segundo lugar, debe atenderse a la naturaleza del acto, sus efectos y contrastarse con la finalidad para la que es solicitada la suspensión, al grado de advertir si el mismo es factible de ser suspendido. Enseguida, en tercer lugar, es menester verificar los presupuestos legales; esto es, la solicitud de parte agraviada, estrechamente relacionada con el interés suspensional, sin que todo ello derive en una afectación al interés social ni a las reglas del orden público. Es en este apartado, donde para valorar el significado de que se afecta o no el orden público y el interés social, se pondera la apariencia del buen derecho y el peligro en la demora. Finalmente, en cuarto lugar, si todos los elementos anteriores se encuentran satisfechos y resulta necesario (pues no siempre lo es), la autoridad jurisdiccional debe, a la luz de los efectos de la medida cautelar, ponderar, las medidas de efectividad a las que debe estar sujeta la suspensión del acto reclamado (garantía y, en su caso, medidas de seguridad), pues la ausencia de éstas, quitarían vigencia a la determinación encaminada, no sólo a preservar la materia del amparo, sino a impedir la posible afectación de las prerrogativas fundamentales del solicitante, ello en términos del artículo <u>136, segundo párrafo</u>, de la ley citada.[141]

En ese orden de ideas, a continuación se demuestra a este Tribunal el cumplimiento de todos y cada uno de los requisitos para concesión de la medida suspensional.

La sección tercera, primera parte, de la Ley de Amparo, establece, en lo que interesa, lo siguiente:

> Sección Tercera
> Suspensión del Acto Reclamado
> Primera Parte
> Reglas Generales
>
> Artículo 125. La suspensión del acto reclamado se decretará de oficio o a petición del quejoso.
>
> Artículo 128. Con excepción de los casos en que proceda de oficio, la suspensión se decretará, en todas las materias salvo las señaladas en el último párrafo de este artículo, siempre que concurran los requisitos siguientes:
>
> I. Que la solicite el quejoso; y
>
> II. Que no se siga perjuicio al interés social ni se contravengan disposiciones de orden público.
>
> La suspensión se tramitará en incidente por separado y por duplicado.
> Asimismo, no serán objeto de suspensión las órdenes o medidas de protección dictadas en términos de la legislación aplicable por alguna autoridad administrativa o jurisdiccional para salvaguardar la seguridad o integridad de una persona y la ejecución de una técnica de investigación o medida cautelar concedida por autoridad judicial (…)

Conforme a los artículos 107, fracción X, de la Constitución Política de los Estados Unidos Mexicanos; 125, 128 y 131 al 158 de la Ley de Amparo, en el análisis de la suspensión deben distinguirse diversos temas de estudio escalonado como son:

---

[141] TCC;10a. Época;Gaceta del Semanario Judicial de la Federación;I.9o.C.52 C (10a.) ;TA; Publicación: viernes 29 de enero de 2021 10:30 h



i) los requisitos de su procedencia que, en su conjunto, tendrán como resultado determinar si la medida cautelar debe o no concederse;

ii) los efectos de dicha medida, que consisten en la precisión detallada de lo que las autoridades deben hacer o abstenerse de realizar;

iii) las medidas o garantías que, en su caso, se pidan al quejoso para que los efectos de la suspensión continúen; y,

iv) las previsiones que el juzgador tome para que no se abuse de los efectos de la suspensión.

Respecto al primer tema, fuera de los casos en que proceda de oficio o de las regulaciones especiales, podrá otorgarse la suspensión de los actos reclamados, siempre y cuando se cumplan los siguientes requisitos de procedencia en el orden que se señalan:

1. La petición de parte;

2. La existencia del acto reclamado, que en el caso de la suspensión provisional se presume con base en las manifestaciones o afirmaciones que el quejoso formule bajo protesta de decir verdad en su demanda, y para la definitiva requiere que se haya aceptado su existencia, o bien, prueba de ella;

3. La naturaleza del acto reclamado, esto es, que el acto reclamado sea susceptible de ser suspendido conforme a su naturaleza, análisis en el cual debe tomarse en cuenta la clasificación que la Suprema Corte de Justicia de la Nación ha formulado respecto de los que admiten suspensión y los que no;

4. El quejoso debe resentir una afectación a su interés jurídico o legítimo, aspecto que debe estar acreditado indiciariamente para efectos de la suspensión provisional y, en un grado probatorio mayor, para la suspensión definitiva; y,

5. La ponderación entre la apariencia del buen derecho y el interés social o las disposiciones de orden público en los términos desarrollados por la Suprema Corte de Justicia de la Nación.

Es aplicable la jurisprudencia del Tercer Tribunal Colegiado del Vigésimo Séptimo Circuito contenido en la tesis de rubro "**SUSPENSIÓN A PETICIÓN DE PARTE. REQUISITOS DE PROCEDENCIA CONFORME A LA LEY DE AMPARO, VIGENTE A PARTIR DEL 3 DE ABRIL DE 2013**".[142] A continuación se demuestra el cumplimiento de todos los requisitos:

---

[142] Época: Décima Época Registro: 2007358 Instancia: Tribunales Colegiados de Circuito Tipo de Tesis: Jurisprudencia Fuente: Gaceta del Semanario Judicial de la Federación Libro 10, Septiembre de 2014, Tomo III Materia(s): Común Tesis: XXVII.3o. J/2 (10a.) Página: 2347

CLYDE&CO

a.    <u>La petición de parte.</u>

En el presente caso, se cumple con el primer requisito al comparecer la Quejosa a través de la pesente solicitando, de manera expresa, la concesión de la medida suspensional en el presente juicio de amparo a efecto de salvaguardar los derechos humanos violentados por las autoridades responsables.

b.    <u>Existencia de los actos reclamados.</u>

La existencia del acto reclamado es clara, pues se trata del dictado del Auto Reclamado, mismo que además de acompañarse en copia simple a la presente demanda, constituye un hecho notorio para este Juzgado.

c.    <u>Naturaleza de los actos reclamados, es decir, que sean susceptibles de ser suspendidos.</u>

El tercer requisito exige del juzgador que analice si el acto reclamado es susceptible de ser suspendido, es decir, si el otorgamiento de una medida suspensional puede llegar a tener como efecto la salvaguardar de los derechos fundamentales de la Quejosa durante la tramitación del juicio de amparo o, en su defecto, dicha medida sería inútil para lograr dicho propósito.

Es conveniente que, sin obstar la facultad de este Juzgado de otorgar la medida cautelar para los efectos que estime convenientes, se analicen cada uno de los efectos propuestos y, con ello, confirmar que los actos reclamados son susceptibles de ser suspendidos.

En el presente caso, el acto reclamado consiste en el Auto Reclamado, siendo que la suspensión se solicita a efecto de evitar su ejecución en perjuicio de Dolphin, específicamente para que se abstenga de ejecutar el levantamiento de las Medidas Cautelares.

En ese orden de ideas, la ejecución del Auto Reclamado constituye un actuar positivo o activo de la autoridad, es decir, implican una conducta de hacer. Asimismo, se trata de un acto de ejecución continuada o inacabada, es decir, que se trata de un acto inconcuso que requiere de una serie de conductas desplegadas por la autoridad responsable para concretarse.

En consecuencia, al tratarse de un acto de ejecución inacabada es claro que es susceptible de suspensión, toda vez que el otorgamiento de la medida cautelar solicitada tendría como consecuencia impedir que se siga materializando la ejecución del acto, lo que se traduce en que se abstengan de ejecutar el Auto Reclamado.

Aunado a lo anterior, la jurisprudencia ha reconocido plenamente la procedencia de la suspensión para evitar el levantamiento de medidas cautelares; al respecto, son relevantes los siguientes criterios:

"**PROVIDENCIAS PRECAUTORIAS. SU LEVANTAMIENTO OCASIONA UN PERJUICIO DE DIFÍCIL REPARACIÓN PARA EFECTOS DE LA SUSPENSIÓN EN EL AMPARO, PUES CON ELLO SE DEJAN DE ASEGURAR LOS INTERESES DE QUIEN PROMOVIÓ LA MEDIDA CAUTELAR (LEGISLACIÓN DEL ESTADO DE PUEBLA).** Tomando en



consideración que de la interpretación de los artículos 523, 526 y 528 al 535 del Código de Procedimientos Civiles para el Estado de Puebla, en vigencia, las providencias precautorias consisten en asegurar una situación de hecho o de derecho, con anterioridad o posterioridad a la interposición de la demanda; ante lo cual el derecho del promovente a que se decrete la medida precautoria es adjetivo y le permite asegurar, para el caso de que obtenga sentencia favorable, el efectivo cumplimiento de la obligación que exigirá el deudor, por ende, la medida precautoria no es constitutiva de ningún derecho adicional o ajeno al que será motivo de la controversia en la que deberá decidirse sobre la procedencia de la acción. Que las providencias precautorias tienen por objeto impedir que el deudor eluda el cumplimiento de sus obligaciones o el resultado del juicio que se ha promovido o se intenta promover en su contra y en ellas no se discuten los derechos que en el juicio correspondiente pueda tener el actor, sino simplemente se asegura el resultado de ese juicio, resultado sobre el cual no se prejuzga. Entonces dada su naturaleza y finalidad generales debe considerarse que su levantamiento ocasiona un perjuicio de difícil reparación para efectos de la suspensión en el amparo, pues con ello se dejan de asegurar los intereses de quien promovió la medida cautelar, a pesar de que su propósito es precisamente preservarlo durante el tiempo estrictamente necesario para que sea reconocida la obligación exigida por sentencia ejecutoriada, impidiendo que el deudor eluda el cumplimiento de sus obligaciones o el resultado del juicio, concluyéndose que en este caso sí se da el requisito previsto en el artículo 124, fracción III, de la Ley de Amparo."[143]

"**EMBARGO. PROCEDE OTORGAR LA SUSPENSIÓN DE LOS ACTOS RECLAMADOS, CUANDO ÉSTOS CONSISTEN EN EL LEVANTAMIENTO DEL TRABADO EN EL JUICIO DE ORIGEN, AL NO TRATARSE DE ACTOS CONSUMADOS NI TENER EFECTOS RESTITUTORIOS LA MEDIDA CAUTELAR**. Si se reclama en un juicio de garantías la resolución que ordena el levantamiento de un embargo trabado dentro del juicio de origen, no puede considerarse que dicho acto haya quedado consumado de forma irreparable, ni mucho menos que la medida cautelar solicitada tenga efectos restitutorios, toda vez que los alcances de la medida suspensional son los de paralizar los actos de ejecución que derivarían de la resolución reclamada, es decir, impedir que se tilde la inscripción del que aparece en el Registro Público de la Propiedad. Además, tampoco puede estimarse que con su concesión se darían efectos restitutorios en favor de la promovente del amparo, ya que la finalidad de la suspensión es la de mantener las cosas en el estado que guardan al momento de solicitarla, esto es, por un lado, la de no liberar provisionalmente el inmueble objeto del secuestro y por otro, la subsistencia de la garantía que la quejosa tiene en su favor hasta en tanto se resuelva sobre la suspensión definitiva de los actos reclamados, aspectos que no consisten, como se dijo, en dar efectos restitutorios, propios de la sentencia de fondo."[144]

Sin que deba pasar desapercibido que la jurisprudencia ha reconocido la plena procedencia de la suspensión a pesar de que ésta tenga efectos restitutorios, en congruencia con lo ordenado por el artículo 147 de la Ley de Amparo, que dispone:

"Artículo 147. En los casos en que la suspensión sea procedente, el órgano jurisdiccional deberá fijar la situación en que habrán de quedar las cosas y tomará las medidas pertinentes para conservar la materia del amparo hasta la terminación del juicio, pudiendo establecer condiciones de cuyo cumplimiento dependa el que la medida suspensional siga surtiendo efectos.

Atendiendo a la naturaleza del acto reclamado, ordenará que las cosas se mantengan en el estado que guarden y, de ser jurídica y materialmente posible, **reestablecerá provisionalmente al quejoso en el goce del derecho violado mientras se dicta sentencia ejecutoria en el juicio de amparo**".

Consecuentemente, es constitucionalmente admisible y deseable que este Juzgado conceda la suspensión con efectos provisionalmente restitutorios. Incluso, **la Suprema Corte de Justicia**

---

[143] Registro digital: 167413 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;VI.2o.C.667 C ;TA
[144] Registro digital: 175094 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;XVI.2o.C.25 C ;TA

de la Nación incluso <u>ha denominado "amparo provisional" a esta medida cautelar</u> <u>reconociendo la extensión de la protección de esta medida</u>. Esto ha sido reconocido en jurisprudencia firme de la Suprema Corte de Justicia de la Nación como se puede desprender de la siguiente tesis jurisprudencial aplicable por analogía al caso:

> "**SUSPENSIÓN. LA NATURALEZA OMISIVA DEL ACTO RECLAMADO NO IMPIDE SU PROCEDENCIA**. Los artículos 107, fracción X, primer párrafo, de la Constitución y 147 de la Ley de Amparo vigente, dotan a la suspensión de un genuino carácter de medida cautelar, cuya finalidad consiste en conservar la materia de la controversia y evitar que las personas sufran una afectación a su esfera jurídica mientras se resuelve el fondo del asunto, ya sea con medidas conservativas o de tutela anticipada (efectos restitutorios), para lo cual es necesario analizar: (i) la apariencia del buen derecho; (ii) las posibles afectaciones al interés social; y (iii) la posibilidad jurídica y material de otorgar la medida. En ese sentido, la naturaleza de los actos, ya sea positiva, declarativa o negativa, no representa un factor que determine en automático la concesión o negativa de la medida cautelar, pues la locución "atendiendo a la naturaleza del acto reclamado", que refiere el precepto de la Ley de Amparo, debe analizarse en función de las consecuencias que caso a caso pueden producir los actos reclamados, lo que a su vez es determinante para decidir si el efecto de la suspensión debe consistir en el mantenimiento de las cosas en el estado que se encuentran o debe restituirse provisionalmente a la persona en el goce del derecho violado. En estos términos, la naturaleza omisiva de los actos reclamados es relevante para determinar el contenido que adoptará la suspensión, pero no para determinar si la medida cautelar procede o no. En efecto, dado que el amparo provisional que se pretende con la suspensión definitiva permite que la persona alcance transitoriamente un beneficio que, al final del día, puede confirmarse o revocarse a través de la sentencia principal, sin prejuzgar sobre lo ocurrido antes del juicio de amparo ni lo que ocurrirá después, pues lo importante para que dicha medida cautelar sea material y jurídicamente posible radica en que los efectos suspensorios puedan actualizarse momento a momento, de modo que la suspensión no coincida exactamente, agote o deje sin materia una eventual sentencia estimatoria de amparo, y todo esto va más allá del tipo de medidas que deben dictarse en caso de que proceda conforme a lo anterior."[145]

Asimismo, resulta relevante y aplicable el siguiente criterio:

> "**SUSPENSIÓN EN EL AMPARO. PROCEDE CONCEDERLA, A PESAR DE QUE PUEDA ADELANTAR LOS EFECTOS DE LA DECISIÓN FINAL, SI ES NECESARIO PARA ASEGURAR UNA TUTELA CAUTELAR EFECTIVA QUE PRESERVE LA MATERIA DEL JUICIO Y LA CABAL RESTITUCIÓN DEL AFECTADO EN SUS DERECHOS**. El criterio de que la suspensión no debe otorgar efectos restitutorios o que anticipen la decisión final, por ser propios de la sentencia de fondo, debe superarse en aras de ser congruentes con la finalidad constitucional de preservar la materia del juicio y evitar la ejecución de actos de imposible o difícil reparación, siempre y cuando exista interés suspensional del solicitante y materia para la suspensión, para lo que es menester considerar la naturaleza del acto reclamado. Consecuentemente, procede conceder la suspensión a pesar de que pueda adelantar los efectos de la decisión final, pues ello sería en forma provisional, si es necesario para asegurar una tutela cautelar efectiva que preserve la materia del juicio y la cabal restitución del afectado en sus derechos; es decir, cuando de no otorgarse, la restitución que, en su caso, se ordene en la resolución definitiva, pueda ser ilusoria."[146]

En el caso en que se considere que la suspensión solicitada tiene efectos restitutorios, ello no impide su plena procedencia al cumplirse todos los requisitos necesarios conforme éstos han sido reconocidos por la Suprema Corte de Justicia de la Nación en la jurisprudencia 2ª J. 22/2023, en la que concluyó que la concesión de la suspensión siempre debe proteger los derechos que

---

[145] Época: Décima Época Registro: 2021263 Instancia: Primera Sala Tipo de Tesis: Jurisprudencia Fuente: Semanario Judicial de la Federación Publicación: viernes 06 de diciembre de 2019 10:18 h Materia(s): (Común) Tesis: 1a./J. 70/2019 (10a.)

[146] Registro digital: 161447  TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;I.4o.A. J/90 ;J

CLYDE&CO

los Quejosos considere afectados, aunado que su tutela debe equipararse con la relevancia de conservar el juicio principal.

La Segunda Sala sostuvo que la suspensión del acto reclamado y el fondo del asunto tienen la misma importancia para tutelar derechos humanos y que no es viable negar la suspensión so pretexto de preservar la materia de amparo, o bien, por considerar que eso es propio de la sentencia de amparo, como indebidamente sostuvo el Juez:

"97.    La intelección realizada al precepto nos permite aseverar que la razón que subyace detrás de una concesión de amparo es una acción protectora de un derecho afectado por una autoridad; consecuentemente, el entendimiento del enunciado "conservar la materia del amparo hasta la terminación del juicio" <u>debe contextualizarse en que la concesión de la suspensión significa que su finalidad es que el órgano jurisdiccional esté en aptitud de proteger el derecho que los Quejosos considera afectado.</u>
98.    En un sentido opuesto, es incorrecto considerar que el entendimiento del enunciado "conservar la materia del amparo hasta la terminación del juicio" implica que el órgano jurisdiccional evite, a toda costa, que exista identidad entre los efectos de la suspensión y el de una sentencia favorable a los intereses de los Quejosos.
99.    Bajo ese entendimiento, esta Segunda Sala sostiene que <u>la importancia</u> de la suspensión del acto reclamado <u>debe equipararse</u> con la relevancia de conservar la materia del juicio en lo principal, pues ambas buscan crear las condiciones para que el juicio de amparo cumpla con su función protectora, por lo que por regla general será incorrecto sostener que se deberá negar la suspensión con la finalidad de conservar la materia del asunto en lo principal.
100.   Se sostiene lo anterior porque considerar que debe negarse la suspensión para conservar la materia del juicio supone, de manera implícita, considerar que el fondo debe prevalecer sobre la suspensión, lo cual es inexacto porque, como se sostuvo, la medida cautelar tiene la finalidad de generar las condiciones para salvaguardar los derechos en disputa.
101.   Considerando que la suspensión del acto reclamado y el fondo del asunto tienen la misma importancia para efectos de la protección de los derechos humanos, por lo que por regla general no debe sostenerse que se privilegia una figura sobre la otra, es decir, negar la suspensión para preservar la materia del juicio, corresponde que esta Segunda Sala vislumbre en qué casos sí debe privilegiarse el fondo sobre la medida cautelar."

La Corte distinguió entre el beneficio transitorio de la suspensión con el efecto definitivo de la sentencia de amparo:

"VIII.III  Qué nos permite identificar una suspensión con efectos restitutorios que proporciona beneficios transitorios, en contraposición con una que brinde beneficios definitivos
105.   La suspensión del acto reclamado, por definición, es un beneficio transitorio, dado que el artículo 147 de la Ley de Amparo limita claramente su duración, la cual inicia desde que se dicta el auto o la resolución interlocutoria que concede la medida cautelar, hasta que se pronuncia ejecutoria, es decir, hasta que se emite la decisión que resuelve en definitiva el asunto (ya sea emitiendo un pronunciamiento de fondo o sobreseyendo).
106.   Entonces, la regla general es que la suspensión del acto reclamado es un beneficio transitorio, aun cuando se conceda con un carácter restitutorio y exista identidad entre los efectos de una eventual sentencia favorable a los Quejosos, pues, se insiste, ese beneficio durará únicamente hasta que la sentencia que se dicte en el cuaderno principal cause ejecutoria.
107.   Precisado lo anterior, se esclarecerá cuál es la excepción a la regla general, esto es, en qué casos una medida cautelar con efectos restitutorios verdaderamente dejaría sin materia un juicio de amparo, aun en el caso que los efectos de la suspensión cesen derivado de la ejecutoria que se dicte por la instancia terminal, conforme al artículo 147 de la Ley de Amparo."

170



En consecuencia, la Corte sostuvo que en los casos que un Juez advierta que la suspensión tendría efectos restitutivos de derechos, como en el caso en concreto, debe atender al principio de transitoriedad de la suspensión y será factible conceder la suspensión si en el caso de que el resultado del amparo sea adverso a los Quejosos pueda ser revocado:

"Posibles interacciones de la medida cautelar y el fondo

| **1.** Concede la suspensión con efectos restitutorios. | **2.** Concede la suspensión con efectos restitutorios. |
|---|---|
| Sentencia favorable. | Sentencia adversa. |
| **3.** Niega la suspensión. | **4.** Niega la suspensión. |
| Sentencia favorable. | Sentencia adversa. |

109.    Las interacciones 3 y 4 son irrelevantes para este análisis porque si se negó la medida cautelar, evidentemente no existe una concesión con efectos restitutorios, ya que es un presupuesto necesario conceder la suspensión para que ésta restituya provisionalmente un derecho.

110.    Sin embargo, esta Segunda Sala considera que en el supuesto 3 el órgano jurisdiccional debe tener especial cuidado, porque la negativa de la suspensión (con efectos restitutorios) podría impedir que se materialice el efecto de una sentencia amparadora en la esfera jurídica de los Quejosos.

111.    En la interacción 1 se concedió la suspensión con efectos restitutorios y se concedió el amparo. En ese supuesto la medida cautelar supondría adelantar la restitución del goce de un derecho a la que el quejoso eventualmente tendría acceso en la sentencia de fondo. Un ejemplo es el acto reclamado en el recurso de queja 256/2022 donde se reclamó la omisión de tramitar un recurso de apelación en una causa penal.

112.    En el escenario donde el órgano jurisdiccional advierte una contravención evidente a un derecho fundamental, donde luego de tramitar el juicio previsiblemente la autoridad no podrá demostrar la constitucionalidad del acto, aplicaría la regla general detallada en párrafos anteriores, esto es, que será incorrecto sostener que se deberá negar la suspensión con la finalidad de conservar la materia del asunto, pues recordemos que el entendimiento de la expresión conservar es que el órgano jurisdiccional velará por proporcionar las condiciones para proteger el derecho que los Quejosos considera afectado.

113.    Entonces, en ese supuesto sería incorrecto negar la suspensión por coincidir con el efecto de una eventual sentencia porque no se puede privilegiar el análisis de fondo a la restitución provisional de un derecho, pues conforme a lo sustentado por esta Segunda Sala, no existe prevalencia de uno sobre otro, ya que tanto la suspensión como el expediente principal deben estar en sintonía para conseguir la finalidad última del juicio de amparo, que es la de proteger de manera eficaz los derechos humanos.

114.    En el caso de la interacción 2, se concedió la medida cautelar con efectos restitutorios, pero en el fondo los Quejosos obtuvo una sentencia adversa.

115.    Tengamos claro que la suspensión por regla general es transitoria, sin importar que sus efectos coincidan con la protección que se obtendría con una sentencia favorable a los Quejosos, ya que por disposición expresa del artículo 147 de la Ley de Amparo su efecto terminará cuando se dicte ejecutoria, es decir, por definición no es un beneficio definitivo.

116.    Entonces ante la eventualidad de que el órgano jurisdiccional concedió la suspensión con efectos restitutorios luego efectuó un análisis de la apariencia del buen derecho (al momento de resolver sobre la medida cautelar anticipó que existían indicios razonables para considerar que los Quejosos tiene el derecho que está en disputa), pero una vez desahogado el juicio los Quejosos obtuvo una sentencia adversa, lo que se traduciría en que la apreciación de la apariencia del buen derecho fue equivocada, el beneficio de la medida cautelar será definitivo únicamente si los efectos de la suspensión no se pueden retrotraer. Este supuesto constituiría la excepción a la regla general.

117.    En contraposición a lo sustentado en el párrafo que precede, si el beneficio concedido con la medida cautelar se puede retrotraer, quiere decir que se trata de un

171



beneficio transitorio y, en consecuencia, no coincide con los efectos de una sentencia estimatoria, lo que se traduce en que el juicio no quedaría sin materia, sino que por el contrario, la suspensión cumpliría con su objetivo, pues restituiría provisionalmente el derecho y esa restitución provisional terminaría con motivo de la ejecutoria.

118.    Teniendo presente que el punto discrepante se encuentra en el entendimiento de en qué casos el juicio de amparo se queda sin materia en lo principal o coincide con los efectos de fondo, a juicio de esta Segunda Sala transitorio <u>debe ser entendido como aquel beneficio que puede ser revocado con la sentencia de fondo y, en un sentido opuesto, un beneficio no transitorio o definitivo será aquel que no podrá ser revocado aun cuando se niegue el amparo.</u>"

Estas consideraciones quedaron plasmadas en la jurisprudencia de rubro y texto siguiente:

**"SUSPENSIÓN DEL ACTO RECLAMADO CON EFECTOS RESTITUTORIOS. PARÁMETROS QUE DEBE TOMAR EN CUENTA EL JUZGADOR AL ANALIZAR LA POSIBILIDAD DE CONCEDERLA ANTE LA EVENTUALIDAD DE QUE, CON ELLO, SE DEJE SIN MATERIA EL JUICIO DE AMPARO EN LO PRINCIPAL**.

Hechos: Los Tribunales Colegiados de Circuito llegaron a conclusiones discrepantes en relación con los casos donde se dejaría sin materia el juicio de amparo si se solicita la suspensión del acto reclamado con efectos restitutorios, y esos efectos coinciden con los de una eventual sentencia favorable a la parte quejosa. Las posturas contrarias versaron sobre el requisito referente a la posibilidad jurídica de conceder la suspensión, pues uno de los órganos jurisdiccionales consideró que sí era posible restituir provisionalmente a los Quejosos del derecho vulnerado, mientras que el otro Tribunal sostuvo que no era posible conceder la suspensión dado que con ello se agotaría la materia del juicio en lo principal.

Criterio jurídico: La Segunda Sala de la Suprema Corte de Justicia de la Nación determina que en caso de conceder la suspensión con efectos restitutorios, el órgano jurisdiccional deberá considerar que la materia del juicio de amparo subsiste cuando, en la eventualidad de que resuelva de forma adversa a los Quejosos, puedan retrotraerse los efectos de la suspensión y, en contraposición a ello, se tratará de un beneficio no transitorio o definitivo que dejaría sin materia el juicio, cuando éste no pueda ser revocado aun cuando se niegue el amparo. Lo anterior implica que, por regla general, el hecho de que los efectos de la suspensión y una sentencia favorable a los Quejosos coincidan, no es una razón suficiente para negar la concesión de la medida cautelar, aun cuando se argumente que la finalidad de esa negativa es preservar la materia del asunto, pues el entendimiento de la expresión "conservar la materia del amparo" es que el órgano jurisdiccional velará por proporcionar las condiciones idóneas para proteger el derecho que la parte quejosa considera afectado, no así la prevalencia del fondo sobre la suspensión.

Justificación: El enunciado "conservar la materia del amparo hasta la terminación del juicio", previsto en el primer párrafo del artículo 147 de la Ley de Amparo, debe contextualizarse en armonía con la finalidad última del juicio de amparo, que es la de proteger de forma eficaz los derechos que la parte quejosa considera afectados. En ese orden de ideas, la importancia de la suspensión del acto reclamado debe equipararse con la relevancia de conservar la materia del juicio en lo principal, pues ambas buscan crear las condiciones para que el juicio de amparo cumpla con su función protectora por lo que, por regla general, será incorrecto sostener que debe negarse la suspensión con la finalidad de conservar la materia del asunto en lo principal. La suspensión del acto reclamado es, por definición, un beneficio transitorio, porque aun cuando se conceda con un carácter restitutorio y exista identidad entre los efectos de una eventual sentencia favorable a los Quejosos, ese beneficio durará únicamente hasta que la sentencia que se dicte en el cuaderno principal cause ejecutoria. La excepción a la regla general, esto es, en qué casos una medida cautelar con efectos restitutorios verdaderamente dejaría sin materia un juicio de amparo, se configurará cuando la restitución provisional de los derechos no pueda ser revocada aun cuando se niegue el amparo."[147]

---

[147] Registro digital: 2026730 Instancia: Segunda Sala Undécima Época Materias(s): Común Tesis: 2a./J. 22/2023 (11a.) Fuente: Gaceta del Semanario Judicial de la Federación. Libro 26, Junio de 2023, Tomo V, página 4497 Tipo: Jurisprudencia.

172

CLYDE&CO

En el caso en concreto, es altamente probable que se emita sentencia favorable para la Quejosa precisamente derivado del análisis superficial que debe realizar el Juez y la probable inconstitucionalidad del acto que arroje dicho análisis.

Además, si se niega la suspensión potencialmente se frustrarían los efectos de una eventual sentencia estimatoria de amparo y haría ilusoria la protección constitucional ya que la Quejosa carecería de una protección cautelar que permita su futura reestructura y sus operaciones actuales.

Del precedente citado se pueden desprender 2 (dos) condiciones necesarias para que obtener la suspensión:

1.    Debe equipararse la importancia de concesión de la suspensión con el fondo del juicio de amparo principal.
2.    Que el beneficio transitorio de la suspensión pueda ser revocado en caso de una sentencia adversa a los intereses de los Quejosos.

La importancia de la suspensión descansa en la garantía y observancia del respeto de los derechos humanos referidos.

Por ello, debe concederse la suspensión pues permitiría conservar la materia del juicio y evitar un sobreseimiento por consentimiento expreso de las normas o actos impugnados y, con ello, se tutelaría los derechos de la Quejosa.

En caso de negarse el amparo en sentencia definitiva podría impedírsele a la Quejosa continuar gozando de una protección cautelar y, en consecuencia, permitir a sus acreedores el cobro indiscriminado de créditos que impidan su operación; cuestión que además pone en peligro el trabajo de cientos de trabajadores que dependen de las operaciones de la Quejosa, así como la vida misma de los animales a su cuidado.

Además, se materializa en un beneficio transitorio ordenado en la jurisprudencia 2ª J. 22/2023, pues el Juez de Distrito, en caso de que al momento de analizar el fondo del juicio de amparo determine que no es procedente conceder el amparo para los efectos solicitados, en la sentencia de amparo puede revocar el beneficio otorgado la suspensión válidamente sin que alguno de esos beneficios se considerasen irrevocables en la esfera, es decir, sin que puedan considerarse beneficio permanente.

d.    <u>El quejoso debe resentir una afectación en su interés jurídico o legítimo.</u>

La afectación del interés jurídico de Controladora es evidente, pues como fue ampliamente tratado en los conceptos de violación, el Auto Reclamado pretende no solo la terminación del procedimiento concursal iniciada por ésta, sino el ilegal levantamiento de las Medidas Cautelares que la protegen.



Además, como parte agraviada en el Concurso Mercantil, resulta claro la titularidad de un interés para acudir al presente juicio de amparo.

e.       Ponderación entre la apariencia del buen derecho y el interés social o el orden público.

Finalmente, es posible afirmar que a la Quejosa le asiste la apariencia del buen derecho, existe peligro en la demora y que, con la concesión de la medida suspensional, no se causaría daño alguno al interés social o al orden público.

En cuanto a la apariencia de buen derecho, es posible afirmar que la misma consiste en determinar, hipotéticamente, con base en un conocimiento superficial del caso, la existencia del derecho cuestionado y las probabilidades de que la sentencia de amparo declare la inconstitucionalidad del acto.[148]

Como se ha demostrado, el Auto Reclamado importa graves violaciones a los derechos fundamentales de Dolphin, además de que se encuentra sustentada en interpretaciones evidentemente ilegales e inconstitucionales.

En consecuencia, resulta claro que de un análisis superficial del caso es posible concluir que la sentencia que eventualmente se dicte deberá ser en el sentido de amparar y proteger a la Quejosa, lo que acredita la apariencia de buen derecho.

Por otro lado, también existe peligro en la demora en el otorgamiento de la medida suspensional.

Lo anterior se afirma, pues de permitir la ejecución del Auto Reclamado se estaría permitiendo que se materialicen violaciones graves de derechos fundamentales en perjuicio de Dolphin; principalmente, se privaría a Dolphin de gozar de las medidas cautelares decretadas por el Juzgado Responsable **que son el único medio que la protege de que sus acreedores inicien agresivas acciones para el cobro de sus adeudos e impidan la posibilidad de continuar con su operación**.

Dichas circunstancias son suficientes para sostener que en el presente caso se acredita el peligro en la demora.

Finalmente, en cuanto al requisito consistente en la no vulneración del orden público y el interés social es posible afirmar que el mismo también se encuentra plenamente acreditado.

Los conceptos de "orden público" e "interés social" implican una protección a la colectividad social; en materia de suspensión, el juzgador debe buscar que el otorgamiento de la medida no prive a la sociedad del disfrute de un bien o derecho ni se ponga en peligro su convivencia. Al respecto, resulta relevante el siguiente criterio:

---

[148] Resulta aplicable por analogía el criterio contenido en la tesis de rubro: "SUSPENSIÓN. LA SOLA CIRCUNSTANCIA DE QUE EL ACTO RECLAMADO SE VINCULE AL PAGO DE ALIMENTOS, NO EXCLUYE EL ANÁLISIS DE LA APARIENCIA DEL BUEN DERECHO." [J]; 10a. Época; 1a. Sala; Gaceta S.J.F.; Libro 23, Octubre de 2015; Tomo II; Pág. 1594. 1a./J. 56/2015 (10a.).

CLYDE&CO

**"ORDEN PÚBLICO. ES UN CONCEPTO JURÍDICO INDETERMINADO QUE SE ACTUALIZA EN CADA CASO CONCRETO, ATENDIENDO A LAS REGLAS MÍNIMAS DE CONVIVENCIA SOCIAL.** El orden público no constituye una noción que pueda configurarse a partir de la declaración formal contenida en una ley. Por el contrario, ha sido criterio constante de la Suprema Corte de Justicia de la Nación que corresponde al juzgador examinar su presencia en cada caso concreto, de tal suerte que se perfila como un concepto jurídico indeterminado de imposible definición cuyo contenido sólo puede ser delineado por las circunstancias de modo, tiempo y lugar que prevalezcan en el momento en que se realice la valoración. En todo caso, para darle significado, el juzgador debe tener presentes las condiciones esenciales para el desarrollo armónico de la comunidad, es decir, las reglas mínimas de convivencia social; en la inteligencia de que la decisión que se tome en el caso específico no puede descansar en meras apreciaciones subjetivas, sino en elementos objetivos que traduzcan las preocupaciones fundamentales de la sociedad, siempre buscando no obstaculizar la eficacia de los derechos de tercero."[149]

La Ley de Amparo, en su artículo 129 establece un catálogo ejemplificativo de aquellas situaciones en las cuales el juzgador debe considerar que, de concederse la medida suspensional, se pondría en riesgo el orden público.

Partiendo de dichas premisas, es posible afirmar que en el presente caso **no se sigue perjuicio al interés social o al orden público**.

En primer lugar, este Juzgado podrá observar que en el presente caso **no se actualiza ninguno de los supuestos previstos en el artículo 129 de la Ley de Amparo**.

Aunado a lo anterior, de concederse la medida suspensional solicitada por la Quejosa no se pondría en riesgo la convivencia social ni se privaría a la sociedad del disfrute de un derecho; lo anterior, pues se reclama la ejecución de la ilegal Sentencia Reclamada.

Además, triunfa la apariencia de buen derecho pues ha sido demostrado que la la Sentencia Reclamada es **evidentemente inconstitucional e ilegal**, por lo que aun y cuando su Señoría considere que la medida suspensional solicitada pudiera tener un efecto perjudicial en contra del orden público o el interés social, resulta claro que de una ponderación con la apariencia del buen derecho y el peligro en la demora triunfan éstos. Al respecto, resulta relevante el siguiente criterio:

**"SUSPENSIÓN. PARA DECIDIR SOBRE SU OTORGAMIENTO EL JUZGADOR DEBE PONDERAR SIMULTÁNEAMENTE LA APARIENCIA DEL BUEN DERECHO CON EL PERJUICIO AL INTERÉS SOCIAL O AL ORDEN PÚBLICO.** El Tribunal en Pleno de la Suprema Corte de Justicia de la Nación, en la jurisprudencia P./J. 15/96, de rubro: "SUSPENSIÓN. PARA RESOLVER SOBRE ELLA ES FACTIBLE, SIN DEJAR DE OBSERVAR LOS REQUISITOS CONTENIDOS EN EL ARTÍCULO 124 DE LA LEY DE AMPARO, HACER UNA APRECIACIÓN DE CARÁCTER PROVISIONAL DE LA INCONSTITUCIONALIDAD DEL ACTO RECLAMADO.", sostuvo que para el otorgamiento de la suspensión, sin dejar de observar los requisitos exigidos por el artículo 124 de la Ley de Amparo, basta la comprobación de la apariencia del buen derecho invocado por el quejoso, de modo que sea posible anticipar que en la sentencia de amparo se declarará la inconstitucionalidad del acto reclamado, lo que deberá sopesarse con el perjuicio que pueda ocasionarse al interés social o al orden público con la concesión de la medida, esto es, si el perjuicio al interés social o al orden público es mayor a los daños

---

[149] TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;I.4o.A.63 K ;TA

CLYDE&CO

y perjuicios de difícil reparación que pueda sufrir el quejoso. Conforme a lo anterior, el juzgador debe realizar un estudio simultáneo de la apariencia del buen derecho y el peligro en la demora con la posible afectación que pueda ocasionarse al orden público o al interés social con la suspensión del acto reclamado, supuesto contemplado en la fracción II del referido artículo 124, estudio que debe ser concomitante al no ser posible considerar aisladamente que un acto pudiera tener un vicio de inconstitucionalidad sin compararlo de manera inmediata con el orden público que pueda verse afectado con su paralización, y sin haberse satisfecho previamente los demás requisitos legales para el otorgamiento de la medida."[150]

En conclusión, resultará evidente para este Juzgado que en el presente caso se cumple a cabalidad con la totalidad de los requisitos necesarios para conceder la suspensión solicitada, por lo que se encuentra compelida a otorga la medida en los términos solicitados a efecto de salvaguardar los derechos fundamentales de los que es titular la Quejosa.

f.    <u>Sobre la garantía.</u>

Finalmente, no pasa desapercibido para la Quejosa que los artículos 132 y 190 de la Ley de Amparo a la necesidad de que se constituye garantía cuando exista riesgo de que se causen daños a terceros, sin embargo, dicho supuesto no se actualiza en el caso en concreto.

Sin embargo, no se debe pasar desapercibido que la suspensión que se solicita es con la única finalidad de que no se ejecute el Auto Reclamado y, en consecuencia, no se levanten las medidas cautelares decretadas a favor de la Quejosa.

Estas medidas cautelares fueron decretadas **sin que la Quejosa haya tenido que constituir garantía alguna**, al ser connaturales al procedimiento concursal y buscar no agravar la situación financiera de la Quejosa.

Lo anterior, aunado a que se concedieron durante la fase de visita del concurso mercantil, etapa en la que **aun no hay más partes en dicho procedimiento más que el comerciante**.

Partiendo de dichas consideraciones, es que se considera que **no se debe fijar garantía alguna a la Quejosa**, ya que la suspensión solicitada no implicaría mayores afectaciones que las permitidas por la Ley de Concursos Mercantiles al facultar el decreto de medidas cautelares en el procedimiento concursal (las cuales, en sí mismas, no deben ser garantizadas).

Por lo expuesto y fundado, **A USTEDES MAGISTRADAS O MAGISTRADOS DEL TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO, EN TURNO**, atentamente pido se solicita:

**PRIMERO.**   Acordar el presente escrito y reconocer la personalidad ostentada.

**SEGUNDO.** Admitir a trámite la demanda de amparo promovida en el presente escrito.

---

[150] [J]; 9a. Época; 2a. Sala; S.J.F. y su Gaceta; Tomo XXX, Diciembre de 2009; Pág. 315. 2a./J. 204/2009.

**TERCERO.**  Previos los trámites legales conducentes, conceder el amparo y protección de la Justicia Federal contra de los actos reclamados.

**PROTESTO LO NECESARIO**
**Ciudad de México, a la fecha de su presentación.**

[firmado electrónicamente]
_____
**EDUARDO ALBOR VILLANUEVA**
apoderado general de
**CONTROLADORA DOLPHIN, S.A. DE C.V.**





# PODER JUDICIAL DE LA FEDERACIÓN

**EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN**

**Archivo Firmado:**
**41580020000000000048316492.p7m**
**Autoridad Certificadora:**
**AC DEL SERVICIO DE ADMINISTRACION TRIBUTARIA**
**Firmante(s): 1**
**Este documento digital es una copia fiel de su versión física o electrónica, la cual corresponde a su original.**

EDER FLORES CORONA
7036406290640620000000000000000000041c
15:05:26 17/06/60

| FIRMANTE | | | | |
|---|---|---|---|---|
| Nombre: | EDUARDO DE MARTIN ALBOR VILLANUEVA | Validez: | BIEN | Vigente |
| **FIRMA** | | | | |
| No Serie: | 30.30.30.30.31.30.30.30.30.30.37.31.34.32.31.31.32.31.38 | Revocación: | Bien | No revocado |
| Fecha (UTC/ CDMX) | 18/06/25 02:15:41 - 17/06/25 20:15:41 | Status: | Bien | Valida |
| Algoritmo: | RSA-SHA256 | | | |
| Cadena de firma: | 89 46 25 9c 3f f2 db 13 ea 77 d6 6b 46 81 a6 a5 b8 6f b2 58 a9 4c 36 92 c8 36 89 70 10 ca 9f 31 eb eb c9 37 f6 10 4f a5 4d 4c d7 74 e4 99 98 45 6f 08 ac 17 fb bc 42 1c cb a3 ce d1 45 21 df 5d be aa 56 8c 8b c4 6b 58 28 1d 37 b5 c3 65 e3 cb e2 aa 3f 15 b0 1e 64 e5 1c 25 83 7d ff ea 55 b4 42 7c 2c 49 be 2c 42 49 1c 03 df 6d 28 11 bb c8 8d 1e 9b e6 4a 2b f1 12 65 32 08 cf 17 22 fb 79 9e e7 cb 0a 5c bd f9 c9 0c 72 99 d9 a9 4e ed d9 c8 c3 59 65 03 31 92 9b 9b 9f 1b dc df f4 b9 c2 0c e1 a8 5b 41 44 01 c0 92 c1 c1 bd b8 d0 1a 52 b6 a3 1a 56 f8 38 0d 87 18 9e 20 6f 06 e8 24 40 5a 05 10 23 fc 0b a0 b0 3e 65 50 4c 8a 9d 80 65 cb cf 63 38 37 73 7c 66 01 c6 18 e2 f1 78 9d 84 1d 8b 71 3e 63 e8 8b 9c 72 65 0d ef 84 f3 41 62 53 f0 41 7a b0 39 e0 67 6f f4 99 b3 2a 7e db 9f | | | |
| **OCSP** | | | | |
| Fecha: (UTC/ CDMX) | 18/06/25 02:15:09 - 17/06/25 20:15:09 | | | |
| Nombre del respondedor: | OCSP SAT | | | |
| Emisor del respondedor: | AC DEL SERVICIO DE ADMINISTRACION TRIBUTARIA | | | |
| Número de serie: | 30.30.30.30.31.30.30.30.30.30.37.31.34.32.31.31.32.31.38 | | | |
| **TSP** | | | | |
| Fecha : (UTC/ CDMX) | 18/06/25 02:15:42 - 17/06/25 20:15:42 | | | |
| Nombre del emisor de la respuesta TSP: | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal | | | |
| Emisor del certificado TSP: | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal | | | |
| Identificador de la respuesta TSP: | 13220714 | | | |
| Datos estampillados: | oMm8bfitDrat5BIdyZ/uBMPmZHQ= | | | |



# PODER JUDICIAL DE LA FEDERACIÓN

## EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN

**Archivo Firmado:**
**115521459_4158000037210904023151510227560017.p7m**
**Autoridad Certificadora:**
**Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal**
**Firmante(s): 1**
**Este documento digital es una copia fiel de su versión física o electrónica, la cual corresponde a su original.**

| FIRMANTE | | | | | |
|---|---|---|---|---|---|
| **Nombre:** | EDER FLORES CORONA | | **Validez:** | BIEN | Vigente |
| **FIRMA** | | | | | |
| **No Serie:** | 70.6a.66.20.63.6a.66.32.00.00.00.00.00.00.00.00.00.04.1c | | **Revocación:** | Bien | No revocado |
| **Fecha (UTC/ CDMX)** | 18/06/25 18:52:29 - 18/06/25 12:52:29 | | **Status:** | Bien | Valida |
| **Algoritmo:** | RSA-SHA256 | | | | |
| **Cadena de firma:** | 84 f7 66 e9 53 0f c2 2b 0f 03 02 3f 26 3f bd 62 17 c8 62 f5 1f 50 61 19 2c 3c 32 d8 55 d3 0e 32 13 b7 99 b0 f2 63 86 b7 45 6a 6e 69 66 e8 e1 48 cd 73 3e ce 48 76 7f a8 ab b7 d6 1a ca 6e 61 13 12 f2 77 d4 ea 62 06 2c d6 54 28 60 46 05 6c 29 9c ba 0a bd 3d 31 a9 7f fa e4 94 bc 4f bf 40 1c 17 91 a5 80 2f 4c 50 4a 00 05 42 96 81 76 83 8f b5 2b d8 f3 4d d6 3e 04 a3 c8 6f c0 f1 32 15 f2 f6 d1 9f 6a 1c 18 f7 38 eb 83 ac 5e 09 a5 f8 6c a2 53 93 5f f8 dd 90 82 b0 fa 76 1c 39 b6 84 5f 38 30 51 2b 67 21 64 f9 fb 79 c6 f8 26 ca 09 14 c1 ab 3b 64 13 f1 d2 ce 40 c3 7b 9e d5 14 75 57 27 6f 22 32 e8 76 a5 64 5f c3 fd 0a 4e f4 a1 50 df 3f 76 6e 83 fa f0 b8 3f 0c cd f1 79 cf 67 0a 1d 12 6c 7f c0 6d 5e b2 e4 9d 31 f3 ab 86 9a 64 67 0e dc a3 78 a2 c7 b2 8f 2d 80 2a b1 20 62 19 | | | | |
| **OCSP** | | | | | |
| **Fecha: (UTC/ CDMX)** | 18/06/25 18:52:29 - 18/06/25 12:52:29 | | | | |
| **Nombre del respondedor:** | Servicio OCSP ACI del Consejo de la Judicatura Federal | | | | |
| **Emisor del respondedor:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal | | | | |
| **Número de serie:** | 70.6a.66.20.63.6a.66.32.00.00.00.00.00.00.00.00.00.04.1c | | | | |
| **TSP** | | | | | |
| **Fecha : (UTC/ CDMX)** | 18/06/25 18:52:29 - 18/06/25 12:52:29 | | | | |
| **Nombre del emisor de la respuesta TSP:** | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal | | | | |
| **Emisor del certificado TSP:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal | | | | |
| **Identificador de la respuesta TSP:** | 13551469 | | | | |
| **Datos estampillados:** | htc313obB4Jo5F7+bXJZN883dLI= | | | | |

FORMA B-2

**Concurso Mercantil 1/2025**
**Developments: 22756**
**Table: III**

PODER JUDICIAL DE LA FEDERACIÓN

In Mexico City, on the **nineteenth day of June, two thousand twenty-five**, the Secretary of the Second District Court in Commercial Bankruptcy Matters, with residence in Mexico City and jurisdiction throughout the Mexican Republic, hereby certifies and **CERTIFIES:**

- That the document registered with internal folio number **22756**, is electronically signed by Eduardo de Martin Albor Villanueva.
- That it is verified that the electronic signature certificate is current and valid, and therefore has not been revoked. **I attest.**

The Secretary.
**Marlene Sandra Chávez Reyes.**

On the same date, the Clerk gives account to the Judge with the above certification and with the document registered with internal folio number **22756**. **For the record.**

**Mexico City, Mexico, June nineteenth, two thousand twenty-five.**

Based on the provisions of Article 1077 of the Code of Commerce of supplementary application to the Commercial Bankruptcy Law, by express provision of its numeral 8, the document registered with internal folio number **22756**, electronically signed by Eduardo de Martín Albor Villanueva, who represents himself as attorney in fact of Controladora Dolphin, Sociedad Anónima de Capital Variable, who represents himself as attorney in fact of Controladora Dolphin, Sociedad Anónima de Capital Variable, in terms of the notarial instrument six thousand two hundred sixty one, passed before the faith of Ivonne Lemus Arellano, holder of the Notary Office number sixty four of the state of Quintana Roo; by means of which it promotes **JUDGMENT OF DIRECT AMPARO** against the resolution of **May twenty-first of two thousand twenty-five**, through which this Court resolved the appeal of revocation filed by Controladora Dolphin Sociedad Anónima de Capital Variable, against the order of **April fourteenth of two thousand twenty-five**.

**REPORT IS RENDERED**

Based on article 178, section III, of the Amparo Law, **RENDER THE JUSTIFIED REPORT**, stating that the challenged act **IS CERTAIN**, since before this Court of Amparo, it is

1

**On May twenty-first, two thousand twenty-five**, a decision was rendered in which the appeal for revocation filed by <span style="color:red">Controladora Dolphin Sociedad Anónima de Capital Variable</span> against the order of **April fourteen, two thousand twenty-five** was resolved, and confirmed the dismissal of the petition for reorganization.

Regarding the acts of execution that the plaintiff attributes to the court clerk assigned to this District Court, a report is rendered in the sense that **they are NOT TRUE,** since the actions of said public servant were limited to notifying the decision of this jurisdictional body.

On the other hand, from the content of the amparo petition it is evident that the plaintiff also claims from this District Court:

1.- The order of May twenty-first, two thousand twenty-five, issued in the mercantile insolvency proceeding 1/2025, whereby the appeal for revocation filed against the other order of April fourteenth, two thousand twenty-five was resolved as unfounded and the lifting of the precautionary measures was confirmed.

2.- The order of June four, two thousand twenty-five issued in the mercantile insolvency proceeding 1/2025, through which the appeal for revocation filed against the other order of May twenty-two, two thousand twenty-five was resolved as unfounded and confirmed the decision to revoke the judicial authorizations formulated by the plaintiff in the mercantile insolvency proceeding.

3.- The omission to process and resolve the motion for lack of standing filed on April 1, two thousand twenty-five.

4.- The failure to enforce the injunction issued on April three, two thousand and twenty-five.

5.- Failure to issue the insolvency judgment within the term established by the insolvency law.

6.- The omission to give a hearing or to process through incidental proceedings the request for withdrawal filed in the insolvency proceeding when there is a controversy regarding the applicant's personality and when it is the result of the violation of precautionary measures.

2

FORMA B-2

**PODER JUDICIAL DE LA FEDERACIÓN**

In this respect, a justified report is rendered in the sense that the act claimed in numeral 1 **IS TRUE**, since on **May twenty-first, two thousand twenty-five**, a judgment was issued in which the appeal for revocation filed by Controladora Dolphin Sociedad Anónima de Capital Variable, against the order of **April fourteenth, two thousand twenty-five**, was resolved, and confirmed the lifting of the precautionary measures.

Likewise, the act claimed in paragraph 2 **is TRUE**, since on **June fourth, two thousand twenty-five**, a resolution was issued in which the appeal for revocation filed by Controladora Dolphin Sociedad Anónima de Capital Variable against the order of **May twenty-second of the current year** was resolved, and confirmed the decision to revoke the persons authorized by the plaintiff.

On the other hand, **THE ACTS CLAIMED** in paragraphs 3 to 6 **ARE NOT CERTAIN**, since as of the date of the filing of the amparo lawsuit, the omissions attributed to this jurisdictional body do not exist.

The foregoing is so, since in an order dated **April fourteenth, two thousand twenty-five**, the reservation ordered in a ruling dated April third of the current year was lifted and, consequently, the motion for lack of standing filed by Controladora Dolphin, Sociedad Anónima de Capital Variable by means of document with internal file number 8311 was admitted and resolved outright, since its substantiation was not deemed necessary due to the withdrawal of the merchant.

Likewise, it **is NOT TRUE** the claimed act consisting in the omission to enforce the injunction issued on **April three, two thousand twenty-five**, since in the order **of April fourteen of the current year**, it was established that there is no controversy on the ownership of CI Banco, Sociedad Anónima, Institución de Banca Múltiple of more than ninety-nine percent of the shares of the merchant, for which reason it was deemed sufficient that the said fiduciary institution had sufficiently provided such information in order to resolve on the merits of the merchant's request to have it dismissed from the bankruptcy proceeding in which it is acting.

3

**PODER JUDICIAL DE LA FEDERACIÓN**

Likewise, with respect to the omission to issue the judgment of the insolvency proceeding within the term established by the insolvency law that the petitioner points out as a procedural violation that transcends the result of the judgment, we submit a report in the sense that it **is NOT TRUE**, since from the record of the case it is evident that in a ruling dated **March twenty-fourth, two thousand twenty-five**, the parties were given a hearing with the opinion of the examiner for the purposes set forth in Article 41 of the Bankruptcy Law, which elapsed from **March twenty-seventh to April second of the current year,** therefore, the term to issue the judgment declaring or not the merchant in bankruptcy **would begin** once the term to file pleadings had elapsed.

However, on **March thirty-first, two thousand twenty-five**, a document with internal folio number **7862** was received, whereby the merchant expressed its will to withdraw from the bankruptcy proceeding, and on the **following April fourteenth**, the reservation to rule on the same was lifted and it was resolved to have the merchant **withdraw from** the bankruptcy proceeding.

Likewise, it is not true the omission to give a hearing or to **process through incidental proceedings** the request for withdrawal filed in the reorganization proceeding, since there was no request of the parties in that sense.

On the other hand, the Amparo Court should be informed that in r e l a t i o n  to the acts claimed in numbers 3 to 6, the cause of inadmissibility established in section X of article 61 of the Amparo Law is present, since on April twenty-fifth, two thousand twenty-five, the amparo lawsuit filed by Controladora Dolphin SA de CV was received, in which it claimed, among other acts:

1.- The omission to process and resolve the motion for lack of legal standing filed on April 1, two thousand and twenty-five.

2.- The omission to enforce the injunction issued on April three, two thousand and twenty-five.

3.- Failure to issue the insolvency judgment within the period established by the insolvency law.

4.- The omission of hearing or processing the request for withdrawal filed in the insolvency proceeding as there is a controversy about the applicant's personality and it is the result of the

4

FORMA B-2



PODER JUDICIAL DE LA FEDERACIÓN

violation of precautionary measures.

The **Eighth Collegiate Court in Civil Matters of the First Circuit** was in charge of hearing the amparo lawsuit, which was filed under file number **DC 320/2025-IV**.

## SUMMONING OF INTERESTED THIRD PARTIES

Given the procedural status of this case, it is considered that the existence of interested third parties is not considered to exist.

## CERTIFICATION

Also, in terms of section I, of the same legal provision, the date on which the plaintiff was notified of the challenged act and the date of its filing of the claim before this court, as well as the non-business days that intervened between both dates, must be stated in the written statement of claim.

## REMISSION OF DEMAND AND EVIDENCE.

Consequently, as stipulated in Article 178 of the Amparo Law, the amparo petition with the certification referred to in the aforementioned article is to be sent to the Collegiate Court in Civil Matters of the First Circuit, in turn, through the Common Correspondence Office of the Collegiate Courts, with the certification referred to in the aforementioned article.

Likewise, as justification of the challenged act, inform the **Collegiate Court in Civil Matters of the First Circuit, in turn,** that the complete electronic file is available for its linkage and consultation in the platform of the Integral System of File Tracking [SISE], where it will be able to consult all the evidence of the present contest.

In this sense, the Judicial Officer "A" assigned to this jurisdictional body is instructed to make the electronic file available and the Collegiate Court will be able to make the linkage and to consult the evidence contained therein.

PODER JUDICIAL DE LA FEDERACIÓN

5



**SUSPENSION**

Based on the provisions of Article 190 of the Amparo Law, **THE SUSPENSION OF** THE ACT CLAIMED **IS DENIED**, since it consists of the judgment of **May twenty-first, two thousand twenty-five**, through which this Court resolved the appeal filed by <span style="color:red">Controladora Dolphin SA de CV</span> against the order of **April fourteenth, two thousand twenty-five**.

In this sense, the amparo petitioner requests the suspension of the execution of the act that he is claiming, so that all its effects are paralyzed; and consequently, the precautionary measures continue to be effective, <span style="color:red">Martín Flores Merino</span> and other authorized persons continue to be recognized, the domicile and the consultation of the file are not revoked and the deposit bill that was exhibited to guarantee the fees of the visitor is not made effective; however, the effects of the resolution of **May twenty-first, two thousand twenty-five**, consist of maintaining the status generated, in which <span style="color:red">the merchant was deemed to have withdrawn</span> and, therefore, **that the bankruptcy proceeding not be continued.**

In that order, the granting of the requested suspension would imply granting restitutory effects to the petitioner of amparo; however, this judge considers that the challenged act is not an act susceptible to be suspended with an effect of anticipated protection, since this would go against the public order and the social interest, provided for in article 1 of the Law of Commercial Bankruptcy, which establishes:

> *"This Law is of public interest and its purpose is to regulate insolvency proceedings. It is in the public interest to preserve companies and to prevent the generalized non-compliance with payment obligations from jeopardizing the viability of such companies and of others with which they maintain a business relationship. In order to guarantee an adequate protection to creditors against the detriment of the patrimony of the companies in bankruptcy, the judge and the other subjects of the process regulated in this Law must govern their actions, at all times, under the principles of transcendence, procedural economy, celerity, publicity and good faith."*

The transcribed provision shows that the purpose of the bankruptcy proceeding is the preservation of the companies, as well as

6

FORMA B-2

PODER JUDICIAL DE LA FEDERACIÓN

The Company's interest is to prevent the generalized noncompliance with payment obligations from jeopardizing the viability of such companies and of the others with which it maintains a business relationship, which is an aspect of interest to society, given the impact that their conservation or disappearance has on the national economy and as generators of sources of employment, Therefore, subjecting a company, and its possible creditors, to the processing of a bankruptcy proceeding, in which it may eventually be confirmed that the legal requirements are not met, would undoubtedly affect the public order with which the provisions of the bankruptcy law are covered.

In support of the foregoing, by analogy, the jurisprudence 2a./J.22/2023 (11ª), (record 2026730), published by the Second Chamber of the Supreme Court of Justice of the Nation, visible in the Gaceta del Semanario Judicial de la Federación, Eleventh Epoch, Volume V, June 2023, page 4497, with the following title and text:

*"SUSPENSION OF THE CHALLENGED ACT WITH RESTITUTORY EFFECTS. PARAMETERS THAT THE JUDGE MUST TAKE INTO ACCOUNT WHEN ANALYZING THE POSSIBILITY OF GRANTING IT IN THE EVENT THAT, WITH THIS, LEAVES WITHOUT MATTER THE JUDGMENT OF AMPARO IN THE MAIN PART OF THE CASE. Facts: The Collegiate Circuit Courts reached discrepant conclusions in relation to the cases where the amparo trial would be left without subject matter if the suspension of the challenged act is requested with restitutory effects, and such effects coincide with those of an eventual judgment favorable to the complaining party. The opposing positions dealt with the requirement referring to the legal possibility of granting the suspension, since one of the courts considered that it was possible to provisionally reinstate the plaintiff of the violated right, while the other Court held that it was not possible to grant the suspension since this would exhaust the subject matter of the trial in the main part of the case. Legal criterion: The Second Chamber of the Supreme Court of Justice of the Nation determines that in the case of granting the suspension with restitutory effects, the jurisdictional body must consider that the subject matter of the amparo trial subsists when, in the event that it resolves adversely to the plaintiff, the effects of the suspension can be reversed and, in contrast to this, it will be a non-transitory or definitive benefit that would leave the trial without subject matter, when it cannot be revoked even if the amparo is denied. The foregoing implies that, as a general rule, the fact that the effects of the suspension and a judgment in favor of the plaintiff coincide, is not a sufficient reason to deny the granting of the injunction, even when it is argued that the purpose of such denial is to preserve the subject matter of the c a s e , since the understanding of the term "injunction" is that it is not a sufficient reason to deny the granting of the injunction.*

7

PODER JUDICIAL DE LA FEDERACIÓN

*The purpose of "preserving the subject matter of the amparo" is that the jurisdictional body shall ensure that it provides the ideal conditions to protect the right that the complaining party considers to be affected, not the prevalence of the merits over the suspension. Justification: The statement "to preserve the subject matter of the amparo until the termination of the trial", provided for in the first paragraph of Article 147 of the Amparo Law, must be contextualized in harmony with the ultimate purpose of the amparo trial, which is to effectively protect the rights that the complaining party considers affected. In this order of ideas, the importance of the suspension of the challenged act must be equated with the relevance of preserving the subject matter of the trial, since both seek to create the conditions for the amparo trial to comply with its protective function; therefore, as a general rule, it would be incorrect to sustain that the suspension must be denied with the purpose of preserving the subject matter of the case. The suspension of the challenged act is, by definition, a transitory benefit, because even when it is granted with a restitutory character and there is identity between the effects of an eventual judgment in favor of the plaintiff, such benefit will last only until the judgment issued in the main case becomes final. The exception to the general rule, that is, in which cases a precautionary measure with restitutory effects would truly leave an amparo proceeding without subject matter, will be configured when the provisional restitution of the rights cannot be revoked even if the amparo is denied."*

**Be notified.**

So ordered and electronically signed by **Ruth Haggi Huerta García**, Second District Judge in Commercial Bankruptcy Matters with residence in Mexico City and jurisdiction throughout the Mexican Republic, before **Marlene Sandra Chávez Reyes**, Clerk of the Court, with whom she acts and attests. **I attest**.

*MSCR/KIBR*

**Marlene Sandra Chávez Reyes**, *Clerk of the Second District Court in Commercial Bankruptcy Matters with Residence in Mexico City and Jurisdiction in all the Mexican Republic, certifies: that the above mentioned promotion and the present agreement have been integrated to the electronic file that exists in the Integral File Tracking System; likewise, that the corresponding electronic files coincide in their totality with the present records.* **I attest.**

Reason. On this date, official letter 3138 was sent to the corresponding authority, notifying it of the above order. I attest.

8



FORM B2



JEWISH POWER OF THE FEDERATION

7M0A6aR6L6E20N6E36SaA6N63D2R00A00C0H0A00V0E00Z0R00E0Y0E0S001609d
08/08/25 11:28:02

10

MARLENE SANDRA CHAVEZ REYES
706a66206536a663200000000000000000000000000000000001609d
08/08/25 11:28:02

FORMA B-2

PODER JUDICIAL DE LA FEDERACIÓN

Concurso Mercantil 1/2025-III
JUSTIFIED REPORT

**MEXICO CITY, JUNE NINETEENTH, TWO THOUSAND TWENTY-FIVE.**
**OF. 3138/2025. TRIBUNAL COLEGIADO EN MATERA CIVIL DEL PRIMER CIRCUITO, EN TURNO.**

In compliance with the agreement issued today in the proceedings of the mercantile contest of **1/2025-III**, based on Article 178 of the Amparo Law, a justified report is rendered in the following terms:

*"Based on article 178, section III of the Amparo Law, **RENDER THE JUSTIFIED REPORT**, stating that the claimed act **IS TRUE**, since before this District Court the mercantile insolvency proceeding 1/2025-III is being processed, and on **May twenty-first, two thousand twenty-five**, a decision was issued in which the appeal for revocation filed by Controladora Dolphin Sociedad Anónima de Capital Variable, against the order of **April fourteen, two thousand twenty-five**, was resolved, and confirmed the dismissal of the petition for mercantile reorganization.*

*Regarding the acts of execution that the plaintiff attributes to the court clerk assigned to this District Court, a report is rendered in the sense that **they are NOT TRUE**, since the actions of said public servant were limited to notifying the decision of this jurisdictional body.*

*On the other hand, from the content of the amparo petition it is evident that the plaintiff also claims from this District Court:*

*1.- The order of May twenty-first, two thousand twenty-five, issued in the mercantile insolvency proceeding 1/2025, whereby the appeal for revocation filed against the other order of April fourteenth, two thousand twenty-five was resolved as unfounded and the lifting of the precautionary measures was confirmed.*
*2.- The order of June four, two thousand twenty-five issued in the mercantile insolvency proceeding 1/2025, through which the appeal for revocation filed against the other order of May twenty-two, two thousand twenty-five was resolved as unfounded and confirmed the decision to revoke the judicial authorizations formulated by the plaintiff in the mercantile insolvency proceeding.*
*3.- The omission to process and resolve the motion for lack of legal standing filed on April 1, two thousand twenty-five.*
*4.- The failure to enforce the injunction issued on April three, two thousand and twenty-five.*
*5.- Failure to issue the insolvency judgment within the term established by the insolvency law.*
*6.- The omission to give a hearing or to process through incidental proceedings the request for withdrawal filed in the insolvency proceeding when there is a controversy regarding the applicant's personality and when it is the result of the violation of precautionary measures.*

*In this respect, a justified report is rendered in the sense that the act claimed in numeral 1 **IS TRUE**, since on **May twenty-first, two thousand twenty-five**, a judgment was issued in which the appeal for revocation filed by Controladora Dolphin Sociedad Anónima de Capital Variable, against the order of **April fourteenth, two thousand twenty-five**, was resolved, and confirmed the lifting of the precautionary measures.*

11

Likewise, the act claimed in number 2 **is TRUE**, since on **June fourth, two thousand twenty-five**, a resolution was issued in which the appeal for revocation filed by <span style="color:red">*Controladora Dolphin Sociedad Anónima de Capital Variable*</span>, against the order of **May twenty-second of the current year** was resolved, and confirmed the decision to revoke the persons authorized by the plaintiff.

On the other hand, **THE ACTS CLAIMED** in the following **are NOT CERTAIN** The Court has not found that the omissions attributed to this jurisdictional organ do not exist as of the date of the filing of the amparo lawsuit.

The foregoing is so, since in an order dated **April fourteenth, two thousand twenty-five**, the reservation ordered in a ruling dated April third of the current year was lifted and, consequently, the motion for lack of standing filed by <span style="color:red">*Controladora Dolphin, Sociedad Anónima de Capital Variable*</span> by means of document with internal file number 8311 was admitted and resolved outright, since its substantiation was not deemed necessary due to the withdrawal of the merchant.

Likewise, it **is NOT TRUE** the claimed act consisting in the omission to enforce the injunction issued on **April three, two thousand twenty-five**, since in the order **of April fourteen of the current year**, it was established that there is no controversy on the ownership of <span style="color:red">*CI Banco, Sociedad Anónima, Institución de Banca Múltiple*</span> of more than ninety-nine percent of the shares of the merchant, for which reason it was deemed sufficient that the said fiduciary institution had sufficiently provided such information in order to resolve on the merits of the merchant's request to have it dismissed from the bankruptcy proceeding in which it is acting.

Likewise, with respect to the omission to issue the judgment of the insolvency proceeding within the term established by the insolvency law that the petitioner points out as a procedural violation that transcends the result of the judgment, we submit a report in the sense that it **is NOT TRUE**, since from the record of the case it is evident that in a ruling dated **March twenty-fourth, two thousand twenty-five**, the parties were given a hearing with the opinion of the examiner for the purposes set forth in Article 41 of the Bankruptcy Law, which elapsed from **March twenty-seventh to April second of the current year,** therefore, the term to issue the judgment declaring or not the merchant in bankruptcy **would begin** once the term to file pleadings had elapsed.

However, on **March thirty-first, two thousand twenty-five**, a document with internal folio number **7862** was received, whereby the merchant expressed its will to withdraw from the bankruptcy proceeding, and on the **following April fourteenth**, the reservation to rule on the same was lifted and it was resolved to have the merchant **withdraw from** the bankruptcy proceeding.

Likewise, it is not true the omission to give a hearing or to **process through incidental proceedings** the request for withdrawal filed in the reorganization proceeding, since there was no request of the parties in that sense.

On the other hand, the Amparo Court should be informed that in relation to the acts claimed in numbers 3 to 6, the cause of inadmissibility established in section X of article 61 of the Amparo Law is present, since on April twenty-fifth, two thousand twenty-five, the amparo lawsuit filed by <span style="color:red">*Controladora Dolphin SA de CV*</span> was received, in which it claimed, among other acts:

1.- The omission to process and resolve the motion for lack of legal standing filed on April 1, two thousand and twenty-five.

2.- The omission to enforce the injunction issued on April three, two thousand and twenty-five.

12

PODER JUDICIAL DE LA FEDERACIÓN

3.- Failure to issue the insolvency judgment within the period established by the insolvency law.
4.- The omission of hearing or processing the request for withdrawal filed in the insolvency proceeding as there is a controversy about the applicant's personality and it is the result of the violation of precautionary measures.

The **Eighth Collegiate Court in Civil Matters of the First Circuit** was in charge of hearing said amparo lawsuit, which was filed under file number **DC 320/2025-IV**.

Likewise, the amparo complaint filed electronically is forwarded with the corresponding certification.

On the other hand, I inform you that the complete electronic file is available for your linkage and consultation in the Integral File Tracking System [SISE] platform, where you may consult all the records of this competition.

**I REITERATE TO YOU MY MOST DISTINGUISHED CONSIDERATION AND TAKE THIS OPPORTUNITY TO SEND YOU CORDIAL GREETINGS.**
**A T T E N T A M E N T.**

**(Electronic signature) Ruth**
**Haggi Huerta García, Esq.**
**Second District Judge in Commercial Insolvency Matters with residence in Mexico City and jurisdiction in**
**throughout the Mexican Republic.**

PODER JUDICIAL DE LA FEDERACIÓN



# PODER JUDICIAL DE LA FEDERACIÓN

## CRYPTOGRAPHIC EVIDENCE - TRANSACTION

Signed File: 115790674_4158000037210904051.p7m
Certification Authority:
Intermediate Certification Authority of the Federal Judiciary Council Signatory(s): 2

| SIGNATURE | | | | |
|---|---|---|---|---|
| Name: | MARLENE SANDRA CHAVEZ REYES | Validity: | WELL | Current |
| **SIGNATURE** | | | | |
| No Series: | 70.6a.66.20.63.6a.66.32.00.00.00.00.00.00.00.00.00.01.60.9d | Revocation: | Well | Not revoked |
| Date (UTC/ CDMX) | 19/06/25 23:19:26 - 19/06/25 17:19:26 | Status: | Well | Valida |
| Algorithm: | RSA-SHA256 | | | |
| Signature chain: | 47 02 3e b0 1e 8c a7 94 5c 6f 1c f9 83 d1 99 db 4a 9f c4 fa 97 49 8a d3 97 c0 f0 a5 3c 24 c0 49 87 f7 7a b8 84 92 18 67 e2 1a 8a eb 92 b0 6d 46 82 6d 2a 84 67 73 4a 9a 9a 47 db a7 cd cf 1a 80 d3 2d 25 59 05 cf 48 15 b0 63 94 b9 90 43 0e bf 80 e7 25 80 18 8d 94 1b d0 ca 48 08 95 7d 4e 2b ab b5 20 70 3f fc f5 8a 81 67 ce a2 7b 0d 0f 08 3f a7 62 01 a7 65 00 62 3a 6e d7 e4 4a 1a 1a 4c 92 f3 87 0c 68 99 0b ab 19 e2 fa 3a f6 1b 6e 9a 5d 26 3f 57 9a d7 e0 24 dc ba 7a db 6d 55 82 9c 4b 8f 57 08 fa 24 00 b0 b6 12 52 c6 70 08 6a ff 0a 46 12 9f d8 2c f3 fa 6f db 5d c3 78 34 bd a5 4c 93 2d c6 eb d7 cf 4d 3c 2d 42 a5 e7 4f 5a 29 32 b2 b3 52 4c 0c 77 49 2e b2 d1 6c cb 94 57 fb 9b ab 65 38 9f 71 bf 1b 4e 24 cb 6c d3 55 63 5d bc 7d 93 98 31 0a 63 a1 71 d9 c7 e5 1a c5 d3 35 b3 50 | | | |
| **OCSP** | | | | |
| Date: (UTC/ CDMX) | 19/06/25 23:19:27 - 19/06/25 17:19:27 | | | |
| Name of respondent: | OCSP ACI Service of the Federal Judiciary Council | | | |
| Responder sender: | Intermediate Certifying Authority of the Federal Judiciary Council | | | |
| Serial number: | 70.6a.66.20.63.6a.66.32.00.00.00.00.00.00.00.00.00.01.60.9d | | | |
| **TSP** | | | | |
| Date : (UTC/ CDMX) | 19/06/25 23:19:27 - 19/06/25 17:19:27 | | | |
| Name of the sender of the TSP response: | Federal Judiciary Council Time Stamp Issuing Authority | | | |
| TSP certificate issuer: | Intermediate Certifying Authority of the Federal Judiciary Council | | | |
| TSP response identifier: | 14540055 | | | |
| Stamped data: | 0nv68YoRD0NDh8GvYSw4rGvHn+4= | | | |



## PODER JUDICIAL DE LA FEDERACIÓN

| SIGNATURE | | | | |
|---|---|---|---|---|
| **Name:** | RUTH HAGGI HUERTA GARCIA | **Validity:** | WELL | Current |

| SIGNATURE | | | | |
|---|---|---|---|---|
| **No Series:** | 70.6a.66.20.63.6a.66.32.00.00.00.00.00.00.00.00.00.00.02.31.4d | **Revocation:** | Well | Not revoked |
| **Date (UTC/ CDMX)** | 19/06/25 23:37:25 - 19/06/25 17:37:25 | **Status:** | Well | Valida |
| **Algorithm:** | RSA-SHA256 | | | |
| **Signature chain:** | 5a e4 9a e7 d2 ca 39 13 04 c5 c7 57 dd 71 86 b3 84 c1 08 c5 f6 2a ca 99 fb a0 ed 74 01 6b 87 c5 79 34 e3 3f 82 0e 5b f1 98 6d 7b 40 15 dd cb 43 cf 44 ab a0 cd 1f 29 0c 62 a7 ac 2f 5c 16 e3 54 7e 36 dd 48 9a 9c d2 c6 a7 6d 3f 22 e5 da c1 c1 c1 eb 15 15 16 ee 7e 2a 20 4c 72 1b f6 27 fb c2 2e 3f 18 dc 9d 66 ce a1 e1 30 fe e1 5b f6 13 e5 75 b1 23 d7 d0 04 5f cc 9e 3f ca 0d 54 6e bf c4 ec 3d cf 30 43 6f cf 17 71 d7 a8 d5 ae 46 64 79 f8 73 67 b4 83 0a 4b 53 cb 3d 0f b6 4d e4 4a f1 08 37 b0 2d e1 ad 0f 71 8b fe 97 37 d0 49 14 21 19 23 39 eb ec b3 18 92 ff 1b bc d1 9d 92 67 cd 10 de ee 32 32 32 75 72 50 f3 9c 9f 89 8f 00 a0 a9 e8 08 e0 28 68 77 65 d0 cc 89 a8 88 52 5e f6 67 6b 34 44 34 07 e7 b1 93 59 a9 39 7b 15 71 a8 ff 21 14 97 4c ac 3b 90 03 b5 66 bb 85 b4 65 0e 70 04 08 | | | |

| OCSP | |
|---|---|
| **Date: (UTC/ CDMX)** | 19/06/25 23:37:25 - 19/06/25 17:37:25 |
| **Name of respondent:** | OCSP ACI Service of the Federal Judiciary Council |
| **Responder sender:** | Intermediate Certifying Authority of the Federal Judiciary Council |
| **Serial number:** | 70.6a.66.20.63.6a.66.32.00.00.00.00.00.00.00.00.00.00.02.31.4d |

| TSP | |
|---|---|
| **Date : (UTC/ CDMX)** | 19/06/25 23:37:26 - 19/06/25 17:37:26 |
| **Name of the sender of the TSP response:** | Federal Judiciary Council Time Stamp Issuing Authority |
| **TSP certificate issuer:** | Intermediate Certifying Authority of the Federal Judiciary Council |
| **TSP response identifier:** | 14552200 |
| **Stamped data:** | NsNXWAqDoqZra6RkRwo7+O/y1zI= |

COPY

CERTI7ICATED



NOTARIA

V64

Quintana Roo

Ivonne Lernus Arellano

73E0D63EUa06R3A60RF23L0D063O31R63DEa0E63S60MC320OA03R00O3T0I
BP039
N0N9A00A307L03B010O304R0302V03I01L03L01A0302N03U411E3c8VA



P-.A. 6261.- PUBLIC DEED NUMBER SIX THOUSAND TWO HUNDRED AND SIXTY ONE.

----- VOLUME TWENTY-EIGHTH, VOLUME "A". --------------------------------........ .. 0AC/YPF      J.°.".""""*

In the City of Cancun, Municipality of Benito Juarez, State of Quintana Roo, United Mexican States, on the fifth day of the month of December of the year two thousand twenty-four, I, Attorney IVONNE LEMUS ARELLANO, Notary Public Number Sixty-four of the State, and of the Federal Real Estate Patrimony in exercise, do hereby declare: -------------------------

-- THE PROTOCOLIZATION of the Minutes of the Ordinary General Shareholders' Meeting of the Company named "CONTROLADORA DOLPHIN", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, of the date

November seventh, two thousand and twenty-four, which I carried out at the request of MARTIN FLORES MERINO, as

special delegate of said assembly, in accordance with the following background and clauses: --------------------

- LEGAL PROTEST     - - - - - - - - - - - - - - - - - - - - - - - - - - -

- For the purposes of the provisions of section eight (Roman) of article eighty-nine of the Notary Law for the State of Quintana Roo, the undersigned notary hereby informs the undersigned of the penalties incurred by those who make false declarations in a public instrument, indicating that their declarations shall be considered made under oath to tell the truth. --

- - -  A N T E C E D E N T S   - - - - - - - - - - - - - - - - - - - - - - - - - - -

-- CHARTER OF INCORPORATION. By deed number forty-two thousand nine hundred and seventy-four, dated April tenth, two thousand seven, executed before the faith of Marco Antonio Sánchez Vales, Notary Public Number Three of the State of Quintana Roo, whose first testimony was registered in the Public Registry of Property and Commerce, in its Cancun Delegation, under folio number 18314 (eighteen thousand three hundred and fourteen), the company "GO ON DREAMS", SOCIEDAD ANONIMA DE CAPITAL VARIABLE was incorporated, with domicile in the city of Cancun, Quintana Roo, being able to have agencies and branches; Duration of fifty years; Clause of admission of foreigners; Variable capital stock, having a fixed minimum without right of withdrawal of One Hundred Thousand Pesos, National Currency, and having as corporate purpose the one that was written in said deed. I copy the following from said instrument in its pertinent part: ----------------

--- '....CLAUSES.... TWENTY-FIFTH. - ADMINISTRATION. - The administration of the corporation shall be entrusted to a sole Administrator or to the Board of Directors, as agreed upon by the Ordinary Meeting. The persons shall be appointed by the Assembly itself, which shall establish their attributions, faculties and powers, as well as their emoluments. TWENTY SIXTH - When there are two or more administrators, they shall constitute a Board of Directors, being the president the one who shall legally represent the Board and shall enjoy the use and exercise of the corporate signature with the sum of the faculties contained in these Bylaws or that are specially stipulated in his appointment. The Board will be formed by the number of members designated by the Meeting. TWENTY SEVENTH - In order for the Board of Directors to function legally, at least half of its members must be present and its resolutions will be valid when adopted by majority vote of those present. In case of a tie, the Chairman will have the casting vote.- The resolutions adopted outside a Board meeting, by unanimous vote of its members, will have for all legal purposes the same validity as if they had been adopted in a Board meeting, provided that the resolutions are confirmed in writing.- TWENTY EIGHTH - The Sole Director or the Board of Directors will have the broadest powers.

recognized by the Law for a general agent, being able to enter into all types of contracts and carry out and direct the business of the corporation in the terms of Article Ten of the General Law of Mercantile Corporations, enjoying for such purpose a Broad General Power of Attorney for Pleitos y Cobranzas, Acts of Administration and Rigorous Dominion with all the general powers and the special powers that according to the law require a special clause, in the terms of articles two thousand eight hundred and ten and two thousand eight hundred and forty-three of the Civil Code of the State of Quintana Roo and its correlatives in the various Codes of the Mexican Republic. Eight hundred and forty three of the Civil Code of the State of Quintana Roo and its correlatives in the diverse Codes of the Mexican Republic. Transcription of Article Two Thousand Eight Hundred and Ten of the Civil Code of the State of Quintana Roo: "In all the general powers of attorney for lawsuits and collections it will be enough to say that it is granted with all the general powers and the special ones that require special clause according to the law, so that they are understood to be conferred without any limitation whatsoever. In general powers of attorney to administer property, it shall be sufficient to state that they are granted in that capacity, in order for the attorney-in-fact to have all kinds of administrative powers In general powers of attorney to exercise acts of ownership, with the sole exception of donation, which in this Code is a very personal business for the donor and therefore does not admit the representation as for this one, it will be enough to say that such general powers are given with that character so that the attorney-in-fact has all class of faculties of owner, as much in the relative thing to the goods, as to make all class of managements in order to defend us. When it is desired to limit, in the three cases mentioned above, the powers of the attorneys-in-fact, the limitations shall be recorded or special powers of attorney shall be granted in this respect. The notaries will insert this article in the testimonies of the powers of attorney granted before them. The same shall be done at the beginning of the power of attorney and before the signatures of the ratification if it has not been inserted in the text of the document by the interested parties, the officials before whom the grantors and the witnesses ratify their signatures in accordance with section ll of article 2807 in relation to 218 and 2811. Without this insertion, the aforementioned testimonies and ratifications will lack any legal effect"- By way of illustration but not limitation, the Sole Administrator or the Board of Directors, as the case may be, will enjoy the corporate signature, being expressly empowered to subscribe negotiable instruments, request their protest, endorse, guarantee and in general! The Company is also empowered to file complaints and lawsuits and to withdraw from them in the appropriate cases; to act as coadjutant of the Public Prosecutor for the effect of the reparation of damages; to articulate and absolve positions; to present witnesses and to confront those presented by the opposing party; to compromise and compromise in arbitration; to have labor representation in accordance with articles eleven, forty-six, forty-seven, one hundred thirty-four, section three, five hundred six, eight hundred seventy-eight, eight hundred eighty, eight hundred eighty-three, and eight hundred eighty-four of the Federal Labor Law; likewise, to have labor representation in accordance with articles eleven, forty-six, forty-seven, one hundred thirty-four, section three, five hundred six, eight hundred seventy-eight, eight hundred eighty-eight, eight hundred eighty-three, and eight hundred eighty-four of the Federal Labor Law. Labor; in the same way it is conferred the employer's representation of the company to act before or in front of the unions with which it has celebrated collective work contracts, as well as to celebrate and to rescind individual work contracts; to appear before the Conciliation and Arbitration Boards, either Local or Federal, carrying the employer's representation to accredit personality and capacity in trial or out of it, in the terms of article six hundred ninety-two Section! And II!; it will be able to appear to the development of the testimonial and confessional tests in the terms of the article seven hundred eighty-seven and seven hundred eighty-eight of the Federal Labor Law, with faculties to indicate domiciles.

to hear and receive notifications under the terms of article eight hundred and seventy */.

appear, with sufficient and sufficient employer representation, at the hearing referred to in article "*.

In the same way, the Sole Administrator or the Board of Directors is empowered to request and withdraw from the Constitutional Amparo Proceeding, to designate attorneys-in-fact for the processing of the Constitutional proceeding, to grant and withdraw from the Constitutional Amparo Proceeding, to designate attorneys-in-fact for the processing of the Constitutional proceeding, and to grant and withdraw from the Constitutional Proceeding. Likewise, the Sole Administrator or the Board of Directors is empowered to request and withdraw the Constitutional Amparo Proceeding, to appoint attorneys-in-fact for the processing of the Constitutional Proceeding; to grant and revoke general or special powers of attorney, without detriment to its powers; to open and close, deposit, withdraw and draw on checking and investment accounts in all kinds of banking and insurance institutions, designating the persons who may sign on such accounts; to appear before all kinds of tax authorities, whether federal, state or municipal; to process and register the Federal Taxpayers Registry, increase or decrease tax obligations, as well as the electronic signature of the Company before the Ministry of Finance and Public Credit; to present and receive all kinds of documents before the Ministry of Finance and Public Credit, the Ministry of Finance of the State of Quintana Roo and the Treasury in any of t h e Municipalities of the State of Quintana Roo; to present all kinds of writs, appeals, disagreements, lawsuits and nullity trials before the Federal Court of Fiscal and Administrative Justice, handling in all its instances the processes in which the Company is a party or third party and in the broadest manner, to represent the Company before all kinds of authorities and national or foreign individuals or legal entities...".

-- SECOND - CHANGE OF NAME AND MODIFICATION OF THE CORPORATE PURPOSE By deed number forty-five thousand one hundred ninety-seven, dated February twenty-fifth, two thousand eight, executed before the Notary Public Marco Antonio Sánchez Vales, Notary Public number three of the State of Quintana Roo, whose first testimony was registered in the Public Registry of Property and Commerce of the State of Quintana Roo, in its Cancun Delegation, under folio number 118314 (one hundred eighteen thousand three hundred fourteen), it was recorded the notarization of the minutes of an extraordinary general shareholders' meeting of the company called "GO ON DREAMS", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, in which, among its most important points, it was agreed to change the corporate name of the company to CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, and consequently the amendment to the first clause of the Bylaws. The extension of the corporate purpose of the corporation and consequently the amendment of the fourth clause of the Bylaws referring to such purpose, which was drafted as follows: "FOURTH.- CORPORATE PURPOSE: The corporate purpose of the corporation shall be, by way of example but not limitation, the following: a) The establishment, administration, operation and exploitation of tourist attraction centers, including but not limited to the presentation of shows with marine animals; b) The establishment, administration, exploitation and operation of all kinds of commercial or industrial negotiations; c) The realization, management, exploitation and operation of any type of business of a commercial or industrial nature; d) The establishment, administration, operation and exploitation of any type of business, including but not limited to the presentation of shows with marine animals.

of all kinds of tourism activities and especially the purchase, sale, lease, exploitation, operation and construction of all kinds of hotels, restaurants, bars, clubs, condominiums, marinas and sports centers, as well as the purchase and sale of real estate and personal property necessary for the

d) The promotion, administration and participation of all kinds of real estate businesses, as well as the acquisition, alienation by any title, lease, sublease, and in general, the performance of all kinds of commercial acts with respect to real estate and personal property; e) The organization and promotion of all kinds of tourist excursions, as well as the rendering of all kinds of services for the establishment, administration, operation and exploitation of tourist attraction centers; f) The import, export and handling of all kinds of merchandise in the different customs regimes, as well as the purchase and sale of maritime, air and land freight; g) The acquisition and sale of maritime, air and land freight; h) The purchase and sale of maritime, air and land freight.g) The import, exhibition, and handling of all kinds of merchandise in the different customs regimes, as well as the purchase and sale of maritime, air and land freight; h) The acquisition and export of Mexican and foreign flag vessels; i) The obtaining, administration and exploitation of all kinds of concessions, federal permits in the Federal Maritime Terrestrial Zone, as well as the construction of docks prior authorization of the Secretary of Social Development and the Secretary of Communications and Transports; j) The organization and promotion of all kinds of tourist excursions, as well as the rendering of all kinds of services for the establishment, administration and exploitation of tourist attraction centers; k) The organization, promotion of all kinds of tourist excursions, as well as the rendering of all kinds of services for the establishment, admistration, operation and exploitation of tourist attractions centers. and the Secretary of Communications and Transportation; j) The acquisition, construction, installation and operation of all kinds of warehouses, deposits, warehouses, offices, plants, docks, docks, docks, oil loading docks, gas stations, shipyards, dry docks, and other establishments and real estate necessary or convenient for the accomplishment of the purposes of the corporation; k) In general, the realization of all kinds of activities of construction, operation, exploitation of tourist marinas to hold and provide services to all kinds of Mexican and foreign vessels; l) The rendering and exploitation of the federal public transportation service of! Tourism in the routes or section of federal and local jurisdiction, by means of the concessions or permits that for such effect it grants to the corresponding society or by means of the concessions or permits that in enjoyment contribute its own partners; m) The exploitation and operation of the auxiliary and related services; n) The coordination, link, combination and interchange of equipment with other physical or moral people dedicated to the same object, as well as e! o) To obtain all kinds of loans and credits with or without specific guarantee and to grant loans to mercantile and civil societies with which the company has business relations or titles of credit in charge of societies in which it has interest or participation, as well as obligations or titles of credit in charge of other societies to persons with which the company has business relations; p) To issue and issue all kinds of loans and credits with or without specific guarantee and to grant loans to mercantile and civil societies with which the company has business relations or titles of credit in charge of societies in which it has interest or participation, as well as obligations or titles of credit in charge of other societies to persons with which the company has business relations; p) Emitir y girar toda clase de títulos de crédito, aceptamos y endosarlos, incluyendo obligaciones con o sin garantía hipotecaria o real; q) Adquirir en propiedad o en arrendamiento toda clase de bienes muebles e inmuebles, asi como derechos reales sobre ellos que sean necesarios convenientes para su objeto socia! o para las operaciones de las sociedades mercantile5 o civil companies in which the company has an interest or participation or with which it maintains business relations; r) To acquire shares, interests or participations in other mercantile or civil companies, either by taking part in their incorporation or by acquiring shares or participations in those already incorporated, as well as to dispose of or transfer such shares or participations; s) To act as representative, intermediary, mediator, commission agent, agent, factor, advisor and service provider of any nature before all kinds of persons and institutions of a civil, mercantile, public or private, national or foreign nature in the performance of all kinds of operations, acts and civil, mercantile, credit, labor and of any other nature contracts; t) The promotion, administration and participation in all kinds of real estate businesses, as well as the acquisition, alienation, sale and sale of real estate properties, as well as the acquisition, sale and sale of real estate properties, and the acquisition, sale and sale of real estate properties, as well as the acquisition, sale and sale of real estate properties, as well as the acquisition and sale of real estate properties. t) The promotion, administration and participation in all kinds of real estate businesses, as well as the acquisition, alienation by any title, lease and sublease.

and, in general, the performance of all kinds of commercial acts with respect to goods and services.

granting and obtaining credits for itself or for third parties, receiving and constituting the profits and

v) To be liable for the obligations of third parties onerously or free of charge, constituting all kinds of real or personal guarantees; w) To enter into all kinds of contracts whose purpose is the concession of the use or authorization of exploitation of trademarks, patents, investments, models and industrial designs, the assignment or authorization of trade names, the concession of copyrights, the transmission of technical knowledge and the provision of technical assistance, as well as the execution of all kinds of license and franchise contracts; x) To bind jointly and severally; y) To register, acquire, alienate, own, license, grant and assign the right to use patents, trademarks, concessions, franchises, commercial names, distinctive logos, permits, licenses, privileges, inventions, improvements and copyrights that are related or useful with respect to any business of the corporation, whether domestic or foreign; z) The issuance of bonds and obligations with or without mortgage or pledge guarantee; aa) The investment of capital in securities of all kinds; bb) The preparation, conceptualization, execution, implementation, interpretation, complementation, research and, in general, the elaboration of all kinds of studies and projects related to science, industry and commerce, as well as the promotion, administration and participation in all kinds of businesses; cc) In general, the execution of all agreements and contracts and the performance of all acts of whatever nature and that directly or indirectly favor the good progress and better development of its corporate purpose, after obtaining and subject, as the case may be, to the authorizations and/or permits required by law."

-- THIRD: CAPITAL INCREASE: By deed number forty-nine thousand one hundred and seventy-nine thousand one hundred and seventy-nine

nine, dated December three of the year two thousand nine, granted before the faith of Dr. Marco Antonio Sánchez Vales, Notary Public Number Three of the State of Quintana Roo, it was recorded the notarization of the Minutes of the Ordinary General Shareholders' Meeting of the company named CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, in which among other things

The Board of Directors agreed to increase the capital stock. ---------------------------------------------------------

- FOURTH. By deed number fifty-one thousand and seventeen, dated December thirteenth, two thousand and ten, executed before the faith of Doctor Marco Antonio Sánchez Vales, Notary Public Number Three of the State of Quintana Roo, whose first testimony was registered in the Public Registry of Property and Commerce of the State of Quintana Roo, Delegation Cancun, under electronic folio number 18314 (eighteen thousand three hundred and fourteen). State of Quintana Roo, Delegation Cancun, under the electronic folio number 18314 (eighteen thousand three hundred and fourteen), it was recorded the protocolization of the Minutes of the Ordinary Shareholders' Meeting of the company named CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, in which among other items of the agenda it was agreed to ratify the Board of Directors, resignation and appointment of a new Statutory Auditor of the Company.

--- FIFTH.- CAPITAL INCREASE. By deed number fifty-four thousand and twenty-four, dated September twenty-ninth of the year two thousand twelve, executed before the faith of Doctor Marco Antonio Sánchez Vales, Notary Public Number Three of the State of Quintana Roo, it was recorded the notarization of the Minutes of the Ordinary Shareholders' Meeting of the Company named CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, in which among other items on the agenda it was agreed to increase the capital stock of the company. ------------------------------------ ----------------------------------------------------------

-- SIXTH. By deed fifty-five thousand two hundred and one, dated July fifth of the year two thousand thirteen, executed before the faith of Dr. Marco Antonio Sánchez Vales, Notary Public Number Three of the State of Quintana Roo, whose first testimony was recorded in the Public Registry of Property and Commerce of the State of Quintana Roo, Delegation Cancun, under folio number 18314 (eighteen thousand three hundred and fourteen), it was made Public Registry of Property and Commerce of the State of Quintana Roo, Delegation Cancun, under folio number 18314 (eighteen thousand three hundred and fourteen), it was recorded the notarization of the Minutes of the Ordinary Shareholders' Meeting of the Company named CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, which was registered in the Public Registry of Property and Commerce of the State of Quintana Roo, Delegation Cancun, under folio number 18314 (eighteen thousand three hundred and fourteen).

which among the most important items on the agenda was the ratification of the President, Secretary and Treasurer. Eduardo Albor VJlanueva, Concepción Esteban Manchado and Martin Flores Merino, who in the exercise of their functions will continue to enjoy each and every one of the powers previously granted to them.

- SEVENTH. By deed number fifty-five thousand two hundred and two, dated the fifth day of July of the year two thousand thirteen, executed before the Notary Public of the State of Quintana Roo, Dr. Marco Antonio Sánchez Vales, Notary Public Number Three of the State of Quintana Roo. Marco Antonio Sánchez Vales, Notary Public Number Three of the State of Quintana Roo, it was recorded the notarization of the Minutes of the Ordinary Shareholders' Meeting of the Company named CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, which among other items on the agenda agreed to ratify the resolutions adopted at the meeting held on February fifteenth, two thousand eight, which was notarized through deed number forty-five thousand one hundred ninety-seven, dated February twenty-fifth, two thousand eight, granted in the presence of the attorney of the Secretary of the Board of Directors of CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE. eight, granted in the presence of Mr. Marco Antonio Sánchez Vales, Notary Public Number Three of the State of Quintana Roo, whose first testimony was registered in the Public Registry of Property and Commerce of the State of Quintana Roo, and which first testimony was registered in the Public Registry of Property and Commerce of the State of Quintana Roo. Commerce of the State of Quintana Roo, in its Cancun Delegation, under folio number 118314 (one hundred and eighteen thousand three hundred and fourteen), regarding the amendment of Clause One of the bylaws, with respect to the modification of the name of the corporation and consequently the Secretary of the Board of Directors was instructed to make the respective annotations in the Share Registry Book kept by the corporation for such purpose, as well as to carry out the cancellation of the shares of the corporation, as well as to carry out the cancellation of the shares of the corporation, in the case of the amendment of Clause One of the bylaws. The Secretary of the Board of Directors was also instructed to carry out the exchange of the certificates that cover the shares of the corporation by means of the cancellation of the certificates currently in circulation and the issuance of new ones; and with respect to the amendment of the fourth clause of the bylaws of the corporation in this Meeting, regarding the purpose of the corporation to be in the terms of the minutes of the meeting that were ratified and specified; it was also agreed that the corporation becomes a joint obligor and/or guarantor of Olimpia Investments Group, LID, up to the amount of $1530,000.00 (one million five hundred thirty thousand dollars legal currency of the United States of America), with respect to Caterpillar Financial Services Corporation, subscribing the respective contract; The appointment of Mr. Eduardo Albor Villanueva, to subscribe on behalf of the company the necessary documents for the correct constitution of the guarantee approved in the previous point. -------------------------------------------------------------------------------------

- EIGHTH.- By deed number fifty-six thousand seven hundred and fifty-seven, dated July fourteenth of the year two thousand seven hundred and fifty-seven, granted before the faith of Doctor Marco Antonio Sánchez Vales, Notary Public Number Three of the State of Quintana Roo, it was recorded the notarization of the Minutes of the Ordinary Shareholders' Meeting of the Company named CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, which among other points of the Agenda agreed the amount that has been paid to the shareholders of the Company, and the amount that has been paid to the shareholders of the Company, and the amount that has been paid to the shareholders of the Company.

US 'UnOUPÇ U0ȴ3+^°¡ag 'ooh euetuinp ap ope sq ¡aŞ 0|0J6üJ0Ç |6p * ëeP°¡do g e¡ a 03||Şnğ 0JȴS|Ò6$ |6 U9 0|| 0sUi opanb

oiuomi¡şa ++¡Jd ohm 'ooh eueue\uinp ap ope¡sg ¡ap S6Jȴ 0J6IsJnU P3i¡qnd ei e ou e ou e¡ óŞ Je¡n¡¡ 'S6|P^ Z6g3(*üS)

0(¡*)0ȴÚğ 00J+N J0ȴ30ğ |ap ay e¡ e¡ a¡ue ep96J0 o 'a3uinb ¡im sop ap oi¡rf ap araf1U Pğ36} 6Ş 'Ü6|0

       ¡iw oqoo   eȴuancu¡o o awnu e ni!'* 6 JOE -'So1n1Y1S3 30 NOIOYOIJIOON -'OONñO3S ONI03O - --

       'Sa|el30S SOȴnȴeȴSa S0| ap etXaS e|nSne|3 e| 0|3ata |e OûJJO aJ aS              ef¡ȴa Jed nS Ua |ei30S |eȴid93 ¡a

o uawne as uo!sn oq3i$ ap eicuan3asU03 Onion ewi¡ȴn edsa opuai s!sqns a ueuoisnq pepa|00S 6 J6ȴ3CJ93 ns u°

'3lBvibxA gYlldY3 30 YNINONY OYO3I0OS 'NIHdOOO Yd00YgOblNOO * 'epeuoisng $9Ş6|00S 0IJJJ03

'Şğg\llbYAgY1IdY0 30 YNINONY OYO3I3OS 'OOb YNYINIOD 30 S3NIJ13O

sepeuimouap sa e oz seuos ad S9| U0JPJqa|a3 anb yş¡lINIJ3o NoiSŞJ@ğ 0Z|||em o as satueqodwi see

       so¡und sns a ua ¡end e| ua 'gqg9lbYAIYIIdY3 30 YNINONY OYO3I3OS 'NIHdgOO YbOdYJOblNOO

       ağ YNINONY OYO3I0OS 'NIHdgOO YbOdYJOblNOO
       de un Acta de Asamblea General Extraordinaria de Accionistas de la Sociedad denominada

LI0|3PŻl|000ȴ|0ğ P| JPȴSUOO 0*Ş¡+Ȉ¡o auime6ȴ0 o ns ap a uaiua o¡ ap e oĵeauano ȴun3ueg ooh 'ena eue uinp ap

0Ş9ȴST |6Ş 0|3J6L|J0Ç |6p ȧ pepaldo g e¡ 6 03i¡qng oJȴ ȴ^^b|6 Ug 0ȴlJ3SU| JMS ap atualpuad eȴS6 ȴ'O+fl +¡

an d ohm 'ooh euetuinq ap ope sq ¡ap sa o awnu eoi¡qnd °¡° ou e¡ ap eqn          'sa¡eȦ Z6gc*^_S0lü0ȴUÿ

00J+N J0ȴ30Ç |6Ş 6j P| 6ȴU9 PÔJOȴO 'a3uinb ¡iw sop ap oiunf ap o awud equal ap 'e uasas so¡uaica'ou

       +T+! * PȴU6fl0U|3 0J6Lü ''* +**T!J3S6 JOE -'ÇZOYOZIOOS 30 NoISŞJ - Ob3Nlbd ONI3ŞO

----- ----- -- -- ----------------------------------------'9Ş|U6/U03

uoisn q3i¡ ¡a iȴiuiaȴ ua '0gP3 P JPA6||        0ȴS60doJd uoisnȴ 6Ş 0!*+AU00|6 JPLLIJ|¡ 6 0ȴ06ȴ6 P P P6|gLùPŞğ P|

(°P) (l+!)3adsa epe6aȴ6Q 0Lü03 '0ŞPg3UPNU9qa sq u0d60Ll0Ç P 9|3J63l| P| 9 0UÔ|S6Ş 6S        0+!T3adsa uuisn

6 0!*+Aü03|6 6SJ9+*!¡ ·uoi¡snj e<*|P0ğPc e as era¡¡ eiqap sa¡en3 set e aLüJ0J|U03 S6S9Ş SP| U0J9 J009 OS Ȧ

       6ȴU9U0||S0A P+P+!>0SOLü03 'ğğØ@|bYAIY1IdY3 30 YNINONY OYO3I0OS 'NIHd10O YdOOYJOb1NO3

opuaiȴ ! qns ż 'epeU0! ^' P+P+!*0SOLü03 9Luiȴn etsa opuaioasedesap 'gqgy¡ȧvA1Y1IdV0 30 YNINONY OYO3I0OS

'00b YNY1Nlño ZCI SZNIJI3O +P+*!+0U6ŞŞP6|30S 9| U03 Pp6|30S e sa euoisnt opsooe as sa ueqodæi see so und

sns aJ üa ¡en3 e¡ ua 'gaggȴbv\ 1Y1IdY0 Zg YNINONY OYO3I0OS 'NIHdñOO

YbOOYJOb1N00^P^*!+0U6Ş 9 6|30S 9| 6 SPȴS|U0l339 6Ş PIJPUIŞJOPJJȴXT |PJ6U6Ç P6|ÇLLIPSŞ 6 Pȴ3ğ |6

U0¡3 Z||030ȴ0sd e| JPȴSUO0 0Z¡J S 60J0ȴP>(!l+) O(P) (P) (P)  (*1+) i3l 6Ş 6ȴ6|S|36|Ş 9g36j 6ğ '63J0ȴB3 S0ȴU ¡>S6Jȴ

I!+ 0g30|3alp) (I) (!S8) (I)0J6Lü?N 00|U0Jȴ36(I+) (I!!T^)P3J6IJJJ 0Iȴo ¡a ofeq 'un3ueg U0|0e6a¡ug 'ooh euetuinp

6 0 PȴSA |6Ş 0!*J++ 00 +P 03!Ignd 0*iS!*+b I+ U° ¡iI*3 u¡ opanb oi°¡*i*¡, ¡i '++!J^  Ohm '00s PUPȴ°ing ap Ope sq ¡ap

S6Jȴ Osamng e3|||4nd (+!*+T) 0N+!' d Je¡nI!1 'sa¡eş zaqcuCs oi\uo0o¡g 03J9N '0ȴ00Q|6 6Ş 9| 6ȴU9 PŞP6J0ȴ0 '63J0ȴP0 ||Lù SOA

0u9 |6Ş 6JŞ++!dlas ap sop equal ap 'aisiȴU|6A S0ȴU6|36A0U ¡l+Spas e¡uan3+¡30 awnu e3l|qn¡ e ni! >Sã a ueiP°N -

ovO3I0OS YI 30 NOISŞJ YdYd S00bZñ3Y - "0NI3ŞO ---

       P^P+!*0SP| 6Ş U0|0PJȴS|U|Lù ğ 6Ş 0(óSU0Ç |6Ş 6ȴlJ6 |S6Jğ |6 9l|ȴ¡3J6d anb sa¡ensuam

S0lȴ+J0U0g S0| 0ŞJ03P US P| l6 U6P°oi°ğ sotund so o a tua ¡end e¡ 'gdgyiavA ñY1IbdY0 Zg YNINONY

Asamblea Ordinaria de Accionistas de la Sociedad denominada CONTROLADORA DOLPHIN, SOCIEDAD

Notaría Pública Número Tres del Estado de Quintana Roo, se hizo constar la Protocolización de un Acta de

de julio del año dos mil catorce, otorgada ante la fe del Doctor Marco Antonio Sánchez Vales, Titular de la

---------------------------------------------------------------------------------- funciones que desempeña en la sociedad.

de percibir el Presidente del Consejo de Administración de la sociedad, en concepto de honorarií

73E0D63EU:a06R3A60RF23L0D063O3R63DEa0E63S60
MC32OO:A03RO0O3T0N0N3A00A307L03B0100304HOD
2XÜ3J01L031O1A030ZN03U4I1E3c8VA
05050

el folio mercantil electrónico 18314*2 (dieciocho mil trescientos catorce asterisco dos), se hizo constar la protocolización de un Acta de Asamblea General Extraordinaria de accionistas de la sociedad denominada **CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, en la que entre sus puntos más importantes del orden del día se acordó la reforma de las cláusulas Sexta, Octava, y Décima primera, referente al capital social y sus acciones; de los estatutos sociales. ----------------------------------------------------

----- **DÉCIMO TERCERO**.- Mediante escritura pública número mil setecientos once del protocolo abierto, de fecha veintidós de julio del dos mil quince, otorgada ante la fe de la suscrita notario, se hizo constar la protocolización de un Acta de Asamblea General Ordinaria de accionistas de la sociedad denominada **CONTROLADORA DOLPHIN, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, en la que entre sus puntos del orden del día se acordó la aprobación para celebrar los documentos de la operación documento que quedo descrito en el instrumento citado, y la aprobación de otorgar en favor de CT CORPORATION SYSTEM, un poder especial irrevocable tan amplio como en derecho proceda, para ser ejercido en el Estado de Nueva York, Estados Unidos de América. ----------------------------------------------------------------------------------------------------

---- **DÉCIMO CUARTO.- OTORGAMIENTO DE UN PODER ESPECIAL IRREVOCABLE.-** Por escritura [illegible]

José Miguel Ortiz Martínez, actuando como notario auxiliar de esta notaría, de la cual su titular es la licenciada Ivonne Lemus Arellano, se hizo constar la protocolización de un Acta de Asamblea General Ordinaria de [illegible]

[illegible]

emplazamientos antes citados el ubicado en 818 (ochocientos dieciocho) W. 7th (séptima) Street, Suite 930 (novecientas treinta), Los Ángeles, California 90017 (noventa mil diecisiete), Estados Unidos de América, o

73E0D63EUa06R3A60RF23L0D063O31R63DEa0E63S60
MC320OA03R00O3T0IN0N3A00A307L03B010O304R030
2V03I01L03L01A0302N03U411E3c8VA
B030

-a ap / oi ojesi)ipom oįua oįua uos amį d / uoise(ode ap oįua uos iç (q .ľ̃s                    bp        oouç/ksind

at *age juoç" ia) (,s iį e eç ap ajua q" /a} sa ape dinos soį ap o/3/ auaq ered / a qmou ua seįue eõ ap ajuaõe ap

ajee es ns ua '(įuaby įe ajeioç} 'uoi eisoss\/ įeuoi eg                      en į uoįbuįmįį/yį ( i) / '(,pi        ıŧłoç"

soį ) s a ope dm 00  6 p   a joe eО  n s   u a  'e opeį o juoç God sopįima  (sa)og  p a n e  a  t   o iual)

s a oįe                  soį  u e   ainbpe odmaį ua odmaį ap anb '(s aseqs n ) sa ape dinos soįįanbe (ii) '(s o

ue end) sa ue eõ oral '$PŢ6Į3OÇ 9| 0|0U6/n|3Įį| 'U|ğÒ|0g ap sepeįįje/ seueįpįsqns seyaįs t/03 ò)uameįuniuos (, įq įog"

aįueįape ua) ( oįue end įua eį) '/ 'ç at                              $ ap 'ç '/uedmoç įejideç uįqdįog (ii)

'opisaįqe su įqe va never a įo aįnbįens oieq / e osįma pepaįsos ap va/ee es ns ua '( anssį) pepaįsoç eį (i) 'a ua ope

qaįas eras anb (įuamaa ôy aajue end pue aseqs ng atop) sa oįe ap eį ue e6 / e dinos 'uoisįma ap o e įuos įç" :onor

opUeU0!t+|+J

auaįr as anb 96įqwese eį US 0U|!'csap opanb anb 0U|+*áun6as ''"U0į3^J6d@ 9į ap so uamn3og" sob

J9OJ0ţ0 9JPd aįuaIU6/\U03 0 +|*9S63aU u0į339 J"įnbįen3 eJewo            eJ9įȘ6|60 P+P+!30Ç C1 6FI^ +P+į3U+|U6AIJ00

9| S9ţS|U0į339 S0| 6 U0|39J6ŞISU03 P| P 0|į+ŁùOs as satUegodwi see so und sns a įua įen3 eį ua 'aranu|3^įp I!+ SO   +P

I!*g+ +P+^ Jţ 9g36į U03 P P PJŞ6|63 '3OBYIbYA 1Y1IdY3 3O YNINONY OYO3IOOS 'NIHd1OO

Yb0öYIOdINO3+Ę9U|IJJJOU6Ş P+P+!30S P| 6Ş SPţS|U0|33P (+P) ^|*PU¹ŞJ0 I+*+**°seaįqmesą ap eyeV/ un ap

U0|09Z||000ţ0Jd e|J9ţSU03 0Z|J+ S '0|°*tou e I 3sns eį ap ay eį a ue ep9ôJ0ţ0 'aranU|36|p įIrù SOA 6F I|JğP 6Ş S6Jţ 9g06į 6Ş

'0J6|Ş9 0|000ţ0Jd |6p e uia ţ S0ţU6|36/\0U I!+S6Jţ 0J6ùJnu eJn*IJ3Sa aįueįpa(i*/-) ('01X3S ONI3Şõ) (-)U0!*9J6d(o) (° i )

(° p )S0}uawn3og sopeJ6Ş|SU00 UCJaS sopoį saįen3 sob 'sowS|^J S0|° p 9IJJJ|0J6J PJţ0 J+| I|ĥ|e03 0 U0į.n iįsns 'o uawaįdns

'įem ed o įeį0ţ Cas P/ 'U0|3 0+| ipom ™įnbįen0 '0593 e 93 Ua 'opua/nįcui a 'lJ0į3^J(+*0)

9| 6Ş S0ţU6úJ030Q Sof ap esaįnbįe03 U03 S9Ş9IJ0I39|6J 0 6   SPŞeAI ap 'e um o uoc sepi anba sapn¹[ᵣᵢ]ₐₛ

0/s S6Japod 'So U¹I+! anbaJ 'sosire 'S6U0|>+3Ijiíou 'sau0|33nJ suį 'sope i IĘ63 'SeIţUPJe6 'sotuamn3op 'S0ţU6úJ0JţSU(|)

'S0ţ9JţU00 'S0| U6Aü03 S0JţO JaInbsaįen g (3 'sjuamnsog juamįsa/\U/ S0| Ā S6J0|9s a 9Jdmog UoiSiIsJ    ap e oiJU0/ |e 00Ui0

0įuaIJJnU 0|3S0 0įuaIJJnuð 'Sáį0 p6Jh a/0įLI6/

S0|) S6J0|9ș a PJdwog      U0|S|+3    0 0\"'JįU03 I^ O3*í3 9 O* +?N   0|Jį0 3IţIPON 0|U6AU0Ç |6 U00 U0|09|6J

Ua O Ua 0pi3a|qeįSa 0| U00 aùJ 0 U03   0Se3 |a eas Un 6aS   'etSi|eAe 0 0IJepį|0S 0pe6iìq0 0 100 'J0 dií3SnS

0IJJ03 'Ŝ^P^¹!* S ^į 0d S0!ţ*3SFIs as ue ainbaJ anb (sa oįeș aŞ PJduJOÇ Ā U0|SIùJT 6 OţPJţIJOÇ IC Ş 0*++?N 0(I*) 0(T^3IJIP) 0(N)

0(|¹)U+ AU0Ç |6 6U 6|į6Ş BS 0U|üJJat oq*|p un6as) saįog o sa og pa nsas J0/U6Ç 6Ş PLùJOị U9 0ţ|Pạ3 ap oįntiţ ° įnbsaįenc ap

uoicd|s3SnS eg (q . įuamaa ô\/ aseqs nq atop oį osuįs ç 'ay uampuamq) S6J0|P/\ ó e dwog.     Uoislwg ap oţeJţU0Ç

|9 (03U|3) ç o amnu ouoįe*!JJ!PON 0|ᵤᵤ'u0g į6 '( anssį) e osica pepa|30S 6Ş

J6|3C e3 ns ua pepa|00S 9| 6 U0|3PJ6d0 9į ap s0įuauJ030Ş S0| 6Ş U0(į3^) Jg°ᵣ*c eį Oqo de as eip įap uap o įap saįuegod=I s?e

so Und sns aJ ua anb eį ua 'oqc0|3+!P I!+ SOP I°r° n++!"ᵃˢ ap o įen3 eq36į U03 9ŞPJŞ6|63 '318YIbYA gY1IdY3

30 YNINONY OYO3I3OS        'NIHd1OO    Yb0OYIOb1NO0+P+*|JJSOA6Ş  P^F+į*O5

9| 6Ş S9ţS|U0|33+ (+P) (^I**^*!P) J(0) (I+) J+*+9^^I4u°s\/ ap e 0t un ap u0(|) (ᵣ)ezIioc0 o o d e| eisuoc 0z|g 6S '0IJ+i0*

+į|J3sns eį ap ay eį atue epe6 0ţ0 '0g00(|) 3(+!P) (I|+)SOA |6    6JŞ++!Td6S 6Ş 0Jten3 eq36į aŞ '0|J+Ig*P 0|0c0 oId įap

oun e uarou so uaiuinb į!+ Sa o amnu eJniIJ3S6 6i*^!P+N "NOI0YZI10001Obd - OINIißD 0NI3ŞO –

---------------------------------------------------------------

I+J+P+J 0í|*T!O UP * S0Ş9ţSÁ S0| 6Ş S6I!^|0 06|p0g SOA ua sort eįa "oc sns            ieJ6 (°J) (I|+|0) 0(*!P) 00¹ᵃ (Sias "03|X+.N +P

etuarou soţuaiuinb įim sop) 9ss¿ oį n3|ᵥᵥ\/ ᶦa s⁰ᵈ oįsandsip oį ap ioumss8ţ U9 6|Ş900A6JJJ| S9 '0ţUPţ 0| J0d '/ua soįeş ap e

dinos       Uoį (I+3) (+P) 0(i^JT)U03į a US 9ţS|^aJd u0í*IP*03 eun ap o uaimįdwnu 0m03 0 96J0ţ0

God oq3!P P°P+!*0S +|    0 +30'ç ap aįua6ą įa anbíi|0° aį o non įa ua ua anb oíí|*ímop o o o J°įnbįenu





73E0D63EUa06R3A60RF23L0D063O3IR63DEa0E63S60
MC32OOA03R00O3TT0N0N3A00A307L03B0I00O30AR030
2X0ŞI0IL03L0I0A02N03IU41E3c8YA
E6050

expresión total al contrato de fideicomiso irrevocable de garantía número CIB/2380 de fecha 8 de octubre de 2015, que será celebrado entre, (i) la Sociedad, Promotora Garrafón, S.A. de C.V. ("**Promotora**"), y Dolphin, en su carácter de fideicomitentes y fideicomisarios en segundo lugar, (ii) el Agente de Garantías, en su carácter de fideicomisario en primer lugar y (iii) CIBanco, S.A., Institución de Banca Múltiple, (el "**Fiduciario**"), como fiduciario, con la comparecencia de Dolphin Austral Holdings, S.A. de C.V. ("**Aqua Tours**"), Aqua Tours, S.A. de C.V. (el "**Fideicomiso de Garantía**"), c) El convenio de ampliación, modificación ratificación y subsistencia de contrato de hipoteca marítima, de fecha 10 de diciembre de 2015, celebrado entre la Sociedad, como garante hipotecario, y el Agente de Garantías, como acreedor hipotecario (la "**Hipoteca Marítima**"), d) Cualquier pagarés que requieran ser suscritos por la Sociedad, como acreedor prendario (el "**Contrato de Prenda sin Transmisión de Posesión**" y, conjuntamente con el Contrato de Emisión y Compra de Valores, el Fideicomiso de Garantía, la Hipoteca Marítima y los Pagarés, los "**Documentos de la Operación**"); y f) Cualesquiera otros convenios, contratos, instrumentos, documentos, garantías, certificados, instrucciones, notificaciones, avisos, requerimientos, poderes y/o solicitudes requeridas conforme a, derivadas de o relacionadas con cualquiera de los Documentos de la Operación, e incluyendo, en cada caso, cualquier modificación, ya sea total o parcial, suplemento, sustitución o cualquier otra reforma de los mismos" Por lo que se resolvió aprobar la celebración por parte de la Sociedad de los Documentos de la Operación y cualesquier otros convenios, contratos, instrumentos, documentos, garantías, certificados, instrucciones, notificaciones, avisos, requerimientos, poderes y/o solicitudes requeridas conforme a, derivadas de o relacionadas con cualquiera de los Documentos de la Operación, e incluyendo, en cada caso, cualquier modificación, ya sea total o parcial, suplemento, sustitución o cualquier otra reforma de los mismos. En tal virtud, la Sociedad podrá realizar, suscribir, celebrar y llevar a cabo todos aquellos actos que sean necesarios o convenientes a fin de consumar todas las operaciones objeto de dichos Documentos de la Operación, incluyendo sin limitar, el Contrato de Emisión y Compra de Valores, el Fideicomiso de Garantía y el Contrato de Prenda sin Transmisión de Posesión; asimismo se aprobó; el otorgamiento de un poder irrevocable en favor de CT Corporation System, con domicilio en 818 W. 7th (siete, t, h), Street, Suite 930 (novecientos treinta), Los Ángeles, California 90017 (nueve, cero, cero, uno, siete,) Estados Unidos de América. ----------------------------------------------------

**DÉCIMO SÉPTIMO.- PROTOCOLIZACIÓN DE ACTA.-** Mediante escritura número cuatro mil trescientos noventa y tres, de fecha dos de julio de dos mil veinte, otorgada ante la suscrita notario, se hizo constar la protocolización del acta de la Asamblea General Ordinaria de la sociedad denominada "**CONTROLADORA DOLPHIN", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, en el cual de la página dieciséis frente a la página diecinueve frente, obra el acta de asamblea general ordinaria de fecha primero de julio de dos mil veinte, en la que entre otras resoluciones se acordó confirmar y ratificar la validez, vigencia y el contenido de las Resoluciones Corporativas 2019 en su integridad y el otorgamiento de un poder especial

10

73E0D63EUa06R3A60RF23L0D063O31R63DEa0E63S60MC320OA03R00O3T0I
R00SA00A307L03B010O304R0302V03I01L03L01A0302N03U411E3c8VA

0p enpg saJ0u6S S0| P atuaweri 06dS6J Ş+P°ʰ!30S +ı 6Ş U0!39°ʰı !ᵁ!+Fb 6Ş 0f6SU0Ç |6Ş 0J6J0S6J Á ₀UPʰ₆J36S

'6ţU6PʰS6J¿ ¡e sa apod so Ua|me qùJ0U S0| U0J93!tʰtᵗt9J +Ş° anu¡36|p ¡ıw sop oUe ¡ap°4++!3!P° p oun Ä 9ţU!+°ʰı|9 0J6Ua ap o aw|Jd ¡ap er anb o!3!>°*°!a¡a God 'pepaicos °¡ 6Ç 0|J9S|ùJ00 i° God ope¡U6S6Jd aw o ui

|6 0g0Jde °ş ı^!*°0S 0|0|0Jafa ¡a aţueJnp °°i9°ʰr°^¡e Idea IP 9IJJJIU0Ug Ş°P°+!°0S °ᵤ¡qd|O@ 9JOŞ9|OJţU0Ç 6Ş U0i0eJ¡Si UiiuJpV/ 0faSU 0/ ¡a J0d S0p¡ J Ş0 3e S0| ap 0Un epe3     S0p0¡ Uaiqùu̇e aS0pUe3¡ ¡ eJ     aS0pU q0Jde

'aranui3°!P !!+ S0p ap asqw6|3!P° p oun e U!+°i ¡e op|n¡3u03 !+!30S 0|3|0J6ta ¡a atue np 'pep6|30S e¡ God oqe3 P SP e'a||| Sauolce ado set ap eun epec sep0ţ U0J9Ş0Jde (°S) (-ü+)Ş6|30(S) (+I) (+P)9U|3|]0 SP| Ug S9ţS|U0!₃>9 SOA 6 IJ0!>! 0d !p9 0f6SU0Ç |6Ş 6IJJJJ0}°! INU03 0 unt uo a¡rntsa saįen3 on 'aranu!°°°!P!!+50 ßŞ

+°ü++!*!9° p own etuia ¡e °ı₣+ʰ^ᵛ|et|deg 6Ş PLIJ|U0IJǧ Ş9Ę6|00(S) °U¡Jd|oǧ PJ0ŞÇ|0JţU00 6Ş S0J6|0UP*ᵤJS0ĘPţŞA S0| U0JPŞ0Jde as !aranu(!) 3°!P!!+50 0U9 |6Ę 6JǧIţJ°!!9° p oun° °!+J ¡a opin¡3u03 ¡9|00S 0|>!3J6f6|6 a ueJnp e S6 J0d S9Ş9Z|ţ+6J S6U0I39sado set Oboe iS9 'pepal30S 9| a 9ǧ3J9IJJJ e| 9 0ţ3adsa 'uoice tsiuimpg 6Ş 0f6SU0Ç i° God ope uasa d 6LLIJ0}U!ˈa Oqo de US :S6|^+!*^!S sop'an3e sob uo emo¡ as ¡end e¡ ua 'S0Pţ|U|6 ¡ıw sop ap ozsem ap 60J0ţ93 Clp |6 PŞ9JŞ6|63 'TŞ@\i|@(YA) (0Y1IdV0) (30)YNINONY OYO3I00S

'.. "iHdaoo xboo9aoa1No2,,. °9° != °9 9°P°!3     °i °r   ° ¡ ^ |° !"°°°° °°g °!°° !9' ¡°ᵒᵒᵒᵒᵒA °¡*°

a ap u0i39Z|¡030ţ0Jed| JP|SU00 0Z|g 6S 0|Je¡ou e¡IJ3sns e¡ ap ay e¡ a ue epe6 ono 'sopiţuȷar ¡im sop ap ¡isqe 6Ę 6ţ6|S Pg36j 6Ş '0Ę6|Ş9 0|030ţ0Jd ¡ap etuan3uic o uaic ¡im ocul3 0Jamnu eJnj¡J3Sa a uel9°N (-) ('ONIS39IA)

- sasam s0=ᵗ|ı̇n sob a uesnp sepez|¡ea4 'S6U0!*Uf1} SC/l cadsa sns ap o¿adwasap ¡6 J0d U0|09Jţ|S|U!+Fb 6Ş 0f6SU0Ç |6Ş S0Jǧ|JJJ6|ţ.ù S0| *!₀¡**6d ap ueq anb S0!ʰ° ouoo ap 0ţÓ63U00 US 9|JPUI J09JtX6 IJ0|09SuaduJ00 6 IJ0|09Ş0Jde.                                            !S9ZU9UĮA 6 0J6f6SU0Ç    0^!t°sod oq osafasuog

'J0|9JţU0Ç 0J6f6SU0Ç !P66T 0J6f6SU0Ç '6ţU6Pʰ!6Jǧ 0J6íaSUog ow03 ᵘᵃˢⁿˢ!! 'so6 e3 sns ap ou6dmasap U0|39 ado e¡ aŞ S0|36}6 PJ9d 'U0!39JţS|U!+ü̇b6 0í6SU0Ç ¡ap s0 q^++!= sob anb e Pd e¡sandoJ                                        e¡ e S0AIţe¡aJ S0pJan3e

LIOJeLIJ 0ţ aS |en0 e| Ua atUiaA |IùJ S0p ap aJqùJa¡ţdaS ap eţUiaJt el p ¡a epe qa¡a3 'Ş-jgę¡yyĘ

1YIIdY3 30 YNINONY OYO3I00S '"NIHdʰOO YbOüYñOblNOO" 9ŞPU!+oU6Ş ŞP 6I30S 9| 6Ş U0|39J|S|ʼUİùJ9 6Ş 0f6SU0Ç |6 U0!S6S P| 6Ş 9ţ3P |6Ş U0!39Z||030ţ0Jde| JP|SU03 0Z|q as oue oue ou e I 3sns eᵢ ∅ᵢ ∅y e¡ atue epe6J0to 'ounit°|!++i!W sop ap aªq=ʰ>!P° p oun¡ţuiar equal ap 'oUn e u°^ᵛı> Iı+ 03^!30J6ùJnU 9J0i¡*0S6 6T°*!P+N 'O£3SN00 g3O NOIS3S 30 YIOY 30 NOI0YZIJ0001Obd '0N3A0N 0NI33d

- sasaz somi¡n sob a¡ue np sepezi¡ea 'sau0¡*un seri 06dS6J SMS ap o¿admasap ¡a od 'u0|3PJtS|IJIIJJJJŞǧ 6Ş 0í6SU0Ç |6Ş S0Jǧ++!+ s0| J|S|3J6d ap ueq anb ei euip oes x6 ü0!3+ SUaduJ03 6Ş IJ0|*°qo de    !sezueuiq 6Ş 0J6í6SU0Ç    0^!r° od og 0J6í6SùoÇ 'J0|9JţU0Ç 0J6f6SU0Ç '!96ğT 0J6f6SU0Ç '6ţU6P! *d0J6í6SU0Ç 0ùJ000

ua nᵛ|i 06 ec sns ap ouadt.ùasaŞ U0|39 ado e¡ aŞ S0ţ36}6 ered 'U0!3+JtS!u!+PV 6Ş 0í6SU0Ç |6Ş S0JŞ++!+ sob anb ered etsandos¿ .sape ¡me ap o ua¡we6 ono pepaiuo$ e| 6Ş U0|09(*¡) (!I)JIùJĘA6Ş 0f6SIJ0Ç I6Ş eJn en sa e¡ e saįe00$ S0 J9b6JÓ9 0ùJ03 ISC 'IJ0|09JţS|UIIJJJŞA 6Ę 0f6SU0Ç UP 0(*g+) (!+) (S)0| Ş IJ0|393!t¡i J

e¡ e som eta sop an3e uo ego as ¡ef13 e¡ ua 'a uiar ¡¡ùJ SOA 6°(4++!) das ap e uja                        eip ¡a e PJǧ6|63

'3g8YIbYA JYIIdY3 30 YNINONY OYd3I3OS '..NIHdgOO YbOOYgOblNOO" PŞPU|ùJ0U6 $Ş6|30S el ap Uoi0e SiUi I pe ap OfaSU0/ |ap U0iSaS e| ap e 0e ¡ap U0i0eZi|000 0Jd e| Je SU00 0Zi q aS 0iJ    OU e u0SnS

número cinco mil cincuenta, de fecha veintiuno de diciembre de dos mil veintiuno, otorgada ante la fe de la

e ni!°0Saa  ueiP°N -'003SN00 g3O N0IS3S 3d YIOY 30 NOI0YZI1O001Obd '-OAYIOO ONI03O

----------------------------------------------------------------------------------------- n Alcocer.                                                     opuecsg ¡auP°N S0|JeÇ

ZaJa    0JnJnJV SaJOUaS S0| ap J0/e Ua SOU 0iXa        e|ţUeJe    ap S0|U0ùJ n30$ S0| ap U0¡0e qa|a0 e| eJed



de Martin Albor Villanueva (también conocido como Eduardo Albor Villanueva), Concepción Esteban Manchado y Martín Flores Merino. ----------------------------------------------------------------------------------------------------

**VIGÉSIMO PRIMERO.- PROTOCOLIZACIÓN DE ASAMBLEA.-** Mediante escritura pública número cinco mil ciento ochenta y ocho del protocolo abierto, de fecha diecinueve de mayo del dos mil veintidós, otorgada ante la suscrita notario, se hizo constar la protocolización de un acta de asamblea general ordinaria de accionistas de la sociedad denominada **"CONTROLADORA DOLPHIN", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, celebrada el día diecinueve de mayo del dos mil veintidos, en la cual se tomaron los acuerdos siguientes: la aprobación de la sociedad para que celebre los *documentos del Financiamiento, así como los Documentos de Garantía, los Contratos del Deudor y los Contratos Tagepa, cualquier documento necesario o conveniente para la apropiada suscripción e implementación de los Documentos de la Operación.*

**VIGÉSIMO SEGUNDO.-** Mediante escritura pública número seis mil doscientos sesenta del protocolo abierto de fecha cinco de diciembre del dos mil veinticuatro, otorgada ante la fe de la suscrita notario, se hizo constar la protocolización de un acta de asamblea general ordinaria de accionistas de la sociedad denominada **"CONTROLADORA DOLPHIN", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, celebrada el día siete

U0I3PĘ0Jde e| :S6ţU+!**!S0Ş4603P S0| U0J9úJ0ţ US |P03 P| US '0JţP03IţUI6/ |ILIJ SOA |6Ş 6JğùJ6|/\0U 6Ş

*presentado por el Consejo de Administración de la Sociedad, respecto del ejercicio fiscal que va del primero de enero al treinta y uno de diciembre del año dos mil veintiuno; Ratificación del Contador Público Javier Otero Ibarra, en su cargo de Comisario de la Sociedad; Ratificación del Consejo de Administracion de la*

PePa!2o °i aP a4!1° ai* aï ° !3a'edu * ïü - vzino2o1oba 9s ano v129 nao -'oba3aa1 oMsșsiA.

°P °t3Y i° '3ga9ibYù gY1idY3 30 YNiNoNY O9aai0os '..NiHdgoO Yboo9üob1Noîi,. °P°°!+ °P

Asamblea General Ordinaria de Accionistas, de fecha siete de noviembre del dos mil veinticuatro, así como

e \a¡ e ofeq o uamnJțsU!° uaSaJd ¡ap ac¡puade ¡e ueõa 6e as sewsiw set ap seidom 'e|3U6ţSiS9 6Ş 9ţSI| 9|

**"A"**, y la cual transcribo a continuación: ----------------------------------------------------------------------------------------

*"**---------------------------------------- CONTROLADORA DOLPHIN, S. A. DE C.V. --------------------------------------***

***---------------------------------- ASAMBLEA GENERAL ORDINARIA DE ACCIONISTAS------------------------------***

***---------------------------------------------------------------- Ejercicio 2022 ----------------------------------------------------------***

***--------------------------------------------------- 7 DE NOVIEMBRE DE 2024 -------------------------------------------------***

uT

uoJa¡unaJ aS 'ÿŢgŢ ap aJqLİJalÄou ap] e|p|ap seJoĘ gĘ.Ţ[ s e|opuals 'ooh eu9)ulng 'un0ueÇ ap pepnlÇ e|

/° ("e'opelo'iuos" o"pepa!°oS" -il 'h 3 so 'ë 's 'x/nd7oo 4dooP1od'xo3 -o i-!!'-- -!i!-!+-ê i- ua

*Sr. Sergio Said Jácome Palma en nombre y representación de CIBanco S. A., Institución de Banca Múltiple, y el Licenciado Eduardo Albor Villanueva, (quien también acostumbra usar indistintamente el nombre de Eduardo de Martín Albor Villanueva), accionistas de la Sociedad, con el objeto de celebrar una Asamblea General Ordinaria de Accionistas (la "**Asamblea**").* ---------------------------------------------------------------------------

*La Asamblea fue presidida por el Licenciado Eduardo Albor Villanueva, Presidente del Consejo de Administración de la Sociedad, y fungió como Secretaria de la misma la Licenciada Concepción Esteban Manchado quien es Secretaria del Consejo de Administración de la Sociedad, quienes protestaron el leal y fiel desempeño de su cargo manifestando tener pleno conocimiento de los estatutos vigentes de la sociedad sobre los cuales se deberá regir la presente asamblea.* ----------------------------------------------------------------------

73E0D63EUa06R3A60RF23L0D063O31R63DEa0E63S60
MC320OA03R00O3T0IN0N3A00A307L03B010O304R030
2Y03I01L03L01A0302N03U411E3c8VA
B030

*El Presidente y Secretaria de esta Asamblea hacen constar la presencia del 100% (CIEN POR CIEN las acciones con derecho a voto asi como de la presencia del Contador Público Javier Otero Ibarra, Comisario de la Sociedad.* ----------------------------------------------------------------------------------------------------------------

*Asimismo se encuentran en la asamblea los demás miembros del Consejo de Administración de la Sociedad señores Valeria Margarita Albor Domínguez y Martin Flores Merino y como invitado el señor Juan Alfonso Delgado del Olmo.* ------------------------------------------------------------------------------------------------------

*Por unanimidad de todos los miembros del Consejo de Administración se acordo designar al Sr. Sergio Said Jácome Palma como Escrutador de la Asamblea, quien aceptó desempeñar este encargo procediendo a confirmar la representación de las acciones del capital social asi como la identidad de todos los miembros del Consejo de Administración y demás asistentes a esta asamblea.* --------------------------------------------------

*El escrutador certifica la presencia de la totalidad del capital social de la Sociedad conforme a la siguiente lista:* ----------------------------------------------------------------------------------------------------------------

| em/¡) / e s¡uo¡aag | **Capital Fijo Serie "A"** | **Capital Variable Serie "B"** | **Valor** |
|---|---|---|---|
| CIBanco, S.A., Institución de Banca Múltiple, en su carácter de fiduciario del fideicomiso irrevocable de garantía número CIB/2380 RFC: BNY080206UR9 | | | |
| p¡eç oi6 a¿ ç /a God epe uasa day en¡ed avowe | ssó | z 'oz zżz | tet oí''' |
| e anue¡i/ oq¡y op enpş et19eíí99a'oY '3-/d | 6 (las cuales se encuentran pignoradas en favor de Wilmington Trust, National Association) | | $600.00 |
| **TOTAL** | 1,005 | 2,102,242 | $210,324,700.00 |

*La lista de asistencia se agrega al expediente de la presente acta como* ***Anexo "B"*** *debidamente firmada por todos los asistentes a la presente Asamblea.* --------------------------------------------------------------------------------

*Con base en la certificación emitida por el Escrutador, el Presidente declaró la Asamblea legalmente instalada en virtud de que se encontraba presente en la Asamblea el 100% (CIEN POR CIENTO) de las acciones con*

LIC. IVONNE LEMUS ARELLANO NOTARIA PÚBLICA NÚMERO 64 DEL ESTADO DE QUINTANA ROO MUNICIPIO DE BENITO JUAREZ ESTADOS UNIDOS MEXICANOS

73E0D63EUa06R3A60RF23L0D063O31R63DEa0E63S60
MC320OA03R00O3T0IN0N3A00A307L03B010O304R030
2V03I01L03L01A0302N03U411E3c8VA
B030

derecho a voto lo cual satisface los requisitos establecidos en los estatutos sociales y en la Ley General de Sociedades Mercantiles para tales efectos. -----------------------------------------------------------------------------------

Acto seguido, el Presidente solicitó a la Secretaria procediera a dar lectura al Orden del Día propuesto para esta Asamblea, el cual se transcribe a continuación: ------------------------------------------------------------------------

------------------------------------------------------- **ORDEN DEL DÍA** -------------------------------------------------------

sa¡e¡aos so¡o¡o aha s ¡ God pepa¡o s e¡ at ug¡ae js¡u¡uipy ap o/asUOÇ |a| a-* J*! UP UO|ü8}UãS6Jd 'I

---- - -- -- otos¡//// ¡e ou oj oa sopva/tce J zz0z -p avqt/\a/o/p -P it ° 'a-° °P f0/°p tiesanb

sapep¡ ¡joe se¡ ap o:¡sadsa pepa¡aoç ei *P !°**!^ 3 )ã|3 ãttIJO)U| )BfiJ tJO/09/UãS6Jd 'II

qma¡s¡p at it J6U6 6P /0 UP -e anb s-ie¡oos so/o/aza/a so¡ God uo¡se js¡uiuipy ap Oí6SUO |ã God sep°-¡i°-

-- auuo)u¡ oqo¡p e ou oj oa sopzanse J zz0čap a

R) 6fił UO)08J}S|U|ł Jpy ap o¡aSUO UP - --z/a¡itl S I -ł' uo¡oeo¡j¡j e oseo ns ua o oj ua¡/z/e quio¡j ¡ ¡ ¡ ¡

-----'sapej/nae) ap oțoa////e6vojo Z pepa¡oo$

----- 'pepa¡oo$ e¡ ap o¡ esiui 1 ¡-p uo¡ses¡)¡je ei - qos uo¡snas¡g /¡

Os¡¡qną o¡ ena ia ațtfe ue ¡pnse anb SOpe^-i-a P**+I+0 UP UO|3RUÖ|SBQ 'fi

sepea¡)¡pas seidoa sei -!padxae 'o'*°/° |- ^° /vesaaaUwas ap oseo ua 'e:¡se ajuasa d ei ez¡o3O]OJd e uo¡aoa¡a ns at

--- euis¡M°¡ at

----- eay/z/esy e¡ ap ajuej¡nsa e:¡se ¡ap uo¡oeqo de/ e njoa¡ 'uç¡asepaa 'ih

— — ------ e nsn-i3 'lih

uçise¡e sui ¡eõa¡ e¡ at a sadsa a uap¡sa ą ¡ap ei age e¡sap e¡ oqo de 'solo ap pepimiueun God 'ea¡qmesg e)

so¡ ua sopeõoqesap uo an) so¡und some 'opeuoisuam sabre eiQ ¡ap uap ¡a oral we 'ea¡qmesą e¡ ap

siguientes términos: -----------------------------------------------------------------------------------------------------------

---------------------------------------- **PRIMER PUNTO DEL ORDEN DEL DIA** ----------------------------------------------

***I. Presentación del informe del Consejo de Administración de la Sociedad por los ejercicios sociales que van del 01 de enero 31 de diciembre de 2022 y acuerdos en torno al mismo.*** ----------------------------

*El Presidente del Consejo de Administración de la Sociedad, en uso de la voz, cuentionó a los contadores presentes Sergio Jácome Palma y Martín Flores Merino, responsables de la preparación y revisión de la información financiera que aquí se presenta, respecto al retraso en la disponibilidad de esta información financiera asi como la de los ejercicios anteriores. En uso de la voz el Contador Publico Martín Flores recordó a los presentes que el retraso principalmente se ocasionó por los cambios de despacho de auditoría, asi como el retraso que se tuvo para cubrir los honorarios de la auditoría externa de los ejercicios anteriores. --*

*Por otro lado el Contador Publico Sergio Jácome Palma recordó a los presentes que independientemente de los retrasos a que se refiere el Contador Martín Flores, se ha elaborado reportes financieros cada mes durante el presente año para ser enviados a los acreedores financieros de la empresa y tenedores de las notas emitidas, principalmente a los tenedores de la deuda Senior PRUDENTIAL INSURANCE COMPANY*

*LIFE INSURANCE COMPANY, LIFE INSURANCE COMPANY OF NORTH AMERICA, de conformidad con el NPA modificado y vigente a la fecha de la entrega de los aludidos reportes.* --------------------------------------

*Por otro lado, el señor Jacome recordó a los presentes que con fecha 27 de junio de 2022, la Sociedad suscribió en su calidad de deudor colateral, la deuda contraida por Tritón Investments Holdings LLC hasta*

73E0D63EUa06R3A60RF23L0D063O31R63DEa0E63S60
MC320OA03R00O3T0IN0N3A00A307L03B010O304R030
2V03I01L03L01A0302N03U411E3c8VA
B030

por USD$ 75,000,000.00 (Setenta y cinco millones de Dólares, Moneda de los Estados Unidos de América) en favor de SCULPTOR REAL ESTATE AND LEISURE INVESTMENT FUNDING LLC, como tenedores de deuda Junior, razón por la cual a partir de dicha fecha se comparte a SCULPTOR REAL ESTATE AND LEISURE INVESTMENT FUNDING LLC, la misma información financiera. En consecuencia, la situación financiera de la empresa no nada más la que aquí se presenta, sino la de los meses corrientes, ha sido debidamente reportada a los interesados mencionados (acreedores financieros) y a los Últimos Beneficiarios en el capital de las sociedades controladoras de la Sociedad. 

Habiéndose aclarado la razón en el retraso de la información, se dio uso de la voz a los contadores Sergio Jacome y Martín Flores quienes expusieron de una manera resumida a los presentes el contenido de los informes financieros que corresponden al periodo que va del 01 de enero al 31 de diciembre de 2022. Se hizo constar que dichos informes, se encontraban en las oficinas de la Sociedad a disposición de los interesados y con toda la información a que se refiere el artículo 172 de la Ley General de Sociedades Mercantiles, por lo cual el informe referido incluye: 

A. Estado de Situación Financiera al 31 de diciembre de 2022 

B. Estado de Resultados del 1 de enero al 31 de diciembre de 2022 

C. Estado de cambios en la situación financiera al 31 de diciembre de 2022 

D. Estado de cambios en las partidas que integran el patrimonio social, al 31 de diciembre de 2022 

E. Principales políticas y criterios contables y de información seguidos en la preparación de la información financiera 

F. Informe sobre la marcha de la sociedad en el ejercicio, así como sobre las políticas seguidas por los administradores y, en su caso, sobre los principales proyectos existentes. 

F.1 Entorno de mercado 

F.2 Aspectos macroeconómicos relevantes 

G. Notas a los Estados Financieros 

G.1 Notas al Estado de Resultados 

G.2 Notas al Estado de Situación Financiera 

G.3 Notas de la Deuda Senior a favor de Prudential Insurance Company of America, Prudential Legacy Insurance Company of New Jersey, Cigna Health and Life Insurance Company, Life Insurance Company of North America, así como de la deuda Junior de la cual la Sociedad es responsable colateral a favor de Sculptor Real Estate and Leisure Investment Funding LLC (necesidad de recursos para reforzar el capital de trabajo) 

H. Otros asuntos relevantes 

Una vez concluida la exposición y desglose de todos los puntos contenidos en el informe, los socios por unanimidad de votos, tomaron el siguiente: 

**ACUERDO I.1.-** Aprobar por unanimidad el informe aquí presentado por el Consejo de Administración de la Sociedad, respecto del ejercicio fiscal que va del 01 de enero al 31 de diciembre del año 2022. 

**ACUERDO I.2.-** Se conservará en las oficinas de la Sociedad un ejemplar del informe del Consejo de Administración en los términos de lo establecivo en el artículo 172 y siguientes de la Ley General de Sociedades Mercantiles. 

73E0D63EUa06R3A60RF23L0D063O31R63DEa0E63S60MC320OA03R00O31O1
N00S9A00A307L03B010O304R0302V03I01L03L01A0302N03U411E3c8VA

16

--------- SEGUNDO PUNTO DEL ORDEN DEL DÍA ---------

**I. Presentación del informe del Comisario de la Sociedad respecto de las actividades realizadas por el Consejo de Administración por los ejercicios sociales que van del 01 de enero 31 de diciembre de 2022 y acuerdos en torno a dicho informe.** ---------

El Comisario de la Sociedad, Contador Público Javier Otero Ibarra, dando cumplimiento con el segundo punto del Orden del Día, presentó a la Asamblea su informe, el cual incluye los siguientes puntos: ---------

a. Su opinión respecto de si las políticas y criterios contables y de información seguidos por la Sociedad son los adecuados y suficientes. ---------

b. Su opinión respecto de si las políticas y criterios contables han sido aplicados consistentemente en el informe presentado por el Consejo de Administración. ---------

c. Su opinión respecto de si la información presentada por el Consejo de Administración refleja en forma veraz y suficiente la información financiera y los resultados de la sociedad. ---------

Los Accionistas, tomando en cuenta el informe presentado por el Comisario y las opiniones vertidas en él, discutieron y analizaron el mismo, tomando el siguiente: ---------

**ACUERDO II.1.-** Se aprueba el informe presentado por el Comisario de la Sociedad, y en consecuencia por unanimidad de votos y en su totalidad, el informe presentado por el Consejo de Administración de la Sociedad, respecto del ejercicio social que va del 01 de enero al 31 de diciembre de 2022.---------

**ACUERDO II.2.-** Se conservará en las oficinas de la sociedad un ejemplar del informe del Comisario de la Sociedad. ---------

--------- TERCER PUNTO DEL ORDEN DEL DÍA ---------

**I. Nombramiento o en su caso ratificación de los miembros del Consejo de Administración de la Sociedad y otorgamiento de facultades.** ---------

En cumplimiento del siguiente punto del orden del día, el Presidente de la Asamblea, propone que se ratifique a cada uno de los miembros que integran el Consejo de Administración de la Sociedad, a lo cual Concepción Esteban Manchado solicitó el uso de la voz, quien manifestó a los presentes que quisiera poner sobre la mesa su propuesta de renunciar al cargo de Secretaria del Consejo de Administración de la Sociedad, efectivo al 31 de Diciembre de 2024, exponiendo que la razón principal de ello es que considera que el cargo de miembro del consejo amerita gran disponibilidad de tiempo para desempeñarlo de la mejor manera posible, y que en virtud de otras responsabilidades que implica estar al frente del departamento legal de la compañía, es que tomo esa decisión, mas sin embargo de ser aceptada su renuncia, manifestó que siempre estará disponible para apoyar al Consejo de Administración, y de suplir, si hubiera necesidad de ello, la ausencia de alguno de los miembros. Tras haber mencionado lo anterior, exhibió y entregó al Presidente de la Asamblea en su Calidad de Presidente del Consejo de Administración de la Sociedad, su renuncia por escrito y solicitó que la misma sea aceptada. A lo cual el presidente solicita que la renuncia entregada se agregue al legajo de esta Acta en el anexo que corresponde. ---------

Con base en lo anterior, el presidente de la Asamblea en uso de la voz y tras la presentación de la renuncia de la licenciada Concepción Esteban Manchado, preguntó a los presentes si alguno tiene alguna objeción en aceptar la renuncia, a lo que nadie manifestó estar en contra de ello. El Presidente agradeció a la Secretaria del Consejo la participación activa que ha desempeñado durante todo el tiempo que ha estado al frente de

73E0D63EUa06R3A60RF23L0D063O31R63DEa0E63S60MC320OA03R00O3T0I08039
N0O9A00A307L03B010O304R0302V03I01L03L01A0302N03U411E3c8VA

--- a o/ ns e/¡s op¡¡dns ¡a opuaiqap 'so alasuos      soj at ¿ ap a¡qe a ej ago

¡a uos 4e/n i ova/asL/o3 ve gwou ose3 ns ua o ej¡j¡ 0'LloO a ua/dns /e es¡)i¡e uç/uev;s/ulwPP ap o!asuo0

/ap pep¡¡¡qesuodsa eras 'ope¡euas opered ¡a ua ua euna as ou se¡sjuoiosg at ¡e auaE̞ ea¡qmesę̞ e¡ anb at

over ¡a ered oö es oqs¡p adnso anb ered euos ad e e ¡o e e e qmou 'osec ns ua o '¡e odma¡ e aueui ap o¡sand

/a ednso anb a¡ua¡dns ¡e e¡n¡¡¡¡ onion esij¡¡¡e e aqap se¡s¡Uol00g ap /e auag ea¡qmesg e¡ 'age un at oze¡d

e anöa¡¡ anb ¡e odma¡ e¡suasne o 'sa ej̩n i¡ so a¡asuos so¡ ap ounö¡e ap e i ¡uj¡ap e¡suasne at ose0 ¡a ered

- 'age un e seq God e'/ /u/ ap eisuasne eun e any is/ 'casas g e seq God opi¡dns a a¡asuos

/ap sa¡e odLüa¡ seisuasne se¡ e ¡ qns a ua¡dns oqsip .'oj̩sadsa ¡e a or ns e ¡es e e aqap e¡n¡i¡ /a / 'so a¡asuos ç so¡ at

¿God a)ua¡dns /a opesij¡)e was opuaiqap ej̩n i a alasuo0 oido d ¡a God opeub¡sap euas 'eiueduios e¡ ap aged ou a was

apand ¡end /a 'sauoisun) ua ej̩n¡j¡ ¡a uos a¡uaineaue¡nuiis ¡ s¡xaos ue pod ou

¡end/a 'a ua¡dns un ebua uç¡se siuimpg ap olasuoç ¡ap so qma¡m so¡ ap oun epes anb 'omsimise .'a ¡samiq

epes auo¡sas as uoise ¡siLflmpy ap o¡asuoç ¡a anb ğ¡ ¡6ns a¡ilowe( sofas ¡a 'ue¡ses¡¡dxa e¡ uos opuenu¡ uoç

- ŞP¡36l3OŞ P¡ 6Ç L/Ç/3PJ¡SI iwpą ap o/asuog /ap aged ow03 öJöa¡ui as anb ered e¡sando d

e¡ at euuo)u¡ a¡ a¡ a¡ as / 'a uaui o¡ a ue opeuoisuom o¡ ap o¡ue) ¡e osnd o¡ avowed sofas /a opinöas oboe/ sa¡uasa d so¡

old epiua ua¡q e¡ o¡p a¡ as .' esed oz/q a¡ as 'sa uasa d so¡God op¡uasuoo op¡s opualqeq anb o¡ e 'e¡oJ esap as ejsa apuop

o ui0a ¡e ered e am u¡ a¡ as e iuuad eas¡quiesg e¡ e g¡s¡s¡¡¡os as 'on¡y

|6Ţ 0Ţ9Ö|6Q 0SU0)|'g' U9iJŢ J0}20Q ¡a ea¡qmesg e¡ ap e¡esa¡ue e¡ ua e ¡uan."ua as anò at pny¡ ua anb o¡ JOÖ 'o|30Ö6U

|6| S0a e sa¡ua a))¡ ap ojua¡uie sn¡o ui ¡a uos / sepeLü o)ui see sauoisisisap Leroy e apn/e anb 'odmes at

eisuauadxa ueöua / esa dna e¡ at uoise ado e¡ ua ua ualqwe¡ ours 'uoise siuimpe e¡ ua o¡os ou 'hope sn¡o ui a

uauij̩e¡o¡ ua¡sa anb uo¡se )s¡uimpy ap o¡asuoç ¡ap so qma¡m ua a¡nba se¡sue suns ¡s se¡ 'o Raja ua anb ouo¡suaw

uoixa¡)a eun opuaiseq a uapisa d ¡a oua ue e tanda d e¡ ua aseq uoç

- pepaisoç e/ at uoise ¡s¡u¡mpţ

at o¡asuoç ¡ap eue a saç e¡ adFl30 O¡asuoç ¡ap oJ)UöŢ 0ŢUPŢjadmasap op¡ua      eg uainb 'sa o¡-¡

u¡yeg ope uos ¡a anb auodo d / 'opeb¡aQ osuoj¡g o top ¡a e ¡a e ¡ e ado eisuap¡sa das¡r e¡ 'awoue¡ o¡ö aç o¡do d /a e

a¡sueui) eisuap¡sa dam e¡ oq¡V eua¡e/ epe/2L/an// e¡ eiJ9dn0o e¡ e¡ ¡ e ad as P/3L/a§¡SöJÖa4/fl e¡ ¡sap sa 'saUo|s0öJip

Seqs¡p ap eun epes edn0o anb euos ad P¡ US UelJaesaJ Sa¡ens e¡ e me ado eun / e ã¡3ueuij eun elite od os eun

se¡suapisa dam easy e/eq anb .'e anue¡¡¡/ oq¡q op enpç rotas ¡a ua eb¡esa eisuap¡sa d e¡ anò auodo d anb o¡ God

'pepaisog e¡ ap a ¡uap ¡en¡re uçisun) ns ua¡a¡)a 'uç¡se s¡uimpg ap o¡asuoç ¡ap so qualm so¡ ap oun epe3 ap so¡sand

so¡ ua sa qmou so¡ anb auodo d avowe rotas iç

- sape ¡me) se/ uas aha as anb ua

euro) e¡ / uo¡se ¡s¡u¡lllpy ap o¡asuoç ¡ap so qLüaiw ap a amnu ¡a anb¡¡)pow ou anb avdma/s Pepe apisuos ue as

se¡sa anb sise)ua opua¡seq seap¡ sns eyedmos anb auiose sofas ¡e apid a¡ a uapisa ğ ¡:¡j

-- '/ş a çgay aq¡o¡aQ God osed ns e op¡ nbpe eg /a anb

e¡suauadxa e/ e aseq ua 'osimeu¡p sen/ on sa)a see o¡ aseq ered uç¡se s¡uimpg ap o¡asuoç ¡a evado anb ua envoy

e¡ e sauo¡ses¡jipoui seş̧ais oboe a/sa ua auodo d e a¡sinb anb euoisuaui 'opeö a o za eun ¡end o¡ 'zo e¡ ap osn ¡a a

u6¡ ¡SäJd |9 P)|3|||0S 6/a/03eÇ 0/6 ag sofas ¡a 'ep¡ a)a e¡sunua e¡sunua e¡ sexy / a¡uauiep¡nöaç

"       -- oö es ¡a ¡a ua emu sns e¡ uainb e sauoisunj̩s ns ap adedma anb ap¡d er¡¡saja eas anb

Ţğnb odmai /a anb ap ui) e 'e¡sunua ns e uasaJd anb uos uoise¡a¡ue epiqap e¡ oral ise oö es ¡e¡


73E0D63ELa06R3A60RŢ23L0D063O3lR63DEa0E63S60
MC32O0A03RO003T0N0N3A00A307L03B0l0O3304RO00
2X03¡01L03L0l04302N03U4¡1E3c8VA
030

Sin contravenir a lo anterior, para el caso de ausencia del Presidente del Consejo de Administración, ocupará su posición como suplente la vicepresidenta corporativa, quien a su vez será suplida por su suplente; por hasta 6 meses, con posibilidad de una prórroga de una sola vez por seis meses adicionales, a solicitud del titular, y en caso de ausencia definitiva, la Asamblea General de Accionistas deberá nombrar de entre los tres vicepresidentes a quien deberá ocupar la titularidad de la Presidencia, y en el caso que no lo acepte, o por decisión unánime de la Asamblea General de Accionistas, un tercero ocupará dicho cargo, el cual deberá ser ratificado por el Consejo de Administración. En el caso de que la Asamblea General de Accionistas no se reúna para ratificar al presidente suplente, como titular de la presidencia del Consejo, o nombrar a un tercero por unanimidad de votos, el suplente permanecerá en funciones una vez ratificado por 3 de 4 miembros del Consejo de Administración. --------------------------------------------

Continuando con la propuesta de conformación del Consejo de Administración, el presidente solicitó a los presentes que sugirieran, para el caso de ser aprobada la propuesta, quién podría ser su suplente, a lo que:

- El Consejo Presidente propone como suplente a Valeria Margarita Albor Domínguez;----------
- La Consejera Vice Presidente Corporativa como su suplente a Concepción Esteban Manchado;
- El Consejero Vicepresidente Financiero propone como su suplente a Rosalba Ortiz Merlo;---------
- El Consejero Vicepresidente Operativo propone como su suplente a Franco Martínez Sánchez;----------------------------------------------------------------------
- El Secretario de momento se abstiene de nombrar suplente y solicita a la Asamblea que se le autorice a designarlo a más tardar el 31 de diciembre del presente año. -----

Tras un amplio intercambio de opiniones, los accionistas, por unanimidad de votos acordaron:

*ACUERDO III.1.-* Se acepta la renuncia de Concepción Esteban Manchado al cargo de Secretaria del Consejo de Administración con efectos al 31 de Diciembre de 2024.----------

*ACUERDO III.2.-* Se nombra como nuevo Consejo de Administración de la Sociedad a las siguientes personas y con los cargos que se mencionan que entrará en funciones a partir del 1° de Enero de 2025: ----

*CONSEJERO PRESIDENTE:* ----------------- Eduardo Albor Villanueva -----------------

conoss rsaasoo hicsaasssi0snl1s zaivaicaso —  — °n^'I/"°,0 viv 9iv u-!'-^'-i! e.l'ai°h,

conoss rsaossaascih oaisrssno oasicavaiz s1ns0issaascih —  — °-j...°o.o.c°2 J-7 f/6-'s -s-'v-s- -s-

*CONSEJERO VICEPRESIDENTE OPERATIVO:* ----------- Juan Alfonso Delgado Del Olmo -----------------

*CONSEJERO SECRETARIO:* --------------------------------- Martín Flores Merino ---------------

quienes estando presentes en esta Asamblea aceptan el cargo para el que fueron elegidos, los que no causarán su manejo por así determinarlo esta asamblea. ----------------------------------------

*ACUERDO III.3.-* Se aprueba por unanimidad que el Consejo de Administración sesione bimestralmente.

*ACUERDO III.4.-* Se ratifica que el Consejo de Administración de la Sociedad, continúe ejerciendo sus facultades tal y como están consignadas en la Cláusula Vigésima Octava de los Estatutos Sociales, de la siguiente forma: -----

a) Las facultades para Pleitos y Cobranzas, las ejercerán todos y cada uno de los 5 miembros que conforman el Consejo de Administración de la Sociedad, indistintamente. --------------------------

b) Las facultades para Actos de Administración, las ejercerán: ----------------------------------

i) El Presidente del Consejo de Administración, sin restricción alguna. -----------------------------

73E0D63EUa06R3A60RF23L0D06303IRG3DEa0E63S60
MC32OOAO3RO003T10N0N3A00A307L03B0100304R00
2X03J01L03L01A03O2N03U41I1E3c8VA

T 8

*ii) Cualquiera de los miembros del Consejo de Administración, indistintamente, en actos de $2´500,000.00 (Dos millones quinientos mil pesos 00/100 M.N.) o el equivalente a USD$100,000.00 (Cien mil dólares de Estados Unidos de Norteamérica).*

*iii) Se requerirá la firma de 2 de los miembros del Consejo de Administración, conjuntamente, para actos que excedan $2´500,000.00 (Dos millones quinientos mil pesos 00/100 M.N.) o el equivalente a USD$100,000.00 (Cien mil dólares de Estados Unidos de Norteamérica).*

*c) Las facultades para Actos de Dominio y Títulos de Crédito, las ejercerán:*

*i) El presidente del Consejo de Administración en forma individual o 2 de los integrantes del Consejo de Administración, conjuntamente, en actos que no excedan el umbral de $12´000,000.00 (Doce Millones de Pesos 00/100 M.N.) o USD$500,000.00 (Quinientos mil dólares de Estados Unidos de Norteamérica.*

*ii) El presidente del Consejo de Administración en forma individual o 3 de los integrantes del Consejo de Administración, conjuntamente, en actos mayores de $12´000,000.00 (Doce Millones de Pesos 00/100 M.N.) o USD$500,000.00 (Quinientos mil dólares de Estados Unidos de Norteamérica, pero que no excedan $50´000,000.00 (Cincuenta millones de pesos 00/100 M.N.) o USD$2´000,000.00 (Dos millones de dólares de Estados Unidos de Norteamérica).*

*iii) Los Actos de Dominio y Títulos de Crédito que excedan los umbrales de $50´000,000.00 (Cincuenta millones de pesos 00/100 M.N.) o USD$2´000,000.00 (Dos millones de dólares de Estados Unidos de Norteamérica), deberán ser aprobados mediante una Sesión del Consejo de Administración, requiriéndose el voto favorable de cuando menos 4 de los miembros del Consejo de Administración.*

**ACUERDO III.5.-** Se aprueba la designación de los suplentes de cada uno de los consejeros a las siguientes personas:

- Suplente del Consejo Presidente *Valeria Margarita Albor Domínguez;*
- Suplente de la Consejera Vicepresidente Corporativa: *Concepción Esteban Marchado;*
- Suplente del Consejero Vicepresidente Financiero: *Rosalba Ortiz Merlo;*
- Suplente del Consejo Vicepresidente Operativo: *Franco Martínez Sánchez;*
- El Secretario de momento se abstiene de nombrar suplente y esta asamblea aprueba a que sea designado a más tardar el 31 de diciembre del presente año.

**ACUERDO III.6.-** Se aprueba por unanimidad de votos el mecanismo propuesto para el manejo de las suplencias temporales y definitivas de los miembros del Consejo de Administración, así como las específicas para el caso de ausencia temporal o definitiva del presidente, ya que estas agilizaran la operatividad del Consejo de Administración, en el entendido de que deben mantenerse siendo 5 miembros y las facultades y funciones deben quedar como lo establecen los estatutos de la Sociedad, y como se aprobó en la presente asamblea de Accionistas, por lo cual cualquier cambio aquí no previsto deberá ser aprobado por la Asamblea de Accionistas.

**ACUERDO III.7.-** El Consejo de Administración continuará buscando e implementando medidas dentro de su operación, que agilicen la toma de decisiones, lo realizará en la sesiones que sostenga el propio Consejo de Administración, siempre que no implique una modificación a lo aprobado en esta Asamblea General de Accionistas.

**CUARTO PUNTO DEL ORDEN DEL DÍA**

73E0D63EUa06R3A60RF23L0D063O31R63DEa0E63S60MC320OA03R00O31OL
R0O9A00A307L03B010O304R0302V03I01L03L01A0302N03U411E3c8VA

20

**IV. Discusión sobre la ratificación del Comisario de la Sociedad.** ------

*En cumplimiento del siguiente punto del Orden del día, el Presidente de la Asamblea, puso a consideración de los presentes la posibilidad de ratificar o remover al Comisario de la Sociedad. En virtud de lo anterior y toda vez que el Comisario se condujo bien y fielmente durante el ejercicio 2022, y que cumplió los objetivos y expectativas esperadas por la Sociedad, por unanimidad de votos de las partes sociales representadas, la Asamblea adoptó el siguiente:* ------

**ACUERDO IV.1.-** *Se ratifica al Contador Público Javier Otero Ibarra, en su cargo de Comisario de la Sociedad.* ------

------ **QUINTO PUNTO DEL ORDEN DEL DÍA** ------

**V. Designación del Delegado o Delegados que acudirán ante el Notario Público de su elección a protocolizar la presente acta, en caso de ser necesario y al efecto, a expedir las copias certificadas de la misma.** ------

*Los presentes en la Asamblea, acordaron por unanimidad de votos, nombrar a los Licenciados Eduardo Albor Villanueva y/o Martín Flores Merino y/o Concepción Esteban Manchado como delegados especiales de la misma, para que conjunta o separadamente expidan la copia o copias que de esta acta sean necesarias, así como para asentar la presente en el libro de actas de la Sociedad y acudir ante el Notario Público de su elección a realizar la protocolización de la misma, en caso de que esto fuera necesario, y para presentar cualesquier avisos que sean necesarios y/o convenientes en relación con las resoluciones adoptadas por la presente Asamblea, así como para inscribir, por sí o a través de terceros, los testimonios que correspondan, en los Registros Públicos correspondientes.* ------

------ **SEXTO PUNTO DEL ORDEN DÍA** ------

**VI. Redacción, lectura y aprobación del acta resultante de la Asamblea.** ------

*En el presente punto del Orden del Día, la Secretaria de la Asamblea, a petición del Presidente, redactó el acta resultante de la misma, para ser asentada en el libro de Actas, la cual es firmada por todos los presentes para constancia.* ------

------ **SÉPTIMO PUNTO DEL ORDEN DEL DÍA** ------

**VII. Clausura.** ------

*Asimismo y toda vez que no hay más asuntos que tratar, por haberse agotado el Orden del Día propuesto para la presente Asamblea, el Presidente la declaró formalmente clausurada, siendo las 14:10 horas del día en que dio inicio, haciendo constar que al término de la Asamblea se contó con el quórum indicado al inicio de la misma, siendo firmada por el Presidente y la Secretaria de la Asamblea, así como los demás asistentes que quisieron firmar.* ------

*Espacio en blanco intencionalmente, sigue hoja de firmas-* ------

Firma ---- **Lic. Eduardo Albor Villanueva --- Presidente** ------

Firma ---- **Lic. Concepción Esteban Manchado --- Secretario** ------

Firma ---- **Sergio Saíd Jácome Palma ---- Escrutador** ------

Firma ---- **C. P. Javier Otero Ibarra --- Comisario** ------

Firma ---- **Valeria Margarita Albor Domínguez** ------

Firma ---- **Martín Flores Merino** ------

73E0D63EUa06R3A60RF23L0D063O31R63DEa0E63S60MC320OA03R00O3T0I
08O39
R0O59A00A307L03B010O304R0302V03I01L03L01A0302N03U411E3c8VA

73E0D63EUa06R3A60RF23L0D063O31R63DEa0E63S60
MC320OA03R00O3T0IN0N3A00A307L03B010O304R030
2V03I01L03L01A0302N03U411E3c8VA
B030

Firma --- **Juan Alfonso Delgado del Olmo** ---------------------------------------------------------------------------

'Ṣiii-ig) g q$00y)0$jN0ç ap sejsịuoi0sq ap eueuip Q ịe auab ea/qwesy at edit /ap sem i) ap eíog

---.---........ w.wæee . .wwwwe.......... .... ..._. ____________________ ________ @ @/@ @ 2@ @

------------------------------------------- **Lista de Asistencia** ---------------------------------------------------------------

---------------------- **CONTROLADORA DOLPHIN, S. A. DE C.V.** -------------------------------------------------------

Lista de Asistencia de los accionistas de **CONTROLADORA DOLPHIN, S. A. DE C.V.** (la **"Sociedad"**) correspondiente a la Asamblea General Ordinaria de Accionistas celebrada el día 7 de noviembre del 2024, a las 13:00 horas (la "**Asamblea**"). ------------------------------------------------------------------------------------------------

| **Accionista** | **Número de Acciones** | **Valor en MXN** | **Firmas** |
| --- | --- | --- | --- |
| LIC. Eduardo Albor Villanueva AOVE661126732 | 6 | $600.00 | Sr. Eduardo Albor Villanueva |
| CIBanco S. A., Institución de Banca Múltiple, como CIB/2380 BNY080206UR9 Representada por el Sr. Sergio Said Jácome Palma | 2,103,241 | $210,324,100.00 | Sr. Sergio Said Jácome Palma |
| **Total** | **2,103,247** | **$210,324,700.00** | |

--- o/Yes/æog --- e "eq¡ o°°°ło°°!-°r d 3 ------------eu/v/g

---oį ejav--s opeqoueg ueqa sq uojadaauoQ ---------etov¡g

- zanõuiuioQ oq¡y e//ve6veg eį aįe/------------en ıg

- ouuag sa oį-į uiṣeg --------eLü i¿

-- onįy ¡ap opeöįag osuo)y uen -------------ev i¿

ap sa uejuasa da soį at pepi¡euos ad eį ap uoisesi)ua ei a d anb esi)iṣas ope n ssç opeuôisap a /ymsns ¡ş

ap sauo¡ssy ap o ¡s¡ba$ at o q¡) ¡ap/ se¡siuo¡ssg soį at ¡essij uoįsesijį)uapi ap eįnpas eį at 'se;s/Uo/30¢ Soļ

8361 01N3IS S3N0JJJ/N S0AJ Z#č t0/'č --iqmesy ejsa ua sepejuasa da ue ¡uansua as 'pepa¡soç eį

l°/!^° l°P Soluble aoanslcl %ooi l °*^i!i -° b-° °!--- s1sisł '#1nsaënc së1asl0soo hn

'ea¡qmesg eį ap uoise qa¡as eį ered op¡ örlba ¡eöa¡ min onb ¡a ajsixa anb oį God pepaiso eį at ¡emos

--- pepa¡sog eį at sa¡eisos so njejsa so/ ua ope¡euas o¡ uos op ance ap

--- p¿g¿ ap a qma ou ap y e 'ooh eue)uinQ 'Unsued ——————————————

- ----" ope¡n osg ---- ew/eg avowe p¡eç o/6 ag --- ewv/J

9ţ|J0SU9Jţ Pţ39 |6 U9 UPJq0 anb SeLIJ |} S9| Å 0ţX6ţ |6 anb aţU+!>^JeduJ03 |6 9J9I3+O (-'O1bYñ0) (ONIS1Sıń) (---) (-)(-)

'/6Ţ 6Ş S0UIIJJJ8ţ US 63| | |000ţ0Jd as e'!3¡i0s. ua/nqi e e as sauainb e seu0sJad set aŞ S03Iįuatne Nos

----- Expuesto lo anterior la compareciente otorga las siguientes: --------------------------------------------------------

---------------------------------------------------- **C L Á U S U L A S** ----------------------------------------------------------

----- **PRIMERA**.- Queda protocolizada el acta de la Asamblea General Ordinaria de accionistas de la sociedad denominada **"CONTROLADORA DOLPHIN", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, celebrada el día siete de noviembre del dos mil veinticuatro, para todos los efectos legales a que haya lugar. -----------

------ **SEGUNDA**.- En consecuencia, de la cláusula anterior quedan formalizados todos y cada uno de los acuerdos tomados en el acta que por este instrumento se protocoliza los cuales se tienen por reproducidos en la presente clausula como si a la letra se insertasen para todos los efectos legales a que haya lugar. ----

----- **TERCERA**.- Los derechos, gastos y honorarios que devengue el presente instrumento serán a cargo de la sociedad denominada **"CONTROLADORA DOLPHIN", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE.**

---------------------------------------------------- **P E R S O N A L I D A D** ---------------------------------------------------

----- Manifiesta **MARTIN FLORES MERINO,** bajo protesta de decir verdad, que su representada se encuentra legalmente constituida y que cuenta con plena capacidad legal para el otorgamiento de este acto, así como que sus facultades de representación no le han sido revocadas, suspendidas, modificadas o limitadas de forma alguna y que conservan íntegro su vigor, acreditando su personalidad con el acta de la asamblea general ordinaria de accionistas que se protocoliza en términos del presente instrumento, y manifiesta que el Registro Federal de Contribuyentes de su representada es "**CDO070410V77**" (C, D, O, cero, siete, cero, cuatro, uno, cero, V, siete, siete). -----------------------------------------------------------------------------------------------

------------------------------------------------------------- ***I N S E R C I O N*** --------------------------------------------------------

----- **TRANSCRIPCIÓN DEL ARTÍCULO DOS MIL OCHOCIENTOS DIEZ DEL CÓDIGO CIVIL PARA EL ESTADO DE QUINTANA ROO.** ---------------------------------------------------------------------------------------------------

----- *"Artículo dos mil ochocientos diez. – En todos los poderes generales para pleitos y cobranzas bastará que se diga que se otorga con todas las facultades generales y las especiales que requieran cláusula especial conforme a la ley, para que entiendan conferidos sin limitación alguna.- En los poderes generales para administrar bienes bastará expresar que se dan con ese carácter, para que el apoderado tenga toda clase de facultades administrativas.- En los poderes generales para ejercer actos de dominio, con la sola excepción de la donación, que en este código es un negocio jurídico personalísimo para el donante y por tanto no admite la representación en cuanto a éste, bastará que se diga que dichos poderes generales se dan con ese carácter para que el apoderado tenga todas las facultades de dueño, tanto en lo relativo a los bienes, como para hacer toda clase de gestiones a fin de defenderlos. Cuando se quieran limitar, en los tres casos antes mencionados, las facultades del apoderado, se consignarán las limitaciones o se otorgarán al respecto poderes especiales. Los Notarios insertarán este artículo en los testimonios de los poderes que ante ellos se otorguen. Lo mismo hará al calce del poder y antes de la firma de la ratificación si es que el texto del documento no lo hubieran insertado los interesados, los funcionarios ante quienes los otorgantes y los testigos ratifiquen sus firmas de conformidad con la fracción II del artículo 2807 en relación con el 218 y 2811.*

----- *"ARTÍCULO 2554.- En todos los poderes generales para pleitos y cobranzas bastará que se otorga con todas las facultades generales y las especiales que requieran cláusula especial conforme a la Ley, para que se entiendan conferidos sin limitación alguna.- En los poderes generales para administrar bienes, bastará expresar que se dan con ese carácter para que el apoderado tenga toda clase de facultades administrativas.- En los poderes generales para ejercer actos de dominio, bastará que se den con ese carácter, para que el apoderado tenga todas las facultades de dueño, tanto en lo relativo a los bienes, como para hacer toda clase de gestiones, a fin de defenderlos.- Cuando se quisieren limitar en los tres casos antes mencionados las facultades de los apoderados, se consignarán las limitaciones o los poderes serán especiales.- Los notarios insertarán este artículo en los testimonios de los poderes que otorguen y sus correlativos en las demás entidades de la República Mexicana".* -----

----- **G E N E R A L E S** -----

----- Por sus generales, previamente advertida de las penas en que incurren quienes declaran con falsedad, el compareciente manifestó ser: -----

----- **MARTÍN FLORES MERINO,** mexicano, originario de Orizaba, Estado de Veracruz, lugar en donde nació el día veintinueve de julio de mil novecientos setenta, casado, contador público, con domicilio en supermanzana trescientos veinte, manzana noventa, lote diez, Cerrada Chinak Meru, Fraccionamiento Quintana Kavanayen, de esta ciudad de Cancún, Municipio Benito Juárez, Quintana Roo, con Clave Única del Registro de Población **"FOMM700729HVZLRR00"** (F, O, M, M, siete, cero, cero, siete, dos, nueve, H, V, Z, L, R, R, cero, cero), y con Registro Federal de Contribuyentes **"FOMM700729N9"** (F, O, M, M, siete, cero, cero, siete, dos, nueve, uno, N, nueve). -----

----- **YO, EL NOTARIO, CERTIFICO:** -----

----- **I.-** Que conceptúo al compareciente con la capacidad jurídica necesaria para el otorgamiento de este acto, quien se identificó Ante Mí con el documento que en copia se agrega al apéndice de la presente escritura bajo la **letra "B"**. -----

----- **II.-** Que lo relacionado e inserto en la presente escritura concuerda con sus originales, a que me remito y tuve a la vista. -----

----- **III.-** Que advertí y expliqué al solicitante en cumplimiento de lo dispuesto por la "Ley Federal de Protección de Datos Personales en Posesión de los Particulares", que sus "Datos Personales" se utilizarán de la forma que estipula el "Aviso de Privacidad" que fue puesto a su disposición con anterioridad a la firma del presente instrumento y el cual declara conocer en su totalidad. -----

----- **IV.-** Que para cumplir con lo dispuesto por el apartado B fracción IX y apartado D fracción V del artículo veintisiete del Código Fiscal de la Federación y la Resolución Miscelánea Fiscal vigente, hago constar lo siguiente: -----

A) Que le solicité a la compareciente que me proporcionara la clave del Registro Federal de Contribuyentes y la Cédula de Identificación Fiscal o la Constancia de Situación Fiscal correspondiente, de cada uno de los asociados y de los representantes legales nombrados en el acta de asamblea que por este instrumento se protocoliza y que solicitaran la e.firma de la persona moral, o bien, ejercerán facultades de representación de dicha persona moral ante las autoridades fiscales. -----

B.- Que la compareciente me declara, de manera expresa, lo siguiente: -----

73E0D63EUa06R3A60RF23L0D063O31R63DEa0E63S60MC320OA03R00O3T01
R0N9A00A307L03B010O304R0302V03I01L03L01A0302N03U411E3c8VA



………………………………………………………… .. .>…………. '            O    .'      )|

O1b3lBV O0O0O1Obd gz N3 VbBO Zoo gYNlsibo ns aa oov39s oa93i'i1b33 YldO0 S3 —

------ ------ 'JPZ|J0}0P 6§ 0||6S |/ '+>!Jgn$_

ONYOOZbYSFIN3g3NNOAl+ gP|3U63|/ - 'l/ 6}U¢ —

0Nlb3N S3b0gJ Nl1bYN +P PLüJl/ –

--------- --'$$, {]'0}U6lLLLl9Z6g90U6 BS 6p PL|06j PLtJS!LLl 9| U6 0!JP}0    9}iJ3SnS P| 6}U9 §9§|LLLlJ0jU00

ap eL Jj 0| 'J0Ua¡ nS U00 aL J0 U03 Uainb OtUaLurlJ SUB SUB atsa ap 0piiJa U03 |a§ Sa|e6a| Sei3Uarl3aSU03

J0|9/i6§ 90J60P +T*+!*6Jedmoc e¡ e a sn/ anb .6}U6LLL9JÖ6}Lll Op|*any a 'opl3Jat6 0|Jaq9g OU Jod anb

'o uamnJtsui atuasa d |6 eüJS|LlJ lS J0d J66| 6§ auait anb oq a ap ¡a 6}U6l06JPdLLl00 |P J6g9S 63iq ang (-'iiA) (-)(-)(-)

– –   --------- --- '0/\}3adsa 0S|re |6 J9§ P J6§600Jd anb o¡ 0d 'se alUPJ}X/ S6U0lSJ6/\U|

ap leuo!3eN o si6ag ¡a ua prpai os e¡ ap o \s¡6a ¡a o uasa d as ou atua¡3a ed+oc a and -'¡g —

- 'g9 l|9}0} BS U6 J600U03 9J9|0ap ¡ent ¡a              otuamn t •!

atUaS aJd |ap eLrlJi e| e pepiJ0 Ja Ue 1103 U0l0lS0dSip nS e 0 Sand anb "pep¡3e/\iJ            ap 0SI^\§" |a e|ndltSa anb

PLtJJOj 9| 6g Ue'9Z!!l}'1 6S "S6|9U0SJ6§ S0}P@" SMS 6nÖ "'S6'9l''0!J'9§ S0| 6g U0iS6S0§ U6 S6|9U0SJ6§ S0}P@ 6p

U0l036}0J/ 6§ |PJ6§6g /aq" 9| J0d otsand !p0¡ ap otua|w|¡dmn3 ua atue\iç¡os e e e anbjdxa    sharpe ang - g —

"3" g'ja| e| 0lPC| OtUaLrlnJ SUB a sa ap a0lpUarle |e 06aJ6e e|d00 Ua anb

S0tUaLrln30p '|e3S|    U0|3e3j¡tUap| ap e|npa\ e| 0 Oa a |e aLrl0pU tUaSaJd '(S0p SaJ} 'atais SlaS 'S0p

'oun 'oun 'sias 'sias 'sias 'g " 'o' 'o 'Y} Zt/9Zf f99ZA0Y S6 '@AZ0NYgllA b081Y Nl1bYN ZO 0ObY0O3 J0U6S

|ap Sa Ua/nqiJtU0/ ap |eJapa-j oJtS¡6a$ |a arlb            '|e3Si -¡ lJ0|3Pnt|    ap 9¡0U9tSU0/ e 0 Oa a |e aLu0pUe UaSaJd

'(6A60U '$ '/    'SI6S '0J60 'S0§ '0J63 '0g00 0J60          ('N) ('a}) (6b090Z080XN8)      C)Uäg0O SO}U+!3S+*\*.

I!+ SO '|CUOÜ*!P'8 'I '3 *auinu seque'e6 UO3 aiq°ooaa'*! 0S!+O*!äP!J|a            !*°¡*nP!' 0 "ioo 'a|d!TI?N

eoueg ap u !*'n!ï!SUi '+=!Uoug pepa!- s '.. "u-aiu.. ap sa ua/nr!Jï-03 -P i-°°°P-J 0 ï |*+s a and (i ---

2Y0§J0lLl031L01A0302N03U4I1E3c8VA
MC32OOA03R00O3T0!N0N3A00A307L03B0!00304R030
73E0D63EUa06R3A60RF23L0D06JO31R63DEa0E63S60
l603|



# PODER JUDICIAL DE LA FEDERACIÓN

**CRYPTOGRAPHIC EVIDENCE - TRANSACTION**

**File Signed:**
**41580020000000000048316489.p7m**

**Certification Authority:**
**AC OF THE TAX ADMINISTRATION SERVICE**

**Signatory(s): 1**

**This digital document is a true copy of its physical or electronic version, which corresponds to its original.**

EDER TURRES CORONA 700ce62636303ba60739000000000000000000000000000000 15/05/25 17:00:00

| SIGNATURE | | | | |
|---|---|---|---|---|
| **Name:** | EDUARDO DE MARTIN ALBOR VILLANUEVA | **Validity:** | WELL | Current |
| SIGNATURE | | | | |
| **No Series:** | 30.30.30.30.31.30.30.30.30.30.37.31.34.32.31.31.32.31.38 | **Revocation:** | Well | Not revoked |
| **Date (UTC/ CDMX)** | 18/06/25 02:15:42 - 17/06/25 20:15:42 | **Status:** | Well | Valida |
| **Algorithm:** | RSA-SHA256 | | | |
| **Signature chain:** | 52 10 cc 38 47 91 ba 84 52 14 97 76 fa 1f 77 09 17 7e 01 from 16 50 7f f4 94 06 13 d7 f8 87 61 4f 62 9d d7 db 01 8b 82 78 ca 82 b4 7c 2a f8 4e 44 5e e7 e4 5f 2e fe cb ce 0f a2 90 0e 8a eb 53 e5 7b 5e 3a d3 15 74 da f1 9b 0c a0 8c f7 5a ba 78 3e 37 03 f5 87 04 4f 86 0e aa f7 fb bb 54 9f 0c 47 65 04 18 85 87 99 0b 3f 1a f0 06 32 32 73 38 63 31 a6 74 c6 3e 26 cb 32 a6 7a 51 d6 09 20 b0 60 01 62 41 65 52 31 30 8b c2 1b a5 46 a5 4c 78 9b bd f8 95 5e 5d 0b fd 94 99 49 5b 76 88 ac e3 e3 a6 70 ad 18 2d 9f 94 eb 37 13 cd cb 39 19 b2 cb 0e 77 1f 42 39 27 59 df aa 66 d0 22 2c fe fb 8a 7d ba 70 63 ed d1 80 93 29 66 ed 18 e1 ed 57 52 9c d9 bc d7 00 64 64 83 41 ee 83 c2 d4 56 6c d8 c1 c6 b7 8a 7d 7e 4b d3 ef 69 98 f8 62 45 ef e4 5f 78 08 2e 0c 3d ec db ac d1 fe 5f d7 a9 60 05 e5 85 | | | |
| OCSP | | | | |
| **Date: (UTC/ CDMX)** | 18/06/25 02:15:12 - 17/06/25 20:15:12 | | | |
| **Name of respondent:** | OCSP SAT | | | |
| **Responder sender:** | AC OF THE TAX ADMINISTRATION SERVICE | | | |
| **Serial number:** | 30.30.30.30.31.30.30.30.30.30.37.31.34.32.31.31.32.31.38 | | | |
| TSP | | | | |
| **Date : (UTC/ CDMX)** | 18/06/25 02:15:44 - 17/06/25 20:15:44 | | | |
| **Name of the sender of the TSP response:** | Federal Judiciary Council Time Stamp Issuing Authority | | | |
| **TSP certificate issuer:** | Intermediate Certifying Authority of the Federal Judiciary Council | | | |
| **TSP response identifier:** | 13220718 | | | |
| **Stamped data:** | 5zv6rG+vW1x6x6oCvKiVvUCIqH9f0= | | | |



# Federal Judicial Branch Online Services Portal

**Poder Judicial de la Federación**

# Acknowledgement of Receipt of Notification

## Second District Court in Commercial Bankruptcy Matters, with residence in Mexico City and jurisdiction throughout the Mexican Republic.

| | |
|---|---|
| **Type of case:** | Commercial Bankruptcy |
| **File number:** | 1/2025 |
| **Notebook:** | Principal |
| **Notified Party:** | CONTROLADORA DOLPHIN, S.A. DE C.V. (Plaintiff) |

**Notification made by:** Carlos Eduardo Milla Ortega

**Summary of the agreement:**

Mexico City, May twenty-first, two thousand twenty-five. HAVING CONSIDERED the records of mercantile reorganization proceeding 1/2025, to resolve the appeal for revocation filed by C.D. Sociedad Anónima de Capital Variable, through its legal representative V.B.R., against the decision of April fourteen, two thousand twenty-five; and, R E S U L T A N D O : FIRST. Presentation of the appeal for revocation. By means of a writ filed on April twenty-fourth, two thousand twenty-five (folio 11350), through the Online Services Portal of the Federal Judicial Branch, received on the following April twenty-fifth at the Clerk's Office of this District Court, **** filed an appeal of revocation against the order of April fourteenth, two thousand twenty-five, specifically, in the pertinent part that considered the merchant as withdrawn from the present commercial reorganization proceeding. In view of the foregoing and based on Article 268 of the Bankruptcy Law and Articles 1334 and 1335 of the Code of Commerce, it is hereby decided: The appeal for revocation filed by C.D.Sociedad Anónima de Capital Variable, through its legal representative V.B.R., against the decision of April fourteenth, two thousand twenty-five, is declared unfounded; for the reasons and grounds set forth in the fourth recital of this resolution. SECOND: The challenged order is confirmed. Notify it, and personally to the appellant.

| | |
|---|---|
| **Date of agreement:** | 21/05/2025 |
| **Date of publication of the agreement:** | 22/05/2025 |
| **Date of notification:** | 26/05/2025 |
| **Notification time:** | 09:33 |



# PODER JUDICIAL DE LA FEDERACIÓN

**CRYPTOGRAPHIC EVIDENCE - TRANSACTION**

**File Signed:**
415800200000000000048316490.p7m
**Certification Authority:**
**AC OF THE TAX ADMINISTRATION SERVICE**
**Signatory(s): 1**
**This digital document is a true copy of its physical or electronic version, which corresponds to its original.**

ESTER FLORES CORONA
786a6f26363e69a663389000000000000000000000000000
000000C
15/05/25 17:08:00

| SIGNATURE | | | | | |
|---|---|---|---|---|---|
| Name: | EDUARDO DE MARTIN ALBOR VILLANUEVA | | Validity: | WELL | Current |
| **SIGNATURE** | | | | | |
| No Series: | 30.30.30.30.31.30.30.30.30.30.37.31.34.32.31.31.32.31.38 | | Revocation: | Well | Not revoked |
| Date (UTC/ CDMX) | 18/06/25 02:15:38 - 17/06/25 20:15:38 | | Status: | Well | Valida |
| Algorithm: | RSA-SHA256 | | | | |
| Signature chain: | 80 3c 3f af 59 9a 2f e9 f0 69 ba bb 68 c1 0c 33<br>d7 07 29 68 ec 01 fa 2d cc 0e 7c 60 32 31 da bf<br>97 ac 2f 2e 1c 8f 99 c2 64 6f 6e 61 4a dd f9 21<br>f7 d3 b6 1f 14 13 4c 54 df 7e 1c 87 97 b0 c1 33<br>86 98 bb e9 e4 12 6e 18 ae b9 be c7 32 99 84 3e<br>6e 90 2a e2 d6 a9 f0 5e 2c e9 85 5e 74 11 16 b5 0c d6 92<br>e4 ec 4d 5b fb 98 a7 03 3b f5 c7 ef e1 8c bc b7 62 d8 52<br>61 48 04 6f e5 fd bf 9a ad 42 a4 89 98 a2 1d cb c0 b8 bd<br>1a b4 4f 4d 8b 80 b2 bb a5 16 cd 17 d5 8c 46 18 e4 f5 6e<br>8c fa 25 00<br>ed 50 9d 54 77 44 5c eb 76 ee 3b e2 6e 7e 14 a2<br>1a 8d c9 4d a6 59 8a 4b 8f 85 41 54 26 02 69 67<br>0b 3a 4b 52 46 20 20 12 4f 9c ba 9e 55 29 3c b7 7c<br>9e 2b 2e 01 c9 de 03 75 de ae 99 10 89 be a9 9a 6a 60 5d<br>d4 c2 71 ba b1 0e 00 78 b2 de d7 fb a8 b9 3a df be b5 0d<br>2d e2 56 6e 77 4a eb e1 57 53 | | | | |
| **OCSP** | | | | | |
| Date: (UTC/ CDMX) | 18/06/25 02:15:07 - 17/06/25 20:15:07 | | | | |
| Name of respondent: | OCSP SAT | | | | |
| Responder sender: | AC OF THE TAX ADMINISTRATION SERVICE | | | | |
| Serial number: | 30.30.30.30.31.30.30.30.30.30.37.31.34.32.31.31.32.31.38 | | | | |
| **TSP** | | | | | |
| Date : (UTC/ CDMX) | 18/06/25 02:15:39 - 17/06/25 20:15:39 | | | | |
| Name of the sender of the TSP response: | Federal Judiciary Council Time Stamp Issuing Authority | | | | |
| TSP certificate issuer: | Intermediate Certifying Authority of the Federal Judiciary Council | | | | |
| TSP response identifier: | 13220700 | | | | |
| Stamped data: | oL7pR3gYzDy3IjP0FNkbfVsu9c= | | | | |

**Complainer**:

Controladora Dolphin, S.A. de C.V. ("**Controladora**" or "**Complainant**")

Commercial bankruptcy: 1/2025

**Subject**:  Direct amparo lawsuit is filed and the suspension of the challenged acts is requested.

**SECOND DISTRICT COURT FOR COMMERCIAL BANKRUPTCY MATTERS WITH RESIDENCE IN MEXICO CITY AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC.**

**EDUARDO ALBOR VILLANUEVA**, general attorney-in-fact of **CONTROLADORA DOLPHIN, S.A. DE C.V.**, ("**Controladora**" or "**Complainant**"), with legal capacity as evidenced by the public deed attached as Exhibit "1", appears and states:

It is hereby declared **under oath** that the digitalization of the public document attached as Annex "1" is a complete and unaltered copy of the printed document obtained from its original, in accordance with section VI of Article 3 of General Agreement 12/2020 of the Plenary of the Federal Judiciary Council.

Attached to the present document is a complaint for direct protection (amparo directo) claiming the order of May 21, 2025 through which this Court resolved the appeal for revocation filed by Controladora against the order of January 14, 2025.

This Court is requested to forward the amparo lawsuit that is being filed, together with all of the original records of the lawsuit in question, to the corresponding Collegiate Court in Civil Matters of the First Circuit.

In view of the foregoing and for the foregoing reasons, You **DISTRICT JUDGE**, kindly request:

**FIRST**. To consider as filed the present petition for direct constitutional protection (amparo directo) that is being filed, and to forward it, together with the original case file and the attachments of the present petition, to the corresponding Collegiate Court in Civil Matters of the First Circuit.

**SECOND:** To grant the suspension requested in the body of said lawsuit.

<div align="center">

**I OBJECT TO WHAT IS NECESSARY**
**Mexico City, as of the date of presentation.**

[electronically signed] [electronically signed

_____
**EDUARDO ALBOR VILLANUEVA**
general proxy of
**CONTROLADORA DOLPHIN, S.A. DE C.V.**

</div>

Complainer:

Controladora Dolphin, S.A. de C.V. ("**Controladora**" or "**Complainant**")

Subject:

**A direct amparo lawsuit is filed and the suspension of the challenged acts is requested.**

**COLLEGIATE COURT IN CIVIL MATTERS OF THE FIRST CIRCUIT, IN TURN.**

**EDUARDO ALBOR VILLANUEVA**, general attorney-in-fact of **CONTROLADORA DOLPHIN, S.A. DE C.V.,** ("**Controladora**" or "**Complainant**"), with legal capacity as evidenced in terms of the public deed attached as Exhibit "1", as well as **VICENTE BAÑUELOS RIZO**, in his own right and as authorized in broad terms of the Complainant, appear and state the following:

**Under oath that** the digitalization of the public documents attached as Annexes "1", "1-A" and "1-B" is a complete and unaltered copy of the printed documents obtained from the originals, in accordance with section VI of Article 3 of General Agreement 12/2020 of the Plenary of the Federal Judiciary Council.

Based on Articles 103 section I and 107 of the Political Constitution of the United Mexican States, as well as Articles 1, 5, 17 and 170 of the Amparo Law, a **DEMAND FOR DIRECT AMPARO** is filed, in the terms specified below.

Now, in order to comply with the provisions of article 175 of the Amparo Law, the following is expressed:

<div align="center">

**INDEX**

</div>

I.     PREVIOUS CONSIDERATION .................................................................................4

II.    AUTHORIZATION OF PERSONS ........................................................................6

III.   NAME AND ADDRESS OF COMPLAINANT ..................................................7

IV.    NAME AND ADDRESS OF THE INTERESTED PARTY .............................7

V.     RESPONSIBLE AUTHORITIES .............................................................................8

VI.    ACTS COMPLAINED OF ........................................................................................8

VII.   TIMELINESS OF THE AMPARO ACTION.......................................................9

VIII.  PROVENANCE .........................................................................................................10

A.    The Requested Order put an end to the insolvency proceeding.....................................10

B.    Ordinary resources have been exhausted .............................................................13

IX.    BRIEF RELEVANT BACKGROUND...................................................................14

A.    About the Parent Company and its current financial situation. ....................................14

B.    Background of the insolvency proceeding .............................................................20

X.     CONCEPTS OF VIOLATION.................................................................................27

1



**FIRST. CONTRARY TO THE ALLEGATIONS OF THE RESPONSIBLE COURT, IT IS FALSE THAT THE MOTION FOR LACK OF LEGAL STANDING FILED BY THE CONTROLLER WAS "WITHOUT SUBJECT MATTER" AT THE TIME OF ITS PRESENTATION, BEING EVIDENT THAT THE COURT DID RECOGNIZE THE LEGAL STANDING OF THE ALLEGED ATTORNEYS-IN-FACT, SO IT SHOULD HAVE ADMITTED AND SUBSTANTIATED IT PRIOR TO RULING ON THE REQUEST FOR WITHDRAWAL AND, BY NOT DOING SO, IT VIOLATED THE RIGHTS TO LEGAL CERTAINTY AND ACCESS TO JUSTICE OF THE PLAINTIFF.**............27

a. Principle of legal certainty ............27
b. Right of access to justice ............29
c. Unlawfulness of the Complaint and violation of the rights of legal certainty and access to justice. 32

**SECOND. THE RESPONSIBLE COURT VIOLATED THE PRINCIPLE OF CONTRADICTION BY RULING ON THE VALIDITY OF THE REPRESENTATION AND POWERS OF THE ALLEGED ATTORNEYS-IN-FACT WITHOUT FIRST EXHAUSTING A PROCEDURE TO THAT END.**............46

a. Due Process, guarantee of a hearing and the adversarial principle ............46
b. The Responsible Court s right to due process, the right to a hearing and the principle of violated Dolphin'adversarial proceedings. ............53

**THIRD. FURTHERMORE, THE MERE FACT THAT IN THE CI BANCO AND WILMINGTON TRUST WILL PARTICIPATE ALLEGED RUA DOES NOT IMPLY THE VALIDITY OF SAID RESOLUTION, IN ADDITION TO THE FACT THAT IT DOES NOT REMEDY THE OBLIGATION OF THE RESPONSIBLE COURT TO RESOLVE WITH PRIORITY THE INCIDENT OF LACK OF LEGAL STANDING AND THE REST OF THE CHALLENGES FILED BY CONTROLADORA TO QUESTION THE LEGAL STANDING OF THE ALLEGED ATTORNEYS-IN-FACT.**............57

**FOURTH. CONTRARY TO WHAT THE RESPONSIBLE COURT MAINTAINS, THE FACT THAT CI BANCO IS THE "MAJORITY SHAREHOLDER" AND HAS STATED THAT IT DOES NOT AGREE WITH THE FILING OF THE CONCURSO MERCANTIL, DOES NOT IMPLY THE VALIDITY OF THE ALLEGED RUA NOR DOES IT ENDOW IT WITH A PRESUMPTION OF LEGALITY, NOR DOES IT JUSTIFY THE VIOLATIONS COMMITTED BY THE RESPONSIBLE COURT.**............63

**FIFTH. CONTRARY TO THE RESPONSIBLE COURT'S CONTENTION, THE COURT DID ACT CONTRARY TO ITS OWN DETERMINATIONS WHEN IT PROCESSED THE REQUEST FOR WITHDRAWAL DESPITE THE FACT THAT IT HAD NOT COMPLIED WITH THE REQUEST IT HAD MADE**............66

a. Principle of legal certainty ............67
b. Principle of consistency and completeness ............67
c. Unlawfulness of the Order Complained Against ............68

**SIXTH. THE RESPONSIBLE COURT STARTS FROM ERRONEOUS PREMISES AND DOES NOT UNDERSTAND THE RATIO OF THE GRIEVANCES FORMULATED BY THE COMPLAINANT, SINCE THE LATTER DOES NOT COMPLAIN ABOUT A MERE GRANTING OF EFFECTS TO THE ALLEGED RUA, BUT ABOUT THE FACT THAT IT FAILED TO EVALUATE THE REST OF THE EVIDENCE AND REASONS THAT DEMONSTRATED THE INVALIDITY OF SAID RESOLUTION, VIOLATING THE PRINCIPLE OF CONTRADICTION SINCE, CONTRARY TO WHAT THE RESPONSIBLE COURT HELD, IT DID IMPLICITLY REJECT THE PROMOTIONS FORMULATED BY THE CONTROLLER** ............75

a. Due Process, guarantee of a hearing and the adversarial principle ............75
b. The Responsible Court s right to due process, the right to a hearing and the principle of violated Dolphin'adversarial proceedings. ............75

**SEVENTH. CONTRARY TO WHAT THE RESPONSIBLE COURT MAINTAINS, THE WITHDRAWAL FORMULATED BY THE ALLEGED ATTORNEYS-IN-FACT WAS INDEED PROMOTED BY THE CREDITORS OF THE PLAINTIFF, FOR WHICH REASON IT WAS ENTITLED TO EXERCISE THE POWERS GRANTED TO IT BY ARTICLE 87 OF THE COMMERCIAL BANKRUPTCY LAW, WHICH DO NOT DEPEND ON THE .ISSUANCE OF A COMMERCIAL BANKRUPTCY JUDGMENT** ............80

a. The par conditio creditorum principle in bankruptcy proceedings ............81
b. The application of article 87 of the Commercial Bankruptcy Law ............87
c. Case in point ............91

**EIGHTH. CONTRARY TO WHAT THE RESPONSIBLE COURT MAINTAINS, THE FACT THAT THE RESPONSIBLE COURT OVERLOOKED THE FACT THAT THE WITHDRAWAL FILED BY THE ALLEGED ATTORNEY-IN-FACT OF CONTROLADORA IS THE RESULT OF THE FLAGRANT VIOLATION OF THE PRECAUTIONARY MEASURES, ARE NOT ISSUES UNRELATED TO THE CONTROVERSY AND, ON THE CONTRARY, SHOULD HAVE BEEN ANALYZED BY THE RESPONSIBLE COURT BEFORE DECIDING ON THE WITHDRAWAL FILED BY THE ALLEGED ATTORNEYS-IN-FACT.**............96



**NINTH. CONTRARY TO WHAT THE RESPONSIBLE COURT MAINTAINS, IT WAS OBLIGED TO ISSUE THE INSOLVENCY JUDGMENT AFTER THE NON-REASONABLE PERIOD FOR DOING SO HAD ELAPSED, ESPECIALLY SINCE THE CONDITIONS FOR THE DECLARATION OF INSOLVENCY HAD BEEN PROVEN.** ........................................................... **102**

**TENTH. THE RESPONSIBLE COURT FAILED TO NOTICE THE ILLEGALITY OF THE ALLEGED RUA, BASED ON THE OBVIOUS FACT THAT IT WAS ENTERED INTO BY THE WILMINGTON TRUST DESPITE THE FACT THAT IT HAD RESIGNED AS "COLLATERAL AGENT", AND THEREFORE DID NOT HAVE THE AUTHORITY TO ENTER INTO IT AND WAS VITIATED BY ABSOLUTE NULLITY, IN ADDITION TO THE FACT THAT THE PROCEDURE FOR THE EXECUTION OF COLLATERAL THAT SUPPORTED SAID RESOLUTION WAS NOT FOLLOWED.** ................................................................................. **108**

**ELEVENTH. CONTRARY TO WHAT THE RESPONSIBLE COURT MAINTAINS, THE COURT DID VIOLATE THE PRINCIPLE OF PROCEDURAL GOOD FAITH BY SUSTAINING THE CHALLENGED ORDER ON THE FACT THAT CI BANCO, AS MAJORITY SHAREHOLDER OF CONTROLADORA, ARGUED THAT IT SUPPOSEDLY DID NOT CONSENT TO THE FILING OF THE CONCURSO MERCANTIL, SINCE THIS DOES NOT AFFECT THE VALIDITY OF THE ALLEGED RUA, MUCH LESS DOES IT DEPRIVE THE GENERAL SHAREHOLDERS' MEETING AND THE MEETING OF THE BOARD OF DIRECTORS THAT SUPPORTED THE FILING OF THE PETITION, WHICH SHOULD HAVE BEEN EVALUATED PRIOR TO DECIDING ON THE WITHDRAWAL AND SHOULD HAVE BEEN CONSIDERED UNDER THE SAME WEIGHT AS THE ACTS OF THE CREDITORS.**
      **114**
    a.   The principle of procedural good faith ................................................................................. 115
    b.   Illegality of the Reclaimed Auto ......................................................................................... 117

**TWELFTH. THE RESPONSIBLE COURT ACTED ILLEGALLY BY CONFIRMING THE LIFTING OF THE PRECAUTIONARY MEASURES DESPITE THE FACT THAT THE DISMISSAL ORDER HAD NOT YET BECOME FINAL.** ............................................................. **119**

**THIRTEENTH. BY CONFIRMING THE DISMISSAL ORDER AND THE CONSEQUENT LIFTING OF THE PRECAUTIONARY MEASURES, THE RESPONSIBLE COURT FAILED TO COMPLY WITH THE PROVISIONS OF ARTICLE 25 OF THE COMMERCIAL BANKRUPTCY LAW, SINCE IT WAS NOT EMPOWERED TO ORDER THE LIFTING OF THE PRECAUTIONARY MEASURES WITHOUT PREVIOUSLY EXHAUSTING ANY OF THE MEANS AND REMEDIES REGULATED BY ARTICLE 1183 OF THE COMMERCIAL CODE.** 122

**FOURTEENTH. UNCONSTITUTIONALITY OF ARTICLES 1, 7, 25, 26 AND 28 OF T H E INSOLVENCY LAW, AS WELL AS ARTICLE 1183 OF THE COMMERCIAL CODE BY IMPLICITLY INTERPRETING THE POSSIBILITY OF DECREEING THE LIFTING OF PRECAUTIONARY MEASURES WITHOUT AN ORDINARY APPEAL HAVING BEEN FILED AND WITHOUT AN EXPRESS REQUEST TO DO SO.** ................................................................. **124**
    a.   Due process and adversarial principle ................................................................................. 124
    b.   Effective precautionary protection ...................................................................................... 124
    c.   Unconstitutional and implicit interpretation undertaken by the Responsible Court ............ 126
    d.   Necessity of exercising constitutionality control to safeguard the constitutionality of the challenged precepts and consequent unconstitutionality of the Challenged Resolutions under the exercise of said control ..................... 130

**FIFTEENTH. UNCONSTITUTIONALITY OF ARTICLES 1, 7, 25, 26 AND 29 OF THE COMMERCIAL BANKRUPTCY LAW, AS WELL AS ARTICLE 1343 OF THE COMMERCIAL CODE, BY IMPLICITLY INTERPRETING THE POSSIBILITY OF ORDERING THE LIFTING OF THE PRECAUTIONARY MEASURES DESPITE THE FACT THAT THE CHALLENGED ORDER HAD NOT CAUSED STATE** .......................................................... **134**
    a.   Access to justice ................................................................................................................. 135
    b.   Effective judicial protection ............................................................................................... 140
    c.   Actual resource ................................................................................................................... 145
    d.   The unconstitutional and implicit interpretation upheld by the Responsible Court ............. 147
    e.   Necessity of exercising constitutionality control to safeguard the constitutionality of the challenged precepts and consequent unconstitutionality of the Challenged Resolutions under the exercise of such control .................. 149

**SIXTEENTH. UNCONSTITUTIONALITY OF ARTICLE 28 OF THE INSOLVENCY LAW, AS IT IMPLICITLY INTERPRETS THE POSSIBILITY THAT THE WITHDRAWAL OF THE INSOLVENCY PROCEEDING MAY BE FILED BY THE CREDITORS OF THE MERCHANT.**
.................................................................................................................................................... **150**
    a.   Principle of legal certainty ................................................................................................. 150
    b.   Due process, effective judicial protection and access to justice.......................................... 150
    c.   The implicit and unconstitutional interpretation sustained by the Responsible Court.......... 151
    d.   The exercise of the review of constitutionality to be carried out with respect to the challenged Precepts ............ 152



**SEVENTEENTH. UNCONSTITUTIONALITY OF ARTICLES 18 AND 19 OF THE BANKRUPTCY LAW, BY INTERPRETING THAT THE MOTION FOR LACK OF LEGAL CAPACITY IS NOT OF PRIOR AND SPECIAL PRONOUNCEMENT AND MAY BE PROCESSED FOR PETITIONS FILED BY PERSONS WHOSE LEGAL CAPACITY WAS CHALLENGED.** .......................................................................................................................**153**

    a.   Principle of legal certainty ..................................................................................................153
    b.   Due process, effective judicial protection and access to justice..........................................153
    c.   Actual resource .................................................................................................................153
    d.   Unconstitutional and implicit interpretation undertaken by the Responsible Court.............155
    e.   The exercise of the review of constitutionality to be carried out on the challenged precepts ...............159

**XI.    REQUEST FOR SUSPENSION** ...........................................................................**160**

    **A.    Effects for which suppression is requested** ..............................................................**160**

    **B.    Fulfillment of the requirements for the suspension to proceed** ...............................**164**

    a.   The request of a party ......................................................................................................167
    b.   Existence of the challenged acts.......................................................................................167
    c.   Nature of the challenged acts, i.e., that they are susceptible to be suspended......................167
    d.   The complainant must feel that his or her legal or legitimate interest has been affected...............173
    e.   Balancing the appearance of good faith against the social interest or public order.................174
    f.   About the warranty...........................................................................................................176

## I.    PRIOR CONSIDERATION.

From the record of the present case file, as well as from the brief background narrated below, this Tribunal will notice that the present controversy has at its core unresolved questions of personality.

The controversy arose after certain creditors of the Complainant unlawfully foreclosed on certain stock pledges against it and attempted to take "corporate control" over it by appointing a new Board of Directors and new attorneys-in-fact.

This was done by means of an alleged "unanimous shareholders' resolution" held on March 28, 2025, in which the following attorneys-in-fact were appointed: *(i)* Steven Robert Strom, *(ii)* Robert L. Wagstaff, *(iii)* Michael Nicosia Flynn, *(iv)* Eduardo Moyano Luco, *(v)* Matías Marambio Calvo, *(vi)* María Lucia Wagstaff, *(vii)* Carlos Alfredo Moyano Luco, *(viii)* Francisco José Glennie Calvo, *(ix)* Jaime René Guerra González, *(x)* Jesús Armando Treviño Moyeda, *(xi)* Alfonso Peniche García, *(xii)* Román Salazar Castillo, *(xiii)* Rogelio Héctor Palacios Beltrán, *(xiv)* Carlos Braulio Reyes Escandón, *(xv)* Miguel Ángel Hernández Morales, *(xvi)* Sebastián Ruanova Carbajal and, *(xvii)* Rodrigo Josué Gazcón Quintana ("**Proxy Trustees**").

The validity of this illegal resolution is already being challenged by Controladora through the appropriate channels; in fact, Controladora has currently filed an ordinary commercial lawsuit against the Power of Attorney Judges, filed before the Tenth Civil Court of the Superior Court of Justice of Mexico City ("**Tenth Court**") under file number 256/2025, which even issued precautionary measures that are already included in the present file, suspending the validity of the unanimous resolution under which they intend to act.

The foregoing, in addition to the fact that, as is evident in the record, the validity of such resolution **was also challenged in this reorganization proceeding** through a "motion for lack of standing", the rejection of which by the Responsible Court **is precisely one of the violations claimed in this amparo lawsuit**.



Moreover, it is reiterated to this Court that the present controversy has at its core precisely the invalidity of the representation of the attorneys-in-fact and other acts carried out with the purpose **of ignoring the personality of the legitimate representatives of the Complainant**, who are signing the present extension of the complaint.

Therefore, if the present controversy is precisely about questions of personality, it is evident that this Tribunal **should not agree to any request, formulated by different attorneys-in-fact, that seeks to dismiss the present lawsuit nor, much less, should it prevent the proceeding of this lawsuit by alleging questions of personality.** In this regard, the following binding jurisprudential criterion is applicable:

> **"PERSONALITY. THE APPEAL FILED AGAINST ITS DISREGARD IN THE AMPARO PROCEEDING SHOULD NOT BE DISMISSED BASED ON THE ARGUMENT OF LACK OF PERSONALITY**.
>
> Facts: The contending Collegiate Circuit Courts ruled in a contradictory manner as to whether it is appropriate to dismiss an appeal for lack of standing ad procesum or personality of the plaintiff, when this is the legal point debated, by virtue of having been the basis of the appealed resolution; or whether its study should be reserved for the judgment deciding the appeal, as a substantive issue.
>
> Legal criterion: The Plenary in Civil Matters of the Third Circuit establishes that the court that hears the appeal filed against the resolution that considered that the personality of the person who appeared on behalf of the plaintiff was not accredited, must resolve the merits of the issue raised and not dismiss it based on such lack of accreditation.
>
> Justification: This, in order to respond to the arguments tending to demonstrate the illegality of the appealed resolution, in observance of the fundamental rights of access to jurisdictional protection and of hearing and defense. By virtue of the fact that the substantive matter to be elucidated in the respective means of challenge is, properly speaking, to analyze whether or not he has or does not have such representation. **To ignore, from the outset, the challenged personality, rejecting the appeal for that very reason, would lead to the fallacy of "petition of principle", which consists of using the challenged argument against the appellant, when it is not susceptible to be used, because this would imply that the court already accepted the legality of the legal point being debated.** The aforementioned, without having answered each one of the claims asserted with the intention of proving the contrary"[1].

> [Emphasis added]

It is worth mentioning that this criterion is consistent with the different one issued by the First Chamber of the Supreme Court of Justice of the Nation, which is reproduced below:

> **"PERSONALITY, REASON FOR THE AMPARO**. If the legality or illegality of a ruling is brought to the attention of the District Judge hearing the amparo, which in a trial, in process, ignores a personality, it is unlawful for that official to demand prior to the admission of the claim, that the personality be accredited, since it is precisely the problem that will be discussed and resolved in the merits of the trial of guarantees"[2].

---

[1] Digital Record: 2023081 Plenos de Circuito;11a. Época;Gaceta del Semanario Judicial de la Federación;PC.III.C. J/55 C (10a.) ;J; Publication: Friday, May 07, 2021 10:12 a.m.

[2] Digital Record: 345916 SCJN;5a. Época;Semanario Judicial de la Federación ;TA



Consequently, it is hereby made known to this Court that the Controladora **is unaware of any action taken by the Representative Representatives, <u>and</u> therefore <u>no action taken by them before this Court should be considered</u>**, since it is evident that the legal status they hold is illegal.

The foregoing, and it should not go unnoticed by this Court that **Vicente Bañuelos Rizo** also appears in this amparo proceeding in his own right and, consequently, under a different personality than that of the Controladora.

## II.    AUTHORIZATION OF PERSONS.

In broad terms of Article 12 of the Amparo Law in force, Vicente Bañuelos Rizo,[3]to consult the file and take notes and photographs of the sameAlejandro Acevedo Juárez,[4]Luis Roberto Luna Reyes,[5]Carlos Eduardo Milla Ortega,[6]Francisco Alberto Ladino Chávez,[7]Gian Carlo Alexis Cardiel Ávila[8], Gonzalo López de Lerena de Giau[9]and Ilse Angulo Leyva,[10][11]are hereby authorized,who, consequently, are authorized to hear and receive all kinds of notifications in the name of the Complainant, to collect documents and securities, , are hereby authorized to hear and receive all types of notifications on behalf of the Complainant, collect documents and securities, consult the file and take notes and photographs of the same, take possession of the records, file the appropriate appeals, offer and render evidence, plead in the hearings, request their suspension or deferral and perform any act necessary for the defense of the rights of the authorizing party.

Yolanda Aimée Díaz Chacón, Lucía Paulina Aguilar Fernández, Emilio Jesús Flores Domínguez, Karla Pamela Ramos Guerrero, Nilda Noelia Báez Padilla and Luis Emilio Sánchez Solano are authorized only to hear and receive notifications, to inspect the records, to collect documents and to take notes and photographs of the pleadings and agreements included in the file.

Based on Articles 35, 36 and 40 of General Agreement 12/2020 of the Plenary of the Federal Judiciary Council, it is requested to authorize the following persons whose user names of the Online Services Portal System of the Federal Judiciary are identified, to consult via Internet the electronic file mentioned above, in order to consult and act electronically in said portal, for which the following registration data are provided:

| Name | User | E-mail address |
|---|---|---|
| Vicente Bañuelos Rizo | Vicentebanuelos | Vicente.Banuelos@clydeco.com |
| Alejandro Acevedo Juarez | AlejandroAC1404 | Alejandro.Acevedo@clydeco.com |
| Francisco Alberto Ladino Chavez | fcoladinoc | francisco.ladino@clydeco.com |
| Luis Roberto Luna Reyes | Luisr_Luna | Luis.Luna@clydeco.com |
| Carlos Eduardo Milla Ortega | Carlos.milla | Carlos.Milla@clydeco.com |

[3] Professional license 3298102
[4] Professional license 12247946
[5] Professional license 6416703
[6] Professional license 8080362
[7] Professional license 12819729
[8] Professional license 13272464
[9] Cédula profesional 12081219
[10] Professional license 12445965



| Gian Carlo Alexis Cardiel Avila | giancarlo.cardiel | Gian-Carlo.Cardiel@clydeco.com |
| Yolanda Aimée Díaz Chacón | yolandadc_ | Yolanda.Diaz@clydeco.com |
| Karla Pamela Ramos Guerrero | karla.ramos | Karla.Ramos@clydeco.com |
| Gonzalo López de Lerena From Giau | gonchis95 | Gonzalo.LopezdeLerena@clydeco.com |
| Ilse Angulo Leiva | Isal93 | Ilse.Anguloleyva@clydeco.com |
| Lucía Paulina Aguilar Fernández | lucia.agfe | Lucia.Aguilar@clydeco.com |
| Luis Emilio Sánchez Solano | luis.emilio.sanchez | LuisEmilio.Sanchez@clydeco.com |
| Emilio Jesús Flores Dominguez | Emiliofd22 | Emilio.flores@clydeco.com |

Pursuant to Article 55 of General Agreement 12/2020 of the Plenary of the Federal Judiciary Council, the judicial decisions issued in the case file are expressly notified electronically to the persons whose user names of the Online Services Portal System of the Federal Judiciary are identified:

| Name | User |
|---|---|
| Vicente Bañuelos Rizo | vicentebanuelos |
| Alejandro Acevedo Juarez | AlejandroAC1404 |
| Carlos Eduardo Milla Ortega | Carlos.milla |
| Yolanda Aimée Díaz Chacón | yolandadc_ |
| Lucía Paulina Aguilar Fernández | lucia.agfe |
| Emilio Jesús Flores Domínguez | Emiliofd22 |

For the exclusive purposes of this amparo proceeding, the domicile is located at Camino a Santa Teresa no. 187-C, Tercer Piso, Colonia Parques del Pedregal, Alcaldía Tlalpan, C.P. 14010, Mexico City.

## III.    NAME AND ADDRESS OF THE COMPLAINANT.

**CONTROLADORA DOLPHIN, S.A. DE C.V. ("Controladora"** or **"Complainant"**), acting through its attorney-in-fact **EDUARDO ALBOR VILLANUEVA**.

The legal capacity shown is duly accredited before the responsible authority in terms of Article 11 of the Amparo Law, and it is also accredited with the notarial instrument attached as Annex "1". It is stated **UNDER PROTEST OF TRUTH** that the digitalization of the public document attached as Annex "1" is a complete and unaltered copy of the printed document obtained from its original, in accordance with section VI of Article 3 of General Agreement 12/2020 of the Plenary of the Federal Judiciary Council.

## IV.    NAME AND ADDRESS OF THE INTERESTED THIRD PARTY.

It is declared **UNDER PROVESTION OF TRUTH** that there is no knowledge of any person who meets any of the requirements of Section III of Article 5 of the Amparo Law.

7



## V.    RESPONSIBLE AUTHORITIES.

The following authorities are designated as such:

    a.   Juzgado Segundo de Distrito en Materia de Concursos Mercantiles with residence in Mexico City and jurisdiction throughout the Mexican Republic ("**Responsible Court**").

    b.   Clerk assigned to the Second District Court in Commercial Bankruptcy Matters with residence in Mexico City and jurisdiction throughout the Mexican Republic.

## VI.    ACTS COMPLAINED OF.

    a.   From the Responsible Court, it is claimed:

       i.    The order dated May 21, 2025 issued in the insolvency proceeding 1/2025, whereby the appeal for revocation filed against the other order dated April 14, 2025 was denied and the dismissal of the insolvency proceeding was confirmed ("**Requested Order**").

       ii.    The order of May 21, 2025 issued in the insolvency proceeding 1/2025, whereby the appeal for revocation filed against the different order of April 14, 2025 was denied and the lifting of precautionary measures was confirmed, as a procedural violation that transcends the result of the ruling ("**Order of Confirmation of the Lifting of Precautionary Measures**").

       iii.    The order dated June 4, 2025 issued in the insolvency proceeding 1/2025, whereby it resolved the appeal for revocation filed against the other order dated May 22, 2025 as unfounded and confirmed the decision to revoke the judicial authorizations filed by the Complainant in the insolvency proceeding ("**Order of Confirmation of Revocation of Authorized Persons**").

       iv.    The failure to process and resolve the motion for lack of standing filed by Controladora on April 1, 2025" as a procedural violation that transcends the result of the judgment.

       v.    The failure to enforce the entirety of the injunction issued on April 3, 2025, as a procedural violation that transcends the result of the ruling.

       vi.    The omission to issue the insolvency judgment within the five-day non-extendable term referred to in Article 42 of the Insolvency Law, as a procedural violation that transcends the result of the judgment.



vii.    The omission to give a hearing or to process through incidental proceedings the request for withdrawal filed in the reorganization proceeding, since there is a controversy regarding the personality of the alleged attorney-in-fact and it is the result of the violation of precautionary measures.

b.   From the Responsible Actuary, it is claimed:

i.    Any act tending to enforce the Order Complained Against, specifically, any act tending to lift the precautionary measures decreed on January 28, 2025.

## VII.    TIMELINESS OF THE AMPARO ACTION.

The Order was notified electronically on May 26, 2025, as evidenced by the proof of notification attached as "Exhibit 2".

Articles 17 and 18 of the Amparo Law establish that the initial petition must be filed within 15 days from the day following the effective date of the notification, according to the law governing the challenged act.

Taking into account that it was a notification made through the Online Services Portal of the Federal Judiciary, Articles 61, 62, 96, 97, 102 section II and 103 section VI of the "General Agreement 12/2020, which Regulates the Integration and Processing of the Electronic File and the Use of Videoconferences in All Matters under the Competence of the Jurisdictional Bodies in Charge of the Council Itself, issued by the Plenary of the Federal Judiciary Council", article 1075 of the Commercial Code, [11]in supplementary application to the Commercial Bankruptcy Law and the thesis entitled "**NOTIFICATION BY ELECTRONIC WAY IN THE COMMERCIAL EXECUTIVE JUDGMENT, PURSUED BEFORE A FEDERAL COURT. BECOMES EFFECTIVE ON THE DAY FOLLOWING THE DAY IN WHICH IT WAS**

[12]), applicable by analogy to the specific case, it is clear that such notification took effect **the day after it was given**.

Consequently, the period of 15 (fifteen) days to file the amparo claim must be computed as of April 26, 2025 and expires on May 17, 2025, as follows:

---

Article 1075.- All judicial terms shall begin to run from the day following that on which the summons or notifications have taken effect, and the day of expiration shall be counted therein.

Personal notifications take effect the day after they have been made, and other notifications take effect the day after that in which they have been made by bulletin, gazette or judicial newspaper, or posted on the court dockets, as well as those made by mail or telegraph, when there is proof of having been delivered to the interested party, and edicts the day after the last one has been made in the official newspaper of the State or of the Federal District.

When the first notification is to be made in a place other than that of the court's residence, it will be increased to the terms established by law or by the judge, one day more for every two hundred kilometers or for the fraction that exceeds one hundred, and the judge may, depending on the difficulties of communications, and even weather problems, increase said terms, duly reasoning and basing his determination in this sense.

[12] Digital Record: 2026285 TCC;11a. Época;Gaceta del Semanario Judicial de la Federación;XV.1o.2 C (11a.) ;TA; Publication: Friday, April 14, 2023 10:18 am



| April and May 2025 | | | | | | |
|---|---|---|---|---|---|---|
| **Monday** | **Tuesday** | **Wednesday** | **Thursday** | **Friday** | **Sab.** | **Dom.** |
| 26<br><br>*The following was notified electronically the Auto Claimed.* | 27<br><br>*Effects* | 28<br><br>Day 1 | 29<br><br>Day 2 | 30<br><br>Day 3 | 31 | 1 |
| 2<br><br>Day 4 | 3<br><br>Day 5 | 4<br><br>Day 6 | 5<br><br>Day 7 | 6<br><br>Day 8 | 7 | 8 |
| 9<br><br>Day 9 | 10<br><br>Day 10 | 11<br><br>Day 11 | 12<br><br>Day 12 | 13<br><br>Day 13 | 14 | 15 |
| 16<br><br>Day 14 | 17<br><br>**<u>Day 15</u>** | 18<br><br>* | 19<br><br>* | 20<br><br>* | 21 | 22 |

## VIII.    PROVENANCE.

### A.  The Order was issued to terminate the insolvency proceeding.

Pursuant to Article 170 of the Amparo Law, a direct amparo proceeding may be filed against judgments, awards, or resolutions that **put an end to the proceeding**, meaning those that, without deciding the main issue, terminate it:

> "The **direct amparo** proceeding shall proceed:
>
> I. Against **final judgments, awards and <u>resolutions that put an end to the trial</u>, issued by judicial**, administrative, agrarian or labor **courts**, whether **the** violation is committed therein, or committed during the proceeding, affecting the defenses of the plaintiff and transcending the result of the judgment.
>
> Final judgments or awards **shall be understood as** those that decide the main part of the trial; **resolutions that put an end to the trial** shall **be understood as those that, without deciding the main part of the trial, terminate it**. In criminal matters, convictions, acquittals and dismissals may be challenged by the victim or injured party (...).
>
> <div align="right">[Emphasis added]</div>

In the present case, the Order is a judicial decision that puts an end to the trial, being susceptible to be claimed by direct amparo.

In this regard, the withdrawal of the reorganization proceeding is regulated in Article 28 of the Commercial Bankruptcy Law, in the following terms:

> "Article 28.- The Merchant who has requested the declaration of bankruptcy or, as the case may be, the creditors or the Public Prosecutor's Office who have sued him, may withdraw their request or claim, provided that there is the express consent of all of them. The Merchant or the plaintiff creditors shall bear the expenses of the process, among others, the fees of the visitor and, if applicable, of the conciliator."

10



Although said provision does not regulate the effects of abandonment, the Federal Code of Civil Procedures, applicable in a supplementary manner to the bankruptcy law, assimilates them to the effects of forfeiture, in the following terms:

> "The process lapses in the following cases (...) II.- By abandonment of the
>
> prosecution of the trial (...)".

In these terms, the jurisprudence has recognized that the resolution that declares the caducidad of a lawsuit is considered to "put an end to it", as is evident from the following criteria, applicable by analogy:

**"AMPARO DIRECTO. PROCEEDS AGAINST THE DECISION ISSUED DURING THE PERIOD OF EXECUTION OF THE SENTENCE THAT DECREES THE EXPIRATION OF THE INSTANCE, LEAVES WITHOUT EFFECT THE ACTIONS PRACTICED DURING THE TRIAL OF ORIGIN AND THE IS CONSIDERED CONCLUDED**. The decision issued in the period of execution of the judgment that declares the expiration of the instance, and leaves without effect the proceedings practiced in the original trial, must be challenged in the direct amparo proceeding, because although it is true that we are before a determination issued in the stage of execution of the judgment, it is also true that it decided that the expiration of the instance, all the proceedings of the main trial were left without effect and, therefore, it concluded it, it is also true that it decided that due to the expiration of the statute of limitations all the proceedings of the main trial were without effect and, therefore, it concluded it, and therefore it has the characteristics of those that put an end to the trial referred to in the third paragraph of article 46 of the Amparo Law; Therefore, in accordance with the principles of concentration, expeditiousness, celerity and procedural economy to which the proceeding, processing and resolution of the amparo trials are subject, as sustained by the Supreme Court of Justice of the Nation in several criteria, the direct amparo trial is appropriate."[13]

**"AMPARO DIRECTO. IT PROCEEDS BOTH AGAINST THE ORDER THAT DECREES THE EXPIRATION OF THE INSTANCE, AS WELL AS THE OTHER ONE THAT REJECTS THE APPEAL FOR REVOCATION FILED AGAINST IT, ISSUED IN AN ORAL COMMERCIAL EXECUTIVE TRIAL**.

Facts: An oral commercial executive trial was filed, in which the expiration of the instance was decreed; an appeal for revocation was filed against such resolution, which was dismissed outright. In a direct amparo, both the order that decreed the expiration of the instance and the resolution that dismissed the appeal for reversal were challenged.

Legal criterion: This Circuit Collegiate Court determines that the direct amparo proceeding is applicable both against the order that decrees the expiration of the instance, as well as the other one that rejects the appeal for revocation filed against it, indicated as outstanding acts, issued in an oral commercial executive trial.

Justification: In the considerations of contradiction of thesis 38/2014, the Plenary of the Supreme Court of Justice of the Nation established three procedural assumptions in direct amparo, which must be analyzed in logical order, so that the dissatisfaction of a previous one prevents the study of the subsequent ones, namely: a) the procedural basis of the remedy, depending on whether the challenged act is a final judgment, award or resolution that put an end to the trial; b) the competence of the Collegiate Circuit Courts to hear such remedy; and c) the procedural basis of the trial, section in which the possible causes of inadmissibility and dismissal listed in Articles 61 and 63 of the Amparo Law must be studied.

Both the resolution that decrees the expiration of the instance, as well as the one that rejects the appeal for reversal filed against it, constitute resolutions that put an end to the trial. The first one, because in terms of article 1076, third paragraph, of the Code of Commerce, the caducity extinguishes the natural process, which prevents it from continuing its course and that the merits of the controversy be studied. The second, because its effect is to leave the challenged agreement firm, without any means of appeal.

---

[13] Digital Record: 173622 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;VII.2o.C.28 K ;TA

CLYDE&CO

> The Court has also ruled that the appeal against it, in accordance with article 1335, second paragraph, of the Code itself, which also puts an end to the trial, in analogous application of the jurisprudence thesis of the First Chamber 1a./J. 97/2008 and 1a./J. 51/2004.
>
> The agreement that decreed the expiration of the instance based on its procedural substitution through the dismissal of the appeal for revocation cannot be excluded as a challenged act, since this study corresponds to the subsequent stage in which the possible causes of inadmissibility are analyzed. Neither can the agreement that dismissed the appeal for revocation be excluded on the grounds that it is not the appropriate means of challenge against the agreement that decreed the expiration of the instance in the oral commercial executive trial, because that also corresponds to a later stage, related to the study of the merits; otherwise, the concepts of violation in which the complaining party argues that this means of challenge was appropriate would remain unanswered.
>
> The different jurisprudence thesis 1a./J. 78/2012 (10th.) is not an obstacle, since it was issued based on the repealed Amparo Law, which conditioned that the direct amparo proceeding could not proceed against the final judgment, award or resolution that put an end to the trial, without any ordinary recourse"[14].

In addition to the foregoing, it has been interpreted that the dismissal of the lawsuit, since it has the effect that "things return to the state they were in before the lawsuit", is a resolution that puts an end to the lawsuit and, therefore, a direct amparo proceeding may be filed against it:

**"DISMISSAL OF THE INSTANCE IN THE ORDINARY COMMERCIAL LAWSUIT. THE AMPARO PROCEEDING MAY BE FILED DIRECTLY AGAINST THE RULING THAT APPROVES IT FAVORABLY (APPLICABLE LEGISLATION FOR MEXICO CITY).**

Facts: In an ordinary commercial lawsuit, the plaintiff withdrew from the proceeding after the summons was served on the defendant, so that in compliance with the provisions of Article 34 of the Code of Civil Procedures for the Federal District, applicable for Mexico City, the Judge of the knowledge gave sight with that one to the co-defendants, who expressed their disagreement with it; However, the Judge of origin determined that it was appropriate to decree the dismissal of the proceeding, for which reason the dissatisfied defendants filed the ordinary means of challenge established in the law of the matter, in which the determination of the a quo was confirmed.

Legal criterion: This Circuit Collegiate Court determines that a direct amparo proceeding may be filed against a ruling that favorably agrees the dismissal of the proceeding -not of the action- and that has as a consequence that things return to the state they were in prior to the filing of the lawsuit, as well as the filing of the case file.

Justification: The foregoing, because Article 170, section I, of the Amparo Law contemplates, in essence, that the direct amparo trial will be admissible against final judgments, awards and resolutions that put an end to the trial, the latter being understood as those determinations that, without deciding it in the main, terminate it. This is in addition to the fact that in order for the amparo proceeding to proceed, the ordinary remedies established in the law of the matter, through which such resolutions may be modified, must be previously exhausted. Now, the fourth paragraph of Article 34 of the Code of Civil Procedures for the Federal District, applicable to Mexico City, establishes that the dismissal of the proceeding produces the effect that things return to the state they had before the filing of the lawsuit. Therefore, it can be validly stated that such determination constitutes a resolution that puts an end to the lawsuit, since even without deciding the main issue, it concludes it and makes things return to the state they were in before the filing of the lawsuit, as it can be observed in the referred article. Consequently, from the harmonic interpretation of the above-mentioned precepts, it is obtained that the determination that favorably agrees the

---

[14] Digital Record: 2029596 TCC;11a. Época;Gaceta del Semanario Judicial de la Federación;XVII.2o.10 K (11a.)
TA; Publication: Friday, November 29, 2024 10:40 am



The dismissal of the proceeding, which results in the file being archived, can be claimed through a direct amparo proceeding"[15].

**B.  Ordinary appeals have been exhausted**.

Article 171 of the Amparo Law regulates the "principle of finality" in direct amparo proceedings, according to which, as a general rule, it is necessary to exhaust ordinary remedies prior to filing an amparo proceeding, in the following terms:

> "When claiming the final judgment, award or resolution that puts an end to the trial, violations to the procedural laws must be asserted, provided that the complainant has challenged them during the processing of the trial, by means of the recourse or means of defense that, as the case may be, is indicated by the respective ordinary law and the procedural violation transcends the result of the judgment.
>
> This requirement will not be enforceable in appeals against acts that affect the rights of minors or disabled persons, the civil status, or the order or stability of the family, ejidatarios or ejidatarias, communal farmers, workers, ejido or communal population centers, or those who due to their conditions of poverty or marginalization are at a clear social disadvantage to undertake a trial, nor in those of a criminal nature promoted by the accused person. **Nor will the requirement be enforceable when it is alleged that, <u>the law applied or that should have been applied in the procedural act, is contrary to the Constitution or international treaties</u> to which the Mexican State is a party.**"

[Emphasis added]

In the present case, the original order that illegally had Controladora withdrawing from the petition for reorganization was the different one dated April 14, 2025 ("**Order of Withdrawal**"), as is evidenced in the record of the original lawsuit.

In this regard, Article 268 of the Mexican Bankruptcy Law provides that the appeal for revocation may be filed against **any determination in the bankruptcy proceeding**, other than those against which the appeal may be filed:

> "Article 268.- When this Law does not provide for an appeal, revocation shall proceed, which shall be processed in accordance with the provisions of the Code of Commerce."

As will be described below, on April 24, 2025, Controladora timely **filed a motion for revocation against the Order of Dismissal**, which was admitted by the Responsible Court on April 25, 2025.

Consequently, it is clear that the Controladora **has exhausted the ordinary appeals against the order of April 14, 2025, which dismissed the petition for bankruptcy**, thus complying with the principle of finality.

---

[15] Digital Record: 2025089TCC;11a. Época;Gaceta del Semanario Judicial de la Federación;I.3o.C.19 C (11a.) ;TA; Publication: Friday, August 12, 2022 10:20 am



## IX.    BRIEF RELEVANT BACKGROUND.

Although it is not a procedural requirement for the present lawsuit, in order for this Court to be able to notice the seriousness of the violations claimed in the present amparo lawsuit, the Complainant considers of utmost relevance to recount some relevant facts. In this order of ideas, **the** following relevant antecedents of the claimed acts are stated **UNDER PROTEST OF TRUTH**:

### A.    About Controladora and its current financial situation.

1.      Controladora Dolphin, S.A. de C.V. (**"Quejosa**" or **"Controladora**", interchangeably) is a company that is principally engaged in the care of marine animals and other species, as well as entertainment and tourism through experiences with them.

2.      Among its main projects is the preservation of the environment through the care of marine animals and taking responsibility for the care of the planet or the environment through the connection of people with nature.

3.      Controladora is part of a corporate group called The Dolphin Company, which has the largest family of captive dolphins in the world, operating parks and habitats for different marine animals in different countries. In this sense, Controladora is the main subsidiary of this corporate group, holding the majority of the shares in other park operating companies in Mexico with subsidiaries that operate parks in Argentina, the United States, Italy and the Caribbean Sea.

4.      Controladora opened its doors in Mexico in 1994 in Isla Mujeres with only four dolphins and by 2015 the company had at least 100 dolphins raised in the parks by expert staff.

5.      Over the years, Controladora Dolphin has been acquiring different animals and conserving their species through responsible care and environmental commitments to provide quality experiences to its visitors.

6.      In this sense, Controladora Dolphin has positioned itself as the number one company in the market and is also a socially and environmentally responsible company that cares for the environment and the animals with which it operates through its various parks and other attractions.

7.      On October 8, 2015, Controladora Dolphin, as issuer, entered into a securities purchase and sale agreement with Imperial Capital, LLC (**"Imperial**"), as placement agent, and Wilmington Trust National Association (**"Wilmington Trust**"), as Senior Collateral Agent, pursuant to which certain purchasers agreed to purchase *senior* notes, in connection with the purchase and sale of securities.



secured by Controladora Dolphin in the amount of $115,000,000.00 (one hundred and fifteen million dollars 00/100) ("**First Financing Agreement**" or "**2015 NPA**").

8.      On April 8, 2019, Controladora Dolphin in its capacity as issuer together with other subsidiaries and Wilmington Trust as Preferred Collateral Agent entered into a second securities purchase and security purchase agreement ("**Second Financing Agreement**" or "**2019 NPA**") to refinance the debt acquired under the First Financing Agreement, whereby certain acquirers, subject to the terms of such agreement, obligated themselves to purchase credit notes or "Notes" issued by Controladora Dolphin in the amount of
$100,000,000.00 (one hundred million dollars 00/100, currency of the United Mexican States). This money was used for expansion purposes and for the acquisition of 4 aquatic parks, which according to several market studies would have sufficient profits not only to cover the debt, but also to generate important profits that would allow Dolphin to continue performing in the tourist and environmental industry under the care of marine animals.

9.      On March 21, 2020, as a result of the global COVID-19 pandemic, Dolphin was forced to shut down all park and attraction operations.

10.      As is well known to this Court, the pandemic derived from COVID-19 had a high percentage of economic impact on companies around the world and implied millions of dollars in losses to companies worldwide, with different sanitary restrictions and specific regulations on the capacity of people in places and the concurrence of the same in public spaces.

11.      Nevertheless, and with a contingency plan, some of the company's accounts payable were reduced and deferred and different plans were negotiated to mitigate the pandemic; however, the situation of keeping the parks closed or with reduced capacity sanitary restrictions, forced Controladora Dolphin to seek a refinancing of its debt.

12.      Consequently, on June 8, 2020, the purchasers of the Second Financing Agreement entered into an Amendment and Restatement Agreement, whereby the purchasers agreed to purchase new notes in addition to the existing notes, up to $8,000,000.00 (eight million U.S. dollars, 00/100, United States currency), with an interest rate of 12%, as well as an agreement not to pay interest ("**2020 Financing Agreement**").

13.      However, in spite of important efforts made by Controladora, other problems strongly affected its operation. As it is a notorious fact for this Court, the effects of the COVID-19 pandemic expanded almost until the beginning of the year 2021 (being the tourist attractions and places of the most affected sectors, being the last ones to be affected).



The company was allowed to resume operations), which prevented it from obtaining the expected returns on the investments obtained.

14.     In order to restructure its indebtedness and, on the other hand, to obtain greater resources that would allow Controladora to face the difficult situation it was going through as a consequence of the ravages caused by the COVID-19 pandemic, after several negotiations with the purchasers of the notes issued under the First and Second Financing Agreement, the following agreements were entered into:

- Note Purchase and Second Lien Guarantee Agreement, from which debt was issued for USD $100,000,000.00 (one hundred million dollars, 00/100, currency of the United States of America) for a term of 7 years, with a SOFRI rate of+ 10.5, for which a new note ("**NPA 2022**") was entered into.

- Amendment Agreement to the 2020 Financing Agreement (which was referred to as the "Second Amended and Restated Note Purchase and Security Agreement", hereinafter referred to as the "**2020 Financing Agreement Amendment Agreement**" and, together with the 2022 NPA, the "**Financing Agreements**"), which essentially modified (substantially increased) the terms and conditions for the payment of the notes issued since the 2019 NPA.

15.     The Financing Agreements were entered into with Wilmington Trust, which in turn acted as general representative ("Collateral Agent") of the bondholders The Prudential Insurance Company of America, Cig & Co. JPM LLC and Leisure Investment Funding LLC ("**Bondholders**"). Pursuant to such agreements, Wilmington Trust is the common representative of the Bondholders, as evidenced by the following transcript:

<div align="center"><b>2019 NPA Amending Agreement</b>. "Section</div>

24.1 Appointment of Collateral Agent.

(a)     Warrant Agent. The Purchasers and the other holders desire to appoint a Person to act (and continue to act) as their collateral agent and representative on their behalf with respect to all matters relating to the Collateral and pursuant to the Security Documents, the other Financing Documents and the related documents. Accordingly, by execution of this Agreement, each Purchaser and each other holder irrevocably appoints, authorizes and irrevocably appoints Wilmington Trust, National Association to act as its security agent and representative on its behalf with respect to all matters relating to the Collateral and pursuant to the Collateral Documents and the other Financing Documents and the related documents. Each Purchaser and each other holder hereby grants to the Collateral Agent all powers and authorities necessary, desirable or appropriate to carry out the functions and duties delegated or assigned to the Collateral Agent pursuant hereto (including the authority to release the Collateral from the Liens created under the Collateral Documents and the other Financing Documents in the circumstances specifically provided for therein."



16.     With such financing, the expectation of the business projected a favorable scope for the business, with a payment plan derived from the profits obtained from the developments and from the company's regular operations.

17.     Now, in order to guarantee compliance with the Financing Agreements (and the hope that the Parent Company's operations would return to normal), the Parent Company created aggressive guarantees in favor of Wilmington Trust, through which it essentially *(i)* pledged its shareholders' shares; *(ii)* pledged its main personal property and *(iii)* mortgaged its main real estate assets. For the purposes of this section, the most relevant collateral pledged is as follows:

- Pledge without Transfer of Possession Agreement" entered into with Controladora Dolphin, S.A. de C.V. on October 8, 2015,[16] which regulates the execution procedure in its sixth clause.

- Adhesion, Amending and Restatement Agreement dated April 5, 2019, which amended the agreement referred to in the immediately preceding item; [17]

- Second Amending Agreement to the Pledge Agreement without Transfer of Possession" dated July 6, which amended the two agreements referred to in the preceding paragraphs [18].

- Accession Agreement to the Original Pledge Agreement dated June 27, 2022[19]

- Stock Pledge Agreement Subject to Condition Suspensive [(20)] Collectively,

such agreements would be referred to as "**Pledged Warrants**."

18.     According to the text of the Pledges, Controladora pledged **almost all of its shares in** favor of Wilmington Trust; this pledge also included the shares of its subsidiaries "Dolphin Leisure Inc.", "Viajero Cibernético, S.A. de C.V.", "Dolphin Austral Holdings, S.A. de C.V.", "Promotora Garrafón, S.A. de C.V." and "Aqua Tours, S.A. de C.V.".

19.     In addition, the Parent Company, together with its subsidiaries, entered into the Irrevocable **Guarantee** Trust Agreement CIB/2380 ("**Trust Agreement**") with Wilmington Trust as trustee in the first place ("**First Place Trustee**") and the credit institution CiBanco, S.A. Institución de Banca Múltiple ("**CI Banco**") as trustee. **Most of the relevant assets of the Company** were assigned to this Trust.

---

[16] The same was attached to the petition for insolvency proceedings as Exhibit "13".
[17] The same was attached to the petition for bankruptcy as Exhibit "14".
[18] The same was attached to the petition for bankruptcy as Exhibit "15".
[19] The same was attached to the petition for bankruptcy as Exhibit "16".
[20] The same was attached to the petition for insolvency proceedings as Exhibit "13".



**Controlling Company, including its shares as** well as its tourist parks, boats and other real estate.

20.    It is as a consequence of the execution of such Trust Agreement that in the current corporate structure of Controladora CI Banco appears as holder of 99% of its shares. However, it is emphasized to this Tribunal that such ownership is exercised **as a consequence of the constitution of a pledge in favor of Wilmington Trust and the Bondholders**. In fact, in section 2.05 of the Trust Agreement[21] it was clearly agreed that the sole purpose of the ownership of the shareholding rights, which integrate the trust patrimony, was to **guarantee the compliance of the Financing Agreements**:

> Sección 2.04. **FINES DEL FIDEICOMISO.** Los fines del presente Contrato de Fideicomiso (los "Fines del Fideicomiso") son garantizar el puntual y debido cumplimiento, pago y satisfacción a su vencimiento (ya sea a su fecha de vencimiento programado, por vencimiento anticipado o por cualquier otro motivo) de todas y cada una de (i) las Obligaciones Garantizadas Senior, en favor del Fideicomisario en Primer Lugar, en nombre y para el beneficio de los Adquirentes Senior, y (ii) de manera subordinada, conforme a lo previsto en el Convenio entre Acreedores y de Subordinación, las Obligaciones Garantizadas Subordinadas, en favor del Fideicomisario en Segundo Lugar, en nombre y para el beneficio de los Adquirentes Subordinados. Para tales efectos, el Fiduciario deberá:
>
> (a)    ser el único y legítimo propietario y titular del Patrimonio del Fideicomiso (trasmitido al Fiduciario en esta fecha o en cualquier momento posterior conforme a los términos previstos en este Contrato de Fideicomiso), libre de cualesquier Gravámenes, durante la vigencia de este Contrato de Fideicomiso y, en todo caso, hasta que (i) todas las Obligaciones Garantizadas Senior hayan sido Pagadas en Su Totalidad, y el Fideicomisario en Primer Lugar confirme dicho cumplimiento, pago y satisfacción mediante la entrega de una Notificación de Terminación del Fideicomisario en Primer Lugar al Fiduciario (con copia al Fideicomisario en Segundo Lugar) conforme a la Sección 3.01, y (ii) todas las Obligaciones Garantizadas Subordinadas hayan sido debida y legalmente satisfechas y pagadas e irreversiblemente liquidadas en su totalidad, y el Fideicomisario en Segundo Lugar, respectivamente, confirme dicho cumplimiento, pago y satisfacción mediante la entrega de una Notificación de Terminación del Fideicomisario en Segundo Lugar al Fiduciario conforme a la Sección 3.01;

21.    The foregoing shows that CI Banco's ownership of Controladora's shares is the exclusive consequence of **the guarantees constituted by the latter in favor of Wilmington Trust, without it being an unconditional assignment or with the intention that said trust company would corporately integrate Controladora.** Thus, in Section 5.01 of the Trust Agreement it was agreed that Controladora **would continue exercising voting rights** of the shares:

---

[21] The same was attached to the petition for insolvency proceedings as Exhibit "'"".

18



> **Sección 5.01.    ACCIONES, VOTO Y ADMINISTRACIÓN Y DISTRIBUCIONES DE CAPITAL.**
>
> (a)    Salvo que el Fideicomisario en Primer Lugar haya entregado al Fiduciario un Aviso de Incumplimiento, los Fideicomitentes de Acciones estarán facultados para ejercer los derechos de voto inherentes a las Acciones, respectivamente, transmitidas por dichos Fideicomitentes de Acciones al Fiduciario de conformidad con el presente Contrato de Fideicomiso, incluyendo sin limitación, el derecho de declarar dividendos en cada una de las Sociedades de Acciones en la medida permitida al amparo de los Documentos de la Operación (conjuntamente, los "Derechos de Voto"), en cada caso, en una manera que no resulte (o que no pudiera razonablemente esperarse que resulte) en un incumplimiento de, o en conflicto con, los términos y condiciones del presente Contrato de Fideicomiso o cualquier otro Documento de la Operación, en el entendido, sin embargo, que ninguno de los Fideicomitentes podrá, bajo ninguna circunstancia, instruir al Fiduciario (i) que constituya u otorgue Gravamen alguno o cualquier otra clase de garantía sobre o respecto a las Acciones (o cualquier parte de las mismas), o (ii) que venda, transmita, aporte o que de cualquier otra manera disponga de la totalidad o cualquier parte de las Acciones, en cada caso, sin el consentimiento previo y por escrito del Fideicomisario en Primer Lugar, o (iii) que ejerza los Derechos de Voto en cualquier asamblea o que firme cualesquier Resoluciones Unánimes que pretendan autorizar o de otra manera resolver la escisión, fusión, transformación o la modificación o reforma de los estatutos sociales vigentes de las Sociedades de Acciones, en cada caso, sin el consentimiento previo y por escrito del Fideicomisario en Primer Lugar.

22.    In addition, pursuant to the Trust Agreement, if the Parent Company were to default in any way under the Financing Agreements, then its creditors (represented by Wilmington Trust) are entitled to accelerate all of the promissory notes issued and sell out of court all of Dolphin's assets.

23.    Despite the financing obtained and the best efforts for the correct operation of the company, Dolphin is currently going through a worrisome financial situation.

24.    On the one hand, there were unexpected effects in different factors such as inflation, e.g., in the United States inflation reached up to 6.3% and up to 9% per year specifically in Florida in 2023, directly affecting the operating structure of the business and, therefore, decreases in business expectations.

25.    Different situations such as the impact of the death of the orca whale "Lolita" in Miami (one of the main attractions of Dolphin's parks), as well as the increase in the cost of destinations for foreign tourists in Mexico due to the devaluation of the peso and the exchange rate, were fundamental to the impact on the performance of the company's activities and operations.

26.    In addition, the projects estimated for the increase in operations were rejected by the Federal Antitrust Commission, which impeded the performance and with it the drop in cash flow expectations as a consequence of the development of operations.

27.    On the other hand, as it is a notorious fact for this Court between March 2023 and August 2024, the exchange rate faced several irregularities, therefore, the profits obtained by Controladora Dolphin were affected in relation to the amounts owed and the value of the profits in relation to the exchange rate.

28.    Consequently, as the Company's liabilities exceeded its obligations and it was facing an imminent default of the obligations assumed in the Financing Agreements, the General Shareholders' Meeting held on November 7, 2024, resolved to approve the



filing of the insolvency petition ("**Concurso Mercantil General Meeting**"), which in turn was approved by a board of directors meeting held on December 23, 2024 ("**Board of Directors Meeting**").

29.     Therefore, on December 31, 2025, Controladora filed for bankruptcy protection.

**B.  Background of the insolvency proceeding**.

30.     Such petition was filed in the Second District Court in Commercial Bankruptcy Matters with residence in Mexico City and jurisdiction throughout the Mexican Republic ("**Responsible Court**") under file number 1/2025 ("**Concurso Mercantil**").

31.     On January 28, 2025, the Responsible Court admitted the petition, considering, at least presumptively, that Controladora complied with the requirements to be declared bankrupt in accordance with Article 9 of the Mexican Bankruptcy Law, and decreed the following precautionary measures ("**Precautionary Measures**"):

> "On the other hand, in view of the request of the merchant that is presumed illiquid, in addition to the purpose of avoiding that the viability of the bankrupt company be put at risk or that such risk be aggravated, in order to safeguard the public interest provided for in Article 1 of the Commercial Bankruptcy Law, based on the provisions of Articles 25 and 37 of the Commercial Bankruptcy Law, who provides, ex officio, decrees the following precautionary measures:
>
> **1.** The prohibition to the merchant to make payments of obligations due prior to the date of admission of the insolvency proceeding.
>
> **2.** The **suspension of all enforcement or extrajudicial proceedings against the goods or rights of the merchant**.
>
> **3.** The prohibition to the merchant to carry out operations of alienation or encumbrance of the main assets of its business.
>
> **4.** The prohibition to transfer funds or securities in favor of third parties, except for those payments that are considered ordinary operations.
>
> And it must be understood that **no creditor of the merchant may, due to the precautionary measures, collect its debts contracted prior to the issuance of such measures** and neither may the merchant make any payment, in contravention of what is decreed herein, with the exception of what is decreed herein and those ordinary operating expenses; also **the suspension of the judicial or extrajudicial proceedings against assets and rights of the merchant have been suspended**; likewise, **no guarantee granted by the merchant**, in terms of measure 3, **may be perfected**.[...]
>
> The foregoing allows decreeing, in addition to the measures already expressed, the prohibition to rescind and/or terminate in advance the contracts to which the merchant is a party, which is granted only on the occasion of the present petition, that is to say that the rescission of the contracts is prohibited on account of the bankruptcy petition. [...]"

[Emphasis added]



32.     In addition to the foregoing, as can be seen from the record, following a petition filed by the Complainant, on **January 31, 2025** the Responsible Court ordered the notification of the Precautionary Measures to CI Banco, with the purpose of informing it of the **suspension of any judicial or extrajudicial execution proceeding**. Said notification was made on **February 4, 2025**.

33.     Following the corresponding procedural steps, on February 11, 2025, the Responsible Court had Mr. José Gerardo Badín Cherit ("**Visitor**"), Visitor appointed by IFECOM, accept and protest the position of Visitor in the Concurso Mercantil.

34.     On February 24, 2025, Controladora received two e-mails in which Wilmington Trust informed of its **resignation** as "Collateral Agent" of the Financing Agreements. This is highly relevant since, according to such agreements, the Bondholders had to appoint a successor to act as "Collateral Agent" and, otherwise, it would be the Bondholders who would exercise the corresponding rights and obligations, as can be seen in the following transcriptions:

**NPA 2022**

"Section 24.8. Successor to the Collateral Agent

The Collateral Agent may resign at any time by providing at least 20 days' prior written notice to the Required Holders and Triton Investments. Upon receipt of such notice of resignation, **the Required Holders will have the right to designate a person to act as successor to the Warrant Agent**. If the Required Holders do not designate a successor to the Collateral Agent within 20 days after the resignation of the Collateral Agent, the Collateral Agent may, on behalf of the Holders, designate a person to act as successor, which person must be a Holder, if a Holder is willing to accept such designation, or otherwise must be a commercial bank or financial institution, or a subsidiary thereof, organized under the laws of the United States of America or any State and with a combined capital and surplus of at least $1,000,000,000. **If a successor to the Warrant Agent has not been appointed within 20 days after notice of resignation, such resignation shall become effective, and the Required Holders** shall thereafter perform all of the functions of such Warrant Agent until they appoint a successor (...).

[Emphasis added]

**2019 NPA Amending Agreement**. "Section 24.8

Successor Collateral Agent.

The Warrant Agent may resign at any time upon not less than 20 days' written notice to the Holders and the Company. Upon receipt of such notice of resignation, the Required Holders shall have the right to designate a Person to act as successor to the Warrant Agent. If no such successor to the Warrant Agent has been designated and accepted by the Required Holders within 20 days after notice of resignation of the resigning Warrant Agent, the resigning Warrant Agent may, on behalf of the holders, designate a Person to act as successor to the Warrant Agent, who shall be a holder, if a holder is willing to accept such designation, or otherwise shall be a commercial bank or financial institution is organized under the laws of the United States of America or any State thereof and has a combined capital and surplus of at least $1,000,000,000,000. **If no successor to the Agent has been appointed**

211



**Warrant Agent within 20 days after the date on which such notice or resignation was given, such resignation shall become effective and <u>the Required Holders shall assume all of its functions from such</u> resigning <u>Warrant Agent</u> hereunder and the other Finance Documents until such time, if any, as the Required Holders shall appoint a successor to the Warrant Agent as provided above (...)"**

[Emphasis added]

35.    The above was brought to the attention of the Responsible Court on February 25, 2025 and, consequently, it ordered that Wilmington Trust be notified of the Precautionary Measures on **February 27, 2025,** which notification was eventually given to its legal representative on **March 19, 2025.**

36.    Having carried out the visit and after requesting the extension referred to in Article 40 of the Bankruptcy Law, on **March 20, 2025** the Visitor rendered his report, in which he concluded that Controladora **does meet the requirements to be declared in bankruptcy,** as can be seen in the following graphic reproduction:

> Por medio del presente ocurso, en cumplimiento a lo dispuesto por el artículo 40 de la Ley de Concursos Mercantiles (en lo sucesivo "**LCM**"), así como, al Lineamiento SEXTO de Supervisión de los Especialistas de Concursos Mercantiles, exhibo el **DICTAMEN DE VISITA** en los formatos que, para tal efecto emite el Instituto Federal de Especialistas de Concursos Mercantiles, del cual se desprende que la empresa Controladora Dolphin, Sociedad Anónima de Capital Variable **SÍ SE ENCUENTRA EN LA HIPÓTESIS DEL INCUMPLIMIENTO GENERALIZADO EN EL PAGO DE SUS OBLIGACIONES,** y, por ende, en los supuestos que establece el artículo 10 de la LCM, siendo procedente su declaración del concurso mercantil en **etapa de conciliación,** tal y como lo pidió en su escrito de solicitud.

37.    As this Court may notice, in the agreement of reference, a term of 5 days was granted for the Controladora to express its opinion regarding the report rendered by the Visitor; such term elapsed as follows:

| March - April 2025 | | | | | | |
|---|---|---|---|---|---|---|
| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
| 23 | 24 | 25<br><br>*Notification was sent of the agreement that gives view with opinion* | 26<br><br>*Effects* | 27<br><br>Day 1 | 28<br><br>Day 2 | 29 |
| 30 | 31<br><br>Day 3 | 1<br><br>Day 4 | 2<br><br><u>**Day 5**</u> | 3 | 4 | 5 |

38.    Subsequently, on **March 21, 2025,** the Responsible Court was informed that the term set forth in the Financing Agreements for the appointment of the successor of the "Collateral Agent" had elapsed and that, consequently, in accordance with the applicable clauses, it is the Bondholders who perform the functions as such agent. Consequently, on **March 28, 2025,** the Responsible Court ordered the following to be notified



The Bondholders were notified by certified mail on **April 7, 2025**.

39.     On March 31, 2025, after the deadline referred to in the opinion rendered by the Visitor, through several international media, Controladora learned of the illegal filing of certain insolvency applications by other companies of its corporate group, **including those of its Mexican subsidiaries** "Viajero Cibernético, S. A. de C.V.", "Dolphin Austral Holdings, S.A. de C.V.", "Promotora Garrafón, S.A. de C.V." and "Aqua Tours, S.A. de C.V.".A. de C.V.", "Dolphin Austral Holdings, S.A. de C.V.", "Promotora Garrafón, S.A. de C.V." and "Aqua Tours, S.A. de C.V." ("Mexican Subsidiaries"). ("**Controladora's Mexican Subsidiaries**") and its holding company "Dolphin Capital Company, S. De R.L. de C.V.", under Chapter 11 before the *United States Bankruptcy Court for the District of Delaware*.

40.     Upon noticing the foregoing, public access to the files corresponding to the applications filed was consulted; upon analyzing them, the Controladora noticed that the corresponding applications had been filed under the pretext of the execution of alleged "unanimous resolutions" **entered into as a consequence of the execution of certain Pledges**.

41.     Consequently, on March 31, 2025, Controladora **denounced before the Responsible Court the flagrant <u>violation of the Provisional Measures</u>**, warning that the alleged attorneys-in-fact of Controladora would surely appear at the Concurso Mercantil based on some alleged "unanimous resolution" that would be, evidently, invalid ("**<u>First Complaint of Violation of Provisional Measures</u>**"). In these terms, the Responsible Court was requested, based on Article 87 of the Concurso Mercantil Law, not to grant any effect to such a request.

42.     Eventually, Controladora became aware that, as it had been advised, on March 31, 2025, Rogelio Héctor Palacios Beltrán ("**<u>Controladora's Attorney-in-Fact</u>**") appeared in the reorganization proceeding, purporting to be Controladora's alleged attorney-in-fact and requesting the dismissal of the proceeding. The purported legal standing was supported by a "unanimous shareholders' resolution" executed before the Notary Public 142 of Mexico City ("**<u>Purported RUA</u>**"), which essentially resolved the alleged removal of the members of the Boards of Directors of the Mexican Subsidiaries of Controladora and, in the specific case of Controladora, even allegedly decided the dismissal of the present insolvency proceeding. In such letter, the purported attorney-in-fact of Controladora essentially requested the dismissal of the Concurso Mercantil.

43.     According to the background information contained in the Alleged RUA, the RUA had been entered into **as a consequence of the extrajudicial foreclosure of certain pledges** by Wilmington Trust and CI Banco, due to the non-compliance with the Financing Agreements, as can be seen in the following graphic reproductions:



```
(ix) Con anterioridad a este acto, Wilmington, como acreedor
prendario y en términos de lo dispuesto por el Contrato de
Prenda, entregó al Secretario del Consejo de Gerentes de la
Sociedad un Aviso de Incumplimiento por virtud del cual
certificó la ocurrencia de un Evento de Incumplimiento. En
virtud de lo anterior, a partir de dicha fecha, Wilmington
quedó facultado para ejercer los derechos de voto de las
Acciones Pignoradas, y demás derechos y facultades que EA
tenga derecho de ejercer de conformidad con las disposiciones
del Contrato de Prenda. -------------------------------------
----------------------------------------------------------------
```

```
----------------- [SIGUEN HOJAS DE FIRMAS] -----------------
------------------------------------------------------------
Página de firmas de las Resoluciones Unánimes Adoptadas Fuera
de Asamblea de Accionistas de CONTROLADORA DOLPHIN, S.A. DE
C.V. de fecha 28 de marzo de 2025. -------------------------
------------------------------------------------------------
CIBanco, S.A., Institución de Banca Múltiple, como fiduciario
```

```
                                        - 24 -
                                        33,553
del fideicomiso Irrevocable de Garantía número CIB/2380 ------
- ----------------------------------------------------------
-------------------- Por: [firma ilegible] -------------------
-----------------Nombre: Ma. Eugenia Soberanis Pérez --------
```

44.     As can be seen from a simple reading of said documents, the alleged RUA is based on the alleged exercise of rights derived from the **execution of the Pledged Collateral**, as well as on the exercise of rights by CI Bank that invariably imply an extrajudicial execution of collateral.

45.     Consequently, on April 1, 2025, Controladora filed **a motion for lack of standing** against Rogelio Héctor Palacios Beltrán and the rest of the alleged attorneys-in-fact allegedly appointed in the Alleged RUA. In this motion, Controladora alleged the invalidity of the Alleged RUA since it had been executed **in violation of the Provisional Measures**, since it was the unequivocal product of an extrajudicial execution of pledge guarantees to the detriment of Controladora. It was also argued that the Responsible Court should abstain from granting any legal effect to the Alleged RUA, since this would imply a violation of the *par conditio creditorum* principle.

46.     Exhausting its procedural burden, on April 2, 2025, Controladora filed a written statement regarding the opinion rendered and requested the Responsible Court to declare the insolvency proceeding, since it was evident that the requirements for such proceeding were met.



47.     Based on the foregoing, the non-extendable period of 5 days referred to in Article 42 of the Bankruptcy Law for the issuance of the bankruptcy judgment elapsed as follows:

| March - April 2025 | | | | | | |
|---|---|---|---|---|---|---|
| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
| 30 | 31 | 1 | 2<br><br>*Last day to comment on the opinion* | 3<br><br>Day 1 For sentencing | 4<br><br>Day 2 For sentencing | 5 |
| 6 | 7<br><br>Day 3 For sentencing | 8<br><br>Day 4 For sentencing | 9<br><br>**Day 5 For sentencing** | 10 | 11 | 12 |

48.     On April 3, 2025 ("**Request to Wilmington and CI Banco**"), the Responsible Court reserved its decision on the request for dismissal filed by the alleged attorney-in-fact of Controladora and, prior to this, it ordered to send official letters to CI Banco and Wilmington Trust so that they would inform on the compliance granted to the Precautionary Measures. Likewise, **it reserved its decision on the admission of the motion for lack of legal standing filed by Controladora**.

49.     On April 7, 2025, the Responsible Court considered that the hearing granted with the Visitor's opinion had been granted and **confirmed the validity of the Precautionary Measures**, as well as the fact that they were binding Wilmington Trust and CI Banco, in the following terms:

> "In that order, with respect to his request to maintain in force the precautionary measures decreed, it is hereby stated to the plaintiff that the precautionary measures remain in force until they are lifted, modified or revoked by this jurisdictional body.
>
> On the other hand, as to its request to decree new precautionary measures, the plaintiff should be informed that it should abide by the decisions of January twenty-eighth and March twenty-seventh of this year, from which it is stated that this District Court has already issued a pronouncement regarding the precautionary measures related to CI Banco, Sociedad Anónima, Institución de Banca Múltiple, and Wilmington Trust; likewise, that in an order dated March twenty-seventh, two thousand twenty-five, certified copies of the order dated January twenty-eighth, two thousand twenty-five and March twenty-seventh of the current year were made available to the merchant, so that, through certified mail, prior translation by a certified expert, they could be delivered to the bondholders, at the addresses indicated and they could have knowledge of the precautionary measures decreed in the proceedings."

50.     In the same order, the Responsible Court improperly recognized the legal capacity and granted access to the file of the Concurso Mercantil to the alleged attorneys-in-fact of Controladora; consequently, on April 8, 2025, it filed an appeal for revocation ("**Recurso de Revocación contra Reconocimiento de Sedicente Apoderado**").



51.     On April 8, 2025, CI Banco appeared before the Responsible Court with the purpose of, supposedly, informing on the compliance with the Precautionary Measures. However, as this Tribunal may notice from a simple reading of the brief submitted, it expressed a series of statements but none of them tending to comply with the requirement formulated.

52.     In its brief, CI Banco merely stated that the Board of Directors of Controladora had allegedly "deceived" CI Banco and that the latter had not consented to the filing of the insolvency proceeding (a matter that is obviously false, since the consent of its legal representative is recorded in the General Shareholders' Meeting that supported the filing of the insolvency proceeding).

53.     Likewise, it argued that it had complied with the Precautionary Measures since they only protected the assets of Controladora, and therefore allegedly did not protect the shares owned by CI Banco; at the same time, it took the opportunity to express that CI Banco was the majority shareholder of Controladora and that, consequently, it had allegedly only exercised such rights.

54.     However, this Tribunal should not overlook the fact that the only reason why CI Banco holds itself out as the holder of Controladora's shares is because these **were contributed to the Guarantee Trust to guarantee compliance with the Financing Agreements**. The foregoing, in addition to the fact that the unequivocal participation of CI Banco was necessarily required to execute the shares on the Controladora's guarantees, a matter that was conveniently ignored by said banking entity.

55.     April 9, 2025 elapsed and the Responsible Court **did not issue a judgment declaring the insolvency proceeding**, despite the fact that the non-extendable term of 5 days had evidently elapsed. It is worth mentioning that the Responsible Court did not issue any determination (since this would not be possible) to suspend such term.

56.     In addition to the foregoing, the Responsible Court was unable to notify Wilmington Trust of the Order to Wilmington and CI Bank, and therefore the Controlling Company requested that such notification be made by certified mail.

57.     However, after the deadline to issue the reorganization proceeding judgment had passed and despite the fact that Wilmington Trust had not complied with the request made by the Responsible Court, on April 14, 2025 ("**Order of Dismissal**"), the Responsible Court granted the dismissal made by the Appointed Judges and **had Controladora withdraw from the reorganization proceeding**. Likewise, *(i)* allegedly "admitted", but declared without subject matter the motion for lack of legal standing filed by Controladora, as well as the Motion for Revocation against the Acknowledgment of the Appointed Trustee and *(ii)* considered that the mere declarations of CI Bank were "sufficient", without the need to wait for Wilmington Trust to comply with the requirements made to it.



58.     The Responsible Court did not express any reasons to favor the withdrawal presented by the creditors of Controladora other than the fact that CI Banco was the majority shareholder and it did not agree with the bankruptcy petition. However, such court did not analyze the violation of the Precautionary Measures or the implications that such withdrawal, in contravention of the very purpose of the bankruptcy proceeding, would have to the detriment of the Complainant.

59.     Consequently, on April 24, 2025, Controladora **filed two appeals for reversal** against the Order of Dismissal, which were admitted by the Responsible Court on April 25, 2025.

60.     On May 21, 2025 ("**Reclamado Auto Reclamado**"), the Responsible Court resolved the appeal of revocation filed **as unfounded**, confirming then the illegal dismissal of the petition for insolvency proceeding filed by the Representative Judges. This determination is the one that is being challenged through this amparo lawsuit.

### X.     CONCEPTS OF VIOLATION.

**FIRST. CONTRARY TO THE ALLEGATIONS OF THE RESPONSIBLE COURT, IT IS FALSE THAT THE MOTION FOR LACK OF LEGAL STANDING FILED BY THE CONTROLLER WAS "WITHOUT SUBJECT MATTER" AT THE TIME OF ITS FILING, IT BEING EVIDENT THAT SAID COURT DID RECOGNIZE THE LEGAL STANDING OF THE ALLEGED** ATTORNEYS-IN-FACT**, AND THEREFORE SHOULD HAVE ADMITTED AND SUBSTANTIATED IT PRIOR TO RULING ON THE REQUEST FOR WITHDRAWAL AND, BY NOT DOING SO, VIOLATED THE RIGHTS TO LEGAL CERTAINTY AND ACCESS TO JUSTICE OF THE PLAINTIFF.**

Summary.     The purpose of the motion for lack of legal standing filed by Controladora was clearly and evidently to disregard the legal standing of the Representative Judges, regardless of the fact that its admission was reserved by the Responsible Court. Therefore, it is clear that before recognizing the validity of the actions of the Representative Agents, the Responsible Court should have resolved the motion for lack of legal standing filed by the Controladora.

Development.

a.     Principle of legal certainty

The Supreme Court of Justice of the Nation has held that the principle of legal certainty, enshrined in Articles 14 and 16 of the Political Constitution of the United Mexican States, is the basis on which the Mexican legal system rests, **to the extent that it protects the right of the governed to <u>never find themselves in a situation of legal uncertainty and, consequently, in a state of defenselessness</u>**.

27



In this regard, these articles establish the following:

> "Article 14. No law shall have retroactive effect to the detriment of any person.
>
> No one may be deprived of his liberty or of his property, possessions or rights, except by means of a trial before the previously established courts, in which the essential formalities of the procedure are complied with and in accordance with the Laws issued prior to the fact."
>
> "Article 16. No one may be disturbed in his person, family, domicile, papers or possessions, except by virtue of a written order of the competent authority, which substantiates and justifies the legal cause of the proceeding. In trials and proceedings conducted in the form of a trial in which orality is established as a rule, it shall be sufficient that they be recorded in any medium that provides certainty as to their content and compliance with the provisions of this paragraph."

The essence of the right to legal certainty **is based on the premise of "*knowing what to expect*" with respect to the content of laws and the actions of the authority itself**, and, with respect to legislative acts, it requires the establishment of rules that provide certainty to the governed.

However, although Article 16 of the Federal Constitution contains the protection of the legal certainty of the situation of the governed with respect to the existing regulation and the conduct of the State, it should not be understood in the dimension that the legal system -specifically the normative portions- must indicate in a special way the procedure that regulates the relations between individuals and the authorities, but only constrains that **the law in question contains the minimum and necessary elements to enforce the right of the interested party and thus avoid the generation of arbitrary attitudes on the part of the public power.** This is supported by the following thesis:

> **"GUARANTEE OF LEGAL CERTAINTY, WHAT IS MEANT BY**. The
> The guarantee of legal certainty provided for in Article 16 of the Political Constitution of the United Mexican States should not be understood in the sense that the law must indicate in a special and precise manner a procedure to regulate each of the relationships that are established between the authorities and private parties, Rather, it must contain the minimum elements to enforce the right of the governed and so that, in this aspect, the authority does not incur in arbitrariness, which easily explains that there are procedures or relationships that, due to their simplicity, straightforwardness or irrelevance, do not require that the law detail a detailed procedure to exercise the correlative right. The foregoing corroborates the idleness of the fact that in all cases the law must detail in extreme detail a procedure, when it is defined in a simple and sufficient manner to show the way in which the right must be asserted by the individual and the powers and obligations that correspond to the authority"[22].
>
> **"GUARANTEE OF LEGAL CERTAINTY. ITS SCOPE.** The guarantee of
> The legal security provided for in Article 16 of the Political Constitution of the United Mexican States should not be understood in the sense that the law must indicate in a special and precise manner a procedure to regulate each of the relationships that are established between the authorities and private parties, Rather, it must contain the minimum elements to enforce the right of the governed and so that, in this aspect, the authority does not incur in arbitrariness, which explains that there are procedures or relationships that, due to their simplicity or straightforwardness, do not require the law to detail a detailed procedure to exercise the correlative right. The foregoing corroborates that it is unnecessary that

---

[22] Isolated Thesis; Instance: Second Chamber; Source: Appendix (2002 update), volume I, Jur. Actions of Unconstitutionality and C.C., page 321.



in all the cases of the law, the procedure must be detailed in detail, when it is defined in a simple manner to show the way in which the right must be asserted by the individual, as well as the powers and obligations that correspond to the authority"[23].

In this perspective, **the constitutional principle of legal certainty has as its objective**, at the normative level, from a positive aspect, **that individuals have full certainty of the content of the existing legal system, to the extent that they can know the scope and consequences of the normative hypotheses that the legislator has contemplated, as well as the scope of competence and action of the institutions and authorities of the public power**, so that with this, from a negative aspect, **they are in a position to avoid arbitrary actions by the authorities and, in case this happens, to have access to the legal remedies or means of defense that may be appropriate**.

Accordingly, legal certainty is one of the guiding principles that regulate the interaction between the State and the governed, since, as long as the legal provisions are vested with certainty, they will enable individuals to know the powers and abilities allowed to the authority, in **order to avoid the occurrence of arbitrary or disproportionate and excessive conduct** and, in the event of such occurrence, citizens will have the certainty to assert their rights.

b.    <u>Right of access to justice</u>

Article 17 of the Federal Constitution recognizes the human right of access to justice, which implies that all persons have the right to have justice administered to them by jurisdictional bodies that will be ready to impart it within the time and terms established by law.

> "No person may take justice into his own hands, nor exercise violence to claim his right. Every person has the right to have justice administered by courts that shall be ready to impart it within the time limits and terms established by law, issuing their resolutions in a prompt, complete and impartial manner. Their service shall be free of charge, and consequently, judicial costs are prohibited."

In addition, this right is recognized in the American Convention on Human Rights, in Articles 8 and 25, the contents of which are transcribed below:

> "Article 8. Judicial Guarantees
>
> 1. Every person has the right to a hearing, with due guarantees and within a reasonable time, by a competent, independent, and impartial tribunal, previously established by law, in the substantiation of any criminal accusation made against him, or for the determination of his rights and obligations of a civil, labor, fiscal, or any other nature."
>
> "Article 25. Judicial Protection
>
> 1. Everyone has the right to simple and prompt recourse, or any other effective recourse, to a competent court or tribunal for protection against acts that violate his fundamental rights recognized by the constitution or laws of the state concerned or by this Convention,

---

[23] Jurisprudence; Instance: Second Chamber; Source. Judicial Weekly of the Federation and its Gazette, volume XXIV, October 2016, page 351.

29



even when such violation is committed by persons acting in an official capacity.

2. The States Parties undertake:

a) To ensure that the competent authority provided for by the legal system of the State shall decide on the rights of any person seeking such a remedy;

b) To develop the possibilities of judicial recourse, and

c) To ensure the enforcement, by the competent authorities, of any decision in which the appeal has been upheld."

This right implies that every person is guaranteed access to the courts for the purpose of obtaining justice for the determination of his rights and obligations of any nature, with due guarantees.

In this regard, the First Chamber of the Supreme Court of Justice of the Nation defined this right as "the subjective public right that every person has, within the terms and periods established by law, to have expeditious access to independent and impartial courts, to file a claim or to defend against it, so that through a process in which certain formalities are respected, a decision is made on the claim filed and, if applicable, the decision is enforced". The foregoing is based on the following jurisprudence thesis:

> **"GUARANTEE TO THE JURISDICTIONAL PROTECTION   PROVIDED FOR IN THE ARTICLE 17 OF THE POLITICAL CONSTITUTION OF THE STATES**
> **UNITED MEXICANS. ITS SCOPE.** The guarantee of judicial protection can be defined as the subjective public right that every person has, within the terms and periods established by law, to have prompt access to independent and impartial courts, to file a claim or to defend against it, so that through a process in which certain formalities are respected, the claim or defense is decided upon and, if applicable, the decision is enforced. Now, if we consider that the prevention of the jurisdictional organs to be expeditious -unburdened, free of any hindrance- to impart justice in the terms and terms established by law, means that the public power -in any of its manifestations, Executive, Legislative or Judiciary- is not allowed to impart justice in the terms and terms established by law: Executive, Legislative or Judicial - cannot make access to the courts subject to any condition, because if any were established, it would constitute an obstacle between the governed and the courts, so it is unquestionable that the right to judicial protection can be violated by rules that impose impeditive or hindering requirements for access to jurisdiction, if such obstacles are unnecessary, excessive and lacking in reasonableness or proportionality with respect to the purposes that the legislator may lawfully pursue. However, not all requirements for access to the process can be considered unconstitutional, as is the case with those that, while respecting the content of this fundamental right, are aimed at preserving other constitutionally protected rights, goods or interests and are adequately proportionate to the purpose pursued, as is the case of compliance with legal deadlines, the exhaustion of prior ordinary remedies before exercising certain types of actions or the prior posting of bonds or deposits."[24]

[Emphasis added]

In the same sense, the Second Chamber of the Supreme Court of Justice of Mexico has considered that the right of access to justice implies that it must be (i) prompt, (ii) complete, (iii) impartial and (iv) free, according to the following jurisprudence:

---

[24] Digital Record: 172759 SCJN; 9a. Época; Semanario Judicial de la Federación y su Gaceta; 1a./J. 42/2007; J

CLYDE&CO

**"ACCESS TO THE ADMINISTRATION OF JUSTICE. ARTICLE 17 OF THE POLITICAL CONSTITUTION OF THE UNITED MEXICAN STATES ESTABLISHES SEVERAL PRINCIPLES THAT INTEGRATE THE RELATIVE INDIVIDUAL GUARANTEE, TO WHOSE OBSERVANCE ARE OBLIGATED THE AUTHORITIES THAT PERFORM ACTS MATERIALLY JURISDICTIONAL.** The individual guarantee of access to the administration of justice enshrines the following principles in favor of the governed: 1. Prompt justice, which translates into the obligation of the authorities in charge of its administration to resolve the controversies brought before them, within the terms and time periods established by law for such purpose; 2. Complete justice, which means that the authority hearing the matter must issue a ruling on each and every one of the aspects of the debate whose study is necessary, and guarantee that the governed will obtain a resolution in which, through the application of the law to the specific case, it is resolved whether or not he is right or wrong regarding the rights that guarantee him the jurisdictional protection he has requested; 3. Impartial justice, which means that the judge issues a decision in accordance with the law, and without favoritism towards any of the parties or arbitrariness in its sense; and, 4. Free justice, which means that the organs of the State in charge of its administration, as well as the public servants entrusted with this function, will not charge the parties in conflict any emolument for the rendering of this public service. Now, if the aforementioned constitutional guarantee is aimed at ensuring that the authorities in charge of applying it do so in a prompt, complete, free and impartial manner, it is clear that the authorities that are obliged to observe all the rights that comprise it are all those that perform materially jurisdictional acts, that is to say, those that within their sphere of competence have the necessary attribution to settle a conflict arising between various subjects of law, regardless of whether they are judicial bodies, or only materially jurisdictional."[25]

Now, the First Chamber of the Supreme Court of Justice of the Nation, in defining the right of effective access to justice, also established the stages and rights that arise from it, which are three, consisting of a pre-trial stage, a judicial stage, and a post-trial stage. The foregoing is based on the following jurisprudence:

**"RIGHT OF EFFECTIVE ACCESS TO THE  JUSTICE.  STAGES AND RIGHTS TO WHICH HE IS ENTITLED.** Articles 14, 17 and 20, sections B and C, of the Political Constitution of the United Mexican States and 8 of the American Convention on Human Rights, derive from the right of effective access to justice, which includes, in addition to certain socioeconomic and political factors, the right to an effective jurisdictional protection and the mechanisms of non-jurisdictional protection that must also be effective and constitutionally and legally based. Now, in the jurisprudence 1a./J. 42/2007, under the heading: "GUARANTEE TO JURISDICTIONAL PROTECTION PROVIDED FOR IN ARTICLE 17 OF THE POLITICAL CONSTITUTION OF THE UNITED MEXICAN STATES. ITS SCOPE."The First Chamber of the Supreme Court of Justice of the Nation defined access to judicial protection as the subjective public right that every person has, within the periods and terms established by law, to have expeditious access to independent and impartial courts, to present a claim or to defend against it, so that, through a process in which certain formalities are respected, the claim or defense is decided upon and, if applicable, the decision is enforced; Hence, this right comprises three stages, to which correspond three rights: (i) one prior to the trial, to which corresponds the right of access to jurisdiction, which is based on the right of action as a kind of petition addressed to the jurisdictional authorities and which motivates a pronouncement on their part; (ii) a judicial one, which goes from the beginning of the proceeding to the last action and to which concerns the right to due process; and, (iii) a post-trial one, identified with the effectiveness of the decisions issued. Now, the aforementioned rights extend not only to proceedings before Judges and courts of the Judicial Branch, but also to all those before authorities that, when ruling on the determination of rights and obligations, perform materially jurisdictional functions"[(26)].

[25] Digital Record: 171257 SCJN; 9a. Época;Semanario Judicial de la Federación y su Gaceta; 2a./J. 192/2007 ;J

[26] Digital Record: 2015591 SCJN; 10a. Época; Gaceta del Semanario Judicial de la Federación; 1a./J. 103/2017 (10a.); J; Published: Friday, November 24, 2017 10:35 am.



From the above jurisprudence it is clear that this right comprises three stages to which correspond their respective three rights. The second, relevant to the present case, is the judicial stage, to which corresponds the right to due process.

The right of access to justice in the judicial stage refers to the set of rights that the parties to a proceeding have, understood as the set of essential formalities of the procedure that guarantee that the parties can assert their claims in court, on a level of equality and legal certainty.

In this sense, the right of access to justice in the judicial stage includes all the actions within the proceeding, and allows the parties to participate in it, expressing what is convenient to them and carrying out all the necessary actions for the prosecution or defense of their claims and interests.

This right also implies that judicial proceedings must be subject to due process and respect the rights of the parties in order to effectively guarantee the aforementioned right. Judicial proceedings must always be carried out with the purpose of achieving true and effective justice, attending to the claims of the parties and ensuring that the process serves the purposes for which it was created.

That is to say, the jurisdictional organs must ensure not only that the process is carried out in compliance with the procedural or formal rules that regulate it, but must also oversee compliance with the necessary rules that ensure the rights of the parties, in order to provide legal certainty to them and guarantee due process. Otherwise, the right of access to effective justice would be null and void, since it would be considered guaranteed by the mere fact of following a formal procedure, without any consideration as to its merits.

In this sense, effective judicial protection or the right to effective access to justice implies that the procedural rules must be interpreted in such a way as to maximize access to justice, i.e., that the resolutions that decide on a matter resolve the merits of the issue raised and not in such a way as to hinder the exercise of these rights.

c.      Unlawfulness of the Order and violation of the rights of legal certainty and access to justice.

One of the main grievances that Controladora asserted against the decision of the Responsible Court to favorably dismiss the withdrawal filed by the Attorneys-in-fact is that a motion for lack of standing had been previously and timely filed against it, which was not resolved by said judicial authority.

In order to respond to the above-mentioned grievance, in the Complaint, the Responsible Court argues that it was not obliged to resolve the lack of personality incident because at the time the

32



filed "*there was no matter on which to resolve it*". In this order of ideas, the Responsible Court sustains that since at the time of the filing of the motion for lack of legal standing the legal standing of the Attorney-in-fact had not been recognized, then the motion should not be resolved. Such considerations are illegal, as will be demonstrated below.

First of all, it is necessary to emphasize to this Court the context under which the unlawful dismissal of the insolvency petition was filed and, consequently, how the motion for lack of standing was filed. As described in the "Facts" chapter, at the time of the filing of the dismissal request, the legitimate attorneys-in-fact of Controladora **were not aware that such act was being carried out**.

On the contrary, as has been duly narrated, Controladora learned of the existence of the Alleged RUA as a consequence of other proceedings initiated in Delaware, United States of America, and immediately denounced the illegality of such resolution as a consequence of the frontal violation of the Precautionary Measures decreed by the Responsible Court itself.

In this order of ideas, on the **same day in which Controladora <u>denounced the violation of the Precautionary Measures</u>, the Trustees filed their request for the withdrawal of the insolvency proceeding**, which only became known as a consequence of a visit to the Court in which the record in the merit file was noted. Consequently, **on the next business day following the filing of the petition for the reorganization proceeding, the <u>Controladora filed a motion for lack of legal standing against them</u>**.

As it appears in the file, the Responsible Court decided to **reserve** both the request for the dismissal of the insolvency proceeding and the motion for lack of legal standing filed by Controladora; it is noted to this Court that said body **did not dismiss or reject the motion filed, but simply "reserved" its pronouncement**, conditioning said reservation to Wilmington Trust and CI Banco complying with the request made to them.

Likewise, this Court is informed that the Responsible Court **agreed at the same time to the request for dismissal and the motion for lack of standing, reserving the pronouncement of both**, without distinguishing or giving priority to the processing of either.

According to the foregoing, and from a simple analysis of the evidence, this Court will notice the falsity of the statements of the Responsible Court. This is because it is **false that the motion for lack of legal standing did not have "subject matter"; contrary to what was alleged, its subject matter was clear: to <u>denounce the lack of representation of the attorneys-in-fact</u> to act in the insolvency proceeding and the clear nullity of the alleged RUA under which it intended to act on behalf of Controladora.**



The fact that the Responsible Court has "reserved" the admission of the motion **does not deprive it of its clear and evident object, even more so if, as allegedly argued by the Responsible Court, it had not recognized the legal capacity of the Representative Judges either**.

The Responsible Court seems to argue that, since at the time of the filing of the motion for lack of legal capacity the legal capacity of the authorized representatives had allegedly not been recognized, then it is valid to first recognize said legal capacity in order to accept the withdrawal of the motion and only then to rule on the admission of the motion in order to leave it without subject matter. However, the Responsible Court ignores the nature and purpose of the motion for lack of legal standing.

In this regard, the jurisprudence has recognized that personality is a matter of crass relevance in judicial proceedings that must be analyzed, even in preference to the "merits" of the case, since its effects make the very subsistence of the judicial proceeding depend on it. In this regard, in resolving the contradiction of thesis 50/98-PL, the Plenary of the Supreme Court of Justice of the Nation held the following:

> "That being the personality a procedural presupposition, given the above conditions, its questioning motivates the integration of a litis, **as preponderant as that of the merits, only that it must be defined before the main one**. It should also be noted that **the resolution on personality is not only declaratory, or of simple recognition or disregard of the standing of one of the parties, but it is also constitutive, since the <u>continuation or the discontinuance of the proceeding depends on it</u>**; in its case, it notably affects the performance of the parties, the burdens of the parties, the consequence on the latter, etc.., from which it is inferred that the resolution on the personality causes, to one of the parties, an immediate damage of impossible reparation that demands to be amended, of course, through the indirect protection (...).) The above observations lead us to consider that the resolution on personality, when it falls within an incident prior to the final decision, must be challenged in indirect amparo (with the exception that will be indicated later), because **in addition to resolving a procedural requirement, it leaves one of the parties without defense, or affects it to a high degree**; This is so, because if the resolution rejects or dismisses the motion for lack of standing filed against the defendant, it binds the plaintiff to follow the entire flawed procedure filed by a party who lacks the representation he holds, with all the inconveniences and damages that the judgment and its execution entails, exposing himself, in addition, to never being heard in the event that the judgment on the merits is favorable to him and that his counterpart obtains the amparo against it; The same will occur, but to the detriment of the defendant, if the decision rejects the plea of lack of standing that he may raise against the person appearing on behalf of the plaintiff. And, in the event that the resolution does not recognize the personality of the person appearing on behalf of the defendant, it prevents this party from any type of defense.It should be added that, in addition to the serious consequences already mentioned, when the ordinary judge rejects the objection of the personality of the representative of the plaintiff, the granting of the amparo requested by the defendant will not be for the procedure to be reinstated, starting from the point at which the violation was committed, as happens in the case of other procedural violations, but for a new resolution to be issued in which the personality of the person who represented the plaintiff is disregarded, thus ending the trial (...)".

[Emphasis added]



From said precedent, the jurisprudential thesis entitled "**PERSONALITY. AGAINST THE RESOLUTION THAT RESOLVES THIS ISSUE, PRIOR TO THE MERITS, AN INDIRECT AMPARO PROCEEDING MAY BE FILED**"[27].

In the same order of ideas, in resolving the contradiction of thesis 19/2001-SS, the Second Chamber of the Supreme Court of Justice of the Nation held the following considerations:

> "In this case, this Second Chamber deems it necessary to specify the meaning of some procedural concepts related to the present contradiction of thesis, such as 'incident', 'prior and special pronouncement' and 'resolve flatly'.

> "The Dictionary of the Spanish Language, when referring to the word incidente, defines it in the following terms: Incident. (From lat. Incidens, -entis.) adj. That which occurs in the course of a matter or business and has with it some connection. 2. Number of cases, sometimes as a percentage, or, more generally, the repercussion of them on something. 3. Der. Incident, question other than the main one in a trial.

> "For its part, the Mexican Legal Dictionary, edited by the Instituto de Investigaciones Jurídicas de la Universidad Nacional Autónoma de México, Ninth Edition, on page 1665, in the volume relating to the letters I to O, defines the word 'incident' in the following terms: 'Incident. I. (From the Latin incidere, which means to survive, to interrupt, to occur). Procedurally, the incidents are procedures that tend to resolve controversies of an adjective nature immediately and directly related to the main matter ...'.

> "On the other hand, Eduardo Pallares, in his dictionary of civil procedural law, when referring to the incident establishes the following: '... derives from the Latin, incido incidens (to happen, interrupt, suspend) means in its broadest meaning, what happens accessorily in some matter or business outside the main one, and legally, the issue that arises between the litigants during the course of the main action. The word incident can be applied to all the exceptions, to all the answers, to all the accessory events that originate in a business and interrupt or alter or suspend its ordinary course. Incidents of a trial are the appointment of a new procurator, the recusal of a judge or other official of the administration of justice, the accumulation of proceedings, the opposition to the requested proof, the claim of nullity of one or several proceedings, the reinstatement of an order, the request for extraordinary term of proof, the declinatory of jurisdiction, the allegation and proof of accusations, etc., because all of these are derived and have their origin in the main business; but not all of those that we have mentioned and others that fit within the definition are included in the prescriptions of this title, aimed at outlining the procedure to be followed in all the matters that the law considers incidental to the main business. Both the law and jurisprudence also recognize these incidents or incidental questions under the name of articles, but the true legal word is that of incidents, and under this name they are principally treated by the law ...'.

> "From the foregoing, we may conclude that the incidents are the issues that are promoted during the processing of a lawsuit and have immediate relation with the main business.

> "**With respect to the incidents of prior and special pronouncement, both the doctrine and the jurisprudence have coincided in stating that these are those that <u>suspend the proceeding in substance</u>, until such time as the question discussed therein is not resolved. In other words, the incidents of prior and special pronouncement are those that prevent the trial from continuing its course until they are resolved, because they refer to procedural requirements without which the process cannot continue. They are called of special pronouncement because they must be resolved by means of a resolution that only concerns the incidental issue and not the definitive one, which is the one in which the main litigious issues are decided.**

---

[27] Digital Registration: 190368 SCJN;9a. Época;Semanario Judicial de la Federación y su Gaceta;P./J. 4/2001 ;J

35



**"Within the incidents of prior and special pronouncement, the procedural doctrine has included, among others, incompetence, litis pendencia, connection and <u>lack of personality</u>.**

"In relation to the term 'resolve flatly', in legal jargon it means that it must be resolved in the same piece of evidence without further substantiation, immediately and integrally. It also means to resolve without any formality or special procedure."

[Emphasis added]

Considerations that are added to the jurisprudential criteria under the heading "**INCIDENT OF LACK OF PERSONALITY IN THE JUDGMENT OF AMPARO. BEING OF PREVIOUS AND SPECIAL PRONOUNCEMENT, IT MUST BE ADMITTED AND RESOLVED IN ACCORDANCE WITH THE SECOND RULE PROVIDED FOR IN ARTICLE 35 OF THE AMPARO LAW**"[28] and "**EXPIRATION OF THE INSTANCE IN COMMERCIAL MATTERS. THE EXCEPTION OF LACK OF PERSONALITY WHEN CONSTITUTING A RESOLUTION OF A PREVIOUS OR RELATED QUESTION, INTERRUPS THE PERIOD FOR IT TO OPERATE**"[29] that the Court

Responsible, without explaining any reason, improperly considered them inapplicable.

According to these criteria, it is evident the extent to which the jurisprudence has recognized the relevance of personality issues and the need for them to **be analyzed as a priority over any other issue**.

Based on the nature and relevance of personality in judicial proceedings, it should be evident to this Court the illegality of the considerations of the Responsible Court in sustaining that its action was correct in first agreeing in favor of the request for dismissal formulated by the authorized Judges, **who were the parties against whom the motion for lack of personality was filed**, and only later dismissing the motion because it "had no subject matter" at the time of its filing.

The truth is that, contrary to what the Responsible Court maintains, the lack of capacity incident **should have been processed in a privileged manner and prior to any effect being granted to the request for withdrawal formulated by the Attorney** Attorneys-in-fact**.** The foregoing because, if the purpose of such incident **was** precisely **that their powers of representation were not recognized, by logical order and in accordance with the aforementioned criteria, its resolution should have been privileged**.

The fact that the Responsible Court claims that "no recognition had been given to the legal capacity" of the attorneys-in-fact was not an obstacle, since, in addition to the fact that this is a false consideration, regardless of whether or not there was already a recognition of legal capacity**, there was already a clear denunciation of a lack of representation of said persons <u>that should have been attended to in a privileged manner.</u>** In this regard, the following criteria are relevant:

---

[28] Digital Record: 169288 SCJN;9a. Época;Semanario Judicial de la Federación y su Gaceta;1a./J. 42/2008 ;J

[29] Digital record: 2017789 SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;1a./J. 33/2018 (10a.)

J; Published: Friday, 07 September 2018 10:16 am

CLYDE&CO

**"COMPLAINT PROVIDED FOR IN SECTION VI OF ARTICLE 95 OF THE AMPARO LAW. IT PROCEEDS AGAINST THE ORDER THAT REJECTS THE INCIDENT OF LACK OF LEGAL STANDING OR THE RESOLUTION OF THE ABOVE-MENTIONED MEANS OF DEFENSE PROCEEDS AGAINST THE DECISION OF THE DISTRICT JUDGE THAT REJECTS THE MOTION FOR LACK OF STANDING OF THE PLAINTIFF, THE INJURED THIRD PARTY OR THE RESPONSIBLE AUTHORITY.** The aforementioned means of defense proceeds against the decision of the District Judge that rejects the motion for lack of standing of the person claiming to represent the plaintiff, the injured third party or the responsible authority, as well as against the decision that resolves it on the merits, during the processing of the indirect amparo proceeding, because: (a) It is issued by a District Judge or the superior of the responsible authority; (b) It is issued once the amparo trial has been initiated; (c) The appeal for review established in Article 83 of the Amparo Law does not proceed against this type of decision; and, (d) Due to its transcendental and serious nature it may cause damage or harm to the parties not reparable in a final judgment -even if in the end the party that questions the personality of the other party obtained a favorable ruling-. This is so, **because the aspect of personality must be studied in a preferential manner, without waiting for the final judgment to be issued, to find out if it affects or not any of the parties, the deficient or lack of proof of the personality, since apart from the sterile use of resources, whether material or human, or the loss of resources, the lack of proof of the personality of the other party may cause damage or prejudice to the parties, whether material or human, or the waste of time, the represented party in the amparo proceeding must have the certainty that the actions of his representative will have a valid effect on him and on his counterpart, and the certainty that the procedures and proceedings carried out by him are effective and legal.**"[30]

[Emphasis added]

**"PERSONALITY, EXAMINATION OF THE.** If in terms of article 222, section I, paragraph b) of the Code of Civil Procedures of the State of Puebla, the exception of lack of capacity of the plaintiff was opposed; the judge had the obligation to examine such aspect when pronouncing the judgment, in accordance with the provisions of article 221 of the same legal ordinance, since the personality of the parties is a procedural requirement, that is to say, an indispensable requirement without which a trial cannot be validly initiated or substantiated, Therefore, it must be analyzed by the common power even ex officio, that is, regardless of whether or not it has been challenged in a timely manner, **either through the exception or the respective incident, since it would be unlawful to rule on the merits when the plaintiff lacks the legal standing to bring the action.**"[31]

[Emphasis added]

In this order of ideas, it is clear that the order in which it should have resolved the petitions formulated by the parties was incorrect, since it should have first resolved the motion for lack of standing and then the request for withdrawal.

The foregoing, since it follows a logical order. If the legal standing of the Controladora's representative was challenged through an incident (for which reason it was evidently questioned, as well as the validity of his actions), it is **congruent that said incident must be resolved before granting full effects to his acts, with a majority of reason if this is the dismissal of the instance.**

Acting otherwise, as the Responsible Court did, implies the frontal violation of the right to legal certainty and effective access to justice, since it would allow that the mere intervention of any person who appears to have personality, despite the fact that this is challenged through the appropriate means, could have transcendental consequences, such as causing the withdrawal of a person from a commercial bankruptcy, with the consequences that this entails.

---

[30] Registro digital: 162748 SCJN;9a. Época;Semanario Judicial de la Federación y su Gaceta;2a./J. 203/2010 ;J

[31] Digital Record: 203267 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;VI.2o.29 C ;TA



That is to say, when a person's personality is challenged in a lawsuit, the Court, prior to resolving any other issue, must take cognizance of such matter, since it is fundamental for the outcome of such proceeding.

On this point, case law has recognized the need to resolve questions of personality even in preference to other procedural requirements, given that the very standing of the parties is in question:

> **"INCOMPETENCE AND LACK OF PERSONALITY. IF BOTH EXCEPTIONS ARE OPPOSED SIMULTANEOUSLY, IT MUST BE RESOLVED     PREVIOUSLY     THE LAST   (   LEGISLATION OF THE**
> **STATE OF MEXICO).** Articles 217 and 218 of the Labor Law of the Public Servants of the State and Municipalities, allow processing as incidents of prior and special pronouncement, the issues of: I. Nullity; II. Jurisdiction; III. Personality; IV. Accumulation; and V. Excuses, and even when the same are filed within a "hearing or proceeding", the State Court of Conciliation and Arbitration will substantiate and resolve them on a flat basis, hearing the parties and continuing the proceeding immediately; however, except for the third of the hypotheses indicated, in relation to the others, it will indicate within the following twenty-four hours, day and time for the incidental hearing, in which it will resolve the issue raised. **Consequently, the aspects related to the personality, must be elucidated flatly, with the purpose of continuing the trial immediately.** Therefore, in the event of simultaneous opposition of the exceptions of lack of jurisdiction and lack of personality, it is illegal to order the solution of the first one, when previously the incidental issue must be examined on its own, because the numerals invoked so provide"[32].

<div align="right">[Emphasis added]</div>

The above criterion has a simple reason: as has been recognized by the First Chamber of the Supreme Court of Justice of the Nation, the actions taken in a lawsuit by someone who does not have representation **do not produce any legal effect,** that is to say, **any act performed by another without a valid power of attorney to support his action is null and void,** and cannot be ratified by the corresponding party.

On this last point, the First Chamber has established that although the ineffectiveness of the acts carried out by another without power of attorney consisting in the execution of contracts, the management of business, the acts executed by an agent in excess of the limits of the mandate, or to extinguish the action of nullity of the legal acts vitiated by relative nullity, may be validated by the ratification of the party in whose representation such acts were executed, this does not apply in the case of acts carried out within a judicial proceeding.

The ratification of null acts due to lack of personality within the trial cannot be validated by the party in whose alleged representation they were performed because in the trial there is a legal relationship of a public nature, because it implies the exercise of the state function of jurisdiction.

In this order of ideas, the non-compliance with any of the procedural requirements **prevents the valid constitution of the legal relationship,** one of them being that the parties be duly represented. Therefore, in the absence of the personality requirement, the acts of the parties must be duly represented.

---

[32] Digital Record: 192242 TCC; 9a. Época;Semanario Judicial de la Federación y su Gaceta; II.T.132 L; TA



made by one of them **are null and void.** The foregoing is based on the following thesis of the First Chamber of the Supreme Court of Justice of the Nation:

### "LACK    OF    PERSONALITY.    NO    IS    NOT VALID SUBSCRIBE BY THE RATIFICATION OF THE ACT BY THE PERSON WHO LACKS

**OF IT.** The ratification of the parties regarding the actions taken in the trial by someone who is not represented by them is not a valid means to cure the lack of capacity referred to in Article 41 of the Code of Civil Procedures for the Federal District. The above, since ratification is provided for in Articles 1802, 1896, 1906, 2234 and 2583 of the Civil Code for said entity, with the purpose of saving the original ineffectiveness of the acts performed by another without power, consisting of the execution of contracts, the management of business, the acts executed by the agent exceeding the express limits of the mandate, or to extinguish the action of nullity of the legal acts whose invalidity is relative, through voluntary compliance by means of payment, novation or in any other way; such assumptions do not take place in the case of acts carried out within a judicial proceeding, because in the latter there is a legal relationship of a public nature, since it implies the exercise of the state function of jurisdiction, where the non-compliance of any of its presuppositions prevents the valid constitution of the legal relationship, and one of them consists of the party being duly represented. In this situation, the lack of this requirement cannot be validated by the mere will of one of the parties with the pretension of conferring the mandate with retroactive effects, within the trial"[33].

### "LACK    OF    PERSONALITY.    THE    DEFECT    CURABLE    ONLY THE PROOF AND NOT ON THE EXISTENCE OF THE BUDGET.

**PROCEDURAL.** From article 41, in relation to articles 35, section IV, 36, 47, 95, section I, 272-A and 272-C, all of the Code of Civil Procedures for the Federal District, it is evident that the defects to be corrected when the exception of lack of capacity of the plaintiff is declared founded, or of the challenge with respect to the defendant, are the formal defects of the material evidence of said procedural requirement, which ordinarily consists of a document, either the one where the power of attorney, mandate or representation is granted to appear in court on behalf of another, or the one where the appointment of the position for which the legal representation is conferred, or the minutes of the corporation where the powers conferred to the agent are recorded, or some other; This, under the premise that the representation was indeed conferred but it is deficiently proven due to a matter of form in the evidentiary means that prevents its verification; that is to say, in the context of the mentioned article 41, to cure means to repair or remedy the defect of the proof of the personality and not the opportunity to exhibit another mandate or some other means where the representation is granted that before was not had, with the pretension that it has retroactive effects. This is so, because as the personality is a procedural presupposition, only upon its existence is the procedural relationship validly integrated, otherwise, the actions carried out by the false representative are invalid; hence, the presentation of the new power of attorney where, unlike the previous one, the representation is granted, could at most lead, in the case of the defendant, to recognize his personality from that moment on, but not with respect to the previous acts in which he lacked it"[(34).]

From the above theses it is evident that, due to the fact that the lack of personality of one of the parties **cannot be remedied in the trial,** added to the fact that the incident of lack of personality constitutes a prior resolution and of special pronouncement because it is an **essential** element **for the issuance of the judgment,** the Responsible Court illegally and improperly resolved the dismissal of the insolvency proceeding without first analyzing the personality of the attorneys-in-fact.

---

[33] Digital Record: 2005131SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;1a. CCCLVII/2013 (10a.) ;TA; Publication: Friday, December 13, 2013 1:20 pm.
[34] Digital Record: 2005129 SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;1a. CCCLIII/2013 (10a.) ;TA; Publication: Friday, December 13, 2013 13:20 h.

CLYDE&CO

Precisely for this reason is why the incident of lack of personality must be resolved previously, flatly, with special pronouncement. Any action taken by someone who **does not have powers or attributions within a given trial will always be <u>invalid</u> and will never be validated.**

In these terms, it is clear that the Responsible Court should have resolved in the first place, the incident of lack of legal standing of the persons filed against the President Representative of Controladora, without previously processing its request for dismissal; The foregoing, even more so if it is taken into consideration that **the personality of the person <u>requesting the dismissal of a reorganization proceeding</u>** was **unknown**, therefore, the importance of such resolution merited to first study the personality of the petitioner and then, based on the resolution of the incident, to study the request for dismissal.

On this point, the Second Collegiate Court in Administrative Matters of the Fourth Circuit, in a criterion applicable analogically to the specific case, recognized that if the personality of a representative is being challenged, then **no effect can be given to an attempt to withdraw <u>until such personality issue is resolved</u>**:

> **"DISMISSAL DUE TO WITHDRAWAL OF THE AMPARO PROCEEDING OUTSIDE THE CONSTITUTIONAL HEARING BY ONE OF THE PLAINTIFF'S REPRESENTATIVES. IS INADMISSIBLE WHEN THAT REPRESENTATION IS IN DISPUTE.** From the interpretation of Articles 4o, 8 and 14 of the Amparo Law, in light of the principle of legal certainty that requires that the situation of the parties in the trial be modified only by regular, previously established procedures, it must be considered that the personality of the one who expressly withdraws from the constitutional action must be duly accredited and, therefore, it is a sine qua non condition that there be full certainty that the one who does so, really and effectively represents the plaintiff in order for the dismissal to proceed in accordance with article 74, section I, of the law of the matter. Therefore, **if several professionals appear before the constitutional instance who mutually dispute the recognition as representatives of the plaintiff, <u>it is improper to dismiss outside the constitutional hearing due to the withdrawal expressed by one of them, given the lack of certainty of such representation since, in any case, this point will be the subject of the judgment where the evidence that during the proceeding is provided or influences the decision to resolve the withdrawal will have to be taken into account</u>. To consider the contrary would imply concluding the trial without having certainty about the representation of the plaintiff and without evaluating the totality of the evidence that could be presented, even in the constitutional hearing**, in contravention of the guarantee of complete and effective justice contained in article 17 of the Political Constitution of the United Mexican States"**[35].**

[Emphasis added]

It is evident that, contrary to what the Responsible Court maintains, the criterion of merit **is fully applicable to the specific case, even when it has been pronounced in an amparo trial**, since questions of personality are **inherent to any judicial proceeding**, in addition to the fact that it is possible to apply precedents **in an analogous manner.**

---

[35] Digital Record: 2000903 TCC;10a. Época;Semanario Judicial de la Federación y su Gaceta;IV.2o.A.3 K (10a.) ;TA

CLYDE&CO

In this order of ideas, the non-compliance of any of the procedural requirements **prevents the valid constitution of the legal relationship,** one of them being that the parties be duly represented**.** Therefore, in the absence of the personality requirement, the acts performed by one of them **are null and void.** The foregoing is based on the following thesis of the First Chamber of the Supreme Court of Justice of the Nation:

> **"LACK OF PERSONALITY.    NO IS    NOT VALID SUBSCRIBE BY THE RATIFICATION OF THE ACT BY THE PERSON WHO LACKS OF IT.** The ratification of the parties regarding the actions taken in the trial by someone who is not represented by them is not a valid means to cure the lack of capacity referred to in Article 41 of the Code of Civil Procedures for the Federal District. The above, since ratification is provided for in Articles 1802, 1896, 1906, 2234 and 2583 of the Civil Code for said entity, with the purpose of saving the original ineffectiveness of the acts carried out by another without power, consisting of the execution of contracts, the management of business, the acts executed by the agent exceeding the express limits of the mandate, or to extinguish the action of nullity of the legal acts whose invalidity is relative, through voluntary compliance by means of payment, novation or in any other way; such assumptions do not take place in the case of acts carried out within a judicial proceeding, because in the latter there is a legal relationship of a public nature, since it implies the exercise of the state function of jurisdiction, where the non-compliance of any of its presuppositions prevents the valid constitution of the legal relationship, and one of them consists of the party being duly represented. In this situation, the lack of this requirement cannot be validated by the mere will of one of the parties with the pretension of conferring the mandate with retroactive effects, within the trial"[36].

> **"LACK OF PERSONALITY. THE DEFECT CURABLE ONLY THE PROOF AND NOT ON THE EXISTENCE OF THE BUDGET.**
> **PROCEDURAL.** From article 41, in relation to articles 35, section IV, 36, 47, 95, section I, 272-A and 272-C, all of the Code of Civil Procedures for the Federal District, it is evident that the defects to be corrected when the exception of lack of capacity of the plaintiff is declared founded, or of the challenge with respect to the defendant, are the formal defects of the material evidence of said procedural requirement, which ordinarily consists of a document, either the one where the power of attorney, mandate or representation is granted to appear in court on behalf of another, or the one where the appointment of the position for which the legal representation is conferred, or the minutes of the corporation where the powers conferred to the agent are recorded, or some other; This, under the premise that the representation was indeed conferred but it is deficiently proven due to a matter of form in the evidentiary means that prevents its verification; that is to say, in the context of the mentioned article 41, to cure means to repair or remedy the defect of the proof of the personality and not the opportunity to exhibit another mandate or some other means where the representation is granted that before was not had, with the pretension that it has retroactive effects. This is so, because as the personality is a procedural presupposition, only upon its existence is the procedural relationship validly integrated, otherwise, the actions carried out by the false representative are invalid; hence, the presentation of the new power of attorney where, unlike the previous one, the representation is granted, could at most lead, in the case of the defendant, to recognize his personality from that moment on, but not with respect to the previous acts in which it was lacking."[37]

From the above theses it is evident that, since the lack of legal capacity of one of the parties **cannot be remedied in the trial,** and in addition to the fact that the lack of legal capacity constitutes a prior and special ruling because it is an **essential** element **for the issuance of the judgment,** the Responsible Court ruled illegally and

---

[36] Digital Record: 2005131SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;1a. CCCLVII/2013 (10a.) ;TA; Publication: Friday, December 13, 2013 1:20 PM.
[37] Digital Record: 2005129 SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;1a. CCCLIII/2013 (10a.) ;TA; Publication: Friday, December 13, 2013 13:20 h.

CLYDE&CO

The withdrawal of the insolvency proceeding without first analyzing the legal standing of the attorneys-in-fact.

Precisely for this reason is why the incident of lack of personality must be resolved previously, flatly, with special pronouncement. Any action taken by someone who **does not have powers or attributions within a given trial will always be <u>invalid</u> and will never be validated.**

In these terms, it is clear that the Responsible Court should have resolved in the first place, the incident of lack of legal standing of the persons filed against the President Representative of Controladora, without previously processing its request for dismissal; The foregoing, even more so if it is taken into consideration that **the personality of the person <u>requesting the dismissal of a bankruptcy proceeding</u> was unknown**, therefore, the importance of such resolution merited to first study the personality of the petitioner and then, based on the resolution of the incident, to study the request for dismissal.

On this point, the Second Collegiate Court in Administrative Matters of the Fourth Circuit, in a criterion applicable analogically to the specific case, recognized that if the personality of a representative is being challenged, then **no effect can be given to an attempt to withdraw <u>until such personality issue is resolved</u>**:

> **"DISMISSAL DUE TO WITHDRAWAL OF THE AMPARO PROCEEDING OUTSIDE THE CONSTITUTIONAL HEARING BY ONE OF THE PLAINTIFF'S REPRESENTATIVES. IS INADMISSIBLE WHEN**
> **THAT REPRESENTATION IS IN DISPUTE.** From the interpretation of Articles 4o, 8 and 14 of the Amparo Law, in light of the principle of legal certainty that requires that the situation of the parties in the trial be modified only by regular, previously established procedures, it must be considered that the personality of the one who expressly withdraws from the constitutional action must be duly accredited and, therefore, it is a condition sine qua non that there be full certainty that the one who does so, really and effectively represents the plaintiff in order for the dismissal to proceed in accordance with article 74, section I, of the law of the matter. Therefore, **if several professionals appear before the constitutional instance who mutually dispute the recognition as representatives of the plaintiff, <u>it is improper to dismiss outside the constitutional hearing due to the withdrawal expressed by one of them, given the lack of certainty of such representation since, in any case, this point will be the subject of the judgment where the evidence that during the proceeding is provided or influences the decision to resolve the withdrawal will have to be taken into account</u>**. To consider the contrary would imply concluding the trial without having certainty about the representation of the plaintiff and without evaluating the totality of the evidence that could be presented, even in the constitutional hearing**, in contravention of the guarantee of complete and effective justice contained in article 17 of the Political Constitution of the United Mexican States"[38].

<div align="right">[Emphasis added]</div>

As can be seen from said criterion, the Collegiate Court logically considered that if two different persons appear in a judicial proceeding, and there is a controversy regarding the legal standing of one of them, and the latter withdraws from the proceeding, it is evident that **the aforesaid**

---

[38] Digital Record: 2000903 TCC;10a. Época;Semanario Judicial de la Federación y su Gaceta;IV.2o.A.3 K (10a.) ;TA



The **withdrawal cannot take effect without first resolving the problem of personality presented**, otherwise the lawsuit would be resolved without having certainty of representation, **in violation of Article 17 of the Federal Constitution.**

It is evident that, contrary to what the Responsible Court maintains, the criterion of merit **is fully applicable to the specific case, even when it has been pronounced in an amparo trial**, since questions of personality are **inherent to any judicial proceeding**, in addition to the fact that it is possible to apply precedents **in an analogous manner.**

In the same vein, the following judicial criterion is also applicable:

> **"INCIDENT OF LACK OF PERSONALITY IN THE AMPARO TRIAL. IS ALSO ADMISSIBLE WHEN THE DISPUTE OF LEGAL REPRESENTATION IS BETWEEN INDIVIDUALS WHO SAY**
> **TO HAVE IT ON THE SAME PLAINTIFF.** From the joint analysis of the rulings issued by the First and Second Chambers of the Supreme Court of Justice of the Nation, which gave rise to the jurisprudence thesis 1a./J. 42/2008 and 2a./J. 203/2010, published in the Seminario Judicial de la Federación y su Gaceta, Novena Época, Tomo XXVIII. 42/2008 and 2a./J. 203/2010, published in the Seminario Judicial de la Federación y su Gaceta, Novena Época, Volume XXVIII, July 2008, page 258 and Volume XXXIII, February 2011, page 917, entitled: "INCIDENTE DE FALTA DE PERSONALIDAD EN EL JUICIO DE AMPARO. BEING OF PREVIOUS AND SPECIAL PRONOUNCEMENT, IT MUST BE ADMITTED AND RESOLVED IN ACCORDANCE WITH THE SECOND RULE PROVIDED FOR IN ARTICLE 35 OF THE AMPARO LAW" and "COMPLAINT PROVIDED FOR IN SECTION VI OF ARTICLE 95 OF THE AMPARO LAW. IT PROCEEDS AGAINST THE ORDER THAT REJECTS THE MOTION FOR LACK OF STANDING OR THE DECISION ON THE MERITS ISSUED BY THE COURT.
> IN IT.In the "Amparo", respectively, several premises are established related to the object and procedure of the incident of lack of personality in the amparo trial, obtained from the interpretation that the Maximum Court of the Country has given to article 35 of the repealed Amparo Law, namely, that: 1) Personality must be studied in a preferential manner, without waiting for the final judgment to be issued, in order to ascertain whether the deficiency or lack of proof of this aspect, affects or not any of the parties; 2) The represented party in the amparo trial must be certain that the actions of his representative will have a valid effect on him and on his counterpart, and the conviction that the proceedings and proceedings carried out are effective and legal; 3) The purpose of the incident is to provide certainty in the amparo proceeding; 4) It corresponds to the amparo judge to analyze the personality of the parties considering that the subject matter of the debate is not purely private interests but to safeguard the constitutional order, therefore, by virtue of this, said judge and, as the case may be, the appellate court, have the power to analyze the personality of the plaintiff, without the need for a complaint or request from the injured third party, the responsible authorities or the Public Prosecutor's Office; and, 5) The referred precept allows the challenge of the personality of the parties appearing on behalf of any of the parties in the amparo trial, through an incident that is resolved flatly and without further procedure or form of substantiation, within the same main file, for which reason, it requires a prior and special pronouncement, which deserves to be decided before reaching the merits of the case, since its anticipated resolution conditions the issuance of the main judgment. Therefore, in view of this, the merits motion is also admissible when the dispute of legal representation is between individuals who claim to have it over the same plaintiff, since, finally, what is in controversy is a question of personality; which justifies the promotion of such motion."[39]

In that order of ideas, contrary to the Responsible Court's argument, the fact is that the motion for lack of legal standing at no time "lacked subject matter", but its clear purpose was to challenge the illegal representation of the attorneys-in-fact, and, in

---

[39] Digital Record: 2006629 TCC;10a. Época;Gaceta del Semanario Judicial de la Federación;VIII.A.C.12 K (10a.)
TA; Release: Friday, 06 June 2014 12:30 am

CLYDE&CO

Consequently, **it should be resolved prior to and in preference to any other issue, including, obviously, the request for the withdrawal of the insolvency proceeding**.

Therefore, contrary to what the Responsible Court maintains in the Complaint Order, it is evident that its action was illegal to prefer the resolution of the request for dismissal filed by the Attorney Generals over the resolution of the motion for lack of standing filed.

Now then, the different argument sustained by the Responsible Court in the sense that it had not recognized the legal capacity of the authorized representatives and that in the order of April 7, 2025 it limited itself to simply "*granting access to the file*" to them, and therefore, the motion for lack of legal capacity lacked subject matter.

On this point, it is necessary to start from the premise that the fact that at the time of the filing of the motion the legal capacity of the Appointing Officers had not been expressly recognized **does not automatically imply that the motion lacked subject matter**. As has been demonstrated, the purpose of this motion is to challenge the general representation of the Appointing Officers and, consequently, to demonstrate that they **lacked any authority to act on behalf of Controladora**.

In this order of ideas, the subject matter of the incident subsists **independently of an express recognition of the personality of the Attorney Generals**, since, as has been duly demonstrated, **said incident should have been resolved prior to and in preference to any recognition of the validity of the actions of said persons.**

Notwithstanding the foregoing, the fact is that in the order of April 7, 2025, the Responsible Court **did recognize, even if implicitly, the legal capacity of the authorized representatives**. This is affirmed because, contrary to what the Responsible Court maintains, it is not possible to only "*grant access to the file*" to a person without first recognizing him as a party to the lawsuit.

This is because neither the Bankruptcy Law, nor the Federal Code of Civil Procedures, nor the Commercial Code provide for any figure or power for a person who is not a party to a judicial proceeding to have access to a file without having previously been recognized as a party to such proceeding; on the contrary, such recognition **is necessary to be entitled to consult any judicial file.**

Therefore, it is clear that the Responsible Court had indeed formulated an implicit recognition of the legal personality held by the authorized representatives, which reinforces the fact that the motion for lack of legal personality **did not lack subject matter and should have been resolved prior to granting the request for dismissal.**

44



In addition to the foregoing, it should not go unnoticed that the Appeal for Revocation with Acknowledgment of Power of Attorney (filed precisely against the order of April 7, 2025), in which the acknowledgment of the power of attorney of the Power of Attorney was also challenged, was also pending resolution.

The foregoing reinforces the fact that the recognition of the legal capacity of said alleged attorney-in-fact was, to say the least, *sub judice*, since the decision of the Responsible Court to recognize the legal capacity of the said attorney-in-fact was challenged.

Consequently, the Responsible Court **was not empowered to recognize the actions of the Controladora's Representative** **until the resolution of the appeal for revocation**, since it is evident that an order cannot be executed or take effect until it has become res judicata:

> **"SECOND INSTANCE JUDGMENTS IN COMMERCIAL MATTERS. DO NOT CAUSE STATUS WHILE THE TRIAL IS PENDING.**
> **CORRESPONDING AMPARO**. Although it is true that the amparo trial is not a third instance but a trial of constitutionality or legality whose subject matter is constituted by legal issues different from those of the trial from which the challenged act emanates, since in the latter the judicial authority decides on the rights and obligations disputed by the parties, and in the former what is judged is whether or not the acts of said authority are in violation of the constitutional guarantees invoked by the plaintiff; and although it is also true that the responsible authority plays the role of defendant in the amparo, while in the ordinary trial it acts as an organ of justice, and although it is also true, finally, that in accordance with the express text of article 1343 of the Code of Commerce "the judgment of second instance shall be enforceable, whether it confirms or revokes the judgment of first instance, and regardless of the interest involved in the litigation"; However, it must be said that in accordance with the principle of the hierarchy of the laws of our federal system, by virtue of which the Constitution and its organic law of amparo are superior to other laws, in such a way that, even though according to the express text of the aforementioned precept of the Code of Commerce, the judgments of second instance are executory, constituting res judicata, it is certain that by establishing the amparo proceeding our Federal Constitution, which is the supreme law of all the laws of Mexico, which is the Supreme Law of the whole Union (article 133), it follows that it is not possible, under any concept, that the repeated sentences can be considered to have the certainty and authority of res judicata, since against them there is the constitutional remedy of amparo, and therefore the provision contained in the referred article 1343 of the Code of Commerce must be understood only insofar as it no longer admits any ordinary recourse established by said code. Therefore, when the direct amparo proceeding is filed against second instance judgments, it must be admitted that the judgment that is challenged in the extraordinary proceeding does not cause a state until its processing is concluded by the resolution of the corresponding amparo trial, and until this does not occur, the lawsuit continues sub judice."[40]
>
> **"JUDGMENTS OF SECOND INSTANCE. THEY DO NOT CAUSE STATE WHILE THERE IS PENDING THE TRIAL OF AMPARO**
> **CORRESPONDING**. It is true that according to Article 426 of the Code of Civil Procedure for the Federal District and Territories, the judgment of second instance terminates the trial and, therefore, becomes executory by operation of law. This is true, however, only insofar as it no longer admits any ordinary appeal established by the common law, since the aforementioned precept does not say anything, nor is there any provision in the Code of Civil Procedure, in relation to second degree judgments. However, section III of article 107 of the Constitution provides that the direct amparo is applicable against final judgments, issued in the civil trial, with respect to which the ordinary remedies established by law have been exhausted. Therefore,

---

[40] Digital Record: 241851 SCJN;7a. Época;Semanario Judicial de la Federación ;TA



when the direct amparo proceeding against second instance judgments proceeds, it must be admitted that the judgment that is challenged in the extraordinary proceeding does not cause status until its processing is concluded by the resolution of the corresponding amparo trial, and while this does not occur, the lawsuit continues subjudice"[(41).]

For the foregoing reasons, the Responsible Court violated the principle of legal certainty, the right of access to justice and the principle of procedural economy, since it declared the dismissal of the insolvency proceeding despite the fact that the resolution of a motion for lack of standing filed against the petitioner of such dismissal was pending, in flagrant contravention of the provisions of the Mexican legal system.

**SECOND. THE RESPONSIBLE COURT VIOLATED THE PRINCIPLE OF CONTRADICTION BY DECIDING ON THE VALIDITY OF THE REPRESENTATION AND FACULTIES OF THE ALLEGED ATTORNEYS-IN-FACT WITHOUT FIRST EXHAUSTING A PROCEDURE FOR THIS PURPOSE.**

<u>Summary.</u> In the Order Challenged, the Responsible Court argues that it was legal to recognize the effects of the withdrawal formulated by the Representative Agents since they based their legitimacy on the Alleged RUA, which was adopted by CI Banco as majority shareholder and, therefore, enjoyed a presumption of legality and authenticity. In this sense, the Responsible Court violated the principle of contradiction and due process to the detriment of the Controladora, since it upheld the validity of the Supposed RUA despite the fact that it was challenged in the motion for lack of legal standing, which was not duly processed and, therefore, the Controladora was not heard and did not prevail with respect to the reasons why such resolution lacked any legal effect.

<u>Development.</u>

a.  <u>Due Process, guarantee of hearing and the principle of contradiction.</u>

The right to due process may be defined as the right of everyone "to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations or of any criminal charge against him"[(42).]

International doctrine[43] recognizes the right of every person to have recourse to the courts and to assert his rights through a simple and brief procedure whereby he is protected against acts of the authority that violate his fundamental rights to his detriment.

---

[41] Digital Record: 269673 SCJN;6a. Época;Semanario Judicial de la Federación ;TA
[42] Article 10 of the Universal Declaration of Human Rights.
[43] For example, the American Declaration of the Rights and Duties of Man in its Article XVIII



For example, the Universal Declaration of Human Rights defines the right to due process as "the set of conditions and requirements of a legal and procedural nature that are necessary to be able to legally affect the rights of the governed" (44). [44]

Likewise, the doctrine has recognized that the right to due process protects several aspects and implies a series of prerogatives in favor of the governed, such as:

i. The requirement of a prior process in which the essential formalities of the procedure are complied with.

ii. Prohibition of special courts and privative laws.

iii. Restriction of military jurisdiction.

iv. Right or guarantee of hearing.

v. Grounding and motivation of the resolutions issued by the competent authorities.[45]

As may be inferred from the broad definition set forth above, due process has several facets built in favor of the governed, which seek that any controversy be resolved by a truly impartial court, allowing the presentation of the claims made by the parties and the exercise of their actions, protecting them from the commission of any arbitrariness to their detriment.

In the Mexican legal system, the right to due process is enshrined in Articles 14 and 16 of the General Constitution:

"Article 14. No law shall have retroactive effect to the detriment of any person.

No one may be deprived of his liberty or of his property, possessions or rights, except by means of a trial before the previously established courts, in which the essential formalities of the procedure are complied with and in accordance with the Laws issued prior to the event.

In criminal trials it is forbidden to impose, by simple analogy, and even by majority of reason, any penalty that is not decreed by a law exactly applicable to the crime in question.

In civil trials, the final judgment must be in accordance with the letter or the legal interpretation of the law, and in the absence thereof, it shall be based on the general principles of law".

\*

"Article 16. No one may be disturbed in his person, family, domicile, papers or possessions, except by virtue of a written order of the competent authority, which substantiates and justifies the legal cause of the proceeding. In trials and proceedings conducted in the form of a trial in which orality is established as a rule, it shall be sufficient that they be recorded in any medium that provides certainty as to their content and compliance with the provisions of this paragraph."

---

[44] Article 10 Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him.
[45] Cipirano Gómez Lara (2006). El debido proceso como derecho humano. Mexico: UNAM.



Mexican jurisprudential doctrine has defined the right to due process as follows:

> **"GUARANTEE OF DUE PROCESS OF LAW CONTAINED IN THE ARTICLE 14 OF THE CONSTITUTION. DEFINITION**. The guarantee of due process of law enshrined in Article 14 of the Constitution, in the part relating to the fact that trials must be carried out before a competent authority, complying with "... the essential formalities of the procedure..." necessarily implies that the jurisdictional procedures followed before the respective authorities be processed in accordance with the procedural provisions exactly applicable to the specific case, since otherwise the positive law is transgressed and, therefore, the infringement of the guarantee in question is actualized"(46).

As can be inferred from the transcribed thesis, the Mexican jurisprudential doctrine has sought to synthesize the protection sought by the right to due process in what it calls "essential formalities of the proceeding", the following jurisprudential criterion is relevant:

> **"RIGHT TO DUE PROCESS. SU CONTENT**. Within of the
> There is a "hard core" of due process guarantees, which must be inexcusably observed in any jurisdictional proceeding, and another set of guarantees that are applicable in proceedings involving the exercise of the punitive power of the State. Thus, as to the "hard core", the guarantees of due process that apply to any proceeding of a jurisdictional nature are those that this Supreme Court of Justice of the Nation has identified as essential formalities of the proceeding, which together make up the "guarantee of a hearing", which allow the governed to exercise their defenses before the authorities modify their legal sphere definitively. In this regard, the Full Court of this Supreme Court of Justice of the Nation, in the jurisprudence P./J. 47/95, published in the Judicial Weekly of the Federation and its Gazette, Ninth Epoch, Volume II, December 1995, page 133, under the heading: "ESSENTIAL FORMALITIES OF THE PROCEDURE. ARE THOSE THAT GUARANTEE AN ADEQUATE AND OPPORTUNE DEFENSE PRIOR TO THE
> PRIVATIVE ACT.", held that the essential formalities of the procedure are:
> (i) notification of the initiation of the proceeding; (ii) the opportunity to offer and present evidence in support of the defense; (iii) the opportunity to present arguments; and, (iv) a resolution that resolves the issues debated and whose challenge has been considered by this First Chamber as part of this formality. Now, the other core is commonly identified with the minimum set of guarantees that any person whose legal sphere is to be modified by the punitive activity of the State must have, as occurs, for example, with criminal, immigration, tax or administrative law, where it is required that the guarantees be made compatible with the specific subject matter of the matter. Therefore, within this category of due process guarantees, two species can be identified: the first, which corresponds to all persons regardless of their condition, nationality, gender, age, etc., among which are, for example, the right to have a lawyer, not to testify against oneself or to know the cause of the sanctioning procedure; and the second, which is the combination of the minimum list of guarantees with the right to equality before the law, and which protects those persons who may be at a disadvantage before the legal system, because they belong to a vulnerable group, for example, the right to consular notification and assistance, the right to have a translator or interpreter, the right of children to have their detention notified to those who exercise their parental authority and guardianship, among others of the same nature."47

As can be inferred from the aforementioned thesis, the following have been recognized as essential formalities of the proceeding: *(i)* notification or summons to the proceeding; *(ii)* the

---

46 [TA]; 9th Epoch; T.C.C.; S.J.F. and its Gazette; Volume III, June 1996; Page 845. I.8o.C.13 K .

47 SCJN;10th Epoch;Gaceta del Semanario Judicial de la Federación;1a./J. 11/2014 (10a.) ;J; Published: Friday, February 28, 2014 11:02 am.



opportunity to offer and present evidence; *(iii)* the opportunity to plead; *(iv)* the judgment or resolution.

On the other hand, in the case of acts of nuisance or deprivation, the right to due process acquires special relevance since it is established as a burden against the authorities, so that, <u>without observing the essential formalities of the procedure, they cannot issue any act of nuisance.</u> In this regard, the following thesis is relevant:

> **"RIGHT TO DUE PROCESS. ARTICLE 14 OF THE CONSTITUTION PROVIDES TWO AREAS OF APPLICATION DIFFERENTIATED.** The First Chamber of the Supreme Court of Justice of the Nation, in the isolated thesis 1a. LXXV/2013 (10a.), published in the Semanario Judicial de la Federación y su Gaceta, Tenth Epoch, Book XVIII, Volume 1, March 2013, page 881, under the heading: "RIGHT TO DUE PROCESS. Its content", established that the mentioned constitutional precept contains the human right to due process, integrated by a hard core of essential formalities of the procedure, which allow the governed to exercise their defenses before the authorities modify their legal sphere in a definitive manner. However, understood as a right essentially intended to grant a right of defense, it is possible to identify in the precedents of this Supreme Court of Justice of the Nation, two differentiated scopes of application. From a first perspective, said right is concerned with the citizen, who is subject to a jurisdictional process when being the recipient of the exercise of an action that, if it proves to be appropriate and founded, would lead the judicial authority to issue a privative act against him, in which case the authority must verify that the essential formalities of the procedure are complied with, in order to grant the passive subject of the procedural relationship the possibility of an effective defense, for which reason it must be guaranteed that he is notified of the beginning of the procedure and its consequences; The right to allege and offer evidence, and the issuance of a resolution that settles the issues debated must be ensured. However, due process can also be understood from the perspective of the person who is requesting the jurisdictional function of the State to vindicate a right and not so much to defend himself, in which case he is placed in a position, within a trial, on whose fate depends the exercise of a right, which if not adequately resolved could render his right null and void. Thus, under this second perspective, it is understood that said human right allows the parties to have access to the courts to assert their rights and defend their interests in an effective manner and under conditions of procedural equality, that is, it demands a procedure that grants the parties equal opportunity to defend their points of view and offer evidence in support of their claims"[48].

Within the framework of the essential formalities of the proceedings and, in general, of the right to due process, there are certain fundamental principles that must be respected.

One of them is the so-called "principle of contradiction."

The Supreme Court of Justice of the Nation[49] has defined this principle as that which "guarantees that the process is a true argumentative contest in which any discursive or evidentiary element is refutable and that the pretension of one of the parties is not favored without demonstrating why the other party did not know it, ensuring the quality of the information that is given to the Judge or Court".

---

[48] SCJN;10a. Época;Semanario Judicial de la Federación y su Gaceta;1a. CCLXXVI/2013 (10a.) ;TA
[49] Amparo Directo en Revisión 225/2019



In turn, it holds that the principle of contradiction "makes possible the confrontation between the parties, allowing the knowledge of the arguments of the opposing party and the manifestation before the Judge or Court of their own arguments, for which reason it constitutes an unavoidable requirement linked to the right to a public process with all the guarantees, <u>whose observance requires the duty of the judicial bodies to make it possible</u>".

In Amparo Directo en Revisión 243/2017, the First Chamber of the Supreme Court of Justice of the Nation held that the principle of contradiction is manifested from two different complementary aspects: as a right of defense and as a guarantee in the formation of evidence, in this regard:

> "Conceptually, the principle of contradiction is manifested from two different complementary aspects: as a right of defense and as a guarantee in the formation of evidence.
>
> **When speaking of the right of defense or hearing, reference is made to the consideration of the principle of contradiction from the perspective of a right of all parties in the process, whose essential content lies in the requirement to be heard, in the sense that they may allege and prove to shape the judgment, that they know and may refute all factual and legal materials that may influence the issuance of the judicial decision.**
>
> In this sense, **as a consequence of the classic principle audiatur et altera pars (let the other party be heard), the first derivation of this principle is the impossibility of proceeding to the conviction of any person without first being heard in the case**.
>
> (...)
> In this sense, the observance of the referred principle requires that any affirmation, petition or claim formulated by one of the parties in the process must be made known to the other party so that the latter may express its conformity or opposition by stating its own reasons. From this approach, the principle under study denies the possibility of the existence of hidden evidence. The knowledge of the probative elements and physical evidence that will be the object of proof in the trial is the condition that allows the exercise of the contradictory in the trial hearing. Therefore, the evidence practiced behind the parties' backs, kept secret or known only by the judge before the judgment, will lack evidentiary value, because it violates the right of defense of the party to whom it prejudices.
>
> Hence, in this aspect, the principle of contradiction consists of the indispensable interest of submitting to refutation and counter-argumentation the information, acts and evidence of the opposing party, in a jurisdictional process.
>
> From another approach, in the evidentiary aspect, the principle of contradiction constitutes a guarantee in the formation of evidence, applied specifically to the production of testimonial evidence, the principle requires that the counterpart of the offerer of the evidence - in a public hearing - has the opportunity to cross-examine the subject of the evidence on the content of his statements, with the purpose of controverting the credibility of his testimony.
>
> Indeed, as this First Chamber held when deciding the direct amparo in review 3457/2013 , the credibility of the testimony can be controverted through the following strategies: (i) by questioning the way in which the witness acquired the knowledge about the facts that he/she testifies, in such a way that it is clarified whether it is a personal, reference or inferential knowledge; or (ii) by debating the credibility of the attributes of the statement, which may go so far as to question the veracity of the testimony (arguing that the witness testifies against his beliefs), the objectivity of what the witness claims to believe (arguing that the witness did not form his beliefs about the facts he testifies to according to an objective understanding of the evidence he perceived with his senses) or the quality of the observation on which the statement was based (arguing that the witness's



sensory capacities of the witness are not optimal, that the physical state of the witness at the moment of perceiving the facts was not the most adequate for those effects or that the conditions in which he perceived those facts make him unreliable)".

[Emphasis added]

According to what has been transcribed, the principle of contradiction in its aspect of the right of defense implies the possibility that both parties be heard during the proceeding, so that they **may allege and prove in order to shape the sentence.**

The principle of contradiction seeks to provide the parties with equal opportunities so that both are duly heard at trial, that their "version" is heard and that they are given the opportunity to refute the allegations made by their counterpart.

On the importance of the principle of contradiction, it is worth considering the opinion of Pietro Calamendrei:

> "The parties are persons, i.e., subjects of duties and rights who are not placed before the judge as subjects of his power and obliged to obey him passively, but as free and active citizens who have before the judge not only duties to fulfill but also rights to respect, so that the judge should not be considered only as an authority endowed with powers, but as an official subject to duties and responsibilities towards the parties, who have the right to freely make their reasons and to be listened to attentively.
>
> (...)
>
> The principle of contradictoriness resembles like two drops of water the principle of parliamentary opposition. Both are founded on certain ideas so simple that they may even seem naive; that is, that men know how to be reasonable, capable of persuading with good reasons and of allowing themselves to be convinced by those of others; that truth can only be known in its integrity if it is observed in its various aspects, turning it over to discover its three dimensions and that the contradictor is not an enemy, but a collaborator, because with his objections he helps to discover and correct errors, feeding the contest of emulation, which is the stimulus and ferment of all human progress.
>
> (...)
>
> Therefore, the contradictory is indispensable in the process not to exarcegate the litigiousness of the parties or to give the opportunity to the litigants to show off their eloquence, but in the interest of justice and the judge, since it is precisely in the dialectical opposition of the opposing defenses that he easily finds the most appropriate means to discover the whole truth, illuminated under its most diverse aspects"[50].

As can be inferred from the above quotation, the principle of contradiction as a consequence of the right to due process, seeks an equitable participation of the parties in the judicial proceeding.

Through the active participation of the parties, the aim is for the judge to obtain the greatest number of elements that will allow him to elucidate the facts of the controversy and, to that extent, come closer to a concept of "truth".

---

[50] Pietro Calamandrei (1960). Process and Democracy. Buenos Aires, Argentina: Ediciones jurídicas Europa-América.

CLYDE&CO

In short, the principle of contradiction allows the court to fulfill the purpose of any judicial proceeding, i.e., the resolution of the controversy **based on the truth proven by the parties at trial**.

In order to understand the importance and transcendence of the adversarial principle in the procedure, it is necessary to start from the premise that the judicial procedure seeks to resolve a controversy based on the facts made known by the parties.

In other words, it can be said that the purpose of all judicial proceedings is to know the "truth" and resolve in accordance with it.

Truth can be defined as the existence of coincidence between what is said and the facts that are described. For example, Heidegger51 states that "truth is coincidence. Such coincidence is given because the statement is governed according to that about which it says."

In the case of judicial proceedings, the judge, listening to both parties, must seek to arrive at a knowledge of "truth," i.e., of the facts that actually gave rise to the controversy before him and, consequently, rule in accordance with such "truth."

The judge, as an applicator of the law, has the task of elucidating the facts that gave rise to the controversy and applying the rules that coincide with the controversy raised. Only if this coincidence exists can we affirm that the purpose of the judicial proceeding has been fulfilled.

In order to approach a concept of truth within any judicial proceeding, Michele Taruffo states:

> "The most important condition is that the facts must be correctly established on the basis of relevant and pertinent evidence, as a necessary condition for the correct application of the substantive rules"[(52)].

For said author, knowledge of the truth is through the active participation of the parties in the judicial proceeding, as it is through the offering of "relevant and pertinent" evidence.

This active participation of the parties can only be achieved through full respect for the adversarial principle.

In essence, the judge must at all times take care to listen to the parties, in order to comply with the purpose of the judicial proceeding he is directing, that is, to **know the truth in order to apply the rules that coincide with it**.

---

[51] Heidegger, M. (2007). On the essence of truth (A. Ciria, Trad.) Madrid: Editorial Herder.
[52] Taruffo, M. (2008). La prueba (J. Ferrer, Transl.) Barcelona: Editorial Marcial Pons.



This obligation must be privileged even above any procedural formality that may be established by law; a circumstance that is recognized by our Federal Constitution in Article 17, in this regard:

> "Article 17 (...) Provided that equality between the parties, due process or other rights are not affected in trials or proceedings followed in the form of a trial, **the authorities shall give priority to the solution of the conflict over procedural formalisms**."

> [Emphasis added]

From all that has been said so far, it is possible to conclude that allowing the parties to participate in the judicial proceeding is essential; to limit such participation, that is, to act contrary to the principle of contradiction, would be to act contrary to the very purpose of the judicial proceeding.

b.    The Responsible Court violated Dolphin's right to due process, the right to a hearing and the principle of contradiction to the detriment of Dolphin.

Another of the main reasons put forward by the Responsible Court to support the decision assumed in the Complaint is that the Power of Attorney was indeed empowered to act on behalf of Controladora, since their legal standing was based on the Alleged RUA, which was supposedly "*granted by the will of all the shareholders of the company, particularly of CI Banco...*", for which reason it maintains that it enjoyed a presumption of legality.

However, the Responsible Court completely overlooked - in clear violation of the principle of contradiction - that precisely the fact that the Alleged RUA had been granted by "the will" of the shareholders was an issue that was in dispute, in addition to the fact that the standing of CI Banco to act as shareholder had also been questioned by Controladora in the motion for lack of standing.

Throughout its motion, the Parent Company essentially alleged the illegality of the Alleged RUA because *(i)* it had been entered into in violation of the Provisional Measures, since it was the inexorable product of the extrajudicial foreclosure of collateral, and *(ii)* Wilmington Trust **lacked the power to exercise voting rights**, since it had lost the character of "Collateral Agent" in the Financing Agreements.

Although each of these arguments will be discussed in more detail below, for now it should be emphasized to this Tribunal that the legality of the Alleged RUA was not an undisputed issue and, on the contrary, was precisely the subject matter of the motion filed by Controladora. Moreover, as described in the "Background" chapter, prior to the issuance of the Order of Dismissal, several issues were raised before the Responsible Court:

(i)    on the one h a n d, the legitimate representatives of Controladora denounced the violation of precautionary measures as a consequence of the celebration of the alleged RUA.



and the presentation of the withdrawal, requesting that it not be recognized as having legal effects;

(ii)      at the same time, in contradiction to what was done by the legitimate representatives of Controladora, Controladora's attorney-in-fact appeared in support of its legal standing in the Alleged RUA and argued the withdrawal of the reorganization proceeding, requesting that the acts performed by the legitimate representatives of Controladora be disregarded.

(iii)     Consequently, the legitimate representatives of Controladora filed a **plea of lack of legal standing** against Controladora's attorney-in-fact, in which they again requested the Responsible Court not to grant any legal effect to the Alleged RUA;

(iv)      the Responsible Court requested Wilmington Trust and CI Bank to report compliance with the Precautionary Measures,

(v)       CI Bank complied with such request, without referring to or justifying the extrajudicial execution of the pledges on the shares of Controladora, and

(vi)      the legitimate representatives of Controladora expressed their clear will to continue with the Concurso Mercantil.

From the foregoing, it is possible to conclude that the Responsible Court was faced with a clear controversy: on the one hand, the legitimate representatives of Controladora denounced the illegal execution of guarantees and the consequent need to not recognize the legal effect of the dismissal of the Concurso Mercantil and, on the other hand, alleged attorneys-in-fact requested the dismissal and claimed to have the representation of the Complainant.

Based on these premises, it is clear that the Responsible Court had to respect the principle of contradiction and, in view of the existence of conflicting petitions and a clear allegation of non-compliance with the Precautionary Measures, prior to deciding on the dismissal of the insolvency proceeding, the Responsible Court **should have granted a hearing to the parties in order to know the "legal truth" and, consequently, decide on the effects of** the **Alleged RUA.**

However, since the Order of Withdrawal and now in the Order Challenged, in a completely illegal manner, the Responsible Court starts from the premise (which it unduly assumes undisputed) that the Alleged RUA is valid for the sole fact that it was supposedly adopted by all the shareholders.

However, the mere fact that the shareholders of a company have apparently participated in the adoption of a corporate act **does not automatically render it valid.**



The **alleged RUA** was not a legal act, much less **when there was evidence in the file of the illegality of the alleged RUA and the various irregularities under which it was celebrated.**

Contrary to the manner in which the Responsible Court acted in the Complaint, the truth is that there was no inexcusable obligation to recognize the full effects of the Alleged RUA merely because of the participation of the Controladora's shareholders; on **the contrary, in view of the existence of a clear challenge to such resolution and compelling evidence of its invalidity, the Responsible Court should have respected the principle of contradiction and previously resolved the validity of the Alleged RUA and whether or not it should be effective.**

In respect to the principle of contradiction and due process, any decision (even implicit) on the personality of the legitimate representatives of the Complainant should have been adopted **only as a consequence of having followed an incidental proceeding for such purpose**; in this respect, the following criteria are relevant by analogy:

> **"PERSONALITY OF THE PLAINTIFF. ITS INFORMAL EXAMINATION IS IMPROPER IF IT WAS PREVIOUSLY EXPRESSLY RECOGNIZED AND WAS CONSENTED THE RESOLUTION IN THAT IT HAPPENED.**
> **(LEGISLATION OF THE STATE OF PUEBLA).** Articles 238 and 222 of the Code of Civil Procedures read as follows: "Article 238. The Judge, in the order in which he provides the claim, will previously study its competence and the personality of the plaintiff. If he decides that he is competent and that the plaintiff has the personality he claims, he shall admit the claim and order the defendant to be summoned, if it complies with the legal requirements". "The following provisions shall apply to the personality of the litigants: I. It may be challenged: a) In a complaint against the order recognizing the personality; or b) As an exception when answering the claim. II. Once the personality has been challenged by one of the means set forth in the preceding section, it may not be challenged by the other. III. When, once the claim has been answered, the lack of capacity has a supervening cause, it may be challenged in an incident. IV. The incident referred to in the preceding section will be processed as provided in Articles 632 and 633, but if before resolving the incidental question, the main business is summoned for judgment, the proceeding will be suspended in this one, so that both questions are resolved in a single judgment, and if the lack of personality is declared admissible, it will also be declared that the main business is not in a state of judgment". From the foregoing it follows that if the Judge expressly recognizes the personality of the plaintiff and the defendant does not exhaust any of the two alternatives that the law grants to challenge such determination, such determination must be deemed to be consented and therefore the informal examination that is subsequently sought is undue in accordance with the legal principle of preclusion. This criterion finds support in the final part of the jurisprudence of the Supreme Court of Justice of the Nation, published in the Appendix to the Judicial Weekly of the Federation 1917-1985, Fourth Part, page 614, which reads: "PERSONALITY, EXAMINATION OF PERSONALITY.The personality of the parties is a procedural requirement that must be examined ex officio by the judge, as expressly provided in Article 47 of the Code of Civil Procedures for the Federal District, in connection with Articles 35, section IV, and 36 of the same ordinance, therefore, he must also resolve the objection presented by the parties in this respect, whatever the moment in which they do so, because the lack of timely challenge cannot generate the existence of a representation that does not exist, and it must only omit the reiteration of the examination of the personality, in case it has been expressly resolved before and the judgment is consented, because then the principle of preclusion operates"."[53]

> **"THE COURT OF APPEAL DOES NOT PROCEED WITH ITS INFORMAL STUDY WHEN IT HAS BEEN RESOLVED IN THE FIRST INSTANCE AND    THIS CONSENTED    THE RESPECTIVE    RULING.**
> **(LEGISLATION OF THE STATE OF MICHOACAN).** When the judge of first instance

---

[53] Digital Record: 192974 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;VI.1o.C. J/12 ;J



> If the court expressly resolves the issue related to the lack of standing, in the respective incident, and such resolution is not challenged by the injured party, the study indicated ceases to be unofficial; therefore, the responsible Magistrate was correct in considering that the complaints formulated by the appellant in this respect were not defensible, because this had already been resolved through the interlocutory ruling pronounced in the incident that the appellant had filed regarding the lack of legal standing and personality, which became final since it was not appealed by the parties, and such pronouncement must be considered consented by the petitioner of guarantees, because to consider otherwise would be an attempt against the finality of the proceeding, which is a guarantee of the parties, in terms of article 96 of the adjective code of the entity."[54]

Therefore, the fact that the Responsible Court now upholds the full legality of the Alleged RUA without having previously exhausted the challenges filed by the Controladora or analyzed the evidence provided on the invalidity of such resolution, constitutes an evident and clear violation of the principle of contradiction and the right to due process.

Now, the Responsible Court's argument that the validity of the alleged RUA and the validity of the representation of the Controladora's shareholders are "*issues [that] are beyond the scope of the bankruptcy proceeding, and in any case the interested parties must assert them before the competent authority for such purpose*" does not go unnoticed. However, such reason is false and does not remedy the clear violation of the adversarial principle.

The foregoing is affirmed, since the representation of the Representative Agents rests precisely on the validity of the Alleged RUA and on the fact that those who entered into it were empowered to do so at the time of doing so. In this order of ideas, since it is intimately related to questions of personality, it is evident that the Responsible Court **was obliged to analyze the validity of the Alleged RUA under the arguments presented by Controladora**.

The mere fact that the Alleged RUA was recorded in a notarized instrument or that the resolution presented by the Attorney Generals was a "unanimous" resolution, does not immediately imply that these were already fully valid and should necessarily be recognized by the Responsible Court. On the contrary, if arguments were formulated and evidence was offered to demonstrate the illegality of the resolution, it is evident that the Responsible Court **was compelled and empowered to analyze such issues since they were intimately related to the personality of the Presiding Judges.** The foregoing, even more so if it is taken into account that in accordance with Article 364 of the Federal Code of Civil Procedures[55]the resolution issued in an incident will only have effects in the trial in which they were issued, so that any decision on the lack of personality as a consequence of the invalidity of the alleged RUA **would not affect the power of the parties to assert the invalidity of such corporate act in another forum, in which a resolution with general effects can be had.**

---

[54] Digital Record: 202173 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;XI.2o.48 C ;TA
Incidental resolutions shall have no effect whatsoever except in the trial in which they have been issued, unless the resolution refers to several trials, in which case it shall have effect in all of them.

56

CLYDE&CO

However, the possibility of bringing an action with general effects **does not limit the power and obligation of the Responsible Court to analyze the multiple arguments and evidence that demonstrated the invalidity of the Alleged RUA, in the context of the fact that the representation held by the Attorney Attorneys-in-Fact depended on it.**

Consequently, it is evident that by unilaterally sustaining the validity of the Alleged RUA without resolving the multiple challenges raised by Controladora, the Responsible Court violated the principle of contradiction and, consequently, the Order is illegal.

**THIRD. FURTHERMORE, THE MERE FACT THAT CI BANCO AND WILMINGTON TRUST WILL PARTICIPATE IN THE ALLEGED RUA DOES NOT IMPLY THE VALIDITY OF SAID RESOLUTION, IN ADDITION TO THE FACT THAT IT DOES NOT REMEDY THE OBLIGATION OF THE RESPONSIBLE COURT TO RESOLVE WITH PRIORITY THE INCIDENT OF LACK OF LEGAL STANDING AND THE REST OF THE CHALLENGES FILED BY THE CONTROLLING COMPANY TO QUESTION THE LEGAL STANDING OF THE ALLEGED ATTORNEYS-IN-FACT.**

<u>Synthesis</u>.        Contrary to the Responsible Court's argument, it is false that the Alleged RUA was entered into by all of Controladora's shareholders because *(i)* Mr. Albor, who is the legitimate shareholder of Controladora, did not participate in it; *(ii)* Wilmington Trust participated by having illegally executed the pledge against Mr. Albor's share, in violation of the Provisional Measures, so it is clear that its participation was illegal; *(iii)* Wilmington Trust was no longer a Collateral Agent at the time of execution of the Alleged RUA, and therefore lacked the power to act as a shareholder; and *(iv)* CI Banco could not act as a shareholder either, since it only holds such rights as collateral to the detriment of Controladora, and its actions violated the Provisional Measures. All of the above, notwithstanding the fact that the Responsible Court had to previously admit and resolve the incidents and appeals presented by Controladora.

<u>Development.</u>

In addition to the violation of the principle of contradiction and the rest of the violations pointed out in the immediately preceding concept of violation, it is necessary to point out to this Court that the Responsible Court sustains a large part of the Complaint Order in the fact that it was compelled to recognize the effects of the Alleged RUA by the mere fact that it had supposedly been executed by all of the shareholders of Controladora, and that the withdrawal of the reorganization proceeding "*was instructed by all of its shareholders*". However, as will be demonstrated in the present concept of violation, such considerations are false.

First, the Responsible Court overlooks that it is false that the "totality of the shareholders" of Controladora participated, as was duly demonstrated by Controladora in the reorganization proceeding. The foregoing is affirmed, since the legitimate stockholders

57



The current shareholders of Controladora are **Eduardo de Martín Albor Villanueva ("Mr. Albor")** and CI Banco, as stated in the documents filed in the insolvency proceeding.

Now, the illegitimate reason for which the illegal execution of the Alleged RUA was possible, as is confessed in the background of the resolution itself, is because CI Banco and Wilmington Trust **illegally executed extra-judicially the pledge that weighed on the shares held by Mr. Albor**.

As described in the "Background" chapter, from the admission of the reorganization proceeding, the responsible court decreed the Precautionary Measures, among which, it ordered the
*(i)* the **suspension of any judicial <u>or extrajudicial</u> proceeding for the enforcement of guarantees**; *(ii)* prevented the perfection of any guarantee granted by the Parent Company, and
*(iii)* the prohibition to rescind or terminate early any contract to which the Parent Company is a party.

By agreements dated January 31, 2025 and March 28, 2025, the Responsible Court ordered that the Provisional Measures be notified to CI Banco, as trustee of the Guarantee Trust, and to Wilmington Trust, as Collateral Agent of the Financing Agreements; recognizing, consequently, the obligation of both legal entities to comply with the Provisional Measures.

In this regard, since the admission of the reorganization proceeding, the Provisional Measures were fully in force and, long before the alleged execution of the alleged RUA, it is evident that both CI Bank and Wilmington Trust were properly notified of the measures and, therefore, bound to comply with them.

Notwithstanding the foregoing, CI Banco and Wilmington Trust entered into the Alleged RUA **aware of the validity of and compliance with the Precautionary Measures**; such was their brazenness, that in the background of said resolution they even stated that this was possible **as a consequence of the extrajudicial execution of pledges to the detriment of the Controladora's shares**, as described in the "Background" chapter.

Based on this premise, when Controladora's representative appeared at the reorganization proceeding to request its dismissal, Controladora was clear in requesting that it be dismissed, since it was evident that it was the result of a flagrant violation of the Provisional Measures (since guarantees had been illegally executed to the detriment of Controladora). Likewise, when filing the motion for lack of standing, this ground of illegality of the Alleged RUA was also asserted.

This motive **should have been sufficient to demonstrate the illegality of the Alleged RUA and the fact that, contrary to what was stated therein, not all the shareholders were represented in said resolution, since <u>the extrajudicial execution of the pledges through which they intended to disregard Mr. Albor</u> is <u>illegal.</u>**

58



Notwithstanding the foregoing, it was also fully demonstrated that Wilmington Trust lacked the authority to act as a shareholder in the Alleged RUA. First, as described in the "Background" chapter, on February 24, 2025, Controladora informed the Responsible Court that it had received two e-mails from Wilmington Trust in which, essentially, it informed the Responsible Court of its resignation as "Collateral Agent" of the Financing Agreements (which, in turn, were exhibited since the petition for the declaration of bankruptcy).

Wilmington Trust's role as "Collateral Agent" was essentially to represent and exercise the rights of the Bondholders under the Financing Agreements, as is evident from the following clauses:

### NPA 2022

"Section 24, on Collateral Agent.

(a)      The Purchasers and the other Holders desire to appoint a Person to act (and continue to act) as their security agent and representative on their behalf with respect to all matters relating to the Collateral and pursuant to the Security Documents, the other financing documents and the related documents. Accordingly, by execution of this Agreement, each Purchaser and each other holder irrevocably appoints, authorizes and irrevocably appoints Wilmington Trust, National Association, to act as its security agent and representative on its behalf with respect to all matters under the Guaranty and pursuant to the Guaranty Documents, the other Financing Documents and the related documents. Each Purchaser and each other holder grant to the Collateral Agent all powers and authority necessary, desirable or appropriate to carry out the functions and duties delegated or assigned to the Collateral Agent under this Agreement and the other Financing Documents (including the authority to release the Collateral from the Liens created under the Collateral Documents and the other Financing Documents in the circumstances specifically provided for in this Agreement and those)."

### 2019 NPA Amending Agreement. "Section

24.1 Appointment of Collateral Agent.

(a)      Warrant Agent. The Purchasers and the other holders desire to appoint a Person to act (and continue to act) as their collateral agent and representative on their behalf with respect to all matters relating to the Collateral and pursuant to the Security Documents, the other Financing Documents and the related documents. Accordingly, by execution of this Agreement, each Purchaser and each other holder irrevocably appoints, authorizes and irrevocably appoints Wilmington Trust, National Association to act as its security agent and representative on its behalf with respect to all matters relating to the Collateral and pursuant to the Collateral Documents and the other Financing Documents and the related documents. Each Purchaser and each other holder hereby grants to the Collateral Agent all powers and authorities necessary, desirable or appropriate to carry out the functions and duties delegated or assigned to the Collateral Agent pursuant hereto (including the authority to release the Collateral from the Liens created under the Collateral Documents and the other Financing Documents in the circumstances specifically provided for therein."

In these terms, it is evident that his resignation is of the utmost importance. The foregoing because, upon ceasing to act as "Collateral Agent", it is evident that any power of representation in favor of the Bondholders also ceases and, therefore, any power to exercise rights under the Financing Agreements or any other derivative or related



(such as the Pledged Guarantees, which are included in the definition of "Financial Documents" of the Financing Agreements).

In those terms, the Financing Agreements provide that upon the resignation of the "Collateral Agent", the Bondholders have the right to designate a person to act as successor of the collateral agent within 20 and 30 days after the resignation, as provided in the NPA 2022 and the Amending Agreement to the NPA 2019, respectively. As an example of the foregoing and the NPAS being substantially similar, the section pertaining to the successor to the Warrant Agent clause of the Amending Agreement to the NPA 2019 is cited:

<div align="center">

**2019 NPA Amending Agreement**. "Section

</div>

24.8 Successor Collateral Agent.

The Warrant Agent may resign at any time upon not less than 20 days' prior written notice to the Holders and the Company. Upon receipt of such notice of resignation, **the Required Holders shall have the right to designate a Person to act as successor to the Warrant Agent. If no such successor to the Warrant Agent has been designated and accepted by the Required Holders within 20 days after notice of resignation of the resigning Warrant Agent, the resigning Warrant Agent may, on behalf of the holders, designate a Person to act as successor to the Warrant Agent**, who shall be a Holder, if a Holder is willing to accept such designation, or otherwise shall be a commercial bank or financial institution is organized under the laws of the United States of America or any State thereof and has a combined capital and surplus of at least
$1,000,000,000,000. If no successor to the Collateral Agent has been appointed within 20 days after the date such notice or resignation is given, such resignation shall become effective and the Required Holders shall assume all of its functions from such resigning Collateral Agent hereunder and under the other Financing Documents until such time, if any, as the Required Holders shall appoint a successor to the Collateral Agent as provided above. (...)[56]"

[Emphasis added]

However, as is evident from the foregoing, in the event that the bondholders do not appoint a successor to the "Collateral Agent" within such deadlines, **then the duties of such agent will fall upon them until such time as the corresponding appointment is made**.

Based on the foregoing, as it appears in the file, on March 21, 2025, the Responsible Court was informed that the terms set forth in the Financing Agreements for the appointment of the successor of the "Collateral Agent" had elapsed and that, consequently, in accordance with the applicable clauses mentioned above, the Bondholders are the ones performing the functions as such agent. It is reiterated that all this is in the file of the insolvency proceeding and was made duly known to the Responsible Court.

---

[56] This transcript is contained on page 621 of the document attached to the request for bidding as Exhibit "37".



Notwithstanding the obvious fact that by the date indicated it was clear that Wilmington Trust **was no longer acting as "Collateral Agent" for the Financing Agreements**, the purported RUA stated that it was an alleged attorney-in-fact of the latter who entered into it in alleged exercise of shareholder rights under the Financing Agreements:



In these terms, a mere analysis of the record of the trial should have made it evident to the Responsible Court that the Alleged RUA was completely invalid.

Based on these considerations, the illegality of the Order is evident, since the Responsible Court intends to sustain the legality of the alleged RUA based on the fact that it was entered into by all the shareholders of Controladora, a matter that has already been proven to be false.

Now, the fact that CI Banco has entered into the Alleged RUA is not relevant either. This is because, although it is the majority shareholder of Controladora, it should not go unnoticed that the Proxy Advisors based their representation on an alleged "unanimous shareholders' resolution". In that order of ideas, in accordance with the General Law of Mercantile Corporations, in order for a resolution adopted outside a meeting to be valid, it is necessary to have **the approval of all of the shareholders**, as can be inferred from the following provision:

> "Article 80.- The meetings shall be held at the registered office, at least once a year, at the time established in the contract (...).
>
> Additionally, the members may hold meetings outside the corporate domicile, **provided that <u>all the members approve it</u> and there is also the possibility of using electronic, optical or any other technology**. For such meetings, in this case, the address at which the respective meeting was held must be indicated in the minutes of the meeting."
>
> [Emphasis added]

Therefore, even if he was the majority partner, his mere manifestation of will was not sufficient to sustain the validity of the Alleged RUA, contrary to what the Responsible Court maintains.

611



In addition to the foregoing, the Responsible Court overlooked that the only reason why CI Banco is a majority shareholder of Controladora is because the shares of such companies were **contributed as collateral to the Trust**. In that order of ideas, the ownership of the shares that it exercises is as a consequence of **the constitution of a pledge in favor of Wilmington Trust and the Bondholders**. In fact, in section 2.05 of the Trust Agreement[57] it was clearly agreed that the sole purpose of the ownership of the share rights, which integrate the trust patrimony, was to **guarantee the compliance of the Financing Agreements**:

> Sección 2.04. <u>FINES DEL FIDEICOMISO</u>. Los fines del presente Contrato de Fideicomiso (los "<u>Fines del Fideicomiso</u>") son garantizar el puntual y debido cumplimiento, pago y satisfacción a su vencimiento (ya sea a su fecha de vencimiento programado, por vencimiento anticipado o por cualquier otro motivo) de todas y cada una de (i) las Obligaciones Garantizadas Senior, en favor del Fideicomisario en Primer Lugar, en nombre y para el beneficio de los Adquirentes Senior, y (ii) de manera subordinada, conforme a lo previsto en el Convenio entre Acreedores y de Subordinación, las Obligaciones Garantizadas Subordinadas, en favor del Fideicomisario en Segundo Lugar, en nombre y para el beneficio de los Adquirentes Subordinados. Para tales efectos, el Fiduciario deberá:
>
> (a)   ser el único y legítimo propietario y titular del Patrimonio del Fideicomiso (trasmitido al Fiduciario en esta fecha o en cualquier momento posterior conforme a los términos previstos en este Contrato de Fideicomiso), libre de cualesquier Gravámenes, durante la vigencia de este Contrato de Fideicomiso, en todo caso, hasta que (i) todas las Obligaciones Garantizadas Senior hayan sido Pagadas en Su Totalidad, y el Fideicomisario en Primer Lugar confirme dicho cumplimiento, pago y satisfacción mediante la entrega de una Notificación de Terminación del Fideicomisario en Primer Lugar al Fiduciario (con copia al Fideicomisario en Segundo Lugar) conforme a la Sección 3.01, y (ii) todas las Obligaciones Garantizadas Subordinadas hayan sido debida y legalmente satisfechas y pagadas e irreversiblemente liquidadas en su totalidad, y el Fideicomisario en Segundo Lugar, respectivamente, confirme dicho cumplimiento, pago y satisfacción mediante la entrega de una Notificación de Terminación del Fideicomisario en Segundo Lugar al Fiduciario conforme a la Sección 3.01;

The foregoing shows that CI Banco's ownership of Controladora's shares is the exclusive consequence of **the guarantees constituted by the latter in favor of Wilmington Trust, without it being an unconditional assignment or with the intention that said trust company would corporately integrate Controladora.** Thus, in Section 5.01 of the Trust Agreement it was agreed that Controladora **would continue exercising voting rights** of the shares:

> Sección 5.01.   <u>ACCIONES, VOTO Y ADMINISTRACIÓN Y DISTRIBUCIONES DE CAPITAL</u>.
>
> (a)   Salvo que el Fideicomisario en Primer Lugar haya entregado al Fiduciario un Aviso de Incumplimiento, los Fideicomitentes de Acciones estarán facultados para ejercer los derechos de voto inherentes a las Acciones, respectivamente, transmitidas por dichos Fideicomitentes de Acciones al Fiduciario de conformidad con el presente Contrato de Fideicomiso, incluyendo sin limitación, el derecho de declarar dividendos en cada una de las Sociedades de Acciones en la medida permitida al amparo de los Documentos de la Operación (conjuntamente, los "<u>Derechos de Voto</u>"), en cada caso, en una manera que no resulte (o que no pudiera razonablemente esperarse que resulte) en un incumplimiento de, o en conflicto con, los términos y condiciones del presente Contrato de Fideicomiso o cualquier otro Documento de la Operación, <u>en el entendido</u>, <u>sin embargo</u>, que ninguno de los Fideicomitentes podrá, bajo ninguna circunstancia, instruir al Fiduciario (i) que constituya u otorgue Gravamen alguno o cualquier otra clase de garantía sobre o respecto a las Acciones (o cualquier parte de las mismas), o (ii) que venda, transmita, aporte o que de cualquier otra manera disponga de la totalidad o cualquier parte de las Acciones, en cada caso, sin el consentimiento previo y por escrito del Fideicomisario en Primer Lugar, o (iii) que ejerza los Derechos de Voto en cualquier asamblea o que firme cualesquier Resoluciones Unánimes que pretendan autorizar o de otra manera resolver la escisión, fusión, transformación o la modificación o reforma de los estatutos sociales vigentes de las Sociedades de Acciones, en cada caso, sin el consentimiento previo y por escrito del Fideicomisario en Primer Lugar.

Therefore, it is clear that the exercise of corporate rights by CI Banco through the Alleged RUA was carried out **as an act of enforcement of guaranties against**

---

[57] The same was attached to the bankruptcy petition as Exhibit "'''".



**Controladora, a matter that <u>was prohibited by the Precautionary Measures decreed by the Responsible Court and, therefore, renders such act illegal.</u>**

Notwithstanding the foregoing, it is necessary to emphasize that the Responsible Court was obliged to resolve the lack of legal standing filed by Controladora as a matter of priority and in advance and, consequently, **lacked the authority to simply unilaterally affirm the validity of the Alleged RUA without first having resolved the issues raised by** the **merchant.**

In other words, even assuming without conceding that the Alleged RUA had indeed been executed by all the shareholders of Controladora **this did not relieve the Responsible Court from disregarding the plea of lack of standing and the rest of the means of challenge presented by Controladora, in respect to the principle of contradiction and the rights of access to justice and due process.**

Consequently, it is evident that by unilaterally sustaining the validity of the Alleged RUA without noticing that it had not been entered into by legitimate shareholders and by ignoring the multiple challenges that Controladora asserted, the Responsible Court violated the principle of contradiction and, consequently, the Order is illegal.

**FOURTH. CONTRARY TO WHAT THE RESPONSIBLE COURT MAINTAINS, THE FACT THAT CI BANCO IS THE "MAJORITY SHAREHOLDER" AND HAS STATED THAT IT DOES NOT AGREE WITH THE FILING OF THE INSOLVENCY PROCEEDING, DOES NOT IMPLY THE VALIDITY OF THE ALLEGED RUA NOR DOES IT ENDOW IT WITH A PRESUMPTION OF LEGALITY, NOR DOES IT JUSTIFY THE VIOLATIONS COMMITTED BY THE RESPONSIBLE COURT.**

<u>Summary</u>.       In order to support the validity of its decision to favorably accept the withdrawal formulated by the attorneys-in-fact, the Responsible Court repeatedly states that CI Banco, as majority shareholder, expressed its disagreement with the filing of the petition for bankruptcy. However, the will of CI Banco does not validate the multiple illegalities denounced against the Alleged RUA, nor does it relieve the Responsible Court from analyzing the grounds for nullity denounced by Controladora.

<u>Development.</u>

Following up on what was stated in the immediately preceding concept of violation, it should not go unnoticed by this Court that one of the main arguments used by the Responsible Court to dismiss the motion for revocation filed by Controladora is that CI Banco, who is the majority shareholder of Controladora, stated that it was not its will to continue with the reorganization proceeding, which gives a "presumption" of legality to the Alleged RUA and also constituted sufficient evidence to rule on the request for dismissal. As will be demonstrated, such argument is illegal.



First of all, this Court is reminded of the need to be clear about the fundamental reason why CI Banco is a shareholder of Controladora: because it is the trustee institution of a **guarantee trust**, the essential purpose of which is to **guarantee the obligations assumed by Controladora in favor of its creditors**.

In this order of ideas, although it is not denied that CI Banco is a majority shareholder, it should not be lost sight of (as the Responsible Court did) that it was **linked to the compliance of the Precautionary Measures and, therefore,** <u>**it was forbidden to participate in any judicial or extrajudicial enforcement proceeding of guarantees to the detriment of Controladora**</u>, as was developed in the two previous concepts of violation.

However, beyond these considerations, and even leaving aside the violation of the Precautionary Measures, the fact is that it is false that the mere participation of CI Banco would validate or in any way give effect to the Alleged RUA, much less that it would generate in its favor a "presumption" of legality.

As has been developed, the General Law of Mercantile Corporations is clear in establishing that for a resolution adopted outside of a meeting to be valid, the **approval of all the partners** is required, as can be inferred from the following precept:

> "Article 80.- The meetings shall be held at the registered office, at least once a year, at the time established in the contract (...).
>
> Additionally, the members may hold meetings outside the corporate domicile, **provided that** <u>**all the members approve it**</u> **and there is also the possibility of using electronic, optical or any other technology**. For such meetings, in this case, the address at which the respective meeting was held must be indicated in the minutes of the meeting."

<div align="right">[Emphasis added]</div>

In this case, as has also been demonstrated, CI Banco **was not the sole shareholder of Controladora**, and although it was the majority shareholder, Mr. Albor was the second shareholder necessary for the adoption of any resolution in terms of the aforementioned Article 80 of the General Law of Mercantile Corporations.

In that order of ideas, contrary to what the Responsible Court held, **the will and statements of CI Banco are completely irrelevant and irrelevant to decide on the validity of the Alleged RUA and to recognize its legal effects.**

Regardless of CI Banco's argument, the Responsible Court **was obliged to analyze the validity of the Alleged RUA in light of the standing of all the alleged "shareholders" that adopted it**, which it completely failed to do.

As developed in the immediate preceding concept of violation, the Alleged RUA was **illegitimately** adopted with the illegal participation of the Wilmington Trust, which sustained



its legal standing in **the illegal extrajudicial execution of guarantees to the detriment of Controladora, which in itself was prohibited by the Precautionary Measures**. A matter that, although ignored by the Responsible Court, was sufficient to warn of the illegality of the Alleged RUA and, consequently, the lack of any power of representation of the Power of Attorney.

Based on these premises, it is completely untrue that the alleged RUA enjoyed a "presumption" of legality, as the Responsible Court asserts. In the first place, neither the General Law of Commercial Companies, nor the Code of Commerce, nor the Commercial Bankruptcy Law **recognize the existence of the presumption alleged by the Responsible Court**, so it would not be possible to affirm that it is a legal presumption.

In its case, the "presumption" to which the Responsible Court adduces would be inferred from the elements of conviction that appear in the present trial, as can be inferred from the following criterion:

> **"RELATIVE PRESUMPTION IN CIVIL MATTERS. IF THE LAW GRANTS IT FULL EVIDENTIARY EFFECTIVENESS, IN ORDER TO DESTROY ITS EFFECT, IT IS INSUFFICIENT TO OPPOSE EVIDENCE (LEGISLATION OF THE STATE OF CHIHUAHUA).** In the procedural legal doctrine of our days, it is almost unanimous the conviction that the two kinds of presumptions: legal and human are not properly evidence, but the principle or logical argument that allows the judge to grant convictive merit to the evidence in general, that is, it is the rational function performed by the judge to infer from a proven fact the existence of another unknown fact. When the presumption is provided for in the law, it is called legal, while the judicial presumption is the one made by the deciding body according to the rules of logic and experience, also called human. Among the legal presumptions, the presumptions are relative iuris tantum or absolute iuris et de iure, depending on whether or not they admit proof to the contrary. Thus, this provisional or absolute truth comes from the provisions of the legislator, so that once the fact has been proven, it is up to the judge to attribute certainty to its consequences. Now, according to the systematic interpretation of Articles 258, 373 and 391 of the Code of Civil Procedures for the State of Chihuahua, the lack of answer to the complaint generates the presumption of having the facts alleged therein as confessed and, in turn, this tacit confession, result of a relative legal presumption, must be valued as evidence whose certainty can only be destroyed by other evidence to the contrary; but, in addition, it is necessary to keep in mind that the last mentioned provision clearly states that legal presumptions are full proof. From the foregoing it is concluded that the suitability of the counter-evidence must be such that it is conclusive to overcome the convictive fullness that the law attributes to the tacit confession, so that if the defendant does not offer any evidence or only provides an indication or several not articulated among themselves, or one or several dissociated evidences that the law does not reserve them the quality of full, then, it is not possible to overcome the solidity attributed by the adjective law of merit to the relative presumption in question"[58].

As can be seen from the above criterion, unless the law expressly provides for the existence of a presumption ("legal presumption"), then these can only exist as a consequence of the assessment made in this regard by the court and, in any case, the presumption only implies a "provisional" truth that can be destroyed with other means of proof.

---

[58]Digital Record: 182792 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;XVII.1o.P.A.31 C ;TA



In this case, at the time the Alleged RUA was presented to the Responsible Court and even after it was recognized as effective, the Controladora **offered various evidence and arguments to contest its validity, demonstrating that it had been executed <u>in violation of the Precautionary Measures and by persons (Wilmington Trust) who lacked the authority to execute it.</u>**

In other words, the Responsible Court had evidence that **destroyed any possible "presumption" of validity of the Alleged RUA, which <u>necessarily should have been analyzed and evaluated before recognizing the effects of such resolution</u>**. In this case, such authority simply decided to ignore the evidence offered by Controladora, considering the alleged "presumption of validity" enjoyed by the Alleged RUA as a consequence of the participation of CI Banco.

In this sense, the illegality of the Responsible Court's actions is evident, as it gave an undue value to the participation and statements of CI Banco for the sole fact that it was the "majority shareholder" of Controladora, when it is clear that *(i)* for the validity of the Alleged RUA it is not enough that the majority shareholder participates, but the totality of the shareholders, so the Responsible Court should have analyzed the participation of all the shareholders with special emphasis on the illegal representation held by Wilmington Trust, who acted in execution of guarantees to the detriment of Controladora and Mr. Albor, and *(ii)* the mere participation of CI Banco does not grant any presumption since none is regulated by law, especially since, even if there were a presumption, there were elements of evidence provided by Controladora that destroyed it by fully demonstrating the nullity of the Alleged RUA, which were unduly disregarded by the Responsible Court.

Consequently, the illegality of the Order is evident, and therefore this Court must grant the protection and protection of the justice of the Union in favor of Controladora to order its revocation and the immediate continuation of the insolvency proceeding.

**FIFTH. CONTRARY TO THE RESPONSIBLE COURT'S CONTENTION, THE COURT DID ACT CONTRARY TO ITS OWN DETERMINATIONS WHEN IT PROCESSED THE REQUEST FOR WITHDRAWAL DESPITE THE FACT THAT IT HAD NOT COMPLIED WITH THE REQUIREMENT IT HAD FORMULATED.**

<u>Summary</u>.        By issuing the Injunction to Wilmington Trust and CI Banco, the Responsible Court sought to be informed about the compliance with the Provisional Measures by such persons and to determine, if applicable, the validity of the Alleged RUA; however, the Responsible Court did not notice Wilmington Trust's response to such injunction and agreed to the withdrawal of the withdrawal filed by the Court Attorneys-in-Fact. In this order of ideas, contrary to what the Responsible Court maintains in the Complained Order, the Responsible Court did act against its own determinations, and such violation is not remedied by the mere fact that CI Bank did comply with the requirement formulated.

66



Development.

    a.   <u>Principle of legal certainty</u>

The content and scope of this principle has been developed in the present document and is therefore reproduced as if it were inserted verbatim.

    b.   <u>Principle of consistency and completeness</u>

Articles 14, 16 and 17 of the Federal Constitution are the foundation of the principle of congruence and exhaustiveness of judicial decisions. Their content is transcribed below:

> "Article 14. No law shall have retroactive effect to the detriment of any person.
>
> No one may be deprived of his liberty or of his property, possessions or rights, except by means of a trial before the previously established courts, in which the essential formalities of the procedure are complied with and in accordance with the Laws issued prior to the fact."
>
> "Article 16. No one may be disturbed in his person, family, domicile, papers or possessions, except by virtue of a written order of the competent authority, which substantiates and justifies the legal cause of the proceeding. In trials and proceedings conducted in the form of a trial in which orality is established as a rule, it shall be sufficient that they are recorded in any medium that provides certainty as to their content and compliance with the provisions of this paragraph."
>
> "No person may take justice into his own hands, nor exercise violence to claim his right.
>
> Every person has the right to have justice administered by courts that will be ready to impart it within the terms and periods established by law, issuing their resolutions in a prompt, complete and impartial manner. Their service shall be free of charge, being, consequently, prohibited judicial costs."

From the constitutional mandates transcribed above, it is clear that every person has the right to go before the previously established courts, which will be ready to impart justice, respecting the essential formalities of the procedure.

> **"CONSISTENCY AND COMPLETENESS, PRINCIPLES OF. THEIR DIFFERENCES AND THE CASE IN WHICH THE AWARD FAILS TO COMPLY WITH THE SECOND PRINCIPLE.**
> **OF THEM.** Article 842 of the Federal Labor Law establishes the existence of two fundamental principles or substantive requirements that must be observed in the issuance of the award: the principle of congruence and the principle of completeness. The first is explicit, while the second is imbibed in the legal provision. Thus, the principle of congruence refers to the fact that the award must be congruent not only with itself, but also with the litis, as it has been established at the appropriate stage; Hence, we speak, on the one hand, of internal congruence, understood as that characteristic that the award does not contain resolutions or statements that contradict each other and, on the other hand, of external congruence, which in itself refers to the concordance that there must be with the claim and answer formulated by the parties, that is, that the award does not distort or alter what was requested or alleged in the defense, but only deals with the claims of the parties and of the latter, without introducing any matter that was not claimed, nor condemning or acquitting someone who was not a party to the labor lawsuit. While the principle of exhaustiveness is related to the examination that the authority must carry out with respect to all the issues or litigious points, without omitting any of them, that is to say, said principle implies the obligation of the judge to decide the controversies that are submitted to him taking into account the arguments adduced both in the claim and in the lawsuit, as well as the arguments of the plaintiff.



as in those on which the answer and other claims made in the trial are based, in such a way that the respondent is condemned or acquitted, resolving on each and every one of the litigious points that would have been the subject of the debate. Therefore, when the labor authority issues an award without resolving on any litigious point, in reality it is not contrary to the principle of congruence, but rather to the principle of exhaustiveness, because far from distorting or altering the dispute, its procedure is reduced to omitting the examination and pronouncement of a controversial issue that was timely presented to it, which makes it possible, then, to speak of a properly incomplete award, lacking exhaustiveness, precisely because congruence -external- means that it must only deal with the persons who contended as parties and their pretensions; whereas completeness implies that the award must deal with all debatable points. Consequently, if the award does not satisfy the latter, it is unquestionable that it is contrary to the principle of exhaustiveness that emerges from article 842 of the Federal Labor Law, resulting in an incomplete award, with the consequent violation of the guarantee enshrined in article 17 of the Federal Constitution"[59].

The principles of consistency and completeness must be complied with in all judicial decisions issued, in order to provide legal certainty to the parties whose legal sphere will be affected by their effects.

The first of these, congruence, refers to the fact that the resolution must be congruent in its internal and external aspect. The internal congruence refers to the fact that the resolution must not contain resolutions or affirmations that contradict each other or with resolutions previously issued by the same jurisdictional body. On the other hand, external congruence refers to the fact that the resolution must coincide with the litis and with everything that was requested by the parties.

The second, the principle of exhaustiveness, refers to the examination that the jurisdictional organ must carry out with respect to all the points raised by the parties and those provided by the law, without omitting any of them. In other words, it implies the obligation to decide on the issues submitted to it, taking into account the arguments made by the parties.

The purpose of said principle is to guarantee the principle of legal certainty, so that the parties have certainty on all the issues resolved by the jurisdictional body, without contradictions or omissions in its resolutions, and the parties may know their legal situation, as well as the effects that will be produced in their legal sphere.

c.   Unlawfulness of the Order Complained Against

The Order is illegal because it violates the principle of legal certainty, as well as the principle of congruence and completeness of the judicial decisions because, as will be demonstrated in the present concept of violation and contrary to what the Responsible Court maintains, it did act against its own determinations.

As described in the "Background" chapter, prior to agreeing to the withdrawal formulated by the Court of Appeals, the Responsible Court issued a Request to Wilmington and CI Banco, through which it sought information on the compliance with the Precautionary Measures that said companies had carried out. In its agreement, the Court

---

[59] Digital Record: 179074 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;IV.2o.T. J/44 ;J

CLYDE&CO

The Responsible Party was clear in establishing that **prior to deciding on the withdrawal, such requirements had to be complied with:**

> En ese orden, del instrumento notarial que se exhibe con el escrito identificado con el número de folio interno 7862, se advierte la participación de i] CI Banco, Sociedad Anónima, Institución de Banca Múltiple, y de ii] Wilmington Trust, en su otorgamiento, con motivo del ejercicio de derechos de conformidad con el contrato de prenda al que hace alusión en el instrumento notarial de referencia.
>
> En consecuencia, previo a proveer sobre el escrito de cuenta, requiérase a i] CI Banco, Sociedad Anónima, Institución de Banca Múltiple, y a ii] Wilmington Trust, para que en el término de tres días computados legalmente, informen sobre el cumplimiento dado a las medidas precautorias decretadas en el presente procedimiento concursal que les fueron notificadas.

Notwithstanding the foregoing, as the record shows, the only person notified of the above-mentioned injunction was CI Banco and, consequently, it was the only one that "complied" (with quotation marks because, as this Court will note, it made a series of statements that have nothing to do with compliance with the Precautionary Measures) with the order of the Responsible Court.

In spite of this, after CI Banco presented its submissions, the Responsible Court agreed in favor of the dismissal formulated by the Court of Appeals, considering CI Banco's statements as "sufficient" and, evidently, ignoring what was formulated in the Injunction to Wilmington and CI Banco.

Now, in the Order Challenged, the Responsible Court excuses its actions in the fact that although it had also requested Wilmington Trust, it "considered sufficient" the statements of CI Banco since it is the majority shareholder of Controladora, in addition to the fact that compliance with such request was not a "suspensive condition" to agree to the withdrawal request, but simply a way to obtain evidence that it considered satisfied with the mere statements of CI Banco. It will be evident for this Tribunal that such considerations are illegal.

In the first place, it is necessary to start from the premise that the Injunction to Wilmington and CI Banco was issued by the Responsible Court in order to know **the compliance that had been granted to the Precautionary Measures**; the foregoing, as a consequence of the various complaints filed by Controladora in the sense that CI Banco and Wilmington Trust, **jointly, had violated the Precautionary Measures of which they were fully aware by extrajudicially executing guarantees to the detriment of Controladora.**

Based on this purpose, it will be evident for this Court that in order to have a full and accurate knowledge of the compliance with such measures **it was essential to know not only the**

69



**The** Court **also** <u>recognized</u> **that it** <u>was</u> **not only CI Banco's statement, but also that of Wilmington Trust, since both entities were the ones that entered into the Alleged RUA and violated the Precautionary Measures, a** <u>fact that was implicitly acknowledged by the Responsible Court in the injunction formulated.</u>

Therefore, contrary to what the Responsible Court held, the truth is that it was not "enough" for CI Bank alone to make a statement, but that it was also necessary for Wilmington Trust to explain its compliance with the precautionary measures.

The statement of the Responsible Court in the sense that CI Banco was the "majority shareholder" of Controladora does not go unnoticed; however, the representation held by the Attorneys-in-fact was based on the Alleged RUA, in which **not only CI Banco participated, but also Wilmington Trust, so that** <u>the majority shareholding of the former is</u> <u>completely irrelevant to know the validity of the resolution allegedly adopted.</u>

In addition to the foregoing, this Court will not overlook the fact that when formulating the Injunction to Wilmington and CI Banco, the Responsible Court was clear in establishing that it would only decide on the withdrawal once both persons had complied with the injunction.

Therefore, if one of them did not comply with the injunction, the Responsible Court had to use other means in order to notify again the missing one, Wilmington Trust, or take any other action to obtain compliance with the injunction.

However, contrary to what was expressed in the Order Challenged, the truth is that by ignoring the need for Wilmington Trust to comply with the request made to it, the Responsible Court departed from its own decision and considered, without any basis whatsoever, that the statements made by CI Banco were sufficient.

In this order of ideas, it is evident that the Responsible Court, in an arbitrary and discretionary manner, decided not to comply with its own resolution, which consisted of not lifting the reservation and not deciding on the withdrawal until both persons had complied with the requirement.

Contrary to what is now alleged by the Responsible Court, the truth is that it **did condition any pronouncement on the withdrawal formulated to the compliance of the injunction to Wilmington and CI Banco, without making any reservation on the possibility that it would only be "partially" complied with.**

In this order of ideas, the Responsible Court, in order to provide legal certainty to the parties so that they may have certainty as to the scope and effects of its acts, should have avoided arbitrary and discretionary actions, and should have complied with the provisions of the legal system.



In this sense, once the jurisdictional bodies issue their resolutions, they cannot revoke their own determinations, except for the exceptions provided by law. In other words, once an order or resolution has been issued, the jurisdictional body must abide by its provisions, since it does not have the power to revoke its own decisions.

To hold otherwise would lead to the conclusion of allowing judicial authorities to revoke their actions whenever they wish to do so without the need to state any reason, leaving individuals without certainty as to what to expect in a judicial proceeding.

That is, if the judicial authority can modify and even contradict its own determinations, then any judicial action would lack effectiveness or certainty, because at any moment that same authority could substitute or modify it, without any other reason than its discretion.

This would render any judicial proceeding useless, since it would place the governed at the mercy of the discretion of the jurisdictional body, thus openly violating the principle of legal certainty.

Allowing this to the judicial authorities would imply completely eliminating the certainty that individuals have in knowing where they stand with respect to the actions of the authority and the scope of a judicial proceeding.

If this were the case, the legal system and the principle of legality would have little reason to exist, since the jurisdictional body could freely decide the scope, duration and effects of its resolutions, without the individuals having prior knowledge of them. Or worse, even if they were aware of the act, they would not have any certainty because in the future such act could be revoked or replaced by another one.

In the present case, if the Responsible Court expressly established that it **would not decide on the withdrawal without first having the reports from CIBanco and Wilmington Trust and, subsequently, failed to comply with said requirement, it is evident that it <u>did act in contravention of an elementary congruence and against its own determinations.</u>**

The principle of legal certainty is one of the most important principles of the Mexican legal system, since it allows the exercise of other rights and the knowledge of the scope and effects of the proceedings, as well as of the intra-procedural acts. In this case, the Responsible Court violated this principle by "backtracking" its own resolution.

This is a violation of great importance, since it prevents the Complainant from knowing what consequences to abide by and to continue acting in the proceeding, since at any time the authority could revoke its determinations.



No judge may revoke his own determinations. Doing so violates the public order from which legal certainty, the principle of legality and even the right to due process derive.

This principle is recognized in the Mexican legal system, as well as in the jurisprudential niche of the Federal Judiciary.

So much so that the Commercial Code, which is supplementary to the Commercial Bankruptcy Law, regulates the revocation as a means of defense, by means of which the judge who issued the resolutions may revoke them. However, there is an **express** basis **and requirements that must be met in order for the court to be able to do so.**

In other words, the court may not revoke its determination without further ado, but must comply with the requirements and procedure established for such purpose, precisely in compliance with the principle of legal certainty and legality. In this regard, the Code of Civil Procedures for Mexico City, applicable supplementarily to the Bankruptcy Law, provides:

> "ARTICLE 272-G Judges and magistrates may order, even outside the hearing referred to in Article 272A, that any omission they notice in the substantiation be remedied, for the sole purpose of regularizing the proceeding, **with the limitation that they may not revoke their own determinations**."

> [Emphasis added]

In addition to the foregoing, the following jurisprudential criteria serve as support:

> **"REGULARIZATION OF THE PROCEDURE, THE COURTS SHOULD NOT REVOKE THEIR OWN RESOLUTIONS WHEN DECREEING THE.** From the provisions of Article 272-G of the Code of Civil Procedures of the Federal District, it is clear that such provision does not establish an obligation, but rather a power for judges and magistrates to correct any omission that they notice in the substantiation of the proceeding, <u>for the sole purpose of regularizing it, as long as they do not modify their own determinations by doing so</u>; Therefore, if in addition Article 84 of the aforementioned Code is conclusive in ordering that such jurisdictional bodies may not vary or modify their sentences or orders after they have been signed, establishing only the possibility of clarifying some concept or making up for any omission that the former contain on a point discussed in the litigation, or when the latter are obscure or imprecise, but emphasizing above all that the **essence of such sentences and orders may not be altered**; Therefore, it is unquestionable that the plaintiff's claim for the regularization of the proceeding could not proceed, since this would not only have the purpose of correcting the omission of not agreeing to a promotion of the defendant, by which it indicated a new domicile to hear notifications, since this would also necessarily result in the annulment of everything that was done in the natural trial, subsequent to an order by which a personal notification to the parties was ordered, since the same was carried out in the domicile originally indicated by the plaintiff and not in the one that was later specified; Therefore, since it is clear that it is not the case that a simple omission is being sought to be corrected, it is unquestionable that such claim should have been attempted through the ordinary appeal that would be appropriate to obtain the nullity of the related proceedings."[60]

> [Emphasis added]

---

[60] Digital Record: 203474 TCC; 9a. Época;Semanario Judicial de la Federación y su Gaceta;I.3o.C.77 C ;TA



In addition, by means of **case law,** it has been established that the courts cannot revoke ex officio their own determinations in the case of important and transcendental agreements in the proceeding:

> **"COURTS OF THE NEW LABOR JUSTICE SYSTEM. THEY CANNOT REVOKE EX OFFICIO THEIR OWN DETERMINATIONS IN THE CASE OF IMPORTANT AND TRANSCENDENT AGREEMENTS IN THE PROCEEDING THAT PRODUCE A PROCEDURAL RIGHT TO THE PARTY THEY FAVOR.**
>
> Facts: A Collegiate Circuit Court, in resolving a direct amparo trial, considered that in an individual social security dispute, when a District Judge Specialized in Labor Matters, motu proprio regularizes the file processed by the examining clerk, to leave the procedure unsubsidized until the agreement of admission of the claim, this did not imply the revocation of his own determinations, since article 873-K of the Federal Labor Law, empowers him to correct the omissions or errors in which the latter has incurred. On the other hand, the other contending collegiate body, in the same venue of constitutional control, arrived at the determination that when an investigating secretary admits the labor lawsuit, such decision, if altered ex officio by the Labor Judge, does imply the revocation of his own determinations, notwithstanding the existence of a prohibition to do so in the terms postulated by articles 686 and 848 of the Federal Labor Law.
>
> Legal criteria: The Regional Plenary in Labor Matters of the Central-North Region, with residence in Monterrey, Nuevo Leon, determines that the agreement of the investigating secretary issued in the written phase of the proceeding through which the labor lawsuit is admitted for processing, although it is a mere procedural action, the truth is that it has importance and transcendence, since it is a decision that produces a procedural right for the party that favors it, which of course cannot be revoked ex officio.
>
> Justification: The principle of immediacy, together with the principle of finality of the proceedings, preclusion, celerity and legal certainty in procedural matters, permeate the current Articles 686, 848, 873 and 873-K of the Federal Labor Law, which have as a common denominator that the Judge in labor matters must assume a proactive role; that is to say, as a protagonist to correct or remedy any irregularity or formal omission that he may appreciate in the substantiation of the process, for which he may regularize it; naturally, without such proceeding implying the extreme of revoking the resolutions of the jurisdictional body itself. Therefore, it is not allowed for the labor judge to establish, ex officio, the invalidity of an order admitting the claim issued by the examining magistrate of the court itself when he takes subsequent cognizance of the matter, since, if he does so, such proceeding would imply revoking his own determination (that of the court, regardless of the persons who embody it), even in the case of agreements of mere formality, such as the admission, since it is important and transcendental in the labor proceeding; with the exception of the fact that such decision is challenged through the appeal for reconsideration provided for in the labor law."[61]

In this case, the resolution by which the aforementioned persons were requested to report on compliance with the precautionary measures was fundamental for the insolvency proceeding, since its **complete** fulfillment would determine whether or not a decision would be made on the withdrawal.

Consequently, by ignoring the need for Wilmington Trust to comply with the injunction that was formulated, the Responsible Court acted against its own determinations, without any basis whatsoever, violating the principle of legal certainty, legality and the right to due process.

---

[61] Digital Record: 2028140 Plenos Regionales; 11a. Época;Gaceta del Semanario Judicial de la Federación;PR.L.CN. J/23 L (11a.) ;J; Publication: Friday, February 02, 2024 10:04 am

CLYDE&CO

Although the Responsible Court has the discretion to issue its resolutions, it **does not have the discretion to act against its own determinations or to leave them without effect without any basis whatsoever.**

When issuing a resolution, the provisions of the resolution must be complied with, in order to generate legal certainty. If it is illegal or erroneous, it may be subject to modification or revocation, but only through the mechanisms and procedures provided for by the legal system.

In this order of ideas, it is illegal what the Responsible Court considered in the sense that the fact that it resolved only with what was manifested by CI Banco was simply "*the power of the judge to resolve according to the elements available in the record*". The foregoing is affirmed because, the unclaimed power **does not relieve the court from complying with what was previously ordered and allowing the correct execution of the request to Wilmington Trust, especially if the latter <u>sought to be informed about the compliance with the Precautionary Measures, which was essential to know the validity of the Alleged RUA</u>**.

The foregoing, in addition to the fact that the statements expressed by CI Banco **made no reference to the compliance with the Precautionary Measures, but limited themselves to argue that the filing of the petition for bankruptcy had supposedly not been approved**. Therefore, **it is completely false that the Responsible Court had the necessary elements to decide on the compliance with the Precautionary Measures**.

In this order of ideas, it is clear that the Complaint Order generates instability and legal uncertainty for the Complainant because the Court went against its own determinations, by considering that the injunction was satisfied without having been complied with in its entirety.

The Responsible Court should have obtained all possible elements in order to issue a complete and congruent resolution. However, as a consequence of the Order of Withdrawal now confirmed by the Order Challenged, this was not possible since the Wilmington Trust report was not available.

For the aforementioned reasons, the Order under appeal violates the principle of legal certainty and the principle of congruence and completeness of judicial decisions.



**SIXTH.    THE RESPONSIBLE COURT STARTS FROM ERRONEOUS PREMISES AND DOES NOT UNDERSTAND THE *RATIO OF* THE GRIEVANCES FORMULATED BY THE PLAINTIFF, SINCE THE LATTER DOES NOT COMPLAIN ABOUT A MERE GRANTING OF EFFECTS TO THE ALLEGED RUA, BUT ABOUT THE FACT THAT IT FAILED TO EVALUATE THE REST OF THE EVIDENCE AND REASONS THAT DEMONSTRATED THE INVALIDITY OF SAID RESOLUTION, VIOLATING THE PRINCIPLE OF CONTRADICTION SINCE, CONTRARY TO WHAT WAS SUSTAINED BY THE RESPONSIBLE COURT, THE LATTER DID IMPLICITLY REJECT THE PROMOTIONS FORMULATED BY THE CONTROLLER.**

<u>Synthesis</u>.        At the time of deciding on the request for dismissal, the Responsible Court was faced with a clear controversy: requests were filed by different persons, which were distantly opposed to each other (on the one hand, the dismissal of the insolvency proceeding was requested and, on the other hand, the continuation of the insolvency proceeding and the disregard of the personality of the other promoter was requested). Therefore, in order to be able to decide on these, the Responsible Court should have respected the principle of contradiction and carried out a procedure that allowed both parties to be heard and defeated; even more so, if the decision would entail the disregard of the personality of the legitimate representatives of the Complainant, which evidently cannot be made in a unilateral manner. However, in the Complained Order, the Responsible Court limited itself to sustain that it should not have followed any procedure, since the only thing it did was to recognize the legal value of a new power of attorney, being that the mere recognition does not constitute the violation alleged by the Complainant, but the fact that it completely ignored the multiple complaints, arguments and evidence that demonstrated the invalidity of the power of attorney under which the Attorney-in-fact intended to act.

<u>Development</u>.

    a.    <u>Due Process, guarantee of hearing and the principle of contradiction.</u>

The content and scope of these rights have already been developed in the third concept of violation; therefore, in order to avoid unnecessary repetitions, it is requested that said considerations be considered as if they were inserted.

    b.    <u>The Responsible Court violated Dolphin's right to due process, the right to a hearing and the principle of contradiction to the detriment of Dolphin.</u>

As described in the "Background" chapter, prior to the issuance of the Order of Dismissal, several questions were submitted to the Responsible Court:

    (i)        on the one hand, the legitimate representatives of Controladora denounced the violation of Precautionary Measures as a consequence of the execution of the Alleged RUA and the presentation of the withdrawal, requesting then that the legal effects of the RUA not be recognized;



(ii)     at the same time, in contradiction to what was done by the legitimate representatives of Controladora, Controladora's attorney-in-fact appeared in support of its legal standing in the Alleged RUA and argued the withdrawal of the reorganization proceeding, requesting that the acts performed by the legitimate representatives of Controladora be disregarded.

(iii)    Consequently, the legitimate representatives of Controladora filed a **plea of lack of legal standing against** Controladora's attorney-in-fact, in which they again requested the Responsible Court not to grant any legal effect to the Alleged RUA;

(iv)    the Responsible Court required Wilmington Trust and CI Banco to report on the compliance with the Precautionary Measures, prior to ruling on the request for withdrawal.

(v)     CI Bank complied with such request, without referring to or justifying the extrajudicial execution of the pledges on the shares of Controladora, and

(vi)    the legitimate representatives of Controladora expressed their clear will to continue with the Concurso Mercantil.

From the foregoing, it is possible to conclude that the Responsible Court was faced with a clear controversy: on the one hand, the legitimate representatives of Controladora denounced the illegal execution of guarantees and the consequent need to not recognize the legal effect of the dismissal of the Concurso Mercantil and, on the other hand, alleged attorneys-in-fact requested the dismissal and claimed to have the representation of the Complainant.

However, instead of deciding on such requests, the Responsible Court limited itself to accept the withdrawal formulated by the Representative Judges. In the Complained Order, said Court justified its decision in the fact that it only limited itself to recognize the validity of a corporate act (the Alleged RUA), arguing that by its action it did not violate the right of due process or the principle of contradiction since it did not "unofficially revoke" the personality of the attorneys-in-fact of Controladora, being that "*the fact that a representative has been substituted through corporate channels does not require specific pronouncement of the judging person.*" Evidently, such determination is illegal.

In the first place, this Court must warn that the Responsible Court started from an inaccurate assessment of the grievance suffered by the Complainant and the true nature of the violation in which she incurred.

The Complainant does not intend to sustain the legal or material impossibility for a legal entity to grant new powers of attorney in favor of third parties, as the Responsible Court conveniently tries to reduce the argument. Nor does Controladora deny the possibility of



"substitution" of a representative, nor the need for a special judicial procedure whenever the recognition of a new representative is sought.

The violation committed by the Responsible Court is not limited simply to the fact that it recognized the effects of the Alleged RUA and the actions of the Attorney Generals; the violation alleged by the Complainant, and which is now claimed in this amparo proceeding, is that such assessment was made **without taking into consideration the multiple evidence and arguments offered by the Complainant to demonstrate the illegality of such resolution, an omission that <u>constitutes a frontal violation of the right to due process and the principle of contradiction</u>.**

Beyond the fact that the Responsible Court was or was not empowered to recognize the effects of a corporate act, what is certain is that such recognition was made in the context of a **legal proceeding**, so that in view of the existence of clear and convincing allegations regarding the invalidity of such act (mainly, In view of the existence of clear and convincing allegations regarding the invalidity of such act **(mainly,** in view of the clear allegations of non-compliance with the Precautionary Measures), the fact is that prior to deciding on the dismissal of the insolvency proceeding, the Responsible Court **should have granted a hearing to the parties in order to know the "legal truth" and, consequently, decide on the effects of the alleged RUA**.

In order to do so, the Responsible Court should have processed the motion for lack of standing filed by the Complainant **prior to resolving the dismissal**, and/or **resolving the Appeal for Revocation against Recognition of** Attorney-in-fact**, as has been demonstrated in previous concepts of violation.**

Now, in the event that the Responsible Court considered that some special proceeding was required, the Commercial Bankruptcy Law itself, which in Article 267 allows the proceeding in the incidental way of "various issues that may arise during the commercial bankruptcy." In this order of ideas, in order to decide whether or not the Alleged RUA had violated the Precautionary Measures and, therefore, whether it should recognize its effects, then **it should have opened an incident that would allow the parties to formulate their arguments**.

Furthermore, even if the Court considered that it was not necessary to proceed with the motion, the Responsible Court **should have at least heard the statements of the Court Representative and CI Banco, <u>prior to deciding to proceed with the dismissal filed</u>**; even more so, if the legitimate representatives of the Complainant were clear in their will to continue with the bankruptcy proceeding.

Contrary to the Responsible Court's argument, although the recognition of legal standing did not imply that "*a proceeding within the insolvency proceeding must be exhausted*", the evaluation of the evidence and arguments that demonstrated the illegality of the alleged RUA and, therefore, the lack of legal standing of the Representative Agents **was a matter that necessarily had to be resolved in advance and in compliance with essential procedural formalities in favor of the legitimate representatives of Controladora.**

77



However, the Responsible Court ruled in favor of the withdrawal **without respecting the principle of contradiction, completely yielding to the request made by the Attorney-in-fact without taking into consideration or granting a hearing guarantee to their legitimate representatives**, who are the ones who requested the declaration of insolvency proceedings from the beginning.

In this sense, contrary to what the Responsible Court maintains in the Complaint, the fact that it did not hear the arguments of the legitimate representatives of the Merchant, only processing the arguments of its counterpart, is a clear violation of the **principle of contradiction and the right to due process of the Complainant.**

Furthermore, the fact that the Responsible Court simply ignored the multiple complaints and promotions of the legitimate representatives of Controladora to challenge the Alleged RUA and demonstrate its illegality, **did imply an illegal disregard of their personality to their detriment**.

The Responsible Court supported the omission to hear the legitimate representatives of the Complainant on the grounds that this "*does not constitute an informal revocation [of the personality], but the natural result of a corporate change duly formalized and communicated to the court*"; however, as this Court will notice from what has been stated so far, the truth is that the Responsible Court only took notice of the communication of the Power of Attorney, and not of those made by the legitimate representatives of Controladora duly informing it of **the lack of powers of said** attorneys-in-fact**.**

That is, contrary to what the Responsible Court maintains, the decision to only "hear" the arguments of certain representatives, **despite the fact that there were other arguments made by the representatives recognized in the insolvency proceeding, does imply an implicit and unilateral disregard of the legitimate representatives of Controladora, which violates the principle of contradiction and the right to due process.**

Moreover, the mere fact that it has processed the request of the Complainant's attorney-in-fact to withdraw from the reorganization proceeding implies, materially and consequently, that **it ignored the legal representatives of Controladora's legitimate representatives since, despite the fact that they expressly stated their will to initiate and continue with the reorganization proceeding, this was ignored and what was expressed by the attorney-in-fact of Controladora was preferred.**

The foregoing, in addition to the fact that the General Shareholders' Meeting and the Meeting of the Board of Directors under which the representatives of the Complainant supported their legal standing, **remain in force without any evidence to the contrary and, notwithstanding the foregoing, the Responsible Court only granted validity to the Alleged RUA.**



In this order of ideas, it is evident the contradiction in which the Responsible Court incurs when sustaining that it limited itself to simply recognize the validity of a corporate act, since the truth is that the **invalidity of those acts, validly adopted by the corporate bodies of Controladora, in which it was decided to initiate the insolvency proceeding, had not been demonstrated** in the record**.**

Therefore, there is no valid justification for the Responsible Court to arbitrarily recognize the validity of the acts of the Proxy Holders and not the validity of the corporate acts performed to support the request for the dismissal of the insolvency proceeding.

Furthermore, the Responsible Court **expressly and previously recognized the legal standing of the Complainant's representatives**, only to later ignore their petitions and process only those of the Controladora's attorney-in-fact.

This material disregard of the personality of the Complainant's legitimate attorneys-in-fact could not be carried out unilaterally, much less unofficially, as the Responsible Court did.

In respect to the principle of contradiction and due process, any decision (even implicit) on the personality of the legitimate representatives of the Complainant should have been adopted **only as a consequence of having followed an incidental proceeding for such purpose**; in this respect, the following criteria are relevant by analogy:

> **"PERSONALITY OF THE PLAINTIFF. ITS INFORMAL EXAMINATION IS IMPROPER IF IT WAS PREVIOUSLY EXPRESSLY RECOGNIZED AND WAS CONSENTED THE RESOLUTION IN THAT IT HAPPENED. (LEGISLATION OF THE STATE OF PUEBLA).** Articles 238 and 222 of the Code of Civil Procedures read as follows: "Article 238. The Judge, in the order in which he provides the claim, will previously study its competence and the personality of the plaintiff. If he decides that he is competent and that the plaintiff has the personality he claims, he shall admit the claim and order the defendant to be summoned, if it complies with the legal requirements". "The following provisions shall apply to the personality of the litigants: I. It may be challenged: a) In a complaint against the order recognizing the personality; or b) As an exception when answering the claim. II. Once the personality has been challenged by one of the means set forth in the preceding section, it may not be challenged by the other. III. When, once the claim has been answered, the lack of capacity has a supervening cause, it may be challenged in an incident. IV. The incident referred to in the preceding section will be processed as provided in Articles 632 and 633, but if before resolving the incidental question, the main business is summoned for judgment, the proceeding will be suspended in this one, so that both questions can be resolved in a single judgment, and if the lack of personality is declared admissible, the main business will also be declared not to be in a state to issue a judgment. From the foregoing it follows that if the Judge expressly recognizes the personality of the plaintiff and the defendant does not exhaust any of the two alternatives that the law grants to challenge such determination, such determination must be deemed to be consented and therefore the informal examination that is subsequently sought is undue in accordance with the legal principle of estoppel. This criterion finds support in the final part of the jurisprudence of the Supreme Court of Justice of the Nation, published in the Appendix to the Judicial Weekly of the Federation 1917-1985, Fourth Part, page 614, which reads: "PERSONALITY, EXAMINATION OF THE.-The personality of the parties is a procedural requirement that must be examined ex officio by the judge, as expressly provided in article 47 of the Code of Civil Procedures for the Federal District, in connection with articles 35, section IV, and 36 of the



Therefore, it must also resolve the objection presented by the parties, regardless of the time at which they do so, because the lack of timely challenge cannot generate the existence of a representation that does not exist, and it must only omit the reiteration of the examination of personality, in case it has been expressly resolved before and the ruling is consented, because then the principle of preclusion operates."[62]

**"THE COURT OF APPEAL DOES NOT PROCEED WITH ITS INFORMAL STUDY WHEN IT HAS BEEN RESOLVED IN THE FIRST INSTANCE AND       THIS CONSENTED    THE RESPECTIVE    JUDGMENT    .**
**(LEGISLATION OF THE STATE OF MICHOACAN).** When the Judge of first instance expressly resolves the issue related to the lack of legal standing, in the respective incident, and such resolution is not challenged by the injured party, the study indicated ceases to be informal; therefore, the responsible Magistrate was correct in considering that the complaints formulated by the appellant in this respect were not defensible, because this had already been resolved through the interlocutory ruling pronounced in the incident that the appellant had filed regarding the lack of legal standing and personality, which became final since it was not appealed by the parties, and such pronouncement must be considered consented by the petitioner of guarantees, since to consider otherwise would be an attempt against the finality of the proceeding, which is a guarantee of the parties, in terms of article 96 of the adjective code of the entity."[63]

Therefore, contrary to what is maintained in the Complaint, the fact that the Responsible Court has materially disregarded the personality of the legitimate representatives of the Complainant without previously following an incidental proceeding **violates to its detriment** the **right to due process and the principle of contradiction.**

In view of such violation, this Court must grant the protection and protection of the justice of the Union in order to revoke the Order in Complaint.

**SEVENTH. CONTRARY TO WHAT THE RESPONSIBLE COURT MAINTAINS, THE WITHDRAWAL FORMULATED BY THE ALLEGED ATTORNEYS-IN-FACT WAS INDEED PROMOTED BY THE CREDITORS OF THE PLAINTIFF, FOR WHICH REASON IT WAS ENTITLED TO EXERCISE THE POWERS GRANTED TO IT BY ARTICLE 87 OF THE BANKRUPTCY LAW, WHICH DO NOT DEPEND ON THE ISSUANCE OF A BANKRUPTCY JUDGMENT.**

<u>Summary</u>.        Since the First Complaint of Violation of Provisional Measures (and, subsequently, in the Motion for Lack of Personality), the Responsible Court was requested to warn that the Alleged RUA, under which the Attorney-in-fact sustained his legal standing and the withdrawal of the insolvency proceeding, constituted an act evidently carried out by the creditors of the Complainant for the undue, indiscriminate and preferential collection of their credits, which was not allowed by virtue of the principle of par condicio par conditio, was an act evidently carried out by the creditors of the Complainant for the undue, indiscriminate and preferential collection of their credits, which was not permitted by virtue of the principle *of par conditio creditorum*, for which reason said Court should exercise the power granted to it by Article 87 of the Commercial Bankruptcy Law and disregard ("consider as not filed") said acts. However, the Responsible Court was completely negligent in undertaking the aforementioned analysis and, consequently, it failed to notice the notorious impropriety of the proposed dismissal. In the Order Complained Against, the Responsible Court intends to support such omission on the following grounds

---

[62] Digital Record: 192974 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;VI.1o.C. J/12 ;J
[63] Digital Record: 202173 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;XI.2o.48 C ;TA



the fact that it was not "proven" that the withdrawal had been formulated by the creditors of the Complainant, in addition to the fact that the powers regulated by article 87 depend on the issuance of a bankruptcy judgment; However, Controladora offered multiple evidence to demonstrate that CI Banco, although its majority shareholder, was one of the main creditors of Controladora and who controlled the execution of aggressive guarantees against it, in addition to the fact that the alleged RUA was executed with the participation of Wilmington Trust, representative of the Bondholders and main creditors of Controladora, so it is evident that the filing of the waiver was an act intended to execute guarantees and unduly and preferentially collect credits to the detriment of Controladora.

<u>Development</u>

    a.  <u>The *par conditio creditorum* principle in bankruptcy proceedings.</u>

In the explanatory memorandum of the Bankruptcy Law, the legislator made clear the intention of the bankruptcy proceeding and the protection that such proceeding provides to the merchants:

> "(...) Production chains are integrated vertically and horizontally, nationally and internationally, technologically and sectorally. Increased competitiveness forces some companies to respond nimbly to new market niches and to abandon those where they no longer have competitive advantages. As society modernizes, the number of companies increases, and so do the factors that make their competitiveness, profitability and permanence in the market vary.

> There is, however, a serious problem when there are conditions that lead an entrepreneur, quickly and irremediably, to face economic and financial problems: even when this is caused by an error of calculation or foresight made by an honest, competent and prosperous entrepreneur. The company, considered as the organization of work, tangible and intangible assets destined to produce or professionally offer goods and services to the market, with lucrative purposes, can be successful or find itself in serious difficulties that threaten its survival. The bankruptcy of a company is not a singular and concrete breach of an obligation, but a general breach, which affects all those related to the company: it also affects the economic survival of the workers who work in it, so that its bankruptcy has repercussions on its entire social environment.

> In addition, **when a company is unable to comply in a generalized manner with its liquid obligations vis-à-vis a plurality of creditors, there is a risk of a situation in which the collection through individual action by its creditors results in a detriment to the total value of the company. In this case the individual action may also affect the priority that existed among the creditors, resulting in inequities. This is the moment in which bankruptcy law must direct its regulations to try to prevent the company from failing, to avoid wasting the creative effort already made by the entrepreneur, and to avoid harming the social conglomerate which, to some extent, benefits from the operation of the company. The possible bankruptcy is therefore an economic phenomenon, and the purpose of bankruptcy legislation is precisely to address the social ills derived from this singular phenomenon.**

> With regard to the legal framework regulating commercial relations between private parties, it must be taken into account that in the past Mexican courts and their procedural laws were created to solve problems of companies established in smaller cities, in which all the actors knew each other and met every day in public places and at work. In such social conditions it was feasible to assume in the judge basic knowledge and the immediacy with the company, necessary to solve many problems.



of the problems caused by the lack of liquidity. In addition to the fact that the cases of cessation of payments were fewer in a society that showed a lower degree of development. Nowadays, life in cities does not allow judges to personally meet the parties involved, the number of businesses submitted to them is overwhelming, the size and complexity of commercial enterprises requires that they be handled by teams of specialists in administration, accounting and in the various fields of commercial, industrial or service activity involved.

For all of the above reasons, the legal framework cannot remain on the sidelines of society's progress. In order to promote healthy and sustained economic growth that offers development opportunities to the entire population, a necessary condition is to have an appropriate legal framework that offers certainty and confidence in the resolution of conflicts between individuals, facilitates the efficient reallocation of productive resources in the economy, and contributes to ensure that the exit of companies from the markets affects their social and economic environment as little as possible. The legal framework regulating economic activity in this regard has been modernized in recent years. Not only have trade agreements been established with the main countries of the world, but also the Federal Competition Law has been enacted, and important advances have been made in the way of resolving conflicts between individuals, among them the Arbitration Law.

Bankruptcy law also plays a strategic role. **Its purpose is to order business restructuring processes, seeking firstly to take advantage of the experience and expertise of the food entrepreneur and secondly to ensure that creditors, whether commercial or financial, can also continue to operate. When one body is unable to conclude successfully, the State <u>can play a central role in coordinating efforts, providing a forum where information can flow and viable businesses can take advantage of the opportunity to restructure,</u> continue to operate and maintain employment.** On the other hand, when it is the case that enterprises are no longer viable, the State plays a key role in reallocating productive factors so that workers can find new sources of productive and well-paying employment while assets are taken over by other, more productive enterprises. In this process, creditors and traders obtain the greatest value from the company or its assets, and with the opportunity to resume other businesses and activities that contribute to the general welfare of society.

Thus, the situation of a company facing economic or financial problems that threaten its survival becomes an object of public interest, which requires a participation congruent with the economic reality, relying on the institutions for the administration of justice and, on the other hand, on the experience and knowledge that independent agents can contribute to this type of process. To a large extent, this is the reason for the concern, not only in Mexico but also in countries with a higher degree of economic development, such as Germany, Spain, France, England and Holland, and in countries with a similar economic structure, such as Argentina, Brazil, Chile, Indonesia, Peru and Colombia, to review, update and modernize the legal framework for the bankruptcy of a company (...)".

[Emphasis added]

As can be seen from the foregoing, the Bankruptcy Law was created with the purpose of providing dual protection to the Mexican economic system: on the one hand, it protects **the merchant** from aggressive, indiscriminate and individual collection by its creditors that may **prevent the continuation of its business** and, on the other hand, it also protects the **creditors** so that they can fairly collect their credit.

With respect to the protection of the merchant, the Bankruptcy Law provides for a series of mechanisms to grant such protection. In the first place, there is **the granting of precautionary measures**, which precisely seek to prevent creditors from initiating aggressive collection procedures that would end the possibility of continuing with the business.



As regards the second of the purposes mentioned above, the insolvency principle "*par conditio creditorum*" has been recognized, by virtue of which all creditors **must have equal status with respect to the debtor's assets**, which has been recognized by case law in the following criteria:

"**COMPENSATION OF CREDITS IN THE JUDGMENT OF BANKRUPTCY.**
**CONDITIONS UNDER WHICH IT OPERATES**. One of the basic principles of insolvency proceedings at the bankruptcy stage is that of par condicio creditorum, by virtue of which all creditors, except those of a privileged nature, have equal status vis-à-vis the assets of the common debtor; The principle of par condicio creditorum means that all creditors are equal before the bankruptcy law, which in turn leads to the so-called "law of dividend", which implies that if the assets of the common debtor are insufficient to meet all claims, such assets are divided among the creditors pro rata or in proportion to all claims, so that the sacrifice of the creditors is proportionally equal for all. In accordance with this rule, and except for the exceptions provided by law, the creditors must be paid pro rata to the extent of the assets of the common debtor. Under these conditions, although Article 105 of the Bankruptcy Law allows for set-off and, in accordance with Articles 2185 and 2186 of the Federal Civil Code, set-off operates when two persons are debtors and creditors reciprocally and its effect is to extinguish, by operation of law, the two debts up to the amount of the lesser amount, it must be taken into account that these rules, in the case of bankruptcy, must necessarily be interpreted in accordance with the basic principle of equality previously mentioned, because otherwise, to consider that the set-off proceeds credit against credit, would imply attributing to the creditors entitled to set-off a privilege that the law does not grant them, to enforce their credit in conditions of advantage over the others, since it would not be done on a pro rata basis, since once the bankruptcy is declared, all the assets of the bankrupt become unavailable because they are exclusively destined to the satisfaction of the mass of creditors, under the principle of equality; Consequently, it is not possible to dispose of one of the elements of such assets to pay with it a creditor in a situation of advantage over the others, and precisely the compensation in substance is equivalent to a payment, inasmuch as although the debtor does not deliver the thing owed, he gives in payment his own right to the performance that his creditor owed him."[64]

"**CONCURSO MERCANTIL. WHEN A CREDITOR IS ALLOWED TO EXECUTE GUARANTEES AND OBTAIN THE TOTAL OR PARTIAL AMOUNT OF ITS CREDIT WITHOUT SUBMITTING TO THE PROCEDURE SET FORTH IN THE APPLICABLE LAW TO DETERMINE THE ORDER AND PRIORITY OF THE CREDITS, THE PAR CONDICIO CREDITORUM PRINCIPLE IS CONTRAVENED.**

Facts: A creditor of the merchants enforced the guarantees granted in a contract entered into prior to the bankruptcy proceeding and during its processing, thus obtaining part of its credit to the detriment of the other creditors, having thereby violated provisions of public order (Commercial Bankruptcy Law) **that seek to protect both merchants and creditors based on the par condicio creditorum principle, by virtue of which all creditors, except those of a privileged nature, have equal status vis-à-vis the common debtor's assets**; principle of equality of condition, which means that all creditors are equal before the insolvency law, its purpose being the pro rata (proportional) satisfaction of the rights of the creditors, respecting the respective preferential position that they have by virtue of the law.

Legal criterion: This Collegiate Circuit Court determines that allowing a creditor in a bankruptcy proceeding to execute guarantees, thus obtaining the total or partial payment of its credit without following the order and priority regulated in the Commercial Bankruptcy Law, contravenes the principle of par condicio creditorum and, in the case of a creditor, it is contrary to the principle of par condicio creditorum.

---

[64] Digital Record: 2017608 TCC;10a. Época;Gaceta del Semanario Judicial de la Federación;I.8o.C.61 C (10a.) ;TA; Publication: Friday, August 17, 2018 10:25 am.

CLYDE&CO

Consequently, public policy provisions are violated to the detriment of other creditors.

Justification: The foregoing, because the breach of the par condicio creditorum principle occurs when a creditor is allowed to receive an early payment of its credit, or when a creditor is favored with better guarantees after the commencement of the reorganization proceeding. Therefore, in accordance with the reasoning of the Bankruptcy Law, the general rule of said principle is that all creditors have the right to be creditors under equal conditions with respect to other creditors of the same type; however, said general rule allows for exceptions, which are strictly limited in the applicable law, as is the case with creditors that have a special privilege over the rest, due to the nature of their credit, for example, with tax, social security or labor credits, just to cite a few examples; Therefore, **this principle is violated when in a bankruptcy proceeding one or several creditors are allowed to execute guarantees, thus obtaining part or all of their credits, without observing the provisions of the Bankruptcy Law to establish the order and priority of credits**, which translates into a violation of the provisions of public order that compose it."[65]

[Emphasis added]

As can be inferred from the aforementioned criteria, the "*par conditio creditorum*" principle implies in principle **the impossibility of creditors to enforce their guarantees for the collection of their credits** without observing the provisions of the Bankruptcy Law; the foregoing, since it would be unfair to the rest of the creditors to allow the collection of their credits in a preferential manner and in a clear undue affectation to the debtor's patrimony.

In the last of the precedents cited above, the Eighth Collegiate Court in Civil Matters in Mexico City interpreted a case in which the merchant requested that measures be decreed in its favor to prevent the declaration of a default under a bond agreement and to prevent one of the creditors from enforcing guarantees that would allow it to appoint new directors and administrators of the company. *The ratio decidendi* of such precedent was to decide whether a stay granted in amparo that prevented the bankruptcy court from applying article 87 of the Commercial Bankruptcy Law to prevent the execution of guarantees and to consider as not enforced certain clauses that prevented the Complainant from filing for bankruptcy proceedings was valid; in this regard:

"Article 1 of the Bankruptcy Law provides that it is in the public interest to preserve companies and to prevent widespread noncompliance with payment obligations from jeopardizing the viability of such companies and others with which they maintain a business relationship.

Article 3 of the Commercial Bankruptcy Law establishes that the purpose of the conciliation is to achieve the preservation of the merchant's business through the agreement entered into with its recognized creditors, while the purpose of the bankruptcy is the sale of the merchant's business, its productive units or its assets for the payment of the recognized creditors.

What gave rise to the amparo lawsuit was the request of the traders for a measure to annul contractual clauses that would allow the bondholder to declare a default by the traders, i.e., they sought to prevent the guarantees from being executed as agreed in the bond issuance agreement entered into with the traders.

---

[65] Digital Record: 2025038 TCC;11a. Época;Gaceta del Semanario Judicial de la Federación;I.8o.C.11 C (11a.) ;TA; Publication: Friday, August 05, 2022 10:13 am



Ltd. and Nordic Trustee Asa, on January twenty-fourth, two thousand fourteen; also, that the shares not be transferred to Ond Pte. Ltd.

In this regard, it **was argued that allowing the creditor Nordic Trustee Asa to enforce the guarantees would imply rendering the insolvency proceeding ineffective, pointing out that its main purpose is not to lead the merchants directly to bankruptcy and that the situation described above would affect the economic objectives of the State in relation to its citizens**; Since the main objective of the Law of Commercial Insolvency is to preserve the companies and prevent the generalized noncompliance of their payment obligations from jeopardizing their viability, as well as that of their correlative companies with which they do business, the plaintiffs assert that it seeks to protect the company to preserve its operation and the jobs it generates, in order to preserve the balance between the merchant and its creditors.

Now, it should be specified in the first place that the provisions contained in the Bankruptcy Law are of public order, since they tend to protect the interests of an entire collectivity and the national economy, which is confirmed by the statement of motives of such legislation enacted by decree published in the Official Gazette of the Federation on May 12, 2000, from which it is clear that the main purpose of such law is to maximize the value of a company in crisis through its preservation, thus protecting the employment of its human resources and avoiding the negative economic repercussion to society caused by the loss of a company that provides goods or services. It also seeks to maintain the principle of equality among creditors.

In effect, from the explanatory memorandum of the Bankruptcy Law it is evident that the legislator provided that the insolvency of a company involves employees, suppliers and the population as consumers or clients, which is negative for the society of the Mexican State.

From this point of view, in principle, it would be inappropriate to grant the suspension in the amparo proceeding filed against the determination of the bankruptcy judge in which, applying Article 87 of the Bankruptcy Law, he leaves without effect contractual clauses, considering that their content aggravates the situation of the merchants, because, on the one hand, Article 128 of the Amparo Law expressly states that this precautionary measure will not proceed when the social interest is prejudiced or public order provisions are contravened (...).

Therefore, if the suspension of the effects of the challenged resolution were granted in the terms established by the District Judge in the appealed interlocutory decision, it would not cause the application of clause 15.1 (g) (i) of the bond issuance agreement, since the consequence of the suspension would be that the resolution in which said clause was determined as inapplicable would be provisionally without effect, that is, that it would continue to be applied; **such circumstance would conflict with the determination of the responsible party to consider the clause in question as unenforceable, in addition to <u>allowing the prior enforcement of the guarantees by a creditor, which would be detrimental to the group of creditors, since this could cause the merchants to be left without assets and, therefore, leave the insolvency proceeding without subject matter</u>**.

Thus, it is evident, in principle, that if the definitive suspension of the challenged acts were granted in the terms established by the amparo judge, the social interest would be affected because the community would be deprived of a benefit granted to it by the Bankruptcy Law, and it **could cause damage by continuing to apply a clause that it was considered should be considered as not having been applied, by aggravating the situation of the company and violating the principle of "par condicio creditorum"** and consequently violating the provisions of the Bankruptcy Law, as well as the economy and the social interest.

Certainly, **the aforementioned "par condicio creditorum" principle means that the bankruptcy law must protect the integrity of the assets and the equality of creditors within the bankruptcy, so that both guiding principles of the bankruptcy (the integrity of the assets and equality among creditors) must be protected by the law, <u>from the moment the debtor formally manifests its will to submit to the bankruptcy.</u>**



**insolvency regime**. Its purpose is the pro rata satisfaction (proportionality) of the creditors' rights, respecting the respective preferential position that they have by virtue of the law.

The breach of the "par condicio creditorum" principle **occurs when a creditor is allowed to receive an early payment of its claim, or when a creditor is favored with better guarantees after the commencement of the** insolvency **proceeding.**

Therefore, according to the explanatory memorandum of the Mexican Bankruptcy Law, the general rule of the "par condicio creditorum" principle is that **all creditors have the right to be paid on an equal basis with respect to other creditors of the same type**. However, such general rule allows for exceptions, which are strictly limited in the Bankruptcy Law itself, as is the case with creditors that have a special privilege over other creditors, due to the nature of their credit, as is the case, for example, with tax, social security or labor credits, just to cite a few examples.

Hence, **the "par condicio creditorum" principle means the possibility that creditors enter the insolvency proceeding under equal conditions for the payment of their claims**, however, this does not mean treating unequals equally, since the rule is to treat equals equally, that is, that they are in the same conditions.

In this order of ideas, it could be concluded that it is not appropriate to grant the definitive suspension of the challenged acts, in the terms decreed by the District Judge in the appealed interlocutory decision, since **this would be allowing the creditor Nordic Trustee As to collect its credit in advance, appropriating the assets of the merchants to the detriment of its other creditors; which would be contrary to the purpose pursued by the Commercial Bankruptcy Law** (...).

This does not admit any other interpretation, but **the bankruptcy judge, when deciding on the non-application of certain contractual clauses, necessarily also refers to the "par condicio creditorum" principle, according to which the creditors have the right to collect their credits under the terms, conditions and priority provided in the Commercial Bankruptcy Law, without any of them being able to collect their credit in advance during the bankruptcy proceeding.**

The "par condicio creditorum" principle **seeks to solve the problem that arises when, in a given legal situation, more than one creditor is in a position to pay its claim on the assets of the debtor who is in insolvency**. The condition of equality or equal treatment advocated by the principle in question refers to creditors of equal rank, so that common creditors will not enter on equal terms in relation to privileged creditors.

In the specific case, in the resolution indicated as the claimed act, the bankruptcy judge left without effect the notice of default of the bond agreement entered into on January twenty-ninth, two thousand fourteen, by Oro Negro Drilling Pte, as pledgee and Nordic Trustee, As., as pledgee, on the shares of Oro Negro Primus, Oro Negro Decus, Oro Negro Laurus and Oro Negro Fortius, all Pte. Ltd., and as a consequence, also set back the effects of that notice, in the following aspects (...)

The enforcement of the guarantees by the creditor Nordic Trustee As. would result in the insolvency and bankruptcy of the merchants having no purpose, since there would be no estate to liquidate; ergo, the claims of the other creditors could not be paid either, all this in contravention of the principle of "par condicio creditorum" (...)".

[Emphasis added]

As can be inferred from the aforementioned text, said Collegiate Court interpreted that an axis of the insolvency proceeding is the protection of creditors so that they enter the insolvency proceeding under equal conditions for the payment of their credits and that, consequently, the insolvency judge must **watch over the integrity of the insolvency patrimony from the beginning of the insolvency proceeding to the end of the insolvency** proceeding.



The **purpose is to <u>avoid the indiscriminate collection or execution of guarantees prior to the</u>** filing of the insolvency proceeding <u>**and if the insolvency proceeding is followed.**</u>

b.    <u>The application of Article 87 of the Commercial Bankruptcy Law</u>.

Now, in order to ensure the protection of the principle of *par conditio creditorum*, as stated in the aforementioned precedent of the Eighth Collegiate Court, the bankruptcy court may use several tools.

Among them is the decree of precautionary measures (such as those decreed by the Responsible Court), which prevent the indiscriminate execution of guarantees or the aggressive collection of credits. In addition to such tool, there are provisions that precisely seek to avoid the possibility that any legal act entered into by the merchant prior to the filing of the reorganization proceeding may prevent it from accessing such proceeding. On this point, Article 87 of the Commercial Bankruptcy Law provides:

> "Article 87.- **Any contractual stipulation that on the occasion of the filing of a petition or lawsuit for bankruptcy**, or of its declaration, establishes modifications that aggravate for the Merchant the terms of the contracts, shall be deemed not to have been made, except for the exceptions expressly set forth in this Law."

[Emphasis added]

In the precedent cited in the immediately preceding section, the Eighth Collegiate Court mentioned that said precept could serve as a basis for "considering corporate acts as not having been put in place", such as, for example, the declaration of termination of a bond agreement, with the purpose of **protecting the merchant and privileging the principle *of par conditio creditorum.***

In these terms, the scope of the aforementioned provision has been interpreted jurisprudentially in the sense that the bankruptcy court is empowered to **suspend the effects of any contractual stipulation** that, due to the filing of the petition for bankruptcy, aggravates the situation of the merchant, in the following terms:

> "INSOLVENCY PROCEEDING. THE JUDGE MAY SUSPEND THE EFFECTS OF ANY CONTRACTUAL STIPULATION THAT ON THE OCCASION OF THE FILING OF THE RELATED PETITION OR ITS DECLARATION, ESTABLISHES MODIFICATIONS THAT AGGRAVATE THE SITUATION OF THE MERCHANTS OR PREVENT THE INITIATION OF THE INSOLVENCY PROCEEDING.
>
> Facts: The merchants, for purposes of the admission of their insolvency proceeding, requested the Judge of knowledge to leave without effect clauses of a contract entered into with their main creditor that stipulated the need for their approval through the opinion of an independent advisor so that the insolvency proceeding could be initiated.
>
> Legal criterion: This Collegiate Circuit Court determines that the Judge may suspend the effects of any contractual stipulation that establishes modifications due to the filing of the bankruptcy petition or its declaration.



that aggravate the situation of the merchants or prevent the initiation of the insolvency proceeding.

Justification: The foregoing, because the application of Article 87 of the Commercial Bankruptcy Law, which states: "Any contractual stipulation that on the occasion of the filing of a petition or lawsuit for mercantile bankruptcy, or of its declaration, establishes modifications that aggravate for the merchant the terms of the contracts, shall be deemed not to have been made, except for the exceptions expressly set forth in this law."This does not imply nullifying, modifying or extinguishing the contracts or their statutory clauses under the protection of the laws to which the merchants and their creditors have been subject, but only inapplying them so as not to aggravate the situation of the petitioners of the insolvency proceeding, on the basis that its fundamental purpose is to preserve them while maintaining a principle of equality among the creditors. Therefore, if a contractual clause is deemed not to be enforced, it is to suspend its effects for the sole purpose of allowing the merchants to initiate their insolvency proceedings, without requiring the consent of their creditors"[66].

This precedent arose from a case in which the company **granted its shares in guarantee** in favor of one of its creditors, which implied the modification of its bylaws and the impossibility of filing a petition for bankruptcy, as can be seen in the following excerpts from the above-mentioned precedent:

> "Prior to the study of the grounds of disagreement, it is necessary to establish that the complainants accept **that their shares were delivered in guarantee**, as well as that their bylaws were amended and that, therefore, according to their bylaws, they are in the cases contemplated in articles 2, 88A and 111A or 115A (depending on the company), which provide for (...)
>
> That is, the plaintiffs agree that they agreed in their bylaws that in order to initiate a bankruptcy proceeding it was their will that an independent director should be appointed, whose appointment should be approved by the credit institution. Also, that the business and affairs of the companies should be managed under the direction of the directors (not through a sole shareholder). However, **they assert, that bylaw clauses 2, 88A and 111A or 115A (depending on the partnership) should have been deemed not to have been put in place because they depend on the will of their creditor** (...)"

[Emphasis added]

Consequently, in such precedent, the Eighth Collegiate Court in Civil Matters of the First Circuit interpreted the scope of article 87 of the Mexican Bankruptcy Law in the following terms:

> "As already noted, the plaintiffs confess that their bylaws were amended to adopt the form of administration and decision-making stipulated therein; also, that their shares are encumbered by virtue of what they called "stock contracts" and that said shares guarantee the corporate debt they contracted with ****** ******* ***.
>
> This means that before initiating insolvency proceedings, the approval of the directors (managing directors of the companies) and, if applicable, of the independent director they appointed (they did not prove that they had done so) was required because it was expressly provided for in their bylaws.
>
> The fact that ****** ******* ****, as principal creditor, may or may not have disagreed with or accepted the independent director appointed by the plaintiffs, is merely a supposition that has not been proven, since the plaintiffs did not

---

[66] Digital Record: 2023843 TCC;11a. Época;Gaceta del Semanario Judicial de la Federación;I.8o.C.101 C (10a.)
TA; Publication: Friday, November 26, 2021 10:37 am



appointed that director as they were obligated to do, however, they requested the declaration of their insolvency through their sole shareholder (...)

However, our daily reality is marked by multiple situations in which causes beyond the control of the subjects cause that the commitments contracted by them do not come to fruition. This is what is known as a supervening impossibility to fulfill the obligation.

These external causes that prevent the parties from performing are varied, such as natural disasters that physically destroy the object of the relationship, legal provisions that prohibit the performance of the obligation, death or illness of the debtor of a very personal obligation, lack of cooperation of the creditor, among others.

Article 1943 of the Federal Civil Code provides that conditions that are impossible to give or to do, those prohibited by law or that are against good customs, nullify the obligation that depends on them.

This supervening and non-culpable impossibility must also be objective and not subjective, which has been understood in two senses. Some consider that the difference lies in the extent of the impediment, i.e. the impossibility is objective when the performance is not susceptible of being performed by anyone. Performance must be impossible for the obligor and for any other person.

The extraordinary difficulty of performance occurs in the event of a supervening alteration of the circumstances of the contract that break the contractual equilibrium as agreed by the parties and entail the excessive onerousness of one of the benefits.

The obligee's cooperation may be necessary to enable the obligor to perform exactly as agreed. This cooperation of the obligee is based on good faith, which is projected throughout the contractual relationship.

The obligee's cooperation **should not be understood as a duty to perform or an accessory duty, but as a burden on the obligee. Thus the obligee who does not fulfill its burden may cause its obligor to be unable to perform the due performance, giving rise to a transitory impossibility, or even to a** definitive **impossibility** of performance. Giving rise to a supervening impossibility of performance due to a cause not attributable to the obligor.

It follows from the foregoing that the judge hearing a bankruptcy proceeding (in this case a petition for), must adjust his actions to the mandates of the law and may not attribute to himself greater powers than those permitted by law.

Article 87 of the Commercial Insolvency Law provides that any contractual stipulation that establishes modifications that aggravate for the merchant the terms of the contracts will be deemed not to have been entered into; this provision refers to the contracts that the merchant has entered into with other individual or collective legal entities.

Thus, the aforementioned articles of the bylaws may contravene the provisions of the Mexican Bankruptcy Law, which establishes that it is in the public interest to preserve companies and prevent the generalized noncompliance with payment obligations from jeopardizing the viability of such companies and of others with which they maintain a business relationship.

The guiding principles of the Bankruptcy Law are: the public interest, equal treatment of creditors, universality, the principle of preservation of the company and the principle of orderly liquidation of the bankrupt company.

**The public interest is basically justified for two reasons: a) because it is in the interest of the Mexican State to preserve the country's productive plant and sources of employment (the principle of preservation of the company) and b) because the generalized non-compliance with the obligations of a trader can lead to the loss of the company's assets, and c) because the generalized non-compliance with the obligations of a trader can lead to the loss of the company's assets.**

89



**The insolvency law may generate damage to the commercial traffic of the country, since it is feasible that it may derive in a generalized insolvency problem due to contagion (if one merchant does not pay another, it is possible that this second merchant may not be able to pay a third one).** In itself, bankruptcy matters are part of the economic policy of the Mexican State, so it is logical that Article 1 of the Bankruptcy Law clearly establishes that the law is vested with public interest.

The first effect of the public interest is derived from the provisions of Article 6 of the Federal Civil Code, which establishes that the will of private parties may not waive the observance of the law, nor alter or modify it. Private rights that do not directly affect the public interest may only be waived when the waiver does not prejudice the rights of third parties.

Pursuant to Article 1 of the Bankruptcy Law, its second paragraph states that: "It is in the public interest to preserve companies and prevent that the generalized default of payment obligations jeopardize the viability of such companies and others with which it maintains a business relationship....". PJF- Public Version As of the 2014 reform, it is included within the public interest of the bankruptcy law, to conserve companies that have contact with a company that defaults in the payment of its obligations on a generalized basis, i.e., it tries to avoid bankruptcies by contagion.

**The company is considered a good that generates benefits for the community (it provides jobs and generates internal wealth), and therefore must be protected by the State. This principle of preservation of the enterprise gives meaning to the principle of public interest, including the law is of public interest because its primary purpose is the preservation of the enterprise.**

It should be clear that the purpose of this principle is to protect the conservation of the company, not its owners or shareholders.

Universality is one of the characteristics of insolvency and succession proceedings. It is universal in two senses, since it affects all of the merchant's assets and all of the merchant's claims, hence the concepts of active mass (all of the merchant's assets) and passive mass (all of the merchant's debts).

Derived from this principle of universality, two secondary principles are generated: procedural uniqueness and uniqueness of patrimony. **The first one refers to the fact that there must be only one proceeding and therefore this process has the quality of attracting any other proceeding against or followed by the merchant; and the second one indicates that the merchant's patrimony must be unique and must be submitted in its entirety to the bankruptcy proceeding.**

Finally, **the principle of equal treatment of creditors derives from the universality of insolvency proceedings. If all of the merchant's claims are affected, it is logical that <u>all creditors are treated equally</u>.**

**The Commercial Bankruptcy Law itself establishes that the creditor <u>has a subjective public right to request the opening of the bankruptcy proceeding</u>. If the procedural and material requirements that condition the opening of the insolvency proceeding are effectively met, <u>the creditor has an undoubted subjective and public right, because it is addressed to the State to request and request that the Judge agree to the opening of the insolvency proceeding</u>.**

The articles of association of the plaintiffs are contrary to the provisions of Section VII of Article 20 of the Commercial Bankruptcy Law, since they contain a legal obstacle that prevents them from initiating the procedure, which is contrary to the principles governing the procedure, i.e., the public interest, equal treatment among creditors, universality and the principle of preservation of the company and above all violates the right of access to justice of the plaintiffs (...)."

[Emphasis added]

90



As can be inferred from the foregoing, said Court interpreted that the Bankruptcy Law provides for a **right of the companies to have the bankruptcy proceeding opened when the requirements for such proceeding are met**, relieving them from the compliance of contractual commitments that may prevent the exercise of such right.

In these terms, according to the cited precedent, it is clear that the bankruptcy court has the obligation to remove any obstacle to access bankruptcy protection and, in compliance with a mandate of public order, it may waive ("disregard") contractual provisions or legal acts that in any way impede access to the bankruptcy proceeding.

c.      <u>Case in point</u>.

From a simple reading of the Alleged RUA, it is possible to conclude that the alleged legal standing alleged by the Court Representative of Controladora is based on the alleged extrajudicial execution of guarantees to the detriment of the Complainant and that, consequently and contrary to what the Responsible Court maintains, **the withdrawal of the petition for reorganization was <u>indeed promoted by its creditors.</u>**

As mentioned above, it is necessary to start from the proven premise that CI Banco **is a creditor of Controladora**. As can be seen in the Trust Agreement, CI Banco is the trustee of the Irrevocable **Guarantee** Trust CIB/2380, which was **created for the purpose of <u>guaranteeing the obligations assumed in the Financing Agreements and for the purpose of affecting most of the assets of Controladora</u>**, including its shares.

It is as a consequence of the execution of such Trust Agreement that in the current corporate structure of Controladora CI Banco appears as holder of 99% of its shares. However, it is emphasized to this Tribunal that such ownership is exercised **as a consequence of the constitution of a pledge in favor of Wilmington Trust and the Bondholders**. In fact, in section 2.05 of the Trust Agreement[67]it was clearly agreed that the sole purpose of the ownership of the shareholding rights, which integrate the trust patrimony, was to **guarantee the compliance of the Financing Agreements**:



---

[67] The same was attached to the bankruptcy petition as Exhibit "'''".



> Sección 2.04.  **FINES DEL FIDEICOMISO**.  Los fines del presente Contrato de Fideicomiso (los "_Fines del Fideicomiso_") son garantizar el puntual y debido cumplimiento, pago y satisfacción a su vencimiento (ya sea a su fecha de vencimiento programado, por vencimiento anticipado o por cualquier otro motivo) de todas y cada una de (i) las Obligaciones Garantizadas Senior, en favor del Fideicomisario en Primer Lugar, en nombre y para el beneficio de los Adquirentes Senior, y (ii) de manera subordinada, conforme a lo previsto en el Convenio entre Acreedores y de Subordinación, las Obligaciones Garantizadas Subordinadas, en favor del Fideicomisario en Segundo Lugar, en nombre y para el beneficio de los Adquirentes Subordinados.  Para tales efectos, el Fiduciario deberá:
>
> (a)  ser el único y legítimo propietario y titular del Patrimonio del Fideicomiso (trasmitido al Fiduciario en esta fecha o en cualquier momento posterior conforme a los términos previstos en este Contrato de Fideicomiso), libre de cualesquier Gravámenes, durante la vigencia de este Contrato de Fideicomiso y, en todo caso, hasta que (i) todas las Obligaciones Garantizadas Senior hayan sido Pagadas en Su Totalidad, y el Fideicomisario en Primer Lugar confirme dicho cumplimiento, pago y satisfacción mediante la entrega de una Notificación de Terminación del Fideicomisario en Primer Lugar al Fiduciario (con copia al Fideicomisario en Segundo Lugar) conforme a la Sección 3.01, y (ii) todas las Obligaciones Garantizadas Subordinadas hayan sido debida y legalmente satisfechas y pagadas e irreversiblemente liquidadas en su totalidad, y el Fideicomisario en Segundo Lugar, respectivamente, confirme dicho cumplimiento, pago y satisfacción mediante la entrega de una Notificación de Terminación del Fideicomisario en Segundo Lugar al Fiduciario conforme a la Sección 3.01;

The foregoing shows that CI Banco's ownership of Controladora's shares is the exclusive consequence of **the guarantees constituted by the latter in favor of Wilmington Trust, without it being an unconditional assignment or with the intention that said trust company would corporately integrate Controladora**.

In that sense, although CI Banco is a shareholder of Controladora, it is evident that it **is also its creditor, since several guarantees are constituted in its favor (all of which are recorded in the bankruptcy proceeding)**, in **addition to the fact that it is the trustee of a** guarantee trust, **constituted in favor of the Bondholders, main creditors of Controladora.**

In addition to the foregoing, according to the Financing Agreements **exhibited to the Responsible Court since the filing of the petition for bankruptcy**, it is clear that Wilmington Trust acted as "Collateral Agent" of the Bondholders, the main creditors of Controladora. Therefore, it is clear that Wilmington Trust **is also a creditor of Controladora or, at least,** was the common representative of its main creditors.

In that sense, contrary to the Responsible Court's opinion, it is true that it is duly demonstrated that **CI Banco and Wilmington Trust** are Controladora's creditors (and, in fact, they are the main creditors).

In fact, **the Responsible Court itself implicitly recognized that CI Banco and Wilmington Trust were Controladora's creditors**. Thus, as described in the "Background" chapter, by orders dated January 31, 2025 and February 27, 2025, **it ordered that they be notified of the Precautionary Measures and bound them to comply with them.**

It is completely incongruous that the Responsible Court now claims that "it was not proven" that CI Banco and Wilmington Trust are the main creditors of Controladora, when the Responsible Court had already recognized this.



Now, the Alleged RUA was entered into precisely by CI Banco and Wilmington Trust, as can be seen from a simple reading of the public instrument in which it is recorded. Therefore, contrary to what the Responsible Court maintains**, it is evident and it is duly demonstrated that the Alleged RUA was entered into by the main creditors of Controladora and that, in fact, it is the product of an extrajudicial execution of guarantees**.

In this regard, in the "Background" of the Alleged RUA, Wilmington Trust and CI Banco stated that its execution was only possible as a consequence of the execution of *(i)* the declaration of an "Event of Default" under the Financing Agreements, and *(ii)* the extrajudicial execution (through the improper exercise of rights) of the pledges constituted on the shares of Controladora.

Consequently, since the First Complaint of Violation of Provisional Measures, Controladora warned that any possible action by Controladora's Attorney-in-Fact was not only a flagrant violation of the Provisional Measures decree by the Responsible Court, but also an aggressive act of execution that would seek to deprive Controladora of access to bankruptcy protection and prevent the restructuring of its credits.

As a premonition, the first act to be performed by Controladora's representative (appointed, it is worth mentioning, by the Complainant's creditors, Wilmington Trust and CI Banco) was to **request the dismissal of the Concurso Mercantil**, just a few days before Controladora was declared in bankruptcy.

Based on these premises, if it was duly demonstrated that Wilmington Trust and CI Banco were creditors of Controladora and that they were taking advantage of the guarantees constituted in their favor to enter into the Alleged RUA and file the request for withdrawal, it is certain that, contrary to what is alleged in the Complaint, the Responsible Court, as the governing body of the proceeding, was obliged to evaluate the validity of such act in light of the essential principles that govern insolvency proceedings, among them the *par conditio creditorum* principle; even more so, if **this was expressly requested by the Controladora in the First Complaint of Violation of Provisional Measures**.

In this order of ideas, it is evident that the Responsible Court **did have a serious omission to issue any pronouncement on the evident fact that the Alleged RUA and, ~~consequently,~~ the legal standing held by the President Representative of Controladora was the inexorable product of the extrajudicial execution of guarantees by Controladora's creditors**. This, contrary to what is maintained in the Complaint Order, is illegal.

Contrary to the allegations of the Responsible Court, there was evidence and arguments that fully demonstrated that the alleged RUA was invariably based on the extrajudicial execution of warrants on shares of Controladora, since **this was** even **stated in the text of the resolution itself**.

93



This extrajudicial execution, which also constitutes a **flagrant violation of the Provisional Measures**, **is independent of the fact that CI Banco is the "majority" shareholder of Controladora, or the fact that the Alleged RUA is recorded in a notarized instrument.** As developed in the second, third and fourth allegations of violation, the fact is that the grounds for invalidity of the Alleged RUA have nothing to do with the shareholding of CI Banco.

Moreover, the fact that CI Banco is the majority shareholder **does not mean that it is not, in turn, one of the main creditors of Controladora (as in fact had been recognized by the Responsible Court) and that therefore its acts should be analyzed under the scrutiny of a creditor.**

In this sense, the fact that the alleged RUA was recorded in a notarial instrument is also irrelevant, since, as has been demonstrated in previous claims of violation, this does not relieve the Responsible Court from analyzing the multiple grounds for invalidity of said resolution.

The truth is that, due to the mere fact that the main creditors of Controladora participated in the Alleged RUA, the Responsible Court had to analyze whether such act is permitted in light of the principle of *par conditio creditorum* and whether, consequently, despite its effects, a future valid restructuring of Controladora and the future collection of the affected debtors' claims would be allowed.

In view of such analysis, the Responsible Court should have inexorably concluded that the extrajudicial execution of guarantees on the shares of Controladora that led to the removal of its Board of Directors and the resolution to withdraw from the reorganization proceedings, as set forth in the Alleged RUA, are matters that **evidently do not respect the principle *of par conditio creditorum.***

This is because, in accordance with the precedents cited in the preceding paragraphs, it is evident that the indiscriminate enforcement of guarantees outside of bankruptcy proceedings **is contrary to the very purpose of bankruptcy proceedings, since it prevents all creditors from exercising their right to collect their claims on equal terms.**

Granting effects to the extrajudicial enforcement of guarantees would then imply that certain privileged creditors **take advantage of the guarantees constituted in their favor to prevent other creditors from collecting their credit and taking control of the bankruptcy estate, <u>even preventing (as in this case) the continuation of the commercial bankruptcy</u>**, which is evidently contrary to the principle *of par conditio creditorum.*

The foregoing, in addition to the fact that in this particular case, Controladora is even being prevented from continuing with the insolvency proceeding and, therefore, from reaching a future restructuring.



Now then, having determined that the granting of effects to the Alleged RUA and the actions of the Controladora's Representative violated the *par conditio creditorum* principle, the Responsible Court **was fully authorized to use the tools within its reach to prevent such act from taking effect** (as it had been requested since the First Complaint of Violation of Precautionary Measures), such as the application of Article 87 of the Commercial Bankruptcy Law.

In the first place, it is necessary to start from the premise that Article 87 of the Bankruptcy Law is not an exclusive effect of the bankruptcy judgment. As has been recognized in the criteria under the heading **"CONCURSO MERCANTIL. THE JUDGE MAY SUSPEND THE EFFECTS OF ANY CONTRACTUAL STIPULATION WHICH, ON THE GROUNDS OF THE PRESENTATION OF THE RELEVANT APPLICATION OR ITS DECLARATION, ESTABLISHES MODIFICATIONS THAT AGGRAVATE THE SITUATION OF THE TRADERS OR PREVENT THE INITIATION OF THE PROCEDURE OF THE INSOLVENCY"[68]** and**"INSOLVENCY. WHEN A CREDITOR IS ALLOWED TO EXECUTE GUARANTEES AND OBTAIN THE TOTAL OR PARTIAL AMOUNT OF ITS CREDIT WITHOUT SUBMITTING TO THE PROCEDURE PROVIDED IN THE LAW OF THE MATTER TO DETERMINE THE ORDER AND PRIORITY OF THE CREDITS, SE CONTRAVENES THE PRINCIPLE PAR CONDICIO CREDITORUM"[69]**, the fact is that the possibility of "disregarding" contractual provisions is a power that can and should be exercised at any stage, in order to **allow access to bankruptcy protection**.

In this order of ideas, from the filing of the petition for bankruptcy, Article 87 of the Commercial Bankruptcy Law allows the bankruptcy court to "disregard" contractual provisions or acts that aggravate the situation of the merchant and prevent her from accessing bankruptcy protection; in these terms, the Eighth Collegiate Court has recognized that such precepts **are suitable** to enforce the principle *of par conditio creditorum* and respect the "subjective right of the merchant" to access the bankruptcy proceeding.

Based on the exercise of such power, as expressly requested to the Responsible Court, the Responsible Court should have simply disregarded ("disregarded") the Alleged RUA and, consequently, **deprived it of its effects, denying the request for withdrawal filed by Controladora's attorney-in-fact**, since it was fully demonstrated that such act was carried out by its creditors with the purpose of achieving an illegal collection of credits.

---

[68]Digital Record: 2023843 TCC;11th Epoch;Gaceta del Semanario Judicial de la Federación;I.8o.C.101 C (10th.) TA; Publication: Friday, November 26, 2021 10:37 am

[69]Digital Record: 2025038 TCC;11a. Época;Gaceta del Semanario Judicial de la Federación;I.8o.C.11 C (11a.) ;TA; Publication: Friday, August 05, 2022 10:13 AM





# PODER JUDICIAL DE LA FEDERACIÓN

**CRYPTOGRAPHIC EVIDENCE - TRANSACTION**

**File Signed:**
415800200000000000048316491.p7m
**Certification Authority:**
**AC OF THE TAX ADMINISTRATION SERVICE**
**Signatory(s): 1**
**This digital document is a true copy of its physical or electronic version, which corresponds to its original.**

ELIDER FLORES CORONA
706e68206c30386a63306000000000c
00006e0c
15/05/25 17:00:00

| SIGNATURE | | | | |
|---|---|---|---|---|
| **Name:** | EDUARDO DE MARTIN ALBOR VILLANUEVA | **Validity:** | WELL | Current |
| SIGNATURE | | | | |
| **No Series:** | 30.30.30.30.31.30.30.30.30.30.37.31.34.32.31.31.32.31.38 | **Revocation:** | Well | Not revoked |
| **Date (UTC/ CDMX)** | 18/06/25 02:15:39 - 17/06/25 20:15:39 | **Status:** | Well | Valida |
| **Algorithm:** | RSA-SHA256 | | | |
| **Signature chain:** | 4e 80 52 70 25 51 c8 db 5b dd ec 00 a6 8c 92 eb 0f 60 4a fa e9 e0 b6 3c 3c 4a 23 90 97 32 e5 b9 d3 76 50 ed 2d 0e f2 67 cd b2 78 a2 14 d9 aa d7 04 43 0f cf 5e 06 11 c2 d9 a3 02 81 f7 2d b1 85 f0 a8 79 f7 cb 0a f4 21 88 a9 7b 21 7b 40 2c 6e 3b d5 52 3b 6e ce 2e 18 8f 48 9e 45 03 79 25 8a 06 ec 15 be 06 37 c2 ac 02 20 0a 81 5b ce 8b 47 e4 fd 6c 44 8c e0 2e fa 48 2b 2e 5d d0 2a 8b 1c 12 ec fd 45 2c 13 10 e5 e9 e9 43 0d 6e 26 8e ac 3e 55 01 05 c8 b8 d4 8c 59 b7 e5 61 0e cd ed c6 76 5d 38 49 f1 d4 31 3e 54 59 59 b7 63 cd 5b 01 79 33 8b e2 66 b0 42 c7 8e b6 8d b4 35 c0 cb c3 1a 28 d9 d1 83 02 a8 8f 46 b7 ac 27 95 f2 70 8a 63 2a f5 a6 42 7e 0a 21 ea 5b d1 6f e4 00 ab a5 7b 34 c9 7b e6 58 da b7 6e 6a 28 57 e8 cd f2 67 a4 19 73 55 f9 30 06 f8 9b 66 9e fb 55 8c c8 aa 8f 60 | | | |

| OCSP | |
|---|---|
| **Date: (UTC/ CDMX)** | 18/06/25 02:15:08 - 17/06/25 20:15:08 |
| **Name of respondent:** | OCSP SAT |
| **Responder sender:** | AC OF THE TAX ADMINISTRATION SERVICE |
| **Serial number:** | 30.30.30.30.31.30.30.30.30.30.37.31.34.32.31.31.32.31.38 |

| TSP | |
|---|---|
| **Date : (UTC/ CDMX)** | 18/06/25 02:15:41 - 17/06/25 20:15:41 |
| **Name of the sender of the TSP response:** | Federal Judiciary Council Time Stamp Issuing Authority |
| **TSP certificate issuer:** | Intermediate Certifying Authority of the Federal Judiciary Council |
| **TSP response identifier:** | 13220710 |
| **Stamped data:** | iDkjJfJg5UF23LiG6LCm5PkejVY= |

As has been recognized in the precedents cited above, the exercise of this power would have allowed the Responsible Court to deprive of effects an act that evidently intends to deprive Controladora of access to the bankruptcy proceeding (in spite of meeting the requirements for it) and that, in addition, **privileges the actions of certain creditors who illegally seek the extrajudicial execution of pledge guarantees for the preferential collection of their credits.**

Contrary to what was sustained in the Order in Remedy, beyond allowing Controladora's attorney-in-fact to withdraw from the bankruptcy proceeding and to recognize the effects of the Alleged RUA, since it is evident that it violates the principle of *par condictio creditorum* by being the product of the illegal execution of pledge guarantees and pretending to deprive the rest of the creditors and the merchant itself to have access to a future restructuring, the Court should have applied Article 87 of the Commercial Bankruptcy Law and disregarded the Alleged RUA in order to protect the insolvency estate and allow the bankruptcy proceeding to fulfill its purposes, in order to protect the insolvency estate and allow the reorganization proceeding to fulfill its purposes, it should have applied article 87 of the Commercial Insolvency Law and **disregarded the alleged RUA ("consider it as not filed") and denied the withdrawal of the requested proceeding.**

By failing to act in such manner, and by failing to even undertake an analysis of the exercise of the aforementioned powers as expressly requested by the Controladora, it is evident that the Order is illegal and, therefore, this Court must grant the protection and protection of justice of the Union requested.

**EIGHTH.   CONTRARY TO WHAT THE RESPONSIBLE COURT MAINTAINS, THE FACT THAT THE RESPONSIBLE COURT OVERLOOKED THE FACT THAT THE WITHDRAWAL FILED BY THE ALLEGED ATTORNEY-IN-FACT OF CONTROLADORA IS THE RESULT OF THE FLAGRANT VIOLATION OF THE PRECAUTIONARY MEASURES, ARE NOT ISSUES UNRELATED TO THE CONTROVERSY AND, ON THE CONTRARY, SHOULD HAVE BEEN ANALYZED BY THE RESPONSIBLE COURT BEFORE DECIDING ON THE WITHDRAWAL FILED BY THE ALLEGED ATTORNEYS-IN-FACT .**

<u>Synthesis</u>.        In spite of having been denounced by Controladora in a timely manner, when deciding on the withdrawal filed by Controladora's Representative, the Responsible Court failed to analyze that it was an inexorable product of the extrajudicial execution of guarantees in violation of the Precautionary Measures, and therefore should not have recognized any legal effect to such act. This matter is inexorably related to the present controversy and was not beyond the powers of analysis of the Responsible Court.

<u>Development</u>

As described in the "Background" chapter, from the admission of the reorganization proceeding, the responsible court decreed the Precautionary Measures, among which, it ordered the

*(i)* the **suspension of any judicial <u>or extrajudicial</u> proceeding for the enforcement of guarantees**; *(ii)* prevented the perfection of any guarantee granted by the Parent Company, and

*(iii)*   the prohibition to rescind or terminate early any contract to which the Parent Company is a party.



By agreements dated January 31, 2025 and March 28, 2025, the Responsible Court ordered that the Provisional Measures be notified to CI Banco, as trustee of the Guarantee Trust, and to Wilmington Trust, as Collateral Agent of the Financing Agreements; recognizing, consequently, the obligation of both legal entities to comply with the Provisional Measures.

This obligation was endorsed on April 7, 2025, when the Responsible Court justified the denial of new precautionary measures requested by Controladora against CI Banco and Wilmington Trust in the fact that the measures already decreed had already been notified to them, considering this sufficient to protect the rights of the Complainant.

In this regard, since the admission of the reorganization proceeding, the Provisional Measures were fully in force and, long before the alleged execution of the alleged RUA, it is evident that both CI Bank and Wilmington Trust were properly notified of the measures and, therefore, bound to comply with them.

Notwithstanding the foregoing, CI Banco and Wilmington Trust entered into the Alleged RUA **aware of the validity of and compliance with the Precautionary Measures**; such their brazenness, that in the background of said resolution they even stated that this was possible **as a consequence of the extrajudicial execution of pledges to the detriment of the Controladora's shares**, as described in the "Background" chapter.

Based on this premise, when Controladora's legal representative appeared before the Bankruptcy Court to request its dismissal, Controladora was clear in requesting that it be dismissed, since it was evident that it was the result of a flagrant violation of the Precautionary Measures (since guarantees had been illegally executed to the detriment of Controladora).

In these terms, in the First Complaint of Violation of Precautionary Measures, Controladora requested not only to impose injunctive relief against CI Banco as Wilmington Trust, but also to warn of the illegality of its acts, particularly of the Alleged RUA and, consequently, not to grant it any legal effect whatsoever.

However, when deciding the dismissal of the Concurso Mercantil, the Responsible Court failed to notice, or even analyze, the fact that this was a consequence of a flagrant violation of the Precautionary Measures and the effects that they should have entailed in order to dismiss the petitions filed by Controladora's Counsel. This is clearly illegal.

In the first place, the Responsible Court overlooked the fact that the Precautionary Measures decreed constitute a **legitimate mandate of authority**, and therefore are **strictly complied with** by the affected parties.



Beyond the criminal or civil liability that may derive from the breach of a precautionary measure, a relevant issue to note is the effects that may be recognized to the infringing act (if any).

To resolve this question, it is sufficient to resort to the general theory of the validity of legal acts to note that an act carried out in contravention of a court order **lacks any legal effect**.

In this regard, the Federal Civil Code provides the following requirements of validity, without which the act may be invalidated:

> "Article 1795.- The contract may be invalidated:
>
> I. By legal incapacity of the parties or or of one of them;
>
> II. Due to vices of consent;
>
> III. **Because its object, motive or purpose is <u>unlawful</u>**;
>
> IV. Because the consent has not been manifested in the form established by law."
>
> <div align="right">[Emphasis added]</div>

In this sense, it is understood that a fact or act is unlawful when it is contrary to the laws of public order or good customs. The foregoing is based on the Federal Civil Code:

> "Article 1830.- The fact that is contrary to the laws of public order or to good customs is illicit."

Now, if an act is unlawful in its object, motive or purpose, because it is contrary to the laws of public order or good customs, this produces the nullity of the same, either absolute or relative, as provided by law.

> This is based on Article 2225 of the Federal Civil Code:

> Article 2225.- Illicitness in the object, purpose or condition of the act produces its nullity, either absolute or relative, as provided by law.

According to this article, nullity due to illegality may be absolute or relative. However, the law does not use these terms again in relation to nullity due to illegality.

In order to distinguish the type of nullity due to unlawfulness, we must rely on the principle of rigidity of absolute nullity, in the sense that absolute nullity must have three characteristics: *(i)* It must not disappear by confirmation, *(ii)* It must not disappear by prescription and *(iii)* It must be invoked by any interested party. The foregoing is based on the following article of the aforementioned law:

> "Article 2226.- Absolute nullity as a general rule does not prevent the act from provisionally producing its effects, which shall be retroactively destroyed when the



> The nullity may be pronounced by the judge. Any interested party may avail himself of it and it does not disappear by confirmation or prescription."

On the other hand, relative nullity must differ in at least one of them:

> "Article 2227.- Nullity is relative when it does not have all the characteristics enumerated in the preceding article. It always allows the act to provisionally produce its effects."

In this sense, in order to know what type of nullity it is, we will have to pay attention to the characteristics attributed to it in each specific case.

However, in those cases in which its characteristics are not established, the doctrine has held that it is necessary to distinguish whether the rule protects a general interest or a particular one. In the first case, the contravention of such rule gives rise to absolute nullity and, in the second case, it gives rise to relative nullity.

In the present case, since these are precautionary measures dictated in a commercial bankruptcy proceeding, it is clear that this is a rule of **public order and interest,** since there is a public interest that, through the commercial bankruptcy, companies are preserved and that the generalized noncompliance with payment obligations does not jeopardize their viability and that of the other companies with which they maintain business relations.

This is based on Article 1 of the Bankruptcy Law:

> "This Law is of public interest and its purpose is to regulate insolvency proceedings.
>
> It is in the public interest to preserve the companies and to prevent the generalized noncompliance with payment obligations from jeopardizing the viability of such companies and of others with which they maintain a business relationship. In order to guarantee adequate protection to creditors against the detriment of the patrimony of companies in bankruptcy, the judge and the other subjects of the process regulated in this Law must govern their actions, at all times, under the principles of transcendence, procedural economy, celerity, publicity and good faith."

In addition, said law, when regulating the precautionary or precautionary measures, empowers the Judge to issue the measures he deems necessary in **order to safeguard the public interest provided for in article one of the law.** The content of said article is transcribed below:

> "Article    26.-
>
> (...)
>
> The judge, at the request of the Merchant, or ex officio, shall issue the precautionary measures deemed necessary in order to avoid jeopardizing the viability of the company as a result of the claim or others that may arise during the visit, or aggravating such risk, in order to safeguard the public interest provided for in article one of this Law".



Based on this premise, it is evident that if an act occurs in contravention of precautionary measures decreed in a bankruptcy proceeding, then such act **is null and void and lacks any legal effect.**

Therefore, if in the specific case *(i)* the Provisional Measures expressly ordered that no judicial or extrajudicial guarantee be executed to the detriment of the Controladora; *(ii)* the Provisional Measures were notified to Wilmington Trust and CI Banco and, therefore, they were bound to comply with them and *(iii)* notwithstanding the foregoing, Wilmington Trust and CI Banco executed out-of-court pledges and, in illegal exercise of alleged powers obtained from such execution, entered into the Alleged RUA, it is evident that the latter **lacked any legal effect, since it was the inexorable product of the flagrant violation of the Provisional Measures.**

In this order of ideas, upon filing the First Complaint of Violation of Precautionary Measures (and, if applicable, upon resolving the motion for lack of standing filed by Controladora) and before deciding on the withdrawal filed, the Responsible Court **should have analyzed whether <u>or not</u> the Alleged RUA, under which the Court of Appeals of Controladora intended to support its legal standing, <u>violated the Precautionary Measures and, if so, whether it should have recognized any legal effect or noted that it was null and void.</u>**

Evidently, based on the premises developed above, such analysis should have led the Responsible Court to conclude that the execution of the alleged RUA, being the product of the extrajudicial execution of guarantees to the detriment of Controladora, invariably **violated the Precautionary Measures and, therefore, was an <u>unlawful act that could not be recognized as having any legal effect whatsoever.</u>**

Consequently, the Responsible Court **should have declared the existence of a violation of the Precautionary Measures, dictated measures of constraint and, evidently, disregarded any validity or effect to the Alleged RUA** (including, by majority of reason, the withdrawal filed by the Controladora's Attorney-in-fact).

Although it would appear that the Responsible Court in issuing the Injunction to Wilmington and CI Banco intended to undertake the analysis noted above (appearing to seek to obtain evidence of a violation), it is clear that this was not done in the Order Complained Against.

Acting illegally and ignoring the evident violation of the Precautionary Measures, when deciding in favor of the dismissal of the Concurso Mercantil, the Responsible Court limited itself to considering that it "could not ignore" the existence of the Alleged RUA, **but did not rule on the flagrant violation of the Precautionary Measures and the effects that this had on the Alleged RUA.**

Moreover, as will be discussed in more detail in subsequent concepts of violation, the Responsible Court even acted contrary to its own determinations and ignored the injunction that had been issued to it.



The company considered that its compliance was no longer necessary in order to decide the effects of the withdrawal that had been submitted to it.

It even overlooked that CI Banco, when supposedly reporting on the compliance with the Precautionary Measures, only argued that it had allegedly been "deceived" (which is evidently false) and that it had not acted on Controladora's assets; **however, it did not justify or pronounce itself on its participation in the execution of pledges on Controladora's collateral**.

In this order of ideas, it is evident that the Responsible Court simply decided to ignore the violation of the Precautionary Measures and its own mandate, ignoring the obvious fact that, as a consequence of such violation, the Alleged RUA had no effect and, therefore, the President Attorney of Controladora **did not have the authority to request the dismissal of the Concurso Mercantil**.

In addition to the foregoing, the Responsible Court's argument that the precautionary measures could not be interpreted as prohibiting the right of the shareholders to decide the withdrawal of the insolvency proceeding does not go unnoticed. However, such argument does not respond to the omission to analyze the violation of the Precautionary Measures that should have culminated in the disregard of the Alleged RUA.

That is, it is not intended to disregard the power of a party in a judicial proceeding to decide the dismissal; what is certain is that the Responsible Court is misrepresenting the claims formulated by the Complainant. The violation incurred by said court is that **it failed to analyze the invalidity of the alleged RUA <u>as a consequence of the violation of the Precautionary Measures</u>**.

While it is true that the Provisional Measures did not in themselves prevent the filing of a request for withdrawal, **they did prevent the possibility of enforcing guarantees to the detriment of the Controladora and, nevertheless, the Alleged RUA was entered into <u>precisely as a consequence of an illegal extrajudicial enforcement of guarantees to its detriment</u>**.

In this order of ideas, it is evident that the Responsible Court should have noted that the Alleged RUA **was a consequence of the inexcusable violation of the Precautionary Measures and that, therefore, <u>it should not be recognized as having any legal effect whatsoever</u>**, thus rejecting the withdrawal presented by the Attorney-in-fact of Controladora.

By omitting such analysis and, consequently, **not noticing the flagrant violation of the Precautionary Measures on which the dismissal was based**, the Responsible Court acted unlawfully in issuing the Requested Order. Therefore, this Court must grant the amparo and protection of the justice of the Union to revoke it and order the continuation of the reorganization proceeding.



**NINTH. CONTRARY TO WHAT THE RESPONSIBLE COURT MAINTAINS, IT WAS OBLIGED TO ISSUE THE INSOLVENCY JUDGMENT AFTER THE NON-REASONABLE PERIOD FOR DOING SO HAD ELAPSED, ESPECIALLY SINCE THE CONDITIONS FOR THE DECLARATION OF INSOLVENCY HAD BEEN PROVEN. .**

<u>Summary</u>.        The Bankruptcy Law is clear in establishing that it is sufficient to prove that the assumptions referred to in Article 10 have been met and that the term referred to in Article 42 has elapsed in order for the merchant to be declared in bankruptcy. In this case, both requirements were met, and therefore the Responsible Court should have issued a judgment declaring the bankruptcy proceeding and not give priority to the withdrawal filed by the Attorney-in-fact of Controladora, which was not granted until after the fatal term for the issuance of the bankruptcy proceeding judgment had elapsed.

<u>Development</u>

As has been developed in previous concepts of violation, the insolvency proceeding is a judicial proceeding of public order that seeks to privilege the protection of merchants and the possibility that their creditors receive a fair payment of their credits through a restructuring procedure, a matter that was recognized in the explanatory memorandum of the insolvency law.

Based on such premises, the possibility of requesting the declaration of an insolvency proceeding has been recognized in case law as an authentic **subjective right**. On this point, it is convenient to cite some considerations sustained by the Eighth Collegiate Court in Civil Matters of the First Circuit when ruling on the direct amaro 836/2019:

> "According to Article 1 of the Bankruptcy Law, its second paragraph states that: "It is in the public interest to preserve the companies and prevent that the generalized default of payment obligations jeopardizes the viability of such companies and others with which it maintains a business relationship....". PJF- Public Version As of the 2014 reform, it is included within the public interest of the bankruptcy law, to conserve companies that have contact with a company that defaults in the payment of its obligations on a generalized basis, i.e., it tries to avoid bankruptcies by contagion.
>
> **The company is considered a good that generates benefits for the community (it provides jobs and generates internal wealth), and therefore must be protected by the State. This principle of preservation of the enterprise gives meaning to the principle of public interest, including the law is of public interest because its primary purpose is the preservation of the enterprise**.
>
> It should be clear that the purpose of this principle is to protect the conservation of the company, not its owners or shareholders.
>
> Universality is one of the characteristics of insolvency and succession proceedings. It is universal in two senses, since it affects all of the merchant's assets and all of the merchant's claims, hence the concepts of active mass (all of the merchant's assets) and passive mass (all of the merchant's debts).

102



Derived from this principle of universality, two secondary principles are generated: procedural uniqueness and uniqueness of patrimony. **The first one refers to the fact that there must be only one proceeding and therefore this process has the quality of attracting any other proceeding against or followed by the merchant; and the second one indicates that the merchant's patrimony must be unique and must be submitted in its entirety to the bankruptcy proceeding.**

Finally, **the principle of equal treatment of creditors derives from the universality of insolvency proceedings. If all of the merchant's claims are affected, it is logical that <u>all creditors are treated equally</u>**.

**The Commercial Bankruptcy Law itself establishes that the creditor <u>has a subjective public right to the opening of the bankruptcy proceeding</u>. If the procedural and material requirements that condition the opening of the insolvency proceeding are effectively met, <u>the creditor has an undoubted subjective and public right, because it is addressed to the State to request and request that the Judge agree to the opening of the insolvency proceeding.</u>**

The articles of association of the plaintiffs are contrary to the provisions of Section VII of Article 20 of the Commercial Bankruptcy Law, since they contain a legal obstacle that prevents them from initiating the procedure, which is contrary to the principles governing the procedure, i.e., the public interest, equal treatment among creditors, universality and the principle of preservation of the company and above all violates the right of access to justice of the plaintiffs (...)."

[Emphasis added]

The above, without overlooking the fact that since it is a judicial proceeding, its access and the possibility of acting in it are **guarantees of the rights of access to justice and effective judicial protection**, which also imply the provision of **prompt justice**, <u>**within the legal terms established for such effect**</u>, as was recognized by the First Chamber of the Supreme Court of Justice of the Nation in the thesis entitled **"GUARANTEE TO JURISDICTIONAL PROTECTION PROVIDED FOR IN ARTICLE 17 OF THE POLITICAL CONSTITUTION OF THE UNITED MEXICAN STATES. ITS SCOPE."**

Based on these premises, and taking into account the speed of the insolvency proceedings, the Commercial Insolvency Law imposes as a limit to the powers of the insolvency court the **impossibility of modifying deadlines within the proceedings**, in this respect:

"Article 7. The judge shall be the governing body of the insolvency proceeding and shall have the necessary powers to comply with the provisions of this Law, **without being able to modify any term or term established therein, unless expressly authorized to do so by this Law.** The failure of the judge or the Institute to comply with their respective obligations within the terms set forth in this Law will be cause for liability attributable to the judge or the Institute, except for causes of force majeure or acts of God."

[Emphasis added]

Evidently, such limit constitutes a guarantee of the right of access to justice and allows the merchant to have timely access to the judicial protection granted by the insolvency proceeding in her favor, if the legal requirements for such purpose are complied with.



Based on the foregoing, case law has been clear in recognizing that the deadlines regulated by the Bankruptcy Law **cannot be disregarded**, but that any delay that would go against the principles pursued by the bankruptcy proceeding must be avoided at all costs:

> **"SUSPENSION OF THE CONCILIATION STAGE IN THE INSOLVENCY PROCEEDING. THE JUDGE IS NOT EMPOWERED TO GRANT IT, EXCEPT IN THE CASE OF FORCE MAJEURE.**
> **FORCE MAJEURE OR FORTUITOUS EVENT.** According to the literal meaning of Article 7 of the Mexican Bankruptcy Law, the technical assumptions in which the judge or the Federal Institute of Bankruptcy Specialists may fail to comply with their obligations within the terms established by law without incurring liability are due to force majeure or acts of God. That is, the Judge hearing the insolvency proceeding may not suspend it except for an unforeseeable event caused by a force of nature (vis maior), or by a man-made event (vis absoluta). This has its reason for being, because the legislator in no way intended to grant the Judge of the insolvency proceeding a discretionary power to suspend the proceeding for a determined period of time nor for an indefinite period of time, excluding any type of subjectivity, guaranteeing legal certainty to the parties involved and obliging the judge to act in strict compliance with the provisions of the law; therefore, suspending the conciliation stage in the insolvency proceeding cannot depend on the will or discretionary exercise of the Judge, in order to avoid at all costs any delay that may be detrimental to the interests of any of the parties involved in the insolvency proceeding."[70]

It has even been recognized that the paralyzation of the bankruptcy proceeding or the fact of impeding, in any way, its processing, is prohibited by the Mexican legal system, since it is contrary to public policy, as can be inferred from the following criteria:

> **"CONCURSO MERCANTIL. AGAINST THE RESOLUTION THAT DECLARES THE BANKRUPTCY, IS IMPROPER TO GRANT THE SUSPENSION.**
> **DEFINITIVE.** The main purpose of the suspension in the amparo proceeding is to preserve the subject matter of the constitutional trial, avoiding that damages of difficult repair be caused to the plaintiff, for which it is necessary that each and every one of the requirements referred to in Article 124 of the Amparo Law be satisfied, such as: that no harm be done to the social interest, nor that provisions of public order be contravened. On the other hand, taking into account that the procedure regulated by the Bankruptcy Law is not exclusively intended to satisfy or provide certainty to the interests of private parties, but also plays a strategic role for society, in such a way that said legislation in its numeral 1o. establishes that it is of public interest and that its purpose is to regulate the insolvency proceeding, as well as that it is of public interest to avoid the generalized noncompliance of payment obligations, which translates into an objective element that shows the concern of society as opposed to a particular interest; it is unquestionable that when the definitive suspension of the resolution declaring the bankruptcy is requested, if granted, it would cause greater damages to the community than those that are sought to be avoided with this precautionary measure, since above the particular interest, there is the interest of the community and, even, to protect the rights of the creditors or the estate of the merchant and, at the same time, that with this measure the set of goods and rights that belong to the negotiation in bankruptcy are protected."[71]

> **"INSOLVENCY JUDGMENT. IT IS NOT APPROPRIATE TO GRANT THE SUSPENSION, WITH RESPECT TO ITS PUBLICATION, SINCE IT WOULD AFFECT THE SOCIAL INTEREST THAT PREVAILS OVER THAT OF THE**
> **THE INSOLVENT MERCHANT.** Article 128 of the Amparo Law,(1) establishes the requirements to be complied with for the granting of the suspension.

---

[70] Digital Record: 2004598 TCC;10a. Época;Semanario Judicial de la Federación y su Gaceta;I.3o.C.115 C (10a.) ;TA

[71] Digital record: 166210 Instance: Tribunales Colegiados de Circuito Novena Época Materia(s): Civil Thesis: IV.3o.C.33 C Fuente: Judicial Weekly of the Federation and its Gazette. Volume XXX, October 2009, page 1411 Type: Aislada



of the challenged act, among which are that it does not harm the social interest, nor contravene provisions of public order. In this context, this measure cannot be granted with respect to the publication of the insolvency proceeding judgment, since the weighing of the social interest of making its existence known to all persons who may be interested in resorting to this special and universal process to enforce their rights, indicates that, against the interest of the bankrupt merchant of not seeing his patrimony affected by the payment of the publication expenses, the former must prevail, because the granting of the suspension would have the effect of paralyzing the bankruptcy proceeding, which is of public interest, in terms of Articles 1 and 2 of the Mexican Bankruptcy Law. and 2nd. of the Commercial Bankruptcy Law"[72].

"**SUSPENSION. WHEN THE EXECUTION OF THE APPROVAL OF A BANKRUPTCY AGREEMENT IS CLAIMED, IT IS NOT FEASIBLE TO GRANT IT BECAUSE IT WOULD IMPLY A PREJUDICE TO THE SOCIAL INTEREST        AND    IT WOULD CONTRAVENE    PROVISIONS    OF**
**PUBLIC ORDER.** In order to grant the suspension of the acts claimed in the trial of warranties, the requirements of article 124 of the Amparo Law must be met, namely: that the aggrieved party requests it; that there is no harm to the social interest or contravention of provisions of public order and that, in addition, the damages caused to the aggrieved party with the execution of the act are difficult to repair. With respect to the provisions of public order, they are understood to be those contained in the legal ordinances whose immediate and direct purpose is to protect the rights of the community, to avoid any disorder or disadvantage, or to procure the satisfaction of needs or any benefit or advantage. In the above context, if in the amparo the execution of the judgment that approved a bankruptcy agreement is claimed, and of the provisions of the Bankruptcy Law, it is clear that it is a legal ordinance of public interest that has the purpose of regulating the bankruptcy, which has the purpose of preserving the companies and to avoid that the generalized noncompliance with the payment obligations, The purpose of this law is to preserve the companies and to avoid that the generalized noncompliance with the payment obligations may jeopardize the viability of the companies and of the other companies with which they maintain a business relationship, it is not appropriate to grant the definitive suspension of the execution acts, considering that doing so would paralyze the bankruptcy proceeding, which would imply suspending the execution and compliance of the same, with the consequent withholding of payments to all the recognized creditors, putting the viability of the commercial company at risk; This would even result in the failure to order the lifting of the provisional measures decreed within the insolvency proceeding, to the detriment of creditors and suppliers of the company subject to the insolvency proceeding, the subsistence of the registrations that were made in the Public Registries, and the consequent direct affectation of the rights of the merchant subject to the insolvency proceeding, as well as those of the creditors who signed the agreement and those who did not sign the agreement; in contravention of the content of Article 124, Section II of the Amparo Law, since such consequences would be detrimental to the corporate interest and would contravene public order provisions, since the company is interested in the continuation and conclusion of the insolvency proceedings."[73]

Under the aforementioned premises, it will be evident that the illegality of the Order is evident.

Contrary to what the Responsible Court argued, the mere fact that the term established in Article 42 of the Commercial Bankruptcy Law had elapsed required it to issue the bankruptcy judgment **without there being any impediment to do so**.

It is false, as the Responsible Court argues, that the fact that a request for withdrawal was filed in any way "prevented" it from issuing the bankruptcy judgment.

---

[72] Digital Record: 2009906 Instance: Collegiate Circuit Courts Tenth Epoch Subject Matter(s): Common, Civil Thesis: III.1o.C.25 C (10a.) Source: Gazette of the Judicial Weekly of the Federation. Book 22, September 2015, Volume III, page 2209 Type: Aislada

[73] Digital Record: 163724 Instance: Tribunales Colegiados de Circuito Novena Época Materia(s): Común Tesis: III.2o.C.54 K Fuente: Judicial Weekly of the Federation and its Gazette. Volume XXXII, September 2010, page 1456 Type: Aislada

CLYDE&CO

commercial. The foregoing is affirmed, since the referred term is **non-extendable and non-modifiable,** with **no underlineexceptions to it.underline**

The fact that a request for withdrawal was filed in no way obviated the expiration of the time period for the issuance of the insolvency judgment, which must necessarily have been complied with by the Responsible Court.

Even more so if, contrary to what the Responsible Court maintains, **the extremes for the declaration of bankruptcy were fully demonstrated, underlinewithout this being a simple "subjective assessment", but based on objective elements demonstrated in the fileunderline**.

On the one hand, according to the accounting documents that were submitted to the Responsible Court (and based on which it considered, at least presumptively, that the assumptions to be declared in bankruptcy were met), Controladora demonstrated not only the generalized default of its obligations, but also the fact that its assets correspond **to only 1.28% to meet its obligations**[74].

This financial situation was subsequently verified by the Visitador, who in rendering his opinion considered conclusively that Controladora **met the requirements established in Article 10 of the Bankruptcy Law to be declared in bankruptcy**, as can be seen in the following graphic reproduction:

> Por medio del presente ocurso, en cumplimiento a lo dispuesto por el artículo 40 de la Ley de Concursos Mercantiles (en lo sucesivo "underlineLCMunderline"), así como, al Lineamiento SEXTO de Supervisión de los Especialistas de Concursos Mercantiles, exhibo el **underlineDICTAMEN DE VISITAunderline** en los formatos que, para tal efecto emite el Instituto Federal de Especialistas de Concursos Mercantiles, del cual se desprende que la empresa Controladora Dolphin, Sociedad Anónima de Capital Variable **underlineSÍ SE ENCUENTRA EN LA HIPÓTESIS DEL INCUMPLIMIENTO GENERALIZADO EN EL PAGO DE SUS OBLIGACIONESunderline**, y, por ende, en los supuestos que establece el artículo 10 de la LCM, siendo procedente su declaración del concurso mercantil en **etapa de conciliación**, tal y como lo pidió en su escrito de solicitud.

Based on the foregoing, it was evident that Controladora **should be declared bankrupt**, since all the evidence offered to the Responsible Court showed the inexorable fulfillment of the necessary assumptions for such purpose.

In addition, upon the hearing granted with the Visitor's opinion, Controladora **ratified its full intention to be declared in insolvency proceedings**, requesting the Responsible Court to issue the corresponding judgment within the legal term for such purpose.

In these terms, upon the appearance of the Tradeswoman's attorney-in-fact to request the withdrawal of the insolvency proceeding, the time limit that the Insolvency Court had to issue the insolvency judgment, in accordance with Article 42 of the Insolvency Law, was

---

[74] *See* Annex 1 Section 2 "Manifestation of default or imminent default in the payment of obligations" attached to the petition for the declaration of bankruptcy.

CLYDE&CO

Concursos Mercantiles was running. As described in the "Background" chapter, this fatal term expired on **April 9, 2025, which was inexcusable and could not be extended**.

As the record shows, upon the expiration of such term, the Responsible Court **had not yet admitted the request for withdrawal filed by the Court Representative of Controladora**, since it had reserved it because it was supposed to analyze the compliance with the Precautionary Measures. Therefore, **there was no impediment or legal justification why such court <u>should not have issued a judgment declaring the insolvency proceeding of Controladora</u>**.

If all the evidence showed that Controladora **should be declared bankrupt**, even regardless of the contrary statements of different attorneys-in-fact, the Responsible Court **was obliged to act within the legal deadlines established by the Concurso Mercantil Law and, therefore, <u>it should have issued the bankruptcy judgment no later than April 9, 2025.</u>**

This determination would provide certainty not only to Controladora, but also to all of its creditors whose obligations had been proven to be in default or would imminently be in default, allowing them to access a restructuring procedure that would imply a fair payment of their credits.

In other words, beyond any corporate conflict in which different persons filed contradictory petitions before the Responsible Court, what is certain is that said authority was bound to a fatal deadline to decide, based on the evidence presented (including the opinion of the Visitor), whether or not Controladora should be declared in bankruptcy; once said term was reached, as it was, the Responsible Court **had to issue the corresponding judgment in strict compliance with the bankruptcy law in order to ensure its principles of public order, mainly, the protection and certainty of both the Complainant and its creditors.**

However, in contravention of the essential principles of insolvency proceedings, the Responsible Court **omitted to issue the insolvency judgment** and, instead, preferred to illegally reserve its pronouncement.

The failure to issue such judgment constitutes a clear violation by the Responsible Court that should be sufficient for this Court to grant the protection and protection of the justice of the Union in favor of Controladora, ordering the revocation of the Order in Remedy and the resumption of the reorganization proceeding under the applicable terms set forth in the Concurso Mercantil Law.



**TENTH. THE RESPONSIBLE COURT WAS NEGLIGENT IN NOTING THE ILLEGALITY OF THE ALLEGED RUA, BASED ON THE OBVIOUS FACT THAT IT WAS ENTERED INTO BY THE WILMINGTON TRUST DESPITE THE FACT THAT IT HAD RESIGNED AS "COLLATERAL AGENT", AND THEREFORE DID NOT HAVE THE AUTHORITY TO ENTER INTO IT AND WAS VITIATED BY ABSOLUTE NULLITY, IN ADDITION TO THE FACT THAT THE PROCEDURE FOR THE EXECUTION OF COLLATERAL THAT SUPPORTED SAID RESOLUTION WAS NOT FOLLOWED.**

<u>Summary</u>.        Since the First Complaint of Violation of Provisional Measures, and having reiterated in the motion for lack of legal personality, the Controladora warned that the Alleged RUA lacked any legal effect since, in addition to having been executed in violation of the Provisional Measures, it was evident that the persons who executed it lacked the power to do so. Specifically, Wilmington Trust lacked the power to exercise any shareholder rights since it had waived as "Collateral Agent" to the Financing Agreements, in addition to the fact that the necessary procedure for the execution of the pledges was not followed, so it was evident that it lacked any power to enter into the Alleged RUA, which implies its evident invalidity since it lacked the consent of the shareholders. However, none of this was even analyzed by the Responsible Court despite the fact that, if it had done so, it was evident that it should not have given any effect to the actions of the Controladora's Representative.

<u>Development</u>

As has been developed above, the personality of the parties in a judicial proceeding is considered as an **essential presupposition of the proceeding**, without which, evidently, no action can be allowed.

As a consequence of the foregoing, Article 1057 of the Commercial Code, of supplementary application to the Commercial Bankruptcy Law, allows its analysis to be informal by the judge; in this regard:

> "Article 1057.- The judge **shall examine ex officio the personality of the parties**, but the litigants may challenge the personality of their opponent when they have reasons to do so, in an incidental way that shall not suspend the proceeding and the decision issued shall be subject to appeal in the devolutive effect, of immediate processing, without prejudice to the provisions of Article 1126 of this Code."

> [Emphasis added]

The following criteria are also relevant:

> "**PERSONALITY, EXAMINATION OF THE.** The personality of the litigants is a procedural requirement, that is, a requirement without which the trial cannot be validly initiated or substantiated, since it would not be legal to resolve a controversy in which the parties, or any of them, were not legally represented; hence, the lack of timely challenge of the personality of a litigant can in no way motivate a representation that does not exist; from which it follows that the personality of the litigants is a procedural requirement, that is, a requirement without which the trial cannot be validly initiated or substantiated, since it would not be legal to resolve a controversy in which the parties, or any of them, were not legally represented.

108



The parties must be analyzed, even ex officio, by the judge at any stage of the trial, and he must only omit the reiteration of the examination of the personality, in case it has been expressly resolved before, through the legally appropriate means of challenge, or when in the first instance the defendant has not appeared and in the appeals he fights against the personality"[75].

**"PERSONALITY, EXAMINATION OF THE**. If in terms of article 222, section I, paragraph b) of the Code of Civil Procedures of the State of Puebla, the exception of lack of capacity of the plaintiff was opposed; the judge had the obligation to examine such aspect when pronouncing the judgment, in accordance with the provisions of article 221 of the same legal ordinance, since the personality of the parties is a procedural requirement, that is to say, an indispensable requisite without which a trial cannot be initiated, nor can it be validly substantiated, Therefore, it must be analyzed by the common power even ex officio, that is, regardless of whether or not it has been challenged in a timely manner, either through the exception or the respective incident, since it would be unlawful to rule on the merits when the plaintiff lacks the legal standing to bring the action."[76]

**"PERSONALITY, VERIFICATION OF THE. MUST BE FULL AND DIRECT**. The personality constitutes an indispensable procedural presupposition to validly integrate the procedural relation, whose examination can even be made ex officio with the purpose of maintaining the process ordered to its own end, avoiding to continue a proceeding with a person who is not the legitimate representative and condemning the party without having really heard and defeated him in the litigation. Hence, it must be fully justified and directly stated in the relative document, and in no way deduced on the basis of presumptions, since it is an essential issue in the proceeding"[77].

Based on said considerations, it is evident that beyond the violations committed by the Responsible Court by omitting to process the motion for lack of legal standing filed by Controladora and the analysis of the First Complaint of Violation of Precautionary Measures (which are developed in other concepts of violation), it is certain that said court had a legal obligation to analyze, ex officio, the legal standing of the Attorney-in-fact of Controladora.

In these terms, the Responsible Court was required to analyze the validity of the Alleged RUA in order to determine whether or not Controladora's Chief Representative had the authority to act in the Concurso Mercantil. Evidently, the Court failed to undertake such analysis.

It was enough with the existing evidence in the file for the Responsible Court to notice the irregularities of the Alleged RUA and the evident fact that it lacked legal effects (although, it is reiterated, these reasons were repeatedly stated by Controladora, only that its arguments were illegally ignored).

First, as described in the "Background" chapter, on February 24, 2025, Controladora informed the Responsible Court that it had received two e-mails from Wilmington Trust in which, essentially, it informed the Responsible Court of its resignation as "Collateral Agent" of the Financing Agreements (which, in turn, were exhibited since the petition for the declaration of bankruptcy).

---

[75] Digital Record: 189416 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;VI.2o.C. J/200 ;J

[76] Digital Record: 203267 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;VI.2o.29 C ;TA

[77] Digital Record: 199697 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;XII.2o.9 K ;TA



Wilmington Trust's role as "Collateral Agent" was essentially to represent and exercise the rights of the Bondholders under the Financing Agreements, as is evident from the following clauses:

### NPA 2022

"Section 24, on Collateral Agent.

(a)     The Purchasers and the other Holders desire to appoint a Person to act (and continue to act) as their security agent and representative on their behalf with respect to all matters relating to the Collateral and pursuant to the Security Documents, the other financing documents and the related documents. Accordingly, by execution of this Agreement, each Purchaser and each other holder irrevocably appoints, authorizes and irrevocably appoints Wilmington Trust, National Association, to act as its security agent and representative on its behalf with respect to all matters under the Guaranty and pursuant to the Guaranty Documents, the other Financing Documents and the related documents. Each Purchaser and each other holder grant to the Collateral Agent all powers and authority necessary, desirable or appropriate to carry out the functions and duties delegated or assigned to the Collateral Agent under this Agreement and the other Financing Documents (including the authority to release the Collateral from the Liens created under the Collateral Documents and the other Financing Documents in the circumstances specifically provided for in this Agreement and those)."

### 2019 NPA Amending Agreement. "Section

24.1 Appointment of Collateral Agent.

(a)     Warrant Agent. The Purchasers and the other holders desire to appoint a Person to act (and continue to act) as their collateral agent and representative on their behalf with respect to all matters relating to the Collateral and pursuant to the Security Documents, the other Financing Documents and the related documents. Accordingly, by execution of this Agreement, each Purchaser and each other holder irrevocably appoints, authorizes and irrevocably appoints Wilmington Trust, National Association to act as its security agent and representative on its behalf with respect to all matters relating to the Collateral and pursuant to the Collateral Documents and the other Financing Documents and the related documents. Each Purchaser and each other holder hereby grants to the Collateral Agent all powers and authorities necessary, desirable or appropriate to carry out the functions and duties delegated or assigned to the Collateral Agent pursuant hereto (including the authority to release the Collateral from the Liens created under the Collateral Documents and the other Financing Documents in the circumstances specifically provided for therein."

In these terms, it is evident that his resignation is of the utmost importance. The foregoing because, upon ceasing to act as "Collateral Agent", it is evident that any power of representation in favor of the Bondholders and, therefore, any power to exercise rights under the Financing Agreements or any other derivative or related to them (such as the Pledged Guarantees, which are included in the definition of "Financial Documents" of the Financing Agreements), also ceases.

In those terms, the Financing Agreements provide that upon the resignation of the "Collateral Agent", the Bondholders have the right to designate a person to act as successor to the collateral agent within 20 and 30 days after the resignation, as provided in the NPA 2022 and the Amending Agreement to the NPA 2019, respectively. As an example of the foregoing and the NPAS being substantially similar, the following paragraph is cited.



pertaining to the successor to the Warrant Agent clause of the 2019 NPA Amending Agreement:

**2019 NPA Amending Agreement**. "Section 24.8

Successor Collateral Agent.

The Warrant Agent may resign at any time upon not less than 20 days' prior written notice to the Holders and the Company. Upon receipt of such notice of resignation, **the Required Holders shall have the right to designate a Person to act as successor to the Warrant Agent. If no such successor to the Warrant Agent has been designated and accepted by the Required Holders within 20 days after notice of resignation of the resigning Warrant Agent, the resigning Warrant Agent may, on behalf of the holders, designate a Person to act as successor to the Warrant Agent**, who shall be a Holder, if a Holder is willing to accept such designation, or otherwise shall be a commercial bank or financial institution is organized under the laws of the United States of America or any State thereof and has a combined capital and surplus of at least

$1,000,000,000,000. If no successor to the Collateral Agent has been appointed within 20 days after the date such notice or resignation is given, such resignation shall become effective and the Required Holders shall assume all of its functions from such resigning Collateral Agent hereunder and under the other Financing Documents until such time, if any, as the Required Holders shall appoint a successor to the Collateral Agent as provided above. (...)[78]"

[Emphasis added]

However, as is evident from the foregoing, in the event that the bondholders do not appoint a successor to the "Collateral Agent" within such deadlines, **then the duties of such agent will fall upon them until such time as the corresponding appointment is made**.

Based on the foregoing, as it appears in the file, on March 21, 2025, the Responsible Court was informed that the terms set forth in the Financing Agreements for the appointment of the successor of the "Collateral Agent" had elapsed and that, consequently, in accordance with the applicable clauses mentioned above, it is the Bondholders who perform the functions as such agent. It is reiterated that all this is in the file of the insolvency proceeding and was made duly known to the Responsible Court.

Notwithstanding the obvious fact that by the date indicated it was evident that Wilmington Trust **was no longer acting as "Collateral Agent" of the Financing Agreements**, the purported RUA stated that it was an alleged attorney-in-fact of the latter who entered into it in alleged exercise of shareholder rights under the Financing Agreements:



---

[78] This transcript is contained on page 621 of the document attached to the request for bid as Exhibit "37".





In these terms, a mere analysis of the record of the trial should have made it evident to the Responsible Court that the Alleged RUA was completely invalid.

In order for unanimous resolutions adopted outside a meeting to be valid, several requirements must be met: *(i)* that **all the shares** with voting rights or of the special category of shares in question be **present** and *(ii)* that they be adopted unanimously.

That is to say, the first requirement demands that all the shareholders of the respective company be present. The purpose of this is that, in order not to comply with the formalities of a meeting, all shareholders are required to be present in order to guarantee their right to information and to be able to adopt the necessary decisions, without excluding them.

Therefore, if one of the shareholders does not appear or if a person who does not have such character appears, **such resolution will be null and void**, since it does not comply with the requirements established by law.

In that sense, at the time Wilmington Trust relinquished its character as "Warrant Agent", it relinquished all rights and obligations it had as such, which included the exercise of the corporate rights derived from such shares, including the right to vote.

By resigning, Wilmington Trust was unable to exercise any voting power with the shares pledged to it since it relinquished its capacity as Warrant Agent.

Therefore, when entering into the Alleged RUA, Wilmington Trust had no authority to consider itself as a shareholder and enter into it. Therefore, it is evident that the Alleged RUA **is invalid** because it **did not have the consent of all the shareholders of Controladora**, which is <u>an element of existence of the legal act</u>, pursuant to article 1794 of the Federal Civil Code:



"Article 1794.- For the existence of the contract it is required:

I. Consent (...)"

In this order of ideas, it is evident that from the informal study that the Responsible Court should have undertaken based on the record of the case, it should have noticed the evident invalidity of the Alleged RUA and, therefore, the clear fact that the President Attorney-in-Fact of Controladora **lacked the authority to act in the reorganization proceeding**.

Furthermore, from the record, the Responsible Court would have noticed other reasons for the illegality of the Alleged RUA. As has been established, according to the text of the Alleged RUA, this was only possible as a consequence of the **illegal extrajudicial execution of collateral to the detriment of Dolphin**.

Regardless of the illegality of said act (which should have been warned by the Responsible Court, as has been developed in other concepts of violation), the truth is that it was evident that **the execution procedure provided for by** the **constituted guarantees was not even followed.**

In this regard, the pledges constituted by the Parent Company are essentially set forth in the "Pledge Agreement on Shares Subject to Suspensive Action" entered into between the Parent Company and Wilmington Trust, which was attached as Exhibit "19" to the bankruptcy petition, which in its fourth clause, section 4.02, provides:

> Sección 4.02. Derechos de Voto y Evento de Incumplimiento. A partir del cumplimiento de la Condición Suspensiva, en caso de que ocurra un Evento de Incumplimiento, y siempre y cuando hayan transcurrido los plazos para subsanar dicho Evento de Incumplimiento que, en su caso, se establezcan en el Documento de la Operación correspondiente, todos los derechos del Deudor Prendario para ejercer los Derechos de Voto de conformidad con lo dispuesto en la Sección 4.01 de la presente Cláusula Cuarta terminarán, y a partir de dicho momento la totalidad de dichos derechos serán ejercidos por el Acreedor Prendario, quien tendrá el único y exclusivo derecho y facultad de ejercer los Derechos de Voto y cualesquiera otros derechos corporativos y económicos inherentes a las Acciones Pignoradas; en el entendido, que (i) antes de ejercer dichos derechos, el Acreedor Prendario entregará al respectivo Secretario miembro o no miembro del

> Consejo de Administración de la Sociedad, una notificación por escrito manifestando que un Evento de Incumplimiento ha ocurrido y (ii) el Acreedor Prendario tendrá el derecho, mas no la obligación de, y en cualquier momento posterior a la existencia de un Evento de Incumplimiento, de autorizar por escrito al Deudor Prendario que corresponda, para ejercer los Derechos de Voto y cualesquiera otros derechos corporativos y económicos inherentes a las Acciones Pignoradas que sean de su propiedad. Con el medio para cumplir con las obligaciones establecidas en la presente Cláusula Cuarta, el Deudor Prendario, una vez cumplida la Condición Suspensiva y conforme a los términos establecidos en el presente Contrato, el Deudor Prendario otorgará, dentro de los 15 (quince) Días Hábiles siguientes al cumplimiento de la Condición Suspensiva, un poder especial irrevocable, (sustancialmente en términos del formato que se adjunta al presente Contrato como **Anexo "G"**,) en términos del artículos 2554 y 2596 del Código Civil Federal y sus correlativos en los Códigos Civiles de los Estados de México, con el fin de facultar al Acreedor Prendario para que ejerza los Derechos de Voto y demás derechos corporativos y económicos inherentes a las Acciones Pignoradas conforme a lo establecido en el presente Contrato. El Deudor Prendario en este acto reconoce y acuerda que dicho poder especial se otorga como un medio para cumplir con una obligación de un contrato bilateral y, por tanto, es irrevocable. Las disposiciones de la presente sección, incluyendo la información relativa al otorgamiento del poder irrevocable a que se refiere el mismo, deberán ser incluidas en el asiento correspondiente del libro de registro de acciones de la Sociedad que documente la Prenda otorgada conforme al presente Contrato.

As can be seen from the foregoing, such agreement provides that prior to be able to execute the pledges and exercise any voting rights derived from the shares on which they are constituted, it is necessary to have previously notified **in writing** an "event of default" to the Secretary of the Board of Directors of Controladora. In this case, **such notice <u>was not given</u>**, despite the fact that it was an essential requirement to be able to exercise the voting rights of the shares over which they are constituted.



any right derived from the pledges constituted (so much so, that neither in the minutes of the alleged RUA nor in the insolvency proceeding was evidence of such alleged notification exhibited).

Therefore, by failing to comply with such essential formality, it is evident that Wilmington **lacked any right or power to enter into the unanimous resolution under which the Attorney Generals now purport to sustain their representation**.

All the aforementioned irregularities should necessarily have been noticed by the Responsible Court in an informal analysis of the Controladora's personality (which it was evidently called to undertake) and, consequently, conclude that the Alleged RUA was invalid and that the personality of the Controladora's Attorney-in-fact was not duly demonstrated, and therefore, any application filed by the latter should have been denied.

Consequently, the omission to undertake the aforementioned analysis and, consequently, to **dismiss the petitions of Controladora's Attorney-in-fact dismissing the alleged personality**, is a clear violation that renders the Order in Remedy unlawful. Therefore, this Court must grant the protection and protection of the justice of the Union to the effect of revoking it, ordering that the legal standing of the President Representative of Controladora be disregarded and, therefore, its request for dismissal be dismissed.

**ELEVENTH. CONTRARY TO WHAT THE RESPONSIBLE COURT MAINTAINS, THE COURT DID VIOLATE THE PRINCIPLE OF PROCEDURAL GOOD FAITH BY SUSTAINING THE CHALLENGED ORDER ON THE FACT THAT CI BANCO, AS MAJORITY SHAREHOLDER OF CONTROLADORA, ARGUED THAT IT ALLEGEDLY DID NOT CONSENT TO THE FILING OF THE CONCURSO MERCANTIL, SINCE THIS DOES NOT AFFECT THE VALIDITY OF THE ALLEGED RUA, MUCH LESS DOES IT DEPRIVE THE GENERAL SHAREHOLDERS' MEETING AND THE BOARD OF DIRECTORS' MEETING THAT SUPPORTED THE FILING OF THE PETITION, WHICH SHOULD HAVE BEEN EVALUATED PRIOR TO DECIDING ON THE WITHDRAWAL AND SHOULD HAVE BEEN CONSIDERED UNDER THE SAME WEIGHT AS THE ACTS OF THE CREDITORS .**

<u>Summary</u>.        The only reason used by the Responsible Court to decide to accept the waiver filed by the Court Representative of Controladora, reiterated extensively in the Complaint Order, is that CI Banco "as majority shareholder" of the Complainant did not want to continue with the reorganization proceeding. However, contrary to what the Responsible Court considered, such statement does not imply the validity of the alleged RUA nor, much less, detracts from the validity of the meeting of the Board of Directors and the General Shareholders' Meeting that supported the filing of the Complainant's petition for bankruptcy, which should have had the same weight to decide the continuation of the bankruptcy proceeding.

<u>Development</u>

114



a. The principle of procedural good faith.

The principle of procedural good faith, derived from the right to effective judicial protection, implies the requirement of conduct to comply with certain minimum burdens in any proceeding, such as stating the facts truthfully or not altering evidence or facts and, in general, any procedural conduct that is socially accepted as correct:

> **"PRINCIPLE OF PROCEDURAL GOOD FAITH. EMANATES FROM THE GUARANTEE OF**
> **EFFECTIVE JUDICIAL PROTECTION**. The principle of procedural good faith can be defined, in general terms, as the conduct required of any person in the context of a proceeding, because it is socially accepted as correct. Generally, this principle is not expressly included in the procedural laws, but is inferred from the rules that sanction specific acts contrary to good faith. Nevertheless, the principle in question has its origin in the right to effective judicial protection and is related to the rights of defense, equality and expeditiousness in the administration of justice, because the possibility of going to a jurisdictional body to declare the right of the party requesting it is the means by which the State settles controversies and, with this, makes effective the mandate that no person can obtain justice on his own"[79].

> **"LOYALTY PROCEDURAL. ELEMENTS WHICH THE CONFORM**. The
> The principles of good faith and procedural loyalty and probity must be based on the search for the truth, both in relation to the right sought and in the manner in which it is applied or followed to achieve it. Thus, within good faith are the specific duties of stating the facts truthfully, not offering useless or unnecessary evidence, not maliciously omitting or altering facts essential to the cause and not ostensibly and repeatedly obstructing the normal development of the process. On the other hand, the principle of loyalty and probity consists of a set of rules of conduct, governed by the ethical imperative to which all parties to the proceedings (parties, attorneys, lawyers, among others) must adjust their behavior, consisting of the duty to be truthful and proceed with professional ethics, in order to make possible the discovery of the truth. That is, procedural loyalty is a consequence of good faith and excludes judicial cheating, twisted resources, distorted evidence and even immoralities of all kinds; hence, no credit can be given to the conduct of the parties that does not reflect loyalty to the process"[(80).]



As a consequence of this principle, jurisprudence has recognized the existence of a series of presumptions by virtue of which the judge must act throughout the proceeding, and their impact on the evidentiary assessment is of utmost relevance.

In this order of ideas, the principle of procedural good faith implies a series of assumptions, such as the existence of an intention to act honestly, which in evidentiary matters translates into an obligation of the judge to grant the evidentiary value adduced except for the existence of contrary indications that reflect the scope or content of such evidence:

> **"PRINCIPLE OF PROCEDURAL GOOD FAITH. IT OBLIGES NOT TO PREJUDGE AS FALSE THE DOCUMENTARY EVIDENCE OFFERED IN SIMPLE COPY".**
> **PHOTOSTATICS**. Article 373 of the Code of Civil Procedures for the Federal District provides that in order to prove facts or circumstances that are related to the business at trial, the parties may submit photographs or photostatic copies, means of evidence that will be evaluated as a whole by the judge, according to the rules of logic and experience, as provided in Article 402 of the Code of Civil Procedures for the Federal District.

---

[79] Digital Record: 168826 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;I.7o.C.49 K ;TA
[80] Digital Record: 2018319 TCC;10a. Época;Gaceta del Semanario Judicial de la Federación;XI.1o.A.T. J/16 (10a.)
J; Publication: Friday, November 09, 2018 10:20 am



of the same law. **Said precepts start from a fundamental premise to achieve its validity, which is to observe the principle of procedural good faith, because it recognizes that "to prove facts or circumstances" the parties may present photographs, which constitutes the recognition that they act in the process with probity, with the sincere conviction that they are in the right, and that for this circumstance they may provide this type of evidence. The principle of good faith implies a series of assumptions, such as the existence of a psychological stage, which includes the intention to act honestly; the belief that the counterpart acts in the same way and the belief or ignorance of attributes or qualities in persons or things. It also supposes the existence of an influence of that psychological stage of the counterpart that drives him to the determination of offering a means of evidence with the firm conviction that it is plausible that with it he can lawfully demonstrate a fact subject to controversy; as well as the performance in accordance with that psychological stage and influence, which is verified in the effective offer of the evidence.** These presuppositions are analyzed by the Judge not only by the special position and attitude of the offerer of such means of evidence, but also by the acceptance, lack of reticence or contrary evidence provided by the opposing party to disprove its scope or to demonstrate the contrary meaning of the facts that are intended to be accredited and that justly demand the application of the rules of logic and experience. Therefore, the judge must start from a principle of procedural good faith, which is based on the dignity of the persons and the acts they perform and which must be treated as such, since it is the basis on which the parties act and only when there are indications contrary to the same reflected in the content or scope of said means of evidence, may the judge not grant evidentiary value to a document in photostatic copy that the law considers, prima facie, a source of proof of the facts or circumstances of the debate. It would be detrimental to the truth and to the aforementioned principle if the judge were to assume that any photostatic copy has the latent possibility, given the nature of the reproduction and the advances of science, that it does not correspond to a really existing document, but to a prefabricated one that, for the purpose of its photocopying, allows reflecting the existence, unreal, of the document that is intended to be made to appear. This is so, because instead of adhering to the procedural good faith, it would be based on its rejection by the authority, constituting a true and unjustified prejudice, and would only resort to its protection when it has been linked to other means of evidence, which would imply to disregard, prima facie, its evidentiary value by itself, which is far from the content of the norm and the guiding principles of the judicial function protected by article 17 of the Federal Constitution. This does not mean that the judge does not observe that the parties who litigate in defense of their interests may incur in the alteration of the document or its confection, but the access to justice as a human right demands from the judicial authority a disposition and attitude open to the knowledge of the facts with the tools and instruments that the procedural text provides as well as the rest of the legal system"[81].

Likewise, it has been recognized that as a consequence of the principle of procedural good faith, it must be assumed that the parties act with probity and the sincere conviction that they are in the right, which implies an honest act that **the evidence is not illicit**:

> **"PRINCIPLE OF PROCEDURAL GOOD FAITH. VALUATION OF A SIMPLE COPY OFFERED BY A PUBLIC SERVANT OF THE PROCURADURÍA DE LA DEFENSA DEL TRABAJO WITH WHICH HE INTENDS TO PROVE HIS PERSONALITY IN THE LAWSUIT IN WHICH HE APPEARS AS ATTORNEY IN FACT OF THE WORKER**. Although the
> A simple copy of a document does not have full evidentiary value, but is left to the free appreciation of the judge, the truth is that the principle of procedural good faith can be taken into account, **which consists of presupposing that the parties in the trial act with probity and the sincere conviction that they are right; that is, an honest act based on the conviction that the evidence is not illicit, which must be combined with the human right of effective judicial protection, which is related to the rights of defense, equality and expeditiousness in the administration of justice.** Under this principle, it may be considered that the legal personality in a trial in which a public servant of the Mexican government intervenes as an attorney-in-fact can be accredited.

---

[81] Digital Record: 2002179 TCC;10a. Época;Semanario Judicial de la Federación y su Gaceta;I.3o.C.54 C (10a.) ;TA



The possibility of going to a jurisdictional body to defend the rights of the party that requests it, is the means by which the State settles controversies and, with this, makes effective the mandate that no person can obtain justice on his own; for this reason, we are convinced that with the referred copy, the interested party is indeed a public servant who renders his services for the mentioned Attorney General's Office, under the Ministry of Labor and Social Welfare and, with this character, represents the complainant worker in the amparo proceeding."[82]

[Emphasis added]

In other words, under the principle of procedural good faith, it is assumed that the parties act with probity, that the documents and evidence they offer are real and have not been modified or altered, and that the only thing they seek is to honestly prove the scope of their actions or exceptions.

    b.   <u>The unlawfulness of the Complained Order</u>.

In support of the Complaint Order and the decision to favorably accept the withdrawal formulated by the Representative Judges, the Responsible Court reiterates that the Alleged RUA is a "*sovereign decision*" of the Controladora and that, consequently, it was not obliged to prioritize prior corporate acts over subsequent ones, since it was fully empowered to recognize the alleged validity of the Alleged RUA.

However, once again, the Responsible Court overlooks the fact that it **completely ignored the multiple grounds of invalidity that were raised by Controladora against the Alleged RUA and, consequently, the obvious fact that the Appointing Officers lacked power of attorney.**

In this sense, beyond a simple acknowledgement of the existence of a corporate act, the fact that the Responsible Court did not evaluate all the defenses and statements made by Controladora to reject the validity of the alleged RUA and the standing of CI Banco to enter into it (which are developed in several claims of violation), the fact is that even the reason stated by the Responsible Court is false and illegal, as shown below.

First, the fact that CI Banco is the "majority shareholder" of Controladora does not mean, by that fact alone, that the Alleged RUA is valid and should be given any effect.

As developed above, the General Law of Mercantile Corporations is clear in establishing that for a resolution adopted outside a meeting to be valid, the **approval of all the partners** must be obtained, as can be inferred from the following provision:

> "Article 80.- The meetings shall be held at the registered office, at least once a year, at the time established in the contract (...).

---

[82] Digital Record: 2013578 TCC;10a. Época;Gaceta del Semanario Judicial de la Federación;III.3o.T.41 L (10a.)
TA; Issued: Friday, January 27 2017 10:28 am



Additionally, the members may hold meetings outside the corporate domicile, **provided that all the members approve it and there is also the possibility of using electronic, optical or any other technology**. For such meetings, in this case, the address at which the respective meeting was held must be indicated in the minutes of the meeting."

[Emphasis added]

Based on the foregoing, even assuming without conceding that CI Banco was authorized to enter into the alleged RUA (which, it is reiterated, it was not, since this would imply a violation of the Precautionary Measures), this does not imply that the consent **of the rest of the shareholders of Controladora** was not required, which was not granted.

On the contrary, as it has been widely developed, who appeared in supposed representation of the rest of the shareholders was Wilmington Trust, who **no longer had any authority since it had resigned as "Collateral Agent", besides acting in violation of the Provisional Measures.**

Therefore, even ignoring the illegality of CI Banco's actions (as the Responsible Court did), it is certain that in any case **the Alleged RUA is invalid, since it is evident that it <u>was not executed by all the shareholders, since it is clear that whoever represented the rest (Wilmington Trust), lacked the authority to do so.</u>**

On the other hand, the fact that CI Banco has alleged that it "never" consented to the filing of the insolvency proceeding and that it was allegedly "deceived" by the Board of Directors of Controladora has no impact whatsoever.

In addition to the fact that such matters are **notoriously false**, it is certain that the record shows that CI Banco appeared through a proxy at the Meeting for the Approval of the reorganization proceeding and that, in its capacity as shareholder, it **approved the filing of the reorganization proceeding**, a decision that was subsequently materialized at the Meeting of the Board of Directors.

Under this premise, it is evident that CI Banco, **also as majority shareholder<u>, consented to the filing of the insolvency petition</u>**, with the difference that such decision was also approved by the legitimate shareholders of Controladora.

Therefore, the fact that it now intends to argue that in reality it "did not consent" to such act, **does not detract from the validity of the** Bankruptcy **Approval Meeting,** being clear that in the event that CI Bank considers that the attorney-in-fact who attended such meeting acted beyond the powers granted to him, then it must repeat against him, **but this does not affect the consent expressed and the validity of such meeting.**

Furthermore, the Responsible Court itself considered valid and sufficient the Meeting for the Approval of the Concurso Mercantil and the Meeting of the Board of Directors, so much so that based on these it decided to admit the application filed by the Controladora.

118



In these terms, there is no valid reason why the Responsible Court can now disregard the validity and effects of said corporate acts in preference to the Alleged RUA, much less is there any valid reason why it **should prefer what is resolved in said alleged resolution.**

On the contrary, the truth is that under the principle of procedural good faith, the Responsible Court should have valued the fact that the legitimate representatives of Controladora were authorized to file the insolvency proceeding (as in fact was implicitly recognized by said Court when deciding its admission), **and not to prefer, without any basis whatsoever, what CI Banco expressed in the sense that there was a "deception" in its filing.**

There is no valid reason why the Responsible Court should have given weight to the reasons put forward by CI Banco as opposed to what was demonstrated by the legitimate representatives of Controladora, as well as its clear intention to continue with the bankruptcy proceeding.

Much less, as developed in previous concepts of violation, could the Responsible Court simply disregard the validity of the Meeting of Approval of the reorganization proceeding, the Meeting of the Board of Directors and the consequent personality held by those who requested the declaration of the reorganization proceeding **without previously exhausting a procedure that respects the principle of contradiction**.

In compliance with the principle of procedural good faith, the Responsible Court was obliged to recognize the value of the actions carried out by the legitimate representatives of the Merchant, without preferring the statements made by CI Banco and, consequently, noting not only the illegality of the withdrawal presented but also the evident fact that **it was not the Controladora's will to withdraw from the bankruptcy proceeding, but that said act was being carried out by its creditors,** in **an illegal manner.**

Therefore, it is evident that the Order is illegal and, consequently, this Court must grant the protection and protection of the justice of the Union in order to revoke it.

**TWELFTH. THE RESPONSIBLE COURT ACTED ILLEGALLY BY CONFIRMING THE LIFTING OF THE PRECAUTIONARY MEASURES DESPITE THE FACT THAT THE DISMISSAL ORDER HAD NOT YET BECOME FINAL.**

<u>Summary</u>.     The Order confirmed the Order of Dismissal, through which the Responsible Court immediately ordered the lifting of the Precautionary Measures despite the fact that the case had not yet been filed, which implies a flagrant violation of the right to legal certainty and is in direct violation of Article 1343 of the Commercial Code.

<u>Development</u>



Article 1343 of the Commercial Code, of supplementary application to the Bankruptcy Law, provides that a judgment will become executory when it cannot be challenged by any ordinary or extraordinary means of defense:

> "Article 1343.- The judgment of second instance shall be enforceable when it cannot be appealed by any other ordinary or extraordinary means of appeal, whatever the interest involved in the litigation may be."

In similar terms, Articles 354 and 356 of the Federal Code of Civil Procedures provide:

> "ARTICLE 355.- There is res judicata when the sentence has become enforceable".
>
> The following sentences shall be enforceable:
> "
> I.- Those that do not admit any appeal;
>
> II.- Those that, having admitted an appeal, are not appealed, or, having been appealed, have not been declared the appeal as abandoned, or the appellant has withdrawn the appeal (...)".

As can be inferred from said precepts, **only until such time as no ordinary or extraordinary appeal is filed against a judgment or resolution is it considered enforceable**.

These provisions have been interpreted by case law in the sense that until a judgment becomes enforceable, it **cannot be executed nor can it be given any effect**; the following criteria are applicable:

> **"SECOND INSTANCE JUDGMENTS IN COMMERCIAL MATTERS. DO NOT CAUSE STATUS WHILE THE TRIAL IS PENDING.**
> **CORRESPONDING AMPARO.** Although it is true that the amparo trial is not a third instance but a trial of constitutionality or legality whose subject matter is constituted by legal issues different from those of the trial from which the challenged act emanates, since in the latter the judicial authority decides on the rights and obligations disputed by the parties, and in the former what is judged is whether or not the acts of said authority are in violation of the constitutional guarantees invoked by the plaintiff; and although it is also true that the responsible authority plays the role of defendant in the amparo, while in the ordinary trial it acts as an organ of justice, and although it is also true, finally, that in accordance with the express text of article 1343 of the Code of Commerce "the judgment of second instance shall be enforceable, whether it confirms or revokes the judgment of first instance, and regardless of the interest involved in the litigation"; However, it must be said that in accordance with the principle of the hierarchy of the laws of our federal system, by virtue of which the Constitution and its organic law of amparo are superior to other laws, in such a way that, even though according to the express text of the aforementioned precept of the Code of Commerce, the judgments of second instance are executory, constituting res judicata, it is certain that by establishing the amparo proceeding our Federal Constitution, which is the supreme law of all the laws of Mexico, which is the Supreme Law of the whole Union (article 133), it follows that it is not possible, under any concept, that the repeated sentences can be considered to have the certainty and authority of res judicata, since against them there is the constitutional remedy of amparo, and hence the provision contained in the referred article 1343 of the Code of Commerce must be understood only insofar as it no longer admits any ordinary recourse established by said code. Therefore, when the direct amparo against second instance judgments proceeds, it must be admitted that the judgment that is challenged in the extraordinary proceeding does not cause state until its processing is completed.

120



The decision in the corresponding amparo proceeding concludes with the resolution of the corresponding amparo lawsuit, and while
this does not occur, the lawsuit continues sub judice"[83].

**"JUDGMENTS OF SECOND INSTANCE. THEY DO NOT CAUSE STATE WHILE THERE IS PENDING THE TRIAL OF AMPARO CORRESPONDING.** It is true that according to Article 426 of the Code of Civil Procedure for the Federal District and Territories, the judgment of second instance terminates the trial and, therefore, becomes executory by operation of law. This is true, however, only insofar as it no longer admits any ordinary appeal established by the common law, since the aforementioned precept does not say anything, nor is there any provision in the Code of Civil Procedure, in relation to second degree judgments. However, section III of article 107 of the Constitution provides that the direct amparo is applicable against final judgments, issued in the civil trial, with respect to which the ordinary remedies established by law have been exhausted. Therefore, when the direct amparo is applicable against second instance judgments, it must be admitted that the judgment that is challenged in the extraordinary proceeding, does not cause status until its processing is concluded by the resolution of the corresponding amparo trial, and while this does not occur, the lawsuit continues subjudice"[84].

Now, in this specific case, and subject to what is set forth in the "Proceedings" chapter of this claim, the Requested Order can be challenged (**optionally, taking into consideration the existence of several exceptions to the principle of definitiveness that have already been developed**) through the appeal for revocation provided for in the Commercial Bankruptcy Law:

"Article 268.- When this Law does not provide for an appeal, revocation shall proceed, which shall be processed in accordance with the provisions of the Code of Commerce."

In addition to the foregoing, as was duly demonstrated in the chapter on "Proceedings" of the
The present lawsuit, against the challenged writ of amparo proceeding is an indirect amparo proceeding.

Based on these premises, it is clear that at the time of the issuance of the Order under appeal, it had not yet become enforceable because it **was still susceptible to be challenged through both ordinary and extraordinary means of defense**.

Notwithstanding the foregoing, immediately and despite the possibility that such determination could be challenged, the Responsible Court **ordered the lifting of the Precautionary Measures decreed in favor of the Complainant**, thus completely executing the unlawful dismissal of the insolvency proceeding.

Evidently, such resolution is contrary to the express text of the Code of Commerce and the Federal Code of Civil Procedures, as interpreted by the jurisprudence, because even though the judgment is still *sub judice*, the Responsible Court has already given it full effects and ordered its material execution.

As developed above, this is also a violation of the right to effective precautionary protection.

---

[83] Registro digital: 241851 SCJN;7a. Época;Semanario Judicial de la Federación ;TA
[84] Digital Record: 269673 SCJN;6a. Época;Semanario Judicial de la Federación ;TA



Based on the foregoing, it should be evident to this Court that the Order Challenged is illegal because it is contrary to the express text of the Code of Commerce and the Federal Code of Civil Procedures and, consequently, it should grant the protection and protection of the Justice of the Union for the effect of revoking said resolution.

**THIRTEENTH.    BY CONFIRMING THE ORDER OF DISMISSAL AND THE CONSEQUENT LIFTING OF THE PRECAUTIONARY MEASURES, THE RESPONSIBLE COURT FAILED TO COMPLY WITH THE PROVISIONS OF ARTICLE 25 OF THE COMMERCIAL BANKRUPTCY LAW, SINCE IT WAS NOT EMPOWERED TO ORDER THE LIFTING OF THE PRECAUTIONARY MEASURES WITHOUT FIRST EXHAUSTING ANY OF THE MEANS AND REMEDIES REGULATED BY ARTICLE 1183 OF THE COMMERCIAL CODE .**

<u>Synthesis</u>.       Based on the premise that the Requested Order was not yet in force (therefore, the reorganization proceeding has not ended), it is evident that in accordance with the provisions of Article 25 of the Bankruptcy Law, the Responsible Court did not have the authority to order the lifting of the Precautionary Measures except through one of the means provided for in Article 1183 of the Commercial Code.

<u>Development</u>

Article 25 of the Bankruptcy Law is clear in establishing that the decree and lifting of precautionary measures is governed in accordance with the provisions of the Commercial Code:

> "Article 25.- The creditor requesting the declaration of bankruptcy of a Merchant may apply to the judge for the adoption of precautionary measures or, as the case may be, the modification of those that have been adopted. The constitution, modification or lifting of such precautionary measures shall be governed by the provisions to that effect in the Commercial Code."

In these terms, Article 1183 of the Commercial Code establishes that precautionary measures may be lifted, either by filing an appeal or by proving the existence of a supervening fact:

> "Article 1183.- Against the resolution that decrees a precautionary measure there is an appeal for immediate processing in devolutive effect, in terms of Articles 1339, 1345, section IV, and 1345 bis 1 of this Code.
>
> Without prejudice to the foregoing, the person against whom a precautionary order has been issued, may at any time, but before the enforceable judgment, request the judge to modify or revoke it, when a supervening event occurs."

This provision must be interpreted, in accordance with the principle of contradiction, in harmony with articles 1349, 1350 and 1351 of said ordinance, which provide:



Article 1349.- Incidents are those matters that are filed in a trial and have an immediate relation with the main business; therefore, those that do not have such relation shall be dismissed out of hand.

Article 1350.- Incidents shall be heard in the same part of the proceedings, without suspending the proceeding of the trial in the main proceedings.

Article 1351.- Incidents, whatever their nature, shall be processed orally in the hearings or in writing, as provided in the following articles.

Thus, a precautionary measure can only be modified or lifted after proving the existence of a supervening fact that so warrants it, provided that the corresponding incidental proceeding is exhausted.

The only case in which a precautionary measure may be revoked "ex officio" is if the requirements set forth in Article 1181 of the Commercial Code are not met:

"Article 1181.- Once the precautionary measure has been executed before the lawsuit is filed, the party requesting it must file it within three days, if the lawsuit is to be heard in the place where it was issued. If it is to be followed in another place, the judge shall add to the three days indicated, those resulting from the last paragraph of Article 1075.

The person who requested the precautionary measure must prove before the judge who granted the order the filing of the claim before the competent judge, within three days following the expiration of any of the terms of the preceding paragraph."

"Article 1182.- If the person requesting the precautionary measure does not comply with the provisions of the preceding article, **it shall be revoked ex officio**, even if not requested by the person against whom it was decreed."

[Emphasis added]

Based on such premises, it will be evident for this Court the illegality of the Order Challenged, since in it, the Responsible Court ordered the lifting of the Precautionary Measures **without having exhausted any of the means described above**.

It is necessary to emphasize that the Order has not yet caused the status, so the reorganization proceeding is still in process and it is not yet possible to consider its termination; based on such consideration, it is clear that **there is no reason why the Precautionary Measures should be lifted**.

Based on this premise, the lifting of the Precautionary Measures could only be ordered by the Responsible Court prior to the filing of any of the defenses regulated by the Code of Commerce.

However, as the record shows, **none of these means of defense were exhausted against the Precautionary Measures**, so that, consequently, the Responsible Court <u>lacked the authority to order their lifting.</u>

123



Consequently, it is evident that the order to lift the Precautionary Measures, confirmed by the Order **is illegal**, since it was not carried out as a consequence of any of the means provided by the Code of Commerce for such purpose.

Therefore, this Court must grant the protection and protection of the Justice of the Union in order to revoke the Order in Complaint.

**FOURTEENTH. UNCONSTITUTIONALITY OF ARTICLES 1, 7, 25, 26 AND 28 OF T H E BANKRUPTCY LAW, AS WELL AS ARTICLE 1183 OF THE COMMERCIAL CODE BY IMPLICITLY INTERPRETING THE POSSIBILITY OF DECREEING THE LIFTING OF PRECAUTIONARY MEASURES WITHOUT AN ORDINARY APPEAL HAVING BEEN FILED AND WITHOUT AN EXPRESS REQUEST TO DO SO.**

<u>Synthesis</u>.        By confirming the order to lift the Precautionary Measures in the Requested Order, the Responsible Court implicitly interpreted that the Bankruptcy Law and the Commercial Code empowered it to revoke precautionary measures without the need to previously follow a procedure to do so or to exhaust ordinary remedies against them; such interpretation renders the aforementioned articles unconstitutional, for which reason this Court must exercise constitutional control over them and, in doing so, it must find that the Requested Order is unconstitutional.

<u>Development</u>.

  a.   <u>Due process and adversarial principle</u>.

The content and scope of these rights has already been developed in section "a" of the third concept of violation, therefore, in order to avoid unnecessary repetitions, it is requested that said considerations be considered as if they were reproduced as if they were inserted verbatim.

  b.      <u>Effective precautionary protection</u>.

The right to effective precautionary protection was recognized in General Comment No. 31 (issued on May 26, 2004) of the Human Rights Committee:

> "The obligation under article 2, paragraph 2, to take steps to give effect to the rights recognized in the Covenant is unqualified and immediate. Compliance with this obligation cannot be justified by reference to considerations of a political, social, cultural or economic nature within the State.
>
> Article 2, paragraph 3, provides that, in addition to effectively protecting the rights recognized in the Covenant, States parties shall ensure that all persons have accessible and effective remedies for claiming those rights. Such remedies should be appropriately tailored to take into account the special vulnerability of certain classes of persons, in particular children. The Committee attaches importance to States parties establishing adequate judicial and administrative mechanisms in domestic law to deal with complaints of violations of rights. The Committee takes



note that the judiciary can ensure the enjoyment of the rights recognized in the Covenant in various ways, in particular through the direct application of the Covenant, the application of constitutional or other similar legislative provisions, or the effect of the interpretation of the Covenant on the application of domestic law. In particular, administrative mechanisms are required to implement the general obligation to investigate allegations of violations promptly, thoroughly and effectively by independent and impartial bodies. National human rights institutions with relevant powers can assist in this regard. The failure of a State party to investigate allegations of violations may in itself be a violation of the Covenant. Cessation of the violation is an indispensable element of the right to an effective remedy. (...)

The Committee further notes that in certain circumstances, the right to an effective remedy may require <u>States parties to adopt and implement provisional measures to prevent the recurrence of violations and to remedy as soon as possible any harm that such violations may have caused.</u>

Although the legal systems of the States parties are formally endowed with adequate remedies, violations of the rights recognized in the Covenant continue to occur. It may be <u>assumed that this is attributable to the fact that the remedies do not function effectively in practice</u>. States parties are therefore requested to identify in their periodic reports obstacles to the effectiveness of existing remedies."

The Inter-American Commission on Human Rights has recognized the existence of this right as can be seen in its publication entitled "Access to Justice as a Guarantee of Economic, Social and Cultural Rights: A Study of the Standards Established by the Inter-American Human Rights System" in which it stated the following:

> "261.      The ISHR has recognized that the notion of "effectiveness" that arises from Article 25 of the ACHR <u>requires that the available judicial tools include procedural measures such as precautionary, provisional or precautionary measures and</u>, in general, simple and rapid judicial remedies for the protection of rights, with a view to preventing violations from being prolonged over time. The foregoing, even when the determination of the merits of the matter requires a longer period of time. [...]
>  Thus, by virtue of the special nature of these remedies and the necessity and urgency with which they must act, the IACHR points out certain basic characteristics that they must present in order to be considered "suitable": a) they must be simple, urgent, informal, accessible and processed by independent bodies; b) they must have the possibility of accessing federal or national courts when there is suspicion of partiality in the actions of local bodies; c) they must guarantee broad legal standing; d) that they can be processed as individual appeals and also as collective precautionary actions (to protect a determined or determinable group according to certain parameters, affected or under imminent risk); and e) that the application of protection measures is foreseen in consultation with the affected parties" [85].

The right to effective judicial protection has also been recognized at the national level, as can be seen in the following thesis:

> **"SUSPENSION IN THE AMPARO. IT IS APPROPRIATE TO GRANT IT, EVEN THOUGH IT MAY ADVANCE THE EFFECTS OF THE FINAL DECISION, IF IT IS NECESSARY TO ENSURE AN EFFECTIVE PRECAUTIONARY PROTECTION THAT PRESERVES THE SUBJECT MATTER OF THE TRIAL AND THE FULL RESTITUTION OF THE AFFECTED PARTY'S RIGHTS**. The criterion that the suspension should not grant restitutory effects or effects that anticipate the final decision, since they are proper to the judgment on the merits, must be overcome in order to be congruent with the constitutional purpose of preserving the subject matter of the trial and avoiding the execution of acts that would have a negative effect on the final decision.

---

[85] This is accessible at the following hyperlink: https://www.cidh.oas.org/countryrep/AccesoDESC07sp/Accesodescv.sp.htm

CLYDE&CO

of impossible or difficult repair, as long as there is a suspensive interest of the petitioner and subject matter for the suspension, for which it is necessary to consider the nature of the challenged act. Consequently, it is appropriate to grant the suspension even though it may advance the effects of the final decision, since this would be provisional, if it is necessary to ensure an effective precautionary protection that preserves the subject matter of the trial and the full restitution of the affected party's rights; that is, when if it is not granted, the restitution that, if applicable, is ordered in the final decision, may be illusory."[86]

In these terms, the jurisprudence has recognized that the granting of precautionary measures

**as an authentic human right**, as can be inferred from the following jurisprudential criterion:

**"PRECAUTIONARY MEASURES OR PRECAUTIONARY MEASURES IN COMMERCIAL LAWSUITS. THEY ARE INHERENT TO THE RIGHT TO JURISDICTION, THEREFORE THE LIMITATION OF THEIR GRANTING MUST FOLLOW A FUNCTIONAL INTERPRETATION IN ACCORDANCE WITH ARTICLE 1168 OF THE COMMERCIAL CODE AND ARTICLES 1 AND 17 OF THE CONSTITUTION**. In the
Precautionary measures or precautionary measures may be decreed in commercial lawsuits to maintain a pre-existing situation, since this type of instruments are inherent to the right to jurisdiction, since their purpose is to make the Judges' sentences effective, as provided in Article 17, paragraph seven, of the Political Constitution of the United Mexican States, which provides that: "Federal and local laws will establish the necessary means to guarantee the independence of the courts and the full execution of their resolutions". Thus, the amendment published in the Official Gazette of the Federation on January 10, 2014 to Articles 1168 and 1171 of the Code of Commerce, was not intended to prevent that in commercial lawsuits the necessary precautionary measures or injunctions are decreed to enforce the enforcement of judgments, since its purpose was focused on the interpretation of clear and precise rules that allow creditors to obtain the effective collection of their unpaid credits, through the placement of persons or the withholding of assets. Thus, the amended text of article 1168, first paragraph, invoked, which establishes: "In commercial lawsuits, only the precautionary measures or precautionary measures provided for in this Code may be issued and which are the following: (...)", should not be interpreted with a criterion of simple literalism, since it would be prohibitive as opposed to the duty of the ordinary Judge to preserve the subsisting subject matter of the lawsuit, which, of course, would violate the fundamental rights recognized by the international instruments signed by the Mexican State and by the Political Constitution of the United Mexican States, in accordance with its Article 1o.Nevertheless, a functional and conforming interpretation of that numeral gives the guideline to notice that it is a taxative norm when foreseeing two assumptions applicable to certain factual situation, which, however, does not restrict the possibility of the judge that in compliance with his function in relation to the granting and proceeding of the different precautionary measures, they must be adapted to the circumstances and needs of each case, since these measures must be flexible even with the possibility of modification as needed in the proceeding in which they are issued; Furthermore, when granting them, they must be duly grounded and motivated, as well as in terms of the guarantees that are required, in order to avoid abuses by the parties requesting them. By virtue of this, such interpretation is in accordance with the fundamental rights to effective judicial protection and access to the administration of justice recognized both by the constitutional article in question, as well as by precept 25 of the American Convention on Human Rights"[(87)]

c.    The unconstitutional and implicit interpretation undertaken by the Responsible Court.

As can be inferred from the Complained Order, when agreeing to the dismissal filed by the Controladora's Representative, the Responsible Court considered it appropriate to order the immediate lifting of the Precautionary Measures, despite the fact that it had not been followed.

---

[86] [J]; 9th Epoch; T.C.C.; S.J.F. and its Gazette; Volume XXXIV, July 2011; Page 1919. I.4o.A. J/90.

[87] Digital Record: 2020903 Plenos de Circuito;10a. Época;Gaceta del Semanario Judicial de la Federación;PC.I.C. J/94 C (10a.) ;J; Published: Friday, October 25, 2019 10:35 am.



The Company did not have any prior proceeding nor exhausted any of the means of defense provided for such purpose by the Commercial Code. Such determination was based on Articles 1, 7 and 28 of the Bankruptcy Law.

Although it is not expressly stated, it is evident that the Responsible Court interpreted that such precepts empowered it to order the lifting of the Precautionary Measures unilaterally and without having previously heard the Controladora or without having previously exhausted any means of defense against it.

Evidently, this Court will note that such determination renders the aforementioned articles unconstitutional, since they are contrary to Articles 14 and 17 of the Federal Constitution and 25 of the American Convention on Human Rights for violating the rights to due process and effective precautionary protection.

On this point, this Court must consider that the demonstrated unconstitutionality of said precepts by violating the rights of access to justice and effective judicial protection is a true constitutional issue in terms of the thesis under the heading "**REVIEW IN DIRECT AMPARO. WITHIN THE PROPERLY CONSTITUTIONAL ISSUES SUBJECT TO THIS REMEDY IS THE INTERPRETATION PERFORMED BY THE RESPONSIBLE AUTHORITY OR THE CIRCUIT COLLEGIATE COURT OF THE GENERAL RULE WHOSE CONSTITUTIONALITY IS CONTESTED, WHEN RESOLVING QUESTIONS OF LEGALITY**"[88] and"**REVIEW IN DIRECT AMPARO. IT IS PROCEEDEDED WHEN A COLLEGIATE CIRCUIT COURT, WHEN EVALUATING THE EVIDENCE IN A GUARDIANSHIP AND CUSTODY JUDGMENT, PERFORMS AN IMPLIED INTERPRETATION OF ARTICLES 4 AND 16, NINTH AND TENTH PARAGRAPHS OF THE POLITICAL CONSTITUTION OF THE UNITED STATES OF AMERICA**"[88] and "**REVIEW IN DIRECT AMPARO.**
**UNIDOS MEXICANOS**"[89]cited and developed in the chapter on "Proceedings" of the present lawsuit.

As this Court may infer from the cited theses, for a question of constitutionality to exist, it is not even necessary for the responsible authority to expressly cite the articles it is interpreting, but rather the existence of an implicit interpretation that establishes their meaning and scope is sufficient.

Therefore, it is clear that even though the Responsible Court has not expressly stated its interpretation, as a consequence of the implicit interpretation of the same in the terms developed in this section, they must be declared unconstitutional.

This is because the interpretation of the responsible Court implies the possibility of ordering the lifting of precautionary measures **without prior proceedings and without having exhausted**

---

[88] Digital Record: 2006486 SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;2a./J. 55/2014 (10a.) J; Issued: Friday, May 23 2014 10:06 am

[89] Digital Record: 162729 SCJN;9th Epoch;Semanario Judicial de la Federación y su Gaceta;1a. XXXIV/2011 ;TA

127



The Court of Appeals **has previously used an ordinary means of defense**, that is, violating the principle of contradiction and the essential requirements of the right to due process and effective precautionary protection.

As developed above, the right to due process enshrines the principle of "contradiction" according to which the possibility of the parties to be heard during the proceeding must be respected, so that they **may allege and prove**, in order to be able to reach a knowledge of "truth" during the trial".

Thus, in accordance with this principle, the judge must allow equal participation of the parties in the trial, and must listen to both parties before making a decision.

Now, the principle of contradiction acquires a special relevance when it comes to precautionary measures, since they seek to guarantee the right to effective precautionary protection in favor of the parties, in order to achieve a useful and fair sentence.

However, these measures are "flexible" in the sense that they can be modified or even revoked during the course of the proceedings; however, this means that their modification or revocation can be done unilaterally by the judge.

Precisely, in order to respect the right of contradiction, the participation of both parties is necessary prior to the court's decision to lift or modify a precautionary measure; such participation must be carried out through an incidental proceeding.

In this respect, Articles 1349, 1350, 1351 and other applicable articles of the Code of Commerce establish the possibility for the parties to raise issues related to the main business in order to have them resolved through incidental proceedings, respecting the essential formalities of the procedure.

In the event of the possible existence of a supervening fact that merits the revocation or lifting of a precautionary measure, it is necessary that the applicant be given the opportunity to disprove such fact or to offer evidence by virtue of which it is demonstrated that the need to maintain the validity of the precautionary measures prevails.

Otherwise, the principle of contradiction would be violated by preventing the active participation of one of the parties during the proceeding.

The foregoing is evident if it is taken into consideration that article 1177 of the Commercial Code establishes that precautionary measures will only be granted without hearing the opposing party when they are requested prior to the commencement of the trial, and when the trial has begu**n, they must be processed through incidental proceedings**:

> "Article 1177.- Precautionary measures established by this Code may be decreed both as preliminary acts and after the commencement of any of the proceedings provided for therein. In the first of the cases, the order shall be decreed outright, without summoning the person against whom it is requested, once the requirements set forth in this Code have been met. In the second case, the order shall be substantiated in the following manner

128



The judge or court that is hearing the case at the time the petition is filed shall hear the case separately.

Consequently, if during the trial process the principle of contradiction must be respected when deciding on the granting of precautionary measures; by majority of reason, compliance with said principle must be ensured when it comes to the lifting or modification of such measures.

The following criterion issued by the First Chamber of the Supreme Court of Justice of the Nation does not go unnoticed by the Complainant:

> **"ATTACHMENT IN COMMERCIAL MATTERS. IN ITS DICTATION, LIFTING OR SUBSTITUTION DOES NOT GOVERN THE LAW OF**
> **PRIOR HEARING**. The effects on the expectation of rights, understood as prerogatives whose scope or enjoyment is conditioned to the fulfillment of certain conditions, cannot be considered as private acts, but as acts of nuisance. In this sense, the obtaining of a precautionary measure must be understood as an expectation of rights whose admission or rejection constitutes an act of nuisance, which is consistent with the jurisprudential doctrine of the Plenary of the Supreme Court of Justice of the Nation, regarding the origins and effects of the distinction between private acts and acts of nuisance, according to which the precautionary measures, both in general and in the specific case of attachment, constitute acts of nuisance with respect to which the right to a prior hearing does not apply. Thus, the Plenary framed the lifting of the attachment - in terms of article 1180 of the Commercial Code - as part of that doctrine, emphasizing that the substitution of the guarantee - bond instead of attachment - does not extinguish the validity of the precautionary measure and that, in any case, the guarantee that seeks to ensure the effectiveness of the credit has no impact on the merits, since it does not presume the existence of the right that is alleged as support of the action attempted, which will be determined by the judgment and not by such precautionary measure."[90]

However, from an analysis of amparo en revisión 710/2017 (from which said criterion derives) this Court may notice that the Supreme Court analyzed the case in which the precautionary measures are lifted **on the occasion of the granting of counter-guarantee**:

> "By letter filed on September 21, 2012, Hes Logistics & Consulting,
> S.A. de C.V. (hereinafter "Hes Logistics & Consulting") filed a lawsuit in ordinary mercantile proceedings against Fresenius Medical Care de México, S.A. de C.V. (hereinafter "Fresenius Medical Care de México"), from whom it claimed the payment of the following amounts
> The plaintiff requested as a precautionary measure the provisional seizure of assets of the defendant to guarantee the payment of the amount claimed, in order to guarantee the payment of the amount claimed. The plaintiff requested as a precautionary measure the provisional seizure of the defendant's assets to guarantee the payment of the claim.
>
> Regarding the precautionary measure, in the admissory order of September 26, 2012, the Fifth Mercantile Court of the First Judicial District of the State of Jalisco, gave notice to the plaintiff to present two witnesses to prove the well-founded fear of concealment or dilapidation of the assets, in compliance with the provisions of Article 1173 of the Commercial Code (according to the text prior to the reforms of January 2014). On October 1, 2013, a hearing was held within which the requested testimonies were rendered.
>
> By interlocutory judgment of October 9, 2012, the Judge decreed the attachment of the defendant's assets for the amount claimed, as well as for USD $7,091.8 (amount in

---

[90] Digital Record: 2018656 SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;1a. CCXLII/2018 (10a.) ;TA; Publication: Friday, December 07, 2018 10:19 am.



United States dollars), conditioned to the plaintiff exhibiting a bond, which took place on October 17 of the same month and year. The seizure proceeding was carried out the following day, October 18, 2012.

It is important to mention that, during the processing of the trial and based on Article 1180 of the Code of Commerce, on November 1, 2012, **the lifting of the precautionary measure was decreed, since the defendant exhibited two surety policies to guarantee the value of what was claimed** (...)."

That is, the Supreme Court did not analyze the case in which the defendant requests the lifting of the precautionary measure as a consequence of the existence of supervening facts that merit it, but by virtue of the exercise of a right, which is the granting of counter-guarantee.

In this regard, in said precedent the Supreme Court recognized the counter-guarantee as **a right of the parties to the proceeding**, being that through it **the precautionary measure granted is not lifted, but remains in force through the guarantee constituted by the affected party**:

"In fact, there is a clear jurisprudential doctrine of the Full Court on the origins and effects of the distinction between acts of restraint and acts of nuisance, according to which the precautionary measures -both in general and in the specific case of the attachment- constitute acts of nuisance for which the guarantee of a hearing does not apply. In this regard, the Plenary framed the lifting of the attachment -in terms of article 1180 of the Commercial Code- as part of that doctrine, **emphasizing that the substitution of the guarantee -security instead of attachment- does not extinguish the validity of the precautionary measure and that, in any case, the guarantee that seeks to ensure** the effectiveness of the precautionary measure does not extinguish the validity of the precautionary measure, <u>the guarantee that seeks to ensure the effectiveness of the credit has no impact on the merits of the</u> case, since it does not presume the existence of the right alleged as support of the action, which will be determined by the judgment and not by the precautionary measure (...)".)"

In these terms, the exception to the guarantee of a hearing and to the principle of contradiction detected by the First Chamber of the Supreme Court of Justice of the Nation is only sustained to the **extent that counter-guarantee is granted, since it ensures the effectiveness of the action brought and has no impact on the merits.**

Outside this case (i.e., when the lifting of a measure is sought without the granting of counter-guarantee), it is clear that the adversarial principle must be respected.

However, the Responsible Court interpreted the possibility of ordering the lifting of precautionary measures unilaterally, without respecting the principle of counter-adjudication, without prior exhaustion of remedies and without the need to grant any counter-guarantee; this is evidently unconstitutional because it violates the right to due process and the right to effective precautionary protection.

d.   <u>Necessity of exercising constitutionality control to safeguard the constitutionality of the challenged precepts and consequent unconstitutionality of the Challenged Resolutions under the protection of the exercise of such control.</u>

130



Prior to declaring the unconstitutionality of Articles 1, 7 and 28 of the Bankruptcy Law, the wording of the rules requires an *ex officio* control of constitutionality and conventionality.

In this regard, it is worth noting the following jurisprudences of the Supreme Court of Justice of the Nation:

**"CONTROL OF CONSTITUTIONALITY AND CONVENTIONALITY EX OFFICIO. IS NOT A MATTER OF SUBSIDIARITY, AND THEREFORE MUST BE CARRIED OUT EVEN WHEN THE HUMAN RIGHT IN QUESTION IS CONTAINED IN THE FEDERAL CONSTITUTION**.
The obligation to exercise ex officio review of the constitutionality and conventionality of a norm is present even in those cases in which the human right in question is regulated in the Federal Constitution itself. This is because the Plenary Court, in resolving the case Varios 912/2010, did not make this clarification, nor did it determine that the ex officio control was a matter of subsidiarity, but rather emphasized that the judges and all the authorities of the country were obliged to watch over human rights and that this vigilance translated, in the case of the judges, into an interpretative problem; to this end, it is required that they effectively carry out this control in those cases in which the norm to be applied arouses suspicions for the applying authority or is pointed out by the interested party as violating rights in the amparo trial; in these cases, they must also carry out the exercise in the three steps indicated in the file Varios 912/2010: conforming interpretation in the broad sense, conforming interpretation in the strict sense and, if applicable, inapplication."[91]

**"CONTROL OF CONSTITUTIONALITY AND CONVENTIONALITY EX OFFICIO. GENERAL CONDITIONS FOR ITS EXERCISE. The authority**
In order to exercise the ex officio control in the terms established in the file Varios 912/2010 of the Supreme Court of Justice of the Nation, it must ensure that the need for this type of control has been met, that is, in each case it must determine whether it is essential to make an interpretation in a broad sense, one in a strict sense or an inapplication, which occurs when there is in the presence of a rule that is suspicious or doubtful in the face of the parameters of control of human rights. Thus, when a norm does not generate suspicions of invalidity for the judge, because it does not seem to potentially violate human rights, then an exhaustive analysis of constitutionality and conventionality is not necessary, because the presumption of constitutionality enjoyed by all legal norms has not even been called into question. This is so because, as was pointed out in the aforementioned case, the norms do not lose their presumption of constitutionality until the result of the control so reflects, which implies that the norms that are controlled can even save their presumption of constitutionality by means of a broadly or strictly conforming interpretation"[92].

**"CONTROL OF CONSTITUTIONALITY AND CONVENTIONALITY EX OFFICIO. ITS EXERCISE DOES NOT NECESSARILY LEAD TO LA NON-APPLICATION OF A NORM**. While it is true that all judges must prefer the observance of the human rights contained in the Political Constitution of the United Mexican States and in the international treaties to which the Mexican State is a party, even in cases where there are provisions to the contrary in any inferior norm, it is also true that not every exercise of ex officio control of the constitutionality of the rights contained in the Constitution and in the referred treaties necessarily leads to the inaplication of the norm in question, because, as stated by the Full Court of the Supreme Court of Justice of the Nation in the case of several 912/2010 (compliance with the judgment of the Inter-American Court of Human Rights in the case of Rosendo Radilla Pacheco), the norms do not lose their presumption of constitutionality until the result of the control so reflects. This situation implies that the norms that are controlled can even save their presumption of constitutionality by means of their interpretation, either: 1) in a broad sense; or, 2) in a strict sense. Thus, the inapplication will come only in the following cases

---

[91] [J]; 10th Epoch; 1st Chamber; Gaceta S.J.F.; Book 18, May 2015; Volume I; Page 186. 1a./J. 38/2015 (10a.).

[92] [J]; 10th Epoch; 1st Chamber; Gaceta S.J.F.; Book 27, February 2016; Volume I; Page 430. 1a./J. 4/2016 (10a.).



cases in which the norm does not bridge these two interpretative possibilities. Therefore, the concepts "ex officio review of constitutionality and conventionality" and "non-application" are not interchangeable; in other words, such a review does not necessarily lead to the non-application of the norm. Moreover, what is relevant for the constitutional order is not that such control is omitted in depth in cases in which the presumption of constitutionality enjoyed by all norms is clearly not defeatable, but, on the contrary, when it is necessary to justify such inderrotability"[93].

Now, with respect to the foregoing, it follows that (i) an ex officio review of constitutionality must be undertaken in those cases in which the rule to be applied arouses suspicion or is doubtful with respect to the parameters of control of human rights in the amparo proceeding; and, (ii) that the rules do not lose their presumption of constitutionality, until the result of the review so reflects, which implies that the rules that are reviewed may even save their presumption of constitutionality through their interpretation, either: 1) conforming in a broad sense; or, 2) in a strict sense.

In this particular case, the implicit interpretation undertaken by the Responsible Court is doubtful in view of the parameters of control of the human rights of legal certainty and effective judicial protection.

In this sense, it is appropriate to request this District Court to undertake an ex officio exercise of constitutionality control. It is important for your Honor to take into consideration that the non-application of the norm is not sought; instead, the Complainant considers that the validity of said norm can be safeguarded through its interpretation in accordance with the Constitution of the Republic and the international human rights treaties to which Mexico is a party.

With respect to the conforming interpretation, it is convenient to recall the jurisprudential line designed by the Federal Judiciary.

In the classic constitutional doctrine, even prior to that adopted on the occasion of the human rights reform of June 2011, the Plenary of the Supreme Court of Justice of the Nation pointed out that before declaring the invalidity of a norm, and in its case, expelling it from the legal system, it must opt for the interpretation that safeguards its constitutionality.[94]

The second paragraph of Article 1 of the Constitution, amended by decree published in the Official Gazette of the Federation on June 10, 2011, establishes that human rights norms shall be interpreted in accordance with the Constitution itself and with international treaties on the subject, favoring at all times the broadest protection for individuals (pro persona principle), specifically with respect to the pronouncements of the Supreme Court of Justice of the Nation and the criteria - mandatory when the State

---

[93] [TA]; 10th Epoch; 1st Chamber; Gaceta S.J.F.; Book 1, December 2013; Volume I; Page 511. 1st CCCLIX/2013 (10th.).
[94] By analogy, it is convenient to invoke the criterion of the Plenary of the Supreme Court of Justice of the Nation contained in the following thesis: "INTERPRETACIÓN CONFORME EN ACCIONES DE INCONSTITUCIONALIDAD, CUANDO UNA NORMA ADMITA VARIAS INTERPRETACIONES DEBE PREFERIRSE LA COMPATIBLE CON LA CONSTITUCIÓN."

CLYDE&CO

The Mexican Supreme Court was a party to the case and the opposing case of the Inter-American Court of Human Rights[95].

The principle of interpretation in conformity with the Constitution, repeatedly used by the Supreme Court of Justice of the Nation, is an elementary consequence of the conception of the legal system as a coherent structure.

This interpretative rule operates prior to the judgment of invalidity; before considering a legal norm as constitutionally invalid (either because it contradicts the fundamental text, its judicial or international interpretation, or because it violates fundamental rights), it is necessary to exhaust all the possibilities of finding in it a meaning that makes it compatible with the Constitution and that allows it, therefore, to subsist within the legal system.

Only in the case of a clear and unavoidable incompatibility or an insurmountable contradiction between the ordinary norm and the Constitution, would it be appropriate to declare it unconstitutional.

The judge must try, whenever possible, to avoid the void that occurs when a rule is denied validity and, if several interpretations are possible, he must prefer the one that bridges the apparent contradiction. The interpretation of rules in accordance with the Constitution has traditionally been based on the principle of preservation of the law, which in turn is based on the principle of legal certainty and the democratic legitimacy of the legislator.

The courts, within the framework of their powers, may only declare a law unconstitutional when an interpretation in conformity with the Constitution is not possible. In any case, the rules are valid as long as a court does not rule otherwise.

Nowadays, the principle of interpretation in accordance with the Constitution is reinforced by the *pro persona* principle, contained in Article 1 of the Political Constitution of the United Mexican States, which obliges to maximize the interpretation in those scenarios in which such interpretation allows the effectiveness of the fundamental rights of individuals in the face of the legislative vacuum that may cause a declaration of unconstitutionality of the rule.[(96)]

Furthermore, conforming interpretation will be treated as a constitutional issue when it is questioned that the interpretative modality adopted, although within the scope of legality, has the potential to violate the Constitution, being possible to find an interpretation that makes it compatible with the Constitution, so that the choice of one modality over another implies a pronouncement on the constitutionality of the norm.[97]

---

[95] See thesis 1a. CCXIV/2013 under the heading "HUMAN RIGHTS. CONFORMING INTERPRETATION, PROVIDED FOR IN ARTICLE 1 OF THE POLITICAL CONSTITUTION OF THE UNITED STATES MEXICANOS."

[96] See jurisprudence 1a./J. 37/2017 issued by the First Chamber of the Supreme Court of Justice of the Nation under the heading "INTERPRETACIÓN CONFORME. NATURALEZA Y ALCANCES A LA LUZ DEL PRINCIPIO PRO PERSONA."

[97] See thesis 1a. CCCLXVIII/2013 (10a.) issued by the First Chamber of the Supreme Court of Justice of the Nation under the title "REVISIÓN EN AMPARO DIRECTO. DIFFERENCES BETWEEN ISSUES



Based on these premises, this Court is called upon to undertake an exercise of conforming interpretation of the precepts that are being challenged, as follows:

In order to order the lifting of precautionary measures, the judge must respect due process and the principle of contradiction, being that such request must be resolved through incidental proceedings in accordance with the Commercial Code; the only exception to such rule is that the affected party grants sufficient counter-guarantee.

Such interpretation safeguards the constitutionality of said precept, since it fully respects the right to due process and effective precautionary protection.

In the present case, the Order is unconstitutional because the Responsible Judge ordered the lifting of the withholding decreed **without respecting the principle of contradiction, since it was ordered immediately after the dismissal of the insolvency proceeding and despite the fact that such determination has not yet become final**.

Therefore, this Court must grant the protection and protection requested and, consequently, revoke the Order.

**FIFTEENTH. UNCONSTITUTIONALITY OF ARTICLES 1, 7, 25, 26 AND 29 OF THE BANKRUPTCY LAW, AS WELL AS ARTICLE 1343 OF THE COMMERCIAL CODE, BY IMPLICITLY INTERPRETING THE POSSIBILITY OF ORDERING THE LIFTING OF THE PRECAUTIONARY MEASURES DESPITE THE FACT THAT THE CHALLENGED ORDER HAD NOT CAUSED STATE.**

<u>Synthesis.</u> By confirming the lifting of the precautionary measures through the Requested Order, the Responsible Court implicitly interpreted Articles 1, 7, 25, 26 and 29 of the Commercial Bankruptcy Law, as well as Article 1343 of the Commercial Code by ordering the lifting of the Precautionary Measures even though the Requested Order had not become enforceable, giving full effect to the withdrawal filed by the Comptroller's Attorney-in-Fact, even though such decision could still be challenged. Such interpretation renders the aforementioned articles unconstitutional, as it violates the rights of effective judicial protection, access to justice and effective judicial recourse.

<u>Development.</u>

---

CONSTITUTIONAL AND ASSUMPTIONS OF CONFORMING INTERPRETATION, FOR THE PURPOSE OF PROCEEDING WITH THAT APPEAL".



a. <u>Access to justice.</u>

The right of access to justice enshrined in Article 17 of the Political Constitution of the United Mexican States and 8, numeral 1, of the Pact of San José, implies that every person has the right to have justice administered by courts that will be expeditious to impart it **within the time and terms established by law, issuing their resolutions in a prompt, complete and impartial manner.**

In this regard, the First Chamber of the Supreme Court of Justice of the Nation defined such right as "*the subjective public right that every person has, within the terms and periods established by law, to have prompt access to independent and impartial courts, to file a claim or defend against it, so that, through a process in which certain formalities are respected, the claim or defense is decided upon and, if applicable, such decision is enforced".* The foregoing, according to the following jurisprudential criterion:

> **"DERECHO DE ACCESO EFECTIVO A LA JUSTICIA. STAGES Y RIGHTS TO WHICH HE IS ENTITLED**. Articles 14, 17 and 20, sections B and C, of the Political Constitution of the United Mexican States and 8 of the American Convention on Human Rights, derive from the right of effective access to justice, which includes, in addition to certain socioeconomic and political factors, the right to effective jurisdictional protection and the mechanisms of non-jurisdictional protection that must also be effective and constitutionally and legally founded. Now, in the jurisprudence 1a./J. 42/2007, under the heading: "GUARANTEE TO JURISDICTIONAL PROTECTION PROVIDED FOR IN ARTICLE 17 OF THE POLITICAL CONSTITUTION OF THE UNITED MEXICAN STATES. ITS SCOPE."The First Chamber of the Supreme Court of Justice of the Nation defined access to judicial protection as the subjective public right that every person has, within the periods and terms established by law, to have expeditious access to independent and impartial courts, to present a claim or to defend against it, so that, through a process in which certain formalities are respected, the claim or defense is decided upon and, if applicable, the decision is enforced; Hence, this right comprises three stages, to which correspond three rights: (i) one prior to the trial, to which corresponds the right of access to jurisdiction, which is based on the right of action as a kind of petition addressed to the jurisdictional authorities and which motivates a pronouncement on their part; (ii) a judicial one, which goes from the beginning of the proceeding to the last action and to which concerns the right to due process; and, (iii) a post-trial one, identified with the effectiveness of the decisions issued. Now, the aforementioned rights extend not only to proceedings before Judges and courts of the Judiciary, but also to all those before authorities that, when ruling on the determination of rights and obligations, perform materially jurisdictional functions"[98].

In the same sense, the Second Chamber of the Supreme Court of Justice of the Nation has considered that the right of access to justice implies that it must be "prompt", "complete", "impartial" and "free", as can be inferred from the following criterion:

> **"ACCESS TO THE ADMINISTRATION OF JUSTICE. ARTICLE 17 OF THE POLITICAL CONSTITUTION OF THE UNITED MEXICAN STATES ESTABLISHES SEVERAL PRINCIPLES THAT INTEGRATE THE RELATIVE INDIVIDUAL GUARANTEE, TO WHOSE OBSERVANCE ARE OBLIGATED THE AUTHORITIES THAT PERFORM ACTS MATERIALLY JURISDICTIONAL**. The individual guarantee of access to the administration of justice

---

[98] Digital Record: 2015591, Source: Gaceta del Semanario Judicial de la Federación, Book 48, November 2017, Volume I, Subject(s): Constitutional and Page: 151.



Prompt justice, which translates into the obligation of the authorities in charge of administering justice to resolve the controversies brought before them, within the terms and time periods established by law for such purpose; 2. Complete justice, which means that the authority hearing the matter must issue a ruling on each and every one of the aspects of the debate whose study is necessary, and guarantee that the governed will obtain a resolution in which, through the application of the law to the specific case, it will be resolved whether or not he is right or wrong regarding the rights that guarantee him the jurisdictional protection he has requested; 3. Impartial justice, which means that the judge issues a decision in accordance with the law, and without favoritism towards any of the parties or arbitrariness in its sense; and, 4. Free justice, which means that the organs of the State in charge of its administration, as well as the public servants entrusted with this function, will not charge the parties in conflict any emolument for the rendering of this public service. Now, if the aforementioned constitutional guarantee is aimed at ensuring that the authorities in charge of applying it do so in a prompt, complete, free and impartial manner, it is clear that the authorities that are obliged to observe all the rights that comprise it are all those that perform materially jurisdictional acts, that is to say, those that in their sphere of competence have the necessary attribution to settle a conflict arising between various subjects of law, regardless of whether they are judicial bodies, or only materially jurisdictional."[99]

The following criteria are also relevant:

**"GUARANTEE OF JUDICIAL PROTECTION PROVIDED FOR IN ARTICLE 17 OF THE POLITICAL CONSTITUTION OF THE UNITED STATES OF AMERICA UNITED MEXICANS. ITS SCOPE**. The guarantee of judicial protection can be defined as the subjective public right that every person has, within the terms and periods established by law, to have prompt access to independent and impartial courts, to file a claim or to defend against it, so that through a process in which certain formalities are respected, the claim or defense is decided upon and, if applicable, the decision is enforced. Now, if we consider that the prevention of the jurisdictional organs to be expeditious -unburdened, free of any hindrance- to impart justice in the terms and terms established by law, means that the public power -in any of its manifestations, Executive, Legislative or Judiciary- is not allowed to impart justice in the terms and terms established by law: Executive, Legislative or Judicial - cannot make access to the courts subject to any condition, because if any were established, it would constitute an obstacle between the governed and the courts, so it is unquestionable that the right to judicial protection can be violated by rules that impose impeditive or hindering requirements for access to jurisdiction, if such obstacles are unnecessary, excessive and lacking in reasonableness or proportionality with respect to the purposes that the legislator may lawfully pursue. However, not all requirements for access to the process can be considered unconstitutional, as is the case with those which, while respecting the content of this fundamental right, are aimed at preserving other constitutionally protected rights, goods or interests and are adequately proportionate to the purpose pursued, as is the case of compliance with legal deadlines, the exhaustion of prior ordinary remedies before exercising certain types of actions or the prior posting of bonds or deposits."[100]

**"ACCESS TO JUSTICE. CONSTITUTES A FUNDAMENTAL RIGHT PROVIDED FOR IN ARTICLES 17, SECOND PARAGRAPH, OF THE FEDERAL CONSTITUTION AND 8, NUMERAL 1, OF THE AMERICAN CONVENTION ON HUMAN RIGHTS**. Article 8, paragraph 1, of the American Convention on Human Rights.
Article 17, second paragraph, of the Political Constitution of the United Mexican States establishes that every person has the right to have justice administered by courts that will be expeditious to impart it within the terms and periods established by law, issuing their resolutions in a prompt, complete and impartial manner, in addition to the fact that their service will be free of charge, and judicial costs are prohibited. For its part, Article 8, numeral

---

[99], Digital Record: 171257, Source: Semanario Judicial de la Federación y su Gaceta, Volume XXVI, October 2007, Subject(s): Constitutional and Page: 209.
[100] Digital Record: 172759, Instance: First Chamber, Ninth Epoch, Subject Matter(s): Constitutional, Thesis: 1a./J. 42/2007, Source: Judicial Weekly of the Federation and its Gazette. Volume XXV, April 2007, page 124, Type: Jurisprudence.

CLYDE&CO

1 of the American Convention on Human Rights provides that every person has the right to a hearing, with due guarantees and within a reasonable time, by a competent, independent and impartial judge or tribunal, previously established by law, in the substantiation of any criminal accusation made against him, or for the determination of his rights and obligations of a civil, labor, fiscal or any other nature. Thus, although the expression "access to justice" is not found in the wording of these norms, it is concluded that it is the simple way to identify the appropriate method or means to materialize the content of these norms in favor of the governed, since being provided for in the dogmatic part of the Federal Constitution, said term constitutes a fundamental right that, in addition, has been recognized and ratified in the international instrument mentioned as a power inherent to the person. In this sense, access to justice is a human right that guarantees, subject to certain requirements, that every person may have access to independent and impartial courts, so that his rights may be respected and enforced and so that the organs in charge of imparting justice may resolve without obstacles the controversies submitted for their consideration, in a prompt and effective manner and within the time limits established by law."[101]

In addition to the foregoing, it is relevant to point out that the first two (2) paragraphs of Article 17 of the Constitution have not undergone any changes since its issuance in 1917. As mentioned above, this reason could explain why the jurisprudence had focused on exploring the scope of these procedural figures and jurisdictional competences as autonomous aspects establishes the following:

"No person may take justice into his own hands, nor exercise violence to claim his right.

Every person has the right to have justice administered by courts that will be ready to **impart it within the time limits and terms established by law**, issuing their resolutions in a prompt, complete and impartial manner. Their service shall be free of charge and, consequently, judicial costs are prohibited.

Provided that equality between the parties, due process or other rights are not affected in trials or proceedings conducted in the form of a trial, **the authorities shall give priority to the solution of the conflict over procedural formalities**."

This precept recognizes the principle of "privilege of conflict resolution over procedural formalisms", which has been widely interpreted by case law in the sense that legislative activity **must be subject to scrutiny**, and that formalisms that prevent the exercise of an action must be obviated or, at least, the law must be interpreted in such a way as to allow the resolution of the conflict submitted to jurisdictional activity:

"**ACCESS TO JUSTICE. THE COURTS ARE EMPOWERED TO CARRY OUT A SCRUTINY OF THE REASONABLENESS OF LEGISLATIVE ACTIVITY WHEN IT IMPOSES DIFFERENT REQUIREMENTS FOR THE EXERCISE OF ACTIONS THAT ARE NOT IN ACCORDANCE WITH THE LAW.**
**PROTECT SIMILAR LEGAL RIGHTS.** While it is true that the Political Constitution of the United Mexican States does not expressly establish parameters for an ordinary or strict analysis of legislative activity, it is also true that it recognizes that the exercise of human rights may only be restricted or suspended in the cases and under the conditions established by the Constitution itself; It also states that rights must be interpreted in a manner that favors the broadest protection of the individual and imposes on all authorities, within the scope of their competencies, the obligation to respect, promote, protect and guarantee human rights; hence, constitutional norms seek to ensure that the authorities, as a general rule, allow the enjoyment of rights and, exceptionally, impose some restriction. In the same way, Article 30 of the American Convention on Human Rights states that "the authorities must, as a general rule, permit the enjoyment of rights and, exceptionally, impose restrictions.

---

[101] Digital Record: 2020111, Instance: Collegiate Circuit Courts, Tenth Epoch, Subject Matter(s): Constitutional, Thesis: IV.3o.A.2 CS (10a.), Source: Gaceta del Semanario Judicial de la Federación. Book 67, June 2019, Volume VI, page 5069, Type: Aislada. 344

CLYDE&CO

Human Rights establishes that the restriction to these rights must be applied in accordance with the laws that are dictated for reasons of general interest and with the purpose for which they have been established. Consequently, the fact that Article 17 of the Constitution allows the legislature to regulate the terms and terms in which access to justice must be guaranteed does not imply that it may freely establish requirements that inhibit the exercise of the right or alter its essential core, so that the courts are empowered to carry out a scrutiny of reasonableness when the legislature imposes different requirements for the exercise of actions that protect similar legal rights."[102]

**"PRECAUTIONARY MEASURES IN COMMERCIAL MATTERS. IT IS IMPROPER TO DECREE THEM IF THEIR PURPOSE IS TO INHIBIT OR PREVENT A PERSON FROM EXERCISING THE CORRESPONDING ACTIONS BEFORE THE COURTS, SINCE THIS IMPLIES VIOLATING THE RIGHT OF ACCESS TO JURISDICTION.**

Facts: In a proceeding for the adoption of precautionary measures prior to the commercial arbitration proceeding, the Judge responsible issued them and established that the counterpart of the petitioner should refrain from taking actions tending to rescind, terminate or annul the contract entered into between them or to revoke some irrevocable letters of credit granted in guarantee of the performance of its obligation.

Legal criterion: This Collegiate Circuit Court determines that it is inadmissible to decree precautionary measures whose purpose is to inhibit or prevent a person from exercising the corresponding actions before the courts, since this implies violating the right of access to jurisdiction.

Justification: The foregoing, because the First Chamber of the Supreme Court of Justice of the Nation held in the jurisprudence thesis 1a./J. 42/2007, that the right to judicial protection may be defined as the subjective public right that every person has, within the terms and time periods established by law, to have prompt access to independent and impartial courts, to file a claim or to defend himself, so that through a process in which certain formalities are respected, the claim or defense may be decided and, if applicable, the decision may be enforced; that the prevention of the jurisdictional organs to be expeditious -free of any hindrance- to impart justice within the terms and time limits established by law, means that the public power -in any of its manifestations, whether Executive, Legislative or Judicial- is not allowed to impart justice within the terms and time limits established by law: Executive, Legislative or Judicial - cannot make access to the courts subject to any condition, because if any such condition were established, it would constitute an obstacle between individuals and the courts; To that extent, our Supreme Court also indicated that the reservation of law established in Article 17 of the General Constitution, which provides that the administration of justice must take place within the "terms and periods established by law", responds to a reasonable requirement and that, therefore, that constitutional provision must be interpreted in a reasonable manner, this constitutional prevention must be interpreted in the sense that the legislator is granted the power to establish rational limits for the exercise of the rights of action and defense, without imposing conditions that imply, in truth, the denial of the right to jurisdictional protection, because they constitute obstacles between the parties and the action of the courts. Now, in the Federal Code of Civil Procedures, applicable supplementarily to the Code of Commerce, the precautionary measures are generally of a conservative nature, that is, they are dictated so that things remain in the state they are in and with the purpose of avoiding acts of violence between the parties; however, this in no way implies the possibility that through a measure of this nature a person may be prevented from exercising the right of access to justice; hence, if a judicial authority, under the pretext of preserving things in the state they are in, issues a precautionary measure by which it prevents a person from exercising an action or going to court to exercise it, such measure will not be properly of a conservative nature, but will actually constitute a new state of affairs, in view of which, in fact, it will prevent the exercise of the constitutional right of access to justice, reason for which, being contrary to such constitutional right, that is, for inhibiting the access to jurisdiction, it must be declared inadmissible."[103]

---

[102] Digital record: 2009011 Instancia: Primera Sala Décima Época Materia(s): Constitutional Tesis: 1a. CXLVV/2015 (10a.) Fuente: Gazette of the Judicial Weekly of the Federation. Book 18, May 2015, Volume I, page 391 Type: Aislada

[103] Digital Record: 2024663 Instance: Collegiate Circuit Courts Subject Matter(s): Constitutional, Civil Thesis: I.15o.C.3 C (11a.) Source: Gazette of the Judicial Weekly of the Federation. Book 13, May 2022, Volume V, page 4679 Type: Aislada



**"THE LATTER SHOULD BE PRIVILEGED OVER THE FORMER, PROVIDED THAT THE EQUALITY OF THE PARTIES IS NOT AFFECTED, THE EQUALITY OF THE PARTIES IS NOT AFFECTED, THE**
**DUE PROCESS OR OTHER RIGHTS**. For a long time it was a matter of criticism for the amparo courts that the protective judgments were granted for formal or procedural aspects and not for substantive issues; which motivated the issuance of the new Amparo Law (published in the Official Gazette of the Federation on April 2, 2013), which established in its Article 189 that the amparo courts would proceed to the study of the concepts of violation according to their logical priority, but giving priority at all times to the principle of the greatest benefit; and it was in this context that by amendment to precept 17 of the General Constitution of the Republic published in the Official Gazette of the Federation on September 15, 2017, a third paragraph was added to said provision, in which it was pointed out "Provided that equality between the parties, due process or other rights are not affected in trials or proceedings followed in the form of a trial, the authorities shall give priority to the solution of the conflict over procedural formalisms.". Therefore, in accordance with this social aspiration and in strict compliance with the aforementioned articles, in trials or in the related proceedings, all authorities must give priority to the solution of the conflict over procedural formalisms, with the only limitation that the equality of the parties, the due process or other rights are not affected."[104]

**"RIGHT OF ACCESS TO JUSTICE (PRINCIPLE OF GREATER BENEFIT). AS OF THE ENTRY INTO FORCE OF THE ADDITION TO ARTICLE 17, THIRD PARAGRAPH, OF THE CONSTITUTION, ALL JUDICIAL AUTHORITIES AND THOSE WITH MATERIALLY JURISDICTIONAL FUNCTIONS MUST PRIORITIZE THE SOLUTION OF THE CONFLICT OVER PROCEDURAL FORMALISMS, PROVIDED THAT EQUALITY BETWEEN THE PARTIES IS NOT AFFECTED (DOF OF SEPTEMBER 15, 2017).**

Facts: A person filed an indirect amparo lawsuit in which he alleged that Articles 91 and 92 of the Federal Law of Administrative Procedure, which provide for the resolution of the appeal for review in an administrative venue, are contrary to the mandate provided in the third paragraph of Article 17 of the Political Constitution of the United Mexican States, since they do not contemplate that the resolution of the merits of the matter is privileged over procedural formalisms. The District Judge who heard the case considered that the constitutional provision in question contains a rule that confers power to the legislative authority, but not a subjective public right in favor of the individual, which implies that until such time as this power is exercised by the Congress of the Union, in order to adapt the legal norms to the text of article 17 of the Constitution itself, the prevailing legal situations regarding the resolution of appeals for review in the administrative venue should not change.

Legal criteria: The Second Chamber of the Supreme Court of Justice of the Nation considers that upon the entry into force of the addition to Article 17, third paragraph, contained in the Decree by which Articles 16, 17 and 73 of the Political Constitution of the United Mexican States are reformed and added, in matters of Everyday Justice (Substantive Resolution of Conflict and Legislative Competence over Civil and Family Proceedings), published in the Official Gazette of the Federation on September 15, 2017, all judicial authorities and those with materially jurisdictional attributions in the country must privilege the substantive resolution of the conflicts submitted to their power over procedural formalisms, provided that equality between the parties is not affected. The foregoing, regardless of the fact that the rules governing their procedures do not expressly establish this issue.

Justification: From the analysis of the aforementioned constitutional reform, it can be seen that the Permanent Constituent considered that, in order to address the problem of the "proceduralist culture", which generates that in a significant number of cases formal matters are dealt with and the merits are left aside and, therefore, without resolving the controversy actually raised, it was necessary to add to Article 17

---

[104] Digital Record: 2016171 Tenth Epoch Subject(s): Constitutional, Common Thesis: (IV Region)2o.13 K (10a.) Source: Gaceta del Semanario Judicial de la Federación. Book 51, February 2018, Volume III, page 1524 Type: Aislada

CLYDE&CO

The constitutional duty of the authorities to prioritize, above formal aspects, the resolution of the merits of the case. It was said that this duty also requires a change in the mentality of the authorities so that in the handling of cases they do not opt for the simplest or quickest resolution, but for the study that effectively closes the controversy and the application of substantive law. Furthermore, it was specified that the explicit incorporation of such principle in the General Constitution intends that it permeates the justice system at a national level, that is to say, that all judicial authorities and with materially jurisdictional attributions of the country are subject to its rule, but beyond its obligatory nature, they recognize the reason and moral principle that underlies the addition to article 17 of the Constitution. Therefore, this Chamber concludes that upon the entry into force of the referred addition, all jurisdictional authorities must prioritize the resolution of the conflicts submitted to their power, regardless of the fact that the rules governing their procedures do not expressly establish such issue, since from the teleological analysis of the constitutional reform, it is clear the intention regarding that this added principle would support the entire national justice system so that the authorities would prioritize a resolution of substance over form, thus avoiding unnecessary and dilatory re-directions of jurisdiction in the administration of justice."[105]

b.  Effective judicial protection.

The fundamental right to effective judicial protection is derived from the nature of the fundamental rights of access to justice and to jurisdiction, for which reason it is convenient to explain the content, development, extremes and limits of such fundamental rights (guiding principles of the also known -in some doctrinal sectors- as effective judicial protection and access to justice), contained in Articles 25 of the American Convention on Human Rights ("**ACHR**") and 2 of the International Covenant on Civil and Political Rights.[106]

---

[105] Digital Record: 2023741 Instance: Second Chamber Eleventh Epoch Subject Matter(s): Constitutional Thesis: 2a./J. 16/2021 (11a.) Source: Gazette of the Judicial Weekly of the Federation. Book 7, November 2021, Volume II, page 1754 Type: Jurisprudence.

[106] "American Convention on Human Rights (Pact of San José) Article 25.

Judicial Protection

1. Everyone has the right to simple and prompt recourse, or any other effective recourse, to a competent court or tribunal for protection against acts that violate his fundamental rights recognized by the constitution or laws of the state concerned or by this Convention, even though such violation may have been committed by persons acting in the course of their official duties.

2. The States Parties undertake:

a) To ensure that the competent authority provided for by the legal system of the State shall decide on the rights of any person seeking such a remedy;

b) To develop the possibilities of judicial recourse, and

c) To ensure the enforcement, by the competent authorities, of any decision in which the appeal has been upheld."

International Covenant on Civil and Political Rights

Article 2

1.      Each State Party to the present covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present covenant, without distinction of any kind, such as race, color, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

2. Each State Party undertakes to adopt, in accordance with its constitutional processes and the provisions of the present covenant, such legislative or other measures as may be necessary to give effect to the rights recognized in the present covenant and not already guaranteed by legislative or other provisions.

3. Each State Party to this compact undertakes to ensure that:

a) Any person whose rights or freedoms as set forth in the present Covenant are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;

b) The competent judicial, administrative or legislative authority, or any other competent authority provided for by the legal system of the State, shall decide on the rights of any person seeking such recourse and to develop the possibilities of judicial recourse;

c) The competent authorities shall comply with any decision in which the appeal has been upheld."



In the Inter-American sphere, although it is true that the States Parties to the ACHR enjoy a margin of appreciation to articulate the fundamental right of effective judicial protection,[107] it is no less true that the requirements and formalities established in the legislative venue must be proportional to the end or objective pursued, that is, they must not harm the very substance of that right.[108]

On August 6, 2008, the Inter-American Court of Human Rights, in resolving the Castañeda Gutman v. United Mexican States case, considered that an effective judicial remedy is one capable of producing the result for which it was conceived, that is, it must be a remedy capable of leading to an analysis by a competent court for the purpose **of establishing whether or not there has been a violation of human rights and, if so, _providing reparation_**.[109]

Closely related to the above, the Human Rights Committee reasoned in General Comment No. 31 (issued on May 26, 2004) that **the right to an effective remedy may require <u>States Parties</u> to <u>adopt and implement provisional measures to prevent the recurrence of violations and to remedy as soon as possible any damage that such violations may have caused</u>**.[110]

Mexico, as a signatory to the Covenant and a party to the American regional system for the protection of human rights, has the obligation to implement the effectiveness of the remedies provided for in the Covenant.

---

[107] This margin of appreciation of the States has been recognized by this Chamber in the following thesis: "REVISIÓN EN AMPARO DIRECTO. ARTICLE 25 OF THE AMERICAN CONVENTION ON HUMAN RIGHTS. DOES NOT MAKE THAT APPEAL ADMISSIBLE. [Tenth Epoch. Digital Record: 2002906. Instance: First Chamber. Type of thesis: isolated. Source: Semanario Judicial de la Federación y su Gaceta: Semanario Judicial de la Federación y su Gaceta, Book XVII, Volume 1, February 2013, common matter, thesis 1a. XLVIII/2013 (10a.), page 843]. "REVISIÓN EN AMPARO DIRECTO. EL ARTÍCULO 83, FRACCIÓN V, DE LA LEY DE AMPARO, NO VULNERA EL DERECHO A UN RECURSO JUDICIAL EFECTIVO PREVISTO EN EL ARTÍCULO 25 DE LA CONVENCIÓN". AMERICAN DECLARATION ON HUMAN RIGHTS." [Tenth Epoch. Digital Record: 2002907. Instance: First Chamber. Type of thesis: isolated. Source: Semanario Judicial de la Federación y su Gaceta: Semanario Judicial de la Federación y su Gaceta, Book XVII, Volume 1, February of 2013, constitutional matter, thesis 1a. XLVII/2013 (10a.), page 843]

[108] In similar terms, the European Court of Human Rights ruled in the Ashingdane v. Royaume-Uni case, May 28, 1985, A. 93, para. 57.

[109] Case of Castañeda Gutman v. United Mexican States. Preliminary Objections, Merits, Reparations and Costs. . Judgment of August 6, 2008. Series C No. 184.

[110] "(...) The obligation under article 2, paragraph 2, to take steps to give effect to the rights recognized in the Covenant is unqualified and immediate. Compliance with this obligation cannot be justified by reference to considerations of a political, social, cultural or economic nature within the State.

Article 2, paragraph 3, provides that, in addition to effectively protecting the rights recognized in the Covenant, States parties shall ensure that all persons have accessible and effective remedies for claiming those rights. Such remedies should be appropriately tailored to take into account the special vulnerability of certain classes of persons, in particular children. The Committee attaches importance to States parties establishing adequate judicial and administrative mechanisms in domestic law to deal with complaints of rights violations. The Committee notes that the judiciary can ensure the enjoyment of the rights recognized in the Covenant in various ways, including through the direct application of the Covenant, the application of constitutional or other similar legislative provisions, or the effect of the interpretation of the Covenant on the application of domestic law. Administrative mechanisms are particularly required to implement the general obligation to investigate allegations of violations promptly, thoroughly and effectively by independent and impartial bodies. National human rights institutions with relevant powers can assist in this regard. The failure of a State party to investigate allegations of violations may in itself be a violation of the Covenant. Cessation of the violation is an indispensable element of the right to an effective remedy. (...)

The Committee further notes that in certain circumstances, the right to an effective remedy may require <u>States parties</u> to <u>adopt and implement provisional measures to prevent the recurrence of violations and to remedy as soon as possible any harm that such violations may have caused.</u>

Although the legal systems of the States parties are formally endowed with adequate remedies, violations of the rights recognized in the Covenant continue to occur. It may be <u>assumed that this is attributable to the fact that the remedies do not function effectively in practice</u>. States parties are therefore requested to identify in their periodic reports obstacles to the effectiveness of existing remedies."



in said international instrument, specifically, **with respect to those cases where <u>provisional measures must <u>be adopted and applied to avoid the repetition of the harmful conduct complained of, its persistence or consummation, and to repair as soon as possible any damage that such violations may have caused</u>**; This, by means of the corresponding legislative implementation, directly invoking the Covenant, or, before the judicial interpretation of the norms that provide for remedies and trials, that is to say, Mexico, and therefore, this court, has the international obligation to apply and implement the fundamental conventional right of effective precautionary protection.

The notion of "effectiveness" that arises from Article 25 of the ACHR requires that the judicial tools available include procedural measures such as precautionary, provisional or precautionary measures and, in general, **simple and rapid judicial remedies for the protection of rights, with a view to preventing violations from being prolonged in time**.[111] The foregoing, even when the determination of the merits of the case requires a longer period of time

The right to judicial protection generates the State's obligation to establish and guarantee suitable and effective judicial remedies for the protection of rights."[112] For a remedy to be considered "suitable" it must meet the following characteristics:

**a)**      that the appeals **are simple**, urgent, **informal**, accessible and handled by independent bodies;

**b)**      The possibility of accessing federal or national courts in the event of suspicion of bias in the actions of local bodies;

**c)**      that **broad legal standing** is guaranteed;

**d)**      that can be processed as individual remedies and also as collective precautionary actions (to protect a determined or determinable group according to certain parameters, affected or under imminent risk situation); and,

**e)**      that the **implementation of <u>protective</u> measures** is foreseen in consultation with those affected.[113]

In relation to the processing of these appeals, the IACHR established in its report that "... as these are actions for the protection of fundamental rights in urgent cases, the ritual of the evidence should not be the same as that required in ordinary proceedings, since it is a matter of

---

[111] In the same vein, the Human Rights Committee, in its General Comment No. 31, has stated: "...The Committee is further of the view that the right to an effective remedy may, in certain circumstances, require States parties to establish and implement provisional or precautionary measures to prevent the continuation of violations and to ensure that any harm caused by such violations is redressed as promptly as possible..." (emphasis added) Cf. Human Rights Committee, General Comment No. 31, "The nature of the general legal obligations imposed by the Covenant on States parties", May 26, 2004, CCPR/C/21/Rev.1/Add.13, para. 19.
[112] Access to justice for women victims of violence in the Americas, cit.
[113] Ibid., pages 35, 36.

CLYDE&CO

in a short period of time to adopt the necessary measures for the immediate protection of the threatened rights".

In the comparative sphere, the Spanish constitutional court determined that "the right to judicial protection requires the jurisdictional bodies to interpret the procedural rules that condition this access in the most favorable sense for the effectiveness of the mentioned fundamental right (STC 159/1990), being of obligatory observance of the hermeneutic principle pro actione"[114].

The national jurisprudence has been headed by the Supreme Court of Justice of the Nation, which has issued several precedents interpreting articles 25 and 2 of the Convention in relation to article 17 of the Political Constitution of the United Mexican States,[115]arriving at the conclusion, in what is of interest, that the jurisdictional bodies must resolve the conflicts submitted to their consideration **without any other condition than the necessary, reasonable and proportional formalities to the case in order to achieve its processing and resolution.**

Therefore, the bodies responsible for administering justice **must assume an attitude of facilitating access to jurisdiction.** The rules for the processing and the very requirements for the admission of lawsuits, incidents allowed therein, or appeals attempted established by the legislator are of strict interpretation, which is intended not to limit the fundamental right to effective judicial protection.

It is precisely in accordance with the pro persona principle, in its pro actione aspect, [116]that the Judge must find the interpretation most favorable to the action, this is aimed at **not hindering or obstructing the right to effective judicial protection, therefore, when in doubt, the procedural requirements and budgets should always be interpreted in the most favorable sense to the full effectiveness of this human right**, This implies resolving the conflicts that arise without obstacles or unnecessary delays and avoiding formalisms or unreasonable interpretations that impede or hinder the trial of the merits and authentic judicial protection, **preventing mere formalisms from preventing a trial of the merits of the case.**

---

[114] STC 136/1995, of September twenty-fifth, nineteen ninety-five, paragraph 2 -legal grounds .

[115] The Supreme Court has determined that effective judicial protection is enshrined as a human right in Article 17 of the Constitution in the following jurisprudence: "JUSTICE, ACCESS TO. THE POWER GRANTED TO THE LEGISLATOR IN ARTICLE 17 OF THE GENERAL CONSTITUTION OF THE REPUBLIC, TO FIX THE TERMS AND PERIODS ACCORDING TO WHICH IT WILL BE ADMINISTERED IS NOT UNLIMITED, SO THAT THE LEGAL REQUIREMENTS ESTABLISHED TO OBTAIN BEFORE A COURT A DECISION ON THE MERITS OF THE REQUEST MUST FIND CONSTITUTIONAL JUSTIFICATION."(Ninth

Epoch. Digital record: 188804. Instance: Plenary. Type of Thesis: Jurisprudence. Source: Semanario Judicial de la Federación y su Gaceta: Judicial Weekly of the Federation and its Gazette, Volume XIV, September 2001, constitutional matter, thesis P./J. 113/2001, page 5). "GARANTÍA A LA TUTELA JURISDICCIONAL PREVISTA EN EL ARTÍCULO 17 DE LA CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS. SUS ALCANCES." (Ninth

Epoch. Digital record: 172759. Instance: First Chamber. Type of thesis: jurisprudence. Source: Semanario Judicial de la Federación: Semanario Judicial de la Federación y su Gaceta, Volume XXV, April 2007, constitutional matter, thesis 1a./J. 42/2007, page 124)

CCXIV/2013 (10a.) the second paragraph of Article 1 of the Constitution, the norms related to human rights shall be interpreted in accordance with the Constitution itself and with the international treaties on the matter, favoring at all times the broadest protection to individuals (pro persona principle). The thesis in question has the following heading and identification data: "DERECHOS HUMANOS. CONSTANT INTERPRETATION, PROVIDED FOR IN ARTICLE 1 OF THE POLITICAL CONSTITUTION OF THE UNITED MEXICAN STATES." [Tenth Epoch. Digital record:

2003974. Instance: First Chamber. Type of Thesis: Isolated. Source: Semanario Judicial de la Federación y su Gaceta, Libro XXII, Tomo 1, July 2013, constitutional matter, thesis 1a. CCXIV/2013 (10a.), page 556]

143



Thus, **in the development of the right of access to jurisdiction, the legislator is prohibited not only from arbitrariness and unreasonableness**, but also from establishing rules that, due to their strictness, excessive formalism or for any other reason, reveal a clear disproportion between the purposes that those formalities and requirements established by law preserve for the correct and functional administration of justice and for the effective protection of the rights of individuals, and the interests that they sacrifice.[117]

All of the above were considerations made by the Plenary of the Supreme Court of Justice of the Nation when resolving the **action of unconstitutionality 62/2016, which jurisprudence of mandatory observance for this Court.**

It should be recalled that the Fourth Collegiate Court in Administrative Matters of the First Circuit in firm jurisprudence **recognized the existence of the fundamental right to effective precautionary protection**, as it appears in the criterion with the following title and text:

> **"SUSPENSION IN THE AMPARO. IT IS APPROPRIATE TO GRANT IT, EVEN THOUGH IT MAY ADVANCE THE EFFECTS OF THE FINAL DECISION, IF IT IS NECESSARY TO ENSURE AN EFFECTIVE PRECAUTIONARY PROTECTION THAT PRESERVES THE SUBJECT MATTER OF THE TRIAL AND THE FULL RESTITUTION".**
> **OF THE AFFECTED PARTY'S RIGHTS.** The criterion that the suspension should not grant restitutory effects or effects that anticipate the final decision, because they are proper to the judgment on the merits, must be overcome in order to be congruent with the constitutional purpose of preserving the subject matter of the trial and avoid the execution of acts of impossible or difficult reparation, as long as there is a suspensory interest of the petitioner and subject matter for the suspension, for which it is necessary to consider the nature of the challenged act. Consequently, it is appropriate to grant the suspension even though it may advance the effects of the final decision, since this would be provisional, **if it is necessary to ensure an effective precautionary protection that preserves the subject matter of the trial and the full restitution of the affected party in his rights**; that is, when if it is not granted, the restitution that, in its case, is ordered in the final decision, may be illusory."[118]

In these terms, the Plenary in Civil Matters of the First Circuit issued the following jurisprudential criterion:

> **"PRECAUTIONARY MEASURE OR PRECAUTIONARY MEASURES IN COMMERCIAL LAWSUITS. THEY ARE INHERENT TO THE RIGHT TO JURISDICTION, THEREFORE THE LIMITATION OF THEIR GRANTING MUST FOLLOW A FUNCTIONAL INTERPRETATION IN ACCORDANCE WITH ARTICLE 1168 OF THE COMMERCIAL CODE AND ARTICLES 1 AND 17 OF THE CONSTITUTION.** In the
> Precautionary measures or precautionary measures may be decreed to maintain a pre-existing situation, since this type of instruments are inherent to the right to jurisdiction, since their purpose is to make the Judges' sentences effective, as provided in Article 17, paragraph seven, of the Political Constitution of the United Mexican States, which provides that: "Federal and local laws shall establish the necessary means to guarantee the independence of the courts and the full execution of their resolutions". Thus, the amendment published in the Official Gazette of the Federation on January 10, 2014 to Articles 1168 and 1171 of the Commercial Code, was not intended to prevent that in commercial lawsuits the

---

[117] Similarly, the Spanish Constitutional Court has pronounced in judgment 90/2013, April 22, 2013, paragraph 3 -legal grounds-.
[118] Epoch: Ninth Epoch Record: 161447 Instance: Collegiate Circuit Courts Type of Thesis: Jurisprudence Source: Semanario Judicial de la Federación y su Gaceta Volume XXXIV, July 2011 Subject Matter(s): Common, Administrative Thesis: I.4o.A. J/90 Page: 1919

144

CLYDE&CO

decree the necessary precautionary measures or injunctions to enforce compliance with the judgments, since its purpose was the interpretation of clear and precise rules that allow the creditors to obtain the effective collection of their unpaid credits, through the location of persons or the withholding of assets. Thus, the amended text of article 1168, first paragraph, invoked, which establishes: "In commercial lawsuits, only the precautionary measures or precautionary measures provided for in this Code may be issued and which are the following: (...)", should not be interpreted with a criterion of simple literalism, since it would be prohibitive as opposed to the duty of the ordinary Judge to preserve the subsisting subject matter of the lawsuit, which, of course, would violate the fundamental rights recognized by the international instruments signed by the Mexican State and by the Political Constitution of the United Mexican States, in accordance with its article 1o.Nevertheless, a functional and conforming interpretation of that numeral gives the guideline to notice that it is a taxative norm when foreseeing two assumptions applicable to certain factual situation, which, however, does not restrict the possibility of the judge that in compliance with his function in relation to the granting and proceeding of the different precautionary measures, they must be adapted to the circumstances and needs of each case, since these measures must be flexible even with the possibility of modification as needed in the proceeding in which they are issued; in addition, when granting them, they must be duly grounded and motivated, as well as in terms of the guarantees that are required, in order to avoid abuses by the parties requesting them. By virtue of this, such interpretation is in accordance with the fundamental rights to effective judicial protection and access to the administration of justice recognized both by the constitutional article in question, as well as by precept 25 of the American Convention on Human Rights"[119].

c.    Effective resource.

Within the rights of access to justice and effective judicial protection, the importance of the guarantee of access to an "effective remedy", protected in articles 14 and 17 of the Constitution, has been recognized.

In this regard, case law has recognized this guarantee as the possibility for individuals to challenge a decision and for this to be decided by a body that, in turn, establishes whether or not a violation of fundamental rights has occurred and provides the necessary remedy:

> **"HUMAN RIGHT TO AN EFFECTIVE JUDICIAL REMEDY. REMEDIES WHICH, BECAUSE OF THE GENERAL CONDITIONS OF THE COUNTRY OR THE PARTICULAR CIRCUMSTANCES OF A GIVEN CASE, ARE ILLUSORY, CANNOT BE CONSIDERED EFFECTIVE**. The
> aforementioned human right is closely linked to the general principle regarding the effectiveness of the instruments or procedural means intended to guarantee the human rights recognized by the Political Constitution of the United Mexican States or the international instruments on the matter. The lack of an effective remedy against violations of such rights constitutes a violation of the human right to an effective judicial remedy. In this sense, for such a remedy to exist, it is not enough that it is provided for by the Constitution or the law, or that it is formally admissible, but it is required that it is actually suitable to establish whether a human rights violation has been committed and, if so, to provide the necessary remedy to remedy it. Thus, remedies cannot be considered effective when, due to the general conditions of the country or even the particular circumstances of a specific case, they are illusory, that is, when their uselessness has been demonstrated in practice, either because the Judiciary lacks the necessary independence to decide impartially, lacks the means to execute the decisions issued, justice is denied, the decision is unreasonably delayed or the alleged injured party is prevented from having access to judicial recourse."[120]

---

[119] Digital Record: 2020903 Plenos de Circuito;10a. Época;Gaceta del Semanario Judicial de la Federación;PC.I.C. J/94 C (10a.) ;J; Publication: Friday, October 25, 2019 10:35 am.

[120] Digital Record: 2002287 SCJN;10a. Época;Semanario Judicial de la Federación y su Gaceta;1a. CCLXXVII/2012 (10a.) ;TA

CLYDE&CO

**"EFFECTIVE JUDICIAL PROTECTION. THE ACCESS TO AN EFFECTIVE REMEDY, SIMPLE AND   FAST, IS CONSEQUENCE OF ESE FUNDAMENTAL RIGHT.** Article 1 of the Political Constitution of the United Mexican States establishes that all persons enjoy the human rights recognized in the Constitution and in the international treaties to which the Mexican State is a party, as well as the guarantees for their protection. Article 17 of the Constitution provides for the fundamental right to effective judicial protection, which implies, firstly, access to jurisdiction, that is, that the governed may be a party to a judicial proceeding and, secondly, the right to obtain a judgment on the merits of the matter in question and its full execution, which must be prompt, complete and impartial, This is closely related to the principle of due process, contained in Article 14 of the aforementioned law, and therefore, in order to fully comply with the aforementioned right, the opportunity of defense must be granted prior to any act depriving of liberty, property, possessions or rights, which also imposes that the essential formalities of the procedure be complied with. Therefore, access to an effective, simple and prompt recourse, through which the Judges and courts effectively protect the exercise of the human rights of any person who requests it, substantiated in accordance with the rules of due process of law, is a consequence of the fundamental right to effective judicial protection, inasmuch as it ensures the obtaining of prompt, complete and impartial justice, in accordance with the formal requirements that the Constitution itself establishes for the benefit of all persons under its jurisdiction"[121].

In this sense, Article 25.1 of the American Convention on Human Rights establishes, as a human right for all persons subject to the jurisdiction of the State without discrimination, the right to effective judicial protection, determining that everyone has the right to simple and prompt recourse, or any other effective recourse, to a competent court or tribunal for protection against acts that violate his fundamental rights recognized by the Constitution, the law or the Convention, even though such violation may have been committed by persons acting in the course of their official duties:

"Article 25. Judicial Protection

Everyone has the right to simple and prompt recourse, or any other effective recourse, to a competent court or tribunal for protection against acts that violate his fundamental rights recognized by the constitution or laws of the state concerned or by this Convention, even though such violation may have been committed by persons acting in the course of their official duties (...)".

In these terms, the Inter-American Court has reiterated that it is not enough to provide for the existence of remedies **if they are not effective in combating the violation of the rights protected by the Convention**. The guarantee of an effective remedy "constitutes one of the basic pillars, not only of the American Convention, but of the rule of law itself in a democratic society within the meaning of the Convention"[122].

This guarantee of protection of the rights of individuals involves not only the direct protection of the violated person, but also of the family members, who, due to the particular events and circumstances of some cases, are the ones who exercise the claim in the order

---

[121] Digital Record: 2002096 TCC;10a. Época;Semanario Judicial de la Federación y su Gaceta;II.8o.(I Región) 1 K (10a.) ;TA
[122] I/A Court H.R., Case of Cantos v. Argentina. Merits, Reparations and Costs. Judgment of November 28, 2002. Series C No. 97.

CLYDE&CO

domestic remedies[123]. Thus, the Inter-American Court of Human Rights has indicated that **these remedies must be suitable and effective, capable of achieving, among other results, reparation for the violations suffered**[124].

d.    <u>The unconstitutional and implicit interpretation sustained by the Responsible Court.</u>

As described in the "Background" chapter, by means of the Order Challenged, in addition to agreeing to the dismissal of the reorganization proceeding, the Responsible Court immediately ordered the lifting of the Provisional Measures.

Subject to what is set forth in the "Proceedings" chapter of this lawsuit, in accordance with Article 1343 of the Mexican Bankruptcy Law, such determination may be challenged (**optionally, taking into consideration the existence of several exceptions to the principle of finality that have already been developed**) through the appeal for reversal:

> "Article 1343.- The judgment of second instance shall be enforceable when it cannot be appealed by any other ordinary or extraordinary means of appeal, whatever the interest involved in the litigation may be."

In addition to the foregoing, as was duly demonstrated in the "Proceedings" chapter of this lawsuit, an indirect amparo proceeding may also be filed against such resolutions.

Article 1343 of the Code of Commerce provides that a judgment is enforceable when it cannot be challenged by any ordinary or extraordinary means of defense:

> "Article 1343.- The judgment of second instance shall be enforceable when it cannot be appealed by any other ordinary or extraordinary means of appeal, whatever the interest involved in the litigation may be."

In similar terms, Articles 354 and 356 of the Federal Code of Civil Procedures provide:

> "ARTICLE 355.- There is res judicata when the sentence has become enforceable".
>
> The following sentences shall be enforceable:
> "
> I.- Those that do not admit any appeal;
>
> II.- Those that, having admitted an appeal, are not appealed, or, having been appealed, have not been declared the appeal as abandoned, or the appellant has withdrawn the appeal (...)".

---

[123] See: I/A Court H.R., Case 19 Comerciantes v. Colombia. Merits, Reparations and Costs. Judgment of July 5, 2004. Series C No. 109, para. 193.

[124] See: I/A Court H.R., Case of Castañeda Gutman v. United Mexican States. Case of Castañeda Gutman v. United Mexican States. Preliminary Objections, Merits, Reparations and Costs. Judgment of August 6, 2008. Series C No. 184, para. 78.



Evidently, at the time of issuance of the Order in Complaint, no appeal (ordinary or extraordinary) had been filed against it, but, moreover, **the term for any of the parties** to **challenge such determination was running.**

Notwithstanding the foregoing, the Responsible Court, implicitly supported by the aforementioned articles and the rest of the precepts that regulate the challenge of the challenged determinations, considered the possibility of giving full effects to said withdrawal, ordering the lifting of the Precautionary Measures, **despite the fact that the necessary time periods for their challenge and/or declaration that said determinations have become enforceable had not even elapsed.**

In these terms, the Responsible Court considered that even when a judicial decision is subject to challenge, it is fully empowered to execute the decision and grant it full effects immediately.

Evidently, this Court will note that such interpretation renders unconstitutional Articles 1, 7, 25, 26 and 29 of the Bankruptcy Law, as well as Article 1343 of the Code of Commerce, which regulate the withdrawal of the bankruptcy proceeding, the powers of the bankruptcy court and the availability of appeals, as they are contrary to Articles 14 and 17 of the Federal Constitution and Article 25 of the American Convention on Human Rights.

On this point, this Court must consider that the demonstrated unconstitutionality of said precepts by violating the rights of access to justice and effective judicial protection is a true constitutional issue in terms of the thesis under the heading **"REVIEW IN DIRECT AMPARO. WITHIN THE PROPERLY CONSTITUTIONAL ISSUES SUBJECT TO THIS REMEDY IS THE INTERPRETATION PERFORMED BY THE RESPONSIBLE AUTHORITY OR THE CIRCUIT COLLEGIATE COURT OF THE GENERAL RULE WHOSE CONSTITUTIONALITY IS CONTESTED, WHEN RESOLVING QUESTIONS OF LEGALITY"**[125] and**"REVIEW IN DIRECT AMPARO. IT IS PROCEEDEDED WHEN A COLLEGIATE CIRCUIT COURT, WHEN EVALUATING THE EVIDENCE IN A GUARDIANSHIP AND CUSTODY JUDGMENT, PERFORMS AN IMPLIED INTERPRETATION OF ARTICLES 4 AND 16, NINTH AND TENTH PARAGRAPHS OF THE POLITICAL CONSTITUTION OF THE UNITED STATES OF AMERICA"(125) and "REVIEW IN DIRECT AMPARO.**
**MEXICAN UNITED STATES"**[126]cited and developed in the chapter on "Proceedings" of the present lawsuit.

As this Court may infer from the cited theses, for a question of constitutionality to exist, it is not even necessary for the responsible authority to expressly cite the articles it is interpreting, but rather the existence of an implicit interpretation that establishes their meaning and scope is sufficient.

---

[125] Digital Record: 2006486 SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;2a./J. 55/2014 (10a.) J; Issued: Friday, May 23 2014 10:06 am

[126] Digital Record: 162729 SCJN;9a. Época;Semanario Judicial de la Federación y su Gaceta;1a. XXXIV/2011 ;TA



Therefore, it is clear that even though the Responsible Court has not expressly cited the challenged precepts, as a consequence of the implicit interpretation of the same in the terms developed in this section, they must be declared unconstitutional.

This is because the interpretation of the Responsible Court means that the possibility of filing appeals against a judicial decision is ineffective and useless, since under its interpretation, even though there is the possibility of filing an appeal, this does not prevent the decision adopted from taking full effect and being enforceable against the injured party.

That is, under the interpretation of the Responsible Court, even when there is a possibility that a judicial decision may be revoked as a consequence of the filing of an appeal, as long as it is not revoked, it may be fully enforced, **even though such enforcement may entail irreparable effects that make the effects of** the **appeal illusory.**

Moreover, under the interpretation of the Responsible Court, the filing of an appeal in the proceeding has no material effect, since it allows the jurisdictional authority to grant full effects to a decision that is still *sub judice*, regardless of the adverse consequences that this may have.

Therefore, such implicit interpretation ignores the content of the rights of access to justice, effective judicial protection and effective judicial recourse, since, then, **the remedies would not be suitable for the protection of fundamental rights or to modify or revoke a judicial decision that is considered illegal**, by allowing its full execution and the realization of adverse consequences against the appellant.

e.    <u>Necessity of exercising constitutionality control to safeguard the constitutionality of the challenged precepts and consequent unconstitutionality of the Challenged Resolutions under the protection of the exercise of such control.</u>

Prior to declaring the unconstitutionality of Articles 1, 7, 25, 26 and 29 of the Bankruptcy Law, as well as Article 1343 of the Commercial Code, the wording of the rules requires an *ex officio* control of constitutionality and conventionality.

The scope, limits and consequences of the exercise of such control were already extensively developed in section "d" of the preceding concept of violation, therefore, in order to avoid unnecessary repetitions, this Court is requested to consider such considerations as if they were inserted verbatim.

Based on these premises, this Court is called upon to undertake an exercise of conforming interpretation of the precepts that are being challenged, as follows:

In order to respect the rights of access to justice, effective judicial protection and effective judicial recourse, when a judicial decision is challenged through ordinary or extraordinary means of defense, the jurisdictional authority must abstain from executing or granting effects to the challenged decision until such time as it becomes enforceable.



the appeal filed has positive effects in favor of the appellant, allowing the revocation, annulment or modification of the challenged decision and safeguarding any violated rights.

In this case, if the Order has not yet become final, it is clear that according to the proposed interpretation, the Responsible Court **should have abstained from executing and granting it effects**, and should have abstained from ordering the lifting of the Precautionary Measures until it was declared that said order had become final.

Consequently, it will be evident for this Court that the challenged order is unconstitutional, since it grants full effects to an interlocutory judgment that has not yet become enforceable, in violation of Articles 14 and 17 of the Constitution, and therefore this Court must grant the protection and protection requested in order to revoke the aforementioned resolutions.

## SIXTEENTH. UNCONSTITUTIONALITY OF ARTICLE 28 OF THE CONCURSO MERCANTIL LAW, SINCE IT IMPLICITLY INTERPRETS THE POSSIBILITY THAT THE WITHDRAWAL OF THE CONCURSO MERCANTIL BE RAISED BY THE CREDITORS OF THE COMERCIANTE.

<u>Synthesis</u>.        By confirming the possibility that the request for withdrawal filed by the Court of Appeals of Controladora had full effects despite having been filed by its creditors, the Responsible Court materially allowed the creditors of the Complainant to withdraw from the reorganization proceeding, based on Article 28 of the Mexican Bankruptcy Law. Consequently, the implicit interpretation sustained by the Responsible Court renders such provision unconstitutional.

<u>Development.</u>

   a.   <u>Principle of legal certainty</u>

The content and scope of the principle of legal certainty was previously developed in this brief, and therefore it is reproduced as if it were inserted verbatim.

b.        <u>Due process, effective judicial protection and access to justice.</u>

The content and scope of these rights has already been developed in section "a" of the third concept of violation; therefore, in order to avoid unnecessary repetitions, it is requested that said considerations be considered as if they were reproduced as if they were inserted verbatim.



c.      The implicit and unconstitutional interpretation sustained by the Responsible Court.

As has been extensively developed in the present lawsuit, the withdrawal formulated by Controladora's attorney-in-fact is, invariably, an act carried out by the Complainant's creditors.

As has been established, Controladora's attorney-in-fact supported his personality in the Alleged RUA, which, according to its own background, was entered into as a consequence of the extrajudicial foreclosure of pledges carried out by CI Banco and Wilmington Trust.

CI Banco acted, as has also been established, as **trustee in the** **Guarantee Trust** constituted by Controladora (among other subsidiaries) to guarantee compliance with the Financing Agreements. Wilmington Trust acted as the purported "Collateral Agent" of these same Financing Agreements.

As this Court may conclude, both companies acted **on behalf and for the benefit of the Bondholders, who** **are the main creditors of the Complainant**, as demonstrated before the Responsible Court.

The fact that both companies represented the creditors of Controladora was a matter that was evidently proven before the Responsible Court, so that the Responsible Court was fully aware of their representation and the interests they intended to ventilate before the Concurso Mercantil.

Notwithstanding the foregoing, the Responsible Court granted the request for withdrawal filed by Controladora's attorney-in-fact, **knowing that it was an act performed on behalf of and in the interests of Controladora's creditors.**

However, case law has widely recognized that given the transcendence of the withdrawal, this **is a very personal act**, so that it can only be performed by the person who initiated the action at the beginning:

> "**WITHDRAWAL.** It is improper to dismiss the amparo trial, due to withdrawal made by a person who did not initiate it, and when said trial must resolve precisely on the personality of the person making the withdrawal"[127].

> "**WITHDRAWAL.** The withdrawal is invalid if it is not ratified by the person who makes it, or if it is not shown that he personally presented the related document"[128].

Notwithstanding the foregoing, in favorably granting the request made by the Controladora's attorney-in-fact, the Responsible Court overlooked the fact that the Controladora was being

---

[127] Digital Record: 288340 SCJN;5a. Época;Semanario Judicial de la Federación ;TA
[128] Digital Record: 280561 SCJN;5a. Época;Semanario Judicial de la Federación ;TA



The Court interpreted that such a request could be filed by persons other than those who filed the bankruptcy action and, consequently, interpreted that such a request could be filed even by the creditors of the merchant.

Although it did not expressly state so, it is evident that the Responsible Court interpreted the scope of Article 28 of the Commercial Bankruptcy Law to consider that the withdrawal of the petition for bankruptcy must not necessarily be filed by the person who filed the bankruptcy action and is the holder of such right, but may be filed by any other representative, even if the latter acts for the benefit of the creditors of the merchant.

Evidently, such interpretation renders the referred article unconstitutional by violating the rights to legal certainty, access to justice, due process and effective judicial protection, since it then allows any person to decide the continuation of a bankruptcy proceeding or to withdraw from it, even though he is not the one who filed the action and even represents interests contrary to those of the merchant.

d.    <u>The exercise of constitutionality control to be exercised on the challenged Precepts.</u>

Prior to declaring the unconstitutionality of Article 28 of the Bankruptcy Law, the wording of the rules requires an *ex officio* review of constitutionality and conventionality.

The scope, limits and consequences of the exercise of such control were already extensively developed in section "d" of the preceding concept of violation, therefore, in order to avoid unnecessary repetitions, this Court is requested to consider such considerations as if they were inserted verbatim.

Based on these premises, this Court is called upon to undertake an exercise of conforming interpretation of the precepts that are being challenged, as follows:

In order to respect the rights to legal certainty, access to justice, due process and effective judicial protection, the withdrawal referred to in Article 28 of the Bankruptcy Law is a very personal act, which can only be carried out by the same person who filed the bankruptcy action and not by different persons who represent interests contrary to those of the merchant, regardless of whether they claim legal standing to do so.

Consequently, it will be evident for this Court that the Order is unconstitutional, since it allows the President Attorney of Controladora to withdraw from the reorganization proceeding, therefore, this Court must grant the protection and protection requested in order to revoke the aforementioned resolutions.



**SEVENTEENTH. UNCONSTITUTIONALITY OF ARTICLES 18 AND 19 OF THE INSOLVENCY LAW, BY INTERPRETING THAT THE MOTION FOR LACK OF LEGAL STANDING IS NOT OF PRIOR AND SPECIAL PRONOUNCEMENT AND MAY BE PROCESSED FOR PETITIONS FILED BY PERSONS WHOSE LEGAL STANDING WAS CONTESTED.**

Summary. Articles 18 and 19 of the Mexican Bankruptcy Law are unconstitutional since the Responsible Court implicitly interpreted that the motion for lack of legal standing is not of prior and special pronouncement, granting the motions filed by the Court Representative of Controladora, despite the fact that its legal standing was contested.

Development.

    a.   Principle of legal certainty

The content and scope of the principle of legal certainty was previously developed in this brief, and therefore it is reproduced as if it were inserted verbatim.

    b.   Due process, effective judicial protection and access to justice

The content and scope of these rights has already been developed in section "a" of the third concept of violation, therefore, in order to avoid unnecessary repetitions, it is requested that said considerations be considered as if they were reproduced as if they were inserted verbatim.

    c.   Effective resource

Within the rights of access to justice and effective judicial protection, the importance of the guarantee of access to an "effective remedy", protected in articles 14 and 17 of the Constitution, has been recognized.

In this regard, case law has recognized this guarantee as the possibility for individuals to challenge a decision and for this to be decided by a body that, in turn, establishes whether or not a violation of fundamental rights has occurred and provides the necessary remedy:

> **"HUMAN RIGHT TO AN EFFECTIVE JUDICIAL REMEDY. REMEDIES WHICH, BECAUSE OF THE GENERAL CONDITIONS OF THE COUNTRY OR THE PARTICULAR CIRCUMSTANCES OF A GIVEN CASE, ARE ILLUSORY, CANNOT BE CONSIDERED EFFECTIVE**. The
> The aforementioned human right is closely linked to the general principle regarding the effectiveness of the instruments or procedural means intended to guarantee the human rights recognized by the Political Constitution of the United Mexican States or the international instruments on the matter. The lack of an effective remedy against violations of such rights constitutes a violation of the human right to an effective judicial remedy. In this sense, for such a remedy to exist, it is not enough that it is provided for in the Constitution or the law, or that it is formally



admissible, but rather it is required that it be truly suitable to establish whether a violation of human rights has been committed and, if so, to provide the necessary remedies to remedy it. Thus, remedies cannot be considered effective when, due to the general conditions of the country or even the particular circumstances of a specific case, they are illusory, that is, when their uselessness has been demonstrated in practice, either because the Judicial Branch lacks the necessary independence to decide impartially, lacks the means to enforce the decisions issued, justice is denied, the decision is unreasonably delayed, or the alleged injured party is prevented from having access to judicial recourse."[129]

**"EFFECTIVE JUDICIAL PROTECTION. THE ACCESS TO AN EFFECTIVE REMEDY, SIMPLE AND FAST, IS CONSEQUENCE OF ESE FUNDAMENTAL RIGHT.** Article 1 of the Political Constitution of the United Mexican States establishes that all persons enjoy the human rights recognized in the Constitution and in the international treaties to which the Mexican State is a party, as well as the guarantees for their protection. Article 17 of the Constitution provides for the fundamental right to effective judicial protection, which implies, firstly, access to jurisdiction, that is, that the governed may be a party to a judicial proceeding and, secondly, the right to obtain a judgment on the merits of the matter in question and its full execution, which must be prompt, complete and impartial, This is closely related to the principle of due process, contained in Article 14 of the aforementioned law, and therefore, in order to fully comply with the aforementioned right, the opportunity of defense must be granted prior to any act depriving of liberty, property, possessions or rights, which also imposes that the essential formalities of the procedure be complied with. Therefore, access to an effective, simple and prompt recourse, through which the Judges and courts effectively protect the exercise of human rights of any person who requests it, substantiated in accordance with the rules of due process of law, is a consequence of the fundamental right to effective judicial protection, inasmuch as it ensures the obtaining of prompt, complete and impartial justice, in accordance with the formal requirements that the Constitution itself establishes for the benefit of all persons under its jurisdiction."[130]

In this sense, Article 25.1 of the American Convention on Human Rights establishes, as a human right for all persons subject to the jurisdiction of the State without discrimination, the right to effective judicial protection, determining that everyone has the right to simple and prompt recourse, or any other effective recourse, to a competent court or tribunal for protection against acts that violate his fundamental rights recognized by the Constitution, the law or the Convention, even though such violation may have been committed by persons acting in the course of their official duties:

"Article 25. Judicial Protection

Everyone has the right to simple and prompt recourse, or any other effective recourse, to a competent court or tribunal for protection against acts that violate his fundamental rights recognized by the constitution or laws of the state concerned or by this Convention, even though such violation may have been committed by persons acting in the course of their official duties (...)".

In these terms, the Inter-American Court has reiterated that it is not enough to provide for the existence of remedies **if they are not effective in combating the violation of the rights protected by the Convention**. The guarantee of an effective remedy "constitutes one

---

[129] Digital Record: 2002287 SCJN;10a. Época;Semanario Judicial de la Federación y su Gaceta;1a. CCLXXVII/2012 (10a.) ;TA
[130] Digital Record: 2002096 TCC;10a. Época;Semanario Judicial de la Federación y su Gaceta;II.8o.(I Región) 1 K (10a.) ;TA



of the basic pillars, not only of the American Convention, but also of the rule of law itself.
in a democratic society within the meaning of the Convention"[131].

This guarantee of protection of the rights of individuals does not only imply the direct protection of the violated person, but also of the family members, who, due to the particular events and circumstances of some cases, are the ones who exercise the claim in the internal order[132]. Thus, the Inter-American Court of Human Rights has indicated that **these remedies must be suitable and effective, capable of achieving, among other results, reparation for the violations suffered**[133]**.**

d.   The unconstitutional and implicit interpretation undertaken by the Responsible Court.

By means of the Order Challenged, the Responsible Court interpreted that the incident of lack of legal standing is not of prior and special pronouncement, therefore, it processed the petitions formulated by the Controladora's Attorney-in-fact, despite the fact that its legal standing was challenged.

By issuing the Order Challenged, the Responsible Court illegally decided to dismiss the insolvency proceeding and left without effects the motion for lack of legal standing, despite the fact that it should have resolved this motion prior to that one, since this motion is a resolution of a prior or related matter to the main issue, which conditions the issuance of a final resolution or award.

In ruling in this sense, the interpretation made by the Responsible Court renders Articles 18 and 19 of the Bankruptcy Law unconstitutional, since it considers that the motion for lack of standing is not of prior and special pronouncement.

In this regard, the above articles establish the following:

> "Article 18.- The exceptions of a procedural nature, including those of incompetence of the judge and lack of capacity, shall be processed as an incidental matter and shall not suspend the proceeding. Nor will the procedure for the declaration of bankruptcy be suspended by the filing and processing of appeals against the resolutions issued by the judge for such purpose.
>
> The judge shall dismiss out of hand the notoriously improper exceptions and may resolve the procedural exceptions in one or more interlocutory judgments."
>
> "If the plea of lack of capacity of the plaintiff or the objection made to the capacity of the person who has represented the Merchant is declared admissible, the judge shall grant a term of not more than ten days to correct it, if the defects in the document presented by the representative can be corrected. If the defects are not cured, in the case of the Merchant's legal standing in the proceeding, the trial shall continue in default of the latter. If the defects of the plaintiff are not cured, the judge will immediately dismiss the trial".

---

[131] I/A Court H.R., Case of Cantos v. Argentina. Merits, Reparations and Costs. Judgment of November 28, 2002. Series C No. 97.

[132] See: I/A Court H.R., Case 19 Comerciantes v. Colombia. Merits, Reparations and Costs. Judgment of July 5, 2004. Series C No. 109, para. 193.

[133] See: I/A Court H.R., Case of Castañeda Gutman v. United Mexican States. Case of Castañeda Gutman v. United Mexican States. Preliminary Objections, Merits, Reparations and Costs. Judgment of August 6, 2008. Series C No. 184, para. 78.

CLYDE&CO

Now then, the Responsible Court omitted to consider the processing of the incidents in the matter of commercial bankruptcy. In this regard, Article 267 of the Bankruptcy Law provides that the issues that arise during the processing of the bankruptcy proceeding will be processed through the incidental proceedings.

However, there is an exception: **unless they have a special substantiation**.

That is to say, if a matter has a special substantiation either in the law itself or in its supplementary regulation, which is the Code of Commerce, then such matter will be governed in accordance with the same and not in accordance with the provisions of the aforementioned article:

> "Article 267.- For the knowledge and decision of the various questions that may arise during the processing of the insolvency proceeding, which do not have a special substantiation, they shall be raised, by the interested party, through the incidental proceedings before the judge, observing the following procedures:"

Notwithstanding the foregoing, by means of the Order Challenged, the Responsible Court, implicitly supported by Articles 18 and 19 of the Commercial Bankruptcy Law, resolved that the motion for lack of legal standing was not of prior and special pronouncement.

In other words, the Responsible Court held that the incident of lack of personality is processed as any other incident, in a subsequent manner and that it is not subject to prior and special pronouncement, in spite of the transcendence that it may have in the proceeding.

Evidently, this Court will note that such interpretation renders unconstitutional Articles 18 and 19 of the Bankruptcy Law, which regulate the processing of the incident of lack of personality within a bankruptcy proceeding, since it violates Articles 14, 16 and 17 of the Political Constitution of the United Mexican States, as well as Articles 8 and 25 of the American Convention on Human Rights.

On this point, this Court must consider that the demonstrated unconstitutionality of said precepts by violating the rights of access to justice and effective judicial protection is a true constitutional issue in terms of the thesis under the heading **"REVIEW IN DIRECT AMPARO. WITHIN THE PROPERLY CONSTITUTIONAL ISSUES SUBJECT TO THIS REMEDY IS THE INTERPRETATION PERFORMED BY THE RESPONSIBLE AUTHORITY OR THE COLLEGIATE CIRCUIT COURT OF THE GENERAL RULE WHOSE CONSTITUTIONALITY IS CONTESTED, WHEN RESOLVING QUESTIONS OF LEGALITY"**[134] and**"REVIEW IN DIRECT AMPARO. ES PROCEDENTE CUANDO UN TRIBUNAL COLEGIADO DE CIRCUITO, AL VALORAR LAS PRUEBAS EN UN JUICIO DE GUARDIANSHIP Y CUSTODY, REALIZA UNA**

---

[134] Digital record: 2006486 SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;2a./J. 55/2014 (10a.)
J; Issued: Friday, May 23 2014 10:06 am

156



**IMPLIED INTERPRETATION OF ARTICLES 4 AND 16, NINTH AND TENTH PARAGRAPHS OF THE POLITICAL CONSTITUTION OF THE UNITED MEXICAN STATES"[135].**

As this Court will be able to infer from the cited theses, for there to be a question of constitutionality it is not even necessary for the responsible authority to expressly cite the articles it is interpreting, but rather the existence of an implicit interpretation that establishes their meaning and scope is sufficient.

Therefore, it is clear that even though the Responsible Court has not expressly cited the challenged precepts, as a consequence of the implicit interpretation of the same in the terms developed in this section, they must be declared unconstitutional.

This is because the interpretation of the Responsible Court means that the lack of personality incident is not of prior and special pronouncement, but can be resolved later, or even with the final judgment.

That is to say, under the interpretation of the Responsible Court, even when the personality of the Proxy Attorneys is questioned, they could continue to act and their actions could continue to have effects in the bankruptcy proceeding, without analyzing such incident, until a later time.

This implies that the lack of personality incident has no material effect, since it allows the jurisdictional body to resolve and admit requests made by the person whose personality is unknown, despite the fact that these **are never validated nor can they be ratified in court,** thus flagrantly violating the right to due process, to effective judicial protection and to an effective and suitable remedy**.**

As mentioned in the first concept of violation, the Responsible Court should have first analyzed the incident of lack of standing and after that, and based on the respective interlocutory judgment, decide on the dismissal. However, by interpreting according to the challenged articles, that the incident can be resolved at a later time, it renders such precepts unconstitutional, since it does not allow the Complainant to assert its claims within the bankruptcy proceeding.

In addition, the interpretation of said articles implies that it is left without material effects, that is to say, the incident of lack of personality is left empty or useless whenever the person whose personality is questioned can act and make his actions produce effects of great importance and transcendence, without these being declared invalid until a later moment.

---

[135] Digital Record: 162729 SCJN;9th Epoch;Semanario Judicial de la Federación y su Gaceta;1a. XXXIV/2011 ;TA



In the present case, it was not even possible to declare them invalid at a later time since the **null and void** action of the authorized representatives had the effect of **withdrawing the insolvency proceeding.**

In this sense, commercial regulations and case law have established that the plea of lack of personality is a prior or related issue that must be resolved prior to any other issue, since it conditions the issuance of the final judgment.

Although this topic has not been developed as a main issue in the jurisprudential niche of the jurisdictional bodies, the First Chamber of the Supreme Court of Justice of the Nation has indirectly and expressly established through **jurisprudence** that the lack of personality incident **constitutes a "resolution of a prior and related issue"**, because it has a direct and immediate impact on the continuation of the proceeding.

In addition, it constitutes an essential element for the issuance of the judgment, because it is one of the procedural requirements that demonstrate the powers or faculties that a person has to intervene in the trial to assert his or her claims.

This criterion has been developed by the jurisprudence when studying the expiration of the commercial instance, establishing that such incident, due to its importance and transcendence, interrupts the term for it to operate, since it is **a resolution of a prior or related matter**.

The foregoing is based on the following jurisprudence of the First Chamber of the Supreme Court of Justice of the Nation:

> **"EXPIRATION OF THE INSTANCE IN COMMERCIAL MATTERS. THE PLEA OF LACK OF LEGAL CAPACITY, SINCE IT CONSTITUTES A RESOLUTION OF A PRIOR OR RELATED MATTER, INTERRUPTS THE PERIOD OF TIME FOR THE LAPSE OF TIME TO OPERATE.** Pursuant to the provisions of Article 1076, Section VI of the Commercial Code, the expiration of the time limit in commercial matters does not operate, among other cases, when it is necessary to wait for a resolution of a prior or related matter issued by the judge of the trial or by other authorities. Now, **the plea of lack of capacity constitutes a "resolution of a prior or related matter", since it is a significant issue that directly and immediately affects the due continuation of the proceeding and constitutes an essential element for the issuance of the judgment, since it is a procedural requirement tending to demonstrate the necessary powers or faculties that the intervening person or individual has, to go before the jurisdictional body to assert his or her pretensions.** Therefore, the plea of lack of standing interrupts the term for the expiration of the statute of limitations in commercial matters, since it is a condition for the issuance of a valid judgment"[136].

[Emphasis added]

Therefore, the incident of lack of personality must be resolved prior to any other issue that arises concomitantly or similarly to that one. In this sense, the organs

---

[136] Digital record: 2017789 SCJN;10a. Época;Gaceta del Semanario Judicial de la Federación;1a./J. 33/2018 (10a.) J; Published: Friday, 07 September 2018 10:16 am



This criterion has been developed by jurisdictional courts, especially in labor matters, since it is expressly regulated therein that the incident of lack of personality is of prior and special pronouncement. However, even in labor matters, the reasoning is applicable because in any proceeding, this incident must be resolved prior to any other, due to the consequences that its outcome may have on the proceeding.

The foregoing is based on the following isolated thesis cited previously in this brief: **"INCOMPETENCE AND LACK OF PERSONALITY. IF BOTH EXCEPTIONS ARE OPPOSED SIMULTANEOUSLY, THE LATTER MUST BE PREVIOUSLY RESOLVED (LEGISLATION OF THE STATE OF MEXICO).**

Therefore, the Responsible Court should have first resolved the incident of lack of personality of the persons requesting the dismissal of the proceeding. This is due to the fact that, if the person who **did not know the personality of the person <u>requesting the dismissal of a reorganization proceeding</u>**, the transcendence of such resolution merited to first study the personality of the petitioner and then, based on the resolution of the incident, to study the request for dismissal.

The reason for this is that, if the Court first studied the incident of lack of legal capacity of the authorized representatives and resolved the lack of legal capacity of such representatives, then it would not allow the request for dismissal for such reason and would continue the processing of the insolvency proceeding. On the other hand, if the court determined that the legal standing of the insolvency representatives was proven, then it could consider the request for dismissal of the insolvency proceeding.

In any case, what the Responsible Court should not have done was to agree to the dismissal and leave the motion for lack of standing without subject matter, since this leaves this means of defense empty and allows the actions of any person in a proceeding, who appears to have standing, to have transcendental results, to the point of having the petitioner of a bankruptcy proceeding dismissed, with the serious consequences that this implies.

Therefore, it is clear that, in accordance with the content of the rights to due process, access to justice, effective judicial protection and effective recourse, as well as with the provisions of the Federal Constitution and the American Convention on Human Rights, the interpretation of the challenged articles renders them unconstitutional, since they do not allow studying the incident of lack of personality as one of special processing and prior to any other issue, due to the impact and transcendence it has for the development of the proceeding and its result.

e.    <u>The exercise of constitutionality control to be exercised on the challenged Precepts.</u>

From the foregoing, this Court may conclude that the implicit interpretation of the Responsible Judge becomes unconstitutional because it violates the right to legal certainty, due process and access to justice;



The above, since the Responsible Court **made an interpretation of the Challenged Precepts in the sense that it is possible to avoid the proceeding of an incident of lack of personality despite the fact that it is of prior and special pronouncement, and to recognize full effects to acts carried out by those persons whose personality is questioned**.

However, the implicit interpretation of the Responsible Judge, proven unconstitutional, would render the challenged precepts invalid and, prior to declaring the unconstitutionality of said precepts, the wording of the norms requires *an ex officio* exercise of control of constitutionality and conventionality.

The scope, limits and consequences of the exercise of such control were already extensively developed in section "d" of the twelfth violation concept immediately above; therefore, in order to avoid unnecessary repetitions, this Court is requested to consider such considerations as if they were inserted verbatim.

Based on such premises, this District Court is requested to interpret the Challenged Precepts in accordance with the Constitution as follows.

As it implies the resolution of an essential presupposition of the proceeding, the motion for lack of personality must be resolved **in a prior and special pronouncement manner**, without being able to decide on the termination of the proceeding before its resolution.

The foregoing is even more relevant when the resolution of such incident impacts on the validity of an act **that may have a transcendental impact on the proceeding**, such as the request for dismissal.

Moreover, it is not possible to grant any validity to acts of a person whose personality is being questioned in court, **without first resolving the incident of lack of personality**.

Therefore, this Court must grant the constitutional protection requested for the purpose of interpreting the challenged Precepts and, based on such interpretation, assess that the challenged Order violates the rights of legal certainty and due process.

## XI.    REQUEST FOR SUSPENSION.

Based on Article 107 section X and other relative provisions of the Political Constitution of the United Mexican States, as well as Articles 190, 191 and other relative and applicable provisions of the Amparo Law, the granting of the suspension of the challenged act, for the effects specified below:

### A.  Effects for which the suspension is requested

The suspension of the challenged acts is requested for the following effects:



1.      That all the effects and consequences of the Order and the Order of Confirmation of the Lifting of Precautionary Measures be paralyzed;

2.      As a consequence of what is requested in point "1", in order for the precautionary measures decreed by the Responsible Court on January 28, 2025 to continue to be effective;

3.      As a consequence of what is requested in item "1", to continue recognizing the personality of Martín Flores Merino in the Concurso Mercantil, as well as to continue recognizing the persons authorized for such purpose to act in said proceeding;

4.      As a consequence of what is requested in point "1", the revocation of the authorization, procedural domicile and consultation of the electronic file requested by the alleged attorney-in-fact Rogelio Héctor Palacios Beltrán is annulled.

5.      As a consequence of what is requested in point "1", the deposit bill presented by Controladora for the payment of the fees of the Visitor should not be made effective.

It is worth mentioning that this Court is fully empowered to grant the requested suspension for different effects and consequences that, in its consideration, have as a consequence the protection of Dolphin's fundamental rights.

This is supported by the following jurisprudential criterion:

> **"SUSPENSION. THE JUDGE MAY GRANT IT FOR EFFECTS AND CONSEQUENCES DIFFERENT FROM THOSE PROPOSED BY THE PLAINTIFF, BUT NOT FOR ACTS NOT CLAIMED IN THE COMPLAINT.**
> From Articles 124, last paragraph, of the repealed Amparo Law and 147, first paragraph, of the current Amparo Law, it is clear that in the cases in which the suspension is appropriate, the jurisdictional body must establish the situation in which things must remain and take the pertinent measures to preserve the subject matter of the amparo until the trial is concluded, which means that the judge is legally empowered to specify, according to his prudent discretion, the consequences and/or legal status in which things must remain after the precautionary measure is granted, It does not matter if he departs from the effects proposed by the plaintiff in his initial brief, either to maximize them or to adjust them to the needs of the specific case, since it is a matter of preserving the subject matter of the amparo proceeding and not to limit himself mechanically to provide the suspension in the strict terms proposed by the plaintiff, especially in those cases in which it is evident that if his request would be promptly complied with, the integral objective of the suspension would not be achieved.     Now then, the attribution deposited in the amparo organ to modulate founded and     motivatedly    the    implications    future   of the    granting   of the suspension does not    reach    to the    extreme    of    power    to order    the paralyzing of acts not claimed in the lawsuit, because if their constitutionality was not questioned, it is obvious that they do not constitute the subject matter of the trial, which must be kept intact, in order to preserve the property or rights whose protection is demanded in the amparo trial. [137]

In this case, this Court must grant the suspension in order to avoid and/or paralyze the effects and consequences of the Order in order to avoid that the withdrawal formulated by the Court Representative of the Controladora does not materialize and that the Precautionary Measures are not lifted.

---

[137] Location: [J]; 10th Epoch; Plenary; Gaceta S.J.F.; Book 63, February 2019; Volume I; P. 14. P./J. 4/2019 (10a.).

CLYDE&CO

In addition, all of the above must be interpreted in accordance with the provisions of the third paragraph of Article 17 of the General Constitution of the Republic, specifically, with respect to the principle of greater benefit as opposed to procedural formalisms and the preference for the substantive resolution of conflicts.

It is applicable by analogy the criteria of the Second Collegiate Circuit Court of the Auxiliary Center of the Fourth Region contained in the following thesis:

> **"THE LATTER SHOULD BE PRIVILEGED OVER THE FORMER, PROVIDED THAT THE EQUALITY OF THE PARTIES IS NOT AFFECTED, THE EQUALITY OF THE PARTIES IS NOT AFFECTED, THE**
> **DUE PROCESS OR OTHER RIGHTS.** For a long time it was a matter of criticism for the amparo courts that the protective judgments were granted for formal or procedural aspects and not for substantive issues; which motivated the issuance of the new Amparo Law (published in the Official Gazette of the Federation on April 2, 2013), which established in its Article 189 that the amparo courts would proceed to the study of the concepts of violation according to their logical priority, but giving priority at all times to the principle of the greatest benefit; and it was in this context that by amendment to precept 17 of the General Constitution of the Republic published in the Official Gazette of the Federation on September 15, 2017, a third paragraph was added to said provision, in which it was pointed out "Provided that equality between the parties, due process or other rights are not affected in trials or proceedings followed in the form of a trial, the authorities shall give priority to the solution of the conflict over procedural formalisms.". Therefore, in accordance with this social aspiration and in strict compliance with the aforementioned articles, in trials or in the relative proceedings, all authorities must <u>give priority to the solution of the conflict over procedural formalisms</u>, with the only limitation that the equality of the parties, due process or other rights are not affected."[138]

Likewise, it is necessary to make it clear that the suspension in the amparo trial does not only seek that a certain situation remains untouched, nor only to preserve the subject matter of the amparo, but through this measure this Court must seek to reestablish the Complainant in the enjoyment of the violated right; in this regard, article 147 of the Amparo Law states:

> Article 147. In the cases in which the suspension is appropriate, the jurisdictional organ shall establish the situation in which things shall remain and shall take the pertinent measures to preserve the subject matter of the amparo until the termination of the trial, and may establish conditions on whose compliance depends the continuation of the effects of the suspension measure.
>
> Depending on the nature of the act complained of, it will order that things remain as they are and, <u>if legally and materially possible, it will provisionally reestablish the plaintiff in the enjoyment of the violated right while the amparo proceeding is pending the issuance of an enforceable judgment</u>.
>
> The court shall take such measures as it deems necessary to prevent the rights of minors or incompetent persons from being violated, pending the final judgment in the amparo proceeding.

---

[138] Epoch: Tenth Epoch Record: 2016171 Instance: Collegiate Circuit Courts Type of Thesis: Isolated Source: Gaceta del Semanario Judicial de la Federación Libro 51, Febrero de 2018, Tomo III Materia(s): Constitutional, Común Tesis: (IV Región)2o.13 K (10a.) Página: 1524

CLYDE&CO

This means that the Amparo Judge must seek to ensure the protection of the fundamental rights of the Complainant; in the specific case, a human right of special relevance comes into play: the right to effective precautionary protection.

The right to effective precautionary protection was recognized in General Comment No. 31 (issued on May 26, 2004) of the Human Rights Committee, as can be seen below:

> "The obligation under article 2, paragraph 2, to take steps to give effect to the rights recognized in the Covenant is unqualified and immediate. Compliance with this obligation cannot be justified by reference to considerations of a political, social, cultural or economic nature within the State.
>
> Article 2, paragraph 3, provides that, in addition to effectively protecting the rights recognized in the Covenant, States parties shall ensure that all persons have accessible and effective remedies available to them to claim those rights.
>
> Such remedies should be adequately adapted to take into account the special vulnerability of certain classes of persons, in particular children. The Committee attaches importance to States parties establishing adequate judicial and administrative mechanisms in domestic law to deal with complaints of violations of rights. The Committee notes that the judiciary can ensure the enjoyment of the rights recognized in the Covenant in various ways, including through the direct application of the Covenant, the application of constitutional or other similar legislative provisions, or the effect of the interpretation of the Covenant on the application of domestic law. In particular, administrative mechanisms are required to implement the general obligation to investigate allegations of violations promptly, thoroughly and effectively by independent and impartial bodies. National human rights institutions with relevant powers can assist in this regard. The failure of a State party to investigate allegations of violations may in itself be a violation of the Covenant. Cessation of the violation is an indispensable element of the right to an effective remedy. (...)
>
> **The Committee further notes that in certain circumstances the right to an effective remedy may require <u>States parties to</u> <u>adopt and implement interim measures to prevent the recurrence of violations and to remedy as soon as possible any harm that such violations may have caused.</u> Although the legal systems of the States parties are formally endowed with the appropriate remedy, violations of Covenant rights continue to occur. It may be <u>assumed that this is attributable to the fact that the remedies do not function effectively in practice.</u> States parties are therefore requested to** identify **in** their periodic reports any obstacles to the effectiveness of existing remedies.

On the other hand, the Inter-American Commission on Human Rights has recognized the existence of this right, as can be seen in its publication entitled "Access to Justice as a Guarantee of Economic, Social and Cultural Rights: A Study of the Standards Established by the Inter-American Human Rights System", which states the following:

> 261.      The ISHR has recognized that the notion of "effectiveness" that arises from Article 25 of the ACHR requires that the available judicial tools include procedural measures such as precautionary, provisional or precautionary measures and, in general, simple and rapid judicial remedies for the protection of rights, with a view to preventing violations from being prolonged over time. The foregoing, even when the determination of the merits of the matter requires a longer period of time. [...]
>
> Thus, by virtue of the special nature of these resources and the need and urgency with which they must act, the IACHR points out certain basic characteristics that they must present in order to be considered "suitable": a) they must be



a) that the remedies be simple, urgent, informal, accessible and processed by independent bodies; b) that there be the possibility of accessing federal or national courts in the event of suspicion of bias in the actions of local bodies; c) that broad legal standing be guaranteed; d) that they can be processed as individual appeals and also as collective precautionary actions (to protect a determined or determinable group according to certain parameters, affected or at imminent risk); and e) that the application of protection measures is foreseen in consultation with the affected parties. [139]

On the other hand, at the national level, the right to effective judicial protection has also been recognized, as can be seen in the following thesis:

> **"SUSPENSION IN THE AMPARO. IT IS APPROPRIATE TO GRANT IT, EVEN THOUGH IT MAY ADVANCE THE EFFECTS OF THE FINAL DECISION, IF IT IS NECESSARY TO ENSURE AN EFFECTIVE PRECAUTIONARY PROTECTION THAT PRESERVES THE SUBJECT MATTER OF THE TRIAL AND THE FULL RESTITUTION".**
> **OF THE AFFECTED PARTY'S RIGHTS**. The criterion that the suspension should not grant restitutory effects or effects that anticipate the final decision, because they are proper to the judgment on the merits, must be overcome in order to be congruent with the constitutional purpose of preserving the subject matter of the trial and avoid the execution of acts of impossible or difficult reparation, as long as there is a suspensory interest of the petitioner and subject matter for the suspension, for which it is necessary to consider the nature of the challenged act. Consequently, it is appropriate to grant the suspension even though it may advance the effects of the final decision, since this would be provisional, if it is necessary to ensure an effective precautionary protection that preserves the subject matter of the trial and the full restitution of the affected party's rights; that is, when if it is not granted, the restitution that, in its case, is ordered in the final decision, may be illusory.[140]

The above thesis is of great relevance in the present case, since it reveals the obligation of the Judge to ensure the effective precautionary protection and, ~~therefore,~~ it allows him to anticipate certain effects of the final decision of the amparo with the purpose of restoring the violated rights of the plaintiff.

Having established the foregoing, it is evident for this Court that any interpretation made in order to resolve the granting of the requested suspension measure must be in order to protect the right of effective precautionary protection of the Complainant.

### B.  Compliance with the requirements for suspension .

Now, although Title Two, Chapter II, Section Four of the Amparo Law does not regulate greater requirements for the granting of the suspension measure in direct amparo, it has been recognized in case law that the same requirements must be analyzed as in the case of the suspension in the indirect amparo trial, in this respect:

> **"SUSPENSION IN DIRECT AMPARO. ITS ANALYSIS, AT THE MOMENT O F RULING ON IT, IS INTEGRATED OF DIVERSE ORDERED AND CONCATENATED PHASES THAT, GIVEN THEIR PRIORITY AND CLOSE RELATIONSHIP, CANNOT BE OMITTED OR ALTERED IN THE    ORDER    OF    STUDY    BY    THE AUTHORITY    THAT    SHOULD**
> **PRONOUNCE**. From the systematic interpretation of section X of article 107 of the General Constitution and of precepts 5, section I, 128, 134, 140, 146, section I, 150 and 190, last paragraph, of the Amparo Law, it can be deduced that upon a weighted analysis

---

[139]       This       is       accessible       at       at       following       hyperlink: https://www.cidh.oas.org/countryrep/AccesoDESC07sp/Accesodescv.sp.htm

[140]Location: [J]; 9th Epoch; T.C.C.; S.J.F. and its Gazette; Volume XXXIV, July 2011; Page 1919. I.4o.A. J/90.



that must be carried out at the time of ruling on the suspension underlies a logical process composed of several ordered and concatenated phases that, given their priority and close relationship, cannot be omitted or altered in the order of study by the authority that must rule on the precautionary measure, regardless of the way -direct or indirect- in which they are proposed. Now, although said phases are fully developed in the legal framework that governs the incident of suspension in the indirect amparo trial, the systematic examination of the rule reflects its applicability, although with the due nuances, to the uni-instantial amparo. Thus, as a first phase, it is necessary to establish the challenged act and corroborate its certainty, since the natural and legal requirements inherent to the concession revolve around its precision and existence; then, in second place, the nature of the act, its effects and contrast it with the purpose for which the suspension is requested must be considered, to the extent of determining whether it is feasible to be suspended. Then, in third place, it is necessary to verify the legal presuppositions; that is, the request of the aggrieved party, closely related to the suspensory interest, without all this deriving in an affectation to the social interest or to the rules of public order. It is in this section, where in order to assess the meaning of whether or not the public order and the social interest are affected, the appearance of good law and the danger in the delay are weighed. Finally, in fourth place, if all the above elements are satisfied and it is necessary (since it is not always necessary), the jurisdictional authority must, in light of the effects of the precautionary measure, weigh the measures of effectiveness to which the suspension of the challenged act must be subject (guarantee and, if applicable, security measures), in its case, security measures), since the absence of these, would render the determination aimed not only at preserving the subject matter of the amparo, but also at preventing the possible affectation of the fundamental prerogatives of the petitioner, in terms of article <u>136, second paragraph</u>, of the cited law.[141]

In this order of ideas, the following demonstrates to this Court the fulfillment of each and every one of the requirements for the granting of the suspensory measure.

The third section, first part, of the Amparo Law, establishes, in what is of interest, the following:

> Section Three
> Suspension of the Act Complained
> Against Part One
> General Rules
>
> The suspension of the challenged act shall be decreed ex officio or at the request of the complainant.
>
> With the exception of the cases in which the suspension shall proceed ex officio, the suspension shall be decreed in all matters except those indicated in the last paragraph of this Article, provided that the following requirements are met:
>
> I. The complainant requests it; and
>
> II. That it does not harm the social interest or contravene provisions of public order.
>
> The suspension shall be processed in a separate incident and in duplicate.
> Likewise, protection orders or measures issued in terms of the applicable legislation by any administrative or jurisdictional authority to safeguard the safety or integrity of a person and the execution of an investigation technique or precautionary measure granted by a judicial authority (...) shall not be subject to suspension.

Pursuant to articles 107, section X, of the Political Constitution of the United Mexican States; 125, 128 and 131 to 158 of the Amparo Law, the analysis of the suspension must distinguish several issues of staggered study, such as:

---

[141] TCC;10th Epoch;Gaceta del Semanario Judicial de la Federación;I.9o.C.52 C (10a.) ;TA; Publication: Friday, January 29, 2021 10:30 am

CLYDE&CO

i) the requirements that, as a whole, will result in determining whether or not the precautionary measure should be granted;

ii) the effects of such measure, which consist of the detailed specification of what the authorities must do or refrain from doing;

iii) the measures or guarantees that, as the case may be, are requested from the complainant for the effects of the suspension to continue; and,

iv) the precautions taken by the judge to ensure that the effects of the suspension are not abused.

With respect to the first issue, except in cases in which the suspension is granted ex officio or under special regulations, the suspension of the challenged acts may be granted, provided that the following requirements are met in the order indicated:

1. The request of a party;

2. The existence of the challenged act, which in the case of the provisional suspension is presumed based on the manifestations or affirmations that the plaintiff formulates under oath in its complaint, and for the definitive suspension it requires that its existence has been accepted, or proof of it;

3. The nature of the challenged act, that is, that the challenged act is susceptible to be suspended according to its nature, an analysis in which the classification that the Supreme Court of Justice of the Nation has formulated with respect to those that admit suspension and those that do not must be taken into account;

4. The plaintiff must feel an affectation to his legal or legitimate interest, an aspect that must be evidenced by evidence for the purposes of the provisional suspension and, to a higher evidentiary degree, for the definitive suspension; and,

5. The weighing between the appearance of good law and the social interest or the provisions of public order in the terms developed by the Supreme Court of Justice of the Nation.

The jurisprudence of the Third Collegiate Court of the Twenty Seventh Circuit contained in the thesis entitled "**SUSPENSION AT THE REQUEST OF A PARTIE. PROCEDURAL REQUIREMENTS IN ACCORDANCE WITH THE AMPARO LAW, IN FORCE AS OF THE DATE OF THE AMPARO PROCEEDING.**

**APRIL 3, 2013.**"[142]Compliance with all requirements is demonstrated below:

---

[142] Epoch: Tenth Epoch Record: 2007358 Instance: Collegiate Circuit Courts Type of Thesis: Jurisprudence Source: Gaceta del Semanario Judicial de la Federación Book 10, September 2014, Volume III Subject Matter(s): Common Thesis: XXVII.3o. J/2 (10a.) Page: 2347

CLYDE&CO

a.   The request of a party.

In the present case, the first requirement is met by the Complainant appearing through the petition, expressly requesting the granting of the injunction in this amparo proceeding in order to safeguard the human rights violated by the responsible authorities.

b.    Existence of the challenged acts.

The existence of the challenged act is clear, since it is the issuance of the Order Challenged, which in addition to being accompanied in a simple copy to the present lawsuit, constitutes a notorious fact for this Court.

c.    Nature of the challenged acts, i.e., that they are susceptible to be suspended.

The third requirement requires the judge to analyze whether the challenged act is susceptible of being suspended, that is to say, whether the granting of a suspensory measure may have the effect of safeguarding the fundamental rights of the Complainant during the processing of the amparo proceeding or, if not, such measure would be useless to achieve such purpose.

It is convenient that, without prejudice to the power of this Court to grant the precautionary measure for the effects it deems convenient, each of the proposed effects are analyzed and, with this, confirm that the claimed acts are susceptible to be suspended.

In the present case, the challenged act consists of the Requested Order, being that the suspension is requested in order to avoid its execution to the detriment of Dolphin, specifically to refrain from executing the lifting of the Precautionary Measures.

In this order of ideas, the execution of the Complained Order constitutes a positive or active act of the authority, that is to say, it implies a conduct of doing. Likewise, it is an act of continuous or unfinished execution, that is to say, it is an uncontested act that requires a series of conducts deployed by the responsible authority to be carried out.

Consequently, since it is an act of unfinished execution, it is clear that it is susceptible to suspension, since the granting of the requested precautionary measure would have the consequence of preventing the execution of the act from continuing to materialize, which translates into refraining from executing the Order Complained Against.

In addition to the foregoing, the case law has fully recognized the validity of the suspension to avoid the lifting of precautionary measures; in this regard, the following criteria are relevant:

> **"PRECAUTIONARY MEASURES. ITS LIFTING CAUSES A DAMAGE THAT IS DIFFICULT TO REPAIR FOR PURPOSES OF THE SUSPENSION IN THE AMPARO, SINCE WITH IT, THE INTERESTS OF THE PARTY THAT PROMOTED THE PRECAUTIONARY MEASURE ARE NO LONGER SECURED (LEGISLATION OF THE STATE OF PUEBLA).** Taking into account

167



Considering that from the interpretation of articles 523, 526 and 528 to 535 of the Code of Civil Procedures for the State of Puebla, in force, the precautionary measures consist of securing a factual or legal situation, prior or subsequent to the filing of the lawsuit; Therefore, the right of the plaintiff to have the precautionary measure decreed is adjective and allows him to ensure, in the event that he obtains a favorable judgment, the effective compliance of the obligation that the debtor will demand; therefore, the precautionary measure does not constitute any additional or foreign right to the one that will be the reason for the controversy in which it must be decided whether the action is admissible or not. That the purpose of the precautionary measures is to prevent the debtor from evading compliance with his obligations or the result of the lawsuit that has been filed or is intended to be filed against him, and they do not discuss the rights that the plaintiff may have in the corresponding lawsuit, but simply ensure the result of such lawsuit, a result that is not prejudged. Therefore, given its nature and general purpose, it must be considered that its lifting causes a damage that is difficult to repair for the purposes of the suspension in the amparo, since with it the interests of the one who promoted the precautionary measure are no longer ensured, despite the fact that its purpose is precisely to preserve it during the time strictly necessary for the obligation demanded by an enforceable judgment to be recognized, preventing the debtor from evading compliance with its obligations or the result of the trial, concluding that in this case the requirement set forth in article 124, section III, of the Amparo Law is met."[143]

**"HOWEVER, IT IS APPROPRIATE TO GRANT THE SUSPENSION OF THE CHALLENGED ACTS, WHEN THEY CONSIST OF THE LIFTING OF THE INJUNCTION IN THE TRIAL OF ORIGIN, SINCE THEY ARE NOT    OF    ACTS CONSUMMATED    NOR    HAVE    EFFECTS.**
**RESTITUTORIOS THE PRECAUTIONARY MEASURE**. If a claim is filed in a trial of guarantees against the resolution ordering the lifting of a seizure in the original trial, it cannot be considered that such act has been irreparably consummated, much less that the requested precautionary measure has restitutory effects, since the scope of the suspension measure is to paralyze the acts of execution that would derive from the challenged resolution, that is to say, to prevent the registration of the one that appears in the Public Registry of the Property. In addition, it cannot be considered that with its concession it would have restitutory effects in favor of the plaintiff of the amparo, since the purpose of the suspension is to maintain things in the state they are in at the time of requesting it, that is, on the one hand, not to provisionally release the property, and on the other hand, not to release the property temporarily, that of not provisionally releasing the property object of the seizure and on the other hand, the subsistence of the guarantee that the plaintiff has in her favor until a decision is made on the definitive suspension of the acts claimed, aspects that do not consist, as was said, in giving restitutory effects, proper of the judgment on the merits."[144]

It should not go unnoticed that the jurisprudence has recognized that the suspension is fully admissible even though it has restitutory effects, in accordance with the provisions of article 147 of the Amparo Law, which states:

"Article 147. In the cases in which the suspension is appropriate, the jurisdictional body shall establish the situation in which things shall remain and shall take the pertinent measures to preserve the subject matter of the amparo until the termination of the trial, being able to establish conditions on whose compliance depends the continuance of the suspensory measure.

Taking into account the nature of the act complained of, it will order that things remain as they are and, if legally and materially possible, it **will provisionally reestablish the complainant in the enjoyment of the violated right while a final judgment is issued in the amparo proceeding**".

Consequently, it is constitutionally admissible and desirable that this Court grant the suspension with provisional restitutory effects. In fact, **the Supreme Court of Justice**

---

[143] Digital Record: 167413 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;VI.2o.C.667 C ;TA
[144] Digital Record: 175094 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;XVI.2o.C.25 C ;TA



**The Supreme Court of Justice of the Nation <u>has</u> even <u>called this precautionary measure "amparo provisional", recognizing the extension of the protection of this measure</u>**. This has been recognized in firm jurisprudence of the Supreme Court of Justice of the Nation as can be seen in the following jurisprudential thesis applicable by analogy to the case:

> **"SUSPENSION. THE OMISSIVE NATURE OF THE CHALLENGED ACT DOES NOT PREVENT IT FROM PROCEEDING**. Articles 107, section X, first paragraph, of the Constitution and 147 of the Amparo Law in force, endow the suspension with a genuine character of precautionary measure, whose purpose is to preserve the subject matter of the controversy and avoid that the persons suffer an affectation to their legal sphere while the merits of the case are being resolved, either with conservative measures or of anticipated protection (restitutory effects), for which it is necessary to analyze: (i) the appearance of good faith; (ii) the possible effects on the social interest; and (iii) the legal and material possibility of granting the measure. In this sense, the nature of the acts, whether positive, declaratory or negative, does not represent a factor that automatically determines the granting or denial of the precautionary measure, since the phrase "according to the nature of the challenged act", which refers to the provision of the Amparo Law, must be analyzed according to the consequences that the challenged acts may produce on a case-by-case basis, must be analyzed according to the consequences that the challenged acts may produce case by case, which in turn is decisive to decide whether the effect of the suspension must consist of maintaining things in the state they are in or whether the person must be provisionally restored to the enjoyment of the violated right. In these terms, the omissive nature of the challenged acts is relevant to determine the content that the suspension will adopt, but not to determine whether the precautionary measure proceeds or not. In effect, given that the provisional injunction sought with the definitive suspension allows the person to temporarily obtain a benefit that, at the end of the day, can be confirmed or revoked through the main judgment, without prejudging what happened before the amparo trial or what will happen afterwards, since what is important for such precautionary measure to be materially and legally possible lies in that the suspensive effects can be actualized moment by moment, so that the suspension does not coincide exactly, exhaust or leave without matter an eventual amparo judgment, and all this goes beyond the type of measures that must be dictated in case it proceeds according to the above."[145]

The following criterion is also relevant and applicable:

> **"SUSPENSION IN THE AMPARO. IT IS APPROPRIATE TO GRANT IT, EVEN THOUGH IT MAY ADVANCE THE EFFECTS OF THE FINAL DECISION, IF IT IS NECESSARY TO ENSURE AN EFFECTIVE PRECAUTIONARY PROTECTION THAT PRESERVES THE SUBJECT MATTER OF THE TRIAL AND THE FULL RESTITUTION".
> OF THE AFFECTED PARTY'S RIGHTS**. The criterion that the suspension should not grant restitutory effects or effects that anticipate the final decision, because they are proper to the judgment on the merits, must be overcome in order to be congruent with the constitutional purpose of preserving the subject matter of the trial and avoid the execution of acts of impossible or difficult reparation, as long as there is a suspensive interest of the petitioner and subject matter for the suspension, for which it is necessary to consider the nature of the challenged act. Consequently, it is appropriate to grant the suspension even though it may advance the effects of the final decision, since this would be provisional, if it is necessary to ensure an effective precautionary protection that preserves the subject matter of the trial and the full restitution of the affected party's rights; that is, when if it is not granted, the restitution that, if applicable, is ordered in the final decision, may be illusory."[146]

In the event that the requested suspension is considered to have restitutory effects, this does not prevent it from being fully admissible if all the necessary requirements are met, as these have been recognized by the Supreme Court of Justice of the Nation in jurisprudence 2ª J. 22/2023, in which it concluded that the granting of the suspension must always protect the rights that

---

[145] Epoch: Tenth Epoch Record: 2021263 Instance: First Chamber Type of Thesis: Jurisprudence Source: Semanario Judicial de la Federación Published: Friday, December 06, 2019 10:18 am Subject(s): (Common) Thesis: 1a./J. 70/2019 (10a.)
[146] Digital Record: 161447 TCC;9a. Época;Semanario Judicial de la Federación y su Gaceta;I.4o.A. J/90 ;J



The Complainants consider affected, in addition to the fact that their protection must be equated with the relevance of preserving the main lawsuit.

The Second Chamber held that the suspension of the challenged act and the merits of the case have the same importance to protect human rights and that it is not feasible to deny the suspension under the pretext of preserving the subject matter of the amparo, or to consider that this is proper to the amparo judgment, as the Judge unduly held:

"97. The interpretation of the precept allows us to assert that the reason behind a grant of amparo is a protective action of a right affected by an authority; consequently, the understanding of the statement "to preserve the subject matter of the amparo until the termination of the trial" must be contextualized in that the grant of the suspension means that its purpose is that the jurisdictional body is in a position to protect the right that the Complainants consider affected.

98.      On the other hand, it is incorrect to consider that the understanding of the phrase "to preserve the subject matter of the amparo until the termination of the trial" implies that the jurisdictional body avoids, at all costs, that there be identity between the effects of the suspension and that of a judgment favorable to the interests of the Complainants.

99.      Under this understanding, this Second Chamber holds that the importance of the suspension of the challenged act must be equated with the relevance of preserving the main subject matter of the trial, since both seek to create the conditions for the amparo trial to fulfill its protective function, and therefore, as a general rule, it would be incorrect to hold that the suspension should be denied in order to preserve the main subject matter of the case.

100.     The foregoing is held because considering that the suspension should be denied in order to preserve the subject matter of the trial implies, implicitly, considering that the merits should prevail over the suspension, which is inaccurate because, as stated above, the purpose of the precautionary measure is to generate the conditions to safeguard the rights in dispute.

101.     Considering that the suspension of the challenged act and the merits of the case have the same importance for purposes of the protection of human rights, so that as a general rule it should not be held that one figure is privileged over the other, that is, to deny the suspension in order to preserve the subject matter of the trial, this Second Chamber should consider in which cases the merits should be privileged over the precautionary measure".

The Court distinguished between the transitory benefit of the suspension and the definitive effect of the amparo judgment:

"VIII.III What allows us to identify a suspension with restitutionary effects that provides transitory benefits, as opposed to one that provides definitive benefits?

105.     The suspension of the challenged act, by definition, is a transitory benefit, since Article 147 of the Amparo Law clearly limits its duration, which starts from the issuance of the order or interlocutory ruling granting the precautionary measure, until it is pronounced enforceable, that is, until the decision that finally resolves the matter is issued (either issuing a ruling on the merits or dismissing the case).

106.     Therefore, the general rule is that the suspension of the challenged act is a transitory benefit, even when it is granted with a restitutory character and there is identity between the effects of an eventual judgment in favor of the Complainants, since, it is insisted, such benefit will last only until the judgment issued in the main file becomes enforceable.

107.     Having specified the foregoing, it will be clarified which is the exception to the general rule, that is, in which cases a precautionary measure with restitutory effects would truly leave an amparo proceeding without subject matter, even in the event that the effects of the suspension cease as a result of the judgment issued by the final instance, pursuant to Article 147 of the Amparo Law".



Consequently, the Court held that in those cases in which a Judge notices that the suspension would have a restorative effect on rights, as in the case in question, he must take into account the principle of transitoriness of the suspension and it will be feasible to grant the suspension if in the event that the result of the amparo is adverse to the Complainants, it can be revoked:

"Possible interactions of the injunction and the merits.

| 1. Grants the suspension with effect restitution.<br><br>Favorable ruling. | 2.    Concede to .    the    suspension with    effects restitution.<br><br>Adverse ruling. |
|---|---|
| Denies the suspension.<br><br>Favorable ruling. | 4. Denies the suspension.<br><br>Adverse ruling. |

109.    Interactions 3 and 4 are irrelevant for this analysis because if the precautionary measure was denied, evidently there is no grant with restitutory effects, since it is a necessary presupposition to grant the suspension in order for it to provisionally restore a right.

110.    However, this Second Chamber considers that in case 3, the court must be especially careful, because the denial of the suspension (with restitutory effects) could prevent the effect of a protective judgment from materializing in the legal sphere of the Complainants.

111.    In interaction 1, the suspension with restitutory effects was granted and the injunction was granted. In this case, the precautionary measure would mean to advance the restitution of the enjoyment of a right to which the plaintiff would eventually have access in the judgment on the merits. An example is the act complained of in complaint 256/2022 where the omission to process an appeal in a criminal case was complained of.

112.    In the scenario where the jurisdictional body notices an evident contravention of a fundamental right, where after processing the trial the authority will foreseeably not be able to demonstrate the constitutionality of the act, the general rule detailed in previous paragraphs would apply, that is, it would be incorrect to maintain that the suspension should be denied in order to preserve the subject matter of the case, since let us remember that the understanding of the expression preserve is that the jurisdictional body will ensure to provide the conditions to protect the right that the Complainants consider to be affected.

113.    Therefore, in this case it would be incorrect to deny the suspension because it coincides with the effect of an eventual judgment because the analysis of the merits cannot be privileged over the provisional restitution of a right, since according to what has been sustained by this Second Chamber, there is no prevalence of one over the other, since both the suspension and the main file must be in harmony to achieve the ultimate purpose of the amparo trial, which is to protect human rights in an effective manner.

114.    In the case of interaction 2, the injunction was granted with restitutory effects, but on the merits the Quejosos obtained an adverse judgment.

115.    Let us be clear that the suspension, as a general rule, is transitory, regardless of whether its effects coincide with the protection that would be obtained with a favorable judgment for the Complainants, since by express provision of Article 147 of the Amparo Law, its effect will end when the judgment becomes final, that is to say, by definition, it is not a definitive benefit.

116.    Then, in the event that the court granted the suspension with restitutory effects because it made an analysis of the appearance of good faith (at the time of ruling on the precautionary measure it anticipated that there were reasonable indications to consider that the Complainants have the right that is in dispute), but once the trial has been conducted, the Quejosos obtained an adverse judgment, which would mean that the assessment of the appearance of good faith was wrong, the benefit of the injunction will be definitive only if the effects of the suspension cannot be reversed. This would be the exception to the general rule.

117.    In contrast to what is stated in the preceding paragraph, if the benefit granted with the precautionary measure can be reversed, it means that it is a

1711



This means that the trial would not be without subject matter, but on the contrary, the suspension would fulfill its objective, since it would provisionally restore the right and this provisional restitution would end when the judgment is enforceable.

118.    Bearing in mind that the discrepant point is found in the understanding of in which cases the amparo trial is left without matter in the main issue or coincides with the effects of the merits, in the opinion of this Second Chamber, transitory <u>must be understood as that benefit that can be revoked with the judgment on the merits and, in the opposite sense, a non-transitory or definitive benefit will be that which cannot be revoked even when the amparo is denied</u>".

These considerations were set forth in the following jurisprudence:

**"SUSPENSION OF THE CHALLENGED ACT WITH RESTITUTORY EFFECTS. PARAMETERS THAT THE JUDGE MUST TAKE INTO ACCOUNT WHEN ANALYZING THE POSSIBILITY OF GRANTING IT IN THE EVENT THAT, WITH THIS, THE AMPARO PROCEEDING IS LEFT WITHOUT SUBJECT MATTER IN THE MAIN PROCEEDINGS.**

Facts: The Collegiate Circuit Courts reached discrepant conclusions in relation to the cases where the amparo trial would be left without subject matter if the suspension of the challenged act is requested with restitutory effects, and such effects coincide with those of an eventual judgment favorable to the complaining party. The opposing positions dealt with the requirement regarding the legal possibility of granting the suspension, since one of the courts considered that it was possible to provisionally reinstate the rights of the Complainants, while the other Court held that it was not possible to grant the suspension since this would exhaust the subject matter of the trial in the main part of the case.

Legal criterion: The Second Chamber of the Supreme Court of Justice of the Nation determines that in the event of granting the suspension with restitutory effects, the court must consider that the subject matter of the amparo trial subsists when, in the event that it rules adversely to the Complainants, the effects of the suspension can be reversed and, in contrast, it will be a non-transitory or definitive benefit that would leave the trial without subject matter, when it cannot be reversed even if the amparo is denied. The foregoing implies that, as a general rule, the fact that the effects of the suspension and a judgment favorable to the Complainants coincide, is not a sufficient reason to deny the granting of the precautionary measure, even when it is argued that the purpose of such denial is to preserve the subject matter of the case, since the understanding of the expression "preserve the subject matter of the amparo" is that the jurisdictional body will ensure to provide the suitable conditions to protect the right that the complaining party considers affected, not the prevalence of the merits over the suspension.

Justification: The statement "to preserve the subject matter of the amparo until the termination of the trial", provided for in the first paragraph of Article 147 of the Amparo Law, must be contextualized in harmony with the ultimate purpose of the amparo trial, which is to effectively protect the rights that the complaining party considers to be affected. In this order of ideas, the importance of the suspension of the challenged act must be equated with the relevance of preserving the subject matter of the trial, since both seek to create the conditions for the amparo trial to comply with its protective function; therefore, as a general rule, it would be incorrect to sustain that the suspension must be denied with the purpose of preserving the subject matter of the case. The suspension of the challenged act is, by definition, a transitory benefit, because even when it is granted with a restitutory character and there is identity between the effects of an eventual judgment in favor of the Complainants, such benefit will last only until the judgment issued in the main case becomes final. The exception to the general rule, that is, in which cases a precautionary measure with restitutory effects would truly leave an amparo proceeding without subject matter, will be configured when the provisional restitution of the rights cannot be revoked even if the amparo is denied."[147]

---

[147] Digital record: 2026730 Instancia: Segunda Sala Undécima Época Materia(s): Común Tesis: 2a./J. 22/2023 (11a.) Fuente: Gazette of the Judicial Weekly of the Federation. Book 26, June 2023, Volume V, page 4497 Type: Jurisprudence.

CLYDE&CO

In this particular case, it is highly probable that a favorable judgment will be issued for the Complainant precisely because of the superficial analysis that the Judge must perform and the probable unconstitutionality of the act that such analysis will yield.

In addition, denying the stay would potentially frustrate the effects of an eventual amparo judgment and render the constitutional protection illusory since the Complainant would lack a precautionary protection that would allow its future restructuring and current operations.

From the precedent cited above, 2 (two) conditions are necessary to obtain the suspension:

1.     The importance of granting the suspension must be equated with the merits of the main amparo proceeding.

2.     That the transitory benefit of the suspension may be revoked in the event of a judgment adverse to the interests of the Complainants.

The importance of the suspension lies in the guarantee and observance of respect for the aforementioned human rights.

Therefore, the suspension should be granted since it would allow the preservation of the subject matter of the lawsuit and avoid a dismissal by express consent of the challenged norms or acts and, with this, the rights of the Complainant would be protected.

If the amparo is denied in a final judgment, it could prevent the Quejosa from continuing to enjoy precautionary protection and, consequently, allow its creditors to indiscriminately collect credits that would prevent it from operating; a matter that also endangers the jobs of hundreds of workers who depend on the Quejosa's operations, as well as the very lives of the animals in its care.

In addition, it is materialized in a transitory benefit ordered in the jurisprudence 2ª J. 22/2023, since the District Judge, in the event that at the time of analyzing the merits of the amparo trial he determines that it is not appropriate to grant the amparo for the requested effects, in the amparo judgment he may revoke the benefit granted the suspension validly without any of those benefits being considered irrevocable in the sphere, that is, without being considered a permanent benefit.

d.     <u>The complainant must feel that his or her legal or legitimate interest has been affected.</u>

The affectation of the legal interest of Controladora is evident, since, as it was extensively discussed in the concepts of violation, the Order is intended not only to terminate the bankruptcy proceeding initiated by it, but also the illegal lifting of the Precautionary Measures that protect it.



In addition, as an aggrieved party in the Concurso Mercantil, it is clear that it has an interest in filing this amparo proceeding.

e.     Balance between the appearance of good faith and the social interest or public order.

Finally, it is possible to affirm that the Complainant has the appearance of good faith, that there is danger in the delay and that, with the granting of the suspension measure, no damage would be caused to the social interest or to public order.

As for the appearance of good faith, it is possible to affirm that it consists of determining, hypothetically, based on a superficial knowledge of the case, the existence of the challenged right and the probabilities that the amparo judgment will declare the act unconstitutional.[148]

As has been demonstrated, the Complaint involves serious violations to Dolphin's fundamental rights, in addition to the fact that it is based on evidently illegal and unconstitutional interpretations.

Consequently, it is clear that from a superficial analysis of the case it is possible to conclude that the judgment that will eventually be rendered must be in the sense of protecting and protecting the Complainant, which proves the appearance of a good right.

On the other hand, there is also danger of delay in the granting of the suspensory measure.

The foregoing is affirmed, since allowing the execution of the Writ of Mandamus would be allowing the materialization of serious violations of fundamental rights to the detriment of Dolphin; mainly, it would deprive Dolphin from enjoying the precautionary measures decreed by the Responsible Court, **which are the only means that protect it from its creditors initiating aggressive actions for the collection of its debts and prevent the possibility of continuing with its operation.**

These circumstances are sufficient to sustain that in the present case the danger of delay is proven.

Finally, with respect to the requirement of not violating public order and social interest, it can be affirmed that this requirement has also been fully accredited.

The concepts of "public order" and "social interest" imply a protection of the social community; in matters of suspension, the judge must ensure that the granting of the measure does not deprive society of the enjoyment of an asset or right or endanger its coexistence. In this regard, the following criterion is relevant:

---

[148] It is applicable by analogy the criterion contained in the thesis under the heading: "SUSPENSION. THE MERE CIRCUMSTANCE THAT THE CHALLENGED ACT IS RELATED TO THE PAYMENT OF ALIMONY DOES NOT EXCLUDE THE ANALYSIS OF THE APPEARANCE OF GOOD FAITH." [J]; 10th Epoch; 1st Chamber; Gaceta S.J.F.; Book 23, October 2015; Volume II; Page 1594. 1a./J. 56/2015 (10th.).

CLYDE&CO

**"PUBLIC ORDER. IS AN INDETERMINATE LEGAL CONCEPT THAT IS ACTUALIZED IN EACH SPECIFIC CASE, TAKING INTO ACCOUNT THE MINIMUM RULES OF SOCIAL COEXISTENCE**. Public order is not a notion that can be configured from the formal declaration contained in a law. On the contrary, it has been a constant criterion of the Supreme Court of Justice of the Nation that it is up to the judge to examine its presence in each concrete case, in such a way that it is an indeterminate legal concept of impossible definition whose content can only be delineated by the circumstances of manner, time and place prevailing at the moment in which the assessment is made. In any case, in order to give it meaning, the judge must bear in mind the essential conditions for the harmonious development of the community, that is to say, the minimum rules of social coexistence; in the understanding that the decision to be taken in the specific case cannot rest on mere subjective appraisals, but on objective elements that translate the fundamental concerns of society, always seeking not to hinder the effectiveness of the rights of third parties."[149]

Article 129 of the Amparo Law establishes an exemplary catalog of those situations in which the judge must consider that, if the suspension measure were granted, public order would be put at risk.

Based on these premises, it is possible to affirm that in the present case **there is no harm to the social interest or to public order**.

In the first place, this Court may observe that in the present case **none of the circumstances set forth in Article 129 of the Amparo Law are present**.

In addition to the foregoing, if the suspension measure requested by the Complainant were granted, social coexistence would not be put at risk, nor would society be deprived of the enjoyment of a right; the foregoing, since the execution of the unlawful judgment being challenged is being demanded.

Furthermore, the appearance of good law triumphs, since it has been demonstrated that the Judgment is **evidently unconstitutional and illegal**, and therefore, even if your Honor considers that the requested suspension measure could have a detrimental effect against the public order or the social interest, it is clear that from a weighing with the appearance of good law and the danger in the delay, the latter triumphs. In this regard, the following criterion is relevant:

**"SUSPENSION. TO DECIDE ON ITS GRANTING, THE JUDGE MUST SIMULTANEOUSLY WEIGH THE APPEARANCE OF A GOOD RIGHT WITH THE PREJUDICE TO THE SOCIAL INTEREST OR TO THE PUBLIC ORDER**. The Full Court of the Supreme Court of Justice of the Nation, in the jurisprudence P./J. 15/96, under the heading: "SUSPENSION. IN ORDER TO RULING ON IT, IT IS FACTUAL, WITHOUT OBSERVING THE REQUIREMENTS CONTAINED IN ARTICLE 124 OF THE AMPARO LAW, TO MAKE A PROVISIONAL APPRECIATION OF THE UNCONSTITUTIONALITY OF THE ACT SUGGESTED.
The granting of the suspension, without failing to observe the requirements of Article 124 of the Amparo Law, it is sufficient to verify the appearance of good faith invoked by the plaintiff, so that it is possible to anticipate that the amparo judgment will declare the unconstitutionality of the challenged act, which must be weighed against the harm that may be caused to social interest or public order with the granting of the measure, that is, if the harm to social interest or public order is greater than the damage caused by the granting of the measure.

---

[149] TCC;9th Epoch;Semanario Judicial de la Federación y su Gaceta;I.4o.A.63 K ;TA

CLYDE&CO

and damages that are difficult to repair that the plaintiff may suffer. In accordance with the foregoing, the judge must carry out a simultaneous study of the appearance of good faith and the danger in the delay with the possible affectation that may be caused to the public order or the social interest with the suspension of the challenged act, assumption contemplated in section II of the aforementioned article 124, This study must be concomitant since it is not possible to consider in isolation that an act could have an unconstitutional flaw without comparing it immediately with the public order that could be affected by its suspension, and without having previously satisfied the other legal requirements for the granting of the measure."[150]

In conclusion, it will be evident for this Court that in the present case all the necessary requirements to grant the requested suspension are fully complied with, so it is compelled to grant the measure in the requested terms in order to safeguard the fundamental rights of the Complainant.

f.      About the warranty.

Finally, it does not go unnoticed by the Complainant that Articles 132 and 190 of the Amparo Law require the creation of a guarantee when there is a risk of damage to third parties; however, such assumption is not present in this specific case.

However, it should not go unnoticed that the suspension requested is for the sole purpose of not executing the Order and, consequently, not lifting the precautionary measures decreed in favor of the Complainant.

These precautionary measures were decreed **without the Complainant having to provide any guarantee**, since they are inherent to the bankruptcy proceeding and are intended to avoid aggravating the financial situation of the Complainant.

The foregoing, in addition to the fact that they were granted during the visit phase of the insolvency proceeding, a stage in which **there are still no other parties to the proceeding other than the merchant.**

Based on such considerations, it is considered that **no guarantee should be granted to the Complainant**, since the requested suspension would not imply greater effects than those permitted by the Bankruptcy Law when it authorizes the decree of precautionary measures in the bankruptcy proceeding (which, in themselves, should not be guaranteed).

In view of the foregoing and for the foregoing reasons, **TO YOU, JUDGES OF THE COLLEGATE COURT IN CIVIL MATTERS OF THE FIRST CIRCUIT, AT TURNO**, I kindly request:

**FIRST:** To agree to the present document and to recognize the personality shown.

**SECOND:** To admit the amparo action filed in this document.

---

[150] [J]; 9th Epoch; 2nd Chamber; S.J.F. and its Gazette; Volume XXX, December 2009; Page 315. 2a./J. 204/2009.



**THIRD.** After the appropriate legal proceedings, grant the protection and protection of the Federal Justice against the challenged acts.

**I OBJECT TO WHAT IS NECESSARY**
**Mexico City, as of the date of presentation.**

[electronically signed] [electronically signed

_____

**EDUARDO ALBOR VILLANUEVA**
general proxy of
**CONTROLADORA DOLPHIN, S.A. DE C.V.**





# PODER JUDICIAL DE LA FEDERACIÓN

**CRYPTOGRAPHIC EVIDENCE - TRANSACTION**

**File Signed:**
**41580020000000000048316492.p7m**
**Certification Authority:**
**AC OF THE TAX ADMINISTRATION SERVICE**
**Signatory(s): 1**
**This digital document is a true copy of its physical or electronic version, which corresponds to its original.**

| SIGNATURE | | | | | |
|---|---|---|---|---|---|
| **Name:** | EDUARDO DE MARTIN ALBOR VILLANUEVA | | **Validity:** | WELL | Current |
| **SIGNATURE** | | | | | |
| **No Series:** | 30.30.30.30.31.30.30.30.30.30.30.37.31.34.32.31.31.32.31.38 | | **Revocation:** | Well | Not revoked |
| **Date (UTC/ CDMX)** | 18/06/25 02:15:41 - 17/06/25 20:15:41 | | **Status:** | Well | Valida |
| **Algorithm:** | RSA-SHA256 | | | | |
| **Signature chain:** | 89 46 46 25 9c 3f f2 db 13 ea 77 d6 6b 46 81 a6 a5 b8 6f b2 58 a9 4c 36 92 c8 36 89 70 10 ca 9f 31 eb eb c9 37 f6 10 4f a5 4d 4c d7 74 e4 99 98 45 6f 08 ac 17 fb bc 42 1c cb a3 ce d1 45 21 cf 5d be aa 56 8c 8b c4 6b 58 28 1d 37 b5 c3 65 e3 cb e2 aa 3f 15 b0 1e 64 e5 1c 25 83 7d ff ea 55 b4 42 7c 2c 49 be 2c 42 49 1c 03 df 6d 28 11 bb c8 8d 1e 9b e6 4a 2b f1 12 65 32 08 cf 17 22 fb 79 9e e7 cb 0a 5c bd f9 c9 0c 72 99 d9 a9 4e ed d9 c8 c3 59 65 03 31 92 9b 9b 9b 9f 1b dc df f4 b9 c2 0c e1 a8 5b 41 44 01 c0 92 c1 c1 c1 bd b8 d0 1a 52 b6 a3 1a 56 f8 38 0d 87 18 9e 20 6f 06 e8 24 40 5a 05 10 23 fc 0b a0 b0 3e 65 50 4c 8a 9d 80 65 cb cf 63 38 37 73 7c 66 01 c6 18 e2 f1 78 9d 84 1d 8b 71 3e 63 e8 8b 9c 72 65 0d ef 84 f3 41 62 53 f0 41 7a b0 39 e0 67 6f f4 99 b3 2a 7e db 9f | | | | |
| **OCSP** | | | | | |
| **Date: (UTC/ CDMX)** | 18/06/25 02:15:09 - 17/06/25 20:15:09 | | | | |
| **Name of respondent:** | OCSP SAT | | | | |
| **Responder sender:** | AC OF THE TAX ADMINISTRATION SERVICE | | | | |
| **Serial number:** | 30.30.30.30.31.30.30.30.30.30.30.37.31.34.32.31.31.32.31.38 | | | | |
| **TSP** | | | | | |
| **Date : (UTC/ CDMX)** | 18/06/25 02:15:42 - 17/06/25 20:15:42 | | | | |
| **Name of the sender of the TSP response:** | Federal Judiciary Council Time Stamp Issuing Authority | | | | |
| **TSP certificate issuer:** | Intermediate Certifying Authority of the Federal Judiciary Council | | | | |
| **TSP response identifier:** | 13220714 | | | | |
| **Stamped data:** | oMm8bfitDrat5BIdyZ/uBMPmZHQQ= | | | | |



## PODER JUDICIAL DE LA FEDERACIÓN

**CRYPTOGRAPHIC EVIDENCE - TRANSACTION**

Archivo Firmado:

**115521459_415800003721090402315102275600017.p7m**

Certification Authority:

**Intermediate Certification Authority of the Federal Judiciary Council Signatory(s): 1**

**This digital document is a true copy of its physical or electronic version, which corresponds to its original.**

| SIGNATURE | | | | |
|---|---|---|---|---|
| **Name:** | EDER FLORES CORONA | **Validity:** | WELL | Current |

| SIGNATURE | | | | |
|---|---|---|---|---|
| **No Series:** | 70.6a.66.20.63.6a.66.32.00.00.00.00.00.00.00.00.00.04.1c | **Revocation:** | Well | Not revoked |
| **Date (UTC/ CDMX)** | 18/06/25 18:52:29 - 18/06/25 12:52:29 | **Status:** | Well | Valida |
| **Algorithm:** | RSA-SHA256 | | | |
| **Signature chain:** | 84 f7 66 e9 53 0f c2 2b 0f 03 02 3f 26 3f bd 62<br>17 c8 62 f5 1f 50 61 19 2c 3c 32 d8 55 d3 0e 32<br>13 b7 99 b0 f2 63 86 b7 45 6a 6e 69 66 e8 e1 48<br>cd 73 3e ce 48 76 7f a8 ab b7 d6 1a ca 6e 61 13<br>12 f2 77 d4 ea 62 06 2c d6 54 28 60 46 05 6c 29<br>9c ba 0a bd 3d 31 a9 7f fa e4 9e c4f bf bf 40 1c 17 91<br>a5 80 2f 4c 50 4a 00 05 42 96 81 76 83 8f<br>b5 2b d8 f3 4d d6 3e 04 a3 c8 6f c0 f1 32 15 f2 f6 d1 9f<br>6a 1c 18 f7 38 eb 83 ac 5e 09 a5 f8 6c a2 53 93 5f f8 dd<br>90 82 b0 fa 76 1c 39 b6 84 5f<br>38 30 51 2b 67 21 64 f9 fb 79 c6 f8 26 ca 09 14<br>c1 ab 3b 64 13 f1 d2 ce 40 c3 7b 9e d5 14 75 57<br>27 6f 22 32 e8 76 a5 64 5f c3 fd 0a 4e f4 a1 50 df 3f 76<br>6e 83 fa f0 b8 3f 0c cd f1 79 cf 67 0a<br>1d 12 6c 7f c0 6d 5e b2 e4 9d 31 f3 ab 86 9a 64 67 0e dc<br>a3 78 a2 c7 b2 8f 2d 80 2a b1 20 62 19 | | | |

| OCSP | |
|---|---|
| **Date: (UTC/ CDMX)** | 18/06/25 18:52:29 - 18/06/25 12:52:29 |
| **Name of respondent:** | OCSP ACI Service of the Federal Judiciary Council |
| **Responder sender:** | Intermediate Certifying Authority of the Federal Judiciary Council |
| **Serial number:** | 70.6a.66.20.63.6a.66.32.00.00.00.00.00.00.00.00.00.04.1c |

| TSP | |
|---|---|
| **Date : (UTC/ CDMX)** | 18/06/25 18:52:29 - 18/06/25 12:52:29 |
| **Name of the sender of the TSP response:** | Federal Judiciary Council Time Stamp Issuing Authority |
| **TSP certificate issuer:** | Intermediate Certifying Authority of the Federal Judiciary Council |
| **TSP response identifier:** | 13551469 |
| **Stamped data:** | htc313obB4Jo5F7+bXJZN883dLl= |