## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LEISURE INVESTMENTS HOLDINGS LLC, *et al.*,[1] | Case No. 25-10606 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:** **July 23, 2025 at 10:00 a.m. (ET)** |
| | **Objection Deadline:** **July 16, 2025 at 4:00 p.m. (ET)** |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) ENFORCING (A) THE AUTOMATIC STAY AND (B) THE COURT'S (1) TURNOVER ORDER AND (2) STAY ENFORCEMENT ORDER, AND (II) GRANTING RELATED RELIEF

Leisure Investments Holdings LLC ("**LIH**"), and certain of its affiliates (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**") hereby file this motion (the "**Motion**") for entry of an order, substantially in the form of Exhibit A hereto (the "**Proposed Order**"), (a) enforcing the automatic stay (the "**Automatic Stay**") imposed by section 362 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), the *Interim Order (I) Compelling the Debtors' Former Officers and Other Required Persons to Turn Over Records and (II) Granting Related Relief* [Docket No. 38] (the "**Turnover Order**"), the *Order (I) Enforcing (A) the Automatic Stay and (B) the Court's Order Compelling Debtors' Former Officers and Other Required Persons to Turn Over Records, and (II) Granting Related Relief* [Docket No. 205] (the "**Stay Enforcement Order**"); and (b) granting related relief.

---

[1] Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the Debtors is not provided herein. A complete list of the Debtors along with the last four digits of their tax identification numbers, where applicable, may be obtained on the website of the Debtors' noticing and claims agent at https://veritaglobal.net/dolphinco, or by contacting counsel for the Debtors. For the purposes of these chapter 11 cases, the address for the Debtors is Leisure Investments Holdings LLC, c/o Riveron Management Services, LLC ("**Riveron**"), 600 Brickell Avenue, Suite 2550, Miami, FL 33131.

In support of this Motion, the Debtors rely on the *Declaration of Robert Wagstaff (A) In Response to the Certification of Eduardo Albor Pursuant to 28 U.S.C. 1746 and (B) in Support of the Debtors' Motion for Entry of an Order (I) Enforcing (A) the Automatic Stay and (B) the Court's (1) Turnover Order and (2) Stay Enforcement Order and (II) Granting Related Relief* (the "**Wagstaff Declaration**"),[2] which is being filed contemporaneously with this Motion and is incorporated by reference herein.  In further support of the Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.    Due to the unlawful actions of Eduardo Albor and individuals acting on his behalf or in their own self-interests, the Debtors are again forced to request fundamental and necessary relief—access to, and control over, their books and records and related documentation.  As the Court is aware, the Debtors' diligent and good faith efforts to access their headquarters, located in Cancun, Mexico (the "**Headquarters**"), and obtain the Debtors' books, records, and other information have been met with brazen and unlawful resistance and demands for Debtor releases and payments in exchange for providing the records and other information that the Automatic Stay, the Turnover Order, and Stay Enforcement Order mandate must be turned over to the Debtors.

2.    At the outset of the Chapter 11 Cases, the Debtors understood and anticipated that a chapter 11 bankruptcy filing, and the operation of the worldwide automatic stay, might not be fully understood by Mr. Albor and other key employees in Mexico.  The Debtors were therefore proactive in seeking the Turnover Order and a "comfort" order [Docket No. 34] to support the enforcement of the Automatic Stay.  Those orders were sent and explained to no less than three

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Wagstaff Declaration or the *Debtors' Motion for Entry of an Order (I) Enforcing (A) the Automatic Stay and (b) the Court's Order Compelling Debtors' Former Officers and Other Required Persons to Turn Over Records, and (II) Granting Related Relief* [Docket No. 73], as applicable.

different law firms in Mexico that represent Mr. Albor individually or as purported company counsel.

3.      In April, the Debtors were required to file the *Debtors' Motion for Entry of an Order (I) Enforcing (A) the Automatic Stay and (b) the Court's Order Compelling Debtors' Former Officers and Other Required Persons to Turn Over Records, and (II) Granting Related Relief* [Docket No. 73] (the "**Albor Motion to Enforce**").  As detailed therein, the Debtors had no choice but to file the Albor Motion to Enforce to combat Mr. Albor's pattern of obstinate conduct from day one of these Chapter 11 Cases.  The purpose of the Albor Motion to Enforce was, among other things, geared toward obtaining all recorded information, including but not limited to books, documents, records, papers, electronically stored information, and email relating to, in connection with, the Debtors' property and finances or in furtherance of the Required Persons' performance of their duties on behalf of the Debtors (the "**Records**").

4.      After holding a preliminary hearing on April 29, 2025, an evidentiary hearing on May 21, 2025, and closing argument on June 2, 2025, the Court entered the Stay Enforcement Order.

5.      Unfortunately, notwithstanding the Automatic Stay and the Stay Enforcement Order, Riveron uncovered a fraudulent scheme by Mr. Albor to divert revenues from the Debtors' Mexican parks to an entity called "Proyectos Ejecutivos Sostentables, S.A. de C.V." ("**PES**"). This scheme was initiated as a result of the Debtors' efforts to obtain control over the Debtors' Mexican bank accounts.  Mr. Albor or his associates purchased temporary portable point-of-service payment terminals and deployed them at the Debtors' park locations in Mexico, allowing park revenues to circumvent the Debtors' ordinary bank accounts and be deposited into a non-Debtor account held or maintained by PES.  This scheme began in or around April 2025.

6.     The Debtors' former Chief Legal Officer, who was also an officer and director of various Debtors (including certain domestic Debtor entities), Concepcion Esteban Manchado and Mr. Albor continue to defy the Automatic Stay, Turnover Order, and the Stay Enforcement Order by (a) restricting access to only those Records that Ms. Esteban and Mr. Albor themselves have confirmed directly relate to the Debtors' business operations and (b) otherwise preventing the Debtors from obtaining the Records.  Moreover, Mr. Albor is now taking the position that he does not maintain the Records or have control over the facilities that house the Debtors' records, even though they are housed in the Debtors' former Headquarters, a building Mr. Albor owns and controls.  That absurd position is contradicted by, among other things, Mr. Albor's sworn deposition testimony and his sworn testimony before the Court at the May 21, 2025 evidentiary hearing on the Stay Enforcement Motion.

7.     Ms. Esteban's actions are likewise egregious.  On several occasions, Ms. Esteban stated she would not provide access to or otherwise turn over the Debtors' Records unless the Debtors (i) provide a general release[3] for any and all actions taken by Ms. Esteban in the course of her duties as the Debtors' former Chief Legal Officer and (ii) pay Ms. Esteban twelve million Mexican pesos (approximately $600,000) in severance.  The Debtors sent Ms. Esteban a letter detailing her unlawful actions that violate the Automatic Stay and the Stay Enforcement Order and demanding immediate access to the Records to which they are entitled.  She has failed to respond or comply.

8.     Ms. Esteban's and Mr. Albor's unlawful interference deprives the Debtors of the records, information, and important assets necessary to (i) operate the Debtors' businesses,

---

[3] An idea first suggested by Mr. Albor in an email to Ms. Conception and others dated June 13, 2025.  *See* Wagstaff Decl. ¶ 12; *see also* Wagstaff Decl., Exhibit H at 2.

(ii) comply with the Debtors' obligations in the Chapter 11 Cases, and (iii) conduct a sale process to maximize value to the estates and their stakeholders.  By this Motion, the Debtors seek to enforce the protections of the Automatic Stay and compel compliance with the Turnover Order and Stay Enforcement Order to provide the Debtors access to the information necessary to, among other things, preserve estate assets, ensure animal welfare, and successfully administer the Chapter 11 Cases.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware, the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

11.     The statutory and legal predicates for the relief requested herein are sections 105(a), 362(a), and 542(e) of the Bankruptcy Code, the Turnover Order, and the Stay Enforcement Order.

## PERTINENT BACKGROUND

12.     Through previous requests to enforce the Automatic Stay and to obtain the Turnover Order and Stay Enforcement Order, the Court is aware of the Debtors' efforts to secure the Records necessary to administer the Chapter 11 Cases.  The Debtors hereby incorporate and rely upon the factual recitation included in the Albor Motion to Enforce, which details the Debtors' efforts to obtain the Records and access the Headquarters.

I.      **Mr. Albor and Ms. Esteban Continue to Violate the Automatic Stay and the Court's Orders.**

13.     On June 5, 2025, the Court entered the Stay Enforcement Order, finding that Mr. Albor violated the Automatic Stay.  The Stay Enforcement Order further provides that any further obstruction by Mr. Albor, or anyone acting for or on his behalf, with respect to interfering with the Debtors' collection of Records shall be deemed a willful violation of the Automatic Stay. *See* Stay Enforcement Order ¶ 10.

14.     On June 26, 2025, after holding a status conference the previous day, the Court entered the *Order Imposing Sanctions on Eduardo Albor for Violation of the Automatic Stay* [Docket No. 257] (the "**Sanctions Order**").  The Sanctions Order imposed sanctions on Mr. Albor in the amount of $10,000 per day until Mr. Albor filed with the Court a declaration under 28 U.S.C § 1746, evidencing that performance of one of the corrective measures required by the Stay Enforcement Order (dismissal of the new amparo proceeding initiated in Mexico), was taken. *Id.* ¶ 2; Stay Enforcement Order ¶ 7.

15.     On June 27, 2025, Mr. Albor filed the *Certification of Eduardo Albor Pursuant to 28 U.S.C. § 1746* [Docket No. 259] (the "**Albor Certification**"), attesting that he has taken all corrective measures to remedy his violations of the Automatic Stay, including dismissal of his new amparo filings.  Specifically, Mr. Albor stated that he is not interfering with the Debtors' business operations.  Albor Cert. ¶ 8.  As detailed below, despite filing the Albor Certification, Mr. Albor has been violating the Automatic Stay, the Turnover Order, and Stay Enforcement Order by appropriating funds from Mexican Debtors to PES and failing to provide access to the Records.

A.      **The PES Scheme**

16.     On June 12, 2025, the Riveron team discovered that Mr. Albor had been diverting revenues from the Debtors' Mexican parks to PES.  Wagstaff Decl. ¶ 7.  This scheme appears to

have been a result of the Debtors' efforts to obtain control over the Debtors' Mexican bank accounts. *Id.* Upon discovering the scheme to utilize PES to divert revenues from the Debtors' Mexican parks, Riveron contacted Debtors' counsel, who then contacted Mr. Albor's counsel to obtain full information regarding PES and the amount of funds illegally diverted. Riveron demanded from Mr. Albor's authorized representatives the immediate return of all diverted funds so that the Debtors could pay an upcoming payroll to Debtor employees and other operating expenses. *Id.* ¶ 10. Riveron also demanded that all efforts to divert funds through PES be discontinued immediately so that the Debtors' revenues would continue to properly flow into the Debtors' bank accounts. *Id.* As a result of that demand, the Debtors' current revenues no longer flow through PES. *Id.*

17.     As of the date of this Motion, Riveron has not received any documentation related to PES from either Mr. Albor or Ms. Esteban, but a preliminary review of PES payment records furnished by Debtor employees in the treasury department indicates that PES paid at least $2,687,712.18 Mexican pesos (approximately $143,000 U.S. dollars) to Cervantes Diaz Gutierrez ("**CDA**"), Mr. Albor's personal attorneys in Mexico. *Id.* ¶¶ 11-13. Based on representations by PES representatives, a portion of these funds were used to reimburse Mr. Albor's personal attorneys at CDA for travel between Mexico and Miami in May 2025. *Id.* ¶ 13. Neither Mr. Albor, nor PES, nor CDA have returned the funds diverted from the Debtors to PES.

18.     Mr. Albor, or his associates, undertook a similar scheme to circumvent ordinary banking activities with respect to non-Mexican subsidiaries of the Debtors. *Id.* ¶ 14. On June 17, 2025, Mr. Albor directed Debtor employees responsible for the Debtors' accounting and treasury functions to transfer money from an "Elysium" bank account in one hour. *Id.* "Elysium" is the name of a Delaware limited liability company through which Mr. Albor personally owns property

in the United States. *Id.* Mr. Albor's email to the accounting and treasury employees states that "this email is not a joke" and that he is "not asking a favor, but rather giving [them] a clear and precise instruction." *Id.* Bank records discovered by Riveron indicate that several Elysium entities received disbursements from certain subsidiaries of Debtor Controladora Dolphin, S.A. de C.V. (including DTraveller Limited, Tours R' Us Limited, and World of Dolphins, Inc.), rather than those funds ultimately being deposited into Controladora Dolphin, S.A. de C.V.'s bank accounts. *Id.* These bank records indicate that Elysium entities have received approximately $414,000 from Debtor subsidiaries between April and June 2025. *Id.* To date, the Debtors have been unable to determine the nature of the "Elysium" account, nor has Mr. Albor returned the misdirected payments made to the "Elysium" account. *Id.* Neither Mr. Albor nor Elysium have returned the funds diverted away from the Debtors.

19.    On June 13, 2025, Riveron received an email Mr. Albor sent to his counsel (with instructions to forward the email to the Debtors), admitting that Mr. Albor undertook the PES scheme so that he could maintain control over the Debtors' cash flow, since the Debtors' existing banks had been directed to provide account access to the Independent Director and CRO. *Id.* ¶ 12.

20.    Rather than turning over all documents and records related to the assets diverted from the Debtors and/or their subsidiaries to PES and/or Elysium, Mr. Albor stated in his June 13 email that the Debtors' employees should only provide such information if they are released from any and all liability. *Id.* Contrary to the Albor Certification, while the Debtors have taken various actions to exercise control over operations, Mr. Albor is still interfering in the Debtors' business operations.

### B.    Interference with Access to the Records

21.    Mr. Albor also certified that he has taken corrective measures to permit supervised access to the Debtors' Records held in the Headquarters and provide the Debtors with keys, fobs,

usernames, passwords, and all other credentials and information required for such access to the Debtors' Records.  Albor Cert. ¶ 9.  This certification is false.  Mr. Albor continues to obstruct the Debtors' access to the Records.

22.      Despite the statements made in the Albor Certification, Mr. Albor has not completed the Corrective Measures and continues to engage in certain of the Identified Stay Violations, as well as other actions inconsistent with his obligations under the Turnover Order, the Stay Enforcement Order, and the Sanctions Order.

23.      On June 18, 2025, Riveron requested access to the Debtors' contract file repository, which is maintained in a locked room at the Headquarters and is accessible only by fingerprint access limited to Ms. Esteban.  Wagstaff Decl. ¶ 17.  When Riveron requested a meeting with Ms. Esteban to access this room and the Records therein, Ms. Esteban refused and demanded a severance payment of twelve million Mexican pesos (approximately $600,000 U.S. dollars).  *Id.* The Debtors' counsel spoke to Mr. Albor's counsel, and requested that Mr. Albor direct Ms. Esteban, in her capacity as his authorized representative, to arrange access to the contract room since she is allegedly the only person who can provide access.  *Id.*

24.      Instead of requiring Ms. Esteban to provide the Debtors with access to the Records in the contract room, Mr. Albor stated that Ms. Esteban is not his personal representative.  *Id.* ¶ 21.

25.      On June 21, 2025, Mr. Albor sent a representative (his driver) to change the locks on the door to the legal department, located on the first floor of the Headquarters.  *Id.* ¶ 19.  A Debtor representative who was at the Headquarters prevented this attempt.  Mr. Albor alleged that he had only sought to change the locks in his own office; however, his office is not on the first floor of the Headquarters.  *Id.*

26.     On June 23, 2025, in connection with the Debtors' request for the Records in the contract room, Ms. Esteban sent a notary public to the Headquarters to meet with the Debtors' staff. *Id.* ¶ 18. Ms. Esteban did not appear personally. *Id.* The Debtors requested that two notaries attend and be tasked with documenting the Records being collected from the locked contract room. *Id.* Upon arrival at the Headquarters, the Debtors' representatives were granted access to the legal department. *Id.* The door to the locked room containing the contract repository was open, allowing the Debtors' representatives to begin the process of reviewing and cataloging the Debtors' contracts and other legal documents. *Id.* Shortly thereafter, Mr. Albor appeared at the Headquarters and stated that the Debtors' conduct was illegal and threatened to contact the district attorney unless the Debtors stopped the process of reviewing and cataloging the Records and return the documents to the locked office. *Id.*

27.     On June 29, 2025, Mr. Wagstaff emailed Mr. Albor to coordinate the collection of Records from the Headquarters on June 30, 2025, in compliance with the Stay Enforcement Order. *Id.* ¶ 20. The same day, Mr. Albor responded via email stating "I do not keep any records of the Company nor have any passwords or codes at all." *Id.* ¶ 21. "Any records you may want are under the control of the people under your command and, if they do not follow your commands, you can fire them or sue them. I am not under your command at all and you are no body [sic] to give me orders." *Id.*

28.     On Monday, June 30, 2025, Mr. Wagstaff emailed Mr. Albor and Ms. Esteban, asking who would act as Mr. Albor's representative to accompany the Debtors' representatives in collecting Records from the Headquarters, but received no response. *Id.* ¶ 22.

29.     Twice on June 30, 2025, Debtors' counsel emailed Mr. Albor's counsel advising of Mr. Albor's continued obstructionist behavior. *Id.* ¶ 23.

30.     On July 1, 2025, counsel for Mr. Albor communicated to the Debtors for the first time (and contrary to Mr. Albor's sworn testimony before the Court) that the Records are under the control of Ms. Esteban and housed in a location leased by Ms. Esteban to which Mr. Albor does not have access. *Id.* ¶ 24.

31.     The same day, at a Mexican court-ordered mediation regarding Ms. Esteban's labor and employment claims against the Debtors, Ms. Esteban informed the mediator that she will not turn over the Debtors' Records until she receives (a) a general release of liability for every action she has taken as the Debtors' former Chief Legal Officer, and (b) a guarantee that the Debtors will pay to Ms. Esteban twelve million Mexican pesos in severance (approximately $600,000 U.S. dollars). *Id.* ¶ 27.

32.     After the mediation, Ms. Esteban was observed on video surveillance entering the Headquarters with an unknown companion. *Id.* ¶ 29.  Ms. Esteban and her companion were empty-handed upon entering the Headquarters. *Id.*  Video surveillance then captures Ms. Esteban and a companion exiting the Headquarters with a box containing unknown contents. *Id.*  The Debtors are concerned that Ms. Esteban is removing the Debtors' Records from the Headquarters, in furtherance of her scheme to extort from the Debtors significant estate resources and hold the Debtors' Records, which relate to the operations of the Debtors' business and the nature of the Debtors' legal interests in various assets, hostage.

33.     The Debtors have also learned that Ms. Esteban may be taking a six-week vacation to Europe beginning July 5, 2025.  As a result, on July 3, 2025, Debtors' counsel sent correspondence to Ms. Esteban, demanding that she turnover or otherwise provide access to the Debtors' requested information on or before July 7, 2025. *Id.* ¶ 30.  As of the date of this Motion, Ms. Esteban has not responded to or complied with that demand.

**RELIEF REQUESTED**

34.     By this Motion, the Debtors seek entry of the Proposed Order, (a) enforcing the fundamental protections of the Automatic Stay; (b) compelling Mr. Albor and Ms. Esteban to comply with the Turnover Order and Stay Enforcement Order; (c) continuing the monetary sanctions against Mr. Albor, and (d) granting related relief.

**BASIS FOR RELIEF REQUESTED**

I.     **Ms. Esteban and Mr. Albor Violated and Continue to Violate Section 362(a)(3) of the Bankruptcy Code by Exercising Control Over the Debtors' Property**

35.     Immediately upon filing a chapter 11 case, the Automatic Stay goes into effect and prohibits, among other things, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).   "The automatic stay is intended . . . 'in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.'"   *In re Aleris Int'l, Inc.*, 456 B.R. 35, 46 (Bankr. D. Del. 2011) (quoting *Borman v. Raymark Indus.*, Inc., 946 F.2d 1031, 1036 (3d Cir. 1991)).   Consequently, "[t]he automatic stay provides one of the fundamental protections for debtors found in the Bankruptcy Code." *In re Nortel Networks, Inc.*, 669 F.3d 128, 137 (3d Cir. 2011) (citing *Midlantic Nat'l. Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986)).

36.     The Automatic Stay is "undeniably broad" and encompasses "all legal obligations of the debtor, no matter how remote or contingent." *In re Baldwin-United Corp.*, 57 B.R. 759, 763–64 (S.D. Ohio 1985) (quoting H.R. Rep. No. 595, 95th Cong., 2d Sess. 309).   Additionally, the automatic stay is an "existing, statutorily-created injunction" that a debtor can enforce by motion. *In re Extraction Oil & Gas, Inc.*, 2020 WL 7074142, at *4 (Bankr. D. Del. Dec. 3, 2020) (citing *In re THG Holdings LLC*, 604 B.R. 154, 162 (Bankr. D. Del. 2019) (holding that it is unnecessary "to establish each of the factors necessary to impose a preliminary injunction because

the Bankruptcy Code itself establishes the basis for the enforcement of the automatic stay.")). The protections of the worldwide automatic stay extend to protect a debtor's property and contracts wherever they are located and by whomever held.  *See Nortel Networks,* 669 F.3d at 138 ("United States courts have uniformly upheld that extraterritorial application of the automatic stay"); *In re NDEP Corp.*, 193 B.R. 710, 712 (Bankr. D. Del. 1995) (stating that section 541 applies to a debtor's "legal or equitable interests as of the commencement of the case wherever located and by whomever held").

37.    A party violates the Automatic Stay by taking "a post-petition act to exercise control over property of the estate."  *In re Denby-Peterson*, 941 F.3d 115, 125 (3d Cir. 2019); *see also City of Chicago, Illinois v. Fulton*, 592 U.S. 154, 159 (2021).  Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case," and includes property "***wherever located and by whomever held***," including tangible and intangible property. *See* 11 U.S.C. § 541(a) (emphasis added); *see also United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.9 (1983); *Acands, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006).

38.    To determine whether particular actions taken by a third party amount to an exercise of control over property of the estate, a court should determine whether the "non-debtors' actions will adversely impact the estate's property interests" and, if so, "then evaluate (1) the nexus between the conduct at issue and the property interests of the bankruptcy estate, (2) the degree of impact on the bankruptcy estate and (3) the competing legal interests of the non-debtor parties." *Allentown Ambassadors, Inc. v. Northeast Am. Baseball, LLC (In re Allentown Ambassadors, Inc.*, 361 B.R. 422, 440 (Bankr. E.D. Pa. 2007) (citing *In re Burgess*, 234 B.R. 793, 799 (D. Nev.1999)); *In re Trump Entm't Resorts, Inc.*, 534 B.R. 93, 103 (Bankr. D. Del. 2015) (applying the three-factor test articulated in *Allentown Ambassadors*).

A.        **Nexus Between Conduct and Property Interests**

39.        There is a direct nexus between Ms. Esteban's and Mr. Albor's actions and the negative impact on the Debtors' estates and property interests.  Ms. Esteban and Mr. Albor have directly impeded the Debtors' access to the Records by securing them in a locked room at the Headquarters that is accessible only through her fingerprint.  Ms. Esteban's and Mr. Albor's efforts directly interfere with and impact the Debtors' rights in the Headquarters by preventing the Debtors and the Debtors' advisors from accessing the Records.

40.        The facts here are incontrovertible:  Ms. Esteban and Mr. Albor are directly interfering with the Debtors' lawful use and possession of the Records.  The Records stored in the Headquarters include the Debtors' books, records, financial data, and property, which constitute "property of the estate" pursuant to section 541(a) of the Bankruptcy Code.  *See, e.g., ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252 (3d Cir. 2006) (citing *Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 242 (3d Cir. 2001) for the proposition that the "definition of property 'encompasses rights and interests arising from ordinary contractual relationships.'").  The Debtors' interests in the Records are therefore subject to, and protected by, the Automatic Stay. *In re Enron Corp.*, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) ("Courts have consistently held that contract rights are property of the estate, and that therefore those rights are protected by the automatic stay.") (citations and internal quotations omitted); *see In re Vu*, 591 B.R. 596, 602–04 (Bankr. E.D. Pa. 2018) ("[B]y changing the locks and failing to respond to counsel's request for access to the restaurant Premises, [landlord] acted to obtain possession of and to exercise control over" property of the estate and constituted a willful violation of the automatic stay) (citations and internal quotations omitted); *Lankford v. Advanced Equities, Inc. (In re Lankford)*, 305 B.R. 297, 302 (Bankr. N.D. Iowa 2004) (finding a stay violation where landlord removed debtor-tenant property and changed locks); *In re Boston Bus. Machines*, 87 B.R. 867,

871 (Bankr. E.D. Pa. 1988) (finding a stay violation where landlord instituted eviction proceedings and locked debtor out of the premises).

41.    Ms. Esteban and Mr. Albor, simply stated, are "interfering with the orderly . . . rehabilitation of the debtor[,]" which the Court of Appeals for the Third Circuit held is one of the fundamental purposes of the Automatic Stay.  *Borman*, 946 F.2d at 1036 ("The automatic stay was designed to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.") (internal citations omitted).

### B.    Degree of Impact on the Debtors' Estates

42.    Ms. Esteban's and Mr. Albor's actions are adversely affecting the Debtors and their estates' property interests.  The Debtors must have access to the Headquarters and the Records and other information contained therein to effectively manage their business operations.  The inability to access such information poses a direct and significant threat to the Debtors' operations, the safety of the Debtors' animals, and the Debtors' ability to prosecute the Chapter 11 Cases, as the Debtors are unable to identify, among other things, the Debtors' material vendors and the amounts owed to them, the Debtors' payroll obligations, animal welfare information, tax obligations, contracts, and insurance policies and related claim information.  Given the Debtors' limited liquidity, any further constraints or negative impacts on the Debtors' efforts to continue to operate could severely undermine, if not derail, the Debtors' efforts in the Chapter 11 Cases.

### C.    Competing Legal Interest

43.    Ms. Esteban and Mr. Albor have no competing legal interests in the Debtors' Records.  Neither Mr. Albor nor Ms. Esteban are in a position of management or authority over the Debtors and do not require, and should not have access to, the Records.  Ms. Esteban's and

Mr. Albor's continued interference, if left unchecked, may erode the Debtors' estates to the detriment of the Debtors' chapter 11 efforts, the Debtors' employees and creditors, and other interested parties.

44.    Given that Ms. Esteban's and Mr. Albor's efforts to thwart the Debtors' access to the Records of the Debtors' corporate enterprise constitute a clear and unambiguous act to exercise control over property of the estate, and as the Debtors remain unable to access the Records, the Debtors require the Court's intervention and respectfully request that the Court enter the Proposed Order.

## II.    The Court Should Compel Compliance with the Turnover Order and the Stay Enforcement Order

45.    "[O]rders and judgments of courts must be complied with promptly." *Maness v. Meyers*, 419 U.S. 449, 458 (1975). To effectuate this fundamental principle of law, section 105(a) of the Bankruptcy Code grants bankruptcy courts wide latitude, including "taking any action or making any determination necessary or appropriate to enforce or implement court orders[.]" 11 U.S.C. § 105(a). The purpose of section 105(a) is to assure that the bankruptcy court "has the power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction." *Collier on Bankruptcy* ¶ 105.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); *see In re Kaiser Aluminum Corp.*, 456 F.3d 328, 340 (3d Cir. 2006) ("bankruptcy courts have broad authority to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy estates"). Although "there are some significant limits to a bankruptcy court's ability to use section 105(a) of the Code . . . [it] plainly may be used 'to enforce and implement' earlier orders." *In re River Ctr. Holdings, LLC*, 394 B.R. 704, 711 (Bankr. S.D.N.Y. 2008). The Court therefore possesses authority to enforce the Turnover Order and the Stay Enforcement Order,

which implicates one of the most fundamental purposes of the Bankruptcy Code—the preservation of estate property.

46.     Section 542(e) of the Bankruptcy Code mandates that "[s]ubject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee." 11 U.S.C. § 542(e). Pursuant to this authority, the Court entered the Turnover Order and the Stay Enforcement Order, which required that Mr. Albor and all entities and individuals acting for or on his behalf to provide the Debtors with recorded information related to the Debtors' property and financial affairs. *See generally,* Turnover Order; Stay Enforcement Order.

47.     Here, Ms. Esteban possesses, controls, and is actively preventing the Debtors from obtaining and utilizing business records and other information that is essential to the Debtors' operations and affairs. Without access to the Records, the Debtors will be unable to effectively preserve the value of the Debtors' estates.

48.     Therefore, in light of Mr. Albor's and Ms. Esteban's willful violations of the Turnover Order and Stay Enforcement Order, the Debtors request that the Court (i) compel Ms. Albor, Ms. Esteban, and any persons acting on their behalf to immediately turnover the Records and (ii) impose a monetary sanction against Ms. Esteban should she fail to turn over or otherwise provide access to the Debtors' Records within seven days of entry of the Proposed Order. The monetary sanctions against Mr. Albor should continue to accrue until he actually complies with the Stay Enforcement Order and Sanctions Order, and any further "certifications" of compliance should be supported by definitive proof.

## **RESERVATION OF RIGHTS**

49.     The Debtors expressly reserve any and all rights, claims, and causes of action against Ms. Esteban and Mr. Albor and any other person that violates the Automatic Stay and this Court's orders, including, without limitation, any and all rights, claims, and causes of action to seek recovery on account of (i) the costs incurred by the Debtors in connection with Ms. Esteban's and Mr. Albor's violation of the Automatic Stay, the Turnover Order, and the Stay Enforcement Order, including attorneys' fees and costs incurred in prosecuting this Motion, (ii) the costs incurred in pursuit of access to the Records, (iii) any costs related to damage to the Headquarters or other property during and/or as a result of Ms. Esteban's and Mr. Albor's violation of the Automatic Stay, the Turnover Order, and the Stay Enforcement Order, and (iv) punitive damages on account of Ms. Esteban's and Mr. Albor's willful violation and disregard of the Automatic Stay, the Turnover Order, and the Stay Enforcement Order.

## **NOTICE**

50.     Notice of this Motion will be provided to:  (a) the U.S. Trustee; (b) counsel to the Unsecured Creditors' Committee; (c) counsel to the Prepetition First Lien Noteholders and DIP Lenders; (d) counsel to the DIP Agent; (e) counsel to the Prepetition Second Lien Noteholders; (f) counsel to the Prepetition First Lien Collateral Agent and the Prepetition Second Lien Collateral Agent; (g) Ms. Esteban; (h) counsel to Mr. Albor; and (i) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

33336549                                                    18

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter the Proposed Order, substantially in the form annexed hereto as Exhibit A, granting the relief requested herein and granting such other and further relief as is just and proper.

Dated: July 9, 2025

/s/ Sean T. Greecher

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (No. 2847)
Sean T. Greecher (No. 4484)
Allison S. Mielke (No. 5934)
Jared W. Kochenash (No. 6557)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Email: rbrady@ycst.com
        sgreecher@ycst.com
        amielke@ycst.com
        jkochenash@ycst.com

*Counsel to the Debtors and Debtors in Possession*
