## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LEISURE INVESTMENTS HOLDINGS LLC, *et al.*[1] | Case No. 25-10606 (LSS) (Jointly Administered) |
| Debtors. | **Hearing Date: August 12, 2025 2:00 p.m. (ET)** **Objection Deadline: August 5, 2025 at 4:00 p.m. (ET)** |

### MIAMI-DADE COUNTY'S MOTION TO LIFT THE AUTOMATIC STAY TO CONCLUDE STATE COURT EVICTION CASE, COMPEL DEBTORS TO IMMEDIATELY REJECT THE MIAMI SEAQUARIUM LEASE, AND ALLOW AND IMMEDIATELY PAY ALL POST-PETITION RENT

Miami-Dade County, a political subdivision of the State of Florida, through its Department of Parks, Recreation, and Open Spaces (the "County"), as landlord of Debtor MS Leisure Company, Inc. ("MS Leisure"), respectfully requests this Court: (i) lift the automatic stay of section 362(d) of title 11 of the United States Code, §§ 101, *et seq.* (the "Bankruptcy Code") to permit the County to conclude the state court eviction case (the "Eviction Case") it brought after terminating its lease with MS Leisure (the "Lease") pursuant to which the Debtors occupy and use the County's land to operate The Miami Seaquarium (the "Seaquarium"); (ii) if applicable, compel the Debtors to immediately reject the Lease pursuant to Bankruptcy Code sections 105(d)(2) and 365(a); and (iii) direct the Debtors to immediately pay the County all rent due and accruing post-petition under Bankruptcy Code sections 365(d)(3) and/or 503(b)(1). In support, the County states:

### PRELIMINARY STATEMENT

1.     The County terminated its Lease with MS Leisure nearly a year and a half before MS Leisure filed for bankruptcy. The County has been incredibly patient with the Debtors and

---

[1] The names of the Debtor entities in these jointly administered chapter 11 cases are listed at ECF No. 126 of the lead case In re Leisure Investments Holdings LLC (2025-10606 LSS).

their new management, especially given the local importance of the Seaquarium site and the egregiousness of MS Leisure's defaults under the Lease. But the time has come for MS Leisure to surrender the County's land. While the County is cognizant of the Seaquarium's plight to reorganize, it is not in the best interests of the County or the Debtors to continue expending estate resources to hold over on the County's land in the hopes that the Debtors might be able to sell or otherwise monetize its interest in the Lease. The Lease was terminated a year before the bankruptcy proceedings were instituted. Thus, no lease interest exists to assume or assign. Moreover, the nature of the defaults and the obligations of the Lease are such that Debtors and any potential assignee will almost certainly be unable to comply with the Lease terms in the future.

2.      The County's pre-petition termination of the Lease establishes "cause" for this Court to lift the automatic stay. This will enable the Florida state court to apply Florida law to determine that the Lease was validly terminated and order the Debtors to surrender the possession of the County's land. Florida courts hear thousands of eviction cases annually, and the County is entitled to present its Eviction Case in that forum.

3.      Although the County has been working voluntarily with the Debtor's new management, Riveron Consulting, LLC ("Riveron"), and their counsel since the bankruptcy case's inception, the County has not deviated from its position that it terminated the Lease pre-petition in accordance with Florida law; and thus, the Lease should not be considered an asset for purposes of these proceedings. As such, the County respectfully requests this Court enter an order finding the Lease is not the property of the estate; and therefore, not subject to assumption, rejection, assignment, or sale under Bankruptcy Code sections 365 and 363.

4.      Alternatively, if the Court finds the Lease was not terminated pre-petition, the County submits that cause exists, nonetheless, to lift the stay; and in such scenario, the County

requests the Court lift the stay to allow completion of the Eviction Case, and in addition, compel the Debtors to immediately reject the Lease.  As set forth below, the Lease must be assumed *cum onere.* The Lease requires daily operation of The Seaquarium. The Seaquarium requires millions of dollars of capital improvements in order to come into compliance with the Lease, and the Debtors' monthly operating reports confirm that The Seaquarium's admission receipts are insufficient to cover operating expenses. The County believes neither the Debtors nor a potential assignee will be able to adequately assure performance of all tenant obligations under the Lease. To avoid wasting time and resources on attempting to sell the Lease, the County believes rejection of the Lease and surrender of the County's land voluntarily or through the Eviction Case, if necessary, is in the best interests of the Debtors as well as the residents of Miami-Dade County.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over the subject matter of the Motion pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(l) and (b)(2)(A), (G). Venue in this Court is proper under 28 U.S.C. §§ 1408 and 1409(a).

6.      On March 31, 2025 (the "Petition Date"), MS Leisure filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") along with numerous debtor entities.  Since the Petition Date, the Debtors are operating their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7.      While the bankruptcy cases of multiple affiliated debtors are being jointly administered under the lead case 25-10606-LSS, they have not been substantively consolidated. *See* ECF 126.

3

## FACTUAL BACKGROUND

### I.    The County's Land:  a gem in Biscayne Bay

#### A.  The Park

8.    Miami-Dade County owns the 38-acre parcel of verdant land that has served as the Seaquarium's site for decades (the "Park"). The Park sits on the barrier island of Virginia Key, which is encircled by the crystalline waters of Biscayne Bay and overlooks the world-famous downtown Miami skyline. The Park's legal description is attached to the Declaration of Ileana Cruz (the "Decl.") at **Exhibit A**.

#### B.  Article 7 County Home Rule Charter: Use restrictions on County parks

9.    The County holds this Park for preservation in trust "for the education, pleasure, and recreation of the public." HOME RULE AMENDMENT AND CHARTER FOR MIAMI-DADE COUNTY, FLORIDA (the "Charter"), Art. 7, § 7.01 (as amended through Nov. 8, 2022). *See* Charter's Article 7, Decl. **Exhibit B**.

10.    As a matter of parkland policy, the County's objectives include protecting such lands from commercial development; the County Charter states in pertinent part:

> Parks, aquatic preserves, and lands acquired by the County for preservation shall be held in trust for the education, pleasure, and recreation of the public and they shall be used and maintained in a manner which will leave them unimpaired for the enjoyment of future generations as a part of the public's irreplaceable heritage. They shall be protected from commercial development and exploitation and their natural landscape, flora and fauna, and scenic beauties shall be preserved. In lands acquired by the County for preservation and in parks along the Ocean or the Bay the public's access to and view of the water shall not be obstructed or impaired by buildings or other structures or concessions which are in excess of 1,500 square feet each. Adequate maintenance shall be provided.

*Id.*, County Home Rule Charter, Art. 7, § 7.01 (emphasis added).

11.    In furtherance of this policy, Charter Article 7 provides that:

4

> parks shall be used for public park purposes only, and subject to the limited exceptions set forth in this Article, <u>there shall be no . . . private commercial use of a public park</u> or renewals, expansions, or extensions of existing leases, licenses, or concessions to private parties of public park property, unless each such structure, lease, license, renewal, expansion, extension, concession or use shall be approved by a majority vote of the voters in a County-wide referendum.

*Id.*, § 7.02.

12.     The Charter enumerates certain limited exceptions to these restrictions on commercial use. The operation of a Seaquarium is one such exception. Despite this exception, use of the Park's land and improvements thereon nevertheless is subject to the Charter's Article 7 restrictions. Therefore, in light of the County's nature preservation policy, while the County may lease such parklands, tenant's uses under any such lease must adhere to the strictly limited legal uses established under the Charter's Article 7.

## II.  **The Miami Seaquarium and the Lease as amended**

13.     On March 9, 1954, the County entered into the Lease, originally with Marine Exhibit Corporation ("<u>MEC</u>"), to use the Park to provide a family-oriented tourist attraction. A year later, the Seaquarium opened its doors to the public with three marine exhibits. Over the years, the Seaquarium underwent significant expansion and development, adding marine exhibitions to accommodate public demand.

### A.  **July 25, 2000: Amended and Restated Lease with MEC**

14.     MEC sought to redevelop the Seaquarium's operations and footprint. In doing so, MEC submitted its proposed Capital Improvement Plan ("<u>CIR</u>"), which provided for the renovation and reconstruction of the Seaquarium's then-existing improvements and certain adjacent parcels of land. To that end, MEC and the County entered into the *Amended and Restated Lease between the County and MEC, d/b/a/ The Miami Seaquarium* dated as of July 25, 2000. This

Lease amendment was approved by resolution of the Board of County Commissioners (the "County Board") adopted on July 25, 2000. *See* Reso. R-825-00, Decl. **Exhibit C**.

### B. November 16, 2001: First Amendment to Lease

15.     The terrorist attacks of September 11, 2001, marked a reduction in the tourism industry, which negatively impacted the Seaquarium's operations. To assist in its recovery, the County extended the Lease term and reduced cost obligations under the CIR. The County Board adopted this First Amendment November 6, 2001. *See* Reso. R-1256-01, Decl. **Exhibit D**.

### C. August 7, 2003: Second Amendment to Lease

16.     MEC sought clarification on its authority under the Lease to use land adjacent to the Park as an additional parking facility. The County Board adopted this Second Amendment on July 22, 2003. *See* Reso. R-861-03, Decl. **Exhibit E**. MEC merged with Festival Fun Parks, LLC, after the County Board approved in 2014.

### D. September 9, 2022: Third Amendment to Lease. Assignment of Lease to MS Leisure Company, Inc.

17.     In 2022, MS Leisure, led by Eduardo Albor, proposed to take over the Lease from Festival Fun Parks LLC, and committed to assuming and completing all repairs "to the Seaquarium including the whale habitat and stadium facilities to include, but not limited to: structural repairs as required by the 40-years inspection, paint remediation throughout the park, and water filtration improvements throughout the various habitats."  *See* Memo p. 3, Reso. R-991-21, Decl. **Exhibit F**. MS Leisure touted the experience and accreditations of its parent, The Dolphin Company ("TDC"). According to a County memorandum, TDC held itself out as "a large, experienced, animal welfare-focused, and well-established aquatic park, habitat, and marina operator that is able to make the necessary infrastructure improvements to the Seaquarium along with the capacity to ensure the highest levels of animal welfare and management." *See* Memo p. 2, Reso. R-991-21. Pursuant to

that assignment, MS Leisure took over the Lease—including all of its benefits and burdens—and began operating the Seaquarium in March 2022. As part of the assignment, the Lease was amended to increase protections related to the care of the animals at the Seaquarium. For instance, stricter requirements related to certifications by outside accrediting agencies were added. *See* ¶¶ 2-3, 3d Amd. The County Board found the assignment to MS Leisure was in the best interests of the County and adopted the resolution approving the Third Amendment on October 19, 2021. *See id.*

18. The Lease term has been extended three times resulting the current Lease expiration date of November 26, 2044, with optional renewal terms of up to 20 years, if tenant makes substantial capital improvements. *See* ¶ 3, 1st Amd.; *see also* Lease Extension Agreements dated 7/7/2006, 10/6/2009, and 3/9/2020, Decl. **Exhibit G**.

19. The Lease imposes numerous obligations upon the Lessee, including:

- Keeping the Seaquarium open to the public at reasonable times and hours, and without discrimination. § 27 L, Lease.

- Keeping the Park "and all improvements and personal property thereon, exclusive of animals, in a good state of repair and in a clean condition, subject to damage or destruction by fire or other elements, similar to other facilities maintained by [the] Lessee." § 11, 3d Amd.

- Providing for the needs of the animals in the Lessee's care "in accordance with federal laws and regulations," to include "the Marine Mammal Protection Act and the Animal Welfare Act." *Id.*

- Securing and maintaining "all applicable certifications necessary to ensure the proper maintenance and oversight of the [ ] Premises and all improvements thereon, including but not limited to, certifications by the Alliance of Marine Mammal Parks and Aquariums ('AMMPA') and the American Human Association (or similar third-party validated programs." § 27 R, 3d Amd.

### III.   **MS Leisure begins to default under the Lease almost immediately**

20. Sadly, and almost immediately, negative reports began to surface concerning MS Leisure's treatment of the Seaquarium's marine animals. For example, during its July 6, 2022 field

inspection, the United States Department of Agriculture ("USDA") found, among other things, that MS Leisure had failed to provide adequate facilities and veterinary care for the animals. The USDA determined, at various points, that MS Leisure had cut the dolphins' diets by 60% resulting in very thin animals. *See* 9/23/22 USDA Inspection Report, Decl.  **Exhibit H.** MS Leisure was cited for failing to have adequate staff on-site and for inadequate water quality in certain of the Seaquarium's tanks. *See* USDA Reports dated 9/16/22 and 9/23/22, Decl.  **Exhibit H**.

### A.  October 28, 2022: County serves Notice of Non-Compliance

21.     Based on these violations, the County determined MS Leisure was in default of the Lease and, consequently, issued its first Notice of Non-Compliance on October 28, 2022. *See* Decl. **Exhibit H**. This notice gave MS Leisure 45 days to remediate the violation and reserved the County's right to exercise all available remedies under the Lease.

### B.  November 1, 2023: County serves Notice of Default

22.     During its field inspection on July 17, 2023, the USDA found, among other things, that MS Leisure had inadequately handled the animals in its care—which in one instance resulted in a patron being bitten during a dolphin encounter. *See* USDA Report of 9/27/2023.  In another example, in January 2023 a dolphin ingested plastic debris that had detached from the dolphin's dilapidated pool. *See id.* MS Leisure also failed to adequately staff veterinarians, leaving only a single veterinarian to care for all hundreds of animals at the Park.

23.     These violations, which remained consistent and ongoing during MS Leisure's operation of the Seaquarium, constituted events of default under the terms of the Lease. Consequently, the County issued its Notice of Default dated November 1, 2023. *See* Decl.  **Exhibit I**.

### C.  December 22, 2023:  County serves further Notice of Default

24.     By December of 2023, MS Leisure's uncured violations continued to multiply. During a focused inspection conducted on November 2, 2023, the USDA found the Seaquarium had zero full-time veterinary support staff available, as none of the open veterinary technician positions had been filed. *See* USDA Report, Decl. **Exhibit J.** In addition, the County's building department, known as the Regulatory and Economic Resources Department ("RER"), found, among other violations, that certain Seaquarium structures were unsafe and structurally deficient. For example, MS Leisure had failed to maintain "Flipper Stadium," the "Manatee Tank Area," and the "Dolphin Stadium" located on the Park premises. *See* RER Notice of Violation dated on December 13, 2023, Decl. **Exhibit J**. Lastly, the Seaquarium was in arrears on its rent payments for the months of November and December 2023.

25.     Based on these violations, the County determined, again, that MS Leisure was in default of its obligation under the Lease. Therefore, the County issued its Notice of Default dated December 22, 2023. *See* Decl. **Exhibit J**, giving MS Leisure 45 days to remedy its violations.

### D.  March 7, 2024: County terminates the Lease

26.     MS Leisure did not remedy its violations. Indeed, its continuous and ongoing failures to adequately maintain the Seaquarium and the Park premises, care for the animals, and otherwise cure the deficiencies identified beginning in 2022, all amounted to a continuous breach of MS Leisure's obligations under the Lease. Given these continuing violations and absence of remediation, the County notified MS Leisure by letter dated March 7, 2024, that it was terminating the Lease in accordance with Section 16. *See* Termination Notice. *See* Decl. **Exhibit K**. This Termination Notice unequivocally states:

> As a consequence of these violations and defaults of the Lessee's obligations, this letter serves to notify Lessee of Miami-Dade County's decision to terminate the Lease. Commensurate with this

> Notice of Termination we hereby demand that Lessee vacate and surrender the Property by April 21, 2024 ("<u>Date of Termination</u>").

Termination Notice, p. 2.

## IV.   <u>The County commenced Eviction Case after terminating the Lease</u>

27.     MS Leisure did not surrender possession of the Park by the Date of Termination. Consequently, two months later, on June 25, 2024, the County filed suit in the County Court in and for Miami-Dade County, Florida, seeking to evict MS Leisure from the Park based wholly on the many (and well-documented) instances of MS Leisure's breach of the Lease. *See* No. 2024-123937-CC-05, styled *Miami-Dade County v. MS Leisure Co., Inc.* (the "<u>Eviction Case</u>"). See Eviction Case Complaint and docket, Decl. **Exhibit L**.

28.     On August 19, 2024, the court presiding over the Eviction Case ordered MS Leisure to pay all remaining rent owed and/or that accrued during those proceedings to be deposited into the state court registry pursuant to section 83.232(1) and (3) of Florida's Landlord Tenant Act. *See* August 2024 Order, Decl. **Exhibit M**.

29.     On September 19, 2024, after MS Leisure failed to timely deposit rent into the court registry pursuant to the August 2024 Order, the County moved for default judgment in accordance with the Florida Landlord Tenant Act. *See* Eviction Case, *Motion for Default Judgment*, Decl. **Exhibit N**. MS Leisure's failure to make timely payment triggered the provisions of section 83.232(1), Florida Statutes, which states that "[f]ailure of the tenant to pay the rent into the court registry pursuant to court order *shall* be deemed an absolute waiver of the tenant's defenses." *Id.* at 2-3 (emphasis added).

30.     MS Leisure's failure entitled the County to immediate possession of the Park "without further notice of hearing thereon." § 83.232(5), Fla. Stat. When the court denied that motion, the County immediately appealed to Florida's Third District Court of Appeal. *See* Notice

of Appeal, Decl. **Exhibit O,** with docket for Appeal 3D2024-1806, styled *Miami-Dade County v. MS Leisure Company, Inc.* (the "Appeal").

## V.   The Court Registry Appeal

31.     On October 11, 2024, the County filed its notice to appeal the state court's denial of default judgment against MS Leisure based on MS Leisure's failure to timely pay rent into the court registry. The County filed its initial brief on October 31, 2024. After seeking multiple extensions, MS Leisure filed its answer brief on March 10, 2025. On May 14, 2025, counsel for MS Leisure filed a suggestion of bankruptcy, informing the appellate court of the instant bankruptcy proceedings.

## VI. The County's Post-Petition Actions

32.     Since the filing of MS Leisure's bankruptcy petition, the County has worked with Riveron to provide relevant historical information and data in its possession related to the operations of the Seaquarium. The County also arranged a several-hour walk through of the Seaquarium's facility with County staff to advise on unsafe structures and necessary repairs. During this tour, Riveron was able to see firsthand the extensive repairs that are needed for the facility to be brought in compliance with the terms of the Lease. There has not been any movement by Riveron to address the outstanding Notices of Violations related to the unsafe structural issues. As of the date of this filing, there have been no applications to begin the permitting process necessary before repairs commence. The Seaquarium's physical plant continues to deteriorate while the County waits for Riveron to prevail in its litigation against Mr. Albor regarding corporate governance of TDC and other Mexican entities. The County validly terminated the Lease pre-petition; and even if this Court concludes the contrary, stay relief and compelled rejection of the Lease are still warranted, nonetheless, for the reasons set forth herein.

<u>**ARGUMENT AND ANALYSIS**</u>

**I.    Cause exists to grant the County relief
      <u>from the automatic stay to resume its Eviction Case</u>.**

33.    Section 362(d) of the Bankruptcy Code authorizes relief from the automatic stay where, as here, a pending state court eviction case will determine whether the landlord validly terminated the lease pre-petition and is entitled to regain possession of its land. *See In re Scarborough-St. James Corp.*, 535 B.R. 60, 73 (Bankr. D. Del. 2015). Section 362(d) states in relevant part,

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest
> >
> > (2) with respect to a stay of an act against property under subsection (a) of this section, if—
> >
> > > (A) the debtor does not have an equity in such property; and
> > >
> > > (B) such property is not necessary to an effective reorganization;

11 U.S.C. § 362(d).

**A.    Pre-petition termination of Lease establishes cause to lift stay.**

34.    While "cause" is not defined in the Bankruptcy Code, it is a flexible concept. *See In re Scarborough*, 535 B.R. at 67. The analysis is fact intensive, and must be determined on a case-by-case basis upon consideration of the totality of the circumstances. *See id.; see also In re Tribune*, 418 B.R. 116, 126 (Bankr. D. Del. 2009) (finding cause to lift stay to conclude copyright infringement case in California court). When a party seeks relief from stay to continue with pre-petition litigation, this Court generally applies the following three prong balancing test:

(i) Whether any great prejudice to either the bankruptcy estate or the debtor will result from continuation of the civil suit;

(ii) Whether the hardship to the non-bankruptcy party by maintenance of the stay considerably outweighs the hardship to the debtor; and

(iii) Whether the creditor has a probability of prevailing on the merits.

*In re Scarborough*, 535 B.R. at 67-68 (quoting *Izzarelli v. Rexene Products Co.* (*In re Rexene Prods. Co.*), 141 B.R. 574, 576 (Bankr. D. Del. 1992)).

35.     The movant has the initial burden of proof to put forth a prima facie case for cause before the debtor must then rebut the case. *In re Rexene Prods. Co.*, 141 B.R. at 577. Importantly, in making its determination, this Court also considers the general policies underlying the automatic stay. *See In re Scarborough*, 535 B.R. at 67-68 (citing *In re SCO Group, Inc.*, 395 B.R. 852, 857 (Bankr. D. Del. 2007)).

###### i.     Debtor will not suffer great prejudice if the stay is lifted.

36.     Because the Lease was terminated by notice dated March 7, 2024, it is not property of the estate. *See* 11 U.S.C. § 541(b)(2). Termination of the Lease occurred pre-petition. To extent the Debtors claim the Lease was not terminated pre-petition, this issue needs to be resolved to before MS Leisure can reorganize. Where, as here, reorganization cannot go forward without the issue being resolved, bankruptcy courts have held that lifting the stay to allow a state court to make the determination applying state law does not cause a debtor to suffer great prejudice. *See In re Tribune*, 418 B.R. at 126 (debtors had already been litigating the issue pre-petition in state court, and their counsel and witnesses could travel to state court in California in the same way they would need to travel to Delaware if the bankruptcy court heard the issue; thus, no great prejudice); *see also In re Scarborough*, 535 B.R. at 67-68 (also found lack of great prejudice given state law issue had to be decided).

13

37.     This Court has found that a debtor-tenant would not suffer great prejudice by lifting the stay to allow a state court to determine whether a lease was validly terminated pre-petition under state law. *See In re Scarborough*, 535 B.R. at 67-68. In *Scarborough*, the state court was found to be in a better position to make that determination under state law and because the eviction case had been pending prior to the bankruptcy, the state court had familiarity with the parties and the facts of the case as evidenced by the previous orders it had entered. *See id.* at 68. Because a debtor could raise in the state court all of its arguments against termination of the lease, bankruptcy courts have found that lifting the stay to conclude eviction proceedings does not cause great prejudice to such debtor. *See e.g. Tribune*, 418 B.R. at 128 (granting relief from stay to permit litigation to proceed in state court to determine what interest debtor has in a contract).

38.     Here, the outcome of the County's Appeal will be dispositive as to requiring surrender of the Park.  The County has already submitted its initial appeal brief and MS Leisure filed its answer brief. The County submits that prompt resolution of the termination and possession issue by the state trial and appeal courts will not greatly prejudice the Debtors, and indeed, would aid the Debtors in their pursuit of reorganization.

    **ii.**  ***The hardship to the non-bankruptcy party by maintenance of the stay considerably outweighs the hardship to the debtor.***

39.     On balance, where the hardship to the non-debtor contract counterparty is greater than the hardship on the debtor, courts have granted stay relief. *See e.g. Tribune*, 418 B.R. at 128 (location of witnesses, the counsel, participation of local stakeholders are some of the hardship balancing factors); *see also In re Scarborough*, 535 B.R. at 69 (finding landlord would suffer greater prejudice without stay relief due to continued delay in bankruptcy proceedings). The County will suffer prejudice if the Eviction Case continues to be delayed because the Lease is not

property of the estate and should not be tangled up in the Debtors' web of issues regarding the corporate governance of non-Seaquarium entities.

40.     The Debtors have not sought to extend the period for performance of the Lease under section 365(d)(3); they have not yet filed their schedules; the Debtors have spent a majority of the post-petition period fighting with MS Leisure's former board member, rather than focusing on preparing a chapter 11 plan to reorganize the Seaquarium. Most importantly, they have not publicly announced what use they have planned for the Park; and how, if at all, the Park will play a role in the reorganization.

41.     Despite having filed for eviction over a year ago and terminating the Lease even before that, the County is still not in possession of the Park. The Park continues to degrade as the structures are exposed to the elements, and the County is deprived of the opportunity to develop the Park into a space that can be used for the enjoyment of the public as required by Article 7 of the County's Home Rule Charter. In addition, the County's witnesses are located in Miami-Dade County, the Park at issue is unique and significant to the public, including the local residents for whose benefit the land is held in trust. The balance of hardships weighs in favor of allowing the state court and appeals court to render the decision on termination of the Lease under Florida law.

### iii.     *Creditor has a probability of prevailing on the merits.*

42.     This prong of the balancing test examines the County's probability of success on the merits of the Eviction Case. "Even a slight probability of success on the merits may be sufficient to support lifting an automatic stay in an appropriate case." *In re Scarborough*, 535 B.R. at 67-68 (quoting *In re Continental Airlines, Inc.*, 152 B.R. 420, 426 (Bankr. D. Del. 1993) (lifting stay upon finding "at least some probability" that, as claimed by stay relief movant, release language in pre-petition settlement agreement could succeed in barring introduction of certain materials in related litigation)).

43.     In *Scarborough*, this Court found that the landlord "made (at least) the requisite slight showing of the probability of success on the merits" of the state court litigation given "there is a high hurdle to overturn an arbitrator's award." *Id.* at 69. In the instant case, the County's complaint sets forth sufficient allegations to show that MS Leisure was in default of the Lease and failed to cure those defaults throughout the nearly two-year cure period granted by the County. Importantly, the County's Eviction Case is stayed due to the County's Appeal of the state court order concerning the Debtor's failure to timely deposit rent into the state court registry. If the County prevails in its Appeal, the Debtor will have been deemed to waive all of its defenses, which will result in the entry of default judgment for possession in favor of the County. The County has a high likelihood of success on the merits of the court registry Appeal because the statutory mandate of section 83.232(5), Florida Statutes, is clear and unambiguous.

44.     Specifically, section 83.232(1), Florida Statutes provides that, "[i]n an action by the landlord which includes a claim for possession of real property, the tenant shall pay into the court registry . . . any rent accruing during the pendency of the action, when due." Further, "[t]he court, on its own motion, shall notify the tenant of the requirement that rent be paid into the court registry by order, which shall be issued immediately upon filing of the tenant's initial pleading, motion, or other paper." § 83.232(3), Fla. Stat. Finally, "[f]ailure of the tenant to pay the rent into the court registry pursuant to court order shall be deemed an absolute waiver of the tenant's defenses. In such case, **the landlord is entitled to an immediate default for possession without further notice or hearing thereon**." § 83.232(5), Fla. Stat. (emphasis added). "[I]t is well settled that a trial court has a non-discretionary, ministerial duty to issue a writ of possession under the circumstances set forth in the statute, . . . notwithstanding any equitable arguments on behalf of

the tenant." *Bimini Properties, Inc. v. Puff or Sip Hookah Lounge & Liquor Store, LLC*, 343 So. 3d 1249, 1251 (Fla. 3d DCA 2022).

45.     Here, MS Leisure was ordered on August 19, 2024, to "[d]eposit into the Court Registry all future Guaranteed Rent—$83,333.33 monthly—accruing during the pendency of this action, **when due**." *See* Eviction Case, *Order Directing Defendant to Deposit Rent Into the Court Registry*, Decl. **Exhibit M**. Pursuant to the Lease, rent payments "shall be made no later than the fifteenth day of each calendar month." MSQ Lease ¶ 6A(4). On September 15, 2024, Guaranteed Rent in the amount of $83,333.33 for August 2024 accrued and became due. Because September 15, 2024, was a Sunday, MS Leisure should have deposited the rent into the Court Registry no later than Monday, September 16, 2024. *See* Fla. R. Gen. Prac. & Jud. Admin. 2.514; *see also* Eviction Case, p. 5 n.2, *MS Leisure's Response in Opposition to the County's Motion for Default*, Decl. **Exhibit P**. However, as evidenced by the "Notice of Compliance" filed on September 18, 2024, MS Leisure—a sophisticated corporation represented by counsel in the Eviction Case—did not deposit the accrued rent into the Court Registry until September 17, 2024, at 11:59 a.m. *See* Eviction Case, 9/18/2024, Notice of Compliance, Decl. **Exhibit Q**. Importantly, in responding to the County's *Motion for Default*, MS Leisure admits there was no ambiguity as to when the rent was due, stating that "September 15, 2024 falls on a Sunday, so the **rent is due** by the next business day, September 16, 2024. The rent was deposited **one day past the deadline** because of a delay in the clearance of funds through our trust account, thereby necessitating the deposit first thing in the morning on September 17, 2024." **Exhibit P** at 5 n.2 (emphasis added). This admission demonstrates that MS Leisure understood the court's unambiguous order but failed to comply.

46.     Because the state court was statutorily required to enter an immediate default and writ of possession under these circumstances, the trial court's denial of the County's *Motion for*

*Default* is reversible error under established Florida law. Based on the strict application of the Court Registry statute, the County makes the requisite showing of probability of success on the merits. The County has a high likelihood of success on the merits of its Appeal because the statutory mandate of Fla. Stat. § 83.232(5) is clear and unambiguous.

### B.   Valid termination under Florida law.

47.     Further buttressing its probability of success is the fact that the County's Termination Notice employed clear and unambiguous language to convey its pre-petition termination. *See e.g. Kopelman v. Halvajian (In re Triangle Laboratories, Inc.),* 663 F. 2d 463, 471 (3d Cir. 1981) (state law determines validity of pre-petition termination). The County validly terminated the Lease under Florida law prior to the Petition Date.

48.     To effectively terminate a lease under Florida law, the landlord must first elect to terminate the contract without seeking future damages under the lease and must show: (a) the tenant defaulted, (b) landlord served clear notice of termination absent timely cure under the lease terms, and (c) the tenant failed to timely cure defaults within the cure period, which expired pre-petition. *See In re Jet 1 Center, Inc.,* 335 B.R. 771 (Bankr. M.D. Fla. 2005) (finding Naples Airport Authority's pre-petition termination of lease was valid); *In re 2408 W. Kennedy, LLC,* 512 B.R. 708, 712 (Bankr. M.D. Fla. 2014) (a landlord's remedy of termination "cuts off the tenant's obligation to pay any future rent under the lease."); *In re Gande Rests., Inc.,* 162 B.R. 345 (Bankr. M.D. Fla. 1993) (landlord notice indicating it "hereby elects to terminate" effectively terminated lease upon the tenant's failure to cure defaults within the time fixed in the notice); *see In re Foxfire Inn of Stuart Florida, Inc.,* 30 B.R. 30, 31 (Bankr. S.D. Fla. 1983) ("although judgment of eviction had not been entered, that lease was not assumable because the landlord effectively terminated the lease under its terms and in accordance with the relevant state statutes").

18

49.     Under Florida law, a landlord must follow the lease agreement terms with precision and termination notices must use "express affirmative language indicating termination." *In re Citrus Tower Boulevard Imaging Center, LLC*, 460 B.R. 334, 338 (Bankr. N.D. Ga. 2011) (quoting *In re PAVCO Enters.*, 172 B.R. 114, 118 (Bankr. M.D. Fla. 1994)). A bankruptcy court's analysis focuses on whether the termination notice's language is clear and unequivocal. For example, the U.S. District Court of Appeals for the Middle District of Florida upheld the validity of a notice terminating a debtor-tenant's lease that employed the following language:

> This letter is to notify you that since you have not made the rent payment due on the 1st day of December 1984 and the 1st day of January 1985, Walling Crate Company is terminating that certain lease agreement made between Walling Crate Company and Hickory Point Industries, Inc.... We are hereby making formal demand that you vacate the premises within ten (10) days from the date of this letter as provided in the lease.

*In re Hickory Point Industries, Inc.*, 83 B.R. 805, 806 (M.D. Fla. 1988).

50.     The landlord's notice in *Hickory Point* was clear and unequivocal and stated in the present tense. The district court found the lessor's letter "clearly evidences an intent by the lessor to terminate the lease agreement . . . [and] effectively terminated the lease agreement prior to the Bankruptcy Court entering its Order allowing the lessee to assume the lease agreement." *Id.*

51.     By contrast, the intention to terminate was not clearly stated in *PAVCO Enters.*, 172 B.R. at 118.  In *PAVCO Enters.*, the non-debtor landlord's notice of default did not contain a single affirmative statement regarding termination. It indicated the debtor owed delinquent rent in the amount of $22,655. The notice in relevant part states, "I demand payment of the rent or possession of the premises within three days (excluding Saturday, Sunday and legal holidays) from the date of delivery of this notice to you, that is, on or before February 24, 1994." Underneath, capitalized and underlined, "FAILURE TO PAY MONIES DUE WILL CAUSE EVICTION CASE."

*Id.* at 116-117. The bankruptcy court found this language failed to "indicate[] an express intent to terminate the lease under consideration." *Id.* The notice merely stated the amount of the past due rent, made a demand for payment of the same within three days and stated that if the past due rents were not paid, the landlord would institute an eviction case. But the notice never stated that the lease was terminated.

52.    The County's Termination Notice language is similar to the language employed by the Naples Airport Authority to successfully terminate its lease with a tenant who later filed a bankruptcy petition. *See In re Jet 1 Center*, 335 B.R. at 781. In *Jet 1 Center*, the debtor sought to assume the debtor-tenant's unexpired lease, but the landlord argued it had terminated the lease pre-petition. *Id.* (tenant whose lease was terminated pre-petition has no interest to pass into property of the estate under 11 U.S.C. § 541(b)(2)). The debtor removed the state court eviction to the bankruptcy court. The bankruptcy court concluded that based on the record evidence, the actions taken by the airport before the tenant's bankruptcy were sufficient to terminate the lease under Florida law. The focus of the bankruptcy court's analysis was the clarity of the language used by the landlord in its termination letter to convey that it had terminated the lease.    The airport authority's termination letter states:

> this letter will confirm that the period for curing defaults by Jet One Center, Inc. with respect to defaults under the leases has expired. Further, The City of Naples Airport Authority has elected to terminate the subject leases, . . . . possession is to be surrendered at the end of the time period.

*In re Jet 1 Center, Inc.*, 335 B.R at 783.

53.    Here, the County followed the Lease's default paragraphs with precision and used termination language similar to that used by the Naples Airport Authority. Paragraph 16 governs defaults of the Lease. (MSQ Lease, ¶ 16A-C). To validly terminate the Lease, the County must first notify the lessee of violations and give the lessee at least 45 days to cure (the "Cure Period").

If lessee does not cure within the Cure Period, the County, then, is authorized to establish a date

upon which the Lease shall terminate. (MSQ Lease, ¶ 16C). The Lease's Default paragraphs state

as follows:

> A.    General Provisions.  In the event Lessee should violate any
> of the covenants or conditions of this Amended and Restated Lease,
> Lessor shall notify Lessee in writing of said violations and Lessee
> shall have forty-five (45) days from receipt of such notice to remedy
> said violations. In the event any monetary defaults are not remedied
> within forty-five (45) days from receipt of such notice, Lessee shall
> pay to Lessor a penalty charge of one-and-one half percent (1-1/2%)
> per month of any principal amount that remains outstanding.  If at
> the end of forty-five (45) days there exist no monetary defaults and
> Lessee shall be actively engaged in steps to remedy the non-
> monetary-defaults, Lessee shall be afforded such additional time as
> is reasonably necessary to remedy said violation.
>
> B.    Provisions Applicable if Leasehold Mortgage in Place.  If
> the Demised Premises, or any portion thereof is subject to a
> leasehold mortgage; the additional provisions of Section 21 below
> shall also apply.
>
> C.    Provisions Applicable If No Leasehold Mortgage in Place.
> In the event the Demised Premises, or any portion thereof, is not
> subject to a leasehold mortgage, and any violation of the covenants
> and conditions of this Amended and Restated Lease is not remedied
> within the cure periods set forth in Section 16(A) above, then, the
> date upon which this Amended and Restated Lease shall terminate
> shall be set by Lessor, or, in the alternative, other remedial steps
> shall be determined.

MSQ Lease, Default ¶ 16.

54.    Similar to the termination language used by the Naples Airport Authority, the

County's Termination Notice clearly states that the decision to terminate had already been made

due to MS Leisure's defaults, and demands MS Leisure vacate the premises by a date certain. The

Termination Notice states:

> Although Lessor herein details Lessee's extensive history of
> defaults, each and every material default constitutes an independent
> basis on which Lessor seeks to terminate the Lease. As a
> consequence of these violations and defaults of the Lessee's

> obligations, this letter serves to notify Lessee of Miami-Dade
> County's decision to terminate the Lease. Commensurate with this
> Notice of Termination we hereby demand that Lessee vacate and
> surrender the Property by April 21, 2024.

County Termination Notice, pp. 1-2.

55.     The County's termination of the Lease is valid under Florida law: (a) it is undisputed that MS Leisure defaulted on the Lease and after being notified of these defaults did not timely cure them; (b) the Termination Notice clearly states the County terminated the Lease under the Default provision of paragraph 16(C) and established the Termination Date of April 21, 2024. The Termination Date occurred eleven months before the Petition Date. The County's Notice demanded surrender of the Park. MS Leisure did not sign the Notice, as requested, and thereby acknowledged it would not surrender the Park by the Termination Date. Consequently, the County reinforced its position that the Lease was terminated because it commenced the Eviction Case to eject MS Leisure from the Park without asserting a claim for future rent.

56.     In sum, the County's pre-petition Termination Notice, as well as the numerous default notices that preceded it, validly terminated the Lease; therefore, the County has a high likelihood of success on the merits of its Eviction Case. In turn, "cause" is established under this three-prong balancing test to lift the stay to allow the County to resume its Eviction Case and ultimately regain possession of the County's land.

## II.  In the alternative, Debtors should be compelled to immediately reject the Lease pursuant to section 365(a) of the Bankruptcy Code.

57.     If the Court determines that the Lease was not terminated, it should nevertheless compel MS Leisure to reject the Lease and surrender possession of the Park because: (a) the Debtors cannot provide adequate assurance of performance of their obligations under the Lease; and (b) rejection would benefit the bankruptcy estate.

58.     Section 365(a) empowers a "trustee [or debtor], subject to the court's approval, [to] assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  A debtor-tenant may reject an unexpired lease to relieve the estate of burdensome obligations, so long as the court approves any such rejection. *See* 11 U.S.C. § 365(a); *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 514, 104 S. Ct. 1188, 1194 - 1197, 79 L. Ed. 2d 482 (1984) (authorizing rejection of collective bargaining agreement). In deciding whether to reject an unexpired lease, a debtor must exercise its business judgment to determine whether rejection benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp.*, 872 F. 2d 36, 38 (3d Cir. 1989) (affirming debtor's rejection of service agreement because rejection would benefit the estate by relieving both parties from obligations thereunder). Additionally, the Bankruptcy Code likewise authorizes a party in interest to request that a court set a date by which the debtor must assume or reject an unexpired lease. *See* 11 U.S.C. § 105(d)(2)(A).

59.     When considering a motion to assume or reject an unexpired lease under section 365(a), bankruptcy courts must apply the "business judgment standard" to determine that rejection is reasonable and supported by record evidence. *See In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 238 (3d Cir. 1995) (a "debtor will assume an executory contract when the package of assets and liabilities is a net asset to the estate. When it is not, the debtor will (or ought to) reject the contract."). Courts consider the totality of the circumstances, including such factors as the "impact that rejection of an executory contract or unexpired lease may have on the estate and a debtor in possession's prospect of confirming a plan, including the effect of the resulting rejection damages claim[.]" *In re Brick House Props.*, LLC, 633 B.R. 410, 424 (Bankr. D. Utah 2021) (denying rejection upon finding lack of financial advantage for estate). Thus, where an unexpired lease would cost an estate more to perform than it would generate in return, it should be rejected.

60. As to the timing of rejection, section 105(d)(2)(A) authorizes this Court to set a date by which the Debtors must assume or reject the Lease. The 120-day rejection deadline of section 365(d)(4) ends in the MS Leisure bankruptcy case on July 29, 2025. The County requests the Court set the assumption / rejection deadline also on that date (the "Rejection Deadline").

### A. Assumption unlikely, given onerous Lease terms.

61. Rejection should be compelled, given the Debtors will likely be unable to assume Lease. This is because the record shows the Debtors still have not cured their nonmonetary defaults. It is likely they will be unable to adequately assure that they will promptly compensate the County for any actual pecuniary loss resulting from such defaults, or provide adequate assurance of future performance of nonmonetary Lease terms. *See* 11 U.S.C. §365(b)(1)(A-C). *See e.g., In re Fleming Companies, Inc.*, 499 F. 3d 300, 307 (3d Cir. 2007) (denying debtor's motion to assume executory supply agreements). The Third Circuit has analyzed specific contract terms to determine whether they are material and economically significant, and if they are, the question becomes: could the debtor adequately assure performance of such terms? *See id.* In *Fleming*, the court considered the rights of Fleming's creditors "to get the benefit of the bargain Fleming struck with [contract counterparty] Albertson's." *Id.* (quoting *In re Joshua Slocum Ltd.*, 922 F. 2d 1081, 1091 (3d Cir. 1990) (concluding "average sales" lease provision is "material in the sense that it goes to the very essence of the contract, i.e., the bargained for exchange")).

62. The legislative history of the Bankruptcy Code shows that the term "adequate assurance of future performance" was "intended to be given a practical, pragmatic construction." *Cinicola v. Scharffenberger*, 248 F. 3d 110, 120 n. 10 (3d Cir. 2001). What constitutes 'adequate assurance of future performance' must be determined by consideration of the facts of the proposed assumption." *Id.* In *Fleming Companies*, the evidence showed that AWG, the potential assignee of debtor-Flemings' grocery supply business, could not provide the same benefits to Fleming's

24

customer, Albertson's Supermarkets, as had been available from Fleming due to the fact that Fleming had rejected its "Tulsa Facility lease" at the AWG's behest. *See In re Fleming Cos.*, 499 F.3d at 307. On balance, the court considered the right of Albertson's under the lease to expect their foodstuffs be "suppl[ied] ... from the Tulsa Facility" and the rights of AWG and Fleming's creditors to get the benefit of a supply contract. *Id.* Albertson's representative testified that the Tulsa Facility used the same electronic record-keeping system for ordering, billing and inventory control as Albertson's; thus, by not using the Tulsa Facility, Albertson's would be required to bear the cost of overhauling its electronic record-keeping system. Consequently, the court concluded the scales tipped in favor of contract counterparty Albertson's. It held that the lease term: "supply ... from the Tulsa Facility" was both a "material and an economically significant term" of the contract, and AWG, by its own actions, could not give adequate assurance of performance." *Id.*

63.    Here, the Lease requires MS Leisure to open the Seaquarium to the public while properly caring for the marine animals, and maintaining its state and federal certifications and accreditations. These are material and economically significant terms of the Lease. Paragraph 27 (L) requires the Seaquarium be "open to admission by the general public without discrimination, at such reasonable times and hours as shall be prescribed by Lessee, upon the payment of such admission fees as may be charged." MSQ Lease, ¶ 27(L). They are also out of compliance with the certifications and accreditations required by the Third Amendment. Moreover, one of the purposes of the assignment of the Lease to MS Leisure in 2022 was to enable the construction of necessary capital infrastructure improvements while at the same time ensuring the "highest levels of animal welfare and management." *See* County Memo dated 10/19/2021, pg. 2, regarding assignment of Lease to MS Leisure, attached as hereto **Ex. F**.

64. The Lease should be rejected because the Debtors are not meeting MS Leisure's obligations under the Lease. Bankruptcy law requires the Debtors to either assume or reject unexpired leases before the earlier of plan confirmation or 120 days after the petition date. 11 U.S.C. § 365(d)(4)(A). Based on the record to date, the Debtors are not capable of assuming this Lease because there is no way for the Debtors to cure their nonmonetary defaults, adequately assure that it will promptly compensate the County for any actual pecuniary loss resulting from such defaults, and provide adequate assurance of future performance under such the Lease, including managing the safety and welfare of the Seaquarium's live animal attractions. *See* 11 U.S.C. §365(b)(1)(A-C). In other words, to comply with the Lease going forward, they must keep the Seaquarium open and operating. This does not appear economically feasible based on MS Leisure's monthly operating reports. If the Debtors cannot assume the Lease, they must reject it.

**B. Rejection of the Lease will benefit the estate.**

65. Even setting aside MS Leisure's inability to meet the statutory requirements for assumption, the Lease should be rejected also because assuming it would impose significant and disproportionate costs on the estate—without any guarantee of a meaningful return.

66. Courts have permitted rejection of an agreement where it is shown that the agreement burdens the estate and the equities weigh in favor of rejection. *See Bildisco*, 465 U.S. at 514 (authorizing rejection of collective bargaining agreement); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 567 n.16 (8th Cir. 1997) ("[D]eciding whether to approve [a] motion to assume, reject, or assign an unexpired lease or executory contract…entails a determination that the transaction is in the best interest of the estate."); *In re Central Jersey Airport Servs., LLC*, 282 B.R. 176 (Bankr. D.N.J. 2002) (permitting chapter 11 debtor airport to reject executory contract for sale of its property when debtor established it had a good chance of selling property at higher price and rejection would eliminate debtor's onerous obligations required by the agreement).

26

67.     Here, the Lease is a burden on the estate for several reasons. The Seaquarium is not a passive asset that is simply operating at a loss; it is a live-animal operation featuring multiple types of animals—including dolphins and other marine mammals, flamingoes, other birds, and thousands of fish—that require daily veterinary care and feeding. Maintaining proper levels of care requires ongoing capital investment, staffing, regulatory compliance, and general oversight of the animals' welfare—all at the expense of the estate. Indeed, according to the Debtors' monthly operating reports, it costs more to operate the Seaquarium than the meager receipts the Debtors receive for admission from patrons. Given that operation costs exceed return, the Debtor has no equity in this leasehold. Additionally, the Lease requires MS Leisure to obtain and hold certain certifications and accreditations from various governmental organizations to reflect that the animals displayed at the Seaquarium are being cared for in accordance with federal and state regulations. MS Leisure has thus far failed to obtain those certifications and accreditation. This remains an ongoing and onerous burden on the estate and constitutes a default under the Lease's provisions that will almost certainly not be rectified if MS Leisure remains in possession of the Park. These factors weigh in favor of compelling the Debtors to reject the Lease

68.     Moreover, the County's rejection damages claim will be significantly smaller than the size of its cure claim and operating expenses arising from post-petition assumption of the Lease. Section 365 provides that a debtor's rejection of a contract under that authority "constitutes a breach of such contract." 11 U.S.C. § 365(g). Part of the calculus in determining whether rejection is appropriate involves comparing the size of the damages claim arising from a pre-petition breach as compared to those associated with assumption. *See, e.g.*, *In re Exide Technologies*, 340 B.R. 222, 245 (Bankr. D. Del. 2006) ("In reviewing the impact of a rejection," a court should determine whether "the rejection claim would be so large as to make [the] decision

to reject the agreement unreasonable."), *vacated and remanded on other grounds*, 607 F.3d 957 (3d Cir. 2010); *In re Noranda Aluminum*, 549 B.R. 725, 730 (Bankr. E.D. Mo. 2016) (rejection of contract was appropriate, in the best interests of estate, and showed sound business judgment, because cost of performance substantially outweighed the benefit the contract conferred).

69.     In this case, the County's future rent claim (*i.e.*, the damages claim the County, as creditor, would be entitled to as a result of rejection) is insignificant given the County's decision to forego future rent under the Lease upon termination. The costs and expenses necessary to cure the Debtors' nonmonetary defaults if the Lease is assumed are staggering when coupled with the cost and expenses of administering the Lease for the remainder of its term (*i.e.*, operating the Seaquarium). Assumption of the Lease is exponentially more expensive to the estate than rejection.

70.     Section 365 protects a bankruptcy estate from burdensome contracts, and the Lease exemplifies the kind of burdensome agreement Congress meant to allow debtors to avoid. Because the damages resulting from rejection are *de minimis*—particularly when compared to the substantial cure costs and ongoing operational expenses assumption would impose on the estate— rejection is not only justified, but necessary to aid in preserving the estate's overall value.

## III. Request to establish deadline to require MS Leisure to assume or reject the Lease pursuant to 11 U.S.C. § 105(d)(2)(A).

71.     On July 3, 2025, the Debtors moved to extend their deadline to reject the Lease by 90 days, through and including October 27, 2025. *See Debtor's Extension Motion*, ECF 302.[2] As grounds for the request, the Debtors cite to their ongoing battle with Eduardo Albor over the corporate governance of non-Seaquarium entities in Mexico. These disputes with Mr. Albor have distracted the Debtors, turning their attention away from the Seaquarium, and forcing the County

---

[2] By separately filed objection, the County also requests this Court deny the *Debtor's Motion to Extend the Rejection Deadline* [ECF 302].

to sit idly by while the Debtors hold the Park captive. It is inequitable and not in the best interests of the public to extend MS Leisure's rejection period.

72.     Even if the Court is not inclined to compel rejection of the Lease, it should nevertheless establish a deadline to require MS Leisure to assume or reject as soon as possible pursuant to 11 U.S.C. § 105(d)(2)(A). The legislative history of section 365(d) indicates its purpose is to "prevent parties in contractual or lease relationships with a debtor from being left in doubt concerning their status vis-à-vis the estate." H. Rep. No. 95-595, 95th Cong. 1st Sess. at 348 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. at 59 (1978). Accordingly, while section 365(d) generally "allows the trustee or debtor-in-possession a reasonable time within which to determine whether assumption or rejection of an executory contract would be beneficial to an effective reorganization" such time is "not without limits." *In re Adelphia Commc'ns. Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003) (citations omitted).

73.     To that end, bankruptcy courts maintain the authority to compel the debtors to assume or reject executory contracts by a date certain. *See* 11 U.S.C. § 105(d)(2)(A) (courts have the authority to issue various kinds of orders, including an order that "sets the date by which the trustee must assume or reject an executory contract or unexpired lease"). "The determination of what constitutes a reasonable time to assume or reject [an unexpired lease] is within the bankruptcy court's discretion based on the particular facts of each case." *In re Adelphia Commc'ns. Corp.*, 291 B.R. at 292 (citing *S. St. Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys),* 94 F.3d 755, 760 (2d Cir. 1996); *Theatre Holding Corp. v. Mauro (In re Theatre Holding Corp.)*, 681 F.2d 102, 105 (2d Cir. 1982); *In re Teligent, Inc.,* 268 B.R. 723, 738 (Bankr. S.D.N.Y. 2001)). Relevant considerations include the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code, the importance of the contract to the debtor's business and

reorganization (*i.e.*, whether the lease is the debtor's primary asset), whether the debtor has had sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan, and whether exclusivity has terminated. *See In re Teligent, Inc.*, 268 B.R. at 738-39. "Above all, the court should interpret reasonable time consistent with the broad purpose of Chapter 11, which is 'to permit successful rehabilitation of debtors.'" *Id*. at 739 (quoting *In re Dunes Casino Hotel*, 63 B.R. 939, 949 (D.N.J. 1986)).

74.    *First*, Debtor MS Leisure filed its bankruptcy petition nearly four months ago. The Debtors have been afforded more than enough time to apprise their financial situation and make an informed decision as to whether to assume or reject the Lease. But thus far, they have failed to do so. MS Leisure has not even filed its bankruptcy schedules or disclosed its assets and liabilities. This factor clearly weighs in the County's favor. *See id*.

75.    *Second*, during the time between MS Leisure's bankruptcy petition and the filing of this Motion, it appears that Mr. Albor, has been dissipating estate funds. *See* D.E. 245, Riveron's *Preliminary Report  in Connection with Order Enforcing the Automatic Stay and the Court's Order Compelling Debtors' Former Officers and Other Required Persons to Turn Over Records* (the "Riveron Report"). According to the Riveron Report, Mr. Albor has—among other things—taken funds owed to the estate and redirected those funds to entities in which he, alone, controls. *Id*., ¶¶ 4, 7-10, 16. A concern remains that Mr. Albor's activities could impact payment obligations MS Leisure owes to the County under the Lease, and the more time that passes before a decision is made on assumption or rejection, the more this risk increases—and the more the County's recovery of post-petition rental payments is put at risk.

76.    *Third*, and at bottom, the Debtors are benefitting from the protections afforded by these proceedings while avoiding the obligations owed to the County under the clear terms of the

Lease. Indeed, while these proceedings remain pending, MS Leisure enjoys possession of the Seaquarium, collection of admission and concession revenues, and other benefits, while avoiding burdensome Lease terms—such as maintaining and upgrading the physical plant, ensuring adequate animal nutrition, required accreditation, and veterinary and staffing needs. To continue to allow Debtors to skirt their obligations while they spend time and resources battling Mr. Albor's corporate governance disputes is an inequitable result that must be rectified by requiring Debtors to choose, by a date certain, whether the Lease will be assumed or rejected.

77.     In sum, the Court must make an equitable determination based on the balance of equities. The totality of the circumstances and the interest of justice in this case weigh in favor of denying the Debtors' requested extension of its deadline and compelling them to reject the Lease no later than the Rejection Deadline of July 29, 2025.

**IV.    Request for Adequate Protection.**

78.     If the Court is not inclined to order the Debtors to assume or reject the Lease by the Rejection Deadline, then in such case the County respectfully requests the Court grant adequate protection in the form of declaring its legal right and entitlement to post-petition rent payments, including rent deposited by MS Leisure into the Eviction Case court registry. In addition, as adequate protection, the County requests this Court compel the Debtors to remove all marine mammals, fish and other animals from the Park by a date certain to prevent further harm and injury.

79.     Section 363(e) of the Bankruptcy Code provides:

> (e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. . . .

11 U.S.C. § 363(e).

80.     Courts have held that a non-debtor party to an executory contract or unexpired lease is entitled to adequate protection of its interest pending a debtor's decision to assume or reject the contract. *See Memphis-Shelby Cnty. Airport Authority v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 783 F.2d 1283, 1286-87 (5th Cir. 1986) (noting that adequate protection pursuant to section 363(e) may provide interim relief pending debtor's decision to assume or reject a real property lease).

81.     Here, the County is entitled to post-petition rent as adequate protection for continued use of the Park. As discussed above, on August 19, 2024, and pursuant to Fla. Stat. § 83.232(1) and (3) of Florida's Landlord Tenant Act, the Court presiding over the Eviction Case ordered MS Leisure to pay all remaining rent owed and/or that accrues during those proceedings to be deposited into the Court registry. This request includes, pursuant to section 356(d)(3), allowance and immediate payment of MS Leisure's post-petition obligations under the Lease. *See* 11 U.S.C. § 365(d)(3) (stating the "trustee shall timely perform all obligations of the debtor, …arising from and after the order for relief under any expired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title."); *In re JLM Couture, Inc.*, 661 B.R. 862, 87-71 (Bankr. D. Del. 2024) (awarding landlord renumeration for post-petition rent based on contractual rate of rent in lease, on landlord's motion for payment of administrative expenses for debtor's holdover occupancy of nonresidential premises).

82.     Finally, in addition or in the alternative, the County is entitled to an administrative claim under section 503(b)(1)(A) which grants a claimant administrative priority for the "actual, necessary costs and expenses of preserving the estate." It is well settled that "[p]ending the decision to reject, the non-debtor entity to the contract is entitled to payment as an administrative expense

for goods and services provided during the period of time before the debtor assumes or rejects the contract." *In re Bethlehem Steel Corp.,* 291 B.R. 260, 264 (Bankr. S.D.N.Y. 2003).

83.    To show that a claimant is entitled to an administrative expense, "(1) there must be a post-petition transaction between the creditor and the debtor; and (2) the estate must receive a benefit from the transaction." *In re Waste Sys. Int'l, Inc.*, 280 B.R. 824, 826 (Bankr. D. Del. 2002). The Supreme Court has held that "'actual and necessary' costs should include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible." *Reading Co. v. Brown*, 391 U.S. 471, 483 (1968).

84.    The County satisfies each requirement of section 503(b)(1)(A) of the Bankruptcy Code because the Debtors have benefitted by using the Park for multiple purposes, including the rehoming of multiple marine mammals to the Seaquarium from Debtors' other locations, as well as by collecting admission fees from Seaquarium's patrons. Accordingly, the County is entitled to allowance and payment of post-petition rent (currently in the amount of **$308,194.43**[3]) as an administrative claim and/or as an obligation of the Debtors under section 365(d)(3), through July 15, 2025, and continuing to accrue until Debtors surrender the Park.

## V.    Waiver of Bankruptcy Rule 6004(a) and 6004(h)

85.    To implement the foregoing successfully, the County requests that this Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 4001(a) and that the County has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 4001(a)(3).

---

[3]  Base Rent in the amount of $83,333.33 is due on the 15th of every month. The total given above is computed as follows: stub rent from March 31 through April 15, 2025 ($44,444.44); plus rent due for the months of April, May, June through July 15th ($263,749.99), **equals total of $308,194.43**.

WHEREFORE, Miami-Dade County respectfully requests this Court enter an order granting this Motion: (i) lifting the automatic stay to conclude the Eviction Case and regain possession of the Park; (ii) compelling the Debtors to immediately reject the Lease, if found not to have been terminated; (iii) authorizing allowance and immediate payment of all rent incurred for Debtors' post-petition use (as adequate protection, or otherwise, as applicable); and (iv) granting any other and further relief as the Court deems just and equitable.

Dated: July 16, 2025
Wilmington, Delaware

**ARMSTRONG TEASDALE LLP**

*/s/ Eric M. Sutty*
Eric M. Sutty (No. 4007)
1007 North Market Street, Third Floor
Wilmington, Delaware 19801
Telephone: (302) 416-9670
esutty@atllp.com

and

Ileana Cruz (FL. Bar No. 419140)
Assistant County Attorney
111 N.W. First Street, Suite 2810
Miami, FL 33128
Telephone:  (305) 375-5151
E-mail (*Direct*):   ileanac@miamidade.gov
E-mail(*CM/ECF*):cao.bkc@miamidade.gov

*Counsel to Miami-Dade County*