## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LEISURE INVESTMENTS HOLDINGS LLC, *et al.*,[1] | Case No. 25-10606 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:**<br>**October 17, 2025 at 10:00 a.m. (ET)** |
| | **Objection Deadline:**<br>**October 10, 2025 at 4:00 p.m. (ET)** |

## DEBTORS' MOTION FOR AN ORDER (I) APPROVING ASSUMPTION AND ASSIGNMENT OF THE MIAMI SEAQUARIUM LEASE FREE AND CLEAR OF LIENS AND OTHER ENCUMBRANCES, AND (II) GRANTING RELATED RELIEF

Leisure Investments Holdings LLC, and certain of its affiliates (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"), hereby submit this motion (this "**Motion**") for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Order**"): (i) approving the terms of the *Agreement for Assignment and Assumption of Amended and Restated Lease*, attached hereto as **Exhibit B** (as described in greater detail below, the "**Assignment Agreement**") by and between MS Leisure Company, Inc. ("**MS Leisure**"), as assignor thereunder, and Resilient Aquarium LLC (the "**Purchaser**"), an affiliate of Terra Acquisitions Florida, LLC, as assignee thereunder; (ii) approving the assumption and assignment of the Debtors' right, title and interest in and to the Lease (as defined below), as may be further amended, on an "as is" basis, free and clear of all

---

[1]     Due to the large number of Debtors in these chapter 11 cases a complete list of the Debtors is not provided herein. A complete list of the Debtors along with the last four digits of their tax identification numbers, where applicable, may be obtained on the website of the Debtors' noticing and claims agent at https://veritaglobal.net/dolphinco, or by contacting counsel for the Debtors. For the purposes of these chapter 11 cases, the address for the Debtors is Leisure Investments Holdings LLC, c/o Riveron Management Services, LLC, 600 Brickell Avenue, Suite 2550, Miami, FL 33131.

liens, security interests, claims, pledges and other encumbrances (collectively, the "**Encumbrances**"), without any representations or warranties of any kind other than expressly set forth in the Assignment Agreement, substantially on the terms and conditions of the Assignment Agreement and (iii) granting related relief.  In support of this Motion, the Debtors rely on and incorporate by reference the (a) *Declaration of Harold J. Bordwin in Support of Debtors' Motion for an Order (I) Approving Assumption and Assignment of the Miami Seaquarium Lease Free and Clear of Liens, and (II) Granting Related Relief* and (b) *Declaration of Robert Wagstaff in Support of Debtors' Motion for an Order (I) Approving Assumption and Assignment of the Miami Seaquarium Lease Free and Clear of Liens, and (II) Granting Related Relief*, filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state as follows:

**JURISDICTION AND VENUE**

1. The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors confirm their consent to the entry of a final order or judgment by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory and other legal predicates for the relief requested herein are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 6004-1.

## RELIEF REQUESTED

4.     By this Motion, the Debtors seek entry of the Order, authorizing and approving the assignment of all of the Debtors' right, leasehold title and interest in and to that certain *Amended and Restated Lease Between Miami-Dade County and Marine Exhibition Corporation, d/b/a the Miami Seaquarium*, dated July 25, 2000 (such lease together with any recorded memoranda thereof and all amendments, modifications, extensions, renewals and supplements thereto from time to time, are hereinafter collectively referred to as the "**Lease**"); and granting related relief.

## BACKGROUND

**A.     General Background**

5.     On March 31, 2025, certain of the Debtors filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code.  On April 16, 2025 and May 4, 2025, Controladora Dolphin, S.A. de C.V. and Embassy of the Seas Limited, respectively, also filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases are being jointly administered for procedural purposes only.  *See* Docket Nos. 32, 68 & 126.

6.     On May 6, 2025, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Committee**").  *See* Docket Nos. 128 & 151.

7.     Additional information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the commencement of the Chapter

11 Cases, are set forth in detail in the *Declaration of Steven Robert Strom in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 10].

**B.      The Lease**

8.      The Debtors' marine habitat and dolphin park located in Miami, Florida, the Miami Seaquarium (the "**Seaquarium**"), sits on a 38-acre parcel of leased land (the "**Real Property**") on Virginia Key, a barrier island in Biscayne Bay.  Miami-Dade County (the "**County**") is the landlord under the Lease and holds fee simple interest in the Real Property.

9.      The County initially leased the Real Property to Marine Exhibit Corporation pursuant to the original Lease dated March 9, 1954.  The Real Property and the Seaquarium have been developed and renovated over the intervening decades.  The Lease has also been amended, extended, modified, and restated from time to time and is currently set to expire on November 26, 2044.  On October 19, 2021, the County's board approved the assignment of the Lease to MS Leisure, and on September 9, 2022, the County and MS Leisure entered into that certain *Third Amendment to Amended and Restated Lease Between Miami-Dade County and Marine Exhibition Corporation d/b/a/ the Miami Seaquarium* (the "**Third Amendment**").

10.      Shortly after entering into the Third Amendment, in June 2024, the County initiated eviction proceedings, which remain pending but have been stayed by the commencement of the Chapter 11 Cases.  The Debtors' new independent leadership has worked closely and transparently with the County since their appointment and the filing of the Chapter 11 Cases to avoid further litigation and pursue a disposition of the Lease that maximizes value for the Debtors' stakeholders while also ensuring the health and safety of the animals residing at the Seaquarium.

33524654.8

**C.      The Efforts to Market the Lease**

11.      Given the Seaquarium's prime location in Biscayne Bay, the Debtors believed that their interest in the Lease could provide substantial value to their estates.  However, complicating factors made realizing that value challenging.

12.      First, as noted above, pending eviction proceedings inject uncertainty into the marketing and redevelopment process.

13.      Second, regardless of the outcome of the eviction proceedings, the term of the Lease is set to expire in less than twenty years, which would require any real estate developer investing in substantial capital and infrastructure improvements to renegotiate the Lease with the County.

14.      Third, the use of the Real Property is subject to significant legal restrictions that are not easily modified.  The County's *Home Rule Amendment and Charter* (the "**Home Rule Charter**") restricts the Real Property's use "for public park purposes only[.]"  Home Rule Charter at Art. 7.02.  The Home Rule Charter further provides that, subject to certain exceptions, "there shall be no private commercial use of a public park or renewals, expansions, or extensions of existing leases, licenses, or concessions to private parties of public park property, unless each such structure, lease, license, renewal, expansion, extension, concession or use shall be approved by a majority vote of the voters in a County-wide referendum."  *Id.*  The Seaquarium is one of the enumerated exceptions under the County's Home Rule Charter.  Accordingly, the Property may continue to be utilized as a marine- and aquatic-based tourist attraction (i.e., the Seaquarium), but could not be redeveloped for other uses (such as housing) without an amendment to the Home Rule Charter approved by a majority vote in a Countywide referendum election.

15.      Finally, the property is in serious need of capital improvements as a result of the operation of the Seaquarium by prior management in recent years.  At the May 21, 2025 hearing

before this Court, the Debtors presented evidence of the substantial maintenance and structural repairs required at the facility, all of which require the commitment of significant capital. *See* Tr. of May 21, 2025 hearing, pp. 44-48.

16.    Given the unique circumstances surrounding the use restrictions as to the Real Property, the short amount of time remaining on the Lease, the cloud of the eviction proceeding, and the significant capital commitment required in connection with the existing facilities at the Seaquarium, the marketing of the Lease required a bespoke, yet still comprehensive, process.  The Debtors contacted the widest possible universe of potential buyers, but the Debtors have determined that they cannot risk losing time and incurring substantial cost to pursue an auction process, only to then have the County contest a chosen bidder and its proposed transaction.  Indeed, the Seaquarium continues to operate at a loss, and the costs of continuing to maintain the Seaquarium – particularly given the current state of the premises – would be prohibitive.  Further, such delay would leave in limbo the fate of the animals living at the Seaquarium.

17.    Accordingly, the Debtors coordinated their marketing and sale efforts so that the Debtors could have a sufficient level of comfort that potential proposals had a reasonable chance to satisfy the County (subject to the Initial and Final MDC Board Approvals (as defined below)), while also allowing the Debtors to implement the Park Transition and Animal Relocation Plan (defined below) that will help ensure the health and safety of the animals presently at the Seaquarium.

18.    With these circumstances in mind, the Debtors undertook significant efforts to market the Lease.  These marketing efforts were done under the guidance of the Debtors' real estate advisor, Keen-Summit Capital Partners LLC ("**Keen**"), in consultation with the Debtors, their secured lenders, the Committee, and the County.

19.     Beginning on July 14, 2025, Keen marketed the Seaquarium with the Debtors' other Florida properties, including (without limitation) the following efforts:

(a)     creating a teaser for the portfolio of properties and a confidential information memorandum (CIM) for the Real Property (approved on July 9, 2025), which was made available to prospective bidders and interested parties;

(b)     coordinating drone and exterior photography, which were used for the marketing materials, property listings and property videos;

(c)     creating a virtual data room with a dedicated URL address, www.Keen-DolphinRealEstate.com (made live on July 14, 2025) from which prospective bidders, subject to a non-disclosure agreement (an "**NDA**"), could access items such as architectural drawings, the CIM, environmental reports, property maps and site plans, title reports, and related documents;

(d)     directly soliciting strategic buyers and developers in Florida, regionally and nationally;

(e)     coordinating advertising the Real Property in *The Miami Hearld*, *el nuevo Herald*, *Sun Sentinel*, *Florida Times Union*, *St. Augustine Record*, *WSJ – Florida Edition*, and the *South Florida Business Journal*;

(f)     coordinating digital advertising via internet listings, advertisements on websites, industry publications, and in electronic newsletters including the *Miami Herald Digital*, *Sun-Sentinel Digital, Miami Today, NAIOP Source Weekly eNews*, *Wealth Management Real Estate*, *Globestreet National Spotlight*, *Investor's Business Daily*, *IHIF Hotel HM Invest*, *IHIF Hotel*

*Dev/RE Watch*, Keen's website, *CoStar.com*, *Crexi.com*, LoopNet.com, *RCM*, and several commercial real estate marketing websites that connect tens of thousands of investors and developers; and

(g)    engaging in numerous mass emails to over 20,000 contacts in Keen's proprietary database and specialty commercial real estate services.

These extensive marketing efforts by Keen resulted in tens of thousands of views of the Debtors' properties, including the Real Property, and 157 parties executed NDAs to access the virtual data room to conduct diligence.   Ninety-five (95) parties specifically reviewed the Seaquarium materials.

20.    As a result of this marketing, the Debtors received numerous written offers and verbal expressions of interest.  The Debtors carefully considered all offers, including the proposed purchase prices and their proposed uses of the Real Property, and the Debtors determined that the offer from Resilient Aquarium LLC, an affiliate of Terra Acquisitions Florida, LLC ("**Terra**"), was the highest and best offer of value to the Debtors' estates, providing, among other things, the most certainty to close.  Terra is an award-winning, South Florida-based real estate development company with a portfolio of more than five million square feet of residential and commercial real estate valued in excess of $8 billion across all major real estate asset classes.

21.    Terra's proposal contemplates substantial investment in, and renovation of, the Seaquarium to modernize it in a manner that respects the history of the site and is consistent with applicable laws and regulations.  Terra's program contemplates a new accredited aquarium (with no marine mammals); immersive marine- and aquatic-based experiences; an education, conservation and research center; a wet-slip marina and dry dock facility; wellness spaces and experiences tied to the natural waterfront habitat; a marina/fisherman's village with marine-

oriented retail and food and beverage establishments; preservation of the historic Buckminster Fuller Seaquarium "Dome" to be repurposed as event space for public and private gatherings; lushly landscaped green space; and a publicly accessible bay walk.

22.     The Debtors, in their business judgment and after an exhaustive marketing process and in consultation with their prepetition and postpetition lenders, as well as arm's-length negotiations with Terra, believe that Terra's offer represents the highest and best available offer of value to the Debtors' estates for the Lease.

**D.     The Park Transition and Animal Relocation Plan**

23.     In keeping with the Debtors' goal of ensuring the health and welfare of their animals, and as a condition precedent to the closing of the transaction contemplated by the Assignment Agreement (the "**Transaction**"), the Debtors are developing a plan (the "**Park Transition and Animal Relocation Plan**") to temporarily pause operations at the Seaquarium and arrange for the safe and orderly transfer of the animals from the Seaquarium habitat to alternative locations.    The Debtors have hired an internationally renowned animal transfer/relocation consultant, International Animal Exchange, Inc., and are working closely with their regulatory counsel to assist in executing the Park Transition and Animal Relocation Plan. The Debtors will also serve this Motion on all regulators that may have an interest in the Transaction, and will work cooperatively with such regulators to ensure the health and wellness of the affected animals.

*[Continued on Next Page]*

## PROPOSED ASSIGNMENT AGREEMENT

24.    The principal terms of the Assignment Agreement are summarized in the following chart:[2]

| Local Rule 6004-1 Disclosure | Terms of the Assignment Agreement |
|---|---|
| **Seller** | MS Leisure Company, Inc. |
| **Purchaser** | Resilient Aquarium LLC |
| **Property Being Sold** | At the Closing, subject to the Bankruptcy Court's entry of the Lease Assignment Order, Assignor shall convey a good, marketable, and insurable leasehold title to the Premises created under the Lease, together with Assignor's right, title and interest in and to the following: (x) all buildings, improvements and other structures presently located on the Premises (the "**Improvements**"); (y) all personal property owned by Assignor, if any, located in or on, and used exclusively in connection with the operation of, the Premises or the Improvements other than the personal property that will be relocated and/or removed from the Premises pursuant to the Park Transition and Animal Relocation Plan (the "**Personal Property**"); and (z) (1) all assignable permits, licenses, development rights and approvals issued by any governmental authority in connection with the ownership and/or development of the Premises and (2) any and all copyrights, trademarks, service marks and other marks and trade or business names used exclusively in the operation of the Premises, including, without limitation, the right to use the name "Miami Seaquarium" (collectively, the "**Intangibles**;" and together with the Lease, the Improvements, and the Personal Property, the "**Property**"), free and clear of all Liens, except the Permitted Exceptions. |
| **Purchase Price** | $22,500,000.00 |
| **Sale to Insider** | The Purchaser is not an insider of the Debtors. |
| **Agreements with Management** | None. |
| **Releases** | None. |

---

[2]    This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Assignment Agreement, the latter governs in all respects. Capitalized terms used but not defined in this chart have the meaning ascribed in the Assignment Agreement.

33524654.8

| Local Rule 6004-1 Disclosure | Terms of the Assignment Agreement |
|---|---|
| **Private Sale / No Competitive Bidding** | The Debtors have heavily marketed the Real Property in a public process but have determined to seek approval of the Assignment Agreement without pursuing an auction process. |
| **Closing and Other Deadlines** | The closing and delivery of the Assignment of Lease (the "**Closing**") shall occur on the date that is thirty (30) days after the Final MDC Board Approvals Effective Date (as defined in the Assignment Agreement) (the date on which the Closing occurs, the "**Closing Date**"), but not later than May 15, 2026 (the "**Outside Date**"), as such Outside Date may be extended in accordance with Section 12(a) and Section 13(a)(iv) of the Assignment Agreement; provided, however, notwithstanding anything contained in the Assignment Agreement to the contrary, the obligations of each Party to complete the Closing is expressly subject to and contingent upon the applicable conditions precedent set forth in Sections 10 and 11 of the Assignment Agreement. Notwithstanding the foregoing, the Parties, by mutual agreement, may extend the Outside Date. |
| **Good Faith Deposit** | Within three (3) Business Days following the execution of the Assignment Agreement, Purchaser shall deposit the sum of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) (the "**Initial Deposit**") with First American Title Insurance Company ("**Escrow Agent**"); |
|  | If Purchaser does not elect to terminate the Assignment Agreement prior to the expiration of the Due Diligence Period in accordance with terms of the Assignment Agreement, within five (5) Business Days following the expiration of the Due Diligence Period, Purchaser shall deposit an additional sum of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) (the "**Additional Deposit**" and together with the Initial Deposit, the "**Deposit**") with the Escrow Agent; and |
|  | If Purchaser has not elected to terminate the Assignment Agreement in accordance with the terms of the Assignment Agreement, on the Closing Date, Purchaser shall pay to Seller an amount equal to the Purchase Price less the Deposit together with all accrued investment income thereon, and subject to prorations and adjustments in accordance with the Assignment Agreement (the "**Closing Payment**"). |
|  | At the Closing, (i) Purchaser shall pay the Closing Payment to Seller by wire transfer of immediately available funds to such account as Seller shall designate no later than two (2) Business Days prior to |

| Local Rule 6004-1 Disclosure | Terms of the Assignment Agreement |
|---|---|
| | the Closing Date and (ii) Purchaser shall direct the Escrow Agent to deliver the Deposit together with all accrued investment income thereon to Seller by wire transfer of immediately available funds to such account as Seller shall designate to the Escrow Agent.<br><br>If the Assignment Agreement is terminated by Seller pursuant to Section 13(a)(iv) of the Assignment Agreement and Seller is not then in breach of Seller's obligations pursuant to the Assignment Agreement, the Escrow Agent shall deliver an amount equal to Two Million Two Hundred Fifty Thousand and 00/100 Dollars ($2,250,000.00) (the "**Forfeited Deposit**") to Seller and the balance of the Deposit as then constituted together with all accrued investment income thereon to Purchaser.  If the Forfeited Deposit is delivered to, or becomes deliverable to, anyone other than Purchaser such Forfeited Deposit will constitute liquidated damages. Because it would be impractical and extremely difficult to determine the extent of any damages that might result from a breach of, or default under, the Assignment Agreement by Purchaser prior to the Closing, it is understood and agreed that such liquidated damages (in an amount equal to the Forfeited Deposit) represent Seller's and Purchaser's reasonable estimate of actual damages, such liquidated damages do not constitute a penalty and such deposit will constitute Seller's sole and exclusive remedy for any breach of, or default under, the Assignment Agreement by Purchaser prior to the Closing.<br><br>If the Assignment Agreement is terminated for any reason other than as set forth in Section 2(c), the Escrow Agent shall deliver the Deposit together with all accrued investment income thereon to Purchaser. |
| **Interim Arrangements with Proposed Purchaser** | None. |
| **Use of Proceeds** | The Debtors will use the proceeds of the Transaction in accordance with the final order approving the Debtors' debtor-in-possession financing [Docket No. 508]. |
| **Tax Exemption** | None. |
| **Record Retention** | None. |
| **Sale of Avoidance Actions** | None. |

| Local Rule 6004-1 Disclosure | Terms of the Assignment Agreement |
|---|---|
| Requested Findings as to Successor Liability | Customary findings that Purchaser is not a successor to or mere continuation of the Debtors and does not bear successor liability for any obligation of the Debtors other than the Lease. |
| Sale Free and Clear | Purchaser will acquire the Debtors' leasehold interest in the Lease free and clear of liens, claims, encumbrances and interests pursuant to sections 363 and 365 and other applicable provisions of the Bankruptcy Code. |
| Credit Bid | None. |
| Relief from Bankruptcy Rule 6004(h) | The Order provides for a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h). |
| Other Material Terms | Seller shall develop a Park Transition and Animal Relocation Plan. The transfer of all live animals from the Real Property shall be a condition precedent to closing under the Assignment Agreement. |

## BASIS FOR RELIEF

**A.    The Transaction Should Be Approved as an Exercise of the Debtors' Sound Business Judgment.**

25.    Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing.  Bankruptcy Rule 6004(f)(1) also makes clear that such sales may be accomplished through a private sale.  *See* Fed. R. Bank. P. 6004(f)(1).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this district and elsewhere have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction.  *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Eagle Picher Holdings, Inc.*, 2005 Bankr. LEXIS 2894, at *3 (Bankr. S.D. Ohio 2005); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Boston Generating, LLC*, 440 B.R. 302,

321 (Bankr. S.D.N.Y. 2010).  Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

26.    Likewise, section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See e.g.*, *In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  *See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d. Cir. 1989).  The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."  *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assoc.*, 41 B.R. at 596).  Any more exacting scrutiny would slow the administration of a debtor's estates, increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and

threaten this Court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

27.    The Debtors' purpose in consummating the Transaction—maximizing the value of the Lease for the benefit of the Debtors' estates—is a sound business purpose warranting authorization.  However, here, the Debtors are seeking to not only maximize the Lease's value, but to do so in a manner that avoids the significant risks related to the health and safety of the animals located at the Seaquarium.  Put simply, the health and safety of the Seaquarium animals cannot wait for a prolonged process of further marketing, negotiation, and political red tape.

28.    Moreover, the Debtors have aggressively marketed the Lease with the objective of obtaining the highest or best offer for the benefit of the Debtors' estates and their creditors.  The Debtors and their advisors have coordinated with the County in connection with all of the various challenges surrounding the Seaquarium, and based on these ongoing discussions, the Debtors believe that the Transaction (subject to County board approval) will also avoid significant time, delay, and expense associated with potentially litigating against the County in the currently pending eviction proceedings, while also assisting both the Debtors and the County with the shared risks to animal health and safety if the Transaction were not to be successful.  The Debtors have also given all parties in interest, including applicable regulatory authorities, and those that have previously demonstrated an interest in the Lease, notice of the Motion.

29.    Thus, for the reasons set forth herein, because the Assignment Agreement constitutes the highest or otherwise best offer for the Lease, provides greater recovery for these estates than any known or practicably available alternative, and makes it possible for the Debtors to execute on a Park Transition and Animal Relocation Plan that will protect the Seaquarium's

animals, the Debtors submit that the execution thereof represents sound and reasonable business judgment.

**B.  The Debtors and Purchaser Will Provide Adequate Assurance of Future Performance Under the Lease.**

30.     Under section 365(b)(1) of the Bankruptcy Code, a debtor may not assume an unexpired lease unless, at the time of assumption, the debtor provides adequate assurance of future performance under such lease.  *See* 11 U.S.C. § 365(b)(1)(C).

31.     As described above, the Debtors intend to assign the Lease to Terra, which is an experienced, sophisticated real estate developer in the Miami area with which the County has had prior successful transactional experience.  Accordingly, the Debtors believe that the County is familiar with Terra's ability to perform under the Lease and is already engaged in discussions with Terra to ensure that the County has the information necessary to obtain the requisite approvals of the Transaction.  However, should the County request additional information related to adequate assurance of future performance, the Debtors will work with Terra to provide the necessary information.

**C.  The Transaction Has Been Proposed in Good Faith and Without Collusion, and the Purchaser Is a "Good Faith Purchaser" Entitled to Protections of Section 363(m)-(n) of the Bankruptcy Code.**

32.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'"  *In re Abbotts Dairies*, 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders); *see also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995).

33524654.8

33.     In other words, a party would have to show fraud or collusion between the buyer and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith. *See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); *see also In re Angelika Films, 57th, Inc.*, 1997 WL 283412, *7 (S.D.N.Y. 1997); *In re Balcalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1998 (7th Cir. 1978)).

34.     The Debtors submit that Terra is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and that the Assignment Agreement is a good faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code. First, the consideration to be received by the Debtors pursuant to the Assignment Agreement is substantial, fair, and reasonable, as evidenced by the Debtors' extensive marketing process, which established that Terra's offer for the Lease was the highest and best. Second, the parties entered into the Assignment Agreement in good faith, and after extensive, arm's-length negotiations, during which both parties were represented by competent counsel. Third, there is no indication of any "fraud, collusion between the purchaser and other bidders or the Debtors, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Transaction or Assignment Agreement to be avoided under section 363(n) of the Bankruptcy Code. Finally, Terra's offer was evaluated and approved by the Debtors' management

in consultation with the Debtors' professionals and the Debtors' secured lenders, the Committee, and the County.  Accordingly, the Debtors believe that the Transaction should be entitled to the full protections of section 363(m)-(n) of the Bankruptcy Code.

**D.        The Transaction Should Be Approved "Free and Clear."**

35.    The Debtors submit that their interest in the Lease should be sold free and clear of any and all Encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such Encumbrances attaching to the proceeds of the Transaction.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if any one of the following conditions is satisfied:

a.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b.    such entity consents;

c.    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

d.    such interest is in bona fide dispute; or

e.    such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

36.    Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re*

*White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

37.     The assignment of the Lease free and clear of all Encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.  Moreover, the Debtors will send notice of the Transaction to purported lienholders including, without limitation, the following (the "**Record Interest Holders**"): (i) the lien or interest of Show Queen, Inc., an inactive and dissolved Florida corporation, which recorded a year to year docking agreement, dated January 4, 1985, and recorded in the Official Record Book 13875, Page 429, and which agreement has expired or been abandoned; (ii) the lien or interest of Florida Capital Corporation, an inactive and dissolved Florida corporation, which recorded a collateral assignment of sublease or concession in favor of Seaquarium Monorail Corporation, an inactive and dissolved Florida corporation, and recorded in the Official Record Book 13875, at Page 505; (iii) the sublease or concession of Seaquarium Monorail Corporation, an inactive and dissolved Florida corporation; (iv) the Monorail Concession agreement, dated December 4, 1969, in favor of American Electric, Inc., a California corporation, and recorded in the Official Record Book 3949, at Page 606, and which agreement has expired or has been abandoned; and (v) the Assignment of Monorail Concession and Consent recorded in the Official Record Book 3949, at Page 629.  If such lienholders do not object to the Assignment Agreement, then they will have been deemed to consent.  Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim, or encumbrance on or in connection with the Lease timely objects to this Motion, such party shall be deemed to have consented to the assignment of the Lease in accordance with the Assignment Agreement.  *See Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale

motion, a creditor is deemed to consent to the relief requested therein).  Accordingly, the Debtors request that the Court authorize the Assignment Agreement and assignment of the Lease free and clear of any Encumbrances, in accordance with section 363(f) of the Bankruptcy Code, subject to such Encumbrances attaching to the proceeds of the Transaction in the same order of relative priority, with the same validity, force and effect as prior to such.

**E.**     **Bankruptcy Rules 6004(h) and 6006(d) Should Be Waived.**

38.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

39.     The Debtors believe that the Transaction should be consummated as soon as practicable to avoid unnecessary costs, thereby preserving and maximizing value.  Accordingly, the Debtors request that the Order be effective immediately upon entry of such order and that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## <u>NOTICE</u>

40.     Notice of this Motion will be provided to:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) counsel to the Prepetition First Lien Noteholders and DIP Lenders; (d) counsel to the DIP Agent; (e) counsel to the Prepetition Second Lien Noteholders; (f) counsel to the Prepetition First Lien Collateral Agent and the Prepetition Second Lien Collateral Agent; (g) the County; (h) all relevant regulatory agencies, including those with respect to animals located at the Seaquarium; (i) all known parties that have demonstrated an interest within the last 12 months in

acquiring the Debtors' interest in the Lease; (j) all parties known by the Debtors to assert an Encumbrance on the Lease, including the Record Interest Holders; and (k) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **CONCLUSION**

Based on the foregoing, the Debtors submit that the requirements of sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 6004(h) and 6006(d) have been satisfied and respectfully request that this Court enter the Order, in substantially the form attached hereto as **Exhibit A**, and grant such other relief as the Court deems just and proper.

Dated: September 26, 2025

*/s/ Jared W. Kochenash*
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (No. 2847)
Sean T. Greecher (No. 4484)
Allison S. Mielke (No. 5934)
Jared W. Kochenash (No. 6557)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Email: rbrady@ycst.com
sgreecher@ycst.com
amielke@ycst.com
jkochenash@ycst.com

*Counsel to the Debtors and Debtors in Possession*

33524654.8