## **<u>EXHIBIT B</u>**

**Assignment Agreement**

**EXECUTION VERSION**

## AGREEMENT FOR ASSIGNMENT AND ASSUMPTION OF AMENDED AND RESTATED LEASE

This Agreement for Assignment and Assumption of Amended and Restated Lease (this "Agreement") is made effective as of the 26th day of September, 2025 (the "Effective Date"), by and between MS Leisure Company, Inc., a Florida corporation ("Assignor"), and Resilient Aquarium LLC, a Delaware limited liability company ("Assignee"). Assignor and Assignee are sometimes individually referred to herein as a "Party" and collectively as "Parties".

## W I T N E S S E T H:

WHEREAS, Assignor is the operator of an entertainment park at a facility situated along the Rickenbacker Causeway across Biscayne Bay on Virginia Key, Florida and commonly known as the Miami Seaquarium (the "Premises") as more particularly described in the Lease (as hereinafter defined);

WHEREAS, Assignor is the tenant under that certain Amended and Restated Lease, dated July 25, 2000, by and between Miami-Dade County, Florida, as landlord (the "Landlord"), and Marine Exhibition Corporation, a Florida corporation d/b/a The Miami Seaquarium, as tenant, as amended from time to time prior to the date of this Agreement (the "Lease"), a copy of which is attached hereto and made a part hereof as Exhibit A;

WHEREAS, prior to assignment of the Lease, Assignor intends temporarily close the Premises to the public, and safely relocate all animals located thereon, to facilitate the comprehensive renovation and modernization of the Miami Seaquarium by Assignee after assignment of the Lease; and

WHEREAS, after assignment of the Lease, Assignee intends to renovate and operate the Seaquarium on the Premises as a family-friendly destination for residents and visitors that includes a new, accredited aquarium with no marine mammals and the improvements identified on attached Exhibit B (the "Project");

WHEREAS, on March 31, 2025 (the "Petition Date"), Assignor and certain of Assignor's affiliates commenced administratively consolidated cases captioned *In re Leisure Investments Holdings LLC, et al.*, Case No. 25-10606 (LSS) (collectively, the "Bankruptcy Cases") under Chapter 11 of Title 11 of the United States Bankruptcy Code, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), thereby creating the estates of Assignor and Assignor's debtor-affiliates in accordance with Section 541 of the Bankruptcy Code, and are continuing in the possession of their respective assets and in the management of their respective businesses as debtors in possession under Sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, Assignor desires to transfer and assign all of Assignor's right, title, and interest as tenant under the Lease and Assignee desires to accept such assignment and assume the rights, duties, obligations, and liabilities of the Assignee with respect to the Lease upon the terms and conditions hereinafter set forth and as otherwise provided in and subject to the terms of the Lease and this Agreement in accordance with §§ 105(a), 363, and 365 of the Bankruptcy Code.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, together with the foregoing recitals which are hereby restated and incorporated into and made a part of this Agreement, Assignor and Assignee agree as follows:

1.     <u>Transfer, Assignment and Assumption of Lease</u>. As of the Closing Date (as hereinafter defined), Assignor shall transfer and assign to Assignee pursuant to §§ 363 and 365 of the Bankruptcy Code all of Assignor's right, title, and interest in and to the Lease (the "<u>Assignment</u>") free and clear of liens, claims, encumbrances and interests, including without limitation, mortgages, judgments, complaints, claims, easements, covenants, restrictions, and other title matters of any kind and nature whatsoever (collectively, "<u>Liens</u>"), but excluding (a) zoning ordinances affecting the Premises, (b) those items specified on <u>Schedule 1</u>, and (c) the provisions of the Lease (collectively "<u>Permitted Exceptions</u>"). All deposits or other security instruments or monetary collateral deposited by Assignor with the Landlord, if any, under the Lease shall be assigned and transferred over to Assignee as of the Closing Date. Assignee shall accept the assignment of the Lease and Assignee shall assume and agree to perform all agreements and obligations of the tenant under the Lease arising on and after the Closing Date in accordance with the terms and conditions of an Assignment and Assumption of Lease in a form agreed upon by the Parties (which agreement shall not be unreasonably withheld, conditioned or delayed) and approved by the Landlord (the "<u>Assignment of Lease</u>"). Notwithstanding anything contained in this Agreement to the contrary, the obligations of each Party are expressly contingent upon and subject to the applicable conditions precedent set forth in <u>Sections 10</u> and <u>11</u>. At the Closing (as hereinafter defined), subject to the Bankruptcy Court's entry of the Lease Assignment Order (as hereinafter defined), Assignor shall convey a good, marketable, and insurable leasehold title to the Premises created under the Lease, together with Assignor's right, title and interest in and to the following: (x) all buildings, improvements and other structures presently located on the Premises (the "<u>Improvements</u>"); (y) all personal property owned by Assignor, if any, located in or on, and used exclusively in connection with the operation of, the Premises or the Improvements other than the personal property that will be relocated and/or removed from the Premises pursuant to the Park Transition and Animal Relocation Plan (as hereinafter defined) (the "<u>Personal Property</u>"); and (z) (1) all assignable permits, licenses, development rights and approvals issued by any governmental authority in connection with the ownership and/or development of the Premises and (2) any and all copyrights, trademarks, service marks and other marks and trade or business names used exclusively in the operation of the Premises, including, without limitation, the right to use the name "Miami Seaquarium" (collectively, the "<u>Intangibles</u>;" and together with the Lease, the Improvements, and the Personal Property, the "<u>Property</u>"), free and clear of all Liens, except the Permitted Exceptions.  Assignor and Assignee acknowledge that all existing mortgages, security interests and other monetary liens or encumbrances on the Property (collectively, the "<u>Mandatory Cure Items</u>") are not Permitted Exceptions and Assignor shall remove, cure and discharge the Mandatory Cure Items no later than at the time of Closing (including, for the sake of clarity, discharge at Closing from the Purchase Price).

2.     <u>Purchase Price</u>.

(a)   Assignee shall pay to Assignor the sum of Twenty-Two Million Five Hundred Thousand and 00/100 Dollars ($22,500,000.00) (the "Purchase Price") as consideration for the Assignment, payable as follows:

(i)   Within three (3) Business Days (as hereinafter defined) following the execution of this Agreement, Assignee shall deposit the sum of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) (the "Initial Deposit") with First American Title Insurance Company ("Escrow Agent");

(ii)   If Assignee does not elect to terminate this Agreement prior to the expiration of the Due Diligence Period (as hereinafter defined) in accordance with terms of this Agreement, within five (5) Business Days following the expiration of the Due Diligence Period, Assignee shall deposit an additional sum of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) (the "Additional Deposit" and together with the Initial Deposit, the "Deposit") with the Escrow Agent;

(iii)   If Assignee has not elected to terminate this Agreement in accordance with the terms of this Agreement, on the Closing Date, Assignee shall pay to Assignor an amount equal to the Purchase Price less the Deposit together with all accrued investment income thereon, and subject to prorations and adjustments in accordance with this Agreement (the "Closing Payment").

(b)   At the Closing, (i) Assignee shall pay the Closing Payment to Assignor by wire transfer of immediately available funds to such account as Assignor shall designate no later than two (2) Business Days prior to the Closing Date and (ii) Assignee shall direct the Escrow Agent to deliver the Deposit together with all accrued investment income thereon to Assignor by wire transfer of immediately available funds to such account as Assignor shall designate to the Escrow Agent.

(c)   If this Agreement is terminated by Assignor pursuant to Section 13(a)(v) and Assignor is not then in breach of Assignor's obligations pursuant to this Agreement, the Escrow Agent shall deliver an amount equal to Two Million Two Hundred Fifty Thousand and 00/100 Dollars ($2,250,000.00) (the "Forfeited Deposit") to Assignor and the balance of the Deposit as then constituted together with all accrued investment income thereon to Assignee. If the Forfeited Deposit is delivered to, or becomes deliverable to, anyone other than Assignee such Forfeited Deposit will constitute liquidated damages. Because it would be impractical and extremely difficult to determine the extent of any damages that might result from a breach of, or default under, this Agreement by Assignee prior to the Closing, it is understood and agreed that such liquidated damages (in an amount equal to the Forfeited Deposit) represent Assignor's and Assignee's reasonable estimate of actual damages, such liquidated damages do not constitute a penalty and such deposit will constitute Assignor's sole and exclusive remedy for any breach of, or default under, this Agreement by Assignee prior to the Closing.

(d)   If this Agreement is terminated for any reason other than as set forth in Section 2(c), the Escrow Agent shall deliver the Deposit together with all accrued investment income thereon to Assignee.

3

3.     Due Diligence Period.   Assignee has been previously provided an opportunity by Assignor and shall continue to have the opportunity through and including October 10, 2025 (the "Due Diligence Period") within which to determine that the Premises and the Property are satisfactory to Assignee, in Assignee's sole discretion, for development of the Project. Within one (1) Business Day following the Effective Date, Assignor shall provide Assignee a copy of (i) all existing boundary surveys of the Premises, (ii) all existing title insurance policies and commitments relating to the Premises and copies of all title documents reflected therein, and (iii) all due diligence materials described on Schedule 3 (the "Due Diligence Materials") to the extent such Due Diligence Materials are in Assignor's or Landlord's and/or any of their respective agents' or representatives' possession or control and to the extent not previously delivered to Assignee prior to the Effective Date.   During the Due Diligence Period and thereafter until the Closing, Assignee shall be permitted to perform such inspections and investigations as Assignee deems necessary with respect to the Premises and the Property, including the Lease, and the physical condition of the Improvements situated on the Premises, and including, but not limited to, the environmental condition of the Premises.   Prior to the expiration of the Due Diligence Period, Assignee may elect, in Assignee's sole discretion, for any reason or no reason, to either (i) terminate this Agreement by written notice to Assignor at any time prior to the expiration of the Due Diligence Period, whereupon this Agreement shall automatically be terminated and neither Party shall have any further rights, duties, obligations, or liabilities to the other except as otherwise expressly provided in this Agreement and the Parties shall direct the Escrow Agent to deliver the Initial Deposit to Assignee, or (ii) elect to waive, by written notice to Assignor, any objections with respect to the Premises, the Lease, and the other Property and proceed with the Closing subject to the remaining terms and conditions provided in this Agreement and deliver the Additional Deposit to the Escrow Agent.   If Assignee fails to deliver written notice to Assignor of Assignee's election prior to the expiration of the Due Diligence Period, Assignee shall be deemed to have elected alternative (ii) above.

4.     Due Diligence Activities.   Any and all due diligence activities conducted by or on behalf of Assignee during the Due Diligence Period or thereafter shall be at Assignee's sole cost and expense.   Assignee hereby indemnifies, protects, and holds Assignor harmless and agrees to defend Assignor from and against any and all claims, demands, losses, costs, actual damages, expenses (including reasonable attorneys' fees), and liabilities (including, but not limited to, personal injury and property damage claims and mechanics' or other liens), caused by Assignee's exercise of its rights under this Section 4, including any negligent act or willful misconduct of Assignee or Assignee's affiliates, agents, employees, surveyors, inspectors, contractors, representatives, consultants, advisors, or prospective lenders (collectively, the "Assignee Parties"), provided, however, Assignee shall not be liable for (i) any negligent act or willful misconduct of Assignor, its employees, officers or agents, or (ii) the mere discovery of any pre-existing conditions by Assignee as a result of its due diligence activities.   In addition, Assignee shall keep the Premises free from any liens that could arise as a result of the exercise by Assignee of any of Assignee's rights under this Agreement.   Assignee, at Assignee's sole cost and expense, shall repair any damage caused by the Assignee Parties such that the Premises are restored to the same condition as existed prior to their entry onto the Premises and shall be liable for any and all damage in connection therewith.   Any invasive investigations, examinations, or tests of the Premises (the "Tests"), shall be coordinated with and subject to the prior review by and approval of  Assignor's environmental personnel and advisors in advance of any such Tests, which review and approval

shall not be unreasonably withheld, conditioned, or delayed.  The provisions of this <u>Section 4</u> shall survive the Closing or the earlier termination of this Agreement.

5.    <u>Condition of Premises</u>.  Assignee acknowledges and agrees that Assignor makes no covenant, representation or warranty of any kind, express or implied, as to the suitability of the Premises as a development project or as to the physical condition thereof for any purpose whatsoever.  Assignee hereby waives any and all objections to or claims with respect to, and assumes responsibility for, any and all physical characteristics and all past or existing conditions of the Premises, including without limitation, any hazardous substances in, at, on, under, above ,or related to the Premises.  In addition, subject to <u>Section 10(e)</u>, Assignee shall accept the Premises in their present "as is" condition with all known or unknown faults.  Assignee hereby assumes the risk that adverse past, present, or future physical characteristics and conditions may not have been revealed by any inspection or investigation of the Premises.  Except as provided in this Agreement, Assignee has relied on Assignee's own inspection to determine the condition of the Premises and has not relied on any statement or representation of Assignor, or Assignor's agents, representatives, or consultants with respect thereto.  Except as provided in this Agreement and the documents and instruments executed and delivered by Assignor at Closing, Assignee agrees to accept the Assignment without recourse against Assignor of any kind or nature, including under any applicable laws or regulations.  By acceptance of the Assignment, Assignee shall have released and waived any claim against or rights of contribution against Assignor under any Environmental Law for environmental conditions at the Premises that may exist as of the Closing Date and such release and waiver shall survive the Closing and the Assignment.  For purposes hereof, "<u>Environmental Laws</u>" includes, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 *et seq.*), the Hazardous Materials Transportation Act, as amended (49 U.S.C. § 108 *et seq.*), the Resource Conservation and Recovery Act, as amended (42 U.S.C. § 6901 *et seq.*), the Toxic Substances Control Act, as amended (15 U.S.C. § 2601 *et seq.*), the Clean Water Act, as amended (33 U.S.C. § 1251 *et seq.*), and any corresponding state law and the regulations, rules, ordinances, decisions, orders, or determinations of any judicial or governmental entity of the State of Florida or any of its political subdivisions.

6.    <u>Representations and Warranties of Assignor</u>.  Assignor represents and warrants to Assignee that:

(a)    <u>Authority</u>.  Assignor is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida.  Assignor has full power and authority to enter into and perform this Agreement in accordance with its terms.  Subject to entry of the Lease Assignment Order, this Agreement (i) (A) has been duly authorized, executed, and delivered by Assignor, (B) is the legal, valid, and binding obligations of Assignor, and (C) is enforceable in accordance with its terms, except for principles of equity, insolvency, and bankruptcy and (ii) does not and will not at Closing constitute a default under or violate any document, instrument, agreement, stipulation, judgment, or order to which Assignor is a party.  Subject to entry of the Lease Assignment Order, all documents to be delivered by Assignor to Assignee at Closing, will as of Closing (i) (A) be duly authorized, and duly executed and delivered by Assignor, (B) be legal, valid, and binding obligations of Assignor, and (C) be enforceable in accordance with their respective terms, except for principles of equity, insolvency, and bankruptcy and (ii) will not constitute a default under or violate any document, instrument, agreement,

stipulation, judgment, or order to which Assignor is a party. No approval or consent is required from any person or entity (including any partner, shareholder, member, creditor, investor or governmental body) for Assignor to execute, deliver or perform this Agreement, and subject to entry of the Lease Assignment Order, no approval or consent is required from any person or entity (including any partner, shareholder, member, creditor, investor or governmental body) for Assignor to execute, deliver or perform the instruments Assignor is required to deliver at Closing to consummate the transaction contemplated by this Agreement.

(b)      Litigation.  Except for (i) the Bankruptcy Cases, (ii) the eviction action filed by the Landlord in respect of the Lease pending in the County Court in and for Miami-Dade County, Florida, case no. 2024-123937-CC-05, styled *Miami-Dade County v. MS Leisure Co., Inc.* (the "Eviction Action"), and (iii) the motion for a relief from stay filed by the Landlord in the Bankruptcy Cases (ECF No. 352) (the "Stay Relief Motion"), there is no litigation or proceeding pending, or to Assignor's knowledge, threatened against Assignor relating to the Lease or the Premises that would prohibit or restrict the assignment of the Lease.

(c)      Subleases.  Except for the Lease, there are no ground leases, subleases, concessions, or other agreements related to the occupancy or use of the Premises.

(d)      Title to Premises.  Assignor owns good, marketable, and insurable leasehold title to the Premises created under the Lease, which, subject to entry of the Lease Assignment Order, shall be free and clear of Liens, except the Permitted Exceptions, as of the Closing Date, and shall transfer the same at Closing.

(e)      Governmental and Similar Regulations.

(i)      Except as set forth on Schedule 6(e)(i), there are no outstanding orders or notices of any governmental body requiring any work to be done or any condition to be corrected on or about the Premises, or any road, highway, street or alley abutting the Premises.

(ii)      Except for the Eviction Action and the Stay Relief Motion, there are no pending or, to the knowledge of Assignor, threatened orders, notices, suits, or proceedings of any governmental body alleging a violation of any governmental law, ordinance, or regulation with respect to the condition, use, or manner of operation of the Premises.

(iii)      There have been no unrecorded written restrictions, covenants, or other agreements entered into or consented to by Assignor limiting, conditioning, or in any way affecting the use of the Premises.

(iv)      No municipal or other governmental improvements for which an assessment or lien against the Premises could be made or filed and that directly affect the Premises are in the course of construction or installation and no such improvement has been ordered to be made.

(v)      There are no outstanding contracts made by Assignor (or any agents or affiliates of Assignor) of which Assignee has not been made aware and provided

6

Assignee's consent for any work in connection with the Premises or for any improvements to the Premises for which full payment has not been made or provided for at the time of Closing.

        (f)       <u>Environmental Matters</u>.

        (i)       Except as provided below, the Premises' use by Assignor during Assignor's tenancy has materially complied with, and Assignor, to Assignor's knowledge, is not in violation of, and has not violated, in connection with Assignor's tenancy, use, maintenance, or operation of the Premises, any Environmental Laws.  Assignor has not received any notice of violation of any Environmental Laws.

        (ii)       Without limiting the generality of <u>Section 6(f)(i)</u>, during the period Assignor has occupied and operated the Premises, Assignor, to Assignor's knowledge, has received, handled, used, stored, treated, shipped, or disposed of all regulated substances and hazardous waste as identified in and in substantial compliance with all Environmental Laws.

        (g)       <u>Non-Foreign Status</u>.  Assignor is not a foreign person, foreign corporation, foreign partnership, foreign trust or foreign estate, as those terms are defined in (i) the Internal Revenue Code and the corresponding income tax regulations, and (ii) similar provisions of state law. Assignee has no duty to collect withholding taxes for Assignor pursuant to the Foreign Investors Real Property Tax Act of 1980, as amended, or any applicable foreign, state, or local law.

        7.       <u>Representations and Warranties of Assignee</u>.  Assignee represents and warrants to Assignor that:

        (a)       <u>Authority</u>.  Assignee has full power and authority to enter into and perform this Agreement in accordance with the terms of this Agreement.  This Agreement and all documents to be delivered by Assignee to Assignor at Closing (i) (A) have been duly authorized and have been or will be duly executed and delivered by Assignee, (B) are or will be legal, valid, and binding obligations of Assignee, and (C) are or will be enforceable in accordance with their respective terms, except for principles of equity, insolvency, and bankruptcy, and (ii) do not and will not at Closing constitute a default under or violate any document, instrument, agreement, stipulation, judgment, or order to which Assignee is a party.

        (b)       <u>Litigation</u>.  There is no litigation or proceeding pending, or to Assignee's knowledge, threatened against Assignee that would prohibit or restrict Assignee's ability to perform Assignee's obligations under this Agreement or the Lease.

        (c)       <u>Funding</u>.  As of Closing, Assignee will have sufficient liquid assets and financing proceeds available to Assignee to pay the Purchase Price on the Closing Date and, after assignment of the Lease, to pay and perform Assignee's obligations under the Lease as they become due.

        (d)       <u>Adequate Assurance</u>.  Assignee has the ability to demonstrate to the Bankruptcy Court adequate assurance of future performance under the Lease, and shall provide a copy of Assignee's financial statements and such other financial information reasonably available to Assignee that may be required by the Bankruptcy Court to demonstrate Assignee's

ability to assume, or to take an assignment of, the Lease; provided, however, that any such financial information and related testimony and exhibits, other than information that is otherwise publicly available or is ordinarily provided by Assignee to Landlord, shall be distributed subject to appropriate confidentiality arrangements and shall be filed or otherwise introduced in the Bankruptcy Court only under seal if requested by Assignee.

8.    Bankruptcy Court Approval.

(a)    Lease Assignment Order.  On or before September 26, 2025, Assignee will file a motion (the "Lease Assignment Motion") seeking an order of the Bankruptcy Court (the "Lease Assignment Order"), in form and substance reasonably acceptable to Assignor, Assignee, and the DIP Lenders (as defined in the Order entered in the Bankruptcy Cases at ECF No. 508) that (i) approves the transfer and assignment of the Lease to Assignee on the terms and conditions set forth in this Agreement and authorizes Assignor to proceed with the assignment of the Lease to Assignee on the terms and conditions set forth in this Agreement, subject to the MDC Board Approvals, (ii) includes specific findings that Assignee is (A) a good faith purchaser of the Lease within the meaning of §363(m) of the Bankruptcy Code, (B) that this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith, and from arms' length bargaining positions, and (C) that Assignee is entitled to the protections of §363(m) of the Bankruptcy Code, (iii) states that the transfer and assignment of the Lease to Assignee shall be free and clear of all Liens, except the Permitted Exceptions, pursuant to §363 of the Bankruptcy Code, and (iv) approves Assignor's transfer and assignment to Assignee of the Lease pursuant to §365 of the Bankruptcy Code subject to Assignee's ability to demonstrate to the Bankruptcy Court adequate assurance of future performance under the assigned Lease.  Assignee shall use commercially reasonable efforts to provide a copy of such financial information available to it as may be required by the Bankruptcy Court to demonstrate Assignee's ability to assume, or to take an assignment of, the assigned Lease.  Assignor shall use commercially reasonable efforts to obtain entry of the Lease Assignment Order by October 21, 2025, and Assignee shall support entry of the Lease Assignment Order by the Bankruptcy Court. Both Assignor's and Assignee's obligations to consummate the transactions contemplated in this Agreement are conditioned upon the Bankruptcy Court's entry of the Lease Assignment Order.

(b)    Defense of Orders.  If the Lease Assignment Order or any other order of the Bankruptcy Court relating to this Agreement (collectively, the "Bankruptcy Orders") shall be appealed (or a petition for certiorari or motion for rehearing or re-argument shall be filed with respect thereto), (i) Assignor, at its sole cost and expense, shall take all steps as may be appropriate to defend against such appeal, petition, or motion, (ii) Assignee agrees to reasonably cooperate in such efforts, at no cost or expense to Assignee (other than its own legal fees) and (iii) Assignor, at its sole cost and expense shall endeavor to obtain an expedited resolution of any such appeal.

9.    Covenants, Agreements Pending Closing, and Other Agreements.

(a)    Park Transition and Animal Relocation Plan.  Prior to September 30, 2025, Assignor shall develop a plan (the "Park Transition and Animal Relocation Plan") in consultation with the Mayor of Miami-Dade County (the "County Mayor") to temporarily cease all current business operations at the Premises and relocate all marine mammals and other animals

from the Premises (the "Park Transition"). Assignor shall commence implementation of the Park Transition and Animal Relocation Plan no later than three (3) Business Days after date of the adoption by the Board of County Commissioners of Miami-Dade County (the "MDC Board") of the Initial MDC Board Approvals (as hereinafter defined) and shall complete the Park Transition on or before December 31, 2025.

(b)       Initial MDC Board Approvals. Within five (5) Business Days after the Bankruptcy Court's entry of the Lease Assignment Order, Assignee shall cause to be submitted to an appropriate sponsor of the MDC Board any documentation necessary to, and thereafter shall take such other actions as may be reasonably required to, seek the MDC Board's adoption of formal resolutions to approve the following (the "Initial MDC Board Approvals"):

(i)       A term sheet with Landlord outlining the principal business terms of an amendment to the Lease that includes (A) amendments to the development program terms to permit the Project uses; (B) amendments to the rent provisions, including annual rent in an amount equal to 3% of annual gross revenues, subject to a minimum annual guaranteed rent of $750,000; and (C) amendments to incorporate market standard financing provisions (the "Lease Amendment Term Sheet");

(ii)       Recognition of Assignee as a responsible developer;

(iii)       Direction to the County Mayor to (A) negotiate with Assignee an assignment and amendment to, or restatement of, the Lease (the "Lease Amendment," and together with the Lease, the "Amended Lease") consistent with the terms of the Lease Amendment Term Sheet and (B) present the Amended Lease to the MDC Board for final approval within forty-five (45) days thereafter;

(iv)       Direction to the County Mayor to negotiate a settlement agreement and other documentation with Assignor as may be required to effectuate  (a) the waiver of any transfer fees that may be due to Landlord at closing on this Agreement, (b) the payment to the bankruptcy estate of Assignor at closing on this Agreement of all funds paid by or on behalf of Assignor after the Petition Date but prior to the Closing and held in the state court registry ("Dedicated Animal Relocation Funds"), (c) a waiver of all other claims of Miami-Dade County against the bankruptcy estates of the Assignor and its affiliates, and (d) withdrawal with prejudice of the Eviction Action and the Stay Relief Motion before or upon the closing on this Agreement, with all such documentation to be presented to the MDC Board for final approval contemporaneously with the MDC Board's approval of the Amended Lease;

(v)       Direction to the County Mayor to prepare and file the land use and zoning applications required to authorize the Project as may be further described in the Lease Amendment Term Sheet, if necessary; and

(vi)       Authorize the temporary closure to the public of the park operated on the Premises by Assignor and wind down of current park operations.

(c)       Lease Amendment; Final Approvals; Satisfaction of Closing Conditions. Each of the Parties shall (i) diligently pursue negotiation of the Lease Amendment with the County Mayor and take such actions as may be reasonably required to implement the

other documents and actions to be taken in connection with the Initial MDC Board Approvals and to seek the MDC Board's formal approval and authorization of the County Mayor to execute the Lease Amendment and the Assignment of Lease and pay, or cause the payment of, the Dedicated Animal Relocation Funds to Assignor's bankruptcy estate from the state court registry (the "Final MDC Board Approvals;" and together with the Initial MDC Board Approvals, the "MDC Board Approvals"), (ii) use commercially reasonable efforts to satisfy all conditions to the Parties' respective obligations hereunder and to cause the transactions to be effected as soon as practicable in accordance with the terms of this Agreement, and (iii) reasonably cooperate with the other Party in connection with any actions required to be taken as a part of such other Party's obligations hereunder. For the avoidance of doubt, in accordance with the Miami-Dade County Home Rule Charter and Miami-Dade County Code of Ordinances, the effective date of the Final MDC Board Approvals will generally be ten (10) days after the MDC Board action, unless vetoed by the County Mayor (such effective date, the "Final MDC Board Approvals Effective Date").

(d)     Development Approvals. Assignor shall reasonably cooperate with Assignee in pursuing any permits and other development approvals prior to Closing, including, but not limited to, the timely execution and delivery of all applications and documents relating to such approvals as requested or required by any governmental authority. Assignor authorizes Assignee and Assignee's agents to deal directly with any governmental authorities and professionals in connection with such approvals.

(e)     Auction Contingency. If Assignor, in consultation with the DIP Lenders, determine that a public sale and auction process is necessary for the disposition of the Lease, then, in such case, customary and reasonable bankruptcy sale stalking horse bidder provisions shall be provided to the Assignee, including a reasonable expense reimbursement and minimum overbid amount, as may be agreed upon by Assignor, Assignee, and DIP Lenders and approved by the Bankruptcy Court.

10.     Conditions to Closing of Assignee.   The obligation of Assignee to consummate the transactions contemplated by this Agreement is subject to the satisfaction prior to Closing of each of the following conditions:

(a)     Representations and Warranties. Each of the representations and warranties made herein by Assignor shall be true and correct in all material respects (except for those representations and warranties already qualified by materiality, which shall be true and correct in all respects) as of the Closing with the same effect as though made at that time except for changes expressly permitted by this Agreement.

(b)     Performance.   Assignor shall have materially performed and complied with all agreements, covenants, and conditions required by this Agreement to be performed and complied with by Assignor prior to and at the Closing.

(c)     Certificate.   Assignee shall have received, at the Closing, a certificate of Assignor, signed by an authorized officer of Assignor, stating that the conditions set forth in Sections 10(a) and 10(b) have been satisfied or waived by Assignee.

(d)     Ability to Develop Project.  There shall be no building, use, or concurrency moratorium pending or in force adversely affecting the potential future issuance of unconditional building permits for the Premises for the intended Project.

(e)     Environmental Condition.  There shall have been no material adverse change in the environmental condition of the Premises since the Effective Date of this Agreement.

(f)     Ground Leases, Subleases and Other Agreements.  All known ground leases (other than the Lease) and subleases shall be rejected by Assignor. All other agreements relating to the occupancy, use, or operation of the Premises shall have been terminated by Assignor at or prior to Closing.

(g)     Park Transition.  Assignor shall have completed the Park Transition in accordance with the Park Transition and Animal Relocation Plan.

(h)     Pending State Litigation.  The Eviction Action and any other pending legal actions by Landlord against Assignor in any state court shall have been withdrawn, dismissed, or denied with prejudice.

(i)     Pending Motion.  The Stay Relief Motion shall have been withdrawn, dismissed, or denied with prejudice.

(j)     Bankruptcy Order.  The Lease Assignment Order shall have been entered by the Bankruptcy Court and shall be final and non-appealable.

(k)     MDC Board Approvals.  The MDC Board shall have adopted by resolution (i) the Initial MDC Board Approvals and (ii) all Final MDC Board Approvals.

(l)     Delivery of Assignment of Lease and other Closing Documents. Assignee shall have received the Assignment of Lease duly executed by Assignor and Landlord, which shall convey to Assignee clean, insurable, and marketable leasehold title created under the Lease, free and clear of all Liens, except the Permitted Exceptions, and Assignor shall have delivered all of the other documents and instruments required to be delivered by Assignor pursuant to Section 12(b).

(m)     Lease Amendment.  Assignee and Landlord shall have entered into the Lease Amendment effective as of the Closing.

(n)     Termination.  This Agreement shall not have been terminated pursuant to Section 13.

(o)     No Injunction.  No court of competent jurisdiction shall have issued any injunction that prohibits consummation of the Closing.

11.     Conditions to Closing of Assignor.  The obligation of Assignor to consummate the transactions contemplated by this Agreement is subject to the satisfaction, prior to Closing of each of the following conditions:

11

(a)    <u>Representations and Warranties</u>. Each of the representations and warranties made herein by Assignee shall be true and correct in all material respects (except for those representations and warranties already qualified by materiality, which shall be true and correct in all respects) as of the Closing with the same effect as though made at that time except for changes expressly permitted by this Agreement.

(b)    <u>Performance</u>.    Assignee shall have materially performed and complied with all agreements, covenants, and conditions required by this Agreement to be performed and complied with by Assignee prior to and at the Closing.

(c)    <u>Certificate</u>.    Assignor shall have received, at the Closing, a certificate of Assignee, signed by an authorized officer of Assignee, stating that the conditions set forth in <u>Sections 11(a)</u> and <u>11(b)</u> have been satisfied or waived by Assignor.

(d)    <u>Payment of Purchase Price</u>.  Assignor shall have received payment of the Purchase Price on the Closing Date in accordance with this Agreement.

(e)    <u>MDC Board Approvals</u>.  The MDC Board shall have adopted by resolution (i) the Initial MDC Board Approvals and (ii) all Final MDC Board Approvals and such Final MDC Board Approvals shall provide for Landlord's agreement to pay or cause to be paid all Dedicated Animal Relocation Funds to Assignor's bankruptcy estate from the state court registry.

(f)    <u>Delivery of Assignment of Lease and other Closing Documents</u>. Assignor shall have received the Assignment of Lease duly executed by Assignee and Landlord and Assignee shall have delivered all of the other documents and instruments required to be executed and delivered by Assignee pursuant to <u>Section 12(c)</u>.

(g)    <u>Termination</u>.    This Agreement shall not have been terminated pursuant to <u>Section 13</u>.

(h)    <u>No Injunction</u>.  No court of competent jurisdiction shall have issued any injunction that prohibits consummation of the Closing.

12.    <u>Closing and Possession</u>.

(a)    The closing and delivery of the Assignment of Lease (the "<u>Closing</u>") shall occur on the date that is thirty (30) days after the Final MDC Board Approvals Effective Date (the date on which the Closing occurs, the "<u>Closing Date</u>"), but not later than May 15, 2026 (the "<u>Outside Date</u>"), as such Outside Date may be extended in accordance with this <u>Section 12(a)</u> and <u>Section 13(a)(iv)</u>; <u>provided</u>, <u>however</u>, notwithstanding anything contained in this Agreement to the contrary, the obligations of each Party to complete the Closing is expressly subject to and contingent upon the applicable conditions precedent set forth in <u>Sections 10</u> and <u>11</u>. Notwithstanding the foregoing, the Parties, by mutual agreement, may extend the Outside Date.

(b)     The Closing shall take place through an escrow with Escrow Agent, whereby Assignor, Assignee, and their respective attorneys need not be physically present and may deliver documents by overnight air courier or other means.  Closing may occur via such other method as the Parties may designate or agree in writing.  Assignee shall have possession and

occupancy of the Premises from and after the Closing Date free and clear of any tenancies but subject to the Lease.

        (c)      At Closing, Assignor shall deliver the following:

        (i)      the Assignment of Lease;

        (ii)      a Bill of Sale and General Assignment or other appropriate instrument of transfer or assignment in a form agreed upon by the Parties (which agreement shall not be unreasonably withheld, conditioned or delayed) assigning and transferring to Assignee all of Assignor's right, title and interest in and to the Improvements, the Personal Property, and the Intangibles;

        (iii)      a Certificate of Non-Foreign Status in a form agreed upon by the Parties (which agreement shall not be unreasonably withheld, conditioned or delayed);

        (iv)      the Certificate of Assignor pursuant to <u>Section 10(c)</u>;

        (v)      a Closing Statement in a form agreed upon by the Parties (which agreement shall not be unreasonably withheld, conditioned or delayed) (the "<u>Closing Statement</u>");

        (vi)      documentation to establish to Assignee's and the Title Company's satisfaction that (A) Assignor and all persons and entities directly or indirectly controlling Assignor have the full right, power and authority to enter into this Agreement, the Assignment of Lease and all other documents required to be delivered by Assignor pursuant to this Agreement, and to consummate the transactions contemplated by this Agreement, (B) all requisite action has been taken by Assignor and such persons and entities in connection with entering into and consummating this Agreement, and will be taken by Assignor and such parties prior to the Closing in connection with the execution and delivery of the instruments referenced in this Agreement, and the consummation of the transactions contemplated by this Agreement, and (C) each of the persons and entities signing this Agreement, the Assignment of Lease, and the other documents contemplated by this Agreement on behalf of Assignor has the legal right, power and authority to bind Assignor; and

        (vii)      a title affidavit in a form approved by Assignee and the Title Company.

        (d)      At Closing, Assignee shall deliver the following:

        (i)      the Closing Payment;

        (ii)      the Assignment of Lease;

        (iii)      the Certificate of Assignee pursuant to <u>Section 11(c)</u>;

        (iv)      the Closing Statement; and

(v)     such evidence of Assignee's authority as the Title Company may reasonably require and such other instruments consistent with this Agreement as are reasonably required by Escrow Agent or otherwise required to close escrow.

(e)     Real estate taxes, assessments imposed by any governmental authority and any assessments by private covenant constituting a lien or charge on the Premises, and rents, and any prepaid expenses or items the benefit of which inures to Assignee after Closing, and such other items as are normally prorated (to the extent paid by or received by Assignee) in each instance that are payable under the Lease, including utilities, shall be prorated on a per diem basis between Assignor and Assignee as of midnight the day before the Closing at the applicable discounted rate, if any. Any special assessments that are payable under the Lease for public improvement liens levied, certified, or perfected against the Premises and by any governmental authority on or before the date of this Agreement will be paid by Assignor. However, if any special assessment is payable in installments, installments coming due before the year of Closing will be paid by Assignor, installments coming due after the year of Closing will be paid by Assignee, and installments coming due in the year of Closing will be prorated as described herein.  Any special assessments or public improvement liens levied, certified, or perfected against the Premises by any governmental authority that are payable under the Lease following the date of this Agreement will be paid by Assignee. Where an exact allocation or adjustment cannot reasonably be made at Closing, the Parties agree to estimate such adjustment or allocation based on past charges. Assignor shall prepare and deliver to Assignee a proposed schedule of tentative adjustments at least five (5) Business Days prior to the Closing Date.

(f)     Assignor shall pay for any documentary stamps, surtax, and any other transfer taxes due in connection with the assignment of the Lease, and the costs of curing any title defects.

(g)     Assignee shall pay all costs relating to Assignee's due diligence, all premiums and charges of the Title Company for Assignee's title policy, the cost of the Survey, and all miscellaneous recording and filing charges in connection with the instruments by which Assignor conveys the Property to Assignee.

(h)     Each Party shall pay such Party's own attorneys' fees.

(i)     All other closing costs in connection with this Agreement will be allocated among the Parties in the manner that is customary for commercial real estate transactions in Miami-Dade County, Florida.

13.     Termination.

(a)     This Agreement may be terminated at any time prior to Closing:

(i)     in writing by mutual consent of the Parties;

(ii)     by either Party if the Closing has not occurred (other than through failure of any Party seeking to terminate this Agreement to have complied fully with such Party's obligations under this Agreement) by the Outside Date;

14

(iii)    by Assignee if Assignor's Bankruptcy Case is dismissed or converted to one under Chapter 7 of the Bankruptcy Code, if a trustee or an examiner with expanded powers is appointed in any of the Bankruptcy Cases, or if a final, non-appealable order for relief from the automatic stay is granted with respect to the Stay Relief Motion;

(iv)    by either Party if a challenge to an MDC Board Approval is filed with an applicable court or administrative tribunal and such challenge is not resolved within forty-five (45) days of filing; provided, however, if any such challenge is filed, the Outside Date shall automatically be extended for forty-five (45) days;

(v)    by the non-breaching Party upon a material breach of any provision of this Agreement provided that such breach has not been waived by the non-breaching Party and has continued after notice to the breaching Party by the non-breaching Party without cure for a period of ten (10) Business Days; or

(vi)    by Assignee if satisfaction of any condition in Section 10 becomes impossible (other than through the failure of Assignee to comply with Assignee's obligations under this Agreement) or by Assignor if satisfaction of any condition in Section 11 becomes impossible (other than through the failure of Assignor to comply with Assignor's obligations under this Agreement).

(b)    Each Party's right of termination of this Agreement is in addition to any other right such Party may have under this Agreement or otherwise, and the exercise of a Party's right of termination will not constitute an election of remedies. If this Agreement is terminated pursuant to Section 13(a), this Agreement will be of no further force or effect; provided, however, that (i) this Section 13(b) will survive the termination of this Agreement and will remain in full force and effect, (ii) in the event of Assignor's termination of this Agreement pursuant to Section 13(a)(v) without any default by Assignor, Assignor shall retain the Forfeited Deposit as provided in Section 2(c), (iii) if this Agreement is terminated for any other reason the Deposit shall be returned to Assignee, and (iv) subject to Section 2(c), the termination of this Agreement will not relieve any Party from any provisions of this Agreement that expressly survive termination of this Agreement.

(c)    Any Party desiring to exercise such Party's right to terminate this Agreement shall deliver to the other Party notice of termination in accordance with Section 17, stating with a reasonable degree of specificity the reason relied upon for such termination.

14.    Damage or Destruction.  If any of the Improvements are damaged or destroyed prior to Closing, Assignor shall assign to Assignee at Closing any and all proceeds and claims under any applicable insurance coverage and afford Assignee a credit at Closing for any applicable insurance deductible and uninsured loss, and Assignee shall take title to the Property subject to such damage and destruction and the obligations to repair such damage and destruction under the Lease.

15.    Eminent Domain.  If, at any time prior to the Closing, legal proceedings under power of eminent domain are commenced with respect to all or any portion of the Property, Assignor shall assign to Assignee at the Closing any and all proceeds and claims on account of

15

such condemnation proceedings, and Assignee shall take title to the Property subject to such condemnation proceedings.

16. <u>Brokers/Commissions</u>.    Other than Keen-Summit Capital Partners LLC, whose commission shall be paid by Assignor, Assignor and Assignee represent and warrant to the other that there are no brokers involved in this transaction who may assert or claim a commission, referral, or finder's fee or other compensation. Each Party covenants and agrees to indemnify and hold the other Party and the other Party's respective successors and assigns harmless from and against any and all claims, liabilities, losses, and expenses, including reasonable attorneys' fees, incurred in connection with any claim for a real estate brokerage commission, finders' fee, or other compensation asserted by any person or entity based on a breach of the foregoing representation and warranty.  This indemnification shall survive the Closing and any termination or expiration of this Agreement.

17. <u>Notices</u>.    Except as otherwise expressly provided herein, all notices, requests, demands and other communications provided for hereunder shall be in writing (collectively a "<u>Notice</u>"), shall be addressed to the applicable Party at the address hereinafter set forth (or at such other address as shall be designated by such Party in writing to the other Party in compliance with this <u>Section 17</u>), and shall be either (a) delivered by hand, (b) sent by e-mail, or (c) sent by Federal Express, UPS Next Day Air, or another nationally recognized next-day business courier.  All such Notices shall be deemed to have been received (i) if delivered by hand, at the time of the delivery thereof to the receiving Party, (ii) if sent by e-mail, at the time that transmission thereof has been acknowledged by electronic confirmation or otherwise, or (iii) if by next-day business courier, on the next Business Day following the day such Notice is delivered to the courier service.  Any Notice sent in accordance with this <u>Section 17</u> and refused shall be deemed delivered and received as of the date of such refusal.

If to Assignor:

MS Leisure Company, Inc.
c/o Riveron Management Services, LLC
600 Brickell Avenue, Suite 2550
Miami, FL 33131
Attention:      Robert Wagstaff, Chief Restructuring
                Officer
E-Mail:         Robert.Wagstaff@riveron.com

With a copy (that will not constitute Notice) to:

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 N. King Street
Wilmington, DE  19801
Attention:      Sean T. Greecher, Esq.
                Craig D. Grear, Esq.
Email:          sgreecher@ycst.com
                cgrear@ycst.com

16

If to Assignee:

Resilient Aquarium LLC
3310 Mary Street, 2nd Floor
Coconut Grove, FL 33133
Attention:    David Martin
Email:    dmartin@terragroup.com

With a copy (that will not constitute Notice) to:

Gangemi Law Group, PLLC
3310 Mary Street, Suite 303
Miami, Florida 33133
Attention:    Laura Gangemi Vignola
Email:    laura@g-law.com

If to Escrow Agent:

First American Title Insurance Company
2121 Ponce de Leon Blvd., Suite 710
Coral Gables, FL 33134
Attention:    Yessie A. Gonzalez, Senior Commercial Escrow Officer
Phone:    (305) 908-6253
Fax:    (866) 908-6012
Email:    yegonzalez@firstam.com

18.    Controlling Law: Amendment; Venue.  This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Florida and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflict of laws that would provide for the application of another law. This Agreement may not be amended, modified, or supplemented except by written agreement of the Parties. Any suit, action, claim, or proceeding arising out of or relating to this Agreement shall be brought in the Bankruptcy Court, and each of the Parties irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court in any such proceedings, waives any objection such Party may now or hereafter have to venue or to convenience of forum, agrees that all proceedings related to this Agreement shall be heard and determined only in the Bankruptcy Court and agrees not to bring any proceeding in any other court.

19.    Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

20.    Assignment.  Assignee may not assign Assignee's rights and obligations under this Agreement to an entity or individual designated by Assignee without Assignor's prior written consent, which consent shall not be unreasonably withheld; provided that Assignee may assign this Agreement and Assignee's right hereunder, and delegate all or any portion of

Assignee's duties or obligations hereunder, to any affiliate of Assignee without Assignor's consent or approval.  It is expressly understood and agreed that any of such assignment by Assignee shall not release Assignee from any obligations or liabilities provided for in this Agreement.  Assignor shall not assign this Agreement or any rights hereunder, or delegate any of Assignor's obligations, without the prior written consent of Assignee.  Notwithstanding any provisions of this Agreement to the contrary, Assignee shall not be permitted to make any assignment of all or any portion of Assignee's rights, duties, or obligations of this Agreement if such assignment would violate the provisions of any MDC Board Approvals.

21.    <u>Entire Agreement</u>.  The entire agreement by and between the Parties hereto is contained in this Agreement and the Parties are not bound by any agreements, understandings, representations or conditions which are not otherwise expressly set forth and stipulated herein.  No change, alteration, amendment, modification or waiver of any of the terms or provisions hereof shall be valid unless the same is in writing and signed by the Parties.

22.    <u>Survival of Representations and Warranties</u>.  Except for any covenant that by such covenant's terms is to be performed (in whole or in part) by a Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to this Agreement shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.  Any obligations to be performed after the Closing shall survive until completion.

23.    <u>Severability</u>.  If any term or provision, or any portion thereof, of this Agreement, or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

24.    <u>Parties Bound</u>.  This Agreement shall bind and inure to the benefit of the Parties hereto and the Parties' respective successors and assigns.

25.    <u>Time of Essence</u>.  Time is of the essence to both Parties in the performance of this Agreement, and the Parties have agreed that strict compliance is required as to any date or time period set out or described herein. If the final date of any period that is set out in any Section of this Agreement falls upon a Saturday, Sunday, or legal holiday under the laws of the State of Florida, then, and in such event, the time of such period shall be extended to the next day that is not a Saturday, Sunday, or legal holiday. For purposes of this Agreement, the defined term "<u>Business Day</u>" shall mean any day that not a Saturday, Sunday, or legal holiday under the laws of the State of Florida.

26.    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, will be deemed to constitute one and the same agreement. In the event that any signature to this Agreement is delivered by facsimile transmission, by e-mail delivery of a portable document format (.pdf or similar format) data file, or by any other electronic means, including DocuSign, such signature shall create a valid and binding obligation of the Party executing (or on whose

behalf such signature is executed) with the same force and effect as if such facsimile, .pdf, or other electronic  signature page were an original thereof.

*Signature Page Follows*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement effective as of the Effective Date.

Assignor:

**MS LEISURE COMPANY, INC.**

By: _/s/ Steven Strom_____
           Name: Steven Strom
           Title:  Director

Assignee:

**RESILIENT AQUARIUM LLC**

By: _/s/ David Martin_____
           Name: David Martin
           Title: Manager

The undersigned has executed this Agreement solely to confirm the undersigned's agreement to hold the Deposit in escrow in accordance with the provisions of this Agreement  and to disburse the Deposit as indicated in this Agreement.

Escrow Agent:

**FIRST AMERICAN TITLE INSURANCE COMPANY**


By:_____
          Name:
          Title:

<u>Schedule 1</u>

Recorded Documents

1.  Reservations in favor of the Board of Trustees of the Internal Improvement Fund of The State of Florida, filed August 2, 1929, in Deed Book 1325, at Page 248.

2.  Reservations in favor of the Board of Trustees of the Internal Improvement Fund of The State of Florida, filed May 25, 1940, in Deed Book 2065, at Page 454, as modified by instrument, filed September 15, 1960, in Official Records Book 2256, at Page 643, as affected by TIFF Deed recorded in Deed Book 3069, Page 248.

3.  Reservations in favor of the Board of Trustees of the Internal Improvement Fund of The State of Florida, filed October 20, 1948, in Deed Book 3069, at Page 248, as modified by instrument, filed September 15, 1960, in Official Records Book 2256, at Page 643.

4.  Terms, provisions and conditions of that certain Lease between Dade County, as Lessor, and Marine Exhibition Corporation, a Florida corporation, as Lessee, dated March 9, 1954, filed December 7, 1955, in Deed Book 4192, at Page 183, as re-recorded on October 31, 1988, in Official Records Book 13875, at Page 508, together with Clarification Agreement, filed December 7, 1955, in Deed Book 4192, at Page 197, as modified by First Supplementary Lease Agreement, filed July 12, 1955, in Deed Book 4194, at Page 35, as modified by Second Supplementary Lease Agreement, filed December 30, 1969, in Official Records Book 6699, at Page 308, as re-recorded on October 31, 1988, in Official Records Book 13875, at Page 495, as modified by Amendment "A" to Lease, filed April 21, 1986, in Official Records Book 12861, at Page 1641, as modified by Amendment "B" to Lease, filed April 21, 1986, in Official Records Book 12861, at Page 1650, as modified by Settlement Agreement, filed October 31, 1988, in Official Records Book 13875, at Page 448, as modified by Modification of Lease, filed October 31, 1988, in Official Records Book 13875, at Page 522, as modified by Amendment "C" to Lease, filed November 14, 1988, in Official Records Book 13892, at Page 337, as modified by Resolution No. 999-90, filed October 5, 1990, in Official Records Book 14732, at Page 779, as re- recorded in part on October 11, 1990, in Official Records Book 14736, at Page 2741, together with Resolution No. R-467-67, filed January 19, 2001, in Official Records Book 19457, at Page 4470, together with Resolution No. R-825-00 approving Amended and Restated Lease, filed January 19, 2001, in Official Records Book 19457, at Page 4490, all of the preceding having been amended and restated by Amended and Restated Lease between Miami-Dade County and Marine Exhibition Corporation, d/b/a The Miami Seaquarium, attached as an exhibit to Affidavit, filed March 2, 2001, in Official Records Book 19527, at Page 2897.

5.  Easement granted to Florida Power and Light Company, filed December 30, 1971, in Official Records Book 7503, at Page 182.

6.  Notice of Adoption of Development Order for Marine Exhibition Corporation (Seaquarium Village), filed October 18, 1991, in Official Records Book 15234, at Page 3161, as modified by Agreement Between Metropolitan Dade County, Florida and Marine Exhibition Corporation Implementing FQD Development Order Conditions on Transit, filed November 9, 1992, in Official Records Book 15707, at Page 4383, as modified by First Amendment to the Development Order for Seaquarium Florida Quality Development, filed May 26, 1993, in Official Records Book 15927, at Page 3762, and by Second Amendment to the Development Order for Seaquarium Florida Quality Development, filed February 3, 1999, in Official Records Book 18463, at Page 2741.

7.  Conservation Easement, filed October 23, 1991, in Official Records Book 15240, at Page 3385.

8.  Declaration of Restrictive Uses Concerning Miami Seaquarium Village, filed October 2, 1992, in Official Records Book 15669, at Page 880, as re-recorded on October 14, 1992, in Official Records Book 15677, at Page 3214.

9.  Grant of Easement recorded April 14, 2008, in Official Records Book 26322, Page 469.

10. Covenant for Maintenance of Landscaping within Right of Way recorded May 12, 2011, in Official Records Book 27685, Page 4488.

11. Interdepartmental Memorandum for Sewer Facilities recorded April 30, 2019, in Official Records Book 31420, Page 2176.

Schedule 3

Due Diligence Materials

1. All existing environmental assessment reports.

2. Copies of all materials (reports, applications, permits, etc.) relating to the Property.

3. Copies of all existing conditions on property (i.e. including building and enclosure conditions, asbestos report, etc.).

4. Current title commitments and copies of all exceptions to title reflected therein.

5. Copy of existing surveys and tree surveys.

6. Copies of easements and other exceptions to title, whether or not listed in the title commitment.

7. A summary of all pending, threatened, and historical litigation affecting or involving the Property and, where applicable, a copy of all pleadings and correspondence relating thereto. If no litigation affecting or involving the Property is pending or threatened, a written statement by Assignor to that effect.

8. Existing zoning letter and zoning compliance letter.

9. Copies of all agreements and notices with any governmental agency or insurance company affecting the Property.

10. Existing title policy covering the Property.

11. Soil investigation reports.

12. Evidence from appropriate authority of availability of adequate water, gas, storm and sanitary sewers, electrical and telephone services and any other utilities provided to the Property (if available).

13. Copies of all engineering testing data, such as soil compaction tests, geotechnical reports, concrete cylinder tests, etc. (if available).

14. Contact information for Assignor's land use attorney and summary from such attorney of: (i) what has transpired in the pursuit of the approvals sought, (ii) current status of the approvals process, (iii) what is pending to obtain the approvals, and (iv) the estimated time that it will take to finalize the obtaining of such approval (with expiration of applicable appeal periods factored into such timeline).

15. Summary of pending government investigations, and any that are threatened or contemplated.

16. Copy of any lease, contract of sale, letter of intent, right of first refusal or any other legal or quasi- legal instruments affecting the Property.

17. A summary and copies of current (uncorrected) written notices relating to violation(s) and/or noncompliance of any law, regulation or contractual obligation relating to the Property.

Schedule 6(e)(1)

## Case 20210211387-U Whale Bowl

Opened based on engineer's letter describing deterioration to I-Beam Joists and Steel Joists and recommending closure of the Bay 10 area until repairs are completed. The Notice of Violation was issued on 08/24/2021. The entire structure has been closed to the public and permanent shoring throughout the structure has been installed. On 09/21/2022 the Unsafe Structures Board ordered that an Egress Passage be installed; the Board specifically did not establish time frames for permitting and completion of structural repairs to the building. Permit 2023041050 was obtained to Install Egress but has expired.

## Case 20210211348-U Golden Dome

Opened based on engineer's letter describing cracking/spalling in the wall above the last row of pavilion seats and recommending closure of the last row. The Notice of Violation was issued on 08/20/2021. The last row has been barricaded to prevent access and the seating has been removed. On 02/15/2023 the Unsafe Structures Board extended a previous Order to require a permit for the repairs to be obtained within 120 days of the hearing and for the repairs to be completed within 365 days after obtaining the permit. A permit application for Spalling Repairs was submitted under process number C2023070210. The application has expired. No permit has been obtained. The case is in non-compliance with the Unsafe Structures Board Order.

## Case 20230218376-U Corridor A (Maintenance Corridor not open to the public)

Opened as a referral from a previous enforcement case. The Notice of Violation was issued on 11/02/2022. On 06/21/2023 the Unsafe Structures Board ordered that a permit for the repairs be obtained within 180 days of the hearing and for the repairs to be completed within 365 days of the hearing. No permits have been obtained for the corrections. The case is in non-compliance with the Unsafe Structures Board Order.

## Case 20240226206-U Bldg U (Carpenter Workshop and Storage not open to the public)

Opened from a site visit by RER staff. The Notice of Violation was issued on 12/11/2023. On 06/12/2024 the Unsafe Structures Board ordered that a permit for the repairs be obtained within 260 days of the hearing and for the repairs to be completed within 500 days of the hearing. No permits have been obtained for the corrections. The case is in non-compliance with the Unsafe Structures Board Order.

In addition to these 4 cases, Notices of Violation have been issued for failure to complete the recertification of 3 other buildings on complex.

### Case F2022011805-U Bldg 14

Opened based on failure to obtain 60-year building recertification. The structure is a 1,647 SF office building constructed in 1962. The Structural Report has been approved. The Electrical Report was disapproved because of missing voltage information. The NOV was recorded on April 23, 2024. The case was presented to the Unsafe Structures Board on October 16, 2024 and is in non-compliance with the Order to complete the recertification by April 14, 2025.

### Case F2023012690-U Bldg 8

Opened based on failure to obtain 60-year building recertification. The structure is a 2,112 SF building constructed in 1963. This building is identified as the Fish House. Reports have not been submitted. This case was on the agenda for the February 12, 2025 Unsafe Structures Board hearing and was deferred by the Board to the April 23, 2025 hearing.

### Case F2023012691-U Bldg 3

Opened based on failure to obtain 60-year building recertification. The structure is a 5,912 SF office building constructed in 1963. Reports have not been submitted. This case was on the agenda for the February 12, 2025 Unsafe Structures Board hearing and was deferred by the Board to the April 23, 2025 hearing.

Exhibit A

Lease

*Attached*

JULY 25, 2000

# AMENDED AND RESTATED LEASE

## BETWEEN

## MIAMI-DADE COUNTY

## AND

## MARINE EXHIBITION CORPORATION, d/b/a THE MIAMI SEAQUARIUM

# TABLE OF CONTENTS

**Page**

1. DEMISED PREMISES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   A. Description of Demised Premises, Improvements and
      Personal Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   B. Description and Restriction on Use of Portion of
      Demised Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2. ADDITIONAL PROPERTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   A. Adjacent Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   B. Public Parking Extension Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

3. PURPOSE OF LEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

4. TERM OF LEASE AND LEASE YEAR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   A. Term of Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   B. Lease Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5. OPTIONS TO EXTEND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   A. Extension Options . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   B. Additional Capital Improvement Expenditures . . . . . . . . . . . . . . . . . . . . 9
   C. Concurrent Capital Improvement Expenditures . . . . . . . . . . . . . . . . . . . 9
   D. Vesting of Lease Extensions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   E. CPI Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   F. Adjustments to Extension Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

6. RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   A. Annual Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      (1) Guaranteed Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      (2) Percentage Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      (3) Adjustment of Annual Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      (4) Monthly Calculation of Guaranteed Rent and
          Percentage Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      (5) Ad Valorem Taxes and Annual Rent . . . . . . . . . . . . . . . . . . . . . . 14
      (6) Definition of Gross Revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

|  |  | B. | Subleases and Sublet Rent | 16 |
|  |  | C. | Additional Rent | 17 |
|  |  | D. | Review of Guaranteed and Percentage Rent Terms by Lessor | 18 |
| 7. | CAPITAL IMPROVEMENTS |  |  | 19 |
|  |  | A. | Definition | 19 |
|  |  | B. | County Ownership | 20 |
|  |  | (1) | Title | 20 |
|  |  | (2) | Sales, Disposal, or Demolition of Capital Improvements and Personal Property | 21 |
|  |  | C. | Recognition of Prior Capital Improvements | 23 |
|  |  | D. | Recognition of Art in Public Places | 23 |
|  |  | E. | Right to Construct Master Plan Improvements Without Further Approval | 23 |
|  |  | F. | Additional Capital Improvements | 23 |
| 8. | CAPITAL IMPROVEMENT REQUIREMENT (CIR) |  |  | 25 |
|  |  | A. | Purpose | 25 |
|  |  | B. | Permissible Expenditures | 25 |
|  |  | C. | CIR Annual Amount | 26 |
|  |  | D. | CIR Credits For Over Expenditures | 27 |
|  |  | E. | CIR Limitations | 27 |
|  |  | (1) | Deferrals and Forgiveness | 27 |
|  |  | (2) | Debt Covenants | 28 |
|  |  | (3) | Interest Earned | 28 |
|  |  | (4) | Remaining CIR Amounts | 28 |
|  |  | F. | Standard of Care | 28 |
| 9. | PUBLIC CONSTRUCTION BOND |  |  | 28 |
| 10. | INSURANCE |  |  | 29 |
|  |  | A. | Worker's Compensation Insurance | 29 |
|  |  | B. | Public Liability Insurance | 29 |
|  |  | C. | Fire and Extended Coverage | 30 |
|  |  | D. | Automobile Liability Insurance | 30 |
|  |  | E. | Full Value Replacement Insurance | 30 |
|  |  | F. | Business Interruption Insurance | 30 |
|  |  | G. | Liquor Liability Insurance | 30 |

11.  PREMISES TO BE KEPT IN REPAIR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

12.  BUSINESS INTERRUPTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

13.  EMINENT DOMAIN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
     A.    Total Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
     B.    Partial Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
     C.    Temporary Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
     D.    Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

14.  INDEMNIFICATION BY LESSEE OF LESSOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

15.  LIABILITY FOR DAMAGE OR INJURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

16.  DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
     A.    General Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
     B.    Provisions Applicable if Leasehold Mortgage in Place . . . . . . . . . . . . . . 39
     C.    Provisions Applicable If No Leasehold Mortgage in Place . . . . . . . . . . 39

17.  CONCESSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

18.  SUBLEASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
     A.    Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
     B.    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
     C.    Subleasehold Mortgages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

19.  AFFILIATED BUSINESSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

20.  ADMISSION & CONCESSION CHARGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

21.  LEASEHOLD MORTGAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
     A.    Permitted Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
     B.    Leasehold Mortgage Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

|       | (1)  | Notice by Lender ........................................... | 45 |
|       | (2)  | Notice by Lessor ........................................... | 45 |
|       | (3)  | No Lease Termination Without Consent of Lender ......... | 45 |
|       | (4)  | Opportunity of Lender to Cure Defaults Prior to Termination of Lease. ........................................ | 45 |
|       | (5)  | No Liability of Lender ...................................... | 47 |
|       | (6)  | Foreclosure Due to Leasehold Mortgage Default .......... | 47 |
|       | (7)  | During Construction ....................................... | 47 |
|       | (8)  | Insurance ................................................. | 47 |
|       | (9)  | Bankruptcy ............................................... | 48 |
|       | (10) | Cure by Lessee of Defaults ................................ | 48 |
|       | (11) | Notices of Default and Sale Under Leasehold Mortgage .............................................. | 48 |
|       | (12) | Amendments .............................................. | 49 |
|       | (13) | Lender Becoming Lessee Under Lease .................... | 49 |
|   C.  |      | Acknowledgment by Lender ................................ | 49 |

22. ASSIGNMENTS ................................................... 49

23. PARTICIPATION ON SALE OR ASSIGNMENT OF LEASE ................. 51

24. CAUSEWAY CROSSING, PUBLIC PARKING AND LESSOR CONTRIBUTION ....................................... 51

25. NO AQUARIUM COMPETITION ON COUNTY PROPERTY ................. 53
|   A.  | Definition of Aquarium .................................... | 53 |
|   B.  | Prohibitions .............................................. | 53 |
|   C.  | Donor Exception .......................................... | 54 |

26. BOOKS OF LESSEE AND REPORTS ................................. 54

27. MISCELLANEOUS PROVISIONS ................................... 55
|   A.  | Maintenance and Extension of Intake Pipes ................ | 55 |
|   B.  | Water Ski Shows .......................................... | 55 |
|   C.  | Utility Easements ......................................... | 55 |
|   D.  | Replacement of Causeway Entrance Feature ................ | 55 |

E.   Advertising on Causeway Toll Arms ........................... 55
F.   Metrobus ................................................. 56
G.   Police, Fire and Emergency Services ......................... 56
H.   Boulder Zone Water ....................................... 56
I.   Impact Fees .............................................. 56
J.   Covenant of Quiet Enjoyment .............................. 56
K.   Payment of Taxes and other Obligations ..................... 57
L.   Demised Premises to be Open to General Public .............. 57
M.   Notices .................................................. 57
N.   Entire Agreement ......................................... 58
O.   Invalidity of Provision .................................... 58
P.   Successors and Assigns .................................... 59
Q.   Estoppel Statements ...................................... 59

28.   ISSUANCE OF PERMITS AND APPROVALS ........................... 59

29.   APPLICABLE LAWS ............................................. 60

30.   LEGISLATIVE OR QUASI-JUDICIAL ACTION ......................... 60

31.   EFFECTIVE DATE .............................................. 60

32.   GENERAL PROVISIONS PERTINENT TO THE AMENDED
      AND RESTATED LEASE ......................................... 61

33.   INDEPENDENT PRIVATE SECTOR INSPECTOR GENERAL ............... 61

## AMENDED AND RESTATED LEASE BETWEEN
## MIAMI-DADE COUNTY AND MARINE EXHIBITION
## CORPORATION, d/b/a THE MIAMI SEAQUARIUM

This Amended and Restated Lease dated this 25 day of _____July_____, 2000 ("Amended and Restated Lease"), is made by and between Miami-Dade County, Florida ("Lessor"), and Marine Exhibition Corporation, a Florida corporation, d/b/a The Miami Seaquarium ("Lessee").

WHEREAS, Lessor and Lessee have entered into a Lease Agreement, dated March 9, 1954, whereby Lessor has leased to Lessee certain parcels of land lying in Miami-Dade County, Florida, situated along the Rickenbacker Causeway across Biscayne Bay on Virginia Key, Florida, which lease has been amended or clarified from time to time by Lessor and Lessee in writing, as more particularly set forth in Exhibit "1" attached hereto and made a part hereof (collectively, the "Existing Lease");

WHEREAS, Lessor and Lessee deem it to be in their mutual best interests to amend, modify and clarify the Existing Lease to: (i) include options to extend the term thereof in order to construct, operate and maintain the Demised Premises as described in Paragraph 1 (also referred to herein as "the Seaquarium") in accordance with the Master Plan (as hereinafter defined) which is attached to this Amended and Restated Lease as Exhibit "2"; (ii) to make other modifications related thereto; and (iii) to concurrently therewith clarify the Existing Lease, as amended, by incorporating the Existing Lease and all amendments, modifications and clarifications thereto into one restated document, except to the extent indicated on Exhibit "1"; and

WHEREAS, Lessor and Lessee agree that as of the Effective Date (as defined in Section 31 below), this Amended and Restated Lease shall supercede and replace the Existing Lease in its entirety, except to the extent indicated on Exhibit "1".

NOW, THEREFORE, in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable considerations by each of the parties hereto, to the other in hand paid, the receipt of which is hereby acknowledged, and in consideration of the mutual covenants hereinafter set forth, it is mutually covenanted, consented and agreed between Lessor and Lessee that the foregoing recitals are true and correct and incorporated herein as if set forth at length and that as of the Effective Date, the Existing Lease, except to the extent indicated on Exhibit "1", is hereby amended and restated in its entirety as follows:

1.    DEMISED PREMISES:

A.    Description of Demised Premises, Improvements and Personal Property. Lessor hereby leases to Lessee and Lessee hereby leases from Lessor that certain parcel of land lying and being in Miami-Dade County, Florida, and being legally described in Exhibit "3" attached hereto and made part hereof ("Demised Premises"), together with all easements, hereditaments and other rights appurtenant thereto, including without limitation, the right to surface support of the buildings and improvements now or hereafter constructed on the Demised Premises and Lessor's rights, title and interest as owner of the Demised Premises, if any, in any streets, alleys, ways, water courses and water bodies adjacent to such Demised Premises, and together with all improvements, personal property, fixtures, buildings, footings, foundations, machinery and equipment, exclusive of animals which Lessee owns and vehicles, and their appurtenances, which now or hereafter are erected or located in or on the Demised Premises, and all improvements, alterations and replacements thereto.

B.    Description and Restriction on Use of Portion of Demised Premises. Lessee agrees that it has no cause of action against Lessor for loss of use of that portion of the Demised Premises identified in Exhibit "4" attached hereto and made a part hereof. Lessee further agrees that in the

2

event Lessee elects to use that portion of the Demised Premises identified in Exhibit "4" for any purpose other than parking, it shall first obtain from the Trustees of the Internal Improvement Fund an approval of such alternate use.

2.    ADDITIONAL PROPERTY:

A.    Adjacent Property.  Lessor agrees that the certain strip of real property owned by Lessor as of the date of execution of this Amended and Restated Lease, 100 yards in depth immediately across the highway (Rickenbacker Causeway) from the Demised Premises and located on the northerly side of the existing causeway or roadway and identified in Exhibit "4-A" attached hereto and made a part hereof (the "Adjacent Property"), shall not be built upon except for park and other governmental purposes or conveyed or leased to third parties during the term of this amended and Restated Lease, as the same may be extended, but shall be kept in a sightly condition by proper planting and mowing by Lessee and at the expense of Lessee.  Lessee shall pay the cost of and Lessor grants Lessee the right to construct a public parking facility, open to the public in accordance with Section 24 below, on the Adjacent Property for the term of this Amended and Restated Lease and any extension hereof, to the extent such property has not been previously conveyed or leased by Lessor and such additional parking is required by a Development Order issued under Chapter 380, Florida Statutes ("DRI"), a Florida Quality Development Order ("FQD") or by Miami-Dade County ordinance or regulation.  Lessee and Lessor agree that this use constitutes an acceptable purpose for purposes of this Amended and Restated Lease as set forth above.  The construction and operation of the public parking facility by Lessee on the Adjacent Property shall be as more particularly set forth in Section 24 below.

3

B.    Public Parking Extension Area. Lessor agrees that Lessee may continue to use that certain real property shown as Parcels B and C on the sketch attached hereto as Exhibit "5" for public parking, as previously acknowledged by Miami-Dade County Resolution No. R-467-67, adopted April 24, 1967.

3.    PURPOSE OF LEASE: The purpose of this Amended and Restated Lease is to enable the Seaquarium as depicted on the Master Plan which is attached to this Amended and Restated Lease as Exhibit "2", to be reconstructed and operated on the Demised Premises. For purposes of this Amended and Restated Lease, the term "Master Plan" shall mean the plan of development for the Seaquarium as identified in Exhibit "2". Lessor, as the governing body of Miami-Dade County, Florida, hereby recognizes that such use and development serves a public purpose by providing a family oriented tourist attraction which includes, but is not limited to, an Aquarium (as hereinafter defined) and related facilities.

4.    TERM OF LEASE AND LEASE YEAR:

A.    Term of Lease. This Amended and Restated Lease is for a term commencing on March 9, 1954 and ending at midnight on July 12, 2003, unless extended in accordance with the provisions hereinafter set forth.

B.    Lease Year. In recognition of twelve days of previous Business Interruption (as defined in Section 12 below), the period from March 9, 1954 through March 20, 1955 shall be deemed the first Lease Year. Thereafter, and continuing until the year 1993, the term Lease Year shall mean a twelve (12) month period commencing on March 21st of a calendar year. By Resolution No. R-380-93, adopted March 30, 1993, an extension to the term of the Existing Lease of 114 days for Business Interruption was granted. Thereafter, and continuing until the Effective

4

Date, the term Lease Year shall mean a twelve (12) month period commencing on July 13 of a calendar year. The Lease Year in which the Effective Date occurs shall end on the calendar day immediately preceding the Effective Date. Commencing on the Effective Date, a Lease Year, for purposes of this Amended and Restated Lease, shall mean a twelve (12) month period commencing on the calendar day of the Effective Date. Lessor and Lessee recognize that there may be a difference between the calendar day upon which the Effective Date falls and July 13. Accordingly, the last Lease Year of the term of this Amended and Restated Lease (except in the event the Amended and Restated Lease is terminated prior to its scheduled termination date) shall be extended so that the last Lease Year ends on the next succeeding July 12.

5. OPTIONS TO EXTEND:

A. Extension Options. Lessor and Lessee recognize that Lessee has options to renew or extend this Amended and Restated Lease for terms totalling up to an additional twenty-one (21) years as provided by the Existing Lease. Lessor and Lessee agree that Lessee shall have additional options to renew or extend this Amended and Restated Lease for terms totalling up to an additional twenty-five years (for a maximum total of 46 additional years), subject to the requirements for expenditures on Capital Improvements (as defined in Section 7(A) below), as more particularly set forth below. Lessee shall be entitled to lease extensions for all expenditures an Capital Improvements except for expenditures for normal maintenance and repairs ("Capital Improvement Expenditures") as set forth below. As of the Effective Date, Lessee, in its sole discretion, shall have the option to renew or extend the Amended and Restated Lease for additional terms commencing on the same calendar day as the Effective Date in the year 2003, as follows:

5

(1)    Lessee, in its sole discretion, shall have the option to renew or extend the Amended and Restated Lease for a successive term of twenty-one (21) years for a total additional Capital Improvement Expenditure which Lessee undertakes of Eight Million Five Hundred Thousand Dollars ($8,500,000), subject to the provisions of subparagraph 5(F) hereof.

(2)    Provided that Lessee has exercised its maximum option under subparagraph 5(A)(1) above, Lessee, in its sole discretion, shall have the option to renew or extend the Amended and Restated Lease for two (2) additional successive terms of two (2) years each for each One Million Five Hundred Thousand Dollars ($1,500,000) of Capital Improvement Expenditures Lessee undertakes, subject to the provisions of subparagraph 5(F) hereof, which undertaking may be concurrent with any other Capital Improvement Expenditures required, permitted or recognized by this subparagraph. Pursuant to this subparagraph 5(A)(2), Lessee may extend or renew the Amended and Restated Lease for up to an additional four (4) years for a total additional Capital Improvement Expenditure of Three Million Dollars ($3,000,000). All Capital Improvement Expenditures and renewals or extensions provided for in this subparagraph 5(A)(2) shall be in addition to those provided in above subparagraph 5(A)(1).

(3)    Provided that Lessee has exercised its maximum option under subparagraphs 5(A)(1) and 5(A)(2) above, Lessee, in its sole discretion, shall have additional options to renew or extend the Amended and Restated Lease for two (2)

6

additional successive terms of three (3) years each for each additional One Million Five Hundred Thousand Dollars ($1,500,000) of Capital Improvement Expenditures Lessee or its Sublessee(s) undertakes, subject to the provisions of subparagraph 5(F) hereof, which undertaking way be concurrent vith the other Capital Improvement Expenditures required or permitted by this subparagraph. Pursuant to this subparagraph 5(A)(3), Lessee may extend or renew the Amended and Restated Lease for up to an additional six (6) years  for a total additional Capital Improvement Expenditure of Three Million Dollars ($3,000,000) by Lessee or its Sublessee(s).  All Capital Improvement Expenditures and renewals or extensions provided in this subparagraph 5(A)(3) shall be in addition to those provided for in the above subparagraphs 5(A)(1) and 5(A)(2) of this Section.

(4)    Provided that Lessee has exercised its maximum options under subparagraphs 5(A)(1) through 5(A)(3) above, Lessee, in its sole discretion, shall have the additional option to renew or extend the Amended and Restated Lease for five (5) additional successive terms of one (1) year each for each additional One Million Dollars ($1,000,000) of Capital Improvement Expenditures Lessee or its Sublessee(s) undertakes, subject to the provisions of subparagraph 5(F) hereof, which undertaking may be concurrent with the other Capital Improvement Expenditures required or permitted by this subparagraph.  Pursuant to this subparagraph 5(A)(4), Lessee may extend or renew the Amended and Restated Lease up to an additional five (5) years for

7

a total additional Capital Improvement Expenditure of Five Million Dollars ($5,000,000) by Lessee or its Sublessee(s).    All Capital Improvement Expenditures and renewals or extensions provided for in this subparagraph 5(A)(4) shall be in addition to those provided for in subparagraphs 5(A)(1) through 5(A)(3) of this Section.

(5)     Provided that Lessee has exercised its maximum options under subparagraphs 5(A)(1) through 5(A)(4) above, Lessee, in its sole discretion, shall have the additional option to renew or extend the Amended and Restated Lease for five (5) successive terms of two (2) years each for each additional Three Million Eight Hundred Fifty Four Thousand Dollars ($3,854,000) of Capital Improvement Expenditures Lessee or its Sublessee(s) undertakes, subject to the provisions of subparagraph 5(F) hereof, which undertaking may be concurrent with the other Capital Improvement Expenditures required by this subparagraph.    Pursuant to this subparagraph 5(A)(5), Lessee may extend or renew the Amended and Restated Lease for up to an additional ten (10) years for a total additional Capital Improvement Expenditure of Nineteen Million Two Hundred Seventy Thousand Dollars ($19,270,000) by Lessee or its Sub-lessee(s).    All Capital Improvement Expenditures or renewals or extensions provided for in this subparagraph 5(A)(5) shall be in addition to those provided in subparagraphs 5(A)(1) through 5(A)(4) of this Section.

B.    Additional Capital Improvement Expenditures. Nothing herein shall restrict Lessee's or its Sublessees' right to undertake Capital Improvement Expenditure(s) the total cost of which exceed the amounts specified in this Section.

C.    Concurrent Capital Improvement Expenditures. Lessee or its Sublessees shall have the further right to undertake any Capital Improvement Expenditure(s) concurrently with any Capital Improvement Expenditure(s) provided for in any preceding subparagraph herein, provided that the Capital Improvement Expenditure(s) called for by all preceding subparagraphs thereof have either been previously complied with, or will be complied with concurrently. If Lessee or its Sublessee(s) undertakes Capital Improvement Expenditure(s) concurrently, as provided herein, Lessee shall concurrently be granted additional options to renew or extend the Amended and Restated Lease, as provided for by this Amended and Restated Lease.

D.    Vesting of Lease Extensions. Lessee's right to each lease extension as provided herein shall vest upon the occurrence of the conditions set forth in either subparagraph (1) or (2) below, as applicable, as follows:

(1)    Lease extension(s) for Capital Improvement(s) shall vest when the required Capital Improvement Expenditure(s) has been committed, whether the expenditure is to be made on a Capital Improvement(s) to be constructed or renovated by Lessee, a Sublessee or by independent contractors. With the exception of the Replacement Marine Mammal Stadium and Pools, all Capital Improvements for lease extensions must be completed two years prior to the expiration of the lease term. A determination that a Capital Improvement Expenditure(s) is committed shall be made by the County

9

Manager when the following documents are submitted for his or her review and are approved by the County Manager, which review shall be completed within forty-five (45) days and which approval shall not be unreasonably withheld: (a) a building permit for the Capital Improvement(s) issued by Miami-Dade County; (b) a properly executed construction contract for the Capital Improvement(s) unless the Lessee notifies the County Manager that said Capital Improvement(s) will be constructed by Lessee rather than by a contractor; (c) a properly executed Public Construction Bond, where applicable, as provided in Section 9; and (d) a written certification by Lessee or a Sublessee as applicable, that financing for the construction of the Capital Improvement(s) has been committed; provided, however, when Lessee or a Sublessee is to construct the Capital Improvement(s) itself or by independent contractors, Lessor and Lessee, the Sublessee, or contractors, as applicable, may agree to substitute in lieu of a bond, alternative security in the same amount as provided in Section 255.05(7), Florida Statutes (1999). The amount of the Capital Improvement Expenditure committed for purposes of the vesting of Lessee's right to a lease extension shall be deemed to be the amount set forth in the Public Construction Bond or the amount of the alternative form of security submitted in lieu thereof. When the foregoing conditions are met, the County Manager or his or her designee shall forthwith execute an "Extension Agreement" in the form attached as Exhibit "6" ("Extension Agreement"). Lessor represents that the County Manager or his

or her designee is the appropriate official to execute the Extension Agreement. Lessee agrees to notify Lessor forty-five (45) days prior to commencing construction of any Capital Improvement(s) shown on the Master Plan; or

(2)     Lease extension(s) for Capital Improvement(s) shall vest when Lessee or a Sublessee has undertaken the required Capital Improvement Expenditure(s) by acquiring a Capital Improvement(s) as set forth in this subparagraph 5(D)(2). Lessee shall send to Lessor written verification, satisfactory to Lessor, in its reasonable discretion, of the complete actual cost thereof, together with notice of its intention to exercise the appropriate extension of the Amended and Restated Lease, and Lessor shall have forty-five (45) days to review same. The County Manager or his or her designee shall forthwith thereafter execute an Extension Agreement, provided the foregoing conditions are met. Lessor represents that the County Manager or his or her designee is the appropriate official to review the above-described cost verification and to execute the Extension Agreement.

(3)     Provided that the foregoing conditions are met, the sole ground for any objection by Lessor to Lessee's entitlement to any extension(s) shall be whether the improvement(s) is of an amount sufficient to entitle Lessee to an extension pursuant to this Amended and Restated Lease.

E.     CPI Factor. All cost requirements of Capital Improvement Expenditures, including costs of equipment and furnishings, to be undertaken by Lessee or a Sublessee as referred to in this

11

Amended and Restated Lease shall increase or decrease in proportion by seventy-five percent (75%) of any increases or decreases in the Consumer Price Index for Urban Consumers - U.S. City Average All Items, 1982-1984=100, if any, which increases or decreases occur between the month of the Effective Date and the time that such options based on any such Capital Improvement Expenditure(s) are vested in Lessee as provided by subparagraph 5(D) above. The cost requirement shall be increased or decreased in accordance with the following formula:

$$x = \text{Cost Requirements of Capital Improvements}$$

$$x + x \quad .75 \quad \frac{\text{C.P.I. at time of calculation - C.P.I. at time of Effective Date (or at Projects CPI Exception Time, if applicable)}}{\text{C.P.I. at time of Effective Date (or at Projects CPI Exception Time, if applicable)}}$$

F.    Adjustments to Extension Schedule. In the event final audit as provided in Section 26 below shows that Lessee's actual Capital Improvement Expenditures on a particular Capital Improvement(s) were greater than the amount shown on the applicable Public Construction Bond or alternative security, as provided in subparagraph 5(D) above, then Lessee shall be entitled to a credit towards future lease extensions for that amount. In the event such final audit shows that Lessee's actual Capital Improvement Expenditures were less than that which was stated in the applicable Public Construction Bond or alternative security, then Lessee shall have eighteen (18) months from the date of said final audit to make the additional Capital Improvement Expenditures which would entitle Lessee to complete the applicable lease extension, failing which Lessee will lose the proportionate part of the lease extension which has not been earned by Capital Improvement Expenditures. In addition, the lease extension schedule set forth in this Section is subject to

adjustments for additional days due to Business Interruptions (as hereinafter defined) as provided in Section 12.

6.    RENT: It is mutually agreed that Lessee shall pay to Lessor throughout the term of this Amended and Restated Lease, and any extension hereof Annual Rent, the percentage of Sublet Rent to be paid by Lessee to Lessor as set forth below, and Additional Rent, if any, (collectively, the "Rent") as follows:

A.    Annual Rent. Following the Effective Date, the Annual Rent will be the greater of either (i) the Guaranteed Rent or (ii) the Percentage Rent as follows, subject to the force majeure provisions of Section 12 below:

(1)    Guaranteed Rent. For the purposes of this Amended and Restated Lease the term "Guaranteed Rent" shall mean the minimum annual rental Lessee agrees to pay Lessor. The Guaranteed Rent shall be One Million Dollars ($1,000,000). In the event, however, that Gross Revenues, as defined in subsection 5, below, fall below Seven Million Five Hundred Thousand Dollars ($7,500,000) in a Lease Year, then the Guaranteed Rent shall be reduced to Seven Hundred Fifty Thousand Dollars ($750,000) for that Lease Year.

(2)    Percentage Rent. For the purposes of this Amended and Restated Lease the term "Percentage Rent" shall mean the percentages of Gross Revenue Lessee agrees to pay Lessor. The Percentage Rent shall be five percent (5%) upon any and all Gross Revenues received by Lessee up to One Million Dollars ($1,000,000); seven and one-half percent (7-1/2%) upon the next Five Hundred Thousand Dollars ($500,000); and ten percent (10%) upon any amount over One Million Five Hundred Thousand Dollars ($1,500,000).

(3)    Adjustment of Annual Rent. Lessor and Lessee recognize that the amounts of Guaranteed Rent and Percentage Rent set forth in this Amended and Restated Lease may impede Lessee's ability to finance and construct any additional Capital Improvements approved by the County subsequent to the Effective Date of this Amended and Restated Lease and any replacements, renewals or betterments to any Capital Improvement. Lessee may propose an adjustment to the Guaranteed Rent or the Percentage Rent or both by submitting a request for an adjustment to Annual Rent to the County

13

Manager together with supporting documentation demonstrating that the financing or construction of a proposed additional Capital Improvement or any proposed replacement, renewal or betterment to any Capital Improvement, for which the estimated project costs exceed One Million Dollars ($1,000,000), will be impeded unless an adjustment is made to the Annual Rent. Lessor may make appropriate adjustments to Annual Rent, in the sole discretion of the Miami-Dade County Board of County Commissioners, to enable Lessee to proceed to finance and construct such additional Capital Improvements or replacements, renewals or betterments to such Capital Improvements.

(4)   Monthly Calculation of Guaranteed Rent and Percentage Rent. Monthly payment of Annual Rent shall be based upon the greater of the Guaranteed Rent or the Percentage Rent and shall be made no later than the fifteenth day of the calendar month following the applicable Fiscal Month. For purposes of this Amended and Restated Lease, the term Fiscal Month ("Fiscal Month") shall mean the calendar month dates for purposes of reporting and payment in a Fiscal Year ("Fiscal Year") and the term Fiscal Year shall mean twelve consecutive months and shall include fifty-two (52) or fifty-three (53) seven (7) day weeks, as applicable, both of which shall be established by letter submitted by Lessee to the Miami-Dade County Manager or his or her designee on an annual basis but in no event later than thirty (30) days prior to the beginning of Lessor's Fiscal Year. Lessee agrees that if any excess days should occur between Fiscal Years due to a change in fiscal periods, then any rents or other sums due for those excess days shall be paid for those days. Guaranteed Rent shall be paid in twelve (12) equal monthly installments of the Guaranteed Rent amount for each Lease Year. Percentage Rent shall be equal to the applicable percentage described in subparagraph (3) above, times the Gross Revenue collected in the preceding Fiscal Month of the Lease Year. In no event shall the cumulative Annual Rent payment during any Fiscal Year exceed the greater of the Percentage Rent computed on an annual basis or the Guaranteed Rent for that Fiscal Year. Should such excess occur, an adjustment will be made within forty-five (45) days of the end of the Fiscal Year and any resulting credit will be made against the Annual Rent due in the succeeding month. Lessor and Lessee agree that in the event a Fiscal Month occurs during two separate Lease Years and that if, as a result thereof, more than one percentage applies to that Fiscal Month for purposes of determining Percentage Rent or the percentage of Sublet Rent (as defined in Section 6 (B) below) to be paid by Lessee to Lessor as set forth below, then the calendar days of that Fiscal Month will be allocated between the two Lease Years so that the appropriate percentage will apply to the respective portions of said Fiscal Month based on the lease Year in which it falls.

14

(5)    Ad Valorem Taxes and Annual Rent. Lessor and Lessee recognize that the imposition of ad valorem taxes on the leasehold, if such circumstance should occur by virtue of amended legislation or otherwise, would significantly impact Lessee's ability to pay Annual Rent as specified in subparagraphs 6(A)(1) through 6(A)(4) above. Therefore, should ad valorem taxes be imposed on the leasehold, the amount of Annual Rent to be paid shall be deferred by the amount of ad valorem taxes paid by Lessee as set forth below, provided, however, that Lessee shall only have the right to such deferral five (5) times during the term of this Amended and Restated Lease and provided further that the total amount of Annual Rent owed irrespective of the ad valorem taxes imposed for the Fiscal Year in which ad valorem taxes are imposed shall be paid in full not more than forty-five (45) days after the end of that Fiscal Year. An example of the application of this formula is set forth in Exhibit "8" attached hereto.

(6)    Definition of Gross Revenues. For purposes of this Amended and Restated Lease, the term "Gross Revenue(s)" shall mean all amounts received during a Lease Year by Lessee as a result of its use of the Demised Premises (or if this Amended and Restated Lease is assigned, then by the assignee of Lessee) including, but not limited to, income from the following: (a) general admissions to events on the Demised Premises; (b) sales of merchandise or food on the Demised Premises where such sales are made by Lessee or Concessionaires (as hereinafter defined); (c) parking charges if operated by Lessee; (d) all revenues received by Lessee from Affiliated Businesses (as hereinafter defined in Section 19 below) except as set forth in subparagraphs (1), (2) and (ii) below; and (e) other incidental revenues relating to the use of the Demised Premises. In addition, Lessor and Lessee agree that for purposes of this Amended and Restated Lease, "Gross Revenues" shall also include: (1) all income received by Affiliated Businesses of Lessee from general admissions and from food and gift shop sales and (2) all income from parking charges received by Concessionaires, Sublessees (as hereinafter defined) and Affiliated Businesses of Lessee provided that no financing has been obtained in connection therewith. In the event parking, in addition to the number of parking spaces that exist as of the execution date of this Amended and Restated Lease, is to be financed and Lessee, Affiliated Businesses of Lessee, Sublessees and/or Concessionaires must pledge revenues from parking in connection therewith, then from the date said financing is obtained until such financing is extinguished, all income from parking charges except as provided in subparagraph (c) above shall be excluded from the definition of "Gross Revenue" and thereafter such revenues, to the extent received by Lessee, shall be deemed income received by Lessee from Sublessees for purposes of calculating Sublet Rent, as more particularly set forth in Section

15

6 (B) below.  Notwithstanding the foregoing provisions of this Section, "Gross Revenue(s)" shall not include: (i) Sublet Rent received by Lessee from Sublessees not operated by Lessee or Affiliated Businesses; (ii) Revenues received by Lessee from Affiliated Businesses of Lessee so long as such revenues are determined to be obtained at arms length by the Miami-Dade County Manager or his or her designee at his or her sole discretion, except as provided in subsections 1 and 2 above.  Such revenues as are described in this subparagraph (ii) shall be included in Sublet Rent, and the relationship of Lessee with the Affiliated Business shall be included in the definition of a Sublease as such term pertains to the calculation of Rent; (iii) Amusement taxes (for example, if Two Dollars and twenty cents ($2.20) is charged as admission, of which twenty cents ($.20) is an amusement tax, said twenty cents ($.20) shall be deducted and the amount that shall be included as "Gross Revenue" shall be Two Dollars ($2.00) and not Two Dollars and twenty cents ($2.20); the same computations shall apply should there be levied any sales taxes, luxury or other similar taxes); (iv) Any amusement tax, value added tax, head tax, sales tax, gross receipts tax or other similar excise taxes, that may be imposed by any governmental authority whatsoever whether imposed directly on Seaquarium patrons or indirectly on Lessee or its Sublessees, shall not be included as "Gross Revenue".  This paragraph shall apply to such taxes in effect at the execution of this Amended and Restated Lease as well as any such taxes as may be made effective thereafter; (v) Amounts received by Lessee as reimbursements of expenses and cost sharings (for example, reimbursements of utility bills paid by Lessee on behalf of any Sublessee); (vi) Amounts received by Lessee in the form of insurance proceeds; (vii) Other amounts received by Lessee unrelated to the operation of the Seaquarium on the Demised Premises, subject to the approval by the Miami-Dade County Manager or his or her designee at his or her sole discretion; (viii) Amounts of any discounts paid by Lessee or Sublessees to credit card companies; (ix) Amounts received by Lessee from vending machines provided by Affiliated Businesses of Lessee; and (x) Amounts received by Lessee from Lessee's agreements existing as of the execution date of this Amended and Restated Lease with Moldamatic and Remote Boats.

B.    Subleases and Sublet Rent.

(1)    Following the Effective Date, the Sublet Rent shall be all income received by Lessee from land and/or activities sublet by written instrument to Sublessees on the Demised Premises, excluding taxes paid by Lessee or by its Sublessee(s), reimbursements and cost sharings (e.g., contributions by Sublessees to Lessee for common expense, such as common area maintenance, promotions, security and the like) and any amounts included as

16

Gross Revenue(s) under the provisions of Section 6(A)(6)(2) above. Unless a lower percentage is approved by the Board of County Commissioners pursuant to Section 18, below, the percentage of Sublet Rent to be paid by Lessee to Lessor following the Effective Date shall be 33-1/3% and shall be paid by Lessee in monthly installments, no later than the fifteenth day of the calendar month following the applicable Fiscal Month, based on the Sublet Rent collected in the preceding Fiscal Month.

(2)  Each Sublease shall contain a construction schedule committing to a date by which the construction of the Capital Improvements under the Sublease shall be substantially completed.

(3)  All Subleases shall also contain provisions for CIR consistent with those enumerated in Section 8 below.

(4)  Lessee agrees that it will not cause any change in the Marine Mammal Exhibits and Aquarium Exhibits operations or ownership which will result in the conversion of Annual Rent to Sublet Rent other than for certain concessions (as hereinafter defined) customary to the operation of comparable attractions, however, general admissions, food and gift shop sales at the Marine Mammal Exhibits and Aquarium Exhibits cannot be converted to Sublet Rent.

(5)  Lessee agrees that it will continue to pay to Lessor 33-1/3% of all revenues paid to Lessee by Moldamatic, Remote Boats and from vending machines at the Demised Premises where provided by an Affiliated Business of Lessee, no later than the fifteenth day of the calendar month following the applicable Fiscal Month, based on the revenues collected in the preceding month.

C.  Additional Rent. The Lessee agrees and commits to have the Replacement Mammal Stadium and Pool completed and open to the public for its intended purpose no later than forty (40) months after the issuance of the final building permit, provided that the Lessee applies for the final building permit no later than March 31, 2001. As a commitment by Lessee to Lessor to undertake such construction in a timely manner, should the Replacement Mammal Stadium and Pool not be completed and open to the public for its intended purposes within the time frame set forth herein, Lessee shall pay Additional Rent as compensation to the Lessor in an amount of one-half percent

17

(½%) of Gross Revenues for the Lease Year or Lease Years, or portions thereof, in which the Replacement Mammal Stadium and Pool is not completed and open to the public for its intended purpose. In the event, however, that during the construction of the Replacement Mammal Stadium and Pool the Lessee experiences delays caused by forces outside its control, including but not limited to acts of God, litigation or administrative appeals, or Lessor-caused delays, including those associated with any agency or department thereof, then the Lessee shall submit a request for an extension of time to the Lessor, in writing, within thirty (30) days after the commencement of such delay detailing the cause of such delay, and providing documentary proof thereof. The County Manager shall then provide, in writing, an extension of time equal to those days for which the Lessee has documentary proof of delays outside its control, and such extension(s) will serve to amend the permitted time frame as is fully set forth herein. Delays caused by any subcontractor or supplier hired by Lessee shall not be considered outside the control of the Lessee.

D.    Review of Guaranteed and Percentage Rent Terms by Lessor. Notwithstanding the provisions stated above, Lessor, at Lessee's request, may make such adjustments to Annual Rent as it deems fair and equitable under the circumstances, in the sole discretion of the Miami-Dade County Board of County Commissioners, in the event that (i) Lessee is unable, or substantially unable to maintain, show or display marine animals, in whole or in part, due to changes in Federal, State, regional, county or local statutes, ordinances, regulations or rules, and/or (ii) Gross Revenues decrease by more than twelve percent (12%) in any Fiscal Year from those in the preceding Fiscal Year, provided, however, Lessee shall not make a request for an adjustment in Annual Rent due to a total taking or a temporary taking by eminent domain as provided in Section 13(A) and 13(C) below.

18

E.    The provisions of this Section shall be subject to the provisions of this Amended and Restated Lease entitled "EMINENT DOMAIN" and "BUSINESS INTERRUPTIONS".

7.    CAPITAL IMPROVEMENTS:

A.    Definition.  For purposes of this Amended and Restated Lease, the term "Capital Improvements" shall include all Master Plan Components and other elements of the Master Plan attached hereto as Exhibit "2" and all renewals or betterments of Master Plan Components and other elements identified on the Master Plan, regardless if undertaken by Lessee or by Sublessees (as hereinafter defined) so long as such elements, renewals or betterments are defined as capital improvements under Generally Accepted Accounting Principles.  A Master Plan Component shall be defined as those Capital Improvements shown on the Master Plan, as identified in Exhibits 2 and 7, and any other Capital Improvements approved by the County subsequent to the Effective Date of this lease, and any replacements, renewals or betterments to any Capital Improvement.  For purposes of this Amended and Restated Lease, the term Generally Accepted Accounting Principles ("GAAP") shall mean those generally accepted principles of accounting utilized by certified public accountants licensed and authorized to practice in Florida.  Normal maintenance and repairs shall be excluded from the definition of Capital Improvements for purposes of Capital Improvement Expenditures but shall be included in the definition of Capital Improvements for purposes of CIR Permissible Expenditures (as defined in Section 8(B) below).  Notwithstanding anything provided herein, Capital Improvements shall include, but not be limited to, any animals purchased for any new or renovated exhibit, any animals or groups of animals purchased to restock any exhibit which cost in excess of $2,500, or the replacement of machinery and other equipment which costs in excess of $2,500 and has a useful life of over one calendar year.  Further, Capital Improvements shall also include the cost

19

of acquisition or creation of furnishings, plans, designs, or equipment and the amounts of any permits, fees and/or related legal costs including, but not limited to, legal fees related to the DRI or FQD, necessary to complete any construction, and impact fees as provided in Section 28(I) below.

     B.    County Ownership.

     (1)    Title.  Legal title to any and all improvements to real and personal property, exclusive of animals and vehicles, shall be in the name of and legal title shall be vested in the Lessor, and, subject to the rights and obligations of the Lessee pursuant to this Amended and Restated Lease, all rights, title and interest in and to such improvements and personal property shall be vested in the Lessor.  Accordingly, subject to the terms and conditions of this Amended and Restated Lease, Lessor shall, at such times as Lessee may request, promptly execute all instruments as shall be necessary to accomplish the sale, leasing, conveyance, disposal or demolition of such improvements and personal property by Lessee.  With respect to animals and vehicles, during the Amended and Restated Lease term, legal title to all animals and vehicles together with all rights, title and interest with respect thereto, shall be vested in Lessee.  During the Amended and Restated Lease term, Lessee shall be under a duty to manage all animals in accordance with the standards set forth in the Federal Marine Mammal Protection Act and state laws, to the extent applicable, and Lessee, as owner of the animals and vehicles, shall be responsible for payment of all personal property taxes thereon, if applicable.  At the conclusion or termination of the Amended and Restated Lease term, legal title to the animals owned by Lessee and vehicles will pass from Lessor to Lessee to the extent, with respect to animals, allowable, pursuant to then prevailing law.  At such times as the Lessor say request, Lessee shall execute all instruments as shall be necessary to evidence the foregoing and shall cooperate with Lessor in obtaining any governmental approvals necessary in connection therewith.

In recognition of the foregoing, Lessee agrees that from the conclusion of the CIR term (as defined in Section 8(C) below) until the end of the lease term, Lessee shall not sell, dispose of or demolish any animals, equipment or personal property initially costing above $2,500 each, as such amount in adjusted in accordance with the provisions of subparagraph 5(F) above, and Lessee further agrees that from Lease Year 44 following the Effective Date of this Amended and Restated Lease to the end of the lease term Lessee shall not close down operations of any Master Plan Component constructed after the Effective Date and costing more than $7,500,000 (adjusted for CPI from the Effective Date), in each case without the prior approval of the County Manager or his or her designee as set forth below. Lessee shall provide the County Manager or his or her designee with forty-five (45) days prior written notice of a proposed sale, disposal, demolition or closing of operations of a Master Plan Component, as set forth above, which written notice shall be delivered by certified mail, return receipt requested, and shall describe the proposed sale, disposal, demolition or closing of operations as applicable. Unless the County Manager or his or her designee objects in writing to the proposed sale, disposal, demolition or closing of operations within the forty-five (45) day review period, Lessee may proceed with such sale, disposal, demolition or closing of operations. The sole ground for any objection by the County Manager or his or her designee shall be whether the sale, disposal, demolition or closing of operations will be contrary to the best interest of Lessor. Otherwise, the sale, disposal, demolition or closing of operations shall be approved and said approval shall not be unreasonably withheld.

(2)    Sales, Disposal, or Demolition of Capital Improvements and Personal Property. Sales, disposal or demolition of Capital Improvement(s) below One Million Dollars ($1,000,000) and those constructed prior to the Effective Date may be undertaken by Lessee without

the prior approval of Lessor, provided, however, such Capital Improvement(s) must be replaced with a comparable Capita Improvement(s) within eighteen (18) months following the date of such sale, disposal or demolition. Sales, disposal or demolition of Capital Improvement(s) constructed after the Effective Date at a cost in excess of One Million Dollars ($1,000,000) may be undertaken by Lessee provided that such sale, disposal or demolition is first approved by the County Manager or his or her designee as provided below and further provided that such Capital Improvement(s) must be replaced by Lessee with a comparable Capital Improvement(s) within eighteen (18) months following the date of such sale, disposal or demolition. Lessee shall provide the County Manager, or his or her designee, with forty-five (45) days prior written notice of such a proposed sale, disposal or demolition, which written notice shall be delivered by certified mail, return receipt requested. Lessee agrees to use its best efforts to otherwise insure that the County Manager is notified of Lessee's intent to exercise its rights pursuant to this Section. Each written notice shall describe the proposed sale, disposal or demolition of Capital Improvement(s) and the proposed replacement of such Capital Improvement(s). Unless the County Manager or his or her designee objects in writing to the proposed sale, disposal or demolition within the forty-five (45) day review period, Lessee may proceed with such sale, disposal or demolition. If the County Manager or his or her designee so objects, the sole ground for any such objection by the County Manager or his or her designee shall be whether the sale, disposal or demolition will be contrary to the best interests of Lessor. Unless the sale, disposal or demolition by Lessee would be contrary to the best interests of Lessor, it shall be approved and said approval shall not be unreasonably withheld. Notwithstanding the provisions of this Section, Lessee may sell or trade animals at its sole discretion. The provisions of this subparagraph 7 (B) (2) are subject to the provisions of subparagraph 7(B)(1) above.

22

C.    Recognition of Prior Capital Improvements. Subject to the Consumer Price Index (CPI) adjustments specified in section 5(F), using as the CPI base the Projects CPI Exception Time, those projects underway as of the execution date of this Amended and Restated Lease, which projects are enumerated in Exhibit "7" attached hereto, shall be recognized under the Amended and Restated Lease as Capital Improvement Expenditures qualifying for lease extensions.

D.    Recognition of Art in Public Places. Payments, if any, made in accordance with the provisions of the "Art in Public Places" ordinance shall be considered an Capital Improvement Expenditures qualifying for lease extensions.

E.    Right to Construct Master Plan Improvements Without Further Approval. Lessor acknowledges and agrees that the Capital Improvements shown on the Master Plan are approved by Lessor for purposes of this Amended and Restated Lease only and that Lessee has the right to . construct any such Capital Improvement(s) without further approval by Lessor. Approval of this Amended and Restated Lease by the Board of County Commissioners shall not restrict the rights of the Lessee to replace any existing capital improvements on the Demised Premises using the approval process and guidelines for such replacement as established by the Planning and Zoning Department.

F.    Additional Capital Improvements. Lessor and Lessee agree that Lessee shall notify Lessor of any proposed additional Capital Improvement(s) to be added to the Master Plan attached hereto as Exhibit "2", which proposed Capital Improvements would constitute an addition to the Master Plan, by submitting a written description of the proposed additional Capital Improvement(s) to the County Manager and the Director of Parks and Recreation, or their respective designees. Any proposed additional Capital Improvement(s) shall be separately described and include therein the estimated cost and the proposed location and design thereof. All notices required by this paragraph

23

shall be delivered by certified mail, return receipt requested, and Lessee agrees to use its best efforts to otherwise insure that the County Manager and Director of Parks and Recreation are notified as set forth herein. With respect to proposed additional Capital Improvement(s) which do not exceed One Million Dollars ($1,000,000) in estimated project costs, the County Manager shall have forty-five (45) days to review the proposed additional Capital Improvement(s). Unless the County Manager or his or her designee objects to the proposed additional Capital Improvement(s), in writing, setting forth the basis for such objection, within the forty-five day review period, Lessee may proceed with the proposed additional Capital Improvement(s) and shall be credited with the amount of the Capital Improvement Expenditures in connection therewith for purposes of vesting Lessee with entitlement to lease extension(s) and satisfying the CIR (as hereinafter defined), subject to final audit as provided in Section 26. As to each separate proposed additional Capital Improvement for which the estimated project costs exceed One Million Dollars ($1,000,000), exclusive of the Capital Improvements enumerated in Exhibit "2" which are hereby deemed approved, the County Manager shall, within forty-five (45) days of receipt of said description, place the question of whether to approve such proposed additional Capital Improvement(s) upon the agenda of the next available regularly scheduled meeting of the Board of County Commissioners, together with his recommendation in regard thereto. Unless Lessor, upon resolution by the Board of County Commissioners at the meeting described above or at the next available regularly scheduled meeting thereafter, objects to the proposed additional Capital Improvement(s) in writing, which objection shall specifically set forth the basis for said objection, Lessee may proceed with the proposed additional Capital Improvement(s) and shall be credited with the amount of the Capital Improvement Expenditures in connection therewith for purposes of vesting Lessee with entitlement

24

to lease extension(s) and satisfying the CIR, subject to final audit as provided in section 26. The sole grounds for any objection by Lessor to a proposed additional Capital Improvements to be added to the Master Plan shall be whether the proposed additional Capital Improvement(s) is contrary to the best interest of Lessor, is a substantial departure from the existing use as a family oriented tourist attraction, or would cause any non-compliance with laws, rules, regulations or ordinances of any Federal, State, regional, county or local governmental units and approval shall not be unreasonably withheld. It is understood by the parties that the provisions hereof shall not excuse Lessee from obtaining any necessary governmental approvals as to building permits, zoning permits, and the like or any other approvals required under a DRI or FQD, as applicable, shall not restrict the rights of the Lessee to replace any existing capital improvements on the Demised Premises, as identified on Exhibit "2", using the approval process and guidelines for such replacement as established by the Planning and Zoning Department.

8.    CAPITAL IMPROVEMENT REQUIREMENT (CIR):

A.    Purpose. The purpose of the Capital Improvement Requirement ("CIR") is to assure that the Master Plan projects (as may be amended) when completed, together with all improvements to the Demised Premises, personal property and animals, will continue to be maintained, repaired, replaced or upgraded during the term of the Amended and Restated Lease.

B.    Permissible Expenditures. The following are permissible expenditures for the CIR ("CIR Permissible Expenditure(s)"): (i) the cost of all maintenance, repair, replacement or betterments of improvements currently located on the Demised Promises as of the execution date of this Amended and Restated Lease; (ii) the cost of all maintenance, repair, replacement or betterments undertaken by Lessee or on Lessee's behalf on the Master Plan Components and

25

elements thereof so long as such activities are defined as capital improvements under GAAP; (iii) the cost of all maintenance, repair, replacement or betterments of any now projects undertaken by Lessee or on Lessee's behalf not currently in the Master Plan but which are subsequently approved by Lessor so long as such activities are defined as capital improvements under GAAP; (iv) all of the foregoing costs expended by Sublessees; (v) the acquisition of new animals for display or breeding to either populate an exhibit when it is first constructed or to create a new exhibit of animals or groups of animals or to replace animals or groups of animals which cost $2,500 or greater; (vi) all costs Lessee is required to expend to eliminate any shortfall resulting from insufficient casualty proceeds as more particularly set forth in Section 21 below; and (vii) the purchase by Lessee or Sublessees of capital equipment, including boats, motor vehicles, or equipment, used for operational purposes which cost in excess of $2,500 each. Work undertaken by Lessee or its Sublessees by means of their own work forces shall be considered a CIR Permissible Expenditure if first approved by the County Manager or his or her designee, which approval shall not be unreasonably withheld.

C.    CIR Annual Amount. The CIR shall either be (a) expended by Lessee for those Master Plan Components operated by it, or by the Sublessees for those Master Plan Components operated by them, at the sole discretion of the Lessee and its Sublessees, in accordance with the above list of CIR Permissible Expenditures, which may be amended from time to time by mutual agreement, or, (b) at Lessee's or Sublessee(s)' option, shall be deposited in an interest bearing account for future eligible expenses. Except as otherwise provided in this Section, the CIR Annual Amount shall consist of one and one-quarter percent (1.25%) of Gross Revenues as defined in Section 6(A)(6) for any Master Plan Component operated by Lessee and one and one-quarter percent (1.25%) of the gross revenues for any Master Plan Component not operated by Lessee ("Non-Lessee

Gross Revenue(s)"), received during the preceding Fiscal Year. The requirement for payment of the CIR Annual Amount shall commence in Lease Year 11 following the Effective Date of the Amended and Restated Lease and terminate in Lease Year 36 following the Effective Date of the Amended and Restated Lease (the "CIR Term").

  D. <u>CIR Credits For Over Expenditures</u>. In the event that Lessee's or any Sublessee's CIR Permissible Expenditures exceed the CIR Annual Amount in any Fiscal Year, then the average shall first be applied to any accrued deferral, in the manner described in subparagraph 8(E)(1) below, and the remainder, if any, shall then accrue as a credit against the CIR Annual Amount incurred in subsequent years.

  E. <u>CIR Limitations</u>.

    (1) <u>Deferrals and Forgiveness</u>. If the aggregate of Gross Revenue and Non-Lessee Gross Revenue declines from one Fiscal Year to the next by greater than 1%, then no CIR shall be required for that succeeding Fiscal Year. Notwithstanding the foregoing, if such forgiveness should occur more than five (5) times between Fiscal Years 11 and 36 following the Effective Date of the Amended and Restated Lease, then the forgiveness for the sixth Fiscal Year of forgiveness and any additional Fiscal Year(s) thereafter shall cumulatively accrue and shall be expended prior to the end of the lease term. CIR for any Master Plan Component shall also be cumulatively deferred if the aggregate of Gross Revenue and Non-Lessee Gross Revenue remains the same after a prior year of CIR forgiveness or deferral or continues to decline by 1% or less than it from one Fiscal Year to the next between Fiscal Years 11 and 36 following the Effective Date of this Amended and Restated Lease. In such event, the CIR shall be deferred cumulatively on a dollar for dollar basis until the aggregate of Gross Revenue and Non-Lessee Gross Revenue increases in the next or subsequent Fiscal Years. In order to reduce the cumulative deficit, an additional three-quarters of one percent of the aggregate of Gross Revenue and Non-Lessee Gross Revenue of the preceding Fiscal Year, in addition to the CIR Annual Amount, shall be required to be committed to CIR to be applied against the cumulative deficit from Fiscal Year to Fiscal Year until it is eliminated; provided, however, that all cumulative deficit amounts shall be expended prior to the end of the lease

27

term. An example of the application of this formula is set forth in Exhibit "9" attached hereto.

(2)    <u>Debt Covenants</u>. Notwithstanding the provisions of subparagraphs 8(C) and 8(D), should the CIR and/or any deferral in any given Fiscal Year exceed any Debt Covenant(s) (as hereinafter defined) , then such excess shall be deferred until such Debt Covenants no longer apply. However, such deferred amounts shall be expended prior to the end of the lease term. For purposes of this Amended and Restated Lease, the term "Debt Covenant" shall mean any covenant of Lessee or Sublessee pursuant to the terms of a Leasehold Mortgage (as hereinafter defined) or a subleasehold mortgage.

(3)    <u>Interest Earned</u>. Any interest earned by Lessee or its Sublessees on CIR amounts held by them as provided in subparagraph 8(C) may be spent for eligible projects in addition to the required CIR expenditures.

(4)    <u>Remaining CIR Amounts</u>. All remaining CIR amounts, if any, including interest, held by Lessee or its Sublessee(s) at the conclusion of the lease term shall be paid to Lessor.

F.    <u>Standard of Care</u>. Nothing set forth in this Section 8 shall limit Lessee's obligation to maintain the Demised Premises, together with improvements and personal property thereon, in accordance with the standards set forth in Section 11 below.

9.    <u>PUBLIC CONSTRUCTION BOND</u>: Lessee shall obtain and deliver to Lessor, a Public Construction Bond in favor of Lessor or alternative form of security which meets the requirements, as applicable, of in Section 255.05, Florida Statutes (1999), as set forth below, not less than ten (10) days prior to the anticipated commencement of construction in the Demised Premises, the actual construction costs of which exceed $200,000 or such other amount as may be established by the Florida Legislature under Section 255.05, Florida Statutes, or any other sections requiring a Public Construction Bond; provided, however, that no matter what minimum limits may be set by the Florida Legislature, a Public Construction Bond or such alternative form of security shall be furnished to Lessor for all projects over $500,000. The form of the Public Construction Bond or

alternative form of security shall be as provided by Section 255.05, Florida Statutes (1999) and shall be in the amount of the construction contract. The County Manager or his or her designee shall have the right of approval of the bond surety, if applicable, which approval shall not be unreasonably withheld, in accordance with then applicable Miami-Dade County criteria prior to the execution and delivery of the Public Construction Bond by Lessee or its Sublessee to Lessor.

As to work performed for less than the secured amount, Lessee and its Sublessees shall indemnify and hold Lessor harmless from all claims of laborers, materialmen, or subcontractors for work performed on the Demised Premises. In the event such a claim is filed, notice, if given to Lessor, shall be given to Lessee and its Sublessee, if any, by Lessor, and Lessee, or its Sublessee, shall have thirty days from the date when the notice of claim is received to discharge the claim in like manner to Section 713.21, Florida Statutes. In the event the claim is not discharged within the thirty day period after such notice, Lessee or its Sublessee shall immediately bond the claim in accordance with Section 255.05, Florida Statutes, subject to all rights and remedies under law to contest such claim and to discharge the claim.

10.    INSURANCE:  Lessee shall maintain throughout the term of this Amended and Restated Lease and furnish to Miami-Dade County, c/o Risk Management Division, 111 N.W. First Street, Suite 2340, Miami, Florida 33128, and Park and Recreation Department, at the address below, Certificate(s) of Insurance, which Lessor shall review and approve, which indicate that insurance coverage has been obtained which meets the requirements as outlined below:

A.    Worker's Compensation Insurance. As required by Chapter 440, Florida Statutes.

B.    Public Liability Insurance.  On a comprehensive basis, in an amount not less than $5,000,000 combined single limit per occurrence for bodily injury and property damage.  Lessor must be shown as an additional insured with respect to this coverage.

C.    Fire and Extended Coverage.  To cover replacement value of property, landscaping, structures, including wind and water damage, vandalism, malicious mischief.

D.    Automobile Liability Insurance.  Covering all owned, non-owned and hired vehicles used in connection with the Amended and Restated Lease in amounts as indicated in Section 10(B) above.

E.    Full Value Replacement Insurance.  Lessee shall provide Full Value Replacement Insurance as provided in Section 21(B)(8) below.

F.    Business Interruption Insurance.  Lessee shall provide Business Interruption Insurance as provided in Section 21(B)(8) below.

G.    Liquor Liability Insurance.  Lessee shall provide Liquor Liability Insurance with the same limits as the required Public Liability Insurance as set forth in Section 10(B) above.

Lessor shall be named on the foregoing insurance policies as A.T.I.M.A., as its interest may appear, provided, however, in no event shall Lessor be required to be designated as a co-payee for payment of insurance proceeds purposes.  The insurance coverage required shall include those classifications as listed in standard liability insurance manuals, which most nearly reflect the operations of Lessee under this Amended and Restated Lease.  All insurance policies and surety bonds required under this Amended and Restated Lease shall be issued by companies authorized to do business under the laws of the State of Florida, with either of the following qualifications as to management and financial strength:

30

The company must be rated no less than "B" as to management, no less than "Class V" as to financial strength, by the latest edition of Best's Insurance Guide, published by A.M. Best Company, Oldwick, New Jersey, or its equivalent, subject to the approval of the County Risk Management Division; companies holding a valid Florida certificate of authority as shown in the latest "List of All Insurance Companies Authorized or Approved to do Business in Florida," issued by the State of Florida Department of Insurance and are members of the Florida Guaranty Fund.

No material change or cancellation of the insurance shall be effective without thirty (30) days prior written notice to the Department.

The County Manager or his or her designee reserves the right to reasonably amend the insurance requirements by the issuance of notice in writing to Lessee and Lessee agrees to obtain such insurance if commercially available. Lessor agrees that Lessee may request in writing adjustments in the coverages required in this Section if such coverages are not commercially available and Lessee shall provide Lessor with documentation supporting such request.

11.  PREMISES TO BE KEPT IN REPAIR: During the term of the Amended and Restated Lease, as the same may be extended, Lessee and its Sublessee(s), as applicable, shall keep the Demised Premises and all improvements and personal property thereon, exclusive of animals, in a first class condition comparable to similar facilities and shall maintain animals in accordance with the Federal Marine Mammal Protection Act and state laws, to the extent applicable, subject to damage or destruction by fire and elements. In the event of such damage or destruction, Lessee or its Sublessee(s), as applicable, shall promptly undertake such repairs, replacement or rebuilding, as the case may require, in order to restore the Demises Premises and improvements and personal property thereon, exclusive of animals, to a first-class condition comparable to similar facilities. All such repair, replacement or rebuilding shall be done at the expense of Lessee or its Sublessee(s), as

31

applicable and Lessee covenants and agrees that Lessee or its Sublessee (a) shall hold the Lessor harmless from liability for any part of said expense.

Notwithstanding other provisions of this Section:

A.     In the event of total or partial destruction of the Demised Premises and improvements thereon, including equipment of every sort, which destruction exceeds fifteen percent (15%) of the full insurable value of any and all improvements to the Demised Premises, including such equipment, within one (1) year of the expiration of the term of this Amended and Restated Lease, or the expiration of any extension hereof, Lessee may elect not to undertake to repair or rebuild said Improvements.  In such event Lessee shall notify Lessor in writing by certified mail, return receipt requested, to the County Manager and the Director of Parks and Recreation, or their respective designees, and all rights, title and interest of Lessee hereunder shall terminate and Lessee shall be relieved of all obligations to pay Rent and to otherwise perform its covenants and obligation under this Amended and Restated Lease, and any extension hereof, thirty (30) days from the date said written notice is received by Lessor.

B.     In the event of total or partial destruction of the Demised Premises and improvements thereon, including equipment of every sort, which destruction exceeds fifty percent (50%) of the full insurable value of any and all improvements to the Demised Premises, including such equipment, within five (5) years of the expiration of the term of this Amended and Restated Lease or any extension hereof, Lessee may elect not to undertake to repair or rebuild said improvements.  In such event Lessee shall notify Lessor in writing by certified mail return receipt requested, to the County Manager and the Director of Parks and Recreation, or their respective designees, and all right, title and interest of  Lessee hereunder shall terminate and Lessee shall be relieved of all obligations to

32

pay Rent and to otherwise perform its covenants and obligation under this Amended and Restated Lease, and any extension hereof, sixty (60) days from the date said written notice is received by Lessor.

     C.    In the event Lessee elects not to repair or rebuild improvements under Section 11(A) or 11(B) above, then any and all Full Value Replacement Insurance Proceeds received by Lessee which are remaining after the leasehold mortgage requirements under section 21(B)(8) below are satisfied, shall be paid to Lessor.

12.    <u>BUSINESS INTERRUPTIONS</u>: In the event of a hurricane or other weather conditions, fire, or act of God, or failure of electric, water and/or sewer services provided to the Demised Premises, which results in the temporary closing of the Demised Premises for exhibition purposes for three (3) or more continuous days, or in the event the Rickenbacker Causeway is closed to non-residential traffic for any reason for three (3) or more continuous days, such event shall be deemed a "Business Interruption" and Lessee shall have the option to extend the term of this Amended and Restated Lease, or any extension thereof, or any time periods herein, for a period equal to the period of the temporary closing of the Demised Premises or the period of said closing of the Rickenbacker Causeway as applicable. Lessee shall be obligated to continue paying Guaranteed Rent for the period of any Business Interruption.

    If Lessee desires to make a claim for an extension of any time periods based upon a Business Interruption, notice of such claim by Lessee shall be given in writing to Lessor by delivery to the County Manager and the Director of Parks and Recreation, or their respective designees, by certified mail, return receipt requested. Notice shall specify the dates of the Business Interruption, the reasons therefor, the number of additional days to which Lessee claims it is entitled and the time periods for

33

which Lessee claims the Amended and Restated Lease should be extended. Unless Lessor, upon resolution by the Board of County Commissioners, objects to the Lessee's proposed extension of this Amended and Restated Lease for Business Interruption at the first available regularly scheduled Commission meeting held after forty-five (45) days of receipt of Lessee's written notice, Lessee shall be entitled to such extension. If Lessor so objects, the sole ground for any such objection by Lessor shall be whether there existed a Business Interruption. Any extensions of the term of this Amended and Restated Lease granted for Business Interruption shall be subject to all of the terms and conditions of the Amended and Restated Lease in effect at that time.

13.    EMINENT DOMAIN:

A.    Total Taking. If, during the term of this Amended and Restated Lease, or any extension hereof, the entire Demised Premises and all improvements thereon shall be taken by the exercise of the power of eminent domain, this Amended and Restated Lease shall terminate on the date of vesting of title in the condemnor under such eminent domain proceedings and all Rent and other sums payable by Lessee hereunder shall be prorated to the date of such vesting, and thereafter Lessee shall be relieved of all obligations to pay further Rent and to otherwise perform its covenants and obligations under this Amended and Restated Lease, and any extension hereof. The apportionment of the damage award as between Lessor and Lessee shall be determined, pursuant to the terms and conditions of this Amended and Restated Lease, by a Florida Court of competent jurisdiction in accordance with Florida law. Any Leasehold Mortgage or other debt or lien on Lessee's leasehold shall be paid out of the award to Lessee and Lessor shall have no liability therefor as Lessor, although it shall retain any liability it may have as condemning authority. In the event this Amended and Restated Lease, or any extension hereof, is terminated pursuant to this Section,

34

Lessee shall notify Lessor in writing, certified mail, return receipt requested, to the County Manager and the Director of Parks and Recreation or their respective designees no later than the day of vesting of title in condemnor.

B.    Partial Taking.    If, during the term of this Amended and Restated Lease, or any extension hereof, less than the entire Demised Premises and/or the Adjacent Property, together with the improvements thereon, shall be taken by the exercise of the power of eminent domain and, in Lessee's opinion, which shall be exercised reasonably under the circumstances, the portion of the Demised Premises and the Adjacent Property remaining does not permit Lessee to reasonably use and occupy the Demised Premises for the conduct of its ordinary business, or permit the Sublessees to reasonably use and occupy their respective portion of the Demised Premises for the conduct of their ordinary business, this Amended and Restated Lease, and any extension hereof, at Lessee's option, exercised in accordance with the above standard, and all the rights, title and interest of Lessee hereunder, shall terminate on the date six (6) months after the date upon which Lessee provides Lessor with written notification, as provided below, of its election to terminate this Amended and Restated Lease, and, thereafter, Lessee shall be relieved of all obligations under this Amended and Restated lease, and any extension hereof.  In such event, the taking shall be treated as if it were a total taking of the entire Demised Premises and improvements for the provisions of this Amended and Restated Lease and the provisions of subparagraph 13(A) above shall govern as to Rent and the apportionment between Lessor and Lessee of the eminent domain award.  If, in Lessee's reasonable opinion, it is economically feasible to continue to operate the remaining portion of the Demised Premises for the conduct of Lessee's and the Sublessees' ordinary business, this Amended and Restated Lease, and any extension hereof, shall not terminate but shall continue in full force and

35

effect for the remainder of its duration subject to the provisions hereof; provided, however, the Rent and other related terms of this Amended and Restated Lease, and any extension hereof, shall be equitably adjusted from the date possession is taken from Lessee. The apportionment of the damage award as between Lessor and Lessee shall be determined, pursuant to the terms and conditions of this Lease, by a Florida court of competent jurisdiction in accordance with Florida law. Any Leasehold Mortgage or other debt or lien on Lessee's leasehold, if any is permitted, shall be paid out of the award to Lessee and Lessor shall have no liability therefor as Lessor although it shall retain any liability it may have as the condemning authority. In the event Lessee elects to terminate this Amended and Restated Lease or any extension hereof, pursuant to this Section, Lessee shall notify Lessor in writing, certified mail, return receipt requested, to the County Manager and the Director of Parks and Recreation or their respective designees no later than the day of vesting of title in condemnor. Nothing in this Section shall be used by either Lessor or Lessee to establish the nature of a taking in an eminent domain proceeding.

C.    Temporary Taking. In the event of a taking of any portion of the Demised Premises, and the improvements thereon, for a period less than the remaining term of this Amended and Restated Lease or any extension hereof, this Amended and Restated Lease and any extension hereof shall continue and Rent thereafter due and payable shall not be reduced or abated and, except only to the extent that Lessee may be prevented from doing so pursuant to the terms of the order of the condemning authority, Lessee shall continue to perform and observe all of the other terms, covenants and conditions of this Amended and Restated Lease. Lessee, however, shall be entitled to receive the entire amount of any proceeds with respect to such temporary taking, whether paid by way of damages, rent adjustment, in the event the Lessor is the condemning authority, or otherwise, unless

36

such period of temporary taking shall extend beyond the term of this Amended and Restated Lease, or any extension hereof in which case such proceeds shall be apportioned between Lessor and Lessee as of the expiration date of this Amended and Restated Lease, or any extension hereof. Lessee covenants that, upon the termination of any such temporary taking, if this Amended and Restated Lease, and any extension, hereof, shall not have expired or otherwise terminated, it will restore and replace all improvements on the Demised Premises to the extent possible, to their utility and value as existed immediately prior to such taking. All such expenditures shall not be included as Capital Improvement Expenditures vesting Lessee with entitlement to lease extensions and CIR Permissible Expenditures credited towards satisfying the CIR except to the extent that such expenditures provide improvements beyond restoration and replacements, in which case the expenditures shall be included for both purposes in the event of any temporary taking, Lessee shall have the option to extend the running of the term of this Amended and Restated Lease, or any extension hereof, for a period equal to the period of said temporary taking. Lessee shall notify Lessor of its election to exercise any such option in the same manner as provided for in that certain Section entitled "BUSINESS INTERRUPTIONS".

In the event of a taking of the Adjacent Property or portion thereof for a period less than the remaining term of this Amended and Restated Lease or any extension hereof, Lessor agrees to provide Lessee with alternate parking with an equivalent number of parking spaces and located within a reasonable distance from the Demised Premises for the period of such temporary taking.

D.    Notice.    Lessor shall immediately notify Lessee in writing of any condemnation notice or proceeding which affects the Demised Premises.

37

14.    INDEMNIFICATION BY LESSEE OF LESSOR: Lessee agrees to indemnify and save the Lessor harmless from any and all claims, liability, losses and causes of action which may arise out of this Amended and Restated Lease, unless arising from the direct negligence of Lessor, its employees, officers and/or agents. Lessee shall pay all claims and losses of any nature whatsoever in connection therewith, and shall defend all suits, in the name of Lessor where applicable, and shall pay all judgments and costs which may issue thereon. Lessor and Lessee both conclude that this Amended and Restated Lease is consistent with the terms and conditions of all applicable deeds of conveyance and applicable governing laws pertaining to the Demised Premises and Lessor and Lessee agree that neither shall have a cause of action against the other in the event that a court of final jurisdiction shall determine to the contrary. Moreover, Lessee agrees to hold Lessor harmless, and to indemnify Lessor for all damages, reasonable attorney fees and appropriate costs, which are incurred by Lessor in the event that any legal action is brought against Lessor claiming a reversion of interest of the Demised Premises because of the adoption of this Amended and Restated Lease, or as the result of Lessee undertaking Capital Improvements under this Amended and Restated Lease prior to the Effective Date, or incurred by Lessor in the event that any legal action is brought based on a lease extension due to a Business Interruption.

15.    LIABILITY FOR DAMAGE OR INJURY: Lessor shall not be liable for damage or injury which may be sustained by any party, person or property on the Demised Premises other than damage or injury arising from the direct negligence of Lessor, its employees, officers and/or agents.

16.    DEFAULT:

A.    General Provisions. In the event Lessee should violate any of the covenants or conditions of this Amended and Restated Lease, Lessor shall notify Lessee in writing of said

38

violations and Lessee shall have forty-five (45) days from receipt of such notice to remedy said violations. In the event any monetary defaults are not remedied within forty-five (45) days from receipt of such notice, Lessee shall pay to Lessor a penalty charge of one and one half percent (1-1/2%) per month of any principal amount that remains outstanding. If at the end of forty-five (45) days there exist no monetary defaults and Lessee shall be actively engaged in steps to remedy the non-monetary default, Lessee shall be afforded such additional time as is reasonably necessary to remedy said violation.

      B.    <u>Provisions Applicable if Leasehold Mortgage in Place</u>. If the Demised Premises, or any portion thereof is subject to a leasehold mortgage, the additional provisions of Section 21 below shall also apply.

      C.    <u>Provisions Applicable If No Leasehold Mortgage in Place</u>.

        In the event the Demised Premises, or any portion thereof, is not subject to a leasehold mortgage, and any violation of the covenants and conditions of this Amended and Restated Lease is not remedied within the cure periods set forth in Section 16(A) above, then, the date upon which this Amended and Restated Lease shall terminate shall be set by Lessor, or, in the alternative, other remedial steps shall be determined. In the event the Demised Promises, or any portion thereof, is not subject to a leasehold mortgage and Lessee becomes insolvent, makes a general assignment for the benefit of creditors or Lessee should voluntarily file a Petition in Bankruptcy or for Reorganization or an Order granting a Petition in Bankruptcy or for Reorganization should be granted against it, then in any such event this Amended and Restated Lease shall be immediately terminated at the sole option of the Lessor, if such termination is available under prevailing law, and

Lessor shall have the right to retake possession of the Demised Premises together with all improvements, personal property and animals thereon.

17.    CONCESSIONS: Lessee shall have the right to enter into Concession(s) (as hereinafter defined) with respect to the Demised Premises and improvements thereon with third person(s).  For purposes of this Amended and Restated Lease, the term "Concession(s)" shall mean any occupancy agreement(s) or agreement(s) with respect to any legal activities, in each case with respect to any portion of the Demised Premises and improvements thereon, except for Subleases (as hereinafter defined).  Notice of Lessee's intention to enter into any Concession(s) shall be given in writing to the Lessor by delivery to the County Manager and the Director of Parks and Recreation, or their respective designees, at least forty-five (45) days prior to the proposed initiation of operation of said Concession, together with copies of all written contracts proposed to be executed therefor.  Each written notice shall be delivered by certified mail, return receipt requested and Lessee agrees to use its best efforts to otherwise insure that the County Manager and the Director of Parks and Recreation are notified of Lessee's intention to enter into a Concession.  Unless the County Manager or his or her designee objects to the proposed Concession in writing within forty-five (45) days after its receipt of said notice, setting forth the basis for such objection, Lessee shall be permitted to enter into the Concession.  The sole grounds for any such objection by the County Manager or his or her designee shall be whether the proposed Concession is contrary to the best interest of Lessor, is a substantial departure from existing use as a family oriented tourist attraction or would cause any noncompliance with laws, rules, regulations or ordinances of any federal, state, regional, county or local governmental units.  Otherwise, the proposed Concession shall be approved.  Said approval shall not be unreasonably withheld.  Notwithstanding the foregoing, in the event Lessor and Lessee

40

agree on a standard form concession agreement, thereafter Lessor shall have a thirty (30) day review period, rather than a forty-five (45) day review period, under this section.

18.    SUBLEASES:

A.    Definition. For purposes of this Amended and Restated Lease, the term "Sublease" shall mean the subleases, if any, for a term longer than two years of an area of the Demised Premises greater than 20,000 square feet. Notwithstanding the foregoing, a Sublease, if any, shall be subject to the restrictions set forth in subparagraph 6(B)(4) above and any Sublease of any exhibit featuring live marine mammals ("Marine Mammal Exhibits") must be with a competent, experienced operator, comparable to Lessee, as Sublessee.

B.    Lessee shall provide Lessor with forty-five (45) days prior written notice of its intention to enter into a Sublease. Each written notice shall be delivered by certified mail, return receipt requested, to the County Manager and the Director of Parks and Recreation, or their respective designees, and shall be accompanied by a copy of the Sublease. Lessee agrees to use its best efforts to otherwise insure that the County Manager and the Director of Parks and Recreation are notified of Lessee's intention to enter into a Sublease. The County Manager shall, within forty-five (45) days of receipt of Lessee's written notice of entering into a Sublease, place the question of Lessee's intention to sublet upon the agenda of the next available regularly scheduled meeting of the Board of County Commissioners together with his recommendations in regard thereto. Unless Lessor, upon resolution by the Board of County Commissioners, objects to Lessee's proposed Sublease at the meeting described above, Lessee shall be entitled to enter into the Sublease. If Lessor so objects, the sole grounds for any such objection by Lessor shall be whether the proposed Sublease is contrary to the best interest of Lessor, is a substantial departure from existing use as a

41

family oriented tourist attraction, would cause any noncompliance with laws, rules, regulations or ordinances of any federal, state, regional, county or local governmental units, or contains provisions not strictly consistent with applicable provisions of this Amended and Restated Lease, and such approval shall not be unreasonably withheld. Notwithstanding the foregoing, Lessor shall be permitted to require that the Sublease contain subleasehold mortgage provisions consistent with the subleasehold mortgage provisions set forth in Section 18(C) below.

    C.    <u>Subleasehold Mortgages</u>. Lessor agrees that Sublessees shall have the right to mortgage their respective subleasehold estates provided that the following conditions are met:

    (1)    Sublessee(s) shall have the right at any time and from time to time to encumber their respective subleasehold estates as permitted by this Amended and Restated Lease, and any extension hereof, together with any and all improvements located thereon, to a financial institution, insurance company, pension or retirement or welfare trust, or funds supervised by a governmental authority. Such encumbrance may be by mortgage, deed of trust or other security interests, including, but not limited to, assignment of rents, issues and profits from the subleasehold estate subordinate to Lessor's and Lessee's rights. Lessee agrees to cause any Sublessee(s) to provide the County Manager or his or her designee with true copies of note (s) and subleasehold mortgage(s) ("Subleasehold Mortgage Documents") at least thirty (30) days prior to the closing of any subleasehold financing for Lessor's review and approval. Unless the County Manager or his or her designee objects in writing to the Subleasehold Mortgage Documents within the thirty (30) day

review period, Sublessee shall be entitled to enter into the Subleasehold Mortgage Documents. If Lessor so objects, the sole grounds for any objection shall be if the documents do not contain provisions which meet the requirements for the protection of Lessor as set forth in Section 21 below to the extent applicable. Lessee shall provide to Lessor true copies of the Subleasehold Mortgage Documents within ten (10) days of closing of such instruments. Lessor shall have forty-five (45) days thereafter to review such documents in order to make a determinations to whether they differ from those which were approved or deemed to be approved pursuant to this Section as to any required terms as forth above. In the event Lessor provides Lessee with written notice of its determination that the documents are different with respect to such required terms within the forty-five (45) day review period, then Lessor's approval to that Sublease pursuant to Section 18(B) above, at Lessor's election, shall be deemed withdrawn until the Subleasehold Mortgage Documents are brought into compliance with this Section 18(C).

19.    AFFILIATED BUSINESSES: Lessee may engage in advertising and promotional activities which benefit Affiliated Businesses (as hereinafter defined) of Lessee so long as the Miami-Dade County Manager or his or her designee determines in his sole discretion that any such activities or promotional events, together with any terms applicable thereto, will likely increase attendance and Rent to Lessor. For purposes of this Amended and Restated Lease, an Affiliated Business shall mean any wholly owned or partially owned subsidiary or parent of Lessee or of Wometco

Enterprises, Inc., or any business having more than five (5%) percent common stock ownership by owners of more than five (5%) percent of the common stock of Lessee or of Wometco Enterprises, Inc., or having any common officers or directors with Lessee or Wometco Enterprises, Inc.

20.    ADMISSION & CONCESSION CHARGES: Lessee and its Sublessee(s) and Concessionaires shall have the right to make charges for admission to and for use of the Master Plan Components, for various items offered for sale by Lessee, Sublessee(s) or Concessionaires upon the Demised Premises, for parking upon the Demised Premises and the Adjacent Property, subject to the provisions of Section 24 below with respect to the Adjacent Property only, or for other items relating to the facility. The amount to be charged by Lessee or its Sublessee(s) or concessionaire (a) shall be determined by Lessee, its Sublessee(s) or Concessionaire(s), as applicable, and Lessee and its Sublessee(s) and Concessionaires also say offer discounted admissions and promotions to the public, subject to the provisions of Section 19 above.

21.    LEASEHOLD MORTGAGES:

A.    Permitted Financing. Lessee shall have the right at any time and from time to time to encumber its leasehold estate created by this Amended and Restated Lease, or any extension hereof, together with any or all improvements located on the portions of the leasehold mortgaged, to a financial institution, insurance company, pension or retirement or welfare trust, or a fund supervised by a governmental authority (the "Lender"). Such encumbrance may be by mortgage, deed of trust or other security interest, including, but not limited to, an assignment of rents, issues and profits from the leasehold estate subordinate to Lessor's rights (collectively, the "Leasehold Mortgage(s))" Lessee shall provide to Lessor true copies of note(s) and Leasehold Mortgage(s) within ten (10) days of closing of such instruments and shall include therewith the addresses to

44

which all notices to Lender hereunder are to be forwarded. The Leasehold Mortgage permitted and defined in this Section shall be limited to securing of financing and refinancing of Capital Improvements constructed by or for Lessee on the Demised Premises ("Financing of Improvements"). With respect to Financing of Improvements, the amount of financing shall not exceed the costs of the Capital Improvements. Lessee may not encumber the leasehold estate as security for any other indebtedness.

The Leasehold Mortgage and all rights acquired thereunder shall be subject to each and all of the provisions of this Amended and Restated Lease and to all rights of Lessor except as otherwise provided herein.

B.    Leasehold Mortgage Requirements.

(1)    Notice by Lender. Lessor and Lessee agree that any Leasehold Mortgage shall require that Lender shall provide concurrently to Lessor all notices which are sent to Lessee.

(2)    Notice by Lessor. Lessor agrees that Lessor shall provide concurrently to Lender all notices sent to Lessee, at Lender's last address as furnished to Lessor by Lessee or Lender.

(3)    No Lease Termination Without Consent of Lender. Lessor and Lessee agree that they will not mutually terminate the Amended and Restated Lease, and Lessor will not accept a surrender of the Amended and Restated Lease from Lessee, without the prior written consent of Lender. If such consent is not received from Lender within sixty (60) days after notice of intent to terminate is received by Lender, then such consent shall be deemed granted. If Lender does not consent to such termination, then Lender shall commence to cure as provided in subparagraph (4) hereof. Nothing in this subparagraph (3) shall impair Lessor's right to terminate the Amended and Restated Lease in accordance with the provisions of subparagraph (4) below in the event of a Default and the failure or refusal of Lender to comply with the provisions of subparagraph (4).

(4)    Opportunity of Lender to Cure Defaults Prior to Termination of Lease. Lessor may not terminate the Amended and Restated Lease in the event of

45

default without giving Lender written notice (the "Notice of Intent to Terminate") and allowing Lender, at its election, to cure defaults, which election by Lender must be made within sixty (60) days of the date of the Notice of Intent to Terminate. In the event Lender elects to cure, Lender shall be responsible for curing all monetary defaults upon expiration of such 60-day period and shall further be required to continue or to cause to be continued at all times (including during the 60-day period) operation and maintenance of the Demised Premises and improvements thereon (the "Project'") for the purposes set forth in this Amended and Restated Lease. If foreclosure is required to cure the default and Lender is prohibited by any processor injunction issued by any court or by reason of any action by any court having jurisdiction of any bankruptcy or insolvency proceedings involving Lessee from commencing or prosecuting foreclosure proceedings, the Amended and Restated Lease will not be terminated by Lessor provided that Lender has commenced and is diligently pursuing foreclosure, all rental payments are current and the Demised Premises are continuously operated and maintained for the purposes set forth in this Amended and Restated Lease, provided that, in the event of any bankruptcy or insolvency proceedings involving Lessee, Lender's obligation to enter into an Acceptable Operator's Agreement (as hereinafter defined) or to assign the Amended and Restated Lease to an Acceptable operator (as hereinafter defined) shall be extended. Within nine (9) months of the date of the Notice of Intent to Terminate, Lender shall enter into an agreement (the "Acceptable Operator's Agreement") for operation of the Project with an operator reasonably acceptable to the Lessor (the "Acceptable Operator") or shall assign the Amended and Restated Lease to an Acceptable Operator, provided that, if Lender is unable (despite diligent efforts) on or before expiration of the aforementioned 9-month period to engage and enter into an Acceptable Operators Agreement for the Project or it becomes unlawful to operate the Project for the purposes set forth in this Amended and Restated Lease then Lender shall have the option to (i) relinquish all rights in connection with the Project, or (ii) after compliance with the provisions of the immediately succeeding sentences, discontinue the use of the Project for the purposes set forth in this Amended and Restated Lease and to operate the Demised Premises under an alternative public use. Any proposed alternate use must be in accordance with all deed restrictions relating to the Demised Premises. The Board of County Commissioners must find that any proposed alternative use serves a public purpose. Any proposed alternate use must be in compliance with all applicable federal, state, regional, county and local laws, statutes, ordinances, regulations and procedures, including, but not limited to, zoning, environmental, land use, public bidding and municipal law (collectively, the "Regulations"), provided, however, that the execution of this Amended and Restated Lease is not intended to predetermine such use

46

in any manner or to bind the Board of County Commissioners or any County agency to grant or approve any specific use or zoning change. Notwithstanding any other language in this Amended and Restated Lease or in any amendment, modification or extension hereto, Lessor may, in its sole discretion, approve or reject any proposed alternate use whether or not the proposed alternate use conforms to the Regulations, and to all other requirements of this subparagraph (4)g, but such discretion shall not be exercised in an unreasonable arbitrary or capricious manner so as to result in a taking of property under the federal or State of Florida constitutions. Before any proposed alternate use can be approved, all necessary public hearings required under any Regulations must have been held. By agreeing to consider any proposed alternate use, Lessor is not agreeing to be predisposed to that use. No default shall be deemed to exist so long as Lender is complying with the provisions of this subparagraph (4). If Lender fails to comply with any of the requirements of this subparagraph (4) during the 60-day period set forth above, the Amended and Restated Lease will terminate upon expiration of any applicable cure periods provided to Lessee in Section 16 upon five (5) days written notice to Lender, and Lender shall have no further opportunity to cure any default hereunder.

(5)     No Liability of Lender. Lender or its assignee(s) shall have the right, but not the obligation, to cure defaults. Lender and its assignee(s) shall have no personal liability with respect to the performance of Lessee's obligations under the Amended and Restated Lease, it being understood that the sole recourse of Lessor shall be limited to Lender's or its assignee(s) interest in the Demised Premises, and Lender may at any time notify Lessor in writing that it relinquishes all rights in the Project and shall thereafter have no liability with respect to the Amended and Restated Lease.

(6)     Foreclosure Due to Leasehold Mortgage Default. If any foreclosure by Tender in due solely to a default under the Leasehold Mortgage (and not to a default under the Amended and Restated Lease), the 9-month period described in subparagraph (4) above shall be replaced by a 3-month period which shall be deemed to commence upon final judgment in such foreclosure proceedings, and Lender may transfer or assign Lessee's interest under the Amended and Restated Lease subject to the consent of Lessor to such assignment or transfer, which consent by Lessor shall not be unreasonably withheld or delayed. No such foreclosure or sale shall constitute a breach of the Amended and Restated Lease.

(7)     During Construction. In the event of default during construction of Capital Improvements, the incomplete Capital Improvements shall, at Lender's or Lessor's option as hereinafter provided, be completed or demolished using

47

Public Construction Bond funds either (i) at the option of Lender in the event it is complying with the provisions of subparagraph (4) above, or (ii) in the event Lender does not exercise its rights within the 60-day period provided in subparagraph (4) above or relinquishes its rights thereunder, at the option of Lessor.

(8)     Insurance.  Lessee shall be required to obtain and maintain, or cause its Sublessees to obtain and maintain, as applicable, (i) full value replacement insurance (which shall include coverage for demolition and razing of the Demised Premises) with an automatic escalator index, and (ii) business interruption insurance covering debt service, rental obligations for a 12-month period and the cost of maintenance of the Project.  Lessor shall be an additional named insured as its interests may appear.  Subject to the provisions of Section 11, in the event of a casualty loss to the Project, insurance proceeds will be disbursed to Lessee or, if Lender is in possession, to Lender, for reconstruction.  Such reconstruction shall commence as soon as practicable, but in any event within six (6) months after insurance proceeds are available in accordance with Section 11, provided that, if it is impracticable to commence reconstruction within such 6-month period, Lessee shall request in writing the consent of Lessor to a reasonable extension of such six (6) month deadline, which consent shall not be unreasonably withheld.  In the event casualty proceeds are insufficient to reconstruct the Project, Lessee shall be required to pay any shortfall, provided that, if Lessee is unable or shall fail to pay any such shortfall, then Lessor shall give written notice thereof to Lender.  Lender shall have the right, but not the obligation, to fund such shortfall within sixty (60) days of the date of such notice.  If such shortfall is not funded within such 60-day period, then Lessor may terminate the Amended and Restated Lease.  In the event of a termination for failure to fund the shortfall, Lessee shall be required to return to Lessor the Demised Premises in a condition which is either "as is" as of the date of such casualty loss or razed of all Capital Improvements at the option of Lessor.  The balance of the insurance proceeds shall, in the event of such termination or election not to reconstruct, be disbursed to Lender to the extent of any outstanding amounts due Lender by Lessee under the Leasehold Mortgage documents.

(9)     Bankruptcy.  If the Amended and Restated Lease is rejected in bankruptcy proceedings, Lender may request and, provided Lender is complying with the provisions of subparagraph (4) above, Lessor shall execute a new lease with Lender or an Acceptable Operator for the balance of the term (and any extension thereof) and on the same terms and conditions.

48

(10)   Cure by Lessee of Defaults. In the event of a default by Lessee and/or the institution of foreclosure proceedings and if Lender is complying with the provisions of subparagraph (4) above or the 60-day period thereunder has not yet expired, if Lessee nonetheless is able, prior to termination of the Amended and Restated Lease and/or conclusion of the foreclosure proceedings, to cure all defaults and to make Lessor and Lender whole, then Lessee shall be entitled to repossession and to any excess profits earned by Lender during such default or foreclosure period.

(11)   Notices of Default and Sale Under Leasehold Mortgage. On the recording of the Leasehold Mortgage, Lessee shall, at its expense, cause to be recorded, in the office of the Clerk of the Circuit Court of Miami-Dade County, the official records custodian of Miami-Dade County, a written request executed and acknowledged by Lessee for a copy of all notices of default and all notices of sale under the Leasehold Mortgage to be sent by Lender to Lessor. Inclusion in the body of the recorded Leasehold Mortgage itself of a requirement for notice by Lender to Lessor having the effect described above as to notices of default and sale shall constitute compliance with this provision.

(12)   Amendments. Lessor acknowledges Lessee's right to propose future conforming amendments to the Amended and Restated Lease if reasonably necessary to implement the intent of this Section, provided that no such amendments will relate to the term of the Amended and Restated Lease or seek to limit or decrease materially Lessor's rights.

(13)   Lender Becoming Lessee Under Lease. In the event Lender (or any permitted assignee) becomes Lessee under the Amended and Restated Lease, Lender (or any permitted assignee) shall have the right to exercise all options and other rights provided to Lessee, under the Amended and Restated Lease (and/or provided to Lender with respect to any permitted assignee), including, without limitation, the renewal options set forth in the Amended and Restated Lease.

C.   Acknowledgment by Lender. The Leasehold Mortgage documents shall contain an acknowledgment by Lender of the provisions of Section 7(B) above.

22.   ASSIGNMENTS: Subject to the provisions of Section 6 (B) (4) and Section 21 above, Lessee shall have the right to assign this Amended and Restated Lease, or any part thereof or to sell its rights pursuant to this Amended and Restated Lease, or any extension hereof, or any modification

or amendment hereto. In the event Lessee intends to exercise its rights pursuant to this Section, Lessee shall notify Lessor in writing at least forty-five (45) days prior to the date such assignment or sale is to be effective of its intention to so assign or sell by notice to the County Manager and the Director of Parks and Recreation, or their respective designees. Each written notice shall be delivered by certified mail, return receipt requested, and Lessee agrees to use its best of efforts to otherwise insure that the County Manager and the Director of Parks and Recreation are notified of any intent of Lessee to exercise its rights pursuant to this Section. With respect to such an assignment or sale, the County Manager shall, within forty-five (45) days of receipt of Lessee's written notice, place the question of approval of Lessee's said assignment or sale upon the agenda of the next available regularly scheduled meeting of the Board of County Commissioners, together with his recommendations in regard thereto. Unless Lessor, upon resolution of the Board of County Commissioners, at the meeting described above, objects to said assignment or sale, Lessees may proceed with such assignment or sale. If Lessor so objects, the sole ground for any such objection by Lessor, shall be whether such assignment or sale by Lessee will be contrary to the best interests of Lessor, and in the case of the Marine Mammal Exhibits and Aquarium Exhibits only, whether the sale or assignment is to a competent, experienced operator comparable to Lessee, and said approval shall not be unreasonably withheld.

In the event Lessee sells or assigns all of its rights pursuant to this Amended and Restated Lease, Lessee shall be relieved of all obligations to pay Rent and to otherwise perform its covenants and obligations under this Amended and Restated Lease and Lessor shall be entitled to a participation in any Net Book Profit realized by Lessee as provided in Section 23 below. For purposes of this Amended and Restated Lease, Net Book Profit shall be calculated according to

50

Generally Accepted Accounting Principles. In such event, the entity to which Lessee's rights are sold or assigned shall assume all obligations and rights of Lessee pursuant to this Amended and Restated Lease. In the event Lessee sells or assigns less than all of its rights pursuant to the Amended and Restated Lease, Lessee shall continue to be subject to all obligations of the Amended and Restated Lease.

23.    PARTICIPATION ON SALE OR ASSIGNMENT OF LEASE:

A.    In the event Lessee shall sell or assign all or a portion of its rights pursuant to this Amended and Restated Lease, or any extension or modification thereof Lessee shall pay to Lessor eight percent (8%) of any Net Book Profit realized by Lessee pursuant to the sale of that portion of its rights under this Amended and Restated Lease.

Moreover, if any stock of Lessee is sold, assigned or transferred by its parent corporation, Wometco Enterprises, Inc. ("Wometco"), (other than for an Initial Public Offering for the purpose of reductions in debt or construction of Capital Improvements), then Lessee shall also pay to Lessor eight percent (8 %) of any Net Book Profit realized by Wometco which is reasonably attributable to such sale, assignment or transfer.

B.    In no event shall the amount paid to Lessor exceed One Million Dollars ($1,000,000) during Lease Years one (1) through ten (10); One Million Two Hundred Fifty Thousand Dollars ($1,250,000) during Lease Years eleven (11) through twenty (20), and One Million Five Hundred Thousand Dollars ($1,500,000) in all succeeding Lease Years.

24.    CAUSEWAY CROSSING, PUBLIC PARKING AND LESSOR CONTRIBUTION:

A.    Lessor shall pay the cost of constructing the following projects up to a total of Three Million Dollars ($3,000,000): (i) those traffic related improvements within the public right-of-way

51

of Rickenbacker Causeway in accordance with the conditions of the Chapter 380 Development issued on July 25, 1991; (ii) the relocation, if necessary, of the public Works maintenance facility located across the Rickenbacker Causeway from the Demised Premises; and (iii) a low frequency radio station to be used for traffic management and information purposes on Rickenbacker Causeway and Key Biscayne.

B.    Lessee shall provide at its own expense a parking lot or lots, for the parking of automobiles, on the Demised Premises.

C.    Lessee shall pay the cost of constructing a public parking facility, if required, on the Adjacent Property as set forth in Section (2) (A) above. The construction of the public parking facility on the Adjacent Property by Lessee shall be in accordance with, but need not exceed, applicable Miami-Dade County Code requirements, except that Lessor and Lessee shall mutually agree as to the quality of landscaping to be planted adjacent to the Rickenbacker Causeway which shall be in excess of minimum requirements and once constructed, the Adjacent Property shall not be used for other purposes or conveyed or leased by Lessor to other parties during the term of the Amended and Restated Lease, or any extension hereof, so long as Lessee continues to operate a public parking facility thereon. Within sixty (60) days prior to the beginning of Lessee's Fiscal Year, Lessee shall submit in writing to the Miami-Dade County Manager or his or her designee a schedule of recommended parking fees, if any, for the parking facility on the Adjacent Property. The County Manager or his or her designee shall respond within fifteen (15) days of receipt thereof with approval or with an alternative schedule of parking rates. Notwithstanding the foregoing, in no event shall the designated parking rate schedule be such that any financial contribution by Lessee is required in order to operate and maintain the parking facility on the Adjacent Property or in order for Lessee

52

to maintain the debt service and operational costs thereon, unless Lessee agrees, in writing, at its sole discretion, to operate and maintain the parking facility on the Adjacent Property at a deficit. The parking rates shall be implemented by Lessee commencing on either the first day of the subject Fiscal Year or on an alternative date selected by mutual agreement between Lessor and Lessee, or as soon as practicable thereafter.

D.    In the event it becomes necessary for Lessor and Lessee to amend the schedule of parking rates in order for Lessee to be able to operate and maintain the parking facility on the Adjacent Property and to cover all operational costs and debt service with respect thereto without any financial contribution by Lessee, then Lessee may submit in writing an amended schedule of recommended parking fees for the parking facility on the Adjacent Property. The County Manager or his or her designee shall respond in accordance with and subject to the provisions of subparagraph 24(C) above. The amended parking rates shall be implemented by Lessee commencing on the date the County Manager or his or her designee responds to the proposed amended parking rate schedule.

25.    NO AQUARIUM COMPETITION ON COUNTY PROPERTY:

A.    Definition of Aquarium. For purposes of this Amended and Restated Lease the term "Aquarium," shall mean a container of any size or type which incorporates a clear viewing area for the exhibition of different species of fish, marine mammals, and other water born animals to the public ponds, lakes, rivers and other comparable bodies of water shall not be deemed Aquariums for purposes of this Amended and Restated Lease.

B.    Prohibitions. Lessor agrees that it is prohibited from displaying any exhibition in the nature of an Aquarium or from allowing the display of any exhibition in the nature of an Aquarium

53

on any county Property during the term of this Amended and Restated Lease, or any extension hereof, which utilizes any animals displayed at the Seaquarium, which animals are more particularly described in Exhibit "10" attached hereto and made a part hereof, or animals comparable to those animals described in Exhibit "10" (collectively, the "Seaquarium Animals"). Notwithstanding the foregoing, Lessee agrees that Lessor shall be permitted to display at Metrozoo exhibits of water born animals, exclusive of marine mammals and the Seaquarium Animals, provided that such water born animals do not perform in shows.

  C. <u>Donor Exception</u>. With respect to marine mammals to be displayed at Metrozoo, in the event that there is a prospective donor of a marine mammal(s) and either (a) Lessee does not qualify for such marine mammal(s) based on qualifications set by the donor independently of Lessor or (b) Lessee does not elect to pursue the acquisition of said marine mammal(s) within forty-five (45) days of receiving written notice of the opportunity of same, then Lessor shall be permitted to exhibit that marine mammal at Metrozoo, in an Aquarium or otherwise, subject to the above prohibition on performance in shows.

26. <u>BOOKS OF LESSEE AND REPORTS</u>: The books of Lessee and Sublessees shall be open at all times during normal business hours for the inspection of Lessor by its County Manager or his or her designee subject to the prior knowledge, consent and directive of the Board of County Commissioners. Lessee will provide Lessor annually, within seventy-five (75) days of the end of Lessee's Fiscal Year, with an independent CPA's report on all Gross Revenue(s) received under the Amended and Restated Lease whether by Lessee or Affiliated Businesses, gross revenues of Sublessees Sublet Rent and of all Capital Improvement Expenditures and CIR Permissible Expenditures made pursuant to this Amended and Restated Lease, whether by Lessee or

Sublessee(s). Lessee will also provide Lessor with unaudited monthly statements, certified by an officer of Lessee and prepared in accordance with GAAP, of Gross Revenue(s) received under this Amended and Restated Lease and Sublet Rent. Notwithstanding the foregoing provisions, Sublet Rent shall not be included in Lessee's annual or monthly reports, as described above, until the eleventh Lease Year of this Amended and Restated Lease following the Effective Date.

27.    MISCELLANEOUS PROVISIONS:

A.    Maintenance and Extension of Intake Pipes. Lessee may replace, maintain, or extend, intake pipes located in Biscayne Bay, in order to provide for the health and welfare of the animals at the Seaquarium, subject to receiving all required federal, state, regional, county and local permits for such work. All such work shall be undertaken in compliance with applicable federal, state, regional, county and local rules, regulations, ordinances and statutes.

B.    Water Ski Shows. Lessee shall be permitted to include part of the entertainment offered at the Seaquarium water ski shows, subject to receiving all federal, state, regional, county and local permits, where applicable. All such water ski shows shall be undertaken in compliance with applicable federal, state, regional, county and local rules, regulations, ordinances and statutes.

C.    Utility Easements. Lessor may approve corridors within the Seaquarium for utility purposes and grant easements to public utility companies within the corridors as needed by Lessee for the operation of the Demised Premises. Requests for such approvals shall be submitted for approval by resolution of the Board of County Commissioners in accordance with applicable Miami-Dade County requirements.

D.    Replacement of Causeway Entrance Feature. Lessee will have the right, subject to governmental approvals, if any, to replace the existing causeway entrance feature adjacent to the toll

booth with one of comparable size, height, cubic content and function. Such expense shall be considered a Capital Improvement.

E.     Advertising on Causeway Toll Arms. Lessee will have the right to advertise Seaquarium Village functions and events a minimum of four (4) times a year for the week preceding the event or function on the Causeway toll gate arms located at the causeway entrance. Any conflict as to use of toll gate, arms shall be resolved on a first come, first serve basis, after recognizing the priority of County sponsored events, by the Public Works Director. All advertising on the toll gate arms is subject to the approval of the Public Works Director as to design and safety.

F.     Metrobus. The county will develop a proposal for a Metrobus to transfer visitors to and from the Seaquarium to Metrorail on weekends and holidays. The hours of operation sources of funding and a list of specific holidays and the design features of the bus, shall be mutually agreed by Lessee and the County Manager or his or her designee.

G.     Police, Fire and Emergency Services. Lessor, if it is the responding agency, shall provide police, fire and emergency services to Lessee in a manner equal to that offered to service users on Key Biscayne. In the event that a municipal incorporation occurs for any or all of Key Biscayne, Lessor shall make provisions to provide such services to Lessee at a level equal to the services provided prior to the incorporation, if it is the responding agency.

H.     Boulder Zone Water. Lessee may request permits from all federal, state, regional, county and local agencies, where applicable, to obtain, use and discharge chilled water from the boulder zone under or nearby the Demised Premises as a means to reduce energy consumption.

I.     Impact Fees. Any impact fees, monetary contributions, donations or improvements to public facilities or services paid or made by Lessee pursuant to Miami-Dade County ordinance

or as a result of conditions of the DRI or FQD shall be regarded as expenditures for Capital Improvements for purposes of lease term extensions pursuant to Section 5 above.

J.    Covenant of Quiet Enjoyment. Lessor covenants and agrees that so long as Lessee complies with the terms and provisions hereto, Lessee may and shall have, hold and enjoy complete, uninterrupted and peaceful possession and use of the Demised Premises and all fixtures, improvements and personal property thereon as more particularly set forth in Section 1(A) above, during the term of this Amended and Restated Lease, and any extension thereof.

K.    Payment of Taxes and other Obligations. Subject to the terms of that certain Settlement Agreement dated October 30, 1984, between Lessor and Lessee, Lessee shall pay all taxes and other costs lawfully assessed against its interest in the Demised Premises and its operations under this Amended and Restated Lease, for the term of this Amended and Restated Lease, and any extension hereof, and Lessee agrees that such taxes are not the obligation of Lessor, provided, however, that Lessee shall not be deemed to be in default of its obligations under this Amended and Restated Lease for failure to pay such taxes pending the outcome of any legal proceedings instituted to determine the validity of such taxes instituted in a timely fashion. The obligation of Lessee with respect to such taxes and costs shall be prorated for the last Lease Year of the lease term based upon the actual number of days of the lease term during the calendar year in question.

L.    Demised Premises to be Open to General Public. Lessee covenants that the Demised Premises, to the extent not restricted for operational, experimental or other like purposes, shall be open to admission by the general public without discrimination, at such reasonable times and hours as shall be prescribed by Lessee, upon the payment of such admission fees as may be charged.

M.  Notices. All notices that are required to be given by this Amended and Restated Lease shall be given in writing by United States certified mail, postage prepaid, return receipt requested, and shall be delivered or mailed as follows:

If to Lessor:        c/o County Manager
                     111 N.W. lst Street, Suite 2910
                     Miami, Florida 33128

If notice is to be given to the Board of county commissioners, delivery to the County Manager's office shall be deemed delivery to the Board of County Commissioners.

If to the Department  c/o Director
of Parks and          275 N.W. 2nd Street
Recreation:           Miami, Florida 33128

If to Lessee:        c/o Wometco Enterprises, Inc.
                     3195 Ponce de Leon Boulevard
                     Coral Gables, Florida, 33134

Any notices given to Lessor under this Amended and Restated Lease shall set forth the Section of the Amended and Restated Lease pursuant to which the notice is being sent, what is being required or requested of Lessor, as applicable, and the time period for response by Lessor.

N.  Entire Agreement. This Amended and Restated Lease contains the entire agreement of Lessor and Lessee concerning the subject matter hereof except as set forth on Exhibit "l" attached hereto, and made a part hereof. Other than as set forth in Exhibit no collateral or side agreements exist concerning the subject matter of this Amended and Restated Lease or any part hereof. No amendments, modifications or extensions or anything whatsoever pertaining to the subject matter of this Amended and Restated Lease shall be recognized or enforceable unless made in writing and duly executed and sealed by the parties involved.

O.    Invalidity of Provision. If any term or provision of this Amended and Restated Lease, or the application thereof to any person or circumstance, shall, to any extent, be invalid or unenforceable, the remainder of this Amended and Restated Lease or the application of such term or provision, to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term and provision of this Amended and Restated Lease shall be valid and be enforceable to the fullest extent permitted by law. This Amended and Restated Lease shall be construed in accordance with the laws of the State of Florida.

P.    Successors and Assigns. All terms and provisions of this Amended and Restated Lease to be observed and performed by Lessee shall be applicable to and binding upon Lessor's and Lessee's respective heirs, personal representatives, successors and assigns.

Q.    Estoppel Statements. Lessee and Lessor agree that from time to time, upon not less than forty-five (45), days prior written request by the other party, Lessor or Lessee shall deliver to the requesting party a statement in writing certifying: (a) that this Amended and Restated Lease is unmodified and in full force and effect (or, if it is not in full force and effect that it is not, or if there have been modifications, that the Amended and Restated Lease as modified is in full force and effect and stating the modifications); (b) the dates to which Rent and other charges have been paid; and (c) that the other party is not in default under any provisions of this Amended and Restated Lease, or, if in default, the nature thereof in detail.

28.    ISSUANCE OF PERMITS AND APPROVALS: All requests by Lessee of Lessor for requisite approvals, permits, licenses or other authorizations. to construct and operate the Demised Premises shall be considered by Lessor under its applicable codes, rules, regulations and ordinances consistent with its review of other such requests similarly situated. Lessor shall not be under any

59

obligation by virtue of this Amended and Restated Lease to waive any such requirements, or to grant Lessee any permits, permissions or licenses, or to issue any favorable recommendation or grant any approval as to which Lessor, or its employees, agents, instrumentalities and/or boards must exercise its discretion or conduct a public hearing prior to approval. Nonetheless, both Lessor and Lessee recognize that time is of the essence and Lessor agrees to diligently review all such requests for approvals, permits, licenses and authorizations.

29.    APPLICABLE LAWS: All provisions of this Amended and Restated Lease are subject to all applicable laws, rules, regulations, codes, ordinances. and statutes and the Amended and Restated Lease shall not be deemed to permit Lessee to violate the same or to limit Lessor's authority to enforce same.

30.    LEGISLATIVE OR QUASI-JUDICIAL ACTION: Nothing in this Amended and Restated Lease shall restrict the right of the Board of County Commissioners of Miami-Dade County from acting in its legislative or quasi-judicial capacity.

31.    EFFECTIVE DATE: This Amended and Restated Lease shall become effective (the "Effective Date") ten days after the date of adoption by the Board of County Commissioners of a resolution approving this Amended and Restated Lease unless vetoed by the Mayor, and if vetoed, shall become effective only upon an override by the Board of County Commissioners. Commencing on the Effective Date, the Existing Lease, except to the extent set forth in Exhibit "1" attached hereto, shall be deemed deleted in its entirety and of no further force and effect and shall be replaced and superseded by this Amended and Restated Lease. In the event capital Improvements as defined herein have been undertaken by Lessee prior to the Effective Date, in addition to those listed in

Exhibit "7" attached hereto, Lessee shall be credited as of the Effective Date with those capital expenditures for purposes of this Amended and Restated Lease.

In the event of Litigation which affects the Lessee's ability to construct a Capital Improvement, the time periods specified in this Amended and Restated Lease herein for performance by Lessee, including the time periods for making Capital Improvements Expenditures and the coinciding Lease Extensions under Sections 5(A) and 5(D) shall be extended by a period commencing on the date when such Litigation is filed and terminating on the date when such Litigation is finally concluded, including all appeals, by a court of competent jurisdiction. In the event that Capital Improvements are undertaken before the Effective Date under the Existing Lease during the pendency of the Litigation, then the extensions granted under the Existing Lease shall be adjusted so as to be in compliance with this Amended and Restated Lease.

32.    GENERAL PROVISIONS PERTINENT TO THE AMENDED AND RESTATED LEASE: All exhibits attached hereto are incorporated herein by reference. Time is of the essence with respect to approvals and consents to be granted by Lessor to Lessee hereunder. Lessor and Lessee acknowledge that as of the date hereof no defaults exist under this Amended and Restated Lease on the part of Lessee and that all monetary sums required to be paid by Lessee hereunder to date to Lessor or others have been paid in full. The terms Lessor and Lessee as herein contained shall include singular and/or plural, masculine, feminine and/or neuter, heirs, successors, personal representatives and/or assigns wherever the context so requires or admits. Paragraph headings are solely for the convenience of the reader and are not intended to be all inclusive and shall not be deemed to limit or expand any of the provisions of this Amended and Restated Lease. Any exhibit, formally executed addendum or rider to or modification of this Amended and Restated Lease shall

61

be expressly deemed incorporated by reference herein unless a contrary intention is clearly stated therein.

33.    INDEPENDENT PRIVATE SECTOR INSPECTOR GENERAL.    The County shall have the right but not the obligation to retain the services of an independent private sector inspector general (IPSIG) who may be engaged to audit, investigate, monitor, oversee, inspect and review the operations, activities and performance of the Contractor and County in connection with this contract. The scope of services performed by an IPSIG may include, but are not limited to, monitoring and investigating compliance with contract specifications; project costs; and investigating and preventing corruption and fraud.

The IPSIG may perform its services at all levels of the contracting and procurement process, including but not limited to, project design, establishment of bid specifications, bid submittals, activities of Contractor, its officers, agents and employees, lobbyists, County staff and elected officials.

Upon sixty (60) days' written notice to Contractor from an IPSIG, the Contractor shall make all requested records and documents available to the IPSIG for inspection and copying. The IPSIG shall have the right to examine all documents and records in the Contractor's possession, custody or control which, in the IPSIG's sole judgment, pertain to performance of the contract, including, but not limited to, original estimate files; change order estimate files; worksheets; proposals and agreements from and with successful and unsuccessful subcontractors and suppliers; all project-related correspondence, memoranda, instructions, financial documents, construction documents, bid and contract documents; back-charge documents; all documents and records which involve cash,

62

trade or volume discounts, insurance proceeds, rebates, or dividends received; payroll and personnel records; and supporting documentation for the aforesaid documents and records.

The provisions in this section shall apply to the Contractor, its officers, agents and employees. The Contractor shall incorporate the provisions in this section in all subcontracts and all other agreements executed by the Contractor in connection with the performance of the contract.

Nothing in this contract shall impair any independent right of the County to conduct audit or investigate activities. The provisions of this section are neither intended nor shall they be construed to impose any liability on the County by the Contractor or third parties.

IN WITNESS WHEREOF, Lessor and Lessee have caused this Amended and Restated Lease to be executed by the respective proper officers, duly authorized thereunto, the day and year first written above.

"Lessor"

MIAMI-DADE COUNTY, FLORIDA, by its
BOARD OF COUNTY COMMISSIONERS

ATTEST:

By:_____
       Deputy Clerk

By:_____
       County Manager
       (PAUL PHILLIPS)
(OFFICIAL SEAL)

"Lessee"

MARINE EXHIBITION CORPORATION, a
Florida corporation

ATTEST:

By:_____
     Assistant Secretary
     Vice President

By:_____
     Arthur H. Hertz, Chairman

(CORPORATE SEAL) .

## EXHIBITS

| EXHIBIT | EXHIBIT NO. |
|---|---|
| List of Lease Amendments and Clarifications | 1 |
| Master Plan for Seaquarium | 2 |
| Legal Description of Demised Premises | 3 |
| Legal Description of Portion of Demised Premises | 4 |
| Sketch of Public Parking Extension Area | 5 |
| Lease Extension Agreement | 6 |
| Proposed Capital Projects | 7 |
| Examples of Allocations of Formulas | 8 |
| Application of CIR Deferrals and Forgiveness | 9 |
| Animals Displayed at Seaquarium | 10 |
| Resolution R-583-98 | 11 |

EXHIBIT "1"

## LIST OF LEASE AMENDMENTS AND CLARIFICATIONS
## INCORPORATED AND SUPERCEDED BY AMENDED AND RESTATED LEASE

1.  Lease Agreement dated March 9, 1954, between Metropolitan Dade County, Florida ("Dade County") and Marine Exhibition Corporation ("MEC") d/b/a The Miami Seaquarium, except that the lease shall survive and remain in full force and effect to the extent it granted to MEC the initial lease term and initial renewal option thereunder and to the extent it provided MEC with rights to the Demised Premises and to the Adjacent Property.

2.  Clarification Agreement, dated March 9, 1954, between Dade County and MEC.

3.  First Supplementary Lease Agreement, dated July 12, 1955, between Dade County and MEC.

4.  Modification of Lease, dated December 12, 1960.

5.  Amendment A to Lease, dated October 30, 1984, between Dade County and MEC, except that Amendment A shall survive and remain in full force and effect to the extent it granted Lessee the option to renew or extend the lease dated March 9, 1954 for terms totalling up to an additional twenty-five (25) years beyond the initial lease term and the initial renewal option provided for in said lease and, in addition, for purposes of the Settlement Agreement, dated October 30, 1984 between Dade County and MEC.

6.  Amendment B to Lease, dated October 30, 1984, between Dade County and MEC, except that the rights of Lessee to maintain, replace and dispose of personal property granted by the court order approving the Settlement Agreement, dated October 30, 1984, between Dade County and MEC, shall survive and remain in full force and effect.

7.  Amendment C to Lease, dated November 1, 1988, between Dade County and MEC.

8.  Resolution No. R-1198-66, adopted November 14, 1966, authorizing amendment to Lease for the release of certain property to University of Miami and extension of facilities for parking to MEC and accompanying documents.

9.  Resolution No. R-467-67, adopted April 24, 1967, authorizing amendment of Leases with University of Miami and with MEC for property on Virginia Key to provide additional land for University and accompanying documents.

10. Resolution No. R-594-67, adopted May 16, 1967, amending Resolution No. R-467-67 correcting legal description.

11. Second Supplementary Lease Agreement, dated September 10, 1969, between Dade County and MEC.

12. Amended and Restated Lease approved by Resolution No. R-999-90, adopted September 25, 1990.

13. Any amendments or clarifications to the Original Lease not set forth herein or in Exhibit "1-A" attached hereto.

Dade County and MEC acknowledge and agree that the consents, permissions and rights set forth in the instruments listed on Exhibit "1-A" attached hereto shall survive and remain in full force and effect to the extent they are not inconsistent with the express provisions of the Amended and Restated Lease. Except as otherwise indicated, capitalized terms shall have the same meanings as set forth in the Amended and Restated Lease.

## EXHIBIT "1-A"

### LIST OF LEASE AMENDMENTS AND

### CLARIFICATIONS WHICH SURVIVE AMENDED AND RESTATED LEASE

1. Resolution No. 6446, adopted November 3, 1953, approving advertisement for bids for proposed lease of subject property.

2. Resolution No. 6615, adopted January 6, 1954, authorizing Clarification Agreement between Metropolitan Dade County ("Dade County") and Marine Exhbition Corporation ("MEC").

3. Letter Agreement, dated March 9, 1954, from Dade County to MEC regarding water connection and pier construction.

4. Letter, dated March 9, 1954, from Dade County to MEC consenting to use of concessions.

5. Resolution No. 7871, adopted January 18, 1955, granting extension for completion of project.

6. Resolution No. 8257, adopted May 3, 1955, authorizing repayment of $100,000 to MEC from escrow fund at First National Bank of Miami and correspondence thereto.

7. Concession Lease Agreement, dated June 9, 1955, between MEC and L.G. Ball, for the lease of Gift Shop concession.

8. Resolution No. 9172, adopted December 29, 1955, consenting to the assignment of the sublease between MEC and L.G. Ball to Wynnewood Gifts, Inc.

9. Resolution No. 3896, adopted September 15, 1959, approving the construction of Geodesic Aluminum Dome over the sea show arena.

10. Resolution No. 5378, adopted June 28, 1960, approving construction of the Seaquarium sign.

11. Resolution No. 5718, adopted September 13, 1960, consenting to concession sublease agreements by MEC and Wholesale Vending Corporation and Towpark Confections, Inc.

12. Resolution No. 6059, adopted December 6, 1960, and accompanying documents, authorizing the adoption of the Modification of Lease permitting MEC to prepare financial report on a 4-week basis.

13. Resolution No. 6214, adopted January 24, 1961, approving certain improvements to the Snack Bar area and correspondence thereto.

14. Resolution No. 6479, adopted April 25, 1961, approving the construction of walkway and correspondence thereto.

15. Resolution No. 7829, adopted August 24, 1962, approving admission of foreign exchange students as guests.

16. Resolution No. 7906, adopted September 25, 1962, approving construction of Monorail and correspondence thereto.

17. Resolution No. 8301, adopted January 29, 1963, approving contract between MEC and American Electric Inc. for operation of Monorail and correspondence thereto.

18. Resolution No. 8772, adopted June 25, 1963, approving the construction of two pools and correspondence thereto.

19. Resolution No. 9294, adopted December 3, 1963, and assignment documents, consenting to the assignment of the Monorail contract from American Electric Inc. to Seaquarium Monorail Corporation.

20. Resolution No. 10856, adopted May 18, 1965, and accompanying memoranda and court documents, relating to litigation concerning certain matters under the lease.

21. Resolution No. 10984, adopted July 19, 1965, authorizing construction of two pre-cast concrete finger piers and memoranda thereto.

22. Resolution No. 10997, adopted July 26, 1965, authorizing endorsement of check for hurricane damages and accompanying documents.

23. Resolution No. 11548, adopted December 22, 1965, approving reduction of federal excise tax.

24. Resolution No. R-1037-66, adopted October 3, 1966, approving the concession agreement between MEC and Zytron Computer and Electronics.

25. Resolution No. R-1038-66, adopted October 3, 1966, approving concession agreement between MEC and Florida Hydrofoils, Incorporated.

26. Resolution No. R-396-67, adopted April 3, 1967, authorizing construction of water supply system and correspondence thereto.

27. Resolution No. R-515-67, adopted May 1, 1967, authorizing enlargement of cafeteria-snack bar facility and correspondence thereto.

28. Resolution No. R-601-68, adopted June 3, 1968, authorizing installation of four concrete tanks for Pompano Research Project and memorandum thereto.

29. County Managers Report, accepted December 16, 1968, relating to operation of Monorail.

30. Resolution No. R-723-69, adopted June 4, 1969, authorizing construction of a tank and stadium structure for killer whale, stock storage room, fender piling and mooring dolphins and installation of sanitary sewer system.

31. Resolution No. R-1071-71, adopted November 16, 1971, approving joint conveyance by Dade County and MEC of bill of sale for underground duct work and easement to Florida Power & Light Company.

32. Resolution No. R-626-73, adopted May 16, 1973, approving adjustments in admission charges and memoranda thereto.

33. Letter, dated June 4, 1973, from MEC to Dade County, regarding option renewal of lease for an additional 25 years.

34. Resolution No. R-1223-73, adopted October 2, 1973, approving admission of certain children from Division of Youth Services.

35. Resolution No. R-1240-73, adopted October 16, 1973, authorizing construction of grandstand and addition to Flipper exhibit and memorandum thereto.

36. Letter, dated November 28, 1973, from Dade County to MEC, acknowledging MEC's request for renewal.

37. Resolution No. R-554-74, adopted May 21, 1974, approving Affinity Group Rate admission.

38. Resolution No. R-601-74, adopted June 4, 1974, authorizing construction of emergency power station and two diesel fuel storage tanks and correspondence thereto.

39. Resolution No. R-467-77, adopted May 3, 1977, approving relocation of greenhouse and correspondence thereto.

40. Resolution No. R-878-77, adopted July 19, 1977, authorizing placement of portable classroom buildings for use by Dade Marine Institute and correspondence thereto.

41. Resolution of Dade County Property Appraisal Adjustment Board, adopted October 13, 1977, regarding taxation of leasehold interest of MEC.

42. Resolution No. R-944-79, adopted July 17, 1979, approving request of MEC for permission to expand food service facilities and correspondence thereto.

1-A-3

43. Resolution No. R-1306-80, adopted October 7, 1980, approving the construction of a new Flipper house.

44. Resolution No. R-90-81, adopted January 20, 1981, approving sublease between Dave Howell, Trustee and MEC for restaurant and bar.

45. Resolution No. R-763-81, adopted May 19, 1981, approving construction of addition to gift shop.

46. Resolution No. R-1386-81, adopted September 17, 1981, authorizing the installation and operation of radio controlled boat attraction.

47. Resolution No. R-1282-82, adopted September 21, 1982, authorizing construction and operation of ice cream concession stand and correspondence thereto.

48. Memorandum, dated October 2, 1984, from County Manager to Mayor and County Commissioners, regarding Settlement Agreement and Lease Amendments A and B.

49. Resolution No. R-1351-84, adopted October 2, 1984, approving Settlement Agreement relating to ad valorem tax litigation and Amendments A and B to Lease.

50. Settlement Agreement, dated October 30, 1984, between Dade County and MEC.

51. Resolution No. R-382-85, adopted March 19, 1985, approving retroactively the Sublease between MEC and Show Queen, Inc. and documents thereto.

52. Docking Agreement, dated as of January 4, 1985, between MEC and Show Queen, Inc.

53. County Manager's Report (Item 7(a)1) accepted September 2, 1986, regarding the short term Burger King franchise agreement.

54. Resolution No. R-131-88, adopted February 2, 1988, approving sale of Florida lottery tickets and memorandum thereto.

55. Resolution No. R-1449-88, adopted November 1, 1988, approving Amendment "C" to Lease, modifying requirements for financing of capital improvements; authorizing execution by County Manager and directing Clerk to record with official records and documents thereto.

56.    Resolution No. R-380-93, adopted March 30, 1993, approving two special events and contract extension to Lease.

57.    Resolution No. R-1726-95, adopted December 19, 1995, approving Leasehold Mortgage by Miami Exhibition Corporation as required by Lease.

## EXHIBIT "2"

## MASTER PLAN FOR SEAQUARIUM

## SEE ATTACHED

[The Master Plan for the Seaquarium includes all Capital Improvements existing on the Demised Premises as of the Effective Date of the Amended and Restated Lease, the Capital Improvements identified in Exhibit "7" of the Amended and Restated Lease and any other Capital Improvements approved by the County subsequent to the Effective Date of the Amended and Restated Lease, together with any replacements, renewals or betterments to any Capital Improvement].

## EXHIBIT "2"

## MIAMI SEAQUARIUM
## EXISTING CAPITAL IMPROVEMENTS
### JUNE 2000

1.  Parking Lot
2.  Marquee
3.  Finger pier and boat docks
4.  Office building (Marketing bldg)
5.  Main Gate
6.  Administrative Bldg (next to main gate)
7.  Main Gift Shop
8.  Covered Walkways
9.  Remote control Boat pool
10. Remote control car attraction
11. Golden Dome (related equipment, trainer building, pools, stadium, animal facility)
12. Main tank building, Main Tank pool (Top Deck) and related equipment
    Reef Tank building, Reef Tank pool, food court and related equipment
13. Cafeteria
14. Main Filter Plant
15. Main Generator
16. Pompano Pools (four), filters and equipment
17. Discovery Bay (boardwalks, equipment, pools)
18. Shark Channel
19. Aviary
20. Main water intake, piping, facility equipment and related water distribution system
21. Main electric facility and related electric distribution system
22. Sewer lift station and related sewer system
23. Bathrooms (throughout park)
24. Bay filter (currently planned for replacement)
25. Boat basin gantry
26. Seawall
27. Outer boarder security fencing
28. Flipper Stadium, Flipper Lagoon and docks
29. Fish house and maintenance building and shops
30. Wade building and maintenance shops
31. Flipper training building and flipper stadium entrance
32. Chiller plant
33. Landscape maintenance building
34. Celebrity (manatee) pools
35. Whale Spout Café
36. Rain Forest exhibit
37. Merchandise outlet
38. Security guard house
39. Potable water system (underground)
40. Whale Stadium
41. Replacement Marine Mammal Stadium and Pools (related equipment and trainer building)
42. Cafeteria receiving building and cafeteria coolers
43. Pizza restaurant

Page 2 of 3

Exhibit 2



## EXHIBIT "3"

### LEGAL DESCRIPTION OF DEMISED PREMISES

The following described tract of land lying and being in Section 20, Township 54 South, Range 42 East, Dade County, Florida:

Commence at the intersection of the North line of Section 20, Township 54 South, Range 42 East, Virginia Key, Dade County, Florida, and the center line of the Rickenbacker Causeway, both as shown on Sheet 2 of the Bulkhead Line Map, recorded in Plat Book 74 at Page 6 of the Public Records of Dade County, Florida; thence run South 45° 22' 07" East along said center line of Rickenbacker Causeway for a distance of 100.39 feet to a point; thence run South 29° 37' 53" West for a distance of 181.17 feet to the point of intersection with the Southwesterly right of way line of Rickenbacker Causeway, said point being the Point of Beginning of the parcel of land herein described; from said Point of Beginning run North 45° 22' 07" West along the Southwesterly right of way line of Rickenbacker Causeway for a distance of 264.81 feet; thence run South 44° 37' 53" West, a distance of 65 feet more or less to the shoreline of Biscayne Bay; thence run in a Southerly direction, meandering the shoreline of Biscayne Bay to a point on the Bulkhead Line as shown on the above-mentioned Bulkhead Line Map, said point being the point of curvature of a circular curve to the right having a radius of 450.00 feet; thence run Southwesterly along the arc of said circular curve and along said Bulkhead Line, through a central angle of 12° 30' 00" for an arc distance of 98.17 feet to the point of tangency; thence run South 31° 34' 46" West along a line tangent to the last described curve for a distance of 190.17 feet to the point of curvature of a circular curve to the left having a radius of 800.00 feet; thence run Southwesterly, Southerly, and Southeasterly, along the arc of said circular curve to the left and along the said Bulkhead Line, through a central angle of 97° 46' 01" for an arc distance of 1365.08 feet to a point on said curve which is the point of curvature of a circular curve to the left having a radius of 1190.00 feet; thence run Easterly along the arc of said circular curve to the left and along the said Bulkhead Line, through a central angle of 39° 04' 03" for an arc distance of 811.41 feet to the point of intersection with a line that is 757.17 feet Southwesterly of and parallel to the center line of Rickenbacker Causeway; thence run North 45° 22' 07" West along said line parallel to the center line of Rickenbacker Causeway for a distance of 302.52 feet; thence run North 44° 37' 53" East for a distance of 110.00 feet; thence run North 45° 22' 07" West for a distance of 218.00 feet; thence run North 44° 37' 53" East for a distance of 472.17 feet to the point of intersection with the Southwesterly right of way line of Rickenbacker Causeway; thence run North 45° 22' 07" West along the Southwesterly right of way line of Rickenbacker Causeway for a distance of 1209.18 feet to the Point of Beginning.

PAGE 1 OF 2

## EXHIBIT "4"

### LEGAL DESCRIPTION - OF PORTION OF DEMISED PREMISES

A PARCEL OF LAND LYING IN SECTION 20, TOWNSHIP 54 SOUTH, RANGE 42 EAST, VIRGINIA KEY, DADE COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE INTERSECTION OF THE NORTH LINE OF SECTION 20, TOWNSHIP 54 SOUTH, RANGE 42 EAST, VIRGINIA KEY, DADE COUNTY, FLORIDA WITH THE CENTER LINE OF THE RICKENBACKER CAUSEWAY AS SHOWN ON " REVISED PLAT OF SHEETS 8 & 9 METROPOLITAN DADE COUNTY, FLORIDA BULKHEAD LINE PART FOUR", ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 74 AT PAGE 6 OF THE PUBLIC RECORDS OF DADE COUNTY, FLORIDA; THENCE RUN S 45°22'07" E ALONG SAID CENTER LINE FOR 100.39 FEET; THENCE RUN S 29°37'53" E FOR 181.17 FEET TO THE POINT OF BEGINNING, SAID POINT ALSO BEING ON THE SOUTHWESTERLY RIGHT-OF-WAY LINE OF THE RICKENBACKER CAUSEWAY; THENCE RUN N 45°22'07" W ALONG SAID RIGHT-OF-WAY LINE FOR 264.81 FEET; THENCE RUN S 44°37'53" W FOR 65.00 FEET; THENCE RUN S 44°38'01" W FOR 48.00 FEET TO THE APPARENT SHORELINE; THENCE CONTINUE ALONG SAID APPARENT SHORELINE FOR THE NEXT NINE COURSES: (1) S 30°07'30" E FOR 18.69 FEET; (2) S 40°31'32" E FOR 66.78 FEET; (3) S 31°02'20" E FOR 44.90 FEET; (4) S 17°50'33" E FOR 55.45 FEET; (5) S 22°22'31" E FOR 45.25 FEET; (6) S 01°03'05" E FOR 50.20 FEET; (7) S 05°51'58" W FOR 50.33 FEET; (8) S 14°31'46" W FOR 52.46 FEET; (9) S 23°11'14" W FOR 25.80 FEET TO A POINT ON THE AFOREMENTIONED BULKHEAD LINE AS SHOWN ON SAID PLAT AND SAID POINT BEING THE POINT OF CURVATURE OF A CIRCULAR CURVE CONCAVE TO THE WEST AND HAVING A RADIUS OF 450.00 FEET AND A CENTRAL ANGLE OF 12°30'00"; THENCE RUN SOUTHERLY ALONG THE ARC OF SAID CURVE FOR 98.17 FEET TO A POINT OF TANGENCY; THENCE RUN S 31°34'46" W FOR 198.17 FEET TO A POINT OF CURVATURE OF A CIRCULAR CURVE CONCAVE TO THE EAST AND HAVING A RADIUS OF 800.00 FEET AND A CENTRAL ANGLE OF 17°05'19"; THENCE RUN SOUTHERLY ALONG THE ARC OF SAID CURVE FOR 238.60 FEET TO THE POINT OF INTERSECTION WITH THE SOUTHEASTERLY LINE OF THAT CERTAIN PARCEL OF LAND AS DESCRIBED IN DEED BOOK 3069 AT PAGE 248 OF THE PUBLIC RECORDS OF DADE COUNTY, FLORIDA, SAID INTERSECTION BEARS S 75°30'33" W FROM THE CENTER OF LAST DESCRIBED CURVE; THENCE RUN N 29°37'51" E ALONG SAID SOUTHEASTERLY LINE FOR 857.48 FEET TO THE POINT OF BEGINNING.

CONTAINING 1.41 ACRES MORE OR LESS, SUBJECT TO DEDICATIONS, RESTRICTIONS AND EASEMENTS OF RECORD.

SURVEYOR'S CERTIFICATE:

WE HEREBY CERTIFY: THAT THE ATTACHED "SKETCH TO ACCOMPANY LEGAL DESCRIPTION" IS TRUE AND CORRECT TO THE BEST OF OUR KNOWLEDGE AND BELIEF AS RECENTLY PREPARED UNDER OUR DIRECTION AND FURTHER, THAT SAID SKETCH MEETS THE INTENT OF THE MINIMUM TECHNICAL STANDARDS FOR LAND SURVEYING IN THE STATE OF FLORIDA PURSUANT TO CHAPTER 472.027, FLORIDA STATUTES AND RULE 21HH-6 OF THE FLORIDA ADMINISTRATIVE CODE.

POST, BUCKLEY, SCHUH & JERNIGAN, INC.

By: *Carlos M. del Valle*
Carlos M. del Valle
Professional Land Surveyor No. 4408
State of Florida
DATE SEP 11 1991

NOTE: THIS SKETCH IS NOT VALID UNLESS SIGNED AND EMBOSSED WITH SURVEYOR'S RAISED SEAL.

## MIAMI SEAQUARIUM
## SKETCH TO ACCOMPANY LEGAL DESCRIPTION

| NO. | DATE | REVISIONS | | |
|---|---|---|---|---|
| | | | SCALE | AS SHOWN |
| | | | JOB NO | 01-396.00 |
| | | | F.B. NO. | N.A. |
| | | | FILE NO | 135 |

**Post, Buckley, Schuh & Jernigan, Inc.**
CONSULTING ENGINEERS AND PLANNERS
8600 N.W. 36th STREET MIAMI, FLORIDA 33166-6622 592-7275 FAX:599-0448

| DRAWN | B.W. DEANS |
|---|---|
| CHECKED | C.M. del VALLE |
| DATE | 9-11-90 |



PAGE 2 OF 2

NE CORNER OF
SECTION 20-54-42
DADE COUNTY, FLORIDA

NORTH LINE OF
SEC. 20-34-42

P.O.C.    (PLAT BOOK 74, PAGE 6 DADE COUNTY
PUBLIC RECORDS)

S 45°22'07" E    100.39'

RICKENBACKER    CAUSEWAY

N 45° 22' 07" W
264.81'

SW'ly R/W LINE

P.O.B.

1.41 acres ±

S 30°07'30" E 18.69'

S 40°31'32" E 66.78'
S 31°02'20" E 44.90'
S 17°50'33" E 55.48'
S 22°22'31" E 45.25'
S 1°03'05" E 50.20'
S 5°51'58" W 50.33'

S 14°31'46" W 52.46'
S 23°11'14" W 25.80'

R=150.00'
Δ=12°30'00"
A=98.17'

(APPROXIMATE LIMITS OF PARCEL 3 PER DEED BOOK 3065, PAGE 248 DADE COUNTY PUBLIC RECORDS)

MIAMI SEAQUARIUM SITE

NOT TO SCALE

N 29°37'51" E    857.46'

S 31°34'46" W 198.17'

R=800.00'    Δ=11°05'19"
A=238.80'

BISCAYNE BAY

S 75°30'35" E
(RADIAL)

**SURVEYOR'S NOTES:**

1. THE BEARINGS AS SHOWN HEREON ARE DERIVED FROM THE REVISED PLAT OF SHEETS 8 & 9 METROPOLITAN DADE COUNTY, FLORIDA BULKHEAD LINE PART FOUR, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 74 AT PAGE 6 OF THE PUBLIC RECORDS OF DADE COUNTY, FLORIDA.

2. THIS "SKETCH TO ACCOMPANY LEGAL DESCRIPTION" DOES NOT REPRESENT A FIELD BOUNDARY SURVEY.

3. THERE MAY BE RESTRICTIONS ON THIS PARCEL THAT ARE NOT SHOWN THAT MAY BE FOUND IN THE PUBLIC RECORDS OF DADE COUNTY, FLORIDA.

MIAMI SEAQUARIUM
SKETCH TO ACCOMPANY LEGAL DESCRIPTION

4-2

PAGE 1 OF 2

EXHIBIT "4-A"

LEGAL DESCRIPTION - OF ADJACENT PROPERTY

A PARCEL OF LAND LYING IN SECTION 20, TOWNSHIP 54 SOUTH, RANGE 42 EAST, VIRGINIA KEY, DADE COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE INTERSECTION OF THE NORTH LINE OF SECTION 20, TOWNSHIP 54 SOUTH, RANGE 42 EAST, VIRGINIA KEY, DADE COUNTY, FLORIDA WITH THE CENTER LINE OF THE RICKENBACKER CAUSEWAY AS SHOWN ON " REVISED PLAT OF SHEETS 8 & 9 METROPOLITAN DADE COUNTY, FLORIDA BULKHEAD LINE PART FOUR", ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 74 AT PAGE 6 OF THE PUBLIC RECORDS OF DADE COUNTY, FLORIDA; THENCE RUN S 89°56'17" E ALONG SAID NORTH LINE OF SECTION 20 FOR 249.37 FEET TO A POINT OF INTERSECTION WITH THE NORTHEASTERLY RIGHT-OF-WAY LINE OF THE RICKENBACKER CAUSEWAY, SAID RIGHT-OF-WAY LINE BEING 175.00 FEET NORTHEASTERLY OF, AS MEASURED AT RIGHT ANGLES TO AND PARALLEL WITH SAID CENTER LINE OF THE RICKENBACKER CAUSEWAY AND SAID POINT OF INTERSECTION BEING THE POINT OF BEGINNING OF THE HEREINAFTER DESCRIBED PARCEL OF LAND; THENCE RUN N 45°22'07" W ALONG SAID RIGHT-OF-WAY LINE FOR 295.18 FEET TO A POINT; THENCE RUN N 44°37'53" E FOR 300.00 FEET TO A POINT; THENCE RUN S 45°22'07" E FOR 147.3.99 FEET TO A POINT; THENCE RUN S 44°37'53" W FOR 300.00 FEET TO A POINT OF INTERSECTION WITH SAID NORTHEASTERLY RIGHT-OF-WAY LINE OF THE RICKENBACKER CAUSEWAY; THENCE RUN N 45°22'07" W ALONG SAID RIGHT-OF-WAY LINE FOR 1178.81 FEET TO THE POINT OF BEGINNING.

CONTAINING 10.15 ACRES MORE OR LESS AND SUBJECT TO DEDICATIONS, RESTRICTIONS AND EASEMENTS OF RECORD.

SURVEYOR'S NOTES:

1.  THE BEARINGS AS SHOWN HEREON ARE DERIVED FROM THE REVISED PLAT OF SHEETS 8 & 9 METROPOLITAN DADE COUNTY, FLORIDA BULKHEAD LINE PART FOUR, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 74 AT PAGE 6 OF THE PUBLIC RECORDS OF DADE COUNTY, FLORIDA.

2.  THIS "SKETCH TO ACCOMPANY LEGAL DESCRIPTION" DOES NOT REPRESENT A FIELD BOUNDARY SURVEY.

3.  THERE MAY BE RESTRICTIONS ON THIS PARCEL THAT ARE NOT SHOWN THAT MAY BE FOUND IN THE PUBLIC RECORDS OF DADE COUNTY, FLORIDA.

SURVEYOR'S CERTIFICATE:

WE HEREBY CERTIFY: THAT THE ATTACHED "SKETCH TO ACCOMPANY LEGAL DESCRIPTION" IS TRUE AND CORRECT TO THE BEST OF OUR KNOWLEDGE AND BELIEF AS RECENTLY PREPARED UNDER OUR DIRECTION AND FURTHER, THAT SAID SKETCH MEETS THE INTENT OF THE MINIMUM TECHNICAL STANDARDS FOR LAND SURVEYING IN THE STATE OF FLORIDA PURSUANT TO CHAPTER 472.027, FLORIDA STATUTES AND RULE 21HH-6 OF THE FLORIDA ADMINISTRATIVE CODE.

POST, BUCKLEY, SCHUH & JERNIGAN, INC.

By: _Carlos M. del Valle_
Carlos M. del Valle
Professional Land Surveyor No. 4408
State of Florida
DATE: 9/14/90

NOTE: THIS SKETCH IS NOT VALID UNLESS SIGNED AND EMBOSSED WITH SURVEYOR'S RAISED SEAL.

## MIAMI SEAQUARIUM
## SKETCH TO ACCOMPANY LEGAL DESCRIPTION

| | | SCALE | AS SHOWN |
| --- | --- | --- | --- |
| | | JOB NO | 01-396.00 |
| | | FB NO | N.A. |
| NO | DATE | REVISIONS | FILE NO | 337 |
| | | | DRAWN | D.W. DEANS |

**Post, Buckley, Schuh & Jernigan, Inc.**
CONSULTING ENGINEERS and PLANNERS
8600 N.W. 36th STREET  MIAMI, FLORIDA 33166-6623  592-7275  FAX 599-0448

| | |
| --- | --- |
| CHECKED | C. M. del VALLE |
| DATE | 9-14-90 |

4-A-1



MIAMI SEAQUARIUM
SKETCH TO ACCOMPANY LEGAL DESCRIPTION

## EXHIBIT 5

SKETCH OF PUBLIC PARKING EXTENSION AREA



PARCELS B and C
As Acknowledged by Dade County
Resolution No. R-467-67
Adopted April 24, 1967

5

## EXHIBIT "6"

## LEASE EXTENSION AGREEMENT BETWEEN DADE COUNTY AND MARINE EXHIBITION CORPORATION d/b/a THE MIAMI SEAQUARIUM

This Extension of Lease Agreement, dated _____, the ("Extension Agreement") is made by and between Miami-Dade County, Florida ("Lessor") and Marine Exhibition Corporation d/b/a The Miami Seaquarium ("Lessee").

WHEREAS, Lessor and Lessee have entered into an Amended and Restated Lease (the "Amended and Restated Lease") dated _____, whereby Lessor has leased to Lessee certain parcels of land lying and being in Miami-Dade County, Florida, situated along the Rickenbacker Causeway across Biscayne Bay on Virginia Key, Florida, as more particularly described in Exhibit "3" attached thereto, as the same may be amended (the "Demised Premises"), together with all improvements, fixtures and personal property located in or on the Demised Premises, as more particularly described in Section 1(A) of the Amended and Restated Lease;

WHEREAS, Lessee is entitled to a lease extension pursuant to the terms of the Amended and Restated Lease and the parties wish to document the extension.

NOW, THEREFORE, in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable considerations by each of the parties hereto, to the other in hand paid, the receipt of which is hereby acknowledged, Lessor and Lessee agree as follows:

1.      The foregoing recitals are true and correct and are incorporated herein as if set forth at length.

6-1

2.    The term of the Amended and Restated Lease is hereby extended for an additional term of _____ years beyond that which was provided in the Amended and Restated Lease so that the termination date of the Amended and Restated Lease is now _____.

3.    The extension granted by this Extension Agreement is subject to cancellation, in whole or in part, depending upon verification of Capital Improvement Expenditures by audit as provided in Section 5(F) of the Amended and Restated Lease.

4.    Except as modified herein, the Amended and Restated Lease remains unmodified and in full force and effect and is hereby ratified and confirmed in all respects.

IN WITNESS WHEREOF, Lessor and Lessee have caused this Extension Agreement to be executed by the respective proper officers, duly authorized thereunto, the day and year first above written.

"Lessor"

MIAMI-DADE COUNTY, FLORIDA, by its
BOARD OF COUNTY COMMISSIONERS

ATTEST:

By:_____          By:_____
          Deputy Clerk                                      County Manager

(OFFICIAL SEAL)

"Lessee"

MARINE EXHIBITION CORPORATION,
a Florida corporation

ATTEST:

By:_____          By:_____
          Assistant Secretary                               President

(CORPORATE SEAL)

6-2

STATE OF FLORIDA    )
                    )  SS:
COUNTY OF DADE      )

BEFORE ME, the undersigned authority, personally appeared
_____ and _____, the Assistant Secretary and
President of MARINE EXHIBITION CORPORATION, respectively, to me
known to be the persons who signed the foregoing instrument, and
acknowledged the execution thereof to be their free act and deed
for the uses and purposes therein mentioned.

WITNESS my hand and official seal at _____, Florida, this
___ day of _____, ____.


                                    _____
                                    NOTARY PUBLIC
                                    STATE OF FLORIDA AT LARGE
My Commission Expires:


STATE OF FLORIDA    )
                    )  SS:
COUNTY OF _____   )

BEFORE ME, the undersigned authority, personally appeared
_____ and _____, the Deputy Clerk and Assistant
County Manager respectively, to me known to be the persons who
signed the foregoing instrument, and acknowledged the execution
thereof to be their free act and deed for the uses and purposes
therein mentioned.

WITNESS my hand and official seal at _____, Florida, this
___ day of _____, ____.


                                    _____
                                    NOTARY PUBLIC
                                    STATE OF FLORIDA AT LARGE
My Commission Expires:

## EXHIBIT "7"

### MARINE EXHIBITION CORPORATION
#### Capital Projects Completed and Underway
#### May, 2000
#### Approximate Amounts

| | Project | Amount |
|---|---|---|
| 1. | Main Filter Replacement | $ 140,000.00 |
| 2. | Whale Stadium | 14,000,000.00 |
| | TOTAL | $14,140,000.00 |

7

## EXHIBIT "8"

## EXAMPLE OF APPLICATION OF FORMULA

If the greater of Guaranteed Rent or Percentage Rent in months 5, 6, 7, 8 and 9 is $100,000, $150,000, $100,000, $110,000 and $140,000, respectively, and the ad valorem taxes paid in month 4 are $600,000, no Annual Rent shall be paid during months 5 through 9 and Annual Rent payments shall resume, subject to the provisions of Section 6(A)(5), in month 10. Nevertheless, the $600,000 of Annual Rent deferred shall be paid within forty-five (45) days after the end of that fiscal year, subject to the adjustments set forth in Section 6(A)(2) and 6(A)(4).

9-1

EXHIBIT "9"

## APPLICATION OF CIH DEFERRALS AND FORGIVENESS

Page 1 of 2

## EXHIBIT 9

### Page 2 of 2

Marine Exhibition Corporation Lease
Capital Improvement Requirement
Notes to Example

1. **Potential CIR:**      Always 1.25 % of the Gross Revenues of the preceding fiscal year.

2. **CIR Forgiven:**      Permitted, at option of Lessee, up to five (5) times during term of lease, if Gross Revenues during preceding fiscal year decline by more than 1% of Gross Revenues during prior year.

3. **Current CIR Required:**      Potential CIR, less CIR Forgiven.

4. **Deferred CIR Required:**      The lesser of three-quarters of one percent of the Gross Revenues of the preceding fiscal year or the cumulative amount previously deferred.

5. **CIR Expended:**      Actual amount expended during fiscal year.

6. **Overexpenditure:**      Represents the amount by which expenditures in current fiscal year exceeds Current CIR plus Deferred CIR.

7. **Deposit Bank:**      A deposit must be made to bring the bank balance equal to the amount that cumulative under-expenditures exceed cumulative over-expenditures.

     (a). Funds in bank may be used for future year over-expenditures.

     (b). A deposit is not required to the extend of a current deferral, which is permitted in a year when the preceding fiscal years Gross Revenues declined by more than 1% and a forgiveness was not taken.

8. **Deferral**      The amount of deferral is equal to the Current and Deferred CIR Required, less the sum of CIR expended, plus preceding years cumulative overexpenditures.

## EXHIBIT "10"

### ANIMALS DISPLAYED AT SEAQUARIUM

1. <u>Marine Mammals</u>: dolphins, manatees, sea lions, seals, whales, walruses.

2. <u>Sea Turtles</u>.

3. <u>Fish</u>: sharks, rays and cartelagenous fishes, eels.



# TEXT FILE REPORT

## R-583-98 Resolution

Stephen P. Clark Government Center
111 N.W. 1st Street
Miami, FL 33128

### LEGISLATIVE FILE NUMBER _981667_

**VERSION: 0**    **STATUS: Adopted**

********************* Title *********************

RESOLUTION DIRECTING THAT CONTRACTS FOR  PRIVATELY FUNDED
IMPROVEMENTS ON COUNTY-OWNED LAND REQUIRE THE DESIGN OF SUCH
IMPROVEMENTS BE SUBJECT TO THE REQUIREMENTS OF THE BBE, HBE AND
WBE ORDINANCES
********************* Body *********************

 BE IT RESOLVED BY THE BOARD OF COUNTY COMMISSIONERS OF DADE
COUNTY, FLORIDA, that except as provided in the following sentence, all future leases
and contracts providing for privately funded improvements on County-owned land where
the funding is provided by for-profit entities, and amendments to existing leases and
contracts therefor, shall require the design of such improvements be subject to the
requirements of Sections 2-8.2, 2-8.2.3 and 2-8.2.4 of the Miami-Dade County Code to
the same extent as if the design was County, rather than privately, funded.  The
requirements of this resolution shall not apply to the following three airport projects: the
development leases with Professional Modifications Service, Inc., Airbus, and Federal
Express.  The requirements of this resolution may be waived by two-thirds vote of the
Board members present.

********************* E *********************

 The Chairperson thereupon declared the resolution duly passed and adopted this 19th
day
of May, 1998. This resolution shall become effective ten (10) days after the date of its
adoption unless vetoed by the Mayor, and if vetoed, shall become effective only upon an
override by this Board

1256-01

2

Approved _____ Mayor

Veto   _____

Override _____

Not On
Agenda Item No.   6(L)(1)(F)
11-6-01

OFFICIAL FILE COPY
CLERK OF THE BOARD
OF COUNTY COMMISSIONERS
DADE COUNTY, FLORIDA

RESOLUTION NO.____R-1256-01____

RESOLUTION APPROVING EXECUTION OF AN
AMENDMENT TO THE AMENDED AND RESTATED
LEASE AGREEMENT WITH MARINE EXHIBITION
CORPORATION d/b/a MIAMI SEAQUARIUM

WHEREAS, Marine Exhibition Corporation has operated the Miami Seaquarium
on Virginia Key since 1954; and

WHEREAS, the Marine Exhibition Corporation has entered into an amended and
restated lease with Miami-Dade County for use of a certain parcel of land lying in
Miami-Dade County, Florida, situated along the Rickenbacher Causeway across
Biscayne Bay on Virginia Key, Florida; and

WHEREAS, the amended and restated lease with Marine Exhibition Corporation
provides for options to extend the term of the Agreement ; and

WHEREAS, the September 11, 2001 terrorist attacks on the United States have
resulted in a marked reduction in the tourism industry; and

WHEREAS, the Marine Exhibition Corporation, a major tourist attraction in
Miami-Dade County can better recover from the current tourism decline through lease
modifications,

NOW, THEREFORE BE IT RESOLVED BY THE BOARD OF COUNTY
COMMISSIONERS OF MIAMI-DADE COUNTY, FLORIDA, that this Board

3

Not On
Agenda Item No. 6(L)(1)(F)
Page No. 2

approves the amendment to the amended and restated lease agreement with Marine Exhibition

Corporation d/b/a Miami Seaquarium in the form attached hereto and made part hereof; and

authorizes the County Manager to execute same for and on behalf of Miami-Dade County.

    The foregoing resolution was offered by Commissioner    **Dorrin D. Rolle**

who moved its adoption. The motion was seconded by Commissioner **Gwen Margolis**

and upon being put to a vote, the vote was as follows:

| | | | |
|---|---|---|---|
| Dr. Miriam Alonso | aye | Bruno A. Barreiro | aye |
| Dr. Barbara M. Carey-Shuler | aye | Betty T. Ferguson | aye |
| Gwen Margolis | aye | Joe A. Martinez | aye |
| Jimmy L. Morales | aye | Dennis C. Moss | aye |
| Dorrin D. Rolle | aye | Natacha Seijas | absent |
| Katy Sorenson | aye | Rebeca Sosa | aye |
| | Javier D. Souto  aye | | |

    The Chairperson thereupon declared the resolution duly passed and adopted this 6th day

of November, 2001. This resolution shall become effective ten (10) days after the date of its

adoption unless vetoed by the Mayor, and if vetoed, shall become effective only upon an override

by this Board.



MIAMI-DADE COUNTY, FLORIDA
BY ITS BOARD OF COUNTY
COMMISSIONERS

HARVEY RUVIN, CLERK

Approved by County Attorney as
to form and legal sufficiency

By **KAY SULLIVAN**
Deputy Clerk

Angelique Ortega

4

**FIRST AMENDMENT TO AMENDED AND RESTATED LEASE
BETWEEN MIAMI-DADE COUNTY AND
MARINE EXHIBITION CORPORATION d/b/a THE MIAMI SEAQUARIUM**

THIS FIRST AMENDMENT to Amended and Restated Lease between Miami-Dade County and Marine Exhibition Corporation, d/b/a The Miami Seaquarium, is made and entered into this ___16___ day of ___Nov___, 2001, between Miami-Dade County ("Lessor") and Marine Exhibition Corporation ("Lessee").

WHEREAS, Lessor and Lessee have entered into an Amended and Restated Lease dated July 25, 2000, whereby Lessor leased to Lessee a certain parcel of land lying in Miami-Dade County, Florida, situated along the Rickenbacker Causeway across Biscayne Bay on Virginia Key, Florida; and

WHEREAS, Lessor and Lessee deem it to be in their mutual best interests to amend and modify the Amended and Restated Lease to adjust certain lease term provisions in response to adverse impacts on the tourism industry emanating from terrorist attacks which took place on September 11, 2001;

NOW, THEREFORE, in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration by each of the parties hereto, to the other in hand paid, the receipt of which is hereby acknowledged, and in consideration of the mutual covenants hereinafter set forth, it is mutually covenanted, consented and agreed between Lessor and Lessee that the Amended and Restated Lease is hereby amended and modified as follows:

1. Paragraph 4 A "Term of Lease" is deleted in its entirety and replaced with the following language:

> A. Term of Lease. This Amended and Restated Lease is for a term commencing on March 9, 1954, and ending at midnight on July 12, 2008, unless extended in accordance with the provisions hereinafter set forth.

2. The fourth sentence of Paragraph 5 A "Extension Options" is deleted in its entirety and replaced with the following language:

> As of the Effective Date, Lessee, in its sole discretion, shall have the option to renew or extend the Amended and Restated Lease for additional terms commencing on the same calendar day as the Effective Date in the year 2008, as follows:

\*           \*           \*
DADE COUNTY, FLA.
CLERK, CIRCUIT & COUNTY COURTS
2002 FEB 20  PM 1: 26
CLERK OF THE BOARD

3. Paragraph 5 A (5) is deleted in its entirety and replaced with the following language:

(5) Provided that Lessee has exercised its maximum options under subparagraphs 5(A)(1) through 5(A)(4), above, Lessee, in its sole discretion, shall have the additional option to renew or extend the Amended and Restated Lease for two (2) successive terms of two and one-half (2.5) years each for each additional Nine Million Six Hundred Thirty Five Thousand Dollars ($9,635,000) of Capital Improvement Expenditures Lessee or its Sublessee(s) undertakes, subject to the provisions of subparagraph 5(F) hereof, which undertaking may be concurrent with the other Capital Improvement Expenditures required by this subparagraph. Pursuant to this subparagraph 5 (A)(5), Lessee may extend or renew the Amended and Restated Lease for up to an addition five (5) years for a total additional Capital Improvement Expenditure of Nineteen Million Two Hundred Seventy Thousand Dollars ($19,270,000) by Lessee or its Sublessee(s). All Capital Improvement Expenditures or renewals or extensions provided for in this subparagraph 5(A)(5) shall be in addition to those provided in subparagraphs 5(A)(1) through 5(A)(4) of this Section.

4. The second sentence of Subparagraph (1) of Paragraph 5 D "Vesting of Lease Extensions" is deleted in its entirety.

5. Paragraph 6 C "Additional Rent" is deleted in its entirety.

6. Paragraph 6 D "Review of Guaranteed and Percentage Rent Terms by Lessor" is redesignated Paragraph 6 C.

7. Paragraph 6 E is redesignated Paragraph 6 D.

8. The third sentence of Paragraph 8 C "CIR Annual Amount" is deleted in its entirety and replaced with the following language:

The requirement for payment of the CIR Annual Amount shall commence in lease year 16 following the Effective Date of the Amended and Restated Lease and terminate in Lease Year 41 following the Effective Date of the Amended and Restated Lease (the "CIR Term").

9. Paragraph 25 A "Definition of Aquarium" is deleted in its entirety and replaced with the following language:

A. Definition of Aquarium. For purposes of this Amended and Restated Lease the term "Aquarium" shall mean a container of any size or type which incorporates a clear viewing area for the exhibition of different species of fish, marine mammals and other water born animals to the public. Ponds, lakes, rivers and other comparable bodies of water shall not be deemed Aquariums for purposes of this Amended and Restated Lease.

10. Except as amended herein, the Amended and Restated Lease remains in full force and effect and is hereby ratified and confirmed in all respects.

IN WITNESS WHEREOF, Lessor and Lessee have caused this First Amendment to Amended and Restated Lease to be executed by the respective proper officers, duly authorized thereunto, the day and year first written above.

"Lessor"

MIAMI-DADE COUNTY, FLORIDA, by its
BOARD OF COUNTY COMMISSIONERS

ATTEST:

By: _____
    Deputy Clerk

By: _____
    County Manager

(OFFICIAL SEAL)

"Lessee"

MARINE EXHIBITION CORPORATION, a
Florida corporation

ATTEST:

By: _____
    Assistant Secretary

By: _____
    Arthur H. Hertz, Chairman

(CORPORATE SEAL)



# Miami-Dade Legislative Item
# File Number: 012888

---

**File Number:** 012888      **File Type:** Resolution      **Status:** Adopted

**Version:** 0      **Reference:** R-1256-01      **Control:** County Commission

**File Name:** AMND LEASE AGRMNT W/ MARINE EXHIBITION CORP. **Introduced:** 11/1/2001

**Requester:** Park & Recreation Department    **Cost:**      **Final Action:** 11/6/2001

**Agenda Date:** 11/6/2001 **Agenda Item Number:** 6L1F

**Notes: Title:** RESOLUTION APPROVING EXECUTION OF AN AMENDMENT TO THE AMENDED AND
         RESTATED LEASE AGREEMENT WITH MARINE EXHIBITION CORPORATION D/B/A
         MIAMI SEAQUARIUM

**Indexes:** AMENDMENT TO LEASE **Sponsors:** NONE
       MIAMI SEAQUARIUM

**Sunset Provision:** No        **Effective Date:**        **Expiration Date:**

**Registered Lobbyist:** None Listed

---

## Legislative History

| Acting Body | Date | Agenda Item | Action | Sent To | Due Date | Returned | Pass/Fail |
|---|---|---|---|---|---|---|---|
| Board of County Commissioners | 11/6/2001 | 6L1F | Adopted | | | | P |
| County Attorney | 11/1/2001 | | Assigned | Angelique Ortega | | 11/1/2001 | |
| County Manager **REPORT:** | 11/1/2001 PARKS AND RECREATION | | Assigned | County Attorney | 11/6/2001 | | |
| County Manager | 11/1/2001 | | Assigned | Alina Tejeda-Hudak | 11/1/2001 | 11/1/2001 | |

---

## Legislative Text

**TITLE**
RESOLUTION APPROVING EXECUTION OF AN AMENDMENT TO THE AMENDED AND RESTATED
LEASE AGREEMENT WITH MARINE EXHIBITION CORPORATION d/b/a MIAMI SEAQUARIUM

**BODY**
WHEREAS, Marine Exhibition Corporation has operated the Miami Seaquarium on Virginia Key since 1954; and

WHEREAS, the Marine Exhibition Corporation has entered into an amended and restated lease with Miami-Dade County for use of a certain parcel of land lying in Miami-Dade County, Florida, situated along the Rickenbacher Causeway across Biscayne Bay on Virginia Key, Florida; and

WHEREAS, the amended and restated lease with Marine Exhibition Corporation provides for options to extend the term of the Agreement, and

WHEREAS, the September 11, 2001 terrorist attacks on the United States have resulted in a marked reduction in the tourism industry; and

WHEREAS, the Marine Exhibition Corporation, a major tourist attraction in Miami-Dade County can better recover from the current tourism decline through lease modifications,

NOW, THEREFORE BE IT RESOLVED BY THE BOARD OF COUNTY COMMISSIONERS OF MIAMI-DADE COUNTY, FLORIDA, that this Board approves the amendment to the amended and restated lease agreement with Marine Exhibition Corporation d/b/a Miami Seaquarium in the form attached hereto and made part hereof; and authorizes the County Manager to execute same for and on behalf of Miami-Dade County.

.. HEADER
To: Honorable Chairperson and Members Date:
Board of County Commissioners

Subject: Amendment to Lease Agreement with Marine
From: Steve Shiver Exhibition Corp. d/b/a Miami Seaquarium
County Manager

At its meeting of October 23, 2001, the Board adopted an ordinance relating to placing items on the County Commission Agenda. Said ordinance requires that items subject to the 4-day rule not be placed on the agenda by the County Manger unless it is certified in writing that the item is time sensitive or is an emergency affecting, life, health property, or public safety. As indicated by the attached letter from the attorney for the Miami Seaquarium, approval of this lease amendment is time sensitive because the Seaquarium's lender requires an extension of the lease term as a condition of the loan. The loan will expire before the next Board meeting on November 20, 2001, and must be considered now in order to ensure the Seaquarium's financing.

**STAFF RECOMMENDATION**
It is recommended that the Board approve the attached amendment to the amended and restated lease agreement with Marine Exhibition Corporation d/b/a Miami Seaquarium that modifies the terms under which lease extensions are granted.

**MANAGER'S BACKGROUND**
The Marine Exhibition Corporation has operated at the Miami Seaquarium on Key Biscayne as one of Miami's premier tourist attractions since 1954. In July 2000, the Board approved an amended and restated lease for the property on which the Miami Seaquarium is situated, that provided for term extensions based on contemplated capital improvements.

The September 11, 2001 terrorist attack on the World Trade Center in New York City has had a profound effect on the tourism industry in south Florida. The resulting reduction in visitors to the area and more specifically the Miami Seaquarium has resulted in the Marine Exhibition Corporation's reassessing the wisdom of initiating large scale capital improvements until such time as the economy and the tourism industry recovers.

The attached lease amendment does not change the total years available under the agreement, but rather restructures the conditions under which certain term extensions are granted. It provides for an additional term of five (5) years

beginning at the end of the current term on July 12, 2003, and extending until July 12, 2008. This allows for the Miami Seaquarium to re-assess its capital improvement plan.

⌐orresponding modifications to the agreement eliminate rent penalties for failure to immediately construct the ⌐eplacement Mammal Stadium and Pool, defer for five (5) years the set-aside requirement for Capital Improvement Reserve (CIR), and correct a punctuation scrivener's error in the definition of aquarium.

Home  |  Agendas  |  Minutes  |  Legislative Search  |  Lobbyist Registration  |  Legislative Reports
2011 BCC Meeting Calendar  |  Miami-Dade County Code of Ordinances  |  ADA Notice  |

Home  |  Using Our Site  |  About  |  Phone Directory  |  Privacy  |  Disclaimer

E-mail your comments, questions and suggestions to Webmaster

Web Site © 2011 Miami-Dade County.
All rights reserved.

 **MEMORANDUM**

Agenda Item No. 7(M)(1)(A)

TO: Honorable Chairperson and Members
Board of County Commissioners

DATE: **July 22, 2003**

FROM: George M. Burgess
County Manager

SUBJECT: Second Amendment to the
Amended and Restated Lease
Agreement with Marine
Exhibition Corporation d/b/a/
Miami Seaquarium

## RECOMMENDATION

It is recommended that the Board approve a Second Amendment to the Amended and Restated Lease Agreement with Marine Exhibition Corporation d/b/a Miami Seaquarium (Seaquarium) to reallocate property on Virginia Key for future expansion of overflow parking facilities to serve the Seaquarium and provide public parking for Virginia Key and Crandon Park.

## BACKGROUND

In March 1954 the County entered into a Lease Agreement with Marine Exhibition Corporation for development and operation of the Seaquarium. As part of that agreement, the Seaquarium was afforded access to property north of the Rickenbacker Causeway for future development of overflow parking.

Through the years the designated property was utilized for various educational and research facilities and is no longer available. The Seaquarium is currently in the process of obtaining funding for development of its master plan. The current ambiguity in the lease agreement regarding this property and the Seaquarium's opportunity for future development of parking facilities must be resolved before that financing can be finalized.

After extensive discussion with Miami-Dade Park and Recreation Department, the Public Works Department and County Attorney's Office, all parties have agreed that the alternate property as detailed in the attached exhibits can be made available to satisfy the future need for dedicated public parking. This parking facility would serve the Seaquarium, as well as public patrons utilizing facilities and attending special events in the area.

Attachment



# MEMORANDUM
### (Revised)

TO: Honorable Chairperson and Members
Board of County Commissioners

DATE: July 22, 2003

FROM: Robert A. Ginsburg
County Attorney

SUBJECT: Agenda Item No. 7(M)(1)(A)

---

Please note any items checked.

_____ "4-Day Rule" ("3-Day Rule" for committees) applicable if raised

_____ 6 weeks required between first reading and public hearing

_____ 4 weeks notification to municipal officials required prior to public hearing

_____ Decreases revenues or increases expenditures without balancing budget

_____ Budget required

_____ Statement of fiscal impact required

_____ Bid waiver requiring County Manager's written recommendation

_____ Ordinance creating a new board requires detailed County Manager's report for public hearing

_____ Housekeeping item (no policy decision required)

_____ No committee review

2

## SECOND AMENDMENT TO AMENDED AND RESTATED LEASE
## BETWEEN MIAMI-DADE COUNTY AND
## MARINE EXHIBITION CORPORATION d/b/a THE MIAMI SEAQUARIUM

THIS SECOND AMENDMENT to Amended and Restated Lease between Miami-Dade County and Marine Exhibition Corporation, d/b/a The Miami Seaquarium, is made and entered into this 7TH day of August, 2003, between Miami-Dade County ("Lessor") and Marine Exhibition Corporation ("Lessee").

WHEREAS, Lessor and Lessee have entered into an Amended and Restated Lease ("Lease") dated July 25, 2000, whereby Lessor leased to Lessee a certain parcel of land lying in Miami-Dade County, Florida, situated along the Rickenbacker Causeway across Biscayne Bay on Virginia Key, Florida; and

WHEREAS, the Lease was amended by a First Amendment to Amended and Restated Lease dated November 6, 2001; and

WHEREAS, Lessor and Lessee deem it to be in their mutual best interests to amend and modify the Lease to adjust certain lease term provisions;

NOW, THEREFORE, in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration by each of the parties hereto, to the other in hand paid, the receipt of which is hereby acknowledged, and in consideration of the mutual covenants hereinafter set forth, it is mutually covenanted, consented and agreed between Lessor and Lessee that the Amended and Restated Lease, as amended, is hereby further amended and modified as follows:

1. Paragraph 2 A is deleted in its entirety and replaced with the following language:

A. <u>Adjacent Property</u>. Lessor agrees that the certain property owned by Lessor as of the date of execution of this Amended and Restated Lease located across the highway (Rickenbacker Causeway) from the Demised Premises and located on the northerly side of the existing causeway or roadway and identified as Parcels "A", "B", "C", and "D" in Exhibit "4-A" dated July, 2003, attached hereto and made a part hereof (the "Adjacent Property"), shall not be built upon (except as more particularly set forth in Paragraph 24, below), or conveyed or leased to third parties during the term of this Amended and Restated Lease, as the same may be extended, but shall be kept in a sightly condition by proper planting and mowing by Lessee and at the expense of Lessee. Lessee shall pay the cost of and Lessor grants Lessee the right to construct a public parking facility subject to any applicable regulatory approvals. Lessee further agrees to pay the costs

associated with the realignment of Virginia Beach Road and Arthur Lamb Road, to the extent any such realignment is necessary to construct the parking facilities. Said public parking facility shall be open to the public in accordance with Section 24 below, on the Adjacent Property for the term of this Amended and Restated Lease and any extension hereof. Lessee and Lessor agree that this use constitutes an acceptable public purpose for purposes of this Amended and Restated Lease as set forth above and for purposes of any applicable restrictions or requirements. The construction and operation of the public parking facility by Lessee on the Adjacent Property shall be as more particularly set forth in Section 24 below. Lessee further agrees that in the event Lessee elects to use the Adjacent Property for any purpose other than    public purpose stated herein, it shall first obtain from the Trustees of the Internal Improvement Trust Fund an approval of such alternate use. Any portions of Parcels "A," "B," "C," or  "D" that include the travel lane of either Virginia Beach Road or Arthur Lamb Road shall not be modified or obstructed by the Lessee, and the public shall have continued use of the travel lanes, except and until Lessee has obtained applicable regulatory approvals for any realignment of said roads, to the extent any such realignment is necessary to construct the public parking facility.

2. Paragraphs 24 A and 24 B are deleted in their entirety and replaced with the following language:

A. Lessee shall provide at its own expense a parking lot or lots for the parking of automobiles on the Demised Premises.

B. Subject to any applicable regulatory approvals, Lessee may construct, at its expense, a public parking facility on the Adjacent Property as set forth in Paragraph 2 A, above. The public parking facility on the Adjacent Property shall be constructed in substantial compliance with the conceptual plans entitled "Miami Seaquarium Conceptual Overflow Parking, Exhibit 1A and Exhibit 2" dated July 2, 2003, prepared by David Plummer & Associates, Inc. ("Conceptual Plans"). The construction of the public parking facility on the Adjacent Property by Lessee shall be in accordance with, but need not exceed, applicable Miami-Dade County Code requirements, except that Lessor and Lessee shall mutually agree as to the quality of landscaping to be planted within a five foot wide area located within the clear zone and within the Adjacent Property, and identified on the Conceptual Plans as the "5 foot parking landscaped area." If additional landscaping is required, it

shall be planted in the clear zone outside the Adjacent Property. Any modifications and adjustments to the Conceptual Plans, including any modifications and adjustments to signalization, must be approved by the Director of the Public Works Department and other applicable regulatory and permitting agencies. The Adjacent Property shall not be used for other purposes or conveyed or leased by Lessor to other parties during the term of the Amended and Restated Lease, or any extension hereof; provided, however, that notwithstanding the provisions of Paragraph 13, above, Lessor reserves the right to modify, remove or reduce the parking area within (1) the Adjacent Property identified as Parcels "A" and "B" on the attached Exhibit "4-A" dated July, 2003, if and when it is necessary and solely to the extent necessary for Virginia Beach Road to be widened by Lessor and it is not practical to widen the road by using property located on the opposite side of the road on land not subject to this Amended and Restated Lease; and/or (2) the Adjacent Property identified as Parcels "C" and "D" on the attached Exhibit "4-A" dated July, 2003, if and when it is necessary and solely to the extent necessary for Arthur Lamb Road to be widened by Lessor and it is not practical to widen the road by using property located on the opposite side of the road on land not subject to this Amended and Restated Lease. In the event that the widening of Virginia Beach Road results in the loss of parking spaces within Parcel "B", Lessor agrees to endeavor to make available within 500 feet of Parcels "A", "B", "C" or "D" land sufficient in size to accommodate parking spaces equal in number to those spaces displaced by the widening of Virginia Beach Road. Further, notwithstanding the provisions of Paragraph 13, above, Lessee agrees to remove any parking spaces that may prevent driveway access to a property located adjacent to the public parking facility. The parking spaces will be removed only to the minimum extent necessary to provide safe and lawful driveway access and only after the appropriate authorities have approved an application for permission to construct a driveway that has been filed by the owner of a property located adjacent to the public parking facility.

3. Paragraph 24 C is amended by deleting the first two sentences in their entirety.

4. Except as amended herein, the Lease remains in full force and effect and is hereby ratified and confirmed in all respects.

IN WITNESS WHEREOF, Lessor and Lessee have caused this Second Amendment to Amended and Restated Lease to be executed by the respective proper officers, duly authorized thereunto, the day and year first written above.

"Lessor"

MIAMI-DADE COUNTY, FLORIDA, by its
BOARD OF COUNTY COMMISSIONERS

ATTEST:

By: _____        By: _____
    Deputy Clerk                        County Manager

                                    (OFFICIAL SEAL)

"Lessee"

MARINE EXHIBITION CORPORATION, a
Florida corporation

ATTEST:

By: _____        By: _____
    Assistant Secretary                Arthur H. Hertz, Chairman

                                    (CORPORATE SEAL)

8

# EXHIBIT 4-A

## July 2003
## SKETCH TO ACCOMPANY LEGAL DESCRIPTION
## PARCEL "A"
## IN SECTION 20, TOWNSHIP 54 SOUTH, RANGE 42 EAST
## ISLAND OF VIRGINIA KEY, CITY OF MIAMI, MIAMI-DADE COUNTY, FLORIDA

### DEFINITIONS, GENERALLY:

SKETCH: Shall mean the graphic depiction of the Map made a part hereof and incorporated herein, reference to which is made for a more full and complete description thereof.
COUNTY: Shall mean Miami-Dade County, a Political Subdivision of the State of Florida, the name of which was changed from "Dade County" by its electors on November 13, 1997 and codified by its Board of County Commissioners pursuant to County Ordinance Number 97-212. All references to instruments recorded prior to that date shall refer to the previous County name and conversely, all references to instruments recorded subsequent to that date (or mention by common report, as the case may be) shall refer to the present County name.

### LEGAL DESCRIPTION:

All that lot, piece or parcel of land, situate, lying and being in Section 20, Township 54 South, Range 42 East, on the Island of Virginia Key, City of Miami, Miami-Dade County, Florida, the same being more particularly described by metes and bounds as follows, viz.:

Commence at the Point of Intersection of the North line of said Section 20 with the Centerline of the Rickenbacker Causeway, the location which is more fully described in the Plat entitled SECOND REVISED PLAT OF SHEET 9 METROPOLITAN DADE COUNTY BULKHEAD LINE PART FOUR, according to the Plat thereof, as recorded in Plat Book 74 at Page 9 of the Public Records of Dade County (now Miami-Dade County), Florida; thence S45°44'14"E along said Centerline of the Rickenbacker Causeway for 545.63 feet; thence departing said Centerline of the Rickenbacker Causeway, N44°15'46"E for 76.00 feet to the POINT OF BEGINNING of the hereinafter described parcel of land; from said POINT OF BEGINNING, thence continue N44°15'46"E for 99.00 feet; thence S45°44'14"E for 1004.90 feet; thence S13°48'38"E for 52.00 feet to a Point of Curvature with the arc of a circular curve concave to the Northeast, the last described course being radial to said curve; thence Northwesterly along the arc of said curve, having a radius of 151.76 feet and a central angle of 58°04'24" for 153.81 feet to a Point of Tangent Intersection with a line; thence N45°44'14"W along said line for 920.24 feet to the POINT OF BEGINNING.

Said Parcel contains 100,541 Square Feet or 2.31 Acres, more or less by calculation.

### SOURCES OF DATA:

The Legal Description as cited above was generated based on the following data:

Bearings as shown hereon refer to a calculated bearing of South 45 degrees 44 minutes 14 seconds East along the Centerline of the Rickenbacker Causeway, as shown on the Plat of SECOND REVISED PLAT OF SHEET 9 METROPOLITAN DADE COUNTY BULKHEAD LINE PART FOUR, according to the Plat thereof, as recorded in Plat Book 74 at Page 9 of the Public Records of Dade County (now Miami-Dade County), Florida, and rotated to match the State Plane Coordinate System for the East Zone of Florida.

### LIMITATIONS:

Since no other information other than what is cited in the Sources of Data were furnished, the client is hereby advised that there may be legal restrictions on the subject property that are not shown on the Map or contained within this Report that may be found in the Public Records of Miami-Dade County or the records of any other public and private entities as their jurisdictions may appear.

THIS DOCUMENT CONSISTS OF THREE (3) PAGES AND EACH PAGE SHALL NOT BE CONSIDERED FULL, VALID AND COMPLETE UNLESS ATTACHED TO THE OTHERS.

NOT A FIELD SURVEY

RVEY DIVISION\WORK2003\01-0588.30 0050 MIAMI SEAQUARIUM\01-0588.30 FINAL PARCEL LOCATIONS\dwg\01058830.dwg  06/26/2003  9:22:44 AM CDT

SHEET 1 OF 3

| **PBS** 2001 N.W. 107th AVE. MIAMI, FL 33172-2507 (305) 592-7275 FLORIDA CERTIFICATE OF AUTHORIZATION NUMBER LB24 | WOMETCO ENTERPRISES, INC. SKETCH TO ACCOMPANY LEGAL DESCRIPTION | DATE: 07-07-2003 DESIGNED: R.P. DRAWN: R.P. CHECKED: D.W.D. JOB NO.: 01-0588.30 0100 |

This "Sketch to Accompany Legal Description" does not represent a field boundary survey of the Subject Property, or the underlying tracts of land thereof.

The Boundary data as depicted on the Map was acquired from field location work performed by PBS&J on June 17, 2003 as part of this project and is indicated thereon for informational purposes only.

## SURVEYOR'S CERTIFICATE:

I HEREBY CERTIFY: That this "Sketch to Accompany Legal Description" was prepared under my direction and is true and correct to the best of my knowledge and belief and further, that said Sketch meets the intent of the applicable provisions of the "Minimum Technical Standards for Land Surveying in the State of Florida," pursuant to Rule 61G17-6 of the Florida Administrative Code and its implementing law, Chapter 472.027 of the Florida Statutes.

**PBSJ**, a Florida Corporation
Florida Certificate of Authorization No. LB24

By: _C. M. del Valle_

Carlos M. del Valle, PLS
Professional Land Surveyor No. 4408
State of Florida
Date of Certification:    **JUL 0 7 2003**

NOTICE:   Not valid without the signature and original raised seal of a Florida licensed Surveyor and Mapper. Additions or deletions to survey maps and reports by other than the signing party or parties are prohibited without the written consent of the signing party or parties. This document consists of multiple pages and each page shall not be considered full, valid and complete unless attached to the others. This notice is required pursuant to Rule 61G17-6 of the Florida Administrative Code.

© 2003-PBS&J, a Florida Corporation
All Rights Reserved

THIS DOCUMENT CONSISTS OF THREE (3) PAGES AND EACH PAGE SHALL NOT BE CONSIDERED FULL, VALID AND COMPLETE UNLESS ATTACHED TO THE OTHERS.

NOT A FIELD SURVEY

\SURVEY DIVISION\WORK2003\01-0588.30 0050 MIAMI SEAQUARIUM\01-0568.30 FINAL PARCEL LOCATIONS\dwg\01058830_recover.dwg  06/25/2003  11:45:09 AM EDT

SHEET 2 OF

| **PBSJ** 2001 N.W. 107th AVE. MIAMI, FL 33172-2507 (305) 592-7275 FLORIDA CERTIFICATE OF AUTHORIZATION NUMBER LB24 | WOMETCO ENTERPRISES, INC. SKETCH TO ACCOMPANY LEGAL DESCRIPTION | DATE: 06-25-13 DESIGNED: R.P. DRAWN: R.P. CHECKED: D.W.D. JOB NO.: 01-0588.30 011 |



# PARCEL "A"

**LEGEND**

℄ CENTER LINE

**ABBREVIATIONS**

P.O.C. = POINT OF COMMENCEMENT

P.O.B. = POINT OF BEGINNING

(C) = CALCULATED

CH.L.F. = CHAIN LINK FENCE

CONC. = CONCRETE

O.R.B. = OFFICIAL RECORDS BOOK

PG. = PAGE

(R) = RECORD

SEC. = SECTION

R = RADIUS

Δ = CENTRAL ANGLE

L = ARC LENGTH

TAN = TANGENT

PC = POINT OF CURVATURE

PT = POINT OF TANGENCY

L=153.81'
R=151.76'
Δ=58°04'24"
Tan=84.25'

THIS DOCUMENT CONSISTS OF THREE (3) PAGES AND
EACH PAGE SHALL NOT BE CONSIDERED FULL, VALID
AND COMPLETE UNLESS ATTACHED TO THE OTHERS.

NOT A FIELD SURVEY

SURVEY DIVISION\WORK2003\01-0588.30 0050 MIAMI SEAQUARIUM\01-0588.30 FINAL PARCEL LOCATIONS\dwg\010588.30.dwg  06/26/2003  9:22:44 AM CDT

SHEET 3 OF :

| PBSJ 2001 N.W. 107th AVE. MIAMI, FL 33172-2507 (305) 592-7275 FLORIDA CERTIFICATE OF AUTHORIZATION NUMBER LB24 | WOMETCO ENTERPRISES, INC. SKETCH TO ACCOMPANY LEGAL DESCRIPTION | DATE: 07-07-200: DESIGNED: R.P. DRAWN: R.P. CHECKED: D.W.D. JOB NO.: 01-0588.30 01C |

# EXHIBIT 4-A

## July 2003
## SKETCH TO ACCOMPANY LEGAL DESCRIPTION
## PARCEL "B"
## IN SECTION 20, TOWNSHIP 54 SOUTH, RANGE 42 EAST
## ISLAND OF VIRGINIA KEY, CITY OF MIAMI, MIAMI-DADE COUNTY, FLORIDA

### DEFINITIONS, GENERALLY:

SKETCH: Shall mean the graphic depiction of the Map made a part hereof and incorporated herein, reference to which is made for a more full and complete description thereof.
COUNTY: Shall mean Miami–Dade County, a Political Subdivision of the State of Florida, the name of which was changed from "Dade County" by its electors on November 13, 1997 and codified by its Board of County Commissioners pursuant to County Ordinance Number 97–212. All references to instruments recorded prior to that date shall refer to the previous County name and conversely, all references to instruments recorded subsequent to that date (or mention by common report, as the case may be) shall refer to the present County name.

### LEGAL DESCRIPTION:

All that lot, piece or parcel of land, situate, lying and being in Section 20, Township 54 South, Range 42 East, on the Island of Virginia Key, City of Miami, Miami–Dade County, Florida, the same being more particularly described by metes and bounds as follows, viz,:

Commence at the Point of Intersection of the North line of said Section 20 with the Centerline of the Rickenbacker Causeway, the location which is more fully described in the Plat entitled SECOND REVISED PLAT OF SHEET 9 METROPOLITAN DADE COUNTY BULKHEAD LINE PART FOUR, according to the Plat thereof, as recorded in Plat Book 74 at Page 9 of the Public Records of Dade County (now Miami–Dade County), Florida; thence S45°44'14"E along said Centerline of the Rickenbacker Causeway for 545.63 feet; thence departing said Centerline of the Rickenbacker Causeway, N44°15'46"E for 175.00 feet; thence S45°44'14"E for 1004.90 feet to the POINT OF BEGINNING of the hereinafter described parcel of land; from said POINT OF BEGINNING, thence N76°11'22"E for 498.60 feet; thence S13°48'38"E for 52.00 feet; thence S76°11'22"W for 498.60 feet; thence N13°48'38"W for 52.00 feet to the POINT OF BEGINNING.

Said Parcel contains 25,927 Square Feet or 0.60 Acres, more or less by calculation.

### SOURCES OF DATA:

The Legal Description as cited above was generated based on the following data:

Bearings as shown hereon refer to a calculated bearing of South 45 degrees 44 minutes 14 seconds East along the Centerline of the Rickenbacker Causeway, as shown on the Plat of SECOND REVISED PLAT OF SHEET 9 METROPOLITAN DADE COUNTY BULKHEAD LINE PART FOUR, according to the Plat thereof, as recorded in Plat Book 74 at Page 9 of the Public Records of Dade County (now Miami–Dade County), Florida, and rotated to match the State Plane Coordinate System for the East Zone of Florida.

### LIMITATIONS:

Since no other information other than what is cited in the Sources of Data were furnished, the client is hereby advised that there may be legal restrictions on the subject property that are not shown on the Map or contained within this Report that may be found in the Public Records of Miami–Dade County or the records of any other public and private entities as their jurisdictions may appear.

THIS DOCUMENT CONSISTS OF THREE (3) PAGES AND EACH PAGE SHALL NOT BE CONSIDERED FULL, VALID AND COMPLETE UNLESS ATTACHED TO THE OTHERS.

NOT A FIELD SURVEY

E:\SURVEY DIVISION\WORK2003\01–0588.30 0050 MIAMI SEAQUARIUM\01–0588.30 FINAL PARCEL LOCATIONS\dwg\01058830.dwg  06/26/2003  9:22:44 AM EDT

SHEET 1 OF

| | | |
|---|---|---|
| **PBS** 2001 N.W. 107th AVE. MIAMI, FL 33172–2507 (305) 592–7275 FLORIDA CERTIFICATE OF AUTHORIZATION NUMBER LB24 | WOMETCO ENTERPRISES, INC. SKETCH TO ACCOMPANY LEGAL DESCRIPTION | DATE: 07–07– DESIGNED: R.P. DRAWN: R.P. CHECKED: D.W.D. JOB NO.: 01–0588.30 01 |

This "Sketch to Accompany Legal Description" does not represent a field boundary survey of the Subject Property, or the underlying tracts of land thereof.

The Boundary data as depicted on the Map was acquired from field location work performed by PBS&J on June 17, 2003 as part of this project and is indicated thereon for informational purposes only.

## SURVEYOR'S CERTIFICATE:

I HEREBY CERTIFY: That this "Sketch to Accompany Legal Description" was prepared under my direction and is true and correct to the best of my knowledge and belief and further, that said Sketch meets the intent of the applicable provisions of the "Minimum Technical Standards for Land Surveying in the State of Florida," pursuant to Rule 61G17-6 of the Florida Administrative Code and its implementing law, Chapter 472.027 of the Florida Statutes.

**PBS**, a Florida Corporation
Florida Certificate of Authorization No. LB24

By: _C. M. del Valle_

Carlos M. del Valle, PLS
Professional Land Surveyor No. 4408
State of Florida
Date of Certification:    **JUL 0 7 2003**

NOTICE:    Not valid without the signature and original raised seal of a Florida licensed Surveyor and Mapper. Additions or deletions to survey maps and reports by other than the signing party or parties are prohibited without the written consent of the signing party or parties. This document consists of multiple pages and each page shall not be considered full, valid and complete unless attached to the others. This notice is required pursuant to Rule 61G17-6 of the Florida Administrative Code.

© 2003-PBS&J, a Florida Corporation
All Rights Reserved

THIS DOCUMENT CONSISTS OF THREE (3) PAGES AND EACH PAGE SHALL NOT BE CONSIDERED FULL, VALID AND COMPLETE UNLESS ATTACHED TO THE OTHERS.

NOT A FIELD SURVEY

\SURVEY DIVISION\WORK2003\01-0588.30 0050 MIAMI SEAQUARIUM\01-0588.30 FINAL PARCEL LOCATIONS\dwg\01058830_recover.dwg  06/25/2003  12:05:37 PM EDT

SHEET 2 OF

| **PBS** 2001 N.W. 107th AVE. MIAMI, FL 33172-2507 (305) 592-7275 | WOMETCO ENTERPRISES, INC. | DATE: 06-25-200 DESIGNED: R.P. |
|---|---|---|
| FLORIDA CERTIFICATE OF AUTHORIZATION NUMBER LB24 | 13  SKETCH TO ACCOMPANY LEGAL DESCRIPTION | DRAWN: R.P. CHECKED: D.W.D. JOB NO.: 01-0588.30 0 |

# PARCEL "B"



0    70    140    280    420

GRAPHIC SCALE IN FEET

## LEGEND

₵    CENTER LINE

## ABBREVIATIONS

P.O.C. = POINT OF COMMENCEMENT
P.O.B. = POINT OF BEGINNING
(C) = CALCULATED
CH.L.F. = CHAIN LINK FENCE
CONC. = CONCRETE
O.R.B. = OFFICIAL RECORDS BOOK
PG. = PAGE
(R) = RECORD
SEC. = SECTION
R = RADIUS,
Δ = CENTRAL ANGLE
L = ARC LENGTH
TAN = TANGENT
PC = POINT OF CURVATURE
PT = POINT OF TANGENCY

FOUND CONCRETE MONUMENT(NO ID)
(S.E. CORNER)

POC
FOUND 1/2"⌀
IRON PIPE IN CONC.
(NO ID)

S 89°40'47" W
2650.16'(C)

NORTH LINE OF
SEC.20-54-42

N 44°15'48" E
175.00'(C)

S 45°44'14" E
100±.90'(C)

S 45°44'14" E
545.63'(C)

₵ DEFINED BY
P.B. 74, PAGE 9

RICKENBACKER
CAUSEWAY

N 76°11'22" E    498.60'(C)

PARCEL "B"

S 76°11'22" W    498.60'(C)

POB

175'

N 13°48'36" W
52.00'(C)

S 13°48'36" E
52.00'(C)

FOUND 1"⌀
IRON PIPE
IN CONC.(NO ID)

THIS DOCUMENT CONSISTS OF THREE (3) PAGES AND
EACH PAGE SHALL NOT BE CONSIDERED FULL, VALID
AND COMPLETE UNLESS ATTACHED TO THE OTHERS.

SHEET 3 OF

NOT A FIELD SURVEY
E:\SURVEY DIVISION\WORK2003\01-0588.30 0050 MIAMI SEAQUARIUM\01-0588.30 FINAL PARCEL LOCATIONS\dwg\01058830.dwg  06/26/2003  9:22:44 AM EDT

| PBS | 2001 N.W. 107th AVE.<br>MIAMI, FL 33172-2507<br>(305) 592-7275 | WOMETCO ENTERPRISES, INC. | DATE: 07-07-2000 |
|-----|----------------------------------------------------------------|---------------------------|------------------|
| | | | DESIGNED: R.P. |
| | | SKETCH TO ACCOMPANY | DRAWN: R.P. |
| | | LEGAL DESCRIPTION | CHECKED: D.W.D. |
| FLORIDA CERTIFICATE OF AUTHORIZATION NUMBER LB24 | 14 | | JOB NO.: 01-0588.30 01 |

# EXHIBIT 4-A

## July 2003
### SKETCH TO ACCOMPANY LEGAL DESCRIPTION
### PARCEL "C"
### IN SECTION 20, TOWNSHIP 54 SOUTH, RANGE 42 EAST
### ISLAND OF VIRGINIA KEY, CITY OF MIAMI, MIAMI-DADE COUNTY, FLORIDA

**DEFINITIONS, GENERALLY:**

SKETCH: Shall mean the graphic depiction of the Map made a part hereof and incorporated herein, reference to which is made for a more full and complete description thereof.
COUNTY: Shall mean Miami-Dade County, a Political Subdivision of the State of Florida, the name of which was changed from "Dade County" by its electors on November 13, 1997 and codified by its Board of County Commissioners pursuant to County Ordinance Number 97-212. All references to instruments recorded prior to that date shall refer to the previous County name and conversely, all references to instruments recorded subsequent to that date (or mention by common report, as the case may be) shall refer to the present County name.

**LEGAL DESCRIPTION:**

All that lot, piece or parcel of land, situate, lying and being in Sections 17 and 20, Township 54 South, Range 42 East, on the Island of Virginia Key, Miami-Dade County, Florida, the same being more particularly described by metes and bounds as follows, viz.:

Commence at the Point of Intersection of the North line of said Section 20 with the Centerline of the Rickenbacker Causeway, the location which is more fully described in the Plat entitled "SECOND REVISED PLAT OF SHEET 9 METROPOLITAN DADE COUNTY BULKHEAD LINE PART FOUR," according to the Plat thereof, as recorded in Plat Book 74 at Page 9 of the Public Records of Dade County (now Miami-Dade County), Florida; thence S45°44'14"E along said Centerline of the Rickenbacker Causeway for 145.31 feet to a Point of Intersection with the Centerline of Arthur Lamb Jr. Road; thence departing said Centerline of the Rickenbacker Causeway, N64°12'18"E along said Centerline of Arthur Lamb Jr. Road for 176.47 feet; thence departing said Centerline of Arthur Lamb Jr. Road, N25°47'42"W for 48.00 feet to the POINT OF BEGINNING of the hereinafter described parcel of land; from said POINT OF BEGINNING, thence S64°12'18"W for 54.00 feet to a Point of Curvature of a circular curve concave to the North; thence Southwesterly, Westerly and Northwesterly along the arc of said curve, having a radius of 85.00 feet and a central angle of 70°03'28" for 103.93 feet to the Point of Tangency; thence N45°44'14"W for 591.45 feet; thence N44°15'46"E for 124.50 feet; thence S45°44'14"E for 640.90 feet; thence S25°47'42"E for 52.00 feet to the POINT TO BEGINNING.

Said Parcel contains 82,729 Square Feet or 1.90 Acres, more or less by calculation.

**SOURCES OF DATA:**

The Legal Description as cited above was generated based on the following data:

Bearings as shown hereon refer to a calculated bearing of South 45 degrees 44 minutes 14 seconds East along the Centerline of the Rickenbacker Causeway, as shown on the Plat of "SECOND REVISED PLAT OF SHEET 9 METROPOLITAN DADE COUNTY BULKHEAD LINE PART FOUR," according to the Plat thereof, as recorded in Plat Book 74 at Page 9 of the Public Records of Dade County (now Miami-Dade County), Florida, and rotated to match the State Plane Coordinate System for the East Zone of Florida.

**LIMITATIONS:**

Since no other information other than what is cited in the Sources of Data were furnished, the client is hereby advised that there may be legal restrictions on the subject property that are not shown on the Map or contained within this Report that may be found in the Public Records of Miami-Dade County or the records of any other public and private entities as their jurisdictions may appear.

THIS DOCUMENT CONSISTS OF THREE (3) PAGES AND EACH PAGE SHALL NOT BE CONSIDERED FULL, VALID AND COMPLETE UNLESS ATTACHED TO THE OTHERS.

NOT A FIELD SURVEY

SURVEY DIVISION\WORK2003\01-0588.30 0050 MIAMI SEAQUARIUM\01-0588.30 FINAL PARCEL LOCATIONS\dwg\01058830.dwg   06/26/2003  9:22:44 AM EDT

SHEET 1 OF

| **PBS** | 2001 N.W. 107th AVE.<br>MIAMI, FL 33172-2507<br>(305) 592-7275<br><br>FLORIDA CERTIFICATE OF AUTHORIZATION NUMBER LB24 | WOMETCO ENTERPRISES, INC.<br><br>15   SKETCH TO ACCOMPANY<br>LEGAL DESCRIPTION | DATE: 07-07-200<br>DESIGNED: R.P.<br>DRAWN: R.P.<br>CHECKED: D.W.D.<br>JOB NO.: 01-0588.30 01 |

This "Sketch to Accompany Legal Description" does not represent a field boundary survey of the Subject Property, or the underlying tracts of land thereof.

The Boundary data as depicted on the Map was acquired from field location work performed by PBS&J June 17, 2003 as part of this project and is indicated thereon for informational purposes only.

## SURVEYOR'S CERTIFICATE:

I HEREBY CERTIFY: That this "Sketch to Accompany Legal Description" was prepared under my direction and is true and correct to the best of my knowledge and belief and further, that said Sketch meets the intent of the applicable provisions of the "Minimum Technical Standards for Land Surveying in the State of Florida," pursuant to Rule 61G17-6 of the Florida Administrative Code and its implementing law, Chapter 472.027 of the Florida Statutes.

**PBS**, a Florida Corporation
Florida Certificate of Authorization No. LB24

By: _C. M. del Valle_

Carlos M. del Valle, PLS
Professional Land Surveyor No. 4408
State of Florida
Date of Certification: JUL 0 7 2003

NOTICE:   Not valid without the signature and original raised seal of a Florida licensed Surveyor and Mapper. Additions or deletions to survey maps and reports by other than the signing party or parties are prohibited without the written consent of the signing party or parties. This document consists of multiple pages and each page shall not be considered full, valid and complete unless attached to the others. This notice is required pursuant to Rule 61G17-6 of the Florida Administrative Code.

© 2003—PBS&J, a Florida Corporation
All Rights Reserved

THIS DOCUMENT CONSISTS OF THREE (3) PAGES AND EACH PAGE SHALL NOT BE CONSIDERED FULL, VALID AND COMPLETE UNLESS ATTACHED TO THE OTHERS.

NOT A FIELD SURVEY

SURVEY DIVISION\WORK2003\01-0588.30 0250 MIAMI SEAQUARIUM\01-0588.30 FINAL PARCEL LOCATIONS\dwg\01058830_recover.dwg  06/25/2003  11:45:09 AM EDT

SHEET 2 OF

| **PBS** 2001 N.W. 107th AVE.<br>MIAMI, FL 33172-2507<br>(305) 592-7275<br><br>FLORIDA CERTIFICATE OF AUTHORIZATION NUMBER LB24 | WOMETCO ENTERPRISES, INC.<br><br>16  SKETCH TO ACCOMPANY<br>LEGAL DESCRIPTION | DATE: 06-25-<br>DESIGNED: R.P.<br>DRAWN: R.P.<br>CHECKED: D.W.O.<br>JOB NO.: 01-0588.30 01C |
|---|---|---|

# PARCEL "C"



FOUND PK NAIL AND DISC(DADE)

PORTION OF "MAST ACADEMY" SECTION 13, TOWNSHIP 54 SOUTH RANGE 42 EAST

O.R.B. 14528 PG. 664

N 44'15'46" E 124.50'(C)

N 45'44'14" W 222.96'(C)

-200'-

S 45'44'14" E 640.90'(C)

CITY OF MIAMI PARCEL

FOUND 1"ø IRON PIPE (NO ID)

N 45'44'14" W 417.94'(C)

FOUND 1"ø IRON PIPE IN CONC. (NO ID)

N 25'47'42" W 48.00'(C)

S 25'47'42" E 52.00'(C)

P.O.B.

ARTHUR LA... JR. ROA...

RICKENBACKER CAUSEWAY

-75.5'-

N 45'44'14" W 591.45'(C)

S 45'44'14" E 3894.34'(C)

PARCEL "C"

L=103.93'
R=85.00'
Δ=70'03'28"
Tan=59.58'

-200'-

S89'40'47"W 2650.16'(C)

PT

PC

# LEGEND

₵ = CENTER LINE

## ABBREVIATIONS

P.O.C. = POINT OF COMMENCEMENT
P.O.B. = POINT OF BEGINNING
(C) = CALCULATED
CH.L.F. = CHAIN LINK FENCE
CONC. = CONCRETE
O.R.B. = OFFICIAL RECORDS BOOK
PG. = PAGE
(R) = RECORD
SEC. = SECTION
R = RADIUS
Δ = CENTRAL ANGLE
L = ARC LENGTH
TAN = TANGENT
PC = POINT OF CURVATURE
PT = POINT OF TANGENCY

-75.5'-

P.O.C.
FOUND 1"ø IRON PIPE IN CONC. (NO ID)

FOUND NAIL AND WASHER (NO ID)

S 45'44'14" E 145.31'(C)

N 64'12'18" E 176.47'(C)

S 64'12'18" W 54.0'(C)

NORTH LINE SEC.20-54-42

FOUND CONCRETE MONUMENT(NO ID)

₵ DEFINED BY P.B. 74, PAGE 9

NOT A FIELD SURVEY

SURVEY DIVISION\WORK2003\01-0588.30 0050 MIAMI SEAQUARIUM\01-0588.30 FINAL PARCEL LOCATIONS\dwg\0105883O.dwg 06/26/2003 9:22:44 AM EDT

| GRAPHIC SCALE IN FEET | | | | |
|---|---|---|---|---|
| 0 | 70 | 140 | 280 | 420 |

THIS DOCUMENT CONSISTS OF THREE (3) PAGES AND EACH PAGE SHALL NOT BE CONSIDERED FULL, VALID AND COMPLETE UNLESS ATTACHED TO THE OTHERS.

SHEET 3 OF

PBSJ
2001 N.W. 107th AVE.
MIAMI, FL 33172-2507
(305) 592-7275
FLORIDA CERTIFICATE OF AUTHORIZATION NUMBER LB24

WOMETCO ENTERPRISES, INC.

SKETCH TO ACCOMPANY LEGAL DESCRIPTION

17

DATE: 07-07-200.
DESIGNED: R.P.
DRAWN: R.P.
CHECKED: D.W.D.
JOB NO.: 01-0588.30 01...

# EXHIBIT 4-A

## July 2003
### SKETCH TO ACCOMPANY LEGAL DESCRIPTION
### PARCEL "D"
### IN SECTION 20, TOWNSHIP 54 SOUTH, RANGE 42 EAST
### ISLAND OF VIRGINIA KEY, CITY OF MIAMI, MIAMI-DADE COUNTY, FLORIDA

## DEFINITIONS, GENERALLY:

SKETCH: Shall mean the graphic depiction of the Map made a part hereof and incorporated herein, reference to which is made for a more full and complete description thereof.

COUNTY: Shall mean Miami-Dade County, a Political Subdivision of the State of Florida, the name of which was changed from "Dade County" by its electors on November 13, 1997 and codified by its Board of County Commissioners pursuant to County Ordinance Number 97-212. All references to instruments recorded prior to that date shall refer to the previous County name and conversely, all references to instruments recorded subsequent to that date (or mention by common report, as the case may be) shall refer to the present County name.

## LEGAL DESCRIPTION:

All that lot, piece or parcel of land, situate, lying and being in Section 17, Township 54 South, Range 42 East, on the Island of Virginia Key, Miami-Dade County, Florida, the same being more particularly described by metes and bounds as follows, viz,:

Commence at the Point of Intersection of the South line of said Section 17 with the Centerline of the Rickenbacker Causeway, the location which is more fully described in the Plat entitled "SECOND REVISED PLAT OF SHEET 9 METROPOLITAN DADE COUNTY BULKHEAD LINE PART FOUR," according to the Plat thereof, as recorded in Plat Book 74 at Page 9 of the Public Records of Dade County (now Miami-Dade County), Florida; thence S45°44'14"E along said Centerline of the Rickenbacker Causeway for 145.31 feet to a Point of Intersection with the Centerline of Arthur Lamb Jr. Road; thence departing said Centerline of the Rickenbacker Causeway, N64°12'18"E along said Centerline of Arthur Lamb Jr. Road for 176.47 feet; thence departing said Centerline of Arthur Lamb Jr. Road, N25°47'42"W for 48.00 feet to the POINT OF BEGINNING of the hereinafter described parcel of land; from said POINT OF BEGINNING, thence continue N25°47'42"W for 52.00 feet; thence N64°12'18"E for 489.34 feet; thence S25°47'42"E for 52.00 feet; thence S64°12'18"W for 489.34 feet to the POINT OF BEGINNING.

Said Parcel contains 25,445 Square Feet or 0.58 Acres, more or less by calculation.

## SOURCES OF DATA:

The Legal Description as cited above was generated based on the following data:

Bearings as shown hereon refer to a calculated bearing of South 45 degrees 44 minutes 14 seconds East along the Centerline of the Rickenbacker Causeway, as shown on the Plat of "SECOND REVISED PLAT OF SHEET 9 METROPOLITAN DADE COUNTY BULKHEAD LINE PART FOUR," according to the Plat thereof, as recorded in Plat Book 74 at Page 9 of the Public Records of Dade County (now Miami-Dade County), Florida, and rotated to match the State Plane Coordinate System for the East Zone of Florida.

## LIMITATIONS:

Since no other information other than what is cited in the Sources of Data were furnished, the client is hereby advised that there may be legal restrictions on the subject property that are not shown on the Map or contained within this Report that may be found in the Public Records of Miami-Dade County or the records of any other public and private entities as their jurisdictions may appear.

THIS DOCUMENT CONSISTS OF THREE (3) PAGES AND EACH PAGE SHALL NOT BE CONSIDERED FULL, VALID AND COMPLETE UNLESS ATTACHED TO THE OTHERS.

NOT A FIELD SURVEY

R:\SURVEY DIVISION\WORK2003\01-0588.30 0050 WMM SEAQUARIUM\01-0588.30 FINAL PARCEL LOCATIONS\dwg\01058830.dwg  06/28/2003  9:22:44 AM CDT

SHEET 1 OF

| | | | |
|---|---|---|---|
| **PBS** 2001 N.W. 107th AVE. MIAMI, FL 33172-2507 (305) 592-7275 FLORIDA CERTIFICATE OF AUTHORIZATION NUMBER LB24 | WOMETCO ENTERPRISES, INC. SKETCH TO ACCOMPANY LEGAL DESCRIPTION | DATE: 07-07- DESIGNED: R.P. DRAWN: R.P. CHECKED: D.W.O. JOB NO.: 01-0588.30 01( |

This "Sketch to Accompany Legal Description" does not represent a field boundary survey of the Subject Property, or the underlying tracts of land thereof.

The Boundary data as depicted on the Map was acquired from field location work performed by PBS&J on June 17, 2003 as part of this project and is indicated thereon for informational purposes only.

## SURVEYOR'S CERTIFICATE:

I HEREBY CERTIFY: That this "Sketch to Accompany Legal Description" was prepared under my direction and is true and correct to the best of my knowledge and belief and further, that said Sketch meets the intent of the applicable provisions of the "Minimum Technical Standards for Land Surveying in the State of Florida," pursuant to Rule 61G17-6 of the Florida Administrative Code and its implementing law, Chapter 472.027 of the Florida Statutes.

**PBSJ**, a Florida Corporation
Florida Certificate of Authorization No. LB24

By: _C. M. del Valle_

Carlos M. del Valle, PLS
Professional Land Surveyor No. 4408
State of Florida
Date of Certification:    **JUL 0 7 2003**

NOTICE:   Not valid without the signature and original raised seal of a Florida licensed Surveyor and Mapper. Additions or deletions to survey maps and reports by other than the signing party or parties are prohibited without the written consent of the signing party or parties. This document consists of multiple pages and each page shall not be considered full, valid and complete unless attached to the others. This notice is required pursuant to Rule 61G17-6 of the Florida Administrative Code.

© 2003-PBS&J, a Florida Corporation
All Rights Reserved

THIS DOCUMENT CONSISTS OF THREE (3) PAGES AND EACH PAGE SHALL NOT BE CONSIDERED FULL, VALID AND COMPLETE UNLESS ATTACHED TO THE OTHERS.

NOT A FIELD SURVEY

SURVEY DIVISION\WORK2003\01-0588.30 0050 MIAMI SEAQUARIUM\01-0588.30 FINAL PARCEL LOCATIONS\dwg\01058830_redraw.dwg  06/25/2003  12:05:37 PM EDT

SHEET 2 OF

| **PBSJ** | 2001 N.W. 107th AVE. MIAMI, FL 33172-2507 (305) 592-7275 | WOMETCO ENTERPRISES, INC. | DATE: 06-25-200. DESIGNED: R.P. |
| --- | --- | --- | --- |
| FLORIDA CERTIFICATE OF AUTHORIZATION NUMBER LB24 | | SKETCH TO ACCOMPANY LEGAL DESCRIPTION | DRAWN: R.P. CHECKED: D.W.D. JOB NO.: 01-0588.30 01( |

19

# PARCEL "D"

LEGEND
¢ CENTER LINE

ABBREVIATIONS
P.O.C. = POINT OF COMMENCEMENT
P.O.B. = POINT OF BEGINNING
(C) = CALCULATED
CH.L.F. = CHAIN LINK FENCE
CONC. = CONCRETE
O.R.B. = OFFICIAL RECORDS BOOK
PG. = PAGE
(R) = RECORD
SEC. = SECTION

0   70   140   280   420

GRAPHIC SCALE IN FEET

CITY OF MIAMI PARCEL

PARCEL "D"

ARTHUR LAMB JR. ROAD

RICKENBACKER CAUSEWAY

NOT A FIELD SURVEY

THIS DOCUMENT CONSISTS OF THREE (3) PAGES AND EACH PAGE SHALL NOT BE CONSIDERED FULL, VALID AND COMPLETE UNLESS ATTACHED TO THE OTHERS.

SHEET 3 OF

| PBSJ | 2001 N.W. 107th AVE. MIAMI, FL 33172-2507 (305) 592-7275 | WOMETCO ENTERPRISES, INC. | DATE: 07-07- |
|------|------|------|------|
| | | | DESIGNED: R.P. |
| | | SKETCH TO ACCOMPANY LEGAL DESCRIPTION | DRAWN: R.P. |
| FLORIDA CERTIFICATE OF AUTHORIZATION NUMBER LB24 | | | CHECKED: D.W.D. |
| | | | JOB NO.: 01-0588.30 01 |

## LEASE EXTENSION AGREEMENT BETWEEN MIAMI-DADE COUNTY AND MARINE EXHIBITION CORPORATION d/b/a THE MIAMI SEAQUARIUM

This Extension of Lease Agreement, dated July __7__, 2006, the ("Extension Agreement") is made by and between Miami-Dade County, Florida ("Lessor") and Marine Exhibition Corporation d/b/a The Miami Seaquarium ("Lessee").

WHEREAS, Lessor and Lessee have entered into an Amended and Restated Lease and a First Amendment and Second Amendment thereto, dated November 16, 2001, and August 7, 2003, respectively, (collectively, the "Amended and Restated Lease"), whereby Lessor has leased to Lessee certain parcels of land lying and being in Miami-Dade County, Florida, situated along the Rickenbacker Causeway across Biscayne Bay on Virginia Key, Florida, as more particularly described in Exhibit "3", attached hereto, as the same may be amended (the "Demised Premises"), together with all improvements, fixtures and personal property located in or on the Demised Premises, as more particularly described in Section 1(A) of the Amended and Restated Lease;

WHEREAS, Lessee is entitled to a lease extension pursuant to the terms of the Amended and Restated Lease and the parties wish to document the extension.

NOW, THEREFORE, in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable considerations by each of the parties hereto, to the other in hand paid, the receipt of which is hereby acknowledged, Lessor and Lessee agree as follows:

1.    The foregoing recitals are true and correct and are incorporated herein as if set forth at length.

2.    The term of the Amended and Restated Lease is hereby extended for an additional term of 23 years beyond that which was provided in the Amended and Restated Lease so that the termination date of the Amended and Restated Lease is now July 12, 2031.

3.    The extension granted by this Extension Agreement is subject to cancellation, in whole or in part, depending upon certification of Capital Improvement Expenditures by audit as provided in Section 5(F) of the Amended and Restated Lease.

4.    Except as modified herein, the Amended and Restated Lease remains unmodified and in full force and effect and is hereby ratified and confirmed in all respects.

IN WITNESS WHEREOF, Lessor and Lessee have caused this Extension Agreement to be executed by the respective proper officers, duly authorized thereunto, the day and year first above written.

"Lessor"

By: _____
     Vivian Donnell Rodriguez
     Director, Miami-Dade County
     Park and Recreation Department

E BARBA
WITNESS

ATTEST:

_____
     Deputy Clerk

MIAMI-DADE COUNTY, FLORIDA, by its
BOARD OF COUNTY COMMISSIONERS

By: _____
     County Manager
     (OFFICIAL SEAL)

"Lessee"

MARINE EXHIBITION CORPORATION,

-2-

MIAMI 1098738.1 7433813663

ATTEST:

a Florida corporation

By: _____

By: _____

Chief Executive Officer

(CORPORATE SEAL)

STATE OF FLORIDA          )
                          : ss
COUNTY OF MIAMI-DADE      )

BEFORE ME, the undersigned authority, personally appeared Arthur Hertz, the Chief Executive Officer of MARINE EXHIBITION CORPORATION, to me known to be the person who signed the foregoing instrument, and acknowledged the execution thereof to be their free act and deed for the uses and purposes therein mentioned.

WITNESS my hand and official seal at *Coral Gables*, Florida, this *11* day of *July*, *2006*.

*Eleanor Allen*

NOTARY PUBLIC
STATE OF FLORIDA AT LARGE

My Commission Expires:

OFFICIAL NOTARY SEAL
ELEANOR ALLEN
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. DD135754
MY COMMISSION EXP. JULY 31,2006

STATE OF FLORIDA          )
                          :ss
COUNTY OF MIAMI-DADE      )

BEFORE ME, the undersigned authority, personally appeared Vivian Donnell Rodriguez, the Miami Dade Park and Recreation Department Director to me known to be the person who signed the foregoing instrument, and acknowledged the execution thereof to be their free act and deed for the uses and purposes therein mentioned.

-3-

MIAMI 1098738.1 7433813663

WITNESS my hand and official seal at _Miami_, Florida, this _7th_ day of

_July_, _2006_.

Marie Elena Regojo
Commission # DD350409
Expires: AUG. 26, 2008
Bonded Thru
Atlantic Bonding Co., Inc.

NOTARY PUBLIC
STATE OF FLORIDA AT LARGE

Marie Elena Regojo

STATE OF FLORIDA )
:ss
COUNTY OF MIAMI-DADE )

BEFORE ME, the undersigned authority, personally appeared _Alex Muñoz_.

Assistant County Manager, to me known to be the persons who signed the foregoing

instrument, and acknowledged the execution thereof to be their free act and deed for the

uses and purposes therein mentioned.

WITNESS my hand and official seal at _Miami   Florida this 7th_ day of

_June_        , _2006_

JEANNETTE VAZQUEZ
MY COMMISSION #DD427323
EXPIRES: MAY 09, 2009
Bonded by 1st State Insurance

_Jeannett Vazquez_

_____
NOTARY PUBLIC
STATE OF FLORIDA AT LARGE

## LEASE EXTENSION AGREEMENT BETWEEN MIAMI-DADE COUNTY
## AND MARINE EXHIBITION CORPORATION
### d/b/a THE MIAMI SEAQUARIUM

This Extension of Lease Agreement, dated September ___, 2006, the ("Extension Agreement") is made by and between Miami-Dade County, Florida ("Lessor") and Marine Exhibition Corporation d/b/a The Miami Seaquarium ("Lessee").

WHEREAS, Lessor and Lessee have entered into an Amended and Restated Lease and a First Amendment and Second Amendment thereto, dated November 16, 2001, and August 7, 2003, respectively, (collectively, the "Amended and Restated Lease"), whereby Lessor has leased to Lessee certain parcels of land lying and being in Miami-Dade County, Florida, situated along the Rickenbacker Causeway across Biscayne Bay on Virginia Key, Florida, as more particularly described in Exhibit "3", attached hereto, as the same may be amended (the "Demised Premises"), together with all improvements, fixtures and personal property located in or on the Demised Premises, as more particularly described in Section 1(A) of the Amended and Restated Lease;

WHEREAS, Lessee is entitled to a lease extension pursuant to the terms of the Amended and Restated Lease and the parties wish to document the extension.

NOW, THEREFORE, in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable considerations by each of the parties hereto, to the other in hand paid, the receipt of which is hereby acknowledged, Lessor and Lessee agree as follows:

1.    The foregoing recitals are true and correct and are incorporated herein as if set forth at length.

MIAMI 1098744.1 7433813663

2.      The term of the Amended and Restated Lease is hereby extended for an additional term of 111 days beyond that which was provided in the Amended and Restated Lease and in that certain Lease Extension Agreement between Lessor and Lessee dated July 7, 2006, so that the termination date of the Amended and Restated Lease is now October 21, 2031.

3.      The extension granted by this Extension Agreement is granted pursuant to Section 12 of the Amended and Restated Lease ("Business Interruption") due to temporary closing of the Demised Premises for 111 days following Hurricane Wilma.

4.      Except as modified herein, the Amended and Restated Lease remains unmodified and in full force and effect and is hereby ratified and confirmed in all respects.

IN WITNESS WHEREOF, Lessor and Lessee have caused this Extension Agreement to be executed by the respective proper officers, duly authorized thereunto, the day and year first above written.

"Lessor"
MIAMI-DADE COUNTY, FLORIDA, by its
BOARD OF COUNTY COMMISSIONERS

ATTEST:

By: _____
Deputy Clerk  10/16/06        County Manager
                              (OFFICIAL SEAL)

"Lessee"
MARINE EXHIBITION CORPORATION,
a Florida corporation

ATTEST:

By: _____

By: _____
Assistant Secretary                President
                              (CORPORATE SEAL)

MIAMI 1098744.1 7433813663

STATE OF FLORIDA          )
                          : ss
COUNTY OF MIAMI-DADE      )

BEFORE ME, the undersigned authority, personally appeared *Arthur H. Hertz*

and *Michael S Brown*, the Assistant Secretary and President of MARINE EXHIBITION

CORPORATION, respectively, to me known to be the persons who signed the foregoing

instrument, and acknowledged the execution thereof to be their free act and deed for the

uses and purposes therein mentioned.

WITNESS my hand and official seal at *Coral Gables*, Florida, this *6*

day of *October, 2006.*

_____
NOTARY PUBLIC
STATE OF FLORIDA AT LARGE

My Commission Expires:

STATE OF FLORIDA          )
                          : ss
COUNTY OF MIAMI-DADE      )

BEFORE ME, the undersigned authority, personally appeared _____

and _____, the Deputy Clerk and Assistant County Manager,

respectively, to me known to be the persons who signed the foregoing instrument, and

acknowledged the execution thereof to be their free act and deed for the uses and

purposes therein mentioned.

WITNESS my hand and official seal at _____, Florida, this _____ day of

_____, _____.

_____
NOTARY PUBLIC
STATE OF FLORIDA AT LARGE

MIAMI 1098744.1 7433813663

-3-

### LEASE EXTENSION AGREEMENT BETWEEN MIAMI-DADE COUNTY AND FESTIVAL FUN PARKS, LLC d/b/a THE MIAMI SEAQUARIUM

This Extension of Lease Agreement, dated March 9, 2020, the ("Extension Agreement") is made by and between Miami-Dade County, Florida ("Lessor") and Festival Fun Parks, LLC d/b/a The Miami Seaquarium ("Lessee").

WHEREAS, Lessor and Marine Exhibition Corporation ("MEC") entered into an Amended and Restated Lease Agreement on July 25, 2000, a First Amendment on November 16, 2001, a Second Amendment dated August 7, 2003, as well as two (2) subsequent Lease Extension Agreements, dated July 7, 2006 and October 6, 2006 respectively, (collectively, the "Amended and Restated Lease Agreement").

WHEREBY, Lessor leased to MEC certain parcels of land lying and being in Miami-Dade County, Florida, situated along the Rickenbacker Causeway across Biscayne Bay on Virginia Key, Florida, as more particularly described in Exhibit "3", attached hereto, as the same may be amended (the "Demised Premises"), together with all improvements, fixtures and personal property located in or on the Demised Premises, as more particularly described in Section 1(A) of the Amended and Restated Lease Agreement;

WHEREAS, by Resolution No. R-421-14 the Board of County Commissioners authorized and approved the sale of stock of MEC to Lessee and authorized and approved the subsequent merger between MEC and Lessee;

WHEREAS, Lessee is the Surviving Party pursuant to Articles of Merger of Marine Exhibition Corporation into Festival Fun Parks, LLC effective July 3, 2014;

WHEREAS, Lessee is entitled to a lease extension pursuant to the terms of the Amended and Restated Lease Agreement and the parties wish to document the extension.

NOW, THEREFORE, in consideration of the sum of Ten and 00/100 Dollars ($10.00) and other good and valuable considerations by each of the parties hereto, to the other in hand paid, the receipt of which is hereby acknowledged, Lessor and Lessee agree as follows:

1.     The foregoing recitals are true and correct and are incorporated herein as if set forth at length.

2.     Lessee has provided Lessor with capital improvement expenditure documentation for the period of July 2, 2006 to June 19, 2016, and the Parties agree that the amount of $9,500,000.00 will be applied toward the Lease Extension Options as provided for in Section 5(A) of the Amended and Restated Lease Agreement.

3. The term of the Agreement is hereby extended for an additional term of 13 years beyond the Agreement termination date of October 21, 2031, which was provided in the 2nd Lease Extension Agreement. This Extension Agreement exhausts all available Options to Extend through and including Section 5 (A)(4) of the Amended and Restated Lease Agreement, leaving only the options detailed in Section 5 (A)(5) available for future extensions.

4.     Pursuant to Section 12 ("Business Interruption") of the Amended and Restated Lease, the term of the Agreement is also hereby extended for an additional term of 36 days beyond the 13 years referenced in Section 3, due to the temporary closing of the Demised Premises for 36 days following Hurricane Irma.

5.      The extension granted by this Extension Agreement is subject to cancellation, in whole or in part, depending upon verification of Capital Improvement Expenditures by audit as provided in Section 5(F) of the Amended and Restated Lease.

6.      The termination date of the Agreement is now November 26, 2044. (13 years plus an additional 36 days extended from the Agreement termination date of October 21, 2031 as provided in the 2nd Lease Extension Agreement).

7.      Except as modified herein, the Agreement remains unmodified and in full force and effect and is hereby ratified and confirmed in all respects.

8.      The Parties may execute this Agreement in one or more counterparts, each of which will be deemed an original and all of which, when taken together, will be deemed to constitute one and the same Agreement.

IN WITNESS WHEREOF, Lessor and Lessee have caused this Extension Agreement to be executed by the respective proper officers, duly authorized thereunto, the day and year first above written.

"Lessor"

MIAMI-DADE COUNTY, FLORIDA, by its
BOARD OF COUNTY COMMISSIONERS

ATTEST:

By:_____
        Deputy Clerk

By:_____
    for   County Mayor

(OFFICIAL SEAL)

-3-

"Lessee"

FESTIVAL FUN PARKS, LLC
A Delaware Limited Liability Company

By: _____
Jesús Fernández Morán
Director

By: _____
John Reilly
Chief Operating Officer

(CORPORATE SEAL)

STATE OF Pennsylvania

COUNTY OF Allegheny

: ss
)

BEFORE ME, the undersigned authority, personally appeared Jesús Fernández Morán, Director of Festival Fun Parks, LLC, who acknowledged the execution of the foregoing instrument on behalf of Festival Fun Parks, LLC.

WITNESS my hand and official seal at Westmifflin Pennsylvania this 9th day of March , 2020.

NOTARY PUBLIC
STATE OF Pennsylvania AT LARGE

My Commission Expires:
Nov. 12,2023

COMMONWEALTH OF PENNSYLVANIA - NOTARY SEAL
Nicole M Sikorski-Jacobs, Notary Public
Washington County
My Commission Expires 11/12/2023
Commission Number 1209258

STATE OF Pennsylvania )
                        : ss
COUNTY OF Allegheny )

     BEFORE ME, the undersigned authority, personally appeared John Reilly, Chief Operating Officer of Festival Fun Parks, LLC, who acknowledged the execution of the foregoing instrument on behalf of Festival Fun Parks, LLC.

     WITNESS my hand and official seal at West Mifflin, Pennsylvania this 9th day of March , 2020.

                                 NOTARY PUBLIC
                          STATE OF Pennsylvania AT LARGE

My Commission Expires:
Nov 12, 2023

COMMONWEALTH OF PENNSYLVANIA - NOTARY SEAL
Nicole M Sikorski-Jacobs, Notary Public
Washington County
My Commission Expires 11/12/2023
Commission Number 1209258

STATE OF FLORIDA          )
                          : ss
COUNTY OF MIAMI-DADE      )

     BEFORE ME, the undersigned authority, personally appeared _____ and _____, the Deputy Clerk and (Assistant) County Mayor, respectively, to me personally known, who acknowledged the execution of the foregoing instrument on behalf of Miami-Dade County, Florida.

     WITNESS my hand and official seal at Miami, Florida, this _____ day of _____, 2020.

                              _____
                              NOTARY PUBLIC
                              STATE OF FLORIDA AT LARGE

My Commission Expires:

OFFICIAL FILE COPY
CLERK OF THE BOARD
OF COUNTY COMMISSIONERS
MIAMI-DADE COUNTY, FLORIDA

## THIRD AMENDMENT TO AMENDED AND RESTATED LEASE
## BETWEEN MIAMI-DADE COUNTY AND
## MARINE EXHIBITION CORPORATION D/B/A THE MIAMI SEAQUARIUM

**THIS THIRD AMENDMENT** to **Amended and Restated Lease Agreement between Miami-Dade County and Marine Exhibition Corporation, d/b/a The Miami Seaquarium** (the "**Amendment**") is made and entered into as of ____9 September____, 2022 (the "**Amendment Effective Date**") by and between **Miami-Dade County** (the "**County**" or the "**Lessor**") and **MS Leisure Company, Inc., a Florida corporation** (the "**Lessee**"), each of which may also be referred to as a "**Party**," and which may be referred to collectively as the "**Parties**." Capitalized terms which are not separately defined herein shall have the meanings ascribed to them in the Lease.

### RECITALS

**WHEREAS,** Lessor and Lessee's predecessor (Marine Exhibition Corporation ("MEC"), as succeeded by Festival Fun Parks, LLC, a Delaware corporation, through its merger with MEC as approved and adopted by the Board of County Commissioners of Miami-Dade County (the "BCC") on May 6, 2014) entered in to that certain Amended and Restated Lease Agreement (the "**MEC Lease**") with an effective date of August 5, 2000, with respect to the Demised Premises consisting of certain parcels of land lying in Miami-Dade County, Florida, situated along the Rickenbacker Causeway across Biscayne Bay on Virginia Key, Florida  (also referred to herein as the "**Seaquarium**"); and

**WHEREAS,** the MEC Lease was amended by that certain First Amendment to Amended and Restated Lease Agreement dated November 16, 2001 (the "**First Amendment**"); and

**WHEREAS,** the MEC Lease was further amended by that certain Second Amendment to Amended and Restated Lease Agreement dated August 7, 2003 (the "**Second Amendment**") (the **First Amendment** and the **Second Amendment** together with the MEC Lease, the "**Lease**"); and

**WHEREAS,** the Lease permits Festival Fun Parks, LLC to assign the Lease or sell its rights under the Lease upon giving notice to the Lessor and affording the Lessor an opportunity to object if the transaction is contrary to the best interests of the Lessor; and

WHEREAS, the BCC approved the assignment of the Lease from Festival Fun Parks, LLC to MS Leisure Company, Inc. by an item identified by File No. 212417 and amended at the BCC meeting of October 19, 2021, which amended item has been assigned as Resolution R-991-21; and

**WHEREAS,** the Parties deem it in to be in their mutual best interests to amend and modify the Lease on terms and conditions as set forth herein to memorialize the amendments requested by the BCC in connection with its approval of Resolution R-991-21;

**NOW, THEREFORE,** in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration by each of the Parties hereto, to the other in hand paid, the receipt of which is hereby acknowledged, and in consideration of the mutual covenants hereinafter set forth, it is mutually covenanted, consented and agreed between Lessor and Lessee that the Amended and Restated Lease, as amended, is hereby further amended and modified as follows:

1.  At Subsection 7.B.(2), replace the second to the last sentence of subsection 7.B(2) with the following:

    "Notwithstanding the provisions of this Section, Lessee may sell or trade animals in its reasonable discretion upon provision of written notice to Lessor and approval by the applicable federal and/or state governing agencies that are required to approve any such sale or trade, including, but not limited to, the National Oceanic and Atmospheric Administration ("NOAA") and the United States Fish and Wildlife Service ("FWS").

2.  At Section 11, replace the first sentence of Section 11 with the following:

    "During the term of the Amended and Restated Lease, as same may be extended, Lessee and its Sublessee(s), as applicable, shall keep the Demised Premises and all improvements and personal property thereon, exclusive of animals, in a good state of repair and in a clean condition, subject to damage or destruction by fire or other elements, similar to other facilities maintained by Lessee and shall maintain animals in accordance with federal laws and regulations, including the Marine Mammal Protection Act and the Animal Welfare Act as applicable. Lessee shall maintain an active United States Department of Agriculture Class C Exhibitor License.

3.  At Section 11, add the following at the end of the first paragraph:

    "Additionally, notwithstanding anything to the contrary in this Lease, Lessor reserves the right at any time engage the services of one or more independent marine mammal veterinarians not associated with Lessee to conduct independent third-party analyses and investigations pertaining to any animal health, safety and welfare issues. The selection of such independent marine mammal veterinarians shall be mutually agreed-upon by the Parties. Any findings so received will be shared with Lessee by Lessor. Any corrective actions deemed necessary by the Lessor as a result of such findings shall be implemented by Lessee pursuant to such reasonable timeframes as the Parties determine, and in no event beyond any timeframes promulgated under applicable laws and regulations as set forth herein".

4.  At Section 27, add the following to the end of subsection J:

    "Notwithstanding anything to the contrary in this subsection J or this Amended and Restated Lease, Lessor reserves the right at any time to perform unannounced site and operational inspections of the Demised Premises to

ensure continued contractual compliance. Lessee will cooperate with such unannounced site and operational inspections as performed by Lessor."

5. At Section 27, add the following new subsections at the end as follows:

"R. Certifications. The Lessee shall secure and maintain all applicable certifications necessary to ensure the proper maintenance and oversight of the Demised Premises and all improvements thereon, including but not limited to, certifications by the Alliance of Marine Mammal Parks and Aquariums ("AMMPA"), and the American Humane Association (or similar third-party validated program). The Lessee shall also commit to using reasonable efforts to seek Association of Zoos & Aquariums ("AZA") accreditation.

S. Conservation, Educational, and Environmental Awareness Programs.

   (i) Within one (1) year from the date of execution of the Third Amendment to the Amended and Restated Lease, Lessee shall implement conservation and education programs, and awareness campaigns for the community, including the development of a classroom curriculum for routine and periodic instruction and education to the public and students at the Demised Premises that incorporates environmental protection, science conservation, and other educational programs. Such programming shall also include programming for neurodivergent children and adults.

   (ii) Lessee shall provide Lessor with a report outlining the programming activities and outreach to be provided under this Section 27.S, within one year from the date of execution of the Third Amendment to the Amended and Restated Lease and shall update said report on an annual basis Such program shall be coordinated with Lessor.

T. Animal Welfare Plan. Lessee shall provide Lessor with an updated animal welfare plan for all the marine mammals at the Demised Premises and the improvements thereon, particularly for the currently resident orca known as Lolita/Tokitae, as well as infrastructure maintenance and improvement plans, on quarterly basis commencing on July 1, 2022.

U. Additional Reporting Requirements. Upon request from Lessor, Lessee shall provide Lessor with copies of any reports, letters, or correspondence from or to any state or federal agency related to the management and operation of the Demised Premises and the improvements thereon immediately upon receipt or generation of such by Lessee.

V. Prohibition Against Capture and Display of Wild Orca. In the event of the release, transfer, or demise of the current resident orca known as Lolita/Tokitae, the Parties agree that no new or replacement orcas - including any orcas born in captivity - shall ever be procured for, or reside at, within or

- 3 -

upon, the Demised Premises, The prohibition in this Section shall not apply to injured or sick wild orca that are  captured for recovery and/or rehabilitation purposes pursuant to a federally-issued permit or authorization, with such orca to be released back into their native environment upon the completion of their recovery and/or rehabilitation unless such release is not possible as determined by the relevant federal agencies and any independent marine mammal veterinary analysis that such agencies may obtain.  The prohibition in this Section also shall not apply in the event that a federally-licensed zoological facility needs to transfer, on an emergency basis or otherwise, an orca to Lessee to provide housing and care to any orca in order to maintain its health and welfare.

6.  In all other respects the Lease remains unmodified and in full force and effect.


**IN WITNESS WHEREOF,** Lessor and Lessee have caused this Third Amendment to Amended and Restated Lease to be executed by their respective proper officers, duly authorized thereunto, the day and year first written above.


**[SIGNATURE PAGE FOLLOWS]**

**Witnesses**

Print Name:  Shirley L. Jones

Print Name:  Yvonne Ramirez

**LESSOR:**

**MIAMI-DADE COUNTY, FLORIDA, by its
BOARD OF COUNTY COMMISSIONERS**

By: _____
for
     Daniella Levine Cava, County Mayor
     Jimmy Morales, Chief Operations Officer

AD

**ATTEST:** Luis G. Montaldo, Interim Clerk

By: _____
Deputy Clerk    Gene Spencer - e102883

**LESSEE:**

**MS LEISURE COMPANY, INC.,** a Florida
corporation

By: _____
    Name:   Travis Burke

Title:   Director

Print Name:

Print Name:

- 5 -

<u>Exhibit B</u>

Project Description

Following the acquisition of Assignor's leasehold interest in the Premises, Assignee proposes to renovate the Seaquarium use on the Premises to incorporate at least the following uses and features, to the extent such uses are consistent with the Lease and the Miami-Dade County Home Rule Charter, Comprehensive Development Master Plan, and Code of Ordinances, all as may be amended:

1. New accredited aquarium (with no marine mammals);
2. Immersive marine- and aquatic-based experiences that emphasize the unique environment of Biscayne Bay;
3. Education, conservation, and research center;
4. Wellness spaces and experiences tied to the natural waterfront habitat;
5. Marina/fisherman's village with marine-oriented retail and food & beverage establishments;
6. Preservation of the historic Buckminster Fuller Seaquarium dome to be repurposed as event space for public and private gatherings;
7. Required parking;
8. Marina with wet slips and a dry stack; and
9. Public green areas and a public walkway across the marina border.