UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                              .  Chapter 11
                                    .  Case No. 25-10606 (LSS)
LEISURE INVESTMENTS                 .
HOLDINGS LLC, *et al.,*             .  (Jointly Administered)
                                    .
                                    .  Courtroom No. 6
                                    .  824 North Market Street
         Debtors.                   .  Wilmington, Delaware 19801
                                    .
                                    .  Friday, February 13, 2026
. . . . . . . . . . . . . . . . .   1:00 p.m.

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          Sean Greecher, Esquire
                          YOUNG CONAWAY STARGATT & TAYLOR LLP
                          Rodney Square
                          1000 North King Street
                          Wilmington, Delaware 19801

For Open Nature:          Michael Goldstein, Esquire
                          GOODWIN PROCTOR LLP
                          The New York Times Building
                          620 Eighth Avenue
                          New York, New York 10018


(APPEARANCES CONTINUED)

Audio Operator:           Brandon J. McCarthy, ECRO


Transcription Company:    Reliable
                          The Nemours Building
                          1007 N. Orange Street, Suite 110
                          Wilmington, Delaware 19801
                          Telephone: (302)654-8080
                          Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (CONTINUED):

For the DIP Lender:        Blaire Cahn, Esquire
                           BAKER MCKENZIE LLP
                           452 Fifth Avenue
                           New York, New York 10018

3

INDEX

MOTION:                                                       PAGE

Agenda
Item 1:    Debtors' Notice of Proposed Share Sale            5
           Pursuant to the Miscellaneous Asset
           Sale Procedures [D.I. 927, 1/29/26]

           Court's Ruling:                                   31


DECLARATIONS:                                                 PAGE

1)   Robert Wagstaff, Docket 927                             5

2)   Robert Wagstaff, Supplemental Docket 966                5

(Proceedings commenced at 1:02 p.m.)

THE COURTROOM DEPUTY:  Please rise.

THE COURT:  Please be seated.

Mr. Greecher.

MR. GREECHER:  Your Honor, Sean Greecher from Young Conaway.  Thank you, again, for setting this time to hear us.

We filed the agenda to deal with the proposed sale of Embassy of the Seas shares in Zoomarine Italia and various Italian entities.

First, if I might, I wanted to give a brief update, late breaking news from Mexico.  Yesterday, Your Honor, Eduardo Albor was arrested in Cancun in connection with an action that Controladora Dolphin filed in April of 2025.  That action asserted that Mr. Albor committed, what is called, procedural fraud, which, as I understand it as a U.S. lawyer, is essentially akin to perjury or intentional deception of a judicial or administrative authority during a legal proceeding to induce the court or authority into an error.

In this action, the charges that Mr. Albor misled the Court in Mexico in order to obtain precautionary measures that he then attempted to use to block or undermine the governance changes of the entity that were completed in March of 2025.  You may recall, there was a lot of discussion about

precautionary measures and, in fact, this was one of the precautionary measures that Mr. Albor was holding up as a basis for his actions which Your Honor found to be in violation of the automatic stay.

The order for the arrest was issued in August. Mr. Albor filed a number of amparos to seek to suspend the arrest. Those suspensions were vacated.  As I said, the arrest occurred yesterday and we are awaiting a date to be set for an initial hearing on that criminal matter.

So, onto the main event.  Your Honor, we are here in connection with Docket Number 927, the proposed sale of the debtors equity interest in Zoomarine Italia S.p.A., owned by debtor, Embassy of the Seas Limited.

Your Honor, we have evidence today. I would point Your Honor to Mr. Wagstaff's declaration attached or docketed at Number 927.  A supplemental declaration filed yesterday at Docket Number 966.  I would seek to move those two documents into evidence.

THE COURT:  Is there any objection?

(No verbal response)

THE COURT:  I hear none. They're admitted.

(Wagstaff declarations received into evidence)

THE COURT:  Does anyone wish to cross-examine Mr. Wagstaff?

(No verbal response)

THE COURT:  I hear no one.

MR. GREECHER:  Thank you.

In addition to the declarations, we also have a proffer from Mr. Charles Geizhals from Greenhill.  If Your Honor would allow us, I would propose to make that proffer now.

THE COURT:  Okay.

MR. GREECHER:  Thank you, Your Honor.

The debtors propose to supplement the testimony today by proffer.  Mr. Geizhals is present in the courtroom and available to take the stand if the Court has any questions or if any parties in interest wish to cross-examine him.

Mr. Geizhals would testify that he is a director at Greenhill & Co., LLC, the debtors investment banker in these Chapter 11 cases.  The debtors, with Greenhill's assistance, conducted a comprehensive sale and marketing process for the debtors interests in their Italian subsidiaries and related operations and assets.  That process began in July of 2025.

Greenhill's outreach with respect to Italy specifically involved outreach to 142 potential buyers including 106 financial sponsors and 36 strategic acquirers. And subsequently signed nine confidentiality agreements which

provided potential buyers with access to a virtual data room and confidential information memorandum, among other things.

Mr. Geizhals would further testify that primarily, due to the financial condition of the Italian operations and the physical condition of the parks, the debtors were unable to secure an actionable proposal for the Italian parks that would yield a substantial net cash recovery to the estate. In particular, the marketing process was complicated by the discovery of new liabilities and deferred capital expenditure requirements over time.

At its launch, the debtor was aware of approximately 7 million euro in bank debt outstanding at the Italian companies.  As time went on three new categories of liabilities emerged:

First, Greenhill was informed that the dolphin pool at Zoomarine had not received sufficient maintenance capital expenditures in prior years, requiring significant repairs.

Secondly, Greenhill was informed that Zoomarine would need to complete negotiations with the Municipality of Pomezia to address years of unsatisfied obligations with respect to the lease of its land.

Finally, Greenhill was informed that a third-party employment agency, which supplied labor to Zoomarine, had neglected to pay certain taxes.  And that Zoomarine was

jointly and severally liable for those amounts.  The estimated total of those liabilities exceeded the value of the Italian companies as represented by the offers that were received by Greenhill during the marketing process.

Mr. Geizhals would further testify that the debtors entered into an agreement with existing management of Zoomarine Italia for the sale of the debtors equity interest in Zoomarine Italia for one euro.  And the primary source of the value to the debtors in this transaction, the assumption of liabilities other than the estate guarantee liabilities which would be released at closing.

After filing that proposal with the Court, Open Nature, which was a potential bidder that had long been negotiating with the debtors regarding the potential transaction, eventually submitted a bid that contemplated a cash purchase price of 350,000 euro and a firm and documented commitment to fund the Zoomarine Italia operations with up to 3.5 million euro.

Mr. Geizhals would further testify that following the Court's status conference in this matter, on Tuesday, February 10th, Mr. Geizhals engaged in conversations and negotiations with Open Nature, the management bidders, the debtors, the DIP lenders, and others regarding the potential transactions.  These conversations led to two proposals that the debtors considered immediately prior to the auction.

The management bidder submitted a revised proposal, which was on similar terms for their initial proposal but adjusted the cash consideration portion.  They provided that 360,000 euro would be provided to the Zoomarine Italia companies as part of a loan that could be provided to Zoomarine immediately and would convert to equity at closing. The management bidders took this step because they cited a pressing need for liquidity at the Italian parks. The management bidders provided proof of funds in the form of a bank letter from an individual person, an individual investor showing available funds in excess of the $360,000 but not in excess of the 1.5 million euro which was the amount that was attempted to be obtained in the initial stock purchase agreement.

Mr. Geizhals would further testify that after conferring with their advisors, the debtors engaged in conversations with Open Nature regarding Zoomarine Italia's potential need for immediate cash and Open Nature agreed to revise its bid to allow for an advance of the cash purchase price, if necessary prior to closing, to fund downstream operational expenditures prior to the sale close and to increase the cash purchase price to 360,000 euro.

Mr. Geizhals would further testify that the debtors conferred with their advisors and other interested parties and determined that the revised open nature bid was

the highest and best proposal for the shares because it provided, among other things, the most cash consideration for the shares, the greatest amount of committed funding to support the Italian operations post-closing, and the assumption of substantial liabilities; thereby, mitigating the risk of post-closing financial distress at the Italian operations and providing the debtors and their estates with the greatest value in terms of the avoidance of liabilities to the debtors and their estates.

Specifically, the debtors valued the Open Nature offer at 3.86 million euro, which included the 360,000 euro in consideration for the equity as well as the additional 3.5 million euro in committed capital at Open Nature's discretion to support the business post-closing.

Mr. Geizhals would further testify that to ensure the management bidders had a sufficient opportunity to participate in a competitive process, the debtors commenced a Zoom auction on February 12th, yesterday. The debtors convened with the parties on Zoom at noon but ultimately delayed the start of the auction several times to provide the parties with sufficient time to finalize transaction documentation and obtain approvals which sometimes happens.

At approximately 4 p.m., the debtors opened the auction. The debtors read into the record the terms of the Open Nature bid and determined that it was the opening bid.

The management bidders did not attend the auction either at its scheduled start time of noon or at any subsequent time when parties were asked to rejoin the auction.  And no party submitted an overbid.  Accordingly, the debtors selected the Open Nature bid as the successful bid and closed the auction.

That would be Mr. Geizhals's proffer.

THE COURT:  Thank you.  The proffer is accepted.

Does anyone wish to cross-examine Mr. Geizhals?

(No verbal response)

THE COURT:  I hear no one.

MR. GREECHER:  Thank you, Your Honor.

So, we had a status conference on Tuesday before Your Honor where we explained the circumstances in general terms and I think the declarations and proffer provide pretty significant detail.  So, I will just briefly recap.

It was filed with a notice describing share purchase agreement between Embassy of the Seas and the CEO and CFO, Mr. Alejandro Mata and Mr. Federico Viola.  The notice describes what these shares represent: 100 percent equity and three facilities in Italy.  Notably, there are over 400 animals that reside in the Zoomarine Italia park.

After the months long marketing process and in light of continued administrative costs to the estate, the debtors determined to move forward with managements offer to acquire the business for one euro subject to their intention

to obtain a clean break from the debtor enterprise which would give them an opportunity to pursue funding from third party capital sources for the purposes of Italian companies cash needs in an aggregate amount of not lower than 1.5 million euro or failing that to initiate a composizione negoziata della crisi, which is one of the tools available in Italy to address that crisis.  Management's offer calls for closing within 15 days of Court approval of the sale.

After the notice was filed, our investment banker was contacted by Open Nature, a party who had offered to proceed previously with an asset-only sale.  Open Nature indicated an informal objection to the proposed sale on the basis that they now were willing to submit a higher bid for the Zoomarine shares.

After Tuesday's conference, as Mr. Geizhals's proffer indicated, we had numerous painstaking calls with the parties.  We explained, before the auction, that we valued the commitment of funds not only for the shareholders but also for the commitment of funds to address the go forward operation of the business, particularly the care for the animals and the employees.

We asked both parties to provide us with updated offers by 4 p.m. Eastern on Wednesday. Open Nature provided a revised offer of 360,000 euro for the shares, which they're prepared to advance 300,000 euro to the debtor for purposes

of asserting as a bridge loan between now and closing if there are urgent needs at the Zoomarine Italia level; again, for example, animal care, employee obligations.

Further, Open Nature has undertaken to fund 3.5 million euro for purposes of satisfying cash needs over the long term to address the ongoing maintenance of the business. Management, likewise, revised its offer.  They reported that they would acquire the shares for no consideration but they had received a commitment from an American citizen who they advised was willing to provide the company with an immediate bridge loan of 360,000 and that they assert would undertake to continue to support Zoomarine through equity contributions or shareholder loans as needed.

We did, as Mr. Geizhals's testimony shows, received a letter purporting to be a bank statement from this proposed bridge lender suggesting that he had the funds to satisfy the bridge loan amount stated but not proof of funds to meet the 1.5 million euro threshold.

Your Honor, will recall at Wednesday's status conference, we highlighted that the debtors value both the share purchase aspect and the committed post-closing funding to cover ongoing obligations.  Also important is who we are dealing with as a purchaser here, Your Honor.

Through its existing zoological parks in Italy, Open Nature currently cares for 1,600 animals.  They are

well-funded and a commitment operation.  And the debtors believe that they are motivated to close, motivated to ensure the success of Zoomarine's operations, and well suited to maintain the health and welfare of Zoomarine's animals.

Your Honor, you don't have to just take that from a bankruptcy lawyer, Your Honor also received a letter from the employees in the zoological and scientific departments of Zoomarine, Docket 961.  They express concerns about:

"Past management experiences, the need for capital investments in the facilities, the need for a financially stable buyer, the need for a party who has a "widely recognized reputation" in the zoological field with a strong focus on animals, and on the entertainment component rather than pure entertainment."

Your Honor, we believe that Open Nature's stewardship of Zoomarine going forward will meet the mark on all of those points that the Italian employees raised.  And, in fact, if you look at pages 7 and 8 of the letters from the employees, the employees specifically call out Open Nature as a company that is "solid and with strong experience and credibility in the world of zoological management."  And that it represents the "best and most solid Italian entities capable of carrying for and improving Zoomarine."

So, Your Honor, as I mentioned at the status conference and is noted in Mr. Wagstaff's declaration, given

Zoomarine's financial condition, there is a need to move for a quickly -- to close this transaction quickly given the Italian entities own tenuous financial position.  There is also a need to move quickly given the ongoing administrative costs of holding these shares and the potential costs and risks to the estate and creditors if a transaction is not closed quickly and the Italian companies would be forced into an insolvent position.

The debtors first and second lien lenders are aligned with this goal.  They have, in fact, consented to execute the necessary releases so that Zoomarine can move forward free of any guarantee liability.

One point that I did agree to confirm on the record, which is very easy to do because it's a true fact, Embassy of the Seas is not a borrower or obligor under the DIP.

Your Honor, with that, as the basis for the request, the debtors would respectfully request that the Court approve the sale.

THE COURT:  Does anyone else wish to be heard?

MR. GOLDSTEIN:  Your Honor, one clarification, if I may.  If I can confer with Mr. Greecher.

THE COURT:  Yes.

(Pause)

MR. GREECHER:  Okay.  Sean Greecher again.

To expand on the point that was raised, Embassy of the Seas is not a borrower or obligor under the DIP. And the Italian entities are not borrowers or obligors under the DIP either.  So, I just wanted to clarify that.

I believe that counsel to the DIP lenders is on the call as well and hopefully they can confirm that as well.

MS. CAHN:  Good morning, Your Honor.  Blaire Cahn from Baker McKenzie on behalf of the DIP lender as the first lien noteholders.

I can confirm that with respect to the Italian entities.  I would have to check on Embassy of the Seas, as I understood that the representation before the Court was only pertaining to the Italian entities.

THE COURT:  Let me ask a question because now I'm thinking.  I thought Embassy of the Seas was a debtor.

MR. GREECHER:  It is, Your Honor.

THE COURT:  Okay.  But --

MR. GREECHER:  The Italian entities --

THE COURT:  -- the Italian entities are not.

MR. GREECHER:  Correct.  So, the sale -- the request to you is for the sale of the shares.

THE COURT:  The shares, okay.  Well, that is what I thought but then I looked at this chart.  As I said, it must be an older chart.

Anyone else wish to be heard?

(No verbal response)

THE COURT:  I have one question -- well, I have a couple of questions on the order but they're actually prompted by the way you described -- actually, both of the offers.  It's the sale for euros plus the assumption of liabilities.  There are no liabilities being assumed here, are there?  What liabilities are being assumed?

MR. GREECHER:  I think you're right, Your Honor.  It's probably a misstatement on my part.  The shares are being assumed.  The shares represent ownership in the Italian entities and I think that the language in the order, we attempted to make it clear that nothing about this transaction was affecting those liabilities.  Those liabilities of those Italian entities are not affected.  So, apologies for leading you astray there.  There is no assumption of liabilities.

THE COURT:  They're just taking the stock.

MR. GREECHER:  Correct.

THE COURT:  They're becoming the new equity holder.

MR. GREECHER:  Yes.  They're assuming the kitchen sink with respect to the Italian entities.

THE COURT:  Okay.  Let me take a look at the order because those are the questions I had mostly surrounded the

language in the order.  I want to make sure I understand the standard.

(Pause)

THE COURT:  Let's start. I'm looking at Docket 965.

MR. GREECHER:  Yes, Your Honor.

THE COURT:  Happen to be in the redline but it doesn't really matter.

Paragraph (a) talks about me approving the stock purchase agreement as opposed to authorizing the debtor to enter into the stock purchase agreement, which I think is the better way to say this.

MR. GREECHER:  Yes.  We recognize that that is Your Honor's bugaboo on this point.  I would suggest that we add the debtors entry into rather than approval of.

THE COURT:  Okay.  That carries over into several paragraphs (c), (d), (e), etc.  You can do a search for it.

Paragraph (r) -- well, actually, I think this is probably okay.  Again, the issue here was the no successor liability concept is kind of odd in the context of a sale of shares.  So, I am trying to make sure it's all lined up appropriately.  That one is probably okay.

MR. GREECHER:  Yes.  We tried to anchor that to any way relating to the transferred shares.

THE COURT:  Okay.  In Paragraph 4, the added language, the last sentence I want to make sure I understand. So, I don't have any problem with the first part.  I think I understand that.  There is some advance funding before the closing.  That is fine.  "The debtors are hereby authorizing their discretion, prior to the closing date, to take all actions necessary to facilitate the funding for the minimum resources at or prior to the closing date including, without limitation, taking such actions as may be necessary to enable the debtors to cause the resignation or removal of the directors of the group companies on or before the closing date."

Why am I approving that and how does that relate to the minimum resources?

MR. GREECHER:  So, Your Honor, the use of the minimum resources is made available with a condition. The condition is that as part of that, where Open Nature has begun to fund the company, they want to ensure that the decision making and stewardship of the company that they have begun to fund is going to be overseen by Mr. Strom.

So, there is a trigger under the SPA that if the debtors, in consultation with the Italian companies, determine that money is needed imminently we can make that request and in conjunction with that request the shareholder

would take an action that its entitled to under the governing documents of Zoomarine to make replacements to the board.

So, what we are asking here, and I don't know that it's necessary because I would think that this is within Mr. Strom's authority but -- within Embassy of the Seas authority but for the avoidance of doubt we wanted to seek that authorization.

THE COURT:  To enable the debtors to cause the resignation or removal of the directors of the group companies.  I mean, if they can do it, and in particular --

MR. GREECHER:  Correct.

THE COURT:  -- it's more downstream.

MR. GREECHER:  Correct, correct.

THE COURT:  I don't know about the non-debtors and what requirements there are for the non-debtors.

MR. GREECHER:  Obviously, our ability -- or Embassy of the Seas' ability to do so is governed by the governing documents and we would abide by the governing documents in taking any action.  You are not authorizing us to do it free of the obligations and limitations baked into the agreement.

THE COURT:  Well, let's add that, subject to the governing documents and applicable non-bankruptcy law.

MR. GOLDSTEIN:  Your Honor, if I may ask a clarifying question?

THE COURT:  Yes.

MR. GOLDSTEIN:  Michael Goldstein, Goodwin Proctor, for Open Nature.  Governing documents of the Group Companies?

THE COURT:  Yeah, I assume so --

MR. GREECHER:  Yes.

THE COURT:  -- yeah.

MR. GOLDSTEIN:  Okay, just to be clear.  And I'm fine with the language, Your Honor, I would just observe for the record that the shares, right, are property of the estate.  You may see EODS is a debtor before Your Honor, their governance exercise is controlling shareholder --

THE COURT:  Right.

MR. GOLDSTEIN:  -- is it in the ordinary course of business, is it not?  Clearly, this Court has authority to approve out of the ordinary course actions of that debtor as a shareholder with respect to its assets to shares.

So I think the language requested here is actually well within the Court's jurisdiction and within the parameters of 363.  I'm perfectly happy with Your Honor's additional language to make it clear.  That may be so, but to the extent we have non-debtors, their documents obviously --

THE COURT:  Right.

MR. GOLDSTEIN:  -- aren't overridden by you, but with respect to the debtor you do have authority to give Mr.

Strom the ability to say you can take these actions to implement this transaction.

THE COURT: Well, yes, if Mr. Strom or the debtor -- Embassy of the Seas is asking for permission, I guess, to exercise its right as a shareholder to do something, that's fine, but then we have a second tier, a lower tier where I don't -- it's not a non-debtor. So, we've got Zoomarine Italia, which has three subsidiaries, and as to that those are all -- those are non-debtors.

MR. GREECHER: Of course. And so you are not giving Mr. Strom the right to look past the obligations under the governing documents of the Italian companies, fully and well understood, Your Honor.

THE COURT: Okay. Paragraph 8, again, it seems to me it's sort of a disconnect. The transfer of the transferred shares to the buyer will not subject the buyer to any liability whatsoever which may become due or owing prior to the closing date -- to whom, by whom, that's -- that doesn't identify whose liability they're not responsible for and I don't know what that -- what would that be?

MR. GREECHER: Okay. Your Honor, I think that it's probably clearer if we say we will not subject the buyer to any liability of the debtors.

THE COURT: Okay. Again, I'm not sure what that would be because if we're selling --

MR. GREECHER:  I'm not sure what that would be either given the --

THE COURT:  What's being sold, but --

MR. GREECHER:  -- what's being sold, yes.

THE COURT:  -- okay.

Okay, paragraph 18, and this is the very broad injunction relief.

(Pause)

THE COURT:  And here's where I think it -- there's been inserts talking about the operation of the Group Companies' business prior to the closing, and the Group Companies and their respective assets or properties.  And I recognize this last sentence, for the avoidance of doubt, and I have a question about that too, but -- I mean, again, that concept just doesn't fit because the Italian companies are what they are, they have the assets and liabilities they have.  As a shareholder -- you're just substituting a shareholder, nothing at the company is changing, assets and liabilities stay the same, and all you have is a new shareholder.  So I can't possibly be affecting any of those assets and liabilities at the Italian entity level.

MR. GREECHER:  Let me talk to Mr. Goldstein.  I think that we can maybe --

(Pause)

MR. GOLDSTEIN:  Your Honor, if I may, Michael

Goldstein, Goodwin Proctor, for Open Nature.

Your Honor, Mr. Greecher's comment to me is absolutely correct that this is kind of limited to claims against the debtors and the shares. So that's what's being dealt with here. The question is, what are those claims. It's the descriptors that follow and I think the one you -- we added from what was originally filed that is redlined here and what the Court made reference to is the Group Companies, their respective assets or properties, and let me explain the thinking, if you will.

So, we heard at the outset here that the debtors sort of came to Chapter 11 and have a history of conduct that was problematic. We weren't party to that, that's not part of our diligence. We don't know what these debtors historically did or didn't do with respect to these entities and what claims these debtors' creditors may or may not have because of actions that the controlling shareholder that was controlled by the debtors did to these entities, didn't do, transfer money, didn't transfer money. And it's that unknown that we're saying, look, if the debtors -- you have claims, creditors, of the debtor with respect to the shares, your claims against the debtor, or some action that related to the Group Companies and the Group assets, you can't come after us, those are claims against this estate.

We are clearly taking all of the direct claims of

the Group Companies and that's -- for the avoidance of doubt, we actually had conversation on that to make that clear, that was one of the questions.  And while it's not an assumption of liabilities, as Your Honor indicated earlier, those liabilities of the Group Companies, its creditor claims come with the ownership.

And so we just really wanted to make a clear break, the same way Mr. Greecher said at the outset, they want to sell these companies and make sure there's a clear break between these debtors and the operations of these Group Companies, which by the way, as we heard, are not terrific, there's a lot of problems there and we're stepping into that. And, as Mr. Greecher indicated, my client is a sophisticated entity, is in the space, has done its diligence, we're not a stranger, we understand that, but what we don't want to take and what we don't know about is these other entities.

And the controlling shareholder relationship, okay, is one that creative lawyers know how to argue around, and that's really what we're trying to block here.  We're not impacting in any way the direct claims; we made that clear in the language.  And the language that Your Honor focused on, the highlighted language in this paragraph, is really just to anchor that if your -- you know, that your claims and interests against the debtors, if they relate somehow to our Group Companies' assets and operations, that doesn't give you

a link to come after us, you need to look to the debtors. And that was our thinking, Your Honor, and I'm happy to answer any follow-up questions that you may have.

Thank you, Mr. Greecher, for yielding the podium.

THE COURT:  I understand that.  Let me ask you a question, though, about the for-avoidance-of-doubt language, which I guess is in paragraph 19.  "Nothing in this order shall release the Group Companies from any liabilities asserted directly and not derivatively as guarantor, successor, or otherwise."

So that's meant to handle the situation you just described, the derivative?  Because normally I would say, listen, if they have derivative liability, they have derivative liability, that's what the company has.  So, what's the meaning there?

MR. GOLDSTEIN:  Well, what we're saying is that the only -- this avoidance of doubt is that the Group Companies claims have their liabilities -- and let's think about them more specifically, what do we mean by direct -- they have their ordinary course liabilities, they have contingent liabilities with third parties they deal with, and they may have contract liabilities of their own, or contract liabilities that are actually suretyship or guaranty or other types of claims that are actually direct claims against other people, the debtors.

So, we're not taking those guaranty or surety claims and that's why the guaranty claims are specifically called out and are released.  We are taking all those direct claims, but we're not taking the derivative claims.  It goes back to the other point.  If somebody is saying because the shareholder did something wrong and that somehow gives a derivative claim against their companies, that's not our liability, that's a claim against the debtors and that's an encumbrance on the shares because it emanates from the controlling shareholder position, and that's part of the free and clear.  And then, for the avoidance of doubt, is we're not taking the claims against the debtors, they are being released.  The guaranty claims as defined, which are the guaranty claims that we know about are being defined, and the intercompany claims --

THE COURT:  But those are the easy things.

MR. GOLDSTEIN:  Those are the -- Your Honor, I appreciate that.  I just wanted to be complete in my response to Your Honor's question.

MR. GREECHER:  If I could give it a stab, Your Honor.  To me, I would see this as an example of, if there's a claim against Zoomarine Italia for failure to pay wages, that claim against Zoomarine Italia for failure to pay wages belongs to Zoomarine Italia and, therefore, it will be -- it will not be affected by this order.  If there is a cause of

action that an employee could say, well, I'm going upstream and I'm going to say it was Embassy of the Seas' decision or duty -- or duty or breach of duty to fail to pay that claim and, therefore, I have an action against Embassy of the Seas, that claim stays with the estate.

So, to me, that would be the way I would look at this that claims that are fully and properly asserted at the Italian entity level, they're not affected today; claims that have some way to go against Embassy of the Seas *qua* shareholder, there's this clean break and the shareholder is not responsible for that claim, that claim, it needs to come to the Bankruptcy Court.

MR. GOLDSTEIN:  Your Honor, I see the wheels spinning and I appreciate -- there's two really issues, right, and one I want to address.  There's the jurisdictional issue and I think, from a jurisdictional perspective, per my earlier comments, I think that's an easy one.  These shares are part of your *in rem* jurisdiction and, as part of your *in rem* jurisdiction and your ability to maximize the value of those shares and deliver clean title under the Bankruptcy Code and the jurisprudence that follows that, you can grant ancillary relief to do that.  And that ancillary relief here is defined in part as part of giving certainty and clarity to the claims that properly belong at the debtors and should not transfer with the shares to a third party good faith

purchaser who's entitled to a free and clear order.

Obviously, the 363 issue is the statutory authority to allow you to grant the relief that I'm requesting, the law has been developed that, you know, the definition of interest is very broad and it includes claims related to the property.  We have the TWA case of many, many years ago, I'm old enough to remember the old cases, I'm sure Your Honor who's much younger than me probably remembers those cases as well.  So, I don't say that to educate the Court, but just to note it for purposes of the presentation.

I think Mr. Greecher comes up with a very good example of where you find like claims and causes of action, theories of liability that rest with controlling shareholders, but find their way to third parties, and I think that was a great anchor.  I didn't think of that one, and so I thank my colleague for thinking of that specific one because I think it helps bring it in, but it is -- in the context of this case with the historical context that this -- we're in this case given -- and how deeply problematic these Group Companies are in terms of their financial health, the history here is fraught with potential landmines and, if anything, this Court in its jurisdiction is to allow assets to be clean and cleansed of those landmines to transfer them to a good faith purchaser free and clear in a way that the estate can maximize value.  And they're doing that here

because they're both getting some money for the shares, helping them solve an immediate problem, and they're getting certainty that somebody else with a reputation, with a balance sheet, with experience and knowledge is going to help solve the Group Companies' issues in those liabilities in a way that they don't have to.

And by the way, they also have an indemnity that backstops, you know, if somebody comes after them for us not doing what we're supposed to do.

So, I think those are all value adds that help balance the equation of the benefit of the estate, the maximization of value, the free and clear ability that the Court has, and the jurisdiction to really handle in an appropriate way property that this Court has constitutional *in rem* jurisdiction of.

Thank you, Your Honor.

THE COURT:  Thank you.

(Pause)

THE COURT:  Okay.  Well, I will permit this language.  As I understand it, it's really meant to guard against attenuated causes of action that properly belong elsewhere, but I will deal with it if it arises and someone comes to me to ask me to interpret this language in the context of the type of asset sale we have here.  And of course if someone raises some cause of action in Italy, that

will be for the Italian companies to deal with, most likely in an Italian court.

So, I'll permit it, and I will approve the sale. The evidence that was admitted into shows the process that was undertaken in connection with the shares of stock of Embassy of the Seas in Zoomarine Italia S.P.A.  The debtors marketed the assets, as described in the declarations and also the proffer that was given at the hearing today.  The marketing resulted in an offer from a management group and in an offer from our current purchaser.  And, as has been detailed in the evidence that's been presented, these assets come with challenges -- the actual operating businesses come with challenges that have to be addressed and they are being addressed by not only -- well, the challenges are being addressed by access to a commitment of three and a half million in Euros, a balance sheet of a parent company that is significant, Open Nature runs zoological parks in Italy, as I said, it's well funded, and has the ability and the expertise to take care of the animals that are currently part of the Zoomarine Italia, the one park.

The process was fair and open, it resulted in an auction.  The management company chose not to appear, it chose not to up its bid, and Open Nature was selected as the highest and best offer.  There is no evidence of any collusion or any evidence that there is not good faith in

connection with the transaction, and there's clearly a need to sell the shares outside of the context of a plan of reorganization, as the Italian assets need to be addressed immediately.

So, for all of those reasons, I will approve the sale. And there are some changes to the form of order that need to be made. So, I will look for a revised form of order and that conforms to the discussion that we've had after it's been circulated to parties, if it can be uploaded with the redline, I would appreciate it.

MR. GREECHER: We will endeavor to do that this afternoon, Your Honor. Thank you.

THE COURT: Thank you.

MR. GOLDSTEIN: Your Honor, may I just two -- just two points?

THE COURT: Yes.

MR. GOLDSTEIN: Michael Goldstein, Goodwin Proctor, for Open Nature.

Your Honor, two points. In terms of the revised form of order, is the Court amenable to our adding in that initial paragraph reference to the comments made by the Court at the hearing, we did not do that. And, more importantly, since -- and I'm going to apologize to the pronunciation, Charles, of your last name, but to the proffer of testimony, that wasn't incorporated in the recitation, that that would

be evidence before Your Honor, you would be amenable to our adding --

THE COURT:  Certainly.

MR. GOLDSTEIN:  -- reference to that so it's part of the record --

THE COURT:  Yes.

MR. GOLDSTEIN:  -- and reflected here?  Thank you, Your Honor.

THE COURT:  Okay, anything else for today?

MR. GREECHER:  That's enough, Your Honor.  Thank you, Your Honor.

THE COURT:  Okay, thank you.  We're adjourned.

(Proceedings concluded at 1:49 p.m.)

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

/s/ William J. Garling                    February 13, 2026

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable


/s/ Tracey J. Williams                    February 13, 2026

Tracey J. Williams, CET-914

Certified Court Transcriptionist

For Reliable